## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KÉTO NORD HODGES, MEIKO
SEYMOUR, JARVIS EL-AMIN,
JENNIFER GARCIA, and
JACQUELINE AZIS,

    *Plaintiffs,*

v.                                   Case No. 8:24-cv-879

KATHLEEN PASSIDOMO, in her official
capacity as President of the Florida Senate,
and CORD BYRD, in his official capacity
as Florida Secretary of State,

    *Defendants.*

_____/

## COMPLAINT

**Three Judges Required; Permanent Injunctive Relief Requested; Declaratory
Relief Requested; Challenge to the Constitutionality of Fla. Stat. § 10.203**

This action challenges two Florida Senate districts in the Tampa Bay area—
Districts 16 and 18—as racially gerrymandered in violation of the Fourteenth
Amendment. District 16 stretches across the waters of Tampa Bay to connect disparate
and distinct Black communities in Tampa and St. Petersburg, packing more than half
of the region's Black residents into that district. As a result, adjacent District 18 is
artificially stripped of Black residents, diminishing their influence and voice in
elections there. When the State redistricts predominantly based on racial
considerations, the Equal Protection Clause requires the State's use of race both to be
narrowly tailored and to serve a compelling interest. Here, the State's use of race was

1

not narrowly tailored to serve a compelling interest. The State drew these districts purportedly to avoid diminishing Black voters' ability to elect representatives of their choice in District 16, but the State unnecessarily used race to disregard traditional, race-neutral redistricting considerations. And far from advancing representation, the enacted districts dilute Black voters' power. The State could have drawn these districts to both avoid the diminishment of Black voting power and respect traditional redistricting criteria. Instead, the State engaged in racial gerrymandering that unconstitutionally abridges Plaintiffs' rights to the equal protection of the laws.

Plaintiffs bring suit to vindicate those rights, and allege:

## INTRODUCTION

1.     On February 3, 2022, the Florida Legislature passed Senate Joint Resolution 100 ("SJR 100"), adopting Plan S027S8058 ("Plan 8058" or the "Enacted Plan") to redraw the State's Senate districts for the next decade.

2.     Plaintiffs—five individual residents of Tampa and St. Petersburg—challenge Senate Districts 16 and 18 (the "Challenged Districts") as racially gerrymandered in violation of the Fourteenth Amendment.

3.     **Figure 1** below depicts the Challenged Districts and the surrounding area in the Enacted Plan (Plan 8058).



*Fig. 1. The Challenged Districts and surrounding area in the Enacted Plan (Plan 8058).*

4.      While redistricting bodies "will . . . almost always be aware of racial demographics," *Miller v. Johnson*, 515 U.S. 900, 916 (1995), and are often required to look at race in drawing maps, the Fourteenth Amendment prohibits the unnecessary centering of race in redistricting decisions.

5.      Map-drawing in which race predominates, subordinating traditional race-neutral redistricting considerations to racial considerations, is presumptively invalid under the Equal Protection Clause. This type of excessively race-based line-drawing is constitutional only where it satisfies strict scrutiny—where it is narrowly tailored to advance a compelling government interest. The Challenged Districts fall far short of this exacting standard.

6. In developing the Challenged Districts, the Legislature elevated race above all other considerations. The Challenged Districts feature tell-tale indicia of racial gerrymandering in their deviations from traditional redistricting criteria: traversing large bodies of water like Tampa Bay, splitting political subdivisions like Pinellas County and St. Petersburg, and forming noncompact shapes.

7. Legislators and their staff purportedly drew these districts in a race-predominant manner to avoid the diminishment of Black voters' ability to elect representatives of their choice in District 16,[1] as the Fair Districts Amendment to the Florida Constitution requires. Fla. Const. art. III, § 21(a) (hereinafter "Fair Districts").

8. That is a laudable and constitutional goal. Complying with Fair Districts' non-diminishment (or "non-retrogression") requirement is a compelling governmental interest that could justify race-predominant redistricting.

9. But the Constitution also requires the means by which that interest is achieved be narrowly tailored. The Legislature failed to narrowly tailor its use of race to compliance with Fair Districts. Nor do any facts indicate the Challenged Districts are necessary to achieve compliance with Fair Districts' non-retrogression requirement, or any other compelling interest.

10. The resulting harm to Plaintiffs is acute, and threefold. *First*, racial gerrymandering "reinforces racial stereotypes and threatens to undermine our system

---

[1] Plaintiffs use the term "the Protected District" to refer to this and similar districts across multiple proposed or enacted plans. This district is numbered 16 in the Enacted Plan and 19 in the plan in place from 2016 to 2022 (the "Benchmark Plan"). District 19 in the Benchmark Plan is referred to as the "Benchmark District."

of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole." *Shaw v. Reno*, 509 U.S. 630, 650 (1993).

11.     **Second**, Plaintiffs are further harmed because the Legislature sacrificed genuine communities of interest, unnecessarily dividing St. Petersburg and Pinellas County and lumping parts of St. Petersburg and Tampa together in District 16—simply because they are both predominantly Black areas.

