## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KÉTO NORD HODGES, *et al.*,

    *Plaintiffs*,

v.

                                   Case No. 8:24-cv-879-CEH-TPB-ALB

BEN ALBRITTON, in his official
capacity as President of the Florida
Senate, *et al.*,

    *Defendants*.

_____/

## PRESIDENT ALBRITTON'S MOTION FOR SUMMARY JUDGMENT
## AND INCORPORATED MEMORANDUM OF LAW

### Introduction

Florida's congressional and state senate elections in 2016, 2018, and 2020 were conducted under court-ordered maps imposed after nearly four years of litigation involving claims of partisan gerrymandering. *See League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258 (Fla. 2015) (approving remedial congressional plan); *League of Women Voters of Fla. v. Detzner*, No. 2012-ca-2842 (Fla. 2d Cir. Ct., Dec. 30, 2015) (adopting remedial senate plan). Following the 2020 Census, the Florida Senate adopted redistricting procedures intended to avoid a similar result. After months of public deliberation regarding potential district configurations, the Senate unanimously passed Senate Joint Resolution 100 (the "Enacted Plan") to

apportion Florida's legislative districts on February 3, 2022. One month later, after no party objected or challenged the map, the Florida Supreme Court affirmed the validity of the legislative apportionment under the Florida Constitution. *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d 1282 (Fla. 2022).

More than two years passed before Plaintiffs filed suit. Their Complaint contains a single cause of action alleging that two senate districts in the Tampa Bay region—Districts 16 and 18—are "racially gerrymandered in violation of the Fourteenth Amendment." Compl. at 1. This claim fails for multiple reasons.

*First*, although Plaintiffs' Complaint contains only one cause of action, this single claim attempts to challenge two different districts on two distinct theories. Plaintiffs allege that District 16 is racially gerrymandered because it combines in a single district "disparate and distinct" black communities in Tampa and St. Petersburg. Compl. at 1. But as to District 18, Plaintiffs allege only that its shape resulted from the configuration of District 16. This "impact theory" concept of racial gerrymandering has been expressly rejected by the Supreme Court. Because Plaintiffs make no allegations that District 18 itself was racially gerrymandered, their challenge to that district necessarily fails as a matter of law. The Court should grant summary judgment to Defendants on Count I as to District 18, and also grant summary judgment against Plaintiffs Garcia and Azis, who reside in District 18, because they lack standing to challenge District 16.

2

*Second*, Plaintiffs' claims as to District 16 are also deficient as a matter of law. Although pleaded in the language of a federal Equal Protection claim, the Complaint's allegations regarding District 16 are, at their core, claims that the Enacted Plan does not comply with redistricting standards imposed by the Florida Constitution. Plaintiffs assert that their preferred alternative configurations of District 16 would better promote criteria such as compactness and adherence to political and geographical boundaries while achieving similar racial metrics to the Enacted Plan. Although these arguments may be cognizable in state court under the Florida Constitution, they do not amount to a claim under the Fourteenth Amendment. Sovereign immunity prohibits federal courts from exercising jurisdiction over this sort of state-law claim disguised as a violation of federal law.

*Finally*, on the undisputed material facts, Plaintiffs' claim that District 16 is a racial gerrymander fails as a matter of law. This claim requires proof that facially neutral district lines are "unexplainable on grounds other than race." *Miller v. Johnson*, 515 U.S. 900, 905 (1995) (*quoting Shaw v. Reno*, 509 U.S. 630, 644 (1993)). But the undisputed evidence proves that the contrary is true: District 16 is compact both visually and by quantitative measures, adheres to political and geographical boundaries, and maintains a historical configuration joining portions of Tampa and St. Petersburg in a single district. Plaintiffs offer no direct evidence that racial considerations improperly predominated, and the undisputed deposition

testimony of the Florida Senate's map drawer establishes that race was considered only to the extent required by law and as one of multiple factors influencing District 16's configuration.

Defendants are entitled to summary judgment as a matter of law.

## Relevant Background and Statement of Undisputed Facts

### Florida Legislature Approves Enacted Plan in 2021-22 Redistricting Process

Following the 2020 Census, the Florida Legislature was required to redraw the state's congressional and legislative districts. Ex. 1 at 3-5 (Florida Senate Committee Meeting Expanded Agenda Sept. 20, 2021). At its first two meetings, the Senate Committee on Reapportionment received informational briefings on the census data and legal requirements governing redistricting. Exs. 1, 2 (Florida Senate Committee Meeting Expanded Agendas Sept. 20 and Oct. 11, 2021 (including presentation on federal and state legal requirements)).

