# EXHIBIT 15

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF FLORIDA
                        TAMPA DIVISION

                   CASE NO.: 8:24-cv-879


   KÉTO NORD HODGES, et al.,

           Plaintiffs,
   v.

   KATHLEEN PASSIDOMO, in her official
   capacity as President of the Florida
   Senate, et al.,

           Defendants.
   _____/




                        DEPOSITION OF

                         JAY FERRIN


                 VOLUME 1: (Pages 1 - 158)


                Friday, November 15, 2024
                  9:30 a.m. - 2:45 p.m.



                         LOCATION:

             Office of Insurance Regulation
                 200 East Gaines Street
                Tallahassee, Florida 32399




               Stenographically Reported By:
                       I. Iris Cooper
                    Stenographic Reporter

   Job No.: 384146
```

Jay Ferrin
November 15, 2024

Page 2

1                  A P P E A R A N C E S

2

   FOR THE PLAINTIFFS

3

   DANIEL B. TILLEY, ESQ.
4   NICHOLAS L.V. WARREN, ESQ.
   OF:   ACLU OF FLORIDA
5        4343 West Flagler Street, Suite 400
        Miami, Florida 33134-1585
6        Phone: 786-363-2714
        Email: dtilley@aclufl.org
7               nwarren@aclufl.org

8

9

   FOR THE DEFENDANTS
10

   GEORGE N. MEROS, JR., ESQ.
11  DANIEL E. NORDBY, ESQ.
   TARA R. KLIMEK PRICE, ESQ.
12  LEILA S. OBERSCHALL, ESQ.
   OF:   SHUTTS & BOWEN
13        215 South Monroe Street, Suite 804
        Tallahassee, Florida 32301-1858
14        Phone: 850-241-1717
        Email: gmeros@shutts.com
15              dnordby@shutts.com
                tprice@shutts.com
16             loberschall@shutts.com

17

18

19

20

21

22

23

24

25

 1   drawing maps, will you understand that unless otherwise
 2   specified, I'm referring to the maps or plans drawn
 3   during the Florida legislature's 2022 redistricting
 4   process?
 5        A    Say that again.
 6        Q    When I reference drawing maps in this
 7   deposition, unless I otherwise specify, I'm referring to
 8   maps or plans drawn during the Florida legislature's
 9   2022 redistricting process?
10        A    Which would have gone from when to when?  The
11   process started on the 18th when we got our
12   instructions.  So the staff-drawn maps?
13        Q    Correct.  What criteria did you use when
14   drawing maps in the 2022 redistricting process?
15        A    The criteria that my team and the committee
16   followed were the ones laid out in that memorandum,
17   which were to -- it's been two years.  So other than
18   reviewing them the other day, if we have a copy here, it
19   may be easier to read from that than to try to trust my
20   memory.
21             But to adhere to tier-one and tier-two
22   standards to not consider any political data and not
23   consider any residential information about members,
24   incumbency, things like that.
25             (Plaintiffs' Exhibit 2 was marked.)

```
 1   BY MR. TILLEY:
 2        Q    We'll mark that as Exhibit 2.  So you
 3   recognize this as the memo from Senator Rodrigues that
 4   you mentioned just before?
 5        A    Yes.
 6        Q    Did you follow the principles of the Rodrigues
 7   memo when you were drawing maps as part of the 2022
 8   redistricting process?
 9        A    Yes.
10        Q    Let's walk through some of this memo together.
11   On Page No. 1 in 2nd paragraph, it says, quote, you are
12   directed to the plain language of the Constitution
13   federal law and the judicial precedent that exists today
14   in regards to that language closed quote; is that
15   correct?
16        A    Yes.
17        Q    What plain language of the Constitution, if
18   any, did you consider when drawing the maps?
19        A    Article III, sections 20 and 21.
20        Q    Is that it?
21        A    As far as the plain language of the Florida
22   Constitution, that was the primary guiding principle,
23   yes.
24        Q    Were there non-primary guiding principles from
25   the Florida Constitution?
```

