# EXHIBIT  25

**In the Matter Of:**

HODGES V. PASSIDOMO

8:24-cv-879

---

**MATTHEW BARRETO, PH.D.**

*November 25, 2024*

---



800.211.DEPO (3376)
EsquireSolutions.com

1                IN THE UNITED STATES DISTRICT COURT
                           TAMPA DIVISION
2                     CASE NO. 8:24-cv-879

3

      KETO NORD HODGES, et al.
4
              Plaintiffs,
5
        vs.
6
      KATHLEEN PASSIDOMO, et al.,
7
              Defendants.
8    _____/

9


10

    VIDEOCONFERENCE EXPERT TESTIMONY OF MATTHEW BARRETO, PH.D.
11
                     Monday, November 25, 2024
12                    11:30 a.m. - 3:16 p.m.

13                 Esquire Deposition Solutions
                       Zoom Videoconference
14
              ---------------------------------------------
15

16

17

18

19

20   Stenographically Reported by:
     Nancy H. Swartz, Court Reporter
21   Notary Public, State of Florida at Large
     Appearing Remotely from Hillsborough County, Florida
22   Esquire Deposition Solutions - Tampa Office
     Phone - 813.221.2535, 800.838.2814
23   Esquire Job No. 11986647

24

25



MATTHEW BARRETO, PH.D.                    November 25, 2024
HODGES V. PASSIDOMO                                      2

```
 1   APPEARANCES:

 2

 3   Attorney for Plaintiffs
     (Appeared via Zoom)
 4   DAVID CHEN, ESQUIRE
     DEBORAH ARCHER, ESQUIRE
 5   ABE EVANS, LAW STUDENT
     New York University School of Law
 6   Washington Square Legal Services
     245 Sullivan Street, Fifth Floor
 7   New York, New York  10012
     Phone:  212.998.6430
 8   Email:  Davidchen@nyu.edu

 9

10   Attorney for Defendant, Kathleen Passidomo in her
     Official Capacity as President of the Florida Senate
     (Appeared via Zoom)
11   TARA PRICE, ESQUIRE
     GEORGE MEROS, ESQUIRE
12   KASSANDRA REARDON, ESQUIRE
     Shutts & Bowen, LLP
13   215 South Monroe Street, Suite 804
     Tallahassee, Florida  32301
14   Phone:  850.241.1717
     Email: Tprice@shutts.com
15

16

17

18

19   ALSO PRESENT:  OLIVER THOMAS, FLORIDA SENATE

20

21

22

23

24

25
```



 1   this case, not considered for purposes.

 2           Similar to the communities of interest, I'm not

 3   outlining, this is a sentence in one of my conclusions, I'm

 4   not outlining a delineated list of all the natural boundaries

 5   in the region.  I meant this more to say that it does not

 6   appear that the explanation can be natural boundaries or

 7   communities, such that the main peninsula of Tampa was drawn

 8   into 14 instead of 16.  And that, you know, East Tampa was

 9   drawn into 16 and other portions of the city were drawn into

10   14.  Then it goes south and then it jumps across the bay.  So

11   I've seen other maps, including the Bay Area in San Francisco,

12   where lines much more closely approximate the natural

13   boundaries.  And I'm going to offer the opinion that that does

14   not appear to be the case here.

15       Q.   I heard you mention 14, so I guess as we're talking

16   about 18 and 16, you see the same issues with 14 and 16?

17       A.   Well, just in terms of if somebody said, why is

18   there a line, you know, in the middle of Tampa and excludes

19   the main peninsula and even parts of the islands, there are

20   natural boundary regions why oftentimes mapmakers try to keep

21   certain parts of a district together or whole, whether it's

22   ports or shipping channels or all sorts of bridges.  And we

23   already discussed the western portion of Tampa, which goes

24   between 16 and 14.

25       Q.   Mm-hmm.



1  It's up to --

2    Q.   Is every natural boundary that exists, if you did

3  analysis -- and I'm trying to talk about anything but the bay,

4  so if you want to talk about -- we talked about the river.  Is

5  there anything else about the western portion of 16, the

6  northern portion of 16, the eastern portion of 16, is there

7  any natural boundaries, that you're aware of as of today, that

8  were not respected?

