# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

KETO NORD HODGES, et al.,

    *Plaintiffs*,

    v.                        Case No. 8:24-cv-879

BEN ALBRITTON, et al.,

    *Defendants*.

_____/

## THE SECRETARY'S MOTION FOR SUMMARY JUDGMENT

Secretary Byrd moves for summary judgment under Federal Rule of Civil Procedure 56. The motion is accompanied by a memorandum of law. For the reasons stated in the memorandum, this Court should grant the Secretary's motion.

1

## INTRODUCTION

This is a racial gerrymandering case. Doc.1 at 1, 29-30. It's only a racial gerrymandering case. Docs.28, 33. The first question in such cases is whether race predominated in the drawing of districts. If so, the next question is whether the State had a compelling interest for the racial predominance. And where there's a compelling interest, this Court must assess whether the State's use of race was narrowly tailored to further that interest. At the very least, Plaintiffs lose on narrow tailoring.

Given the complexities inherent in redistricting, the State must have "'breathing room'" to implement a race-based plan when necessary to serve a compelling interest. *Cooper v. Harris*, 581 U.S. 285, 293 (2017) (quoting *Bethune-Hill v. Va. Bd. of Elections*, 580 U.S. 178, 195-96 (2017)). Narrow tailoring, therefore, doesn't require the State to create districts with the lowest possible level of black voting age population—or BVAP—that can elect a black candidate of choice. It doesn't require the State to hit a specific compactness metric for a race-conscious district, particularly when doing so would worsen the metrics for surrounding districts. It doesn't require upending a decades-long practice of joining communities on either side of a bay into a single district. And it doesn't require the State to keep a district wholly within a county.

But Plaintiffs would have this Court snuff out the State's breathing room. The alternative maps they offer aren't meaningfully better when it comes to BVAP, compactness, or adherence to political and geographic boundaries. The one meaningful difference is this: Plaintiffs' alternatives create an extra Democratic seat. That difference can't upend the State's choices. Summary judgment is appropriate.

2

## UNDISPUTED FACTS

At the outset, two points are important: (1) though Plaintiffs' contention that race predominated in the drawing of Senate Districts 16 and 18 remains in dispute, without waiving the issue for trial, this motion assumes that it did; and (2) at this time, without waiving the issue for trial, the Secretary doesn't dispute Plaintiffs' premise that compliance with the State Constitution's analog to Section 5 of the Voting Rights Act—the Fair Districts Amendments' non-diminishment provision—can serve as a compelling interest for the use of race. The issue remains whether the drawing of the Senate Districts in the Tampa-St. Petersburg-Clearwater Metropolitan Statistical Area was narrowly tailored to satisfy that interest.

**A.** In 2010, Florida voters approved the Fair Districts Amendments to the Florida Constitution. These amendments, which apply to both congressional and state house and state senate districts, contain a race-based, non-diminishment provision:

SECTION 21. Standards for establishing legislative district boundaries.—In establishing legislative district boundaries:

(a)   No apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and *districts shall not be drawn* with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or *to diminish their ability to elect representatives of their choice*; and districts shall consist of contiguous territory.

(b)   Unless compliance with the standards in this subsection conflicts with the standards in subsection (a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.

(c)   The order in which the standards within subsections (a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.

Fla. Const. art. III, § 21 (emphases added, footnotes omitted).

As Plaintiffs note, the non-diminishment provision is an analog to, and embraces the interpretation of, Section 5 of the Voting Rights Act. *In re Sen. Joint Res. of Leg. Apportionment 1176*, 83 So. 3d 597, 620, 625 (Fla. 2012). Like Section 5, the State Constitution's non-diminishment provision "attempts to eradicate impermissible retrogression in a minority group's ability to elect a candidate of choice." *Id.* at 620. To ensure non-diminishment, a "functional analysis" must be conducted, which considers "not only" "the minority population in" a district, "or even the minority voting-age population" in the district, "but" also "political data and how a minority population group has voted in the past." *Id.* at 625. This is all to ensure that a minority group will have an ability to elect a candidate of its choice in a district. Or as the Supreme Court put it when it comes to Section 5 of the Voting Rights Act: Section 5 "is satisfied if minority voters retain the ability to elect their preferred candidates." *Ala. Leg. Black Caucus v. Alabama*, 575 U.S. 254, 276 (2014).

