Jay Ferrin
November 15, 2024

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.: 8:24-cv-879

KÉTO NORD HODGES, et al.,

        Plaintiffs,

v.

KATHLEEN PASSIDOMO, in her official
capacity as President of the Florida
Senate, et al.,

        Defendants.

_____/

DEPOSITION OF

JAY FERRIN

VOLUME 1: (Pages 1 - 158)

Friday, November 15, 2024
9:30 a.m. - 2:45 p.m.

LOCATION:

Office of Insurance Regulation
200 East Gaines Street
Tallahassee, Florida 32399

Stenographically Reported By:
I. Iris Cooper
Stenographic Reporter

Job No.: 384146

Jay Ferrin
November 15, 2024

Page 2

1                    A P P E A R A N C E S

2

     FOR THE PLAINTIFFS
3
     DANIEL B. TILLEY, ESQ.
4    NICHOLAS L.V. WARREN, ESQ.
     OF:  ACLU OF FLORIDA
5         4343 West Flagler Street, Suite 400
          Miami, Florida 33134-1585
6         Phone: 786-363-2714
          Email: dtilley@aclufl.org
7                 nwarren@aclufl.org

8

9
     FOR THE DEFENDANTS
10
     GEORGE N. MEROS, JR., ESQ.
11   DANIEL E. NORDBY, ESQ.
     TARA R. KLIMEK PRICE, ESQ.
12   LEILA S. OBERSCHALL, ESQ.
     OF:  SHUTTS & BOWEN
13        215 South Monroe Street, Suite 804
          Tallahassee, Florida 32301-1858
14        Phone: 850-241-1717
          Email: gmeros@shutts.com
15                dnordby@shutts.com
                  tprice@shutts.com
16                loberschall@shutts.com

17

18

19

20

21

22

23

24

25

Jay Ferrin
November 15, 2024

Page 3

1                    INDEX OF PROCEEDINGS

2

   Deposition of JAY FERRIN                              PAGE
3
      Direct Examination by Mr. Wildermuth                5
4
      Certificate of Oath                                155
5
      Certificate of Reporter                            156
6
      Errata Sheet                                       157
7
      Witness Read Letter                                158
8

9
   PLAINTIFSS' EXHIBITS:                                 PAGE
10
   Exhibit 1      Plaintiffs' notice of Rule 30(b)(6)      8
11                deposition of the Florida Senate

12 Exhibit 2      10/18/2021 memo from Senator Ray        13
                  Rodrigues to Jay Ferrin, Re:
13                Committee Directives to staff on
                  mapping
14
   Exhibit 3      10/11/2021 Senate Committee on          36
15                Reapportionment transcript

16 Exhibit 4      President Passidomo's responses and     40
                  objections to plaintiffs' first set
17                of requests for admission

18 Exhibit 5      1/19/2022 Florida Senate committee      49
                  meeting regular session floor
19                debate transcript

20 Exhibit 6      1/13/2022 Senate Committee on           54
                  Reapportionment transcript
21
   Exhibit 7      1/17/2022 Reapportionment              55
22                committee meeting transcript

23 Exhibit 8      Introduction to redistricting          58
                  law
24
   Exhibit 9      12/30/2015 2016-2022 Florida           63
25                Senate districts

Jay Ferrin
November 15, 2024

Page 4

1                    INDEX OF PROCEEDINGS - (Continued)

2

    PLAINTIFFS' EXHIBITS:                                    PAGE
3
    Exhibit 10     1/13/2022 Florida State Senate         92
4                  districts by Senator Rodrigues

5   Exhibit 11     1/10/2022 Florida Senate Select       103
                   Subcommittee on legislative
6                  reapportionment

7   Exhibit 12     Florida State Senate Districts        123
                   1992-1996 FLSD 1992
8                  1996-2022 FLSD 1996

9   Exhibit 13     President Passidomo's initial         129
                   disclosures
10
    Exhibit 14     11/22/2021 memo to All Senators       137
11                 from Senator Rodrigues

12  Exhibit 15     11/24/2021 letter to Senator          139
                   Rodrigues from Kirk Bailey, Re:
13                 Committee Appearance Forms re:
                   Nicholas Warren
14
    Exhibit 16     12/8/202 letter to the Florida        140
15                 Senate from Nicholas L.V. Warren

16  Exhibit 17     11/29/2021 email from Jason Rojas     141
                   to Kathy Mears, Re: letter
17                 regarding committee appearance
                   forms by Nicholas Warren to
18                 Senate Committee on
                   reapportionment
19
    Exhibit 18     President Passidomo's answer          144
20                 and affirmative defenses

21  Exhibit 19     2022 redistricting process           148
                   timeline
22
    Exhibit 20     President Passidomo's                 153
23                 categorical privilege log

24

25

Jay Ferrin
November 15, 2024

Page 5

1    Thereupon, proceedings began at 9:30 a.m.:

2            THE STENOGRAPHER:  Do you swear or affirm that

3        the testimony you are about to give in this case

4        will be the truth, the whole truth, and nothing but

5        the truth?

6            THE WITNESS:  Yes.

7    Thereupon:

8                    JAY FERRIN,

9    under penalty of perjury, was examined and testified

10   as follows:

11                DIRECT EXAMINATION

12   BY MR. TILLEY:

13       **Q    Good morning.**

14       A    Morning.

15       **Q    My name is Daniel Tilley.  I represent the**

16   **plaintiffs in this case, which is Nord Hodges versus**

17   **Passidomo.  I would like to go over some ground rules**

18   **for the deposition.  You see that the deposition is**

19   **being transcribed by a court reporter.**

20       A    Yes.

21       **Q    Can you make sure to say yes or no, rather**

22   **than nodding or shaking your head or saying uh-huh or**

23   **uh-uh?**

24       A    Sure.

25       **Q    Also the court reporter will have trouble**

Jay Ferrin
November 15, 2024

Page 6

1    recording what we're saying if we're talking over one

2    another.  So even if you know what I'm about to say,

3    could you please just wait until I'm finished before

4    answering the question?

5        A    Yes.

6        Q    And I'll try to do the same.

7             Do you understand that you are under oath and

8    that you have to give truthful and accurate answers to

9    questions, just as though you were testifying in a

10   courtroom?

11       A    Yes.

12       Q    If you don't understand a question, please

13   don't answer it.  If you say you don't understand it,

14   I'll try to ask a clearer question.  Do you understand

15   that?

16       A    Yes.

17       Q    If you want a break, just let me know.  I'll

18   finish my line of questioning, and then we'll take a

19   break; okay?

20       A    Yes.

21       Q    If you want to talk to an attorney here,

22   that's okay.  But I just ask that if a question is

23   pending that you answer the question before speaking

24   with your attorney, unless you're talking with them

25   about a matter of legal privilege; okay?

Jay Ferrin
November 15, 2024

Page 7

1      A    Okay.

2         Q    Sometimes even though you've given what you

3   felt was a complete answer, you remember some additional

4   information or perhaps a clarification of an earlier

5   answer.  If that happens, will you please tell me so

6   that we can address that while it's right on your mind?

7      A    Yes.

8         Q    And if you realize that an earlier answer you

9   gave is not completely accurate, will you stop me and

10  tell me that, too?

11     A    Yes.

12         MR. MEROS, JR.:  Sorry.  Just one second.  I'm

13         with an associate who won't fit in the room.  Let

14         me call him real quick.

15         MR. TILLEY:  Okay.

16         (Leila S. Oberschall joined deposition suite

17         via teleconference.)

18  BY MR. TILLEY:

19         Q    Because it's so important for you to give

20  full, complete, and accurate answers today, I have to

21  ask if you're taking any medication or drugs of any

22  kind, such as cough syrup or alcohol, something that

23  contained alcohol, that might make it difficult for you

24  to understand and answer my questions today?

25     A    No.

Jay Ferrin
November 15, 2024

Page 8

```
 1      Q    Are you at all sick today?

 2      A    No.

 3      Q    Are you under a doctor's care for any illness

 4   or condition that might affect your ability to

 5   understand my questions or give full, complete, and

 6   accurate answers to my questions today?

 7      A    No.

 8      Q    Is there any other reason why you would not be

 9   able to give full, complete, and accurate testimony here

10   today?

11      A    Not that I'm aware of.

12      Q    Do you understand that you're testifying today

13   not in your personal capacity, but as a designated

14   representative of the Florida Senate?

15      A    I do.

16           (Plaintiffs' Exhibit 1 was marked.)

17   BY MR. TILLEY:

18      Q    I'd like to show you Exhibit 1.  Have you seen

19   this notice before?

20      A    Yes.

21      Q    I'm told that you're here today testifying

22   with respect to Topic Nos. 1 through 7; is that

23   accurate?

24      A    No.  I believe two is handled, so, no.

25      Q    You're here for?
```

Jay Ferrin
November 15, 2024

Page 9

```
 1      A    One, three, four, five, six, and seven.

 2      Q    We can discuss that further at the break.

 3           And you understand that the testimony you will

 4   give in response to my questions about those topics will

 5   be deemed to be the testimony of the Florida Senate?

 6      A    Yes.

 7      Q    Have you ever been deposed before?

 8      A    Yes.

 9      Q    How many times?

10      A    Once.

11      Q    When was that?

12      A    2015.  Maybe twice.

13      Q    What was the second potential time?

14      A    Both of them would have been redistricting in

15   2015.

16      Q    Can you describe the two instances?

17      A    During the remedial map drawing sessions and

18   the hearings and legal proceedings thereafter.

19      Q    At what time did those take place among that

20   series of processes?

21      A    Probably in August and December.

22      Q    And what did those timeline times represent

23   within that timeline of process?

24      A    So in the summer of 2015, we were redrawing

25   Congressional maps, and then there was a hearing held, I
```

Jay Ferrin
November 15, 2024

Page 10

1   believe, in August.  I think I was probably deposed in

2   that instance and then again after the Senate maps were

3   done in November or December.  I think the deposition

4   was probably in December of 2015.

5        Q    And the subject matter of both of those

6   depositions was redistricting?

7        A    Yes.

8        Q    And those were the only times you've been

9   deposed, to your recollection?

10       A    Yes.

11       Q    How did you prepare for this deposition?

12       A    I read through the various filings, the

13   complaint, the answers, read through some transcripts of

14   communicatee meetings and memoranda from the most recent

15   redistricting cycle.

16       Q    So can you be more specific about which

17   filings you read?  I heard the complaint, and you said

18   answers?

19       A    The complaint, the answers.  I don't have a

20   list of everything that I looked at and memorized.

21       Q    And what about the transcripts?

22       A    Looked at some of the transcripts from the

23   different meetings that were relevant to the Senate and

24   legislative reapportionment.  So October -- maybe it was

25   the October 18th one where we got our directions from

Jay Ferrin
November 15, 2024

Page 11

1    the chair.

2            I think I looked at the one in January,

3    January 10th, when the subcommittee was choosing its

4    plans.  I think I reviewed portions of some of the floor

5    transcripts.  I don't remember which days.

6        **Q    You mentioned memoranda as well?**

7        A    Yes.  Some of the memoranda that memorialized

8    the instructions to staff, other communications from the

9    chairman.

10       **Q    So you said memoranda plural, so what were the**

11   **memoranda?**

12       A    So there was a series of things.  They're all

13   published on our website.  So it's when plans are

14   released, what the criteria was used to draw them.

15   There were some other notifications sent out from the

16   chairman, stuff from the Senate president.  There's kind

17   of a slew of this.

18       **Q    What were the notifications sent out by the**

19   **chairman?**

20       A    That maps were available, what the committee

21   processes were going to be for selecting maps at the

22   subcommittee level.  Again, you know, I don't have it

23   memorized, but there was a series of those that I looked

24   at and reviewed, since it was over two years ago now.

25       **Q    Of course.  And what about from the Senate**

Jay Ferrin
November 15, 2024

Page 12

1    president?

2        A    He had some memoranda relating to the release

3    of census data, again, the processes, and the member

4    conduct.  Those are the ones that are jogging my memory.

5        Q    When you referenced a memoranda about the

6    criteria you used to draw the maps, are you talking

7    about the memo from Senator Rodrigues?

8        A    He sent several memos, I think.  But there was

9    one that he sent, in particular, that I believe was

10    after our committee meeting on the 18th of October in

11    2021 that was memorializing the discussion of the

12    committee with the directives for staff to begin drawing

13    maps.

14        Q    Were there other memoranda that he sent?

15        A    Yes.

16        Q    Discussing criteria used to draw the maps?

17        A    That was the main one that was relied on, so

18    that's the one I looked at for that context.  I don't

19    think there were other ones that were talking about

20    specific map drawing instructions.

21        Q    Can you describe your role in the Florida

22    legislature's 2022 redistricting process?

23        A    I was the staff director of the Senate

24    committee on reapportionment.

25        Q    During this deposition, when I reference

Jay Ferrin
November 15, 2024

Page 13

1  drawing maps, will you understand that unless otherwise

2  specified, I'm referring to the maps or plans drawn

3  during the Florida legislature's 2022 redistricting

4  process?

5       A    Say that again.

6       Q    When I reference drawing maps in this

7  deposition, unless I otherwise specify, I'm referring to

8  maps or plans drawn during the Florida legislature's

9  2022 redistricting process?

10      A    Which would have gone from when to when?  The

11 process started on the 18th when we got our

12 instructions.  So the staff-drawn maps?

13      Q    Correct.  What criteria did you use when

14 drawing maps in the 2022 redistricting process?

15      A    The criteria that my team and the committee

16 followed were the ones laid out in that memorandum,

17 which were to -- it's been two years.  So other than

18 reviewing them the other day, if we have a copy here, it

19 may be easier to read from that than to try to trust my

20 memory.

21           But to adhere to tier-one and tier-two

22 standards to not consider any political data and not

23 consider any residential information about members,

24 incumbency, things like that.

25           (Plaintiffs' Exhibit 2 was marked.)

Jay Ferrin
November 15, 2024

Page 14

1   BY MR. TILLEY:

2       Q    We'll mark that as Exhibit 2.  So you

3   recognize this as the memo from Senator Rodrigues that

4   you mentioned just before?

5       A    Yes.

6       Q    Did you follow the principles of the Rodrigues

7   memo when you were drawing maps as part of the 2022

8   redistricting process?

9       A    Yes.

10      Q    Let's walk through some of this memo together.

11  On Page No. 1 in 2nd paragraph, it says, quote, you are

12  directed to the plain language of the Constitution

13  federal law and the judicial precedent that exists today

14  in regards to that language closed quote; is that

15  correct?

16      A    Yes.

17      Q    What plain language of the Constitution, if

18  any, did you consider when drawing the maps?

19      A    Article III, sections 20 and 21.

20      Q    Is that it?

21      A    As far as the plain language of the Florida

22  Constitution, that was the primary guiding principle,

23  yes.

24      Q    Were there non-primary guiding principles from

25  the Florida Constitution?

Jay Ferrin
November 15, 2024

Page 15

```
 1        A    Well, the Florida Constitution also lays out

 2   the process for maps and the time frames and things like

 3   that, so we had to stick to those?

 4        Q    But other than that?

 5        A    Other than that, that's the only part of the

 6   Constitution that speaks to redistricting criteria.

 7        Q    What federal law, if any, did you consider

 8   when drawing the maps?

 9        A    We have federal -- the Voting Rights Act

10   primarily.  There's other, you know, case law that comes

11   out of the federal system that we had available to us.

12        Q    What case law?

13        A    There's a bevy of it.  I don't know.  I'm not

14   going to have cases memorized, but it's well documented.

15        Q    Other than the Voting Rights Act and the case

16   law you were referring to, were there other aspects of

17   federal law that you used, that you considered when

18   drawing the maps?

19        A    Followed the federal Constitution as it

20   relates to, you know, equal protection clause, stuff

21   like that.

22        Q    And what principles apply there?

23        A    One person, one vote.

24        Q    Any others?

25        A    Nonracial predominance, things like that that
```

Jay Ferrin
November 15, 2024

Page 16

 1    would have been impacted by the 14th Amendment.
 2        Q    What is nonracial predominance?
 3             MR. MEROS, JR.:  Object to the form.  Calls
 4        for a legal a conclusion.  You can answer the
 5        question.
 6             THE WITNESS:  That would be when you sacrifice
 7        all other criteria for consideration of race.
 8    BY MR. TILLEY:
 9        Q    And other than nonracial predominance, any
10    other aspects of the federal Constitution?
11        A    I think that covers it.
12        Q    You've, in part, answered some of this.  But
13    what judicial precedent, if any, did you consider when
14    drawing the maps?
15        A    The apportionment decisions 1 through 8 or 9
16    in the associated district level stuff, circuit level
17    stuff.
18        Q    Anything, other than that?
19        A    Those are what comes to mind.
20        Q    The memo references tier-one and tier-two
21    criteria.  Can you describe those?
22        A    Sure.  So tier-one was the prohibition on
23    favoring or disfavoring a political party or incumbent
24    and the prohibition on drawing plans to diminish the
25    opportunity for minorities to participate in elections

Jay Ferrin
November 15, 2024

Page 17

1  and elect their candidate of choice.  I'm paraphrasing

2  that because I don't have the Constitution language

3  right in front of me.

4      Q    Sure.  I'll read you from the Constitution.

5      A    That would be great.

6      Q    So you mentioned political parties or

7  incumbents.  I'll read the next portion.  Quote,

8  districts shall not be drawn with the intent or resolve

9  to denying or abridging the equal opportunity of racial

10  or language minorities to participate in the political

11  process or to diminish their ability to elect

12  representatives of their choice, closed quote.

13      A    That sounds right.

14      Q    And in this deposition, if I refer to minority

15  ability to elect, you'll know that I'm referring to a

16  minority group's ability to elect a candidate of their

17  choice.  Is that fair?

18      A    Yes.

19      Q    The Constitution also mentions that district

20  shall consist of contiguous territory for tier-one?

21      A    Yes.

22      Q    And those are the only tier-one criteria?

23      A    I believe that's correct, yes.

24      Q    What about tier-two?

25      A    Tier-two requires districts to be drawn that

Jay Ferrin
November 15, 2024

Page 18

1   are compact that use political and geographic boundaries

2   where feasible and that have equal population.

3        **Q     Looking at the memo on the first page, third**

4   **paragraph, that first sentence is the directive with**

5   **respect to equal population; is that right?**

6        A    It says in accordance with the tier-two

7   standards of the Constitutional requirements related to

8   equal population, you are directed to prepare Senate

9   plans with district population deviations not to exceed

10  1 percent of the ideal population of 538,455 people and

11  to prepare Congressional plans with population

12  deviations of plus or minus one person of the ideal

13  population of 769,221 people.

14       **Q     And in that last paragraph regarding**

15  **compactness, the first part says, quote, you are**

16  **directed to draw districts that are visually compact in**

17  **relation to their shape and geography, closed quote; is**

18  **that right?**

19       A    Yes, it does.

20       **Q     What is the difference, if there is one,**

21  **between a district being visually compact in relation to**

22  **its shape versus in relation its geography?**

23       A    So the classic example that's given to that is

24  districts that involve Monroe County, which is the

25  Florida Keys, and extend way out into the Gulf of

Jay Ferrin
November 15, 2024

Page 19

1    Mexico.  That is a district that can only be drawn in so

2    many ways because of its geography, and its shape is

3    dictated by its geography.

4        **Q    Are there other examples, other than Monroe,**

5    **that you can think of that are relevant to the**

6    **distinction between shape and geography?**

7        A    I think that's a very good example of that.  I

8    think that's the best example of that.

9        **Q    After that, it says, you're directed to draw**

10   **districts that are -- after it says you're directed to**

11   **draw districts that are visually compact in relation to**

12   **shape and geography, it adds, quote, and to use**

13   **mathematical compactness scores where appropriate,**

14   **closed quote?**

15       A    It does.

16       **Q    When is using a mathematical compactness score**

17   **appropriate?**

18       A    Well, we ran compactness scores for all

19   districts and all plans and looked at them as a whole,

20   as well as regionally.  And so there are, again,

21   circumstances like the Florida Keys where the

22   mathematical scores are going to be relatively lower as

23   a result of the shape of the geography.

24           And so we wouldn't in a district like that,

25   you wouldn't place a ton of emphasis on the mathematical

Jay Ferrin
November 15, 2024

Page 20

1    scores because they can't change much.  There's not a

2    lot of different ways to manipulate those district lines

3    to change the compactness scores.

4        **Q    Is it your understanding that the first**

5    **directive here is to create something visually compact**

6    **and then to use a mathematical score where appropriate?**

7        A    I believe that both of those are relevant to

8    the compactness assessment, both visual and metric

9    compactness.  So I don't know that I would place visual

10   compactness necessarily above mathematical scores or

11   mathematical scores above visual compactness.  I believe

12   it's a total assessment.

13       **Q    And you mentioned that the mathematical score**

14   **for Monroe County might be lower; right?**

15       A    Yes.

16       **Q    And is that a justification to discount the**

17   **mathematical scores when considering the principles as**

18   **they apply to Monroe County?**

19       A    I don't think you have to discount the

20   mathematical scores or anything else, but it's a

21   situational awareness of why those scores would be what

22   they are.

23       **Q    And when you take in that situational**

24   **awareness, what do you do with that information?**

25       A    You take it at its face.  It is what it is.

Jay Ferrin
November 15, 2024

1    Q    So you're looking at Monroe County, you're

2   looking at certain mathematical scores.  What do those

3   tell you?

4        A    The mathematical scores?

5        Q    Uh-huh.

6        A    I don't think I understand the question.  I'm

7   sorry.

8        Q    Sure.  What mathematical scores do you use as

9   part of the redistricting process in drawing maps?

10        A    Right.  So we use the Reock score, which is

11   the area of the district in relation to the area of the

12   circle.  We use a convex hull score, which is kind of

13   the rubber band around the district so it measures the

14   different -- the concavities of a district, and then we

15   use Polsby-Popper, which is a ratio of the perimeter.

16        Q    So using those mathematical scores, if they're

17   lower for Monroe County, what does that tell you?

18        A    That tells you that the geography is dictating

19   the shape of the district.

20        Q    And does that suggest relying less on the

21   mathematical scores when deciding how to map or draw

22   districts as they relate to Monroe County?

23        A    It tells you that they're necessarily going to

24   be lower.

25        Q    The scores tell you that, or the shape and

Jay Ferrin
November 15, 2024

Page 22

1    geography of --

2        A    The shape and geography tells you that the

3    scores -- I mean, they're correlated.  They're tied to

4    each other.

5        **Q    Is it ever inappropriate to rely on**

6    **mathematical compact scores?**

7        A    Is it ever inappropriate to rely on them?

8        **Q    (Nods head up and down.)**

9        A    They inform the map drawing process,

10   generally.  So I mean I think we have throughout the

11   redistricting process used those scores.  I don't think

12   the appropriateness of them was ever in your question.

13       **Q    If you had a district that looked visually**

14   **compact, in your view, but it scored lower mathematical**

15   **scores than you might have expected, how would you**

16   **incorporate those scores into a question of whether to**

17   **adjust the boundaries of the proposed district?**

18       A    Say that one more time.  I'm sorry.

19       **Q    Sure.  If you have a draft district that to**

20   **you looks visually compact but you notice that it scores**

21   **lower in the mathematical scores than you would have**

22   **expected, what would that tell you, if anything, about**

23   **how you should adjust -- should or might adjust the**

24   **boundaries of the district?**

25       A    I think we would have looked at it in a

Jay Ferrin
November 15, 2024

Page 23

1    regional scenario.  So is that shape of that district

2    related to the shape of the districts around it and

3    impacted by their compactness?  It's all a balancing

4    act, so you don't draw one at a time in isolation.

5        **Q    So if you saw those lower scores, what would**

6    **you be looking to see, if anything, in the surrounding**

7    **districts to make a decision about how to adjust the**

8    **line, if you felt that was appropriate?**

9        A    We'd be looking at the compactness metrics in

10   the surrounding districts and whether or not perhaps the

11   low scores in, I guess, the district in question is

12   related to high scores in some of the other ones.  This

13   is all a balancing act.

14            And on top of that, we're looking at the usage

15   of political and geographic boundaries.  So is adherence

16   to those causing some of the scores?  I mean, there's a

17   ton of things that go into this.  You don't look at

18   compactness in complete isolation.

19       **Q    Let's look at Page No. 2, paragraph 3.  It**

20   **says, quote, you are further directed to examine the use**

21   **of existing geographic boundaries where feasible,**

22   **specifically railways, interstates, federal and state**

23   **highways, and large water bodies, such as those that**

24   **were deemed to be easily recognizable and readily**

25   **ascertainable by Florida Supreme Court.  We recognize**

Jay Ferrin
November 15, 2024

Page 24

1    that these geographic features afford us an opportunity

2    to create districts with static boundaries, closed

3    quote; is that accurate?

4        A    Yes.

5        Q    Based on this language, is it accurate to say

6    that the memo's directive includes a preference for

7    geographic boundaries that are easily recognizable and

8    readily ascertainable?

9        A    So we describe the geographic boundaries that

10   are easily recognizable and readily ascertainable as

11   those that were established by the Florida Supreme

12   Court, which were primary and secondary roads, which are

13   coded in the census bureau data, to be federal and state

14   highways, interstates as well.

15           Railways were mentioned in the Supreme Court

16   briefings.  The political boundaries -- well, we're

17   talking about geographic boundaries.  The large water

18   bodies were for this cycle used.  We used water areas

19   that were contiguous and greater than ten acres in area.

20       Q    And were those the ones deemed to be easily

21   recognizable and readily ascertainable by the Florida

22   Supreme Court?

23       A    That is how we applied their order.

24       Q    And does the memo also include a preference

25   for static boundaries?

Jay Ferrin
November 15, 2024

Page 25

 1     A    It does in relation to municipal boundaries.

 2     Q    **What do you mean by that?**

 3     A    Florida cities regularly annex territory and

 4  sometimes recede their boundaries.  And some of our

 5  research indicated that some cities had changed their

 6  boundaries like 350 times between census geography data

 7  sets.

 8          An so that led us to the conclusion that in

 9  all likelihood the municipal boundaries that were in

10  place for the redistricting cycle would not be there or

11  at least were not static.  And so one of our approaches

12  was to deemphasize the use of city boundaries.

13     Q    **Do you consider a city boundary to be a**

14  **non-static boundary?**

15     A    Yes.

16     Q    **Let's look at Page No. 2, paragraph 2, the**

17  **language there saying, you're directed to, quote,**

18  **explore concepts that were feasible, keep cities whole,**

19  **while also considering the impermanent and changing**

20  **nature of municipal boundaries, closed quote.  Is that**

21  **what you were just referring to?**

22     A    That is what I was just explaining, yes.

23     Q    **And that's a directive that you followed?**

24     A    Yes.

25     Q    **In the first paragraph on that same Page No.**

Jay Ferrin
November 15, 2024

Page 26

1    2, it says you are, quote, directed to examine the use

2    of county boundaries where it feasible, closed quote.

3            It then says, you're directed to, quote,

4    explore concepts that where feasible result in districts

5    consisting of whole counties in less populated areas,

6    closed quote.

7            And then it adds, quote, and to explore

8    concepts that were feasible, keeps districts wholly

9    within a county in the more densely populated areas,

10   closed quote.

11   A    Yes.

12   Q    I want to ask what it means to, quote, examine

13   the use of county boundaries?

14   A    That means that as we were drafting things to

15   keep that in mind and use county boundaries.

16   Q    Does it mean complying with those two

17   directives that came after the directive to examine the

18   use of county boundaries when feasible to -- the next

19   sentence?

20   A    Well, within the Constitutional criteria,

21   those boundaries are all placed on equal footing.

22   Q    All the county boundaries?

23   A    County boundaries, city boundaries, water

24   boundaries, railroads, roads, interstates, et cetera.

25   Q    So county boundaries and city boundaries are

Jay Ferrin
November 15, 2024

Page 27

1    placed on equal footing?

2        A    With rivers, roads, railroads, yes.

3        Q    I thought you said that there was a preference

4    for static boundaries and that cities were a non-static

5    boundary?

6        A    Within the directives, yes.

7        Q    I'm sorry.  I'm not following.

8        A    So the Constitutional criteria says use

9    political and geographic boundaries where feasible.  The

10   Supreme Court opinions also helped us define -- and this

11   is the last fortunate cycle -- what those political and

12   geographic boundaries were.

13           The directives to staff say to use political

14   and geographic boundaries where feasible and take into

15   consideration the more permanent nature of some of the

16   county boundaries, geographic boundaries, rather than

17   these municipal boundaries which keep changing.  It

18   doesn't mean that we weren't allowed to use them or

19   couldn't use them or didn't use them.

20       Q    When you say them?

21       A    Municipal boundaries.

22       Q    So does the reference to impermanent and

23   changing nature of municipal boundaries mean that they

24   were discounted in favor of more permanent and less

25   changing boundaries?

Jay Ferrin
November 15, 2024

Page 28

1        A    Not necessarily discounted.  But when we had a

2   choice and we were looking at trying to draw plans and

3   be consistent throughout the state, sometimes we opted

4   to rather than follow a very small portion of a city

5   boundary, follow a road or interstate or something that

6   may have cut through it.

7        **Q    And under what circumstances would you make**

8   **that decision?**

9        A    We would probably look at how much population.

10  You know, this is all in the context of balancing

11  population and districts and balancing compactness and

12  other things as well.

13            So in circumstances where there was a sliver

14  that was either unpopulated or didn't have a -- even if

15  it had a significant population and if it was needed to

16  equalize a district, we would just use a road, a

17  railroad, a river to cut through the city if it was --

18  you know, made the configuration of the district more

19  compact and better population balanced, things like

20  that.

21       **Q    If it was feasible to keep a city whole**

22  **without impacting other criteria, was it a directive to**

23  **explore keeping the city whole?**

24       A    I don't recall it being a specific directive,

25  but it was something that was under consideration.  So

Jay Ferrin
November 15, 2024

Page 29

1   areas in the panhandle where you have cities that are

2   parts of all counties, sure, or wholly contained within

3   a county.

4       Q    And when you say it would be under

5   consideration, under what circumstances?

6       A    Well, we measured the metric.  And we looked

7   at it when we were assessing and evaluating plans, you

8   know, how many cities does the plan keep whole is an

9   element of the -- it's a characteristic of the plan.

10      Q    It would be a goal to explore keeping cities

11  whole; is that right?

12      A    It was a concept that was measured and

13  reported and considered.

14      Q    A concept that was measured because that was a

15  goal; is that right?

16      A    Because it was an element that was considered

17  by the Supreme Court in prior cycles.  There was lots of

18  discussion about plans that kept cities whole being --

19  this court showed a preference for that, I think would

20  be a fair way to characterize that.  And so it was a

21  metric that we continued to report on and evaluate it as

22  we were drafting plans and comparing iterations of these

23  things.

24      Q    So if the court showed a preference for it,

25  did you show a preference for it?

Jay Ferrin
November 15, 2024

Page 30

1    A    We measured the statistic and considered it in

2    relation to the other plans, yes.

3    **Q    Considered it with the goal of preferring it?**

4    A    There was never a mandate to keep as many

5    cities as whole as possible.  That was not the goal.

6    **Q    Is it accurate to say you did not have a goal**

7    **to keep as many cities whole as possible?**

8    A    I think that's what I just said.

9    **Q    On Page No. 2, third paragraph, second**

10   **sentence says, quote, we recognize that these**

11   **geographic features afford us an opportunity to create**

12   **districts with static boundaries, closed quote?**

13   A    Yes.

14   **Q    Just so I'm clear, were static boundaries**

15   **favored over non-static boundaries?**

16   A    There's very few circumstances in which I

17   would say we have a direct choice.  So it's as you're

18   drawing, are you looking for a city boundary or are you

19   looking for a geographic boundary.

20        And as you're drawing trying to equalize

21   population and draw compact boundaries, you know, I took

22   that directive to mean, you know, look for a road, look

23   for a river.  If there's not one of those available, use

24   a city boundary.

25   **Q    And just so I'm following, would the idea**

Jay Ferrin
November 15, 2024

Page 31

1    behind that be that the river and road are less static

2    boundaries than a city boundary, is that what you're

3    saying?

4         A    Yes.

5              MR. MEROS, JR.:  Did you mean more static, the

6         river and the road are more static?

7              MR. TILLEY:  I'm sorry.  Yes.

8              THE WITNESS:  Yeah.

9              MR. TILLEY:  Thank you.

10   BY MR. TILLEY:

11        Q    On Page No. 2, paragraph 3, I guess the rest

12   of that sentence says, quote, would ask that staff

13   present the boundary analysis report with each plan so

14   that we can determine coincidence of districts'

15   boundaries with these features, closed quote.  What is a

16   boundary analysis report?

17        A    That's a report that we created as part of our

18   processes to measure the coincidence of a district

19   boundary with each category of political and geographic

20   features that we've been discussing.

21        Q    What are all the uses of a boundary analysis

22   report?

23        A    The uses of it?

24        Q    (Nods head up and down.)

25        A    To measure the coincidence of the district

Jay Ferrin
November 15, 2024

Page 32

1    boundary with each of those features.

2         Q    What does the score tell you?

3         A    I'm sorry.  It gives you a percentage.  So it

4    gives you a percentage of the district boundary that

5    overlaps a road or a primary and secondary road,

6    percentage of a district boundary that overlaps a

7    railroad, percentage that overlaps water bodies, county

8    boundaries, and a percentage for municipal boundaries.

9         And then it also reports the kind of inverse

10   of that, which is the portion of the district boundary

11   that does not follow any of those features.

12        Q    And what would you use that number for?

13        A    To try to gauge compliance with the

14   Constitutional criteria to follow political and

15   geographic boundaries.

16        Q    So to you, a high boundary analysis score

17   would suggest higher compliance with the principles laid

18   out in the Rodrigues memo; is that accurate?

19        A    Yes, except we measured the inverse.  So we

20   reported each of the individual categories and then to

21   avoid sort of double counting where there was a waterway

22   and a county boundary, for example, or a county boundary

23   and a municipal boundary or a municipal boundary and a

24   water boundary, et cetera.

25        We reported the inverse as a non-political and

Jay Ferrin
November 15, 2024

Page 33

1   geographic score, and that would be -- you know, if we

2   had a district that was 100 percent made of counties,

3   the non-political geographic boundary score for that

4   would be zero percent, and that would indicate a high

5   compliance.

6        Q    Are there any limitations to looking to that

7   score to assess compliance with the principles laid out

8   in the Rodrigues memo?

9        A    Any limitations, I don't know if I understand

10  what you mean by limitations.

11       Q    Sure.  So if you had a district that followed

12  the water and a highway and had a couple of county lines

13  as the boundaries, but it cut through a of bunch of

14  cities, for example, and therefore it had, I guess, a

15  zero percent non-polygeo score, would you say that's --

16  I guess is there -- is there -- do you think there's

17  anything missing from what that score tells you to

18  determine compliance with other aspects of what you're

19  required to do under the Rodrigues memo?

