**In the Matter Of:**

KETO NORD HODGES vs ALBRITTON

8:24-cv-879

---

**CORY MCCARTAN, PH.D.**

*December 02, 2024*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION
                    CASE NO. 8:24-cv-879
 3

 4   KETO NORD HODGES, et al.,

 5        Plaintiffs,

 6   vs.

 7   BEN ALBRITTON, et al.,

 8        Defendants.
     _____/

 9

10      VIDEOCONFERENCE DEPOSITION OF CORY McCARTAN, Ph.D.
            Appearing Remotely Via Videoconference from
11              University Park, Pennsylvania 16802

12
                Taken By Counsel for Defendants
13                       (Pages 1-80)

14
                   Monday, December 2, 2024
15                   2:34 p.m. - 4:24 p.m.

16
                         HELD REMOTELY
17                    VIA VIDEOCONFERENCE

18

19

20

21

22   Stenographically Reported By:
     Jennifer Figueroa, RPR, FPR
23   Notary Public, State of Florida at Large
     Appearing Remotely from Hillsborough County, Florida
24   Esquire Deposition Solutions - Tampa Office
     Phone - 813.221.2535, 800.838.2814
25   Esquire Job No. J12075395
```



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                          2

```
 1   REMOTE APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFFS:

 3        NICHOLAS LYNDOL VILLACORTA WARREN, ESQUIRE
          ACLU of Florida - Staff Attorney
 4        4343 West Flagler Street
          Suite 400
 5        Miami, Florida 33134-1585
          786-363-1769
 6        nwarren@aclufl.org


 7

 8   ON BEHALF OF DEFENDANT BEN ALBRITTON, IN HIS OFFICIAL
     CAPACITY AS PRESIDENT OF THE FLORIDA SENATE:
 9
          TARA RENEE KLIMEK PRICE, ESQUIRE
10        KASSANDRA SATTERLY REARDON, ESQUIRE
          GEORGE N. MEROS, JR., ESQUIRE
11        Shutts & Bowen LLP
          215 South Monroe Street
12        Suite 804
          Tallahassee, Florida 32301-1858
13        850-241-1734 (Price)
          850-241-1724 (Reardon)
14        850-241-1717 (Meros)
          kreardon@shutts.com
15        tprice@shutts.com
          gmeros@shutts.com
16

17   ON BEHALF OF DEFENDANT SECRETARY OF STATE:

18        RANDALL MCKAY RABAN, ESQUIRE
          Holtzman Vogel
19        119 South Monroe Street
          Suite 500
20        Tallahassee, Florida 32301-1591
          850-270-5938
21        rraban@holtzmanvogel.com

22

23   ALSO PRESENT:

24        ABE EVANS, NEW YORK UNIVERSITY SCHOOL OF LAW
          OLIVER THOMAS, ESQUIRE, THE FLORIDA SENATE
25
```



1                        I N D E X

2                                                      PAGE

3    Direct Examination by Ms. Price                      4

4    Cross-Examination by Mr. Warren                     73

5    Errata Sheets                                    76-78

6    Certificate of Reporter                             79

7    Certificate of Oath                                 80

8

9

10                        EXHIBITS

11   NO.                 DESCRIPTION                  PAGE

12   Exhibit 1     Dr. McCartan's Curriculum Vitae      10

13   Exhibit 2     Benchmark Plan Map                   17

14   Exhibit 3     Enacted Plan Map                     18

15   Exhibit 4     Expert Report of Cory McCartan,
16                 Ph.D.                                22

17   Exhibit 5     Redrawn Area of Enacted Plan
                   zoomed in to Tampa                   28
18
     Exhibit 6     Senator Rodrigues Memo to
19                 Jay Ferrin dated 10/18/2021          35

20   Exhibit 7     Illustrative Plan A                  36

21   Exhibit 8     Illustrative Plan B                  55

22   Exhibit 9     Illustrative Plan C                  59

23

24

25



```
 1            Videoconference Telephonic Deposition

 2   stenographically reported by Jennifer Figueroa,

 3   Registered Professional Reporter and Notary Public in

 4   and for the State of Florida at Large, in the above

 5   cause.

 6                  *    *    *    *    *

 7            (Mr. Thomas is not present.)

 8            THE COURT REPORTER:  Do you swear or affirm

 9       that the testimony you're about to give will be the

10       truth, the whole truth, and nothing but the truth?

11            THE WITNESS:  I do.

12            THE COURT REPORTER:  And you are currently

13       located in University Park, Pennsylvania, with a

14       ZIP Code of 16802.  Is that correct?

15            THE WITNESS:  That's right.

16            THE COURT REPORTER:  Thank you so much.

17            Counsel, you may proceed.

18   THEREUPON,

19                  CORY MCCARTAN, Ph.D.,

20   having been first duly sworn or affirmed, was examined

21   and testified as follows:

22            MS. PRICE:  Thank you, Madam Court Reporter.

23                  DIRECT EXAMINATION

24   BY MS. PRICE:

25       Q.   Hello, Dr. McCartan.  How are you doing this
```



1  afternoon?

2       A.   Well, thanks.  How about you?

3       Q.   Good, thank you.

4            My name is Tara Price.  I'm counsel for the

5  Florida Senate for President Albritton, and I'll be

6  questioning you today.

7            Would you mind stating your full name for the

8  record, please?

9       A.   Yes.  It's Cory McCartan.

10      Q.   And I previously stated this, but on the

11 record could you just identify where you're presently

12 located?

13      A.   I'm in University Park, Pennsylvania.

14      Q.   Thank you.

15           Dr. McCartan, have you had your deposition

16 taken before?

17      A.   Yes.

18      Q.   Are you familiar with the general ground

19 rules?

20      A.   Yes.

21      Q.   Okay.  I'll go over them just so we touch on

22 them, but I'll do it quickly since you said you're

23 familiar.

24           You understand today your testimony is under

25 oath and you have an obligation to tell the truth, just



1  as if you were in a court of law?

2      A.   Yes.

3      Q.   And when you respond to my questions, as you

4  are doing now, you'll need to make sure that you say

5  "yes" or "no" instead of nodding or shaking your head,

6  especially since we're on Zoom.

7           Do you understand that?

8      A.   I do.

9      Q.   And if for any reason you don't understand my

10 question, will you agree to let me know so that I can

11 explain it or rephrase it?

12     A.   Yes.

13     Q.   Okay.  Thank you.

14          So in light of that, is it fair for me if you

15 understand my question that I can assume you understood

16 what I'm asking you?

17     A.   Yes.

18     Q.   And, you know, today is not a test.  So if you

19 don't know the answer to one of the questions, it's not

20 like when you're students, just let me know, that's

21 fine, and we can move on to the next question.

22          Do you understand?

23     A.   I do.

24     Q.   Thank you.

25          And if you need a break, let me know.  I know



 1  that we're only here for two hours today, so I'd like to

 2  kind of power through it and hopefully cover as much

 3  ground as possible.  But I understand and feel free to

 4  ask for a break if you need one.  I would just ask that

 5  if there's a question pending, you answer the question

 6  that's on the table and then we can take a break

 7  afterwards.

 8       A.   I understand.

 9       Q.   Great.

10            Is there any reason why you wouldn't be able

11  to testify completely and truthfully today?

12       A.   There is not.

13       Q.   Okay.  So you're not feeling sick or

14  physically ill or under the influence of anything that

15  might affect your participation today?

16       A.   No.

17       Q.   Thank you so much.

18            And since we're doing the deposition via Zoom

19  I have to ask a couple of questions.

20            You previously spoke with the court reporter,

21  but is there anyone else in the room with you today?

22       A.   There is not.

23       Q.   And do you have any materials or notes in

24  front of you?

25       A.   I have a printed copy of the report I



1  submitted in this case.

2       Q.   Okay.  Is that the only document that you have

3  in front of you?

4       A.   Yes.

5       Q.   Okay.  Do you have any writing or notes or

6  comment on the printed copy of your report?

7       A.   No.

8       Q.   What about any highlighting?

9       A.   No.

10      Q.   It's the same exact copy of the report we

11 would have received from plaintiffs' counsel in this

12 case.

13      A.   Yes.

14      Q.   Is that correct?

15      A.   (Moves head up and down.)

16      Q.   Okay.  Are there any other documents or emails

17 or text or any other communications in front of you?

18      A.   No.

19      Q.   Okay.  Dr. McCartan, can you tell us who hired

20 you to participate in the lawsuit.

21           (Mr. Thomas entered the videoconference.)

22      A.   I was retained by the American Civil Liberties

23 Union of Florida.

24 BY MS. PRICE:

25      Q.   Okay.  Do you remember when you were first



 1  contacted?

 2      A.   Not exactly.  I was contacted while retained

 3  on another separate case.  So sometime in late 2023, I

 4  believe.

 5      Q.   Okay.  Were you aware -- well, I guess since

 6  this is 2023, the lawsuit didn't exist then.

 7           And you mentioned that you were retained by

 8  other litigation.  Can you tell me what that litigation

 9  was that you were currently working on then for the

10  ACLU?

11      A.   I believe it was called GRACE, Inc., versus

12  City of Miami.

13      Q.   Okay.  What were you retained to do in that

14  case?

15      A.   I calculated various population and

16  demographic statistics of some districts and maps that

17  were at issue in that case.

18      Q.   Okay.  Have you been hired by the ACLU for any

19  other cases?

20      A.   The ACLU of Florida?

21      Q.   Yes.

22      A.   Yes.  I don't remember the caption but there

23  is a -- a case that's been filed regarding congressional

24  and state Senate districts that I've been retained to do

25  work on.



CORY MCCARTAN, PH.D.                              December 02, 2024
KETO NORD HODGES vs ALBRITTON                                    10

1        Q.    Okay.  Do you know where that was filed?

2        A.    I believe the Miami division.

3        Q.    Okay.  Anything else?

4        A.    Other cases?  No.

5        Q.    Okay.  I'm going to go ahead and pull up your

6    CV that we were provided.  We'll do a share screen so

7    you can take a look.  All right.  Technical

8    difficulties.

9            MS. PRICE:  Now let's start with the top so we

10           can see -- there you go.  Just slowly scroll down.

11    BY MS. PRICE:

12        Q.    It looks like this is five pages.  Does this

13    look like a true and accurate copy of your CV, Doctor?

14        A.    Yeah.  This is an updated version since the

15    report was first filed, but this looks to be -- this

16    looks to be accurate.

17           MS. PRICE:  Let's go ahead and mark this as

18           Exhibit 1.

19           (Exhibit 1 will be marked for identification

20           and attached to the transcript once received by the

21           reporter.)

22    BY MS. PRICE:

23        Q.    And then on Page 5 it looks like you list some

24    experiences where you've been retained by --

25           MS. PRICE:  Scroll down.



1  BY MS. PRICE:

2      Q.   -- the ACLU.  Does that refresh your

3  recollection as to other cases in which you've been

4  retained?

5      A.   Well, these list cases where I testified by

6  deposition or at trial or submitted reports.  So the

7  case I mentioned for the ACLU of Florida the report has

8  not been yet submitted.

9      Q.   Right.  These are other cases though?

10     A.   With the National ACLU and the Florida

11 affiliate, that's correct.

12     Q.   Okay.  So we've got GRACE.  I'm not sure how

13 to say "Nairne," I butchered that; I believe the Women

14 Voters versus Ohio; and the Miami case in which you said

15 there wasn't a report due; and then this case, all are

16 ACLU.  Is that correct?

17     A.   Or its affiliates.

18     Q.   Or its affiliates.  Okay.

19          Have you ever been retained in a case where

20 the ACLU or its affiliates appeared on the other side,

21 you're testifying against them?

22     A.   No.

23     Q.   Okay.

24          MS. PRICE:  And then if you can scroll up just

25     a little bit.



 1  BY MS. PRICE:

 2      Q.    It looks like you have a couple of cases on

 3  behalf of the NAACP Legal Defense Fund?

 4      A.    Yes.

 5      Q.    Can you tell us a little bit about those?

 6      A.    Two cases which I've submitted reports or

 7  testified they're listing there.  McClure is ongoing.

 8      Q.    Have you ever been retained as an expert

 9  witness in a case where the NAACP Legal Defense Fund or

10  any of its affiliates were on the other side?

11      A.    No.

12            MS. PRICE:  Can you just scroll down a little

13      bit.

14  BY MS. PRICE:

15      Q.    And then the part that says "Data for

16  Progress," can you tell me a little bit about what that

17  is?

18      A.    They're a nonprofit based in D.C. that

19  conducts polling and issue adequacy.  I was retained by

20  them to forecast the results of the 2022 midterm

21  elections.

22      Q.    Do you know whether they work to advance

23  either Republican or Democratic interests?

24      A.    I think my understanding is they're a 501(c)3.

25  I don't think they're a (c)4, but I'm not sure about



1    that.  So I don't think they're explicitly a partisan

2    organization, to my knowledge.  I'm not familiar with

3    their mission statement.

4         Q.   Okay.  So you don't know that organization

5    well enough to know whether it advances democratic or

6    republican interests?

7         A.   Well, I took you -- I took you to mean by

8    "democratic interest," you know, advocacy on the

9    democratic party particularly.  So there are other

10   political or -- interests that, you know, would overlap

11   in some cases and not in others that would not be

12   described, you know, as Democratic or Republican

13   interest.

14        So to the best of my knowledge it's not a

15   democratic organization the way, you know, the

16   D triple-C is.

17        Q.   How would you describe it?

18        A.   A think-tank issue adequacy organization.  It

19   conducts polling, you know, broadly upon what they would

20   consider progressive causes.

21        Q.   And coming up to this lawsuit, can you

22   describe what you were asked to do in this case?

23        A.   Sure.

24        I was retained to redraw a portion of the

25   Florida Senate district map in the Tampa area and write



1    a report describing my changes.

2         Q.   All right.  Are you familiar with the term

3    "benchmark plan"?

4         A.   Sorry, let me stop you there.  I realized

5    my -- answered this question now, I misspoke earlier in

6    describing the other ongoing case with the ACLU of

7    Florida.  It deals with congressional and house

8    districts, not congressional and state Senate districts.

9         Q.   Okay.

10        A.   To answer your question, I'm not sure I

11   understand what you mean and -- without more context

12   about what you mean by "benchmark plan."

13        Q.   You never heard the term "benchmark map" or

14   "benchmark plan"?

15        A.   I've probably used the phrase "benchmark," I'm

16   talking about a plan in some context, but probably not

17   the way that -- or maybe not the way you're thinking of.

18             So no, without context, I'm not sure what that

19   means.

20             MS. PRICE:  Okay.  Let's pull up the benchmark

21        plan.

22   BY MS. PRICE:

23        Q.   Doctor, I'm going to show you now the map that

24   was in plan -- in place for senate districts prior to

25   when the Enacted Plan that the Legislature passed was



 1  adopted.

 2          Have you seen this before?  And we can scroll

 3  in on any parts of it if you'd like.

 4      A.   I have looked at a -- not this exact document,

 5  but I've looked at the Florida State Senate map that was

 6  in place from 2016 to '22.

 7      Q.   And you believe that to be a different map

 8  than this map?

 9      A.   Oh, I -- I don't -- I don't know the map well

10  enough to say yes or no.

11      Q.   I don't want to characterize your review or

12  not review.  It sounds like you've seen the benchmark

13  map but your analysis didn't involve it that much.  Is

14  that fair to say?  Or I'm -- talk to me about how you

15  either looked at or used or didn't use the benchmark

16  map.

17      A.   Sorry.  You're referring to this -- this map

18  in front of us as the "benchmark map"?

19      Q.   When I talk about the "benchmark map" -- let's

20  back up.

21          If I talk about the "benchmark map," I'm

22  talking about the map that was in place until 2022.

23          Do you understand that?

24      A.   Yes.

25      Q.   So whether it was this document or if you



 1  remember another document, please let me know.  I'm

 2  trying to understand to what extent you looked at,

 3  analyzed, reviewed, did anything with the benchmark map.

 4       A.   After drawing the maps that I produced for

 5  this report, I reviewed portions of the benchmark plan

 6  and other historical state senate and state house and

 7  congressional plans to contextualize the changes that I

 8  made in past choice that the Legislature has made in

 9  drawing districts.  So to the extent that that review

10  involved the benchmark plan, I would have looked at

11  portions of that plan.

12       Q.   Okay.  That -- and you said "after."  Does

13  that mean you didn't look at the benchmark before you

14  drew the districts?

15       A.   That's correct, to the best of my

16  recollection.

17       Q.   This document that's in front of you right

18  here -- again, I don't want to characterize what you

19  said, but I thought you said you weren't sure whether

20  this is the document you reviewed or if you reviewed

21  another document.  Is that correct?

22       A.   I believe I looked at the benchmark plan on

23  the Legislature's redistricting website, so it would not

24  have been this exact PDF.

25       Q.   Does this PDF look like a true and accurate



1    representation of the benchmark plan that you looked

2    at?

3        A.    I -- I don't recall enough of the details, the

4    configuration, the benchmark plan to say yes or no, but

5    I'm happy to accept your representation that this is

6    showing us the benchmark plan.

7        Q.    Okay.

8            MS. PRICE:  Let's mark this as Exhibit 2,

9        please.

10           (Exhibit 2 will be marked for identification

11       and attached to the transcript once received by the

12       reporter.)

13   BY MS. PRICE:

14       Q.    And another term that I want to talk to you

15   about and we used a little bit, but I want to make sure

16   you understand, is "Enacted Plan."  Have you used that

17   phrase before or are you familiar with that phrase?

18       A.    Yes.  When you say "Enacted Plan," I

19   understand that to mean the plan enacted by the

20   Legislature that is being challenged by the plaintiffs

21   in this case.

22       Q.    Okay.  We're going to go ahead and pull that

23   up.

24           Is that a document or a plan that you reviewed

25   prior to starting your work?



1      A.   Yes.

2      Q.   And what did you review the Enacted Plan

3  for?

4      A.   I was, you know, shown the Enacted Plan in --

5  you know, as part of my assignment which was to redraw,

6  you know, the -- you know, according to instructions the

7  Tampa portion.  So I would have -- you know, in altering

8  this map to draw my map, I would have then, you know,

9  seen this map and used it as a starting point.

10     Q.   Do you recognize this document that's up right

11 now as the Enacted Plan?

12     A.   I recognize the Tampa region.

13         MS. PRICE:  Let's go ahead and mark this as

14     Exhibit 3.

15         (Exhibit 3 will be marked for identification

16     and attached to the transcript once received by the

17     reporter.)

18 BY MS. PRICE:

19     Q.   Does this look like a true and accurate

20 representation of the Enacted Plan that you would have

21 reviewed?

22     A.   In the Tampa region that I'm familiar with,

23 yes; and I'll accept your representation that the rest

24 of the map is likewise accurate.

25     Q.   Okay.  Besides the enacted map and prior to



CORY MCCARTAN, PH.D.                                      December 02, 2024
KETO NORD HODGES vs ALBRITTON                                          19

1    your drawing of Plans A, B, and C, did you review any of

2    the staff drawn maps that the Florida Senate considered

3    during the redistricting process?

4         A.   No.

5         Q.   Did you review any public submissions that the

6    Florida Senate received --

7         A.   No.

8         Q.   -- during redistricting process?

9              No.

10             Are you familiar with a public submission

11   known as "P000S0042" or "Plan 42" which was created by

12   Nick Warren?

13        A.   Not that I know of or I can recall.

14        Q.   So you don't remember reviewing that before

15   you began your work or as a part of your work in this

16   litigation?

17        A.   No.

18        Q.   Are there any other maps that you reviewed

19   during your work on this litigation?

20        A.   No.

21             Sorry.  Sorry.  Could you repeat the question?

22        Q.   Yes.  I'm wondering whether there's any other

23   maps that you reviewed as a part of your work in this

24   litigation?

25        A.   Ahh.  Yes.  As I mentioned I reviewed numerous



1  historical plans as part of writing my report.  I don't

2  have that list off the top of my head, but I could read

3  it out of the relevant sections of my report if that

4  becomes necessary.

5       Q.   All right.  Anything else?

6       A.   No other maps.

7       Q.   Were you given any financial constraints with

8  regard to your analysis in this case?

9       A.   Could you be more specific?

10      Q.   Were you given any constraints on the amount

11 of -- financial amount to which you would have built

12 plans --

13      A.   Oh.

14      Q.   -- for your work in this litigation?

15      A.   Probably.  There's usually a clause like that

16 in the retainer.  I don't remember the details for this

17 particular matter.

18      Q.   What about time constraints?

19      A.   Only insofar as that would be implied by a

20 financial constraint.

21      Q.   All right.  How much time do you -- how much

22 time did you spend on your analysis and the preparation

23 of this expert report --

24      A.   I don't --

25      Q.   -- approximately?



1          A.    I don't recall.

2          Q.    Is it a couple of days?

3          A.    The work was spaced out over a long period of

4    time and then concluded a while ago when the report was

5    filed; so, yeah, I couldn't say exactly.

6          Q.    Cumulatively would it be closer to a couple of

7    days or a couple of weeks?

8          A.    Days, probably.

9          Q.    Okay.  Dr. McCartan, what did you do to

10   prepare for today's deposition?

11         A.    I met with counsel and we discussed sort of

12   what to expect.

13         Q.    Did you review any documents?

14         A.    We reviewed my report.

15         Q.    Any other documents?

16         A.    Not that I recall.

17         Q.    And how long did you meet to prepare with

18   counsel for this deposition?

19         A.    About 45 minutes or an hour if I remember

20   correctly.

21         Q.    And it was just one meeting.  Is that

22   correct?

23         A.    Yes.

24         Q.    I am going to pull up a document titled

25   "Expert Report of Cory McCartan, Ph.D."  And I know it



1    is lengthy, but we're going to just scroll through the

2    first 21 pages slowly.  I will assure you the rest of

3    the exhibits are there, but I'd like you to just look at

4    it as we scroll through it and let me know if you

5    believe that is a true and accurate copy of your expert

6    report.

7            I think your signature is on Page 21.

8        A.   It appears to be.

9            MS. PRICE:  Go ahead and mark this as 4?  Is

10       that correct?

11           THE COURT REPORTER:  (Moves head up and down.)

12           (Exhibit 4 will be marked for identification

13       and attached to the transcript once received by the

14       reporter.)

15   BY MS. PRICE:

16       Q.   And, Dr. McCartan, you said you were contacted

17   probably late 2023 about this project.  When did you

18   actually begin working on doing the analysis for the

19   parts of your expert report?

20       A.   I don't remember exactly.  Early spring 2024

21   probably.

22       Q.   Okay.  And I know that we talked about some of

23   the maps that you would have reviewed that at least you

24   looked at the enacted map prior to doing your work.

25           Did you also take a look at the complaint as a



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                        23

1   part of your analysis and expert report?

2        A.   Not that I recall.

3        Q.   Is there any document that plaintiffs' counsel

4   provided to you?

5        A.   I was provided with written instructions which

6   if I remember included a memo from the State Senate

7   about criteria to use in drawing districts.

8             After drawing the maps I was also provided

9   with a list of past districts which were represented to

10  me as being protected that I should analyze as part of

11  contextualizing the choices made in the plans that I

12  drew.

13       Q.   All right.  So you were provided with a memo.

14  You were provided with past districts to analyze, and

15  you said that you were provided with a set of written

16  instructions?

17       A.   That's correct.

18       Q.   Do you still have those written

19  instructions?

20       A.   Yes.

21       Q.   Is that something you are willing to provide

22  us today by the end of the day?

23       A.   I mean, I -- both counsel and I have those and

24  I'm sure they can be provided.

25            MS. PRICE:  Counsel, is that agreeable?



 1        MR. WARREN:  To the extent that Dr. McCartan

 2   was provided facts or data that he considered in

 3   forming his opinions or assumptions that he relied

 4   on, certainly he can testify to any of those.  I

 5   think otherwise any communications between counsel

 6   and him about his report would be protected under

 7   26(b)4(C).

 8        MS. PRICE:  I'm not looking for any privileged

 9   communications.  What I'm looking for are

10   instructions that he said he followed and relied

11   upon in conducting his analysis in his report.

12        MR. WARREN:  He --

13        MS. PRICE:  He talked about some of those

14   instructions in his report.  So that's just what I

15   would like to see is just the instructions that he

16   relied upon.

17        MR. WARREN:  I think this same line of

18   questioning happened in Dr. Trende's deposition,

19   and Mr. Raban I think gave the same answer that I'm

20   going to give now, which is that you can definitely

21   ask him about what he was asked to do that he talks

22   about in his report and facts and data and

23   assumptions that he considered and relied on; but

24   other communications between counsel and expert are

25   protected.



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                          25

