## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KÉTO NORD HODGES, *et al.*,

     *Plaintiffs*,

v.                                Case No. 8:24-cv-879

BEN ALBRITTON, *etc.*, *et al.*,

     *Defendants*.

_____/

## PLAINTIFFS' RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT

To obtain summary judgment dismissing Plaintiffs' claims, Defendants bear the burden of showing that there is not a single genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Viewing the evidence in the light most favorable to Plaintiffs—as the Court must, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 261 (1986)—neither the Senate (ECF 74) nor the Secretary of State (ECF 75) have met their burden.

## INTRODUCTION AND BACKGROUND

Plaintiffs challenge Florida Senate Districts 16 and 18 in the Tampa Bay area (the "Challenged Districts," depicted below) as racially gerrymandered in violation of the Fourteenth Amendment. Kéto Nord Hodges and Jarvis El-Amin live in Tampa within District 16. Ex. 1 (Nord RFAs) ¶¶ 1–4; Ex. 2 (El-Amin RFAs) ¶¶ 1, 3–4. Meiko Seymour lives in St. Petersburg within District 16. Ex. 3 (Seymour RFAs) ¶¶ 1–2, 5. Jacqueline Azis and Jennifer Garcia live in St. Petersburg just across the border in District 18. ECF 74-14 (Azis RFAs) ¶¶ 1, 4; ECF 74-13 (Garcia RFAs) ¶¶ 1, 6.



ECF 1 (Compl.) ¶ 3 & fig. 1; ECF 36 (Sen. Ans.) ¶ 3; ECF 35 (Sec'y Ans.) ¶ 3; *see also*

ECF 74-17 (McCartan Rep.) at 5, fig. 1; ECF 74-18 (Barreto Rep.) at 12, fig. 1.

The Senate drew these districts in late 2021 and early 2022 in a process overseen

by Reapportionment Committee Chair Ray Rodrigues, Legislative Reapportionment

Subcommittee Chair Danny Burgess, and Staff Director Jay Ferrin. Ex. 4 (Sep. 20 Tr.)

4:2–23, 10:25–11:6. One of the legal standards framing their work was the Florida

Constitution's Fair Districts Amendment, whose "Tier One" standards prohibit the

diminishment of Black voters' ability to elect representatives of their choice in District

16.[1] Fla. Const. art. III, § 21(a); Compl. ¶¶ 47–50, 56–60; Sen. Ans. ¶¶ 47–50, 56–60.

---

[1]    Plaintiffs use the term "Protected District" to refer to this and similar districts across
multiple proposed or enacted plans. This district is numbered 16 in the Enacted Plan and 19
in the plan in place from 2016 to 2022 (the "Benchmark Plan"), as well as in the Senate's

Every draft map Mr. Ferrin presented featured a similar configuration for the Challenged Districts, with the Protected District grouping Black population centers in Tampa and St. Petersburg, crossing the Bay to do so, and another district (designated District 24 in the draft plans, as in the Benchmark; eventually renumbered 18) taking in the remaining whiter portions of southern Pinellas County. Compl. ¶¶ 63, 71; Sen. Ans. ¶¶ 63, 71; Barreto Rep. ¶ 32–37.

During the legislative process, one of the Subcommittee's five members, African American Sen. Randolph Bracy of Orlando, asked repeatedly whether the law required the Protected District's cross-Bay configuration, prompting responses from Mr. Ferrin and Sen. Burgess. Ex. 5 (Nov. 17 Tr.) 31:21–32:12; ECF 75-4 (Jan. 10 Tr.) 7:10–8:4. Their responses reveal much about the role race played in the Challenged Districts' drawing, as well as how closely (or poorly) the Senate tailored its use of race to comply with Tier One's non-diminishment standard.

## ARGUMENT

### I.    Plaintiffs bring a racial-gerrymandering claim, not a state-law claim.

The Senate argues that Plaintiffs bring a state-law claim disguised as a federal racial-gerrymandering claim. ECF 74 at 14–17. The Secretary disagrees. ECF 75 at 2 ("This is a racial gerrymandering case. It's only a racial gerrymandering case.") (citation omitted). On this point, Plaintiffs agree with the Secretary.

---

drafts plans until all districts were randomly renumbered on January 13, 2022. District 19 in the 2016 Benchmark Plan is referred to as the "Benchmark District."

Plaintiffs use the generic "protected district" to refer in general to districts that Tier One or the Voting Rights Act protect from minority vote diminishment or dilution.

To make out a federal racial-gerrymandering claim, "the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). If so, the district must survive strict scrutiny. *Id.* at 292. As the Court has acknowledged, Plaintiffs allege exactly that. Order, ECF 33 at 4–5. ("It is obvious from the face of the Complaint that Plaintiffs bring a racial-gerrymandering claim.").

To show racial predominance, "a plaintiff must prove that the State 'subordinated' race-neutral districting criteria such as compactness, contiguity, and core preservation to 'racial considerations.'" *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 7 (2025) (quoting *Miller*, 515 U.S. at 916). A plaintiff can establish predominance through direct evidence, including through "a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Id.* at 8. Or, a plaintiff can point to indirect evidence, such as the challenged district's lack of "conformity to traditional districting principles, such as compactness and respect for county lines." *Cooper*, 581 U.S. at 308. Here, Plaintiffs allege both, pointing to statements from legislators and their staff showing that they "drew [the Challenged Districts] with race in mind by packing black voters into District 16 from other places, including District 18," as well as "standard indicia of racial gerrymandering, like having districts traverse large bodies of water, splitting political communities, and forming noncompact shapes." Order, ECF 33 at 2–3 (citing Compl. at 4–5, 10–19).

In this case, the race-neutral redistricting criteria that the Senate subordinated

to race in drawing the Challenged Districts are also embedded in Tier Two of the Florida Constitution's Fair Districts Amendments. Compl. ¶¶ 40–41. But this does not transform Plaintiffs' racial-gerrymandering claim into a claim that the Challenged Districts violate Florida law. State law is relevant to Plaintiffs' claim as a factual matter to establish the Senate's racially motivated purpose. By stating that the Challenged Districts were drawn to prevent diminishment of Black votes in accordance with Florida law, the Senate indicated that race played a significant role in its decision-making, which informs the racial predominance inquiry. But the Court need not find the districts actually violate the Florida Constitution to find that race predominated; the federal claim is independent of any state-law violation. And if the Court finds after trial that race *did* predominate and that the use of race was not narrowly tailored, it would not be "instruct[ing] state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Rather, the Court would merely be enforcing the Fourteenth Amendment's mandates.

Two cases following the 2010 Census are particularly instructive. In *Bethune-Hill v. Virginia State Board of Elections*, voters challenged state legislative districts as racial gerrymanders under the U.S. Constitution. 580 U.S. 178, 181 (2017). The legislature had adopted "criteria to guide the redistricting process," including "traditional redistricting factors such as compactness, contiguity of territory, and respect for communities of interest," two of which were also state constitutional mandates. *Id.* at 183; Va. Const. art. 2, § 6. Following remand by the Supreme Court, the trial court found "race predominated over traditional districting factors" like

compactness and contiguity under the Fourteenth Amendment—independent of the fact that both compactness and contiguity also happened to be required by the Virginia Constitution. *Bethune-Hill v. Va. State Bd. of Elections*, 326 F.Supp.3d 128, 137, 141 (E.D. Va. 2018) (citing Va. Const. art. 2, § 6); *see also Page v. Va. State Bd. of Elections*, No. 3:13-cv-678, 2015 WL 3604029, at *10–11 (E.D. Va. June 5, 2015) (making similar findings to strike down a congressional district and noting "contiguity and other traditional districting principles are 'important not because they are constitutionally required,' but rather 'because they are objective factors' courts may consider in assessing racial gerrymandering claims" (quoting *Shaw v. Reno* (*Shaw I*), 509 U.S. 630, 647 (1993))), *appeal dismissed*, 578 U.S. 539 (2016). At no point did any court suggest that the challenges were barred by sovereign immunity.

