Page 1

```
_____

Common Cause, et al.          )
                              )
v.                            )  4:22-cv-109
                              )
Cord Byrd                     )
_____)
```

TRANSCRIPTION OF AUDIO FILE

Senate Committee on Reapportionment

The Florida Channel

September 20, 2021

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

HT_0006078

P-000055

9/20/2021                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 2

1              (Beginning of Video Recording.)

2              CHAIR RODRIGUES:  Senate Committee on

3       Reapportionment will now come to the order.

4       Dana, please call the roll.

5              MS. IVEY:  Chair Rodrigues.

6              CHAIR RODRIGUES:  Here.

7              MS. IVEY:  Vice Chair Broxson.

8              MR. BROXSON:  Here.

9              MS. IVEY:  Senator Bean.

10             MR. BEAN:  Here.

11             MS. IVEY:  Senator Bracy.

12             MR. BRACY:  Here.

13             MS. IVEY:  Senator Bradley.

14             MS. BRADLEY:  Here.

15             MS. IVEY:  Senator Burgess.

16             MR. BURGESS:  Here.

17             MS. IVEY:  Senator Gibson.

18             MS. GIBSON:  Here.

19             MS. IVEY:  Senator Harrell.

20             MS. HARRELL:  Here.

21             MS. IVEY:  Senator Rodriquez.

22             MS. RODRIQUEZ:  Here.

23             MS. IVEY:  Senator Rouson.

24             MR. ROUSON:  Here.

25             MS. IVEY:  Senator Stargel.

HT_0006079
P-000056

9/20/2021                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 3

1              MS. STARGEL:  Here.

2              MS. IVEY:  Senator Stewart.

3              MS. STEWART:  Here.

4              MS. IVEY:  The quorum is present, Mr.

5       Chair.

6              CHAIR RODRIGUES:  Thank you.  And let

7       the record show that Senator Bracy is excused

8       from today's meeting.  Before we begin, please

9       silence your cellphones and all electronic

10      devices so that those don't go off during the

11      meeting.

12              And let me begin by saying, this is the

13      first time the senate committee has met with

14      an audience since the conclusion of the 2020

15      session.  And I, for one, am happy to see you

16      back.  Welcome back to the Florida State

17      Senate.  With that, I'll start with --

18              (Applause)

19              CHAIR RODRIGUES:  Thank you, President.

20              Start with the observation that COVID-

21      19 precautions, where applicable, are being

22      taken.  Anyone wishing to testify before the

23      committee must fill out an appearance card and

24      hand it to a member of the sergeant's office.

25      Should you waive your speaking time, your

HT_0006080
P-000057

9/20/2021                 Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 4

1      position will be read into the record.

2            Since this is our first meeting, I'd

3      like to start with the first agenda item and

4      introduce our committee staff.  Then I'd like

5      to go to the members of our committee for them

6      to introduce themselves and say a few words,

7      if they would like.

8            So with our staff, I'll start with

9      staff director, who is sitting on my left,

10     your right, Jay Ferrin.  And then on my right,

11     your left, is Jason Rojas, who is our special

12     counsel to our committee.  Danna Ivey -- wave,

13     Dana -- is our committee administrative

14     assistant.

15           Yin Li (phonetic) -- wave, Yin -- and

16     Justin Icromueler (phonetic) are our policy

17     analysts.  And Megan Magnole is our committee

18     legislative research assistant.  And that is

19     our staff.  We are blessed that Jay and Jason

20     have some experience in redistricting, and so

21     we're going to learn from their experience,

22     and their wisdom will help guide us on this

23     process.

24           Now let's move over to our members and

25     have our members introduce themselves.  I'd

HT_0006081

P-000058

Page 5

1    like to start with President Bean at the end

2    and work our way down the row, if we could do

3    so.

4         MR. BEAN:  Mr. Chairman, thank you so

5    much.  I was trying not to make eye contact

6    with you so you would start on the other end,

7    but we did, and so I am pleased to start by

8    introducing myself.  It's Aaron Bean.  I

9    represent Jacksonville.  It's good to see you

10   all, and it's good to see you in audience.  It

11   is an historic day, and we are excited to have

12   you back and looking forward to working with

13   you in the chair -- the Chair and the

14   committee, Mr. Chairman.

15        MR. ROUSON:  Good afternoon.  Thank

16   you, Mr. Chairman, for this opportunity.  I'm

17   Darryl Rouson, representing District 19,

18   portions of Hillsborough and Pinellas

19   Counties.  Very proud to be here, very happy

20   to be here and be a part of this committee and

21   the whole reapportionment/redistricting

22   process.

23        Some of you know I served on

24   redistricting in 2010 when we traveled the

25   state to make sure that we got input of

HT_0006082
P-000059

9/20/2021                 Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 6

1      citizens, residents, and voters.  I look

2      forward to working with the staff to develop

3      constitutional maps that are fair to

4      everybody.  Thank you.

5           MS. STEWART:  Good afternoon.  I'm

6      Senator Linda Stewart.  I'm from Orlando,

7      Orange County, and I am pleased to have been

8      chosen to serve on this very notable

9      committee.  I know that we all are going to

10     strive to make it a fair and open process.

11     And I know everyone here is interested in

12     making sure that happens.

13          I did, too, also serve on a

14     redistricting committee when I was in the

15     County Commission.  It's a very tough job.

16     It's not something that is particularly easy.

17     But you can in the end come to a resolution

18     that everybody could be pleased with, and I'm

19     hoping that will happen with this committee.

20     So thanks -- thank you very much.

21          Thank you, Mr. Chair, and good

22     afternoon to everyone and all of my Senate

23     colleagues.  It's exciting to see you back for

24     committees.  And this is not my first -- how

25     should I say -- redistricting, and so I'm

HT_0006083
P-000060

Page 7

1    excited to be a part of this committee again

2    this year and certainly glad to see that Jay

3    is our leading staff.  I burned the carpet ten

4    years ago going back and forth to his office.

5    So I'm looking forward to -- hopefully, I

6    won't have to do it as much.

7         Looking forward, of course, to our

8    constitutional duty, certainly, on behalf of

9    the citizens of the State of Florida in terms

10    of reapportionment and using that data which

11    has phenomenally increased our population and

12    certainly gives us the opportunity.

13         And I expect that we will do the right

14    thing on behalf of the people of State of

15    Florida and their representation.  And I'm

16    ready to rock and roll.  Thank you, Mr. Chair.

17         MR. BROXSON:  Mr. Chair, Doug Broxson

18    in District 1.  And frankly, when I heard you

19    were appointed to be chair, my heart jumped

20    because I think all the members on both sides

21    of the aisle saw your performance over the

22    last couple years, how fair and deliberate and

23    how you invest in every issue.  And I think

24    you positioned yourself to deliver very

25    deliberate constitutional maps.

HT_0006084
P-000061

Page 8

1           I would have to say, being from

2      District 1 that my district was part of the

3      first redistricting in which there were two

4      counties, St. Johns and Escambia, so we've got

5      a little bit more work to do than then, but

6      I'm looking forward to your leadership, sir,

7      and serving under you is an honor.

8           CHAIR RODRIGUES:  Thank you.  I'm Ray

9      Rodrigues.  I represent District 27 in the

10     Florida State Senate, which is Lee County in

11     southwest Florida.  I'm excited for this

12     opportunity.

13           Thank you very much, Mr. Chair, and

14     happy -- happy Monday, everybody.  It's good

15     to be back in the capital and see all your

16     smiling faces.  Nobody better could have been

17     picked to lead this once-in-a-decade process,

18     Chairman Rodriques, and very excited to have

19     the honor and the massive responsibility to be

20     able to endeavor on this with you.  Thank you.

21           MS. RODRIGUEZ:  Good afternoon, Mr.

22     Chairman, and thank you for having me on this

23     committee.  My name is Ana Marie Rodriguez,

24     and I'm the state senator for District 39,

25     which includes portions of West Miami-Dade

HT_0006085
P-000062

9/20/2021                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 9

1    County and all of Monroe County, so it is the

2    southern-most district in the State of Florida

3    and in the United States, and it's an honor to

4    be here on this committee.  Thank you.

5         MS. HARRELL:  Thank you very much, Mr.

6    Chairman.  I'm Senator Gayle Harrell.  I

7    represent District 25, which is Martin, St.

8    Lucie, and parts of Palm Beach County.  And I

9    am so delighted to be on this

10   redistricting/reapportionment committee.  This

11   is my third time around redistricting.  Maybe

12   Senator Bean and I share that, whether you

13   were here in 2010, I don't remember.

14        But we -- this is the third time

15   around.  I am excited to be a part of this

16   amazing committee and the wonderful people on

17   it.

18        This will be a very fair, open process.

19   I have every confidence that we will come up

20   with constitutional maps that meet every

21   requirement we have under Fair Districts, and

22   I have full confidence in the committee and

23   our wonderful staff.  And I look forward to

24   working with you, Mr. Chairman, and our

25   various vice chairs and subcommittee chairs to

HT_0006086
P-000063

Page 10

```
 1      make this the best ever.  Thank you.
 2           MS. BRADLEY:  Thank you, Mr. Chairman.
 3      My name is Jennifer Bradley.  I am the state
 4      senator for District 5, which is -- includes
 5      11 rural counties across north Florida calling
 6      Clay County home.  It is a tremendous honor to
 7      be a part of this committee.  It is, as
 8      Senator Burgess said, it's a once-in-a-decade
 9      process, and it's constitutionally required,
10      and it's a weighty responsibility that we take
11      on.  And it's one that we take very, very
12      seriously.  And I just couldn't think of a
13      better group to be thoughtful and to be led by
14      just very capable staff.  And I look forward
15      to a great process with great dialogue and
16      input, so look forward to it.  Thank you.
17           MS. STARGEL:  Good afternoon.  I'm
18      Kelli Stargel.  I represent District 22, which
19      is North Polk/South Lake County.  Also had the
20      honor of serving on the redistricting
21      committee back in 2010.  Looking forward to
22      the process this time, looking forward to your
23      leadership, Chairman, and -- and so let's get
24      to work.
25           CHAIR RODRIGUES:  Thank you, members,
```

