```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION

 3

 4   KÉTO NORD HODGES, et al.,

 5        Plaintiffs,

 6           vs.                     Case No:  8:24-CV-879

 7   KATHLEEN PASSIDOMO, et al.,

 8        Defendants.

 9   _____/

10

11

12

13

14              DEPOSITION OF JARVIS EL-AMIN

15

16

17

18        DATE:          November 21, 2024

19        TIME:          2:01 p.m. to 3:51 p.m.

20        LOCATION:      Videoconference-Zoom

21        SETTING FIRM:  Shutts & Bowen - Tallahassee

22        REPORTER:      Jill Saravis-Regan, Court
                         Reporter and Notary Public for
23                          The State of Florida at Large

24        FILE:          J12008347

25
```



1  APPEARANCE:

2

3  FOR THE PLAINTIFFS KÉTO NORD HODGES, ET AL:

4  James Michael Shaw, II, Esquire
   Butler Weihmuller Katz Craig, LLP
5  400 N Ashley Drive
   Suite 2300
6  Tampa, FL 33602-4305
   813-594-5603
7  jshaw@butler.legal

8

9

10
   COUNSEL FOR KATHLEEN PASSIDOMO IN HER OFFICIAL CAPACITY
11 AS PRESIDENT OF THE FLORIDA SENATE:

12
   Denise M. Harle, Esquire
13 Shutts & Bowen, LLP
   215 South Monroe Street
14 Suite 804
   Tallahassee, Florida 32301
15 (850) 241-1717
   DHarle@shutts.com
16

17

18

19

20

21

22

23

24

25



JARVIS EL-AMIN                                    November 21, 2024
HODGES V. PASSIDOMO                                              3

```
 1                    EXAMINATION INDEX

 2

 3

 4  JARVIS EL-AMIN
         DIRECT BY MS. HARLE . . . . . . . . . . .    4
 5

 6

 7

 8

 9

10
    -----------------------------------------------------------
11

12

13

14                    EXHIBIT INDEX

15

16
    Exhibit
17

18   1      Complaint                              34

19   2      Initial disclosures                    55

20

21

22

23

24

25
```



```
 1  THEREUPON,
 2                      JARVIS EL-AMIN,
 3  a witness, having been first duly sworn, upon his oath,
 4  testified as follows:
 5                   DIRECT EXAMINATION
 6  BY MS. HARLE:
 7      Q.   Good afternoon, Mr. El-Amin.  My name is Denise
 8  Harle.  I'm one of the attorneys for the Florida Senate in
 9  this case.
10      Could you please state and spell your name for the
11  record?
12          MR. SHAW:  I think -- before we start, are we --
13      (Thereupon, a discussion was held off the record.)
14  BY MS. HARLE:
15      Q.   Will you please state and spell your name for the
16  record?
17      A.   Jarvis Karin El-Amin, Jarvis is J-a-r-v-i-s;
18  Karin is K-a-r-i-n; El-Amin is E-l, hyphen, capital "A,"
19  m-i-n.
20      Q.   Thank you.  Did you attend yesterday's deposition
21  of Ms. Garcia in this case?
22      A.   No.
23      Q.   All right.  Have you -- do you understand that
24  you're being deposed under oath today?  Meaning, your
25  testimony is subject to penalty of perjury.
```



JARVIS EL-AMIN                                      November 21, 2024
HODGES V. PASSIDOMO                                               5

1      A.    Yes, ma'am.

2      Q.    Do you -- let's see.  Have you ever been deposed?

3      A.    Yes.

4      Q.    Okay.  Tell me about all of the other times

5  you've been deposed, please.

6      A.    I can't recall.

7      Q.    Okay.  Do you recall any times that you've been

8  deposed previously?

9      A.    No.

10     Q.    Okay.  Have you -- have you been a witness and

11 sat for a deposition before?

12     A.    Repeat your question.  I can't understand what

13 you're saying.

14     Q.    Sorry.  Have you been deposed before today?

15     A.    Yes.

16     Q.    Okay, when were you deposed?

17     A.    I don't remember.  A long time ago.

18     Q.    Were you previously deposed one time or more than

19 one time?

20     A.    One time.

21     Q.    Was it a criminal matter or a civil matter?

22     A.    I don't recall.

23     Q.    Were you a party to the dispute?

24     A.    I can't remember, ma'am.

25     Q.    What was the nature of your deposition testimony;



1  what was the subject matter?

2      A.   I don't remember.

3      Q.   Is there anything at all that you remember about

4  your previous deposition; where it happened, who was

5  involved, which court it was related to?

6      A.   All I remember is it was a long time ago in

7  Miami, I'm sorry.

8      Q.   Okay.  You -- was it 30 years ago, can you give

9  me a ballpark estimate?

10     A.   I can't recall how many years, ma'am.

11     Q.   Do you think it was more than ten years ago?

12     A.   I cannot say.

13     Q.   Were you a defendant in the case?

14     A.   I don't remember, ma'am.

15     Q.   Have you ever testified in court?

16     A.   Could you clarify what you mean by that?

17     Q.   Have you ever given testimony in a court of law?

18     A.   Yes.

19     Q.   Okay.  Have you done that more than one time?

20     A.   I don't recall, ma'am.

21     Q.   Is there only one time you recall previously

22  giving testimony in court?

23     A.   One time I remember.

24     Q.   Okay.  Can you tell me about that time, please?

25     A.   I don't remember what it was.  I was young, I



1  don't remember.

2      Q.   Was it the same matter that you gave the

3  deposition in?

4      A.   No, I don't remember, ma'am.

5      Q.   Mr. El-Amin, when you testified in court

6  previously, was that in a civil case?

7      A.   I don't remember.  I think it was civil, I'm not

8  remembering for certain.

9      Q.   Were you a party in that lawsuit?

10     A.   I don't remember, ma'am.

11     Q.   What were the civil claims, or what was the

12  subject matter of the dispute that you testified in court

13  about?

14     A.   I don't recall, ma'am.

15     Q.   Was that here in Florida?

16     A.   Yes.

17     Q.   What city was that in?

18     A.   Miami.

19     Q.   Can you estimate what year or what decade your

20  court testimony occurred in?

21     A.   It could have been the late 70s.

22     Q.   Do you remember anyone else who was involved in

23  that case that you can identify?

24     A.   No, I don't.

25     Q.   How did you get involved in the case where you



1  testified in court?

2      A.   I don't remember, ma'am.

3      Q.   And the previous deposition testimony you gave,

4  was that also here in Florida?

5      A.   Could you clarify what you said?

6      Q.   Earlier, you told me that you had been deposed

7  before.  I'm asking, did that occur here in Florida, your

8  deposition?

9      A.   Yes.

10     Q.   Okay.  What city was that in?

11     A.   It could have been Miami.  I'm not certain.

12     Q.   And are you able to give me an estimated decade

13  when that occurred?

14     A.   No, ma'am.

15     Q.   We'll just to go over a few ground rules for

16  today.  So far you seem to be doing well on all of these,

17  but I just need to make sure that you give a verbal

18  response to all of my questions; that you're careful not

19  to interrupt me or talk over me.  If you have any trouble

20  understanding my question, please just ask me to rephrase

21  or try it again.  I'm happy to do that.

22     If you do answer my question, that answer will be

23  under oath, and we will all assume that you understood my

24  question and the answer you gave is binding and accurate.

25     If at any point, seeing a document would help you



JARVIS EL-AMIN                                    November 21, 2024
HODGES V. PASSIDOMO                                              9

1  refresh your recollection or your understanding, please

2  just let me know and I'll be happy to try to assist you on

3  that.

