IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KÉTO NORD HODGES, et al.,

        Plaintiffs,


v.                                    Case No: 8:24-cv-879


KATHLEEN PASSIDOMO, et al.,

        Defendants.
_____ /



DEPOSITION OF JACQUELINE AZIS
VOLUME 1 of 1, PAGES 1 through 48




NOVEMBER 22ND, 2024
9:56 A.M. to 11:04 A.M.
ALL PARTIES APPEARING BY ZOOM CONFERENCE




Stenographically Reported By:
SHERITA BOYLE
COURT REPORTER



```
 1                    A P P E A R A N C E S

 2

 3     ON BEHALF OF PLAINTIFF:

 4     Butler Weihmuller Katz Craig LLP
       400 North Ashley Drive
 5     Suite 2300
       Tampa, FL 33602-4305
 6     813-594-5603
       Jshaw@butler.legal
 7
             JAMES SHAW, ESQUIRE
 8           NAOMI ROBERTSON, ESQUIRE

 9

10     ON BEHALF OF DEFENDANT:

11     Shutts & Bowen LLP
       215 South Monroe Street
12     Suite 804
       Tallahassee, Florida 32301-1858
13     850-241-1727
       Dharle@shutts.com
14
             DENISE HARLE, ESQUIRE
15           LEILA OBERSCHALL, ESQUIRE

16

17     FLORIDA SENATE
       404 South Monroe Street
18     Tallahassee, Florida 32399
       (850) 487-5855
19     Rey.Carlos@flsenate.gov

20           CARLOS REY, ESQUIRE

21

22

23

24

25
```



```
 1                      I N D E X

 2

 3   DEPOSITION OF JACQUELINE AZIS                  PAGE

 4   DIRECT EXAMINATION BY MS. HARLE                 04

 5   CROSS EXAMINATION BY MR. SHAW                   40

 6   RE-DIRECT BY MS. HARLE                          42

 7   CERTIFICATE OF OATH                             45

 8   CERTIFICATE OF REPORTER                         46

 9   ERRATA SHEET                                    47

10

11

12

13                   E X H I B I T S

14   01    COMPLAINT                                 24

15   02    DISCLOSURE                                39
                              - - -
16

17

18

19

20

21

22

23

24

25
```



1              Deposition taken by Zoom Conference before

2         Sherita Boyle, Court Reporter and Notary Public in

3         and for the State of Florida at Large in the above

4         cause.

5                        - - - - - -

6              COURT REPORTER:  Please raise your right hand.

7              (Witness complies.)

8              Do you swear or affirm that the testimony you

9         are about to give will be the truth, the whole

10        truth, and nothing but the truth under penalty of

11        perjury?

12             THE WITNESS:  Yes, I do.

13             COURT REPORTER:  Thank you.  We are ready.

14   THEREUPON,

15                     JACQUELINE AZIS,

16   having been first duly sworn, testified as follows:

17                   DIRECT EXAMINATION

18   BY MS. HARLE:

19        Q    Good morning, Ms. Azis.  Did I say that right?

20        A    Yes, good morning.

21        Q    I am Denise Harle.  I am going to be the

22   attorney for this case for the Florida Senate.  Can you

23   please state and spell your name for the record?

24        A    Yes.  Jacqueline Azis, J-A-C-Q-U-E-L-I-N-E,

25   A-Z-I-S.



1          Q    Thank you.  And did you observe Ms. Garcia and

2    Mr. Elmean's deposition in this case earlier this week?

3          A    I did.

4          Q    Okay.  Are you an attorney yourself?

5          A    Yes.

6          Q    Okay.  Well, I will plan to skip over the

7    explanation of what depositions are then, if you're okay

8    with that?

9          A    I'm okay with that, yes.

10         Q    Great.  Is there any reason for not being able

11   to give your best and most truthful testimony today?

12         A    No.

13         Q    What is your current residential address?

14         A    206 29th Avenue North, St. Petersburg, Florida

15   33704.

16         Q    When did you move there?

17         A    May of 2019.

18         Q    Is that a house?

19         A    It's a house, yes.

20         Q    And do you own it?

21         A    Yes.

22         Q    Is there any chance you're aware that you might

23   be moving in the next year or two?

24         A    No.

25         Q    Can you just tell me your educational



 1   background since high school?

 2       A    Yes.  I went to the University of Florida to

 3   receive my Bachelor of Science in journalism, and then I

 4   attended the University of North Carolina in Chapel Hill

 5   for law school.

 6       Q    And who is your current employer?

 7       A    Wenzel, Fenton, and Cabassa.

 8       Q    What's your position there?

 9       A    I am an attorney.

10       Q    And when did you join that firm?

11       A    July of 2024.

12       Q    What kind of law do you practice?

13       A    It's employment law.

14       Q    Is it on the defense side, plaintiff's side, a

15   little bit of both?

16       A    Both, yeah.  It's mostly a plaintiff's law firm

17   with occasional in defense cases.

18       Q    And who was your previous employer before you

19   joined that firm?

20       A    The ACLU Foundation of Florida.

21       Q    Is that same organization that's the -- your

22   attornies in this lawsuit?

