IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KETO NORD HODGES, et al.,

     Plaintiffs,

v.                                    Case No.:  8:24-cv-879

KATHLEEN PASSIDOMO, et al.,

     Defendants.
_____/


VIDEOCONFERENCE DEPOSITION OF KETO NORD HODGES

TAKEN ON BEHALF OF THE DEFENDANT

DATE TAKEN:   November 26, 2024

TIME:         2:09 p.m. - 3:49 p.m.

LOCATION:     Via Zoom Videoconference


Examination of the witness taken before:

Wendy E. Rivera, FPR



KETO NORD HODGES                                November 26, 2024
HODGES V. PASSIDOMO                                            2

```
 1                    APPEARANCES OF COUNSEL
                       (Via Videoconference)
 2

 3   On behalf of the Plaintiffs:

 4
             NAOMI ROBERTSON, ESQUIRE
 5           and
             JAMES M. SHAW, JR., ESQUIRE
 6           Butler Weihmuller Katz Craig, LLP
             400 North Ashley Drive
 7           Suite 2300
             Tampa, Florida 33602
 8           P. (813) 281-1900
             Nrobertson@butler.legal
 9           jshaw@butler.legal

10
     On behalf of the Defendants:
11

12           DENISE M. HARLE, ESQUIRE
             and
13           LEILA S. OBERSCHALL, ESQUIRE
             Shutts & Bowen, LLP
14           215 South Monroe Street
             Suite 804
15           Tallahassee, Florida 32301
             P. (850) 241-1717
16           Tprice@shutts.com

17

18
     Also Present:
19

20           MEIKO SEYMOUR

21           ABEM FEKADE-TESSEMA

22

23

24

25
```



```
 1          I N D E X   O F   E X A M I N A T I O N

 2

 3   WITNESS:   KETO NORD HODGES
                                                    PAGE
 4
     Direct Examination by Ms. Harle                 4
 5
     Certificate of Oath                             57
 6
     Certificate of Reporter                         58
 7
     Errata (to be forwarded upon execution)         59
 8

 9

10          D E F E N D A N T ' S   E X H I B I T S

11   EXHIBIT NO.         DESCRIPTION               PAGE

12   Exhibit 1        Complaint                     29

13   Exhibit 2        Plaintiff's Rule 26           51
                      Initial Disclosures
14
     Exhibit 3        November 9, 2012 Blog         54
15

16

17

18

19

20

21

22

23

24

25
```



1    VIDEOCONFERENCE DEPOSITION OF KETO NORD HODGES

2                    November 26, 2024

3                        - - -

4                    KETO NORD HODGES,

5    having been first duly sworn and responding "Yes,"

6    testifies as follows:

7                    DIRECT EXAMINATION

8    BY MS. HARLE:

9         Q.   Good afternoon, Mr. Nord Hodges.  My name is

10   Denise Harle.  I'm one of the attorneys for the Florida

11   Senate in this case and I'll be taking your deposition

12   today.

13             Can you please state and spell your name for

14   the record.

15        A.   Yes.  Keto, K-e-t-o, Nord, N-o-r-d, Hodges,

16   H-o-d-g-e-s.

17        Q.   Great.  And do you understand that you are

18   under oath today and giving deposition testimony, which

19   is subject to the penalty of perjury?

20        A.   Yes.

21        Q.   Have you ever been deposed before?

22        A.   No, I haven't.

23        Q.   Did you observe any of the depositions of your

24   co-plaintiffs in this case yet?

25        A.   Yes.  I observed the -- I believe it was the



1  first one, the lady with the Hispanic last name.  She

2  referred to herself as an Afro-Latina.  I don't recall

3  her last name.

4       Q.   Ms. Garcia?

5       A.   Yes.  There you go.  Ms. Jen Garcia, yes.

6       Q.   Great.  Well, this will probably sound all

7  very familiar to you today, but we just need, for the

8  sake of ground rules, to make sure a few things happen:

9  One, that you speak audibly and give complete answers;

10  two, try to let me finish my question before you begin

11  to answer; three, if your attorney does object, you need

12  to go ahead and answer the question unless she instructs

13  you not to answer.

14           Four, if you don't understand my question, I

15  need you to just let me know that it's not clear.  I

16  could've asked a bad question.  That definitely happens.

17  If you do give an answer, it will be on the record under

18  oath and we will all assume that you understood the

19  question; and five, I just need you to make sure your

20  responses are verbal, so, you know, things like head

21  nods, for example, or uh-huhs doesn't really work very

22  well because this is being transcribed.

23           Does all that make sense to you?

24       A.   Yes.

25       Q.   Great.  If you need to take a break at any



1  time, please just let me know and we can find a stopping

2  point.  No problem.  If at any point seeing a document

3  will help refresh your recollection, also please let me

4  know and I'll try to get that in front of you.

5          Is there anything that's preventing you from

6  giving truthful testimony today?

7      A.   No, there's not.

8      Q.   Very good.  What did you do to prepare for

9  your deposition today?

10     A.   Spoke with the attorneys.

11         MS. ROBERTSON:  Keto, just make sure you don't

12     disclose anything you spoke about with your

13     attorneys.

14         THE WITNESS:  Of course.  Of course.  I spoke

15     with the attorneys and I reviewed the -- I believe

16     it was the initial filing document laying out the

17     -- I guess the ground rules of the case or ground

18     information of the case.

19  BY MS. HARLE:

20     Q.   Okay.  Did you review any other documents in

21  preparation for today?

22     A.   You asked did I review any other documents in

23  preparation for today?

24     Q.   Yes, sir.

25     A.   No, I did not.



KETO NORD HODGES                                      November 26, 2024
HODGES V. PASSIDOMO                                                   7

1       Q.   And again, not telling me anything that was

2    said, but approximately how long did you meet with your

3    attorney to prepare for your deposition?

4       A.   I'm not exactly sure how long.

5            THE WITNESS:  Would you estimate an hour?

6            MS. ROBERTSON:  If you know --

7            THE WITNESS:  I'll estimate about two hours to

8       my recollection.

9    BY MS. HARLE:

10      Q.   Okay.  Can you please state your address,

11   where you currently reside.

12      A.   Yes.  I reside at 10907 North Hyacinth Avenue,

13   Tampa 33612.

14      Q.   And when did you move to that address?

15      A.   I moved to that address June of 2019.

16      Q.   What was your most recent prior address?

17      A.   My most recent prior address, I struggle to

18   remember.  It was in Town 'n' Country, ZIP code 31655.

19   I believe it was 9,000 something.  It was in a condo

20   community.  I don't recall the exact address.

21      Q.   Was that in Tampa?

22      A.   Well, actually, let me see.  Sorry.  Give me a

23   -- may I correct myself?

24      Q.   Yes.

25      A.   Okay.  Let's see.  7349 Abonado Road, Tampa,

```
 1  33615.  There it is.

 2      Q.   Okay.  How far is that from where you live

 3  now?

 4      A.   I'm sorry.  Can you repeat the question?

 5      Q.   Sure.  How far is that Abonado Road address

 6  from where you live now?

 7      A.   That is I'd say approximately eight to

 8  nine miles.

 9      Q.   Okay.  So then Abonado Road, is that -- it's

10  more in South Tampa or middle of Tampa?

11      A.   That's in Town 'N' Country.  That's on the

12  other side of the airport.

13      Q.   Oh, okay.  So -- okay.  I'm bad at that.

14           Back to where you live now, is it a house or

15  an apartment?

16      A.   It's a house.

17      Q.   Do you own it?

18      A.   No, rent.

19      Q.   Is there any reason you're aware of that you

20  might be moving in the next year or two?

21      A.   Possibly, yes.  I may be moving in the next

22  year or two.

23      Q.   And where would you be moving to?

24      A.   I'm not sure yet, wherever the rent is not too

25  high.
```



1        Q.    Do you know if you would stay in Tampa?

2        A.    I do not know that at this time.  I have

3    children in college, so I'm not sure.