12.     **And third**, the Legislature's racial gerrymandering unjustifiably packed Black voters into District 16, stripping them from adjacent District 18 and reducing their influence there.

13.     The Legislature was on notice that its employment of racial criteria was not sufficiently narrowly tailored to further a compelling governmental interest. Floridians, including individual legislators, called out and questioned the Legislature's unconstitutional actions, but their concerns were dismissed by the Legislature as a whole.

14.     The Legislature's intentional sorting by race, absent narrow tailoring to achieve a compelling governmental interest, violates the Equal Protection Clause and renders the Challenged Districts unconstitutional racial gerrymanders.

## PARTIES

15.     Plaintiff Kéto Nord Hodges is a Black resident of District 16 in Tampa.

16.     Plaintiff Meiko Seymour is a Black resident of District 16 in St. Petersburg.

17.    Plaintiff Jarvis El-Amin is a Black resident of District 16 in Tampa.

18.    Plaintiff Jennifer Garcia is a Black and Latina resident of District 18 in St. Petersburg.

19.    Plaintiff Jacqueline Azis is a white, Hispanic resident of District 18 in St. Petersburg.

20.    The Enacted Plan harms Plaintiffs because, among other reasons, it splits up their communities along racial lines and groups their communities with dissimilar ones unnecessarily, simply because of their race.

21.    In particular, Plaintiff Azis lives just seven blocks from the District 16/18 border. Her neighborhood (Historic Old Northeast), her city (St. Petersburg), and her broader community of South Pinellas are split between the two districts.

22.    Additionally, Plaintiff Garcia lives on the border just inside District 18; her residence is surrounded on two sides by District 16. Her precinct (Precinct 202) inside District 18 has a Black voting-age population of 5.8%. In contrast, the two precincts across the street—in District 16—have Black voting-age populations of 56.1% and 82.8% (Precincts 203 and 113, respectively).

23.    Plaintiffs Nord and Seymour, meanwhile, live on opposite ends of District 16: at the district's extreme northern end in the North Tampa neighborhood, and far to the southwest in St. Petersburg. Their communities are grouped together solely because of the Legislature's failure to tailor its use of race.

24.    If the Enacted Plan is not enjoined, Plaintiffs will continue to be harmed by living and voting in unconstitutionally racially gerrymandered districts.

25.     Defendant Kathleen Passidomo is the President of the Florida Senate and is sued in her official capacity. The Senate over which she presides is, along with the House of Representatives, responsible for redrawing legislative districts after each decennial census. Fla. Const. art. III, § 16. Senators are elected from the Enacted Plan.

26.     Defendant Cord Byrd is the Florida Secretary of State and is sued in his official capacity. His Department of State has "general supervision and administration of the election laws," including the Enacted Plan, administers Senate candidate qualifying, receives Senate election returns from the county canvassing boards, and issues certificates of election to successful Senate candidates. Fla. Stat. §§ 15.13, 99,061, 102.112, 102.151, 102.155.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2201–02, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

28.     Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District.

29.     This case is properly filed in this Division under Local Rule 1.04(b).

30.     A three-judge district court must be convened to hear this suit because this action challenges the constitutionality of the apportionment of a statewide legislative body. 28 U.S.C. § 2284(a).

# FACTS

## I.  Legal Background and Requirements

31.     The Florida Senate is comprised of forty members elected from districts.

32.     Legislative redistricting (or reapportionment) is the duty of the Legislature, which is tasked with adopting redistricting plans for both the Florida House and Senate after each decennial census. *See* Fla. Const. art. III, § 16.

33.     The Legislature's discretion in redistricting is cabined by several key legal requirements, including the Fourteenth Amendment's Equal Protection Clause and the Florida Constitution's Fair Districts Amendment.

34.     The Fair Districts Amendment sets forth two tiers of requirements for legislative redistricting. Fla. Const. art. III, § 21.[2]

35.     The four "Tier One" requirements take precedence over the "Tier Two" requirements.

36.     ***First***, Tier One prohibits redistricting plans and individual districts from being "drawn with the intent to favor or disfavor a political party or an incumbent"— banning partisan and incumbency gerrymandering. *Id.* § 21(a).

37.     ***Second***, Tier One incorporates the vote dilution standard of Section 2 of the Voting Rights Act (VRA), prohibiting districts from being "drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process." *Id.*; *In re Senate Joint Res. of Legis. Apportionment*

---

[2] Article III, Section 20 lays out identical requirements for congressional redistricting.

*1176* (*Apportionment I*), 83 So. 3d 597, 619 (Fla. 2012).

38.     **Third**, Tier One incorporates the "diminishment" or "retrogression" standard from Section 5 of the VRA, 52 U.S.C. § 10304(b), prohibiting districts drawn "to diminish [racial or language minorities'] ability to elect representatives of their choice." Fla. Const. art. III, § 21(a). This requirement "attempts to eradicate impermissible retrogression in a minority group's ability to elect a candidate of choice." *Apportionment I*, 83 So. 3d at 620.