On October 18, 2021, the Committee unanimously adopted a series of directives establishing priorities and standards that would govern the drawing of senate district maps by professional staff. Exs. 1, 2, 3 (Rodrigues Memo to Ferrin). The Senate Select Subcommittee on Legislative Reapportionment held three public meetings to workshop and comment on staff-drawn draft maps. Exs. 4-6 (Florida Senate Select Subcommittee Meeting Expanded Agendas Nov. 17, 29, 2021 and Jan. 10, 2022). At a Reapportionment Subcommittee meeting, staff director Jay Ferrin

explained that the "districts were drawn to be as nearly equal in population as practical with district population deviations of less than 1% of the ideal population," "to be visually compact in relation to their shape and geography," using "mathematical scores . . . where appropriate," and "county boundaries where feasible." Ex. 7 at 4:17-21 (Legislative Reapportionment Subcommittee Nov. 17, 2021).

The Select Subcommittee heard public testimony at one meeting on an alternative district configuration proposed by Mr. Nicholas Warren.[1] Ex. 11 at 44:15-21 (Warren Depo). Mr. Warren justified his preferred configuration of the Tampa Bay region districts on "Tier Two" grounds. *See* Ex. 7 at 30:5-10, 31:1 (Warren testimony that his concern was limited to "one issue with Tier-Two compliance" and that his proposed map had "Tier-Two advantages"). Mr. Warren did not assert that the staff-drawn configuration of the Tampa Bay districts was a "racial gerrymander." Ex. 11 at 44:15-21 (Warren Depo). No senator proposed an amendment incorporating Mr. Warren's configuration.[2]

---

[1] Although Mr. Warren is an attorney for the ACLU of Florida (and is lead counsel for Plaintiffs here), he did not disclose his affiliation in his legislative testimony and asserts that he appeared solely in his private capacity. Exs. 8, 9 (Rodrigues Memo to colleagues, Warren Response Letter). His employer also disavowed any connection to his committee testimony. Ex. 10 (ACLU Letter to Senate).

[2] Evidence produced during discovery tends to confirm that race was *not* the Senate's predominant consideration in the configuration of the Tampa Bay senate districts. That evidence includes more than 270 pages of private messages during the redistricting process between Mr. Warren and Matthew Isbell, a political operative working for the Florida Democratic Party and its candidates on redistricting matters. In those messages Mr. Warren agreed with Mr. Isbell's

At the January 10, 2022, meeting, the Select Subcommittee recommended two maps for consideration by the Committee. On January 13, 2022, the Reapportionment Committee held a final meeting and advanced legislation adopting one of those proposed maps. After adopting amendments to renumber the districts and eliminate minor splits in five cities, the Committee favorably reported CS/SJR 100 by a vote of 10-2.[3] The full Senate passed CS/SJR 100 on January 20, 2022. Fla. S. Jour. 215 (Reg. Sess. 2022). After the Florida House of Representatives adopted an amendment to add the representative districts, the Senate unanimously concurred in the House amendment and passed the Enacted Plan by a vote of 37-0. Fla. S. Jour. 325 (Reg. Sess. 2022).

### Plaintiffs' Challenge to the Enacted Plan

The five Plaintiffs here filed a lawsuit more than two years later, challenging Districts 16 and 18 under the Fourteenth Amendment. The Complaint claims that District 16 was drawn to avoid diminishing black voters' influence, Compl. ¶93, impermissibly using race-conscious criteria while ignoring race-neutral considerations, Compl. ¶95. Plaintiffs allege that, as a result of the drawing of

---

observation that the racial composition of the Senate's "plan is almost the same as mine. . . . The pinellas portion isnt even that black since they grab a ring of white liberal Dems as well." Ex. 12 at SEN-0002768 (Warren/Isbell messages). Mr. Warren then boasted that his own proposed alternative map "has a higher black share of Dem primary than the benchmark!!" *Id.* at SEN-0002769.

[3] The Florida Senate, *Committee Vote Record*,
https://www.flsenate.gov/Session/Bill/2022/100/Vote/2022-01-13%200130PM~S00100%20Vote%20Record.PDF.

District 16, District 18 was "stripped of Black residents," Compl. at 1, and left "artificially white," Compl. ¶99.