```
                                                         Page 48
 1   goal to cross any county line?
 2       A    A goal, I don't think so.
 3       Q    Did you have any goals with respect to county
 4   boundaries, other than those in the Rodrigues memo?
 5       A    No.
 6       Q    You didn't have a goal to cross any particular
 7   boundary?
 8       A    No.
 9       Q    Is there any other criterion that I haven't
10   asked about that isn't specifically listed in the
11   Rodrigues memo or the Florida Constitution that you
12   employed when drawing maps as part of the 2022
13   redistricting process?
14       A    No.  I think we've covered them all.
15       Q    Now, I would like to talk about the process of
16   drawing the maps.  Let's take a short break.
17            (Recess 10:35 a.m. until 10:43 a.m.)
18   BY MR. TILLEY:
19       Q    I'd like to talk about the process of drawing
20   the maps.  And just to confirm my understanding, when
21   you drew the maps in the 2022 redistricting process, you
22   always followed the principles outlined in the Rodrigues
23   memo?
24       A    Yes.
25       Q    Is it accurate to say that you never deviated
```

 1   from them?
 2        A    Yes.
 3        Q    And is it accurate to say you never took into
 4   account considerations outside of those in the Rodrigues
 5   memo?
 6        A    That's correct.
 7             (Plaintiffs' Exhibit 5 was marked.)
 8   BY MR. TILLEY:
 9        Q    I would like to ask you about some of the
10   statements made by Senator Rodrigues.  Let's give you
11   Exhibit 5.  Let's go to the orange flag, Page No. 38,
12   starting at line 19.
13             Senator Rodrigues says, quote, the benchmark
14   map identifies what the existing tier-one districts are.
15   Those are the districts that we cannot diminish.  So
16   once we have identified the tier-one districts, we then
17   start with a blank map, highlight the data we have
18   received from the U.S. Census Bureau by race, and then
19   the staff begin drawing around the population
20   distribution in order to ensure we had not diminished
21   the opportunity for minorities to participate or elect a
22   voter of their choice.  The base maps just gave us a
23   starting point, closed quote.
24             Now let's look at Page No. 39 starting at line
25   14.  Rep Rodrigues says, quote, once you have identified

 1   meet certain criteria related to tier-one and then just
 2   fill out the rest.
 3       Q    Is it accurate to state that the process that
 4   Senator Rodrigues described in those quotations we just
 5   read was not the process used for drawing other
 6   districts?
 7       A    Correct.
 8       Q    Was your focus in drawing maps to start with
 9   tier-one compliance and then proceed to tier-two
10   compliance?
11       A    Not necessarily.  You have to balance the two.
12   So as we start with a blank map and start filling in,
13   it's pretty typical to start at both the north and south
14   ends of the state and then fill things in as you go.
15            And so as you're doing that, you know, you're
16   looking at the tier-one considerations when you get to
17   areas of the state where there was a benchmark district
18   that we'd identified with counsel as performing and
19   needing to be protected from diminishment.
20            So you know where those areas of the state
21   are.  And so as you're drawing and you get to those,
22   then maybe you focus a little bit on the tier-one issue
23   and then kind of balance.
24            I mean, the whole thing is dynamic until
25   you're done and you have a whole statewide map that's

1  under the population deviation and you think meets all
2  the other criteria you're supposed to comply with.
3  **Q   So is it accurate to say that you're primarily**
4  **focusing on tier-two until you get to the parts of the**
5  **state that you already know have tier-one protected**
6  **districts; is that accurate?**
7  A   I think so.  I mean, tier-one relating to the
8  diminishment standard, yes.
9  **Q   Right.  So you're only focused -- well, is it**
10 **accurate to say you're only focused on tier-two until**
11 **you get to an area that you understand to be a protected**
12 **district?**
13 A   Yeah, I think so.  I mean, that kind of comes
14 into the prior discussion about old benchmarks and
15 things like that.  I mean, that's how you kind of know
16 where these areas of the state are, coupled with the
17 census demographics.
18       In the panhandle in Senate districts where
19 there are no districts that are protected from
20 diminishment, the focus is tier-two, right, and
21 compactness, local geographic boundaries, usage,
22 et cetera.
23       And as you move down the state, you start to
24 consider, you know, well, we know we have tier-one
25 district in Jacksonville, one in Orlando, one in Tampa,