9    A.   Well, I think if you want to go through this and

10 zoom in, I mean, we could probably talk about this for hours

11 would be my guess --

12   Q.   I'm asking what analysis you did and what opinion

13 you're planning to offer, Doctor.  I'm not asking for a

14 hypothetical.  I'm not trying to quiz you.  I want to know if

15 that's something you're going to testify about in this case.

16   A.   If I'm asked, then I will definitely testify about

17 it.

18   Q.   Sitting here today, can you identify any other

19 natural boundaries in Figure 4 that were not respected that we

20 have not already discussed?

21   A.   That's what I was attempting to say.  That if we

22 zoom in and we go back to some other figures, Figure 1 even,

23 and then zoom in on different portions, I think we could find

24 lots of different examples.  Which is why I tried to include

25 levels of zoom in here where there are boundaries, that we



1  might define as natural boundaries, that the red line either

2  cuts through or could have followed but didn't.

3          And that's the exact type of analysis that would be

4  done, is to have a map like this, whether it's in Figure 1,

5  which is more of a wide angle, or Figure 4, which is more of a

6  zoom, if you're talking about the Tampa region.  And you could

7  even zoom in further in the Esri software.

8          And by doing that, it makes clear that there are

9  places where natural boundaries could have been offered as the

10  explanation but, at least according to this map, it does not

11  appear that they were followed.

12          And I think there's numerous examples.  If you want

13  to go back up to Figure 1, zoom in a lot, we can go through

14  there and see them.

15      Q.    What about manmade boundaries like roads, did you

16  analyze any of those?

17      A.    I think those are typically to be considered parts

18  of communities, and people will oftentimes consider roads.

19      Q.    I'm asking whether you considered roads?

20      A.    Only if they were important parts of communities.  I

21  did not do a separate analysis of roads, no.

22      Q.    You mentioned before that 16, the enacted 16, was

23  not physically contiguous.  Can you tell me what you mean by

24  that?

25      A.    That all the portions of it don't physically touch



1  lines and that they were using that as their metric.

2      Q.   Sole metric?

3      A.   What's the question?  Sorry.  I didn't hear that.

4      Q.   Are you saying that they were using that as their

5  sole metric?

6      A.   I think I outlined in here in paragraph 10, the one

7  we were talking about.

8      Q.   Mm-hmm.

9      A.   I'm just saying that they can be explained by race

10 and ethnicity, and I think it's up to the court to decide

11 whether or not that was appropriate.

12     Q.   Do you know what it means for race to predominate in

13 the drawing of district lines?

14     A.   I've heard that phrase before.

15     Q.   Do you know what it means?

16     A.   Probably varies by state and district court and what

17 the interpretations of that have been.  It's mostly a legal

18 standard.

19     Q.   Are you planning on offering an opinion as to

20 whether race predominated in the drawing of enacted District

21 16?

22     A.   I would say I'm going to stick to the opinions that

23 I've outlined here.  Which is that these lines can be

24 explained by race and ethnicity.  That there are numerous

25 examples where the district borders follow very closely to



MATTHEW BARRETO, PH.D.                              November 25, 2024
HODGES V. PASSIDOMO                                            83

```
1   racial populations.  And that the placement of the boundaries

2   cannot be explained by chance, but rather there is an

3   overwhelming statistical probability that race was relied on.

4       Q.   Are you planning to offer an opinion about the

5   quantitative amount that race was relied on?

6       A.   In my probability analysis, towards the end of the

7   report, I assess what is the likelihood of the black

8   population being higher on the included and lower on the

9   excluded adjacent pairs of VTDs.  And I conclude in that

10  section, with some statistical probability analysis, that

11  it's, you know, far less than a 100th of a percent probability

12  that this occurred by chance.

13      Q.   Is it your understanding that if it didn't occur by

14  chance, that it's unlawful?

15      A.   I'm not going to offer --

16          MR. CHEN:  Object as to form.  Excuse me.

17          THE WITNESS:  I'm not going to offer any legal

18      opinions.  I'm just going to tell you what my data says

19      and you and Mr. Chen and the judge can all figure out what

20      the law says.

21  BY MS. PRICE:

22      Q.   So does that mean you are not going to offer an

23  opinion that race predominated in the drawing of enacted

24  District 16?

25          MR. CHEN:  Objection to form.
```