**B.** The State Constitution's race-based provisions were first put into effect during the 2012 redistricting cycle. That cycle resulted in the following senate map in and around the Tampa-St. Petersburg-Clearwater metropolitan area:

4



**Attachment 1** at 1 (2016-22 Florida State Senate District packet).

Notably, Senate District 19 was a race-conscious district, subject to the State Constitution's non-diminishment provision. **Attachment 1** at 5 (identifying protected districts, subject to a functional analysis). It crossed Tampa Bay to connect portions of Hillsborough County with Pinellas County. The BVAP for District 19 was 31.33%. **Attachment 1** at 5. A functional analysis showed that black voters accounted for 51.41% of the Democratic primary turnout, thereby controlling the Democratic primary, and that the black candidate of choice, i.e., the Democratic candidate, would win all fourteen of the general elections tested for the analysis. **Attachment 1** at 5-6.

Connecting the communities on either side of Tampa Bay into a senate district was nothing new. The Florida Legislature had created a similar district since at least 1992. **Attachment 2** at 97:16-25 (Senate 30(b)(6) deposition).

**C.** Unsurprisingly, during the 2022 redistricting cycle, the two Hillsborough and Pinellas County districts stayed mostly the same. The districts were renumbered to Senate Districts 16 and 18, respectively:



**Attachment 3** at 1 (2022 Florida State Senate District packet).

And, just like its predecessor district, District 16 remains a race-conscious district that reaches across Tampa Bay to connect portions of Hillsborough and Pinellas Counties. **Attachment 3** at 5 (identifying protected districts, subject to a functional analysis). District 16's BVAP is 33.20%. **Attachment 3** at 5. The Florida

Legislature's functional analysis showed that black voters account for 52.82% of the Democratic primary turnout in the district, and that the black candidate of choice should win all fourteen of the test elections held in the district. **Attachment 3** at 6.

The performance and configuration of a race-conscious Tampa Bay district were also the topic of thoughtful legislative discussion. For example, during a January 10, 2022 legislative hearing, committee staffer Jay Ferrin, who drew the state senate maps for the chamber, engaged in a colloquy with Democratic Senator Bracy:

> Senator Bracy: Yeah, I do. I talked to staff about the Tampa Bay area, and I think I brought this question up the last committee, but I wanted to see if you can explain the reason for not crossing the Bay or for crossing the Bay in all of the configurations that we see, as opposed to not crossing the Bay in that Tampa-area seat.
>
> . . . .
>
> Mr. Ferrin: Thank you, Mr. Chairman and Senator. I think in looking at a configuration like that, it was likely that diminishment would occur based on the fact that in order to draw a minority district solely within Hillsborough County, it begins to look like a fairly spidery, non-compact configuration there, it does some damage to the surrounding districts and their metrics as well. *In addition to, as Senator Burgess mentioned, potentially disenfranchising the voters – Black voters in Pinellas County that have had the ability to elect the candidate of their choice since about 1992 when the courts ordered a configuration that resulted in a district that did cross the Bay between Hillsborough and Pinellas County.*
>
> Senator Bracy: What would be the percentage that it would have dropped if we didn't cross the Bay? Like, I guess, what would be the Black percentage now in that district? What would it have been if it didn't cross the Bay?
>
> . . . .
>
> Mr. Ferrin: *My recollection from having looked at it was, was somewhere close to 30%, either just shy of it or just above. I don't recall specifically. The*

*configurations we're looking at today are a little bit higher.* Is that what you were talking about, or are you talking about specific other?

. . . .

Senator Bracy: Yeah, I'm just trying to understand, like, how much it would have diminished the ability for Black voters to vote for the candidate of their choice. So right now, if it's a – if it is a, I guess, a minority-majority district where African Americans make up 50%, did it drop to 30%? Like, was that – I guess I'm trying to measure how much of a diminishment that would have been.

. . . .

Mr. Ferrin: So it's not currently a majority-minority district. It's currently an effective minority district. And the question of diminishment is less about how much diminishment, but is it diminished. Because I think the courts have been clear that diminishment, any diminishment, is diminishment. And so the way we've drawn it, the Black voters within [the district] are able to effectively control the Democratic primary in a district that performs for Democrats. If we look at drawing it differently, I think we're looking at a situation where the Black voters would not be able to control the primary numerically, would not make up a majority of the primary turnout, and that would potentially constitute diminishment.