20       A    I don't think so.  I think given the fact that

21  Florida, to my knowledge, is one of the only states that

22  has that kind of a Constitutional requirement and we've

23  had to come up with a metric to measure that, I think we

24  did a really good job.

25       Q    So are there any limitations to the boundary

Jay Ferrin
November 15, 2024

Page 34

1    analysis score?

2         A    I mean, no.

3         Q    Let me just --

4         A    Try again.

5         Q    Before, you gave an example of Monroe County?

6         A    Right.

7         Q    And the three mathematical compactness scores?

8         A    Uh-huh.

9         Q    And you said that because of -- tell me if I'm

10   misrepresenting that -- the unique shape and geography

11   of Monroe County, the scores are lower for Monroe

12   County; is that right?

13        A    Yes.

14        Q    But the fact that they're lower doesn't mean

15   that it's improper to draw a district that includes

16   Monroe County and maybe some other county; is that fair

17   to say?

18        A    Yes.

19        Q    So I'm asking a similar question.  Well, let

20   me back up.  Because normally a lower scores in the

21   mathematical compactness score might signal something to

22   you that something is amiss; is that fair to say?

23        A    Repeat that one more time.

24        Q    Sure.  Low mathematical compactness scores are

25   something that you would be looking for generally to

Jay Ferrin
November 15, 2024

Page 35

1    determine whether to make adjustments; is that fair to

2    say?

3         A    I think so.

4         Q    And so I'm asking a similar question about the

5    boundary analysis.  Is there something that the score

6    might not be telling you about compliance with the

7    Rodrigues memo because of the way a particular district

8    is drawn, if that makes sense?

9         A    I don't think so.  I think in circumstances

10   where there was a district with a low noncompliance

11   score or a high noncompliance score, low political and

12   geographic boundary usage, that's something that we

13   would have looked to improve as a measurement of

14   compliance.

15            So, you know, I think in all the districts

16   throughout the state, we did a really good job of

17   complying with that.  So I don't think there were

18   circumstances in which you would say, wow, that one was,

19   you know, because of the geography or whatever.  Bearing

20   in mind that all of this has to have some level of

21   flexibility when it comes to Tier One.

22        Q    And what does that mean in the context of a

23   boundary analysis score?

24        A    That in certain circumstances when considering

25   diminishment or other factors like that, really that is

Jay Ferrin
November 15, 2024

Page 36

1    the factor, compliance with a non-diminish reprovision

2    in Tier One, you would look at that through -- if you

3    had a low boundary usage score, you would look to see

4    whether or not that district is a tier-one protected

5    district, and that might have something to do with the

6    boundary usage score.

7        Q    I'm sorry.  Can you repeat that?

8        A    I can try.  So if you're drawing a district

9    generally, we're looking at maximizing the boundary

10   compliance score.  If there are circumstances in which

11   you see a lower score, we would look to see, well, was

12   this a tier-one district that we're trying to avoid

13   diminishment in, is that what we may have come off of

14   certain political or geographic boundaries.

15            (Plaintiffs' Exhibit 3 was marked.)

16   BY MR. TILLEY:

17       Q    I see.  Thank you.  I would like to ask you

18   about a quote from Senator Rodrigues during the October

19   11, 2021 meeting.  Let's go to the yellow flag, which is

20   Page No. 108 starting at line 16.

21            Quote, specifically, if you go back and look

22   at what we received in public input during those tours

23   on the last two redistricting cycles, it was primarily

24   the public letting the legislature know these are the

25   communities of interest that we want you to keep

Jay Ferrin
November 15, 2024

Page 37

1    together.  So what I said was it is no longer required.

2    Now, what I raise was the question, now that Fair

3    Districts has passed and the court made clear in the

4    2012 litigation that the Fair Districts Coalition

5    brought fourth that the legislature can't consider

6    communities of interest because it's not in the

7    objective standards spelled out in the Fair Districts

8    Amendments, closed quote.

9           Did I read that accurately?

10   A    I believe so.

11   Q    Does the Senate agree with that statement?

12   A    I'm trying to recall the context of the

13   conversation, so bear with me while I read the rest of

14   this.

15   Q    Sure.

16   A    So this is in the context of questions of the

17   chair related to a public road show.  And I believe that

18   this is Chair Rodrigues talking about the road show that

19   was -- and the road show being a last cycle of the

20   legislature went to I think it was 26 different cities

21   to hold public hearings and take commentary from the

22   public prior to drawing any districts.

23          And one of the things that I think was brought

24   up at those public hearings was keep my community of

25   interest together.  And the legislature offered some of

Jay Ferrin
November 15, 2024

Page 38

1    that as justification for the boundaries that were drawn

2    in the 2012 cycle to which the Florida Supreme Court

3    rejected that as justification because it was not

4    enumerated in the Constitution.  And, therefore, I think

5    that's what Senator Rodrigues is trying to summarize

6    here.

7         **Q    Is it the Senate's view that communities of**

8    **interest should not be considered when drawing maps**

9    **because they're not, quote, in the objective standard**

10   **spelled out in the Fair Districts Amendments, closed**

11   **quote?**

12        A    I think so, yes.

13        **Q    And just so we're clear, when we're talking**

14   **about the Fair Districts Amendments, we're talking about**

15   **the principles outlined in the Rodrigues memo?**

16        A    We're talking about Article III, sections 20

17   and 21.

18        **Q    And those principles are outlined in the**

19   **Rodrigues memo?**

20        A    Yes.

21        **Q    Does this mean that when drawing maps as part**

22   **of the 2022 redistricting process, it was seen as not**

23   **appropriate to consider anything outside of the, quote,**

24   **objective standards spelled out in the Fair Districts**

25   **Amendments?**

Jay Ferrin
November 15, 2024

Page 39

```
 1        A     I believe that's correct.  I think the
 2   objectives -- I think the directives that we received
 3   were to stick to the objectives that were spelled out in
 4   the memo.
 5        Q     And did you adhere to that directive not to --
 6   I should say did you consider anything outside of the
 7   standard set forth in the Rodrigues memo?
 8        A     I don't believe so.
 9        Q     You said you don't believe so.  Do you think
10   you might have?
11        A     No.
12        Q     Now, I would like to talk about other
13   considerations that one could consider when drawing
14   maps.  Specifically, I'd like to ask you whether you
15   did, in fact, consider them when drawing maps as part of
16   the 2022 redistricting process?
17              And to be clear, with these questions I'm
18   still asking for your answer on behalf of the Senate.
19   When drawing any of the maps in the 2022 redistricting
20   process, did you seek in any way to favor or disfavor a
21   political party?
22        A     No.
23        Q     When drawing any of the maps in the 2022
24   redistricting process, did you seek in any way to favor
25   or disfavor an incumbent?
```

Jay Ferrin
November 15, 2024

Page 40

1        A    No.

2        Q    When drawing any of the maps in the 2022

3    redistricting process, did you seek in any way to

4    preserve the cores of pre-existing districts?

5        A    We did not measure or consider the district

6    core retention, no.

7             (Plaintiffs' Exhibit 4 was marked.)

8    BY MR. TILLEY:

9        Q    I want to show you Exhibit 4.  I want to read

10   to you Page No. 8 RFA 27.  I should be clear.  These are

11   the Senate's responses and objections to the plaintiffs'

12   first set of request for admission.

13            Number 27 says, admit that preserving the

14   cores of pre-existing districts was not a criterion

15   utilized in the drawing of the 2022 enacted Senate plan.

16            The response is, quote, admitted, to the

17   extent that preserving the cores of pre-existing

18   districts is not an explicit standard under Article III,

19   section 21 of the Florida Constitution but denied to the

20   extent the Florida Senate reasonably considered the

21   historical configuration of pre-existing districts that

22   have been litigated and/or upheld by the courts, closed

23   quotes?

24       A    Yes.

25       Q    Do you know why this response makes that

Jay Ferrin
November 15, 2024

Page 41

1    statement?

2         A    Well, yes.  Because we certainly looked at the

3    benchmark plans and things that were in place.  That's

4    very different than preserving cores of pre-existing

5    districts.  than preserving cores of pre-existing

6    districts, when states do that or entities do that as a

7    redistricting, they're actually measuring the population

8    sort of carryover, and that's not something that we

9    considered.

10         The general configuration and prevalence and

11   performance of benchmark districts is something that I

12   think we're bound to consider.  So maybe I should have

13   been more clear in my prior answer.

14         Q    Thank you.  When you say general

15   configuration, what do you mean?

16         A    So where they were, the fact that they

17   existed, what the genesis of that district was.  Some of

18   them were ordered by court.  Some were settlements, I

19   think, as part of litigation, things like that.

20         Q    When you say the genesis of a district, what,

21   if anything, does that encompass beyond a court order or

22   settlement that you just mentioned?

23         A    Well, I guess in the current context, in 1992,

24   there was a court order that drew a district that went

25   from Clearwater through St. Pete over through Tampa

Jay Ferrin
November 15, 2024

Page 42

```
 1   through Lakeland and maybe even farther than that.  I

 2   don't recall specifically, but all these things are

 3   posted.

 4            We posted all the prior iterations of maps on

 5   the Senate website, so that's all available for people

 6   to look at because it's all relevant to the discussion

 7   that there has been a benchmark district, a

 8   court-ordered district that would allow

 9   African-Americans an opportunity to participate and

10   elect candidates of their choice since 1992.

11       Q    You're talking about for that one example?

12       A    In that one example.  There are others, but

13   yes.

14       Q    And did you understand -- if I understand

15   correctly, do you understand that part of your role in

16   the 2022 redistricting process was to comply in some way

17   with the 1992 court-ordered district?

18       A    I don't know about the term comply.  You know,

19   I think that for us to ignore past litigation in the

20   area and other existence of benchmark plans through the

21   decades, I think we should have been looking at that in

22   terms of situational awareness, if nothing else.

23       Q    Situational awareness because --

24       A    Because the historic ability to participate

25   and elect candidates of your choice is relevant to the
```

Jay Ferrin
November 15, 2024

Page 43

1   diminishment standard.

2        **Q    Would you be looking at benchmarks earlier**

3   **than 2012?**

4        A    Not for a specific diminishment standard.  So

5   we wouldn't run population or you can't because you're

6   stuck with the census geography, right.  So the census

7   bureau releases geography that's going to include the

8   benchmark districts, meaning the most recently

9   enforceable plan.

10          And so you can look at 2020 population on the

11  benchmark plan.  If you go back any further, the blocks

12  don't line up, and you couldn't even do that if you

13  tried.

14       **Q    So what, I guess, is the relevance of the**

15  **situational awareness in the example that you gave?**

16          **If you're not looking at benchmarks before**

17  **2012, what does having situational awareness around**

18  **something from 1992, how does that inform, if at all,**

19  **the 2022 process of drawing the plan?**

20       A    I think that that is relevant because we're

21  asked about the diminishment, and it's relevant to the

22  specific benchmark.  But I think it's important to know

23  how long has that been there, is it a new thing that was

24  only around for one cycle, was it drawn specifically to

25  afford minorities an opportunity to elect, or is it

Jay Ferrin
November 15, 2024

Page 44

1    something that kind of naturally became such a district?

2    I think all those things are important for base level

3    understanding as you're going into this.

4         Q    Correct me if I'm wrong.  I think you said if

5    the diminishment just happened in the last cycle; is

6    that accurate?

7         A    We can only measure diminishment from the last

8    legally enforceable benchmark.

9         Q    And maybe I just misunderstood.  But I thought

10   you said one thing you would look at is whether the

11   diminishment just happened in the last cycle and not

12   before?

13        A    Well, no.  Yeah, whether or not that district

14   had existed prior to the last cycle, for example.

15        Q    I see.  And you gave one example about this

16   1992 court order with respect to one district.  Are

17   there other pre-2012 circumstances, things that happened

18   that you think would be relevant for purposes of

19   situational awareness in drawing maps as part of the

20   2022 process?

21        A    I'm not going to recall off the top of my

22   head.  I don't think I can answer that off the top of my

23   head.  I would have to look at it.

24        Q    Sure.  I of course understand you don't

25   necessarily remember everything that happened in the

Jay Ferrin
November 15, 2024

Page 45

1    last 30 years.  I ask because you did give one example

2    of the 1992 court order.  My question for purposes of

3    here today is are there others that you can think of

4    here today?

5        A    Nothing comes to mind in the Senate districts

6    off the top of my head.

7        Q    Other than a court order, are there other

8    situations separate from a specific thing that happened

9    with that district, are there types of situations other

10   than a court order where you might draw upon that

11   situational awareness in thinking about how to do what

12   you were asked to do as part of the 2022 redistricting

13   process?

14       A    Perhaps.  And now that I'm thinking about it,

15   you know, having some contextual situational awareness

16   to the existence of like majority or minority districts,

17   it's probably relevant.  So I know there's a couple of

18   those that were in South Florida, right.

19            We had at least two, I think, Senate

20   majority-minority districts.  And so understanding the

21   history of those districts, how they came to be, when

22   they were drawn, if and when they were challenged or

23   upheld by courts is I think relevant to the task.

24       Q    Any other type of situational awareness that

25   you can think of other than the existence of

Jay Ferrin
November 15, 2024

Page 46

1    majority-minority districts?

2         A    I mean, the districts generally of effective

3    minority districts or other type of districts that would

4    enable that is what I was talking about.

5         Q    I see.  Thank you.  But any other categories

6    you might say of things that would constitute a

7    situational awareness that would inform what you did the

8    in the 2022 redistricting process?

9         A    I think I've answered that.

10         Q    Okay.  When drawing maps in the 2022

11    redistricting process, did you seek in any way to rely

12    on MSAs or metropolitan statistical areas?

13         A    No.

14         Q    When drawing any of the maps in the 2022

15    redistricting process, did you seek in any way to rely

16    on unincorporated places like CDPs or census designated

17    places?

18         A    No.

19         Q    So you drew maps -- you drew all the maps

20    without regard to unincorporated places?

21         A    Correct.

22         Q    And without regard to Metropolitan statistical

23    areas?

24         A    That's correct.

25         Q    When drawing any of the maps in the 2022

Jay Ferrin
November 15, 2024

Page 47

1    redistricting process, was it a goal of yours in any way

2    to keep communities of interest together?

3        A    We did not consider communities of interest.

4        Q    When drawing any of the maps in the 2022

5    redistricting process, was it a goal of yours in any way

6    to separate communities that have diverging interest?

7        A    No.

8        Q    When drawing any of the maps in the 2022

9    redistricting process, was it a goal of yours in any way

10   to connect population centers within the region?

11       A    What do you mean by connect population

12   centers?

13       Q    To have population centers within a region be

14   a part of one district?

15       A    We drew for population equality.  And so to

16   the extent we needed population to reach the ideal,

17   sure.

18       Q    Separate from what you might have to do to

19   achieve population equality, did you separately have a

20   goal in any way to connect population centers within the

21   region?

22       A    I don't think that was something that was

23   considered.

24       Q    Apart from the directive relating to county

25   boundaries that we've discussed, did you have it as a

Jay Ferrin
November 15, 2024

Page 48

1    goal to cross any county line?

2         A    A goal, I don't think so.

3         Q    Did you have any goals with respect to county

4    boundaries, other than those in the Rodrigues memo?

5         A    No.

6         Q    You didn't have a goal to cross any particular

7    boundary?

8         A    No.

9         Q    Is there any other criterion that I haven't

10   asked about that isn't specifically listed in the

11   Rodrigues memo or the Florida Constitution that you

12   employed when drawing maps as part of the 2022

13   redistricting process?

14        A    No.  I think we've covered them all.

15        Q    Now, I would like to talk about the process of

16   drawing the maps.  Let's take a short break.

17             (Recess 10:35 a.m. until 10:43 a.m.)

18   BY MR. TILLEY:

19        Q    I'd like to talk about the process of drawing

20   the maps.  And just to confirm my understanding, when

21   you drew the maps in the 2022 redistricting process, you

22   always followed the principles outlined in the Rodrigues

23   memo?

24        A    Yes.

25        Q    Is it accurate to say that you never deviated

Jay Ferrin
November 15, 2024

Page 49

1    from them?

2         A    Yes.

3         Q    And is it accurate to say you never took into

4    account considerations outside of those in the Rodrigues

5    memo?

6         A    That's correct.

7              (Plaintiffs' Exhibit 5 was marked.)

8    BY MR. TILLEY:

9         Q    I would like to ask you about some of the

10   statements made by Senator Rodrigues.  Let's give you

11   Exhibit 5.  Let's go to the orange flag, Page No. 38,

12   starting at line 19.

13             Senator Rodrigues says, quote, the benchmark

14   map identifies what the existing tier-one districts are.

15   Those are the districts that we cannot diminish.  So

16   once we have identified the tier-one districts, we then

17   start with a blank map, highlight the data we have

18   received from the U.S. Census Bureau by race, and then

19   the staff begin drawing around the population

20   distribution in order to ensure we had not diminished

21   the opportunity for minorities to participate or elect a

22   voter of their choice.  The base maps just gave us a

23   starting point, closed quote.

24             Now let's look at Page No. 39 starting at line

25   14.  Rep Rodrigues says, quote, once you have identified

Jay Ferrin
November 15, 2024

Page 50

1    population distribution, you encircle it and continue to

2    grow until you have the metrics that are required to

3    protect the tier-one district, closed quote.

4             Have I read those two quotes correctly so far?

5    A    That's what the transcript says, yes.

6    Q    And on Page No. 40 starting at line 10,

7    Senator Rodrigues says, quote, once we highlighted the

8    racial population, we began drawing from there, closed

9    quote.

10            And then later down the page starting at line

11   22, he says, so once we had assured that we were

12   tier-one compliant, which trumps all of the other

13   tier-two metrics, then the question was which map is the

14   most tier-two compliant among the tier-one choices,

15   closed quote.  Did I read that correctly?

16   A    Yes.

17   Q    Do these statements accurately state your

18   process for drawing maps in the 2022 redistricting

19   process?

20   A    No.

21   Q    How do they not?

22   A    So in the particular context of this

23   conversation, this is Senator Gibson who's from the

24   Jacksonville area asking specifically about districts in

25   that area.  And what was unique about that was we had

Jay Ferrin
November 15, 2024

Page 51

1  identified that Nassau and Duval Counties together could

2  make up two whole Senate districts.

3         And so one of those we knew from looking at

4  the benchmark map was appropriate to draw a district

5  that did not diminish.  And so because of the unique

6  nature of that circumstance, we could draw the minority

7  district in Duval County and then literally just assign

8  the rest of the blank territory to make up the other

9  district.

10         But we don't actually just like start with a

11  whole blank map of the state and go draw circles around

12  minority population and then fill out the rest.  That's

13  not a correct characterization.

14     **Q    So is it accurate to state that in those**

15  **quotations from Senator Rodrigues that I just read, are**

16  **you saying that was a reference only to the area that**

17  **Senator Gibson was asking about?**

18     A    Yes, I think that's what he was trying to

19  explain.

20     **Q    So is it accurate to say that was the process**

21  **for considering how to draw the district that she was**

22  **referring to?**

23     A    Yes, but it's a very unique circumstance in

24  which you would be able to have a piece of two counties

25  that you could just draw one district in that had to

Jay Ferrin
November 15, 2024

Page 52

1    meet certain criteria related to tier-one and then just

2    fill out the rest.

3        **Q    Is it accurate to state that the process that**

4    **Senator Rodrigues described in those quotations we just**

5    **read was not the process used for drawing other**

6    **districts?**

7        A    Correct.

8        **Q    Was your focus in drawing maps to start with**

9    **tier-one compliance and then proceed to tier-two**

10   **compliance?**

11       A    Not necessarily.  You have to balance the two.

12   So as we start with a blank map and start filling in,

13   it's pretty typical to start at both the north and south

14   ends of the state and then fill things in as you go.

15           And so as you're doing that, you know, you're

16   looking at the tier-one considerations when you get to

17   areas of the state where there was a benchmark district

18   that we'd identified with counsel as performing and

19   needing to be protected from diminishment.

20           So you know where those areas of the state

21   are.  And so as you're drawing and you get to those,

22   then maybe you focus a little bit on the tier-one issue

23   and then kind of balance.

24           I mean, the whole thing is dynamic until

25   you're done and you have a whole statewide map that's

Jay Ferrin
November 15, 2024

Page 53

1    under the population deviation and you think meets all

2    the other criteria you're supposed to comply with.

3        **Q    So is it accurate to say that you're primarily**

4    **focusing on tier-two until you get to the parts of the**

5    **state that you already know have tier-one protected**

6    **districts; is that accurate?**

7        A    I think so.  I mean, tier-one relating to the

8    diminishment standard, yes.

9        **Q    Right.  So you're only focused -- well, is it**

10   **accurate to say you're only focused on tier-two until**

11   **you get to an area that you understand to be a protected**

12   **district?**

13       A    Yeah, I think so.  I mean, that kind of comes

14   into the prior discussion about old benchmarks and

15   things like that.  I mean, that's how you kind of know

16   where these areas of the state are, coupled with the

17   census demographics.

18           In the panhandle in Senate districts where

19   there are no districts that are protected from

20   diminishment, the focus is tier-two, right, and

21   compactness, local geographic boundaries, usage,

22   et cetera.

23           And as you move down the state, you start to

24   consider, you know, well, we know we have tier-one

25   district in Jacksonville, one in Orlando, one in Tampa,

Jay Ferrin
November 15, 2024

Page 54

1   et cetera.  And so when you get to those areas, your

2   focus shifts a little bit.

3        **Q    And when you say it shifts a little bit, and I**

4   **know you said it's a dynamic process, how are you**

5   **weighing tier-two and tier-one compliance when you're**

6   **getting to those areas?**

7        A    So you would start drawing a district in the

8   region that is protected from diminishment.  You would

9   look at that.  You start looking at population

10  characteristics, demographics and drawing a district.

11       And as you sort of -- if you picture it as it

12  starting in the middle and filling out, you're looking

13  for political and geographic boundaries that would

14  qualify under the metrics for use.  You're looking at

15  compactness, you know, visually.

16       And then when you get to a full population

17  that works in conjunction with the other populations

18  around it, that's when you would start looking more

19  closely at the metrics and whether or not your

20  configuration complies with both tier-two and the

21  tier-one diminishment standards or non-diminishment

22  standards.

23            (Plaintiffs' Exhibit 6 was marked.)

24  BY MR. TILLEY:

25       **Q    Let's look at the January 13, 2022 transcript.**

Jay Ferrin
November 15, 2024

Page 55

1  So at Page No. 3, line 9, Senator Rodrigues says, quote,

2  after reviewing the recommendations of the Select

3  Subcommittee with staff and counsel, I have filed

4  amendments to SJR-100 and Senate Bill 102.

5           The substance of my amendments are

6  Congressional Plan S000C8040 and Senate Plan S000S8046,

7  which I believe most consistently adhere to the

8  directives issued to staff by the full committee, closed

9  quote.  Is that right?

10      A    Yes.

11      Q    In general, when applying all the criteria

12  both tier-one and tier-two, were you trying to

13  consistently apply the directives of the committee as

14  stated in the Rodrigues memo?

15      A    Yes.

16           (Plaintiffs' Exhibit 7 was marked.)

17  BY MR. TILLEY:

18      Q    Let's look at Page No. 3, line 18.

19  Senator Burgess says, quote, the maps that we will be

20  workshopping today are not final.

21           MR. MEROS, JR.:  I'm sorry.  Can you repeat

22      which page you're on?

23           MR. TILLEY:  Yes.  Page No. 3, line 18.

24  BY MR. TILLEY:

25      Q    The maps that we will be workshopping today

Jay Ferrin
November 15, 2024

Page 56

1    are not final.  Any alterations that are proposed,

2    whether it is guidance and feedback to the staff or as

3    an amendment offered in the future, should adhere to the

4    Constitutional principles and apply them consistently

5    throughout the state, closed quote.

6            Did I read that correctly?

7    A    Yes.

8    Q    Did you try to apply the committee's

9    directives in a consistent manner throughout the state?

10    A    Yes.

11    Q    Does that mean the Senate didn't apply a

12    certain interpretation of the criteria in one part of

13    the state and a different interpretation of the criteria

14    elsewhere?

15    A    I don't think so.  I think there were some

16    examples throughout the process where we had a choice of

17    roads that we could follow or something like that.  I

18    think at this point, one of the examples that was given

19    related to districts in north central Florida and how

20    like Alachua County was split in and around Gainsville,

21    and there was two different ways to do that.

22            One of them I think had a different

23    compactness score or followed a different road than

24    another.  And so we viewed those as still being

25    consistent with the directives, and so we put them

Jay Ferrin
November 15, 2024

Page 57

1    forward for the committee's decision.

2       **Q    I think what you just said is that you did**

3    **apply the directives consistently throughout the state;**

4    **is that accurate?**

5       A    Yes.  But there were still some areas where

6    there was maybe tradeoffs where, you know, we didn't

7    have a favorite compactness metric, per se.  So one

8    iteration may have scored well on one metric versus

9    another.

10          Or I think in South Florida there was a

11   decision, if I'm remembering correctly, between a

12   configuration that had a majority-minority district and

13   one that was an effective minority district, both of

14   which had, you know, consistent tier-two metrics and

15   configurations around them.

16          We consistently applied those directives but

17   still wound up with a decision that we thought was

18   appropriate for the committee to make and debate

19   publicly.

20      **Q    And you thought it was appropriate because?**

21      A    Well, there was a decision between do we go

22   with a plan that has a plus 50 percent district, which I

23   think was in the benchmark plan, versus one that was a

24   little bit lower than that but still in our analysis

25   performed.

Jay Ferrin
November 15, 2024

Page 58

1          And so we left it up to the members of the

2   committee to look at the surrounding -- the tier-two

3   metrics and the surrounding districts and weigh other

4   considerations about decisions that you would have to

5   make when choosing between drawing a district at or

6   above 50 percent black voting age population and let

7   them make those decisions and do it in a public setting.

8       Q    So there were certain situations where you

9   applied the criteria consistently, but that resulted in

10  different options for the committee to choose from?

11      A    I think that's correct.

12      Q    I'd like to talk more about the tier-one

13  criteria related to racial and language minorities that

14  is on the Rodrigues memo, Page No. 2, paragraph 4.  I'll

15  read, quote, that districts are not drawn with the

16  result of denying or bridging the equal opportunity of

17  racial or language minorities to participate in the

18  political process or diminish their ability to elect

19  representatives of their choice, closed quote.  Is that

20  right?

21      A    Yes.

22          (Plaintiffs' Exhibit 8 was marked.)

23  BY MR. TILLEY:

24      Q    Let's do Exhibit 8.  This is a portion of the

25  slide presentation Mr. Nordby presented at the October

Jay Ferrin
November 15, 2024

Page 59

1    11, 2021 committee meeting.  Mr. Nordby presented to the

2    committee on redistricting law at that meeting; is that

3    accurate?

4         A    I think that's correct, yes.

5         Q    So at Page Bates No. P194, this slide explains

6    a set of standards in tier-one.  It's labeled minority

7    voting protection there on the left.  Do you see?

8         A    I think so, yes.

9         Q    And it says, quote, districts shall not be

10   drawn with the intent or result of denying or abridging

11   the equal opportunity of racial or language minorities

12   to participate in the political process or to diminish

13   their ability to elect representatives of their choice?

14        A    Yes.

15        Q    The Florida Constitution imposes two

16   requirements that serve to protect racial and language

17   minority voters in Florida, closed quote.  Is that the

18   Senate's understanding?

19        A    That's what the sentence says, yes.

20        Q    Is that the Senate's understanding of the

21   requirement?

22        A    The Senate's understanding?

23        Q    Yes.

24        A    I believe so.  That's what was presented to us

25   in this presentation, yes.

Jay Ferrin
November 15, 2024

Page 60

1      Q     And those are the principles that you adhere

2    to?

3      A     Those are, yes.

4      Q     And there are two pieces to this provision.

5    The slide lists one as the, quote, prevention of

6    impermissible vote dilution, closed quote; is that

7    right?

8      A     Yes.

9      Q     The second is the, quote, prevention of

10   impermissible diminishment of a minority group's ability

11   to elect a candidate of its choice.  These two standards

12   are essentially restatements of sections 2 and 5 of the

13   Voting Rights Act respectively, closed quote?

14     A     Yes.

15     Q     And is that the Senate's understanding of the

16   law?

17     A     I believe that's a fair characterization, yes.

18     Q     With respect to vote dilution, I want to turn

19   to Bates Page No. P196.  That slide, in part, says,

20   quote, the anti-vote dilution provision of the Florida

21   Constitution like section 2 of the Voting Rights Act

22   require the creation of a majority-minority district

23   where the jingle's preconditions are satisfied and, if

24   so, where the totality of the circumstances demonstrates

25   that minority voters' political power is truly diluted,

Jay Ferrin
November 15, 2024

Page 61

1    closed quote?

2        A    Yes.

3        Q    Is that the Senate's understanding of the law?

4        A    Yes.

5        Q    Does the Senate consider Benchmark District

6    19 protected under the anti-vote dilution provision?

7        A    I don't believe that there was a requirement

8    to draw a minority-minority district in Tampa Bay.

9        Q    Meaning there was not a requirement because it

10   was not a protected district under the anti-vote

11   dilution provision?

12       A    To my knowledge, the jingles factors weren't

13   present.

14       Q    Does the Senate consider enacting District 16

15   protected under on anti-vote dilution provision?

16       A    I don't think so, no.

17       Q    What about enacted District 18?

18       A    No, it's not protected.

19       Q    So the anti-vote dilution provision did not

20   play a role in the Senate's drawing of enacted District

21   16?

22       A    That's correct, it was not drawn to be

23   majority-minority.

24       Q    Or enacted District 18?

25       A    Right.

Jay Ferrin
November 15, 2024

Page 62

1     Q    Let's go to Bates P-197.  This slide says,

2  quote, the anti-retrogression provisions of the Florida

3  Constitution provide that the legislature cannot

4  eliminate majority-minority districts or weaken other

5  historically performing minority districts where doing

6  so would actually diminish a minority group's ability to

7  elect its preferred candidates; is that right?

8     A    Yes.

9     Q    And that's the Senate's understanding of the

10  law?

11    A    Yes.

12    Q    Does the Senate consider Benchmark District 19

13  protected under the non-diminishment standard?

14    A    Yes.

15    Q    Does that mean that black voters' ability to

16  elect candidates of their choice could not be diminished

17  from their ability that existed in Benchmark District

18  19?

19    A    Yes.

20    Q    Is it accurate to say that Benchmark District

21  19 is a tier-one protected district?

22    A    Yes.

23    Q    And that non-diminishment requirement comes

24  from the Florida Constitution?

25    A    Yes, which mimic the Section 5 provision in

Jay Ferrin
November 15, 2024

Page 63

 1  federal law.

 2      Q    Is it important for the government to comply

 3  with the non-diminishment principle from the Florida

 4  Constitution?

 5      A    Yes.

 6      Q    Does the government have a compelling interest

 7  in complying with the non-diminishment principle from

 8  the Florida Constitution?

 9          MR. MEROS, JR.:  Object to the form, to the

10      extent it calls for a legal conclusion.

11          You can answer.

12          THE WITNESS:  Based on my understanding of the

13      case law, courts have treated compliance with the

14      VRA to be a compelling state interest.  And to the

15      extent that the provisions in the Florida

16      Constitution parallel provisions in the VRA, yes.

17  BY MR. TILLEY:

18      Q    Does the Senate consider Benchmark District 24

19  protected under the non-diminishment standard?

20      A    I'm trying to remember where Benchmark

21  District 24 is.

22          (Plaintiffs' Exhibit 9 was marked.)

23  BY MR. TILLEY:

24      Q    You can see on that first page middle lower

25  left Benchmark District 24.

Jay Ferrin
November 15, 2024

Page 64

1    A    No, that would not have been considered a

2    protected district.

3    Q    Does that mean that the Senate believed black

4    voters did not have an ability to elect candidates of

5    their choice in Benchmark District 24?

6    A    Correct.

7    Q    Does that mean a goal of the Senate was not to

8    avoid diminishing minority ability to elect in Benchmark

9    District 24?

10   A    I'm sorry.  What?

11   Q    Did the Senate have a goal to avoid

12   diminishing minority ability to elect in benchmark 24?

13   A    No.  I think I just said we didn't think it

14   was a protect district.

15   Q    And so the Senate did not have a goal to avoid

16   diminishing minority ability to elect in that district?

17   A    Right.

18   Q    Let's go back to the prior Exhibit 8 and

19   specifically Bates Page No. P-198.  It says, quote, a

20   functional analysis is required to elevate retrogression

21   and to determine whether a district is likely to perform

22   for minority candidates of choice, closed quote.

23   A    I think it says evaluate retrogression, not

24   elevate.

25   Q    Thank you.  And that, quote, requires

Jay Ferrin
November 15, 2024

Page 65

1    consideration of minority population in districts,

2    minority voting age population in districts, political

3    data, how a minority population group has voted in the

4    past and no predetermined or fixed demographic

5    percentages used at any point in the assessment, closed

6    quote?

7        A    That's correct.

8        Q    **Is that the Senate's understanding of the law?**

9        A    That's our understanding of what a functional

10   analysis is, yes.

11       Q    **Is it necessarily diminishment if the minority**

12   **percentage declines from the benchmark?**

13       A    No.  According to the apportionment, case law

14   has come out of last cycle.  That's where the functional

15   analysis and its use kind of stems from.  So it's not a

16   specific population threshold.  It's a totality of the

17   circumstances using the data that's referred to here.

18       Q    **Let's look back at the October 11th transcript**

19   **that's Exhibit 3.  Page No. 70, line 16, quote, the**

20   **focus of the inquiry is to determine whether there are**

21   **districts that provided an effective opportunity to**

22   **elect in a benchmark plan and then to ensure that any**

23   **plans adopted by the legislation during this process**

24   **that there is not a diminishment in the actual or**

25   **effective ability to elect within that district.**

Jay Ferrin
November 15, 2024

Page 66

1               So, for example, a district that in some of

2      the case law out of Alabama and Mississippi, for

3      example, where there are districts that may be 70

4      percent voting age population of African-American

5      population, the courts have said in that context that is

6      not necessarily a diminishment to reduce that percentage

7      from 70 percent to 60 percent.

8               It is driven not only by the racial

9      demographics of this district, but by other factors such

10     as voter registration rates, turnout rates, in some

11     parts of the state citizenship rates effect the ability

12     to elect a certain minority population, closed quote.

13              Is that the Senate's understanding of the law?

14     A    Yes.

15     Q    And looking at Page No. 71 starting at line

16     12, quote, one of the factors that the court looked at

17     in the last cycle was whether particular racial groups

18     would have the ability to control the result in one

19     political party's primary election where the other

20     political party's primary election and then how that

21     would perform in the general election, closed quote.