```
 1              MS. PRICE:  Okay.
 2    BY MS. PRICE:
 3         Q.   Dr. McCartan, since finalizing and submitting
 4    your report have you had an opportunity to review it?
 5         A.   Yes.
 6         Q.   You're satisfied with the analysis and the
 7    opinions inside?
 8         A.   Yes.
 9         Q.   How many maps did you create or draw as a part
10    of this litigation?
11         A.   Three.
12         Q.   Did you create any maps that were not included
13    within your expert report?
14         A.   The three maps that I provided were drawn
15    intervally, so there were drafts that I had revised.  So
16    any draft maps were not included.
17         Q.   Does that mean you had draft maps that you
18    showed to other individuals and then made changes to it
19    after that?
20         A.   That's correct.
21         Q.   And who would those individuals have been?
22         A.   Counsel for the plaintiffs.
23         Q.   Besides counsel for plaintiffs did anyone else
24    review your maps?
25         A.   Well, I don't always know who's a lawyer and
```



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                         26

1    who's not a lawyer, you know, on these calls.  So it's

2    possible there were staff for counsel for the plaintiffs

3    or assistants; but outside of, you know, ACLU of

4    Florida, no.

5        Q.    So did you have like a research assistant or

6    anyone help you drawing the maps or creating the maps?

7        A.    No.

8        Q.    What about in helping you draft or create your

9    expert report?

10       A.    No.

11       Q.    On Page 2 of your report --

12             MS. PRICE:  Let's scroll to Page 2, if that's

13       okay, Kassie.

14   BY MS. PRICE:

15       Q.    -- you discuss a simulation algorithm -- it's

16   called an "SMC algorithm" -- that generates many

17   randomly sampled redistricting plans.  Is that right?

18       A.    Yes.

19       Q.     Is that something that you -- well, first off,

20   can you talk to me about what an SMC algorithm is, just

21   generally?

22       A.    "SMC" stands for "Sequential Monte Carlo."

23   It's a general statistical technique that is used to

24   allow algorithms that can generate random samples.  I

25   developed a particular type of SMC algorithm for the



1    redistricting context in the paper that's footnoted

2    there.

3        Q.   So you -- do you put like certain inputs

4    around what you're looking for and then it generates

5    maps pursuant to those inputs, or do you just show the

6    geographical area and it generates random maps or how --

7    can you, I'm sorry, dumb-it-down for me like I'm a third

8    grader?

9        A.   That's roughly correct.  So you provide the

10   relevant geographic data, particular constraints that it

11   supports that need to be met, it will generate randomly

12   and according to specific probability distribution plans

13   from that region, from that part of the state.

14       Q.   Okay.  Is that -- did you use that algorithm

15   in this litigation?

16       A.   I did not.

17       Q.   You did not.  Okay.

18            Let's go to ...

19            MS. PRICE:  Can you pull up the redrawing area

20       of the Enacted Plan?  It's a separate exhibit.

21   BY MS. PRICE:

22       Q.   On Page 5 of your report you have a Figure 1,

23   and it's called "Redrawn area of the enacted plan."  I'm

24   going to show you just a zoomed-in picture of it.

25            Does that look like a true and accurate



1   representation of Figure 1 to you?

2        A.   Yes.

3             MS. PRICE:   Let's go ahead and mark this as --

4        I think we're on 5?

5             THE COURT REPORTER:   (Moves head up and down.)

6             (Exhibit 5 will be marked for identification

7        and attached to the transcript once received by the

8        reporter.)

9   BY MS. PRICE:

10       Q.   How is this Figure 1, "redrawn area of the

11  enacted plan," different from the Enacted Plan that we

12  saw before which I think we marked as Exhibit 3?

13       A.   This map represents the same plan.  It's just

14  zoomed in to the Tampa area.

15       Q.   But it says "redrawn."  So is it -- how is it

16  different?

17       A.   As I said, this map is the same as the Enacted

18  Plan.  It's just zoomed in to the Tampa area.

19       Q.   Why did you redraw this map instead of using a

20  map off the Florida Legislature's website?

21       A.   I'm not sure I understand the question.  Could

22  you rephrase it?

23       Q.   Figure 1, did you get this figure from the

24  Florida Legislature's website?

25       A.   No.



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                          29

1       Q.    Did you draw this figure?

2       A.    Yes.

3       Q.    Why did you draw a figure that you could have

4    gotten from the Florida Legislature's website?

5       A.    I was producing a number of maps to include in

6    this report, such as Figures 2 and 3 and 4, and so I

7    also produced Figure 1 using the same type of map so

8    they were comparable.

9       Q.    Comparable but not identical?

10       A.    I'm not sure I understand.  Is there a

11   question there?

12       Q.    Yes.  I'm asking if this is identical to the

13   map that you would have seen off the Florida

14   Legislature's website?

15       A.    As I said, this is the same as the Enacted

16   Plan, it's just zoomed in to the Tampa area.

17       Q.    So is that a "yes, it's identical," or is that

18   a "no"?

19       A.    I'm just -- you've asked the same question.

20   I'm giving you the same answer.

21       Q.    I'm looking for a "yes" or a "no" answer,

22   Doctor.  It's a yes-or-no question.

23       A.    So what do you mean by "identical"?

24       Q.    "Identical" means "exactly the same."  Is it

25   exactly the same as the figure that you would have



1  gotten off the Florida Legislature's website?

2      A.   No, because the Florida Legislature website

3  does not have a zoomed-in version of the Enacted Plan

4  with these colors and these labels of the Enacted Plan.

5  So it's not identical.

6      Q.   Did plaintiffs' counsel ask you to redraw the

7  Enacted Plan?

8      A.   Those are my instructions in this case, yes.

9      Q.   On Page 3, going back to your expert report,

10 Paragraph 8, it says you "performed initial adjustments

11 and district drawing using Dave's Redistricting App

12 software."  Do you see that?

13     A.   Yes.

14     Q.   Can you just kind of talk me through what that

15 means, "initial adjustments and district drawing"?

16     A.   I drafted maps in the DRA software.

17     Q.   Okay.  But you're using -- okay.

18          So did you start with a blank slate or is

19 there any significance to the word "initial

20 adjustments"?

21     A.   I see.  I began with the Enacted Plan.

22     Q.   Okay.  Okay.  And then you made -- tell me if

23 I'm wrong or not.  You made adjustments to the Enacted

24 Plan using this software.

25     A.   That's correct.



1    Q.   Is that correct?

2         Okay.  And then in the second sentence it says

3    you performed additional adjustments using the

4    Legislature's online redistricting software.  Is that

5    correct?

6    A.   Yes.

7    Q.   So can you talk to me about what you did

8    during the initial adjustments and what you did during

9    the additional adjustments and why that required the use

10   of two different softwares?

11        MS. PRICE:  Objection; form.

12   A.   The first question --

13   BY MS. PRICE:

14   Q.   We'll start with the first question.

15        Can you talk to me about the difference

16   between your initial adjustments and your additional

17   adjustments?

18   A.   Sure.  The majority of the drafting occurred

19   in DRA.  After completing that drafting I loaded the

20   maps into Legislature's software to make sure that there

21   was no -- there were no inaccuracies, as it were, in the

22   DRA software and that the final map would satisfy all

23   the, you know, population bounds and so on per the

24   Legislature's own software.

25        At that point there were several other maybe



1   block-by-block adjustments that were made to regularize

2   boundaries or adjust water blocks and so on.  And so any

3   sort of final small block little tweaks would have been

4   applied, you know, while in the Legislature software

5   after they had already been loaded into the software.

6         Q.   Okay.  So it's a difference in size of the

7   adjustments?

8         A.   It was just -- it was just sequential.  I did

9   most of the drafting and then I got it ready in the

10  software.  And then any other changes that I made after

11  I initially loaded things into the website or software

12  happened in that software and those were -- what I

13  recall those were exclusively very small block-level

14  adjustments.

15        Q.   We previously touched on -- you said you were

16  given instructions by plaintiffs' counsel.  Can you talk

17  to me about the instructions that plaintiffs' counsel

18  gave you?

19        A.   Yes.  Do you have a more specific question?

20        Q.   What instructions did plaintiffs' counsel give

21  you?

22        A.   I was instructed to adjust the map to ensure

23  that District 16 was wholly contained in Hillsborough

24  County; and then make, you know, any necessary changes

25  to the surrounding districts to accomplish that and end



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                         33

1  up with a plan that still complied with all of the

2  relevant state and federal and constitutional criteria.

3       Q.   Any other instructions?

4       A.   I think I was asked to produce three such

5  plans.

6       Q.   Okay.  What else?

7       A.   Those are the only instructions that I

8  remember receiving.

9       Q.   Can you tell me who gave you those

10  instructions?

11       A.   Counsel for the plaintiffs.

12       Q.   And if we go to Page 4, Paragraph 12, I think

13  this is what you're talking about.  You were instructed

14  to adjust District 16 to be wholly within Hillsborough

15  County.  Correct?

16       A.   Yes.

17       Q.   And then it says here "while altering

18  surrounding districts only to the extent necessary to

19  accomplish this change."

20       A.   Yes.

21       Q.   What does that mean?

22       A.   Well, for instance, redrawing districts

23  around, you know, Jacksonville wouldn't generally be

24  necessary because you could just make changes to

25  districts immediately in the Tampa area.



1          So once you've redrawn District 16 to be

2    within Hillsborough there's now a gap on the other side

3    of the bay that needs to be filled.  So some of the

4    changes are going to have to be made.  I was instructed

5    to keep those changes as minimal as possible while still

6    complying with the redistricting standards.

7          Q.   So the "surrounding districts," what do you

8    understand that term to mean?  How broad?

9          A.   Both districts that immediately adjoin

10   District 16 and those that due to changes in the

11   adjoining districts would also be impacted.  So there

12   might be some districts that don't immediately adjoin

13   District 16 that would count as surrounding due to the

14   way they're configured in the locations of county

15   boundaries.

16         Q.   And who made the decision as to whether it was

17   necessary to alter a surrounding district?  Is that you

18   or plaintiffs' counsel or both?

19         A.   Me.

20         Q.   Do you know why plaintiffs' counsel asked you

21   to draw District 16 wholly within Hillsborough County?

22         A.   Not exactly.

23         Q.   What do you mean by "not exactly"?

24         A.   I'm not sure exactly what their reasons are

25   for that instruction.



1    Q.   Okay.  You can't say one way or the other.  Is

2    that fair?

3    A.   I understand that keeping districts wholly

4    contained within counties where possible is part of the

5    constitutional standards for redistricting.  So I could

6    surmise that the instructions have something to do with

7    that requirement, but I'm not privy to their larger case

8    strategy as it were.

9    Q.   Were you instructed to make any other

10   districts fit wholly within the county?

11   A.   No.

12   Q.   And you said that you were provided with

13   memorandum here from Senator Rodrigues to Jay Ferrin.

14   Let's take a look at a Rodrigues memo dated October 18,

15   2021.

16        Doctor, I'd like you to take a look at this

17   and let us know if this looks like a true and accurate

18   copy of the memorandum that you were given and reviewed

19   and followed as a part of your work.

20   A.   Yeah, that appears to be the same memo.

21        MS. PRICE:  Great.

22        Let's mark this as 6, please.

23        (Exhibit 6 will be marked for identification

24        and attached to the transcript once received by the

25        reporter.)



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                        36