Similarly, in *Covington v. North Carolina*, the North Carolina Constitution's "Whole-County Provision" required redistricting planners to "group counties together in drawing districts, generally keeping such groups as small as possible and minimizing the number of traverses across county boundaries within groups." 316 F.R.D. 117, 125 (M.D.N.C. 2016), *aff'd*, 581 U.S. 1015 (2017) (mem.). Still, when the trial court found that race predominated in the districts' drawing, it did so not because they violated the state constitution but because subordinating the traditional districting principles embodied in the Whole-County Provision was evidence of racial intent under the *federal* racial-gerrymandering standard. *Id.* at 137–39, 176. Again, there was no question plaintiffs were raising federal claims. As in *Bethune-Hill* and *Covington*, Florida's constitutional requirements are relevant to Plaintiffs' claims not for their own

6

sake, but because they are the race-neutral redistricting criteria that the Legislature purportedly sought to respect. Thus, the Tier Two standards' subordination to race is evidence of racial predominance, regardless of whether a state court would find the Challenged Districts compliant with Tier Two as a matter of Florida law.

There is no *Pennhurst* problem at the strict-scrutiny step of Plaintiffs' claim, either. The state has a compelling interest in compliance with Florida's non-diminishment requirement, but whatever the asserted interest—be it federal law, state law, or a policy lacking the status of law—the use of race must be properly tailored. If Plaintiffs establish racial predominance, it is this Court's duty to scrutinize whether the state met that tailoring requirement. As the Senate recently argued at the Florida Supreme Court: "Florida cannot vote into its State Constitution an exemption from the Fourteenth Amendment." Legislature's Answer Br. at 53, *Black Voters Matter Capacity Bldg. Inst. v. Byrd*, No. 23-1671 (Fla. May 6, 2024). And just like a finding that race predominated in the Challenged Districts would not *per se* mean the districts violated Tier Two, a finding that the Legislature's use of race was not sufficiently tailored to a compelling interest would not require this Court to conclude the Challenged Districts violated Florida law. Indeed, Plaintiffs agree that lawmakers avoided diminishing Black voting power in Enacted District 16. The problem is that they did not sufficiently tailor their use of race in doing so.

In sum, the "gravamen of [the] complaint" is not that "the State has improperly interpreted and failed to adhere to a state statute." *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1205 (11th Cir. 2019) (quoting *DeKalb Cnty. Sch. Dist. v. Schrenko*,

109 F.3d 680, 688 (11th Cir. 1997)) (alteration in original). Nor do Plaintiffs here make "conclusory allegations that the same conduct that violates state law also violates the U.S. Constitution," *id.* at 1204, and a finding for Plaintiffs need not "rely on a determination that a state official has not complied with state law," *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-5391, 2019 WL 13221296, at *5 (N.D. Ga. Dec. 27, 2019). Rather, the Challenged Districts violate the Fourteenth Amendment because they were drawn predominantly based on race and fail strict scrutiny: the "gravamen" of a federal racial-gerrymandering claim. "Since the plaintiff alleged a violation of the federal Constitution, *Pennhurst* does not apply." *Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 1023 (11th Cir. 1989).[2]

## II.    There is a genuine factual dispute as to racial predominance in the Challenged Districts.

The Senate argues that it is entitled to judgment as a matter of law as to both the Challenged Districts. ECF 74 at 17–25 (District 16), 11–14 (District 18). But direct evidence from the senators and their staff lays bare the Senate's explicit racial

---

[2]    *See also Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-5391, 2021 WL 9553856, at *14 (N.D. Ga. Mar. 31, 2021) (finding no *Pennhurst* problem even though "state law is relevant to Defendants' responsibility for the challenged practice" because "Defendants' liability . . . will be determined pursuant to the federal . . . framework"); *League of Women Voters of Fla., Inc. v. Detzner*, 314 F.Supp.3d 1205, 1212 (N.D. Fla. 2018) (finding no *Pennhurst* problem where plaintiffs discussed how state law informed the defendant's interests in promulgating the challenged policy); *Ingalls v. U.S. Space & Rocket Ctr.*, No. 2:14-cv-699, 2015 WL 4528687, at *6 (M.D. Ala. July 27, 2015) (rejecting *Pennhurst* argument because, "[a]lthough Plaintiffs complain vehemently about Defendants' alleged violation of state statutes, they seek relief for those violations based upon a purported violation of their [federal] due process and equal protection rights"), *aff'd*, 679 F.App'x 935 (11th Cir. 2017); *Halpin v. David*, No. 4:06-cv-457, 2009 WL 10697969, at *3 (N.D. Fla. July 9, 2009) (finding no *Pennhurst* problem in plaintiff alleging violations of state law as predicate acts for federal RICO claim), *report and recommendation adopted in relevant part*, 2009 WL 2960936 (N.D. Fla. Sept. 10, 2009); *cf. Ford v. Strange*, 580 F.App'x 701, 710–11 & n.20 (11th Cir. 2014) (finding standing to bring claims that the revocation of business licenses in violation of state law also violated federal due process rights).

prioritization in crafting these two districts. Data analysis and alternative maps from Plaintiffs' experts reinforce this conclusion. The record presents a quintessential dispute of material fact.

The Senate built both Districts 16 and 18 around a single racial focus.[3] The Senate joined two far-flung Black population centers separated by miles of open water into a single district, split a city of 260,000 into two racially segregated halves, ignored county borders, and carved the region along racial lines. And during the legislative process, when asked repeatedly why the Challenged Districts did not respect the largest most obvious geographic feature in the region—Tampa Bay—the map's primary drawer replied that the reason was race.

### A. Ample direct evidence demonstrates race drove the drawing of the Challenged Districts.

Direct evidence "often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Alexander*, 602 U.S. at 8; *see also Cooper*, 581 U.S. at 299–301, 310–16 (focusing on evidence of intent

---

[3]    At the outset, the Senate's protestation that Plaintiffs focus too narrowly on St. Petersburg is not only belied by the record, but also legally mistaken. While racial predominance is analyzed "district-by-district," *Ala. Legis. Black Caucus v. Alabama* (*ALBC I*), 575 U.S. 254, 262 (2015), the Supreme Court has explained "[t]his is not to suggest that courts evaluating racial gerrymandering claims may not consider evidence pertaining to an area that is larger *or smaller* than the district at issue." *Bethune-Hill*, 580 U.S. at 192 (emphasis added). Because a district is made up of its parts, "a legislature's race-based decisionmaking may be evident in a notable way in a particular part of a district. It follows that a court may consider evidence regarding certain portions of a district's lines . . . ." *Id.; see also, e.g.*, *GRACE, Inc. v. City of Miami* (*GRACE III*), 730 F.Supp.3d 1245, 1282–83 (S.D. Fla. 2024) (finding the treatment of particular "portion[s]," "area[s]," and "part[s]" of districts probative of racial predominance), *appeal dismissed*, No. 24-11550 (11th Cir. July 17, 2024); *Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville I*), 635 F.Supp.3d 1229, 1274 (M.D. Fla. 2022) (summarizing expert's analysis of "portions of the district lines that are particularly bizarre"), *stay denied* (*Jacksonville II*), No. 22-13544, 2022 WL 16754389 (11th Cir. Nov. 7, 2022).

of the plan's "architects" and "mapmakers"); *Jacksonville II*, 2022 WL 16754389, at *4 ("[R]elevant, contemporaneous statements of key legislators are to be assessed when determining whether racial considerations predominated in redistricting processes.").[4]