HT_0006087
P-000064

9/20/2021              Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 11

```
 1      and since they were too humble to say so, I
 2      will say this: Senator Bradley will be
 3      chairing our Select Subcommittee on
 4      Congressional Reapportionment, and Senator
 5      Burgess will be chairing our Select
 6      Subcommittee on Legislative Reapportionment.
 7      And I look forward to working with both of
 8      you.  And I am very excited for the makeup of
 9      this committee.
10          I think the President has done a
11      tremendous job of ensuring that the entire
12      state has representation.  If you look, we've
13      got representation from northwest Florida,
14      northeast Florida, southeast Florida,
15      southwest Florida, I-4 Corridor, and the
16      heartland of Florida.
17          We've got urban districts represented;
18      we've got rural districts represented.  I
19      really feel like if you take the cross section
20      of Florida, the President's done a good job of
21      putting together a committee that represents
22      citizens in every one of those sections.
23          So the job in front of us is going to
24      be a tremendous one, and before we begin, I'd
25      like to just take a moment and talk about the
```

HT_0006088
P-000065

Page 12

```
 1    task that we are going to be embarking on.  As
 2    senators appointed to this committee, we have
 3    the responsibility of guiding our chamber
 4    through the process of fulfilling our
 5    constitutional obligation to redraw
 6    legislative and congressional district
 7    boundaries.
 8         The last time the legislature embarked
 9    on this task, it was the first time since the
10    adoption of the amendments governing the
11    standards for redrawing of legislative and
12    congressional districts, which have since been
13    codified in Article III, Sections 20 and 21 of
14    the Florida Constitution.
15         Those that came before us did not have
16    the benefit of how the Florida Supreme Court
17    would interpret those standards or a true
18    understanding of the role the judiciary would
19    play.  Some hard lessons were learned through
20    that previous cycle, and I believe we will
21    learn from those lessons.
22         The Florida Supreme Court's
23    interpretation of the then brand-new
24    amendments fundamentally altered the way we do
25    redistricting here in the State of Florida.
```

HT_0006089

P-000066

Page 13

 1    The Court relied on geometric compactness,

 2    consistent use of political and geographic

 3    boundaries, equal population, and functional

 4    analysis of minority districts to serve as

 5    objective indicators of intent when reviewing

 6    a plan or district.  The Court summarily

 7    rejected the use of subjective principles,

 8    such as communities of interest, partisan

 9    favoritism, partisan proportionality, and

10    incumbent protection.

11         The Court, also, expanded the role of

12    the judiciary in the redistricting process.

13    The Court limited legislative privilege to

14    allow for the deposition of sitting

15    legislators and compelled evidence and

16    testimony from nonparty political consultants

17    not directly involved in the legislative

18    decision-making process.

19         Ultimately, after considering both

20    direct and circumstantial evidence obtained

21    through discovery and depositions of

22    legislators, staff, and nonparty political

23    consultants, the State Supreme Court of

24    Florida ruled that the legislatures, senate,

25    and congressional plans had been drawn with

HT_0006090

P-000067

Page 14

1       improper intent.

2              The concurred with a trial court's

3       finding, and I'm quoting from the trial court

4       in the Apportionment 7 decision when it wrote,

5       "Political consultants or operatives did, in

6       fact, conspire to manipulate and influence the

7       redistricting process.  They accomplished this

8       by writing scripts and organizing groups of

9       people to attend public hearings to advocate

10      for adoption of certain component or

11      characteristics in the maps and by submitting

12      maps, impartial maps, through the public

13      process.  They made a mockery of the

14      legislature's proclaimed transparent and open

15      process of redistricting by doing all of this

16      in the shadow of that process."

17             After finding the plans to have been

18      drawn with unconstitutional and improper

19      intent, the Court flipped the burden of proof.

20      Legislative deference was lost, and the

21      presumption of constitutionality of the

22      legislature's redistricting plans was gone.

23             Fortunately, we now have the insight

24      into both the judiciary's expanded scope of

25      review and how courts have interpreted and

HT_0006091

P-000068

Page 15

1    applied the constitutional standards related

2    to redistricting.

3            I intend for this committee to conduct

4    the process in a manner that is consistent

5    with case law that developed during the last

6    decade is beyond reproach and free from any

7    hint of constitutional -- excuse me -- free

8    from any hint of unconstitutional intent.  I

9    agree with the Florida Supreme Court when it

10   said, "Legislative apportionment is primarily

11   a matter for legislative consideration and

12   determination."

13           The Court has indicated that it will

14   defer to the legislature's decision to draw a

15   district in a certain way, so long as that

16   decision does not violate the constitutional

17   requirements, and it is my intention to

18   strictly adhere to the constitutional

19   requirements so that our legislative

20   discretion is preserved.

21           When we've talked about the issues of

22   communication and record retention, it is

23   important moving forward that all senators

24   should be aware that in prior redistricting

25   cycles, significant litigation has followed

Page 16

1    passage of new maps.  Sitting legislators may

2    be compelled to produced records or to be

3    subject to questioning under oath about

4    conversations with colleagues, about

5    conversations with legislative staff, or with

6    outside parties who may attempt to persuade

7    the legislature to pass maps or disfavor --

8    that favor or disfavor a political party or an

9    incumbent.

10        Senators should take care to insulate

11    themselves from interests that may

12    intentionally or unintentionally attempt to

13    inappropriately influence the redistricting

14    process.  Senators should continue to adhere

15    to the Records Retention Policy as directed by

16    Article I, Section 24 of the Florida

17    Constitution, Section 11.0431 of the Florida

18    Statutes, and Senate Rule 1.48.

19        Senators and staff should, also, be

20    mindful that correspondence, emails, texts,

21    and other electronic communications related to

22    the enactment of new districts, whether sent

23    or received, on official senate accounts or

24    devices or personal email accounts or devices,

25    may be a permanent or archival value, and

HT_0006093
P-000070

Page 17

```
 1      those records should be preserved accordingly.

 2             If you have questions about record

 3      retention, I encourage you to contact our

 4      Senator General Counsel for guidance.

 5             As we move forward, we're going to look

 6      at what the approach to this process will be.

 7      While remaining to committed to having an

 8      open, transparent, and interactive process, we

 9      are taking steps to safeguard against the kind

10      of shadow process that occurred in the last

11      cycle.  We will protect our process against

12      the astroturfing that occurred in the past

13      where partisan, political operatives from both

14      parties wrote scripts and recruited speakers

15      to advocate for certain plans or district

16      configurations to create a false impression of

17      a wide-spread grassroots movement.

18             Anyone testifying before our committee

19      or select subcommittees must disclose certain

20      information.  In addition to stating whether

21      or not they are a registered lobbyist,

22      speakers must disclosed whether or not they

23      received compensation or anything of value --

24      travels, meals, lodgings, et cetera -- as part

25      of or exchange for their testimony.  This
```

HT_0006094
P-000071

Page 18

```
 1      policy is being adopted senate-wide in the

 2      form of revised appearance cards.

 3            To prevent secretive submissions by

 4      partisan operatives, we are requiring publicly

 5      submitted written comments, suggestions, and

 6      maps with a signed form.  This form must

 7      contain the identity of the submitter.

 8      Submitters must state whether or not they have

 9      received any compensation or anything of value

10      from any groups or organizations that have an

11      interest in redistricting as part of or in

12      exchange for their comments, suggestions, or

13      map.

14            Submitter must list every person,

15      group, or organization they have collaborated

16      with on their comment, suggestion, or map.

17      And finally, submitters must acknowledge that

18      their communications and submissions may be

19      included, reviewed, and examined in all steps

20      of the legislative process until and even

21      after new district maps are enacted into law.

22            Additionally, our staff will not review

23      or consider publicly submitted comments,

24      suggestions, or maps for inclusion in their

25      work product unless and until a senator asks
```

HT_0006095

P-000072

9/20/2021                Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 19

1      them to do so in writing.  Publicly submitted

2      maps will be available on the joint website

3      the Senate is doing with the House,

4      www.floridaredistricting.gov, for members to

5      review.

6            Any member who requests staff to review

7      and consider such a submission should be

8      prepared to appear before a committee or its

9      select subcommittees and explain their

10     intentions for doing so.  This is consistent

11     with all other aspects of our legislative

12     process and is akin to advocating for

13     inclusion of a policy in a proposed committee

14     bill.

15           My encouragement to each of you as

16     committee members is to make yourself

17     accessible to the public who wishes to have

18     their maps considered so that you meet with

19     them, listen to them, and give them that

20     access.

21           Are there any questions before we

22     proceed to the presentations on our agenda?

23     Senator Gibson, you're recognized.

24           MS. GIBSON:  Thank you, Mr. Chair.

25     During the last redistricting cycle, there was

HT_0006096
P-000073

Page 20

```
1      a particular email address that we used to

2      send any emails or -- that we received related

3      to redistricting.  There was this one

4      depository for forwarding those emails.  Is

5      that -- will that be the case this time, or --

6      can you clarify how such emails get sent?

7      Clarify, please.  Sorry.

8           CHAIR RODRIGUES:  And thank you for the

9      question.  That is a good question.  What we

10     have had staff do is prepare a response that

11     can be given to those who contact us directly

12     on the subject of redistricting.  The response

13     will direct the contactor to the

14     www.floridaredistricting.gov website and ask

15     them to place their idea onto that website.

16          That website will serve as the official

17     repository of all our redistricting data.

18     What I have done as an individual senator is

19     created a redistricting file, and each person

20     who contacts me gets that response, and then

21     their email goes into my redistricting file so

22     that it is archived and available in the

23     future.

24          MS. GIBSON:  Thank you.

25          CHAIR RODRIGUES:  Sure.
```

HT_0006097
P-000074

Page 21

1          MS. GIBSON:  May I have a follow-up for

2     clarity, please?

3          CHAIR RODRIGUES:  Yeah.

4          MS. GIBSON:  Thank you.  And I

5     didn't -- I forgot to say my district when I

6     first introduced myself.  I want to make sure

7     everyone knows Duval is in the house.  Senator

8     Bean has a portion of Jacksonville, and I have

9     the other.

10          On the -- I talked about burning the

11     carpet in the last cycle, but it was for

12     amendments that I wanted to make with staff,

13     and so in your -- in your explanation, that is

14     still a legal process as a part of this

15     committee for any -- any senator, actually,

16     this committee or not, correct?

17          CHAIR RODRIGUES:  That is correct.

18          MS. GIBSON:  All right.  Thank you very

19     much.