4      If at any point you need a break, I'm also happy to

5  accommodate that as well, just let me know.  We'll find a

6  good stopping point.

7      Your attorney may object to some of the questions I

8  today, but unless your attorney instructs you not to

9  answer, you do still need do go ahead and answer the

10  question.

11      Does all of that make sense?

12      A.    Yes, ma'am.

13      Q.    Thank you.  Could you please state your address,

14  your current residence?

15      A.    4818 East 99th Avenue, Tampa, Florida 33617.

16      Q.    And when did you move there?

17      A.    I moved there initially in 1989.  For two years,

18  I moved away, and came back in 2003 to current.

19      Q.    In that exact same address?

20      A.    Excuse me, not 2003, 2005.

21      Q.    Okay, so just to clarify, you've lived at your

22  current address, 4818 East 99th Street in Tampa -- excuse

23  me, East 99th Avenue in Tampa since 2005?

24      A.    I initially moved there in 1989 and stayed away

25  from there from 2003 to 2005.  I moved back there in 2005.



JARVIS EL-AMIN                                          November 21, 2024
HODGES V. PASSIDOMO                                                   10

1   I've been there since 2005.

2        Q.    And is that a house?

3        A.    Yes, ma'am, yes.

4        Q.    Do you own the house?

5        A.    Yes.

6        Q.    Is there any chance that you're aware that you

7   might be moving in the next year or two?

8        A.    No chance.

9        Q.    What's your educational background since high

10  school?

11       A.    I have high school diploma and some college.

12       Q.    Where did you attend college?

13       A.    I attended Miami-Dade Junior College and

14  Hillsborough County Community College.

15       Q.    Sir, after college, what did you do after leaving

16  college?

17       A.    Well, opened up the restaurant business.

18       Q.    Was that -- was that in the Miami area?

19       A.    In Miami.

20       Q.    And how long did you work in the Miami -- excuse

21  me, the restaurant business in Miami?

22       A.    About five years, six years.

23       Q.    What did you do after that?

24       A.    I went into salesmanship.  I worked for a company

25  doing sales.



1     Q.    And what kind of sales?

2     A.    Insurance.

3     Q.    How long did you do insurance sales?

4     A.    I don't recall, a couple of years.

5     Q.    And what did you do after that for a line of

6  work?

7     A.    Entrepreneurship, working at flea markets.

8     Q.    Did you say flea markets?

9     A.    Yes, ma'am.

10    Q.    Is that what you still do, nowadays?

11    A.    No.

12    Q.    Okay.  You don't do entrepreneurship now -- or do

13 you do entrepreneurship now?

14    A.    Yes.

15    Q.    Okay.  Well, maybe we'll start there and then we

16 can work backwards if we need to.  What -- tell me about

17 your current employer, please.

18    A.    I have my own company, Enhancement Enterprises.

19 I do sales training and consulting.

20    Q.    What's the name of your business?

21    A.    Enhancement Enterprises.

22    Q.    How long have you owned that business?

23    A.    Fifteen years.

24    Q.    Do you have a physical office location?

25    A.    No.



1      Q.   Have you ever worked for a political

2   organization?

3      A.   Yes.

4      Q.   Which political organization have you worked for?

5      A.   I worked for specific engagement -- I don't know

6   if it's political -- Florida Rising

7      Q.   I'm sorry, what was it called?

8      A.   Florida Rising.

9      Q.   Florida Rising, okay.  And what does Florida

10   Rising do?

11      A.   Specific engagement.

12      Q.   Can you tell me more specifically some of the

13   particular activities of Florida Rising?

14      A.   Yes, it's canvassing about particular issues in

15   the community, all people, about different issues in the

16   community and educate people through the voting process.

17      Q.   And when did you work there?

18      A.   Recently, from July to -- this year, July to

19   September of 2024; July, 2024, to September.

20      Q.   So you worked with Florida Rising for three or

21   four months earlier this year.  Is that right?

22      A.   Forty-five days.

23      Q.   Okay, and how did you get involved with Florida

24   Rising?

25      A.   Just knew of the work that they do in the



1  community.

2      Q.   Where -- geographically, where did you do your

3  work for Florida Rising?

4      A.   In the Tampa Bay area.

5      Q.   Anything more particular or is it the whole

6  entire Greater Tampa Bay area?

7      A.   Inside of Tampa.

8      Q.   Was it certain areas inside of Tampa?

9      A.   No.

10     Q.   Was there any particular reason why you focused

11 on doing the Florida Rising work inside Tampa?

12     A.   I don't understand that question.

13     Q.   Well, you told me that Florida Rising does

14 specific engagements and that you've worked with them on

15 specific engagements inside of Tampa.  So out of the

16 Greater Tampa Bay area -- just curious -- was there any

17 reason why your focus was inside the City of Tampa?

18     A.   No.

19     Q.   What particular issues did you work on with

20 Florida Rising?

21     A.   Affordable housing.

22     Q.   I'm sorry, say that one more time.

23     A.   Housing.

24     Q.   Housing.  Affordable housing.  Anything else?

25     A.   And high electric bills.



1      Q.    Anything else?

2      A.    That's it.

3      Q.    Other than Florida Rising, have you ever worked

4   for a political organization or a civic engagement

5   organization?

6      A.    No.

7      Q.    Have you ever worked for a legal organization?

8      A.    No.

9      Q.    Are you currently involved in any civil rights

10  organization?

11     A.    Could you clarify what you mean by "civil rights

12  organization"?

13     Q.    Are you currently involved in any voting rights

14  organizations?

15     A.    Could you clarify what you mean by "voting rights

16  organization"?

17     Q.    Are you currently involved with any organization

18  that works on issues related to voters and voting?

19     A.    Yes.

20     Q.    Okay, and what organization is that?

21     A.    NAACP.

22     Q.    And are you an officer with NAACP?

23     A.    No.

24     Q.    Are you a member of NAACP?

25     A.    Yes.



JARVIS EL-AMIN                                      November 21, 2024
HODGES V. PASSIDOMO                                              15

```
 1        Q.    How long have you been a member of NAACP?

 2        A.    I can't recall the exact date.

 3        Q.    Can you estimate?

 4        A.    Maybe five years.

 5        Q.    And what does the NAACP have to do with respect

 6   to voting?

 7        A.    Civic engagement.

 8        Q.    What do you mean by "civic engagement"?

 9        A.    Encouraging people to participate in the

10   political process.

11        Q.    And what do you do as a member of NAACP in terms

12   of that organization?

13        A.    (inaudible).

14        Q.    What do you do in terms of activities within the

15   NAACP organization?  You personally.

16        A.    I sit on the executive committee.

17        Q.    Do you sit on the executive committee?

18        A.    Yes.

19        Q.    But you're not an officer?

20        A.    No.

21        Q.    Okay.  Do you have a title on the executive

22   committee?

23        A.    Executive Committee Member At Large.

24        Q.    Does the NAACP do advocacy relating to black

25   voters specifically?
```



```
 1      A.    No.

 2      Q.    Are you a member of any other organization or are

 3  you involved with any other community organization that

 4  focuses on issues relating to black residents of the Tampa

 5  area?

 6      A.    No.

 7      Q.    Are you a member of City of Tampa Racial

 8  Reconciliation Committee?

 9      A.    Yes.

10      Q.    Okay, and what does that organization do?

11      A.    Well --

12            MR. SHAW:  Object to form.

13            Go ahead and answer.

14            THE WITNESS:  Well, it hasn't been formed yet.

15      It's just been made by the city counsel.  It hasn't

16      been formed.  We haven't even had its first meeting.

17  BY MS. HARLE:

18      Q.    Are you involved in any other community

19  organization that focuses on particular groups or

20  subgroups of people?

21      A.    What do you mean by that?

22      Q.    Well, one of the issues of the case is, you know,

23  you talking and complaining about communities of interest.

24  So are there any other organizations you're involved with

25  actively that focus on certain communities of interest,
```



 1  whether that be voters, black residents, religion,

 2  anything at all?