23       A    Yes.  I mean, some of them, yes.

24       Q    What was your position at ACLU Foundation of

25   Florida?



```
 1        A    I was a staff attorney.

 2        Q    And when did you first start working at ACLU

 3   Foundation of Florida?

 4        A    February 2017.

 5        Q    So when this complaint was filed were you --

 6   you were working at the ACLU of Florida; is that right?

 7        A    Can you remind me the filing date?

 8        Q    It was April 10th, 2024?

 9        A    Correct.  I was still employed there, yes, as a

10   staff attorney.

11        Q    Did you work on election cases at the ACLU?

12        A    No.

13        Q    What kind of cases did you work on at ACLU?

14        A    Mostly criminal justice reform, homelessness

15   rights, and first amendment.

16        Q    Anything related to voting rights?

17        A    Not that I recall.

18        Q    How many lawyers do -- does the ACLU of Florida

19   have?

20             MR. SHAW:  Object to form.

21        Q    You can estimate?

22        A    I would have to look at the website.  I do not

23   know.  I mean, I can ball park, but I'm not sure.

24        Q    Do you think it's between 50 and 100?

25        A    No.
```



```
 1        Q    You think less than that?

 2        A    It's less.

 3        Q    So did you personally know your current

 4   attorney at the ACLU of Florida while you were working

 5   there?

 6        A    I'm trying to remember who is on the papers,

 7   but if you can remind me then.

 8        Q    Yes.  It looks like Nicholas Warren.  Did you

 9   know him when you worked there?

10        A    Yes.

11        Q    Okay.  How about Daniel Tilly?

12        A    Yes.

13        Q    Caroline McNamera?

14        A    Yes.

15        Q    Where did you work before the ACLU of Florida?

16        A    I worked as an assistant public defender in the

17   5th judicial circuit.

18        Q    Where is the 5th Circuit?

19        A    It was based in Marion County, which is the

20   Ocala area.  There were four other counties within the

21   5th Judicial Circuit, though.

22        Q    Was that your first job after law school?

23        A    No, it was not.

24        Q    What did you do before that?

25        A    I spent some time working on a campaign in
```



 1    Illinois immediately before that.

 2        Q    And who's --

 3        A    And before that, I was doing employment law.

 4        Q    Which campaign did you work on in Illinois?

 5        A    It was called Illinois Unite For Marriage.

 6        Q    Was that a paid position?

 7        A    I don't remember.

 8        Q    Other than Illinois Unite For Marriage, have

 9    you ever worked for any other political organization?

10        A    If you could just maybe elaborate on what you

11    mean by "political organization."

12        Q    Yeah.  Have you ever worked -- have you ever

13    worked for an organization other than what we talked

14    about, any other organization that focused on what you

15    consider civil rights?

16        A    No.

17        Q    How about --

18        A    Well -- sorry.  I just -- as, like, an intern,

19    yes.

20        Q    Okay.  Where was that?

21        A    ACLU of North Carolina in the ACLU Capital

22    Punishment Project, if you consider those to be political

23    organizations.

24        Q    Okay.  Have you ever volunteered with any

25    organizations that worked on voting issues, voting



1    related concerns?

2         A    Yes.

3         Q    When was that?

4         A    Currently, I am the board president for The

5    League Of Women Voters in the St. Petersburg area.

6         Q    And when did you take office as board

7    president?

8         A    I believe it was May 2023.

9         Q    And before you became president, were you

10   involved as a member of The League Of Women Voters in

11   St. Pete?

12        A    Yes.

13        Q    Are there any other organizations you've been

14   involved with that worked on issues of voting, voting

15   rights?

16        A    Not that I recall at the moment.

17        Q    And what does St. Pete League Of Women Voters

18   advocate for?

19        A    We have a couple of priorities.  Right now our

20   priorities are voting, reproductive rights, social

21   justice, education, and national popular vote.

22        Q    By national popular vote, you mean getting rid

23   of the electoral college?

24        A    I'll be honest, I'm not a great person to

25   explain it, because that's not an issue I worked a lot



1   on, but I think that's generally what that team is

2   working on.

3        Q    Okay.  Well, let's go back to the first you

4   when said voting.  When you said League Of Women Voters

5   advocating for voting, is there anything more specific

6   about the voting that you all do?

7        A    Yes.  Making sure that we have an informed

8   electorate.  We create a voters guide so people will go

9   with candidates or issues will be on their ballot and we

10  publish candidate's answers to our questions so people

11  can make an informed decision.  We also table at events

12  and give people information about how to register to

13  vote.  We also host candidate forums or informational

14  forums about issues that people are voting on and things

15  like that.

16       Q    In your role as president, do you provide any

17  of the contents for the information that goes out to

18  voters?

19            MR. SHAW:  Object to form.

20       Q    Either written in the pamphlet or oral?

21       A    Sorry.  There's just a lot of content that we

22  put out.

23       Q    Okay.  Do you draft any of the content that

24  goes into the voter guides that you described?

25       A    Voters guides?  No.



1    Q    Okay.  Do you review or edit those -- the

2    voters guides before they go to publication?

3    A    No, I do not.

4    Q    Do you personally speak at the meetings or

5    events that are open to the public on behalf of League Of

6    Women Voters?

7    A    Yes, sometimes.

8    Q    Do you -- does League Of Women Voters ever talk

9    about redistricting?

10    A    Yes.

11    Q    And when in your recollection has the League Of

12    Women Voters spoken out about redistricting?

13    A    I cannot remember the exact dates or times, but

14    I know it's something that we've talked about and I think

15    I gave a short comment on redistricting at a meeting

16    once.

17    Q    Was that this year?

18    A    I think it was earlier this year.

19    Q    Okay.  Do you know if it was after you filed

20    the lawsuit?

21    A    Yes.

22    Q    Do you remember if it was -- I mean, can you

23    estimate what month that happened in?

24    A    It could have been April or May.  It was after

25    the legislative session, because there was a legislative



 1  session recount.

 2      Q    Do you remember the gist of your comments?

 3      A    It was a general overview of this lawsuit.

 4      Q    And who was the audience?

 5      A    It was at a church and I cannot remember all of

 6  the groups that got together for it, but it was open to

 7  the public.