4        Q.    Are they in college in Florida?

5        A.    Yes.  Yes, they are.

6        Q.    Whereabouts?

7        A.    Hillsborough Community College and University

8    of South Florida.

9        Q.    It's nice to have your children nearby?

10       A.    Yes, sometimes.

11       Q.    Did you live in Lakeland, Florida, in the

12   past --

13       A.    Yes, I did.

14       Q.    Okay.  When was that?

15       A.    Let's see.  Two -- eight through -- I believe

16   it was May 2008 through about the end of September 2011

17   I lived in North Lakeland, Florida.

18       Q.    And did you own a home there?

19       A.    Yes, I did.  I owned a home with my -- with my

20   wife and family at the time.

21       Q.    But you've been in Tampa since what year?

22       A.    I originally moved to Tampa September 1991 as

23   a child.

24       Q.    And then in your most recent stint in Tampa,

25   where did you move -- which year did you move back to



 1  Tampa?

 2       A.   I moved back to Tampa that -- I believe it was

 3  the last day of September 2011.

 4       Q.   You said you may move somewhere in the next

 5  year to find lower rent.

 6            Are you currently scoping out different places

 7  to live at the moment?

 8       A.   No, I'm not.  I'm tired of looking right now

 9  because the market is un -- has proven to be

10  unreasonable, so I'm not looking right at this time.

11       Q.   Have you been looking for a place to move

12  recently, say, in the past three to six months?

13       A.   In the past six months, yes.

14       Q.   Can you give me your educational background,

15  if you would, starting just since high school.

16       A.   All right.  Certainly.  I graduated from

17  Hillsborough Adult High school in Tampa with my underage

18  GED, and then I earned my associate in arts degree,

19  two-year degree, at Hillsborough Community College in

20  computer science.  Then I transferred to the University

21  of South Florida, earned my bachelor of science in

22  management information systems magna cum laude in 2002

23  and my MBA from USF, entrepreneurship, in 2005 -- May

24  2005.

25       Q.   Well, congratulations.



KETO NORD HODGES                                    November 26, 2024
HODGES V. PASSIDOMO                                              11

```
 1        A.    Thank you.

 2        Q.    Who is your current employer?

 3        A.    My current employer is Hillsborough County

 4   Public Schools.

 5        Q.    And what is your job title there?

 6        A.    VE.   That's variant exceptionalities math

 7   instructor.   That's another word for special education

 8   math instructor.

 9        Q.    Great.   What -- are you assigned to one

10   particular school?

11        A.    Yes.   I'm assigned to Dr. Carter G. Woodson PK

12   through 8 academy.

13        Q.    When did you first start working as a VE math

14   instructor for Hillsborough County Public Schools?

15        A.    I started working as a VE math instructor

16   November 2014 full time, but I was a part-time VE

17   instructor, you know, as a substitute from about

18   August 2011 until November 2014.

19        Q.    Thank you.

20        A.    Yes.

21        Q.    Are -- did your LinkedIn say that you're a

22   digital political organizer?

23        A.    Yes, it says that among other things.

24        Q.    All right.   Could you tell me what that means,

25   that you're a digital political organizer?
```



1        A.    Yes.   That means that -- excuse me -- I

2   utilize graphics design to create digital products for

3   different political campaigns in the Tampa Bay area.

4        Q.    And is that a paid position?

5        A.    Yes.   Yes.   It's a -- it's -- how would you

6   say -- at-will.   So if a campaign reaches out to me and

7   says, you know, we need these particular products, then

8   they may pay me on a at-project basis or, you know, on a

9   monthly basis, for example, to provide work for the

10  campaign.

11       Q.    So you're kind of like a contractor?

12       A.    Yes.   I would say that.

13       Q.    And it's just your own business?   You're kind

14  of an entrepreneur in that space?

15       A.    Yes.   Yes.   Yes.

16       Q.    List for me the -- any of the political

17  campaigns that you've worked on?

18       A.    All right.   Well, full time -- let's see.

19  Full time and part time or as a volunteer, it's too many

20  to name, but I could -- because I've been doing it since

21  -- I've been volunteering or working in different

22  campaigns since about 2019 when I first got my voter's

23  registration, but most recently, I recall three -- let's

24  see -- two or three campaigns, Tammy Shamburger for

25  school board in Hillsborough County.   Let's see.   Who



1  else?  Walter L.  Smith, II, for Tampa City Council and

2  -- let's see.  Who else?  Starr Brookins for county

3  court judge in this most recent cycle.  That is all I

4  can remember right now.

5      Q.   And those three you just named, were those --

6  were those campaigns where you were hired digital

7  political organizer?

8      A.   Let's see.  The first two, Smith and

9  Shamburger, yes.  The most recent one I named, I was a

10  photographer.  So the photography on the -- you know,

11  some -- some clients will book me for both combined

12  services, photography and digital organizer; some, one

13  or the other.

14      Q.   Have you ever volunteered on any political

15  campaigns?

16      A.   Yes.  Since 2019, it's been more campaigns

17  than I can count and I would do a disservice to try to

18  sit here and name all of them, local and -- local,

19  citywide, municipal, county, and statewide and national.

20      Q.   Well, let's start with statewide.

21          Have you ever worked on any campaigns for a

22  state legislator?

23      A.   Let's see.  I don't believe I have.  I don't

24  believe I have.  Oh, wait.  Let me see.  I apologize.  I

25  recall one in 2014.  I volunteered.  I wasn't on staff.



1  I volunteered with photography.  Let's see.  2014, yes,

2  I volunteered and I believe I was paid for photography.

3  I was a new photographer at the time for Ed Narain for

4  Florida State Representative in Hillsborough County.

5       Q.   Can you name for me the national political

6  campaigns that you recall working on whether paid or

7  volunteer?

8       A.   Yes, of course.  Let's see.  Let's see.  Let's

9  see.  I would say starting in 2008, I worked for the --

10  or did work.  I volunteered photography and other

11  activities for Obama for America in 2008 and 2012,

12  volunteered for -- let's see -- I believe Hillary

13  Clinton campaign and then the Biden campaigns most --

14  the last two Biden campaigns most recently and the

15  Kamala Harris campaign.

16       Q.   I may have misheard.  Did you say you first

17  got your voting registration in 2019?

18       A.   I believe -- I believe it was 2019 because I

19  had became a U.S. citizen a few months prior to that,

20  and so 2019 would've been the first time I was allowed

21  to vote.

22       Q.   Well, that's wonderful.

23       A.   Thank you.  I take it very seriously.

24       Q.   Are you currently involved with any voting

25  rights groups?



1        A.    How would you define a voting rights group?

2        Q.    Are you currently involved with any

3   organizations that work on issues relating to voting or

4   voters?

5        A.    Yes.  I would say I -- involved as a

6   photographer and social media manager for Hillsborough

7   County NAACP.

8        Q.    Anything else?

9        A.    I don't recall any sort of organizations at

10  this time.