39.     **Fourth**, Tier One mandates that districts be contiguous. Fla. Const. art. III, § 21(a).

40.     Tier Two sets out three more requirements, which are subordinate to the Tier One requirements. The Tier Two requirements enshrine in the Florida Constitution several race-neutral "traditional redistricting principles." *See Miller*, 515 U.S. at 916.

41.     Tier Two requires that districts (1) be as nearly equal in population as is practicable; (2) be compact; and (3) where feasible, utilize existing political and geographical boundaries. Fla. Const. art. III, § 21(b).

42.     The Legislature must adhere to the Tier Two requirements, unless doing so would violate a Tier One requirement.

43.     The Legislature can deviate from the Tier Two requirements only to the extent necessary to comply with Tier One's minority-protection provisions.

## II.  2020 Redistricting Cycle Overview

### A.  Redistricting Process Begins

44.     Following the 2020 Census, the Legislature embarked on its redistricting process. Each chamber deferred to the other in drawing the map for its own body, with the Senate developing the Senate plan.

45.     Senate redistricting proceeded through seven committee and subcommittee meetings. The full Committee on Reapportionment (the "Committee") met on September 20, October 11, and October 18, 2021 for presentations on the law and technical aspects of redistricting.

46.     During the **September 20, 2021** meeting, Committee Staff Director Jay Ferrin gave a presentation on census data, the redistricting timeline, and other basics of redistricting.

47.     Ferrin's presentation encompassed an introduction to the Fair Districts criteria, including an explanation of Tier One's "[p]rotections against diminishment, or reduction in the ability of racial or language minorities to elect representatives of their choice," and the Tier Two requirements.

48.     Throughout the redistricting process, legislators, their attorneys, and their staff used the terms "Tier One" and "Tier Two" as a shorthand to refer to the requirements contained within those tiers. This included using "Tier One" as a shorthand to refer to the minority-protection provisions of Article III, Section 21(a).

49.     Ferrin's presentation defined key terminology. His presentation explained: "Retrogression occurs when a redistricting plan reduces the opportunity of

a racial or language minority to participate in the political process or elect representatives of their choice when compared to the benchmark plan. Retrogression can apply to a whole redistricting plan or to an individual district."

50.     His presentation also defined diminishment, explaining that it: "Occurs when a redistricting plan eliminates a majority-minority district, or potentially weakens a historically performing minority district where doing so would actually reduce the ability of racial or language minority groups to elect candidates of their choice when compared to the benchmark plan."

51.     He also gave the definition of the benchmark plan: "The last legally enforceable redistricting plan in force or effect. A proposed redistricting plan is compared to benchmark plan to analyze its compliance with protections for racial and language minorities under federal and state law."

52.     Ferrin defined "geographic boundaries" and "political boundaries" as "[e]asily ascertainable and commonly understood features, such as rivers, railways, and primary and secondary roads. Primary and secondary roads include interstates, U.S. highways, and state highways;" and "[b]oundaries of a county or incorporated municipality (city, town, village, etc)," respectively.

53.     Finally, Ferrin defined two key terms relevant to the Challenged Districts: "effective minority district" meant "[a] district containing sufficient voting age population to provide the minority community with an opportunity to elect a candidate of choice"; "crossover district" meant "[a] district in which a racial or language minority group is not a numerical majority of the voting age population, but

is potentially large enough to elect its preferred candidate by persuading enough majority voters to cross over to support the minority's preferred candidate."

54.    All these commonly understood definitions undergirded the Legislature's redistricting process.

55.    At the Committee's **October 11, 2021** meeting, attorney Daniel Nordby gave a presentation on redistricting law.

56.    Nordby's presentation included an explanation of the Fourteenth Amendment's prohibition on racial gerrymandering and the Fair Districts' minority-protection provisions.

57.    Quoting *Apportionment I*, Nordby noted: "The anti-retrogression provisions of the Florida Constitution provide that the Legislature 'cannot eliminate majority-minority districts or weaken other historically performing minority districts where doing so would actually diminish a minority group's ability to elect its preferred candidates.'"

58.    Further explaining *Apportionment I*, Nordby noted: "A 'functional analysis' is required to evaluate retrogression and to determine whether a district is likely to perform for minority candidates of choice." This "[r]equires consideration of minority population in districts, minority voting-age population in districts, political data, how a minority population group has voted in the past. No 'predetermined or fixed demographic percentage' is used at any point in the assessment."

59.    Nordby further explained: "Tier Two standards may give way to the extent necessary to avoid retrogression."

60.     Finally, Nordby explained that Tier One's non-diminishment requirement "applies to the entire state and remains enforceable" notwithstanding the U.S. Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013).

61.     On **October 18, 2021**, the Committee discussed the map-drawing process and gave general directives to Committee staff to guide the development of draft maps.

### B. Developing the Enacted Plan in Committee

62.     The Select Subcommittee on Legislative Reapportionment (the "Subcommittee") convened for the first time on **November 17, 2021**, to workshop four draft plans Ferrin presented.