The Complaint does not allege that *District 18's* lines were drawn with impermissible race-conscious purposes or criteria. Instead, Plaintiffs' claim as to District 18 is based exclusively on the "impact" that adjacent District 16's configuration had on District 18's shape and demographic composition. Plaintiffs Garcia and Azis live in District 18. Compl. ¶¶18-19; Ex. 13 at 2 (Garcia's Answer to Senate's First Set of Request for Admission); Ex. 14 at 1 (Aziz's Answers to Senate's First Set of Requests for Admission). Plaintiffs' claim against District 16 alleges that the Legislature incorrectly implemented the Florida Constitution's Tier One and Tier Two criteria, and gave too much weight to race when redistricting. *See* Compl. ¶¶ 104, 109, 117, 131-132. In effect, Plaintiffs assert that the Enacted Plan violates the *Florida Constitution's* redistricting standards and, therefore, the Fourteenth Amendment. *Id.* ¶¶7-9, 33-43, 47-48, 57-60, 65, 67-68, 78-80, 85, 104, 106-107, 109, 117-118, 123-124, 131-132.

But the Reapportionment Committee's directives to staff show that traditional redistricting criteria, such as those in Tier Two of the Florida Constitution, were not subordinated to predominant racial concerns in the configuration of the senate districts. Ex. 3 (Rodrigues Memo). The Senate's witness confirmed in deposition that "[t]he criteria that [the Senate redistricting] team and

the committee followed were the ones laid out in that memorandum, which were to. . . adhere to tier-one and tier-two standards, to not consider any political data and not consider any residential information about members, incumbency." Ex. 15 at 13:15-24 (Ferrin Depo). And he further testified that the Senate "always" followed the principles outlined in the 2021 Rodrigues Memo. *Id.* at 48:19-24.

Other undisputed evidence also shows that race did not predominate in the configuration of District 16. For more than three decades, a Florida senate district has combined portions of Tampa and St. Petersburg. The Enacted Plan maintains that configuration while improving the compactness and boundary usage metrics for this Tampa Bay district. Ex. 16 (Historical Districts Composite Exhibit);[4] *see also* Ex. 17 at Fig. 8 (McCartan Report). And Plaintiffs' own alternative maps show roughly the same racial composition for District 16 as the Enacted Plan. *Compare* Ex. 18 (Barreto Report at 3, 7 (Plan A BVAP of 30.8%, Plan B BVAP of 30.8%, and Plan C BVAP of 30.0%)), *with* Ex. 19 (Enacted Map VAP Summary Report (Dist. 16 of 33.2%)).

Plaintiffs themselves concede that they have no direct evidence that the districts were drawn with race as the predominant factor. Ex. 20 at 39:10-15 (Garcia

---

[4] Pursuant to Federal Rule of Evidence 201(b)(2), President Albritton respectfully requests that the Court take judicial notice of Exhibit 16, which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," as it is a composite of documents created by the Florida Senate and available on the Florida Senate's website here: https://www.flsenate.gov/Session/Redistricting/MapsAndStats.

Depo); Ex. 21 at 35:6-13 (Azis Depo); Ex. 22 at 35:10-15 (El-Amin Depo); Ex. 23 at 26:22-27:5, 38:23-39:15 (Seymour Depo); Ex. 24 at 34:4-14, 48:5-14 (Nord Hodges Depo). Nor were Plaintiffs' experts able to offer sufficient circumstantial evidence of racial predominance to withstand summary judgment. Plaintiffs' expert witness Dr. Barreto testified that he believes certain portions of district boundaries were drawn based upon race only because they could not have been created by "chance." Ex. 25 at 82:23-83:3 (Barreto Depo). Dr. Barreto did not conduct a comprehensive review of non-racial explanations and could not exclude the possibility that district lines followed specific political or geographic boundaries. Other than Tampa Bay, Dr. Barreto could not identify any portions of District 16 where such boundaries were not followed, and conceded that he did not analyze whether District 16's lines followed roads. *Id.* at 72:2-14, 77:2-78:21.

Plaintiffs' other expert witness, Dr. McCartan, conceded that drawing district lines necessarily involves considering many factors. Even as to Plaintiffs' own alternative maps, Dr. McCartan was able to testify only that

> race helped inform the overall configuration of the district. But any boundary portion, any decision there, had implications for the rest of the other boundaries, the rest of the map . . . . So I'm not able to look at a portion of a boundary that I drew here and tell you, you know, this was, you know, this percentage due to race or what have you.

Ex. 26 at 53:5-13 (McCartan Depo).