1  et cetera.  And so when you get to those areas, your
2  focus shifts a little bit.
3       Q    **And when you say it shifts a little bit, and I**
4  **know you said it's a dynamic process, how are you**
5  **weighing tier-two and tier-one compliance when you're**
6  **getting to those areas?**
7       A    So you would start drawing a district in the
8  region that is protected from diminishment.  You would
9  look at that.  You start looking at population
10 characteristics, demographics and drawing a district.
11           And as you sort of -- if you picture it as it
12 starting in the middle and filling out, you're looking
13 for political and geographic boundaries that would
14 qualify under the metrics for use.  You're looking at
15 compactness, you know, visually.
16           And then when you get to a full population
17 that works in conjunction with the other populations
18 around it, that's when you would start looking more
19 closely at the metrics and whether or not your
20 configuration complies with both tier-two and the
21 tier-one diminishment standards or non-diminishment
22 standards.
23           (Plaintiffs' Exhibit 6 was marked.)
24 BY MR. TILLEY:
25      Q    **Let's look at the January 13, 2022 transcript.**

1  So at Page No. 3, line 9, Senator Rodrigues says, quote,
2  after reviewing the recommendations of the Select
3  Subcommittee with staff and counsel, I have filed
4  amendments to SJR-100 and Senate Bill 102.
5       The substance of my amendments are
6  Congressional Plan S000C8040 and Senate Plan S000S8046,
7  which I believe most consistently adhere to the
8  directives issued to staff by the full committee, closed
9  quote.  Is that right?
10     A    Yes.
11     Q    In general, when applying all the criteria
12  both tier-one and tier-two, were you trying to
13  consistently apply the directives of the committee as
14  stated in the Rodrigues memo?
15     A    Yes.
16          (Plaintiffs' Exhibit 7 was marked.)
17  BY MR. TILLEY:
18     Q    Let's look at Page No. 3, line 18.
19  Senator Burgess says, quote, the maps that we will be
20  workshopping today are not final.
21          MR. MEROS, JR.:  I'm sorry.  Can you repeat
22     which page you're on?
23          MR. TILLEY:  Yes.  Page No. 3, line 18.
24  BY MR. TILLEY:
25     Q    The maps that we will be workshopping today

 1   A    So we got our directives from the committee in
 2   October, and then we went and looked at those directives
 3   and started with a blank map.  As I think I mentioned
 4   before, it's generally common practice to start drawing
 5   from either end of the state and try to fill out a map.
 6            Sometimes you kind of break along away if you
 7   get to areas like I think I mentioned in Nassau and
 8   Duval where you could draw in through isolation.  You
 9   know that the population of those two counties equals
10   two districts.  Therefore, you could draw one and fill
11   out the rest with the other district.
12            That's how me and my staff went about the
13   process.  We collaborated frequently and compared notes
14   and compared configurations and looked at a lot of the
15   tier-two metrics to start with.
16            And then once we kind of were happy with how
17   we did on tier-two stuff and we were consistently to the
18   best of our ability complying with the committee
19   directives, then we would look at the functional
20   analysis of what we deemed to be protected districts and
21   make sure that those didn't diminish and kind of rinse
22   and repeat throughout the process.
23            And where there were questions about whether
24   we should draw, for example, the minority-majority
25   district in South Florida or an affected minority

Page 87

1  district in South Florida, we kind of preserved those
2  options for the committee.
3    Q   What do you mean by preserved those options
4  for the committee?
5    A   Well, we produced drafts for the committee's
6  consideration that had either or.
7    Q   How did you become the map drawer for the 2022
8  redistricting process?
9    A   I was asked by President Simpson to return to
10 the Senate and be the staff director for the
11 reapportionment committee.
12   Q   Did anyone assist you in the process of
13 drawing maps?
14   A   I had staff that worked for me.
15   Q   And who were those people?
16   A   Yen Le and Justin Eichermuller were my
17 committee analysts.  And I had an attorney on staff,
18 Jason Rojas, as well as two -- I think their official
19 titles was CAAs, one to run the meetings and one to kind
20 of man the phones and help with the website, Megan
21 Magnole (phonetic) and Dana Ivy.
22   Q   Did anyone else assist you with drawing the
23 maps?
24   A   Counsel.  I mean, not drawing the maps, but
25 evaluating maps, talking about pros and cons, what