**Attachment 4** at 7:10–9:4 (Florida Senate Subcommittee on Legislative Reapportionment, Jan. 10, 2022) (emphases added). The discussion underscores the legislature's decision to ensure that the black community in Pinellas County can continue electing a candidate of its choice just as it has since 1992—its decision to connect the black community in Pinellas County with the black community in Hillsborough County. *See id.*

In the end, the state senate maps passed with an overwhelming margin, and with bipartisan support. The Florida Supreme Court unanimously approved the maps when assessing facial compliance with the State Constitution's analogs to the Voting

Rights Act, including the non-diminishment provision, the Section 5 analog. *In re Sen. Joint Res. of Leg. Apportionment 100*, 334 So. 3d 1282, 1290-91 (Fla. 2022).

**D.** Years later, Plaintiffs sued. Plaintiffs allege that the Florida Legislature could have more narrowly tailored Senate District 16 to comply with the State Constitution's non-diminishment provision.

Of note, Plaintiffs say that the State *should* create a race-conscious district in the region. According to Plaintiffs, "the Legislature's predominant goal in drawing the Challenged Districts," Senate Districts 16 and 18, "was to avoid diminishing Black voters' ability-to-elect in District 16," which is "a laudable goal." Doc.1 at ¶ 93.

Plaintiffs also say that "[c]omplying with [the Florida Constitution's] non-diminishment (or 'non-retrogression') requirement is a *compelling governmental interest*." Doc.1 ¶ 8 (emphasis added). They analogize the provision to Section 5 of the Voting Rights Act and add that the State Constitution's provision should be read and assessed just like Section 5, Doc.1 ¶ 38, with compliance judged using a "functional analysis of voting behavior in the Protected District." Doc.1 ¶ 106. So, when drawing the race-conscious district, Plaintiffs explain, "[t]he Legislature's duty [is] to ensure, based on the functional analysis, that Black voters' ability-to-elect [is] not diminished compared to the Benchmark District." Doc.1 ¶ 107.

Plaintiffs never dispute that Senate District 16 performs for black voters—that the black candidate of choice continues to be elected from the district. *See* Doc.1.

Finally, Plaintiffs claim that though the State has a compelling interest in creating a race-conscious Senate District 16, that district, and the adjacent Senate

District 18, are unconstitutional because the districts lack narrow tailoring. Plaintiffs maintain that narrow tailoring requires a lower BVAP in the race-conscious district, Doc.1 ¶ 126, so that "more than half of the region's Black" "communities in Tampa and St. Petersburg" aren't "pack[ed]" in Senate District 16 with "District 18 [being] artificially stripped of Black residents." Doc.1 at 1; *see also* Doc.1 ¶ 99. Plaintiffs' version of narrow tailoring also precludes the State from drawing a district that crosses Tampa Bay to connect the black communities on either side of the bay. Doc.1 ¶¶ 65, 98, 102, 111-116, 120, 123. And, according to Plaintiffs, narrow tailoring requires better compliance with traditional districting criteria like compactness and adherence to political and geographic boundaries. Doc.1 ¶¶ 100-102, 109, 118, 124, 132.

**E.** Plaintiffs offer three alternative plans through their expert Dr. McCartan: ACLU A, ACLU B, and ACLU C. **Attachment 5** at 5-8 (McCartan expert report). These maps redraw the region that covers Senate Districts 14, 16, 18, 20, 21, and 23, ostensibly to provide a more narrowly tailored use of race. As part of that effort, lawyers for the ACLU, representing Plaintiffs, told Dr. McCartan to draw a senate district wholly within Hillsborough County. **Attachment 6** at 1 (McCartan legal instructions) ("2. Adjust District 16 to be wholly contained in Hillsborough County (i.e. not cross Tampa Bay)."). Dr. McCartan also chose to freeze the boundaries of enacted Senate District 14. **Attachment 7** at 21-22 (Trende expert report). The Secretary and the Senate's experts, Drs. Voss and Trende, assessed the alternatives.