22     A    Where?  Sorry.

23     Q    Page No. 71, line 12.

24     A    It is one of the factors that the court looked

25     at in the last cycle was whether the particular racial

Jay Ferrin
November 15, 2024

Page 67

1   group would have the ability to control the results in

2   one political party's primary election where the other

3   political party's primary election -- and then how would

4   that perform in the general election, is that?

5        Q    Yes.  Is that the Senate's understanding of

6   the law?

7        A    I think so, yes.

8        Q    I would like to walk through the functional

9   analysis and your assessment of whether a district was

10  protected and, if so, whether it complied with the

11  non-diminishment requirement.  Let's look back at the

12  benchmark plan, Exhibit 9.

13            First, how would you determine whether a

14  minority group's ability to elect candidates of their

15  choice was protected in a particular benchmark district?

16       A    in a particular benchmark district, we worked

17  with counsel to identify the districts that would have

18  been protected in the benchmark plan.  But generally, it

19  would be an analysis of the factors that have been

20  enumerated here, including the black voting age

21  population, the primary control for the black voting age

22  population's candidate of choice.

23            It's been a while since I've done one of

24  these.  What's the term I'm looking for.  The

25  performance in the general election, you're also looking

Jay Ferrin
November 15, 2024

Page 68

1   at cohesion -- that was it -- cohesion in terms of

2   registration.

3       Q    Going to Page No. 5 of this exhibit which is

4   Bates SEN-823.  This is the list of the ten districts

5   from the benchmark plan that the Senate considered

6   protected from diminishment?

7       A    Yes.

8       Q    And I know you just referenced counsel, and

9   I'm not asking about conversations with counsel.  But

10  where did this list of ten districts come from?

11      A    Conversations with counsel.

12      Q    Did it come from anywhere else?

13      A    No.

14      Q    Do you know what analysis went into

15  determining which districts were protected?

16          MR. MEROS, JR.:  Object to the basis of

17          privilege, to the extent it would require you to

18          discuss any conversations counsel.  Instruct you

19          not to answer on that basis.

20  BY MR. TILLEY:

21      Q    When you're talking about ability to elect, is

22  it the ability to elect that existed at the end of the

23  decade like 2020 or the start of the decade?

24      A    When you're looking at these metrics, there's

25  a lot of variables that go into it.  So certain cycles

Jay Ferrin
November 15, 2024

Page 69

1    may have unopposed candidates.  There may be other

2    factors that lead to turnout numbers, hurricanes,

3    pandemics, et cetera.

4           So rather than try to pick the beginning, the

5    end, the middle, we tried to look at more of an average

6    or a longer kind of -- we try to normalize for that,

7    really.

8           When you look at registration, you're looking

9    at the most recent because it doesn't make sense to try

10   to average registration throughout the time period.  But

11   turnout is something you try to control for with an

12   average.

13       **Q    And you would control for turnout with an**

14   **average because that could vary over time; is that what**

15   **you were saying?**

16       A    Yes.

17       **Q    So when you're determining whether the**

18   **minority group's ability to elect is the same less or**

19   **greater from the benchmark plan, when do you measure**

20   **that ability in the benchmark?**

21       A    I'm sorry.  When do we take the measurement or

22   what year elections are we looking?  I don't understand

23   your question.  I'm sorry.

24       **Q    So when you're determining whether the**

25   **minority group's ability to elect is the same less or**

Jay Ferrin
November 15, 2024

Page 70

1   greater from the benchmark plan, is it the then existing

2   ability in 2020?

3        A    I'm not sure I understand.  Are you asking

4   about a data point?

5        Q    Well, you're looking at the ability to elect

6   as of the end of the decade; is that right?

7        A    Throughout the decade, which is why we average

8   those numbers.  So there's not a single snapshot for our

9   purposes.  I mean, there's probably lots of different

10  ways to do this, but we chose to try to do the averages

11  and so we would avoid people trying to cherrypick one

12  cycle over another for whatever reason.

13          So we looked at when it came to registration,

14  those are 2020 numbers because that was the most

15  recently available stuff when we were back in 2022.  The

16  turnout numbers were averaged on Page No. 6 of this

17  exhibit, whatever number it is.

18          We have the average primary election turnout,

19  and that's throughout the decade, the average general

20  election turnout also throughout the decade.  And then

21  we have the general election performance and statewide

22  elections 2012 through 2020 where we look at the average

23  performance, the total wins, and then the margins as

24  well.

25        Q    And based on what you said about turnout, is

Jay Ferrin
November 15, 2024

Page 71

1    it accurate to say that you're looking at the

2    performance from 2012 to 2020 to accommodate for

3    variability, if that makes sense?

4         A    Yes.

5         Q    But the registration is at the time of 2020?

6         A    Yes, registration is 2020.

7         Q    And what role does voting each population play

8    into this?

9         A    It's not a primary consideration.  It's just

10   an element of the analysis that was mentioned in

11   apportionment one or two, I think, so it's someone that

12   we would report on and consider.  And it's relevant in

13   the context of whether or not you're drawing a majority

14   or minority district.

15        Q    What is it relevant to, if at all, outside of

16   that context?

17        A    Well, in the context of a majority-minority

18   district, it's about 50 percent.  If it's below that,

19   you kind of use the black voting age population to sort

20   of describe the overall characteristics of the district.

21             So if it's in the 40s or something, you may

22   call it an effective minority district because assuming

23   the numbers bear out performing, but it's not a majority

24   status.  So it's kind of just an indicator for

25   terminology purposes.

Jay Ferrin
November 15, 2024

Page 72

1    Q   Well, here on Page No. 5 of the benchmark

2  plan, the BVAP for District 19 is 31.33 percent; is that

3  right?

4    A   Yes.

5    Q   And then looking on Page No. 6, you see the

6  performance for the Democrats in statewide elections in

7  District 19 at 63.9 percent; is that right?

8    A   Yes.  That would have been the average vote

9  share that the Democrat candidate got based on statewide

10  elections held 2012 to 2020.

11    Q   So the BVAP there is 31.33, which is

12  significantly below 50, would you say?

13    A   Yes.

14    Q   But still performed at a level of 63.9

15  percent; is that right?  Am I understanding that

16  correctly?

17    A   I think we would conclude that it allowed --

18  it gave an opportunity for African-Americans to

19  participate in elections and elect candidates of their

20  choice.  That's the conclusion that we would draw, yes,

21  based on factors beyond just the 63.9 percent after --

22    Q   Right.  Let's talk about that.  So walk me

23  through how you would think about that?

24    A   Well, I think as I mentioned earlier, we would

25  look at the other factors as well.  On Page No. 5 in

Jay Ferrin
November 15, 2024

Page 73

1    that district, you've got -- we're looking at registered

2    voters who are black.  That's 30.09 percent of the black

3    voters that are registered in the district.

4           You've got 79.33 percent that are registered

5    as Democrats that would demonstrate a reasonably high

6    level of cohesion.  Of the Democrats in the district,

7    48.29 percent are black.

8           And then on Page No. 6, you'd be looking at

9    the primary election turnout where of the Democrats who

10   turned out in the primary elections held through 2012

11   through 2020, 51.41 percent of the Democrats that turned

12   out were black.

13       Q    I'm sorry.  Where are you reading from?

14       A    I'm in the second column on Page No. 6 under

15   average primary turnout Dem who are black.

16       Q    Thank you.

17       A    And then you're looking at the general

18   election turnout.  You've also got 53.2 percent voters

19   who are Democrats.  This goes to speak to the broader

20   performance of the district, so you kind of evaluate for

21   who controls the primary.

22          And then you look at whether or not in the

23   general election the district would likely forward the

24   Democrats nominee a chance to win, so we look at the

25   turnout there.  And then we look at the performance,

Jay Ferrin
November 15, 2024

Page 74

1    which is the aforementioned 63.9 percent, as well as the

2    14 wins out of 14 statewide elections.  You know, the

3    margins are there for comparison purposes as well.

4         **Q    And is what you just walked through, is that**

5    **the totality of what you would consider when evaluating**

6    **drawing the protected district based on this benchmark?**

7         A    This is the functional analysis of the

8    benchmark plan that we would compare the maps that we

9    were drawing for the 2022 cycle, too.

10        **Q    And this is how you would assess whether a**

11   **newly-drawn district complied with the non-diminishment**

12   **requirement; is that accurate?**

13        A    Yes, this is our functional analysis.

14        **Q    And just so I'm clear.  Sorry.  And this is**

15   **the totality of the functional analysis?**

16        A    Yes.

17        **Q    Is what you just described?**

18        A    Yes.

19        **Q    Let's use an example to walk through what we**

20   **just did with the benchmark.  Let's go to Exhibit 10.**

21   **Let's turn to new District 16, Page No. 5, and we'll**

22   **compare Page No. 5 of the benchmark.**

23        A    I want to back up real quick.  While we walked

24   through those numbers, that's the primary element of the

25   functional analysis.  The other pages, Page No. 7, Page

Page 75

1   No. 8 provides the specific contest and the results for

2   primary and general elections at the candidate level.

3         Those were provided for further analysis if

4   necessary, but not heavily relied on.  It's basically

5   the detail that we summarized in the right most columns

6   on Page No. 6.

7        **Q      That's helpful.  Thank you.  While we're**

8   **there, let's look at Page No. 7, SEN-825 on the**

9   **benchmark plan Exhibit 9.  So it looks like we see**

10  **District 19 BVAP 31.33 percent.  And then down with the**

11  **governor candidate for Democrats Gillum, it says 49.48**

12  **percent?**

13       A    That's correct.

14       **Q      What does that number tell you for purposes of**

15  **the functional analysis?**

16       A    So that would tell us that Gillum would have

17  won the 2018 Democrat gubernatorial primary within

18  Benchmark District 19 by -- I'm not going to do the math

19  right, but 49.48 percent to 26.3 percent.

20       **Q      And what does this number tell you, if**

21  **anything, about support from the black population for**

22  **this candidate?**

23       A    What we would be able to conclude from this is

24  that the black voters within the district had a

25  preference for Gillum in the primary.

Jay Ferrin
November 15, 2024

Page 76

1    Q    And how does it tell you that?

2    A    Well, he won by 15 points or so.  If I'm doing

3    the math right, 13.

4    Q    **Maybe I just misunderstand.  This 49.48 is not**

5    **a percentage of the black population voting for Gillum?**

6    A    Right.  But this is in a district that we

7    considered one that allowed the black voters to elect

8    the candidate of their choice.

9    Q    **Thank you.  Let's go back to Page No. 5 of the**

10   **benchmark and Page No. 5 of the enacted plan.  So when**

11   **we're comparing new District 16 to Benchmark District 19**

12   **step one is -- if you're trying to get to enacted**

13   **District 16, step one is looking to see where black**

14   **voters are cohesive; is that right?**

15   A    That's one of the steps.  I don't know that

16   there's a particular order, but there's a totality of

17   circumstances you examine.

18   Q    **So is that one step?**

19   A    Yes.

20   Q    **And what did you conclude with respect to new**

21   **District 16 with respect to cohesion?**

22   A    The numbers are so -- in the benchmark plan

23   amongst black voters, this is voter registration for

24   2020.  Black voters who are registered as Democrats,

25   you're looking at 79.33 percent.  And in the enacted

Jay Ferrin
November 15, 2024

Page 77

1  plan, it's 79.63 percent in District 16, so it's very

2  similar.

3      Q    And is that the only thing you would look to,

4  in terms of cohesion?

5      A    That's the primary indicator of cohesion, yes.

6      Q    Are there others as part of this functional

7  analysis?

8      A    Not as part of our functional analysis, no.

9      Q    And not of anything else that you conducted to

10  determine?

11      A    Correct.  And that's based off of

12  apportionment.  I think it was won again, but where the

13  court concluded that that was an appropriate metric to

14  use and that numbers that were in that range of 70 to 80

15  percent were indicated at a high degree of cohesion.

16      Q    In looking at -- is another step looking at

17  the black voters in the Democratic party primary?

18      A    In terms of turnout, yes.

19      Q    And is that the only metric you looked at?

20      A    No.  That's one of several we've been

21  discussing.

22      Q    And just making sure I understand your

23  testimony.  The reason you looked at the years that you

24  did is because of changes that could occur over time; is

25  that right?

Jay Ferrin
November 15, 2024

Page 78

1    A    Sure.  The more data points, the better, in

2    terms of trying to assess the overall performance.  You

3    don't want to look at one specific election and draw all

4    of your conclusions based off that because there could

5    be an untold number of variables that lead to voter

6    turnout, and voter enthusiasm is quite subjective.

7    **Q    Would it be better to use more years as part**

8    **of the analysis?**

9    A    The more the better.  I mean, what's available

10   to us is 2012 through 2020.

11   **Q    Nothing more is availability?**

12   A    Not when we were drawing districts in 2022.

13   **Q    Let's also look at District 6 in the Benchmark**

14   **District 5 in the enacted plan; is that right?**

15   A    Yes.

16   **Q    So looking on Page No. 6, we see that for that**

17   **the primary election turnout for District 6 is 69.22**

18   **percent in the benchmark?**

19   A    Yes.

20   **Q    With a BVAP of 43.06 percent?**

21   A    Yes.

22   **Q    And the performance is 57.5 percent?**

23   A    The average performance for a Democrat

24   candidate in the general elections held statewide from

25   2012 to 2020, yes was 57.5 percent.

Jay Ferrin
November 15, 2024

Page 79

1      Q    And that was about 12 points lower than the

2   primary election turnout; right?

3      A    Hold on a second.  What?  I'm sorry.  Lower

4   than the primary election turnout?

5      Q    The 69.22 percent?

6      A    You're talking about the difference between

7   turnout and election results?

8      Q    Yes.

9      A    Those numbers are different, yes.

10      Q    Let's compare District 6 in the benchmark with

11   District 19 in the benchmark.  The primary election

12   turnout is 69 percent for Democrats and 51 percent for

13   -- I'm sorry -- for District 6 and 51 percent for

14   District 19; right?

15      A    You're going to have to repeat those numbers.

16   I'm sorry.

17      Q    Sure.  So for District 6 --

18      A    Yes.

19      Q    The average turnout for black voters is 69.22

20   percent?

21      A    Yes.

22      Q    And for District 19, it's 51.41 percent?

23      A    Yes.

24      Q    And then performance for the general election

25   for District 6, it's 57.5 percent; correct?

Jay Ferrin
November 15, 2024

Page 80

```
 1      A    Yes.

 2      Q    And for District 19, it's 63.9 percent;

 3   correct?

 4      A    Those numbers are all correct.

 5      Q    And even though the BVAP for District 19 was

 6   33.33 percent, the performance was significantly higher

 7   than 50 percent, is that right, 63.9 percent?

 8      A    Yes.  But I don't -- I mean, comparing

 9   Jacksonville to Tampa is not something that we would

10   have done or considered.

11      Q    The performance for what?

12      A    You're comparing Jacksonville to Tampa?

13      Q    No.  I'm identifying the fact that they're

14   both protected districts; right?

15      A    Sure.  But that's probably about all they have

16   in common.

17      Q    Well, let's compare to the enacted plan.  So

18   in the enacted plan on Page No. 6, looking at District 6

19   from the benchmark, let's start with District 19.  In

20   District 19, the BVAP for the benchmark was 31.33

21   percent; correct?

22      A    Yes.

23      Q    And it went up to 33.2 percent in the enacted

24   plan; is that right?

25      A    That's correct.  But you need to keep in mind
```

Jay Ferrin
November 15, 2024

Page 81

1    that the benchmark district was overpopulated, I

2    believe.

3        Q    And what were the implications of that?

4        A    Well, that meant that that district -- yeah,

5    District 19 had 41,946 more people in it than the ideal,

6    so it would have had to shed population.

7        Q    And what population did it shed?

8        A    I mean, I don't know specifically.  But given

9    the fact that the percentage of the black voting age

10   population is higher, I'd venture to guess it shed

11   non-black population.

12       Q    And the average performance for general

13   elections in Benchmark 19 is 63.9 percent; right?

14       A    Yes.

15       Q    And in the enacted District 16, it's 67.6

16   percent; is that right?

17       A    Yes, we would have considered those to be

18   similar.

19       Q    But it went up by several percentage points,

20   the performance, right?

21       A    When we're looking at these things, it's less

22   than minutia, but yes.

23       Q    What do you mean when you're looking at these

24   things it's less than minutia?

25       A    You're looking at does the overall performance

Jay Ferrin
November 15, 2024

Page 82

1   change.  So if that number would have dropped below 50,

2   that would have been an indicator that our district was

3   not performing, a change from plus or minus one way or

4   another from 63 to 60 or 63 to 67 or something like that

5   probably wouldn't have raised any concern.

6       **Q    Can you say that last part again?**

7       A    It probably would not have raised any concerns

8   for us because the district is still clearly performing

9   for Democrats, so that's all that's indicating.

10      **Q    What would not have caused concern?  Sorry.**

11      A    A change from 63 to 60 or 63 to 67 is not

12  going to change the status of the district.

13      **Q    Would it have meant you didn't need to**

14  **increase the number of black voters to -- in that**

15  **district to maintain ability to elect candidate of**

16  **choice?**

17      A    I don't think we needed to increase the number

18  of black voters in that district.  I think it was a

19  coincidence associated with the overpopulation perhaps.

20      **Q    A coincidence because the voters you shed were**

21  **not black?**

22      A    I'm drawing that conclusion based off the fact

23  that this is a percentage.  So in the benchmark, you're

24  at a percentage of the larger number of people.  In the

25  enacted plan, we had to normalize and reduce the

Jay Ferrin
November 15, 2024

Page 83

1   population in the district.

2           Again, this is all starting from blank maps,

3   but that's the effect is to have a different number of

4   the people in the -- 40,000 less people in the district.

5   And so I think the increase in the black voting age

6   population is as a result of that, not adding more black

7   population to the district.

8       Q    All right.  So you talked about looking at

9   cohesion and looking at black voters in the Democratic

10  primary?

11      A    Yes.

12      Q    And another staff is looking at black voters'

13  preferred candidates and the general election; is that

14  right?

15      A    Yes, I think so.

16      Q    And just to be clear, that's talking about

17  Democratic performance; is that right?

18      A    Yes.  In the context of black voters in Tampa,

19  yes.

20      Q    And how did you -- can you walk me through the

21  analysis of getting to -- from enacted district -- I'm

22  sorry -- Benchmark District 19 to enacted District 16?

23      A    What do you mean the analysis?

24      Q    How did you make the determination to -- well,

25  let me ask this.  Apart from the statistics that we

Jay Ferrin
November 15, 2024

Page 84

1   discussed, did you do anything else to assess whether

2   the new district enacted -- the new enacted District 16

3   would diminish the ability of black voters to elect

4   their candidate of choice?

5        A    If I understand the question correctly, no.

6   These are the numbers that we would have looked at after

7   having drawn the district, balanced the population of

8   that district, the surrounding districts, and concluded

9   that we were happy with the compactness metrics, the

10  boundary usage, all those other factors that we have to

11  consider.

12           That's when we, you know, look at this stuff

13  and say, okay, well, we've got a reasonably complete

14  plan that we're confident in that we would like to do

15  the functional analysis on.  These numbers aren't up

16  while you're drawing.

17           It's a draw it the way you want it based off

18  of tier-two criteria and equal population, and then we

19  run the numbers and evaluate whether or not in relation

20  to the benchmark our district changes status is really

21  what we're looking for.

22       Q    A district changing status?

23       A    Yeah.  So does the primary control the average

24  primary turnout, which we refer to as primary control,

25  does is fall below 50 if it's above 50?  Or does it --

Jay Ferrin
November 15, 2024

Page 85

1    you know, does it rise above 50 if it was below 50?

2           Or does that general election performance in

3    statewide elections drop below, you know, 50 percent or

4    close to 50 percent or something -- you know, is there a

5    precipitous drop in that?  Those are the kind of things

6    that would lead us to the conclusion that the

7    configuration that we were analyzing might diminish.

8           Or if you went in BVAP, for example, from

9    above 50 to below 50, you're changing the status of the

10   district.  You want to make sure that at least all the

11   other metrics are still, you know, going to work in

12   terms of preserving that ability.

13   **Q    Is it your understanding that going from a**

14   **BVAP above 50 to below 50 changes the status of a**

15   **protected district?**

16   A    It charges the terminology that we use for it,

17   for sure.

18   **Q    In what way?**

19   A    Well, we wouldn't be calling it a

20   majority-minority district anymore.  It would be an

21   effective minority district, assuming it had performed.

22   **Q    All right.  Walk me through how you went about**

23   **drawing the maps in the 2022 redistricting process?**

24   A    How we went about drawing the maps?

25   **Q    Yes.**

Jay Ferrin
November 15, 2024

Page 86

1          A     So we got our directives from the committee in

2     October, and then we went and looked at those directives

3     and started with a blank map.  As I think I mentioned

4     before, it's generally common practice to start drawing

5     from either end of the state and try to fill out a map.

6               Sometimes you kind of break along away if you

7     get to areas like I think I mentioned in Nassau and

8     Duval where you could draw in through isolation.  You

9     know that the population of those two counties equals

10    two districts.  Therefore, you could draw one and fill

11    out the rest with the other district.

12              That's how me and my staff went about the

13    process.  We collaborated frequently and compared notes

14    and compared configurations and looked at a lot of the

15    tier-two metrics to start with.

16              And then once we kind of were happy with how

17    we did on tier-two stuff and we were consistently to the

18    best of our ability complying with the committee

19    directives, then we would look at the functional

20    analysis of what we deemed to be protected districts and

21    make sure that those didn't diminish and kind of rinse

22    and repeat throughout the process.

23              And where there were questions about whether

24    we should draw, for example, the minority-majority

25    district in South Florida or an affected minority

Jay Ferrin
November 15, 2024

Page 87

1   district in South Florida, we kind of preserved those

2   options for the committee.

3        Q    What do you mean by preserved those options

4   for the committee?

5        A    Well, we produced drafts for the committee's

6   consideration that had either or.

7        Q    How did you become the map drawer for the 2022

8   redistricting process?

9        A    I was asked by President Simpson to return to

10  the Senate and be the staff director for the

11  reapportionment committee.

12       Q    Did anyone assist you in the process of

13  drawing maps?

14       A    I had staff that worked for me.

15       Q    And who were those people?

16       A    Yen Le and Justin Eichermuller were my

17  committee analysts.  And I had an attorney on staff,

18  Jason Rojas, as well as two -- I think their official

19  titles was CAAs, one to run the meetings and one to kind

20  of man the phones and help with the website, Megan

21  Magnole (phonetic) and Dana Ivy.

22       Q    Did anyone else assist you with drawing the

23  maps?

24       A    Counsel.  I mean, not drawing the maps, but

25  evaluating maps, talking about pros and cons, what

Jay Ferrin
November 15, 2024

Page 88

1    should be protected, et cetera.

2        Q    Are you talking about Jason Rojas?

3        A    Mr. Nordby.

4        Q    Did you take input from anyone else during the

5    process?

6        A    No.  The input that was -- no.  We had several

7    amendments that were offered along the way by members of

8    the committee, but there was no other -- no members

9    asked us to come do things and draw different

10   configurations for them.

11           We established a protocol for members that

12   wanted to have us draw things either in a staff work

13   product or as an amendment of their own.

14       Q    What was that protocol?

15       A    For members to submit their requests in

16   writing and really own the issue.  If they were looking

17   at a public submission, they were supposed to contact

18   the map drawer and make sure that they could vouch for

19   the map drawer's intentions.

20       Q    You were present at all of the committee and

21   subcommittee meetings in the September 2021 through

22   January 2022; is that right?

23       A    Yes.

24       Q    You were present for the Senate floor sessions

25   when the plan was considered on the second and third

Jay Ferrin
November 15, 2024

Page 89

1    readings; is that right?

2        A    Yes.

3        Q    You mentioned this before, but on October 18,

4    2021, Senator Rodrigues gave you the directives outlined

5    in the memo that we've discussed?

6        A    Yes.

7        Q    The next legislative subcommittee meeting

8    after that was on November 17, 2021; is that right?

9        A    That sounds correct.

10        Q    What did do in between those meetings?

11        A    We took the -- so at the October 18th meeting

12    when we got the directives, that's when we starred

13    drawing maps.  So I think the November 17th one was the

14    one where we produced the first staff drawing maps.  I

15    believe there were four of them.

16        Q    How did you, if at all, work to implement

17    input from prior meetings to prepare for the November

18    17th meeting?

19        A    Sorry.  Input?

20        Q    Uh-huh.

21        A    The input that we'd gotten at that point was

22    the memo.

23        Q    And that was it?

24        A    To my recollection, yes.

25        Q    The next subcommittee meeting was on November

Jay Ferrin
November 15, 2024

Page 90

1    29, 2020; is that accurate?

2         A    It seems that those dates are correct.

3         Q    **Between the November 17th meeting and the**

4    **November 29th meeting, what did you do in between those**

5    **meetings?**

6         A    Spent some Thanksgiving with the family.  But

7    took the maps that we had presented at the first

8    committee meeting.  And at the chair's directive during

9    that meeting, we went back, looked at those, looked for

10   areas that we could improve both compactness, boundary

11   usage, those type of things.

12             So we produced another set of maps that were

13   sometimes subtle but also meaningful improvements on the

14   initial maps.

15        Q    **And I think you said this already.  But is it**

16   **right that you didn't work with anyone outside of the**

17   **individuals you just named on drafting those maps?**

18        A    That's correct.

19        Q    **Did you get any additional input from anyone**

20   **else?**

21        A    No.

22        Q    **Not from Senator Rodrigues?**

23        A    No.  It's a very lonely existence.

24        Q    **I'll ask you the same questions about the next**

25   **subcommittee meeting, which was January 10, 2022.  Can**

Jay Ferrin
November 15, 2024

Page 91

1    you tell me about between the November 29th meeting and

2    the January 10th meeting?

3        A    I think we got a similar set of directives at

4    the end of November meeting, to go work to continue to

5    improve and come up with options for the subcommittees

6    to consider when everybody came back in January, so it

7    was the same process.

8        Q    I'll ask you to the same am questions about

9    the full committee meeting on January 13th.  So between

10   the January 10th subcommittee meeting and the January

11   13th full committee meeting?

12       A    It's my recollection, and it was a condensed

13   schedule, so things were happening fast.  But at the

14   meeting on the 10th, if I have the date right, that's

15   when the subcommittees met and considered the four

16   recommendations or the four drafts that we had.

17            I think each committee managed to narrow it

18   down to two.  Each subcommittee -- excuse me -- narrow

19   it down to two, which then Chair Rodrigues evaluated and

20   picked one of both the Congressional and the Senate

21   legislative map to bring to the committee for the

22   meeting on, I think it was the 13th.

23            And he filed those as amendments to what we

24   call shell bills, which was an act related to

25   reapportionment with no text in it.

Jay Ferrin
November 15, 2024

Page 92

1    Q    Anything else that took place between those
2    meetings?
3    A    I don't -- I don't recall anything of note
4    right now.
5    Q    Same questions with respect to when the Senate
6    took up redistricting at the second reading of the joint
7    resolution on January 19th?
8    A    I guess I should back up.  My recollection is
9    that we got an amendment request from Senator Gibson.  I
10   think it was both in committee and on the floor to take
11   one of the iterations of the Jacksonville district that
12   staff had drawn that she had a preference for.  And I
13   think we drafted it as an amendment both for committee
14   and for the floor.
15   Q    Anything else that you recall?
16   A    Not of note.
17   Q    I would like to ask about what role the House
18   played in the development of the Senate's plan, if any?
19   What role, if any, did it play?
20   A    None.
21        (Plaintiffs' Exhibit 10 was marked.)
22   BY MR. TILLEY:
23   Q    I would like to ask you about the co-called
24   challenged districts in this case.  So Exhibit 10, you
25   understand that when I'm referring to the challenge

Jay Ferrin
November 15, 2024

Page 93

1    districts, I'm referring to the enacted plan Senate

2    Districts 16 and 18?

3         A    Yes.

4         Q    And this is Tampa Bay; is that right?

5         A    Yes.

6         Q    And when I refer to a district crossing

7    Tampa Bay, do you understand that what I mean is a

8    district that includes parts of land on either side of

9    Tampa Bay without a land connection?

10        A    Yes.

11        Q    And this is probably clear from prior

12   testimony, but I'll ask it again anyway.  During the map

13   drawing process, Senate District 16 was initially

14   labeled Senate District 19 on the maps that you drew?

15        A    I think that's correct because that's what it

16   was on the benchmark, and we kind of kept those numbers

17   until they were randomly renumbered at one of those

18   January meetings.

19        Q    And Senate District 18 was initially labeled

20   Senate District 24 on the maps that you drew; is that

21   right?

22        A    I think that's right.

23        Q    Because they covered generally the same area

24   as the benchmark?

25        A    Right.  We got to have a number so we can kind

Jay Ferrin
November 15, 2024

Page 94

1    of make an educated guess.

2        Q    I'd like to ask some questions about the

3    legislative subcommittee meeting to November 17th, which

4    is Exhibit 7, the subcommittee transcript.  At this

5    subcommittee meeting on the 17th, a map was presented by

6    Nicholas Warren; is that right?

7        A    I think that's correct.

8        Q    And that was Plan 42; is that accurate?

9        A    I think that's right.

10       Q    And Plan 42 did not include a Senate district

11   that crossed Tampa Bay; is that right?

12       A    I think that's correct.

13       Q    So let's look at page -- the yellow flag --

14   Page No. 55 starting at line 15.  This is from

15   Senator Bracy.  Do you see that?

16       A    Which line?

17       Q    Fifteen.

18       A    Yes.

19       Q    Senator Bracy says, quote, he brought up a

20   good point about crossing the bay, and I wanted to ask

21   the staff what was the motivation for doing that when it

22   didn't seem necessary.  You could still comply with

23   other requirements, closed quote.

24            Then you later say, quote, that was to comply

25   with a tier-one non-diminishment standard, closed quote.

Jay Ferrin
November 15, 2024

Page 95

1           Bracy says, quote, could it still be done

2     without violating the diminishment requirement, closed

3     quote.

4           You say, quote, I'm not sure.  I haven't

5     reviewed the statistics for that, closed quote.

6           Bracy says, quote, is that something we can

7     look into, closed quote.

8           You say, quote, I think if that is something

9     you would like to, we can discuss that, closed quote.

10           Senator Bracy says, quote, yes.  Thank you,

11     closed quote.

12           That's all accurate?

13     A    I think so.  That's what the transcript says.

14     Q    And what, if anything, did you do after this

15     subcommittee meeting regarding the Tampa Bay area?

16     A    Well, Senator Bracy, we had a conversation

17     with him after this in which we walked through the

18     functional analysis for the districts that we were at

19     that time I think considering.  Senator Bracy never

20     followed up regarding a request to draft or otherwise

21     analyze anything.

22     Q    When did you talk with Senator Bracy?

23     A    I think it was after that meeting, but I

24     honestly don't recall.

25     Q    You think it was after, but it could have been

Jay Ferrin
November 15, 2024

Page 96

1    before that meeting?

2        A    No, it wouldn't have been before that meeting.

3    I think it was right after.

4        Q    **You think it might have been right after, but**

5    **it may have been later?**

6        A    I think that's correct.  I can't remember when

7    we had the conversation.

8        Q    **Did you say you met with Senator Bracy and his**

9    **staff?**

10       A    No.  I think it was just Senator Bracy.

11       Q    **And did he provide you any feedback?**

12       A    Not that I recall.  It was questions about how

13   we conduct a functional analysis and what the BVAP is,

14   diminishment, et cetera, a lot of the things we've been

15   talking about today.

16       Q    **But he talked to you about Tampa Bay,**

17   **specifically?**

18       A    Not really.  It was more a conversation about

19   how functional analysis works.

20       Q    **You say not really.  Did he mention that at**

21   **all?**

22       A    I don't recall if coming up in our

23   conversation.

24       Q    **And I think you said he never asked you to**

25   **draw a map that did not cross Senate bay with respect to**

Jay Ferrin
November 15, 2024

Page 97

1    Benchmark District 19?

2        A    That's right.  The chairman had established a

3    pretty clear protocol, as I think I mentioned, about

4    members that wanted us to consider different ideas or

5    draft things for them.  And he never sent me an email or

6    followed up on any of that, so I didn't pursue it.

7        Q    Did anybody else send you an email with that

8    request?

9        A    Not with that request, no.

10        Q    During the drafting process, did you ever draw

11    a map that did not include a district that crossed

12    Tampa Bay?

13        A    No.

14        Q    Did you ever analyze that as an alternative?

15        A    No.

16        Q    Why?

17        A    Because I believe that doing so would have

18    raised questions about what would happen and whether or

19    not the population that was in Pinellas and St. Pete had

20    their opportunity diminished.  And I was, again, never

21    asked to.  We looked at all the prior configurations of

22    the historical plans, all of which had a district across

23    the bay going back to 1992.  So I think we had some

24    reasonable assurances that doing so was, in fact,

25    Constitutional and was appropriate.

Jay Ferrin
November 15, 2024

Page 98

1    Q    When you said you had reasonable assurances

2    that doing so would be Constitutional, based on the fact

3    that that had been the configuration since 1992; is that

4    accurate?

5         A    Yes, that was part of the consideration is

6    that was a community with historical minority

7    representation and the ability to elect their candidate

8    of choice.  And so I thought and continue to think that

9    we had some cover from prior district configurations and

10   reasons to believe that we ought to recreate something

11   that preserved that opportunity for that community, yes.

12        Q    And what reasons to believe did you have?

13        A    The historical configurations, the fact that

14   it was a product of intensive litigation held last cycle

15   and that when the court ruled on it last cycle, it was

16   something that the court put forward and enacted.

17        Q    Any other reasons?

18        A    Or courts don't enact, but they order.

19        Q    Any other reasons?

20        A    Those were the primary ones?

21        Q    Any secondary ones?

22        A    No, really not.  I'm trying to make sure I

23   don't leave anything out.  But those are the -- that was

24   why I decided that we ought to do that again.

25        Q    And do you think that was something that was

Jay Ferrin
November 15, 2024

Page 99

1    required or just would be a good idea or something else?

2         A    I thought it was appropriate.  I mean, I guess

3    in the other context, doing that allowed us to draw

4    districts around the region that also had high tier-two

5    metrics in terms of compactness and boundary issues.  So

6    when we put it all together, it fit nicely, made sense.

7         Q    So you thought it was appropriate, but you --

8    is it accurate to say you wouldn't say that you were

9    required to do so to comply with the principles from the

10   Rodrigues memo?

11        A    I think there's any number of different ways

12   to draw Constitutional compliant districts without

13   introducing new novel concepts that might raise all

14   sorts of other suspicions and concerns about what it is

15   and why we were drawing things a certain way.  I thought

16   we had perfectly good reasons to draw the district the

17   way we did.