```
 1  BY MS. PRICE:
 2       Q.   And are there any other instructions that you
 3  remember as we're talking through all this now that you
 4  were also given to follow as a part of your work?
 5       A.   No, not that I recall.
 6       Q.   Let's go ahead and go plan by plan, if that's
 7  okay.  I'm going to pull up an enlarged copy of Plan A
 8  which is Figure 2 from your expert report.
 9            I'd like you to take a look at it,
10  Dr. McCartan, to make sure this is a true and accurate
11  copy of Plan A.
12       A.   Yes, it looks to be.
13       Q.   Great.  Thank you.
14            MS. PRICE:  Let's go ahead and mark this as
15       Exhibit 7.
16            (Exhibit 7 will be marked for identification
17       and attached to the transcript once received by the
18       reporter.)
19  BY MS. PRICE:
20       Q.   And, Doctor, in your own words can you
21  describe to me how you drew Plan A?
22       A.   Sure.
23            So I began by removing the portion of District
24  16 contained in St. Petersburg.  So I removed all those
25  blocks.
```



1          That required then sort of bringing the

2    boundary of District 18 down so that it would contain

3    the rest of the peninsula there, which then in turn

4    required that District 21 be adjusted to take in --

5    taking of the population there.

6          At that point District 21 adjoins, you know,

7    both District 14 and District 23 in the enacted map, but

8    its boundary with District 14 is completely along the

9    county border.  And so to avoid introducing, you know,

10   additional county splitage, it wasn't necessary for me

11   to adjust the District 21/14 border.

12         So instead I adjusted the border of District

13   23, and then that then created a need to adjust the

14   boundaries of District 16 in the northeast as well as

15   District 20 to keep populations balanced.

16         In all those changes I attempted to comply

17   with all the two tiers of the redistricting

18   requirements.

19    Q.    Okay.  Any -- I'm sorry.  I thought you got

20   through 23.  Did you get down to 20 or ...

21    A.    Yeah.  So the adjustment of 23 then required

22   adjustments to 20 and 16 to fill in the map and keep

23   populations balanced.

24    Q.    All right.  So you said you started by moving

25   the Pinellas population of enacted 16 into 18.  Right?



CORY MCCARTAN, PH.D.                                        December 02, 2024
KETO NORD HODGES vs ALBRITTON                                            38

1        A.    Yeah, that's one way to put it.

2        Q.    Okay.  And then you said you moved the excess

3   from 18 into 21?

4        A.    Yes.

5        Q.    Okay.  Why did you do that instead of moving

6   it into 14 or 20?

7             MS. PRICE:  Object to form.

8   BY MS. PRICE:

9        Q.    Why did you choose to put the excess

10  population from 18 into 20?

11       A.    Well, as I said, you know, avoiding splitting

12  counties is one of the tiers of the redistricting -- one

13  of the redistricting criteria.  So adjusting the 21/18

14  boundary can require introducing additional county

15  splits and was a more minimal change compared to

16  somehow, you know, having 20 stretch across into the new

17  county or having 14 also cross the bay.

18       Q.    Okay.  You previously used the word

19  "required."  Did you understand that to mean you could

20  not draw a map with those options?

21       A.    I'm sorry.  I don't -- I don't recall the

22  context in which I said "required."

23             MS. PRICE:  Madam Court Reporter, can you read

24       back Dr. McCartan's answer when he talked about --

25       I first asked him to describe how he drew Plan A,



1      and he said that he moved population into 18, and

2      then I think he said he was required to then move

3      it to 21 and then that required to move it

4      somewhere else.  Can you read that, please?

5              THE COURT REPORTER:  Yes, ma'am.

6              (Reporter read back as requested.)

7   BY MS. PRICE:

8      Q.   So, Dr. McCartan, can you explain why you used

9   the word "required" twice there?

10     A.    Yeah.  So I guess I should, yeah.  So

11  "required" in the sense of the only district adjoin --

12  yeah, that -- so once you unassign the blocks in

13  Pinellas that were part of District 16 then you said,

14  "Okay, where do those blocks get assigned?"  The only

15  option that doesn't introduce a new county split is to

16  assign those blocks to District 18.

17          So my understanding of compliance with

18  constitutional standards would be that 18 -- putting

19  those blocks in 18 would be the appropriate choice.  So

20  I did not receive, you know, instruction to do that

21  per se.

22     Q.   And is the same true for 21?

23     A.    Yes.

24     Q.   Okay.  Let's talk about the boundaries between

25  16 and 23.



1          MS. PRICE:  And can we enlarge those a little

2     bit just so we can see the difference between the

3     blue and the yellow?

4   BY MS. PRICE:

5          Q.   Can you talk to me how you drew those

6   boundaries between 16 and 23?

7          A.   Yeah.  I intended to, you know, ensure that

8   municipalities -- incorporated municipalities -- weren't

9   split and major roadways, waterways, canals and the like

10   were followed.  The irregular shape of some of the

11   census blocks in that part of the county led to, you

12   know, some abnormalities in the geographic shape of the

13   border.

14          But the adjustments there were, you know, as

15   elsewhere, to meet the population targets for each

16   district while, you know, complying with those

17   constitutional standards.

18          Q.   It looks like there's an east-west road that's

19   pretty straight across going down -- just south of the

20   north border of 16.  Why didn't you follow that road for

21   more clear boundary and make adjustments to 14 and 23

22   and 16 there?

23          A.   Well, as I mentioned, adjusting District 14

24   was not necessary to make adjustment to 16 that I was

25   instructed to do.  My instructions were only to make



CORY MCCARTAN, PH.D.                                December 02, 2024
KETO NORD HODGES vs ALBRITTON                                      41

 1  necessary changes.  So any adjustment to 14 would not

 2  have been in line with my instructions.

 3       Q.   Did you --

 4       A.   As to why -- oh.

 5       Q.   Go ahead.  I'm sorry.

 6       A.   As to why that particular road, I couldn't

 7  speculate.  I made -- I drew these maps a while ago and

 8  all the decisions sort of play off each other so you

 9  can't really isolate one decision from another.

10       Q.   You're not able to look at these maps today

11  and tell me whether you were following roads or cities

12  for portions of them?  Is that what you're saying?

13       A.   I don't believe that's what I just said.

14       Q.   Can you restate what you're saying then so

15  that I can better understand.

16       A.   Sure.

17            Because of the need to keep every district

18  within a cer -- narrow population band, changes to one

19  portion of a boundary unnecessarily create changes on

20  other boundaries.  So any one decision about a portion

21  of a map implicates decisions elsewhere.

22            So I can't look at any one portion of the

23  boundary and justify that particular choice of boundary

24  only with regards to that boundary.  It may also have

25  depended on what was happening elsewhere in the map as I



1    was drawing it.

2        Q.    Okay.  Can you tell me right now whether the

3    north side of 16 follows a road or any particular

4    cities?

5        A.    Just based on this map we have in front of us

6    there's not enough detail for me to answer that

7    question.

8        Q.    And you don't remember this as a part of your

9    work sitting here today?

10       A.    No.

11       Q.    Okay.  You said that it wasn't necessary to

12   adjust District 14 and so you didn't.  Is that

13   correct?

14       A.    That's right.

15       Q.    Did you understand the instruction that you

16   could only change districts if it was necessary to mean

17   that you couldn't adjust District 14?

18       A.    As I mentioned my instruction was to adjust

19   surrounding districts only to the extent necessary to

20   accomplish, you know, keeping 16 within Hillsborough.

21   So if a change -- it was possible to leave a district

22   unchanged, then yeah, my interpretation of that

23   instruction would be that I was required not to change

24   it.

25              As I mentioned due to the configuration of 14



1  against the northwest corner of Hillsborough it was not

2  necessary to alter 14 to make the changes to District 16

3  that I was instructed to.

4       Q.   So then I think what I'm hearing you say it's

5  based on the northwest corner of 14 and your

6  instructions from plaintiffs' counsel you were not able

7  to make changes to District 14.  Is that correct?

8       A.   Yes.

9       Q.   Okay.  Let's talk about -- so for -- I think

10  it says in Paragraph 17 of your report -- and I don't

11  want to switch over to it, but I think you have a copy

12  of it in front of you.  Is that correct, Doctor?

13       A.   I do.

14       Q.   It says that 23 had too much population and so

15  you adjusted both 16 and 20 to balance it out.

16            Why didn't you just take that excess

17  population and put it into 16 and leave 20 alone?

18       A.   Sorry.  I'm just reading that section of the

19  report.

20       Q.   That's okay.

21       A.   So in removing the portion of 16 in Pinellas

22  now 16 was underpopulated, so it had to gain from

23  somewhere.  It could gain partially from 23, but in, you

24  know, complying with the standards as I interpreted

25  them, it made more sense to end up adjusting both 16 and



1  20.  And that makes sense especially considering the

2  original adjustment of 16 was down in the southern

3  portion of the district which is right about where it

4  interfaces with District 20.

5      Q.   So what requirements made you take population

6  and change population from 20?  I'm trying to understand

7  why it wouldn't have just been solved by expanding 16 to

8  take the overflow from 23.

9      A.   Yeah.  So part of it is that you have

10  incorporated municipality over around Plant City, so you

11  try to avoid splitting that.  So it a little bit boxes

12  you in as sort of where you can take population up in

13  that corner, whereas there are not really many

14  incorporated municipalities down in the southern portion

15  of the county.

16          Additionally, you know, one of the

17  requirements in the memo is to, you know, make sure that

18  you're not diluting the voting power of minority voters.

19  And so to the extent that you start to include portions

20  of the county that would have that effect, I try to

21  avoid doing that.

22          And so putting those things together, making

23  adjustments to both 16 and 20, to me in my judgment that

24  complied with those standards more closely.

25      Q.   Are there any other incorporated areas of 23



1  besides Plant City that you were concerned about

2  avoiding in Hillsborough County?

3       A.   There may have been.  That's the one that, you

4  know, comes to mind right now that I recall.  I don't

5  have -- I don't memorize all of the incorporated ones.

6  That's the one that comes to mind.

7       Q.   I grew up in Dade City, so I'm a little bit

8  familiar with this area.  So I'm just wondering, you

9  know, if there's something in that northeastern part of

10 Hillsborough County that you were trying to avoid

11 putting into 16?

12      A.   Nothing specific comes to mind.

13      Q.   Okay.  So it would have been either -- I think

14 what I hear you saying, let me know if this is a fair

15 representation -- it would have been either avoiding

16 splitting incorporated cities or municipalities, or else

17 making sure that you didn't diminish the voting power of

18 other races, minority races.  Is that correct?

19      A.   That's right.

20      Q.   Okay.  Let's talk about -- if we could scroll

21 down a little bit -- the boundaries of 16 and 20.

22           Can you talk to me a little bit about how you

23 decided to make these boundaries, the entire boundary

24 line between 16 and 20?  What was driving your

25 decisions?



1        A.    Sure.

2              So at a high level in line with, you know,

3    requirements to not dilute minority voting power, you

4    know, I was aware of sort of the broad demographic

5    trends in southern Hillsborough.

6              And then looking specifically at other aspects

7    of those criteria, you have some major roadways,

8    north-south roadways, that are sort of paralleling the

9    shore there.  So it made sense to build a district

10   boundary around those roadways or in some cases

11   waterways.  So I ended up with that configuration in

12   this particular map sort of balancing those two

13   considerations.

14       Q.    Let's take this piece by piece.

15             I heard you say that you were making

16   considerations based on the demographics of southern

17   Hillsborough County.  Is that correct?

18       A.    Yes.

19       Q.    Can you talk to me a little bit more about

20   what that means?

21       A.    I had through the Legislature software, for

22   instance, had access to, you know, the demographics of

23   this area.  And, you know, mathematically if you add --

24   for instance, if you have a district that's -- has a

25   high minority percentage and you add an area that has a



1   low minority percentage that's going to reduce the

2   overall minority percentage of the district.

3            And so -- and sort of laying out the overall

4   configuration of 16, I was trying to balance keeping 16

5   as similar as possible to the existing plan while on the

6   margin while changing things, avoiding, for instance,

7   removing portions of District 16 that, you know, had,

8   you know -- you know, heavily black areas, for instance.

9        Q.   Okay.  So you had to take race into account

10  when you were drawing these lines, particularly with

11  regard to southern Hillsborough County?

12       A.   I don't know about "particularly."  In order

13  to comply with the redistricting standards and to avoid

14  diluting, you know, or diminishing voters' ability to

15  elect their representatives -- minority voters' ability

16  to elect representatives -- I had to be aware of the

17  racial composition of different parts of the county.

18       Q.   Okay.  So you made decisions based upon some

19  of that demographic information?

20       A.   The overall sort of strategy or configuration

21  aware at a high level changes were made was informed by

22  that, yes.

23       Q.   And I heard you -- let's just talk about that

24  coast part from like Gibsonton down to Ruskin.  I heard

25  you say you were following a roadway.  It looks like



1  you're really close to the coastline.  So I think you

2  were following you said the memo and like Tier 2

3  considerations.

4         Why wouldn't you just -- why would you carve

5  that coastline part out of District 16?

6      A.   I mean, I do have a map that doesn't do that,

7  so I provided multiple options.

8         In this particular map I found that roadway to

9  be a natural boundary.  There's a reasonable amount of

10 population in between that roadway and the coast and so,

11 you know, included in the coastal area would have

12 required adjustments elsewhere.  So I did produce a

13 version that tried out that configuration as well.

14     Q.   Okay.  But in this map you carved that piece

15 out by following that roadway.  Is that correct?

16     A.   I guess I'm not sure I would characterize it

17 as "carved it out."  The boundary has to go somewhere.

18 I found that that roadway was a boundary that led to --

19 you know, it was a major roadway.  It was a, you know,

20 pretty, pretty straight boundary.  It helped me comply

21 with all the standards.

22     Q.   How many municipalities did you split by

23 following that roadway?

24     A.   I'm not sure.

25     Q.   More than one?



1      A.    To the best of my recollection there are no,

2  you know, incorporated municipalities in that portion of

3  the county, so I -- I'm not sure the answer would be

4  yes.

5      Q.    Okay.  So if you split Gibsonton, Apollo

6  Beach, Ruskin, any other areas down there, you're saying

7  that's okay because they're not incorporated?

8      A.    That's --

9           MR. WARREN:  Objection.

10     A.    -- my understanding of the criteria, yes.

11  BY MS. PRICE:

12     Q.    Okay.  And you considered following the road

13  boundary to be more important than a compactness

14  requirement in this particular map.  Is that correct?

15     A.    Could you --

16     Q.    I guess if you had to choose between something

17  that would improve compactness or following the road

18  boundary, it looks to me like for Plan A you went with

19  the road boundary?

20     A.    I'm not quite understanding the hypothetical

21  here.  Is the hypothetical that not following this

22  particular road boundary would have led to a more

23  compact map?

24     Q.    Well, you tell me.  Do you think 20 would have

25  been more compact if you took 16 all the way west to the



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                        50

1    coast?

2         A.   I'm not sure.  You know, compactness is a

3    visual judgment.  It's also -- you know, the portion of

4    the districts that's in the bay is not sort of shown on

5    this map, and there's no metrics on compactness you can

6    use to measure it.  I'm not sure exactly what the impact

7    would have been on some of those metrics, so --

8         Q.   So when -- I don't mean to cut you off.  I'm

9    sorry.

10        A.   Yeah.  Just to conclude, you know, it's

11   possible that a particular reconfiguration of moving the

12   boundary to the coast would have made one district or

13   the other more compact or it might not have.  It might

14   have made one district more compact, the other less

15   compact.

16             So compactness was, you know, an element that

17   I considered in drawing these districts, but I'm not

18   sure it's fair to characterize it as saying I picked one

19   over the other in drawing Map A.

20        Q.   In drawing Map A it -- I'm trying to think of

21   an accurate way to phrase this that accurately restates

22   what you're saying.

23             You're saying you looked at compactness, but

24   sitting here today you can't tell me whether following

25   that road instead of going to the coast impacts



1  compactness one way or the other?  Is that what you're

2  saying?

3       A.   Well, as I mentioned earlier, whenever you

4  make a change to one part of a map, you have to make a

5  change elsewhere on the map to balance population.  So I

6  don't know other than by looking at a comparison with

7  the version -- yeah, with Plan C which does do something

8  like this.  Other than that, I can't tell you what the

9  specific impact would have been in compactness because

10 there would have been changes to both districts in not

11 just this region but elsewhere.

12       So overall when drawing these districts I

13 balanced and kept sort of equal as it were, you know,

14 trying to follow these major boundaries and visual

15 compactness of the districts.

16       Q.   Let's talk about the southeastern boundary

17 right here between 16 and 20.

18       A.   Okay.

19       Q.   If you start from the bottom where it says,

20 "Sun City Center," it looks like you kind of shot over

21 to the east and then you're jetting over to the west and

22 then you're going due east again and then you kind of go

23 north.

24       Can you kind of tell me what was driving those

25 line-drawing decisions?



1      A.   Sure.

2           Some of those follow major roadways, others

3   follow waterways, others are just boundary portions

4   trying to connect the pieces that do follow roadways or

5   waterways.

6      Q.   Did those line-drawn decisions have anything

7   to do with race?

8      A.   I would -- I need a more specific question.

9   Like overall, as I mentioned, the configuration of these

10  districts wasn't formed by racial demographics.  I

11  wouldn't characterize any particular segment of that

12  boundary as drawn due to race or something like that.

13     Q.   Does that mean that you don't think that you

14  can look at pieces of a boundary on a district and

15  characterize those as drawn by race as examples of that?

16          MR. WARREN:  Object to the form.

17     A.   Are you saying as a general principle or for

18  my map specifically?

19  BY MS. PRICE:

20     Q.   I'm trying to understand what you just said.

21  It sounded to me like you said as a general principle

22  you can't look at a specific line of a district and say

23  whether it was informed by race or not.  So I'm trying

24  to understand if you mean with your maps or with any

25  map?



CORY MCCARTAN, PH.D.                              December 02, 2024
KETO NORD HODGES vs ALBRITTON                                    53

1        A.    Gotcha.

2              I think it's a much bigger conversation than

3    general principle.  I'm not here to really speculate on

4    that.

5              In my map specifically, as I mentioned, race

6    helped inform the overall configuration of the district.

7    But any boundary portion, any decision there, had

8    implications for the rest of the other boundaries, the

9    rest of the map, the rest of the population constraint.

10             So I'm not able to look at a particular

11   portion of a boundary that I drew here and tell you, you

12   know, this was, you know, this percentage due to race or

13   what have you.  These were sort of holistic decisions

14   made by trying to balance the requirements within each

15   tier while avoiding diminishing, you know, black voters'

16   ability to elect their representatives of choice.

17        Q.    Do you recall if there's any municipal

18   boundaries that you're following here, or is it just I

19   think you said roadways?

20        A.    I'll have to check, but I don't think to my

21   recollection there are incorporated municipalities in

22   that portion of the county.  So those would in all

23   likelihood not be incorporated municipal boundaries.

24        Q.    The Enacted Plan kind of took 301 down as its

25   eastern border down with 20.



CORY MCCARTAN, PH.D.                           December 02, 2024
KETO NORD HODGES vs ALBRITTON                              54

1          Why didn't you follow that road since it's a

2     major highway?

3          MR. WARREN:  Object to form.

4     A.    Well, in this case if I had done that there

5     would have been not enough population in District 16.

6     So adjustments elsewhere would have been had to be made.

7     And I think several other of my maps did explore

8     configurations where, you know, other roadways or other

9     choices were made there.

10    BY MS. PRICE:

11    Q.    You couldn't have gone a little bit east of

12    the 23 and gone over to the coast and gone south more

13    and still stayed within Hillsborough?

14    A.    I'm not sure I follow that hypothetical.

15    Q.    If you -- was it possible for you to draw --

16    was it possible for you to stay with U.S. 301 in drawing

17    16 and still comply with the instructions that you were

18    given?

19    A.    So I understand 301 to be the sort of

20    right-most marked road on this map, so I'm not familiar

21    with all the roadways.  So if that is in fact 301, it

22    may be possible to draw a map that does that, that stays

23    within Hillsborough and that complies with all the

24    criteria.  In trying to balance these considerations I

25    did not produce such a map.



CORY MCCARTAN, PH.D.                               December 02, 2024
KETO NORD HODGES vs ALBRITTON                              55