Here, statements of key legislators and staff undoubtedly show "race played a role in the drawing of" the Challenged Districts and that the Senate's use of race crossed the threshold from mere "consciousness" to "predominance." *See Alexander*, 602 U.S. at 8; *Allen v. Milligan*, 599 U.S. 1, 33 (2023). The Senate considered Benchmark District 19 a "Tier One-protected district" under the Fair Districts Amendment's non-diminishment standard, meaning "Black voters' ability to elect candidates of choice could not be diminished from their ability that existed in Benchmark District 19." ECF 75-2 (Ferrin Dep.) 62:12–22. Walking through the Senate's first draft maps, Staff Director Ferrin introduced the Protected District as "an effective minority district protected under Tier-One," noting its BVAP. Nov. 17 Tr. 26:20–22. Sen. Rodrigues, the Reapportionment Committee's chair, used the same language when the committee took up what would become the Enacted Plan. Ex. 9 (Jan. 13 Tr.) 25:7–13. On the Senate floor, Rodrigues explained the race-predominant method for drawing Tier One-protected districts like District 16:

---

[4]    The Senate baldly asserts that Plaintiffs have no direct evidence, citing Plaintiffs' deposition testimony. ECF 74 at 8–9, 19. But Plaintiffs testified merely that they *personally* did not have any direct knowledge of the redistricting process. *E.g.*, Ex. 6 (El-Amin Dep.) 35:16–18 ("And do you *personally know* any facts that indicate that the legislature's *predominant* criteria in drawing District 16 was race?"). Any limitations in the five Plaintiffs' own *personal* knowledge of the legislative process do not foreclose them presenting proof of that process through other competent evidence. *E.g.*, Ex. 7 (Azis Dep.) 35:9–10 ("I would have to rely on any information that my attorneys have provided you for that . . . ."), 35:21–23; Ex. 8 (Nord Dep.) 39:9–10 ("Well, for specific facts, I would have to defer to the knowledge of my attorneys."), 41:4–5, 42:1–3, 47:16–17; 49:19–22.

> So once we've identified the Tier One districts, we then start with a blank map, highlight the data we've received from the U.S. Census Bureau by race, and then the staff began drawing around the population distribution in order to ensure we had not diminished the opportunity for minorities to participate or elect a voter of their choice. . . . Once we highlighted the racial population, we began drawing from there.

Ex. 10 (Jan. 19 Tr.) 23:5–9, 24:3–4.[5] Thus, "'[r]ace was the criterion that, in the State's view, could not be compromised' in the drawing of district lines," precisely what the Fourteenth Amendment forbids. *Alexander*, 602 U.S. at 7–8 (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996)).

Additional legislative statements show that by building District 16 around "racial populations," race drove the design of District 18, too. As Rodrigues explained, that district's "shape is affected by the neighboring Tier One District [16], which is an effective minority district protected from diminishment under Tier One." Jan. 13 Tr. 25:6–8 (using district numbers before renumbering). District 18 could have been drawn starting with all of St. Petersburg, then extended north to include as much of Pinellas County as possible until the district reached equal population with the other districts. McCartan Rep. ¶¶ 12–13, 15–19 & figs. 2–4. But critically, Ferrin admitted in deposition that he never tried to unify St. Petersburg in District 18 and build a protected District 16 on the east side of the Bay, relying only on his speculation that it

---

[5]    At his deposition, Ferrin asserted that these statements referred only to districts in the Jacksonville area, where two counties are made up of one Tier One-protected district surrounded by a non-protected district. Ferrin Dep. 50:17–52:7. But Rodrigues's explanation refers not to that particular Jacksonville "district," but rather "the Tier One districts" and "the districts that we cannot diminish," plural. Jan. 19 Tr. 23:4–9. Ferrin further testified that he sought to apply the Senate's directives on protected districts "consistently across the state." Ferrin Dep. 55:11–15, 55:25–56:10. Whether the Court should take Rodrigues' explanation at face value or instead credit Ferrin's contrary post-hoc interpretation is a question for trial.

could not be done. Ferrin Dep. 97:10–100:22, 103:23–114:6. His refusal to seriously investigate whether such a configuration could be drawn indicates that race was not merely one consideration among others, but was the dominant consideration. The Court must interpret this evidence in Plaintiffs' favor, as the party opposing summary judgment, leading to the reasonable conclusion that the Senate "began drawing" once they "highlighted the racial population" and never looked back. Jan. 19 Tr. 24:3–4.

Significantly, legislators and staff *expressly acknowledged* that the Challenged Districts deviated from traditional race-neutral criteria due to racial considerations. When Bracy first asked why the Protected District crossed Tampa Bay, Ferrin replied simply: "That was to comply with the Tier One non-diminishment standards." Nov. 17 Tr. 31:21–32:12. Later in the process, Bracy again asked why the Protected District crossed the Bay. Jan. 10 Tr. 7:10–13. Burgess's answer pointed to the race-based non-diminishment requirement: "there were a significant number of voters who would be disenfranchised under not crossing the Bay." *Id.* 7:14–19. Ferrin agreed: "If we look at drawing it differently, I think we're looking at a situation where the Black voters would not be able to control the primary numerically . . . and that would potentially constitute diminishment." *Id.* 9:1–4. At the final committee meeting, Rodrigues explained why the Protected District "includes the minority populations of St. Petersburg and Tampa:" "[t]o ensure this configuration does not result in the denial or abridgement of the equal opportunity to participate in the political process." Jan. 13 Tr. 25:10–12.

Collectively, the statements from the legislative record evince the Senate's race-

12

based purpose in drawing the Challenged Districts and its explicit sacrificing of race-neutral criteria like respecting Tampa Bay as a "major geographic boundary" and the Hillsborough-Pinellas line as a "major political boundary." Ex. 11 (Sen. RFAs) ¶¶ 19–20, 22. This direct evidence removes this case from the ambit of *Alexander*, whose holdings apply only when (1) a plaintiff relies solely on circumstantial evidence and (2) the state raises a partisan-gerrymandering defense, 602 U.S. at 8–10, 18, neither of which are the case here. Unlike *Alexander*, the Court is not "confronted with evidence that could plausibly support multiple conclusions" as to whether the Legislature engaged in race-based policymaking, because legislators admitted they did so. *Id.* at 10; *see also id.* at 19–20 (reversing finding that legislature deliberately used race to draw a district where plaintiffs "did not offer any direct evidence to support that conclusion, and indeed, the direct evidence that is in the record is to the contrary").

### B. Ample circumstantial evidence corroborates the direct evidence.

Apart from this direct evidence, "circumstantial evidence of [the] district[s'] shape and demographics" point to racial predominance as well. *Miller*, 515 U.S. at 916. District 16 connects the region's two largest Black population centers, "travers[ing] large bodies of water, splitting communities, and forming noncompact shapes" to do so. Order, ECF 33 at 2. It has a self-apparent irregular shape, made up of two parts unconnected by a bridge. Compl. ¶ 98; Sen. Ans. ¶ 98. It splits St. Petersburg unnecessarily, contrary to the Senate's directive that staff explore concepts that "keep cities whole." ECF 74-3 (Oct. 18 Memo) at 2; *see also* Ferrin Dep. 29:12–13 (keeping cities whole "was a concept that was measured and reported and

considered"). It splits Pinellas County into more districts than necessary and prevents Hillsborough from hosting a second district entirely within it, contrary to the directive to "keep districts wholly within a county in the more densely populated areas." Oct. 18 Memo at 2. Dr. Cory McCartan's alternative maps, discussed further in Part IV, *infra*, demonstrate that these choices were not simply natural consequences of Florida's demographics and geography, but rather made for racial reasons. McCartan Rep. ¶¶ 12–19, 22 & figs. 2–4.