20          CHAIR RODRIGUES:  Senator Stewart,

21     you're recognize for a question.

22          MS. STEWART:  For clarification, so a

23     grassroots organization comes to me and asks

24     would I submit a map on their behalf, is that

25     form something that would have to be filled

HT_0006098

P-000075

Page 22

```
 1    out as -- and come with the map that I -- they

 2    ask me to submit?

 3        CHAIR RODRIGUES:  The grassroots

 4    organization would need to submit that map

 5    through the Florida Redistricting.gov website,

 6    and then they would need to ask you to be the

 7    sponsor of it.

 8        And so they would need to complete

 9    whatever is required to submit it on the

10    website, and there's -- as you go onto the

11    website, there are cues that will guide you

12    through the process.  And once they've

13    completed that, then they can meet with you

14    and lobby you to champion their map, in which

15    case you can move forward, bring that map

16    forward, and say, I wish to sponsor this as

17    either a part of the process or as an

18    amendment, whatever the case may be.

19        Senator Rouson, you look like you may

20    have a question.

21        MR. ROUSON:  Yes, thank you, Mr. Chair.

22    You indicated in your introductory remarks

23    that this would be an open and interactive

24    process.  Could you expound upon interactive?

25    I expect that means the public will be able to
```

HT_0006099
P-000076

Page 23

```
 1      participate both through comments, testimony,

 2      and submission of maps.  But is there any

 3      other opportunity for public participation?

 4           CHAIR RODRIGUES:  The examples that

 5      you've given are what has been contemplated

 6      and agreed upon so far between the Florida

 7      Senate and the Florida House.

 8           So to begin with, we've agreed -- and

 9      what's different in this cycle than in the

10      previous cycle is that the Senate and the

11      House are using the same vendor; we're using

12      the same software.  As a result of that, we

13      can do a joint website to receive all of the

14      public submissions.

15           We will have committee meetings, which

16      will -- as all committee meetings are -- be

17      publicly noticed and have the opportunity for

18      public comment.  So the public will have that

19      opportunity.  And of course, the public can

20      reach out to any of us as individual senators

21      to meet with us and ask us to champion their

22      ideas that they have submitted through the

23      website.

24           MR. ROUSON:  And -- thank you, Mr.

25      Chair for that explanation.  Is there any
```

HT_0006100
P-000077

Page 24

1    guidance on how to handle media inquiries or

2    citizen inquiries of individual senators?

3        CHAIR RODRIGUES:  The only guidance

4    that I've seen put together so far is the

5    guidance that directs them to put their ideas

6    into the interactive website.  If we need

7    additional guidance, I'm sure we can work with

8    staff to come up with it.

9        MR. ROUSON:  And do you anticipate

10    that -- you know, last time when we did this,

11    we took this show on the road, to borrow a

12    term, and people were able to come to their

13    local arena or venue to testify.  Is there any

14    thought to virtual appearances by members of

15    the public?

16        CHAIR RODRIGUES:  Both of those

17    concepts are still under consideration at this

18    time.

19        Do we have any questions on this side?

20    Seeing none, we'll move on to Agenda Item 2,

21    Tab 2.  We'll actually go ahead and do Tabs 2,

22    3, and 4.  And I'm going to recognize our

23    staff director, Mr. Ferrin, for presentations

24    on our committee's jurisdiction, redistricting

25    terminology, timeline, and on the census and

9/20/2021                    Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 25

1    census data.  Mr. Ferrin, you're recognized.

2         MR. FERRIN:  Thank you, Mr. Chairman,

3    and good afternoon, members.  Happy to be here

4    or back here.

5         I wanted to -- we wanted to start out

6    today with a general overview of the committee

7    process, committee jurisdiction.  Get -- make

8    sure everyone's familiar with a lot of the

9    terminology we'll use throughout this process.

10    I know a lot of you have been involved in it

11    in different capacities in the past, but this

12    is probably a good opportunity for a refresher

13    and review of the basic subject matter.

14         So today's presentations are a high-

15    level orientation of what redistricting is and

16    why we do it.  I anticipate that in subsequent

17    meetings we'll have opportunities to delve a

18    little further into more detail on the legal

19    environment, the way that we measure the

20    criteria that we'll be using and talking about

21    today, and the methodology that we'll use to

22    draw districts.

23         So to begin with the committee's

24    jurisdiction, the Senate Committee on

25    Reapportionment creates redistricting plans

HT_0006102
P-000079

Page 26

1        for the Florida -- for Florida's congressional

2        and state legislative districts to account for

3        population shifts revealed by data from the

4        2020 census.  As you know, we do this every

5        ten years, as directed by the Florida

6        Constitution, which states that the

7        legislature, at its regular session in the

8        second year following each decennial census,

9        shall apportion the state in accordance with

10       the constitution of the state and of the

11       United States.

12               This cycle of our regular session will

13       begin on January 11th, 2022, and as the census

14       data that was released in a Legacy format on

15       August 12th and formally delivered on

16       September 16th revealed, Florida grew by about

17       2.7 million people and gained one additional

18       seat in Congress.  For various reasons that

19       we'll discuss later today, this data was

20       delivered more than four months after the

21       April 1st, 2021, deadline prescribed in

22       federal law.

23               The data that was released in August

24       was the same data that was delivered last

25       week.  The difference between a Legacy format

HT_0006103
P-000080

Page 27

```
 1     data and the formal release that we got last

 2     week is that the Legacy data is coded in a

 3     series of tables.  They're unformatted,

 4     without clear field labels, and so they have

 5     to be processed in order to be useful.  The

 6     formal data release is a much more pre-

 7     formatted and user-friendly format that's

 8     currently available on data.census.gov and is

 9     being added to our redistricting software.

10          We can jump to the constitutional

11     authority for redistricting.  The legislature

12     and its committees drive the authority to

13     redraw congressional districts from the

14     elections clause of the United States

15     Constitution.  It directs state legislatures

16     to regulate the times, places, and manner of

17     conducting elections for Congress.

18          We derive our authority to redraw state

19     legislative districts from Article III,

20     Section 16 of the Florida Constitution, which

21     directs the legislature to adopt a

22     redistricting plan for state legislative

23     districts in the second year after each

24     census.  In this case, that would be 2022.

25          As I previously mentioned, the regular
```

Page 28

```
 1    session will begin on January 11th.  In

 2    redistricting years, the regular session has

 3    always started in January rather than March,

 4    and this is to afford the greatest amount of

 5    time possible for adoption and implementation

 6    of redistricting plans.

 7         One of the questions that usually pops

 8    up at some point during this process is, what

 9    is the difference between reapportionment and

10    redistricting.  They're frequently used

11    interchangeably, and for all intents and

12    purposes mean the drawing of new district

13    boundaries for the purposes of representation.

14    The term redistricting refers to the process

15    by which boundaries of electoral districts are

16    redrawn to adjust for uneven population growth

17    revealed by the latest decennial census.

18    State legislatures, county commissions, and

19    city commissions redistrict.

20         Reapportionment is the process of

21    assigning seats in a legislative body amongst

22    preexisting political subdivisions such as

23    states or counties.  Following each census,

24    the 435 seats in the United States House of

25    Representatives are apportioned to each state
```

HT_0006105

P-000082

9/20/2021                   Common Cause, et al. v. Cord Byrd                   Audio Transcription

Page 29

1    based on state population.  Each state gets at

2    least one seat, but the larger the state

3    population, the more congressional

4    representation the state will receive.

5         As I mentioned, based on the 2020

6    census, Florida received an additional seat to

7    bring the total number to 28, and that's in

8    the U.S. House.  We have two United States

9    Senate representatives, as well.

10        The term reapportionment gets used in

11   Florida because it's used to assign -- because

12   Florida used to assign districts based on

13   county boundaries.  Article III, Section 16 of

14   the Florida Constitution, also, refers to the

15   process of redrawing State House and State

16   Senate districts as legislative apportionment.

17        So aside from the constitutional

18   requirements to redraw boundaries every ten

19   years, why do we do this?  The primary reason

20   is to comply with the equal population

21   requirements of the United States and Florida

22   Constitutions.  The equal population standard

23   for the congressional districts is based on

24   Article I, Section 2 of the United States

25   Constitution, as interpreted by the U.S.

HT_0006106
P-000083

Page 30

1      Supreme Court in Wesberry v. Sanders in 1964.

2              The Court stated that representatives

3      be chosen by the people of the several states

4      means that, as nearly as is practicable, one

5      person's vote in a congressional election is

6      to be worth as much as another's.  This has

7      come to be known as the one-person, one-vote

8      principle and compels us to draw congressional

9      districts that have a population variance of

10     plus or minus one person.

11             The equal population standard for state

12     legislative districts is based on the 14th

13     Amendment's equal protection clause, as

14     interpreted by the United States Supreme Court

15     in Reynolds v. Sims in 1964.

16             The Court stated that because there is

17     a significantly larger number of seats in

18     state legislative bodies to be distributed

19     within a state than congressional seats, it

20     may be feasible to use the political

21     subdivision lines while still affording

22     adequate representation to all parts of the

23     state.

24             The Court, also, stated that

25     mathematical nicety is not a constitutional

HT_0006107
P-000084

Page 31

1    requisite but nevertheless, states that the

2    overriding objective must be substantial

3    equality of the population amongst the various

4    districts.  This has been interpreted and

5    applied to mean that districts should have no

6    more than a 10 percent difference in their

7    population.

8         Florida's Constitution also contains

9    provisions regarding equal population in

10   Article III, Section 20 and 21, which states

11   in Subsection B, the district shall be as

12   nearly equal in population as is practicable.

13        The equal population criteria contained

14   in the United States Constitution is contained

15   in Article I, Section 2, and in the Fourteenth

16   Amendment, but other redistricting criteria

17   exists in the Florida Constitution, the

18   Federal Voting Rights Act, and in Florida

19   statutes.

20        Protections against diminishment or

21   reduction in the ability of racial or language

22   minorities to elect representatives of their

23   choice are in the Florida Constitution and in

24   the Federal Voting Rights Act.

25        Prohibitions on drawing a plan or

HT_0006108

P-000085

Page 32

1    district with intent to favor or just favor a

2    political party or incumbent are in the

3    Florida Constitution.  Requirements for

4    districts to be contiguous are in -- contained

5    in the Florida Constitution.