 3          MR. SHAW:  Object to form.

 4          You can answer it.

 5          THE WITNESS:  I'm involved with my faith

 6      community.  The same way --

 7  BY MS. HARLE:

 8      Q.  Very good.  What -- okay.

 9      A.  The same way in terms of civic engagement.

10  And --

11      Q.  Okay.  And are -- is there a -- I'm sorry, I

12  interrupted you.

13      A.  Yes.  I'm involved in my faith community and

14  civic engagement educating them to the voting process.

15      Q.  And is that an organized involvement with a

16  particular group, or is that something more organic?

17      A.  Organic.

18      Q.  In other words, is there a specific group with a

19  group name that you are involved with in your faith

20  community?

21      A.  No.

22      Q.  Are you familiar with a Nasr Community

23  Development Corporation?

24      A.  Yes.

25      Q.  Okay.  And what is that?



JARVIS EL-AMIN                                    November 21, 2024
HODGES V. PASSIDOMO                                              18

1      A.    That is a community development organization,

2  it's called "Nasr."  "An-Nasr" means help.  It does youth

3  development, youth entrepreneurship, and training youth in

4  lower income communities teaching them about

5  entrepreneurship.  I'm one of the founding members of

6  that.

7      Q.    That's great.  Are you familiar with the

8  Jacksonville Masjid of Al-Islam?

9      A.    Could you repeat the question?

10     Q.    Well, I might be saying it wrong, but are you

11 familiar with the Jacksonville Masjid, M-a-s-j-i-d, of

12 Al-Islam?

13     A.    I'm familiar with it because it is a part of a

14 African-American Muslim Association that I'm familiar

15 with, and it's called Jacksonville Masjid.  "Masjid" means

16 "place of worship."

17     Q.    Are you actually involved in that organization or

18 just aware of it?

19     A.    Just aware of it.

20     Q.    How about the Masjid and Nasr, are you familiar

21 with that organization?

22     A.    Yes.

23     Q.    Are you involved with that organization?

24     A.    Yes.

25     Q.    Are you the vice chairman of that organization?



1    A.   Yes.

2    Q.   Okay, and what does that organization do?

3    A.   It is a community that do outreach in the

4  community; food pantry, social concerns, youth

5  development, and mentoring young, new Muslims into the

6  Islamic faith.

7    Q.   So does that organization have any participation

8  on the civic engagement front?

9    A.   No.

10   Q.   Is there any other voting-related activities that

11 you're involved with that I haven't asked about yet?

12   A.   No.

13   Q.   Okay.  Did you at one time participate in a tax

14 payer-funded voter education program in Hillsborough's

15 black community?

16   A.   Repeat the question.

17   Q.   Did you at one time participate in a tax

18 payer-funded voter education program in Hillsborough's

19 black community?

20   A.   No, I didn't.

21   Q.   Do you know someone named Buddy Johnson?

22   A.   Yes, I do.

23   Q.   Okay.  Did you participate in a voter education

24 program, Buddy Johnson?  Does that refresh you memory?

25   A.   It was a campaign event.  He was running for



JARVIS EL-AMIN                                         November 21, 2024
HODGES V. PASSIDOMO                                                    20

 1  re-election.  In his campaign, I did some consulting work

 2  for him, for his campaign; not for the supervisor election

 3  office.

 4      Q.   So it was a -- was it a one-time campaign event,

 5  or you're you saying you worked for his campaign?

 6      A.   I did consulting work for his campaign.

 7      Q.   Over what period of time?

 8      A.   I can't recall the dates.  It's been a quite a

 9  while ago.

10      Q.   And who paid you for that?

11      A.   Each campaign paid my company, my consulting

12  company.

13      Q.   Is that a consulting company that you still

14  currently operate?

15      A.   No.

16      Q.   Other than working with Buddy Johnson, have you

17  done any other campaign consulting?

18      A.   Yes, I have.

19      Q.   Okay.  And please tell me the candidates or

20  issues or groups that you've done campaign consulting.

21      A.   It's been quite a few, so I'll name as many as I

22  can remember.

23      Q.   Thanks.

24      A.   I worked with Bob Buckhorn when he ran for Mayor.

25  I worked for Kevin Beckner.  I worked with Sandra Murman.



 1  I worked with Betty Reed.  Just to name a few.

 2      Q.   Have you ever been an outreach coordinator for a

 3  campaign?

 4      A.   Yes.

 5      Q.   Okay, and when was that?

 6      A.   I worked with David Strauss campaign, 2019.  I

 7  was the Urban and Muslim outreach coordinator.

 8      Q.   And what did you do in your capacity as an

 9  outreach coordinator for that campaign?

10      A.   I reached to the black voters and Muslim voters

11  and discussed his campaign with those people.

12      Q.   And was your outreach focused on a particular

13  geographic area?

14      A.   Yes.

15      Q.   Which geographic area was your outreach focused

16  on?

17      A.   The Urban core and the Muslim community.

18      Q.   Was all of that within the city of Tampa?

19      A.   Yes.

20      Q.   And where -- if you can just sort of give me a

21  rough idea -- is the urban core of Tampa, toward the north

22  or the east or the south, somewhere else?

23      A.   Central east.

24      Q.   Is there any other time that we haven't discussed

25  that you worked on voting issues or campaign issues or



 1  partisan issues?

 2      A.   No.

 3      Q.   Have you ever volunteered as a phone maker in an

 4  election?

 5      A.   Yes.

 6      Q.   Okay, and when was that?

 7      A.   A long time ago, when Barack Obama ran for

 8  president.

 9      Q.   Any other time?

10      A.   No.

11      Q.   And have you ever canvassed for an election?

12      A.   Yes.

13      Q.   And when was that?

14      A.   When Barack Obama ran for president.

15      Q.   Any other time?

16      A.   When I was hired for campaigns.  Any of those

17  campaigns I mentioned to you, I did some canvassing with

18  those campaigns.

19      Q.   Besides this lawsuit, have you ever been involved

20  in a civil lawsuit as a party?

21      A.   No.

22      Q.   Have you ever been convicted of a crime?

23      A.   Say it again, ma'am.

24      Q.   Have you ever been convicted of a crime?

25      A.   I had a case that was in a Federal court that was



1  a pre-arrangement I made.  I'm not certain.  My lawyers

2  know that it wasn't -- was told through litigation I

3  wasn't convicted.  I'm not certain of that.

4      Q.   And do you recall what year that was in?

5      A.   2000; twenty-four years ago.  It's been quite a

6  while ago.

7      Q.   And what were the charges?

8      A.   It was credit card -- no, it was social security

9  identity and mail fraud.

10     Q.   And I think you said you plead no contest, or you

11 said you were convicted?

12     A.   It was a plea agreement; I made a plea with the

13 U.S. Attorney's Office.

14     Q.   Have you ever plead no contest to a crime?

15     A.   I can't recall.

16     Q.   Are there any other times that you recall when

17 you were convicted of a crime?

18     A.   No.

19     Q.   Do you recall pleading no contest to a first

20 degree domestic violence battery in the year 2000?