 8      Q    Was that in St. Pete?

 9      A    It was in St. Petersburg.

10      Q    And going back to League Of Women Voters

11  overall and their work on redistricting, what's the

12  general gist, if you can summarize, the League Of Women

13  Voters position or concerns when it comes to

14  redistricting?

15      A    I don't know.

16      Q    It sounded like earlier you said there was

17  certain teams for certain issues in League Of Women

18  Voters?

19      A    Yes.

20      Q    Are you on any particular team?

21      A    Not currently.

22      Q    What do you do as president?

23      A    I oversee our board meetings and oversee all of

24  the different committees that we have.  I make sure that

25  our action teams are doing good work in the community.  I



1   have to approve anything that is, like, a press release

2   or other public comment that we're making.  I help with

3   new member orientation.  I work with our -- on our

4   financials with our treasurer and our finance team and

5   our fundraising teams.

6       Q    You said you took office May of 2023, is that a

7   certain -- is there a certain term limit?

8       A    Yes, it was one year.

9       Q    And then you were reelected?

10      A    Yes.

11      Q    Okay.  Just to finish the loop on elections,

12  other than the Illinois United For Marriage, Illinois

13  United For Marriage, have you ever volunteered as an

14  election service worker for any other issues or

15  candidates?

16      A    Yes.

17      Q    Can you tell me about that?

18      A    Yes.  I worked on the amendment for campaigns

19  to pass voting rights for returning citizens, I believe

20  that was in 2018.  And then this past year I worked again

21  on the Amendment 4 campaign to end Florida's extreme

22  abortion ban.

23      Q    Besides this lawsuit, have you ever been a

24  party in a civil lawsuit?

25           MR. SHAW:  Hold on.  What -- one of her



 1        lawsuits there's a court order that she can be an
 2        anonymous litigant.  If you got to know we can maybe
 3        do some of a protective order, but I don't want her
 4        to say right now the case where she was an anonymous
 5        plaintiff.
 6             MS. HARLE:  Okay.  Sure, that works.
 7             MR. SHAW:  You can ask her about it.
 8        Q    Other than things we will not speak about in
 9   this lawsuit, have you ever been involved in a civil
10   lawsuit as a party?
11        A    Yes.
12        Q    Okay.  Tell me what you can tell me?  Tell me
13   about the lawsuit, what was the nature of it, when was
14   it?
15        A    Sure.  Well, the one that you just learned of
16   where I was an anonymous plaintiff, and then a second one
17   where there was a small claims issue.
18        Q    And were you the plaintiff or defendant in this
19   small claim issue?
20        A    Plaintiff.
21        Q    I'm sorry?  I didn't hear that?
22        A    Plaintiff.
23        Q    Okay.  When was that?
24        A    I believe 2014.
25        Q    And that's been resolved?



```
1        A    Yes.

2        Q    Have you ever been deposed before today?

3        A    No.  No, not to my recollection.

4        Q    Have you ever testified in court?

5        A    No, not to my recollection.

6        Q    Have you ever been charged with -- well, have

7   you ever been convicted of a criminal offense?

8        A    No.

9        Q    Have you ever pled no contest to a criminal

10  offense?

11       A    No.

12       Q    Were you charged with a criminal offense in

13  2009?

14       A    No.

15       Q    Were you charge with criminal offense in 2012?

16       A    No.

17       Q    Okay.

18       A    Not that at I'm aware of.

19       Q    You would probably know.  We'll follow up with

20  these.  I suppose they're showing me someone with your

21  same name.

22       A    Yeah.

23       Q    Our background check does not specify.  It'll

24  just tell you -- it just says "criminal offense" and it

25  gives the case names.  So happy to share that with your
```



 1   attorney if you want to look into it.

 2        A    Sure.

 3             MR. SHAW:  Yeah, if you could share that.

 4             MS. HARLE:  I'll also follow up separately on

 5        the other.

 6        Q    Any other lawsuits -- where your the anonymous

 7   plaintiff, is that ongoing?

 8        A    No.

 9        Q    It's not.  Okay.  All right.  So tell me, just

10   in your own words, why you're bringing this lawsuit?

11        A    Sure.  I believe that my community should have

12   a fair district and I believe that the current district

13   do not reflect a fair district.

14        Q    And can you just tell me, in your own words,

15   what you think is unfair about the current district?

16        A    Yes.  I believe that as the district is drawn

17   right now it splits my community in half.

18        Q    What your community?

19        A    The St. Petersburg area.

20        Q    Are you aware in your work on elections and

21   voting issues and redistricting that district lines do

22   run through communities and counties sometimes?

23        A    Yes, I know that.

24        Q    In your view, does that -- is [sic] that always

25   made district unfair or just sometimes?



 1      A    I think it would depend on the community and
 2  how it's drawn.
 3      Q    What are the things about the community of
 4  St. Pete that made it unfair to separate the resident?
 5      A    The way that the map looks now is it literally
 6  splits, like, St. Petersburg area and, in fact, in my
 7  specific neighborhood it splits my very neighborhood.  I
 8  live in a historical northeast neighborhood in
 9  St. Petersburg and even my neighborhood is split in half
10  based on the way the map is.
11           I also, as the league president of the
12  St. Petersburg area, I generally see the work that we do
13  is the St. Petersburg area of, like, Ulmerton, the
14  street, and south is kind of the geographical area that
15  we think of when we think of neighborhood and our
16  community and this map splits our community in half.
17      Q    Do you know the neighbor lines are traditional
18  criteria in redistricting?
19           MR. SHAW:  Object to form.
20      Q    Do you know if communities lines are
21  traditional criteria in redistricting?
22      A    I don't know that.
23           MR. SHAW:  Object to form.
24      Q    When you became involved in this lawsuit, were
25  there already other plaintiffs?