11       Q.    Are you involved with the Hillsborough County

12  Democrats?

13       A.    Yes, I am.

14       Q.    How long have you been involved with them?

15       A.    I've been a precinct captain or precinct

16  committee person since May 2018.

17       Q.    Are you an officer currently for Hillsborough

18  County Democrats?

19       A.    I'm not an officer.  I am a committee

20  chairperson for the diversity equity and inclusion

21  committee.

22       Q.    What do you do in your role as the committee

23  chair for diversity and inclusion for the Hillsborough

24  County Democrats?

25       A.    As the DEI chairperson, I encourage



1  approximately -- well, I encourage the membership of the

2  county Democratic Party to run for state committee

3  person positions for the -- for the Florida Democratic

4  Party, which -- to look as much as possible as the

5  makeup of our membership.

6      Q.   And what do Hillsborough County Democrats do

7  just generally as a organization?

8      A.   To my understanding, Hillsborough County

9  Democrats seek to encourage democracy by -- by educating

10 on voters' rights for anyone in the Tampa Bay area --

11 well, anyone in Hillsborough County, Florida, who is of

12 voting age.

13     Q.   Have you ever done any election canvassing

14 like go door-to-door?

15     A.   Yes, I have.

16     Q.   And when did you do that?

17     A.   I don't believe -- I don't believe it was for

18 the Democratic Party though.  Well, not recently for the

19 Democratic Party.

20     Q.   No.  I guess I was switching gears a little

21 bit on you.

22          When did you do election canvassing?

23     A.   I did election canvassing in 2018 and 2019 for

24 Walter L. Smith, II, for Tampa city council.

25     Q.   Okay.  Have you ever done any phone banking



 1  for election?

 2         A.   Yes, I have.

 3         Q.   Okay.  And when was that?

 4         A.    I did phone banking for Walter L. Smith, II,

 5  2018 and '19; Obama for America 2008 and 2012; and

 6  possibly other campaigns as well, but I don't recall at

 7  this time.

 8         Q.   Have you ever been involved with a campaign

 9  that was not for a particular candidate or an issue that

10  was going to be on the ballot?

11         A.   I would have to think about that.  Let's see.

12  I'm trying to recall if there were any.  Yes.  Yes.  I

13  believe I was -- I can recall being involved in

14  Hillsborough County -- Hillsborough Classroom Teachers

15  Association, HCTA, recently in -- in pushing for the

16  half-cent sales tax referendum for Hillsborough County

17  with the goal of increasing full-time teacher pay in

18  Hillsborough County.

19         Q.   Have you done any public advocacy on any

20  political or partisan issues?

21         A.   Any -- have I done any public advocacy on

22  political or partisan issues, do you ask?

23         Q.   Yes.

24         A.   I'm -- I'm trying to think.  I hosted a town

25  hall for Black men for the Kamala Harris campaign



 1  recently.

 2       Q.    Where was that held?

 3       A.    That was held at a Baptist church in East

 4  Tampa.  I don't recall the name.

 5       Q.    Anything else you can think of?

 6       A.    I cannot recall any other events at this time.

 7       Q.    What did you-all discuss at the town hall for

 8  Black men for Kamala Harris?

 9       A.    Let's see.  The were multiple issues

10  discussed.  I believe one issue may have been our stance

11  on support of public education in -- nationally and as

12  it relates to Florida.

13       Q.    And did you-all discuss any issues particular

14  to Black men?

15       A.    Yes.  Yes.  The whole town hall was for Black

16  men, so any issues that we discussed were related to how

17  it would impact Black men in Florida.

18       Q.    Do you have a blog that you keep updated?

19       A.    No, I don't.

20       Q.    Do you have an old blog?

21       A.    Yes, I have.  My old blog was called The Great

22  Blog of Keto, and -- yes.

23       Q.    Okay.

24       A.    Yes.  That's been discontinued.  I'm surprised

25  it's still around, still up there.



1        Q.    Do you recall talking about political issues

2   on your blog?

3        A.    Yes, I did.

4        Q.    Okay.  Did you criticize Republicans on your

5   blog?

6        A.    Who?  Can you repeat their name, please.

7        Q.    Republicans?

8        A.    Oh, Republicans --

9        Q.    Yes.

10       A.    -- on the blog?  I don't recall.  I may have.

11   I struggle to recall.  It's been a long time since I had

12   that blog.

13       Q.    Why did you discontinue it?

14       A.    I'm really not sure.  I started it when I was

15   a technology and blog trainer for -- for personal injury

16   law firms around the country and I became good at

17   blogging very quickly, and it was fun, so I started a

18   blog to speak about issues personal to me and my

19   community.

20       Q.    What kind of issues do you remember blogging

21   about if not political?

22       A.    Let's see.  I remember blogging about my

23   adopted mom who was -- who was a missionary to Haiti

24   since 1969 and who moved here with me to Florida in

25   1991.  She had at the time -- I know this was an article



1  from 2010.  I did several of them.  She landed in Haiti

2  on the day of the 2010 earthquake, which killed possibly

3  100,000 or more people, and she went missing for several

4  weeks.  So as part of my research and to try to find

5  her, I posted blogs from time to time about the process

6  of trying to locate -- locate her in Haiti.

7       Q.   Did you find her?

8       A.   Yes, we did.

9       Q.   Okay.

10      A.   Thank God, yes.  Some missionaries -- some

11  American missionaries I believe located her at an

12  orphanage assisting with children in the countryside of

13  Haiti.

14      Q.   I'm so glad to hear that.

15      A.   Thank you.

16      Q.   Are you a board member of the Corporation to

17  Develop Communities of Tampa?

18      A.   Yes, I am.

19      Q.   What does that group do?

20      A.   Corporation to Develop Communities of Tampa is

21  a nonprofit in Hillsborough County founded by Ms. Chloe

22  Coney.  It exists to do multiple things, which fight

23  poverty.  One is workforce development, so through the

24  acquisition of grants and funding, training the

25  community, those hardest economically hit in places like



1 East Tampa to have good economic paying jobs and careers

2 often with a certification or training component.  So

3 that's one, the workforce.

4          And then buying and building affordable

5 housing for Tampa Bay's families, hardworking families,

6 that's two.  There's a new unit that participates in

7 providing low cost marketing materials for small

8 businesses in the Tampa Bay area, nominal cost.  That's

9 three, three pillars.  There may be a fourth, but I

10 believe I referred to the real estate, which has to do

11 with acquiring and building the homes.  That's what I

12 can recall.

13     Q.   Is there a certain portion of Tampa that you

14 focus on or is it for the entire Tampa area?

15     A.   Well, originally, the organization was born in

16 and targeted East Tampa, which is home to the largest

17 concentration of African-Americans in Hillsborough

18 County many of whom are chronically underemployed,

19 possibly undereducated and underemployed for the

20 workforce in order to help them bring up the standard of

21 living and their career opportunities, yes.

22     Q.   Is your home in East Tampa?

23     A.   No.  My home is in North Tampa.  I formerly

24 lived in East Tampa, but my home is in North Tampa and

25 what's considered an ALICE community, which is --



 1        Q.   A what community?

 2        A.   An ALICE community, A-L-I-C-E.  That means the

 3   majority of the residents in that ZIP code are

 4   economically underserved.

 5        Q.   So your -- let's see.  Was your Abonado Road

 6   address in East Tampa?