63.     All four plans (8010, 8012, 8014, and 8016) featured a configuration for the Challenged Districts similar to the Enacted Plan, with one district grouping Black population centers in Tampa and St. Petersburg, crossing the Bay to do so, and another district taking in the remaining whiter portions of southern Pinellas County.

64.     At the same meeting, the Subcommittee heard a presentation on a public submission (P000S0042 or Plan 42), which altered six discrete districts from the staff-drawn plans. **Figure 2** below is an illustration of Plan 42.



*Fig. 2. Plan 42.*

65.    The Subcommittee heard that Plan 42 "tried to solve . . . one issue with

Tier Two compliance which is in Tampa Bay, and seeks to avoid having a district that

crosses Tampa Bay." The Subcommittee heard an explanation of Plan 42 which cited

its improvements to compactness, the number of cities and counties split, and

geographic-boundary utilization, and which concluded:

> Whereas maybe last decade it wasn't possible to draw a
> district wholly in Hillsborough that maintained that ability
> and didn't diminish, I think the statistics bear out that it is
> now possible and the key statistics in that functional
> analysis are actually all comparable or higher than the
> statistics in the Benchmark District, including: the Black
> and Hispanic share of registered voters; the Black and
> Hispanic share of Democratic primary electorate in 2020
> and in 2018; the Hispanic share of registered Dems; and the
> Black share of registered Dems, which only differs from the

benchmark by two-tenths of one percentage point.

66.     Sen. Randolph Bracy, an African American senator from Orlando, asked Ferrin why the Protected District crossed the Bay in the staff-drawn plans, "when it didn't seem necessary; we can still comply with all the requirements?"

67.     Ferrin responded: "That was to comply with the Tier One non-diminishment standards."

68.     Sen. Bracy followed up, "could it still be done without violating the non-diminishment requirement?"

69.     After Ferrin replied that he hadn't reviewed the statistics for that, Sen. Bracy asked him to look into it, and Ferrin confirmed he would.

70.     The Subcommittee met again on **November 29, 2021** to workshop four new maps (8026, 8028, 8030, and 8034).

71.     All four plans made small changes to the initial four plans, and all four featured a configuration for the Challenged Districts similar to the Enacted Plan.

72.     The Subcommittee held its final meeting on **January 10, 2022**, when it recommended advancing what would become Plan 8058[3] to the full Committee.

73.     At this meeting, Sen. Bracy referenced his earlier request for staff to look at the treatment of the Tampa Bay area, saying, "I talked to staff about the Tampa Bay area and . . . I wanted to see if you could explain the reason for crossing the Bay in all of the configurations we see, as opposed to not crossing the Bay in that Tampa-area

---

[3] The *map* the Subcommittee approved was identical to Plan 8058; only the district *numbers* changed.

seat."

74.      Subcommittee Chair Sen. Danny Burgess responded, "My understanding is that staff did look at those options, however, there was a significant number of potential voters who would be disenfranchised under not crossing the Bay, and so in order to avoid that potential diminishment there was just no way to make that work practically."

75.      Sen. Bracy pressed Ferrin on the impact of the alternative configuration on the minority functional analysis and Black voters' share of the relevant statistics, asking: "How much it would have diminished the ability for Black voters to vote for their candidate of their choice . . . . I guess I'm trying to measure how much diminishment that would have been?"

76.      Ferrin concluded:

> So the way we've drawn it, the Black voters within D[istrict] 19 are able to effectively control the Democratic primary in a district that performs for Democrats.[4] If we look at drawing it differently, I think we're looking at a situation where the Black voters would not be able to control the primary numerically, not make up a majority of the primary turnout and that would potentially constitute diminishment.

77.      On **January 13, 2022**, the Reapportionment Committee considered what became Plan 8058 (after district renumbering) and approved it by a 10-2 vote.

### C.  Passage of the Enacted Plan

78.      On **January 19, 2022**, the full Senate took up Plan 8058. Sen. Rodrigues

---

[4] The Protected District was numbered 19 in the Benchmark Plan and in drafts maps.

explained the Committee's approach to drawing the map in each of the areas with a Tier One-protected district: "We started with a blank map, pulled in the demographics, and then drew until we had a Tier One-protected district."

79.     Sen. Rodrigues continued:

> Once we've identified the Tier One districts [by looking at which districts in the Benchmark Plan are protected from diminishment], we then start with a blank map, highlight the data we've received from the U.S. Census Bureau by race, and then the staff began drawing around the population distribution in order to ensure we had not diminished the opportunity for minorities to participate or elect a voter of their choice. . . . Once we highlighted the racial population, we began drawing from there."

80.     "Once we had assured that we were Tier One-compliant, which trumps all the other Tier Two metrics," Sen. Rodrigues explained, the Committee then took into consideration the Tier Two standards.

81.     The full Senate passed Plan 8058 on **January 20, 2022**.

82.     There was more debate on Plan 8058's treatment of the Tampa Bay area after the Senate sent its plan to the House of Representatives.