## **Legal Standard**

Summary judgment is proper when a party can show (i) there is no genuine dispute of material fact and (ii) the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Which facts are "material" depends on the substantive law that applies to the claim at issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

To succeed in a racial gerrymandering challenge, a plaintiff bears the burden to show that the legislature used race as the "predominant" motive in drawing district lines. *Miller*, 515 U.S. at 916. A plaintiff must "prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Id.* The burden is a "demanding" one. *Id.* at 928 (O'Connor, J., concurring). Courts approach any inquiry into the legislature's motives in a gerrymandering case with "extraordinary caution," *Miller*, 515 U.S. at 916, starting with the "presumption that the legislature acted in good faith," *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024). The presumption is "especially stringent" in redistricting cases, requiring "district courts to draw the inference that cuts in the legislature's favor

when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10-11.

Underlying this presumption is the reality that redistricting is a "most difficult subject"—one that presents a "complex interplay of forces" and requires the "balance [of] competing interests." *Miller* at 915-16. State legislatures must clear a "legal obstacle course," *Abbott v. Perez*, 585 U.S. 579, 587 (2018), navigating "delicately balanced requirements regarding the consideration of race," *id.* at 585. Thus, federal courts recognize that scrutinizing reapportionment plans "represents a serious intrusion on the most vital of local functions," *Miller*, 515. U.S. at 915, and that a plan grouping voters of a certain race into the same district may well "reflect wholly legitimate purposes," *Shaw*, 509 U.S. at 646. "[T]o avoid summary judgment, the non-movant must cite 'significantly probative evidence' that 'demonstrates a genuine dispute of material fact.'" *Atkins v. Sarasota Cnty.*, 457 F. Supp. 3d 1226, 1231 (M.D. Fla. 2020) (granting summary judgment against plaintiffs in a racial gerrymandering case and citing *Anderson*, 477 U.S. at 249-250).

<u>**Argument**</u>

**A.    On the undisputed facts, Plaintiffs' "impact theory" claim against District 18 fails as a matter of law.**

Plaintiffs' racial gerrymandering claim as to District 18 fails as a matter of law, as it is premised entirely on their claim regarding a neighboring district's shape. The Supreme Court has rejected this sort of "impact theory," holding that

11

claims like Plaintiffs' against District 18 are nonjusticiable. *United States v. Hays*, 515 U.S. 737 (1995). In *Hays*, four voters alleged that the Louisiana Legislature racially gerrymandered the State's school districts. *Id.* at 740-41. The Court agreed with plaintiffs that race impermissibly motivated the drawing of two districts. *Id.* But the plaintiffs resided in a different district—one which they alleged was "segregated" because of the racially gerrymandered shape of the other two districts. *Id.* at 746. The Court held that the four voters lacked standing, explaining that, to challenge a district as racially gerrymandered, a voter must either reside in the district or otherwise "demonstrate that he or she, personally, has been injured by" the alleged racial classification. *Id.* at 744-45.

The fact that the plaintiffs in *Hays* resided in a district that was impacted by the shape of a neighboring, racially gerrymandered district was not sufficient to confer standing. 515 U.S. at 745. And alleged racial motivations behind drawing other districts did not "prove anything about the legislature's intentions with respect to [plaintiffs' district]," nor did the record "reflect that the legislature intended [plaintiffs' district] to have any particular racial composition." *Id.* at 746. Thus, the plaintiffs' allegation that "the racial composition of District 5 would have been different if the legislature had drawn District 4 in another way" failed to "allege a cognizable injury under the Fourteenth Amendment." *Id.* So too here.

The Supreme Court reaffirmed this principle in *Sinkfield v. Kelley*, 531 U.S. 28 (2000). The plaintiffs in *Sinkfield* alleged that the Alabama Legislature racially gerrymandered state legislative districts when it intentionally created certain majority-minority districts. *Id.* at 28-29. But the plaintiffs did not live in those districts; they lived in "adjacent" districts that "bordered" the majority-minority districts. *Id.* at 29. The *Sinkfield* plaintiffs, like Plaintiffs Garcia and Azis here, alleged that the shapes of their districts were the "product" of racial gerrymandering, *id.*, claiming that the configurations of their districts "were necessarily influenced by the shapes of the majority-minority districts upon which they border," *id.* at 30. Reiterating its ruling in *Hays*, the Court called that case "essentially indistinguishable" and reiterated that one district's racial gerrymander does not mean that the "neighboring" district was also racially gerrymandered. *Id.* at 30-31.