Plaintiffs' alternatives aren't any better than the enacted plan when it comes to compactness. As the lefthand column of Table 1 from Dr. Voss's report shows, only ACLU C improves compactness for the race-conscious Senate District 16. But, as the highlighted figures in the righthand column show, the improvement in compactness for Senate District 16 comes at the cost of compactness for Senate Districts 20 and 23.

## TABLE 1 – Compactness Scores for Select Hillsborough County Districts

| District | P-P | Reock | KIWYSI | District | P-P | Reock | KIWYSI |
|---|---|---|---|---|---|---|---|
| 16 ACLU C | 0.377 | 0.432 | 61 | 23 Enacted | 0.555 | 0.564 | 92 |
| 16 Enacted | 0.361 | 0.376 | 50 | 23 ACLU-C | 0.421 | 0.420 | 69 |
| 16 ACLU B | 0.324 | 0.391 | 55 | | | | |
| 16 ACLU A | 0.274 | 0.351 | 46 | 20 Enacted | 0.421 | 0.386 | 61 |
| 19 Obsolete | 0.260 | 0.407 | 40 | 20 ACLU-C | 0.408 | 0.405 | 60 |

**Attachment 8** at 4 (Voss expert report) (highlights added).

The BVAP isn't much different either. Specifically, the BVAP for Senate District 16 in the enacted plan is 33.20%. **Attachment 5** at 30. ACLU A has a BVAP of 30.8% for the same district. **Attachment 7** at 27. ACLU B has a BVAP of 30.8%. **Attachment 7** at 27. And ACLU C has a BVAP of 30.0%. **Attachment 7** at 27.

What's more, the slightly higher BVAP for the enacted plan makes sense given the erosion of black voting strength in the benchmark district between 2012 and 2020:

| TABLE 4 – The Enacted SSD16 Restored Black Voting Strength after It Had Been Diluted by Erosion | | | | | | |
|---|---|---|---|---|---|---|
| | Share of Registered Voters | | Share of General Election Turnout | | Share of Primary Turnout | |
| **Black density in:** | All Voters | Democrats Only | All Voters | Democrats Only | All Voters | Democrats Only |
| SSD19 in 2012 | 32.91% | 52.44% | 34.82% | 54.74% | 33.49% | 55.34% |
| Enacted SSD16 | 32.96% | 50.20% | 31.27% | 48.08% | 35.33% | 49.04% |
| ACLU-B's SSD16 | 30.42% | 48.42% | 29.55% | 47.29% | 33.19% | 49.07% |
| ACLU-A's SSD16 | 30.39% | 48.40% | 29.51% | 47.27% | 33.15% | 49.04% |
| SSD19 in 2020 | 30.09% | 48.29% | 28.65% | 46.54% | 32.86% | 48.12% |
| ACLU-C's SSD16 | 29.27% | 47.56% | 28.16% | 46.24% | 31.44% | 47.64% |

**Attachment 8** at 10 (highlights added).

Specifically, in 2012, when Senate District 19 was in effect, black voters made up 32.91% of the registered voters in the district and 52.44% of Democratic voters in the district. By 2020, those numbers had declined to 30.09% and 48.29% in Senate District 19. Similar declines are apparent based on general election turnout and primary election turnout. Only Senate District 16 in the enacted plan attempts to reverse that erosion in black voting strength; Plaintiffs' alternatives accelerate the erosion. **Attachment 8** at 10.

True, Plaintiffs' alternatives result in one fewer county split because they create a senate district wholly within Hillsborough County, **Attachment 9** at 74:2-7 (McCartan deposition), but that decision comes with an overall decline in adherence to political and geographic boundaries. As Dr. Trende shows, in the far-right column of the figure below, only 18% of the boundaries in the enacted plan's Senate District 16 fail to follow geographic and political boundaries. That number jumps to 42%, 41%, and 44%, respectively, in Plaintiffs' three alternatives. Plaintiffs' alternatives for Senate Districts 20, 21, and 23 fare much worse as well. So, when assessing *all* political and geographic boundaries, the State's choices are far superior.