18        Q    And I don't want to put words in your mouth.

19   But is part of what you're getting at is it was just

20   easier to do it this way because you had -- I think you

21   used the word -- cover from the past, the 1992 decision;

22   is that an accurate way of describing it?

23        A    I think the better way to say it is that we

24   had a series of prior districts that all showed that

25   drawing a district that included parts of Pinellas and

Jay Ferrin
November 15, 2024

Page 100

1    parts of Tampa and afforded minorities their ability to

2    elect candidates of choice was appropriate.  So I think

3    we can start with that conclusion that it's okay to do

4    that.

5         Q    I forget the exact words you used.  But when

6    you were talking about the ability to -- the importance

7    of protecting the communities in the area, are you

8    referring to the black community?

9         A    Yes.

10        Q    And are you talking about the black community

11   in Hillsborough, in Pinellas, in Hillsborough and

12   Pinellas together, or some other configuration?

13        A    Yes.  There's a black community in

14   St. Petersburg, and there's a black community in Tampa.

15   And generally, the one in St. Petersburg is denser, a

16   little bit more compact than the one is Hillsborough.

17        Q    And is what you're trying not to diminish, if

18   I understand you correctly, is the ability of black

19   voters in both areas?

20        A    I think black voters and black population in

21   both areas would have standing for a diminishment claim

22   if we'd have taken one or the other out.

23        Q    You mentioned litigation.  Did the Senate

24   understand from the court around 2015 the litigation to

25   involve the district crossing Tampa Bay?

Jay Ferrin
November 15, 2024

Page 101

 1     A    To involve, it was part of the plan that was

 2  ordered by the court was one that crossed the bay, yes.

 3     **Q    Did someone challenge?**

 4     A    I don't recall off the top of my head.  I'm

 5  sure it came up.  I know that there were different

 6  configurations of it considered in the hearings that

 7  were part of that.

 8     **Q    But you're not sure whether in that litigation**

 9  **someone challenged the configuration of Tampa Bay?**

10     A    I know that the plaintiffs put forward several

11  options.  I think one of those included a district that

12  did not, and the court did not choose that

13  configuration.

14     **Q    But you don't know whether the plaintiff**

15  **specifically asserted in the litigation that the**

16  **configuration of Tampa Bay would be unconstitutional in**

17  **a certain configuration?**

18     A    I don't recall what the plaintiffs asserted in

19  that case.

20          MR. MEROS, JR.:  I think we're getting a

21          little outside the 30(b)(6) topics with the 2015

22          litigation.

23          MR. TILLEY:  Sure.  I understand.  I think

24          the --

25          MR. MEROS, JR.:  I'm giving you some latitude.

Jay Ferrin
November 15, 2024

Page 102

1      I'm just --

2          MR. TILLEY:  I guess my thought is to the

3      extent he believes past material is relevant to

4      what he understands the proper considerations to be

5      and the choices that are made for the 2022 process,

6      it does seem like it's quite within the topic.

7          MR. MEROS, JR.:  That's why I'm letting you

8      ask the question about specific assertions in that

9      litigation.

10         MR. TILLEY:  And certainly I'm not expecting

11     him to have a perfect memory of everything that

12     happened in the past.  Yes, I can certainly

13     appreciate that.

14  BY MR. TILLEY:

15     **Q    You mentioned having a sense of cover from a**

16  **prior court decision; is that right?**

17     A    I don't think I probably should have been used

18  the term cover.  But when you've got a series of

19  districts that have spanned time that have included

20  those communities, I think it's a good reason to

21  consider re-including those communities in the map.

22         And when all those districts have been -- you

23  know, those were the ones that were legally enforceable

24  at some point.  I'm not talking about the things that

25  got thrown out.

Jay Ferrin
November 15, 2024

Page 103

1     Q    And is the fact that the crossing of the bay

2   was involved in the 2015 case a basis for the Senate's

3   feeling that it had good reasons to think this was

4   proper in the 2022 process?

5     A    The fact that the benchmark district crossed

6   the bay was relevant to our considerations.

7     Q    Is that part of like a situational awareness

8   that you described earlier in the deposition?

9     A    Yes.

10    Q    Did the Supreme Court issue any decisions

11  about redistricting or the use of race after that 2015

12  decision?

13    A    Not that I recall.

14    Q    The U.S. Supreme --

15    A    Are you talking about the Florida Supreme

16  Court?

17    Q    The U.S. Supreme Court.

18    A    There's been a lot of stuff that's come out of

19  the U.S. Supreme Court, a lot of it since redistricting

20  in 2022, and I've not followed that very closely.

21         (Plaintiffs' Exhibit 11 was marked.)

22  BY MR. TILLEY:

23    Q    I'd like to ask you some questions about the

24  subcommittee meeting on January 10, 2022.  Let's go to

25  Page No. 7, the yellow flag starting at line 10.

Jay Ferrin
November 15, 2024

Page 104

1    Senator Bracy says, quote, I talked to staff about the

2    Tampa Bay area, and I think I brought this question up

3    in the last committee.  But I wanted to see if you can

4    explain the reason for not crossing the bay or for

5    crossing the bay and all the configurations that we see,

6    as opposed to not crossing the bay in that Tampa area C,

7    closed quote.

8           And then Burgess says, quote, my understanding

9    is staff did look at those options.  However, there was

10   a significant number of potential voters that would be

11   disenfranchised under not crossing the bay.  And so in

12   order to avoid that potential diminishment, there was

13   just no way to make that work practically, closed quote.

14          Is that accurate?

15   A    That's what the transcript says.

16   Q    And then when Bracy said he talked to staff

17   about the Tampa Bay area, to your knowledge, did he just

18   -- was it just the conversation with you either right

19   after or later of that meeting?

20   A    That's what I took that to mean was the

21   follow-up that we had.

22   Q    And not any other conversation?

23   A    Correct.  Yeah, there were no other

24   conversations about that.

25   Q    And is it the Senate's view that a significant

Jay Ferrin
November 15, 2024

Page 105

1    number of potential voters would disenfranchised if

2    enacted District 16 did not cross Tampa Bay into

3    Pinellas County?

4        A    I think that was the concern that I enumerated

5    earlier about the potential for that was something that

6    I was certainly aware of, yes.

7        Q    What does it mean to say to those voters would

8    be disenfranchised?

9        A    That's Senator Burgess's words, so I can't

10   answer for him.  But I think from my perspective, the

11   concern would have been that their opportunity to elect

12   may have been diminished as a result of a hypothetical.

13       Q    And would that mean that the district wouldn't

14   comply with the Florida Constitution?

15       A    It certainly could.

16       Q    Well, I guess under what circumstance if the

17   ability to elect were diminished would it comply with

18   the Florida Constitution?

19       A    You're asking me to opine on how a court would

20   rule?

21       Q    I'm asking for your understanding of

22   compliance with the Florida Constitution?

23       A    Well, my goal in all this was to not be where

24   we are today, which is in a lawsuit.  So when I was

25   asked about the hypothetical, I viewed that as people in

Jay Ferrin
November 15, 2024

Page 106

1    Pinellas, particularly the black community residing in

2    St. Pete, may feel as though their opportunity was

3    diminished if they were taken out of enacted 16 or

4    benchmark 19.

5              That's to what I was speaking.  I believe

6    that's what Senator Burgess was probably referring to,

7    although he may have used some terminology that gets

8    minced.

9        Q    Sure.  And just to be clear, it's obvious to

10   me from this process that a tremendous amount of work

11   went into this.  And from all accounts, it was a

12   Herculean effort.  And I think it's fair to say that you

13   comported yourself incredibly admirably.

14             And doing depositions of folks who work in

15   government, I'm consistently impressed with like the

16   phenomenal work that gets done by certain individuals,

17   and obviously yourself included.  And as a taxpayer, I

18   certainly appreciate that.

19             And I don't mean this to be a castigation of

20   the project or generally your personal intentions or

21   anything.  So I just want to be clear about that.

22       A    Okay.

23       Q    And I know it's often thankless work, so thank

24   you.  When you're talking about the voters that would be

25   disenfranchised, in Senator Burgess's words, is that

Jay Ferrin
November 15, 2024

Page 107

1   **black voters in both Hillsborough and Pinellas, I think**

2   **is what you said before; is that accurate?**

3        A    I don't know about the black voters in

4   Hillsborough because I don't know that I've examined the

5   functional analysis of the hypothetical by the district

6   that didn't cross the bay is.  But when you cut out --

7   and my rough recollection is there was somewhere around

8   60,000 to 70,000 black voting age population in southern

9   Pinellas, St. Pete area that we were roughly including

10  in the district.

11          When you cut them out, I think that raises the

12  specter that they may have an ability to bring a

13  diminishment suit.  Again, our whole goal was to draw

14  things that constitutionally complied right out the gate

15  and that we wouldn't have to be here for.

16       **Q    Is the reason Senator Burgess gave in the**

17  **quote I read, is that the only reason, quote, there was**

18  **no way to make that work, closed quote, referring to**

19  **crossing the bay; is that accurate?**

20       A    I don't know that I would have used those

21  words in that circumstances.  I think what

22  Senator Burgess was trying to communicate is that we

23  were risk averse in this sense and wanted to continue to

24  operate in such a manner.

25       **Q    A risk averse manner?**

Jay Ferrin
November 15, 2024

Page 108

1      A     Risk averse manner, yes.

2      Q     Let's look at Page No. 7, line 20.  This is

3   where you say, quote, I think in looking at a

4   configuration like that, it was likely that diminishment

5   would occur based on the fact that an order to draw

6   minority districts solely within Hillsborough County, it

7   begins to look like a fairly spidery non-compact

8   configuration there.  It does some damage to the

9   surrounding districts and their metrics as well, closed

10  quote.  Is that what you said?

11     A     That's what the transcript says, yes.

12     Q     Does that statement reflect the view of the

13  Senate?

14     A     I think so because when I looked at the

15  population demographics of Hillsborough County, I think

16  as I mentioned earlier, you have a much more compact,

17  condensed, high density black voting age population in

18  the Pinellas side than you do on the Hillsborough side

19  where it's more spread out and I think intermingled with

20  Hispanic voting age population and other non-black,

21  non-Hispanic voting age population.

22           So I think it would hypothetically cause the

23  district to be less visually less mathematically compact

24  and probably stray from political and geographic

25  boundaries to pick up those kind of separated pockets of

Jay Ferrin
November 15, 2024

Page 109

1   African-American population.

2       Q    And in what way would it be less visually

3   compact to not cross the bay?

4       A    I think when I looked, particularly at the

5   distribution of black voting age population in

6   Hillsborough, it was not as dense, which would result in

7   appendages, fingers, things like that.  In my

8   estimation, that's what you would have had to do to

9   capture that black population.

10      Q    And what is that estimate based on?

11      A    The layers in our redistricting software that

12  showed the density of black and Hispanic population.

13      Q    Did you explore that in the redistricting

14  software?

15      A    I'm very familiar with that as a general layer

16  that was in the application that we looked at.

17      Q    But you didn't seek, I think you said, to try

18  to draw something in Hillsborough that would be a

19  protected district?

20      A    Right, because I did not receive specific

21  instructions to do so.

22      Q    And you had already decided not to do that

23  based on the fact that the district had crossed

24  Tampa Bay since 1992; is that accurate?

25      A    Yes.  Yes.  There was a reason to be risk

Jay Ferrin
November 15, 2024

Page 110

1  averse in that sense and we viewed the more conservative

2  approach, if you will, to keep that general

3  configuration.

4       Q    So when you said it looked -- when you said it

5  begins to look like a fairly spidery non-compact

6  configuration, that was not because you put something

7  into the software and saw that.  It was because how you

8  imagined it would be based on your experience with the

9  software?

10      A    Based on my experience with the software and

11 the layers that we have within our application that

12 showed population density, yes.

13      Q    Let's look at Page No. 8, line 1.  Quote, in

14 addition to, as Senator Burgess mentioned, potentially

15 disenfranchising the voters, black voters in Pinellas

16 County that have had the ability to elect the candidate

17 of their choice since about 1992 when the courts ordered

18 a configuration that resulted in a district that did

19 cross the bay between Hillsborough and Pinellas County,

20 closed quote.

21           That's what you've been describing during this

22 deposition; correct?

23      A    Yes.

24      Q    And you mentioned the black voters in Pinellas

25 being more densely together; is that accurate?

Jay Ferrin
November 15, 2024

Page 111

1    A    Yes.

2    Q    Compared to Hillsborough?

3    A    I think so, yes.

4    Q    And so was part of the idea that -- I mean,

5    did you consider at all that removing black voters from

6    Pinellas would make it harder to draw a district in

7    Hillsborough that included sufficient black voters for

8    them to elect a candidate of choice?

9    A    Can you ask that one more time.

10   Q    Sure.  I think you said there was a denser

11   population of black voters in Pinellas and a more

12   diffuse black population in Hillsborough; is that

13   accurate?

14   A    Yes.

15   Q    And so was part of what you considered that

16   removing a denser population of black voters in Pinellas

17   if you were trying to draw a Hillsborough-only protected

18   district would be harder because you would be removing

19   the denser area; is that accurate?

20   A    I think less about removing the denser area,

21   but more about the tentacles and appendages that you

22   might need to use in violation of other tier-two

23   principles which were something that we were always

24   considering as we went through this process.

25        You know, you would be crossing over

Jay Ferrin
November 15, 2024

Page 112

1  interstates and city boundaries and cutting up

2  neighborhoods and things like that was, in my

3  estimation, what you would like have to do for you to

4  embark on that endeavor.

5       Q    So the tier-two principles there would be

6  challenging to comply with tier-two under your

7  understanding?

8       A    Yes.  I think you would have to necessarily

9  sacrifice some of the tier-two principles.

10       Q    And you said it would be less visually

11  compact?

12       A    In my estimation, yes.

13       Q    And that the mathematical scores would be

14  lower, in your estimation as well?

15       A    I'm guessing if it's less visually compact and

16  there's a bunch of appendages and stuff, the mathematics

17  would reflect that.

18       Q    Is it your understanding that you had to draw

19  a map that protected the ability of black voters in

20  Pinellas County to elect their candidate of choice?

21       A    It was my understanding that should we not do

22  so, we would potentially open ourselves up for a

23  diminishment claim from the black voters in Pinellas

24  County.

25       Q    Open yourself up to what you believe to be a

Jay Ferrin
November 15, 2024

Page 113

1    valid claim or just that someone could sue or something

2    else?

3        A    I went to great lengths not to get sued, so

4    the interest was in avoiding the lawsuit.  I do believe

5    that whatever configuration we went with was going to

6    pass Constitutional muster, so yeah.

7        Q    Let's look at Page No. 9.  First line you say,

8    quote, if we look at drawing it differently, I think

9    we're looking at a situation where the black voters

10   would not be able to control the primary numerically but

11   not make up a majority of the primary turnout, and that

12   would potentially constitute diminishment, closed quote.

13   Is that right?

14       A    That's what the transcript says.

15       Q    And does that statement reflect the view of

16   the Senate?

17       A    Yes, but I was speaking to the potential for

18   voters in Pinellas County.

19       Q    Okay.  And you said you think drawing it

20   differently would potentially constitute diminishment;

21   right?

22       A    I think that's what we've been saying here, is

23   that if we cut those voters out, we may be vulnerable to

24   a lawsuit.

25       Q    Did you seek to find out whether it would

Jay Ferrin
November 15, 2024

Page 114

1    constitute diminishment?

2        A    No, I have not drawn that, did not draw that.

3        Q    And why not?

4        A    Because I didn't receive instruction from

5    committee members to or any other legislator, for that

6    matter.

7        Q    Is it the Senate's understanding that the

8    diminishment standard applies county by county?

9        A    Not necessarily.  I think there's the

10   diminishment standard, it's not -- I don't think it's

11   necessarily community based or county based.  But it's

12   one of those things where if you have reasonably compact

13   geographically cohesive -- politically cohesive

14   community and it's in a district that has that -- where

15   the minority community has that ability to elect and you

16   cut it out, I think that's what the concern is here is

17   that you would potentially be subject to a diminishment

18   inquiry.

19            So not county by county, but certainly within

20   counties and within regions and really kind of gets back

21   to that historical ability to elect and whether or not

22   that community's had it.

23       Q    Even if black voters -- I mean, does that

24   apply even if black voters in the district that is drawn

25   can still elect candidates of choice?

Jay Ferrin
November 15, 2024

Page 115

1      A    I'm not sure I understand what you're saying.

2      Q    Sure.  So if the voters in the district that

3    is drafted can still elect their candidate of choice but

4    there are other black voters outside that district, do

5    you think that's still diminishment?

6      A    I think some of the -- you know, I'm not going

7    to try to cite to the case law.  But I think there are

8    cases out there that say that you can't replace a

9    district in one part of the state, a minority district,

10   with one in another.  And so I don't know to what degree

11   that distance gets measured.  But I think it's relevant

12   to the discussion.

13     Q    When you said that black voters didn't make

14   up -- I just want to clarify something.  You're not

15   saying that a district in Hillsborough only for

16   protected District 16 could not be drawn, just that it

17   would face -- that it would result in a spidery

18   configuration that violated TR2 potentially; is that

19   accurate?

20     A    I think it could, yes.

21     Q    You're drawing that district based on the

22   multi-year average from the functional analysis for

23   performance; is that right?

24     A    Drawing what district?

25     Q    The protected district?

Jay Ferrin
November 15, 2024

Page 116

1      A    In the functional analysis?

2      Q    **Yes.**

3      A    Yes, we look at the multi-year.  We look at

4   those numbers that we went through earlier on Page Nos.

5   5 and 6 and 6 and 7 of the packet.

6      **Q    In the case law you mentioned just now, was**

7   **that case law you were relying upon when drawing these**

8   **districts?**

9      A    Relying upon -- aware of.  I mean, one of the

10  first things you do is go dig through, you know, a

11  couple decades of redistricting case law, read it,

12  familiarize yourself with it.  I'm not a lawyer, so I'm

13  not trying to cite to it or anything.

14         But you want to get a general sense of what

15  the issues were and what the outcomes were.  And it

16  seems to me that I recall some cases I want to say that

17  came out of Florida and related to Hispanic districts,

18  but don't hold me to that, that dealt with

19  proportionality and replacing one district with another.

20  I might be mincing things.

21     **Q    I want to just review the reasons the Senate**

22  **believes it was not appropriate to redraw the protected**

23  **District 16 wholly in Hillsborough County.  One, you**

24  **said it would have a spidery non-compact shape; right?**

25     A    I think it could.

Jay Ferrin
November 15, 2024

Page 117

1     Q     Thank you.  And is it accurate that it would
2  diminish black voters' ability because they would no
3  longer control the Democratic primary?
4     A     I don't know.  Depending on how you drew it.
5     Q     But it would diminish voters in -- black
6  voters in Pinellas County would no longer be in a
7  district where they could elect a candidate of choice;
8  is that right?
9     A     I think it could provide them an opportunity
10  to challenge this configuration under the
11  non-diminishment standard.
12     Q     And you mentioned as a reason the conservative
13  I think risk averse reason of wanting to follow the past
14  practice of having a district that crossed the bay which
15  existed since 1992; is that accurate?
16     A     Our goal throughout the redistricting process
17  was to get it right, get it right the first time, and to
18  not open ourselves up to lawsuits.  So we took a risk
19  averse conservative approach to drawing districts and
20  not introducing previously untested and unknown
21  configurations.
22     Q     Other than those reasons we just discussed,
23  are there any other reasons that the Senate believes it
24  would not be appropriate to redraw the protected
25  district wholly in Hillsborough County?

Jay Ferrin
November 15, 2024

Page 118

1        A    I don't think so.  I mean, we evaluate these

2    things in terms of all the different criteria.  So

3    certainly we were looking at our configuration, and we

4    thought that the configuration we came up with not only

5    protected the voters in both Hillsborough and Pinellas

6    County from diminishment, but was highly tier-two

7    compliant in terms of compactness in use of political

8    and geographic boundaries.  So that would have also

9    entered into the calculus.

10   BY MR. TILLEY:

11       **Q    All right.  One last couple of questions**

12   **before the break.  Let's go to the January 10th**

13   **transcript, Exhibit 11, Page No. 8, line 21, you say,**

14   **quote, and the question of diminishment is less about**

15   **how much diminishment but is it diminished because I**

16   **think the courts have been clear that diminishment, any**

17   **diminishment is diminishment, closed quote.**

18           **That was what you said?**

19       A    Which lines are you looking at?

20       **Q    Line 21 on Page No. 8.**

21       A    Yes, that's in response to Senator Bracy's

22   question about whether or not if it was a

23   majority-minority district and then it became like a 30

24   percent district.  He was trying to get a measurement of

25   diminishment.

1            And I said, well, at that point, I think the

2   courts would consider it's diminishment because it's a

3   question of are you as able, more able, or less able to

4   elect your candidate of choice.  If you're less able,

5   that constitutes diminishment, regardless of what the

6   numbers of black voting age population are.

7        **Q     And so do you mean that you couldn't have a 70**

8   **percent be that district that goes to 60 percent BVAP**

9   **because that would violate the non-diminishment?**

10       A    No, that's not what I'm saying at all.

11       **Q     So can you say what you're saying?**

12       A    So diminishment is measured by the courts as

13  evaluated as the group of voters in question as likely,

14  more likely, or less likely to be able to elect their

15  candidate of choice.  That's not necessarily tied to

16  BVAP or anything else.  That may be part of it.  So you

17  could have a district hypothetically where you were 70

18  percent BVAP and you went to 60 percent or even up to 75

19  percent, I guess.

20            But if for some reason the black voters in

21  question lost control of the primary and lost the

22  Democrats were black sliding in their ability to win the

23  elections or win most of the elections that were held in

24  that district, you could conclude that it diminished and

25  they were somehow less likely, even though potentially

Jay Ferrin
November 15, 2024

Page 120

1    the minority population would have gone up.

2       Q    Here Senator Bracy is asking about going from

3    50 percent to 30 percent BVAP; right?

4       A    Uh-huh.

5       Q    That was a yes?

6       A    Yes.

7       Q    And you say below any diminishment is a

8    diminishment; right?

9       A    Yes.

10      Q    But you could have a 30 percent BVAP district

11   that still had ability to elect a candidate of choice;

12   right?

13      A    Yes.

14      Q    And so how would you then say that it's

15   necessarily diminishment if the ability to elect the

16   candidate of choice is still there?

17      A    Well, I don't think I would consider that

18   diminishment because, as I just said, if they're as

19   likely to elect a candidate of choice, it's not

20   diminishment regardless of what the BVAP is.

21      Q    So then I guess why did you say any

22   diminishment is diminishment in response to a question

23   about a district going from 50 percent BVAP to 30

24   percent BVAP?

25      A    Well, I think I was talking about diminishment

Jay Ferrin
November 15, 2024

Page 121

1    in the context of their opportunity to elect not the

2    BVAP numbers.  I think the context is wrong there.

3         **Q     The full functional analysis?**

4         A     The full functional analysis is what I was

5    referring to.  There's also separate question where if

6    you're above 50 percent and then you go to 30 percent,

7    you're changing from minority-majority status to

8    something else at that point.  That's a subject to

9    potentially a VRA Section 2 claim.  But I think in this

10   context we were talking about the broader functional

11   analysis.

12        **Q     I see.  And I think this is clear from what**

13   **you said, but you're not saying that any reduction in**

14   **black population or registration or turnout by itself is**

15   **in and of itself diminishment?**

16        A     That's correct.  It's evaluation of the

17   totality of the circumstances, all those different data

18   points.

19        **Q     But if ability to elect preferred candidates**

20   **is diminished at all, that constitutes diminishment?**

21        A     Yes.  And this is where you get into the

22   specific elements of that.  So if you lose control of

23   the primary, I think that's a diminishment.  If you lose

24   the influence on the general so that the majority of

25   candidates or most candidates or that margins or

Jay Ferrin
November 15, 2024

Page 122

```
 1   whatever start slipping into a more questionable range,
 2   I think a court could very well call that diminishment.
 3        Q    So is that saying it's not a sliding scale
 4   what constitutes diminishment?  It's an on-off switch?
 5        A    Is the minority group in question as likely to
 6   or less likely?  If they're less likely and there's a
 7   number of elements that that can be concluded on, I
 8   think you're opening yourself up to a diminishment
 9   claim.
10        Q    Senator Bracy in this quote, he references 50
11   percent BVAP, but the benchmark plan for '19 was in the
12   30s; right?
13        A    Yeah.  I think he was asking about general
14   hypotheticals and broad-based conclusions about
15   redistricting and diminishment, not specific to any
16   districts at all.
17        Q    All right.  I think it's time for lunch.
18             (Recess 12:40 p.m. until 1:50 p.m.)
19   BY MR. TILLEY:
20        Q    Going back to the challenge to districts, if
21   tier one wasn't a consideration, would you have drawn
22   enacted District 16 to cross the bay?
23        A    I don't think I could hypothesize about that.
24        Q    Why not?
25        A    Because tier-one is a consideration.  It's
```

Jay Ferrin
November 15, 2024

Page 123

1  Constitutional paramount.

2      **Q     Knowing what you know about the area based on**

3  **your expertise in drafting these maps, can you say that**

4  **you would or would not have drawn enacted District 16 to**

5  **cross the bay?**

6      A    I don't think I can say definitively one way

7  or another.  That's a circumstance where the counties

8  are next to each other.  And so whatever we would have

9  had to do to equalize population or region, draw compact

10  districts, et cetera, I'm not going to speculate.

11     **Q     I would like to ask you more about the**

12  **Senate's understanding of Milan (phonetic) diminishment**

13  **requirement.  You spoke earlier about how if enacted**

14  **District 16 didn't cross the bay, black voters in**

15  **Pinellas County would be diminished in their ability to**

16  **elect candidates of their choice; is that right?**

17          MR. MEROS, JR.:  Object to the form.

18          THE WITNESS:  No.  I think I said that they

19          would potentially have grounds to challenge over

20          the non-diminishment standard.

21          (Plaintiffs' Exhibit 12 was marked.)

22  BY MR. TILLEY:

23     **Q     These are maps showing the predecessors of**

24  **enacted District 16.  You were talking earlier about the**

25  **history and going back to 1992; is that right?**

Jay Ferrin
November 15, 2024

Page 124

1       A    Yes.

2       **Q    And you see that on the top of Page No. 1,**

3   **that is the plan that the Florida Supreme Court ordered;**

4   **is that right?**

5       A    No.  I think that was the United States -- oh,

6   okay.  I guess that was a preclearance determination.  I

7   guess the Florida Supreme Court ordered it.

8       **Q    And this plan included portions of**

9   **Hillsborough, Pinellas, Manatee, and Polk for that**

10  **district; is that accurate?**

11      A    I think that's correct.  I'm having a hard

12  time seeing the County lines, but that sounds right.

13      **Q    And then the map at the bottom of the page,**

14  **well, in 1996 there was a racial jerrymandering lawsuit;**

15  **is that right?**

16      A    Off the top of my head, I don't recall the

17  specifics of the lawsuit, but there was a lawsuit.  What

18  the slide says is that the '92 districts were revised in

19  an agreement with the parties in Scott v. U.S.

20  Department of Justice.

21      **Q    And that resulted in the 1996 plan; is that**

22  **right?**

23      A    Without knowing any of the particulars about

24  the revised agreement, you know, it's my understanding

25  that these were the districts that were in place from

Page 125

1   '96 through 2002.

2       Q    And that plan eliminated Polk County, is that

3   right, for that district?

4       A    As bests I can tell, yes.

5       Q    And under the 2002 plan, it's on the next

6   page, it was numbered 18 and included portions of

7   Hillsborough, Pinellas, and Manatee; is that right?

8       A    I guess.  I don't know that I've seen these

9   images.  Where did these images come from?

10      Q    These come from one of our reports, but they

11  reflect the publicly-available plans.

12          MR. MEROS, JR.:  Where did they come from?  I

13      don't think I've seen these before.

14          MR. TILLEY:  These specific ones come from the

15      McCarton report.

16  BY MR. TILLEY:

17      Q    So under the 2002 plan, you see it was

18  numbered District 18 includes portions of Hillsborough,

19  Pinellas, and Manatee; right?

20      A    I will tell you that's what this image

21  appears, but I'm not going to opine on the source or

22  accuracy of it.

23      Q    I understand.  Thank you.  And under the 2012

24  plan as suggested here, it was numbered District 19 and

25  included portions of Hillsborough, Pinellas, and

Jay Ferrin
November 15, 2024

Page 126

1   Manatee; is that right?

2        A    This image depicts District 19 and includes

3   those portions of those districts.

4        Q    And you were involved in developing 2015

5   Senator Plan 1; is that right?

6        A    What do you mean by involved?

7        Q    Had any role in?

8        A    In 2015, I was working in the remedial plan.

9   I would have to get some specifics as to what this is.

10  You're asking me if I drew this plan?

11       Q    Just if you were involved in developing it?

12       A    I don't know about this plan because I don't

13  know where this came from, and I haven't reviewed this

14  for accuracy.  But in 2015, I was working, again, in

15  reapportionment during the remedial phase.

16       Q    And so this, I'll represent, is the plan

17  proposed by the Senate to the court.  And that plan

18  eliminated a portion of the district in Manatee County;

19  is that right?

20       A    That's what the image reflects, yes.

21       Q    Is that your recollection of the 2015 Senate

22  proposal?

23       A    You're asking me about the development of

24  Senate plans in 2015?

25       Q    Yes.

Jay Ferrin
November 15, 2024

Page 127

1       A    Is that a topic we're discussing?

2       Q    **If you personally remember it.  We don't have**

3    **to take that as the testimony of the Senate.**

4            MR. MEROS, JR.:  We had reached a stipulation

5            that Topic No. 2, the development of the 2015 plans

6            was not a topic for the deposition today.

7            MR. TILLEY:  Sure.  I don't mean to cut

8            against that.  I guess I go back to, to the extent

9            that he does remember, and maybe he doesn't, it's

10           relevant to the things that he was thinking about

11           and the justifications for taking certain actions

12           in 2022, if that was the case.  Or it might not be

13           the case.

14   BY MR. TILLEY:

15       Q    **Do you remember whether the senate eliminated**

16   **Manatee County in its 2015 proposal to the court?**

17       A    I have not reviewed the 2015 proposals to the

18   court in preparation for this, so I really prefer not to

19   speak about those configurations.

20       Q    **Let's look at the third page.  And if the same**

21   **is true here, you can let me know, and we'll move on.**

22   **But I'll represent that this page has the 2002 Senate**

23   **plan and that District 39 was a district in which black**

24   **voters had the ability to elect preferred candidates.**

25   **Do you have a recollection of that?**

Jay Ferrin
November 15, 2024

Page 128

1    A    I can't -- 2002 plans in Miami-Dade County, I

2    wasn't looking at any of that in preparation for this.

3    As far as I know, we're pretty far outside the scope.

4        **Q    Well, you had some recollection of 1992;**

5    **right?**

6    A    In the Tampa Bay region, which was part of my

7    review for this.  I was preparing looking at things like

8    that, yes, but I was not looking at Miami.

9        **Q    Understood.  And I think you referenced**

10   **South Florida history earlier in the deposition; is that**

11   **right?**

12   A    What do you mean by South Florida history?

13       **Q    The history of the protected districts in**

14   **South Florida?**

15   A    I don't recall that off the top of my head.

16   History of which protected districts?

17       **Q    You tell me.**

18   A    I don't know what you're talking about.  We

19   can go back to the transcript if you want.

20       **Q    Let's go to Topic No. 3.  Topic 3 is each**

21   **state interest, if any, that the Senate believes**

22   **justifies the use of race.  Why did the Senate use race**

23   **in its 2022 redistricting process, if it did so?**

24   A    I think race was a consideration in the

25   context of the benchmark districts that had been

Jay Ferrin
November 15, 2024

Page 129

1    identified as being protected from diminishment.

2    **Q    So it was only used as it relates to**

3    **compliance with non-diminishment protections; is that**

4    **accurate?**

5    A    That's accurate.  It was factored in with the

6    other criteria that we were considering as we were

7    drawing plans.

8    **Q    The other criteria being?**

9    A    The tier-two stuff.

10   **Q    Was the use of race to comply with**

11   **non-diminishment, was that an important reason for the**

12   **Senate?**

13   A    To the extent that the non-diminishment is in

14   tier-one of the Constitutional criteria and it was

15   enumerated in the memorandum and directions to staff, I

16   think all the things that were considered were

17   important.

18   **Q    And does the Senate believe that compliance**

19   **with a non-diminishment protection justifies the use of**

20   **race?**

21   A    It justifies the consideration of race.

22   **Q    Is there any other reasons the Senate**

23   **considered race in its 2022 redistricting process?**

24   A    I don't believe so, no.

25        (Plaintiffs' Exhibit 13 was marked.)

Jay Ferrin
November 15, 2024

Page 130

1   BY MR. TILLEY:

2       Q    Let's go to Topic No. 7.  Do you recognize

3   this document?

4       A    Yes, I think I've seen this before.

5       Q    And these are the as noted on Page No. 2,

6   quote, the names and contact information of the people

7   that President Passidomo presently believes are likely

8   to have discoverable information that President

9   Passidomo may use to support her claims and defenses,

10  closed quote?

11      A    Where was that quote?  I'm sorry.

12      Q    On Page No. 2.

13      A    Yes, I see it.

14      Q    So I'd like to go through the witnesses and

15  documents listed.  For the subject of, quote,

16  development and passages of SJR 100 2022, closed quote,

17  it lists the witnesses as Florida State Senators 2020 to

18  2022 Jay Ferrin and Florida State Representatives 2020

19  to 2022; is that right?

20      A    That's what it says.

21      Q    We discussed the role that the House played.

22  I think you said it played no role; correct?

23      A    That's correct.

24      Q    And what knowledge, if any, would state

25  representatives have in the development of the Senate's

Jay Ferrin
November 15, 2024

1  plans?

2      A    None to my knowledge.

3      Q    For the subject of, quote, debate regarding

4  and opposition to SGR 100 2022, closed quote.  The

5  Senate's initial disclosure lists two witnesses,

6  Representative Fentrice Driskell and Representative

7  Andrew Lerner.  Do you see that?

8      A    I do.

9      Q    Tell me what role Representative Driskell

10  played with respect to that subject?

11      A    With respect to debate regarding opposition to

12  SGR 100, discussions with partisan organizations or

13  political operatives or analysts regarding the Florida

14  redistricting process?

15      Q    I'm asking about the first part of that,

16  debate regarding and opposition to SGR 100?

17      A    I think some of her debate was referenced or

18  cited or quoted in the complaint.

19      Q    Okay.  And what aspects of that?

20      A    We can read through the complaint if you want

21  and we'll find it.  I think it's on the list because she

22  was proffered as having brought information to light or

23  something like that in the complaint.

24      Q    Does anything specific come to mind?

25      A    I don't have your complaint memorized.

Jay Ferrin
November 15, 2024

1    Q    But based on your knowledge of Representative

2    Driskell's role in the process?

3    A    I read the complaint at one point, and it had

4    some reference to her debate in it, if I'm not mistaken.