```
 1        Q.   Do you recall why you went east of 301 as
 2   opposed to south or east into 23?
 3        A.   I just -- I didn't think about that particular
 4   decision as a trade-off in that way you just framed.
 5             (Mr. Evans exited the videoconference.)
 6        A.   I believe I probably had finalized the
 7   boundary up around 16 and 23 or close to it and then the
 8   southern portion, so I wasn't thinking about trading
 9   off, following 301 versus, you know, drawing up there in
10   23, so ...
11   BY MS. PRICE:
12        Q.   Go ahead and go to Plan B now.  I'm going to
13   pull up an enlarged graphic of Plan B from your report
14   which is Figure 3.
15             Doctor, I'd like you to take a look at this.
16   Let me know if you believe this to be a true and
17   accurate copy?
18        A.   It looks to be.
19             MS. PRICE:  Let's go ahead and mark this as 8.
20             (Exhibit 8 will be marked for identification
21        and attached to the transcript once received by the
22        reporter.)
23   BY MS. PRICE:
24        Q.   Can you talk to me about how you drew Plan
25   B?
```



1        A.    Sure.

2              I began with Plan A and made sort of minor

3    adjustments, including drawing District 23 out to the

4    gulf coast; making some adjustments to other boundaries

5    to, you know, look at different configurations that

6    still respect both compactness and following major, you

7    know, roadways, waterways, and so on.

8              I think in general I went from A to B.  I

9    tried to sort of -- not always but, you know, produce

10   versions that prioritize compactness a little more; or,

11   you know, when there were two ways to go in Plan A,

12   maybe Plan B looked at the one that ended up with a more

13   visually compact result.

14             So overall the adjustments to Plan A were

15   relatively minor.

16        Q.   Why did you start with Plan A instead of

17   starting with the enacted map and drawing a new -- a new

18   plan?

19        A.   My instructions were to produce three plans.

20   The overall sort of -- I didn't feel there were that

21   many choices to make regarding the overall configuration

22   given the constraints involving county splits, you know,

23   the things we talked through with Plan A.

24             And so through the overall configuration that

25   I found Plan A I felt was sort of what made the most



 1  sense, what was sort of implied by the various

 2  instructions and requirements.

 3          So re-deriving that same configuration from

 4  the starting point wasn't necessary.  I sort of began

 5  with the configuration that was in Plan A and made

 6  further adjustments in there to produce another

 7  alternative for plaintiffs.

 8      Q.    Okay.  So I think what I hear you saying is

 9  that based on the constraints as you understand them in

10  the Florida Constitution, as well as the instructions

11  you were given, I think you said you didn't have that

12  many choices.  Is that correct?

13      A.    I'm sorry.  Can you repeat that question?

14      Q.    Yes.  I want to make sure I understand what

15  you're saying.  And I think you said that based on the

16  constraints and the requirements of the Florida

17  Constitution, as well as the instructions that you were

18  given in doing your drawing, I think you said you didn't

19  have that much choices.  Is that correct?

20      A.    In terms of the overall configuration of the

21  districts, yes.

22      Q.    Yes.  Okay.

23          And you mentioned 23.  Here you're taking 23

24  out to the coast.  Can you talk to me about what drove

25  that decision?



1      A.   Well, that sort of -- we're going to call it
2  the western boundary of 23, and Plan A was a little bit
3  irregular due to the need to avoid splitting
4  municipalities while trying to still follow major
5  roadways.  And so to produce an alternative with a bit
6  of a cleaner western boundary, I found that going out to
7  the coast, then coming in and having sort of a more
8  vertical north-south boundary down to the county line
9  was possible in a way that it sort of didn't work out
10  that way in Plan A.
11      Q.   Let's talk about the adjustment that you made
12  between 16 and 20.
13          MS. PRICE:  Can you scroll down there a little
14      bit?  Thanks.
15  BY MS. PRICE:
16      Q.   Can you tell me -- just talk me through what
17  adjustments you made here?
18      A.   Yeah.  They were pretty minor overall, so I'm
19  not going to recall all of them.
20      Q.   Sure.
21      A.   One that does turn up just looking side by
22  side is sort of straightening out the 16/20 border near
23  the northern end of District 20.  So I made this a
24  straight north-south line here in this map, whereas
25  there was a jog on a major east-west road in Plan A.



CORY MCCARTAN, PH.D.                                December 02, 2024
KETO NORD HODGES vs ALBRITTON                                     59

1      Q.   And then are your boundaries between 16 and

2   23?  Did you adjust much of that or is that mostly the

3   same?

4      A.   There was a adjustment to the northeast corner

5   to sort of make that a little more square.  I mentioned

6   the sort of irregular census block shapes up in that

7   area.  So I found a configuration here with Plan B that

8   increased the visual compactness and sort of squared off

9   that corner.

10      Q.   And it looks like you didn't make any changes

11   to District 14 here either.  Is that correct?

12      A.   That's correct.

13      Q.   Okay.  And is it for the same reason as we

14   discussed for Plan A?

15      A.   Yes.

16      Q.   Okay.  Let's go ahead and go to Plan C now.

17           Dr. McCartan, this is an enlarged

18   representation of Figure 4 which is Plan C in your

19   expert report.  Does this look like a true and accurate

20   copy to you of Plan C?

21      A.   Yes.

22      Q.   Great.

23           MS. PRICE:  Let's go ahead and mark this as

24      Exhibit 9.

25           (Exhibit 9 will be marked for identification



1          and attached to the transcript once received by the

2          reporter.)

3    BY MS. PRICE:

4          Q.    So can you tell me how you drew Plan C?

5          A.    Sure.

6                So I believe most of the changes -- if I

7    remember correctly most of the changes here involved

8    sort of the 16 and 23 -- it was mostly 16 and 20 border.

9                So I was working off Plan B and just sort of

10   made further adjustments to sort of explore the

11   trade-off, to the extent there was one, between visual

12   compactness and some of the other, you know, standards.

13               And so I moved the southern portion of the

14   western boundary of District 16 out to the coast, and

15   then made sort of adjustments from there to the other

16   portion of the boundary while trying to sort of still

17   follow major roadways and waterways and previous compact

18   districts.

19         Q.    So I think I heard you say you started with

20   Plan B.

21         A.    That's right.

22         Q.    Is that right?

23               And is that for the same reasons we discussed

24   before as why you started with Plan A previously for

25   Plan B?



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                        61

1          A.    Yes.  So the chronological -- I first drew

2    Plan A, then Plan B and then Plan C.  So it made sense

3    to take the most recent plan at each stage when drawing

4    the next one.

5          Q.    And it looks like the adjustments that you're

6    making are kind of narrowing off with time.  Is that

7    right?  Did you make more adjustments between Plan A and

8    B than B and C?

9          A.    I would say that B to C probably involved a

10   bigger change, especially in the configuration of 16 and

11   20.  But it's true that fewer districts were adjusted

12   between Plan B and Plan C.

13         Q.    The bigger change is between 16 and 20, and I

14   don't know if you made any changes -- you can tell me --

15   with 21, 23, 18 and 14?

16         A.    I don't believe I did.

17         Q.    Okay.  And you just said no changes to

18   District 14 like in B you had in A.  Is that for the

19   same reasons that we discussed for --

20         A.    Yes.

21         Q.    -- Plans A and B?

22               Dr. McCartan, did you author a rebuttal report

23   as a part of this litigation?

24         A.    No.

25         Q.    Did you review the expert report from Dr. D.



CORY MCCARTAN, PH.D.                                December 02, 2024
KETO NORD HODGES vs ALBRITTON                                      62

1    Stephen Voss in this litigation?

2         A.   No.

3         Q.   Does that mean -- do you plan to have any

4    opinions at trial regarding any opinions in Dr. Voss's

5    report?

6         A.   I don't -- I don't know anything about this

7    report, so at this moment I have no plans.

8         Q.   You have no plans to review it and do further

9    analysis.  Is that correct?

10        A.   That's correct.

11        Q.   Did you review an expert report from Dr. Sean

12   P. Trende in this litigation?

13        A.   No.

14        Q.   And do you have any plans to review that

15   report and do any analysis of that?

16        A.   No.

17        Q.   So is it fair to say that you do not plan to

18   offer any rebuttal of any of the opinions in

19   Dr. Trende's report at trial?

20        A.   Yes.

21        Q.   Let me ask a few more questions.  If we go to

22   Paragraph 28 in your expert report, which is Page 10, to

23   Exhibit 4.

24             And it looks like here you had done in the

25   paragraphs before compactness analysis.  Is that



1    correct?

2         A.    Yes.

3         Q.    And your conclusion in 28 is that across the

4    three compactness measures the three plans, A, B, and C,

5    have comparable scores to the Enacted Plan.  Is that

6    correct?

7         A.    Yes.

8         Q.    And then Paragraphs 29 through 33 it looks

9    like you talk about boundary analysis scores?

10        A.    That's correct.

11        Q.    And at the bottom of Page 10, top of Page 11

12   in Paragraph 29 it says, you know, "The legislative

13   software produces boundary analysis scores ...

14            "These scores do not measure how much these

15   component major boundaries are respected or utilized;

16   rather, they measure only what percentage of a

17   district's boundary tracks the categories of boundaries

18   incorporated into the software."

19            Do you see that?

20        A.    I do.

21        Q.    Can you help me understand in just a very

22   elementary school level what that means; what it doesn't

23   include, what it does analyze?

24        A.    Sure.

25            So anytime we write redistricting



1    requirements, those are written in English; and anytime

2    we try to measure those aspects of a particular plan or

3    district, that happens in math and computer code.  So

4    some translation needs to happen and there are

5    reasonable judgments and decisions can be made about how

6    to best do that.

7           So Legislature software has intended to

8    translate the requirement of respecting, you know,

9    municipal boundaries, waterways, roadways, et cetera, in

10   terms of this particular measurement.  But a particular

11   score on this -- you know, these boundary scores don't

12   in and of themselves establish or disestablish

13   compliance with that particular constitutional standard.

14      Q.   Okay.  What -- I'm trying to understand what

15   the sentence means.  It does "not measure how much these

16   component major boundaries are respected or utilized;"

17   it only measures what percentage of a district's

18   boundary tracks the categories of boundaries in the

19   software.

20           So does that mean it's not telling you whether

21   you move away from a boundary?  I guess I'm trying to

22   under -- do you know what I mean?  Like I'm trying to

23   understand what this metric is used for.

24      A.   So the first part of that sentence refers to

25   the fact that the scores don't tell you whether or not



1    you have respected those boundaries in the sense of the

2    constitutional standards.

3              The second part of that sentence says that

4    what they do tell you is numerically what percentage of

5    the boundary, you know, follows -- you know, aligns with

6    these various types of, you know, natural and political

7    boundaries.

8         Q.   And it looks like your analysis covers

9    Districts 16 and 18.

10             Did you do an analysis for Districts 21, 23,

11   20, and 14?

12        A.   All those scores were produced as part of the

13   legislative software's report, and I believe those are

14   appended to my report.  But given that the district I

15   was redrawing was District 16 and that immediately

16   impacted, you know, the region drawn by District 18, I

17   focused on those two districts in the report write-up

18   here.

19        Q.   Okay.  But you changed boundaries -- right? --

20   for 21, 23 and 20.  Right?

21        A.   That's right.

22        Q.   But you didn't do -- is it true, did you do a

23   boundary analysis for four of those three districts, 21,

24   23, and 20, or no?

25        A.   I did.  They're in the appendix to my report.



CORY MCCARTAN, PH.D.                                December 02, 2024
KETO NORD HODGES vs ALBRITTON                                      66

1          Q.   It's in your appendix but it's not in your
2     narrative.  Is that correct?
3          A.   That's correct.
4          Q.   Okay.  Do you recall sitting here today,
5     without going into your appendix, how those three
6     districts faired with the boundary scores?
7          A.   I do not.
8          Q.   Okay.  If I use the term "geopolitical
9     boundaries" to refer to cities, municipalities or county
10    boundaries, will you understand what I mean?
11         A.   Yes.
12         Q.   Have you done any analysis of the percentage
13    of which your Plans A, B, and C deviate from
14    geopolitical boundaries?
15         A.   To the extent measured by the boundary scores
16    which are in my appendix and discussed in the report,
17    yes.
18         Q.   But I thought this said this doesn't talk
19    about whether you complied on deviation.  It just talks
20    about -- I guess this is where I'm getting confused.
21         A.   Maybe I'm confused.  I maybe misheard or
22    misunderstood what you meant by "deviate" in your
23    question.  So the percentage of the boundaries in each
24    district that align with geopolitical boundaries is
25    measured by the --



CORY MCCARTAN, PH.D.                                December 02, 2024
KETO NORD HODGES vs ALBRITTON                                    67