Dr. Matthew Barreto's analysis lends further support for racial predominance. He examined the districts' shapes and demographics, studied the areas moved between the Benchmark and Enacted Plan, and concluded that both districts "follow a clear pattern whereby the boundary edges, as well as the cores, can be explained by the race and ethnicity of voters/residents." Barreto Rep. ¶¶ 10, 30–43. Examining the manner in which the Challenged Districts' borders cut through Voting Tabulation Districts (VTDs), the building blocks of redistricting, Barreto calculated the statistical probability that the VTDs inside District 16's boundary line would have a consistently higher Black concentration than those on the outside if race were *not* driving the line-drawing decisions. *Id.* ¶ 41. He calculated this probability as 1 in 190,650 for the SD 16-18 border in Pinellas County, and 1 in 61,887 for SD 16's border in Hillsborough. *Id.* ¶¶ 42–43.[6] In other words: an extraordinary statistical anomaly and compelling

---

[6]    For comparison, the risk of dying from a lightning strike in one's lifetime is 1 in 79,746. FLORIDA MUSEUM, Annual Risk of Death During One's Lifetime, https://www.floridamuseum.ufl.edu/shark-attacks/odds/compare-risk/death/.

evidence that the Challenged Districts were drawn to divide the region along racial lines, separating more- from less-Black areas. *See Jacksonville I*, 635 F.Supp.3d at 1273–76, 1284 (expert analysis concluding "district lines are consistently drawn in a manner such that the precincts in [protected Black districts] have higher BVAP than the neighboring precincts on the other side of the line" was "strong evidence" of predominance); *GRACE, Inc. v. City of Miami* (*GRACE I*), 674 F.Supp.3d 1141, 1193–94 & n.15, 1209–11 (S.D. Fla. 2023) (crediting similar analysis and finding predominance), *appeal dismissed*, No. 23-11854, 2023 WL 5624206 (11th Cir. July 13, 2023).

Plaintiffs' direct and circumstantial evidence is sufficient to establish an issue of fact as to whether race predominated in the drawing of the Challenged Districts and overcomes a presumption of the Senate's good faith (i.e., the presumption that the Senate engaged in policymaking without regard to race). *See, e.g.*, *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338, 2023 WL 7093025, at *8, *10 (N.D. Ga. Oct. 26, 2023); *Walen v. Burgum*, 700 F.Supp.3d 759, 769–70 (D.N.D. 2023), *aff'd in part, appeal dismissed in part*, --- S.Ct. ---, No. 23-969, 2025 WL 76410 (Jan. 13, 2025) (mem.). The court in *Georgia State Conference* denied summary judgment regarding Congressional Districts 2 and 8 (the former a predominantly Black district drawn to comply with the VRA; the latter an adjacent majority-white district) based on the plaintiffs' expert's opinion that a single county "was split between these two districts based on 'minutely race conscious decisions.'" 2023 WL 7093025, at *10. The *Walen* court similarly found "a genuine issue of material fact as to whether race was the predominate motivating

factor" in the drawing of two North Dakota legislative districts despite competing interpretations of the evidence offered by the parties.[7] 700 F.Supp.3d at 770. Both cases cite record evidence including plaintiffs' expert reports, *Ga. State Conf.*, 2023 WL 7093025 at *10, and legislative statements regarding efforts to comply with minority-protection laws, *Walen*, 700 F.Supp.3d at 769 ("The record contains ample evidence that VRA compliance and avoiding litigation from Native American voters was a motivating factor in the decision to draw the subdistricts."). As in these cases, Plaintiffs have established a factual dispute on racial predominance sufficient to go to trial.

### C. An actual conflict with traditional redistricting principles is not a prerequisite for a racial-gerrymandering claim.

The Senate argues that the Challenged Districts are not so "highly irregular" or "bizarre" after all, pointing to scores measuring the districts' compactness and coincidence with certain geographic features. ECF 74 at 21–22, 24. As an initial matter, the Supreme Court squarely rejected any specific "bizarreness" requirement:

> Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines. The logical implication . . . is that parties may rely on evidence other than bizarreness to establish race-based districting.

*Miller*, 515 U.S. at 913. Even compact districts with *no* bizarre features and high "adherence to traditional redistricting criteria," ECF 74 at 22, may be unlawfully

---

[7]   *Walen* granted summary judgment for the state on the grounds that, even if race predominated, the use of race survived strict scrutiny as a matter of law. 700 F.Supp.3d at 775.

gerrymandered on the basis of race. *Bethune-Hill*, 580 U.S. at 190 ("[A] conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition . . . ."); *Jacksonville I*, 635 F.Supp. 3d at 1244–45. The Court need only look at the below districts that courts have recently found were drawn with racially predominant intent, or that contained a genuine factual dispute as to predominance, to see that "narrow land bridges" or "low scores with respect to traditional measures of compactness," ECF 74 at 24, are not required:

  

Left to right: *Walen*'s District 4A, *Ga. State Conf.*'s District 10, and *Agee*'s District 14.[8]

But in any event, the record *does* show that the Challenged Districts *are* irregular in shape and depart from race-neutral redistricting criteria in ways that indicate racial motivations (and at worst, shows a factual dispute on these points). *See supra* at 2, 11–14. Visually, District 16 contains two unconnected regions separated by water. *See supra* at 2. And while "many other districts in the plan . . . comprise[] part of two

---

8    *Walen*, 700 F.Supp.3d at 765 (finding genuine dispute of fact as to racial predominance in District 4A); *Ga. State Conf.*, 2023 WL 7093025, at *10 (finding genuine dispute of fact as to racial predominance in District 10), map available at BALLOTPEDIA, https://ballotpedia.org/Georgia%27s_10th_Congressional_District; *Agee v. Benson*, No. 1:22-cv-272, 2023 WL 8826692, at *52 (W.D. Mich. Dec. 21, 2023) (finding racial predominance in House District 14), *stay denied*, 144 S.Ct. 715 (mem.).

neighboring counties," ECF 74 at 21, Rodrigues explained that District 16 does so *because of race*. Jan. 13 Tr. 25:10–12.

**D. The Florida Supreme Court's review does not defeat Plaintiffs' claim.**

Equally unpersuasive is the Senate's invocation of the Florida Supreme Court's automatic review of the Enacted Plan, which is irrelevant to the present case for two reasons. ***First***, *In re SJR 100*, 334 So.3d 1282 (Fla. 2022), was a non-adversarial facial review—without the benefit of a factual record—that assessed the validity of the redistricting plans under the Florida Constitution only. *See In re Sen. Joint Resol. of Legis. Apportionment 1176*, 83 So.3d 597, 689 (Fla. 2012) (Lewis, J., concurring) ("This Court is not structurally equipped to conduct complex and multi-faceted analyses with regard to many factual challenges to the 2012 legislative reapportionment plan. . . . [W]e can only conduct a facial review of legislative plans and consider facts properly developed and presented in our record."); *see also* Fla. Const. Art. III, § 16(c). By contrast, the present case presents an as-applied challenge under the U.S. Constitution.

***Second,*** the Senate misreads and overstates the Florida Supreme Court's ruling. The court held that the Enacted Plan had "generally improved average [compactness] scores" relative to the previous map, declined to "comment on how meaningful those improvements" were, and did not comment on the compactness of any particular district. *In re SJR 100*, 334 So.3d at 1287. The court did not opine on whether any particular district's compactness would be probative of racial predominance, whether any district was drawn predominantly based on race, or whether any district violated the U.S. Constitution.