6         Requestions for districts to be compact

7    are in the Florida Constitution, and

8    requirement for district boundaries to, where

9    feasible, utilize existing political and

10   geographic features are in the Florida

11   Constitution.

12        The requirement to use data from the

13   most recent decennial census is contained in

14   Section 11.031 of Florida Statutes and in

15   Article X, Section 8 of the Florida

16   Constitution.

17        The minority voting right -- excuse me.

18   The minority protections of the Voting Rights

19   Act are applied in the redistricting context.

20   The Voting Rights Act prohibits any state or

21   political subdivision from enacting a map that

22   results in the denial or abridgment of any

23   U.S. citizen's right to vote on account of

24   race, color, or status as a member of a racial

25   or language minority group.  And it prohibits

HT_0006109
P-000086

Page 33

1     purposeful discrimination and protects against

2     retrogression or backsliding in the ability of

3     racial minorities to elect representatives of

4     their choice.

5          The Voting Rights Act contains a couple

6     of pertinent sections.  Section 2 compels the

7     drawing of a majority/minority district -- or

8     excuse me -- compels the drawing of a district

9     that performs for racial and language minority

10    where what are known as the Gingles Conditions

11    are met.  These conditions come from Thornburg

12    v. Gingles, a 1986 case out of North Carolina.

13         They require us to draw a performing

14    minority district where, one, a minority

15    population is geographically compact, and it's

16    sufficiently numerous to be a majority in a

17    single district; two, the minority population

18    is politically cohesive; three, the majority

19    votes sufficiently as a block to enable it to

20    usually defeat the minority-preferred

21    candidate; and four, under all of the

22    circumstances, minority population has less

23    opportunity than others to participate in the

24    political process and elect representatives of

25    its choice.

HT_0006110

P-000087

Page 34

```
 1              The other pertinent section is Section
 2      5, and Section 5 differs somewhat from Section
 3      2 in that it doesn't necessarily compel the
 4      creation of minority -- minority districts.
 5      Rather, it prohibits purposeful discrimination
 6      and protects against retrogression or
 7      backsliding in the existing ability of racial
 8      and language minorities to elect
 9      representatives of their choice.  It contains
10      a coverage formula that was applied to
11      determine if there was a history of
12      discrimination against racial or language
13      minorities in a particular jurisdiction.
14              In Florida, Hardee, Henry,
15      Hillsborough, and Monroe Counties were
16      coverage jurisdictions until the coverage
17      formula was invalidated by the United States
18      Supreme Court in 2013 in a case called Shelby
19      County v. Holder.  It's worth noting that the
20      Shelby decision means that the pre-clearance
21      process established by the Voting Rights Act
22      is no longer in effect, but it does not affect
23      the validity of the diminishment standard in
24      the Florida Constitution.
25              The Florida Constitution contains
```

HT_0006111

P-000088

Page 35

```
 1      several other provisions related to

 2      redistricting.  Article III, Section 16 is our

 3      guidance to the -- the general rationale for

 4      dividing House and Senate districts.  It

 5      requires the state to be divided in 30 or --

 6      30 to 40 contiguous and consequently-numbered

 7      senatorial districts and into between 80 and

 8      120 contiguous and consequently-numbered house

 9      districts.  A district is considered to be

10      contiguous if all of its territories in actual

11      contact and are uninterrupted by the territory

12      of another district.  The courts have ruled

13      that contact at a corner or a right-angle is

14      insufficient, but territory may cross bodies

15      of water.

16              Consequently-numbered districts have

17      been interpreted to mean that districts cannot

18      skip numbers.  We cannot, for example, number

19      all the Senate Districts with odd numbers.  It

20      does not mean that District 1 has to share a

21      boundary with District 2 and District 2 has to

22      share a boundary with District 3 and so on and

23      so forth.  And one other note on this is

24      provision in the constitution is that -- that

25      it technically does allow the state
```

HT_0006112

P-000089

Page 36

```
 1      legislative districts to overlap, either

 2      partially or entirely.  However, this has not

 3      been done since the state switched to single-

 4      member districts.

 5           Moving on to Article III, Sections 20

 6      and 21.  These were added to the constitution

 7      by the voters in 2010.  Article III, Section

 8      20, which deals with congressional, and

 9      Section 21, which deals with legislative

10      provisions, prohibit line drawing that

11      intentionally favors or disfavors a political

12      party or incumbent.  The sections, also,

13      afford protection to racial and language

14      minorities and provide additional standards

15      for the drawing of plans and districts.

16           Subsection A states that no

17      apportionment plan or district shall be drawn

18      with the intent to favor or disfavor a

19      political part of incumbent.  Districts shall

20      not be drawn with the intent or a result of

21      denying or abridging the equal opportunity of

22      racial or language minorities to participate

23      in a pollical process or to diminish their

24      ability to elect representatives of their

25      choice.  And then finally, districts shall
```

9/20/2021                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 37

1     be -- of -- consist of contiguous territory.

2                Subsection B states that unless

3     compliance with the standards of the

4     section -- subsection conflict with the

5     standards in Subsection A or with federal law,

6     districts shall be nearly equal in population

7     that is practicable.  Districts shall be

8     compact, and districts shall, where feasible,

9     utilize existing political geographic

10    boundaries.

11                Subsection C clarifies that the order

12    in which the standards within Subsections A

13    and B are set forth shall not be read to

14    establish any priority of one standard over

15    the other within that subsection.

16                The criteria that we just went over has

17    been broken out into two tiers by the Florida

18    Supreme Court in Apportionment 1.  Tier one

19    consists of the provisions contained in

20    Subsection A relating to diminishment and

21    intent to favor/disfavor a political party or

22    incumbent, as well as the contiguity

23    provision.

24                Tier two apply, unless these -- unless

25    they conflict with tier one or federal law,

HT_0006114

P-000091

Page 38

1    and these are dealing with the equal

2    population, district compactness, and

3    utilization of political and geographic

4    boundaries.  And as I've already noted, as

5    long as they don't -- they cannot be read to

6    establish any one priority over another within

7    that tier.

8         We can take a breather or move on to

9    terminology.

10        CHAIR RODRIGUES:  Do we have any -- do

11   the members have any questions?  Yes, let's go

12   ahead and do questions before we move on.

13   Senator Gibson, you're recognized for a

14   question.

15        MS. GIBSON:  Thank you, Mr. Chair.  On

16   the districts shall be compact in tier two, I

17   know previously we used Reock scores, I think,

18   and Convex Hull scores ad nauseum, those

19   words.  And so since it's not -- there's no

20   real definition in the materials that we have

21   that speaks to compactness, is there some

22   anticipation that -- or why did we use Convex

23   Hull and Reock scores?

24        And then, if you could talk about the

25   appropriateness of following that same method

HT_0006115

P-000092

9/20/2021                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 39

1       in this cycle.  Thank you, Mr. Chair.
2              CHAIR RODRIGUES:  You're recognized.
3              MR. FERRIN:  Thank you, Mr. Chairman
4       and Senator Gibson.  We -- you're correct.  We
5       used a score called a Reock score, a Convex
6       Hull score, and then a Polsby-Popper score.
7       And those three scores are all on a -- they're
8       scored on a range of zero to one, so it's a
9       proportional measurement.  They measure
10      different things.
11             Generally speaking, a Reock is going to
12      measure how much a district resembles a
13      circle.  A Convex Hull is a test for,
14      basically, indentations.  So a star would
15      score very poorly on a Convex Hull, but a
16      square or a rectangle would score highly.  And
17      then Polsby-Popper is a perimeter ratio so
18      that -- that kind of tests for jagged edges,
19      so to speak.  And so the smoother the edges of
20      a district, the higher the score would be
21      there.
22             Those are the three that I would
23      anticipate using in addition to, as the
24      Supreme Court stated, the Intraocular Test,
25      which is just a visual review for compactness.

HT_0006116
P-000093

Page 40

1    I believe that you will see those three

2    available in the software very soon.

3            CHAIR RODRIGUES:  Any further

4    questions?  Okay.  Let's move on to the next

5    tab.

6            MR. FERRIN:  Thank you, Mr. Chairman.

7    So the terminology, a lot of this I've already

8    kind of mentioned, and some of you may be

9    familiar with.  We've talked about equal

10   population and the requirements in the U.S.

11   Constitution for equally-weighted votes.

12           The equal population, as I've

13   mentioned, for congressional districts is plus

14   or minus one person.  It's generally higher in

15   terms of legislative districts.  The courts

16   have allowed in the past in different

17   circumstances up to a 10 percent overall

18   range.  The legislature here in Florida has

19   typically drawn Senate and House districts

20   with deviations of less than 1 or 2 percent.

21           The ideal population is the total state

22   population divided by the number of districts,

23   and so that's our target population as we're

24   drawing districts in terms of what we're

25   trying to get to.  Ideal populations based on

HT_0006117
P-000094

9/20/2021                Common Cause, et al. v. Cord Byrd            Audio Transcription

Page 41

1    the 2020 census are as follows:

2          For congressional, it's 769,221.  For

3    Florida Senate districts, it's going to be

4    538,455.  And for the House, it'll be 4 -- or

5    excuse me -- 179,485.

6          Voting age population refers to the

7    number of --

8          MR. BEAN:  Mr. Chairman, I'm sorry to

9    interrupt.  Can you give those numbers one

10   more time?  I was writing them down.  I

11   missed -- missed them.  Starting with the

12   congressional.

13         MR. FERRIN:  Thank you, Mr. Chairman

14   and Senator Bean.  So congressional is 7-6-9-

15   2-2-1.  The Senate districts will be 5-3-8-4-

16   5-5.  The House districts will be 1-7-9-4-8-5,

17   and I believe I've got a slide later on that's

18   going to have those numbers on it and compare

19   them to the old numbers.

20         And so back to the voting age

21   population, that's the number of people in a

22   district or a plan that are -- excuse me -- in

23   a district that are over 18 years of age and

24   represents the potential electorate in a

25   district.

HT_0006118
P-000095

Page 42

1              And then population deviation is the

2         difference between the ideal population and

3         the population of a district or plan.  It's

4         calculated for individual districts and the

5         redistricting plan as a whole.  We often

6         express this as a percentage, and that's

7         calculated by dividing the deviation of a

8         district by the ideal population.