21     A.   No.  I had problems with my daughter and that

22 case was dissolved in anger management.  I don't recall

23 pleading guilty to the charge.

24     Q.   And, so, you don't recall whether you were

25 convicted of that?



 1    A.    No.

 2    Q.    And the earlier -- the other incident you

 3  described with the identity and the mail fraud, and the

 4  plea agreement, what did you say was the ultimate penalty

 5  or punishment of that case?

 6    A.    Yes.  It was three years, 36-month regular

 7  probation at six months.

 8    Q.    Are there any other times that you have been

 9  convicted of a crime or plead no contest to a crime?

10    A.    I can't recall.

11    Q.    Okay.  Do you recall a time in 2005 where there

12  was a felony information filed against you for a criminal

13  incident?

14    A.    Some of the things that you mentioned have been

15  over 20 years ago, so I may not recall them clearly.  So

16  if you can, refresh my recollection.

17    Q.    The reason -- you know, the reason I'm exploring

18  this is, just, in the Federal Courts when someone has been

19  convicted of a crime or pled no contest to a crime that is

20  subject to a year or more in prison, that's something that

21  actually can become relevant in the case; so I'm just

22  trying to figure out what happened in some of your

23  background here.

24    So have you ever lost your voting rights at any point?

25    A.    I'm not sure that I'd lost my voting rights.



1  Because what happened was, action was taken, but -- and I

2  was on probation.  And when they resolved the probation,

3  they gave me any passport back.  So I don't recall losing

4  my voting right.

5     Q.  Do you recall ever having to take steps to

6  restore your voting rights?

7     A.  No.

8     Q.  Do you recall ever having to pay any criminal

9  fees or costs or restitution related to the felony?

10    A.  Yes.

11    Q.  Okay, and as far as you know, do you have any

12 outstanding costs that you need to pay related to the

13 felony at this point?

14    A.  No outstanding costs.  They -- all was paid.

15 They wouldn't have let me off probation with it.  That's

16 the only thing.

17    Q.  Have you ever been a party to any bankruptcy

18 proceedings?

19    A.  Yes.

20    Q.  How many times?

21    A.  Three times.

22    Q.  Did those end up involving any court testimony?

23    A.  I don't recall.

24    Q.  Do you recall what years those bankruptcies were?

25    A.  No.



1    Q.   All right.  Tell me, just in your own words, if

2  you will, why you're bringing this lawsuit challenging the

3  map?

4    A.   Well, I was put in touch with one of the

5  attorneys and discussed representation, fair

6  representation, for the community in which I live in.  And

7  fairness and equity is all I can say.

8    Q.   Okay.  Well, let me be clear.  I don't want you

9  to ever tell me anything you said to your attorney or

10  anything your attorneys have said to you, but I would like

11  it if you would be able to unpack a little bit more why

12  you think that fairness and equity support your current

13  legal challenge to the map.

14    A.    I just think representation matters and -- I'll

15  leave it there.

16    Q.   And what is it about the map that you're

17  challenging that you think harms fair representation?

18    A.   Well, I'm not an expert on maps, but I can tell

19  you for certain that the only reason I can see that you

20  would take one group of people and lock them across the

21  bay to another group of people, would be to put people

22  that look alike in all in one area.  I don't think that

23  it's fair.

24    Q.   And when you say "people that look alike," what

25  kinds of people are you talking about?



```
 1      A.   Black people.
 2      Q.   Okay.  And, so -- and do you think it's unfair to
 3  have black voters in the same district as other black
 4  voters?
 5           MR. SHAW:  Object to form.
 6           Go ahead and answer.
 7           THE WITNESS:  I didn't say that.  If you -- you
 8      can ask me the question another way, but that ain't
 9      what I said.  But you can ask me a question.
10  BY MS. HARLE:
11      Q.   Yeah, so what's unfair about having groups of
12  black voters in the same district?
13      A.   Nothing.
14           MR. SHAW:  Object to form.
15           Go ahead and answer.
16           THE WITNESS:  Nothing.
17  BY MS. HARLE:
18      Q.   Okay.  Well, then what's unfair about the map
19  you're challenging?
20      A.   Like I said, I'm not an expert on maps, but I
21  know that people on this side of the bay and the
22  Hillsborough side of the bay have different issues and
23  concerns than people that live in South St. Petersburg,
24  even though they're going to be the same color.  They got
25  different issues, different concerns, and they process
```



1  issues differently.

2      Q.   And what are some of the issues that the voters

3  on the one side of the bay would see differently than

4  voters on the other side of the bay?

5      A.   I'll just say this, I'm not an expert on what

6  other people see, but I do know the issues are different.

7  Very -- they're different.

8      Q.   Okay.  Yeah.  Tell me what those very different

9  issues are.

10      A.   I'm not an expert on what the issues are, but

11  I'll give you one example.  Housing is different on this

12  side of the bay than it is in South St. Petersburg.

13      Q.   And in your perspective, what are the housing

14  issues that are of concern on the Tampa side?

15      A.   I think that the housing issues concerned on the

16  Tampa side is affordability and gentrification.

17      Q.   Do you know if there's any housing issues of

18  concern on the St. Pete side of the bay?

19      A.   No.

20      Q.   Are there any other issues you can think of that

21  are very different from Tampa and St. Pete?

22      A.   The way crime is addressed.

23      Q.   Tell me more about that.

24      A.   Well, policing one area, small area, can be

25  different from policing a larger area that's more diverse.



1    Q.    What's -- what police in a small area are you

2 referring to?

3    A.    Well, we're talking about South St. Petersburg.

4    Q.    Okay.  And so what's the different in policing

5 between South St. Petersburg and policing in Tampa, if

6 there is any difference.

7    A.    One is policing an almost all-black community,

8 and one is policing a more diverse area with people of

9 different diverse backgrounds.

10    Q.    And which area is almost all black?

11    A.    South St. Petersburg.

12    Q.    I'm making sure that I don't miss anything.  So

13 are there any other issues that jump out to you that are

14 very different than the two areas of the district that

15 you're challenging?

16    A.    No, those are the main two.

17    Q.    Other than your attorneys, who have you spoken

18 with about this lawsuit?

19    A.    My wife.

20    Q.    Anybody else?

21    A.    I briefly spoke to Mr. Keto Nord.

22    Q.    Another plaintiff in this case?

23    A.    Right.

24    Q.    And I don't want you to tell me what you guys

25 talked about, but was that -- do you remember roughly when



 1  you spoke to him?

 2      A.    After the case was filed in court.

 3      Q.    Shortly after it was filed, or more recently?

 4      A.    Shortly after it was filed.

 5      Q.    Okay.  Do you know any of the other plaintiffs in

 6  this lawsuit in a personal capacity?

 7      A.    No.

 8      Q.    And other than Mr. Nord Hodges, have you spoken

 9  with any of the other plaintiffs?

10      A.    No.

11      Q.    During the redistricting process that resulted in

12  the maps at issue in this case, did you communicate with

13  any members of staff of the Florida legislature?

14      A.    No, I did not.

15      Q.    When the redistricting process was going on that

16  resulted in the map you're challenging, were you aware

17  that redistricting was happening?

18      A.    I saw pictures recently.  Pictures just on the

19  news, and just a sound-bite on the news talking about it,

20  that's it.

21      Q.    Do you remember what year that was?

22      A.    Sometime this year.

23      Q.    After the redistricting was done and the new map

24  you're challenging was selected, did you communicate at

25  that point with any members or staff of the Florida



 1  legislature?