1        A    I have no idea.

2        Q    Have you ever communicated with any of the

3    other plaintiffs directly in this lawsuit?

4        A    Are you asking about this lawsuit?

5        Q    No, not necessarily.  Just have you ever -- you

6    know, have you ever communicated directly with any of the

7    other four plaintiffs about -- without asking what was

8    said or anything like that?

9        A    I haven't talked to any of the plaintiffs about

10   this lawsuit.

11       Q    Have you talked to them otherwise?

12       A    Yes, Jen.

13       Q    Which one?

14       A    Ms. Garcia, yes.

15       Q    Do you know her in a personal capacity?

16       A    No.

17       Q    Did you know her before this lawsuit?

18       A    Yes.

19       Q    How did you come to be a plaintiff in this

20   lawsuit without telling me anything that's

21   attorney-client privileged, of course?

22       A    To your last question, I don't know what you

23   mean by do I know her on a personal level.  We worked

24   together.

25       Q    Okay.  I think that basically meant that you



 1  knew her human being before this lawsuit other than just

 2  you happen to know she exists now because of she's the

 3  plaintiff.  So you did know her prior to this lawsuit?

 4       A    Yes.

 5       Q    Okay.  And did you say you worked together on

 6  issues?

 7       A    I didn't hear your question.

 8       Q    Did you say you worked together on something?

 9       A    We worked at the ACLU at the same time.

10       Q    Okay.  I forgot about that.

11            I'm going back that, how did you come to be a

12  plaintiff in this lawsuit without sharing any privileged

13  information?

14       A    I knew that this, like, was a potential lawsuit

15  and I wanted to be a part of it because it's my

16  community.

17       Q    Were you aware at the time that redistricting

18  process was happening that resulted in this map, were you

19  aware of that process?

20       A    Yes.

21       Q    Did you read any news article on the

22  redistricting process while it was happening?

23       A    I may have.  I very likely could have.

24       Q    During the redistricting process, did you

25  communicate with any members of the media about the



 1  redistricting?

 2       A    Not that I recall.

 3       Q    After the redistricting was done, did you

 4  communicate with any members of the media about the

 5  redistricting process that resulted in the map you're

 6  challenging?

 7       A    Not that I recall.

 8       Q    During the redistricting process that resulted

 9  in the map you're challenging, did you communicate with

10  any staff or members of the Florida legislature?

11       A    Not that I recall.

12       Q    After the redistricting process that resulted

13  in the challenged map, did you communicate with any

14  members or staff of the Florida legislature?

15       A    Not that I recall.

16       Q    While the redistricting process was going on

17  that resulted in these maps, did you communicate with

18  anyone at the ACLU of Florida regarding the redistricting

19  process?

20            MR. SHAW:  Don't reveal attorney-client

21       communications, obviously.

22       A    Not that I recall.

23       Q    Do you remember what you first came to learn

24  about the maps that you're challenging now?

25       A    I don't remember exactly when, no.



JACQUELINE AZIS VOLUME I                          November 22, 2024
KÉTO NORD HODGES vs KATHLEEN PASSIDOMO                          22

1        Q    Do you have an estimated timeframe of when you

2   came to realize that these maps had been drawn?

3        A    When the legislature finalized them, around

4   then.

5        Q    And do you remember at what point you decided

6   you wanted to bring a legal challenge to the maps?

7        A    When I found out that there was one being

8   considered.

9        Q    Did you have any role in advocating for

10  different maps during the redistricting process?

11       A    No.

12       Q    Have you had made any written or oral

13  statements to any reporters about this lawsuit?

14       A    No, not that I recall.

15       Q    Okay.  I know you mentioned that you spoke

16  about it at a church and I think that was -- was that a

17  League Of Women Voters event?

18       A    No.  It was another group putting on the event,

19  but the League Of Women Voters was there.

20       Q    I see.  What group was hosting that event?

21       A    I cannot remember at the moment.

22       Q    Okay.  So other than that event, have you made

23  any written or oral statements to any other community

24  groups or organizations about this lawsuit?

25       A    Not that I recall.



1        Q    Have you had made ant statements or comments on

2   social media relating to this lawsuit?

3        A    No.

4        Q    When social media accounts do you have or

5   apps --

6        A    I have Facebook -- sorry.  What did you say?

7        Q    Or apps.  I don't know what they call these

8   things.

9        A    I have Facebook, Instagram, X, I think it's

10  called Threads, and TikTok.

11       Q    Are you currently a registered voter?

12       A    Yes.

13       Q    Have you voted in every presidential election

14  since you turned 18?

15       A    Yes.

16       Q    Have you voted in every state congressional

17  election since you turned 18?

18       A    I think so.

19       Q    Have you seen the alternative maps that your

20  lawyers and expert witnesses have proposed in this

21  lawsuit?