 7        A.   No.  That's in Town 'n' Country.

 8        Q.   I see --

 9        A.   That was the -- I lived there -- I'm sorry.

10        Q.   I still don't know where Town 'n' Country is.

11        A.   Right.  Right.

12        Q.   So when was it that you lived in East Tampa?

13        A.   I lived in east -- well, let's see -- East

14   Tampa from about 1995 to 2008 when I moved to Lakeland.

15        Q.   All right.  So -- I'm sorry.  I think I

16   interrupted you.  So originally, the Corporation to

17   Develop Communities of Tampa was focussed on East Tampa.

18             Is that still the mission focus today?

19        A.   It's not -- it's the main focus, but we have

20   expended throughout Hillsborough County and also have

21   ongoing projects in St. Petersburg, Florida, for -- in

22   support of the business community there.  Oh, let's see.

23   We also recently added Fort Myers, Florida, as home to

24   some of our workforce opportunities.

25        Q.   So it's still called Corporation to Develop



 1  Communities of Tampa?

 2      A.   Yes, Inc.  Incorporated, yes.

 3      Q.   Inc.  Okay.  But let me make sure I got this

 4  right.  Now, you-all serve Tampa, parts of St. Pete, and

 5  Fort Myers, so also Hillsborough County and Pinellas

 6  County; is that right?

 7      A.   Yes.  That would be correct.

 8      Q.   All right.  And the services on kind of the

 9  same issues in all of those localities, it's workforce

10  affordable housing, small businesses; is that right?

11      A.   Yes.  I would say that.

12      Q.   All right.  Besides this lawsuit, have you

13  ever been involved in a civil lawsuit as a party?

14      A.   No, I have not.

15      Q.   Have you ever been charged with a crime?

16      A.   No, I have not.

17      Q.   Have you ever been charged with driving while

18  your license was suspended?

19      A.   I do not believe I have.

20      Q.   Ever filed for bankruptcy?

21      A.   Yes, I have.

22      Q.   How many times?

23      A.   Once in 2013, I believe, as part of my divorce

24  -- as part of my economic restructure after my divorce.

25      Q.   Have you ever testified in court?



1    A.   Yes, I have for -- I believe for minor traffic

2    offenses, traffic tickets.

3    Q.   Your own traffic tickets?

4    A.   Yes.

5    Q.   Can you estimate how many times you've

6    testified in court for traffic infractions?

7    A.   You'd have to specify over what number of

8    years or time periods.

9    Q.   Ever.

10    A.   Ever?  Ever is a long time.  I would struggle

11    to say.  I'll say at least twice that I'm aware of.

12    Q.   Tell me in your own words why you're bringing

13    this lawsuit?

14    A.   I'm bringing this lawsuit because I believe

15    that it's fundamentally unfair to seemingly dilute the

16    will of the voters in multiple districts by trying to

17    combine all of the voters that -- as many as possible of

18    the voters that look alike into one district, whereas

19    previously, they were in two or -- those same persons or

20    communities were in two districts.

21    Q.   And tell me a little bit more about how you

22    think the will of the voters is diluted, if I got your

23    word right, under the current map that you're

24    challenging?

25    A.   Well, if previously -- if, for example,



1  previously, the different communities had one, let's

2  call them representative -- political representative

3  each and now those communities only have one total

4  between the two of them, I would struggle to see how one

5  person could effectively represent and advocate for the

6  diverse interest of both communities.

7      Q.   And which communities used to have two

8  representatives, but now only have one representative?

9      A.   South St. Petersburg, Florida, and a large

10 portion of my district in -- which includes East Tampa,

11 Florida -- East Tampa, North Tampa, so forth.

12     Q.   And again, I never want to know what you said

13 to your lawyer or what your lawyer said to you, but

14 other than that, can you tell me, how did you come to be

15 involved in this lawsuit?

16         MS. ROBERTSON:  Keto, just make sure you don't

17     disclose any conversations with any of your

18     attorneys.

19         THE WITNESS:  I got you.  I got it.  The law

20     firm reached out to me and informed me of the case.

21 BY MS. HARLE:

22     Q.   Have you spoken with any of the other

23 plaintiffs in this case?  Just yes or no.  I don't need

24 to know what was said.  Have you ever spoken with any

25 other plaintiffs?



1      A.   Yes, I have, but not about the case.

2      Q.   Oh, okay.  And which plaintiff was that?

3      A.   Jarvis El-Amin.

4      Q.   And do you know him in a personal capacity

5  separate and apart from the case?

6      A.   Yes.

7      Q.   Okay.

8      A.   Yes.  We volunteered for many community --

9  community activities together.

10      Q.   Got it.  When the redistricting process was

11  going on that resulted in the map that you're

12  challenging, were you aware at the time that

13  redistricting was happening?

14      A.   Yes, I was aware.

15      Q.   Did you communicate with any members of the --

16  members or staff of the Florida Legislature during the

17  redistricting process?

18      A.   No, I did not.

19      Q.   Have you communicated with any members or

20  staff of the Florida Legislature about the districts

21  since the redistricting happened?

22      A.   No, I have not.

23      Q.   Have you ever communicated with any members of

24  the media regarding the redistricting process?

25      A.   Yes, I have.



 1      Q.   When was that?

 2      A.   It was a few months ago after the lawsuit was

 3  filed.  I don't remember the reporter's name, but it was

 4  a law reporting organization called -- I believe called

 5  Law360, and they cover lawsuits and legal happenings all

 6  over the State of Florida.

 7      Q.   All over the nation in fact.  I'm very

 8  familiar.

 9      A.   Okay.  Okay.

10      Q.   So did you communicate directly with the

11  Law360 reporter?

12      A.   Yes, I did.  He contacted me.

13      Q.   Oh.  Was your -- was it an interview?

14      A.   I would say it was.  He -- we spoke over the

15  phone briefly.

16      Q.   Did he quote you in an article?

17      A.   I believe he did.

18      Q.   Was your attorney on the phone call too?

19      A.   No.  No, they weren't.

20      Q.   Uh-oh.  And what did you tell the reporter

21  about the redistricting process?

22      A.   To my recollection, I told him the same thing

23  I stated a few minutes ago, which was that it was

24  difficult for me to see how having less representation,

25  less political representation for two or more distinct



1  voting regions was beneficial to the communities in

2  those voting regions.

3      Q.   Do you recall any other time that you've

4  spoken with the media about the district lines that

5  you're challenging?

6      A.   I don't recall having participated in any

7  other interviews.

8      Q.   Have you made any written or oral statements

9  to any community groups regarding the districts that

10  you're challenging?

11      A.   No.  I do not recall having made any written

12  or oral communications to any community groups.

13      Q.   Have you spoken with folks at the NAACP

14  regarding the redistricting process or the lawsuit?

15      A.   I don't recall having spoken with anyone at

16  the NAACP about the redistricting process.

17      Q.   Have you spoken with anyone at the

18  Hillsborough County Democrats about the redistricting

19  process you're challenging?

20      A.   No.  I don't recall having spoken with anyone

21  at Hillsborough County Democrats about the districting

22  process.

23      Q.   Have you made any statements or comments on

24  social media about this lawsuit?

25      A.   I do not believe I've made any comments on



1  social media about the lawsuit.  I believe I may have

2  once mentioned to someone that the lawsuit had been

3  filed, but nothing beyond that.

4      Q.   Okay.  Which social media accounts do you

5  have?

6      A.   I have multiple social media accounts on --

7  let's see -- Twitter, Facebook, and -- what's the other

8  one?  Instagram to my recollection.