83.     On **February 1, 2022**, the House took up SJR 100, including Plan 8058.

84.     Teeing up the joint resolution on the House floor, Speaker Chris Sprowls noted that House Redistricting Committee Chair Rep. Tom Leek would introduce and explain SJR 100, and then "you will then be able to ask questions about the Senate map with the understanding, members, that the Senate map was created by the Florida Senate, at their direction."

85.     But when Rep. Fentrice Driskell, an African American representative

from Tampa, attempted to ask Rep. Leek whether certain districts in Plan 8058 had low compactness scores to achieve Tier One compliance, Rep. Leek responded, "Those questions were more appropriately directed to the Senate."

86.   Rep. Leek went on, "I can't answer the type of questions on the detail of the Senate map. I can give you the statistical data which is in the packet that you have."

87.   The following day, **February 2, 2022**, the House passed SJR 100, including Plan 8058 along with the House's plan for its own chamber.

88.   Rep. Andrew Learned of Brandon objected to the Challenged Districts, explaining, "It is splitting part of eastern Hillsborough County and putting it in with downtown St. Petersburg," and commented on the lengthy amount of time it takes to drive between those two areas.

89.   Rep. Learned continued: "We're doing it because we say it's contiguous across water, which is a concept that I understand makes sense mathematically in a formula, but it doesn't make sense to anyone who actually lives there. Crossing the Bay is a problem. It means that people will be underrepresented."

90.   Debating a similarly configured congressional district, Rep. Learned reiterated the same point: "St. Petersburg and Tampa are two different cities. This idea that water makes it contiguous and satisfies a math formula is absurd. Manatees do not vote."

91.   The House passed SJR 100 by a 77-39 vote.

92.   On **February 3, 2022**, the Senate passed the final version of SJR 100, with

Plan 8058 combined with the plan for the House.

### III.  Racial Considerations Predominated in the Drawing of the Challenged Districts

93.    As recounted above, the Legislature's predominant goal in drawing the Challenged Districts was to avoid diminishing Black voters' ability-to-elect in District 16—a laudable goal, as long as the use of race was appropriately tailored.

94.    This goal necessarily had a direct impact on the shape of District 18, which takes up the rest of southern Pinellas County.

95.     These race-based decisions resulted in a map that splits neighborhoods and ignores traditional redistricting criteria.

96.    Where, as here, race is the central consideration in mapmaking and traditional, race-neutral criteria are subordinated to racial considerations, race predominates. Unless the use of race is *necessary* to ensure fair and equal opportunity for minority voters to participate in the electoral process, its use is constitutionally suspect.

97.    Besides the direct evidence of racial predominance, "circumstantial evidence of [the] district[s'] shape and demographics" point to racial predominance as well. *Miller*, 515 U.S. at 916. **Figure 3** below depicts the Challenged Districts with the boundaries of St. Petersburg, Pinellas County, and Hillsborough County.



*Fig. 3. The Challenged Districts, showing county lines and the City of St. Petersburg (hatched).*

98.    District 16 is noncompact, consisting of two distinct areas of land separated by the Bay. No bridge connects these two pieces directly; it is impossible to drive or walk from one part of the district to another without passing through another district.

99.    The Challenged Districts split political subdivisions and do so along racial lines: they split St. Petersburg and Pinellas County to scoop predominantly Black areas into District 16, leaving District 18 artificially white.

100.    The Challenged Districts deviate from major geographic boundaries like highways, railways, rivers, and major roads to achieve the Legislature's intended racial division.

101.    In Pinellas County, for example, the district border deviates from highways like I-275 and US-19 to accomplish racial separation. The border instead

follows local streets such as 13th Avenue North and a zig-zag of lanes in the Broadwater neighborhood to separate more- from less-Black areas.

102.   And of course, District 16 traverses the major geographic feature that defines the region—the Bay—to group far-flung Black residents.

## IV.  The Use of Race Was Not Narrowly Tailored

103.   Where, as here, race was the predominant factor in the government's decision-making, strict scrutiny is triggered and "[t]he burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper v. Harris*, 581 U.S. 285, 292 (2017) (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 173, 193 (2017)).

104.   Compliance with the Voting Rights Act and corollary requirements like the Fair Districts Amendment's non-retrogression standard can justify the predominant consideration of race, but despite its stated concern for protecting diverse representation, the Legislature did not narrowly tailor its use of race to comply with the Fair Districts Amendment.

105.   The Legislature identified no other compelling interest to justify its use of race when it drew the Challenged Districts.

106.   To ensure its use of race was narrowly tailored to achieve Fair Districts compliance, the Legislature was obligated to rely on a functional analysis of voting behavior in the Protected District.

107.   The Legislature's duty was to ensure, based on the functional analysis, that Black voters' ability-to-elect was not diminished compared to the Benchmark

District, and that its effort to avoid diminishment subordinated the race-neutral Tier Two criteria, and any other traditional redistricting criteria, only so far as necessary to comply with Tier One.