Both *Hays* and *Sinkfield* stand for the proposition that a racial-gerrymander claim challenges an individual district, and courts do not attempt to guess which other districts would have been drawn differently but for the impermissible motivations behind one racially gerrymandered district. And in both cases, the Supreme Court remanded to the district court with instructions to dismiss the complaint. In light of this clear and settled precedent, Plaintiffs' impact-theory claim as to District 18 should go no further. And because it is undisputed that

Garcia and Azis live in District 18, Ex. 13 at 2 (Garcia's Answer to Request for

Admission); Ex. 14 at 1 (Azis's Answer to Request for Admission), summary

judgment should be granted dismissing them from the case for lack of standing.

> **B.    Sovereign immunity bars Plaintiffs' claim, which is a disguised state-law claim brought against state actors.**

Plaintiffs' cause of action, although styled as an equal-protection challenge

under the Fourteenth Amendment, focuses almost exclusively on the *Florida*

*Constitution's* redistricting standards. *See, e.g.*, Compl. ¶¶7-9, 33-43, 47-48, 57-60,

65, 67-68, 78-80, 85, 104, 106-107, 109, 117-118, 123-124, 131-132. Plaintiffs allege,

for example, that "the Legislature did not narrowly tailor its use of race to comply

with the Fair Districts Amendment," *id.* ¶104, and that it "dramatically sacrific[ed]

the race-neutral principles embodied in Tier Two [of Florida's Fair Districts

Amendment]," *id.* ¶109. Plaintiffs further allege that the Florida Legislature did

not "properly evaluat[e] whether" alternative maps "more narrowly tailored the

use of race while complying with the Fair Districts Amendment." *Id.* ¶117. And

Plaintiffs allege that the Legislature did not have "good reasons to believe that the

Enacted Plan was necessary to achieve Tier One compliance," *id.* ¶131, or "to

conclude that Tier One required subordinating redistricting principles and Tier

Two criteria to race," under the Florida Constitution, *id.* ¶132.

But a federal court has no jurisdiction over state actors for purported past

violations of state law. A state generally cannot be sued without its consent. *Ex*

*Parte Young*, 209 U.S. 123, 150 (1908). And *Ex Parte Young*'s narrow exception to
sovereign immunity does not extend to suits asking federal courts to "instruct[]
state officials on how to conform their conduct to state law." *Pennhurst State Sch.
& Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). The Supreme Court explained in
*Pennhurst* that "it is difficult to think of a greater intrusion on state sovereignty"
than the sort of intrusion Plaintiffs ask for here, where a ruling on compliance with
the Florida Constitution would do nothing to "vindicate the supreme authority of
federal law." 465 U.S. at 106.

Accordingly, federal courts properly reject claims attempting to disguise an
alleged violation of state law as a violation of federal law. For example, when a
plaintiff sued Georgia alleging it had violated a state statute requiring the release
of escrow funds—which constituted a taking under the Fifth Amendment and a
related First Amendment violation—the Eleventh Circuit affirmed dismissal of the
plaintiff's claim based on state sovereign immunity. *S&M Brands, Inc. v. Georgia ex
rel. Carr*, 925 F.3d 1198 (11th Cir. 2019). Because the "gravamen of the complaint"
dealt with the requirements of state law, the plaintiff could not ask a federal court
for a ruling that "the State has improperly interpreted and failed to adhere to a
state statute": "*Pennhurst* bars such claims." *Id.* at 1205 (cleaned up). Similarly,
when other plaintiffs sued Georgia for violating a state statute governing
reimbursement for local school-bus expenses—which, in turn, plaintiffs alleged

15

violated the Fourteenth Amendment and two federal statutes—the Eleventh Circuit assessed the "gravamen" of plaintiffs' complaint and concluded that the district court's judgment "appears to be one for violation of state law." *DeKalb Cnty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 688 (11th Cir. 1997). Under the fundamental principle of sovereign immunity, the Court "lacked authority to entertain [such a] claim." *Id.* at 692

Here, too, where "the gravamen of the complaint appears to be that the State improperly interpreted and failed to adhere to [the Florida Constitution's redistricting standards], there is a *Pennhurst* problem." *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2019 WL 13221296, at *5 (N.D. Ga. Dec. 27, 2019); *see also Ford v. Strange*, No. 2:13-CV-214-WKW, 2013 WL 6804191, at *9 n.10 (M.D. Ala. Dec. 23, 2013) ("The disguising of state-law claims as federal-law claims would raise a *Pennhurst* problem," as it "would require state officials to conform with [state law] as Plaintiffs interpret it"), *aff'd*, 580 F. App'x 701 (11th Cir. 2014). It is the substance of the complaint, not its label, that determines whether state sovereign immunity bars a claim. Here, "despite references to the United States Constitution in the pleadings, the claims necessarily rely on a determination that a state official has not complied with state law, a determination that is barred by sovereign immunity." *Fair Fight Action*, 2019 WL 13221296, at *5 (denying motion for preliminary injunction on *Pennhurst* grounds where "the gravamen of the