| Map | District | City Boundaries | County Boundaries | Road Boundaries | Water Boundaries | Rail Boundaries | Non-GeoPolitical Boundaries |
|---|---|---|---|---|---|---|---|
| Enacted | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Map A | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Map B | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Map C | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Enacted | 16 | 19% | 6% | 39% | 31% | 1% | 18% |
| Map A | 16 | 10% | 0% | 29% | 24% | 1% | 42% |
| Map B | 16 | 11% | 0% | 32% | 22% | 1% | 41% |
| Map C | 16 | 26% | 8% | 16% | 35% | 1% | 44% |
| Enacted | 18 | 24% | 52% | 16% | 71% | 0% | 8% |
| Map A | 18 | 30% | 67% | 11% | 87% | 0% | 2% |
| Map B | 18 | 30% | 66% | 11% | 86% | 0% | 3% |
| Map C | 18 | 30% | 66% | 11% | 86% | 0% | 3% |
| Enacted | 20 | 1% | 53% | 33% | 33% | 0% | 9% |
| Map A | 20 | 11% | 49% | 27% | 38% | 2% | 14% |
| Map B | 20 | 11% | 50% | 26% | 38% | 2% | 12% |
| Map C | 20 | 5% | 53% | 23% | 36% | 2% | 18% |
| Enacted | 21 | 12% | 45% | 28% | 54% | 0% | 1% |
| Map A | 21 | 11% | 48% | 12% | 64% | 0% | 13% |
| Map B | 21 | 12% | 47% | 10% | 68% | 0% | 10% |
| Map C | 21 | 12% | 47% | 10% | 68% | 0% | 10% |
| Enacted | 23 | 5% | 58% | 46% | 3% | 0% | 7% |
| Map A | 23 | 4% | 53% | 34% | 5% | 3% | 17% |
| Map B | 23 | 4% | 54% | 36% | 46% | 0% | 14% |
| Map C | 23 | 4% | 54% | 36% | 6% | 2% | 12% |

**Attachment 7** at 14-15.

To recap: the Florida Legislature conducted a district-specific functional analysis for the race-conscious Senate District 16, looking at demographic data, turnout data, and the like. The legislature conducted a similar analysis for other districts in the region. The legislative record also includes a district-specific colloquy between legislators and staff about the race-conscious district. Together, the legislative

record explains why the legislature drew the district as it did. The Florida Supreme Court even conducted a facial review of all Senate Districts, including the two Senate Districts at issue in this case. Plaintiffs, for their part, don't disagree about the need for the district. Rather, they say it could have been drawn better. They offer alternatives, though those alternatives aren't materially better when it comes to compactness, BVAP, or adherence to political and geographic boundaries. In fact, though Plaintiffs' alternatives help avoid a county split, based on the ACLU's decision to keep a district wholly within Hillsborough County, the resulting alternatives are materially worse when considering adherence to all political and geographic boundaries.

On closer inspection, however, Plaintiffs' alternatives do have at least one meaningful effect: they tilt the partisan balance in the region. Dr. Voss's undisputed assessment of the Tampa-St. Peterburg-Clearwater Metropolitan Statistical Area shows that the electorate in the region is split 50.4% to 47.3% in favor of Republicans. **Attachment 8** at 5. "[I]f the districts are going to reflect the partisanship of the area," we "expect to see two Democratic-leaning districts, and perhaps a third that's competitive for them." **Attachment 8** at 5. Under the enacted plan, "Districts in the Tampa region look, in partisan terms, roughly as one would expect had mapmakers been trying to embed fair districts within the relevant Metropolitan Statistical Area." **Attachment 8** at 5. Yet, in Plaintiffs' three alternatives, the expected make-up is turned on its head with the decision to keep Hillsborough County intact and freezing a Democratic-leaning district, Senate District 14. **Attachment 8** at 6. The "combination

14

of cracking and packing Republican voters" results in a 3-2 Democratic advantage in each of the alternatives (with highlights showing Democratic seats).

| District | Enacted Map | | McCartan's Adjusted GOP Share | | |
| | Democratic % | Republican % | ACLU-C | ACLU-B | ACLU-A |
|---|---|---|---|---|---|
| SSD14 | 49.90% | 47.98% | 47.98% | 47.98% | 47.98% |
| SSD16 | 68.66% | 29.43% | 34.99% | 33.36% | 33.45% |
| SSD18 | 46.10% | 51.37% | 45.33% | 45.33% | 45.33% |
| SSD20 | 41.28% | 56.66% | 58.17% | 58.69% | 58.73% |
| SSD23 | 42.30% | 55.47% | 57.28% | 57.28% | 57.33% |

TABLE 3 – Packing and Cracking Republican Voters

**Attachment 8** at 7 (highlights added).

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Conclusory allegations and unsupported statements aren't enough to avoid summary judgment. *Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir. 2005); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). And, even in the redistricting context, summary judgment can and should be granted on the narrow tailoring question. *E.g.*, *Walen v. Burgum*, 700 F. Supp. 3d 759, 775 (D.N.D. 2023) (three-judge court).