5    So I think there was question as to what -- maybe how

6    she arrived at the conclusion, if she did, in her

7    debate, which I don't specifically remember what they

8    are.

9    Q    And what about the same question for

10   Representative Lerner?

11   A    Same answer.

12   Q    For the subject of, quote, discussions with

13   partisan organization or political operatives or

14   analysts regarding the Florida redistricting process,

15   closed quote.  The Senate's initial disclosure lists six

16   witnesses, Representative Driskell,

17   Representative Lerner, Nicholas Warren, Matthew

18   Isabelle, Mary Ellen Klas, and Christian Ulvert.

19        So for that subject, what role did

20   Representative Driskell play?

21   A    I think that my understanding is that this

22   stuff, a lot of this emanated out of discovery obtained

23   in a different lawsuit that showed that there may have

24   been communications amongst some or all of these

25   parties.

Jay Ferrin
November 15, 2024

Page 133

1          And I think there was listed here the

2    potential need to talk to some of these folks about

3    their specific intentions and motivations.

4          Q    And is that the extent of your understanding

5    of Representative Driskell's role with respect to this

6    subject?

7          A    I think, yes.

8          Q    And the same question for

9    Representative Lerner?

10          A    I think that's true for all of them, yes.

11          Q    Is your understanding that all six of them

12    were communicating with each other as a group?

13          A    Again, there was voluminous discovery produced

14    in another case that I think alluded to or suggested the

15    fact that there may have been some coordination,

16    communication, collusion, whatever you want to describe.

17    And I think that led to, you know, an overabundance of

18    listing these as potential folks worth calling.

19          Q    Same question for Mr. Warren?

20          A    All of them.  The intent matters in

21    redistricting.

22          Q    For the subject of, quote, discussions with

23    legislators and legislative staff regarding Florida

24    redistricting process, closed quote, the Senate's

25    initial disclosures lists two witnesses for solely the

Jay Ferrin
November 15, 2024

Page 134

1   subject Ms. Klas and Mr. Ulvert.  What role is Ms. Klas

2   play for that subject, discussions with legislators and

3   legislative staff regarding Florida redistricting

4   process?

5        A    So there was a pretty well publicized event

6   that took place during the process in which Mary Ellen

7   Klas appeared to be feeding questions to one of our

8   senators to ask and obtain more information for the

9   purported purposes of litigation or sorting out in

10  court.

11       Q    And can you say more about that event?

12       A    It was in a gaggle, a press gaggle after one

13  of our meetings.  And the recollection is that she came

14  up to Senator Bracy and asked him to ask questions.  All

15  of this is documented elsewhere.  I'm not exactly sure

16  of the particulars.

17            But asked him to ask questions about certain

18  configurations and why things were or weren't a certain

19  way, particularly with regard to the Tampa Bay region in

20  the context of creating a record for litigation.

21       Q    Are there any other discussions with

22  legislators and legislative staff that you can think of

23  regarding Florida redistricting process with respect to

24  Ms. Klas?

25       A    Not that I know of.  But I think that's part

Jay Ferrin
November 15, 2024

Page 135

1   of the reason she's listed here is to find that out,

2   find out if she was asking other members to do similar

3   things.

4        Q    What about Mr. Ulvert, same question?

5        A    I think his name was either alluded to or he

6   was in communications with the other discovery in the

7   other cases, and so that's why he's listed here as well

8   is to figure out if he was potentially working to push

9   an agenda.

10        Q    Any other reason, that you are aware?

11        A    I think that covers the high level.

12        Q    And when you say push an agenda, what are you

13   referring to?

14        A    To push a partisan political outcome.

15        Q    Mr. Warren is listed for two subjects, one is

16   discussions with legislators and legislative staff

17   regarding Florida redistricting process.  And one is,

18   quote, developments of alternative district plans

19   including plan P000S0042 committee testimony regarding

20   Plan P000S0042.  Do you see that?

21        A    I do.

22        Q    And what role did Mr. Warren play with respect

23   to those subjects?

24        A    Well, he submitted a plan, came and testified

25   about it in committee, as I think we've discussed.  And

Jay Ferrin
November 15, 2024

Page 136

1    it appears from discovery in other cases was in regular

2    communication with other political operatives about

3    configurations like that and redistricting, in general.

4        Q    What other political operatives?

5        A    Matt Isabelle, in particular.

6        Q    Any others that come to mind?

7        A    Again, I've not memorized all the discovery in

8    other cases.

9        Q    Do you think any others exist?

10       A    I think we would have to talk to Mr. Warren to

11   find that out.

12       Q    And who are you saying that -- so you're not

13   -- what is your understanding of what Mr. Warren

14   discussed with the individuals referenced?

15       A    Redistricting generally and potentially

16   strategy, legal theories, other potentially

17   characteristics of district and plans.

18       Q    And how, if at all, did that impact the

19   development of the enacted plan?

20       A    As I mentioned earlier, our process is set

21   forth so that a member of the legislature would have to

22   sponsor any action in order for it to be considered, and

23   no member did.

24       Q    Why did no member do so with respect to

25   Mr. Warren's plan?

Jay Ferrin
November 15, 2024

Page 137

1    A    Again, that's probably something we'd have to

2  ask Mr. Warren is why no members took him up on his

3  offer.

4    **Q    And why did no member explore a plan for**

5  **enacted Senate District 16 that did not cross the bay?**

6    A    I don't think I can answer why members didn't

7  do things.  Lots of members don't file things.

8         (Plaintiffs' Exhibit 14 was marked.)

9  BY MR. TILLEY:

10   **Q    Have you seen this document before?**

11   A    Yes.

12   **Q    And what is the document?**

13   A    This is a memo from Chairman Rodrigues that

14  was issued on November 22, 2021 regarding misleading

15  committee appearance forms.

16   **Q    When did you first see this letter?**

17   A    I believe I received -- I think it was sent to

18  all Senate or all committees.  I don't remember, but I

19  got a copy when the other members did.

20   **Q    Did the Senate take any action based on this**

21  **letter?**

22   A    What do you mean action?

23   **Q    Did the Senate change anything it would**

24  **otherwise have done based on the information in this**

25  **letter?**

Jay Ferrin
November 15, 2024

Page 138

1       A    I don't know that I can speculate as to what

2   the Senate did or didn't do.  This went to all members

3   of the Senate.  I can't guess as to their individual

4   reactions or actions to it or things they were going to

5   do but didn't or otherwise.

6       Q    Did you personally take any action because of

7   this letter?

8       A    No.

9       Q    Did you not take an action that you otherwise

10  would have taken because of this letter?

11      A    No.

12      Q    Did you personally discuss this letter with

13  anyone?

14      A    Not that I recall.

15      Q    Did anyone talk to you about the letter?

16      A    Not that I recall.

17      Q    Did anyone comment to you about it?

18      A    Not that I recall.

19      Q    Do you know if any senator knew that

20  Mr. Warren was an employee of the ACLU of Florida at the

21  November 16th or 17th meetings?

22      A    I can't speak to knowledge that individual

23  legislators may have or may not have had about his

24  affiliation and employment.

25      Q    Have any of the senators ever interacted with

Jay Ferrin
November 15, 2024

Page 139

1    him before?

2         A    I wouldn't know the answer to that.

3              (Plaintiffs' Exhibit 15 was marked.)

4    BY MR. TILLEY:

5         Q    Have you seen this letter before?

6         A    Yes, I think I did see a copy of this.

7         Q    Let's just be clear.  This is Exhibit 15?

8         A    Yes.

9         Q    When did you see this letter?

10        A    I don't recall a specific day, but it would

11   have been sometime after it was sent.  It probably would

12   have been delivered to me for recordkeeping purposes.

13        Q    Did the Senate take any action based on this

14   letter?

15        A    Not to my knowledge.

16        Q    Did you personally take any action because of

17   this letter?

18        A    No.

19        Q    Did you not take any action that you otherwise

20   would have taken because of this letter?

21        A    I don't think so, no.

22        Q    Did you have any interaction with anyone about

23   this letter?

24        A    No, other than somebody gave me a copy.

25        Q    What did the Senate do with this letter?

Jay Ferrin
November 15, 2024

Page 140

1    A    I don't know the answer to that.

2    **Q    Did this letter affect the process in any way?**

3    A    Not to my knowledge.

4    **Q    Does the Senate find the assertions in this**

5    **letter persuasive?**

6    A    Can you elaborate on what you would mean by

7    that?

8    **Q    Sure.  Does the Senate believe that the**

9    **assertion in the letter that Mr. Warren appeared on his**

10   **own behalf and not as a representative of ACLU of**

11   **Florida when he testified and submitted materials?**

12   A    I think there are some questions related to

13   that.  The Senate has indicated it would like to ask

14   Mr. Warren.

15   **Q    Does the Senate contest the veracity of the**

16   **claims in this letter?**

17   A    In terms of whether or not he appeared in his

18   personal capacity or that on behalf of the ACLU?

19   **Q    Correct.**

20   A    I think there are questions about that, yes.

21        (Plaintiffs' Exhibit 16 was marked.)

22   BY MR. TILLEY:

23   **Q    I'll show you what's marked as Exhibit 16.**

24   **Have you seen this letter before?**

25   A    I think I have seen a copy of this, yes.

Jay Ferrin
November 15, 2024

Page 141

1      Q    And when did you see this letter?

2      A    Probably sooner than the other one.  It was

3  eventually brought to my office.  I think it appears to

4  be sent -- I guess it was sent to all members of the

5  Senate.  I don't remember how I would have gotten a

6  copy, but I'm sure we had one for our files.

7      Q    Did the Senate take any action based on this

8  letter?

9      A    I don't believe so, no.

10      Q    Did you personally take any action based on

11  this letter?

12      A    No.

13      Q    Did you not take any action that you otherwise

14  would have taken because of this letter?

15      A    No.

16      Q    Did anyone ever speak to you about this

17  letter?

18      A    Not that I recall.

19           (Plaintiffs' Exhibit 17 was marked.)

20  BY MR. TILLEY:

21      Q    I'll show you what's marked Exhibit 17.  Have

22  you seen this email exchange before?

23      A    I don't know whether or not -- I mean, I'm

24  assuming it was produced in discovery.  Other than that,

25  I don't know that I would have seen it.  I don't see

Jay Ferrin
November 15, 2024

Page 142

 1  myself addressed on it anywhere.

 2      Q    Is this the type of communication that

 3  ordinarily would be forwarded to you?

 4      A    I'm sorry.  This is just the email with the

 5  letter attached to it?  What is this?

 6      Q    It's an email that was provided in discovery,

 7  SEN 1629.  It's forwarded from someone in Senator

 8  Rodrigues's offices to Jason Rojas and you?

 9      A    There it is.  Yes, that's probably how I got a

10  copy of whatever the letter is.  Is this Exhibit 15

11  that's attached to this?  I don't know what's attached

12  to this.  I'm sorry.

13      Q    The letter to Kirk Bailey.

14      A    That's probably how I got a copy of it.

15      Q    And why were these emails forwarded to members

16  of the staff?

17      A    I think for preservation purposes to ensure

18  that we had a copy.  I mean, all this stuff is things

19  that you retain in these sort of circumstances.

20      Q    Mr. Isabelle is listed, going back to the

21  initial disclosures, for the subjects of, quote,

22  discussions with the legislators and legislative staff

23  regarding Florida redistricting process, closed quote,

24  and, quote, development of alternative district plans

25  including the 2021 Isabelle plan described in the

Jay Ferrin
November 15, 2024

Page 143

1   complaint committee testimony, closed quote.  Do you see

2   that?

3        A    Let me get back to that exhibit, see if I can

4   find it.  Ask your question again.

5        Q    Sure.  Mr. Isabelle is listed for the subjects

6   of, quote, discussions with legislators and legislative

7   staff regarding Florida redistricting process, closed

8   quote, and, quote, development of alternative district

9   plans, including the 2021 Isabelle plan described in

10  complaint committee testimony, closed quote.  Is that

11  right?

12       A    Yes.

13       Q    What role did Mr. Isabelle play with respect

14  to those subjects?

15       A    Well, I think his plan -- and I don't know

16  where that resides or came from.  But to the extent that

17  he submitted a plan or produced a plan that was

18  referenced in the complaint, I think it would be

19  relevant to ask him about his motivations and intents

20  when we drew that.

21       Q    Is there anything else that comes to mind as

22  to his role with respect to those subjects?

23       A    We have obtained discovery of communications

24  between him and Mr. Oren (phonetic), so I think that's a

25  topic of discussion as well.

Jay Ferrin
November 15, 2024

Page 144

1      Q    Anything else beyond that?

2      A    I don't want to preclude anything from being

3   talked about, but I think that covers the highlights.

4      Q    Well, this topic is also part of what you're

5   here to testify about.  Is there any other way in which

6   Mr. Isabelle is relevant to those listed topics?

7      A    Not that I know of.  But, again, I think a lot

8   of this would come out in a discussion with him.

9      Q    Let's go to Topic No. 5.

10          (Plaintiffs' Exhibit 18 was marked.)

11   BY MR. TILLEY:

12     Q    I'll show you what's marked Exhibit 18.  Do

13   you recognize this document?

14     A    Yes.

15     Q    This is President Passidomo's answer and

16   affirmative defenses; correct?

17     A    Yes.

18     Q    Who drafted this document?

19     A    Counsel and I worked on it.

20     Q    And I don't want to ask about any

21   attorney-client privileged conversations or attorney

22   work product, but I would like to ask you a few

23   questions about the Senate's defenses identified on Page

24   No. 20.  The first affirmative defense says, plaintiff's

25   requested relief is barred by the Purcell principle?

Jay Ferrin
November 15, 2024

Page 145

 1    A    Yes.

 **2    Q    And the second says, plaintiff's requested**

 **3  relief is barred by the doctrine of latches?**

 4    A    Yes.

 **5    Q    What is latches?**

 6         MR. MEROS, JR.:  I'm going to object to the

 7         extend it would require you to disclose attorney

 8         communications.  I'd instruct you not to answer to

 9         that.  If you can answer the question without

10         relying on that, though, you're free to do so.

11         THE WITNESS:  The question is what is latches?

12    BY MR. TILLEY:

**13    Q    Yes.**

14    A    High-level understanding is that it's not a

15  timely suit in the sense that more time has passed and

16  it substantially disadvantages the defense in a suit.

**17    Q    Under that understanding of latches that you**

**18  just said, do you know of any facts that support the**

**19  statement here that plaintiff requested relief is barred**

**20  by that understanding of latches?**

21    A    Well, certainly my memory of all the events

22  surrounding the redistricting process and activities

23  around it would have been much fresher had this occurred

24  in a timely manner and in the automatic review process

25  that's built into the Florida Constitution.

Jay Ferrin
November 15, 2024

Page 146

1    Q    So your memory would have been better, is that

2    what you're saying?

3    A    I'm sure it would have.  I've done a lot of

4    different things in the last two years and put most of

5    the stuff behind me.

6    Q    Is there any other fact you can think of that

7    supports the statement here that plaintiff's requested

8    relief is barred by latches, based on your articulation

9    of your understanding of what latches is?

10   A    Not off the top of my head.

11   Q    Can you identify how, if at all, the

12   Senate has been prejudiced by the alleged delay in the

13   plaintiffs bringing suit?

14   A    Well, I think as I mentioned, it sort of

15   disadvantages me as a witness on behalf of the Senate to

16   not have immediate recollection and to have been fresh

17   out of this.  And I just -- yeah.

18   Q    So similar reason that your recollection would

19   have been fresher had it been brought earlier?

20   A    My recollection primarily, and yes.

21   Q    Any other thing or any other fact that you can

22   think of or any other way in which you can think of that

23   the Senate has been prejudiced by the alleged delay of

24   plaintiffs in bringing suit?

25   A    Not off the top of my head.

Jay Ferrin
November 15, 2024

Page 147

1      Q    What is the Purcell principle?

2           MR. MEROS, JR.:  Same objection.  To the

3      extent it would require you to disclose

4      attorney-client privileged communications, I'll

5      instruct you not to answer.  If you can answer

6      without disclosing those, then feel free to do so.

7           THE WITNESS:  The Purcell principle is a

8      principle that limits the interference of a court

9      within an election or election-related laws close

10     to an election.

11 BY MR. TILLEY:

12     Q    What do you understand plaintiffs' requested

13 relief in this case to be?

14     A    Redrawing of certain legislative districts.

15     Q    Do you know the dates for trial in this case?

16     A    Not off the top of my head.

17     Q    The trial dates in this case are June 9th

18 through 13th.  If the court rules in plaintiff's favor

19 following trial, do you know what happens after that?

20     A    I think it depends on what the order is and

21 when the order comes out.  There's a series of other

22 factors that I don't think we can control when we would

23 actually go about enacting new districts based on

24 favorable opinion.

25     Q    If there is a decision on liability and the

Jay Ferrin
November 15, 2024

Page 148

1    court gives the legislature a chance to propose a

2    remedy, is that your understanding of one possibility?

3              MR. MEROS, JR.:  Object to the form.

4              THE WITNESS:  There's probably an infinite

5         number of possibilities that this could go.  And I

6         also can't guarantee that a legislative enactment

7         would occur based on the fact that we have 160

8         members of the legislature that all get an equal

9         vote.  And asking me to commit to doing something

10        on a certain time frame on behalf of the senate or

11        legislature is not something I can do.

12   BY MR. TILLEY:

13        Q    So you're saying, correct me if I'm wrong,

14   that if the court orders there to be a remedial -- rules

15   in plaintiffs' favor and there's a remedial phrase,

16   there might -- it might not be possible for the

17   legislature to draw a new map, is that what you said?

18        A    The Purcell principle might bar that from

19   happening on a certain time frame.  It depends on a lot

20   of different things that I can't speculate about.

21             (Plaintiffs' Exhibit 19 was marked.)

22   BY MR. TILLEY:

23        Q    Let's take a look back at the 2022

24   redistricting process.  This is Exhibit 19.  This is the

25   2022 redistricting process timeline.  So based on this

Jay Ferrin
November 15, 2024

Page 149

1   exhibit, you see February 3, 2022, the legislature

2   passed SGR 100?

3        A    Yes.

4        Q    And that's your recollection?

5        A    Yes.

6        Q    And on March 3, 2022, the Supreme Court issued

7   its automatic review decision on SGR 100?

8        A    Yes.

9        Q    And that's your recollection?

10       A    Yes.

11       Q    On April 21, 2022, the legislature passed the

12   Congressional map.  Is that your recollection?

13       A    Yes.

14       Q    And then on April 22, 2022, the governor

15   signed the Congressional map.  Is that your

16   recollection?

17       A    That sounds right.

18       Q    And on May 16, 2022 that was the deadline for

19   legislative and Congressional candidates qualifying by

20   petition method to submit their petitions?

21       A    Yes.

22       Q    And that's your recollection?

23       A    Yes.

24       Q    And June 13 through 17, 2022 was the candidate

25   qualifying period that year.  Is that your recollection?

Jay Ferrin
November 15, 2024

Page 150

1      A    I don't pay close of attention to the

2  candidate qualifying period, but sure that sounds about

3  right.

4      Q    So the Florida Supreme Court issued its

5  decision on 2022's SGR 100 on March 3, 2022.  An

6  election was held based on the redistricting of that map

7  on November 8, 2022; is that accurate?

8      A    Yes.

9      Q    Meaning certain individuals who were running

10  for state Senate races in 2022 were running in districts

11  defined according to 2022, SGR 100; is that right?

12      A    That's right.

13      Q    And they were running in those districts based

14  on the map that was final as of March 3, 2022, the date

15  of the Florida Supreme Court's decision; is that

16  accurate?

17      A    Yes.

18      Q    Are you aware of any problems in that election

19  based on the amount of time between March 3, 2022 and

20  November 8, 2022?

21      A    No.  But there's a special qualifying period

22  in redistricting years established by law.  I don't

23  remember the particulars about that.  I'd have to look

24  it up, but I know that there's a special qualifying

25  period that's associated with that.

Jay Ferrin
November 15, 2024

Page 151

1       Q     And what is the relevance of that?

2       A     Just that there's a unique qualifying period

3   for redistricting years.

4       Q     Does that have any -- what impact does that

5   have on election administration, if any?

6       A     I'd probably want to consult with the

7   supervisors of elections as it relates to that.  But I

8   think when they have any change to their processes, they

9   certainly like to talk about it and the inconvenience

10  that it causes them.

11      Q     And if we follow the 2022 timeline for the

12  Senate map, is it fair to say that having a map ordered

13  by the district court in this case by March 3, 2026

14  would provide sufficient time to hold an election based

15  on that new movie without implicating the Purcell

16  principle, as you defined it?

17      A     I don't know.  I mean, I'm assuming that a

18  decision would get appealed, so I don't know how long

19  that would take.

20      Q     Assuming there was a final map as of March 3,

21  2026, would it be fair to say that that would provide

22  sufficient time to hold an election based on that new

23  map without implicating the Purcell principle as you

24  defined it?

25      A     I can't speculate as to that.  It's going to

Jay Ferrin
November 15, 2024

Page 152

1   be a decision for the courts in that circumstance.

2       Q    It's the testimony of the Senate that that's a

3   decision for the courts?

4       A    Whether or not that principle would apply?

5       Q    Yes.

6       A    I think that is.  I think we've reserved the

7   right to raise that, as I understand the defense.

8       Q    My question is whether the Senate's view is

9   that the concerns are implicated in the circumstance if

10  the final map is issued as of March 3, 2026?

11      A    If you're asking if it would be possible to

12  pull off an election if the map was in place by March 3,

13  2026, I'll venture to guess yes.

14      Q    And if we follow the 2022 timeline for the

15  Congressional map where the governor signed the

16  Congressional map on April 22, 2022, is it fair to say

17  that having a final map ordered by April 22, 2026 in

18  this case, it would provide sufficient time to hold an

19  election based on that new map without implicating the

20  Purcell principle as you've defined it?

21      A    Understanding that the Senate doesn't conduct

22  the elections.  It's done by the supervisors, it seems

23  like it would be a similar time frame.

24      Q    And that --

25      A    That supervisors were able to hold an election

Jay Ferrin
November 15, 2024

Page 153

1    as they were in 2022.

2        Q     What date would the Senate need in order for

3    the district court on liability to be confident that the

4    Purcell principle as you defined it would not being

5    implicated?

6        A     I don't know that I can identify a specific

7    date.

8        Q     I think we just need a quick conference, and I

9    think we'll be wrapping up.

10           (Recess 2:35 p.m. until 2:39 p.m.)

11           (Plaintiffs' Exhibit 20 was marked.)

12   BY MR. TILLEY:

13       Q     One final exhibit.  I've handed you

14   Exhibit 20.

15       A     Yes.

16       Q     This is President Passidomo's categorical

17   privilege log?

18       A     Yes.

19       Q     Looking on Page No. 3, it's providing a

20   category description of what has been withheld due to

21   privilege.  And on Page No. 3, it says or refers to,

22   quote, communications with counsel involving the

23   exchange of draft correspondence addressed to members of

24   the media containing attorney work product and

25   pertaining to legal services, legal advice, and mental

Jay Ferrin
November 15, 2024

Page 154

1    impressions of counsel, closed quote; is that right?

2         A     That's what it says, yes.

3         Q     Is that suggesting that there was

4    correspondence directed to the media that contained

5    attorney work product and was pertaining to legal

6    services, legal advice, and mental impressions of

7    counsel?

8         A     I think that was -- I mean, I don't have all

9    of these documents memorized.  It's been two years, two

10   and a half years -- well, three years since November of

11   2021, and I've not memorized the production.  So I don't

12   know off the top of my head exactly what that document

13   is referring to or what that is referring to.

14              MR. MEROS, JR.:  All right.  Thank you.

15              (Recess 2:41 p.m. until 2:45 p.m.)

16              MR. MEROS, JR.:  After consultation, we've

17         decided we don't have any questions.  The witness

18         will read.

19              (Thereupon, the taking of the deposition

20         concluded at 2:45 p.m.)

21

22

23

24

25

Jay Ferrin
November 15, 2024

Page 155

1                    CERTIFICATE OF OATH

2

3   STATE OF FLORIDA

4   COUNTY OF LEON

5

6          I, I. Iris Cooper, Notary Public, State of

7      Florida, certify that JAY FERRIN appeared before me

8      on November 15, 2024 and was duly sworn.

9

10          Signed this 5th day of December, 2024.

11

12

13

14   I. Iris Cooper, Stenographic Reporter
     Notary Public, State of Florida
15   Commission No. 1366674
     Expires: February 7, 2028

16

17

18

19

20

21

22

23

24

25

Jay Ferrin
November 15, 2024

Page 156

1                        CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF LEON

5

6                I, I. IRIS COOPER, do hereby certify that I

7        was authorized to and did stenographically report

8        the foregoing deposition of JAY FERRIN; that a

9        review of the transcript was requested; and that

10       the transcript is a true record of my stenographic

11       notes.

12

13               I FURTHER CERTIFY that I am not a relative,

14       employee, attorney, or counsel of any of the

15       parties, nor am I a relative or employee of any of

16       the parties' attorney or counsel connected with the

17       action, nor am I financially interested in the

18       action.

19

                 Dated this 5th day of December, 2024.

20

21

22       _____

         I. Iris Cooper, Stenographic Reporter
23       Notary Public, State of Florida
         Commission No. 1366674
24       Expires: February 7, 2028

25

Jay Ferrin
November 15, 2024

Page 157

1                        ERRATA SHEET
          DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE
2
          Deponent: JAY FERRIN
3         Date:     November 15, 2024
          CASE NO.: 8:24-cv-879
4         CASE:     Keto Nord Hodges vs. Kathleen Passidomo

5

6         PAGE    LINE        REMARKS

7         _____

8         _____

9         _____

10        _____

11        _____

12        _____

13        _____

14        _____

15        _____

16        _____

17        _____

18        _____

19        _____

20
          Under penalties of perjury, I declare that I have read the
21        foregoing document and that the facts stated in it are true.

22        Signature of Witness _____

23        Dated this _____ day of _____, _____.

24
          Job No. 384146
25

Jay Ferrin
November 15, 2024

Page 158

1    December 5, 2024

2    George N. Meros, Jr., Esq.
     Shutts & Bowen
3    Phone: 850-241-1717
     Email: gmeros@shutts.com

4

5    WITNESS: JAY FERRIN
     CASE NO.: 8:24-cv-879
6    Date:      November 15, 2024
     CASE:      Keto Nord Hodges vs. Kathleen Passidomo

7

8    The transcript of the above proceeding is now available and
     requires signature by the witness.  Please e-mail
     fl.production@lexitaslegal.com for access to a read-only PDF
9    transcript and PDF-fillable errata sheet via computer or use
     the errata sheet that is located at the back of the
10   transcript.

11   Once completed, please print, sign, and return to the email
     address listed below for distribution to all parties.  If
12   you are in need of assistance, please contact Lexitas at
     888-811-3408.

13

14   If the witness does not read and sign the transcript within
     a reasonable amount of time (30 days if Federal court), the
     original transcript may be filed with the Clerk of the
15   court.

16   If the witness wishes to waive his/her signature now, please
     have the witness sign on the line at the bottom of this
17   letter and return to the email address listed below.

18   Very truly yours,

19

20   _____
     I. Iris Cooper, Stenographic Reporter
21   Lexitas
     fl.production@lexitaslegal.com

22

23   I do hereby waive my right to read and sign.

24

     _____
25   JAY FERRIN

Jay Ferrin
November 15, 2024

**1**

**1**
8:16,
18,22
14:11
16:15
18:10
110:13
124:2
126:5

**10**
50:6
74:20
90:25
92:21,
24
103:24,
25

**100**
33:2
130:16
131:4,
12,16
149:2,7
150:5,
11

**102**
55:4

**108**
36:20

**10:35**
48:17

**10:43**
48:17

**10th**
11:3
91:2,
10,14

118:12

**11**
36:19
59:1
103:21
118:13

**11th**
65:18

**12**
66:16,
23 79:1
123:21

**12:40**
122:18

**13**
54:25
76:3
129:25
149:24

**13th**
91:9,
11,22
147:18

**14**
49:25
74:2
137:8

**14th**
16:1

**15**
76:2
94:14
139:3,7
142:10

**16**
36:20
61:14,
21
65:19

74:21
76:11,
13,21
77:1
81:15
83:22
84:2
93:2,13
105:2
106:3
115:16
116:23
122:22
123:4,
14,24
137:5
140:21,
23
149:18

**160**
148:7

**1629**
142:7

**16th**
138:21

**17**
89:8
141:19,
21
149:24

**17th**
89:13,
18 90:3
94:3,5
138:21

**18**
55:18,
23
61:17,
24 89:3

93:2,19
125:6,
18
144:10,
12

**18th**
10:25
12:10
13:11
89:11

**19**
49:12
61:6
62:12,
18,21
72:2,7
75:10,
18
76:11
79:11,
14,22
80:2,5,
19,20
81:5,13
83:22
93:14
97:1
106:4
122:11
125:24
126:2
148:21,
24

**1992**
41:23
42:10,
17
43:18
44:16
45:2
97:23

98:3
99:21
109:24
110:17
117:15
123:25
128:4

**1996**
124:14,
21

**19th**
92:7

**1:50**
122:18

**2**

**2**
13:25
14:2
23:19
25:16
26:1
30:9
31:11
58:14
60:12,
21
121:9
127:5
130:5,
12

**20**
14:19
38:16
108:2
144:24

**2002**
125:1,
5,17
127:22

128:1

**2012**
37:4
38:2
43:3,17
70:22
71:2
72:10
73:10
78:10,
25
125:23

**2015**
9:12,
15,24
10:4
100:24
101:21
103:2,
11
126:4,
8,14,
21,24
127:5,
16,17

**2018**
75:17

**2020**
43:10
68:23
70:2,
14,22
71:2,5,
6 72:10
73:11
76:24
78:10,
25 90:1
130:17,
18

Jay Ferrin
November 15, 2024

2

**2021**
  12:11
  36:19
  59:1
  88:21
  89:4,8
  137:14
  142:25
  143:9
**2022**
  12:22
  13:3,9,
  14 14:7
  38:22
  39:16,
  19,23
  40:2,15
  42:16
  43:19
  44:20
  45:12
  46:8,
  10,14,
  25
  47:4,8
  48:12,
  21
  50:18
  54:25
  70:15
  74:9
  78:12
  85:23
  87:7
  88:22
  90:25
  102:5
  103:4,
  20,24
  127:12
  128:23
  129:23

  130:16,
  18,19
  131:4
  148:23,
  25
  149:1,
  6,11,
  14,18,
  24
  150:5,
  7,10,
  11,14,
  19,20
  151:11
  152:14,
  16
**2022's**
  150:5
**2026**
  151:13,
  21
  152:10,
  13,17
**21**
  14:19
  38:17
  40:19
  118:13,
  20
  149:11
**22**
  50:11
  137:14
  149:14
  152:16,
  17
**24**
  63:18,
  21,25
  64:5,9,
  12

  93:20
**26**
  37:20
**26.3**
  75:19
**27**
  40:10,
  13
**29**
  90:1
**29th**
  90:4
  91:1
**2nd**
  14:11

––––––––
    **3**
––––––––

**3**
  23:19
  31:11
  36:15
  55:1,
  18,23
  65:19
  128:20
  149:1,6
  150:5,
  14,19
  151:13,
  20
  152:10,
  12
**30**
  45:1
  118:23
  120:3,
  10,23
  121:6

**30(b)(6)**
  101:21
**30.09**
  73:2
**30s**
  122:12
**31.33**
  72:2,11
  75:10
  80:20
**33.2**
  80:23
**33.33**
  80:6
**350**
  25:6
**38**
  49:11
**39**
  49:24
  127:23

––––––––
    **4**
––––––––

**4**
  40:7,9
  58:14
**40**
  50:6
**40,000**
  83:4
**40s**
  71:21
**41,946**
  81:5
**42**
  94:8,10
**43.06**

  78:20
**48.29**
  73:7
**49.48**
  75:11,
  19  76:4

––––––––
    **5**
––––––––

**5**
  49:7,11
  60:12
  62:25
  68:3
  72:1,25
  74:21,
  22
  76:9,10
  78:14
  116:5
  144:9
**50**
  57:22
  58:6
  71:18
  72:12
  80:7
  82:1
  84:25
  85:1,3,
  4,9,14
  120:3,
  23
  121:6
  122:10
**51**
  79:12,
  13
**51.41**
  73:11
  79:22

**53.2**
  73:18
**538,455**
  18:10
**55**
  94:14
**57.5**
  78:22,
  25
  79:25

––––––––
    **6**
––––––––

**6**
  54:23
  70:16
  72:5
  73:8,14
  75:6
  78:13,
  16,17
  79:10,
  13,17,
  25
  80:18
  116:5
**60**
  66:7
  82:4,11
  119:8,
  18
**60,000**
  107:8
**63**
  82:4,11
**63.9**
  72:7,
  14,21
  74:1
  80:2,7

81:13
**67**
82:4,11
**67.6**
81:15
**69**
79:12
**69.22**
78:17
79:5,19

———————
**7**
———————
**7**
8:22
55:16
74:25
75:8
94:4
103:25
108:2
116:5
130:2
**70**
65:19
66:3,7
77:14
119:7,
17
**70,000**
107:8
**71**
66:15,
23
**75**
119:18
**769,221**
18:13
**79.33**

73:4
76:25
**79.63**
77:1

———————
**8**
———————
**8**
16:15
40:10
58:22,
24
64:18
75:1
110:13
118:13,
20
150:7,
20
**80**
77:14

———————
**9**
———————
**9**
16:15
55:1
63:22
67:12
75:9
113:7
**92**
124:18
**96**
125:1
**9:30**
5:1
**9th**
147:17

———————
**A**
———————
**a.m.**
5:1
48:17
**ability**
8:4
17:11,
15,16
42:24
58:18
59:13
60:10
62:6,
15,17
64:4,8,
12,16
65:25
66:11,
18
67:1,14
68:21,
22
69:18,
20,25
70:2,5
82:15
84:3
85:12
86:18
98:7
100:1,
6,18
105:17
107:12
110:16
112:19
114:15,
21
117:2
119:22

120:11,
15
121:19
123:15
127:24
**abridging**
17:9
59:10
**accommodate**
71:2
**accordance**
18:6
**account**
49:4
**accounts**
106:11
**accuracy**
125:22
126:14
**accurate**
6:8
7:9,20
8:6,9,
23
24:3,5
30:6
32:18
44:6
48:25
49:3
51:14,
20 52:3
53:3,6,
10 57:4
59:3
62:20
71:1