```
 1        Q.    Uh-huh.
 2        A.    -- (inaudible) score, and that's included in
 3   my report.
 4        Q.    In the narrative?
 5             THE COURT REPORTER:  I'm sorry.  I couldn't
 6        hear that part.  "Is measured by" what "score"?
 7             THE WITNESS:  It's measured by the boundary
 8        scores --
 9             THE COURT REPORTER:  Thank you.
10             THE WITNESS:  -- included in my report.
11   BY MS. PRICE:
12        Q.    Okay.  Is that in the appendix or is that this
13   narrative that we're talking about between 29 and 33.
14        A.    Both.
15        Q.    Do you have an opinion as to whether Plans A,
16   B, and C score better for geopolitical boundaries than
17   the Enacted Plan?
18        A.    On average across districts?  In a particular
19   district?  I guess I would need a more specific
20   question.
21        Q.    Well, let's look at it holistically.  If you
22   looked at all of Plan A with regard to deviations from
23   geopolitical boundaries, do you think Plan A would have
24   more deviations or do you think the Enacted Plan would
25   have more deviations based on your analysis, or did you
```



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                          68

1   not do an analysis on that?

2        A.    I would have to consult the numbers in my

3   appendix.

4        Q.    Okay.  You can't tell me that today?

5        A.    Correct.

6        Q.    Is that something that you're planning on

7   reviewing and giving an opinion on at trial?

8        A.    Haven't discussed trial preparation at this

9   point.  I have no specific plans to do so.

10       Q.    You can't tell me that you're not going to

11  testify about that at trial.  Is that correct?

12       A.    I plan to testify truthfully to any questions

13  I'm asked at trial.  I don't know what those questions

14  will be.

15       Q.    Is the same true for Plans B and C?  You can't

16  tell me sitting here today whether Plans B or C would

17  fair better on an analysis of deviation from boundaries

18  than the Enacted Plan?

19       A.    Not without consulting my appendix, that's

20  right.

21            MS. PRICE:  Let's take a five-minute break, if

22       that's okay?  I may be close to done.

23            THE COURT REPORTER:  I'm off the record.

24            (Recess from 4:09 p.m. to 4:15 p.m.)

25  BY MS. PRICE:



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                       69

1        Q.    Thank you, Dr. McCartan.  I have just a few

2    more questions, if that's okay.  You know, bear with me

3    and you will get out of here before 4:30, I hope.

4              Okay.  In your report on Page 12 you have --

5              MS. PRICE:  Go ahead and pull that up, if you

6         don't mind, Kassie.

7    BY MS. PRICE:

8        Q.    You have a section on "Comparison with Other

9    Protected Legislative Districts"?

10       A.    That's right.

11       Q.    Okay.  And it says here you were -- and I

12   think you mentioned this previously in the deposition --

13   that you were "provided by counsel for the Plaintiffs

14   with a list of districts that were designated by the

15   Legislature as protected under the Tier One minority

16   group standards."  Is that right?

17       A.    That's correct.

18       Q.    Okay.  And then in Footnote 4 you state that

19   "To avoid a conflict, this list excluded certain

20   districts in South Florida that I've been retained to

21   study in other potential litigation."

22             Is that the litigation that we talked about,

23   the congressional state house district that we talked

24   about earlier in this deposition, or is there different

25   litigation?



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                          70

```
 1        A.   It is that litigation, yes.
 2        Q.   Okay.  Can you tell me what those districts
 3   were that were -- did you exclude the districts, or did
 4   plaintiffs' counsel exclude the districts?
 5        A.   Plaintiffs' counsel did.
 6        Q.   Okay.  So do you know what districts were
 7   excluded from the list that you were given?
 8        A.   No, not exactly.  And of the ones that I'm
 9   studying in the other litigation I actually don't know
10   which are protected and which aren't.
11        Q.   You have talked a good bit about some of the
12   constitutional requirements that you followed today.
13   Correct?
14        A.   Yes.
15        Q.   And I think you referred to them as Tier 1 and
16   Tier 2?
17        A.   I'm not sure I have, but I'm familiar with
18   those as well.
19        Q.   Okay.  Thank you.
20             Can you tell me what the source is of your
21   understanding of those constitutional requirements?
22        A.   It would be the Rodrigues memo.
23        Q.   Okay.  Is there any other source that you've
24   relied upon, whether it's documents or plaintiffs'
25   counsel, for interpretations of those constitutional
```



1   requirements?

2        A.   Not that comes to mind.

3        Q.   And are you planning to offer any opinions as

4   to what the Constitution requires with regard to

5   redistricting?

6        A.   I wonder if you can more specific.

7   Specifically are you asking about opinions I may offer

8   about generally what the Constitution requires; or, for

9   instance, in this particular case given the

10  configuration of the geography of the state, the

11  Constitution would require that this district be

12  configured this way?

13       Q.   Let's start with both.  Are you planning on

14  offering any opinions that in general the Florida

15  Constitution requires?

16       A.   Once again, I don't know exactly at all what

17  I'm going to be asked at trial.  But beyond restating

18  the constitutional standards as written, I have no

19  specific plans to offer, you know, general opinions

20  about what the Constitution requires beyond anything

21  contained in my written report.

22       Q.   Okay.  Would you hold yourself out as an

23  expert on what the Florida Constitution requires with

24  regard to redistricting?

25       A.   When you say "requires" that's like --



CORY MCCARTAN, PH.D.                                December 02, 2024
KETO NORD HODGES vs ALBRITTON                                      72

1    Q.    In general.  Do you consider yourself a legal

2    expert who's qualified to offer an opinion about what

3    the Florida Constitution requires with regard to

4    redistricting in general?

5    A.    I am not a legal expert, no.

6    Q.    With regard to your plan -- and we've talked

7    about this a little bit.  With regard to your plan do

8    you anticipate offering opinions that the Florida

9    Constitution would require you to draw lines certain

10   ways?

11   A.    Again, I don't know what I'll be asked but

12   it's possible that I may have opinions of that nature,

13   you know, explaining as we've talked -- discussed today,

14   choices that were made in drawing my illustrative maps.

15   Q.    Would it be more fair to say that your

16   opinions would be that it's your understanding that this

17   is what's required and so that's why you drew the lines

18   this way?

19   A.    That sounds accurate, yes.

20   Q.    Okay.  Thank you.  I appreciate that.

21          I know there's a lot in your expert report

22   that we have not touched on today.  But is there

23   anything that we have not discussed or that is not in

24   your expert report that you are planning to offer as an

25   opinion at trial?



1        A.    No.

2        Q.    Is there any additional analysis or work that

3    you are planning to do in addition to the work that

4    you've already done, besides (inaudible), outside the

5    scope of your expert report between now and the trial?

6        A.    No.

7        Q.    And then have you -- since we're on Zoom I

8    have to ask.  Have you been in communication with

9    anybody since this deposition began at 2:30?

10       A.    No.

11            MS. PRICE:  I think that's all I have, Doctor.

12       Thank you so much.  I appreciate your time today.

13            THE WITNESS:  Thank you.

14                        CROSS-EXAMINATION

15   BY MR. WARREN:

16       Q.    Dr. McCartan, a few short questions.

17            Ms. Price asked you about comparisons between

18   your Plans A, B, and C and the Enacted Plan with respect

19   to the utilization of geopolitical boundaries.

20            Do you remember that?

21       A.    Yes.

22       Q.    Do you know whether your Plans A, B, and C

23   have more, fewer, or the same number of county splits as

24   the Enacted Plan?

25       A.    I do know that.



1      Q.   How can you answer?

2      A.   Yeah.  My instructions were to remove the

3   portion of 16 in Pinellas County.  So that necessarily

4   eliminated a county split.  My further addressments did

5   not, you know, account for that change, did not

6   introduce additional county splits.  So they would all

7   have one fewer county split than the Enacted Plan.

8      Q.   Same question with municipal splits, the

9   splits of incorporated municipalities?

10      A.   To the best of my recollection all the

11   adjustments I made after moving 16 for Pinellas County

12   did not introduce new municipality splits.  Obviously

13   moving the portion of 16 and the city of St. Petersburg

14   eliminated that municipality split.  So the number of

15   municipality splits would have decreased by one in all

16   three maps.

17            MR. WARREN:  I think that's all.  Thank you.

18            MS. PRICE:  I have nothing further to ask.

19            THE COURT REPORTER:  Do --

20            MS. PRICE:  And we will order.

21            THE COURT REPORTER:  Does the witness wish to

22      read the transcript?

23            THE WITNESS:  Yes.

24            THE COURT REPORTER:  Mr. Warren, did you need

25      a copy?



1          MR. WARREN:  No, thank you.

2          THE COURT REPORTER:  I don't know if anyone

3     else on the line needed a copy?

4          MR. RABAN:  Randall Raban; again, with

5     Holtzman Vogel.  If I could get a copy, that would

6     be great.

7          Thank you.

8          THE COURT REPORTER:  Will do.

9          Ms. Price, is ten business days sufficient?

10    That's our normal turnaround.

11         MS. PRICE:  That's your normal?  Can we do --

12    we might need to do an expedited.  A week is great.

13         THE COURT REPORTER:  Okay.  So that would

14    be -- so the 9th is sufficient, Monday?

15         MS. PRICE:  Yes.

16         THE COURT REPORTER:  Mr. Raban, did you need

17    your copy expedited, or are you good with regular

18    turnaround on that?

19         MR. RABAN:  I need it expedited as well, and I

20    put my email in the chat.

21         THE COURT REPORTER:  Okay.  Thank you.

22         (The reading and signing of this deposition is

23    not waived, and the taking of this deposition

24    concluded at 4:24 p.m.)

25



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                        76

```
 1                      DEPOSITION ERRATA SHEET

 2

 3    Our Assignment No. J12075395

 4    Case Caption:  Hodges, et al., vs. Albritton, et al.

 5

 6               DECLARATION UNDER PENALTY OF PERJURY

 7         I declare under penalty of perjury that I have read

 8    the entire transcript of my Deposition taken in the

 9    captioned matter or the same has been read to me, and

10    the same is true and accurate, save and except for

11    changes and/or corrections, if any, as indicated by me

12    on the DEPOSITION ERRATA SHEET hereof, with the

13    understanding that I offer these changes as if still

14    under oath.

15

16         Signed on the _____ day of _____, 20___.

17

18

19

20                      _____

21                      CORY McCARTAN, Ph.D.

22

23

24

25
```



CORY MCCARTAN, PH.D.                                     December 02, 2024
KETO NORD HODGES vs ALBRITTON                                          77

```
                       DEPOSITION ERRATA SHEET
                       ESQUIRE JOB NO. J12075395

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____
                CORY McCARTAN, Ph.D.
```



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                        78

```
                        DEPOSITION ERRATA SHEET
                      ESQUIRE JOB NO. J12075395

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____
              CORY McCARTAN, Ph.D.
```



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                        79

```
 1                    CERTIFICATE OF REPORTER

 2

 3    STATE OF FLORIDA

 4    COUNTY OF HILLSBOROUGH

 5

 6          I, Jennifer Figueroa, Registered Professional

 7    Reporter, certify that I was authorized to and did

 8    stenographically report the foregoing deposition

 9    remotely via videoconference, Pages 1 through 75; and

10    that the transcript is a true record of the testimony

11    given by the witness.

12

13          I further certify that I am not a relative,

14    employee, attorney, or counsel of any of the parties,

15    nor am I a relative or employee of any of the parties'

16    attorneys or counsel connected with the action, nor am I

17    financially interested in the action.