18

### E. The Senate overstates the role of the *Arlington Heights* framework.

The Senate asserts "Plaintiffs fail the *Arlington Heights* test for circumstantial evidence of racially discriminatory intent and effect." ECF 74 at 20. But Plaintiffs raise racial-gerrymandering claims, not vote-dilution or other types of discriminatory-intent claims like the plaintiffs in *Arlington Heights*. The *Arlington Heights* framework is only necessary in vote-dilution cases, *Hunt v. Cromartie*, 526 U.S. 541, 546 n.2 (1999); *Abbott v. Perez*, 585 U.S. 579, 603–07 (2018); racial-gerrymandering claims are "analytically distinct" and require a "different analysis."[9] *Alexander*, 602 U.S. at 38 (quoting *Shaw I*, 509 U.S. at 650, 652) (clarifying that a "racial-gerrymandering claim asks whether race predominated in the drawing of a district regardless of the motivations for the use of race," but in contrast, a "plaintiff pressing a vote-dilution claim cannot prevail simply by showing that race played a predominant role in the districting process." (quotation omitted)); *cf. Common Cause Fla. v. Byrd*, 726 F.Supp.3d 1322, 1330 (N.D. Fla. 2024) ("[T]he proper legal framework to evaluate the plaintiffs' claims is set out in [] *Arlington Heights* . . . . Both sides disavow that this is a constitutional racial gerrymandering case under *Shaw v. Reno*[.]" (quotation omitted)).

Even if the Court "supplemented [its] finding" on racial predominance through the lens of *Arlington Heights*, *GRACE III*, 730 F.Supp.3d at 1256, there is ample record

---

[9]    Before *Alexander* clarified this point, some courts used the *Arlington Heights* factors as an analytical tool to evaluate circumstantial evidence or to "supplement[] [their] finding" on racial predominance. *GRACE III*, 730 F.Supp.3d at 1255–56 ("In instances where there is an absence of direct evidence that single-member districts were drawn with race as the predominant consideration, courts may determine legislative intent through an examination of the *Arlington Heights* evidentiary factors," in addition to the traditional, redistricting-specific "types of circumstantial evidence" that "strongly suggest racial predominance." (cleaned up)).

evidence showing a factual dispute under that framework. As discussed above, "the specific sequence of events leading up to [the Challenged Districts'] passage" and "the contemporary statements and actions of key legislators," *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021), include express acknowledgements of racial motivations and subordination of race-neutral criteria. The Senate faults Plaintiffs for not showing "a substantial disparate impact," ECF 74 at 20, but "[i]n the context of redistricting, the Court judges the impact of the law by examining the challenged districts' shapes and demographics." *GRACE I*, 674 F. Supp. 3d at 1209 (cleaned up, quotation omitted). This factor is amply supported by the evidence discussed above, and by McCartan's alternative plans, discussed in Part IV.

Finally, Senator Bracy's insistent probing about whether the Enacted Plan's configuration was legally necessary, and the legislative discussion of the impact on the region's communities, demonstrate the Legislature's "knowledge of that impact," which was therefore "foreseeab[le]." *Greater Birmingham Ministries*, 992 F.3d at 1322; *see supra* 3, 12; Compl. ¶¶ 88–89; Sen. Ans. ¶¶ 88–89; Ex. 12 (Feb. 2 House Tr.) 6:13–18, 6:23–7:2 (statements of Rep. Learned). Foreseeability is also supported by McCartan's plans, as well as the similar plans proposed just six years before the 2021–22 redistricting process, in 2015. Ex. 13 (Stip. re 2015 Plans) ¶¶ 1–3; Compl. ¶ 113 & fig. 4; McCartan Rep. ¶¶ 12–19 & figs. 2–4.

### III.    Both the Senate and Secretary misuse history and misunderstand its relevance to the racial predominance and narrow tailoring inquiries.

Both Defendants invoke the Protected District's history in their motions, but

20

both misunderstand how that history is relevant to both the racial predominance and narrow tailoring inquiries. The Senate's attempt to compare District 16 with its predecessor configurations fails to negate the dispute of fact in this record, for three separate reasons. *See* ECF 74 at 21–22. *First*, evidence shows the Senate revised the predecessor configurations in racially motivated ways to create District 16. Dr. Barreto testifies to how the Enacted Plan's movement of the District 16-18 border "more closely hews to the Black VAP and excludes majority-white VTDs from district 16, even though they were formerly part of this same district." Barreto Rep. ¶ 36. In other words, the Senate's 2022 changes to the Challenged Districts *exacerbated the already-existing racial division in the Benchmark Plan*. Those changes support, rather than undermine, racial predominance.

*Second*, comparing the Enacted Plan to prior configurations only makes sense if the prior configurations themselves were not race-based. If they *were* race-based, that *supports* Plaintiffs' case. *See McClure v. Jefferson Cnty. Comm'n*, No. 2:23-cv-443, 2025 WL 88404, at *17 (N.D. Ala. Jan. 10, 2025). In fact, the history does just that. Like many racially gerrymandered districts across the country, the Challenged Districts "have their genesis in the 'max-black' policy that the DOJ itself applied to § 5 [of the VRA] throughout the 1990's and early 2000's," "requir[ing] States . . . to create supermajority-black voting districts or face denial of preclearance." *ALBC I*, 575 U.S. at 296, 298 (Thomas, J., dissenting). In 1992, the DOJ denied preclearance to the Senate's redrawn map because it lacked a majority-minority district in Hillsborough County. *In re Sen. Joint Resol. 2G*, 601 So.2d 543, 545 (Fla. 1992). Following a

legislative impasse, the Florida Supreme Court redrew the map to accede to the DOJ's demand, selecting from different submissions the option with the highest Black population in the Protected District. *Id.* at 546; *see also id.* at 548 (Overton, J., dissenting) ("The [] plan . . . effectively strips Pinellas, Hillsborough, Manatee, and Polk Counties of their black population."). The district was redrawn in 1996 following a *Shaw* challenge and has remained largely the same ever since—"ossified" in its mid-'90s configuration borne of the "max-black" policy and its aftermath. ECF 74-16; *see ALBC I*, 575 U.S. at 296 (Thomas, J., dissenting); *Milligan*, 599 U.S. at 56 n.7 (recounting how the Supreme Court "rejected the 'max-black' policy as unwarranted by § 5 and inconsistent with the Constitution[,] [b]ut 'much damage to the States' congressional and legislative district maps had already been done'" (quoting *ALBC I*, 575 U.S. at 299 (Thomas, J., dissenting))).

**Third**, the Senate's comparison of the Challenged Districts to prior maps is untethered to the Legislature's actual purpose in enacting the current map. While "core preservation," or minimizing changes to districts from the prior plan, can be a race-neutral redistricting principle, *Alexander*, 602 U.S. at 7, it was *not* a criterion the Senate adopted.[10] Oct. 18 Memo; Jan. 19 Tr. 22:18–19, 23:4–9 (Rodrigues: "In the drawing of the map, we started with a blank map . . . ."); Ferrin Dep. 40:2–6 ("Q: When drawing the maps in the 2022 redistricting process, did you seek in any way to

---

[10]   Ferrin testified that he referred to the "general configuration and prevalence and performance of benchmark districts," including for the Protected District, because it informed a "situational awareness" relevant to his assessment of whether a district complied with the non-diminishment requirement. Ferrin Dep. 41:10–43:1.

preserve the cores of pre-existing districts? A: We did not measure or consider the district core retention, no."). Even if it were, a state cannot "immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Milligan*, 599 U.S. at 22; *see also Bethune-Hill v. Va. State Bd. of Elections*, 141 F.Supp.3d 505, 545 (E.D. Va. 2015) ("'That's the way we've always done it' may be a neutral response, but it is not a meaningful answer."), *aff'd in part, vacated in part*, 580 U.S. 178.