9              At the district level, population

10        deviation is measured as the amount of a

11        district's total population minus its ideal

12        population, and that can be positive or

13        negative.  At the plan level, population

14        deviation is the numeric range between the

15        smallest total population and the largest

16        total population of a district.

17             This slide contains some redistricting

18        terms related to map drawing and the criteria

19        found in the Florida Constitution.  A

20        benchmark plan is the last legally-enforceable

21        redistricting plan enforcer effect.  A

22        proposed redistricting plan is compared to a

23        benchmark plan to analyze its compliance with

24        protections for racial and language minorities

25        under federal and state law.  In Florida, the

HT_0006119

P-000096

Page 43

1    benchmark plans will be named and referred to

2    as follows:

3         For the congressional plan, you'll see

4    that as FLCD 2016 for 2016 in its date of

5    adoption.  FLHD 2012 would be the House

6    benchmark, and FLSD 2016 would be the Senate

7    benchmark.  And those are your current

8    districts today.

9         Retrogression occurs when a

10   redistricting plan reduces the opportunity of

11   a racial or language minority to participate

12   in the political process or elect

13   representatives of their choice when compared

14   to the benchmark plan.  Retrogression can

15   apply to a whole redistricting plan or to an

16   individual district.

17        Diminishment is similar in that it

18   occurs when a redistricting plan eliminates a

19   majority minority district or potentially

20   weakens a historically-performing minority

21   district where doing so would actually reduce

22   the ability of racial or language minority

23   groups to elect candidates of their choice, as

24   compared to the benchmark plan.

25        Geographic boundaries.  For geographic

HT_0006120
P-000097

Page 44

```
 1        boundaries, we use easily ascertainable and
 2        commonly understood features, such as rivers,
 3        railways, and primary and secondary roads.
 4        Primary and secondary roads are actually
 5        defined by the United States Census Bureau in
 6        their -- their date -- geographical dataset.
 7        They include interstates, U.S. highways, and
 8        state highways.  County roads are not included
 9        in that as -- as some of the roads in those
10        categories can range from a six-lane highway
11        to a dirt road.
12               And then finally, political boundaries
13        in the redistricting context has been defined
14        by the courts as county or incorporated
15        municipality boundaries, so your cities, town,
16        villages, et cetera.  We have 412 of those
17        here in Florida for this cycle.
18               This slide here has an image for the
19        geographical hierarchy that's used by the
20        census.  So the smallest feature that we'll
21        use is the census block.  Blocks are formed by
22        streets, roads, bodies of water, and other
23        physical features and legal boundaries that
24        are shown on U.S. Census Bureau maps.
25               Census block groups are clusters of
```

HT_0006121
P-000098

Page 45

1     census blocks within a census tract.  Tracts

2     are small, relatively-permanent statical

3     subdivisions of a county and are delineated by

4     the local participants as part of the U.S.

5     Census Bureau's Participants Statistical Areas

6     Program.

7          Counties are the primary legal

8     subdivisions of the state and are used for

9     reporting census -- decennial census data.  So

10    each of those nests within each other.

11         Here we have some definitions and terms

12    related to the different kinds of districts

13    that can be drawn for racial or language

14    minority opportunities.  The -- these are kind

15    of listed in the order of significance.  So a

16    majority minority district is a district in

17    which racial or language minority groups

18    comprise a majority, which is 50 percent plus

19    1 or more of the voting age population of the

20    district.

21         An effective minority district is a

22    district that contains sufficient voting age

23    population to provide the minority community

24    with an opportunity to elect a candidate of

25    choice but falls short of a majority.

HT_0006122
P-000099

Page 46

1              A crossover district is a district in

2      which a racial or language minority group is

3      not a numerical majority but is potentially

4      large enough to elect its preferred candidate

5      by persuading enough majority voters to cross

6      over to support the minorities' preferred

7      candidate.

8              A coalition district is a district in

9      which more than one racial or language

10     minority group working together can form a

11     majority to elect their candidates of choice.

12             And then lastly is an influence

13     district, which is a district in which the

14     racial or language minority community,

15     although not sufficiently large enough to

16     elect a candidate of its choice, is able to

17     influence the outcome of an election and elect

18     a candidate who will be responsive to the

19     interests and concerns of the minority

20     community.

21             That would conclude that portion of the

22     presentation, sir, Mr. Chairman.

23             CHAIR RODRIGUES:  Do we have any

24     questions on this tab?

25             Seeing none, let's move on to Tab 4,

HT_0006123

P-000100

Page 47

1    Census -- Census Data Explanation.

2          MALE VOICE:  (Inaudible).

3          CHAIR RODRIGUES:  Oh, I'm sorry.  I

4    missed the timeline.  Let's go back and

5    complete the timeline.

6          MR. FERRIN:  Thank you, Mr. Chairman.

7          So the beginning of this -- this

8    process starts with April 1st, 2020, which is

9    the census day.  And the census responses,

10   although they're collected over a period of

11   time, are used -- are tied to April 1st.  So

12   if you're filling out a response later on in

13   the summer, the question that the Census

14   Bureau is asking you as a respondent is where

15   were you residing on April 1st, 2020.

16          April 26th was the day that the Census

17   Bureau released the state-wide population

18   totals for apportioning the seats in the

19   United States House of Representatives.  That

20   was originally scheduled under the kind of

21   normal cycle to have been December 31st, 2020.

22          On August 12th, 2021, the Census Bureau

23   published tabular population demographic and

24   housing data for all 50 states.  That was the

25   delivery and availability of the Legacy format

Page 48

1    census data.  That should have been available

2    on April 1st, 2021.

3            Last week, on September 16th, we

4    received the formal delivery of the formatted,

5    P.L. 94-171 redistricting data, which is the

6    same data that was delivered as -- in the

7    Legacy format.  That was delivered to the

8    states last week.  That date should have,

9    also, been April 1st.

10           Typically, in a cycle, that data is

11   released together.  It was broken up this

12   cycle.  Due to the delays, the Census Bureau

13   opted to get the Legacy format data out there

14   as soon as possible and then continue working

15   to deliver the formatted data by the end of

16   September.

17           And then lastly there, you see in --

18   later this month or within the month, we plan

19   on launching the joint website and the free

20   publicly-available map-drawing application.

21           Here we have a list of the interim

22   committee weeks and the prospective dates for

23   interim committee meetings.  So our next week

24   that we would be available to meet would be

25   October 11th, followed by October 18th to

HT_0006125
P-000102

9/20/2021                 Common Cause, et al. v. Cord Byrd               Audio Transcription

Page 49

1     22nd, November 1st through 5th, November 15th

2     through 19th, and November 29th through

3     December 3rd.  Because we're kind of going

4     full-blast here and operating at full speed, I

5     would expect at this time, unless told

6     differently, that we would plan on meeting

7     each of those weeks.

8           This slide has some of the important

9     session and post-session dates on it.  So we

10    will -- as I mentioned, we'll convene on

11    January 11th, 2022, for regular session.  The

12    60th day of that session would be March 11th,

13    2022.

14          June 13th to 17th is qualifying for

15    state and federal offices.  The mailing of the

16    overseas ballots, which is the first sort of

17    ballot delivery and -- and everything would

18    have to be finalized, not only in advance of

19    qualifying, but the date for supervisors to

20    mail the first ballots overseas is July 9th,

21    2022.

22          August 23rd is the primary election.

23    The supervisors will, also, have to send out

24    ballots on September 24th for the general

25    election, and then we have the general

HT_0006126

P-000103

9/20/2021                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 50

1     election date of November 8th, 2022.

2              Part of the timeline process is

3     governed by Article III, Section 16 of the

4     Florida Constitution, which includes the

5     provisions for the automatic facial review of

6     the state legislative redistricting plans.

7     Article III, Section 16 states that within 15

8     days after the passage of the joint resolution

9     of apportionment, the attorney general shall

10    petition the Supreme Court of the state for a

11    declaratory judgment determining the validity

12    of the apportionment.

13             The Supreme Court shall permit

14    adversary interests to present their views and

15    within 30 days from the filing of the petition

16    shall enter its judgment.  A judgment of the

17    Supreme Court of the state determining that

18    the apportionment to be -- is -- to -- excuse

19    me -- determining the apportionment to be

20    valid, shall be binding upon all the citizens

21    of the state.

22             Should the Supreme Court determine that

23    the apportionment made by the legislature is

24    invalid, the governor by proclamation shall

25    reconvene the legislature within five days

HT_0006127

P-000104

Page 51

```
1      thereafter in extraordinary apportionment

2      session, during which the legislature shall

3      adopt a joint resolution of apportionment

4      conforming to the judgment of the Florida

5      Supreme Court.

6            Within 15 days after the adjournment of

7      an extraordinary apportionment session, the

8      attorney general is again required to file a

9      petition to the Supreme Court setting forth

10     the apportionment resolution adopted by the

11     legislature.

12           If none was adopted during the

13     extraordinary apportionment session, the

14     attorney general is required to report that

15     fact to the court.  Otherwise, consideration

16     of the validity of the joint resolution shall

17     be -- had -- as provided in -- for in cases of

18     such joint resolution being adopted at a

19     regular or special apportionment session.

20           And then lastly, if the legislature

21     fails to adopt a resolution of apportionment

22     or if the Supreme Court finds the

23     apportionment to be invalid again, the court

24     has 60 days after receiving the petition from

25     the attorney general to file with the
```

HT_0006128

P-000105

Page 52

1    secretary of state an order making the

2    apportionment.

3         The next slide that we have here is a

4    bit of a flow chart that shows the path for

5    the state legislative redistricting plans that

6    we just walked through.  The color coding here

7    indicates which paths were followed for which

8    decade.  This will be available on the website

9    when we launch it, and so I won't walk through

10   the particulars of the past history.  I think

11   we may have an opportunity to do that at

12   subsequent meetings, as well.

13        CHAIR RODRIGUES:  Do we have any

14   questions on the timeline?

15        Seeing none, now we can move forward to

16   the Census/Census Data Explanation.