 2      A.   No, I did not.

 3      Q.   At any point during or after the redistricting

 4  process, have you communicated with any members of the

 5  media regarding the redistricting process or the map?

 6      A.   Would you repeat the question again?

 7      Q.   Well, maybe I can just say it this way.  Have you

 8  communicated with any members of the media regarding the

 9  redistricting process or the resulting map?

10           MR. SHAW:  Object to form.

11           You can go ahead and answer.

12           THE WITNESS:  I spoke to -- not directly to the

13      media -- some people on my attorneys, just for the

14      press release together, and ask for a statement from

15      me.

16  BY MS. HARLE:

17      Q.   Okay.  If I understood you, your attorneys put

18  together press releases on this case.  Is that what you

19  said?

20      A.   There was somebody on my attorney's staff that

21  said they was putting together a press --

22           MR. SHAW:  Don't say what you discussed in the

23      attorney's office.

24  BY MS. HARLE:

25      Q.   So have you -- but have you ever spoken directly



JARVIS EL-AMIN                                    November 21, 2024
HODGES V. PASSIDOMO                                            32

1  with a member of the media regarding the redistricting

2  process of map --

3       A.   No.

4       Q.   Okay.

5       A.   No, I have not spoken directly to the media.

6            MR. SHAW:  Hey, Denise, we're almost at an hour

7       and I need to use the restroom.  Is now a good time

8       for a -- like, a five-minute break?

9            MS. HARLE:  This is just fine, yes.

10           (Thereupon, a short break was taken.)

11  BY MS. HARLE:

12      Q.   All right.  Mr. El-Amin, have you made any

13  statements to any of the community organizations that

14  you're involved with regarding this lawsuit?

15      A.   No.

16      Q.   Have you made any social media posts about this

17  lawsuit?

18      A.   No.

19      Q.   What social media apps or accounts do you have?

20      A.   I have Facebook and Instagram.

21      Q.   Do you have X, or Twitter?

22      A.   No.

23      Q.   Do you have LinkedIn?

24      A.   Yes, but I don't use it.

25      Q.   Do you have a TikTok?



1      A.    No.

2      Q.    Are you currently a registered voter?

3      A.    Yes.

4      Q.    Have you voted in every state's senate election

5    since you have been 18?

6      A.    Yes.

7      Q.    When was the most recent time that you voted in a

8    state senate election?

9      A.    I think two years ago.

10     Q.    Did you vote in the election -- the election we

11   just had in November for any -- in any capacity for any of

12   the elections involved?

13     A.    Yes.  Yes.

14     Q.    You did.  Do you know any reason why you wouldn't

15   show up on the Secretary of State's voter registration

16   rolls?

17     A.    No.

18     Q.    Is your polling place still at Temple Terrace

19   United Methodist Church?

20     A.    Yes.

21     Q.    Have you seen any of the alternative maps

22   involved in this lawsuit?  In other words, if we didn't

23   have the challenge map, some different maps that you in

24   your complaint say would be preferable.  Have you seen

25   those maps?



1          MR. SHAW:  Object to form.

2          Go ahead.

3          THE WITNESS:  Yes, I've seen some maps.

4    BY MS. HARLE:

5      Q.   Let's pull up the complaint.  So if we have some

6    exhibits today, my colleague Leila is going to share her

7    screen.  Hopefully you'll be able to see it.  Just let us

8    know if you need us to zoom in or zoom out, or if we need

9    to try to get it to you in some other format, we'll do

10   that as well.

11     So looking at the complaint --

12         MS. HARLE:  And, Jill, this will be I guess

13     Exhibit 1, LLE-1.

14   (The document referred to was marked for identification as

15              Exhibit No. LLE-1.)

16   BY MS. HARLE:

17     Q.   Let's look, just for example, at -- well, I'll

18   start with this question.  Did you read the complaint

19   before it was filed?

20     A.   Briefly, not fully.

21     Q.   I'm sorry, what did you say?

22     A.   I read it briefly.

23     Q.   And did you approve of everything in the

24   complaint before it was filed?

25     A.   Yes.



JARVIS EL-AMIN                                        November 21, 2024
HODGES V. PASSIDOMO                                              35

1      Q.   Let's look at paragraph 6 and 7.  Do you need

2  time to read that -- the gist of these?

3      And my question will be, in these allegations, you

4  alleged, for example, in paragraph 6, quote, the

5  legislature elevated race above all other considerations.

6  And then in paragraph 7, it says, quote, the legislators

7  and their staff reportedly drew these districts in a race-

8  predominate manner to avoid the diminishment of black

9  voters' ability to elect representatives of their choice.

10      So my question is, what facts do you know is related

11  to the legislature's racial motive in drawing the maps?

12      A.   I'm not an expert on maps.  All I know is that to

13  put -- go across a body of water and put one group in

14  South St. Pete, in with the Hillsborough side, don't seem

15  as fair to me.

16      Q.   And do you personally know any facts that

17  indicate that the legislature's predominant criteria in

18  drawing District 16 was race?

19          MR. SHAW:  Objection to form.

20          Go ahead and answer.

21          THE WITNESS:  No, like I said, I just don't see

22      putting one body of South St. Pete and up and into

23      Tampa as being fair.

24  BY MS. HARLE:

25      Q.   Do you personally know any facts indicating that



1  a legislature's central consideration in the overall

2  map-making process was race?

3         MR. SHAW:  Object to form.

4         Go ahead.

5         THE WITNESS:  No.

6  BY MS. HARLE:

7     Q.   Is there a certain percentage of black voting age

8  population that you think should be in District 16?

9     A.   No.

10    Q.   Do you know how the crime percentage of black

11  voting age population in District 16 compares to the

12  percentage and of black voters' population under the prior

13  map?

14    A.   No.

15    Q.   Are you familiar with the history of the district

16  boundaries of Hillsborough and Pinellas Counties?

17        MR. SHAW:  Object to form.

18        THE WITNESS:  Somewhat.

19  BY MS. HARLE:

20    Q.   Okay.  And what do you know about the history of

21  those district lines in Hillsborough sand Pinellas County?

22    A.   I know it --

23        MR. SHAW:  Object to form.

24        Go ahead.

25        THE WITNESS:  I know it's drawn similar to the



1    way it's not.  It was wrong then and it is wrong now.

2  BY MS. HARLE:

3      Q.   So are you aware that the communities currently

4  combined in District 16 have been combined in a -- in the

5  same district since the early 1990s?

6      A.   Yes, ma'am, I'm aware of that.  It was wrong

7  then, and it's wrong now.  Unfair then, and it's unfair

8  now.

9      Q.   Before filing this lawsuit, have you ever done

10  any advocacy or spoken out against the district boundaries

11  combining those parts of Hillsborough and Pinellas?

12     A.   No.

13     Q.   Have you ever spoken about the issue with the

14  NAACP?

15     A.   No.

16     Q.   Looking at paragraph 11 of your complaint, that

17  paragraph says that, quote, The legislature sacrificed the

18  genuine communities of interest.

19     So my question is which communities of interest are

20  you referring to there?

21     A.   It would be faith community, black community,

22  civic community that vote.

23     Q.   Did you say the faith community?

24     A.   Faith communities, black community, and civic

25  communities that vote.



1    Q.   What do you mean by the civic community that

2  votes?

3    A.   People that live in that community can vote.

4    Q.   And where do you define the community?  Are there

5  certain boundaries?