22       A    Yes.

23       Q    And do you know which district you would be in

24  under any of the alternative maps that your lawyers and

25  experts purposed?



```
 1              MR. SHAW:  Object to form.  Go ahead.
 2       A    I would have to look at it.  16 or 18, I
 3   believe.
 4       Q    Okay.  Okay.  Let's look at the complaint.  If
 5   you can pull that up on your screen, this will be
 6   Exhibit 1.
 7              And if we can start with the maps that you're
 8   challenging or the map that you're challenging on
 9   Page 20, Figure 3?  Okay.  So you're in District 18; is
10   that correct?
11       A    Yes.
12       Q    I if you could just list for me -- you talked a
13   little bit earlier, but can you list for me all the
14   reasons you think that District 18 is -- well, all the
15   reasons you brought into the lawsuit to challenge
16   District 18, all the problems that you appreciate with
17   it?
18       A    From my point of view as a St. Petersburg
19   resident, it cuts our community in half.  And it -- you
20   know, it separates us and in my specific circumstance it
21   cut even my neighborhood in half.  I live an historical
22   northeast neighborhood and cuts my very neighborhood in
23   haft and, like I mentioned earlier, as the president of
24   League Of Women Voters of the St. Petersburg area it cuts
25   that area in half which we view as one community that has
```



 1  similar policy concerns and would benefit from being in a

 2  single district.  I mean, those are two blatantly obvious

 3  reasons that I think of off the top of my head.  I can't

 4  say, like, that covers everything that I've ever thought

 5  of, but those are two I can think of right now.

 6      Q    Are there any others you can think of right

 7  now?

 8      A    I mean, we as a St. Petersburg area, as a

 9  community, we have a lot of the same concerns, and this

10  map cuts our community in half and the pairs half of my

11  community with communities on the other side of the bay

12  that do not share our same policy concerns.

13      Q    So for the --

14      A    -- for the part of our community.

15      Q    Okay.  Sorry to interrupt.  Did you finish?

16      A    Yes.

17      Q    So for the top part of the line, does that, in

18  you view, cut off people that you think should be part of

19  your district?  That top line across the top of 18?  Is

20  that problematic to you?

21          MR. SHAW:  Object to form.

22      A    I would have to think about that more.  I don't

23  know.

24      Q    Okay --

25      A    I mean --



1          MR. SHAW:  What were you going to say?

2     A    I was going to say, I mean, I can tell you my

3  community is cut in half.  The top line I would have to

4  think about it a little more.

5     Q    So you're more focused on the boarder between

6  18 and 16?

7     A    I'm concerned that my community were cut in

8  half and that line that is in the St. Petersburg area in

9  the north part of 16 is cutting that in half, yes.

10    Q    Tell me more about -- you mentioned the policy

11 concerns of your community.  Tell me about the policy

12 concerns for the folks in -- I guess let's start with --

13 I think you said your neighborhood?

14    A    Sure.  For example, when the hurricanes, hit we

15 had lot of infrastructure issues in the St. Petersburg

16 area.  We've had sea walls destroyed.  We've had major

17 sewage issues, people weren't even able to flush their

18 toilets because of the sewage issues.  People didn't have

19 potable water access and there was a lot of damage from

20 the hurricanes from important, like, buildings in the

21 St. Petersburg building.  Ones the raised stadium in the

22 Tropicana Field.  There was also damage to the Tampa Bay

23 Rays building that's in downtown St. Petersburg.  So

24 those are some recent community concerns that have come

25 up over the hurricane season.



1             Other major concerns in St. Petersburg include

2    areas of the community which don't access to, like,

3    grocery stores, while other parts of the community have

4    more grocery stores.  Some of the development projects

5    are of concern to the community.  We have a

6    St. Petersburg peer, that was a big project, development

7    project, in the city.  Then the current big development

8    project that people are worried about in my area is,

9    again, related to the Rays Stadium and the Hines

10   development team working on developing 86 acres in

11   downtown St. Petersburg.

12             You know, we are concerned about our schools

13   and who are superintendent of schools is.  We are

14   concerned about out school ratings.  We are concerned

15   about fair elections and our supervisor of elections and

16   the work that they do to ensure we have fair elections.

17   We are concerned about, you know, the ability for small

18   businesses in our community to thrive and do well.

19             And, you know, I could go on everything from

20   making sure that some of our marinas stay as municipal

21   marinas to making sure that, you know, we have a

22   welcoming community for the LGBT Community and that we

23   maintain, like, our arts district and our priorities

24   related to the arts district.

25             And we have a lot of festival that the



 1 | community cares about.  We have one called Localtopia
 2 | where it focuses on all of the local business in the area
 3 | come out.  So it's, like, no chain restaurants, no big
 4 | brands or names, it's all local businesses that join
 5 | together for Localtopia.
 6 |        So that's a little bit of the concerns of the
 7 | St. Petersburg area.
 8 |    Q    Can you tell me on the map -- and I should know
 9 | this because I just watched the game last season, because
10 | is the Rays' stadium in District 16 or 18 on this map?
11 |    A    I believe it's in 16.
12 |    Q    Okay.  And the 86 acres that you're describing,
13 | is that in 18 or 16 or both?
14 |    A    I believe it's in 16.
15 |    Q    When you were talking about the infrastructure
16 | concerns from the hurricane and the sewage and other
17 | issues, did that affect primarily your neighborhood or
18 | were your saying that was a broader concern for St. Pete
19 | or something else?
20 |        MR. SHAW:  Object to form.  Go ahead.
21 |    A    It impacted parts of my neighborhood as well as
22 | some of the neighborhood to the west of me and to the
23 | north.  I cannot remember for each of these issues, but
24 | thing like the sea wall happened in 16.
25 |    Q    Okay.  So I think I initially was asking about



1    what are the concerns of your neighborhood, but I think

2    -- did you -- do you have any other concerns of the

3    broader St. Pete, or did you cover that in your answer as

4    well?

5        A    I covered everything I could think of at this

6    moment for broader St. Pete.

7        Q    Are you --

8        A    Sorry.  A few more, like, developments going

9    up, like the concern of high rises going up and not

10   having the infrastructure to maintain the growth of our

11   community.  And there's also preservation of historic

12   buildings that people are concerned about and that's

13   throughout all of St. Petersburg.