9      Q.   And you have LinkedIn, right?

10     A.   I'm sorry.  Can you say that again?

11     Q.   You have LinkedIn, right?

12     A.   Yes.  Oh, that's right, yes.

13     Q.   Do you have TikTok?

14     A.   I have, but I don't use it.

15     Q.   Are you currently a registered voter?

16     A.   Yes, I am.

17     Q.   When's the last time you voted?

18     A.   I vote every year.  I'm a super voter.

19     Q.   So have you voted in every state congressional

20  election you've been eligible for?

21     A.   To my recollection, I have voted in every

22  state congressional election that I'm eligible for.

23          MS. HARLE:  Let's pull up the complaint as

24      Exhibit 1.

25          (Defendant's Exhibit No. 1 was marked for



1  identification.)

2  BY MS. HARLE:

3      Q.   And looking at -- let's start just by looking

4  at the map that you're challenging, figure 3 on page 20.

5      A.   Okay.  Was there a question stated?

6      Q.   Yes.  I was just going to pull that up for --

7  to give us a frame of reference.

8          Can you explain to me -- well, first, I guess

9  does this map look familiar to you?

10     A.   Yes, it does.

11     Q.   Okay.  And these are the districts that you're

12 challenging in this lawsuit, right?

13     A.   Yes.  That's correct.

14     Q.   Can you just explain to me while we have this

15 up all of the reasons that you think that these district

16 line are problematic.

17     A.   Yes.  We can see all the sections in purple

18 are two different areas of the State of Florida.  The

19 larger section to the right is primarily Hillsborough

20 County or -- yeah, Hillsborough County from about the

21 University of South Florida/North Tampa area down to

22 much further south, the southernmost part of

23 Hillsborough County, and then the small sliver on the

24 left is part of South St. Pete.

25     Q.   Okay.  So in terms of reason why you think



1  this map is problematic and illegal --

2      A.   Yes.

3      Q.   -- tell me what those are.

4           MS. ROBERTSON:  Object to form.

5           When I say that, you can still answer --

6           THE WITNESS:  Okay.

7           MS. ROBERTSON:  -- unless I tell you.

8           THE WITNESS:  Okay.  Yes.  There are multiple

9      -- several reasons I can think of.  People in

10     Hillsborough County and St. Pete -- excuse me --

11     have different factors that they're concerned

12     about.  One is public transportation.  So if you're

13     in South St. Pete, you have a certain level of

14     service that you come to expect from PSTA, which is

15     the public bussing system.  If you're in -- and you

16     have a much smaller area in which you may need to

17     travel.

18          In Hillsborough County -- excuse me.  Sorry.

19     In Hillsborough County, in that section of

20     Hillsborough County, HART, H-A-R-T, services much

21     of that area, but there's a totally different level

22     of service as customers try to piece together

23     routes so they can get back and forth from home to

24     work, school, church, shopping, sports activities,

25     so forth.  That's one issue.



1          Then another issue is the -- is the school

2     districting.  If you're in South St. Pete, you're

3     part of the Pinellas County Public School district,

4     which is much -- much, much smaller and limited in

5     the number of schools and student that it serves.

6     In Hillsborough County, that's that slice -- the

7     purple slice is part of over 200 schools and I

8     believe the seventh largest school district in the

9     country with over $3.2 billion budget, which has

10    very different factors and -- and points of

11    interest for the citizens of Hillsborough County as

12    opposed to St. Pete.  Those are two of the issues

13    that I can think of.

14         Oh, affordable housing, of course, is the

15    third one.  In St. Pete, where it looks like it's

16    South St. Pete, as far as property values and the

17    ability of the residents to secure affordable

18    housing is drastically different from what it looks

19    like in many parts of Hillsborough County with East

20    Tampa, North Tampa, you know, South Tampa, so forth

21    as far as ability of the residents to find

22    affordable housing.

23 BY MS. HARLE:

24    Q.   Tell me just a little bit more about how the

25 affordable housing issue is different in East Tampa and



1  North Tampa versus South St. Pete?

2      A.   Well, I'm certainly not a geographic expert --

3  geographic or real estate expert.  My understanding is

4  that some of the -- how do you say -- a number of the

5  communities in South St. Pete may primarily be

6  economically depressed, whereas in Hillsborough County,

7  throughout that large slice, you have multiple levels of

8  economic ability.

9          So you may have Seminole Heights, for example,

10  which has houses average three hundred, four hundred

11  thousand dollars, you know, whereas you may have East

12  Tampa where a lot of folks live in apartment

13  communities -- in low income apartment communities.

14      Q.   And just going back to what you said about the

15  school districts, do the voters in the purple part of

16  St. Pete vote for the Pinellas County School Board?

17      A.   Yes, they do.

18      Q.   All right.  Let's look up to paragraph 6 and 7

19  of your complaint.  There we go.  Okay.  I'll give you

20  some time for you to read this.

21      A.   All right.  Okay.

22      Q.   Okay.  So I wanted to focus on a couple of

23  your -- your allegations here.  In paragraph 6, you say,

24  quote, The legislature elevated race above all other

25  considerations, end quote.  And then in paragraph 7, you



1  say, quote, Legislators and their staff purportedly drew

2  these districts in a race-predominant manner, end quote.

3         So my first question was going to be, what --

4  do you have any particular facts regarding the racial

5  motivations of the legislature in drawing the district

6  lines?

7       A.   No.  I don't have any particular facts.  I

8  would have to defer to my attorneys regarding that

9  discussion, but looking at the maps visually, I can't

10  see another reason why you would -- why someone or an

11  entity would divide up the voting district that way

12  especially considering you have two -- it's one of the

13  few if not the only district in the area where you have

14  to cross a body of water and possibly multiple counties.

15       Q.   And who is it that you believe is harmed by

16  the way that district lines are currently drawn?

17       A.   I believe primarily African-American voters

18  living in South St. Pete and Hillsborough County are

19  harmed by the redrawing of this district.

20       Q.   And how are the Black voters in South St. Pete

21  and Hillsborough County harmed by the way the districts

22  are drawn?

23       A.   Voters in both areas are harmed because they

24  are -- they previously had multiple political

25  representatives and now that number has been



1  artificially shrunk to fewer representatives.  Less

2  representation to me does not seem like a fair thing

3  especially when you have more, more, more residents

4  combined in that area now than in years past.

5      Q.   Do you believe there are too many Black voters

6  in your district?

7      A.   Let's see.  Can you restate what you mean by

8  that?

9      Q.   Yeah.  I'm trying to get at what the harm is

10  to the Black voters from your perspective.

11          Is it your contention that there are too many

12  Black voters backed into District 16?

13          MS. ROBERTSON:  Object to form.

14          You can answer, Keto, if you --

15          THE WITNESS:  Okay.  Okay.  If I believe I

16      heard you correctly, you're asking do I believe

17      that the voters -- that the voters are harmed or a

18      specific group of voters are harmed?

19  BY MS. HARLE:

20      Q.   Do you believe there are too many Black voters

21  that are packed into District 16 under the current map?

22          MS. ROBERTSON:  Object to form.

23          Go ahead and answer if you know.

24          THE WITNESS:  Yes, I do.  I believe there are

25      too many voters in the district that are diverse --



1      represent diverse communities.

2  BY MS. HARLE:

3      Q.   Do you believe there are too many Black voters

4  in District 16 currently?

5      A.   Yes, I do believe that.

6      Q.   And do you know what the current percentage of

7  Black voting age population is for District 16?

8      A.   I'm not aware of that fact.  I would have to

9  defer to my attorneys for their knowledge.