108.   As the Senate's counsel advised: "No 'predetermined or fixed demographic percentage' is used at any point in the assessment."

109.   The Legislature was presented with alternative configurations for the Protected District that more narrowly tailored the use of race to avoid diminishing Black voters' ability-to-elect, without so dramatically sacrificing the race-neutral principles embodied in Tier Two.

110.   Even before the 2020 redistricting cycle, the Legislature was offered alternative configurations.

111.   During the 2015 legislative redistricting process following a court order, Rep. Matt Caldwell proposed a plan (H079S9073 or "Caldwell Plan") featuring a Protected District wholly within Hillsborough County, and a South Pinellas district sitting compactly on the other side of the Bay. **Figure 4** below depicts the Caldwell Plan.



*Fig. 4. The Caldwell Plan.*

112.   During the same session, Sens. Jeff Clemens and Oscar Braynon proposed their own plans with a Protected District on the Tampa side of the Bay and another district that united South Pinellas and St. Petersburg.

113.   Rep. Caldwell, Sen. Clemens, and Sen. Braynon filed their plans during the 2015 special session. HJR 5-C (2015); Ams. 142266, 185554, and 758946 to CS for SJR 2-C (2015).

114.   These plans—and their treatment of the Tampa Bay area—garnered significant media attention.[5]

---

[5] *See, e.g.*, Betty Parker, *Court-Ordered Redistricting Could Put All Senate Seats on Ballot*, FORT MYERS NEWS-PRESS, Oct. 24, 2015, at 3A, 8A ("The courts strongly signaled they want new Senate districts to follow other political boundaries, such as county or city lines, as much as

115.    Other senators also questioned the necessity of the Protected District

crossing the Bay.[6]

116.    Outside commenters critiqued the cross-Bay configuration. For example,

in one column, political data analyst Matthew Isbell noted:

> The legislature has a district cross the bay from Tampa to
> south Pinellas in every proposal. Their argument is that this

---

possible, Caldwell said, so he did. 'People are already familiar with those lines and it's
logical,' he said . . . . The hardest area, he said, was the Tampa-Orlando-Ocala triangle, . . .
with significant minority populations, and the Gulf and Tampa Bay forming boundaries or
barriers."); Joe Brown, *Senate Maps Need Not Be Color Coded*, TAMPA TRIB., Oct. 22, 2015,
Metro at 1 ("On Tuesday, state Rep. Matt Caldwell, R-North Fort Myers, and state Sen. Jeff
Clemens, D-Lake Worth, each file their own map . . . . they do have one thing in common:
none of them crosses Tampa Bay."); Mary Ellen Klas, MIA. HERALD (Oct. 21, 2015),
https://miamiherald.typepad.com/nakedpolitics/2015/10/galvano-offers-a-new-map-and-
alternative-plan-for-choosing-who-escapes-re-election.html ("Sen. Jeff Clemens, D-Lake
Worth, [] submitted an alternate map that creates an African-American majority district in
Hillsborough County without linking to black communities in South Pinellas County."); Jim
Rosica, *2 More Maps Filed for Senate Redistricting*, FLA. POLITICS (Oct. 20, 2015),
https://floridapolitics.com/archives/192879-two-more-maps-filed-for-senate-redistricting/
("State Rep. Matt Caldwell, a North Fort Myers Republican, and state Sen. Jeff Clemens, a
Lake Worth Democrat, each filed their own map. A cursory review shows that neither map
contains districts that cross Tampa Bay. . . . Caldwell couldn't be immediately reached
Tuesday night, but Clemens told FloridaPolitics.com that his map, among other things, splits
fewer cities than the other maps. 'I also wanted to draw a map with districts that contain
enough minority voters without jumping the bay,' Clemens said. 'In every version so far, that
didn't happen.'"); Mary Ellen Klas, MIA. HERALD (Oct. 12, 2015), https://miamiherald.
typepad.com/nakedpolitics/2015/10/braynon-offers-a-map-that-makes-big-changes-to-
miami-dade-orlando-and-tampa-bay-.html ("In Tampa Bay, Braynon . . . directed, Districts
19 and 22 'must not jump the Tampa Bay.' . . . Braynon said he specifically refrained from
drawing coastal districts and instead preferred to follow municipal boundaries while also
protecting minority districts, as required by the federal Voting Rights Act and the Fair
Districts amendment to the Florida Constitution."); Jim Rosica, *Oscar Braynon Files Five More
Senate Maps*, FLA. POLITICS (Oct. 26, 2015), https://floridapolitics.com/archives/193175-
oscar-braynon-files-five-more-senate-maps/.