16

Plaintiffs' pending motion appears to be that the Secretary of State (and therefore the State of Georgia) has improperly interpreted and failed to adhere to Georgia's new voter list maintenance statute"); *see also Balsam v. Sec'y of N.J.,* 607 F. App'x 177, 183 (3d Cir. 2015) ("Appellants' attempt to tie their state law claims into their federal claims is unpersuasive."); *Lake v. Hobbs,* 623 F. Supp. 3d 1015, 1030 (D. Ariz. 2022) ("Courts have repeatedly rejected alleged federal constitutional claims that rely on a determination that state officials have not complied with state law."); *Bowyer v. Ducey,* 506 F. Supp. 3d 699, 716 (D. Ariz. 2020) ("However, where the claims are state law claims, masked as federal law claims, *Ex Parte Young* is inapplicable and the Eleventh Amendment clearly bars the suit.").

### C.    The undisputed facts establish that the Legislature used permissible reapportionment criteria not overridden by race.

As construed by the Supreme Court, the Fourteenth Amendment does not prohibit all consideration of race during the redistricting process. Indeed, the Court recently reaffirmed that "[t]he line that we have long drawn is between consciousness and predominance." *Allen v. Milligan*, 599 U.S. 1, 33 (2023). The undisputed material facts here establish that the Florida Senate permissibly *considered* race as required by the Florida Constitution, but that race did not predominate over non-racial factors such as compactness, contiguity, population equality, and boundary usage in the development of the Enacted Plan.

To be sure, the Florida Senate was *aware* of race when developing the Enacted Plan. Both the federal Voting Rights Act and the Florida Constitution require consideration of race under certain circumstances. In its decision affirming the validity of the legislative apportionment under the Florida Constitution, the Florida Supreme Court noted that the Legislature had looked to "objective statistical data" to confirm that the Enacted Plan would not "diminish minority voters' ability to elect representatives of their choice." *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1290. But "awareness" of race does not violate federal law, *Miller*, 515 U.S. at 916, and the undisputed material facts show that the Florida Senate took several other factors into account that were not outweighed by race. Because Plaintiffs' asserted "evidence," even if true, cannot negate the "obvious" alternative explanations for the configuration of District 16, the Florida Senate is entitled to summary judgment. *See Alexander*, 602 U.S. at 8 (The Supreme Court has "never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence" of racial predominance.).

While Plaintiffs' claim of racial predominance focuses on the portion of District 16 in Pinellas County, the Supreme Court has instructed courts to consider "the legislature's predominant motive for the design of the district *as a whole*." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 192 (2017) (emphasis added). Plaintiffs' allegations regarding the black voting-age population in Ms. Garcia's

precinct and "two precincts across the street," Compl. ¶22, or a district line vis a vis Ms. Azis's neighborhood, *id.* ¶21, are improperly hyperfocused on narrow subsections of the district.

Each plaintiff testified that he or she had no specific evidence that racial criteria predominated in the redistricting process. *See* Ex. 20 at 39:13-15 (Garcia Depo) ("Based on the geographical locations of the Black residents that are contained in the districts outlined"); Ex. 21 at 35:9-13 (Azis Depo) ("I would have to rely on any information that my attorneys have provided you for that and I can speak to south St. Pete there is a large Black population there. I do not know about any of the communities on the other side of the bay, however."); Ex. 22 at 35:12-15 (El-Amin Depo) ("All I know is that to put—go across a body of water and put one group in South St. Pete, in with the Hillsborough side, don't seem as fair to me."); Ex. 23 at 39:1-3 (Seymour Depo) ("[O]ther than what is obvious on the map and through – yeah, what's on the map, I am not bringing any other sort of evidence."); Ex. 24 at 48:13-14 (Nord Hodges Depo) ("I'm not sure at this time, but I can't see why else you would need to draw a district in this way.")