## ARGUMENT

This Court should grant summary judgment to Defendants. Plaintiffs say that the State should have drawn a race-conscious district in the Tampa-St. Petersburg-Clearwater region. Plaintiffs even say that compliance with the State Constitution's

non-diminishment provision serves as a compelling reason to draw such a district. Plaintiffs complain only about *how* the State drew that district. Plaintiffs claim that the State could have drawn a better district—one with fewer black voters, and one that better adheres to traditional districting criteria like compactness and adherence to political and geographic boundaries. Yet the alternatives that Plaintiffs offer are only nominally better on some metrics, and worse on others. The one meaningful difference between the State's enacted plan and Plaintiffs' alternatives is an extra seat for the Democratic Party. That difference isn't enough to scuttle the State's three-decade-long choice to draw a race-conscious district that connects two black communities across a bay; the State's choice is narrowly tailored.

## A.    Framework for a racial gerrymandering claim.

The Equal Protection Clause bars the State from "separating its citizens into different voting districts on the basis of race" absent a "sufficient justification." *Bethune-Hill*, 580 U.S. at 187 (cleaned up). In practice, there's a two-part, burden-shifting test for racial gerrymandering. First, a plaintiff must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). That requires a plaintiff to prove that the legislature "subordinated" other factors, like compactness and adherence to political or geographic boundaries, to "racial considerations." *Cooper*, 581 U.S. at 291. Second, where a plaintiff proves that race predominated, the State must show that its race-based sorting of voters serves a

"compelling interest," and that its actions are "narrowly tailored." *Shaw v. Hunt*, 517
U.S. 899, 915 (1996); *see also Cooper*, 581 U.S. at 292.

Given the complexities inherent in redistricting, however, narrow tailoring
doesn't require the least restrictive means to achieve a compelling interest. The State
need only show that it had "a strong basis in evidence" for concluding that something
like the Voting Rights Act required its race-conscious actions. *Cooper*, 581 U.S. at 292.
That "strong basis," or "good reasons" standard, then gives the State "breathing
room" "to adopt reasonable compliance measures." *Id.* (cleaned up). The reasonable
compliance measures should be upheld even if they prove, "in perfect hindsight, not
to have been needed." *Id.* Put another way, narrow tailoring, for redistricting purposes,
doesn't require the State to hit specific targets for BVAP, compactness, or adherence
to geographic and political boundaries. *See id.*

To be sure, the breathing-room standard for narrow tailoring isn't meaningless.
It requires more than "uncritical" assumptions and "generalizations," untethered to
"evidence or analysis." *Wis. Legis. v. Wis. Elections Comm'n*, 595 U.S. 398, 403-04
(2022). It requires a "meaningful legislative inquiry into" a district's configuration,
*Cooper*, 581 U.S. at 304, "a strong showing of a pre-enactment analysis with justifiable
conclusions." *Abbott v. Perez*, 585 U.S. 579, 621 (2018).

### B.    Applying the framework to Florida's Senate Districts 16 and 18.

Applied to this case, the narrow tailoring standard tilts decidedly in the State's
favor. The record shows a debate on the continued configuration of a race-conscious

17

district that connects black communities from Pinellas and Hillsborough Counties so that they may continue electing a candidate of their choice consistent with the State's analog to Section 5 of the Voting Rights Act. **Attachment 4** at 7:10–9:4. The record includes an assessment of the demographic make-up of the district and, critically, a functional analysis evaluating the ability of the black population to control the Democratic primary and then elect its preferred candidate in fourteen test elections. **Attachment 3** at 6. Assessments of traditional districting criteria—like compactness and adherence to political and geographic boundaries—were also available for both the race-conscious and the adjacent districts as legislators did their work. *In re Sen. Joint Res. of Leg. Apportionment 100*, 334 So. 3d at 1291 (Florida Supreme Court facial approval of enacted senate map).