74:12
90:1
94:8
95:12
98:4
99:8,22
104:14
107:2,
19
109:24
110:25
111:13,
19
115:19
117:1,
15
124:10
129:4,5
150:7,
16
**accurately**
37:9
50:17
**achieve**
47:19
**ACLU**
138:20
140:10,
18
**acres**
24:19
**act**
15:9,15
23:4,13
60:13,
21
91:24
**action**
136:22

137:20,
22
138:6,9
139:13,
16,19
141:7,
10,13
**actions**
127:11
138:4
**activities**
145:22
**actual**
65:24
**adding**
83:6
**addition**
110:14
**additional**
7:3
90:19
**address**
7:6
**addressed**
142:1
**adds**
19:12
26:7
**adhere**
13:21
39:5
55:7
56:3
60:1

| | | | | | |
|---|---|---|---|---|---|
| adherence | afford | 24 | 88:7 | 132:14 | appeared |
| 23:15 | 24:1 | Alabama | 91:23 | analyze | 134:7 |
| adjust | 30:11 | 66:2 | amiss | 95:21 | 140:9, |
| 22:17, | 43:25 | Alachua | 34:22 | 97:14 | 17 |
| 23  23:7 | afforded | 56:20 | amount | analyzing | appears |
| adjustments | 100:1 | alcohol | 106:10 | 85:7 | 125:21 |
| 35:1 | aforementioned | 7:22,23 | 150:19 | and/or | 136:1 |
| administration | 74:1 | alleged | analysis | 40:22 | 141:3 |
| 151:5 | African-american | 146:12, | 31:13, | Andrew | appendages |
| admirably | 66:4 | 23 | 16,21 | 131:7 | 109:7 |
| 106:13 | 109:1 | allowed | 32:16 | annex | 111:21 |
| admission | African-americans | 27:18 | 34:1 | 25:3 | 112:16 |
| 40:12 | 42:9 | 72:17 | 35:5,23 | answering | application |
| admit | 72:18 | 76:7 | 57:24 | 6:4 | 109:16 |
| 40:13 | age | 99:3 | 64:20 | answers | 110:11 |
| admitted | 58:6 | alluded | 65:10, | 6:8 | applied |
| 40:16 | 65:2 | 133:14 | 15 | 7:20 | 24:23 |
| adopted | 66:4 | 135:5 | 67:9,19 | 8:6 | 57:16 |
| 65:23 | 67:20, | alterations | 68:14 | 10:13, | 58:9 |
| affect | 21 | 56:1 | 71:10 | 18,19 | applies |
| 8:4 | 71:19 | alternative | 74:7, | anti- | 114:8 |
| 140:2 | 81:9 | 97:14 | 13,15, | retrogression | apply |
| affected | 83:5 | 135:18 | 25 | 62:2 | 15:22 |
| 86:25 | 107:8 | 142:24 | 75:3,15 | anti- | 20:18 |
| affiliation | 108:17, | 143:8 | 77:7,8 | vote | 55:13 |
| 138:24 | 20,21 | amendment | 78:8 | 60:20 | 56:4,8, |
| affirm | 109:5 | 16:1 | 83:21, | 61:6, | 11  57:3 |
| 5:2 | 119:6 | 56:3 | 23 | 10,15, | 114:24 |
| affirmative | agenda | 88:13 | 84:15 | 19 | 152:4 |
| 144:16, | 135:9, | 92:9,13 | 86:20 | anymore | applying |
| 24 | 12 | amendments | 95:18 | 85:20 | 55:11 |
| | agree | 37:8 | 96:13, | appealed | apportionment |
| | 37:11 | 38:10, | 19 | 151:18 | 16:15 |
| | agreement | 14,25 | 107:5 | appearance | 65:13 |
| | 124:19, | 55:4,5 | 115:22 | 137:15 | 71:11 |
| | | | 116:1 | | 77:12 |
| | | | 121:3, | | |
| | | | 4,11 | | |
| | | | analysts | | |
| | | | 87:17 | | |
| | | | 131:13 | | |

approach
  110:2
  117:19
approaches
  25:11
appropriateness
  22:12
April
  149:11,
  14
  152:16,
  17
area
  21:11
  24:19
  42:20
  50:24,
  25
  51:16
  53:11
  93:23
  95:15
  100:7
  104:2,
  6,17
  107:9
  111:19,
  20
  123:2
areas
  24:18
  26:5,9
  29:1
  46:12,
  23
  52:17,
  20
  53:16

54:1,6
57:5
86:7
90:10
100:19,
21
arrived
  132:6
Article
  14:19
  38:16
  40:18
articulation
  146:8
ascertainable
  23:25
  24:8,
  10,21
aspects
  15:16
  16:10
  33:18
  131:19
asserted
  101:15,
  18
assertion
  140:9
assertions
  102:8
  140:4
assess
  33:7
  74:10
  78:2

84:1
assessing
  29:7
assessment
  20:8,12
  65:5
  67:9
assign
  51:7
assist
  87:12,
  22
associate
  7:13
assuming
  71:22
  85:21
  141:24
  151:17,
  20
assurances
  97:24
  98:1
assured
  50:11
attached
  142:5,
  11
attention
  150:1
attorney
  6:21,24
  87:17
  144:21

145:7
attorney
-client
  144:21
  147:4
August
  9:21
  10:1
automatic
  145:24
  149:7
availability
  78:11
average
  69:5,
  10,12,
  14
  70:7,
  18,19,
  22 72:8
  73:15
  78:23
  79:19
  81:12
  84:23
  115:22
averaged
  70:16
averages
  70:10
averse
  107:23,
  25
  108:1
  110:1
  117:13,
  19

avoid
  32:21
  36:12
  64:8,
  11,15
  70:11
  104:12
avoiding
  113:4
aware
  8:11
  105:6
  116:9
  135:10
  150:18
awareness
  20:21,
  24
  42:22,
  23
  43:15,
  17
  44:19
  45:11,
  15,24
  46:7
  103:7

——————
B
——————
back
  34:20
  36:21
  43:11
  64:18
  65:18
  67:11
  70:15
  74:23
  76:9

90:9
91:6
92:8
97:23
114:20
122:20
123:25
127:8
128:19
142:20
143:3
148:23
Bailey
  142:13
balance
  52:11,
  23
balanced
  28:19
  84:7
balancing
  23:3,13
  28:10,
  11
band
  21:13
bar
  148:18
barred
  144:25
  145:3,
  19
  146:8
base
  44:2
  49:22
based
  24:5
  63:12

70:25
72:9,21
74:6
77:11
78:4
82:22
84:17
98:2
108:5
109:10,
23
110:8,
10
114:11
115:21
123:2
132:1
137:20,
24
139:13
141:7,
10
146:8
147:23
148:7,
25
150:6,
13,19
151:14,
22
152:19

**basically**
75:4

**basis**
68:16,
19
103:2

**Bates**
59:5
60:19

62:1
64:19
68:4

**bay**
61:8
93:4,7,
9
94:11,
20
95:15
96:16,
25
97:12,
23
100:25
101:2,
9,16
103:1,6
104:2,
4,5,6,
11,17
105:2
107:6,
19
109:3,
24
110:19
117:14
122:22
123:5,
14
128:6
134:19
137:5

**bear**
37:13
71:23

**Bearing**
35:19

**began**
5:1

50:8

**begin**
12:12
49:19

**beginning**
69:4

**begins**
108:7
110:5

**behalf**
39:18
140:10,
18
146:15
148:10

**believed**
64:3

**believes**
102:3
116:22
117:23
128:21
130:7

**benchmark**
41:3,11
42:7,20
43:8,
11,22
44:8
49:13
51:4
52:17
57:23
61:5
62:12,
17,20
63:18,
20,25

64:5,8,
12
65:12,
22
67:12,
15,16,
18 68:5
69:19,
20 70:1
72:1
74:6,8,
20,22
75:9,18
76:10,
11,22
78:13,
18
79:10,
11
80:19,
20
81:1,13
82:23
83:22
84:20
93:16,
24 97:1
103:5
106:4
122:11
128:25

**benchmarks**
43:2,16
53:14

**bests**
125:4

**bevy**
15:13

**Bill**
55:4

**bills**
91:24

**bit**
52:22
54:2,3
57:24
100:16

**black**
58:6
62:15
64:3
67:20,
21
71:19
73:2,7,
12,15
75:21,
24
76:5,7,
13,23,
24
77:17
79:19
81:9
82:14,
18,21
83:5,6,
9,12,18
84:3
100:8,
10,13,
14,18,
20
106:1
107:1,
3,8
108:17
109:5,
9,12
110:15,
24

111:5,
7,11,
12,16
112:19,
23
113:9
114:23,
24
115:4,
13
117:2,5
119:6,
20,22
121:14
123:14
127:23

**blank**
49:17
51:8,11
52:12
83:2
86:3

**blocks**
43:11

**bodies**
23:23
24:18
32:7

**bottom**
124:13

**bound**
41:12

**boundaries**
18:1
22:17,
24
23:15,
21
24:2,7,

9,16,
17,25
25:1,4,
6,9,12,
20
26:2,
13,15,
18,21,
22,23,
24,25
27:4,9,
12,14,
16,17,
21,23,
25
30:12,
14,15,
21
31:2,15
32:8,15
33:13
36:14
38:1
47:25
48:4
53:21
54:13
108:25
112:1
118:8

**boundary**
25:13,
14 27:5
28:5
30:18,
19,24
31:2,
13,16,
19,21
32:1,4,
6,10,
16,22,

23,24
33:3,25
35:5,
12,23
36:3,6,
9 48:7
84:10
90:10
99:5

**Bracy**
94:15,
19
95:1,6,
10,16,
19,22
96:8,10
104:1,
16
120:2
122:10
134:14

**Bracy's**
118:21

**break**
6:17,19
9:2
48:16
86:6
118:12

**bridging**
58:16

**briefing
s**
24:16

**bring**
91:21
107:12

**bringing**
146:13,
24

**broad-
based**
122:14

**broader**
73:19
121:10

**brought**
37:5,23
94:19
104:2
131:22
141:3
146:19

**built**
145:25

**bunch**
33:13
112:16

**bureau**
24:13
43:7
49:18

**Burgess**
55:19
104:8
106:6
107:16,
22
110:14

**Burgess'
s**
105:9
106:25

**BVAP**
72:2,11
75:10
78:20
80:5,20
85:8,14
96:13

119:8,
16,18
120:3,
10,20,
23,24
121:2
122:11

—————

C

—————

**CAAS**
87:19

**calculus**
118:9

**call**
7:14
71:22
91:24
122:2

**calling**
85:19
133:18

**calls**
16:3
63:10

**candidate**
17:1,16
60:11
67:22
72:9
75:2,
11,22
76:8
78:24
82:15
84:4
98:7
110:16
111:8

112:20
115:3
117:7
119:4,
15
120:11,
16,19
149:24
150:2

**candidat
es**
42:10,
25
62:7,16
64:4,22
67:14
69:1
72:19
83:13
100:2
114:25
121:19,
25
123:16
127:24
149:19

**capacity**
8:13
140:18

**capture**
109:9

**care**
8:3

**carryove
r**
41:8

**case**
5:3,16
15:10,
12,15

63:13
65:13
66:2
92:24
101:19
103:2
115:7
116:6,
7,11
127:12,
13
133:14
147:13,
15,17
151:13
152:18

**cases**
15:14
115:8
116:16
135:7
136:1,8

**castigat
ion**
106:19

**categori
es**
32:20
46:5

**category**
31:19

**caused**
82:10

**causing**
23:16

**CDPS**
46:16

**census**
12:3
24:13

Jay Ferrin
November 15, 2024

8

| | | | | | |
|---|---|---|---|---|---|
| 25:6 | **challenged** | **characterize** | **choices** | 107:21 | **clarification** |
| 43:6 | 45:22 | 29:20 | 50:14 | 121:17 | 7:4 |
| 46:16 | 92:24 | **charges** | 102:5 | 142:19 | **clarify** |
| 49:18 | 101:9 | 85:16 | **choose** | **cite** | 115:14 |
| 53:17 | **challenging** | **cherrypick** | 58:10 | 115:7 | **classic** |
| **centers** | 112:6 | 70:11 | 101:12 | 116:13 | 18:23 |
| 47:10, | **chance** | **choice** | **choosing** | **cited** | **clause** |
| 12,13, | 73:24 | 17:1, | 11:3 | 131:18 | 15:20 |
| 20 | 148:1 | 12,17 | 58:5 | **cities** | **clear** |
| **central** | **change** | 28:2 | **chose** | 25:3,5, | 30:14 |
| 56:19 | 20:1,3 | 30:17 | 70:10 | 18 27:4 | 37:3 |
| **cetera** | 82:1,3, | 42:10, | **Christian** | 29:1,8, | 38:13 |
| 26:24 | 11,12 | 25 | 132:18 | 10,18 | 39:17 |
| 32:24 | 137:23 | 49:22 | **circle** | 30:5,7 | 40:10 |
| 53:22 | 151:8 | 56:16 | 21:12 | 33:14 | 41:13 |
| 54:1 | **changed** | 58:19 | **circles** | 37:20 | 74:14 |
| 69:3 | 25:5 | 59:13 | 51:11 | **citizenship** | 83:16 |
| 88:1 | **changing** | 60:11 | **circuit** | 66:11 | 93:11 |
| 96:14 | 25:19 | 62:16 | 16:16 | **city** | 97:3 |
| 123:10 | 27:17, | 64:5,22 | **circumstance** | 25:12, | 106:9, |
| **chair** | 23,25 | 67:15, | 51:6,23 | 13 | 21 |
| 11:1 | 84:22 | 22 | 105:16 | 26:23, | 118:16 |
| 37:17, | 85:9 | 72:20 | 123:7 | 25 | 121:12 |
| 18 | 121:7 | 76:8 | 152:1,9 | 28:4, | 139:7 |
| 91:19 | **characteristic** | 82:16 | **circumstances** | 17,21, | **clearer** |
| **chair's** | 29:9 | 84:4 | 19:21 | 23 | 6:14 |
| 90:8 | **characteristics** | 98:8 | 28:7,13 | 30:18, | **Clearwater** |
| **chairman** | 54:10 | 100:2 | 29:5 | 24 31:2 | 41:25 |
| 11:9, | 71:20 | 110:17 | 30:16 | 112:1 | **close** |
| 16,19 | 136:17 | 111:8 | 35:9, | **claim** | 85:4 |
| 97:2 | **characterization** | 112:20 | 18,24 | 100:21 | 147:9 |
| 137:13 | 51:13 | 114:25 | 36:10 | 112:23 | 150:1 |
| **challenge** | 60:17 | 115:3 | 44:17 | 113:1 | **closed** |
| 92:25 | | 117:7 | 60:24 | 121:9 | 14:14 |
| 101:3 | | 119:4, | 65:17 | 122:9 | 17:12 |
| 117:10 | | 15 | 76:17 | **claims** | 18:17 |
| 122:20 | | 120:11, | | 130:9 | 19:14 |
| 123:19 | | 16,19 | | 140:16 | 24:2 |
| | | 123:16 | | | |

Jay Ferrin
November 15, 2024

9

25:20
26:2,6,
10
30:12
31:15
37:8
38:10
40:22
49:23
50:3,8,
15  55:8
56:5
58:19
59:17
60:6,13
61:1
64:22
65:5
66:12,
21
94:23,
25
95:2,5,
7,9,11
104:7,
13
107:18
108:9
110:20
113:12
118:17
130:10,
16
131:4
132:15
133:24
142:23
143:1,
7,10

**closely**
54:19
103:20

**co-
called**
92:23
**Coalitio
n**
37:4
**coded**
24:13
**cohesion**
68:1
73:6
76:21
77:4,5,
15  83:9
**cohesive**
76:14
114:13
**coincide
nce**
31:14,
18,25
82:19,
20
**collabor
ated**
86:13
**collusio
n**
133:16
**column**
73:14
**columns**
75:5
**comment**
138:17
**commenta
ry**
37:21

**commit**
148:9
**committe
e**
11:20
12:10,
12,24
13:15
55:8,13
57:18
58:2,10
59:1,2
86:1,18
87:2,4,
11,17
88:8,20
90:8
91:9,
11,17,
21
92:10,
13
104:3
114:5
135:19,
25
137:15
143:1,
10
**committe
e's**
56:8
57:1
87:5
**committe
es**
137:18
**common**
80:16
86:4

**communic
ate**
107:22
**communic
atee**
10:14
**communic
ating**
133:12
**communic
ation**
133:16
136:2
142:2
**communic
ations**
11:8
132:24
135:6
143:23
145:8
147:4
**communit
ies**
36:25
37:6
38:7
47:2,3,
6  100:7
102:20,
21
**communit
y**
37:24
98:6,11
100:8,
10,13,
14
106:1
114:11,

14,15
**communit
y's**
114:22
**compact**
18:1,
16,21
19:11
20:5
22:6,
14,20
28:19
30:21
100:16
108:16,
23
109:3
112:11,
15
114:12
123:9
**compactn
ess**
18:15
19:13,
16,18
20:3,8,
9,10,11
23:3,9,
18
28:11
34:7,
21,24
53:21
54:15
56:23
57:7
84:9
90:10
99:5
118:7

**compare**
74:8,22
79:10
80:17
**compared**
86:13,
14
111:2
**comparin
g**
29:22
76:11
80:8,12
**compariso
n**
74:3
**compellin
g**
63:6,14
**complain
t**
10:13,
17,19
131:18,
20,23,
25
132:3
143:1,
10,18
**complete**
7:3,20
8:5,9
23:18
84:13
**completel
y**
7:9
**complianc
e**

32:13, 17
33:5,7, 18
35:6,14
36:1,10
52:9,10
54:5
63:13
105:22
129:3, 18
**compliant**
50:12, 14
99:12
118:7
**complied**
67:10
74:11
107:14
**complies**
54:20
**comply**
42:16, 18 53:2
63:2
94:22, 24 99:9
105:14, 17
112:6
129:10
**complying**
26:16
35:17
63:7
86:18

**comported**
106:13
**concavities**
21:14
**concept**
29:12, 14
**concepts**
25:18
26:4,8
99:13
**concern**
82:5,10
105:4, 11
114:16
**concerns**
82:7
99:14
152:9
**conclude**
72:17
75:23
76:20
119:24
**concluded**
77:13
84:8
122:7
**conclusion**
16:4
25:8
63:10
72:20
82:22
85:6

100:3
132:6
**conclusions**
78:4
122:14
**condensed**
91:12
108:17
**condition**
8:4
**conduct**
12:4
96:13
152:21
**conducted**
77:9
**confident**
84:14
**configuration**
28:18
40:21
41:10, 15
54:20
57:12
85:7
98:3
100:12
101:9, 13,16, 17
108:4,8
110:3, 6,18

113:5
115:18
117:10
118:3,4
**configurations**
57:15
86:14
88:10
97:21
98:9,13
101:6
104:5
117:21
127:19
134:18
136:3
**confirm**
48:20
**Congressional**
9:25
18:11
55:6
91:20
149:12, 15,19
152:15, 16
**conjunction**
54:17
**connect**
47:10, 11,20
**connection**
93:9
**cons**
87:25

**conservative**
110:1
117:12, 19
**consideration**
16:7
27:15
28:25
29:5
65:1
71:9
87:6
98:5
122:21, 25
128:24
129:21
**considerations**
39:13
49:4
52:16
58:4
102:4
103:6
**considered**
15:17
29:13, 16
30:1,3
38:8
40:20
41:9
47:23
64:1
68:5
76:7
80:10

81:17
88:25
91:15
101:6
111:15
129:16, 23
136:22
**consist**
17:20
**consistent**
28:3
56:9,25
57:14
**consistently**
55:7,13
56:4
57:3,16
58:9
86:17
106:15
**consisting**
26:5
**constitute**
46:6
113:12, 20
114:1
**constitutes**
119:5
121:20
122:4
**Constitution**
14:12,

17,22,
25
15:1,6,
19
16:10
17:2,4,
19  38:4
40:19
48:11
59:15
60:21
62:3,24
63:4,8,
16
105:14,
18,22
145:25

Constitu
tional
18:7
26:20
27:8
32:14
33:22
56:4
97:25
98:2
99:12
113:6
123:1
129:14

constitu
tionally
107:14

consult
151:6

contact
88:17
130:6

contained
7:23
29:2

contest
75:1
140:15

context
12:18
28:10
35:22
37:12,
16
41:23
50:22
66:5
71:13,
16,17
83:18
99:3
121:1,
2,10
128:25
134:20

contextual
45:15

contiguous
17:20
24:19

continue
50:1
91:4
98:8
107:23

continued
29:21

control
66:18
67:1,21
69:11,
13
84:23,
24
113:10
117:3
119:21
121:22
147:22

controls
73:21

conversation
37:13
50:23
95:16
96:7,
18,23
104:18,
22

conversations
68:9,
11,18
104:24
144:21

convex
21:12

coordination
133:15

copy
13:18
137:19
139:6,
24
140:25

141:6
142:10,
14,18

core
40:6

cores
40:4,
14,17
41:4,5

correct
13:13
14:15
17:23
39:1
44:4
46:21,
24  49:6
51:13
52:7
58:11
59:4
61:22
64:6
65:7
75:13
77:11
79:25
80:3,4,
21,25
89:9
90:2,18
93:15
94:7,12
96:6
104:23
110:22
121:16
124:11
130:22,
23
140:19

144:16
148:13

correctly
42:15
50:4,15
56:6
57:11
72:16
84:5
100:18

correlated
22:3

cough
7:22

counsel
52:18
55:3
67:17
68:8,9,
11,18
87:24
144:19

counties
26:5
29:2
33:2
51:1,24
86:9
114:20
123:7

counting
32:21

county
18:24
20:14,
18
21:1,
17,22

26:2,9,
13,15,
18,22,
23,25
27:16
29:3
32:7,22
33:12
34:5,
11,12,
16
47:24
48:1,3
51:7
56:20
105:3
108:6,
15
110:16,
19
112:20,
24
113:18
114:8,
11,19
116:23
117:6,
25
118:6
123:15
124:12
125:2
126:18
127:16
128:1

couple
33:12
45:17
116:11
118:11

coupled

53:16
court
  5:19,25
  23:25
  24:12,
  15,22
  27:10
  29:17,
  19,24
  37:3
  38:2
  41:18,
  21,24
  44:16
  45:2,7,
  10
  66:16,
  24
  77:13
  98:15,
  16
  100:24
  101:2,
  12
  102:16
  103:10,
  16,17,
  19
  105:19
  122:2
  124:3,7
  126:17
  127:16,
  18
  134:10
  147:8,
  18
  148:1,
  14
  149:6
  150:4
  151:13

Court's
  150:15
court-
ordered
  42:8,17
courtroo
m
  6:10
courts
  40:22
  45:23
  63:13
  66:5
  98:18
  110:17
  118:16
  119:2,
  12
  152:1,3
cover
  98:9
  99:21
  102:15,
  18
covered
  48:14
  93:23
covers
  16:11
  135:11
  144:3
create
  20:5
  24:2
  30:11
created
  31:17
creating
  134:20

creation
  60:22
criteria
  11:14
  12:6,16
  13:13,
  15 15:6
  16:7,21
  17:22
  26:20
  27:8
  28:22
  32:14
  52:1
  53:2
  55:11
  56:12,
  13
  58:9,13
  84:18
  118:2
  129:6,
  8,14
criterio
n
  40:14
  48:9
cross
  48:1,6
  96:25
  105:2
  107:6
  109:3
  110:19
  122:22
  123:5,
  14
  137:5
crossed
  94:11
  97:11

101:2
  103:5
  109:23
  117:14
crossing
  93:6
  94:20
  100:25
  103:1
  104:4,
  5,6,11
  107:19
  111:25
current
  41:23
cut
  28:6,17
  33:13
  107:6,
  11
  113:23
  114:16
  127:7
cutting
  112:1
cycle
  10:15
  24:18
  25:10
  27:11
  37:19
  38:2
  43:24
  44:5,
  11,14
  65:14
  66:17,
  25
  70:12
  74:9
  98:14,

15
cycles
  29:17
  36:23
  68:25

————————
    D
————————

damage
  108:8
Dana
  87:21
Daniel
  5:15
data
  12:3
  13:22
  24:13
  25:6
  49:17
  65:3,17
  70:4
  78:1
  121:17
date
  91:14
  150:14
dates
  90:2
  147:15,
  17
day
  13:18
  139:10
days
  11:5
deadline
  149:18
dealt

116:18
debate
  57:18
  131:3,
  11,16,
  17
  132:4,7
decade
  68:23
  70:6,7,
  19,20
decades
  42:21
  116:11
December
  9:21
  10:3,4
decided
  98:24
  109:22
deciding
  21:21
decision
  23:7
  28:8
  57:1,
  11,17,
  21
  99:21
  102:16
  103:12
  147:25
  149:7
  150:5,
  15
  151:18
  152:1,3
decision
s
  16:15

Jay Ferrin
November 15, 2024

13

58:4,7
103:10

declines
65:12

deemed
9:5
23:24
24:20
86:20

deemphasize
25:12

defense
144:24
145:16
152:7

defenses
130:9
144:16,
23

define
27:10

defined
150:11
151:16,
24
152:20

definitively
123:6

degree
77:15
115:10

delay
146:12,
23

delivered
139:12

Dem
73:15

Democrat
72:9
75:17
78:23

Democratic
77:17
83:9,17
117:3

Democrats
72:6
73:5,6,
9,11,
19,24
75:11
76:24
79:12
82:9
119:22

demographic
65:4

demographics
53:17
54:10
66:9
108:15

demonstrate
73:5

demonstrates
60:24

denied
40:19

dense
109:6

densely
26:9
110:25

denser
100:15
111:10,
16,19,
20

density
108:17
109:12
110:12

denying
17:9
58:16
59:10

Department
124:20

Depending
117:4

depends
147:20
148:19

depicts
126:2

deposed
9:7
10:1,9

deposition
5:18
7:16
10:3,11
12:25
13:7

17:14
103:8
110:22
127:6
128:10

depositions
10:6
106:14

describe
9:16
12:21
16:21
24:9
71:20
133:16

describing
99:22
110:21

designated
8:13
46:16

detail
75:5

determination
83:24
124:6

determine
31:14
33:18
35:1
64:21
65:20
67:13
77:10

determining
68:15
69:17,
24

developing
126:4,
11

development
92:18
126:23
127:5
130:16,
25
136:19
142:24
143:8

developments
135:18

deviated
48:25

deviation
53:1

deviations
18:9,12

dictated
19:3

dictating
21:18

difference
18:20
79:6

differently
113:8,
20

difficult
7:23

diffuse
111:12

dig
116:10

diluted
60:25

dilution
60:6,
18,20
61:6,
11,15,
19

diminish
16:24
17:11
49:15
51:5
58:18
59:12
62:6
84:3
85:7
86:21
100:17
117:2,5

diminished
49:20
62:16
97:20
105:12,
17
106:3

118:15
119:24
121:20
123:15

**diminishing**
64:8,
12,16

**diminishment**
35:25
36:13
43:1,4,
21
44:5,7,
11
52:19
53:8,20
54:8,21
60:10
65:11,
24 66:6
68:6
95:2
96:14
100:21
104:12
107:13
108:4
112:23
113:12,
20
114:1,
8,10,17
115:5
118:6,
14,15,
16,17,
25
119:2,
5,12

120:7,
8,15,
18,20,
22,25
121:15,
20,23
122:2,
4,8,15
123:12
129:1

**direct**
5:11
30:17

**directed**
14:12
18:8,16
19:9,10
23:20
25:17
26:1,3

**directions**
10:25
129:15

**directive**
18:4
20:5
24:6
25:23
26:17
28:22,
24
30:22
39:5
47:24
90:8

**directives**
12:12

26:17
27:6,13
39:2
55:8,13
56:9,25
57:3,16
86:1,2,
19
89:4,12
91:3

**director**
12:23
87:10

**disadvantages**
145:16
146:15

**disclose**
145:7
147:3

**disclosing**
147:6

**disclosure**
131:5
132:15

**disclosures**
133:25
142:21

**discount**
20:16,
19

**discounted**
27:24
28:1

**discoverable**
130:8

**discovery**
132:22
133:13
135:6
136:1,7
141:24
142:6
143:23

**discuss**
9:2
68:18
95:9
138:12

**discussed**
47:25
84:1
89:5
117:22
130:21
135:25
136:14

**discussing**
12:16
31:20
77:21
127:1

**discussion**
12:11
29:18
42:6
53:14
115:12
143:25

144:8

**discussions**
131:12
132:12
133:22
134:2,
21
135:16
142:22
143:6

**disenfranchised**
104:11
105:1,8
106:25

**disenfranchising**
110:15

**disfavor**
39:20,
25

**disfavoring**
16:23

**distance**
115:11

**distinction**
19:6

**distribution**
49:20
50:1
109:5

**district**
16:16
17:19
18:9,21

19:1,24
20:2
21:11,
13,14,
19
22:13,
17,19,
24
23:1,11
28:16,
18
31:18,
25
32:4,6,
10
33:2,11
34:15
35:7,10
36:4,5,
8,12
40:5
41:17,
20,24
42:7,8,
17
44:1,
13,16
45:9
47:14
50:3
51:4,7,
9,21,25
52:17
53:12,
25
54:7,10
57:12,
13,22
58:5
60:22
61:5,8,
10,14,

| | | | | | |
|---|---|---|---|---|---|
| 17,20, 24 | 7,21,22 | 24 | 41:5,6, | 124:18, | **drafted** |
| 62:12, | 84:2,7, | 119:8, | 11 43:8 | 25 | 92:13 |
| 17,20, | 8,20,22 | 17,24 | 45:5, | 126:3 | 115:3 |
| 21 | 85:10, | 120:10, | 16,20, | 128:13, | 144:18 |
| 63:18, | 15,20, | 23 | 21 | 16,25 | **drafting** |
| 21,25 | 21 | 122:22 | 46:1,2, | 147:14, | 26:14 |
| 64:2,5, | 86:11, | 123:4, | 3 | 23 | 29:22 |
| 9,14, | 25 87:1 | 14,24 | 49:14, | 150:10, | 90:17 |
| 16,21 | 92:11 | 124:10 | 15,16 | 13 | 97:10 |
| 65:25 | 93:6,8, | 125:3, | 50:24 | **districts'** | 123:3 |
| 66:1,9 | 13,14, | 18,24 | 51:2 | 31:14 | **drafts** |
| 67:9, | 19,20 | 126:2, | 52:6 | **diverging** | 87:5 |
| 15,16 | 94:10 | 18 | 53:6, | 47:6 | 91:16 |
| 71:14, | 97:1, | 127:23 | 18,19 | **doctor's** | **draw** |
| 18,20, | 11,22 | 135:18 | 56:19 | 8:3 | 11:14 |
| 22 | 98:9 | 136:17 | 58:3,15 | **doctrine** | 12:6,16 |
| 72:2,7 | 99:16, | 137:5 | 59:9 | 145:3 | 18:16 |
| 73:1,3, | 25 | 142:24 | 62:4,5 | **document** | 19:9,11 |
| 6,20,23 | 100:25 | 143:8 | 65:1,2, | 130:3 | 21:21 |
| 74:6, | 101:11 | 151:13 | 21 66:3 | 137:10, | 23:4 |
| 11,21 | 103:5 | **districts** | 67:17 | 12 | 28:2 |
| 75:10, | 105:2, | 17:8,25 | 68:4, | 144:13, | 30:21 |
| 18,24 | 13 | 18:16, | 10,15 | 18 | 34:15 |
| 76:6, | 107:5, | 24 | 78:12 | **documented** | 45:10 |
| 11,13, | 10 | 19:10, | 80:14 | 15:14 | 51:4,6, |
| 21 77:1 | 108:23 | 11,19 | 84:8 | 134:15 | 11,21, |
| 78:13, | 109:19, | 21:22 | 86:10, | **documents** | 25 61:8 |
| 14,17 | 23 | 23:2,7, | 20 | 130:15 | 72:20 |
| 79:10, | 110:18 | 10 24:2 | 92:24 | **double** | 78:3 |
| 11,13, | 111:6, | 26:4,8 | 93:1,2 | 32:21 | 84:17 |
| 14,17, | 18 | 28:11 | 95:18 | **draft** | 86:8, |
| 22,25 | 114:14, | 30:12 | 99:4, | 22:19 | 10,24 |
| 80:2,5, | 24 | 35:15 | 12,24 | 95:20 | 88:9,12 |
| 18,19, | 115:2, | 37:3,4, | 102:19, | 97:5 | 96:25 |
| 20 | 4,9,15, | 7,22 | 22 | | 97:10 |
| 81:1,4, | 16,21, | 38:10, | 108:6,9 | | 99:3, |
| 5,15 | 24,25 | 14,24 | 116:8, | | 12,16 |
| 82:2,8, | 116:19, | 40:4, | 17 | | 107:13 |
| 12,15, | 23 | 14,18, | 117:19 | | 108:5 |
| 18 | 117:7, | 21 | 122:16, | | 109:18 |
| 83:1,4, | 14,25 | | 20 | | 111:6, |
| | 118:23, | | 123:10 | | |

17
112:18
114:2
123:9
148:17

**drawer**
87:7
88:18

**drawer's**
88:19

**drawing**
9:17
12:12,
20
13:1,6,
14
14:7,18
15:8,18
16:14,
24 21:9
22:9
30:18,
20 36:8
37:22
38:8,21
39:13,
15,19,
23
40:2,15
43:19
44:19
46:10,
14,25
47:4,8
48:12,
16,19
49:19
50:8,18
52:5,8,
21
54:7,10

58:5
61:20
71:13
74:6,9
78:12
82:22
84:16
85:23,
24 86:4
87:13,
22,24
89:13,
14
93:13
99:15,
25
113:8,
19
115:21,
24
116:7
117:19
129:7

**drawn**
13:2,8
17:8,25
19:1
35:8
38:1
43:24
45:22
58:15
59:10
61:22
84:7
92:12
114:2,
24
115:16
122:21
123:4

**drew**
41:24
46:19
47:15
48:21
93:14,
20
117:4
126:10
143:20

**Driskell**
131:6,9
132:16,
20

**Driskell
's**
132:2
133:5

**driven**
66:8

**drop**
85:3,5

**dropped**
82:1

**drugs**
7:21

**Duval**
51:1,7
86:8

**dynamic**
52:24
54:4

_____

**E**

_____

**earlier**
7:4,8
43:2
72:24
103:8

105:5
108:16
116:4
123:13,
24
128:10
136:20
146:19

**easier**
13:19
99:20

**easily**
23:24
24:7,
10,20

**educated**
94:1

**effect**
66:11
83:3

**effectiv
e**
46:2
57:13
65:21,
25
71:22
85:21

**effort**
106:12

**Eichermu
ller**
87:16

**elaborat
e**
140:6

**elect**
17:1,
11,15,

16
42:10,
25
43:25
49:21
58:18
59:13
60:11
62:7,16
64:4,8,
12,16
65:22,
25
66:12
67:14
68:21,
22
69:18,
25 70:5
72:19
76:7
82:15
84:3
98:7
100:2
105:11,
17
110:16
111:8
112:20
114:15,
21,25
115:3
117:7
119:4,
14
120:11,
15,19
121:1,
19
123:16
127:24