18

19          Dated this 9th day of December, 2024.

20

21

22

23    _____
      Jennifer Figueroa, RPR

24

25
```



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                                        80

1                        CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5

6              I, Jennifer Figueroa, Registered Professional

7    Reporter, Notary Public, State of Florida, certify that

8    CORY McCARTAN, Ph.D., appeared before me remotely via

9    videoconference on the 2nd day of December, 2024, and

10   was duly sworn.

11

12             WITNESS my hand and official seal this 9th day

13   of December, 2024.

14

15   Identification:

16   Personally known ___ or produced identification X.

17   Type of identification produced:

18   Pennsylvania driver's license.

19

20   _____
     Jennifer Figueroa, RPR
21   Notary Public, State of Florida
     Commission No.: HH 101741
22   Commission Expires: 03/08/2025

23

24

25



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                              Index: (c)4..8

**(**

**(c)4**
  12:25

**1**

**1**
  10:18,19
  27:22
  28:1,10,
  23 29:7
  70:15

**10**
  62:22
  63:11

**11**
  63:11

**12**
  33:12
  69:4

**14**
  37:7,8
  38:6,17
  40:21,23
  41:1
  42:12,17,
  25 43:2,
  5,7 59:11
  61:15,18
  65:11

**16**
  32:23
  33:14
  34:1,10,
  13,21
  36:24
  37:14,22,
  25 39:13,
  25 40:6,
  20,22,24
  42:3,20

  43:2,15,
  17,21,22,
  25 44:2,
  7,23
  45:11,21,
  24 47:4,7
  48:5
  49:25
  51:17
  54:5,17
  55:7
  58:12
  59:1
  60:8,14
  61:10,13
  65:9,15
  74:3,11,
  13

**16/20**
  58:22

**16802**
  4:14

**17**
  43:10

**18**
  35:14
  37:2,25
  38:3,10
  39:1,16,
  18,19
  61:15
  65:9,16

**2**

**2**
  17:8,10
  26:11,12
  29:6 36:8
  48:2
  70:16

**20**
  37:15,20,
  22 38:6,

  10,16
  43:15,17
  44:1,4,6,
  23 45:21,
  24 49:24
  51:17
  53:25
  58:12,23
  60:8
  61:11,13
  65:11,20,
  24

**2016**
  15:6

**2021**
  35:15

**2022**
  12:20
  15:22

**2023**
  9:3,6
  22:17

**2024**
  22:20

**21**
  22:2,7
  37:4,6
  38:3
  39:3,22
  61:15
  65:10,20,
  23

**21/14**
  37:11

**21/18**
  38:13

**22**
  15:6

**23**
  37:7,13,
  20,21
  39:25

  40:6,21
  43:14,23
  44:8,25
  54:12
  55:2,7,10
  56:3
  57:23
  58:2 59:2
  60:8
  61:15
  65:10,20,
  24

**26(b)4(c)**
  24:7

**28**
  62:22
  63:3

**29**
  63:8,12
  67:13

**2:30**
  73:9

**3**

**3**
  18:14,15
  28:12
  29:6 30:9
  55:14

**301**
  53:24
  54:16,19,
  21 55:1,9

**33**
  63:8
  67:13

**4**

**4**
  22:9,12

  29:6
  33:12
  59:18
  62:23
  69:18

**42**
  19:11

**45**
  21:19

**4:09**
  68:24

**4:15**
  68:24

**4:24**
  75:24

**4:30**
  69:3

**5**

**5**
  10:23
  27:22
  28:4,6

**501(c)3**
  12:24

**6**

**6**
  35:22,23

**7**

**7**
  36:15,16

**8**

**8**



30:10
55:19,20

――――――――――
       9
――――――――――

9
    59:24,25

9th
    75:14

――――――――――
       A
――――――――――

ability
    47:14,15
    53:16

abnormaliti
es
    40:12

accept
    17:5
    18:23

access
    46:22

accomplish
    32:25
    33:19
    42:20

account
    47:9 74:5

accurate
    10:13,16
    16:25
    18:19,24
    22:5
    27:25
    35:17
    36:10
    50:21
    55:17
    59:19
    72:19

accurately
    50:21

ACLU
    9:10,18,
    20 11:2,
    7,10,16,
    20 14:6
    26:3

add
    46:23,25

addition
    73:3

additional
    31:3,9,16
    37:10
    38:14
    73:2 74:6

Additionall
y
    44:16

addressment
s
    74:4

adequacy
    12:19
    13:18

adjoin
    34:9,12
    39:11

adjoining
    34:11

adjoins
    37:6

adjust
    32:2,22
    33:14
    37:11,13
    42:12,17,
    18 59:2

adjusted
    37:4,12

43:15
    61:11

adjusting
    38:13
    40:23
    43:25

adjustment
    37:21
    40:24
    41:1 44:2
    58:11
    59:4

adjustments
    30:10,15,
    20,23
    31:3,8,9,
    16,17
    32:1,7,14
    37:22
    40:14,21
    44:23
    48:12
    54:6
    56:3,4,14
    57:6
    58:17
    60:10,15
    61:5,7
    74:11

adopted
    15:1

advance
    12:22

advances
    13:5

advocacy
    13:8

affect
    7:15

affiliate
    11:11

affiliates

11:17,18,
    20 12:10

affirm
    4:8

affirmed
    4:20

afternoon
    5:1

agree
    6:10

agreeable
    23:25

ahead
    10:5,17
    17:22
    18:13
    22:9 28:3
    36:6,14
    41:5
    55:12,19
    59:16,23
    69:5

Ahh
    19:25

Albritton
    5:5

algorithm
    26:15,16,
    20,25
    27:14

algorithms
    26:24

align
    66:24

aligns
    65:5

alter
    34:17
    43:2

altering

18:7
    33:17

alternative
    57:7 58:5

American
    8:22

amount
    20:10,11
    48:9

analysis
    15:13
    20:8,22
    22:18
    23:1
    24:11
    25:6
    62:9,15,
    25 63:9,
    13 65:8,
    10,23
    66:12
    67:25
    68:1,17
    73:2

analyze
    23:10,14
    63:23

analyzed
    16:3

anticipate
    72:8

anytime
    63:25
    64:1

Apollo
    49:5

App
    30:11

appeared
    11:20

appears



22:8
35:20

**appended**
65:14

**appendix**
65:25
66:1,5,16
67:12
68:3,19

**applied**
32:4

**approximate
ly**
20:25

**area**
13:25
27:6,19,
23 28:10,
14,18
29:16
33:25
45:8
46:23,25
48:11
59:7

**areas**
44:25
47:8 49:6

**aspects**
46:6 64:2

**assign**
39:16

**assigned**
39:14

**assignment**
18:5

**assistant**
26:5

**assistants**
26:3

**assume**

6:15

**assumptions**
24:3,23

**assure**
22:2

**attached**
10:20
17:11
18:16
22:13
28:7
35:24
36:17
55:21
60:1

**attempted**
37:16

**author**
61:22

**average**
67:18

**avoid**
37:9
44:11,21
45:10
47:13
58:3
69:19

**avoiding**
38:11
45:2,15
47:6
53:15

**aware**
9:5 46:4
47:16,21

———————

——— **B** ———

**back**
15:20
30:9

38:24
39:6

**balance**
43:15
47:4 51:5
53:14
54:24

**balanced**
37:15,23
51:13

**balancing**
46:12

**band**
41:18

**based**
12:18
42:5 43:5
46:16
47:18
57:9,15
67:25

**bay**
34:3
38:17
50:4

**Beach**
49:6

**bear**
69:2

**began**
19:15
30:21
36:23
56:2 57:4
73:9

**begin**
22:18

**behalf**
12:3

**benchmark**
14:3,12,

13,14,15,
20 15:12,
15,18,19,
21 16:3,
5,10,13,
22 17:1,
4,6

**bigger**
53:2
61:10,13

**bit**
11:25
12:5,13,
16 17:15
40:2
44:11
45:7,21,
22 46:19
54:11
58:2,5,14
70:11
72:7

**black**
47:8
53:15

**blank**
30:18

**block**
32:3 59:6

**block-by-
block**
32:1

**block-level**
32:13

**blocks**
32:2
36:25
39:12,14,
16,19
40:11

**blue**
40:3

**border**
37:9,11,
12 40:13,
20 53:25
58:22
60:8

**bottom**
51:19
63:11

**boundaries**
32:2
34:15
37:14
39:24
40:6
41:20
45:21,23
51:14
53:8,18,
23 56:4
59:1
63:15,17
64:9,16,
18 65:1,
7,19
66:9,10,
14,23,24
67:16,23
68:17
73:19

**boundary**
37:2,8
38:14
40:21
41:19,23,
24 45:23
46:10
48:9,17,
18,20
49:13,18,
19,22
50:12
51:16
52:3,12,
14 53:7,



11 55:7
58:2,6,8
60:14,16
63:9,13,
17 64:11,
18,21
65:5,23
66:6,15
67:7

bounds
31:23

boxes
44:11

break
6:25 7:4,
6 68:21

bringing
37:1

broad
34:8 46:4

broadly
13:19

build
46:9

built
20:11

business
75:9

butchered
11:13

——————

C

calculated
9:15

call
58:1

called
9:11
26:16

27:23

calls
26:1

canals
40:9

caption
9:22

Carlo
26:22

carve
48:4

carved
48:14,17

case
8:1,12
9:3,14,
17,23
11:7,14,
15,19
12:9
13:22
14:6
17:21
20:8 30:8
35:7 54:4
71:9

cases
9:19 10:4
11:3,5,9
12:2,6
13:11
46:10

categories
63:17
64:18

census
40:11
59:6

Center
51:20

cer

41:18

cetera
64:9

challenged
17:20

change
33:19
38:15
42:16,21,
23 44:6
51:4,5
61:10,13
74:5

changed
65:19

changing
47:6

characterize
15:11
16:18
48:16
50:18
52:11,15

chat
75:20

check
53:20

choice
16:8
39:19
41:23
53:16

choices
23:11
54:9
56:21
57:12,19
72:14

choose
38:9
49:16

chronological
61:1

cities
41:11
42:4
45:16
66:9

city
9:12
44:10
45:1,7
51:20
74:13

Civil
8:22

clause
20:15

cleaner
58:6

clear
40:21

close
48:1 55:7
68:22

closely
44:24

closer
21:6

coast
47:24
48:10
50:1,12,
25 54:12
56:4
57:24
58:7
60:14

coastal
48:11

coastline

48:1,5

code
4:14 64:3

colors
30:4

comment
8:6

communication
73:8

communications
8:17
24:5,9,24

compact
49:23,25
50:13,14,
15 56:13
60:17

compactness
49:13,17
50:2,5,
16,23
51:1,9,15
56:6,10
59:8
60:12
62:25
63:4

comparable
29:8,9
63:5

compared
38:15

comparison
51:6 69:8

comparisons
73:17

complaint
22:25

completely



7:11 37:8

completing
31:19

compliance
39:17
64:13

complied
33:1
44:24
66:19

complies
54:23

comply
37:16
47:13
48:20
54:17

complying
34:6
40:16
43:24

component
63:15
64:16

composition
47:17

computer
64:3

concerned
45:1

conclude
50:10

concluded
21:4
75:24

conclusion
63:3

conducting
24:11

conducts

12:19
13:19

configurati
on
17:4
42:25
46:11
47:4,20
48:13
52:9 53:6
56:21,24
57:3,5,20
59:7
61:10
71:10

configurati
ons
54:8 56:5

configured
34:14
71:12

conflict
69:19

confused
66:20,21

congression
al
9:23
14:7,8
16:7
69:23

connect
52:4

considerati
ons
46:13,16
48:3
54:24

considered
19:2
24:2,23
49:12
50:17

Constitutio
n
57:10,17
71:4,8,
11,15,20,
23 72:3,9

constitutio
nal
33:2 35:5
39:18
40:17
64:13
65:2
70:12,21,
25 71:18

constraint
20:20
53:9

constraints
20:7,10,
18 27:10
56:22
57:9,16

consult
68:2

consulting
68:19

contacted
9:1,2
22:16

contained
32:23
35:4
36:24
71:21

context
14:11,16,
18 27:1
38:22

contextuali
ze
16:7

contextuali
zing
23:11

conversatio
n
53:2

copy
7:25 8:6,
10 10:13
22:5
35:18
36:7,11
43:11
55:17
59:20
74:25
75:3,5,17

corner
43:1,5
44:13
59:4,9

correct
4:14 8:14
11:11,16
16:15,21
21:22
22:10
23:17
25:20
27:9
30:25
31:1,5
33:15
42:13
43:7,12
45:18
46:17
48:15
49:14
57:12,19
59:11,12
62:9,10
63:1,6,10
66:2,3
68:5,11

69:17
70:13

correctly
21:20
60:7

Cory
4:19 5:9
21:25

counsel
4:17 5:4
8:11
21:11,18
23:3,23,
25 24:5,
24 25:22,
23 26:2
30:6
32:16,17,
20 33:11
34:18,20
43:6
69:13
70:4,5,25

count
34:13

counties
35:4
38:12

county
32:24
33:15
34:14,21
35:10
37:9,10
38:14,17
39:15
40:11
44:15,20
45:2,10
46:17
47:11,17
49:3
53:22
56:22



58:8 66:9
73:23
74:3,4,6,
7,11

couple
7:19 12:2
21:2,6,7

court
4:8,12,
16,22 6:1
7:20
22:11
28:5
38:23
39:5
67:5,9
68:23
74:19,21,
24 75:2,
8,13,16,
21

cover
7:2

covers
65:8

create
25:9,12
26:8
41:19

created
19:11
37:13

creating
26:6

criteria
23:7 33:2
38:13
46:7
49:10
54:24

cross
38:17

CROSS-
EXAMINATION
73:14

Cumulativel
y
21:6

cut
50:8

CV
10:6,13

                D

D.C.
12:18

Dade
45:7

data
12:15
24:2,22
27:10

dated
35:14

Dave's
30:11

day
23:22

days
21:2,7,8
75:9

deals
14:7

decided
45:23

decision
34:16
41:9,20
53:7 55:4
57:25

decisions

41:8,21
45:25
47:18
51:25
52:6
53:13
64:5

decreased
74:15

Defense
12:3,9

democratic
12:23
13:5,8,9,
12,15

demographic
9:16 46:4
47:19

demographic
s
46:16,22
52:10

depended
41:25

deposition
4:1 5:15
7:18 11:6
21:10,18
24:18
69:12,24
73:9
75:22,23

describe
13:17,22
36:21
38:25

describing
14:1,6

designated
69:14

detail
42:6

details
17:3
20:16

developed
26:25

deviate
66:13,22

deviation
66:19
68:17

deviations
67:22,24,
25

difference
31:15
32:6 40:2

difficultie
s
10:8

dilute
46:3

diluting
44:18
47:14

diminish
45:17

diminishing
47:14
53:15

DIRECT
4:23

discuss
26:15

discussed
21:11
59:14
60:23
61:19
66:16
68:8
72:13,23

disestablis
h
64:12

distributio
n
27:12

district
13:25
30:11,15
32:23
33:14
34:1,10,
13,17,21
36:23
37:2,4,6,
7,8,11,
12,14,15
39:11,13,
16 40:16,
23 41:17
42:12,17,
21 43:2,7
44:3,4
46:9,24
47:2,7
48:5
50:12,14
52:14,22
53:6 54:5
56:3
58:23
59:11
60:14
61:18
64:3
65:14,15,
16 66:24
67:19
69:23
71:11

district's
63:17
64:17

districts
9:16,24



14:8,24
16:9,14
23:7,9,14
32:25
33:18,22,
25 34:7,
9,11,12
35:3,10
42:16,19
50:4,17
51:10,12,
15 52:10
57:21
60:18
61:11
65:9,10,
17,23
66:6
67:18
69:9,14,
20 70:2,
3,4,6

**division**
10:2

**Doctor**
10:13
14:23
29:22
35:16
36:20
43:12
55:15
73:11

**document**
8:2 15:4,
25 16:1,
17,20,21
17:24
18:10
21:24
23:3

**documents**
8:16
21:13,15
70:24

**DRA**
30:16
31:19,22

**draft**
25:16,17
26:8

**drafted**
30:16

**drafting**
31:18,19
32:9

**drafts**
25:15

**draw**
18:8 25:9
29:1,3
34:21
38:20
54:15,22
72:9

**drawing**
16:4,9
19:1
23:7,8
26:6
30:11,15
42:1
47:10
50:17,19,
20 51:12
54:16
55:9
56:3,17
57:18
61:3
72:14

**drawn**
19:2
25:14
52:12,15
65:16

**drew**
16:14

23:12
36:21