As for the Secretary—whose sole argument is that there is no genuine factual dispute that the state's use of race was narrowly tailored to comply with the non-diminishment requirement—he invokes the continuation of the Protected District's past configuration as if that shields it from scrutiny. ECF 75 at 2–3, 5–6. But the state has a duty to narrowly tailor its use of race every time it redraws a district, even when it inherits a court-ordered plan. *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1267 n.16, 1271–76 & n.24 (11th Cir. 2002) (finding racial gerrymander failed strict scrutiny even where it "preserved as much as possible" court-ordered predecessor districts, and reversing district court decision that reasoned, "just as the creation of the majority-black districts in [the] 1982 remedial order was narrowly tailored to remedy past discrimination, the maintenance of those districts in 1992 was narrowly tailored to continue that remedy and comply with the requirements of the Voting Rights Act" (cleaned up)); *see Johnson v. Mortham*, 926 F.Supp. 1460, 1492 (N.D. Fla. 1996) (finding congressional district failed strict scrutiny in racial-gerrymandering challenge to redistricting plan which had

been ordered by that same district court four years prior).[11] This is especially so since the Protected District's configuration was not a contested issue before the court that ordered the Benchmark Plan in 2015. Ex. 14, Plfs.' Withdrawal of Certain Proposed Alternative Remedial Plans, *League of Women Voters of Fla. v. Detzner* (*Benchmark Case*), No. 2012-CA-2842 (Fla. 2d Jud. Cir. Ct. Dec. 30, 2015).

## IV.   Plaintiffs' alternative plans show the Senate could have achieved its interest through dramatically less discriminatory means.

Dr. McCartan's alternative plans present less-discriminatory alternatives that employ race in a much more tailored fashion than the Enacted Plan, while still achieving the state's interest in avoiding diminishment in District 16. Barreto Rep. ¶ 9. ("[T]he three maps offered by Plaintiffs all perform nearly identically to the benchmark SD19.").[12] The contrast between McCartan's maps and the Enacted Plan is thus circumstantial evidence that race predominated the Senate's approach, *and* reveals that the Senate's use of race was not narrowly tailored. Rather than connect the region's

---

[11] *See also Ala. Legis. Black Caucus v. Alabama* (*ALBC II*), 231 F.Supp.3d 1026, 1065 (M.D. Ala. 2017) (striking down district that "maintained . . . core" of previous one); *id.* at 1085 (concluding that, notwithstanding similarities between new and prior districts, "the legislature drew new lines in 2012 that must be evaluated on their own merit"); *Navajo Nation v. San Juan Cnty.*, 162 F.Supp.3d 1162, 1177 (D. Utah 2016) (striking down district where "the overriding consideration . . . was to preserve [it] without any modification"), *aff'd*, 929 F.3d 1270 (10th Cir. 2019); *cf. Singleton v. Merrill*, 582 F.Supp. 3d 924, 1016 (N.D. Ala. 2022) (explaining in Section 2 context that core-preservation defense "would turn the law upside-down, immunizing states from liability under Section Two so long as they have a longstanding, well-established map"), *aff'd sub nom. Milligan*, 599 U.S. 1.

[12] It is unclear whether the Secretary disputes this. While his expert suggests that Plaintiffs' plans don't reverse some "erosion" in Black voting strength that the Protected District experienced from 2012–2020, ECF 75 at 12, Florida law does not require a new plan to return minority voters to the position they were in ten years prior. *See In re SJR 100*, 334 So.3d at 1289. Indeed, it makes no sense to refer to Black voters' power in Benchmark District 19 in 2012, because the Benchmark Plan did not exist in 2012—it was first implemented in 2016. Ex. 15, *Benchmark Case*, slip op. at 73; ECF 74-16 at 6. Ferrin confirmed the Senate's understanding of the law was that Black voters' ability-to-elect could not be diminished from their ability that existed in Benchmark District 19. Ferrin Dep. 62:15–19.

24

two far-flung Black population centers separated by miles of open water into a single district, McCartan's plans feature a Protected District that sits compactly on one side of Tampa Bay, wholly within Hillsborough County. Rather than split St. Petersburg and Pinellas County along racial lines, McCartan's plans eliminate the unnecessary split of Pinellas County and unite all of St. Petersburg in a compact, naturally occurring district at the southern end of the peninsula—satisfying the Senate's own race-neutral directives to, where feasible, use county boundaries, keep districts wholly within a county in more densely populated areas, and keep cites whole. Rather than carve the region along racial lines, McCartan "only consulted racial demographic data to the extent required to ensure that Black voters' ability to elect representatives of their choice was not diminished." McCartan Rep. ¶ 13; *see also* ECF 75-6 (McCartan Instructions) at 1. Rather than picking major roads that tracked a desired racial division of St. Petersburg, or connecting Tampa and St. Petersburg Black communities by tracking the highways that lie between them, McCartan followed and respected major boundaries irrespective of race. [13] He did not form the districts "by racial

---

[13]   The Secretary applauds the Enacted Plan for how well it scores under the "boundary analysis score," a metric the Legislature developed which measures the percentage of a district's boundary that tracks certain categories of boundaries incorporated into the Legislature's software: city and county lines, major roads, railways, and water bodies. McCartan Rep. ¶ 29; Ferrin Dep. 31:11–20, 32:2–11. But the manipulation of that technical score is belied by visually assessing the districts. As McCartan discusses and Barreto suggests, the Senate strung the Tampa and St. Pete Black populations together by following highways that lie between them. McCartan Rep. ¶ 31; Barreto Rep. ¶¶ 32–35, 37, 39–43. In fact, the portion of District 16 that crosses Tampa Bay and breaches the Pinellas-Hillsborough County line counterintuitively boosts the "boundary analysis score," since *any* part of the district line that overlaps with *any* part of Tampa Bay is counted as "utilizing" a major waterway. The Senate cannot get credit for following these boundaries in service of race-based goals. *Cf. Benchmark Case*, slip op. at 7–8 (explaining deficiencies of similar boundary metric used in prior cycle and finding "the Legislature's internally calculated 'Pol/Geo' index is of limited use as a reliable way of measuring

demographics" but rather made "holistic decisions" "to balance the requirements within each tier while avoiding diminishing [] black voters' ability to elect their representatives of choice." McCartan Rep. ¶¶ 15–17, 31; ECF 75-9 (McCartan Dep.) 52:8–12, 53:13–16; *cf. Milligan*, 599 U.S. at 31 (praising plaintiffs' mapmaker who testified that while race "was a consideration," "he also took several other factors into account, such as compactness, contiguity, and population equality," and "gave all these factors 'equal weighting'").

These differences between McCartan's plans and the Enacted Plan underscore why the former is less discriminatory in their impact on the region's voters. While McCartan's plans do "reflect a similar racial composition in District 16," ECF 74 at 20–21, that is not surprising, since the point of the Tier One non-retrogression standard is to ensure that Black voters retain the ability to elect preferred candidates that they enjoyed in the Benchmark Plan. Nor does this fact undermine the case for racial predominance in the Senate's drawing of *its* map, as the Senate argues. The Southern District recently found a similar argument "unavailing." *GRACE, Inc. v. City of Miami* (*GRACE II*), 702 F.Supp.3d 1263, 1278 (S.D. Fla. 2023) ("Defendant's assertion that the districts are not racially gerrymandered because they reflect the demographic reality of the city is inapposite."); *see also Perez v. Texas*, slip op. at 1–2, No. 5:11-cv-360

---

tier-two compliance.")

    Even if the Court takes the Secretary's view that Plaintiffs' maps are somehow deficient, "the lack of a workable alternative is not dispositive," and the Court "do[es] not need to see an alternative plan to conclude that a district fails strict scrutiny" in every instance. *ALBC II*, 231 F.Supp.3d at 1063 (putting "no weight on the argument of Alabama that its plans satisfy strict scrutiny because the plaintiffs have not offered any alternative plans that comply with the Committee guidelines").

(W.D. Tex. May 28, 2019), ECF No. 1631 (ordering remedy that "eliminates the changes that led this Court to find racial gerrymandering" despite "maintain[ing] [the district's] majority [Hispanic] status").