17        MR. FERRIN:  Thank you, Mr. Chairman.

18        Established by the U.S. Constitution,

19   the census has been conducted every ten years

20   since 1790 to determine the number of people

21   living in the United States.  Article I,

22   Section 2 of the U.S. Constitution requires

23   this to be an actual enumeration of all people

24   in the United States.  Actual enumeration

25   means a physical count, and the Constitution

HT_0006129

P-000106

Page 53

1    has been determined to not allow for the use

2    of sampling in lieu of an actual count.

3            For redistricting, Florida is one of 21

4    states that explicitly requires the use of

5    census data for redistricting.  As I mentioned

6    in Article X, Section 8, states that -- each

7    decennial census of the state taken by the

8    United States shall be an official census of

9    the state.  The fourth statute -- the

10   statutory provision in Florida, also,

11   designates the most recently federally

12   conducted federal census as the official

13   census for redistricting.

14           I've already touched a little bit on

15   the hierarchy that's used by the census, but

16   it's worth noting that the geography comes

17   from a different source than the actual

18   demographic and population data.  The

19   geographic data that we use for redistricting

20   comes in the form of TIGER/Line shape files

21   that are released by the Census Bureau.

22           And these are extracts of selected

23   geographic information from the United States

24   Census Bureau's database.  It includes polygon

25   boundaries with geographic areas and features,

HT_0006130
P-000107

Page 54

1      linear features, including roads and

2      hydrography, and point features, such as

3      landmarks.

4           The state does not contain any

5      sensitive or -- information or data on

6      population on demographics.  That's linked to

7      later from censuses and other surveys through

8      a standard geographic identifier that we refer

9      to as the geo ID.  And one other note is that

10     Census Bureau is constantly updating this.  We

11     use the 2020 version that was released earlier

12     this year.

13          We can talk a little bit about the race

14     and ethnicity categories in the census data,

15     so since 1980, the Census Bureau has asked

16     each person counted to identify their race and

17     whether or not they are of Hispanic or Latino

18     origin.  An individual's response to the race

19     and ethnicity questions are based on self-

20     identification.  The United States Office of

21     Management and Budget established these

22     standards in 1997, and they are as follows:

23          For racial categories, it's American

24     Indian or Native Alaskan.  And these are

25     person having origins in any of the original

HT_0006131
P-000108

Page 55

1      peoples of North and South America, including

2      Centra America, and who maintains -- excuse

3      me -- maintains tribal affiliation or

4      community attachment.

5           Asian means a person having origins in

6      any of the original peoples of the Far East,

7      Southeast Asia or the Indian Subcontinent,

8      including for example Cambodia, China, India,

9      Japan, Korea, Malaysia, Pakistan, and the

10     Philippine Islands.

11          Black or African American means a

12     person having origins in any of the Black

13     racial groups of Africa.

14          Native or Hawaiian or Pacific Islander

15     is a person having origins of any of the

16     original people of Hawaii, Guam, Samoa, or

17     other Pacific Islands.

18          And then White is a person having

19     origins in any of the original peoples of

20     Europe, the Middle East, or North Africa.

21          The ethnicity question on the Census

22     Bureau or census forms asks whether or not a

23     respondent is of Hispanic or Latino origin or

24     if they are not Hispanic or Latino.  Hispanic

25     or Latino has traditionally meant a person of

Page 56

1    Cuban, Mexican, Puerto Rican, South America --

2    South or Central American, or other Spanish

3    culture origin, regardless of race.

4        So it's important to note that the

5    categories of race include the national origin

6    and sociocultural groups.  People can chose to

7    report more than one race to indicate their

8    racial mixture, and in fact, race alone can

9    result in up to 63 different combinations.

10   And people who identify their origin as

11   Hispanic, Latino, and Spanish may be of any

12   race.

13       Talk briefly about group quarters.  So

14   in 2020, the census continued -- Census Bureau

15   continued to count prisoners, college

16   students, and people in other resident

17   situations, such as nursing homes, at the

18   group location where they lived and slept most

19   of the time.  This is the way it's been done

20   in the past, and by far, the majority of

21   states use population and residence data

22   reported in the census as is.

23       A handful of states have changed their

24   procedures for allocating incarcerated --

25   incarcerated persons for redistricting

HT_0006133

P-000110

Page 57

1    purposes.  And these states, whenever it's

2    possible, they reallocate prisoners from the

3    prison location to their residence prior to

4    incarceration.  To date, eight states, which

5    includes California, Colorado, Delaware,

6    Maryland, Nevada, New Jersey, New York,

7    Virginia, and Washington, have passed laws

8    about how incarcerated persons are counted and

9    allocated during the redistricting process.

10          Personal -- protecting privacy within

11   census data.  So since 2000, the Bureau has

12   used a practice called data swapping between

13   census blocks as its main disclosure avoidance

14   technique.  And for an example of data

15   swapping, we can consider a census block with

16   just 20 people in it, including one Filipino

17   American without any disclosure of

18   (inaudible), it might be possible to figure

19   out the identity of that individual.

20          With the data swapping applied, that

21   person's data might be swapped with that of an

22   Anglo-American from a nearby census block

23   where other Filipino Americans reside.  The

24   details for that person would be aggregated

25   with the others, and therefore, it would be

Page 58

1    not be identifiable.  Yet the total population

2    would remain accurate.

3         Since recent developments and the

4    advent of big data and technical advancement

5    make it theoretically possible to take the

6    many data products that the Census Bureau

7    produces and cross-reference them with each

8    other or with outside data sources to the

9    point that (inaudible) could be compromised,

10   the Census Bureau chose to review their

11   disclosure avoidance techniques and reconsider

12   other methods.  In 2018, they selected

13   differential privacy for use during the 2020

14   census.

15        With differential privacy, the total

16   population in each state is as enumerated.

17   But all other levels of geography -- so tract,

18   counties, census block group -- have some

19   variance from the raw data.  And the Census

20   Bureau refers to this as noise.  And noise

21   would not be injected into the state

22   population, but the smaller units it can be

23   expected.

24        And it's important to note here that

25   when reaggregated, that level of noise is --

HT_0006135

P-000112

9/20/2021                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 59

1      is -- goes away and results in a usable and

2      accurate count.

3              I mentioned the TIGER geometry that we

4      use in the geographical data.  It's worth

5      noting that during the 2020 legislative

6      session, Florida -- the legislature passed two

7      bills that made changes to its political

8      subdivisions.  Senate Bill 616 adjusted the

9      boundary lines of Indian River County and St.

10     Lucie County.  That bill was signed into law

11     by Governor DeSantis on June 9th, 2020.  And

12     Committee Substitute for House Bill 1215

13     abolished the City of Weeki Wachee, which was

14     one square mile and a population of nine.

15     That, also, took effect -- was signed and took

16     effect on June 9th, 2020.

17             Because we used the January 1, 2020,

18     data from the Census Bureau rather than the

19     census day -- or in addition to the fact that

20     these became law after census day, these

21     changes are not reflected in our geographical

22     population and demographic data, so we'll

23     still have the City of Weeki Wachee in our

24     dataset.

25             I've mentioned this a little bit before

HT_0006136

P-000113

Page 60

1      already related to the census delays, and this

2      slide is taken from a presentation that the

3      Census Bureau delivered to us back in, I

4      believe it was, May.  But these are some of

5      the factors that the Bureau has cited for the

6      delay and the reasons the data was delivered

7      late.

8            This includes COVID-19, four tropical

9      systems that made landfall, wildfires on the

10     West Coast, civil unrest, and legal

11     challenges.  And most of those occurred during

12     the door-to-door follow-up -- nonresponse

13     follow-up count portion of the census, which

14     did disrupt the collection and then,

15     subsequently, the processing of the data.

16           And we can go -- we can break there or

17     go right into same additional data points.

18           CHAIR RODRIGUES:  Do we have questions

19     on what's been presented?  Senator Gibson,

20     you're recognized for a question.

21           MS. GIBSON:  Thank you, Mr. Chair.

22     Going back to the race and ethnicity in the

23     census data, I thought there were questions of

24     race that were not represented in the handout.

25     For example, I think there were individual --

HT_0006137

P-000114

Page 61

 1    do you know if these are all the categories

 2    that were questions on the census, by any

 3    chance?  And if not, if we can make sure that

 4    we have that for the next time because I

 5    thought there were -- there was some biracial

 6    or other questions, even an "other" that was

 7    reported when it came to race and ethnicity.

 8         And I'm asking that in light of -- as

 9    we begin to look at districts and minority

10    districts and how those -- how those

11    categories of race play into any potential

12    diminishment or -- if you understand what I'm

13    saying.

14         CHAIR RODRIGUES:  You're recognized.

15         MR. FERRIN:  Thank you, Mr. Chairman

16    and Senator Gibson.  That's, actually, an

17    excellent point.  I did neglect to mention

18    that there is a field for other race.  It's

19    available on the -- where respondents can

20    write in whatever they want, and the Census

21    Bureau will tabulate them that way.

22         But it's important to remember that for

23    redistricting purposes, we can -- we can

24    cross-tabulate.  So -- so if a person can mark

25    multiple races -- and in fact, they can select

HT_0006138

P-000115

9/20/2021                Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 62

1    all of them.  And when they do that, we, in

2    the redistricting dataset that we compile and

3    use in our software, we will count every

4    person that has indicated that race as part of

5    that group.

6         So for example, with African -- Black

7    or African American population, we count

8    anyone who responded that they were any

9    combination of race that included Black or

10   African American, and we also include whether

11   or not they were Hispanic.  And so all that's

12   accounted for, and when we do the functional

13   analysis and we review that, we're looking at

14   the categories of anyone who would have

15   responded that they were that race in any

16   combination.  Hopefully, that answers your

17   question.

18        MS. GIBSON:  So a -- sorry, Mr. --

19        CHAIR RODRIGUES:  Go ahead.  You're

20   recognized.