6         MR. SHAW:  Object to form.

7         Go ahead.

8         THE WITNESS:  Community of Hillsborough.

9  BY MS. HARLE:

10   Q.   Oh, okay.  So in your view, is Hillsborough

11 County a genuine community of interest?

12        MR. SHAW:  Object to form.

13        Go ahead.

14        THE WITNESS:  The community interest is that --

15     is the areas in Hillsborough that the map been drawn

16     for.  There's a community interest.

17 BY MS. HARLE:

18   Q.   And what are the shared -- if there are any, what

19 are the shared characteristics of these members of these

20 communities of interest?  I just want to get more details

21 of, you know, who exactly you're talking about?

22   A.   I don't understand your question.  Could you

23 repeat the question and clarify what you're saying?

24   Q.   Yeah.  What do you understand "communities of

25 interest" to mean?



JARVIS EL-AMIN                                          November 21, 2024
HODGES V. PASSIDOMO                                                  39

1     A.    Anybody that shared the same interest of

2  representation.

3     Q.    And how many communities of interest do you

4  allege are sacrificed under the map you're challenging?

5         MR. SHAW:  Object to form.

6         Go ahead.

7         THE WITNESS:  Community interest would be the

8     communities that has already been assigned to the maps

9     that -- that the legislature had put together.

10 BY MS. HARLE:

11    Q.    And where your complaint says the legislature

12 sacrificed genuine communities of interest, I'm just

13 asking, can you describe for me which communities of

14 interest are sacrificed under the map?

15    A.    The greatest one is the black community.

16    Q.    The black community where?

17    A.    In Hillsborough County.

18    Q.    Any other communities of interest that are

19 sacrificed, in your view, under the map?

20    A.    Yes.

21    Q.    Okay, please tell me.

22    A.    South St. Petersburg.

23    Q.    Is certain people in South St. Petersburg, or all

24 people in South St. Petersburg?

25    A.    Like I said, I'm not an expert on the map, but



1  the only other reason I can see predominant people that

2  live in South St. Petersburg, black men, lumped into

3  Hillsborough County.  It's simply sacrifices interests of

4  both black communities.

5      Q.    Okay.  So in your view, is South St. Petersburg

6  itself a community of interest?

7      A.    Yes, ma'am.

8      Q.    Are there any other communities of interest that

9  you believe are sacrificed in the map you're challenging?

10      A.    No.

11      Q.    Do you believe that communities of interest could

12  be based on a political party?

13      A.    I'm not sure.

14      Q.    Do you think that communities of interest might

15  be based on religion?

16      A.    I don't know.

17      Q.    Do you think that communities of interest might

18  be based on socioeconomic status?

19      A.    I'm not sure.

20      Q.    Do you think that communities of interest might

21  be based on sex?

22      A.    I'm not sure.

23      Q.    And how did you identify the communities of

24  interest that you allege are sacrificed in the plan?

25          MR. SHAW:  Object to form.



1          Go ahead.

2          THE WITNESS:  Black voters.

3   BY MS. HARLE:

4      Q.   Well, my question was, how did you identify the

5   communities of interest that you allege are sacrificed?

6          MR. SHAW:  Object to form.

7          THE WITNESS:  I think that -- like I said, I'm

8      not an expert.  It's obvious that a predominant black

9      community, South St. Petersburg, was locked into a

10     body of water across the bay into Tampa.

11  BY MS. HARLE:

12     Q.   And when did you first form that belief?

13     A.   As I said earlier, it's been wrong since it's

14  been designed like that, and it's wrong now.

15     Q.   When did you first come to believe that

16  communities of interest are sacrificed under the current

17  district lines?

18     A.   I can't give you an exact date.

19     Q.   Can you give me a month and year?

20     A.   I cannot.

21     Q.   Can you give me a year?

22     A.   All I can say is, long time ago.

23     Q.   And how did you -- how did you come to realize

24  and form the opinion that communities of interest are

25  sacrificed under the district lines?



JARVIS EL-AMIN                                    November 21, 2024
HODGES V. PASSIDOMO                                              42

1     A.    It's very simple for me.  One representative

2   trying to represent two sets of citizen's interests being

3   separated by a body of water, instead of one

4   representative for each of the areas.  It seems very

5   simple to me.

6     Q.    And is it your view that a district should only

7   have one community of interest per district?

8     A.    I wouldn't say that.  When you're talking about

9   this particular one you're asking me about.  I don't have

10  expertise on those districts.  I have expertise on this

11  district, the best answer to that question that you're

12  asking.

13    Q.    Is it your understanding that a district might

14  have multiple communities of interest?

15    A.    It's possible.  Everything is possible.  But in

16  my opinion, it's wrong then and it's wrong now.

17    Q.    And what is it that's sacrificed when South

18  St. Pete black voters are voting for the same

19  representative as voters in Tampa?

20    A.    Representation, separately.  True representation

21  of their interests and concerns.

22    Q.    And what, to you, would allow the voters of South

23  St. Pete to have true representation, in your words?

24    A.    A representative that understands the issues and

25  concerns; and, geographically, is there to answer their



1   concerns.

2       Q.   And you don't live in South St. Pete, do you?

3       Sir, do you live in South St. Pete?

4       A.   No, I don't.

5       Q.   Let's look at -- oh, we're there already.

6   Paragraph 12 says that -- let's see.  It's referring to

7   black voters in District 16.

8       It says, the legislature, quote, stripping them from

9   adjacent District 18 and reducing their influence there.

10      So my question would be, do you know of any facts

11  supporting the allegation that the map reduces the

12  influence of black voters?

13      A.   No.

14      Q.   Here in Paragraph 13, it says that, starting with

15  the third line, quote, Floridians, including individual

16  legislators, called out and questioned the legislature's

17  unconstitutional actions.

18      Do you know that what these Floridians called out and

19  questioned?

20      A.   Yes.  Representative Driscoll spoke about the

21  maps.  I saw that on TV.  And that's to the extent that I

22  know about the call out.

23      Q.   Okay.  And what did the representative Driscoll

24  call out?

25      A.   I don't know specifically, but something along



1  the lines of areas.

2      Q.   And what was the legislature's response to that

3  concern?

4      A.   I don't know what their response was.

5      Q.   Any other incidents you're aware of where

6  Floridians called out and questioned the legislature in

7  redistricting?

8      A.   No, ma'am; no.

9      Q.   And when did you -- you told me, when did you

10  learn about Representative Driscoll's comments?

11     A.   As I said before, it was a soundbite on TV

12  somewhere, sometime, this year in 2024.  I can't give you

13  exact date.

14     Q.   Okay.  I just want to make sure I understood your

15  earlier testimony.  Did you say you weren't aware of the

16  redistricting process while it was actually going on, is

17  that right?

18     A.   No, I wasn't.

19     Q.   Okay.  Let's move down to Paragraph 20, please.

20  This says, quote, The inactive plan harms plaintiffs

21  because, among other reasons, it splits up their

22  communities among racial lines and groups their

23  communities with dissimilar ones, unnecessarily, simple

24  because of their race.

25     So my first question is, when this says it splits up



1  the community -- it's -- your plaintiff -- which community

2  are you referring to there, specifically?

3          MR. SHAW:  Object to form.

4          Go ahead.

5          THE WITNESS:  Could you show me a picture of the

6      enacted map, so I can see it?

7  BY MS. HARLE:

8      Q.   Yes.

9          MS. HARLE:  Leila, I think that's figure 3.  Are

10     you able to scroll to figure 3?  I think it's page 23.

11         THE WITNESS:  Is that the enacted map?

12  BY MS. HARLE:

13     Q.   That's the enacted map, sir.

14     A.   Okay.

15     Q.   So the question was, in your allegation, that the

16  plan splits up your community, which community are you

17  referring to specifically?