14       Q    So the historic building concerns is in

15   Districts 18 and 16.  Is the high rise concerns in

16   Districts 16 and 18?

17       A    Yes.  I mean, the ones that I can think of are

18   in 16.  I'm not familiar with everything throughout the

19   whole area, so I could be wrong.

20       Q    How about municipal marinas that you were

21   mentioning, where are those located?

22       A    I don't know.  I know of one that's in 16.  I

23   don't know where others are.

24       Q    Are you -- you're aware that your complaint

25   focuses primarily on the racial composition of the



1  voters, primarily Black voters, right?

2          MR. SHAW:  Object to form.

3      A    I understand that, yes.  Race is a part of our

4  complaint, yes.

5      Q    Is there a certain percentage of the black

6  voting population that you think should be in

7  District 16?

8      A    I don't have an answer for that.

9      Q    Is there percentage of Black voting population

10  you think should be in your District 18?

11      A    I don't have an answer for that either.

12      Q    Are you familiar with the history of the

13  district boundaries in Hillsborough and Pinellas?

14      A    Probably.

15      Q    Are you aware that the communities that are

16  combined in District 16 on this map you're challenging

17  have been historically combined since the early 1990s?

18      A    I'm aware of that, yes.  My -- I think my

19  concern would still stay the same when the legislator

20  doing redistricting it has an obligation to reconsider

21  the lines and do better if can, and unfortunately the

22  legislator failed to do better.

23      Q    What is your harm, in your own words, from

24  having -- from voters in south St. Pete not voting for

25  the same district as you or in the same representative as



1    you?

2         A    My community is cut in half and that means that

3    part of my community is represented by someone who's also

4    representing communities on the other side of the bay

5    that have different policy interests than we do, and I

6    think our community would be better if we weren't cut in

7    half and that we had a representative representing our

8    interests of the St. Petersburg area, generally.

9         Q    And you feel like that is a harm to you?

10        A    Yes.

11        Q    Let's look at Paragraph 11 of the complaint.

12   It explains a lot about your community.  I just want to

13   make sure I have your full understanding of what you mean

14   by -- where you say there, quote, "Plaintiffs are further

15   harmed that the legislator sacrificed genuine communities

16   of interest, unnecessarily dividing St. Petersburg and

17   Pinellas County, et cetera."  Focusing on sacrificed

18   community interests, I just want to know are there any

19   other communities of interest that you have in mind that

20   you feel like are sacrificed under the maps you're

21   challenging?

22        A    The community of interest is the St. Petersburg

23   area as well as, I mean, people in the community.  So, as

24   this explains, it seems like it's combining areas because

25   they were both predominantly Black areas.  And I think



 1   that to protect the community of interest you need make

 2   sure that districts have people who have common, you

 3   know, policy concerns, and the way the lines are drawn

 4   right now it does not do that.

 5       Q    Do you think Black voters generally have common

 6   policy concerns?

 7            MR. SHAW:  Object to form.

 8       A    They might, they might not.  I know my

 9   community of St. Petersburg has policy concerns that are

10   similar to each other as opposed to the policy concerns

11   of, let's say, Sun City or Ruskin or Apollo Beach.  Like,

12   the community of St. Petersburg has different policy

13   concerns than those cities on the other side of the bay.

14       Q    And when you say community of St. Petersburg,

15   do you mean -- are you referring to the municipal

16   boundaries?

17       A    More like the St. Petersburg area, so it

18   wouldn't be just St. Petersburg the city.  It would

19   include, like, the other smaller towns and cities around

20   the St. Petersburg area.  That's how we call it.

21       Q    Paragraph 12 says that:  "Legislator's racial

22   gerrymandering unjustifiably attacked Black voters in the

23   District 16, stripping them from adjacent District 18 and

24   reducing their influence there."

25            I'm wondering do you know any specific facts



 1  supporting the assertion that the plan reduces the

 2  influence of Black voters in District 18?

 3        A    Do I have specific facts?

 4        Q    Yes.

 5        A    I would rely on the work of my attorneys for

 6  this and what they've provided.

 7        Q    Do you know the percentage of Black voters that

 8  are in the current District 18?

 9        A    No.

10        Q    The next paragraph there, Paragraph 13, says

11  that:  "Floridians, including individual legislators

12  called out in the question the legislator's

13  unconstitutional actions but their concerns were

14  dismissed by the legislator as a whole."

15             I'm wondering are you aware of any particular

16  Floridian who called out or questioned the legislator

17  regard the redistricting process?

18        A    I will have to guess.  I believe one of my

19  attorneys.

20        Q    Is that Nick Warren you're referring to?

21        A    I'm just rereading so I can understand.

22        Q    You can Zoom in also?

23        A    Yes, I believe so.

24        Q    Do you know when the legislator's response was?

25        A    I was just going to say my understanding is



1    there were organizations paying attention to this, but I

2    was not a part of it.

3         Q    Do you know what the specific concerns were

4    that were called out in the legislator?

5         A    No.

6         Q    When you -- and looking at the map, you can it

7    pull up if you need to, but I think you know what it

8    looks like, what is it about the east side, the Tampa

9    side, of District 16 that you believe is dissimilar from

10   the St. Pete side of District 16?

11        A    Are you pulling up the map?

12        Q    I can, yeah.  We can go back to Page 20.  I'm

13   just curious if you can share a bit more about, you know,

14   the why you think it's unfair or the voters might have

15   different concerns on the east side of District 16 then

16   the folks on the western side of District 16?