10      Q.   Do you have an estimated percentage in mind

11  that for you is a fair percentage of Black voting age

12  population for your district?

13      A.   No.  I do not have a certain percentage in

14  mind at this time.

15      Q.   Are you familiar with the history of the

16  district boundaries for Hillsborough and Pinellas?

17      A.   I'm familiar with some of the history, not all

18  of it, and for that discussion, I would certainly have

19  to refer to my attorneys for historical perspective.

20      Q.   What of the history can you -- or which part

21  of the history of the boundaries are you familiar with?

22      A.   I'm familiar with the fact that I -- to my

23  recollection, the South St. Petersburg sliver was

24  formerly in a Pinellas County voting district, whereas

25  the Hillsborough County sliver was strictly in a



1  Hillsborough County voting district.  And with the

2  drawing that we saw a few -- earlier today, that has

3  changed.  You have combined voters from both areas.

4      Q.   Are you aware that the communities that are

5  combined into District 16 currently have been combined

6  to a shared district since the early 1990s?

7      A.   I'm not familiar with all of the dates.  For

8  that, I'd have to defer to the knowledge of my

9  attorneys.

10      Q.   Did you read the complaint before it was

11  filed?

12      A.   I believe I did.  I don't recall the exact

13  date, so I wouldn't be able to say for sure.

14      Q.   Yeah.  I don't need the date.  I'm just

15  wondering did you read it in full before it was filed.

16      A.   I believe I did.

17      Q.   Let's go to paragraph 11.

18      A.   Okay.  You want me to read it silently?

19      Q.   Yes.  That'd be great.

20      A.   Okay.  Okay.  I read it.

21      Q.   Okay.  Great.  So I was going to ask about the

22  part where you say, quote, Plaintiffs are further harmed

23  because the legislature sacrificed genuine communities

24  of interest, end quote.

25          My first question is, which genuine



1  communities of interest are you referring to there that

2  you believe the legislature sacrificed?

3       A.   They genuine communities of interest would be

4  Black communities in particular in South St. Petersburg

5  and in Hillsborough County, for example, in East Tampa.

6       Q.   And how do you believe the community of Blacks

7  in East Tampa were sacrificed by the legislature?

8       A.   They -- the -- it's my belief that the

9  legislature put together two totally different

10 communities, communities who have sent their children to

11 school in different community schools and different

12 county systems.  For example, communities that pay taxes

13 in a different -- in different ways at different tax

14 referendums, different tax rules, different incentives

15 for small business, for example, they put them all

16 together among other factors.  All of those folks were

17 suddenly put together despite their differences.

18      Q.   And so how has putting them together

19 sacrificed those communities, just in your own words?

20      A.   Putting these two communities together

21 sacrifices their interest because it's very difficult

22 for a -- for one person to represent two totally

23 different areas that have different interests and

24 different factors that they struggle through on a daily

25 basis.



1    Q.   And what specific facts are you relying on for

2   that claim that the legislature sacrificed genuine

3   communities of interest?

4    A.   Can you restate the question, please?

5    Q.   Yeah.  Were there any specific facts you're

6   relying on in support of your allegation that the

7   legislature sacrificed those genuine communities of

8   interest?

9    A.   Well, for specific facts, I would have to

10  defer to the knowledge of my attorneys.

11   Q.   Are there any other communities of interest

12  that you believe were sacrificed because of the way the

13  district lines were drawn?

14   A.   I'm not aware of any other communities of

15  interest.  It would seem strange for the district to be

16  drawn this way based on any other factors.

17   Q.   What do you understand communities of interest

18  to mean?

19   A.   Communities of interest are groups of people

20  that reside typically in the same or similar geographic

21  area in a region, and so they have I would just say many

22  commonalties and mutual interests in that particular

23  area that others outside that area may not share.

24   Q.   And so the two communities of interest that

25  you've mentioned are the Black voters in South St. Pete



1  and the Black voters in East Tampa.

2         So other than race, is there another factor

3  that you think can serve as a basis for a community of

4  interest?

5      A.   I'm not aware of any other factor at this

6  time.

7      Q.   Do you think political party could be the

8  basis for a community of interest?

9      A.   Not sure.  I'm not sure.  I'm not sure.  I

10  would have to defer to the knowledge of my -- of my

11  attorneys in this -- in that case.

12      Q.   Do you think income level could serve as a

13  basis for a community of interest?

14      A.   I'm not sure and I'd have to defer to the

15  knowledge of my attorneys.

16      Q.   Looking at the next paragraph there, paragraph

17  12, just -- if you'll read that to yourself and let me

18  know when you're ready.

19      A.   Yes, I'm ready.

20      Q.   Okay.  So this one says, quote, The

21  legislature's racial gerrymandering unjustifiably packed

22  Black voters into District 16 stripping them from

23  adjacent District 18 and reducing their influence there,

24  end quote.

25         So my question is, do you have any specific



1  facts asserting -- excuse me -- supporting the

2  allegation that the influence of Black voters in

3  District 18 is reduced?

4      A.   I'm not aware of any specific facts, so I

5  would have to defer to the knowledge of my attorneys,

6  but I can't see why you would divide up the district if

7  that were not a consideration.

8      Q.   Okay.  So the next paragraph we'll take a look

9  at too --

10         MS. ROBERTSON:  I apologize.  Is anyone ready

11      for a break?  I actually need to use the bathroom.

12         MS. HARLE:  Yeah.  That's fine.  We can go off

13      the record.  Back in five.

14         (Brief recess.)

15  BY MS. HARLE:

16      Q.   Mr Nord Hodges, I think we were just looking

17  at paragraph 13 there.  We'll give you a minute to read

18  that.  Let me know when you're ready.

19      A.   All right.  All right.  I'm ready.

20      Q.   So starting on that third line where you say,

21  quote, Floridians including individual legislators

22  called out and questioned the legislature's

23  unconstitutional actions, end quote, I'm wondering, are

24  there any specific Floridians you're aware of that

25  called out and questioned the legislature?



1      A.    I'm not aware of specific names at this time.

2    I'd have to defer to my attorneys for their knowledge of

3    different actors in the case.

4      Q.    Do you have any general recollection that you

5    can share with me of who called out what?

6      A.    I do not.  I watched the news and -- at the

7    time and I know some did.  I don't recall who because it

8    was all the local Tampa Bay area news stations.

9      Q.    Okay.  Let's look at paragraph 20, please.

10     A.    I'm sorry.  Which paragraph number?

11     Q.    Paragraph 20.  If you can just read that to

12   yourself.

13     A.    Okay.  I read it.

14     Q.    Okay.  So this one talks about the district's

15   line splitting up Plaintiff's communities.

16           My question is, which community are you

17   referring to there that you feel like is split up?

18     A.    The two communities that's -- two communities

19   in particular are East Tampa community and the South

20   St. Petersburg community.

21     Q.    And do you consider your community to be North

22   Tampa?

23     A.    Yes.  I live in North Tampa.  I -- yes.

24     Q.    Okay.  But North Tampa is not split up, right?

25     A.    I'm not sure what you mean by that.



1      Q.   Well, so this is -- quote, The enacted plan

2  harms Plaintiffs because among other reasons, it splits

3  up their communities.

4           So I'm just wondering, is your community,

5  North Tampa, split up in your view?

6      A.   Oh, right.  I'm trying to make sure I

7  understand what you're asking.  The North Tampa

8  community that I'm in appears to be part of the same

9  portion of the Hillsborough County side of the district.