[6] *See, e.g.*, Brandon Larrabee, *Senators Still Pitching Maps to Settle Districts*, TAMPA TRIB.,
Oct. 23, 2015, Metro at 4 (Sen. David "Simmons said he might offer another plan later to try
to continue altering districts in the Tampa Bay area. The region has emerged as one of the
key flashpoints, with Republicans pushing ahead with plans that would jump across the bay
in order to draw a districts that would allow minority voters to elect a candidate of their
choice. Democrats say that's unnecessary . . . .").

is needed to maintain the African-American seat (currently numbered the 19th) that currently exists and has existed for decades. However, the legislative staff is using out of date data. . . . Using 2012 primary data, which followed major minority registration increases, I was able to create a district based just in Hillsborough.[7]

117.    But the Legislature rejected all these alternatives without properly evaluating whether they more narrowly tailored the use of race while complying with the Fair Districts Amendment.[8]

118.    During the 2020 cycle, commentators again questioned whether the Protected District needed to cross the Bay, and posited that keeping the district wholly within Hillsborough County complied with Tier One while better adhering to Tier Two requirements.

119.    For example, before the Subcommittee's first meeting, Isbell analyzed the four initial draft plans and a new proposal of his own, which featured a Protected District wholly in Hillsborough County.[9] **Figure 5** below depicts the plan Isbell proposed (the "2021 Isbell Plan").

---

[7] Matthew Isbell, *The Ultimate Guide to the Six State Senate Base Maps*, FLA. POLITICS (Oct. 15, 2015), https://floridapolitics.com/archives/192537-the-ultimate-guide-to-the-six-state-senate-base-maps/.

[8] *See, e.g.*, Mary Ellen Klas, MIA. HERALD (Oct. 21, 2015), https://miamiherald.typepad.com/nakedpolitics/2015/10/galvano-offers-a-new-map-and-alternative-plan-for-choosing-who-escapes-re-election.html (Committee Chair Sen. Galvano "rejected arguments from Democrats and some Republicans and included in his map a district that links black communities of Hillsborough and Pinellas counties by crossing Tampa Bay . . . . The Florida Supreme Court ordered lawmakers not to cross Tampa Bay when drawing the congressional map and [Republican Sen. Tom] Lee joined Democrats in arguing against it.").

[9] Matthew Isbell, *Florida Redistricting Tour #5: Crossing the Tampa Bay*, MCI MAPS (Nov. 11, 2021), https://mcimaps.com/florida-redistricting-tour-5-crossing-the-tampa-bay/.



*Fig. 5.* The 2021 Isbell Plan.

120.    Looking at one key metric within the functional analysis, Isbell explained his plan "has a slightly higher African-American share of the [Democratic] primary electorate than the staff plan; and it[']s done by not crossing the bay."

121.    During the 2020 cycle, the Legislature also received as a public submission Plan 42, prompting the inquiry from Sen. Bracy.

122.    Isbell's proposal, Plan 42, and the general concept of drawing the Protected District wholly in Hillsborough County, received press coverage during the 2020 cycle.[10]

---

[10] *See, e.g.*, Mary Ellen Klas, *Florida Senate Maps of Tampa Bay District Draw Complaints from Experts*, TAMPA BAY TIMES (updated Nov. 18, 2021), https://www.tampabay.com/news/florida-politics/2021/11/17/florida-senate-maps-of-tampa-bay-district-draw-complaints-from-experts/; Jacob Ogles, *Can SD 19 Lines Shift to Only Hillsborough and Still Remain a Minority District?*, FLA. POLITICS (Nov. 17, 2021), https://floridapolitics.com/archives/474130-can-sd-19-move-to-hillsborough-and-still-remain-a-minority-district/; Romy Ellenbogen, *A Senate District Is Split by Tampa Bay. Black Organizers Ask if It's Time to Change*, TAMPA BAY TIMES (updated Jan. 22, 2022), https://www.tampabay.com/news/florida-

123.    Plaintiffs, too, have developed their own version demonstrating a more narrowly tailored approach to Tier One compliance ("Demonstration Plan"). **Figure 6** below is an illustration of Plaintiffs' Demonstration Plan.



*Fig. 6.* *Plaintiffs' Demonstration Plan.*

124.    The Demonstration Plan, as well as all the other alternatives rejected by the Legislature during its development of the Enacted Plan, demonstrate how the use of race can be more narrowly tailored to comply with Tier One requirements without subordinating and sacrificing the Tier Two requirements and other traditional redistricting principles.

---

politics/2022/01/21/a-senate-district-is-split-by-tampa-bay-black-organizers-ask-if-its-time-to-change/.

125.    Indeed, the key metrics of the functional analysis of the electoral behavior within the Protected District bear out that the alternative plans do not diminish Black voters' ability to elect candidates of their choice—they may *enhance* it.