Having no direct evidence of racial predominance, Plaintiffs resort to supposed circumstantial evidence of the Legislature's intent based on Plaintiffs' general awareness of the racial composition of South St. Petersburg. But this speculation does not provide material evidence of racial predominance. A district

court granted summary judgment against plaintiffs in *Johnson-Lee v. City of Minneapolis*, 2004 WL 2212044, at *1 (D. Minn. 2004), who raised similar arguments. There, "plaintiffs testified that they believed that racial considerations predominated" the redistricting process, pointing to racial composition of various regions. *Id.* at *14. But, as here, the plaintiffs "do not have any direct or personal knowledge of the Redistricting Commission's intent to discriminate." *Id.* Therefore, "the testimony of plaintiffs that the Redistricting Commission's racial focus is obvious from the resulting map cannot, without corroborating evidence, support their claim," and summary judgment was warranted. *Id.* at *15, *17.

The undisputed material facts show Plaintiffs fail the *Arlington Heights* test for circumstantial evidence of racially discriminatory intent and effect. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). Under *Arlington Heights* and its progeny, courts evaluate several factors:

> "[R]elevant evidentiary factors include substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and the legislative and administrative history of the decision. ... [E]vidence of the historical background of the decision is relevant to the issue of discriminatory intent.... Indeed, all actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.

*Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999) (cleaned up).

First, Plaintiffs' undisputed facts do not show a substantial disparate impact—their own proposed maps reflect a similar racial composition in District

16. *Compare* Ex. 18 (Barreto Report at 3, 7 (Plan A BVAP of 30.8%, Plan B BVAP of 30.8%, and Plan C BVAP of 30.0%)), *with* Ex. 19 (Enacted Map VAP Summary Report (Dist. 16 of 33.2%)). Second, the undisputed facts show no "history of discriminatory official actions" relevant to the configuration of a Tampa Bay state senate district. Plaintiffs do not even allege any facts relevant to this factor. Third, the undisputed facts reveal no "procedural" or "substantive departures" from the Florida Senate's ordinary legislative processes. The Complaint itself confirms that the Enacted Plan was adopted following seven Senate committee and subcommittee meetings, multiple presentations, public testimony, and debates on numerous alternative maps. Compl. ¶¶45-92.

Although Plaintiffs ostensibly point to supposed "circumstantial evidence" of racial predominance based on the district's "shape and demographics," Compl., ¶97, the Florida Supreme Court has concluded that the Senate districts in the Enacted Plan "are visually at least as compact as the districts that they replace—in many cases more so." *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1287. It is also undisputed that the Enacted Plan demonstrates a high use of "existing political and geographical boundaries"—82% in District 16. *Id.* at 1288; Ex. 17 at 11 (McCartan Report). Like many other districts in the plan, District 16 comprises part of two neighboring counties. And District 16 is an improvement upon its immediate predecessor district on several race-neutral criteria. District 16

is visibly more compact, better utilizes political and geographic boundaries, and
has higher quantitative compactness scores than its predecessor configurations in
the 1992, 1996, 2002, 2012, and 2016 plans, all of which were court-approved and
some of which were court-ordered. Ex. 16 (Historical Districts Composite Exhibit).
Plaintiffs' expert Dr. Barreto does not dispute these facts (*see generally* Ex. 18
Barreto Report), and Dr. McCartan confirms that District 16 has become more
geographically compact (Ex. 17 (McCartan Report at 14-16, 21)). Given District 16's
adherence to traditional redistricting criteria, Plaintiffs cannot establish that its
shape is so "highly irregular" or "bizarre" that it provides circumstantial evidence
of racial predominance. *Cooper v. Harris*, 581 U.S. 285, 308 (2017).

The undisputed material facts refute Plaintiffs' claim that District 16 is an
unconstitutional racial gerrymander. Of course, a legislature engaged in
redistricting will "almost always be aware of racial demographics, but such race
consciousness does not lead inevitably to impermissible race discrimination."
*Allen*, 599 U.S. at 30 (cleaned up); *see Miller*, 515 U.S. at 916 ("Redistricting
legislatures will, for example, almost always be aware of racial demographics; but
it does not follow that race predominates in the restricting process."). Where, as
here, mapmakers considered traditional redistricting criteria, like compactness,
contiguity, political and geographic boundary usage, and population equality—
and merely considered race—a racial gerrymander claim fails. *Allen*, 599 U.S. at

31-32. Uncontested deposition testimony establishing that the Senate carefully and intentionally drew the district lines based on these precise constitutional criteria defeats Plaintiffs' claim. Ex. 15 at 13:15-24, 14:6-9, 48:19-49:6, 55:11-15 (Ferrin Depo); *see also id.* at 52:11-54:22, 86:1-87:2 (Senate drew the district lines and then looked to confirm that the districts complied with the Florida Constitution's non-diminishment standard); Ex. 27 at 4 (Senate's Responses and Objections to Plaintiffs' First Set of Interrogatories) (Senate's objectives in drawing District 16 were "to comply with the applicable provisions of state and federal law . . . including the Florida Constitution's requirements that districts be as equal in population as practicable, compact, and use existing political and geographical boundaries where feasible.")