The record thus shows far more than an "uncritical" assessment untethered to "evidence or analysis" on the part of the Florida Legislature as it drew Senate Districts 16 and 18. *Wis. Legis.*, 595 U.S. at 403-04. Under the circumstances, the State is entitled to its "breathing room." *Cooper*, 581 U.S. at 293.

Indeed, the breathing room seems more than appropriate when attempting to comply with what Plaintiffs say is the State's non-diminishment or non-retrogression standard—the State's analog to Section 5 of the Voting Rights Act. That's because:

> The standards of § 5 are complex; they often require evaluation of controverted claims about voting behavior; the evidence may be unclear; and, with respect to any particular district, judges may disagree about the proper outcome. The law cannot lay a trap for an unwary legislature, condemning its redistricting plan as either (1) unconstitutional racial gerrymandering should the legislature place a few too many minority

voters in a district or (2) retrogressive under § 5 should the legislature place a few too few.

*Ala. Leg. Black Caucus*, 575 U.S. at 278 (cleaned up).

The State's attempts to comply also compare favorably with other cases. Take *Bethune-Hill v. Virginia State Board of Elections*, for example, where Virginia drew a legislative district with a target BVAP of 55% in its attempt to comply with Section 5 of the Voting Rights Act. 580 U.S. at 193. The Supreme Court assumed such attempted compliance to be a compelling interest, and it went on to conclude that Virginia could draw the district as it did because it performed a "functional analysis" to justify the shape, and the legislative record showed an "informed" discussion of the district, one that "considered turnout rates" and "the results of the recent contested primary and general elections." *Id.* at 193-95. The State of Florida's done much the same, albeit without setting a numeric floor for BVAP.

Plaintiffs nevertheless allege that the State could've drawn a better Senate District 16. They say this even though the three alternatives they offer aren't better in any meaningful way. Yes, in ACLU-C the compactness figures for Senate District 16 are slightly better. *See supra*. But that improvement comes at the cost of compactness figures for Senate Districts 20 and (especially) 23. *See supra*. The BVAP numbers are within a handful of percentage points of one another for the enacted plan and the three alternatives, though the enacted plan's slightly higher BVAP helps prevent the further erosion of black-voting strength compared to the benchmark. *See supra*. And, yes, there's one fewer county split in Plaintiffs' three alternatives, compared to the enacted

19

plan, but the alternatives are far worse on overall adherence to geographic and political boundary lines. *See supra.* Plaintiffs' alternatives thus aren't any better than the State's enacted plan (unless you're a Democrat because Plaintiffs' alternatives give the Democrats one extra seat in the region). *See supra.*

## CONCLUSION

In sum, Plaintiffs lose on narrow tailoring. Narrow tailoring doesn't require "that a state legislature, when redistricting, determine *precisely* what percent minority population § 5 [or the State Constitution's analog] demands." *Ala. Leg. Black Caucus*, 575 U.S. at 275. Nor does it set targets for compactness or adherence to geographic or political boundaries. The State instead gets breathing room to implement the plan of its choice. The State has done nothing to forfeit that breathing room. Plaintiffs offer nothing to strangle that room; they provide alternatives that aren't meaningfully better than the State's work. As such, even if race predominated in the drawing of Senate Districts 16 and 18, and even if "[c]omplying with [the Florida Constitution's] non-diminishment (or 'non-retrogression') requirement is a compelling governmental interest," Doc.1 ¶ 8, this Court should still enter summary judgment for Defendants, because the State's redistricting plan is narrowly tailored.

January 2, 2025

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
(850) 270-5938

Bradley R. McVay (FBN 79034)
brad.mcvay@dos.myflorida.com
Joseph S. Van de Bogart (FBN 84764)
joseph.vandebogart@dos.myflorida.com
Ashley Davis (FBN 48032)
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536

**Certificate of Compliance**

I certify that this motion complies with the typography requirements of Local Rule 1.08, and that it complies with Local Rule 3.01(a)'s page requirements.

/s/ Mohammad O. Jazil

**Certificate of Service**

I certify that on January 2, 2025, the foregoing was electronically served on all counsel of record.

/s/ Mohammad O. Jazil