**election**
66:19,
20,21
67:2,3,
4,25
70:18,
20,21
73:9,
18,23
78:3,17
79:2,4,
7,11,24
83:13
85:2
147:9,
10
150:6,
18
151:5,
14,22
152:12,
19,25

**election
-related**
147:9

**election
s**
16:25
69:22
70:22
72:6,
10,19
73:10
74:2
75:2
78:24
81:13
85:3
119:23
151:7
152:22

element
  29:9,16
  71:10
  74:24
elements
  121:22
  122:7
elevate
  64:20,
  24
eliminate
  62:4
eliminated
  125:2
  126:18
  127:15
Ellen
  132:18
  134:6
email
  97:5,7
  141:22
  142:4,6
emails
  142:15
emanated
  132:22
embark
  112:4
emphasis
  19:25
employed
  48:12
employee
  138:20

employme
nt
  138:24
enable
  46:4
enact
  98:18
enacted
  40:15
  61:17,
  20,24
  76:10,
  12,25
  78:14
  80:17,
  18,23
  81:15
  82:25
  83:21,
  22 84:2
  93:1
  98:16
  105:2
  106:3
  122:22
  123:4,
  13,24
  136:19
  137:5
enacting
  61:14
  147:23
enactment
  148:6
encircle
  50:1
encompas
s
  41:21

end
  68:22
  69:5
  70:6
  86:5
  91:4
endeavor
  112:4
ends
  52:14
enforceab
le
  43:9
  44:8
  102:23
ensure
  49:20
  65:22
  142:17
entered
  118:9
enthusias
m
  78:6
entities
  41:6
enumerat
ed
  38:4
  67:20
  105:4
  129:15
equal
  15:20
  17:9
  18:2,5,
  8 26:21
  27:1
  58:16

59:11
  84:18
  148:8
equality
  47:15,
  19
equalize
  28:16
  30:20
  123:9
equals
  86:9
essentia
lly
  60:12
establis
hed
  24:11
  88:11
  97:2
  150:22
estimate
  109:10
estimati
on
  109:8
  112:3,
  12,14
evaluate
  29:21
  64:23
  73:20
  84:19
  118:1
evaluate
d
  91:19
  119:13

evaluati
ng
  29:7
  74:5
  87:25
evaluati
on
  121:16
event
  134:5,
  11
events
  145:21
eventual
ly
  141:3
exact
  100:5
EXAMINAT
ION
  5:11
examine
  23:20
  26:1,
  12,17
  76:17
examined
  5:9
  107:4
examples
  19:4
  56:16,
  18
exceed
  18:9
exchange
  141:22
excuse
  91:18

exhibit
  8:16,18
  13:25
  14:2
  36:15
  40:7,9
  49:7,11
  54:23
  55:16
  58:22,
  24
  63:22
  64:18
  65:19
  67:12
  68:3
  70:17
  74:20
  75:9
  92:21,
  24 94:4
  103:21
  118:13
  123:21
  129:25
  137:8
  139:3,7
  140:21,
  23
  141:19,
  21
  142:10
  143:3
  144:10,
  12
  148:21,
  24
  149:1
exist
  136:9
existed

41:17
44:14
62:17
68:22
117:15

**existence**
42:20
45:16,
25
90:23

**existing**
23:21
49:14
70:1

**exists**
14:13

**expected**
22:15,
22

**expecting**
102:10

**experience**
110:8,
10

**expertise**
123:3

**explain**
51:19
104:4

**explaining**
25:22

**explains**
59:5

**explicit**
40:18

**explore**
25:18
26:4,7
28:23
29:10
109:13
137:4

**extend**
18:25
145:7

**extent**
40:17,
20
47:16
63:10,
15
68:17
102:3
127:8
129:13
133:4
143:16
147:3

---

**F**

**face**
20:25
115:17

**fact**
33:20
34:14
39:15
41:16
80:13
81:9
82:22
97:24
98:2,13

103:1,5
108:5
109:23
133:15
146:6,
21
148:7

**factor**
36:1

**factored**
129:5

**factors**
35:25
61:12
66:9,
16,24
67:19
69:2
72:21,
25
84:10
147:22

**facts**
145:18

**fair**
17:17
29:20
34:16,
22 35:1
37:2,4,
7
38:10,
14,24
60:17
106:12
151:12,
21
152:16

**fairly**
108:7

110:5

**fall**
84:25

**familiar**
109:15

**familiarize**
116:12

**family**
90:6

**farther**
42:1

**fast**
91:13

**favor**
27:24
39:20,
24
147:18
148:15

**favorable**
147:24

**favored**
30:15

**favoring**
16:23

**favorite**
57:7

**feasible**
18:2
23:21
25:18
26:2,4,
8,18
27:9,14
28:21

**features**
24:1

30:11
31:15,
20
32:1,11

**February**
149:1

**federal**
14:13
15:7,9,
11,17,
19
16:10
23:22
24:13
63:1

**feedback**
56:2
96:11

**feeding**
134:7

**feel**
106:2
147:6

**feeling**
103:3

**felt**
7:3
23:8

**Fentrice**
131:6

**Ferrin**
5:8
130:18

**Fifteen**
94:17

**figure**
135:8

**file**
137:7

**filed**
55:3
91:23

**files**
141:6

**filings**
10:12,
17

**fill**
51:12
52:2,14
86:5,10

**filling**
52:12
54:12

**final**
55:20
56:1
150:14
151:20
152:10,
17

**find**
113:25
131:21
135:1,2
136:11
140:4
143:4

**fingers**
109:7

**finish**
6:18

**finished**
6:3

**fit**
7:13
99:6

Jay Ferrin
November 15, 2024

19

**fixed**
65:4
**flag**
36:19
49:11
94:13
103:25
**flexibility**
35:21
**floor**
11:4
88:24
92:10,
14
**Florida**
8:14
9:5
12:21
13:3,8
14:21,
25  15:1
18:25
19:21
23:25
24:11,
21  25:3
33:21
38:2
40:19,
20
45:18
48:11
56:19
57:10
59:15,
17
60:20
62:2,24
63:3,8,
15

86:25
87:1
103:15
105:14,
18,22
116:17
124:3,7
128:10,
12,14
130:17,
18
131:13
132:14
133:23
134:3,
23
135:17
138:20
140:11
142:23
143:7
145:25
150:4,
15
**focus**
52:8,22
53:20
54:2
65:20
**focused**
53:9,10
**focusing**
53:4
**folks**
106:14
133:2,
18
**follow**
14:6
28:4,5
32:11,

14
56:17
117:13
151:11
152:14
**follow-up**
104:21
**footing**
26:21
27:1
**forget**
100:5
**form**
16:3
63:9
123:17
148:3
**forms**
137:15
**fortunate**
27:11
**forward**
57:1
73:23
98:16
101:10
**forwarded**
142:3,
7,15
**fourth**
37:5
**frame**
148:10,
19
152:23

**frames**
15:2
**free**
145:10
147:6
**frequently**
86:13
**fresh**
146:16
**fresher**
145:23
146:19
**front**
17:3
**full**
7:20
8:5,9
54:16
55:8
91:9,11
121:3,4
**functional**
64:20
65:9,14
67:8
74:7,
13,15,
25
75:15
77:6,8
84:15
86:19
95:18
96:13,
19
107:5
115:22
116:1

121:3,
4,10
**future**
56:3

———

G

———

**gaggle**
134:12
**Gainsville**
56:20
**gate**
107:14
**gauge**
32:13
**gave**
7:9
34:5
43:15
44:15
49:22
72:18
89:4
107:16
139:24
**general**
41:10,
14
55:11
66:21
67:4,25
70:19,
21
73:17,
23  75:2
78:24
79:24
81:12
83:13

85:2
109:15
110:2
116:14
121:24
122:13
136:3
**generally**
22:10
34:25
36:9
46:2
67:18
86:4
93:23
100:15
106:20
136:15
**genesis**
41:17,
20
**geographic**
18:1
23:15,
21
24:1,7,
9,17
27:9,
12,14,
16
30:11,
19
31:19
32:15
33:1,3
35:12
36:14
53:21
54:13

108:24
118:8

**geographically**
114:13

**geography**
18:17,
22
19:2,3,
6,12,23
21:18
22:1,2
25:6
34:10
35:19
43:6,7

**Gibson**
50:23
51:17
92:9

**Gillum**
75:11,
16,25
76:5

**give**
5:3 6:8
7:19
8:5,9
9:4
45:1
49:10

**giving**
101:25

**goal**
29:10,
15
30:3,5,
6 47:1,
5,9,20

48:1,2,
6 64:7,
11,15
105:23
107:13
117:16

**goals**
48:3

**good**
5:13
19:7
33:24
35:16
94:20
99:1,16
102:20
103:3

**government**
63:2,6
106:15

**governor**
75:11
149:14
152:15

**great**
17:5
113:3

**greater**
24:19
69:19
70:1

**ground**
5:17

**grounds**
123:19

**group**
65:3
67:1
119:13

122:5
133:12

**group's**
17:16
60:10
62:6
67:14
69:18,
25

**groups**
66:17

**grow**
50:2

**guarantee**
148:6

**gubernatorial**
75:17

**guess**
23:11
31:11
33:14,
16
41:23
43:14
81:10
92:8
94:1
99:2
102:2
105:16
119:19
120:21
124:6,7
125:8
127:8
138:3
141:4
152:13

**guessing**
112:15

**guidance**
56:2

**guiding**
14:22,
24

**Gulf**
18:25

────────

**H**

**handled**
8:24

**happen**
97:18

**happened**
44:5,
11,17,
25 45:8
102:12

**happening**
91:13
148:19

**happy**
84:9
86:16

**hard**
124:11

**harder**
111:6,
18

**head**
5:22
22:8
31:24
44:22,
23 45:6

101:4
124:16
128:15
146:10,
25
147:16

**heard**
10:17

**hearing**
9:25

**hearings**
9:18
37:21,
24
101:6

**heavily**
75:4

**held**
9:25
72:10
73:10
78:24
98:14
119:23
150:6

**helped**
27:10

**helpful**
75:7

**Herculean**
106:12

**high**
23:12
32:16
33:4
35:11
73:5
77:15
99:4

108:17
135:11

**High-level**
145:14

**higher**
32:17
80:6
81:10

**highlight**
49:17

**highlighted**
50:7

**highlights**
144:3

**highly**
118:6

**highway**
33:12

**highways**
23:23
24:14

**Hillsborough**
100:11,
16
107:1,4
108:6,
15,18
109:6,
18
110:19
111:2,
7,12
115:15
116:23

117:25
118:5
124:9
125:7,
18,25

**Hillsborough-only**
111:17

**Hispanic**
108:20
109:12
116:17

**historic**
42:24

**historical**
40:21
97:22
98:6,13
114:21

**historically**
62:5

**history**
45:21
123:25
128:10,
12,13,
16

**Hodges**
5:16

**hold**
37:21
79:3
116:18
151:14,
22
152:18,
25

**honestly**
95:24

**House**
92:17
130:21

**hull**
21:12

**hurricanes**
69:2

**hypothesize**
122:23

**hypothetical**
105:12,
25
107:5

**hypothetically**
108:22
119:17

**hypotheticals**
122:14

———
**I**
———

**idea**
30:25
99:1
111:4

**ideal**
18:10,
12
47:16
81:5

**ideas**
97:4

**identified**
49:16,
25 51:1
52:18
129:1
144:23

**identifies**
49:14

**identify**
67:17
146:11

**identifying**
80:13

**ignore**
42:19

**III**
14:19
38:16
40:18

**illness**
8:3

**image**
125:20
126:2,
20

**images**
125:9

**imagined**
110:8

**impact**
136:18
151:4

**impacted**
16:1
23:3

**impacting**
28:22

**impermanent**
25:19
27:22

**impermissible**
60:6,10

**implement**
89:16

**implicated**
152:9

**implicating**
151:15,
23
152:19

**implications**
81:3

**importance**
100:6

**important**
7:19
43:22
44:2
63:2
129:11,
17

**imposes**
59:15

**impressed**
106:15

**improper**
34:15

**improve**
35:13
90:10
91:5

**improvements**
90:13

**inappropriate**
22:5,7

**include**
24:24
43:7
94:10
97:11

**included**
99:25
101:11
102:19
106:17
111:7
124:8
125:6,
25

**includes**
24:6
34:15
93:8
125:18
126:2

**including**
67:20
107:9
135:19

142:25
143:9

**inconvenience**
151:9

**incorporate**
22:16

**increase**
82:14,
17 83:5

**incredibly**
106:13

**incumbency**
13:24

**incumbent**
16:23
39:25

**incumbents**
17:7

**indicating**
82:9

**indicator**
71:24
77:5
82:2

**individual**
32:20
138:3,
22

individuals
90:17
106:16
136:14
150:9
infinite
148:4
influence
121:24
inform
22:9
43:18
46:7
information
7:4
13:23
20:24
130:6,8
131:22
134:8
137:24
initial
90:14
131:5
132:15
133:25
142:21
initially
93:13,
19
input
36:22
88:4,6
89:17,
19,21
90:19

inquiry
65:20
114:18
instance
10:2
instances
9:16
instruct
68:18
145:8
147:5
instruction
114:4
instructions
11:8
12:20
13:12
109:21
intensive
98:14
intent
17:8
59:10
133:20
intentions
88:19
106:20
133:3
intents
143:19
interacted
138:25

interaction
139:22
interest
36:25
37:6,25
38:8
47:2,3,
6 63:6,
14
113:4
128:21
interference
147:8
intermingled
108:19
interpretation
56:12,
13
interstate
28:5
interstates
23:22
24:14
26:24
112:1
introducing
99:13
117:20
inverse
32:9,
19,25

involve
18:24
100:25
101:1
involved
103:2
126:4,
6,11
Isabelle
132:18
136:5
142:20,
25
143:5,
9,13
144:6
isolation
23:4,18
86:8
issue
52:22
88:16
103:10
issued
55:8
137:14
149:6
150:4
152:10
issues
99:5
116:15
iteration
57:8
iterations
29:22
42:4

92:11
Ivy
87:21

_____

J

_____

Jacksonville
50:24
53:25
80:9,12
92:11
January
11:2,3
54:25
88:22
90:25
91:2,6,
9,10
92:7
93:18
103:24
118:12
Jason
87:18
88:2
142:8
Jay
5:8
130:18
jerrymandering
124:14
jingle's
60:23
jingles
61:12
job
33:24
35:16

jogging
12:4
joined
7:16
joint
92:6
JR
7:12
16:3
31:5
55:21
63:9
68:16
101:20,
25
102:7
123:17
125:12
127:4
145:6
147:2
148:3
judicial
14:13
16:13
June
147:17
149:24
Justice
124:20
justification
20:16
38:1,3
justifications
127:11
justifies

128:22
129:19,
21

**Justin**
87:16

─────────
**K**
─────────

**keeping**
28:23
29:10

**Keys**
18:25
19:21

**kind**
7:22
11:16
21:12
32:9
33:22
44:1
52:23
53:13,
15
65:15
69:6
71:19,
24
73:20
85:5
86:6,
16,21
87:1,19
93:16,
25
108:25
114:20

**Kirk**
142:13

**Klas**
132:18

134:1,
7,24

**knew**
51:3
138:19

**knowing**
123:2
124:23

**knowledge**
33:21
61:12
104:17
130:24
131:2
132:1
138:22
139:15
140:3

─────────
**L**
─────────

**labeled**
59:6
93:14,
19

**laid**
13:16
32:17
33:7

**Lakeland**
42:1

**land**
93:8,9

**language**
14:12,
14,17,
21
17:2,10
24:5

25:17
58:13,
17
59:11,
16

**large**
23:23
24:17

**larger**
82:24

**latches**
145:3,
5,11,
17,20
146:8,9

**latitude**
101:25

**law**
14:13
15:7,
10,12,
16,17
59:2
60:16
61:3
62:10
63:1,13
65:8,13
66:2,13
67:6
115:7
116:6,
7,11
150:22

**laws**
147:9

**lawsuit**
105:24
113:4,
24

124:14,
17
132:23

**lawsuits**
117:18

**lawyer**
116:12

**layer**
109:15

**layers**
109:11
110:11

**lays**
15:1

**Le**
87:16

**lead**
69:2
78:5
85:6

**leave**
98:23

**led**
25:8
133:17

**left**
58:1
59:7
63:25

**legal**
6:25
9:18
16:4
63:10
136:16

**legally**
44:8
102:23

**legislation**
65:23

**legislative**
10:24
89:7
91:21
94:3
133:23
134:3,
22
135:16
142:22
143:6
147:14
148:6
149:19

**legislator**
114:5

**legislators**
133:23
134:2,
22
135:16
138:23
142:22
143:6

**legislature**
36:24
37:5,
20,25
62:3
136:21
148:1,
8,11,17
149:1,

11

**legislature's**
12:22
13:3,8

**leila**
7:16

**lengths**
113:3

**Lerner**
131:7
132:10,
17
133:9

**letter**
137:16,
21,25
138:7,
10,12,
15
139:5,
9,14,
17,20,
23,25
140:2,
5,9,16,
24
141:1,
8,11,
14,17
142:5,
10,13

**letting**
36:24
102:7

**level**
11:22
16:16
35:20
44:2

72:14
73:6
75:2
135:11
**liability**
147:25
**light**
131:22
**likelihood**
25:9
**limitations**
33:6,9,
10,25
**limits**
147:8
**lines**
20:2
33:12
118:19
124:12
**list**
10:20
68:4,10
131:21
**listed**
48:10
130:15
133:1
135:1,
7,15
142:20
143:5
144:6
**listing**
133:18
**lists**

60:5
130:17
131:5
132:15
133:25
**literally**
51:7
**litigated**
40:22
**litigation**
37:4
41:19
42:19
98:14
100:23,
24
101:8,
15,22
102:9
134:9,
20
**local**
53:21
**lonely**
90:23
**long**
43:23
151:18
**longer**
37:1
69:6
117:3,6
**looked**
10:20,
22
11:2,23
12:18

19:19
22:13,
25 29:6
35:13
41:2
66:16,
24
70:13
77:19,
23 84:6
86:2,14
90:9
97:21
108:14
109:4,
16
110:4
**lose**
121:22,
23
**lost**
119:21
**lot**
20:2
68:25
86:14
96:14
103:18,
19
132:22
144:7
146:3
148:19
**lots**
29:17
70:9
137:7
**low**
23:11
34:24
35:10,

11 36:3
**lower**
19:22
20:14
21:17,
24
22:14,
21 23:5
34:11,
14,20
36:11
57:24
63:24
79:1,3
112:14
**lunch**
122:17

———————
**M**
———————
**made**
28:18
33:2
37:3
49:10
99:6
102:5
**Magnole**
87:21
**main**
12:17
**maintain**
82:15
**majority**
45:16
71:13,
23
113:11
121:24

**majority-minority**
45:20
46:1
57:12
60:22
61:23
62:4
71:17
85:20
118:23
**make**
5:21
7:23
23:7
28:7
35:1
51:2,8
57:18
58:5,7
69:9
83:24
85:10
86:21
88:18
94:1
98:22
104:13
107:18
111:6
113:11
115:13
**makes**
35:8
40:25
71:3
**making**
77:22
**man**
87:20

**managed**
91:17
**Manatee**
124:9
125:7,
19
126:1,
18
127:16
**mandate**
30:4
**manipulate**
20:2
**manner**
56:9
107:24,
25
108:1
145:24
**map**
9:17
12:20
21:21
22:9
49:14,
17
50:13
51:4,11
52:12,
25
86:3,5
87:7
88:18,
19
91:21
93:12
94:5
96:25
97:11
102:21

112:19
124:13
148:17
149:12,
15
150:6,
14
151:12,
20,23
152:10,
12,15,
16,17,
19
**maps**
9:25
10:2
11:20,
21
12:6,
13,16
13:1,2,
6,8,12,
14
14:7,18
15:2,8,
18
16:14
21:9
38:8,21
39:14,
15,19,
23 40:2
42:4
44:19
46:10,
14,19,
25
47:4,8
48:12,
16,20,
21
49:22

50:18
52:8
55:19,
25 74:8
83:2
85:23,
24
87:13,
23,24,
25
89:13,
14
90:7,
12,14,
17
93:14,
20
123:3,
23
**March**
149:6
150:5,
14,19
151:13,
20
152:10,
12
**margins**
70:23
74:3
121:25
**mark**
14:2
**marked**
8:16
13:25
36:15
40:7
49:7
54:23
55:16

58:22
63:22
92:21
103:21
123:21
129:25
137:8
139:3
140:21,
23
141:19,
21
144:10,
12
148:21
**Mary**
132:18
134:6
**material**
102:3
**materials**
140:11
**math**
75:18
76:3
**mathematical**
19:13,
16,22,
25
20:6,
10,11,
13,17,
20
21:2,4,
8,16,21
22:6,
14,21
34:7,

21,24
112:13
**mathematically**
108:23
**mathematics**
112:16
**Matt**
136:5
**matter**
6:25
10:5
114:6
**matters**
133:20
**Matthew**
132:17
**maximizing**
36:9
**Mccarton**
125:15
**meaning**
43:8
61:9
150:9
**meaningful**
90:13
**means**
26:12,
14
**meant**
81:4
82:13
**measure**
31:18,

25
33:23
40:5
44:7
69:19
**measured**
29:6,
12,14
30:1
32:19
115:11
119:12
**measurement**
35:13
69:21
118:24
**measures**
21:13
**measuring**
41:7
**medication**
7:21
**meet**
52:1
**meeting**
12:10
36:19
59:1,2
89:7,
11,18,
25
90:3,4,
8,9,25
91:1,2,
4,9,10,
11,14,
22

94:3,5
95:15,
23
96:1,2
103:24
104:19
**meetings**
10:14,
23
87:19
88:21
89:10,
17 90:5
92:2
93:18
134:13
138:21
**meets**
53:1
**Megan**
87:20
**member**
12:3
136:21,
23,24
137:4
**members**
13:23
58:1
88:7,8,
11,15
97:4
114:5
135:2
137:2,
6,7,19
138:2
141:4
142:15
148:8

Jay Ferrin
November 15, 2024

26

| | | | | | |
|---|---|---|---|---|---|
| memo<br>12:7<br>14:3,7,<br>10<br>16:20<br>18:3<br>24:24<br>32:18<br>33:8,19<br>35:7<br>38:15,<br>19<br>39:4,7<br>48:4,<br>11,23<br>49:5<br>55:14<br>58:14<br>89:5,22<br>99:10<br>137:13<br>memo's<br>24:6<br>memoranda<br>10:14<br>11:6,7,<br>10,11<br>12:2,5,<br>14<br>memorandum<br>13:16<br>129:15<br>memorialized<br>11:7<br>memorializing<br>12:11 | memorized<br>10:20<br>11:23<br>15:14<br>131:25<br>136:7<br>memory<br>12:4<br>13:20<br>102:11<br>145:21<br>146:1<br>memos<br>12:8<br>mention<br>96:20<br>mentioned<br>11:6<br>14:4<br>17:6<br>20:13<br>24:15<br>41:22<br>71:10<br>72:24<br>86:3,7<br>89:3<br>97:3<br>100:23<br>102:15<br>108:16<br>110:14,<br>24<br>116:6<br>117:12<br>136:20<br>146:14<br>mentions | 17:19<br>MEROS<br>7:12<br>16:3<br>31:5<br>55:21<br>63:9<br>68:16<br>101:20,<br>25<br>102:7<br>123:17<br>125:12<br>127:4<br>145:6<br>147:2<br>148:3<br>met<br>91:15<br>96:8<br>method<br>149:20<br>metric<br>20:8<br>29:6,21<br>33:23<br>57:7,8<br>77:13,<br>19<br>metrics<br>23:9<br>50:2,13<br>54:14,<br>19<br>57:14<br>58:3<br>68:24<br>84:9<br>85:11<br>86:15<br>99:5 | 108:9<br>metropolitan<br>46:12,<br>22<br>Mexico<br>19:1<br>Miami<br>128:8<br>Miami-dade<br>128:1<br>middle<br>54:12<br>63:24<br>69:5<br>Milan<br>123:12<br>mimic<br>62:25<br>minced<br>106:8<br>mincing<br>116:20<br>mind<br>7:6<br>16:19<br>26:15<br>35:20<br>45:5<br>80:25<br>131:24<br>136:6<br>143:21<br>minorities<br>16:25<br>17:10<br>43:25 | 49:21<br>58:13,<br>17<br>59:11<br>100:1<br>minority<br>17:14,<br>16<br>45:16<br>46:3<br>51:6,12<br>57:13<br>59:6,17<br>60:10,<br>25<br>62:5,6<br>64:8,<br>12,16,<br>22<br>65:1,2,<br>3,11<br>66:12<br>67:14<br>69:18,<br>25<br>71:14,<br>22<br>85:21<br>86:25<br>98:6<br>108:6<br>114:15<br>115:9<br>120:1<br>122:5<br>minority-<br>majority<br>86:24<br>121:7 | minority-<br>minority<br>61:8<br>minus<br>18:12<br>82:3<br>minutia<br>81:22,<br>24<br>misleading<br>137:14<br>misrepresenting<br>34:10<br>missing<br>33:17<br>Mississippi<br>66:2<br>mistaken<br>132:4<br>misunderstand<br>76:4<br>misunderstood<br>44:9<br>Monroe<br>18:24<br>19:4<br>20:14,<br>18<br>21:1,<br>17,22<br>34:5,<br>11,16 |

morning
 5:13,14
motivati
on
 94:21
motivati
ons
 133:3
 143:19
mouth
 99:18
move
 53:23
 127:21
movie
 151:15
MSAS
 46:12
multi-
year
 115:22
 116:3
municipa
l
 25:1,9,
 20
 27:17,
 21,23
 32:8,23
muster
 113:6

_____

**N**

named
 90:17
names
 130:6

narrow
 91:17,
 18
Nassau
 51:1
 86:7
naturall
y
 44:1
nature
 25:20
 27:15,
 23 51:6
necessar
ily
 20:10
 21:23
 28:1
 44:25
 52:11
 65:11
 66:6
 112:8
 114:9,
 11
 119:15
 120:15
needed
 28:15
 47:16
 82:17
needing
 52:19
neighbor
hoods
 112:2
newly-
drawn
 74:11

nicely
 99:6
Nicholas
 94:6
 132:17
nodding
 5:22
nods
 22:8
 31:24
nominee
 73:24
non-
black
 81:11
 108:20
non-
compact
 108:7
 110:5
 116:24
non-
diminish
 36:1
non-
diminish
ment
 54:21
 62:13,
 23
 63:3,7,
 19
 67:11
 74:11
 94:25
 117:11
 119:9
 123:20
 129:3,
 11,13,

 19
non-
hispanic
 108:21
non-
politica
l
 32:25
 33:3
non-
polygeo
 33:15
non-
primary
 14:24
non-
static
 25:14
 27:4
 30:15
noncompl
iance
 35:10,
 11
nonracia
l
 15:25
 16:2,9
Nord
 5:16
Nordby
 58:25
 59:1
 88:3
normaliz
e
 69:6
 82:25

north
 52:13
 56:19
Nos
 8:22
 116:4
note
 92:3,16
noted
 130:5
notes
 86:13
notice
 8:19
 22:20
notifica
tions
 11:15,
 18
November
 10:3
 89:8,
 13,17,
 25
 90:3,4
 91:1,4
 94:3
 137:14
 138:21
 150:7,
 20
number
 32:12
 40:13
 70:17
 75:14,
 20 78:5
 82:1,
 14,17,
 24 83:3

93:25
 99:11
 104:10
 105:1
 122:7
 148:5
numbered
 125:6,
 18,24
numbers
 69:2
 70:8,
 14,16
 71:23
 74:24
 76:22
 77:14
 79:9,15
 80:4
 84:6,
 15,19
 93:16
 116:4
 119:6
 121:2
numerica
lly
 113:10

_____

**O**

oath
 6:7
Oberscha
ll
 7:16
object
 16:3
 63:9
 68:16

123:17
145:6
148:3

**objection**

147:2

**objections**

40:11

**objective**

37:7
38:9,24

**objectives**

39:2,3

**obtain**

134:8

**obtained**

132:22
143:23

**obvious**

106:9

**occur**

77:24
108:5
148:7

**occurred**

145:23

**October**

10:24,
25
12:10
36:18
58:25
65:18
86:2
89:3,11

**offer**

137:3

**offered**

37:25
56:3
88:7

**office**

141:3

**offices**

142:8

**official**

87:18

**on-off**

122:4

**open**

112:22,
25
117:18

**opening**

122:8

**operate**

107:24

**operatives**

131:13
132:13
136:2,4

**opine**

105:19
125:21

**opinion**

147:24

**opinions**

27:10

**opportunity**

16:25
17:9
24:1

30:11
42:9
43:25
49:21
58:16
59:11
65:21
72:18
97:20
98:11
105:11
106:2
117:9
121:1

**opposed**

104:6

**opposition**

131:4,
11,16

**opted**

28:3

**options**

58:10
87:2,3
91:5
101:11
104:9

**orange**

49:11

**order**

24:23
41:21,
24
44:16
45:2,7,
10
49:20
76:16
98:18

104:12
108:5
136:22
147:20,
21

**ordered**

41:18
101:2
110:17
124:3,7
151:12
152:17

**orders**

148:14

**ordinarily**

142:3

**Oren**

143:24

**organization**

132:13

**organizations**

131:12

**Orlando**

53:25

**outcome**

135:14

**outcomes**

116:15

**outlined**

38:15,
18
48:22
89:4

**overabundance**

133:17

**overlaps**

32:5,6,
7

**overpopulated**

81:1

**overpopulation**

82:19

--------

**P**

**P-197**

62:1

**P-198**

64:19

**p.m.**

122:18

**P000s0042**

135:19,
20

**P194**

59:5

**P196**

60:19

**packet**

116:5

**pages**

74:25

**pandemics**

69:3

**panhandle**

29:1
53:18

**paragraph**

14:11
18:4,14
23:19
25:16,
25 30:9
31:11
58:14

**parallel**

63:16

**paramount**

123:1

**paraphrasing**

17:1

**part**

14:7
15:5
16:12
18:15
21:9
31:17
38:21
39:15
41:19
42:15
44:19
45:12
47:14
48:12
56:12
60:19
77:6,8
78:7
82:6
98:5
99:19
101:1,7
103:7

Jay Ferrin
November 15, 2024

29

| | | | | | |
|---|---|---|---|---|---|
| 111:4, 15 | 77:17 | 82:24 | percentage | performed | perspective |
| 115:9 | party's | 83:4 | | 57:25 | 105:10 |
| 119:16 | 66:19, 20 | 87:15 | 32:3,4, 6,7,8 | 72:14 | persuasive |
| 128:6 | 67:2,3 | 105:25 | 65:12 | 85:21 | 140:5 |
| 131:15 | pass | 130:6 | 66:6 | performing | Pete |
| 134:25 | 113:6 | percent | 76:5 | 52:18 | 41:25 |
| 144:4 | passages | 18:10 | 81:9,19 | 62:5 | 97:19 |
| participate | 130:16 | 33:2,4, 15 | 82:23, 24 | 71:23 | 106:2 |
| 16:25 | passed | 57:22 | percentages | 82:3,8 | 107:9 |
| 17:10 | 37:3 | 58:6 | 65:5 | perimeter | Petersburg |
| 42:9,24 | 145:15 | 66:4,7 | perfect | 21:15 | 100:14, 15 |
| 49:21 | 149:2, 11 | 71:18 | 102:11 | period | petition |
| 58:17 | Passidomo | 72:2,7, 15,21 | perfectly | 69:10 | 149:20 |
| 59:12 | 5:17 | 73:2,4, 7,11,18 | 99:16 | 149:25 | petitions |
| 72:19 | 130:7,9 | 74:1 | perform | 150:2, 21,25 | 149:20 |
| particulars | Passidomo's | 75:10, 12,19 | 64:21 | 151:2 | phase |
| 124:23 | 144:15 | 76:25 | 66:21 | perjury | 126:15 |
| 134:16 | past | 77:1,15 | 67:4 | 5:9 | phenomenal |
| 150:23 | 42:19 | 78:18, 20,22, 25 | performance | permanent | 106:16 |
| parties | 65:4 | 79:5, 12,13, 20,22, 25 | 41:11 | 27:15, 24 | phones |
| 17:6 | 99:21 | 80:2,6, 7,21,23 | 67:25 | person | 87:20 |
| 124:19 | 102:3, 12 | 81:13, 16 | 70:21, 23  71:2 | 15:23 | phonetic |
| 132:25 | 117:13 | 85:3,4 | 72:6 | 18:12 | 87:21 |
| partisan | pay | 118:24 | 73:20, 25 | personal | 123:12 |
| 131:12 | 150:1 | 119:8, 18,19 | 78:2, 22,23 | 8:13 | 143:24 |
| 132:13 | penalty | 120:3, 10,23, 24 | 79:24 | 106:20 | phrase |
| 135:14 | 5:9 | 121:6 | 80:6,11 | 140:18 | 148:15 |
| parts | pending | 122:11 | 81:12, 20,25 | personally | pick |
| 29:2 | 6:23 | | 83:17 | 127:2 | 69:4 |
| 53:4 | people | | 85:2 | 138:6, 12 | 108:25 |
| 66:11 | 18:10, 13  42:5 | | 115:23 | 139:16 | picked |
| 93:8 | 70:11 | | | 141:10 | 91:20 |
| 99:25 | 81:5 | | | | |
| 100:1 | | | | | |
| party | | | | | |
| 16:23 | | | | | |
| 39:21 | | | | | |

Jay Ferrin
November 15, 2024

picture
  54:11
piece
  51:24
pieces
  60:4
Pinellas
  97:19
  99:25
  100:11,
  12
  105:3
  106:1
  107:1,9
  108:18
  110:15,
  19,24
  111:6,
  11,16
  112:20,
  23
  113:18
  117:6
  118:5
  123:15
  124:9
  125:7,
  19,25
place
  9:19
  19:25
  20:9
  25:10
  41:3
  92:1
  124:25
  134:6
  152:12
places
  46:16,
  17,20

plain
  14:12,
  17,21
plaintiff
  101:14
  145:19
plaintiff's
  144:24
  145:2
  146:7
  147:18
plaintiffs
  5:16
  101:10,
  18
  146:13,
  24
plaintiffs'
  8:16
  13:25
  36:15
  40:7,11
  49:7
  54:23
  55:16
  58:22
  63:22
  92:21
  103:21
  123:21
  129:25
  137:8
  139:3
  140:21
  141:19
  144:10
  147:12