38:25
40:5 41:7
53:11
55:24
60:4 61:1
72:17

**driving**
45:24
51:24

**drove**
57:24

**due**
11:15
34:10,13
42:25
51:22
52:12
53:12
58:3

**duly**
4:20

**dumb-it-
down**
27:7

————————

E

————————

**earlier**
14:5 51:3
69:24

**Early**
22:20

**east**
51:21,22
54:11
55:1,2

**east-west**
40:18
58:25

**eastern**
53:25

**effect**
44:20

**elect**
47:15,16
53:16

**elections**
12:21

**element**
50:16

**elementary**
63:22

**eliminated**
74:4,14

**email**
75:20

**emails**
8:16

**enacted**
14:25
17:16,18,
19 18:2,
4,11,20,
25 22:24
27:20,23
28:11,17
29:15
30:3,4,7,
21,23
37:7,25
53:24
56:17
63:5
67:17,24
68:18
73:18,24
74:7

**end**
23:22
32:25
43:25

58:23

**ended**
46:11
56:12

**English**
64:1

**enlarge**
40:1

**enlarged**
36:7
55:13
59:17

**ensure**
32:22
40:7

**entered**
8:21

**entire**
45:23

**equal**
51:13

**establish**
64:12

**Evans**
55:5

**exact**
8:10 15:4
16:24

**EXAMINATION**
4:23

**examined**
4:20

**examples**
52:15

**excess**
38:2,9
43:16

**exclude**
70:3,4



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                          Index: excluded..gain

excluded
  69:19
  70:7

exclusively
  32:13

exhibit
  10:18,19
  17:8,10
  18:14,15
  22:12
  27:20
  28:6,12
  35:23
  36:15,16
  55:20
  59:24,25
  62:23

exhibits
  22:3

exist
  9:6

existing
  47:5

exited
  55:5

expanding
  44:7

expect
  21:12

expedited
  75:12,17,
  19

experiences
  10:24

expert
  12:8
  20:23
  21:25
  22:5,19
  23:1
  24:24
  25:13

  26:9 30:9
  36:8
  59:19
  61:25
  62:11,22
  71:23
  72:2,5,
  21,24
  73:5

explain
  6:11 39:8

explaining
  72:13

explicitly
  13:1

explore
  54:7
  60:10

extent
  16:2,9
  24:1
  33:18
  42:19
  44:19
  60:11
  66:15

———————

—— F ——

fact
  54:21
  64:25

facts
  24:2,22

fair
  6:14
  15:14
  35:2
  45:14
  50:18
  62:17
  68:17
  72:15

faired
  66:6

familiar
  5:18,23
  13:2 14:2
  17:17
  18:22
  19:10
  45:8
  54:20
  70:17

federal
  33:2

feel
  7:3 56:20

feeling
  7:13

felt
  56:25

Ferrin
  35:13

fewer
  61:11
  73:23
  74:7

Figueroa
  4:2

figure
  27:22
  28:1,10,
  23 29:1,
  3,7,25
  36:8
  55:14
  59:18

Figures
  29:6

filed
  9:23
  10:1,15
  21:5

fill
  37:22

filled
  34:3

final
  31:22
  32:3

finalized
  55:6

finalizing
  25:3

financial
  20:7,11,
  20

fine
  6:21

fit
  35:10

five-minute
  68:21

Florida
  4:4 5:5
  8:23 9:20
  11:7,10
  13:25
  14:7 15:5
  19:2,6
  26:4
  28:20,24
  29:4,13
  30:1,2
  57:10,16
  69:20
  71:14,23
  72:3,8

focused
  65:17

follow
  36:4
  40:20
  51:14
  52:2,3,4

  54:1,14
  58:4
  60:17

Footnote
  69:18

footnoted
  27:1

forecast
  12:20

form
  31:11
  38:7
  52:16
  54:3

formed
  52:10

forming
  24:3

found
  48:8,18
  56:25
  58:6 59:7

framed
  55:4

free
  7:3

front
  7:24 8:3,
  17 15:18
  16:17
  42:5
  43:12

full
  5:7

Fund
  12:3,9

———————

—— G ——

gain



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                           Index: gap..improve

43:22,23

**gap**
34:2

**gave**
24:19
32:18
33:9

**general**
5:18
26:23
52:17,21
53:3 56:8
71:14,19
72:1,4

**generally**
26:21
33:23
71:8

**generate**
26:24
27:11

**generates**
26:16
27:4,6

**geographic**
27:10
40:12

**geographical**
27:6

**geography**
71:10

**geopolitical**
66:8,14,
24 67:16,
23 73:19

**Gibsonton**
47:24
49:5

**give**

4:9 24:20
32:20

**giving**
29:20
68:7

**good**
5:3 70:11
75:17

**Gotcha**
53:1

**GRACE**
9:11
11:12

**grader**
27:8

**graphic**
55:13

**great**
7:9 35:21
36:13
59:22
75:6,12

**grew**
45:7

**ground**
5:18 7:3

**group**
69:16

**guess**
9:5 39:10
48:16
49:16
64:21
66:20
67:19

**gulf**
56:4

——————————

**H**

——————————

**happen**

64:4

**happened**
24:18
32:12

**happening**
41:25

**happy**
17:5

**head**
6:5 8:15
20:2
22:11
28:5

**hear**
45:14
57:8 67:6

**heard**
14:13
46:15
47:23,24
60:19

**hearing**
43:4

**heavily**
47:8

**helped**
48:20
53:6

**helping**
26:8

**high**
46:2,25
47:21

**highlighting**
8:8

**highway**
54:2

**Hillsborough**

32:23
33:14
34:2,21
42:20
43:1
45:2,10
46:5,17
47:11
54:13,23

**hired**
8:19 9:18

**historical**
16:6 20:1

**hold**
71:22

**holistic**
53:13

**holistically**
67:21

**Holtzman**
75:5

**hope**
69:3

**hour**
21:19

**hours**
7:1

**house**
14:7 16:6
69:23

**hypothetical**
49:20,21
54:14

——————————

**I**

——————————

**identical**
29:9,12,
17,23,24

30:5

**identification**
10:19
17:10
18:15
22:12
28:6
35:23
36:16
55:20
59:25

**identify**
5:11

**ill**
7:14

**illustrative**
72:14

**immediately**
33:25
34:9,12
65:15

**impact**
50:6 51:9

**impacted**
34:11
65:16

**impacts**
50:25

**implicates**
41:21

**implications**
53:8

**implied**
20:19
57:1

**important**
49:13

**improve**



49:17

inaccuracies
31:21

inaudible
67:2 73:4

include
29:5
44:19
63:23

included
23:6
25:12,16
48:11
67:2,10

including
56:3

incorporated
40:8
44:10,14,
25 45:5,
16 49:2,7
53:21,23
63:18
74:9

increased
59:8

individuals
25:18,21

influence
7:14

inform
53:6

information
47:19

informed
47:21
52:23

initial
30:10,15,

19 31:8,
16

initially
32:11

inputs
27:3,5

inside
25:7

instance
33:22
46:22,24
47:6,8
71:9

instructed
32:22
33:13
34:4 35:9
40:25
43:3

instruction
34:25
39:20
42:15,18,
23

instructions
18:6
23:5,16,
19 24:10,
14,15
30:8
32:16,17,
20 33:3,
7,10 35:6
36:2
40:25
41:2 43:6
54:17
56:19
57:2,10,
17 74:2

intended
40:7 64:7

interest
13:8,13

interests
12:23
13:6,10

interfaces
44:4

interpretation
42:22

interpretations
70:25

interpreted
43:24

intervally
25:15

introduce
39:15
74:6,12

introducing
37:9
38:14

involve
15:13

involved
16:10
60:7 61:9

involving
56:22

irregular
40:10
58:3 59:6

isolate
41:9

issue
9:17
12:19
13:18

J

Jacksonville
33:23

Jay
35:13

Jennifer
4:2

jetting
51:21

jog
58:25

judgment
44:23
50:3

judgments
64:5

justify
41:23

K

Kassie
26:13
69:6

keeping
35:3
42:20
47:4

kind
7:2 30:14
51:20,22,
24 53:24
61:6

knowledge
13:2,14

L

labels
30:4

Large
4:4

larger
35:7

late
9:3 22:17

law
6:1

lawsuit
8:20 9:6
13:21

lawyer
25:25
26:1

laying
47:3

leave
42:21
43:17

led
40:11
48:18
49:22

legal
12:3,9
72:1,5

legislative
63:12
65:13
69:9

Legislature
14:25
16:8
17:20
30:2 32:4
46:21



64:7
69:15

**Legislature 's**
16:23
28:20,24
29:4,14
30:1
31:4,20, 24

**lengthy**
22:1

**level**
46:2
47:21
63:22

**Liberties**
8:22

**light**
6:14

**likelihood**
53:23

**likewise**
18:24

**line-drawing**
51:25

**line-drawn**
52:6

**lines**
47:10
72:9,17

**list**
10:23
11:5 20:2
23:9
69:14,19
70:7

**listing**
12:7

**litigation**

9:8
19:16,19, 24 20:14
25:10
27:15
61:23
62:1,12
69:21,22, 25 70:1,9

**loaded**
31:19
32:5,11

**located**
4:13 5:12

**locations**
34:14

**long**
21:3,17

**looked**
15:4,5,15
16:2,10, 22 17:1
22:24
50:23
56:12
67:22

**lot**
72:21

**low**
47:1

———————

**M**

**Madam**
4:22
38:23

**made**
16:8
23:11
25:18
30:22,23
32:1,10

34:4,16
41:7
43:25
44:5 46:9
47:18,21
50:12,14
53:14
54:6,9
56:2,25
57:5
58:11,17, 23 60:10, 15 61:2, 14 64:5
72:14
74:11

**major**
40:9 46:7
48:19
51:14
52:2 54:2
56:6
58:4,25
60:17
63:15
64:16

**majority**
31:18

**make**
6:4 17:15
31:20
32:24
33:24
35:9
36:10
40:21,24, 25 43:2,7
44:17
45:23
51:4
56:21
57:14
59:5,10
61:7

**makes**
44:1

**making**
44:22
45:17
46:15
56:4 61:6

**map**
13:25
14:13,23
15:5,7,8, 9,13,16, 17,18,19, 21,22
16:3
18:8,9, 24,25
22:24
28:13,17, 19,20
29:7,13
31:22
32:22
37:7,22
38:20
41:21,25
42:5
46:12
48:6,8,14
49:14,23
50:5,19, 20 51:4,5
52:18,25
53:5,9
54:20,22, 25 56:17
58:24

**maps**
9:16 16:4
19:2,18, 23 20:6
22:23
23:8
25:9,12, 14,16,17,

24 26:6
27:5,6
29:5
30:16
31:20
41:7,10
52:24
54:7
72:14
74:16

**margin**
47:6

**mark**
10:17
17:8
18:13
22:9 28:3
35:22
36:14
55:19
59:23

**marked**
10:19
17:10
18:15
22:12
28:6,12
35:23
36:16
54:20
55:20
59:25

**materials**
7:23

**math**
64:3

**mathematica lly**
46:23

**matter**
20:17

**Mccartan**
4:19,25



5:9,15
8:19
21:9,25
22:16
24:1 25:3
36:10
39:8
59:17
61:22
69:1
73:16

Mccartan's
38:24

Mcclure
12:7

means
14:19
29:24
30:15
46:20
63:22
64:15

meant
66:22

measure
50:6
63:14,16
64:2,15

measured
66:15,25
67:6,7

measurement
64:10

measures
63:4
64:17

meet
21:17
40:15

meeting
21:21

memo
23:6,13
35:14,20
44:17
48:2
70:22

memorandum
35:13,18

memorize
45:5

mentioned
9:7 11:7
19:25
40:23
42:18,25
51:3 52:9
53:5
57:23
59:5
69:12

met
21:11
27:11

metric
64:23

metrics
50:5,7

Miami
9:12 10:2
11:14

midterm
12:20

mind
5:7 45:4,
6,12 69:6
71:2

minimal
34:5
38:15

minor
56:2,15
58:18

minority
44:18
45:18
46:3,25
47:1,2,15
69:15

minutes
21:19

misheard
66:21

mission
13:3

misspoke
14:5

misunderstood
66:22

moment
62:7

Monday
75:14

Monte
26:22

move
6:21
39:2,3
64:21

moved
38:2 39:1
60:13

moves
8:15
22:11
28:5

moving
37:24
38:5
50:11
74:11,13

multiple
48:7

municipal
53:17,23
64:9 74:8

municipalities
40:8
44:14
45:16
48:22
49:2
53:21
58:4 66:9
74:9

municipality
44:10
74:12,14,
15

_____

N

NAACP
12:3,9

Nairne
11:13

narrative
66:2
67:4,13

narrow
41:18

narrowing
61:6

National
11:10

natural
48:9 65:6

nature
72:12

necessarily
74:3

needed
75:3

Nick
19:12

nodding
6:5

nonprofit
12:18

normal
75:10,11

north
40:20
42:3
51:23

north-south
46:8
58:8,24

northeast
37:14
59:4

northeastern
45:9

northern
58:23

northwest
43:1,5

Notary
4:3

notes
7:23 8:5

number
29:5
73:23
74:14

numbers
68:2

numerically
65:4



numerous
   19:25

_____

O
_____

oath
   5:25

Object
   38:7
   52:16
   54:3

Objection
   31:11
   49:9

obligation
   5:25

occurred
   31:18

October
   35:14

offer
   62:18
   71:3,7,19
   72:2,24

offering
   71:14
   72:8

Ohio
   11:14

ongoing
   12:7 14:6

online
   31:4

opinion
   67:15
   68:7
   72:2,25

opinions
   24:3 25:7
   62:4,18

71:3,7,
   14,19
   72:8,12,
   16

opportunity
   25:4

opposed
   55:2

option
   39:15

options
   38:20
   48:7

order
   47:12
   74:20

organizatio
n
   13:2,4,
   15,18

original
   44:2

overflow
   44:8

overlap
   13:10

_____

P
_____

p.m.
   68:24
   75:24

P000s0042
   19:11

pages
   10:12
   22:2

paper
   27:1

Paragraph

30:10
   33:12
   43:10
   62:22
   63:12

paragraphs
   62:25
   63:8

paralleling
   46:8

Park
   4:13 5:13

part
   12:15
   18:5
   19:15,23
   20:1
   23:1,10
   25:9
   27:13
   35:4,19
   36:4
   39:13
   40:11
   42:8 44:9
   45:9
   47:24
   48:5 51:4
   61:23
   64:24
   65:3,12
   67:6

partially
   43:23

participate
   8:20

participati
on
   7:15

partisan
   13:1

parts
   15:3

22:19
   47:17

party
   13:9

passed
   14:25

past
   16:8
   23:9,14

PDF
   16:24,25

pending
   7:5

peninsula
   37:3

Pennsylvani
a
   4:13 5:13

percentage
   46:25
   47:1,2
   53:12
   63:16
   64:17
   65:4
   66:12,23

performed
   30:10
   31:3

period
   21:3

Petersburg
   36:24
   74:13

Ph.d.
   4:19
   21:25

phrase
   14:15
   17:17
   50:21

physically
   7:14

picked
   50:18

picture
   27:24

piece
   46:14
   48:14

pieces
   52:4,14

Pinellas
   37:25
   39:13
   43:21
   74:3,11

place
   14:24
   15:6,22

plaintiffs
   17:20
   25:22,23
   26:2
   33:11
   57:7
   69:13

plaintiffs'
   8:11 23:3
   30:6
   32:16,17,
   20 34:18,
   20 43:6
   70:4,5,24

plan
   14:3,12,
   14,16,21,
   24,25
   16:5,10,
   11,22
   17:1,4,6,
   16,18,19,
   24 18:2,
   4,11,20



19:11
27:20,23
28:11,13,
18 29:16
30:3,4,7,
21,24
33:1
36:6,7,
11,21
38:25
47:5
49:18
51:7
53:24
55:12,13,
24 56:2,
11,12,14,
16,18,23,
25 57:5
58:2,10,
25 59:7,
14,16,18,
20 60:4,
9,20,24,
25 61:2,
3,7,12
62:3,17
63:5 64:2
67:17,22,
23,24
68:12,18
72:6,7
73:18,24
74:7

planning
68:6
71:3,13
72:24
73:3

plans
16:7 19:1
20:1,12
23:11
26:17
27:12
33:5

56:19
61:21
62:7,8,14
63:4
66:13
67:15
68:9,15,
16 71:19
73:18,22

Plant
44:10
45:1

play
41:8

point
18:9
31:25
37:6 57:4
68:9

political
13:10
65:6

polling
12:19
13:19

population
9:15
31:23
37:5,25
38:10
39:1
40:15
41:18
43:14,17
44:5,6,12
48:10
51:5 53:9
54:5

populations
37:15,23

portion
13:24
18:7

36:23
41:19,20,
22 43:21
44:3,14
49:2 50:3
53:7,11,
22 55:8
60:13,16
74:3,13

portions
16:5,11
41:12
44:19
47:7 52:3