Further, the overall racial composition of McCartan's districts *do* differ from the Enacted Plan in one significant respect: Uniting all of St. Petersburg in District 18 doubles its Black population, a fact the Senate ignores. *Compare* ECF 74-19 at 3 (Enacted District 18 at 6.40% BVAP) *with* McCartan Rep. at 35, 39, 43 (12.63% BVAP in McCartan's plans); *cf. Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville III*), No. 3:22-cv-493, 2022 WL 17751416, at *2, *20 (M.D. Fla. Dec. 19, 2022) (summarizing earlier order finding racial gerrymandering in predominantly Black protected districts resulted in "stripping" Black voters from surrounding districts, even where the court-ordered remedy did not yield an additional Black-performing seat), *stay denied*, No. 22-14260, 2023 WL 119425 (11th Cir. Jan. 6, 2023).

## V.     There is a genuine factual dispute as to narrow tailoring.

Although the strict scrutiny standard gives legislatures "breathing room," *Cooper*, 581 U.S. at 293 (quoting *Bethune-Hill*, 580 U.S. at 196), when drawing race-based district lines to comply with the VRA or a parallel state law,[14] it affords only a "limited degree of leeway," *Bush v. Vera*, 517 U.S. 952, 977 (1996). To satisfy narrow tailoring, the state must still show "that it had 'a strong basis in evidence' for

---

[14]   Plaintiffs agree with the Secretary (at this stage) that the tailoring analysis is the same whether the compelling interest is compliance with the Voting Rights Act or the non-diminishment mandate in Tier One of Florida's Fair Districts Amendments. The Court can therefore read references to the VRA in the authority cited here to encompass Florida's non-diminishment requirement, too.

concluding that the statute required its action"—*i.e.*, "'good reasons' to think that it would transgress the Act if it did not draw race-based district lines." *Cooper*, 581 U.S. at 292–93 (quoting *ALBC I* at 1274). This requires "evidence or analysis supporting [the] claim that the VRA required" the race-based measures, "much more" than "uncritical" assumptions and "generalizations." *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 403–04 (2022) (per curiam).

The Enacted Plan suffers from similar flaws as the map the Supreme Court rejected in *Wisconsin Legislature*. As detailed in Part IV, the Senate could have achieved its compelling interest in complying with Tier One's non-diminishment standard without subordinating traditional race-neutral redistricting criteria to the extent that it did. But did the Senate at least have "good reasons for thinking [Tier One *demanded* such steps"? *Wis. Legislature*, 595 U.S. at 403–04 (emphasis in original) (quoting *Cooper*, 581 U.S. at 301). Subcommittee Chair Sen. Burgess and Staff Director Ferrin asserted two reasons why crossing the Bay was necessary to comply with the law. Both explanations fail to clear the "limited degree" of leeway the Constitution affords. *ALBC II*, 231 F.Supp.3d at 1063 (quoting *Bush*, 517 U.S. at 977).

***First***, Ferrin explained drawing a Hillsborough-only district "could" require drawing "a fairly spidery, non-compact configuration." Jan. 10 Tr. 7:22–23; Ferrin Dep. 116:21–25. This justification is belied by Plaintiffs' alternative plans, which feature no "spidery, non-compact" shape, yet avoid diminishment. Contrary to Burgess's representation to Bracy that "staff did look at [] options" that didn't cross

the Bay, Jan. 10 Tr. 7:16, Ferrin testified at his deposition that he didn't actually draw any Hillsborough-only options, performed no actual functional analysis of a Hillsborough-only district, and based his conclusions on only his "estimation" of "the hypothetical" district he imagined *might* have to be drawn, which he thought "might need" "tentacles and appendages." Ferrin Dep. 105:11–12, :25, 107:3–6, 108:22, 109:8–9, :17–21, 111:20–112:4; *cf. Bethune-Hill*, 580 U.S. at 194–95 (finding proper tailoring where "*informed* bipartisan consensus" relied on "careful assessment of local conditions and structures," including "functional analysis" of proposed district (emphasis added)). Thus, "[r]ather than carefully evaluating evidence at the district level, the [state] improperly relied on generalizations" to reach its conclusion, exactly what *Wisconsin Legislature* forbids. 595 U.S. at 404. Such speculation is far from a "strong showing of a pre-enactment analysis with justifiable conclusions." *Abbott*, 585 U.S. at 621.

***Second***, Burgess and Ferrin were concerned about the "potential" that drawing a Hillsborough-only Protected District would diminish the ability of *Pinellas* Black voters, which (they reckoned) "could" violate Tier One, because Pinellas residents "may feel as though their opportunity was diminished if they were taken out of" the district. Jan. 10 Tr. 7:16–18, 8:1–4; Ferrin Dep. 105:4–5, :13–15, :25–106:4, 113:7–18. According to Ferrin, that "could provide them an opportunity to challenge this configuration under the non-diminishment standard," even if the redrawn Hillsborough-only Protected District still performed for Black voters. Ferrin Dep. 117:5–11. For one, those tentative suppositions are not enough to justify the use of

29

race-based districts. *See Wis. Legislature*, 595 U.S. at 403–04 (holding that it is not enough to "conclude only that the VRA *might* support race based districting;" the state must have "'good reasons' for thinking that the Act *demanded* such steps").

For another, the Senate's supposition lacked any "basis in evidence," much less a strong one. It came to that conclusion despite never seeking to find out whether this actually *would* constitute diminishment, Ferrin Depo. 113:25–114:6. Despite the Florida Supreme Court *rejecting* this county-by-county theory of diminishment.[15] Despite the Senate itself agreeing to remove portions of counties from protected districts in the 2015 redistricting process—including removing the Protected District's Manatee County portion. McCartan Rep. ¶¶ 40–41, 46–47, figs. 8, 11; Ex. 16, Jt. Stip. Regarding Minority Districts ¶ 1, *Benchmark Case* (Senate's stipulation that none of the plaintiffs' proposals violated the non-diminishment standard, besides one Broward County district and three Hispanic-majority districts in Miami-Dade); *Benchmark Case*, slip op. at 26, 30 (describing those districts). Despite the court respecting those choices in the map it ordered (the Benchmark Plan). ECF 74-16 at 6. Despite the Florida

---

[15]    After the non-diminishment requirement first came into effect, the Florida Supreme Court rejected the Senate's defense that Tier Two deficiencies in its proposed map were necessary to comply with Tier One's retrogression mandate, concluding the Senate "did not properly consider when tier-two requirements must yield in order to avoid conflict with Florida's minority voting protection provision." *Apportionment I*, 83 So.3d at 656–57. In particular, the court found two Tier-One districts protected for Black voters "violate[] constitutional mandates by sacrificing compactness and utilizing boundaries when not necessary to do so to avoid conflict with the minority voting protection provision." *Id.* at 665, 675–76 (Northeast Florida's SD 6 and SD 34 in Broward-Palm Beach). Both districts combined predominantly Black portions of different counties, like their benchmark predecessors. *Id.* at 665–66, 673–74. The Senate redrew both to be contained within a single county. *In re Sen. Joint Resol. of Legis. Apportionment 2-B* (*Apportionment II*), 89 So.3d 872, 882, 887 (Fla. 2012); McCartan Rep. ¶¶ 42–43, 48–49, figs. 9, 12. The court declared both districts valid and rejected a challenge that one of them diminished Black voters' ability-to-elect—despite that it shed counties from the protected benchmark. *Apportionment II*, 89 So.3d at 883, 891.

Supreme Court doing the same when it ordered a new congressional map the same year. McCartan Rep. ¶¶ 50–51 & fig. 13 (regarding a protected district in Broward-Palm Beach); *League of Women Voters of Fla. v. Detzner* (*Apportionment VIII*), 179 So.3d 258, 290 (Fla. 2015) (same). And despite the Senate recognizing the diminishment standard didn't operate on a county-by-county basis. Ferrin Dep. 114:7–22.