21        MS. GIBSON:  A combination leans

22   towards a particular race, so if -- if someone

23   put that they were African American and White

24   or African American and Hispanic, what's the

25   dominant race that we're counting them as --

HT_0006139
P-000116

9/20/2021                  Common Cause, et al. v. Cord Byrd              Audio Transcription

```
 1              CHAIR RODRIGUES:  You're recognized.
 2              MS. GIBSON:  -- because, obviously,
 3         they're not counting themselves that way.
 4              MR. FERRIN:  Thank you, Mr. Chairman.
 5         So we follow the OMB guidance, which I didn't
 6         go into in great detail, but provides that for
 7         the purposes of analyzing against,
 8         essentially, discriminatory behavior and
 9         Department of Justice review for things like
10         redistricting plans, we are supposed to count
11         all available population.
12              So -- so essentially, if you marked
13         that you were a -- a Black or African American
14         and White, you would be counted in the Black
15         population because you would, theoretically,
16         have standing to bring a discriminatory claim
17         in that circumstance.
18              CHAIR RODRIGUES:  Senator Rouson,
19         you're recognized for a question.
20              MR. ROUSON:  Thank you very much, Mr.
21         Chairman.  And I think you mentioned it, but I
22         just want to be clear, and I want the public
23         to be clear.  On group quarters, Florida
24         continues to count prisoners and college
25         students at the location where they were on
```

HT_0006140

P-000117

Page 64

1     April 1st of 2020, as opposed to their home or

2     before they were incarcerated?

3          CHAIR RODRIGUES:  You're recognized.

4          MR. FERRIN:  Thank you, Mr. Chairman

5     and Senator Rouson.  The Census Bureau counts

6     them there.  We do not edit the census data

7     and reassign them to another geographic

8     location.

9          CHAIR RODRIGUES:  Any further

10    questions?  Senator Bradley, you're

11    recognized.

12         MS. BRADLEY:  Thank you, Mr. Chairman.

13    In the previous slide, you outlined what the

14    census delays.  And I just wondered if you

15    could give a sense of the overall

16    participation rate, even with those delays, of

17    the 2020 census, maybe compared to prior years

18    or whether it was a -- what the participation

19    rate was in 2020.

20         CHAIR RODRIGUES:  You're recognized.

21         MR. FERRIN:  Thank you, Mr. Chairman

22    and Senator Bradley.  This -- Florida had a

23    99.9 percent enumeration rate, so -- so the

24    Census Bureau calculates the total number of

25    households that they have on record, and 99.9

HT_0006141

P-000118

9/20/2021                Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 65

```
 1      percent of those households responded to the
 2      census in 2020.  I don't know the 2010 number
 3      off the top of my head.
 4            MS. BRADLEY:  (Inaudible).
 5            MR. FERRIN:  But I know the 2021 was
 6      99.9.
 7            CHAIR RODRIGUES:  Any further
 8      questions?
 9            Seeing none, let's move on to Census
10      Data.
11            MR. FERRIN:  Thank you, Mr. Chairman.
12      And so to speak a little bit about some of the
13      trends that we've seen in the census data, one
14      of the underlying themes is the shift in -- or
15      continued trend towards population
16      congregation in metropolitan areas.
17            So the population of the U.S. metro
18      areas grew by 9 percent from 2010 to 2020,
19      resulting in 86. -- 80 -- excuse me -- 86
20      percent of the population living in the United
21      States metro areas, as compared to 85 in 2010.
22            Around 52 percent of the counties in
23      the United States saw their 2020 census
24      populations decrease from the 2010 census.
25      The largest county remains Los Angeles County.
```

HT_0006142

P-000119

Page 66

1      The largest city remains New York.  But across

2      the United States, 312 of the 384 metro areas

3      gained population.  Only a few lost.  But one

4      of the fastest growing ones in the United

5      States was, actually, The Villages.  It grew

6      39 percent from about 93,000 people to 130,000

7      or so.

8            Here we have some of the Florida-

9      specific facts.  So we did surpass New York,

10     become the third-largest state officially.  As

11     we just discussed, 99.9 percent of the housing

12     units were counted in the 2020 census.  Our

13     total growth was 2,736,877 people from 2010 to

14     2020, and that's almost 15 percent.  As I

15     mentioned earlier, The Villages was the

16     fastest-growing metro area in the country and

17     also in the State of Florida.

18           Talking about the self-response rate,

19     which was for the first time this year

20     available online -- so in the past, self-

21     response meant that you received your Census

22     Bureau questionnaire in the mail, you filled

23     it out and responded.  It didn't require a

24     door-to-door visit or a nonresponse follow-up.

25     We did improve that a little bit this -- this

HT_0006143
P-000120

Page 67

1       cycle and went from 63 percent to 63.8.

2              Additionally, Jacksonville remains the

3       largest incorporated place in Florida, and

4       it's got 9 million -- or excuse me -- 949,611

5       people.  And Jacksonville, as many of you

6       know, is also -- coincide with the county

7       boundaries of Duval.

8              Osceola County had the largest county

9       growth rate at 45 percent and growing by about

10      120,000 people.  Not surprisingly, then,

11      Florida State Senate District 15 had a similar

12      growth rate, 51 percent, growing 241,000

13      people, which is nearly half of what a senate

14      district used to be.

15             And in the same general area, Florida

16      House District 44 grew 51 percent, and that's

17      by about 80,000, and I believe an ideal

18      district last cycle was somewhere in the

19      neighborhood of 150,000.  Congressional

20      District 9, similarly, grew by about a third.

21      So 259,000 people from 2010 to 2020.

22             One of the other things that's been

23      noted in the -- the census data across the

24      country has been that we've had some shifts in

25      how people identify themselves racially.

HT_0006144

P-000121

Page 68

1           So that being said, the White

2       population still remains the largest race or

3       ethnicity group in the United States, over 204

4       million people identifying as White alone.

5       Another 35 million bring the total to 235.4

6       million reported being either White alone or

7       in combination with another group.  But

8       specifically, the White alone population

9       decreased, and what that means is that we're

10      seeing a trend in which more people are

11      identifying as being White in combination with

12      some other race.

13           Likewise, the multiracial or two or

14      more race population changed.  The multiracial

15      population was measured at 9 million people

16      across the country in 2010, and that's now at

17      33.8 million people, which is a 276 percent

18      increase.  In Florida, I believe, it exceeded

19      that.

20           The in-combination multiracial

21      populations for all race groups accounted for

22      most of the overall changes within each racial

23      categories, so it wasn't necessarily people

24      identifying as a single race African American

25      or single race Asian; it was people combining

HT_0006145

P-000122

Page 69

 1      them across different races.

 2              And then the next largest races --

 3      racial populations were Asian alone or in

 4      combination.  They're up to 24 million

 5      nationwide, and they exceed the American

 6      Indian and Alaskan Native alone or in

 7      combination group, followed by the Native

 8      Hawaiian and other Pacific Islander Group.

 9              Not surprisingly, as I'm sure many

10      people expected, the Hispanic or Latino

11      population, which includes people of any race,

12      was 61 -- 62.1 million in 2020.  This is a

13      growth of 23 percent.  The population that has

14      identify itself of not being Hispanic or

15      Latino origin grew 4.3 percent since 2010.

16              A lot of this data is currently visible

17      and available via the Census website.  They've

18      provided some demographic map viewers, as well

19      as access to the tabular data and now the

20      interactive tables that you can select which

21      types of information you would like to see in

22      which geographical level.  That, also,

23      includes current state legislative and

24      congressional districts.  That's all available

25      on data.census.gov.  And that would conclude

Page 70

1    this portion.  We can pause or keep going, Mr.

2    Chairman.

3         CHAIR RODRIGUES:  Do we have any

4    questions on this portion?

5         Seeing no questions, let's continue on.

6         MR. FERRIN:  Thank you, Mr. Chairman.

7    So the last thing we have for you today is

8    some maps to look at.  So these -- these

9    display the over/under populations for the

10   different districts we have here in Florida,

11   so these are the current congressional

12   district boundaries.

13        Here you can see where we have listed

14   the 2010 population versus the state, as well

15   as the difference, the ideal population of the

16   old congressional districts, which was

17   696,000, and the new one, 769,000.  So almost

18   a 73,000-person change there, as well as the

19   number of districts that we have.

20        One of the things to kind of note about

21   this map is that because we are gaining a

22   congressional district, the color coding there

23   is going to look a little different.  It's --

24   it's -- these districts are going to trend --

25   show to be slightly more over-populated than

HT_0006147
P-000124

9/20/2021                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 71

1      they should, if we would to divide and color

2      them by 28 districts -- or excuse me -- 27

3      instead of 28.

4              Here we have the same map and same data

5      points for the State Senate districts, so you

6      can see here that a lot of the districts in

7      North Florida or currently underpopulated, as

8      are the districts in South Florida, as well as

9      some in the Tampa Bay area.  Most of the

10     growth in the state, as is displayed by this,

11     occurred along the I-4 Corridor and up along

12     the First Coast in St. Johns and Flagler

13     Counties.  Other districts that are

14     overpopulated include in Lee County, District

15     27, but the -- the one that's far and away the

16     most is District 15.

17             Lastly, we have the same kind of slide

18     for the Florida House and their current

19     districts, so looking at this at a more

20     granular level, smaller districts, is going to

21     display some of the population trends in a

22     little more detail.  So you can see here,

23     really, the underpopulation and the

24     significance of it in the Big Bend area.  You

25     can see the dark blue colors show the

HT_0006148

P-000125

9/20/2021                   Common Cause, et al. v. Cord Byrd                   Audio Transcription

Page 72

1      overpopulation, particularly in Central

2      Florida and along the I-4 Corridor, and then

3      you can see the bright red and shading and

4      colors down there in South Florida, as well.

5           All of these will be visible on our

6      website, when it launches in an interactive

7      manner that will allow users to click around

8      and get some more data on the specific

9      districts, including the population numbers

10     from 2010, 2020, and the percent differences,

11     as well.  And that would include the

12     presentations, Mr. Chairman.

13          CHAIR RODRIGUES:  Do we have any

14     questions on the map showing the under and

15     over populations of our various chambers?

16     Okay.  Senator Rouson, you are recognized.

17          MR. ROUSON:  Thank you very much.  This

18     may go back to an earlier slide, but the

19     boundaries were adjusted in St. -- in St.

20     Lucie and Martin Counties.  Did that

21     significantly add or shed population because

22     of the boundary adjustment?

23          CHAIR RODRIGUES:  You're recognized.

24          MR. FERRIN:  Thank you, Mr. Chairman.

25     Let me -- the answer is no.  The boundary

HT_0006149
P-000126

Page 73

1    shift between Indian River County and St.