18     A.   Specifically, according to this enacted map, is

19  clearly a mix of southern part of St. Pete, South

20  St. Pete, with Hillsborough split up by a body of water

21  that you can see on the map.

22     Q.   Okay, so is your community split up in the map

23  you're challenging?

24         MR. SHAW:  Object to form.

25         Go ahead.



1          THE WITNESS:  What do you mean when you say "your

2      community," could you explain that?

3  BY MS. HARLE:

4      Q.   Well, your allegation is that you -- is it okay

5  if we scroll back to your allegations so we can see the

6  words that you used?

7      Paragraph 20, your allegation is that the plan splits

8  up your community.

9      So I am asking you, is your community split up under

10  the plan you're challenging?

11          MR. SHAW:  Object to form.

12          Go ahead and answer.

13          THE WITNESS:  Well, what I'm reading, ma'am, it

14      said "their communities," split up "their communities"

15      along racial lines; and it says, "your community."

16          So could you repeat the question?  I'm reading it

17      myself.

18  BY MS. HARLE:

19      Q.   So you are a plaintiff, right, sir?

20      A.   Ma'am?

21      Q.   Are you a plaintiff?

22      A.   Yes.

23      Q.   Okay, great.  So this says, the enacted plan

24  harms plaintiffs because, among other reasons, it splits

25  up "their" -- "their" being the plaintiff, that would be



 1  you -- communities.

 2      So I'm asking you, is your community split up under

 3  the enacted plan?

 4          MS. HARLE:  Object to form.

 5          Go ahead.

 6          THE WITNESS:  Yes.

 7  BY MS. HARLE:

 8      Q.   Okay, and what is your community?

 9      A.   The community of voters that live in Hillsborough

10  County and community voters that live in South St. Pete.

11      Q.   Okay, so is your definition -- and you can say no

12  if I'm getting it wrong.  But are you defining your

13  community as the voters of Hillsborough and the voters of

14  South St. Pete?

15      A.   No.  I'm saying that their community is the

16  communities of your enacted map.  That is the communities.

17  The enacted plan is the communities I'm talking about,

18  according to the map you showed me a minute ago.

19      Q.   Okay, so this allegation says that the plan

20  splits up the plaintiff's communities.

21      Do you understand that?

22          MR. SHAW:  Object to form.

23          THE WITNESS:  Yes, ma'am, I do.

24  BY MS. HARLE:

25      Q.   Do you agree with that?



1    A.    I do agree with it.

2    Q.    Okay.  So can you tell me yes or no.  Is your

3  community split up under the enacted plan?

4    A.    Yes, it does.

5    Q.    Okay.  Can you tell me, how do you view or define

6  your community, sir?

7    A.    A community of voters that has similar interests.

8    Q.    Okay, great.  And what are some of those

9  interests that you and your community share as voters?

10    A.    I don't have a list of interests, but I did

11  create some testimony that said we have housing issues,

12  issues of the client's address, gentrification.  Those are

13  the ones I mentioned before, and those are the ones I'm

14  mentioning now.

15    Q.    Okay, and what is it about the lines that splits

16  up your community of interest?

17    A.    Those issues I just mentioned now are addressed

18  differently, based on the geographic location that they're

19  taking place in.

20    Q.    And are you split from others in your community

21  into different districts?

22        MR. SHAW:  Object to form.

23        THE WITNESS:  I don't understand that question.

24    Can you explain and clarify what you're asking?

25  BY MS. HARLE:



1    Q.   Yeah.  You've testified, and you allege, that the

2  plan splits up your community.  So I'm asking you, what is

3  it about the district lines that splits your community?

4         MR. SHAW:  Object to form.

5         THE WITNESS:  I'll just say it like this, again.

6     People on different sides of the bay being separated

7     by water have different interests, and they have to be

8     addressed differently by the representative for the

9     district, and representation matters.

10        And the only reason I can see that South St. Pete

11     is locked into the district is because of race.

12     That's the only thing that I can see.

13        MR. SHAW:  Denise, I think all of your questions

14     are assuming a certain reading of Paragraph 20 that I

15     don't think is right, and that's why we're having such

16     a who's-on-first disconnect between your questions and

17     his answer.

18  BY MS. HARLE:

19    Q.   Mr. El-Amin, is there anyone in your community

20  who's in a different voting district than you in this map?

21    A.   I'm not an expert on voting districts, to be

22  honest.  I can't answer that question.  I don't know for

23  certain, ma'am.

24    Q.   Okay, and do you -- what are the dissimilar

25  communities that you allege you're grouped with?



1    A.   Well, let me just answer it this way.   There are

2  different issues in South St. Pete than there are, for

3  example, in Temple Terrace in east Tampa.   There are

4  different issues that are addressed different by the

5  representative.   That's what I mean in this complaint.

6    Q.   So is it your -- is it your view that black

7  voters are a community of interest?

8         MR. SHAW:   Object to form.

9         THE WITNESS:   Yes, ma'am, I would say so.

10 BY MS. HARLE:

11   Q.   Is it your view that black voters may have

12 certain issues that they see differently than other black

13 voters?

14   A.   Yes.

15   Q.   And then just before we move on from that

16 paragraph, it says that, you know, the plaintiffs are

17 split up, the communities are split up, and grouped with

18 dissimilar ones simply because of their race.   I just want

19 to make sure, are there any facts you're relying on there

20 when you say the communities were split up and grouped

21 differently because of their race?

22   A.   I personally don't have no advice, but it's

23 simply looking at -- in maps, and looking at who lives in

24 south St. Pete and who lives in, for example, in east

25 Tampa and Tampa Terrace.   It's different as a race.



1      Q.   Do you know what types of criteria the

2  legislature is allowed to use when drawing district lines?

3      A.   I'm not an expert on maps; I honestly don't.

4      Q.   Do you know any criteria that the legislature is

5  allowed to use when drawing district lines?

6      A.   No.

7      Q.   Do you know any criteria that the legislature is

8  required to use when drawing district lines?

9      A.   No.

10     Q.   Let's look at Paragraph 95 of your complaint.

11     Okay.  So this allegation says, quote, these

12  race-based decision resulted in a map that splits up

13  neighborhoods and ignores traditional redistricting

14  criteria.

15     What traditional redistricting criteria do you allege

16  is ignored in the current map?

17     A.   Genuine fairness is all I can say.

18     Q.   Did you say "fairness?"

19     A.   Genuine fairness --

20     Q.   Genuine fairness.

21     A.   -- is all I can stay.

22     Q.   And what's your understanding of how the

23  legislature usually uses fairness as a criteria?

24     A.   I'm not sure -- an expert on -- or how they come

25  up with that.  All I can say is, it's the way this one is



JARVIS EL-AMIN                                        November 21, 2024
HODGES V. PASSIDOMO                                                 52

1  drawn.  It's not giving genuine fairness to me.  It's not

2  giving that to me.

3      Q.   Are there any other traditional redistricting

4  criteria that you're aware of that you believe that

5  legislature ignored?

6      A.   No.

7      Q.   And let's look at Paragraph 131.

8      All right.  This one says, quote, The legislature

9  lacked good reasons to believe that the enacted plan was

10  necessary to achieve Tier 1 compliance.

11     Do you know what Tier 1 compliance means in your

12  complaint?

13     A.   No, I don't.

14     Q.   Okay.  Did you do anything to confirm the

15  allegations in the complaint before it was filed?