17        A    When I look at the map, that is two completely

18   different communities that have been put together in a

19   district.  I can tell you personally I do not know a lot

20   about what is going on on the east side of the bay,

21   that's very far away.  It's not easy to get to.  You

22   might have to drive through two or three counties to even

23   get to some of those parts.  So I cannot even begin to

24   tell you what the concerns are of those areas.

25             I mean, this city are, like, Ruskin, Apollo



1  Beach, Sun City.  Like, I don't know a lot of those

2  communities at all, so I cannot begin to tell you what

3  their concerns are.

4      Q    So looking right there at Paragraph 97 just

5  before that map, the paragraph starts out referring to

6  the direct evidence of racial predominance.  So what

7  evidence do you have that race predominates the drawing

8  of the lines for District 16 and 18?

9      A    I would have to rely on any information that my

10 attorneys have provided you for that and I can speak to

11 south St. Pete there is a large Black population there.

12 I do not know about any of the communities on the other

13 side of the bay, however.

14     Q    It actually, just before that, in Paragraph 95,

15 this says:  "These race based decision resulted in map

16 that splits up neighborhoods and ignores traditional

17 redistricting criteria."

18          What criteria do you understand to be

19 appropriate criteria for the legislator to use in

20 redistricting?

21     A    I would have no idea.  I never worked in voting

22 right law, so I would rely on my attorneys and the

23 experts.

24     Q    Let's look at Paragraph 131 of your complaint.

25 This one says:  "The legislator lacks good reasons to



1  believe that the enacted plan was necessary to achieve

2  Tier 1 compliance."

3          Do you know what Tier 1 compliance entails?

4      A    I do not.

5      Q    Sorry for jumping around.  Let's look back at

6  Page 13 and 14 where Plan 42 is.

7          Does this map called "Plan 42" look familiar to

8  you?

9      A    Yes.

10     Q    And you just explain to me in your own words

11 why you think this is a better alternative map than the

12 one that was enacted?

13     A    Yes.  This map has the St. Petersburg area

14 together, which, again, is a community that has

15 spectacular policy concerns and it keeps that community

16 together and does not split it in half.

17     Q    It sounds to me, but correct me if I'm wrong,

18 that seems to be your primary concern, is that the folks

19 of St. Pete are all kept together; that is right?

20     A    I would like our district to be fairly

21 represented and consist of a community with similar

22 policies, like concerns and issues.  And the way it is

23 drawn right now splits the community and it pairs with a

24 community far away that has different policy concerns.

25     Q    Is it your belief that you will be unable to



 1  elect a representative that reflects your personal policy

 2  concerns because of the way the lines drawn now?

 3      A    My community -- my community would not be able

 4  to have a representative that fully represents our

 5  interests.

 6      Q    Do you personally, as Ms. Azis, have -- do you

 7  feel you have the same policy concerns as your community

 8  or is there any diversity or day light between your

 9  particular policy concerns and maybe the broader policy

10  concerns of your community?

11          MR. SHAW:  Object to form.  You can go ahead

12      answer.

13      A    I don't know.  Can you be more specific?

14  Sorry.

15      Q    Yeah.  I'm trying to figure out, do you think

16  you, because south St. Pete is cut off, that you

17  personally are not going to be able to elect a

18  representative that stand for the things that you want

19  represented?

20      A    Right.  I think I understand what you're

21  saying.  I care about my community as a whole, so I care

22  that the south St. Petersburg area fairly represented,

23  yes.  Those are the concerns that I have.

24      Q    And is it your view that south St. Pete will

25  not be fairly represented because their vote would be



 1  diluted?

 2      A    I'm worried that they're -- yeah, they're

 3  separate from other parts of the same community.

 4      Q    Given that the folks of south St. Pete under

 5  the map you're challenging still have the opportunity to

 6  vote and elect a representative, why is it that you think

 7  that they will not be fairly represented?

 8      A    That representative is -- would also, the way

 9  it is now, be representing an entirely different

10  community with different policy concerns.

11      Q    Okay.

12      A    So it's fractured our community and now part of

13  my community is now pair with another community that has

14  different policy concerns.

15      Q    Let's look at Figure 6 in the complaint.  Okay.

16  So does this map look familiar to you?

17      A    Yes.

18      Q    I think you explained very well what your

19  concerns are, so I just want to check is there anything

20  else about this map that makes it better than the

21  challenged map that we haven't already discussed?

22      A    Makes it better?

23      Q    Mm-hmm, yeah.  So you proposed an alternative

24  map.  I understand your testimony to be that you would

25  like St. Pete all together.  So other than St. Pete being



1    all together here is there anything else about this map

2    that makes it a good alternative and the reason why you

3    put it in your complaint?

4         A    It keeps my community together.

5         Q    Have you seen any of the maps that your expert

6    witnesses have proposed in this case as alternative maps?

7         A    I don't know.

8         Q    All right.  Let's pull up your initial

9    disclosure.  This will be Exhibit 2.

10             Okay.  So does this look familiar to you?

11   We've introduced it in the other deposition this week

12   also.

13        A    Yes.

14        Q    So there is your name on the first -- the first

15   paragraphs and it says that you, "Have illustrations

16   intending to show that the challenged district causes

17   harm to yourself and other residents."

18             Is there anything that we haven't talked about

19   yet already today is a harm that you believe you or your

20   -- or other residents of your district are in inflicted

21   with because of the challenged district lines?

22        A    Can you say that again?  I'm sorry.

23        Q    Yeah.  Is there any other information that you

24   have that we haven't already talked about today that

25   shows that you or your fellow residents are incurring



 1  harm of because of the district lines?

 2      A    I mean, besides what we walked about and what's

 3  been presented in the complaint and experts report, not

 4  that I can think of right now.