10  So it's not physically politically split up for them to

11  be divided from the St. Petersburg -- South

12  St. Petersburg district.

13      Q.   And when you think of your own community, how

14  would you define your -- Mr. Hodges -- Nord Hodges'

15  community?

16      A.   Let's see.  How -- how would I define my

17  community?  Can you be specific as to which community

18  you're referring to?

19      Q.   Well, I'm trying to wrap my mind around what

20  is meant in your complaint.  At various times,

21  communities are referred to.  So I guess if I were just

22  asking you, you know, how do you define or describe your

23  community?  Is there one answer?  Are there different

24  answers that you would give me?

25      A.   Well, one answer I would give you right now



1  through my recollection is that I'm part of the

2  Hillsborough County community and all that that entails,

3  and that community is different from the South

4  St. Petersburg community.

5      Q.   So later in that paragraph 20 where it says,

6  groups their communities with dissimilar ones, is --

7  what are you referring to there in terms of

8  dissimilar --

9          MS. ROBERTSON:   Object to form.  I'm sorry.

10         Object to form.

11         THE WITNESS:   I'm referring to the fact that

12         Black communities in areas like East Tampa and

13         South St. Petersburg are very dissimilar other than

14         them being Black -- primarily Black.

15  BY MS. HARLE:

16     Q.   And you don't consider yourself in East Tampa,

17  right?

18     A.   That's correct, although I serve residents of

19  East Tampa in the -- through my job in the school

20  district.

21     Q.   So your -- was it called Dr. Carter?

22     A.   Yes, Dr. Carter G. Wilson school.

23     Q.   That's located in East Tampa?

24     A.   No.  That's located in West -- in North Tampa

25  also, but the students come from all over -- all parts



 1  of Hillsborough County including East Tampa.

 2       Q.   Okay.  And then that last line that says,

 3  quote, Simply because of their race, are there any facts

 4  that you know of that we haven't talked about today that

 5  indicate that the lines were drawn simply because of the

 6  race of the voters?

 7       A.   I would have to defer to my attorneys for

 8  further discussion of that matter, but I can't see why

 9  you would draw the district -- redraw the district that

10  way if race were not a factor.

11       Q.   Let's look at paragraph 95.  Read that and let

12  me when you're ready.

13       A.   All right.

14       Q.   So this is where you say, quote, These

15  race-based decisions resulted in a map that splits

16  neighborhood and ignores traditional redistricting

17  criteria.

18            So my first question is, which --

19       A.   Well, hang on.

20       Q.   I'm sorry.

21       A.   I haven't had a chance to finish reading it

22  yet.

23       Q.   Oh, I'm sorry.

24       A.   That's okay.  You said 95 or 96?

25       Q.   Just number 95, yes, sir.



1      A.   Right.  Okay.  Go ahead.

2      Q.   My first question is, which neighborhoods are

3  split in the map?

4      A.   Well, South St. Petersburg -- South

5  St. Petersburg is politically split from the rest of

6  St. Petersburg, which is not -- which has not always

7  been the case.

8      Q.   Is South St. Petersburg -- South

9  St. Petersburg itself a neighborhood?

10      A.   Yes, it is.

11      Q.   And is all of South St. Petersburg currently

12  in District 16?

13      A.   You would need to show me a map again and

14  restate the question, please.

15      Q.   Okay.  Sure.  Let's -- let's go down to the

16  figure 3 real quick.

17           So the purple part on the map there, that's

18  South St. Petersburg, correct?

19      A.   Yes.  Well, the purple shaded part.

20      Q.   Purple with the diagonal white lines?

21      A.   Yeah.

22      Q.   Okay.  So my question is, just that boundary

23  between 16 and 18 on the Pinellas side, do you see that?

24      A.   Yes.

25      Q.   Okay.  Is any part of South St. Pete in



1  District 18 on that map?

2      A.   Yes, it is.

3      Q.   Okay.  So is South St. Petersburg the

4  neighborhood, as you described it, split between

5  District 16 and 18?

6      A.   Oh, is South St. Pete split between District

7  16 and 18?

8      Q.   That's what I'm trying to ask.

9      A.   No, it's not.  It's divided from it.

10     Q.   Okay.  Thank you.  All right.  Let's look back

11  at 95 for the second part of that question, which is --

12  this says that the legislature ignores traditional

13  redistricting criteria, so I'm wondering, which criteria

14  do you understand it to be appropriate for the

15  legislature to use when drawing district lines?

16     A.   Well, for further discussion of that, I would

17  have to defer to the knowledge of my attorneys.

18     Q.   And which criteria do you believe the

19  legislature ignored in drawing these district lines?

20     A.   I believe they simply ignored geographic

21  criteria by going across multiple counties and dividing

22  it up with the body of water all of -- both of which are

23  unusual.

24     Q.   Anything else?

25     A.   Not at this time.



1        Q.   Okay.  All right.  Let's look at paragraph 97.

2        A.   Okay.  Let me read it.  Okay.  Go ahead.

3        Q.   Just focussing on the first line that refers

4   to, quote, The direct evidence of racial predominance,

5   what direct evidence are you aware of that race

6   predominates the drawing of the district lines you're

7   challenging?

8        A.   I'm not certain on all of the particular

9   factors, so I would have do defer to my attorneys for

10  more complete answering of this.

11       Q.   But do you know of any direct evidence that

12  race predominates the drawing of the lines?

13       A.   I'm not sure at this time, but I can't see why

14  else you would need to draw a district in this way.

15       Q.   Looking at paragraph 131 -- take a minute to

16  read that and let me know, please.

17       A.   Yes.  You can go ahead.

18       Q.   Okay.  Do you know what the phrase Tier One

19  compliance means in that allegation?

20       A.   I don't recall.  I've seen the definition

21  somewhere in my reading of this lawsuit, I believe, but

22  I'd have to refer to -- or defer to my attorneys for

23  more definitions or knowledge.

24       Q.   Let's look at the map of what's called plan

25  42, which is in your complaint.  There it is.



1            Does that look familiar to you?

2       A.   Yeah.  I have seen it in the past.

3       Q.   I'll just represent to you this is a --

4  obviously, it's in your complaint.  This is a map that

5  you and your Co-Plaintiffs have proposed as a better

6  alternative to the map you're challenging.

7            Can you tell me anything about this map that

8  you think is better than the map that you're challenging

9  in the lawsuit?

10      A.   Yes.  If you look at 19, 18, 16, and 24, you

11 can travel the width and height of the -- of those areas

12 without crossing into another county, and the entire

13 community or geographic area is enclosed within the

14 boundaries of each specific voting district.

15      Q.   Based on your knowledge of the demographics in

16 Hillsborough, would there be roughly the same number of

17 Black voters in this map or more or less than the one

18 that you're challenging?

19      A.   I would have to defer to my attorneys, who I'm

20 sure may be relying on the census and other political --

21 and other information or more accurate and complete

22 discussion of that question.

23      Q.   Okay.  Let's look at what's called the Isbell

24 map.  It's also in your complaint.  Does this -- let's

25 see.



1          The Isbell Plan, does that look familiar to

2    you?

3          A.    I believe I've seen it before.

4          Q.    Okay.  And this is in your complaint as an

5    alternative map.

6          What is it about this map that you prefer to

7    the map that you're challenging in the lawsuit?

8          A.    Again, it appears that the -- that each of the

9    voting districts is self-contained and does not cross

10   over or -- or share parts of another voting district.