126.    These include "statistical data pertaining to voting age population" (VAP) and "voter-registration data," *In re Senate Joint Resol. of Apportionment 100* (*In re SJR 100*), 334 So. 3d 1282, 1289 (Fla. 2022):

|  | Black VAP (2020 Census) | Black Share of Registered Voters (2020 Gen. Election) |
|---|---|---|
| Benchmark | 31.33 | 30.09 |
| Enacted | 33.20 | 32.95 |
| Demonstration | 30.84 | 30.40 |
| Isbell (2021) | 31.10 | 30.62 |
| Plan 42 | 30.96 | 30.45 |

127.    These include "voter-registration data" and "voting registration of actual voters" pointing to "whether the minority candidate of choice is likely to prevail in the relevant contested party primary," *League of Women Voters of Fla. v. Detzner* (*Apportionment VIII*), 179 So. 3d 258, 287 n.11 (Fla. 2015):

| | Black Share of: | | | |
|---|---|---|---|---|
| | Dem. Primary Voters, 2012–20 Average | 2020 Dem. Primary Voters | 2018 Dem. Primary Voters | Dem. Registered Voters, 2020 Gen. |
| Benchmark | 51.41 | 48.12 | 49.83 | 48.29 |
| Enacted | 52.82 | 49.22 | 50.93 | 50.18 |
| Demonstration | 51.94 | 49.19 | 52.22 | 48.39 |
| Isbell (2021) | 52.89 | 50.37 | 53.37 | 48.99 |
| Plan 42 | 50.38 | 48.36 | 51.11 | 48.14 |

128.    Black voters form a majority or near-majority of the Democratic primary electorate within the Protected Districts under the Benchmark and all these alternative plans.

129.   Black voters vote cohesively for Democratic candidates in general elections in the Protected District across the plans.

130.   Thus, "election results history" also shows that "that candidate [(the minority candidate of choice)] is likely to prevail in the general election," *In re SJR 100*, 334 So. 3d at 1289; *Apportionment VIII*, 179 So. 3d at 287 n.11, across the alternative plans:

| | Gen. Election Average Performance in Statewide Elections, 2012–2020 | | | | | |
|---|---|---|---|---|---|---|
| | Average Performance | | Dem. Wins | Dem. Margins | | |
| | Dem. | Rep. | | Max | Min | Average |
| Benchmark | 63.9 | 34.3 | 14/14 | +46.1 | +11.6 | +30.0 |
| Enacted | 67.6 | 30.6 | 14/14 | +52.7 | +19.5 | +37.5 |
| Demonstration | 63.3 | 34.9 | 14/14 | +44.5 | +7.7 | +28.4 |
| Isbell (2021) | 62.7 | 35.4 | 14/14 | +44.1 | +6.5 | +27.3 |
| Plan 42 | 63.5 | 34.6 | 14/14 | +45.2 | +7.9 | +28.9 |

131.   The Legislature lacked good reasons to believe that the Enacted Plan was necessary to achieve Tier One compliance.

132.   Similarly, there was no strong basis in evidence for the Legislature to conclude that Tier One required subordinating traditional redistricting principles and Tier Two criteria to race as the Enacted Plan did.

## CLAIM FOR RELIEF

### COUNT ONE

### Racial Gerrymandering
### in Violation of the Fourteenth Amendment to the U.S. Constitution
### (42 U.S.C. § 1983)

133.   Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

134.   The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

135.   Under the Equal Protection Clause, a racial classification is prohibited unless it is narrowly tailored to serve a compelling state interest.

136.   As alleged in detail above, race was the predominant factor in the design of the Challenged Districts. Race predominated over all other redistricting criteria when they were drawn, rendering the Challenged Districts racial classifications subject to strict scrutiny.

137.   The use of race as the predominant factor in creating the Challenged Districts was not narrowly tailored to advance any compelling state interests, including compliance with the Fair Districts Amendment's non-retrogression requirement.

138.   Consequently, the districts do not survive strict scrutiny.

139.   Therefore, the districts violate Plaintiffs' rights under the Equal Protection Clause and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and:

A.  Declare the Challenged Districts to be unconstitutional in violation of the Fourteenth Amendment as racial gerrymanders;

B.  Permanently enjoin Defendants and their agents from calling, conducting,

supervising, or certifying any elections under the Challenged Districts;

C.   Enter a remedial decree that ensures Plaintiffs live and vote in constitutional

districts;

D.   Order Defendants to hold special elections to limit the harm to Plaintiffs

should adequate relief be unavailable prior to the next regular election;

E.   Award Plaintiffs reasonable attorneys' fees and costs of suit;

F.   Grant any other relief the Court deems just and proper.

Respectfully submitted this 10th day of April, 2024,

*/s/ Nicholas L.V. Warren*

Nicholas L.V. Warren[†] (FBN 1019018)
**ACLU Foundation of Florida**
1809 Art Museum Drive, Suite 203
Jacksonville, FL 32207
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Deborah N. Archer*
David Chen*
**Civil Rights & Racial Justice Clinic**
**Washington Square Legal Services, Inc.**
245 Sullivan Street
New York, NY 10012
(212) 998-6473
deborah.archer@nyu.edu
davidchen@nyu.edu

James Michael Shaw, Jr. (FBN 677851)
Naomi Robertson (FBN 1032076)
**Butler Weihmuller Katz Craig LLP**
400 North Ashley Drive, Suite 2300
Tampa, FL 33602
(813) 281-1900
jshaw@butler.legal
nrobertson@butler.legal

*Counsel for Plaintiffs*

[†] *Designated lead counsel*          * *Special admission motions forthcoming*