The fact that Plaintiffs' alternative plans contain a similar black voting age population in their District 16 to that in the Enacted Plan further undercuts any suggestion that racial considerations predominated. *Compare* Ex. 18 (Barreto Report at 3, 7 (Plan A BVAP of 30.8%, Plan B BVAP of 30.8%, and Plan C BVAP of 30.0%)), *with* Ex. 19 (Enacted Map VAP Summary Report (Dist. 16 of 33.2%)).

Moreover, comparing the evidence here on shape and demographics with the evidence in cases where racial predominance *was* found shows that Plaintiffs lack material facts entitling them to relief. For example, when "Alabama expressly adopted and applied a policy of prioritizing mechanical racial targets above all

other districting criteria (save one-person, one-vote)," that constituted "evidence that race motivated that drawing of particular lines in multiple districts." *Ala. Leg. Black Caucus v. Ala.*, 575 U.S. 254, 267 (2015). Elsewhere, "drawing of narrow land bridges to incorporate within the district outlying appendages containing nearly 80% of the district's total black population"—in addition to "considerable additional evidence" in the form of witness testimony to the use of race—was enough to support a claim for racial gerrymander. *Miller*, 515 U.S. at 917. Conspicuous combinations of "high population deviation" and "twisted shapes" or "an iguana-like shape" have been found to "bear witness to racial motivation." *Abrams v. Johnson*, 521 U.S. 74, 89 (1997). And the government avoids summary judgment when a challenged district reflects "low scores with respect to traditional measures of compactness" as well as "statistical evidence prov[ing] the State had ignored traditional districting criteria," plus the district being "the only one statewide to contain no undivided county." *Hunt v. Cromartie*, 526 U.S. 541, 547-48 (1999). In practice, plaintiffs typically "need to show that the State's chosen map conflicts with traditional redistricting criteria." *Alexander*, 602 U.S. at 8. But Plaintiffs here are unable to garner any similar facts here showing a conflict.

Given this undisputed evidence that "the redistricting plan carefully was drawn utilizing traditional redistricting principles while seeking to comply with [other legal duties] by giving minority candidates the opportunity to be elected to

political office," "plaintiffs have failed to substantiate a claim of racial gerrymandering in violation of the Equal Protection Clause." *Robertson v. Bartels*, 148 F. Supp. 2d 443, 458 (D.N.J. 2001), *aff'd*, 534 U.S. 1110 (2002) (granting summary judgment for state); *see also DeWitt v. Wilson*, 856 F. Supp. 1409, 1413 (E.D. Cal. 1994) (granting summary judgment in favor of the state when undisputed facts showed that the challenged "redistricting plan . . . was consistent with traditional redistricting principles, not solely based on race, and not involving extremely irregular district boundaries").

Respectfully submitted,

<table>
<tr>
<td>

CARLOS REY (FBN 11648)
**FLORIDA SENATE**
404 South Monroe Street
Tallahassee, Florida 32399
(850) 487-5855
*Rey.Carlos@flsenate.gov*

</td>
<td>

*/s/ Daniel Nordby*
RICKY L. POLSTON (FBN 648906)
DANIEL E. NORDBY (FBN 14588)
DENISE M. HARLE (FBN 81977)
TARA R. PRICE (FBN 98073)
ALYSSA L. CORY (FBN 118150)
KASSANDRA S. REARDON (FBN 1033220)
**SHUTTS & BOWEN LLP**
215 South Monroe Street, Suite 804
Tallahassee, Florida 32301
(850) 241-1717
*RPolston@shutts.com*
*DNordby@shutts.com*
*DHarle@shutts.com*
*TPrice@shutts.com*
*ACory@shutts.com*
*KReardon@shutts.com*

</td>
</tr>
</table>

*Counsel for Florida Senate President Ben Albritton, in his official capacity*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 2, 2025, I electronically filed the foregoing

with the Clerk of Court by using CM/ECF, which automatically serves all counsel

of record for the parties who have appeared.

<u>/s/ Daniel Nordby</u>

Attorney