148:15,
  21
plan
  29:8,9
  31:13
  40:15
  43:9,
  11,19
  55:6
  57:22,
  23
  65:22
  67:12,
  18 68:5
  69:19
  70:1
  72:2
  74:8
  75:9
  76:10,
  22 77:1
  78:14
  80:17,
  18,24
  82:25
  84:14
  88:25
  92:18
  93:1
  94:8,10
  101:1
  122:11
  124:3,
  8,21
  125:2,
  5,17,24
  126:5,
  8,10,
  12,16,
  17
  127:23
  135:19,

20,24
  136:19,
  25
  137:4
  142:25
  143:9,
  15,17
plans
  11:4,13
  13:2,8
  16:24
  18:9,11
  19:19
  28:2
  29:7,
  18,22
  30:2
  41:3
  42:20
  65:23
  97:22
  125:11
  126:24
  127:5
  128:1
  129:7
  131:1
  135:18
  136:17
  142:24
  143:9
play
  61:20
  71:7
  92:19
  132:20
  134:2
  135:22
  143:13
played
  92:18

130:21,
  22
  131:10
plural
  11:10
pockets
  108:25
point
  49:23
  56:18
  65:5
  70:4
  89:21
  94:20
  102:24
  119:1
  121:8
  132:3
points
  76:2
  78:1
  79:1
  81:19
  121:18
political
  13:22
  16:23
  17:6,10
  18:1
  23:15
  24:16
  27:9,
  11,13
  31:19
  32:14
  35:11
  36:14
  39:21
  54:13
  58:18

59:12
  60:25
  65:2
  66:19,
  20
  67:2,3
  108:24
  118:7
  131:13
  132:13
  135:14
  136:2,4
politically
  114:13
Polk
  124:9
  125:2
Polsby-
popper
  21:15
populated
  26:5,9
population
  18:2,5,
  8,9,10,
  11,13
  28:9,
  11,15,
  19
  30:21
  41:7
  43:5,10
  47:10,
  11,13,
  15,16,
  19,20
  49:19

50:1,8
51:12
53:1
54:9,16
58:6
65:1,2,
3,16
66:4,5,
12
67:21
71:7,19
75:21
76:5
81:6,7,
10,11
83:1,6,
7 84:7,
18 86:9
97:19
100:20
107:8
108:15,
17,20,
21
109:1,
5,9,12
110:12
111:11,
12,16
119:6
120:1
121:14
123:9
**populati
on's**
67:22
**populati
ons**
54:17
**portion**
17:7

28:4
32:10
58:24
126:18
**portions**
11:4
124:8
125:6,
18,25
126:3
**possibil
ities**
148:5
**possibil
ity**
148:2
**posted**
42:3,4
**potentia
l**
9:13
104:10,
12
105:1,5
113:17
133:2,
18
**potentia
lly**
110:14
112:22
113:12,
20
114:17
115:18
119:25
121:9
123:19
135:8
136:15,

16
**power**
60:25
**practica
lly**
104:13
**practice**
86:4
117:14
**pre-2012**
44:17
**pre-
existing**
40:4,
14,17,
21
41:4,5
**precedent**
14:13
16:13
**precipit
ous**
85:5
**preclear
ance**
124:6
**preclude**
144:2
**precondi
tions**
60:23
**predeces
sors**
123:23
**predeter
mined**
65:4

**predomin
ance**
15:25
16:2,9
**prefer**
127:18
**preferen
ce**
24:6,24
27:3
29:19,
24,25
75:25
92:12
**preferre
d**
62:7
83:13
121:19
127:24
**preferri
ng**
30:3
**prejudic
ed**
146:12,
23
**preparat
ion**
127:18
128:2
**prepare**
10:11
18:8,11
89:17
**preparin
g**
128:7

**present**
31:13
61:13
88:20,
24
**presenta
tion**
58:25
59:25
**presente
d**
58:25
59:1,24
90:7
94:5
**presentl
y**
130:7
**preserva
tion**
142:17
**preserve**
40:4
**preserve
d**
87:1,3
98:11
**preservi
ng**
40:13,
17
41:4,5
85:12
**presiden
t**
11:16
12:1
87:9
130:7,8

144:15
**press**
134:12
**pretty**
52:13
97:3
128:3
134:5
**prevalen
ce**
41:10
**preventi
on**
60:5,9
**previous
ly**
117:20
**primaril
y**
15:10
36:23
53:3
146:20
**primary**
14:22
24:12
32:5
66:19,
20
67:2,3,
21
70:18
71:9
73:9,
10,15,
21
74:24
75:2,
17,25
77:5,17

78:17
79:2,4,
11
83:10
84:23,
24
98:20
113:10,
11
117:3
119:21
121:23

**principle**
14:22
63:3,7
144:25
147:1,
7,8
148:18
151:16,
23
152:4,
20

**principles**
14:6,24
15:22
20:17
32:17
33:7
38:15,
18
48:22
56:4
60:1
99:9
111:23
112:5,9

**prior**
29:17

37:22
41:13
42:4
44:14
53:14
64:18
89:17
93:11
97:21
98:9
99:24
102:16

**privilege**
6:25
68:17

**privileged**
144:21
147:4

**problems**
150:18

**proceed**
52:9

**proceedings**
5:1
9:18

**process**
9:23
12:22
13:4,9,
11,14
14:8
15:2
17:11
21:9
22:9,11
38:22
39:16,

20,24
40:3
42:16
43:19
44:20
45:13
46:8,
11,15
47:1,5,
9
48:13,
15,19,
21
50:18,
19
51:20
52:3,5
54:4
56:16
58:18
59:12
65:23
85:23
86:13,
22
87:8,12
88:5
91:7
93:13
97:10
102:5
103:4
106:10
111:24
117:16
128:23
129:23
131:14
132:2,
14
133:24
134:4,

6,23
135:17
136:20
140:2
142:23
143:7
145:22,
24
148:24,
25

**processes**
9:20
11:21
12:3
31:18
151:8

**produced**
87:5
89:14
90:12
133:13
141:24
143:17

**product**
88:13
98:14
144:22

**proffered**
131:22

**prohibition**
16:22,
24

**project**
106:20

**proper**
102:4
103:4

**proportionality**
116:19

**proposal**
126:22
127:16

**proposals**
127:17

**propose**
148:1

**proposed**
22:17
56:1
126:17

**pros**
87:25

**protect**
50:3
59:16
64:14

**protected**
36:4
52:19
53:5,
11,19
54:8
61:6,
10,15,
18
62:13,
21
63:19
64:2
67:10,
15,18
68:6,15
74:6
80:14

85:15
86:20
88:1
109:19
111:17
112:19
115:16,
25
116:22
117:24
118:5
128:13,
16
129:1

**protecting**
100:7

**protection**
15:20
59:7
129:19

**protections**
129:3

**protocol**
88:11,
14 97:3

**provide**
62:3
96:11
117:9
151:14,
21
152:18

**provided**
65:21
75:3
142:6

provision
60:4,20
61:6,
11,15,
19
62:25
provisions
62:2
63:15,
16
public
36:22,
24
37:17,
21,22,
24 58:7
88:17
publicized
134:5
publicly
57:19
publicly-
available
125:11
published
11:13
pull
152:12
Purcell
144:25
147:1,7
148:18
151:15,

23
152:20
purported
134:9
purposes
44:18
45:2
70:9
71:25
74:3
75:14
134:9
139:12
142:17
pursue
97:6
push
135:8,
12,14
put
56:25
98:16
99:6,18
101:10
110:6
146:4

Q

qualify
54:14
qualifying
149:19,
25
150:2,
21,24
151:2

question
6:4,12,
14,22,
23 16:5
21:6
22:12,
16
23:11
34:19
35:4
37:2
45:2
50:13
69:23
84:5
102:8
104:2
118:14,
22
119:3,
13,21
120:22
121:5
122:5
132:5,9
133:8,
19
135:4
143:4
145:9,
11
152:8
questionable
122:1
questioning
6:18
questions
6:9

7:24
8:5,6
9:4
37:16
39:17
86:23
90:24
91:8
92:5
94:2
96:12
97:18
103:23
118:11
134:7,
14,17
140:12,
20
144:23
quick
7:14
74:23
quotations
51:15
52:4
quote
14:11,
14
17:7,12
18:15,
17
19:12,
14
23:20
24:3
25:17,
20
26:1,2,
3,6,7,
10,12

30:10,
12
31:12,
15
36:18,
21 37:8
38:9,
11,23
40:16
49:13,
23,25
50:3,7,
9,15
55:1,9,
19 56:5
58:15,
19
59:9,17
60:5,6,
9,13,20
61:1
62:2
64:19,
22,25
65:6,19
66:12,
16,21
94:19,
23,24,
25
95:1,3,
4,5,6,
7,8,9,
10,11
104:1,
7,8,13
107:17,
18
108:3,
10
110:13,
20

113:8,
12
118:14,
17
122:10
130:6,
10,11,
15,16
131:3,4
132:12,
15
133:22,
24
135:18
142:21,
23,24
143:1,
6,8,10
quoted
131:18
quotes
40:23
50:4

R

race
16:7
49:18
103:11
128:22,
24
129:10,
20,21,
23
races
150:10
racial
17:9
50:8
58:13,

17
  59:11,
  16
  66:8,
  17,25
  124:14
**railroad**
  28:17
  32:7
**railroads**
  26:24
  27:2
**railways**
  23:22
  24:15
**raise**
  37:2
  99:13
  152:7
**raised**
  82:5,7
  97:18
**raises**
  107:11
**ran**
  19:18
**randomly**
  93:17
**range**
  77:14
  122:1
**rates**
  66:10,
  11
**ratio**
  21:15

**re-
including**
  102:21
**reach**
  47:16
**reached**
  127:4
**reactions**
  138:4
**read**
  10:12,
  13,17
  13:19
  17:4,7
  37:9,13
  40:9
  50:4,15
  51:15
  52:5
  56:6
  58:15
  107:17
  116:11
  131:20
  132:3
**readily**
  23:24
  24:8,
  10,21
**reading**
  73:13
  92:6
**readings**
  89:1
**real**
  7:14
  74:23

**realize**
  7:8
**reapport
ionment**
  10:24
  12:24
  87:11
  91:25
  126:15
**reason**
  8:8
  70:12
  77:23
  102:20
  104:4
  107:16,
  17
  109:25
  117:12,
  13
  119:20
  129:11
  135:1,
  10
  146:18
**reasonab
le**
  97:24
  98:1
**reasons**
  98:10,
  12,17,
  19
  99:16
  103:3
  116:21
  117:22,
  23
  129:22
**recall**

28:24
  37:12
  42:2
  44:21
  92:3,15
  95:24
  96:12,
  22
  101:4,
  18
  103:13
  116:16
  124:16
  128:15
  138:14,
  16,18
  139:10
  141:18
**recede**
  25:4
**receive**
  109:20
  114:4
**received**
  36:22
  39:2
  49:18
  137:17
**recent**
  10:14
  69:9
**recently**
  43:8
  70:15
**recess**
  48:17
  122:18
**recogniz
able**
  23:24

24:7,
  10,21
**recognize**
  14:3
  23:25
  30:10
  130:2
  144:13
**recollec
tion**
  10:9
  89:24
  91:12
  92:8
  107:7
  126:21
  127:25
  128:4
  134:13
  146:16,
  18,20
  149:4,
  9,12,
  16,22,
  25
**recommen
dations**
  55:2
  91:16
**record**
  134:20
**recordin
g**
  6:1
**recordke
eping**
  139:12
**recreate**
  98:10

**redistri
cting**
  9:14
  10:6,15
  12:22
  13:3,9,
  14 14:8
  15:6
  21:9
  22:11
  25:10
  36:23
  38:22
  39:16,
  19,24
  40:3
  41:7
  42:16
  45:12
  46:8,
  11,15
  47:1,5,
  9
  48:13,
  21
  50:18
  59:2
  85:23
  87:8
  92:6
  103:11,
  19
  109:11,
  13
  116:11
  117:16
  122:15
  128:23
  129:23
  131:14
  132:14
  133:21,

24
134:3,
23
135:17
136:3,
15
142:23
143:7
145:22
148:24,
25
150:6,
22
151:3

**redraw**
116:22
117:24

**redrawing**
9:24
147:14

**reduce**
66:6
82:25

**reduction**
121:13

**refer**
17:14
84:24
93:6

**reference**
12:25
13:6
27:22
51:16
132:4

**referenced**
12:5
68:8
128:9
131:17
136:14
143:18

**references**
16:20
122:10

**referred**
65:17

**referring**
13:2,7
15:16
17:15
25:21
51:22
92:25
93:1
100:8
106:6
107:18
121:5
135:13

**reflect**
108:12
112:17
113:15
125:11

**reflects**
126:20

**regard**
46:20,
22
134:19

**region**
47:10,
13,21
54:8
99:4
123:9
128:6
134:19

**regional**
23:1

**regionally**
19:20

**regions**
114:20

**registered**
73:1,3,
4 76:24

**registration**
66:10
68:2
69:8,10
70:13
71:5,6
76:23
121:14

**regular**
136:1

**regularly**
25:3

**rejected**
38:3

**relate**
21:22

**related**
18:7

23:2,12
37:17
52:1
56:19
58:13
91:24
116:17
140:12

**relates**
15:20
129:2
151:7

**relating**
12:2
47:24
53:7

**relation**
18:17,
21,22
19:11
21:11
25:1
30:2
84:19

**release**
12:2

**released**
11:14

**releases**
43:7

**relevance**
43:14
151:1

**relevant**
10:23
19:5
20:7
42:6,25
43:20,

21
44:18
45:17,
23
71:12,
15
102:3
103:6
115:11
127:10
143:19
144:6

**relied**
12:17
75:4

**relief**
144:25
145:3,
19
146:8
147:13

**rely**
22:5,7
46:11,
15

**relying**
21:20
116:7,9
145:10

**remedial**
9:17
126:8,
15
148:14,
15

**remedy**
148:2

**remember**
7:3
11:5

44:25
63:20
96:6
127:2,
9,15
132:7
137:18
141:5
150:23

**remembering**
57:11

**removing**
111:5,
16,18,
20

**renumbered**
93:17

**Reock**
21:10

**Rep**
49:25

**repeat**
34:23
36:7
55:21
79:15
86:22

**replace**
115:8

**replacing**
116:19

**report**
29:21
31:13,
16,17,
22

71:12
125:15
**reported**
29:13
32:20,
25
**reporter**
5:19,25
**reports**
32:9
125:10
**represent**
5:15
9:22
126:16
127:22
**representation**
98:7
**representative**
8:14
131:6,9
132:1,
10,16,
17,20
133:5,9
140:10
**representatives**
17:12
58:19
59:13
130:18,
25
**reprovision**
36:1

**request**
40:12
92:9
95:20
97:8,9
**requested**
144:25
145:2,
19
146:7
147:12
**requests**
88:15
**require**
60:22
68:17
145:7
147:3
**required**
33:19
37:1
50:2
64:20
99:1,9
**requirement**
33:22
59:21
61:7,9
62:23
67:11
74:12
95:2
123:13
**requirements**
18:7
59:16
94:23

**requires**
17:25
64:25
**research**
25:5
**reserved**
152:6
**residential**
13:23
**resides**
143:16
**residing**
106:1
**resolution**
92:7
**resolve**
17:8
**respect**
8:22
18:5
44:16
48:3
60:18
76:20,
21 92:5
96:25
131:10,
11
133:5
134:23
135:22
136:24
143:13,
22
**response**
9:4
40:16,

25
118:21
120:22
**responses**
40:11
**rest**
31:11
37:13
51:8,12
52:2
86:11
**restatements**
60:12
**result**
19:23
26:4
58:16
59:10
66:18
83:6
105:12
109:6
115:17
**resulted**
58:9
110:18
124:21
**results**
67:1
75:1
79:7
**retain**
142:19
**retention**
40:6

**retrogression**
64:20,
23
**return**
87:9
**review**
116:21
128:7
145:24
149:7
**reviewed**
11:4,24
95:5
126:13
127:17
**reviewing**
13:18
55:2
**revised**
124:18,
24
**RFA**
40:10
**Rights**
15:9,15
60:13,
21
**rinse**
86:21
**rise**
85:1
**risk**
107:23,
25
108:1
109:25
117:13,

18
**river**
28:17
30:23
31:1,6
**rivers**
27:2
**road**
28:5,16
30:22
31:1,6
32:5
37:17,
18,19
56:23
**roads**
24:12
26:24
27:2
56:17
**Rodrigues**
12:7
14:3,6
32:18
33:8,19
35:7
36:18
37:18
38:5,
15,19
39:7
48:4,
11,22
49:4,
10,13,
25 50:7
51:15
52:4
55:1,14
58:14

89:4
90:22
91:19
99:10
137:13

**Rodrigue**
**s's**
142:8

**Rojas**
87:18
88:2
142:8

**role**
12:21
42:15
61:20
71:7
92:17,
19
126:7
130:21,
22
131:9
132:2,
19
133:5
134:1
135:22
143:13,
22

**room**
7:13

**rough**
107:7

**roughly**
107:9

**rubber**
21:13

**rule**
105:20

**ruled**
98:15

**rules**
5:17
147:18
148:14

**run**
43:5
84:19
87:19

**running**
150:9,
10,13

─────

**S**

─────

**S000c804**
**0**
55:6

**S000s804**
**6**
55:6

**sacrific**
**e**
16:6
112:9

**satisfie**
**d**
60:23

**scale**
122:3

**scenario**
23:1

**schedule**
91:13

**scope**
128:3

**score**
19:16

20:6,13
21:10,
12
32:2,16
33:1,3,
7,15,17
34:1,21
35:5,
11,23
36:3,6,
10,11
56:23

**scored**
22:14
57:8

**scores**
19:13,
18,22
20:1,3,
10,11,
17,20,
21
21:2,4,
8,16,
21,25
22:3,6,
11,15,
16,20,
21
23:5,
11,12,
16
34:7,
11,20,
24
112:13

**Scott**
124:19

**secondar**
**y**
24:12

32:5
98:21

**section**
40:19
60:21
62:25
121:9

**sections**
14:19
38:16
60:12

**seek**
39:20,
24 40:3
46:11,
15
109:17
113:25

**Select**
55:2

**selectin**
**g**
11:21

**SEN**
142:7

**SEN-823**
68:4

**SEN-825**
75:8

**senate**
8:14
9:5
10:2,23
11:16,
25
12:23
18:8
37:11
39:18
40:15,

20 42:5
45:5,19
51:2
53:18
55:4,6
56:11
61:5,14
62:12
63:18
64:3,7,
11,15
68:5
87:10
88:24
91:20
92:5
93:1,
13,14,
19,20
94:10
96:25
100:23
108:13
113:16
116:21
117:23
126:17,
21,24
127:3,
15,22
128:21,
22
129:12,
18,22
137:5,
18,20,
23
138:2,3
139:13,
25
140:4,
8,13,15

141:5,7
146:12,
15,23
148:10
150:10
151:12
152:2,
21

**Senate's**
38:7
40:11
59:18,
20,22
60:15
61:3,20
62:9
65:8
66:13
67:5
92:18
103:2
104:25
114:7
123:12
130:25
131:5
132:15
133:24
144:23
152:8

**senator**
12:7
14:3
36:18
38:5
49:10,
13
50:7,23
51:15,
17 52:4
55:1,19

89:4
90:22
92:9
94:15,
19
95:10,
16,19,
22
96:8,10
104:1
105:9
106:6,
25
107:16,
22
110:14
118:21
120:2
122:10
126:5
134:14
138:19
142:7
**senators**
130:17
134:8
138:25
**send**
97:7
**sense**
35:8
69:9
71:3
99:6
102:15
107:23
110:1
116:14
145:15
**sentence**
18:4

26:19
30:10
31:12
59:19
**separate**
45:8
47:6,18
121:5
**separated**
108:25
**separately**
47:19
**September**
88:21
**series**
9:20
11:12,
23
99:24
102:18
147:21
**serve**
59:16
**sessions**
9:17
88:24
**set**
39:7
40:12
59:6
90:12
91:3
136:20
**sets**
25:7
**setting**

58:7
**settlement**
41:22
**settlements**
41:18
**SGR**
131:4,
12,16
149:2,7
150:5,
11
**shaking**
5:22
**shape**
18:17,
22
19:2,6,
12,23
21:19,
25 22:2
23:1,2
34:10
116:24
**share**
72:9
**shed**
81:6,7,
10
82:20
**shell**
91:24
**shifts**
54:2,3
**short**
48:16
**show**
8:18

29:25
37:17,
18,19
40:9
140:23
141:21
144:12
**showed**
29:19,
24
99:24
109:12
110:12
132:23
**showing**
123:23
**sick**
8:1
**side**
93:8
108:18
**signal**
34:21
**signed**
149:15
152:15
**significant**
28:15
104:10,
25
**significantly**
72:12
80:6
**similar**
34:19
35:4
77:2

81:18
91:3
135:2
146:18
152:23
**Simpson**
87:9
**single**
70:8
**situation**
113:9
**situational**
20:21,
23
42:22,
23
43:15,
17
44:19
45:11,
15,24
46:7
103:7
**situations**
45:8,9
58:8
**SJR**
130:16
**SJR-100**
55:4
**slew**
11:17
**slide**
58:25
59:5
60:5,19

62:1
124:18
**sliding**
119:22
122:3
**slipping**
122:1
**sliver**
28:13
**small**
28:4
**snapshot**
70:8
**software**
109:11,
14
110:7,
9,10
**solely**
108:6
133:25
**sooner**
141:2
**sort**
32:21
41:8
54:11
71:19
142:19
146:14
**sorting**
134:9
**sorts**
99:14
**sounds**
17:13
89:9
124:12
149:17

150:2

**source**
125:21

**south**
45:18
52:13
57:10
86:25
87:1
128:10,
12,14

**southern**
107:8

**spanned**
102:19

**speak**
73:19
127:19
138:22
141:16

**speaking**
6:23
106:5
113:17

**speaks**
15:6

**special**
150:21,
24

**specific**
10:16
12:20
28:24
43:4,22
45:8
65:16
75:1
78:3
102:8
109:20

121:22
122:15
125:14
131:24
133:3
139:10

**specific
ally**
23:21
36:21
39:14
42:2
43:24
48:10
50:24
64:19
81:8
96:17
101:15
132:7

**specific
s**
124:17
126:9

**specter**
107:12

**speculat
e**
123:10
138:1
148:20
151:25

**spelled**
37:7
38:10,
24 39:3

**Spent**
90:6

**spidery**
108:7

110:5
115:17
116:24

**split**
56:20

**spoke**
123:13

**sponsor**
136:22

**spread**
108:19

**St**
41:25
97:19
100:14,
15
106:2
107:9

**staff**
11:8
12:12,
23
27:13
31:12
49:19
55:3,8
56:2
83:12
86:12
87:10,
14,17
88:12
89:14
92:12
94:21
96:9
104:1,
9,16
129:15
133:23

134:3,
22
135:16
142:16,
22
143:7

**staff-
drawn**
13:12

**standard**
38:9
39:7
40:18
43:1,4
53:8
62:13
63:19
94:25
114:8,
10
117:11
123:20

**standard
s**
13:22
18:7
37:7
38:24
54:21,
22 59:6
60:11

**standing**
100:21

**starred**
89:12

**start**
49:17
51:10
52:8,
12,13

53:23
54:7,9,
18
68:23
80:19
86:4,15
100:3
122:1

**started**
13:11
86:3

**starting**
36:20
49:12,
23,24
50:6,10
54:12
66:15
83:2
94:14
103:25

**state**
23:22
24:13
28:3
35:16
50:17
51:11,
14
52:3,
14,17,
20
53:5,
16,23
56:5,9,
13 57:3
63:14
66:11
86:5
115:9
128:21

130:17,
18,24
150:10

**stated**
55:14

**statemen
t**
37:11
41:1
108:12
113:15
145:19
146:7

**statemen
ts**
49:10
50:17

**states**
33:21
41:6
124:5

**statewid
e**
52:25
70:21
72:6,9
74:2
78:24
85:3

**static**
24:2,25
25:11
27:4
30:12,
14
31:1,5,
6

**statisti
c**
30:1

statistical 46:12, 22
statistics 83:25 95:5
status 71:24 82:12 84:20, 22 85:9,14 121:7
stems 65:15
STENOGRAPHER 5:2
step 76:12, 13,18 77:16
steps 76:15
stick 15:3 39:3
stipulation 127:4
stop 7:9
strategy 136:16
stray 108:24

stuck 43:6
stuff 11:16 15:20 16:16, 17 70:15 84:12 86:17 103:18 112:16 129:9 132:22 142:18 146:5
subcommittee 11:3,22 55:3 88:21 89:7,25 90:25 91:10, 18 94:3,4, 5 95:15 103:24
subcommittees 91:5,15
subject 10:5 114:17 121:8 130:15 131:3, 10 132:12, 19 133:6,

22 134:1,2
subjective 78:6
subjects 135:15, 23 142:21 143:5, 14,22
submission 88:17
submit 88:15 149:20
submitted 135:24 140:11 143:17
substance 55:5
substantially 145:16
subtle 90:13
sue 113:1
sued 113:3
sufficient 111:7 151:14, 22

152:18
suggest 21:20 32:17
suggested 125:24 133:14
suit 107:13 145:15, 16 146:13, 24
suite 7:16
summarize 38:5
summarized 75:5
summer 9:24
supervisors 151:7 152:22, 25
support 75:21 130:9 145:18
supports 146:7
supposed 53:2 88:17

Supreme 23:25 24:11, 15,22 27:10 29:17 38:2 103:10, 14,15, 17,19 124:3,7 149:6 150:4, 15
surrounding 23:6,10 58:2,3 84:8 108:9 145:22
suspicions 99:14
swear 5:2
switch 122:4
syrup 7:22
system 15:11

_____

T

taking 7:21 127:11
talk 6:21

39:12
48:15, 19
58:12
72:22
95:22
133:2
136:10
138:15
151:9
talked 83:8 96:16 104:1, 16 144:3
talking 6:1,24 12:6,19 24:17 37:18 38:13, 14,16 42:11 46:4 68:21 79:6 83:16 87:25 88:2 96:15 100:6, 10 102:24 103:15 106:24 120:25 121:10 123:24 128:18

**Tampa**
41:25
53:25
61:8
80:9,12
83:18
93:4,7,
9 94:11
95:15
96:16
97:12
100:1,
14,25
101:9,
16
104:2,
6,17
105:2
109:24
128:6
134:19

**task**
45:23

**taxpayer**
106:17

**team**
13:15

**teleconf
erence**
7:17

**telling**
35:6

**tells**
21:18,
23 22:2
33:17

**ten**
24:19
68:4,10

**tentacle
s**
111:21

**term**
42:18
67:24
102:18

**terminol
ogy**
71:25
85:16
106:7

**terms**
42:22
68:1
77:4,18
78:2
85:12
99:5
118:2,7
140:17

**territor
y**
17:20
25:3
51:8

**testifie
d**
5:9
135:24
140:11

**testify**
144:5

**testifyi
ng**
6:9
8:12,21

**testimon
y**

5:3 8:9
9:3,5
77:23
93:12
127:3
135:19
143:1,
10
152:2

**text**
91:25

**thankles
s**
106:23

**Thanksgi
ving**
90:6

**theories**
136:16

**thing**
43:23
44:10
45:8
52:24
77:3
146:21

**things**
11:12
13:24
15:2,25
23:17
26:14
28:12,
19
29:23
37:23
41:3,19
42:2
44:2,17
46:6

52:14
53:15
81:21,
24 85:5
88:9,12
90:11
91:13
96:14
97:5
99:15
102:24
107:14
109:7
112:2
114:12
116:10,
20
118:2
127:10
128:7
129:16
134:18
135:3
137:7
138:4
142:18
146:4
148:20

**thinking**
45:11,
14
127:10

**thought**
27:3
44:9
57:17,
20 98:8
99:2,7,
15
102:2
118:4

**threshol
d**
65:16

**thrown**
102:25

**tied**
22:3
119:15

**tier**
35:21
36:2
122:21

**tier-one**
13:21
16:20,
22
17:20,
22
36:4,12
49:14,
16
50:3,
12,14
52:1,9,
16,22
53:5,7,
24
54:5,21
55:12
58:12
59:6
62:21
94:25
122:25
129:14

**tier-two**
13:21
16:20
17:24,
25 18:6
50:13,

14 52:9
53:4,
10,20
54:5,20
55:12
57:14
58:2
84:18
86:15,
17 99:4
111:22
112:5,
6,9
118:6
129:9

**Tilley**
5:12,15
7:15,18
8:17
14:1
16:8
31:7,9,
10
36:16
40:8
48:18
49:8
54:24
55:17,
23,24
58:23
63:17,
23
68:20
92:22
101:23
102:2,
10,14
103:22
118:10
122:19
123:22

125:14,
16
127:7,
14
130:1
137:9
139:4
140:22
141:20
144:11
145:12
147:11
148:12,
22

**time**
9:13,19
15:2
22:18
23:4
34:23
69:10,
14 71:5
77:24
95:19
102:19
111:9
117:17
122:17
124:12
145:15
148:10,
19
150:19
151:14,
22
152:18,
23

**timeline**
9:22,23
148:25
151:11

152:14

**timely**
145:15,
24

**times**
9:9,22
10:8
25:6

**titles**
87:19

**today**
7:20,24
8:1,6,
10,12,
21
14:13
45:3,4
55:20,
25
96:15
105:24
127:6

**told**
8:21

**ton**
19:25
23:17

**top**
23:14
44:21,
22 45:6
101:4
124:2,
16
128:15
146:10,
25
147:16

**topic**
8:22

102:6
127:1,
5,6
128:20
130:2
143:25
144:4,9

**topics**
9:4
101:21
144:6

**total**
20:12
70:23

**totality**
60:24
65:16
74:5,15
76:16
121:17

**tours**
36:22
TR2
115:18

**tradeoff
s**
57:6

**transcrib
ed**
5:19

**transcri
pt**
50:5
54:25
65:18
94:4
95:13
104:15
108:11
113:14

118:13
128:19

**transcri
pts**
10:13,
21,22
11:5

**treated**
63:13

**tremendo
us**
106:10

**trial**
147:15,
17,19

**trouble**
5:25

**true**
127:21
133:10

**trumps**
50:12

**trust**
13:19

**truth**
5:4,5

**truthful**
6:8

**turn**
60:18
74:21

**turned**
73:10,
11

**turnout**
66:10
69:2,
11,13
70:16,

18,20,
25
73:9,
15,18,
25
77:18
78:6,17
79:2,4,
7,12,19
84:24
113:11
121:14

**type**
45:24
46:3
90:11
142:2

**types**
45:9

**typical**
52:13

———————

**U**

**U.S.**
49:18
103:14,
17,19
124:19

**uh-huh**
5:22
21:5
34:8
89:20
120:4

**uh-uh**
5:23

**Ulvert**
132:18
134:1

135:4

**unconsti
tutional**
101:16

**understa
nd**
6:7,12,
13,14
7:24
8:5,12
9:3
13:1
21:6
33:9
42:14,
15
44:24
53:11
69:22
70:3
77:22
84:5
92:25
93:7
100:18,
24
101:23
115:1
125:23
147:12
152:7

**understa
nding**
20:4
44:3
45:20
48:20
59:18,
20,22
60:15
61:3

62:9
63:12
65:8,9
66:13
67:5
72:15
85:13
104:8
105:21
112:7,
18,21
114:7
123:12
124:24
132:21
133:4,
11
136:13
145:14,
17,20
146:9
148:2
152:21

**understands**
102:4

**Understood**
128:9

**unincorporated**
46:16,
20

**unique**
34:10
50:25
51:5,23
151:2

**United**
124:5

**unknown**
117:20

**unopposed**
69:1

**unpopulated**
28:14

**untested**
117:20

**untold**
78:5

**upheld**
40:22
45:23

**usage**
23:14
35:12
36:3,6
53:21
84:10
90:11

**utilized**
40:15

_____

**V**

_____

**valid**
113:1

**variability**
71:3

**variables**
68:25
78:5

**vary**
69:14

**venture**
81:10
152:13

**veracity**
140:15

**versus**
5:16
18:22
57:8,23

**view**
22:14
38:7
104:25
108:12
113:15
152:8

**viewed**
56:24
105:25
110:1

**violate**
119:9

**violated**
115:18

**violating**
95:2

**violation**
111:22

**visual**
20:8,9,
11

**visually**
18:16,
21
19:11
20:5
22:13,

20
54:15
108:23
109:2
112:10,
15

**voluminous**
133:13

**vote**
15:23
60:6,18
72:8
148:9

**voted**
65:3

**voter**
49:22
66:10
76:23
78:5,6

**voters**
59:17
64:4
73:2,3,
18
75:24
76:7,
14,23,
24
77:17
79:19
82:14,
18,20
83:9,18
84:3
100:19,
20
104:10
105:1,7
106:24

107:1,3
110:15,
24
111:5,
7,11,16
112:19,
23
113:9,
18,23
114:23,
24
115:2,
4,13
117:5,6
118:5
119:13,
20
123:14
127:24

**voters'**
60:25
62:15
83:12
117:2

**voting**
15:9,15
58:6
59:7
60:13,
21 65:2
66:4
67:20,
21
71:7,19
76:5
81:9
83:5
107:8
108:17,
20,21
109:5

119:6

**vouch**
88:18

**VRA**
63:14,
16
121:9

**vulnerable**
113:23

_____

**W**

_____

**wait**
6:3

**walk**
14:10
67:8
72:22
74:19
83:20
85:22

**walked**
74:4,23
95:17

**wanted**
88:12
94:20
97:4
104:3
107:23

**wanting**
117:13

**Warren**
94:6
132:17
133:19
135:15,
22
136:10,

13
137:2
138:20
140:9,
14
**Warren's**
136:25
**water**
23:23
24:17,
18
26:23
32:7,24
33:12
**waterway**
32:21
**ways**
19:2
20:2
56:21
70:10
99:11
**weaken**
62:4
**website**
11:13
42:5
87:20
**weigh**
58:3
**weighing**
54:5
**wholly**
26:8
29:2
116:23
117:25
**win**
73:24

119:22,
23
**wins**
70:23
74:2
**witnesses**
130:14,
17
131:5
132:16
133:25
**won**
75:17
76:2
77:12
**word**
99:21
**words**
99:18
100:5
105:9
106:25
107:21
**work**
85:11
88:12
89:16
90:16
91:4
104:13
106:10,
14,16,
23
107:18
144:22
**worked**
67:16
87:14
144:19

**working**
126:8,
14
135:8
**works**
54:17
96:19
**workshopping**
55:20,
25
**worth**
133:18
**wound**
57:17
**wow**
35:18
**writing**
88:16
**wrong**
44:4
121:2
148:13

---
Y
---

**year**
69:22
149:25
**years**
11:24
13:17
45:1
77:23
78:7
146:4
150:22
151:3
**yellow**
36:19

94:13
103:25
**Yen**
87:16