potential
69:21

power
7:2 44:18
45:17
46:3

preparation
20:22
68:8

prepare
21:10,17

present
4:7

presently
5:11

President
5:5

pretty
40:19
48:20
58:18

previous
60:17

previously
5:10 7:20
32:15
38:18
60:24

69:12

Price
4:22,24
5:4 8:24
10:9,11,
17,22,25
11:1,24
12:1,12,
14 14:20,
22 17:8,
13 18:13,
18 22:9,
15 23:25
24:8,13
25:1,2
26:12,14
27:19,21
28:3,9
31:11,13
35:21
36:1,14,
19 38:7,
8,23 39:7
40:1,4
49:11
52:19
54:10
55:11,19,
23 58:13,
15 59:23
60:3
67:11
68:21,25
69:5,7
73:11,17
74:18,20
75:9,11,
15

principle
52:17,21
53:3

printed
7:25 8:6

prior
14:24

17:25
18:25
22:24

prioritize
56:10

privileged
24:8

privy
35:7

probability
27:12

proceed
4:17

process
19:3,8

produce
33:4
48:12
54:25
56:9,19
57:6 58:5

produced
16:4 29:7
65:12

produces
63:13

producing
29:5

Professiona
l
4:3

Progress
12:16

progressive
13:20

project
22:17

protected
23:10
24:6,25



69:9,15
70:10

**provide**
23:21
27:9

**provided**
10:6
23:4,5,8,
13,14,15,
24 24:2
25:14
35:12
48:7
69:13

**public**
4:3 19:5,
10

**pull**
10:5
14:20
17:22
21:24
27:19
36:7
55:13
69:5

**pursuant**
27:5

**put**
27:3
38:1,9
43:17
75:20

**putting**
39:18
44:22
45:11

─────────────

**Q**
─────────────

**qualified**
72:2

**question**
6:10,15,
21 7:5
14:5,10
19:21
28:21
29:11,19,
22 31:12,
14 32:19
42:7 52:8
57:13
66:23
67:20
74:8

**questioning**
5:6 24:18

**questions**
6:3,19
7:19
62:21
68:12,13
69:2
73:16

**quickly**
5:22

─────────────

**R**
─────────────

**Raban**
24:19
75:4,16,
19

**race**
47:9
52:7,12,
15,23
53:5,12

**races**
45:18

**racial**
47:17
52:10

**Randall**
75:4

**random**
26:24
27:6

**randomly**
26:17
27:11

**re-deriving**
57:3

**read**
20:2
38:23
39:4,6
74:22

**reading**
43:18
75:22

**ready**
32:9

**realized**
14:4

**reason**
6:9 7:10
59:13

**reasonable**
48:9 64:5

**reasons**
34:24
60:23
61:19

**rebuttal**
61:22
62:18

**recall**
17:3
19:13
21:1,16
23:2
32:13
36:5

38:21
45:4
53:17
55:1
58:19
66:4

**receive**
39:20

**received**
8:11
10:20
17:11
18:16
19:6
22:13
28:7
35:24
36:17
55:21
60:1

**receiving**
33:8

**recent**
61:3

**recess**
68:24

**recognize**
18:10,12

**recollectio
n**
11:3
16:16
49:1
53:21
74:10

**reconfigura
tion**
50:11

**record**
5:8,11
68:23

**redistricti
ng**
16:23
19:3,8
26:17
27:1
30:11
31:4 34:6
35:5
37:17
38:12,13
47:13
63:25
71:5,24
72:4

**redraw**
13:24
18:5
28:19
30:6

**redrawing**
27:19
33:22
65:15

**redrawn**
27:23
28:10,15
34:1

**reduce**
47:1

**refer**
66:9

**referred**
70:15

**referring**
15:17

**refers**
64:24

**refresh**
11:2

**regard**
20:8



47:11
67:22
71:4,24
72:3,6,7

**region**
18:12,22
27:13
51:11
65:16

**Registered**
4:3

**regular**
75:17

**regularize**
32:1

**relevant**
20:3
27:10
33:2

**relied**
24:3,10,
16,23
70:24

**remember**
8:25 9:22
16:1
19:14
20:16
21:19
22:20
23:6 33:8
36:3 42:8
60:7
73:20

**remove**
74:2

**removed**
36:24

**removing**
36:23
43:21
47:7

**repeat**
19:21
57:13

**rephrase**
6:11
28:22

**report**
7:25 8:6,
10 10:15
11:7,15
14:1 16:5
20:1,3,23
21:4,14,
25 22:6,
19 23:1
24:6,11,
14,22
25:4,13
26:9,11
27:22
29:6 30:9
36:8
43:10,19
55:13
59:19
61:22,25
62:5,7,
11,15,19,
22 65:13,
14,17,25
66:16
67:3,10
69:4
71:21
72:21,24
73:5

**reported**
4:2

**reporter**
4:3,8,12,
16,22
7:20
10:21
17:12
18:17

22:11,14
28:5,8
35:25
36:18
38:23
39:5,6
55:22
60:2
67:5,9
68:23
74:19,21,
24 75:2,
8,13,16,
21

**reports**
11:6 12:6

**representat
ion**
17:1,5
18:20,23
28:1
45:15
59:18

**representat
ives**
47:15,16
53:16

**represented**
23:9

**represents**
28:13

**republican**
12:23
13:6,12

**requested**
39:6

**require**
38:14
71:11
72:9

**required**
31:9
37:1,4,21

38:19,22
39:2,3,9,
11 42:23
48:12
72:17

**requirement**
35:7
49:14
64:8

**requirement
s**
37:18
44:5,17
46:3
53:14
57:2,16
64:1
70:12,21
71:1

**requires**
71:4,8,
15,20,23,
25 72:3

**research**
26:5

**respect**
56:6
73:18

**respected**
63:15
64:16
65:1

**respecting**
64:8

**respond**
6:3

**rest**
18:23
22:2 37:3
53:8,9

**restate**
41:14

**restates**
50:21

**restating**
71:17

**result**
56:13

**results**
12:20

**retained**
8:22 9:2,
7,13,24
10:24
11:4,19
12:8,19
13:24
69:20

**retainer**
20:16

**review**
15:11,12
16:9 18:2
19:1,5
21:13
25:4,24
61:25
62:8,11,
14

**reviewed**
16:3,5,20
17:24
18:21
19:18,23,
25 21:14
22:23
35:18

**reviewing**
19:14
68:7

**revised**
25:15

**right-most**
54:20



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                          Index: road..source

road
    40:18,20
    41:6  42:3
    49:12,17,
    19,22
    50:25
    54:1,20
    58:25

roads
    41:11

roadway
    47:25
    48:8,10,
    15,18,19,
    23

roadways
    40:9
    46:7,8,10
    52:2,4
    53:19
    54:8,21
    56:7  58:5
    60:17
    64:9

Rodrigues
    35:13,14
    70:22

room
    7:21

roughly
    27:9

rules
    5:19

Ruskin
    47:24
    49:6

S

sampled
    26:17

samples
    26:24

satisfied
    25:6

satisfy
    31:22

school
    63:22

scope
    73:5

score
    64:11
    67:2,6,16

scores
    63:5,9,
    13,14
    64:11,25
    65:12
    66:6,15
    67:8

screen
    10:6

scroll
    10:10,25
    11:24
    12:12
    15:2
    22:1,4
    26:12
    45:20
    58:13

Sean
    62:11

section
    43:18
    69:8

sections
    20:3

segment
    52:11

senate

5:5  9:24
13:25
14:8,24
15:5  16:6
19:2,6
23:6

Senator
    35:13

sense
    39:11
    43:25
    44:1  46:9
    57:1  61:2
    65:1

sentence
    31:2
    64:15,24
    65:3

separate
    9:3  27:20

sequential
    26:22
    32:8

set
    23:15

shaking
    6:5

shape
    40:10,12

shapes
    59:6

share
    10:6

shore
    46:9

short
    73:16

shot
    51:20

show
    32:3,13

14:23
27:5,24

showed
    25:18

showing
    17:6

shown
    18:4  50:4

sick
    7:13

side
    11:20
    12:10
    34:2  42:3
    58:21,22

signature
    22:7

significanc
e
    30:19

signing
    75:22

similar
    47:5

simulation
    26:15

sitting
    42:9
    50:24
    66:4
    68:16

size
    32:6

slate
    30:18

slowly
    10:10
    22:2

small
    32:3,13

SMC
    26:16,20,
    22,25

software
    30:12,16,
    24  31:4,
    20,22,24
    32:4,5,
    10,11,12
    46:21
    63:13,18
    64:7,19

software's
    65:13

softwares
    31:10

solved
    44:7

sort
    21:11
    32:3  37:1
    41:8
    44:12
    46:4,8,12
    47:3,20
    50:4
    51:13
    53:13
    54:19
    56:2,9,
    20,25
    57:1,4
    58:1,7,9,
    22  59:5,
    6,8  60:8,
    9,10,15,
    16

sounded
    52:21

sounds
    15:12
    72:19

source



CORY MCCARTAN, PH.D.                                    December 02, 2024
KETO NORD HODGES vs ALBRITTON                          Index: south..talk

70:20,23

**south**
  40:19
  54:12
  55:2
  69:20

**southeastern**
  51:16

**southern**
  44:2,14
  46:5,16
  47:11
  55:8
  60:13

**spaced**
  21:3

**specific**
  20:9
  27:12
  32:19
  45:12
  51:9
  52:8,22
  67:19
  68:9
  71:6,19

**specifically**
  46:6
  52:18
  53:5 71:7

**speculate**
  41:7 53:3

**spend**
  20:22

**split**
  39:15
  40:9
  48:22
  49:5
  74:4,7,14

**splitage**
  37:10

**splits**
  38:15
  56:22
  73:23
  74:6,8,9,
  12,15

**splitting**
  38:11
  44:11
  45:16
  58:3

**spoke**
  7:20

**spring**
  22:20

**square**
  59:5

**squared**
  59:8

**St**
  36:24
  74:13

**staff**
  19:2 26:2

**stage**
  61:3

**standard**
  64:13

**standards**
  34:6 35:5
  39:18
  40:17
  43:24
  44:24
  47:13
  48:21
  60:12
  65:2
  69:16
  71:18

**stands**
  26:22

**start**
  10:9
  30:18
  31:14
  44:19
  51:19
  56:16
  71:13

**started**
  37:24
  60:19,24

**starting**
  17:25
  18:9
  56:17
  57:4

**state**
  4:4 9:24
  14:8 15:5
  16:6 23:6
  27:13
  33:2
  69:18,23
  71:10

**stated**
  5:10

**statement**
  13:3

**stating**
  5:7

**statistical**
  26:23

**statistics**
  9:16

**stay**
  54:16

**stayed**
  54:13

**stays**

54:22

**stenographically**
  4:2

**Stephen**
  62:1

**stop**
  14:4

**straight**
  40:19
  48:20
  58:24

**straightening**
  58:22

**strategy**
  35:8
  47:20

**stretch**
  38:16

**students**
  6:20

**study**
  69:21

**studying**
  70:9

**submission**
  19:10

**submissions**
  19:5

**submitted**
  8:1 11:6,
  8 12:6

**submitting**
  25:3

**sufficient**
  75:9,14

**Sun**
  51:20

**supports**
  27:11

**surmise**
  35:6

**surrounding**
  32:25
  33:18
  34:7,13,
  17 42:19

**swear**
  4:8

**switch**
  43:11

**sworn**
  4:20

---

**T**

**table**
  7:6

**taking**
  37:5
  57:23
  75:23

**talk**
  15:14,19,
  21 17:14
  26:20
  30:14
  31:7,15
  32:16
  39:24
  40:5 43:9
  45:20,22
  46:19
  47:23
  51:16
  55:24
  57:24
  58:11,16
  63:9
  66:18



CORY MCCARTAN, PH.D.                                      December 02, 2024
KETO NORD HODGES vs ALBRITTON                         Index: talked..understand

talked
  22:22
  24:13
  38:24
  56:23
  69:22,23
  70:11
  72:6,13

talking
  14:16
  15:22
  33:13
  36:3
  67:13

talks
  24:21
  66:19

Tampa
  13:25
  18:7,12,
  22 28:14,
  18 29:16
  33:25

Tara
  5:4

targets
  40:15

Technical
  10:7

technique
  26:23

Telephonic
  4:1

telling
  64:20

ten
  75:9

term
  14:2,13
  17:14
  34:8 66:8

terms
  57:20
  64:10

test
  6:18

testified
  4:21 11:5
  12:7

testify
  7:11 24:4
  68:11,12

testifying
  11:21

testimony
  4:9 5:24

text
  8:17

things
  32:11
  44:22
  47:6
  56:23

think-tank
  13:18

thinking
  14:17
  55:8

Thomas
  4:7 8:21

thought
  16:19
  37:19
  66:18

tier
  48:2
  53:15
  69:15
  70:15,16

tiers
  37:17
  38:12

time
  20:18,21,
  22 21:4
  61:6
  73:12

titled
  21:24

today
  5:6,24
  6:18 7:1,
  11,15,21
  23:22
  41:10
  42:9
  50:24
  66:4
  68:4,16
  70:12
  72:13,22
  73:12

today's
  21:10

top
  10:9 20:2
  63:11

touch
  5:21

touched
  32:15
  72:22

tracks
  63:17
  64:18

trade-off
  55:4
  60:11

trading
  55:8

transcript
  10:20
  17:11
  18:16

22:13
  28:7
  35:24
  36:17
  55:21
  60:1
  74:22

translate
  64:8

translation
  64:4

Trende
  62:12

Trende's
  24:18
  62:19

trends
  46:5

trial
  11:6
  62:4,19
  68:7,8,
  11,13
  71:17
  72:25
  73:5

triple-c
  13:16

true
  10:13
  16:25
  18:19
  22:5
  27:25
  35:17
  36:10
  39:22
  55:16
  59:19
  61:11
  65:22
  68:15

truth
  4:10 5:25

truthfully
  7:11
  68:12

turn
  37:3
  58:21

turnaround
  75:10,18

tweaks
  32:3

type
  26:25
  29:7

types
  65:6

—————

U

U.S.
  54:16

Uh-huh
  67:1

unassign
  39:12

unchanged
  42:22

underpopula
ted
  43:22

understand
  5:24 6:7,
  9,15,22
  7:3,8
  14:11
  15:23
  16:2
  17:16,19
  28:21
  29:10



34:8 35:3
38:19
41:15
42:15
44:6
52:20,24
54:19
57:9,14
63:21
64:14,23
66:10

**understanding**
12:24
39:17
49:10,20
70:21
72:16

**understood**
6:15

**Union**
8:23

**University**
4:13 5:13

**unnecessarily**
41:19

**updated**
10:14

**utilization**
73:19

**utilized**
63:15
64:16

─────────

**V**

─────────

**version**
10:14
30:3
48:13
51:7

**versions**
56:10

**versus**
9:11
11:14
55:9

**vertical**
58:8

**videoconference**
4:1 8:21
55:5

**visual**
50:3
51:14
59:8
60:11

**visually**
56:13

**Vogel**
75:5

**Voss**
62:1

**Voss's**
62:4

**voters**
11:14
44:18

**voters'**
47:14,15
53:15

**voting**
44:18
45:17
46:3

─────────

**W**

─────────

**waived**
75:23

**Warren**
19:12
24:1,12,
17 49:9
52:16
54:3
73:15
74:17,24
75:1

**water**
32:2

**waterways**
40:9
46:11
52:3,5
56:7
60:17
64:9

**ways**
56:11
72:10

**website**
16:23
28:20,24
29:4,14
30:1,2
32:11

**week**
75:12

**weeks**
21:7

**west**
49:25
51:21

**western**
58:2,6
60:14

**wholly**
32:23
33:14
34:21
35:3,10

**Women**
11:13

**wondering**
19:22
45:8

**word**
30:19
38:18
39:9

**words**
36:20

**work**
9:25
12:22
17:25
19:15,19,
23 20:14
21:3
22:24
35:19
36:4 42:9
58:9
73:2,3

**working**
9:9 22:18
60:9

**write**
13:25
63:25

**write-up**
65:17

**writing**
8:5 20:1

**written**
23:5,15,
18 64:1
71:18,21

**wrong**
30:23

─────────

**Y**

─────────

**yellow**
40:3

**yes-or-no**
29:22

─────────

**Z**

─────────

**ZIP**
4:14

**Zoom**
6:6 7:18
73:7

**zoomed**
28:14,18
29:16

**zoomed-in**
27:24
30:3