So, the Senate's decision to draw the Protected Districts was based on an interpretation of the non-diminishment standard that Florida courts previously "rejected" and thus "fell short of [judicial] standards." *Wis. Legislature*, 595 U.S. at 403–04; *cf. Miller*, 515 U.S. at 921 (rejecting redistricting plan since it "was not required by the Act under a correct reading of the statute"). The record does not even establish that the Senate thought the law "*might* support" its race-based districting measures, which would be insufficient to clear strict scrutiny in any event. *Wis. Legislature*, 595 U.S. at 403–04. Narrow tailoring requires more. *See Clark*, 293 F.3d at 1278 (finding racial gerrymander "not narrowly tailored to serve a compelling state interest because it went well beyond what is necessary to avoid retrogression"). The Secretary fails to meet his burden.[16]

---

[16] Though not quite formulated as an argument, the Secretary asserts that Plaintiffs' proffered maps "give the Democrats one extra seat in the region." ECF 75 at 20. If he is trying to criticize Plaintiffs for "failing to produce . . . an alternative map showing that a rational legislature sincerely driven by its professed partisan goals would have drawn a different map with greater racial balance," *Alexander*, 602 U.S. at 10, there's a big problem: the Legislature had no partisan goals. Sen. RFAs ¶¶ 7–12; Ferrin Dep. 39:17–40:1. If the Secretary is instead accusing McCartan of drawing his plans to favor Democrats, in violation of Florida's partisan gerrymandering ban, that accusation is contradicted by McCartan's testimony. McCartan Dep. 32:20–33:8, 35:12–36:5; *see also* McCartan Rep. ¶¶ 12–13; McCartan Instructions.

### VI.    Plaintiffs have standing to challenge both Districts 16 and 18.

The Senate argues that two Supreme Court cases on *standing* defeat any potential racial-gerrymandering claim against District 18. ECF 74 at 11–14. But the Senate confuses the issues by conflating standing with the merits. *United States v. Hays*, 515 U.S. 737 (1995), and *Sinkfield v. Kelley*, 531 U.S. 28 (2000) (per curiam), stand only for the rule that a person cannot demonstrate injury-in-fact to challenge a district in which they do not live without showing personal harm from the racial classification in that district. *See Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1331 n.3 (11th Cir. 2007) (summarizing *Hays*'s "bright-line standing rule": "if the plaintiff lives in the racially gerrymandered district, she has standing; if she does not, she must produce specific evidence of harm other than the fact that the composition of her district might have been different were it not for the gerrymandering of the other district"). As argued in Part II above, Plaintiffs have shown genuine disputes that both districts are racially gerrymandered, not merely that District 18 is impacted by gerrymandering in District 16. In any event, Plaintiffs Azis and Garcia, who live in District 18, should not be dismissed because they have shown personal injury from a racial classification and because other plaintiffs in the case have standing.

In *Hays*, the Louisiana legislature enacted a new map during the litigation, which moved the challenged majority-minority district to different region of the state. 514 U.S. at 741–42. The *Hays* plaintiffs were left with a generalized grievance no different from any other Louisiana resident who lived outside the challenged district. *Id.* at 745. *Sinkfield* likewise rejected the standing of residents of majority-white

32

legislative districts in Alabama to challenge the impact of neighboring majority-minority districts on their own districts, without any evidence of particular harm they suffered or predominance of race in drawing their own districts. 531 U.S. at 30. In both cases, there was no question that Plaintiffs, despite their representations, were challenging districts in which they did not live.

That is not the case here. Contrary to the Senate's assertions, Plaintiffs do allege that District 18 has been directly gerrymandered. Compl. ¶¶ 11 ("[T]he Legislature sacrificed genuine communities of interest, unnecessarily dividing St. Petersburg and Pinellas County . . . ."), 12 ("[T]he Legislature's racial gerrymandering unjustifiably packed Black voters into District 16, stripping them from adjacent District 18 and reducing their influence there."), 101 ("In Pinellas County, for example, the district border deviates from highways like I-275 and US-19 to accomplish racial separation. The border instead follows local streets such as 13th Avenue North and a zig-zag of lanes in the Broadwater neighborhood to separate more- from less-Black areas."). Plaintiffs developed direct evidence to support these allegations, as argued above in Part II. And Plaintiffs' expert Dr. Barreto showed through demographic analysis of the District 18 boundary with District 16 that it was highly likely to have been drawn based on race. Barreto Rep. ¶¶ 10, 30–43. This is not a case where one district is merely impacted by racial gerrymandering in another. *See Jacksonville I*, 635 F.Supp.3d at 1239, 1296 (enjoining as racial gerrymanders majority-white districts adjacent to predominantly Black districts drawn to protect minority representation).

Even if the Court grants summary judgment as to Plaintiffs' District 18

challenge, it should not dismiss Plaintiffs Azis and Garcia from the case. *First*, they have shown the personal injury from a racial classification that plaintiffs in *Hays* and *Sinkfield* failed to do. Plaintiffs Azis and Garcia each live in St. Petersburg in District 18, very close to the district boundary; Plaintiff Garcia lives literally across the street from District 16. Ex. 17 (map showing district border and residences); Azis RFAs ¶¶ 1, 4; Garcia RFAs ¶¶ 1, 6. They testified extensively in deposition that they are harmed because the racial division between Districts 16 and 18 splits historic neighborhoods and places adjacent parts of St. Petersburg into racially segregated districts. Azis Dep. 17:9–18:16, 24:12–29:23, 30:23–32:20, 34:6–35:3, 36:17–37:5, 40:21–43:7; Ex. 18 (Garcia Dep.) 15:25–17:8, 22:15–23:18, 26:13–31:12, 36:12–37:16, 39:20–40:6, 49:20–50:23. Both are personally harmed in a way not generally true for all residents of District 18. *Cf. Walker v. City of Mesquite*, 169 F.3d 973, 979 (5th Cir. 1999) ("When a homeowner's neighborhood adjoins a proposed public housing project whose site was determined by a race-conscious standard, he has standing to sue because of the explicit racial classification.").

*Second*, the court need not decide if Plaintiffs Azis and Garcia have standing on their own to challenge District 16 because Plaintiffs El-Amin, Nord Hodges, and Seymour live in District 16, and nobody disputes their standing. Under the one-plaintiff standing rule, that is enough. *Arlington Heights*, 429 U.S. at 264 n.9 ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."); *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195–96 (11th Cir. 2009). The plaintiffs in *Hays*

34

and *Sinkfield* could not rely on this rule because every plaintiff in those cases lived outside the allegedly gerrymandered districts. There is no basis to dismiss Plaintiffs Azis and Garcia.

## CONCLUSION

Neither Defendant has met their summary judgment burden. The Court should deny their motions.

Respectfully submitted January 23, 2025,

 */s/ Caroline A. McNamara*

Nicholas L.V. Warren (FBN 1019018)
Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
dtilley@aclufl.org
cmcnamara@aclufl.org

James Michael Shaw, Jr. (FBN 677851)
Naomi Robertson (FBN 1032076)
**Butler Weihmuller Katz Craig LLP**
400 North Ashley Drive, Suite 2300
Tampa, FL 33602
(813) 281-1900
jshaw@butler.legal
nrobertson@butler.legal

Deborah N. Archer*
David Chen*
**Civil Rights & Racial Justice Clinic**
**Washington Square Legal Services, Inc.**
245 Sullivan Street
New York, NY 10012
(212) 998-6473
deborah.archer@nyu.edu
davidchen@nyu.edu

* *Special admission*

*Counsel for Plaintiffs*