2    Lucie County was one parcel that was six-

3    tenths of an acre that went from St. Lucie to

4    Indian River, and then Indian River -- excuse

5    me, five and a half acres of land were

6    transferred from Indian River to St. Lucie

7    County.

8        The land -- it's my understanding and

9    recollection was -- those five and a half

10   acres were vacant.  There was one house that

11   had a piece of property.  Their parcel was

12   divided by the counties, and so they took the

13   one parcel that had a house on it, moved it

14   all to one county, and the other one took some

15   vacant land in exchange, and it was -- should

16   have had little to no -- I mean, the residents

17   of that one house, but other than that, no

18   changes in population would have -- would have

19   occurred.

20       MR. ROUSON:  Thank you.

21       CHAIR RODRIGUES:  Any other questions?

22       Seeing none, that includes Tab 4.

23   We'll now move on to Tab 5, which is public

24   comment.  We'll start with Jonathan Webber

25   with Florida Conservation Voters.  Jonathan,

9/20/2021                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 74

1        you're recognized.

2            MR. WEBBER:  Thank you, Chair.  Good

3        morning -- afternoon.  My name is Jonathan

4        Webber.  I'm the deputy director of Florida

5        Conservation Voters.  It's wonderful to be

6        back in the same room with all of you and

7        seeing your faces.  We have a lot of important

8        work to do ahead of us, although I will say I

9        will miss the basketball buzzer, which did

10       happen in the civic center in the beginning

11       there.  I'll miss that.

12           Fair political districts are the most

13       important aspect of our democratic republic.

14       The integrity -- integrity of our entire

15       system is in those little lines on the map,

16       which are now completely in your hands.

17           Eleven years ago, 63 percent of Florida

18       voters approved the two amendments related to

19       the redistricting process.  Thank you so much

20       for reviewing them.  These amendments are now

21       part of the state constitution, and like you,

22       I will be referring to these words in the

23       constitution regularly as we engage over the

24       coming weeks and months.

25           But the words in the constitution are

HT_0006151

P-000128

Page 75

 1      only part of the story, and I strongly and

 2      respectfully encourage you -- encourage the

 3      following:

 4              So please ensure that all map drafts

 5      become visible in real time and that all

 6      actual work of map-making is livestreamed with

 7      audio and video.  Preserve all communications

 8      about redistricting and make them available as

 9      public records.

10              Make all mapping data available in the

11      public -- to the public in a common, usable

12      format.

13              Solicit extensive input from the

14      public.

15              Seek out and work to understand

16      opposing perspectives and points of view.

17              Provide ample notice of all proceedings

18      and public comment opportunities.

19              Find ways to get the people of Florida

20      involved in a meaningful way, even if they do

21      not have the means to travel to Tallahassee,

22      which includes virtual verbal input

23      opportunities.  Input and committee meetings

24      is not just enough, especially when Floridians

25      who want to comment on multiple maps sometimes

HT_0006152
P-000129

9/20/2021                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 76

1      cannot make it to multiple meetings.

2            And ensure language accessibility for

3      our rich and diverse population.  Translation

4      services is a must.

5            And I know that each and every one of

6      you is taking this process seriously, and I

7      want you to know that so are the people of

8      Florida.  I'll close by saying the

9      redistricting process demands your best.  It

10     demands our best.  Future generations are

11     watching, and current generations are counting

12     on you.  Thank you all so much.  Best of luck.

13           CHAIR RODRIGUES:  Thank you for your

14     comments.  Next we have Rich Templin with the

15     Florida AFL-CIO.  Mr. Templin, you're

16     recognized.

17           MR. TEMPLIN:  Thank you, Mr. Chairman.

18     What an awesome new space you guys have to

19     work in.  This is my first time being in it,

20     so pretty cool.

21           I represent the Florida AFL-CIO.  The

22     Florida AFL-CIO, we represent 1.3 million

23     union members, their families, and retirees in

24     every area of the state.  We have ten central

25     labor councils in every single geographic

HT_0006153
P-000130

Page 77

 1    region of Florida, and we have members in all

 2    67 counties.  And like Leader Gibson, I was

 3    here ten years ago, participated in the

 4    process, and I can tell you that our members

 5    get very engaged in this.  It's something that

 6    they care a lot about.  I actually think that

 7    they enjoy it as much as it was interactive in

 8    the past and I know will be again in the

 9    future.

10         So I'm really just here to avail my

11    organization to you because in so much as

12    getting the word out about how the public can

13    participate and how the public can watch the

14    process and to get to the goals that you all

15    have set for transparency and clarity, we're

16    going to be doing that.

17         And we're going to be taking all of the

18    rules and procedures that you establish and

19    working within those to engage as much of our

20    members as possible, and so we really look

21    forward to watching this process move forward.

22         It was very encouraging what we heard

23    today, Mr. Chairman.  Thank you.  And we're --

24    we're here, and our members want to be a part

25    of the process.  We're a very bipartisan

HT_0006154

P-000131

Page 78

1    group, and so we just want to be here to help.

2    Thank you very much.

3         CHAIR RODRIGUES:  Thank you.  Next we

4    have Cecile Scoon with the Florida League of

5    Women Voters.  She is the new president.  Is

6    she in the room?  Thank you.  You're

7    recognized.

8         MS. SCOON:  Thank you so much for this

9    opportunity.  My name is Cecile Scoon, and as

10   stated, I'm the new president of the League of

11   Women Voters of Florida, and I'm coming here

12   as a citizen, I'm coming here as the

13   president, as a member of the league, and as

14   a -- or the league is a member of the Fair

15   Districts Coalition that was, also -- many of

16   these organizations were involved in the

17   redistricting in 2010 and everything that

18   transpired.

19        It's been really very good feeling to

20   hear the recounting of the actual history and

21   the problems that, you know, our state ran

22   into and the waste of time and energy and

23   upset in the, you know, creation of distrust

24   with the people when people in the past

25   represented to promise to follow the law and

HT_0006155
P-000132

9/20/2021                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 79

```
 1       then they didn't.  They kind of, you know,

 2       went around the back door and did all those

 3       things.

 4            So one of the things that we came up

 5       with to try to win back the trust of the

 6       people is to ask for representatives and

 7       senators to sign a pledge.

 8            And the pledge is found on the Fair

 9       Districts website, which is

10       fairdistrictscoalition.org, and essentially,

11       it's a -- it's a paragraph, and it's basically

12       just reiterating everything -- many of the

13       things that you already said to being

14       transparent, following the law, you know,

15       adhering to the rules of fairness and

16       everybody getting their equal say, no harm to

17       minority, language, or racial groups, no

18       political gerrymandering, and things of that

19       nature.

20            So it's basically just saying, would

21       you pledge to follow the law that the citizens

22       voted on over 63 percent in the Citizens'

23       Initiative that led to the Fair District

24       Amendments.

25            So I would ask you all, since we're all
```

HT_0006156

P-000133

Page 80

```
 1        here and we're starting anew, to consider
 2        signing that pledge and look it over, and if
 3        there are any questions, please let us know.
 4        So we're very excited about this opportunity.
 5        We're looking forward to the continued
 6        interaction and for public input.
 7             We would ask that the public input be
 8        interactionable, in other words the public
 9        would have a question or statement and then
10        you would hear it in real time and then
11        respond.  I know there are many avenues
12        available with digital and email and all the
13        other things, but it really lights a fire in
14        the citizens' heart to feel excited that they
15        spoke to their representative, they were heard
16        by the elected officials, and that there was a
17        response of some kind to their -- to a
18        question.  So we really, really ask you for
19        that.
20             And the other thing I'd like to say is,
21        on the issue of -- I think Senator Rouson had
22        the question about how was the different
23        committees to interact with the media, and I'm
24        not sure I heard a specific answer to that
25        because we just want to know how we're going
```

Page 81

1    to hear from you.  Are you going to be

2    accessible to the media, also?  Or you know,

3    how is that going to work out?  Thank you.

4         CHAIR RODRIGUES:  I just have one

5    question before you go.

6         MS. SCOON:  Yes.

7         CHAIR RODRIGUES:  The language in the

8    Fair Districts pledge -- is the language in

9    the Fair Districts pledge the exact language

10   that is in the Fair Districts Amendment that

11   was adopted into the constitution?

12        MS. SCOON:  I don't think it's exact.

13   I've got it right here.  It's like a paragraph

14   and a half.  Would you like me to read it?

15        CHAIR RODRIGUES:  No, ma'am.

16        MS. SCOON:  Okay.

17        CHAIR RODRIGUES:  I'm just going to

18   share with you my particular position --

19        MS. SCOON:  Sure.

20        CHAIR RODRIGUES:  -- which is, if the

21   language is not exact, I can't pledge to it.

22   When I took my oath of office, I pledged to

23   uphold the Constitution of the State of

24   Florida, which includes the language that was

25   adopted by the voters in that Fair Districts

HT_0006158

P-000135

9/20/2021                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 82

```
 1      Amendment.  So if you're asking me to pledge
 2      to do something that is outside of that
 3      amendment, you're putting me in a position
 4      where I would be violating my oath of office,
 5      and I just can't do that.
 6             MS. SCOON:  Yes, I -- I --
 7             CHAIR RODRIGUES:  But I appreciate your
 8      participation.
 9             MS. SCOON:  yes.
10             CHAIR RODRIGUES:  And I appreciate your
11      enthusiasm.
12             MS. SCOON:  Thank you.  I understand
13      your analysis.  I don't think it's outside.
14      It's not -- it doesn't mirror the exact words,
15      but I think -- it's certainly well within the
16      intent, but I -- I respect what you're saying.
17      Thank you, sir.
18             CHAIR RODRIGUES:  Thank you.
19      Appreciate it.  Do we have any other public
20      comment?
21             Seeing none, do we have any comments
22      from the members before we conclude?  Is there
23      any other business to appear before the
24      committee?
25             Seeing none, Senator Stargel moves that
```

HT_0006159
P-000136

9/20/2021                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 83

1          we adjourn.  Without objection, we'll show

2          that motion's been adopted.  We are adjourned.

3                    (End of Video Recording.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HT_0006160
P-000137

9/20/2021                Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 84

1                        CERTIFICATE

2          I, Wendy Sawyer, do hereby certify that I was

3    authorized to and transcribed the foregoing recorded

4    proceedings, and that the transcript is a true record, to

5    the best of my ability.

6          DATED this 15th day of March, 2023.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    _____

24    WENDY SAWYER, CDLT

25

HT_0006161

P-000138