16         MR. SHAW:  Before you answer that, do not discuss

17     any conversations that you had with your attorneys or

18     their staff.  You can answer if you did anything other

19     than communicate with your attorneys and your staff.

20         THE WITNESS:  I'm not at liberty to discuss what

21     I talked about with my attorneys.

22  BY MS. HARLE:

23     Q.   And did you do any independent research to verify

24  any of the allegations in the complaint?

25         MR. SHAW:  That's a work product inquiry and I'm



1    instructing him not answer.
2         MS. HARLE:  I can't -- I didn't hear that.
3    BY MS. HARLE:
4         Q.   Sir, did you do any independent research to
5    confirm any of the allegations in the complaint?
6         MR. SHAW:  Objection because it's a work product
7         question.  And I'm going to instruct him not to
8         answer.
9    BY MS. HARLE:
10        Q.   Sir, did you draft the complaint?
11        MR. SHAW:  Denise, you know he didn't draft the
12        complaint.
13        Did you draft the complaint, Mr. El-Amin?
14        MS. HARLE:  Then how is it work product?
15        MR. SHAW:  Because you're not allowed to ask a
16        litigant about the research that they did about the
17        case.  You're not -- just like you're not allowed to
18        ask him about the conversations that he had with his
19        attorney.
20   BY MS. HARLE:
21        Q.   All right.  Let's look at pages 13 and 14 of your
22   complaints.  This is a map called "Plan 42."
23        Have you seen that map before, do you recall?
24        A.   Yes.
25        Q.   And can you just tell me in your own words what



1  I -- if you contend this map is better than the enacted

2  map?

3      A.   Repeat your question.

4      Q.   Yes.  Can you tell me, do you contend that this

5  map is better than the map that you're challenging?

6      A.   Yes.

7      Q.   Okay, and if you could just tell me in your own

8  words, what is it about this map that you think is better

9  than the map that you're challenging?

10     A.   Number one, it's all in Hillsborough County, it

11 don't separate no water.

12     Q.   Anything else?

13     A.   No.

14     Q.   And then if we can look at figure 6, I think it's

15 on page 23 or 26 of the complaint.  Thank you.

16     Okay, do you recall seeing this map before, sir?

17     A.   Yes, I do.

18     Q.   Okay, and do you contend that this map is better

19 than the map you're challenging?

20     A.   Yes.

21     Q.   Okay.  And what is it about this map that you

22 think is better than the map you're challenging?

23     A.   It's all in Hillsborough County, and it stands a

24 little further south than Hillsborough County.

25     Q.   Have you seen any of the maps that your expert



1  witnesses have proposed in this case?

2      A.    I'm not sure.

3      Q.    Alright, let's look at your initial disclosures.

4           MS. HARLE:   This will be, I guess, Exhibit 2.

5  (The document referred to was marked for identification as

6                  Exhibit No. 2.)

7  BY MS. HARLE:

8      Q.    Does this document look familiar to you?

9           MS. HARLE:   Leila, do you want to scroll down

10     just a little bit so we can see the whole thing.

11  BY MS. HARLE:

12     Q.    Do you remember seeing this document before?

13     A.    Yes.

14     Q.    Okay.   On the first page at part A-1, it says

15  there, you'll see your name, Jarvis El-Amin, says you

16  have, quote, have information tending to show that the

17  challenge districts caused harm to themselves and other

18  residents.

19     So the first question is, what is the harm that the

20  challenged district lines caused to you personally?

21     A.    Can you explain what you mean by "challenged

22  district?"

23     Q.    Yes, sir.   I think that is -- well, maybe it's

24  your attorney's words, but in the document that you all

25  submitted there, you say "challenged districts."  I --



1  that should be referring, I assume, to District 16 and 18

2  in the complaint that you're challenging.

3      So the question was, what harm do the challenged

4  districts do to you personally?

5      A.   What it does to me personally is, it takes away

6  my chance to have equitable, fair, and good representation

7  in the Florida House of Representatives Senate.

8      Q.   Is it your contention that your vote is diluted

9  because of the district lines?

10     A.   Repeat that question again, ma'am.

11     Q.   Yeah.  Is it your contention that your vote is

12  diluted by the district lines?

13     A.   I would just answer it the way I just answered

14  it.  It just robs me and other people like me in that the

15  community has a chance to have fair and equitable and good

16  representation, addressing concerns of the community.

17     Q.   And when you say people like you, who are you

18  referring to?

19     A.   Other voters.

20     Q.   All other voters?

21     A    Other voters.

22     Q.   Which other voters?

23     A.   Other voters in the same geographical area that I

24  live in.

25     Q.   And you were on the Hillsborough side, sort of



1  the south, is that right?

2      A.   Repeat what you said.

3      Q.   You're in Hillsborough in the south part of

4  Tampa?

5      A.   Yes.

6      Q.   And going back to that sentence, what is the harm

7  that you believe the districts caused to other residents?

8  Is it anything different that when what you just told me?

9      A.   There's nothing different than what I just told

10 you; it's the same.  It's the same.

11     Q.   And then looking down at document -- at Section

12 1D, that's where you shared -- and the other plaintiff

13 shared -- some individuals you believe may have

14 information regarding consideration of race in their

15 districting process.

16     So my question is, on that list --

17         MS. HARLE:  And, Leila, can you scroll a little

18     bit?

19 BY MS. HARLE:

20     Q.   Do you know of any members of the media

21 specifically who would have information about whether the

22 district lines were drawn primarily based on race?

23     A.   No.

24     Q.   Any of those names on the list -- can you

25 identify any of the people on the list of people who you



1  believe have information that would suggest the lines are

2  drawn primarily based race?

3          MR. SHAW:  Object to form.

4          Go ahead.

5          THE WITNESS:  No.

6          MS. HARLE:  Well, that's the end of my questions.

7          Did you want to take a -- I don't know if you're-

8          Did you want to ask --

9          MR. SHAW:  I don't have any follow-up questions.

10         We will be ordering a copy.  Witness will read.

11         MS. HARLE:  We'll order a copy, thank you.

12         MR. SHAW:  Okay.  Then we'll take one, too.

13            (Thereupon, the deposition concluded.)

14

15

16

17

18

19

20

21

22

23

24

25



```
1                    CERTIFICATE OF OATH

2

3

4   STATE OF FLORIDA)

5   COUNTY OF COLLIER)

6

7

8        I, the undersigned authority, certify that Jarvis

9   El-Amin personally appeared before me and was duly sworn.

10

11

12        WITNESS my hand and official seal this 10th day

13  of December, 2024.

14

15                          _____

16

17                          _____

18                          Jill Saravis-Regan
                            Notary Public-State of Florida
                            My Commission No.:  HH 452361
19                          Expires:  10-09-2027

20

21

22

23

24

25
```



1           REPORTER'S DEPOSITION CERTIFICATE

2

3   STATE OF FLORIDA)

4   COUNTY OF COLLIER)

5

6           I, Jill T. Saravis-Regan, Certified Shorthand

7   Reporter, and Notary Public, certify that I was authorized

8   to and did stenographically report the deposition of

9   Jarvis El-Amin; that a review of the transcript was

10  requested and that transcript is a true and complete

11  record of my stenographic notes.

12

13          I further certify that I am not a relative,

14  employee, attorney, or counsel of any of the parties; nor

15  am I a relative or employee of any of the parties'

16  attorney or counsel connected with the action; nor am I

17  financially interested in the action.

18

19  DATED this 10th day of December, 2024

20                   _____

21

22          _____

23                   Jill T. Saravis-Regan, CSR

24

25