 5      Q    Do you know of anyone else, any other

 6  individuals, who might have information about whether the

 7  district lines were drawn based on race?

 8      A    Not that I can think of.  I mean, besides who?

 9      Q    Well, I think that you and I think that you

10  mentioned that your attorney, Nick Warren, has expressed

11  some concerns that generally, but is there any other

12  particular individual you know who would have knowledge

13  that the legislator drew the challenged district lines

14  predominantly because of race?

15      A    I would have to rely on my complaint and our

16  expert testimony.

17          MS. HARLE:  That's the end of my questions.

18          MR. SHAW:  I may have one follow-up.

19                    CROSS EXAMINATION

20  BY MR. SHAW:

21      Q    Tell me again the significance of Ulmerton Road

22  in terms of Pinellas County communities?

23      A    Sure.  So as the League Of Women Voters

24  president of the St. Petersburg area, we define our

25  general community area that we work with as essentially



1  Ulmerton and then south of Ulmerton and then there's

2  another league of women voters that is the League Of

3  Women Voters of north Pinellas County that is essentially

4  Ulmerton north.

5      Q    Okay.  Are those -- is Ulmerton Road as the

6  boundary between to communities something that the League

7  Of Women Voters came up or is that a broader thing?

8      A    I don't know how we came up with that, but it

9  is generally, like -- it's really, really big county, so

10  it's generally understood, like, this is the

11  St. Petersburg area and then once you go north you're

12  more, like, in the Clearwater area.

13      Q    Would you consider geopolitically the community

14  north of Ulmerton Road to be part of the same community

15  as what you're calling the greater St. Petersburg area?

16      A    Well, there's -- yeah.  Stay that again?  I'm

17  sorry.

18      Q    Would you consider geopolitically the community

19  north of Ulmerton Road to be part of the same community

20  as the greater St. Petersburg area?

21      A    Maybe little part of it, but generally -- it's

22  Ulmerton south is what I think is the St. Petersburg area

23  just because of my position of the league.  But yeah, I

24  think that's a good boundary.

25      Q    Okay.  So is the community north of Ulmerton



 1    Road the same community as the community south of
 2    Ulmerton Road?
 3        A    We would have -- you know, some things might be
 4    the same because it was part of Pinellas County and some
 5    things would be different.  But generally, St. Petersburg
 6    area, I think of it as Ulmerton south and we have lot of
 7    the same concern that are different than some concerns
 8    they have Ulmerton north.
 9        Q    What's different north of Ulmerton Road verses
10    south of Ulmerton Road?
11        A    You get into different infrastructure.  You get
12    into different major cities, again, the major city up
13    there is, like, Clearwater.  And it's just -- it's a much
14    longer -- Pinellas is just very long county, so it would
15    be, you know, hard to say that all of -- like, all of
16    that area is the same.
17             MR. SHAW:  I don't have anything further.
18                    RE-DIRECT EXAMINATION
19    BY MS. HARLE:
20        Q    I think it would be helpful, then, if we can
21    just pull up the map one more time so you be maybe see
22    where the Ulmerton Road is.  Can you share the screen on
23    Page 3 of the complaint of Exhibit 1?
24             So these are the challenged district and the
25    surrounding area is enacted plans.  Are you able from



 1  this map to describe where Ulmerton is?  Is that -- is it

 2  near a black line that serves as the top of District 18?

 3           MR. SHAW:  Can you zoom way in on it.

 4      A    It's close to that.

 5      Q    Can you tell if it's south or north of that

 6  line?

 7      A    It's south.

 8      Q    Okay.

 9      A    I'm not expecting the districts exactly the way

10  the League Of Women Voters operates, but something closer

11  than what we're working with here.

12      Q    Can you spell Ulmerton for me?

13      A    U-L-M-E-R-T-O-N.

14      Q    Okay.

15      A    Just so you know, like, I'm giving that as a

16  general idea of that people think of the area in the

17  community.  I'm not saying that's what the legislator

18  should be doing, but if that is -- that's better gauge

19  for what our area is than what 16 is currently doing.

20  And what -- sorry -- what these lines are doing

21  separating 16 and 18 this way.

22           MS. HARLE:  All right.  Thank you.

23           MR. SHAW:  We will read, and if they order a

24       copy, we'll take copy as well, but please bill the

25       ACLU of Florida as opposed to us.



JACQUELINE AZIS VOLUME I                    November 22, 2024
KÉTO NORD HODGES vs KATHLEEN PASSIDOMO                    44

1    MS. HARLE:  We will order a copy.  Thank you.

2    (DEPOSITION CONCLUDED AT 11:04 A.M.)

3                    - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

     I, SHERITA BOYLE, Court Reporter, Notary Public,
State of Florida, certify that JACQUELINE AZIS appeared
before me by Zoom Conference on NOVEMBER 22ND, 2024, and
was duly sworn.

     Signed this 22ND day of NOVEMBER, 2024.

_____
Sherita Boyle
Notary Public, State of Florida
Commission No:  HH409035
Commission Expires:  06/11/2027



```
 1                    CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA

 4   COUNTY OF HILLSBOROUGH

 5

 6        I, SHERITA BOYLE, Court Reporter, certify that I

 7   was authorized to and did stenographically report the

 8   deposition of JACQUELINE AZIS, Pages 1 through 44; a

 9   review of the transcript was requested; and that the

10   transcript is a true and accurate record of my

11   stenographic notes.

12

13        I further certify that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative or employee of the parties'

16   attorneys or counsel connected with the action, nor am I

17   financially interested in the action.

18

19        Dated this 5TH day of DECEMBER, 2024.

20

21

22   _____

23   Sherita Boyle
     Court Reporter

24

25
```