11   You can travel the width and the depth of each district

12   without crossing a body of water and without -- without

13   crossing through another district.

14         Q.    And in this plan, it looks like the voters of

15   South St. Pete are not combined with the voters of

16   Tampa; is that right?

17         A.    That appears to be accurate.

18         Q.    Do you know whether under this plan in the

19   region shaded 17 there would be a diminishment of the

20   Black voting power as compared to the map that you're

21   challenging now?

22         A.    I'm not aware of all the specific boundaries

23   of this proposed plan.  I'd have to defer to my

24   attorneys for more complete and accurate discussion.

25         Q.    Have you seen any of the maps that your expert



 1  witnesses have provided in their reports in this case?

 2      A.   I'm not sure.  I -- I'm not sure.  I would

 3  have to be pointed to specific maps.  It seems like

 4  there's a lot of them.

 5          MS. HARLE:  That is correct.  Let's look at

 6      your initial disclosures.  This will be Exhibit 2.

 7          (Defendant's Exhibit No. 2 was marked for

 8  identification.)

 9          If you can scroll down, Leila, to the bottom

10      and then back up.

11  BY MS. HARLE:

12      Q.   Does this document look familiar to you

13  Mr. Nord Hodges?

14      A.   Let's see.  Let me see.  Well, my name looks

15  familiar.

16      Q.   Okay.  Are you able to say whether you've

17  reviewed this before?

18      A.   I believe I have.  All the documents kind of

19  seem to run together.

20      Q.   I understand.  Well, let's look at what it

21  says there in 1A where it has your name.  So it says

22  that you, quote, have information tending to show that

23  the challenged districts caused harm to themselves and

24  other residents.

25          So I'm wondering, what harm do the challenged



1  districts cause to you?

2      A.   Yes.  Specifically, the harm to me is that I'm

3  forced to share a legislature now -- or not necessarily

4  legislature, a political representative with -- with

5  residents of South St. Pete with whom I have nothing in

6  common other than being Black.  So again, less

7  representation to me is not better than more

8  representation.

9      Q.   And do you believe that Black voters are a

10  community of interest?

11      A.   Yes, I do.

12      Q.   So in what way does being in the same district

13  as other Black voters harm you?

14          MS. ROBERTSON:  Object to form.

15          You can answer.

16          THE WITNESS:  Okay.  In what way does being in

17      a district with other Black voters harm me?

18          MS. HARLE:  Yes, sir.

19          THE WITNESS:  Well, if the -- I'm sorry.  Go

20      ahead.

21          MS. HARLE:  Yes, sir.  That was my question.

22          THE WITNESS:  Okay.  It harms me if I have to

23      share time with a legislator who's -- instead of

24      being able to be dedicated to the interest of my

25      community has conflicting interest in at least two



1        different communities that they have to consider,

2        research, work on, so forth.  So possibly, I may

3        get less, less advocacy on -- for my community on

4        my side of the map and some in another part of the

5        map.

6   BY MS. HARLE:

7        Q.   And if -- if the voters of South St. Pete were

8   moved out of your voting district and that caused the

9   number of Black voters in your district to go down,

10  would you be in favor of that?

11       A.   Yes, I would.

12       Q.   Okay.  So the second part of your claim there

13  is that you have information tending to show that the

14  challenged district cause harm to other residents.

15            So is there any harm to other residents of the

16  districts that you have information on that we haven't

17  talked about yet?

18       A.   I'm not aware of other specific information.

19  I'd have to defer to my attorneys for complete and

20  accurate discussion.

21       Q.   Okay.  Are there any other individuals you

22  know of that have information about whether the district

23  lines were drawn near -- primarily based on race?

24       A.   I'm not aware at this time of who has or

25  doesn't have information about the districts being



 1  redrawn.

 2          MS. HARLE:  And then just one, I think, final

 3      exhibit.  This will be your blog from November 9th,

 4      2012.  Give you time to read it.

 5          (Defendant's Exhibit No. 3 was marked for

 6  identification.)

 7          THE WITNESS:  Okay.

 8  BY MS. HARLE:

 9      Q.  Does this kind of look like your blog?

10      A.  Yes.  That is definitely me.

11      Q.  Okay.  If you don't mind, just read that entry

12  and I'll just have a couple questions.

13      A.  All right.  Sure.  Give me a moment.  All

14  right.  I finished.

15      Q.  Okay.  I just wanted to hone in on towards the

16  bottom there starting with -- I'll read it into the

17  record just so we have it.  Quote, Even the Cuban

18  population is no longer Republican in Florida.

19  Unfortunately, I guarantee that the blind will continue

20  to lead the blind and tea partying war-mongering GOP

21  party leadership will stupidly assume that they lost

22  this election because their candidates were not more

23  extreme.  For their sakes, they should get it right

24  because the number of old white men in America is

25  shrinking and you cannot win with just their vote.  Duh,



 1  end quote.

 2          Did I read that right?

 3      A.   Yes, you did.

 4      Q.   Okay.  Would you say that you had animosity

 5  towards Republicans at the time you wrote this?

 6      A.   No, not at all.  I've -- I'm a first

 7  generation immigrant who grew up in the south in

 8  Arkansas and Florida surrounded by Republicans,

 9  Democrats, Independents, and others from school age

10  including my school in church and my community groups

11  that I actively fellowshiped and was and am still

12  friends with until this day.

13      Q.   Okay.  So you don't have any animosity today

14  towards old white men?

15      A.   No, I did not.

16      Q.   Okay.  And do you think -- do you think

17  Republicans are stupid?

18      A.   No.  This was just an opinion piece based on

19  certain political actions at the time.  And being 12

20  years ago, many things have -- are not the same today as

21  they were in 2012.

22          MS. HARLE:  Understood.  Well, thank you.  I

23      think that's the end of my questions.

24          THE WITNESS:  You're welcome.

25          MS. ROBERTSON:  I don't have any questions.



1    We would like to read.

2          MS. HARLE:  And we will order an electronic

3    copy.

4          MS. ROBERTSON:  We'll also order.  And can you

5    bill the ACLU instead of Butler.

6          (This deposition was concluded at 3:49 p.m.)

7                              - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA  )

 4   COUNTY OF DUVAL   )

 5

 6

 7        I, WENDY E. RIVERA, Florida Professional

 8   Reporter, Notary Public, State of Florida, certify that

 9   KETO NORD HODGES personally appeared before me via

10   videoconference on November 26, 2024, and was duly

11   sworn.

12

13

14        Signed this 13th day of December, 2024.

15

16

17

18

19   _____
               Wendy E. Rivera
20         Notary Public, State of Florida
            Commission No.:  HH 373469
21            Expires: March 15, 2027

22

23

24

25
```



```
 1                   CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA )

 4   COUNTY OF DUVAL  )

 5

 6        I, WENDY E. RIVERA, Florida Professional

 7   Reporter, do hereby certify that I was authorized to and

 8   did remotely stenographically report the videoconference

 9   deposition of KETO NORD HODGES; that a review of the

10   transcript WAS requested; and that the foregoing

11   transcript, pages 1 through 56, is a true record of my

12   stenographic notes.

13

14        I FURTHER CERTIFY that I am not a relative,

15   employee, or attorney, or counsel of any of the parties,

16   nor am I a relative or employee of any of the parties'

17   attorney or counsel connected with the action, nor am I

18   financially interested in the action.

19

20        DATED this 13th day of December, 2024.

21

22

23

24   _____
                   Wendy E. Rivera

25
```

