IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA

THE LEAGUE OF WOMEN VOTERS OF FLORIDA;
COMMON CAUSE; JOAN ERWIN; ROLAND
SANCHEZ-MEDINA, JR.; J. STEELE OLMSTEAD
CHARLES PETERS; OLIVER D. FINNIGAN;
SERENA CATHERINA BALDACCHINO; AND
DUDLEY BATES,

        PLAINTIFFS,

v.

CASE NO.: 2012-CA-2842

KENNETH W. DETZNER, in his official
capacity as Florida Secretary of State; THE
FLORIDA SENATE; ANDY GARDINER,
in his official capacity as President of the
Florida Senate; THE FLORIDA HOUSE OF
REPRESENTATIVES; and STEVE CRISAFULLI, in
his official capacity as Speaker of the Florida
House of Representatives, and PAM BONDI, in
her official capacity as Attorney General of the
State of Florida,

        DEFENDANTS.

## FINAL JUDGMENT ADOPTING REMEDIAL SENATE PLAN

THIS MATTER came before the Court following entry of the Stipulation and Consent Judgment dated July 28, 2015. The Court has conducted a four-day bench trial during which it considered testimony from fact and expert witnesses, reviewed and considered documentary evidence, and heard argument of counsel.

The Court is grateful to the parties for their proposed Final Judgments which the Court has reviewed. The Court has relied primarily on Plaintiffs' proposed "Final Judgment Adopting Remedial Senate Plan" in writing this opinion and has incorporated it to the extent it reflected the Courts own findings and opinions based on the evidence presented at trial. The Court has tried to be mindful of the limited time available to prepare this Final Judgment and apologizes to the readers of this opinion for any technical errors that may be contained herein. Further, the Court

treated all of Plaintiffs' and Defendants' demonstrative exhibits as evidence and admitted them as such.

Based upon the evidence and argument presented at trial, the Court hereby adopts Plan CPS-4a as the remedial Senate redistricting plan and finds as follows:

## FINDINGS OF FACT

### 2012 Initial and Enacted Plans

1.      On February 9, 2012, the Legislature passed Senate Joint Resolution 1176 apportioning Florida into 120 House districts and 40 Senate districts. *In re Senate Joint Resolution of Legislative Apportionment 1176*, 83 So. 3d 597, 600 (Fla. 2012) ("*Apportionment I*"). In *Apportionment I*, the Florida Supreme Court, on a facial review, found that the initial Senate plan (the "2012 Initial Plan") was "rife with objective indicators of improper intent," *id.* at 654, and invalidated the 2012 Initial Plan and eight districts for failure to comply with the tier-one and tier-two mandates of Article III, Section 21 of the Florida Constitution, *id.* at 683.

2.      On March 27, 2012, the Legislature passed Senate Joint Resolution 2-B adopting a remedial Senate redistricting plan (the "2012 Enacted Plan") in response to *Apportionment I*. Even though there are more registered Democrats than registered Republicans in Florida, *id.* at 642, the 2012 Enacted Plan contains 22 Republican-performing districts based on the 2012 presidential election, 25 Republican-performing districts based on the 2010 gubernatorial election, and 23 Republican-performing districts based on the 2008 presidential election.[1] Republicans currently hold 26 out of 40 Senate seats under the 2012 Enacted Plan.[2]

3.      The Florida Supreme Court approved the 2012 Enacted Plan based on a facial review conducted on a limited record. *See In re Senate Joint Resolution of Legislative*

---

[1] J. Ex. 6 at 8.
[2] *See* https://www.flsenate.gov/Senators.

*Apportionment 2-B*, 89 So. 3d 872 (Fla. 2012) ("*Apportionment II*"). Following *Apportionment II*, Plaintiffs brought this as-applied challenge to the 2012 Enacted Plan.[3] Plaintiffs asserted both a whole-plan challenge and challenges to 28 individual districts.[4] The whole-plan challenge alleged that the 2012 Enacted Plan "was drawn with systemic partisan intent in violation of Article III, Section 21, of the Florida Constitution."[5] Among other things, Plaintiffs asserted that the Legislature provided non-public draft maps to Republican partisan operatives, solicited feedback and advice from the operatives, relied on partisan maps submitted by the operatives through "straw" persons for the enacted districts, and deleted relevant documents.[6]

4.      On July 9, 2015, the Florida Supreme Court affirmed Judge Lewis's finding of partisan intent in the 2012 Congressional Plan based, in significant part, on the same conduct alleged in this as-applied challenge. *See League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363 (Fla. 2015) ("*Apportionment VII*"). The Supreme Court, however, ruled that "the burden should have shifted to the Legislature to justify its decisions in drawing the congressional district lines." *Id.* at 371. As a result, the Supreme Court found that Judge Lewis should have invalidated additional districts and rejected the Legislature's 2014 remedial congressional plan. *Id.* at 371-72.

5.      In light of *Apportionment VII*, on July 28, 2015, the Senate stipulated that the 2012 Enacted Plan violated Article III, section 21 "because the [2012 Enacted Plan] and certain individual districts were drawn to favor a political party and incumbents."[7] Accordingly, the

---

[3] In *Apportionment III*, the Florida Supreme Court determined that as-applied challenges to state redistricting plans may be pursued after the initial facial review. *See Fla. House of Reps. v. League of Women Voters of Fla.*, 118 So. 3d 198 (Fla. 2013) ("*Apportionment III*").
[4] *See* Pltf. Disclosure of District Challenges dated May 8, 2015.
[5] *Id.* at 2.
[6] *Id.* at 2-3.
[7] Stipulation & Consent Judgment at 2.

Legislature consented to entry of a judgment in this action invalidating the 2012 Enacted Plan.[8]

In the Consent Judgment, this Court ordered that the 2012 Enacted Plan "shall not be enforced or

utilized for the 2016 primary and general elections" and directed as follows:

> In the remedial proceedings, the burden shall be shifted to Defendants to justify
> the Legislature's decisions in drawing Senate district boundaries, no deference
> shall be afforded to the Legislature's decisions (whether advanced by the whole or
> either chamber of the Legislature) regarding the drawing of Senate districts, and
> the review of the Remedial Senate Map and individual districts shall be subject to
> the same standards as set forth in *Apportionment VII*.[9]

### The Special Session

6.    Under the Consent Judgment, the Legislature had the opportunity to enact a

proposed remedial plan by November 9, 2015.[10]

7.    Before the Legislature met in special session to consider a remedial plan, the

presiding officers of the Legislature directed legislative staff to draw "base maps" in accordance

with certain directions, including that the maps be prepared according to two methodologies

relating to the splitting of counties.[11]  At the direction of the presiding officers, staff did not

consider Plaintiffs' district challenges or prior alternative maps submitted in this case when they

drew the base maps.[12]  Staff interpreted the *Apportionment I* decision as holding that it was

"absolutely necessary to stay above 50 percent" minority voting age population in any majority-

minority district that existed in the 2002 Benchmark Plan, even at the expense of tier-two

compliance.[13]  Finally, staff was instructed to keep total population deviation within a maximum

range of 4.0%.[14]

---

[8] *Id.* at 5-7.
[9] *Id.* at 6.
[10] *Id.* at 5; *see also* Agreed Scheduling Order dated August 19, 2015.
[11] J. Ex. 405.
[12] Rem. Tr. Vol. 2 at 204:15-205:18.
[13] Rem. Tr. Vol. 1 at 95:20-96:11; 98:11-99:8.
[14] J. Ex. 405.

8.    Staff members Jay Ferrin, Jason Poreda, and Jeff Takacs drew six base maps[15] for the Legislature's consideration:

  a)    Plan 9070;

  b)    Plan 9072;

  c)    Plan 9074;

  d)    Plan 9076;

  e)    Plan 9078; and  - (which becomes Plan 9090)

  f)    Plan 9080 - (which becomes Senate Map 1 when Plan 9080's South Florida districts were added to Plan 9078/9090[16]).

9.    Staff analyzed the base maps with the assistance of counsel and confirmed that all of the minority districts in each of the six base maps did not diminish the ability of minorities to elect candidates of their choice in any of their districts.[17]

10.    On October 19, 2015, the Legislature commenced a special session for the purpose of enacting a remedial Senate plan.[18]

11.    Senator Bill Galvano served as Chairman of the Senate Committee on Reapportionment during the special session.[19]

12.    Senator Galvano also serves as Majority Leader for the Senate and, in that capacity, is responsible for working on issues that are important to the Republican Caucus.[20]

13.    During the special session, Senator Galvano also served as head of the Florida Republican Senatorial Campaign Committee.[21]  In that capacity, Senator Galvano was charged

---

[15] J. Ex. 406; See J. Exs. 73-78.
[16] Same Plan - different numbers. Plan 9078 was renumbered to Plan 9090.
[17] Rem. Tr. Vol. 1 at 115:24-116:20.
[18] J. Ex. 404.
[19] Rem. Tr. Vol. 5 at 470:6-9.
[20] Rem. Tr. Vol. 5 at 466:13-21.

with fundraising for Republican campaigns, "ensur[ing] campaign success for Republicans in 2016," and "lead[ing] the Republican Senatorial Campaign to... a victory in 2016."[22] This role required Senator Galvano to be especially concerned with "making sure that Senate campaigns perform well for the Republican Party."[23]

14.    Members of the Republican Caucus of which Senator Galvano is the leader have elected Senator Galvano to become Senate President in 2018.[24] Senator Galvano will succeed Senator Joe Negron and then be succeeded by Senator Wilton Simpson as Senate President.[25]

15.    Senator Galvano selected Plan 9078 from the six base maps to present to the Senate Committee on Reapportionment for approval.[26] Senator Galvano did not poll the Committee to decide which map should be put forward.[27]

16.    Plan 9078 was one of the best Republican-performing plans among the base maps and only paired one set of Republican incumbents in the same district (Senator Diaz de la Portilla and Senator Flores in District 36).[28] Among other pairings, every base map except for Plan 9078 paired Senator Galvano, Senator Negron, or Senator Simpson with another Republican senator.[29]

17.    Plan 9078 had the second highest total population deviation, the highest standard deviation, and the lowest metric compactness (averaging together the Reock, Convex Hull, and Polsby-Popper scores) of the six base maps.[30] Plan 9078 also split four more cities and two more

---

[21] Rem. Tr. Vol. 5 at 467:8-468:6.
[22] Rem. Tr. Vol. 5 at 468:11-469:16.
[23] Rem. Tr. Vol. 5 at 470:16-19.
[24] Rem. Tr. Vol. 5 at 466:22-467:1.
[25] Rem. Tr. Vol. 5 at 467:2-7.
[26] Rem. Tr. Vol. 5 at 484:21-485:1, 488:13-17.
[27] Rem. Tr. Vol. 5 at 487:20-488:21.
[28] J. Ex. 416 at 2.
[29] Id.
[30] P. Dem. Ex. 1-2; J. Exs. 73-78.

counties than the lowest base maps.[31]

18.    Senator Galvano offered that Plan 9078 outperformed the other base maps based on a so-called "Pol/Geo" index that is calculated internally by Senate staff.[32]

19.    The "Pol/Geo" index was created by John Guthrie, the former staff director for the Senate Committee on Reapportionment.[33] None of the witnesses at trial participated in the creation of the index, and no one could explain in any detail how the index is calculated except that it takes into account city and county boundaries, primary and secondary roads designated by the U.S. Census Bureau, and bodies of water over five acres in area.[34] The testimony reflects that the index (a) was not updated at any time after *Apportionment I* and thus does not incorporate the guidance in that opinion, (b) is not weighted, such that following creeks is given the same credit as following county boundaries, and (c) assigns no penalty for breaking boundaries.[35] The result is that a district can score 100% under the "Pol/Geo" index by exclusively following county roads and creeks, even if the district's lines break every county and city boundary in their path. *But see Apportionment I*, 83 So. 3d at 638 (holding that political boundaries include "counties and municipalities" and acceptable geographical boundaries include "rivers, railways, interstates, and state roads," while "the decision to simply use any boundary, such as a creek or minor road, would eviscerate the constitutional requirement").

20.    The failings of the "Pol/Geo" index are best illustrated by Districts 1 and 3 in the 2012 Initial Plan, which the Florida Supreme Court criticized at length for violating the constitutional requirement of respecting political and geographical boundaries where feasible. *See id.* at 656 (citing Senate District 1 as an example of a district that "freely split counties and

---

[31] P. Dem. Ex. 3; J. Exs. 73-78.
[32] Rem. Tr. Vol. 5 at 520:16-18.
[33] Rem. Tr. Vol. 1 at 76:25-77:10.
[34] Rem. Tr. Vol. 1 at 76:25-77:10; Rem. Tr. Vol. 2 at 254:22-255:1.
[35] Rem. Tr. Vol. 5 at 568:14-569:10; Rem. Tr. Vol. 2 at 250:9-251:22.

follow[ed] a variety of roads and waterways, including minor residential roads and creeks"); *id.* at 663-65 (remarking that the boundary between Districts 1 and 3 "follows no consistent political or geographical boundary" and instead "follows a variety of boundaries, switching between major roads (Interstate 10), minor roads, county lines, city boundaries, major waterways, rivers, and even creeks"). Although Districts 1 and 3 in the 2012 Initial Plan divided every county along their common border (five in total) and followed minor and constitutionally unacceptable boundaries, the districts scored 98% and 99% percent on the "Pol/Geo" index.[36] Accordingly, the Court finds that the Legislature's internally calculated "Pol/Geo" index is of limited use as a reliable way of measuring tier-two compliance. Indeed, the Court notes that witnesses for the Legislature could not identify a single example in which the Legislature cited or relied on the "Pol/Geo" index in the nearly four years of redistricting litigation that occurred before this remedial trial.[37]

21.     After a random renumbering of the districts, Plan 9078 was re-designated Plan 9090 with no changes to the districts themselves.[38] On October 23, 2015, the Senate Committee on Reapportionment approved Plan 9090 for presentation to the full Senate.[39]

22.     The Senate declined to pass Plan 9090 as drawn by staff. Instead the Senate passed Plan 9124, based on an amendment offered by Senator Diaz de la Portilla.[40] Plan 9124 modified the South Florida districts in Plan 9090, including the district in which Senators Diaz de la Portilla and Flores had previously been paired.[41] In addition to unpairing those two incumbents, the reconfigured version of the district where Senator Diaz de la Portilla resides

---

[36] J. Ex. 7 at 2.
[37] Rem. Tr. Vol. 1 at 128:14-130:8.
[38] Rem. Tr. Vol. 5 at 485:2-21; J. Ex. 413.
[39] J. Ex. 14 at 113-115.
[40] J. Ex. 15 at 127, 145; J. Ex. 16 at 50.
[41] P. Ex. 120.

went from being Democratic-performing to Republican-performing in the 2012 presidential election.[42]

23.    Following the Senate's adoption of Plan 9124, House staff members Jason Poreda and Jeff Takacs prepared Plan 9079 for consideration by the House.[43]

24.    Plan 9079 modified Plan 9124 by, among other things, incorporating district configurations proposed by Plaintiffs in Plan CPS-1, an alternative plan that Plaintiffs submitted to the Legislature during the special session.[44] House staff touted the changes they made based on CPS-1 as improvements to the map.[45] Plan 9079 contained twelve districts derived from Plan CPS-1.[46] House staff incorporated these districts into Plan 9079 because they recognized that the compactness of CPS-1 was "significantly higher beyond the range [legislative staff] had previously drawn" and that Plaintiffs' map drawer "had done a very good job with compactness and keeping cities whole," particularly in the South Florida districts.[47]

25.    Among the districts incorporated into Plan 9079 from CPS-1 was Hispanic District 37, which is nearly identical to District 35 in Plaintiffs' Plans CPS-3a, 3b, 4a, and 4b.[48] During the special session, legislative staff, legislative counsel, Professor Moreno (an expert for the House), and Senator Galvano all took the position that the South Florida minority districts in Plan 9079, including District 37, did not retrogress after spending an "inordinate amount of time" analyzing the issue.[49]

---

[42] *Compare* J. Ex. 77 at 7 (District 36) *with* P. Ex. 120 at 4 (District 37).
[43] P. Ex. 130; Rem. Tr. Vol. 1 116:21-117:9.
[44] S. Ex. 35.
[45] Rem. Tr. Vol. 1 at 117:10-118:2; 121:21-122:2.
[46] Rem. Tr. Vol. 1 at 122:3-12.
[47] Rem. Tr. Vol. 1 at 123:3-11; 124:4-11; J. Ex. 19 at 30.
[48] P. Dem. Ex. 25.
[49] Rem. Tr. Vol. 5 at 498:21-502:15; Rem. Tr. Vol. 1 at 130:9-135:25.

26.    The House passed Plan 9079, and the Senate and House then convened a conference committee to attempt to agree on a plan.[50] The conference committee recommended Plan 9079, but the Senate voted against it, and the special session adjourned without a legislatively enacted remedial plan.[51]

27.    During the special session, Plaintiffs submitted three proposed remedial plans to the Legislature (Plans CPS-1, CPS-2, and CPS-3), along with several letters advocating for their plans and objecting to the legislative plans under consideration.[52] Although House staff relied on CPS-1 to make improvements to the map in drawing Plan 9079, the Plaintiffs argue the Legislature did not offer any of Plaintiffs' proposed plans in their entirety for consideration or for a vote during the special session. The Senate disputed this version of the events and suggested the Plaintiffs participated when and where they deemed it strategic. The Senate's view is that:

> In fact, unlike the Senate which presented the testimony of Senator Galvano to explain the decision making process behind the maps the Senate submitted, Plaintiffs presented no such testimony for any of their maps. Throughout the course of this redistricting cycle, the Plaintiffs have submitted more than 20 maps to courts or to the Legislature, yet have never explained why they selected CPS-3a, 3b, 4a and 4b for this Court's consideration. (Senate [Proposed] Order Approving Remedial Senate Plan filed December 23, 2015 - p.11)
>
> ****
>
> Other aspects of Plaintiffs' process raise additional concerns. Despite their professed support for transparency, Plaintiffs, Mr. O'Neill, and their attorneys drew, reviewed, discussed, modified, and approved their maps in a closed process. And despite the Legislature's invitation to participate in the public process, Plaintiffs waited until after the first Senate plan passed the Senate Committee on Reapportionment before sending their plan to the Legislature on the eve of the vote on the Senate floor.[53] After the

---

[50] Rem. Tr. Vol. 5 at 496:6-497:13.
[51] Rem. Tr. Vol. 5 at 502:16-23.
[52] P. Ex. 2-5; S. Ex. 35.
[53] Plaintiffs Ex. 4.

House Committee on Redistricting passed its own remedial plan, Plaintiffs submitted two more maps, apparently engaging in a game of "leapfrog" in which they awaited the Legislature's map and then attempted to draw a map that was marginally better on certain tier-two metrics.[54] But, as Plaintiffs' map drawer testified, a skilled map drawer can always improve a given map on the tier-two metrics.[55] And, as Judge Lewis found in the congressional case, "changes which improve tier two performance somewhat" may be "motivated by a desire to affect political performance." Order Approving Remedial Plan at 9, *Romo v. Detzner*, 2012-CA-412 (Fla. 2d Cir. Ct. Oct. 9, 2012). Thus, while the Legislature's process was transparent, Plaintiffs deliberately chose to limit the record by which this Court could discern their true motivations, and their efforts to create maps with better compactness scores does not persuade this Court that Plaintiffs' maps are in fact the "best." (Senate [Proposed] Order Approving Remedial Senate Plan filed December 23, 2015 - p.12)

Irrespective of each parties' claims, what is clear is that no map came out of either the Legislature as a whole or from the Senate as a body that was the product of a majority of the members.

### The Proposed Remedial Plans

28.     Having made the above factual findings concerning the special session, this Court will now turn to the parties' respective remedial plans. Consistent with the framework outlined by the Florida Supreme Court in both *Apportionment VII* and in *League of Women Voters of Fla. v. Detzner*, 2015 WL 7753054 (Fla. Dec. 2, 2015) ("*Apportionment VIII*"), and consistent with Judge Lewis's approach during the congressional remedial proceedings, the Court will first address the Senate's proposed plan, Senate Map 1. The Court will then address Plaintiffs' proposed plans – CPS-3a, 3b, 4a and 4b – and the parties' expert testimony and other evidence offered at trial. Mindful of this Court's duty to adopt the plan that best and most faithfully fulfills all constitutional requirements, this Court will then evaluate Senate Map 1 in light of

---

[54] Plaintiffs Ex. 5.
[55] Rem. Tr. Vol. 6. 733.

Plaintiffs' alternatives, the Senate's burden of proof, and the parties' whole plan and individual district challenges without affording any deference to the Senate.

### Senate Map 1

29.     As a result of the Legislature's failure to adopt a remedial plan, this Court commenced proceedings to judicially adopt a remedial plan and directed the parties to submit proposed remedial plans by November 18, 2015.[56]

30.     The Senate elected not to submit either Plan 9124 (passed by the Senate) or Plan 9079 (passed by the House) in these remedial proceedings.  Instead, the Senate offers a plan designated "Senate Map 1" that was neither passed nor even considered by either chamber.[57]

31.     On October 24, 2015, well before the end of the special session, Senator Galvano directed staff member Jay Ferrin to draw Senate Map 1 by combining Plan 9090 (formerly base map Plan 9078) with the South Florida districts in base map Plan 9080.[58]

32.     Staff did not independently choose to combine Plans 9078/9090 and 9080 as part of their map drawing efforts, and they did not include such a combination in the six base maps offered for the Legislature's consideration.[59]  Senator Galvano did not seek the advice or input of staff regarding the merits or tier-two impact of combining Plans 9078/9090 and 9080.[60]

33.     No legislator other than Senator Galvano participated in the decision to combine Plans 9078/9090 and 9080 into a single map.[61]  Senator Galvano conceded at trial that this "was

---

[56] Amended Scheduling Order dated November 12, 2015 at 1-2.
[57] J. Ex. 1.
[58] P. Ex. 52.
[59] Rem. Tr. Vol. 2 at 223:16-224:18
[60] Rem. Tr. Vol. 5 at 502:24-504:1, 504:24-505:19; Rem. Tr. Vol. 2 at 224:2-9.
[61] *See* Senate's Second Corrected Disclosure of Proposed Remedial Plan dated November 20, 2015 at 2; Rem. Tr. Vol. 5 at 503:17-19.

Senator Galvano creating a map himself" and that he "created a new map" by combining two base maps that staff themselves had not combined.[62]

34.    Although Senator Galvano directed Jay Ferrin to prepare Senate Map 1 for submission, he ultimately decided not to offer it for the Legislature's consideration during the special session and instead kept Senate Map 1 "on the shelf" in legislative parlance.[63] As a result, Senate Map 1 was never offered, considered, or voted on during the special session. But the Senate maintains that Plaintiffs view is too partisan and harsh in its rendition of what was happening within the halls of the Legislature. The Senate view is that:

> During trial, Senator Galvano provided several reasons why he selected Senate Map 1 over plans previously considered by the Senate. He testified that even though the Senate had passed map 9124, he did not feel comfortable in presenting a map that had been explicitly rejected by the House.[64]    Senator Galvano felt that filing Plan 9124 might provoke the House to file plan 9079, which had passed the House, as a competing plan; and Senator Galvano did not want the two chambers to file competing maps as had recently happened in the case considering congressional redistricting.[65]    Senator Galvano knew that the House had supported the base map-drawing process and suspected that the House would not oppose the Senate's presentation of one of the six base maps—or some combination thereof—in this proceeding.[66] Senator Galvano testified that he understood that each sandbox within the six base maps was constitutionally compliant, and therefore swapping one sandbox for another would also produce a constitutionally compliant map.[67] (Senate [Proposed] Order Approving Remedial Senate Plan filed December 23, 2015 - pp.7-8)
>
> ****
>
> Senator Galvano also explained why he felt Senate Map 1, which is composed of the base map 9078 with the South Florida "sandbox" (including the counties of Palm Beach, Broward, Miami-Dade, and Monroe) from base map 9080, was an ideal plan

---

[62] Rem. Tr. Vol. 5 at 505:20-506:1, 525:23-526:2.

[63] Rem. Tr. Vol. 5 at 504:8-23, 506:13-18.

[64] Rem. Tr. Vol. 5. 507-08.

[65] Rem. Tr. Vol. 5. 511-13, 558.

[66] *Id.*

[67] Rem. Tr. Vol. 5. 546.

to present to the Court. Twenty-eight of the 40 districts in Senate Map 1 follow Plan 9090, a base map advanced by the Senate Committee on Reapportionment which addressed concerns senators had expressed about the configuration of Tampa Bay found in four base maps.[68] Senate Map 1 also shared 28 districts with map 9124, which the full Senate had passed.[69] Senator Galvano instructed Jay Ferrin to add the South Florida "sandbox" from Plan 9080, which had a more-compact configuration of the South Florida sandbox than 9090.[70] The change also served to address concerns expressed on the Senate floor about the configuration of South Florida in Plan 9090.[71] Senator Galvano did not consider whether his configuration would pair any Senate incumbents or favor or disfavor incumbents or political parties; instead his goal was to create a constitutionally compliant map.[72] (Senate [Proposed] Order Approving Remedial Senate Plan filed December 23, 2015 - pp.8-9)

35.    Senate Map 1 performs better for Republicans and better protects incumbents than Plan 9078/9090 or any of the other base maps. Under Senate Map 1, there are 23 Republican-performing districts based on the 2012 presidential election, 24 Republican-performing districts based on the 2010 gubernatorial election, and 22 districts Republican-performing districts based on the 2008 presidential election.[73] Senate Map 1 eliminates the sole pairing of Republican incumbents in Plan 9078/9090 by combining the Republican incumbent friendly North and Central Florida in Plan 9078/9090 with Republican incumbent friendly South Florida in Plan 9080.[74]

36.    Senate Map 1 only marginally improves tier-two compliance over Plan 9078/9090 and still underperforms many of the other base maps in tier-two compliance.[75]

---

[68] Rem. Tr. Vol. 5. 512.
[69] Rem. Tr. Vol. 5. 558.
[70] Rem. Tr. Vol. 5. 558..
[71] Rem. Tr. Vol. 5. 558.
[72] Rem. Tr. Vol. 5. 563.
[73] P. Dem. Ex. 4; J. Ex. 1 at 7.
[74] J. Ex. 416 at 1.
[75] P. Dem. Ex. 1-3; J. Exs. 73-78.

37.   Senate Map 1 has, on average, a Reock score of 0.43 and a Convex Hull score of 0.79.  It splits sixteen counties and fourteen cities.  The most overpopulated district in Senate Map 1 is District 7 (7,695 people for a deviation of 1.6%), and the most underpopulated district in Senate Map 1 is District 19 (-6,934 people for a deviation of 1.5%).  Total deviation in Senate Map 1 (*i.e.*, the difference between the most overpopulated district and the most underpopulated district) is 14,629 people, or 3.1%.[76]

38.   The total population deviation of Senate Map 1 is over 50% greater than the 2.0% total deviation in the invalidated 2012 Initial Plan and the 2.0% total deviation in the admittedly unconstitutional 2012 Enacted Plan.[77]

39.   Based on the findings of fact set forth above, and after carefully considering the testimony, demeanor, and credibility of the various witnesses, this Court finds, by the greater weight of the evidence, that Senate Map 1 was created to favor the Republican party and incumbents.  Further, Senate Map 1's political performance lends credibility to the inference that it was created to intentionally favor the Republican Party and incumbents.  The Court relies on the following circumstantial evidence to reach its finding of improper intent:

a.   The Senate repeatedly lauded the efforts of its staff, relied exclusively on staff testimony for the fact witness portion of its case-in-chief, and highlighted the sterile environment that it created so that staff could draw Senate Map 1 without improper partisan influence.  Yet the testimony reveals that the Senate intentionally rejected the work product of its staff and instead submitted a plan that legislative staff did not initially create.  Indeed, the Senate did not even consult staff about the merits of combining Plans 9078/9090 and 9080 into a single plan,

---

[76] J. Ex. 1 at 2.
[77] J. Ex. 1 at 2; J. Ex. 6 at 2; J. Ex. 7 at 2.

and the resulting map is more favorable to the Republican Party and incumbents than any of the maps that staff drew.

      b.      The person who admittedly created Senate Map 1 – Senator Galvano – was the Majority Leader of the Republican Caucus and head of the Republican Senatorial Campaign Committee. These roles required Senator Galvano to consider partisanship and benefiting Republican incumbents to effectively perform his duties, and presumably he was counting on the continued support of the Republican senators who committed to elect him Senate President in 2018. Those conflicting roles leaves Senator Galvano open to the charge that he was acting in a partisan manner when he created Senate Map 1. However, this Court finds that charge "of having conflicting roles" to be a remote inference, as anyone who is in the leadership ranks of a partisan institutional body will likely have several roles to play. Based on his testimony and attendance at trial it appears to this Court that Senator Galvano did all that he could, under less than optimal circumstances, to provide a Senate redistricting map for the citizens of Florida. Senator Galvano testified that he was unaware of the partisan performance of the base maps and that the Legislature did all that it knew how to do to insulate the redistricting process from partisan influences. In the less than optimal circumstances he found himself in, Senator Galvano would have benefited his efforts if he had not acted alone and had consulted with others to the extent possible. In acting alone the he has left himself open to the charge of acting in a partisan manner as it relates to how Senate Map 1 came into being. The Court finds that, in acting alone, irrespective of the circumstances the Senate found itself in, the inference of partisan intent is reasonably supported.

      c.      The record shows Senate Map 1 is within a pattern of selected maps that progressively favored the Republican Party and incumbents. Plan 9078, was one of the most favorable base maps in terms of Republican performance and the most favorable base map for

Republican incumbents, and then performance was improved for the Republican Party and incumbents when Plan 9078/9090 was combined with Plan 9080 to form Senate Map 1. The Court finds that, the continually improving political performance that resulted in Senate Map 1, reasonably supports the inference of partisan intent.

  d.  Although the Senate stipulated that the 2012 Enacted Plan had been drawn with impermissible partisan intent, Senate Map 1 matches the Republican performance of 2012 Enacted Plan based on the 2008 and 2012 presidential elections and contains only one fewer Republican seat based on the 2010 gubernatorial election. Thus, Senate Map 1 maintains essentially the same Republican performance as a map that was admittedly "drawn to favor a political party and incumbents" in violation of Article III, Section 21.[78] Political performance data is a reliable lens by which to measure a map's overall compliance with the Constitutional requirement that no map ". . . .be drawn with the intent to favor or disfavor a political party . . . ." In fact, in a minority district, it is the standard by which lawful compliance is determined. The same should hold true in non-minority districts. When the political performance of a map in non-minority districts is outside the bounds of reasonable expectation based on objective metrics then, absent an explanation, it provides a reasonable basis for an inference of partisan intent. The Supreme Court in *Apportionment I* held that ". . . . although effect can be an objective indicator of intent, mere effect will not necessarily invalidate a plan.", it also held that "While we agree that the standard does not prohibit political effect, the effects of the plan, the shape of the district lines, and the demographics of an area are all factors that serve as objective indicators of intent." (e.s.). In this case we have more than 'mere effect"[79], we have an established pattern of map selection that reasonably indicates an intent to choose the best performing map for the

---

[78] Stipulation & Consent Judgment at p.1.

[79] Definition of the word "mere" includes: By itself, by itself and without anything more. Encarta World English Dictionary, First Edition, 1999.

Republican party. Although, in this case the Court has found more than "mere effect" the issue of political performance appears to be an issue which will surface every time a redistricting map is challenged. Political map drawing is no longer an art but a very sophisticated and precise science. The results and each of the factors that help contribute to the overall result of a map, which is drawn to determine political boundaries are now done by computer programs and results are known instantly of even the slightest movement of a boundary in one direction or another. How a map performs politically is the first thing people want to know about a proposed redistricting map. It is true in this case and, I suspect it will remain true for as long as we live in a competitive democracy. Its human nature, its human political nature. That is why a clear boundary needs to be established regarding the political performance of a redistricting map. If the political performance of a proposed map is outside the bounds of reasonable expectation then the Legislature needs to understand that an explanation will be required to avoid an inference of improper partisan intent.[80] While the Senate maintains that the selection of Senate Map 1 was without partisan intent and that all safeguards were taken to insulate staff from outside political influence, it is difficult to infer anything other than impermissible partisan intent in the selection of Senate Map1 based on its political performance.

      e.     The Senate rejected more tier-two compliant district configurations drawn by staff (including other base maps and Plan 9079) and attempted to rely on metrics that had never previously been relied upon – such as the "Pol/Geo" index – to justify its proposed district configurations.

      f.     Plaintiff's alternative plans demonstrate that more tier-two compliant configurations are feasible without violating any tier-one mandate.

---

[80] That same principle would apply to maps submitted by challengers to a legislative redistricting map if it seeks to become the "map" rather than just a tool to point out weakness in the legislative map. See finding in last sentence of paragraph 85 of this Final Judgment.

**Plaintiffs' Proposed Remedial Plans**

40.     Plaintiffs have submitted four alternative remedial plans – CPS-3a, 3b, 4a, and 4b.[81] The following is a summary of the four plans:

a.      CPS-4a – Plaintiffs offer CPS-4a as their principal alternative map. CPS-4a has, on average, a Reock score of 0.51 and a Convex Hull score of 0.81. It splits sixteen counties and eleven cities. The most overpopulated district in CPS-4a is District 22 (4,385 people for a deviation of 0.9%), and the most underpopulated district in CPS-4a is District 35 (-4,617 people for a deviation of 1.0%). Total deviation in CPS-4a from ideal population is 9,002 people, or 1.9%. As is explained in more detail below, CPS-4a contains four Hispanic-performing districts in South Florida, compared with only three in Senate Map 1, Plans CPS-3b and 4b, and Plan S17S0036 (the "2002 Benchmark Plan").[82]

b.      CPS-3a – Compared with CPS-4a, CPS-3a keeps an additional county whole by reducing compactness and slightly increasing population deviation, but still maintains substantially higher compactness metrics and lower population deviation than Senate Map 1. CPS-3a has, on average, a Reock score of 0.50 and a Convex Hull score of 0.80. It splits fifteen counties and ten cities. The most overpopulated districts in CPS-3a are Districts 15 and 26 (4,700 people for a deviation of 1.0%), and the most underpopulated district in CPS-3a is District 35 (-4,617 people for a deviation of 1.0%). Total deviation in CPS-3a from ideal population is 9,317 people, or 2.0%. CPS-3a, like CPS-4a, contains four Hispanic-performing districts in

---

[81] Before trial, Plaintiffs corrected an error in their initially submitted CPS-3b and filed and served the revised plan as "CPS-3b_corrected." References to CPS-3b in this final judgment are to CPS-3b_corrected.

[82] *Compare* J. Ex. 4 at 2 *with* J. Ex. 1 at 2, J. Exs. 3 and 5 at 2, and J. Ex. 8 at 2.

South Florida.[83]

c.    CPS-3b and CPS-4b – CPS-3b and CPS-4b are alternative configurations of Plans 3a and 4a that contain only three Hispanic-performing districts in South Florida. CPS-3b has, on average, a Reock score of 0.50 and a Convex Hull score of 0.81. It splits fifteen counties and ten cities, and has a total deviation of 9,317 people or 2.0%. CPS-4b has, on average, a Reock score of 0.51 and a Convex-Hull score of 0.81, splits sixteen counties and eleven cities, and has a total deviation of 9,002 people or 1.9%.[84]

41.    Plaintiffs' proposed plans were drawn by John O'Neill ("O'Neill"), the same person who drew CP-1, which was approved by Judge Lewis and the Florida Supreme Court in *Apportionment VIII* and now serves as the official congressional redistricting plan for the State of Florida.[85]

42.    The Court heard extensive testimony from O'Neill regarding the drawing of Plaintiffs' proposed maps, with the opportunity for cross-examination by the Senate, and the Court closely observed O'Neill's demeanor.

43.    O'Neill explained how his approach to map drawing was designed to be objective, to avoid arbitrary or subjective decisions, and to achieve the highest compactness and lowest population deviation at successive numbers of split counties[86] – ultimately, alternatives with 15 and 16 split counties, respectively. O'Neill described taking an objective approach that began by identifying whole-county groups within which one or more compact districts could be drawn with nearly ideal population, while minimizing the number of split counties. In that

---

[83] J. Ex. 2 at 2; J. Ex. 4 at 2.

[84] J. Ex. 3 at 2; J. Ex. 5 at 2.

[85] Rem. Tr. Vol. 6 at 614:20-615:3; *see also*, Final Judgment Adopting Remedial Congressional Redistricting Plan dated December 22, 2015 and entered in Case Nos.: 2012-CA-00412 and 2012-CA-00490.

[86] Rem. Tr. Vol. 6 at 617:21-620:11, 622:7-623:4.

regard, he eventually divided up Florida's 67 counties into a series of 10 whole-county groups that limited the number of split counties to 15, as reflected in Plan CPS-3a.[87]

44.     Legislative staff likewise created whole-county groupings in their approach to drawing Senate Map 1. In fact, of the 10 whole-county groups in CPS-3a and CPS-3b, 6 are the same in Senate Map 1 (the "Identical Whole-County Groups").[88] O'Neill's approach, however, incorporated a more exacting approach to the tier-two requirements of compactness and nearly equal population deviation. Specifically, within the Identical Whole-County Groups, O'Neill drew the districts to achieve high average compactness, respect political and geographical boundaries, generally divide population deviations evenly between districts in each whole-county group, and always avoid population deviations greater than 1%.[89] As a consequence, O'Neill's objective approach yielded more compact districts on average, and yielded lower and more even deviations among the districts in each Identical Whole-County Group, except in one instance where O'Neill adopted a more compact configuration of Plaintiffs' Districts 4 and 9, which was derived from the House's Plan 9079.[90]

45.     In the rest of Florida, O'Neill identified whole-county groups that were different from Senate Map 1.[91] In regard to Plans CPS-3a and CPS-3b, O'Neill described his selection of different whole-county groups in Central North and West Florida as being driven, initially, by a desire to minimize county splits and avoid unnecessary population deviations.[92] The different whole-county groups that O'Neill selected allowed him to draw CPS-3a and CPS-3b with one

---

[87] Rem. Tr. Vol. 6 at 623:25-625:3; P. Dem. 38
[88] P. Dem 39.
[89] Rem. Tr. Vol. 6 at 625:14-630:22
[90] P. Dem. 39; Rem. Tr. Vol. 6 at 630:23-632:11.
[91] *See* P. Dem. 41.
[92] Rem. Tr. Vol. 6 at 635:17-638:8.

fewer split county than Senate Map 1,[93] avoid population deviations of greater that 1% (which Senate Map 1 exceeded in 14 districts),[94] and draw substantially more compact districts than in Senate Map 1.[95]

46.    Similarly, in Plans CPS-4a and CPS-4b, O'Neill identified whole-county groups that were different from Senate Map 1 in North Florida.[96] O'Neill described exploring whether he could achieve higher compactness and lower population deviations by increasing the number of split counties from 15 to 16.[97] As reflected in CPS-4a, O'Neill selected a configuration that resulted in a significant increase in average compactness throughout a region that included 15 districts in North Florida.[98]

47.    After considering the testimony of O'Neill and reviewing the resulting maps, the Court, like Judge Lewis, finds that O'Neill's testimony was credible and that O'Neill's approach to drawing the map was logical and effective, resulting in the most tier-two compliant district configurations offered in these proceedings. Mr. O'Neill is a talented young man who I am sure initially had no idea that his every action in drawing the Plaintiffs' maps would be subject to scrutiny and cross-examination in a court of law. This Court allowed the details of Mr. O'Neill's map drawing and his prior map drawing associations to be examined and presented to the Court.[99] Again, we come to the issue of knowledge of political performance data for non-

---

[93] P. Dem. 44, 50.

[94] P. Dem. 41, 48, 50

[95] Rem. Tr. Vol. 6 at 647:21-649:16; P. Dem. 43, 47, 50.

[96] P. Dem. 46.

[97] Rem. Tr. Vol. 6 at 654:14-655:8.

[98] P. Dem. 46, 58.

[99] There was a clear perception by this Court that the Defendants' believed their right to a fair trial was being abridged by any attempt to judicially restrict or limit the discovery regarding Plaintiffs' and their agents motivations regarding when, how and with what knowledge their maps were drawn. The Defendant's maintain Plaintiffs are nothing but a proxy for the opposing political party. Therefore, in order to insure a complete record and to address Defendant's concerns this Court allowed full discovery

minority districts. While it appears that the use of political performance data for non-minority districts is evidence of improper partisan intent, it is amazes me that, as to both sides, that maps drawn without such knowledge don't end up totally out of whack with what would be the reasonably expected political performance.

48.     The Court further finds that O'Neill did not draw CPS-3a, 3b, 4a, or 4b with the intent to favor or disfavor any political party or incumbent.  O'Neill was instructed by counsel for Plaintiffs to draw the most constitutionally compliant map possible without considering partisan data (except to the extent necessary to assess minority districts) or incumbent information or drawing districts with partisan intent.[100] This Court finds that O'Neill followed these instructions,[101] developed an objective approach focused on tier-two compliance, and the resulting maps, on the whole, significantly outperform Senate Map 1 in tier-two compliance.[102]

49.     The improved tier-two compliance of Plaintiffs' proposed plans created plans that reflect a roughly equal breakdown of Republican-performing and Democratic-performing districts.[103] Also, the Plaintiffs' proposed plans contain features disfavoring both political parties.  For example, Plaintiffs' plans pair three Democratic incumbents in District 27 in all of their plans; two Republican incumbents in District 11 in CPS-4a and 4b; a Republican incumbent with an announced Republican state Senate candidate, Representative Matt Gaetz, in District 1 in all of their plans; and Republican incumbents with Democratic incumbents in several other districts.[104]

---

and cross-examination of Mr. O'Neill. While there is some conflicting understanding of what he knew or didn't know about political performance data, overall, he was a credible and reliable witness.
[100] Rem. Tr. Vol. 6 at 616:24-617:18.
[101] Rem. Tr. Vol. 6 at 713:21-714:5.
[102] P. Dem. Ex. 1-3.
[103] P. Dem. Ex. 52.
[104] J. Ex. 416 at 1; Rem. Tr. Vol. 7 at 961:21-964:6; see also,
http://www.sunshinestatenews.com/story/matt-gaetz-makes-it-official-will-shoot-dads-senate-seat-2016 .

50.     The evidence does not support the Senate's claim that O'Neill intentionally underpopulated Democratic performing districts with partisan intent.    The Senate's own demonstrative shows that the principal map offered by Plaintiffs, CPS-4a, contains 10 underpopulated Democratic districts and 8 underpopulated Republican districts, which does not reflect significantly disproportionate underpopulation.[105] In any event, the districts in question are located in South Florida.[106] O'Neill explained that the underpopulation in his South Florida districts was the result of his decision to create a whole county group in South Florida that did not include Okeechobee County, while the whole county group used by legislative staff in the base maps joined Okeechobee County with other counties.[107] As reflected in the resulting maps, O'Neill's decision allowed him to maintain underpopulation or overpopulation under 1% – a significantly lower population deviation than Senate Map 1 – while permitting the creation of more tier-two compliant configurations of South Florida than the configuration in Senate Map 1.[108] Further, the Senate has failed to explain how minor underpopulation of less than 1% results in any partisan advantage, particularly when Plaintiffs' maps disfavor Democrats in the very same South Florida districts by, for example, pairing three incumbents in a single district.[109]

51.     To ensure a complete record and because it was a non-jury trial, the Court allowed the Senate over Plaintiffs' objections to introduce certain emails from 2011 into evidence and to question O'Neill regarding their content.    The emails dealt with alternative plans that were drawn by Strategic Telemetry, when O'Neill was interning for the company, and that were offered by Coalition Plaintiffs during the 2012 redistricting process and Florida Supreme Court facial review.    The 2011 emails, on the whole, reflected that Strategic Telemetry

---

[105] S. Dem. Ex. 2.
[106] *See* J. Ex. 2 at1-2; J. Ex. 3 at 1-2; J. Ex. 4 at 1-2; J. Ex. 5 at 1-2.
[107] Rem. Tr. Vol. 6 at 659:12-664:12.
[108] *Id.*; *see* P. Dem. Ex. 47-51.
[109] J. Ex. 416 at 1.

considered political performance data in preparing Plaintiffs' earliest alternative plans, a fact not in dispute at trial.[110]

52.     In their *Apportionment I* brief, Plaintiffs argued that partisan data could properly be considered in drawing a map and contended that the Legislature should adopt a map that "reflect[ed] – to the extent possible consistent with other constitutional requirements – the revealed preferences of Florida's electorate as measured by returns in recent statewide elections." [111]    Plaintiffs further argued that submitting a map reflecting the statewide composition of Florida voters, like the initial maps prepared by Strategic Telemetry, meant that "the Legislature's plan must be found invalid" because of its skewed partisan performance.[112]

53.     The Florida Supreme Court rejected Plaintiffs' argument that "once the political results of the plan are known, the Legislature must alter the plan to bring it more in balance with the composition of voters statewide." *Apportionment I*, 83 So. 3d at 643.  The Supreme Court instead held that "[t]he Florida Constitution does not require the affirmative creation of a fair plan, but rather a neutral one in which no improper intent was involved." *Id.* at 643. Nevertheless, the Supreme Court has made it clear that Plaintiffs' "alternative maps are not on trial themselves, as is the Legislature's map," and merely "provide relevant proof that the Legislature's apportionment plans consist of district configurations that are not explained other than by the Legislature considering impermissible factors, such as intentionally favoring a political party or an incumbent." *Apportionment VII*, 172 So. 3d at 401 n.11.[113]

---

[110] S. Exs. 53, 112, 169, 190, 199, 200, 229, 251, 253, 254, and 255.
[111] Coalition's Initial Brief in *Apportionment I*, Case No. SC12-1, at 23-24, *available at* http://www.floridasupremecourt.org/pub_info/redistricting2012/02-17-2012/Bried_02-17-2012_Brief_League_Women_Voters.pdf.
[112] *Id.* at 24.
[113] This Court understood that concept so long as the Senate Map 1 was viable, in whole or in part, but since there was the possibility of it not being viable, then it seemed that under those circumstances the Plaintiffs should have to, at least, minimally demonstrate the methodology and the type of data –

54.     Plaintiffs' reliance on partisan data to prepare their 2011 alternative plans was not relevant in the proceedings in which those plans were submitted. Ordinarily, Plaintiffs' reliance on partisan data, even if it happened, would not be relevant in proceedings involving alternative plans because the alternative plans in an "as applied" challenge are used as a tool to demonstrate how the Legislative plan is not in compliance with Florida's constitution.  However, where the Legislative Plan is out in its entirety, and the Plaintiffs seek to substitute their map, then Plaintiffs' reliance on partisan data is a valid issue for consideration by a trial court where that issue is raised by the opposing party.

### Expert Testimony

55.     The Senate offered the testimony of Professor Liu to challenge certain minority districts in Plaintiffs' remedial plans: (a) District 31, an African-American district, identical in all of Plaintiffs' plans; (b) District 35, a Hispanic district, identical in all of Plaintiffs' plans; and (c) Districts 36 and 38, two Hispanic districts, in CPS-3a and 4a.[114]

56.     District 31 in Plaintiffs' proposed plans has a Black Voting Age Population ("BVAP") of 47.0%.[115]  Analog District 35 in Senate Map 1 has BVAP of 50.1%, and analog District 29 in the 2002 Benchmark Plan had a BVAP of 60.7%.[116]

### Dr. Liu on Plaintiffs' District 31 – Broward County
### (Senate Map 1's analog District 35)

57.     The Senate offered testimony from Dr. Baodong Liu, an expert on racial voting

---

including all political performance data - that was used in constructing their proposed redistricting map for Florida's Senate districts. Therefore the Court allowed the Senate great latitude on this issue so the record would be clear, complete and preserved for appellate review and for review by others who wished to obtain a full understanding of each side's view of the case.

[114] J. Stipulation Regarding Minority Districts dated December 13, 2015.

[115] J. Ex. 2 at 2; J. Ex. 3 at 2; J. Ex. 4 at 2; J. Ex. 5 at 2.

[116] J. Ex. 1 at 2; J. Ex. 8 at 2.

patterns.[117]  Dr. Liu analyzed the benchmark plan, Senate Map 1, and Plaintiffs' plans to assess the ability of minorities to elect candidates of their choice.[118]  Dr. Liu used an advanced statistical technique called ecological inference to analyze 26 elections and to determine whether racially polarized voting existed among white, black, and Hispanic voters in Florida.[119]  Using this technique, Dr. Liu could determine whether majority voting blocs could defeat minority candidates of choice.[120]  Dr. Liu also analyzed the voting age population threshold at which a minority population would be expected to elect their candidates of choice on a consistent basis.[121]  Professor Liu testified that District 31 in Plaintiffs' plans diminishes the ability of African Americans to elect candidates of their choice.  Professor Liu opined that racially polarized voting may lead to the defeat of black candidates generally and that African-American voters tend to turn out at a higher rate in majority-minority districts generally.[122]  Professor Liu, however, failed to specify how these general considerations deprive African Americans of their ability to elect candidates of choice in Plaintiffs' proposed District 31.

58.    Using his statistical analysis, Dr. Liu found that blacks are cohesive throughout Florida, but that their candidates of choice were subject to defeat by majority voting blocs including white voters and, at times, Hispanic voters.[123]  Dr. Liu also found that a black voting age population of 50 percent was critical both to ensure that blacks could elect their candidates of choice and to ensure that blacks participate in the voting process at levels commensurate with their share of the voting age population.[124]  In assessing whether racially polarized voting and

---

[117] Rem. Tr. Vol. 3. 286-87.
[118] Rem. Tr. Vol. 3. 305-06.
[119] Rem. Tr. Vol. 3. 291-295.
[120] Rem. Tr. Vol. 3. 291.
[121] Id.
[122] Rem. Tr. Vol. 3 at 295:24-296:19, 309:10-310:23.
[123] Rem. Tr. Vol. 3. 295-96.
[124] Rem. Tr. Vol. 3. 305-06, 308-11.

voter participation would actually diminish the ability of African Americans to elect candidates of their choice, Professor Liu analyzed only six elections that are not statewide that were provided to him.[125] He was provided the elections he was to utilize and he did not verify any election that he analyzed.[126] Of those elections, only one took place in South Florida, and it was a non-partisan judicial race in Broward County, where the African American candidate lost in a district with a BVAP of 25.5%.[127] Of the remaining five elections he analyzed, all took place in Central Florida [128] districts with BVAPs ranging from about 10% to 36.9%, and African American candidates actually won in three out of the five races.[129] None of the five elections took place in South Florida, where Plaintiffs' District 31 is located; [130] the two African American candidates who lost were running in districts with less than 12% BVAP; [131] and one of those two candidates (Val Demings) only lost by a narrow margin in a district with a BVAP of 11.1%.[132]

### Dr. Lichtman on Plaintiffs' District 31 – Broward County
### (Senate Map 1's analog District 35)

59.    Plaintiffs' expert witness, Dr. Lichtman, testified that District 31 in Plaintiffs' plans provides African Americans with the ability to elect candidates of choice, notwithstanding the reduction in BVAP in District 31, as compared to the analog districts in Senate Map 1 or the

---

[125] Rem. Tr. Vol. 3 at 296:20-297:1, 332:25-333:4; S. Ex. 2.
[126] Rem. Tr. Vol. 3. 347:4-6
[127] Rem. Tr. Vol. 3 at 296:20-297:1, 332:22-333:15, 341:20-342:2, 343:5-19; S. Ex. 2.
[128] Rem. Tr. Vol. 3 at 333:5-15; S. Ex. 2.
[129] *See* S. Ex. 2; Rem. Tr. Vol. 3 at 333:24-335:17 (agreeing that African-American Geraldine Thompson won Orlando-based Senate District 12 in 2014 with 36.9% BVAP); Rem. Tr. Vol. 3 at 338:10-339:13 (agreeing that an African-American candidate Blue lost in Central-Florida based Senate District 15 with 11.9% BVAP); Rem. Tr. Vol. 3 at 345:4-348:7 (admitting error in analysis and agreeing that African-American Tiffany Moore Russell won the race for Orange County Clerk of Court with 20.2% BVAP); Rem. Tr. Vol. 3 348:17-349:11 (agreeing that African-American Jerry Demings won the race for Orange County Sheriff with 20.2% BVAP).
[130] Rem. Tr. Vol. 3 at 333:5-334:4.
[131] Rem. Tr. Vol. 3 at 351:6-9.
[132] Rem. Tr. Vol. 3 at 349:25-351:5.

2002 Benchmark Plan. To reach that conclusion, Dr. Lichtman performed a district-specific functional analysis of District 31 that involved an analysis of, among other things, key district-specific metrics such as voting age population, voter registration and turnout, and election history and voting patterns.[133] As Dr. Lichtman explained, in Plaintiffs' proposed District 31, the BVAP is 47%;[134] the district is heavily Democratic-performing with an average of 81% of the vote for Democratic candidates in the most recent 2012 and 2014 elections and 78% for Democratic candidates in the 13 general elections from 2006 to 2012 that are reported in the parties' joint trial exhibits;[135] African Americans were a decisive majority of proposed District 31's turnout in the 2010, 2012, and 2014 Democratic primary elections, with an average of almost 60%;[136] African American candidates have easily won in statewide elections in proposed District 31;[137] and, in all manner of circumstances, African American candidates consistently won in legislative districts with BVAPs as low as about 30%.[138]

60. Dr. Lichtman explained that the higher BVAP (60.7%) in the 2002 Benchmark Plan's analog district (District 29) did not affect his analysis because proposed District 31 is "more than sufficient" to perform for African American candidates of choice.[139] He concluded that he had no concerns about retrogression as compared with the benchmark district because District 31 is "such an effective performing district that there can't be any retrogression, and 60

---

[133] Rem. Tr. Vol. 7 at 806:21-811:23.

[134] Rem. Tr. Vol. 7 at 812:8-11; *e.g.*, J. Ex. 4 at 2.

[135] Rem. Tr. Vol. 7 at 814:2-816:6; P. Ex. 22; *e.g.*, J. Ex. 4 at 7.

[136] Rem. Tr. Vol. 7 at 816:15-817:24; P. Ex. 23.

[137] Rem. Tr. Vol. 7 at 818:6-819:10; P. Ex. 24; *e.g.*, J. Ex. 4 at 7 (reflecting that in Plaintiffs' proposed District 31, Kendrick Meek won by a margin of almost 20 percentage points above his nearest competitor for U.S. Senate in 2010, and President Obama won with 80.5% of the vote in 2008 and 81.9% of the vote in 2012).

[138] Rem. Tr. Vol. 7 at 819:15-823:23; P. Ex. 25-28.

[139] Rem. Tr. Vol. 7 at 812:16-814:4.

percent [BVAP in the benchmark district] is way too high."[140]

### Conclusion as to Plaintiffs' District 31 – Broward County
### (Senate Map 1's analog District 35)

61.    The Court finds that Professor Liu's opinion as to District 31 in Plaintiffs' plans is

not persuasive, and fails to meet the Senate's burden of showing that it is necessary to maintain

the analog District 35 in Senate Map 1 at 50.1% BVAP to avoid minority retrogression and vote

dilution.  The Court instead accepts the opinion and analysis of Dr. Lichtman, and finds that

Plaintiffs' proposed District 31 effectively performs for African American candidates of choice

without retrogression.

### Dr. Liu on Plaintiffs' District 35, 36 & 38 – Miami-Dade and Monroe Counties
### (Plaintiffs' 3a and 4a Plans)

62.    Professor Liu further testified that racially polarized voting may lead to the defeat

of Hispanic candidates generally,[141] and that Hispanics need a high threshold of voting age

population of at least 75%-80% to control a district generally.[142]  Because District 35 in all of

Plaintiffs' plans and Districts 36 and 38 in CPS-3a and 4a (the "Challenged Hispanic Districts")

each have Hispanic Voting Age Population ("HVAP") of less than 75%-80% using 2010 data

(72%, 74.6%, and 67.2%, respectively), Professor Liu concluded that he could not verify that the

Challenged Hispanic Districts are effective performing Hispanic districts.[143]

63.    The Court does not accept Professor Liu's testimony that 75%-80% HVAP is

necessary to perform effectively for Hispanics.  As an initial matter, this threshold is inconsistent

with positions taken by the Senate in this action and in the congressional action.  As the Court

noted at trial, one of the Senate's proposed Hispanic-performing districts in Senate Map 1

---

[140] Rem. Tr. Vol. 7 at 828:23-829:5.
[141] Rem. Tr. Vol. 3 at 299:21-300:11.
[142] Rem. Tr. Vol. 3 at 303:1-23, 304:16-17.
[143] Rem. Tr. Vol. 3 at 304:11-17; 312:6-313:10.

(District 37) fails to meet Professor Liu's threshold.[144] Moreover, several of the Hispanic-performing districts in the staff-drawn base maps had HVAPs below 75%, and the testimony was undisputed that staff, Senate leadership, and their counsel all agreed that those districts were Hispanic-performing districts.[145] And, as discussed above, legislative staff, legislative in-house and outside counsel, Professor Moreno (an expert for the House), and Senator Galvano all took the position during the special session that District 37 in Plan 9079 did not retrogress at an HVAP of 72.1% after a careful analysis of the district.[146] In the congressional action, the Senate represented to the Florida Supreme Court that District 26 in the 2012 and 2014 enacted congressional plans performed for Hispanic candidates with a 68.9% HVAP.[147] In the end, the Florida Supreme Court upheld Judge Lewis's finding that Professor Liu's opinions at the congressional trial were "not particularly helpful" and approved as constitutionally compliant a Miami-Dade-based Congressional District 26 in CP-1 with an HVAP of 68.3%. *Apportionment VIII*, 2015 WL 7753054 (Fla. Dec. 2015).

64.   Professor Liu's analysis of Hispanic elections in South Florida was more limited than his African American election analysis – down to only five races instead of six.[148] And, once again, of those elections, the Hispanic candidate or Hispanic candidate of choice won each election in districts with HVAPs as low as about 25%, except for a non-partisan judicial race in

---

[144] Rem. Tr. Vol. 3 at 322:4-323:3; S. Ex. 7.

[145] Rem. Tr. Vol. 1 at 115:24-116:20.

[146] Rem. Tr. Vol. 5 at 498:21-502:15; Rem. Tr. Vol. 1 at 130:9-135:25.

[147] *See* Leg. Answer Brief and Initial Brief on Cross-Appeal at 114 in *Apportionment VII*, Case No. SC14-1905, *available at* http://www.floridasupremecourt.org/pub_info/summaries/briefs/14/14-1905/Filed_12-19-2014_Legislative_Parties'_Answer_Brief.pdf ("Enacted District 26 [in the 2012 and 2014 plans] is a competitive district that enables Hispanic voters to coalesce around a Hispanic candidate of either political party. No party contends that it diminishes the ability to elect."); Rem Tr. Vol. 3, 383:22-384:4; P. Ex. 16.

[148] Rem. Tr. Vol. 3 at 380:3-7; S. Ex. 3.

which a young Hispanic lawyer lost to a sitting judge in a district with a 66.4% HVAP.[149] After

conceding that he could not cite a single instance where a district with an HVAP in excess of

67% failed to elect a Hispanic candidate of choice, Professor Liu attempted to clarify that of the

four Challenged Hispanic Districts, District 36 in Plaintiffs' CPS-3a and CPS-4a was really his

"main concern" and opined that "there is very great likelihood" that District 36 would not

perform with an HVAP of 74.6% due to the district's Democratic performance in races involving

non-Hispanic candidates.[150]

### Dr. Lichtman on Plaintiffs' District 35, 36 & 38 – Miami-Dade and Monroe Counties (Plaintiffs' 3a and 4a Plans)

65.     Dr. Lichtman, in contrast, testified that the Challenged Hispanic Districts each

provide Hispanics with the ability to elect candidates of their choice.  To reach that conclusion,

he performed a district-specific functional analysis of each of the Challenged Hispanic Districts

that included an analysis of, among other things, key district specific metrics such as voting age

population, voter registration and turnout, and election history and voting patterns.  As Dr.

Lichtman explained, Hispanics, unlike African Americans, do not unite behind a single party, but

are divided among Democrats, Republicans, and Independents.[151]  Instead, Hispanics unite and,

therefore, remain cohesive in supporting Hispanic candidates versus candidates of other

ethnicities; in other words, Hispanics tend to vote ethnicity over party in multi-racial elections.[152]

Accordingly, Dr. Lichtman did an extensive, five-level analysis of the Challenged Hispanic

Districts to confirm they performed and did not retrogress.  The Defendant's complain that Dr.

---

[149] Rem. Tr. Vol. 3 at 380:3-21, 381:18-384:7; S. Ex. 3.

[150] Rem. Tr. Vol. 3 at 374:18-380:2.

[151] Rem. Tr. Vol. 7 at 831:10-23; see, e.g., J. Ex. 4 at 8 (showing that, in Plaintiffs' District 36 in CPS-4a, for example, Hispanic registered voters in 2014 were about 28% Democratic, 38% Republican, and 34% Independent).

[152] Rem. Tr. Vol. 7 at 831:24-833:12.

Lichtman purported to perform a functional analysis of Plaintiffs' minority districts, but he did not compare Plaintiffs' districts to the benchmark Senate districts as required.[153] Instead, Dr. Lichtman compared Plaintiffs' districts to benchmark *congressional* districts in Miami-Dade County, regardless of whether those districts overlapped geographically.[154] Further, Defendants complain Dr. Lichtman used an older statistical technique called ecological regression to analyze one election – the 2010 Senate election, involving three highly-visible candidates including Marco Rubio, Charlie Crist, and Kendrick Meek – which he then used to evaluate the political performance of Plaintiffs' districts.[155] Defendants maintain that on the basis of this single election, Dr. Lichtman concluded that Plaintiffs' Districts 35, 36, and 38 would perform for Hispanics.[156]

66.    However, as Dr. Lichtman's multi-leveled analysis showed, the Challenged Hispanic Districts are all districts in which Hispanics have over a two-thirds majority of the voting age population, are an outright majority of registered voters, and are an overwhelming majority of registered Republicans.[157] At the same time, Hispanics are a significant and growing segment, ranging from 43.1% to 49.9% in 2012, of registered Democrats in the Challenged Hispanic Districts.[158] Dr. Lichtman demonstrated how the Challenged Hispanic Districts have closely comparable or stronger Hispanic metrics than analogous congressional districts that have consistently performed for Hispanics.[159] Dr. Lichtman then performed an ecological regression for each proposed Challenged Hispanic District, establishing that Hispanics cohered behind a

---

[153] Rem. Tr. Vol. 7. 807.
[154] Rem. Tr. Vol. 7. 840-41.
[155] Rem. Tr. Vol. 7. 805; T3. 294.
[156] Rem. Tr. Vol. 7. 844-85, 851-52, 890-91.
[157] P. Ex. 6, 10, 13.
[158] Rem. Tr. Vol. 7 at 849:5-851:2; P. Ex. 7 (showing growth in Hispanic registration); P. Exs. 6, 10 and 13 (showing Hispanic democratic registration).
[159] Rem. Tr. Vol. 7 at 840:23-851:25.

Hispanic candidate in a key election against candidates of other ethnicities;[160] he analyzed the electoral history of Hispanic districts, which revealed that Hispanics candidates won 40 of 43 partisan legislative elections in districts with 67% or higher HVAP;[161] and he then showed, through ecological regression, how the Hispanic candidate of choice won the remaining legislative elections, such that the Hispanic candidate of choice actually won 43 out of 43 elections (100%) in such districts.[162] Dr. Lichtman analyzed the voting behavior of Hispanics in primary elections and opined that Democrats have a strong incentive to nominate Hispanic candidates and, in fact, have nominated Hispanic candidates 100% of the time in Hispanic districts with 67% or higher HVAP, as a Hispanic Republican will otherwise win in light of Hispanics' tendency to vote ethnicity over party in multi-racial elections.[163] The Defendant's complain Dr. Lichtman purports to confirm his results by analyzing election results with similar Hispanic voting age populations as in Plaintiffs' districts.[164] Defendants further complain that Dr. Lichtman could not identify, however, which of these elections involved candidates of different races; indeed, he did not even know which elections were actually contested.[165] Dr. Liu testified that uni-racial and uncontested elections were of no value in determining the presence of racial bloc voting.[166] Defendants argue that Dr. Lichtman did not conduct a racially-polarized voting analysis to determine whether a particular candidate was the Hispanic candidate of choice, except in two elections where Dr. Lichtman found that a white candidate was the Hispanic candidate of choice.[167] In one of those elections, Hispanic candidates received more votes than

---

[160] See, e.g., Rem. Tr. Vol. 7 at 852:1-853:18; P. Exs. 9, 12 and 15.

[161] See, e.g., Rem. Tr. Vol. 7 at 853:19-856:15; P. Exs. 16, 17, 18, and 19.

[162] See, e.g., Rem. Tr. Vol. 7 at 856:17-858:5; P. Exs. 20 and 21.

[163] Rem. Tr. Vol. 7 at 858:6-860:14, 874:9-875:13.

[164] Rem. Tr. Vol. 7. 884.

[165] See e.g., T7. 939-40, 942-45, 948.

[166] Rem. Tr. Vol. 3. 295.

[167] Rem. Tr. Vol. 7. 857.

the white candidate, but Dr. Lichtman nonetheless found that the white candidate was the Hispanic candidate of choice.[168]

67.    As with District 31, Dr. Lichtman explained that the higher HVAPs in the three "packed" benchmark Hispanic districts do not cause concern because Plaintiffs' proposed districts continue to provide Hispanics with the ability to elect candidates of choice, regardless of lower metrics.[169]   Dr. Lichtman testified that the additional Hispanic population in the benchmark districts is much higher than necessary "to provide the ability to elect and create[s] wasted voters."[170]   Further, Dr. Lichtman noted that CPS-4a and 3a, far from diminishing minority voting opportunities, actually expand opportunities and the ability to elect for South Florida Hispanics by creating four, rather than three, performing Hispanic districts.[171]   As Dr. Lichtman explained, by being packed into only three districts, Hispanics are effectively deprived of representation roughly proportional to their percentage of Florida's electorate, in that they are 15% of registered voters in Florida, but have only three performing Hispanic districts out of 40 Senate districts (*i.e.*, 7%).[172]   Thus, under Plaintiffs' Plans CPS-3a and 4a, Hispanic representation would increase by one-third – going from three to four ability-to-elect districts. According to Dr. Lichtman, under CPS-4a and 3a, Hispanics have a very high probability of electing four, rather than three, candidates of choice.[173]   And as Dr. Lichtman further explained, even if an election in one of Plaintiffs' proposed districts is somehow lost and only three Hispanic-preferred candidates are elected, Hispanics are certainly no worse off than under the 2002 Benchmark Plan or Senate Map 1, which have only three performing districts in South

---

[168] Rem. Tr. Vol. 7. 946-47.
[169] Rem. Tr. Vol. 7 at 836:14-837:7, 879:6-15, 889:4-14.
[170] Rem. Tr. Vol. 7 at 909:23-910:11.
[171] Rem. Tr. Vol. 7 at 837:8-840:20.
[172] Rem. Tr. Vol. 7 at 797:3-798:9.
[173] Rem. Tr. Vol. 7 at 837:8-840:20.

Florida.[174] At the same time, there is a real opportunity to elect a fourth Hispanic-preferred candidate in Plaintiffs' plans that does not exist in either the 2002 Benchmark Plan or Senate Map 1.[175]

### Conclusions on Plaintiffs' District 35, 36 & 38 – Miami-Dade and Monroe Counties

68.    This Court finds that the testimony of Professor Liu was not particularly helpful and that the data he used in forming his opinions was limited and therefore, not probative or persuasive, and it falls short of meeting the Senate's burden of showing that the Challenged Hispanic Districts would diminish the ability of Hispanics to elect candidates of their choice. Defendants point out that Dr. Lichtman testified that he did not retain his output files showing the results of his analysis.[176] The Defendants complain that Dr. Lichtman's systematic destruction of these records troubling, particularly in light of Dr. Liu's testimony that there is no way to verify the results of Dr. Lichtman's work without the output files.[177] However, Dr. Lichtman testified that the program he used is available everywhere and ". . . . anyone who thought I had a problem with any of my results could absolutely directly replicate my ecological regressions."[178] Further, Dr. Lichtman testified that "In fact, Dr. Liu indicated he also performed ecological regressions."[179] Thus, while it would have been best to retain the output files, no complaint was made to the Court prior to trial regarding the issue and it appears the ecological regressions of Dr. Lichtman are duplicable. Dr. Liu's testimony failed to provide this Court with reliable evidence of whether particular districts would perform for a minority group's candidate of choice.  Instead, the Court accepts Dr. Lichtman's opinions and finds that the Challenged

---

[174] Rem. Tr. Vol. 7 at 837:8-840:20.
[175] Rem. Tr. Vol. 7 at 837:8-840:20.
[176] Rem. Tr. Vol. 7. 959.
[177] Rem. Tr. Vol. 3. 315.
[178] Rem Tr. Vol.7 at 959:24-960:1.
[179] Rem Tr. Vol.7 at 960:1-2.

Hispanic Districts provide Hispanics with the ability to elect candidates of choice without retrogression, and finds that a fourth Hispanic-performing district not only can, but should, be drawn in South Florida, as reflected in CPS-4a or CPS-3a.

69.    This Court is also convinced that the Senate has failed to carry its burden of demonstrating that Senate Map 1 does not result in vote dilution. Specifically, the Senate, in presenting the testimony of Professor Liu, has failed to meet its burden of showing that it is necessary to confine Hispanics in South Florida into three districts of 75% or greater HVAP.[180] And, as Dr. Liu agreed, Section 2 of the Voting Rights Act ("VRA") applies to the Hispanic districts in South Florida and that creating additional performing Hispanic districts is desirable, but he (Dr. Liu) did not think ". . . . that's possible in plaintiffs' plan."[181] The Court finds that Plaintiffs' plans CPS-4a and 3a demonstrate that it is indeed possible to draw four majority-minority districts in South Florida in which Hispanic candidates are much more likely than not to be able to elect candidates of their choice.

## CONCLUSIONS OF LAW

### Standard of Review and Burden of Proof

70.    Article III, Section 21 of the Florida Constitution requires all state legislative redistricting plans to comply with two "tiers" of legal requirements. Tier one provides:

> No apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.

FLA. CONST., art. III, § 21(a). Tier two provides:

---

[180] The Senate elected not to call at trial its other disclosed expert (Mr. Watson).
[181] Rem. Tr. Vol. 3 at 384:16-385:7, 386:22-387:13.

> Unless compliance with the standards in this subsection conflicts with the standards in [tier one] or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.

FLA. CONST., art. III, § 21(b).

71.     Absent a conflict between these tiers, legislative districts must be drawn to "comport with all of the requirements enumerated in Florida's constitution." *Apportionment I*, 83 So. 3d at 615.   While tier-two requirements "are subordinate and shall give way where compliance" would conflict with tier one or federal law, districts may deviate from tier-two criteria "only to the extent necessary" to avoid a conflict.  *Id.* at 639-40; *see also id.* at 667 (holding that "the Legislature is permitted to violate compactness only when necessary to avoid conflict with tier-one standards"); *id.* at 669 (striking down Senate district because it could have been "drawn much more compactly and remain a minority-opportunity district").

72.     If the Legislature departs from tier-two requirements in drawing a district and cannot identify a "valid justification" for doing so, then the Legislature's departure is "indicative of intent to favor incumbents and a political party." *Id.* at 669. Although tier-two deviations are not needed to find improper partisan intent, they appropriately create an inference of partisan intent.  *See id.* at 640 ("[A] disregard for the constitutional requirements set forth in tier two is indicative of improper intent, which Florida prohibits by absolute terms.").

73.     The burden of establishing compliance with Article III, Section 21 and the degree of scrutiny fundamentally change after there is a finding – or, in this case, an admission – of partisan intent in a redistricting plan as a whole.  As the Florida Supreme Court explained:

> Once the trial court found unconstitutional intent, there was no longer any basis to apply a deferential standard of review; instead, the trial court should have shifted the burden to the Legislature to justify its decisions in drawing the congressional district lines.

*Apportionment VII*, 172 So. 3d at 396-97.

74.     The Supreme Court further explained how the burden shift upon a finding or

admission of improper intent works, and can be determinative, in practice:

> Because there are many ways in which to draw a district that complies with, for
> example, the constitutional requirement of compactness, which party bears the
> burden of establishing why a decision was made to accept or reject a particular
> configuration can ultimately be determinative. This can be seen in reviewing the
> seven maps initially released to the public by the House.
>
> All of these maps were considered by the Legislature to be maps that complied
> with the tier-two constitutional standards. But, in one of the maps, designated as
> H000C9001, there were as few as 14 Republican districts based on 2008
> presidential election data and 15 Republican districts based on 2012 presidential
> data. In the map chosen by the House to move forward in the process, designated
> as H000C9011, there were 16 Republican districts under both the 2012 and 2008
> presidential results. And, after additional revisions, the Legislature's enacted map
> performed with 17 Republican districts under the 2008 data and 16 using the 2012
> data – actually more favorable to Republicans than the performance of the
> admittedly gerrymandered 2002 districts under the same data. This consistent
> improvement in the Republican performance of the map – even when comparing
> maps the Legislature itself produced and considered two-tier compliant – reveals
> that there are many ways to draw constitutionally compliant districts that may
> have different political implications.
>
> Since the trial court found that the Legislature's intent was to draw a plan that
> benefitted the Republican Party, the burden should have been placed on the
> Legislature to demonstrate that its decision to choose one compact district over
> another compact district, or one tier-two compliant map over another tier-two
> compliant map, was not motivated by this improper intent. This is particularly
> true where the challengers presented evidence that the Legislature's choices
> ultimately benefitted the Republican Party and also showed alternative maps that
> performed more fairly.

*Id.* at 400-01 (footnotes omitted).

75.     Because the Legislature has failed to enact a remedial plan, it falls to this Court to

judicially adopt a plan. Presented with a similar situation in the congressional case, the Florida

Supreme Court held that the trial court should approve the remedial plan that "best fulfills . . . all

constitutional requirements." *Apportionment VIII*, 2015 WL 7753054, at *7. Accordingly, the

question is no longer whether a plan is merely constitutionally compliant, but whether it *best*

complies with the constitutional requirements among the options presented to the Court.

76.     Despite the absence of an enacted plan, "the burden remains on the . . . Senate to justify [its] chosen district configurations." *Id.* If the rule were otherwise, the Legislature could lessen its burden and escape the consequences of the Senate's admission of improper intent in the Stipulation and Consent Judgment by merely declining to enact a remedial plan.

### The Parties' Whole Plan Challenges

77.     Article III, Section 21(a) provides that "[n]o apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent." In that regard, "[t]he prohibition on improper partisan intent in redistricting applies, by its express terms, to both the apportionment plan as a whole and to each district individually." *Apportionment VII*, 172 So. 3d at 375. Under Article III, Section 21(a), "there is no acceptable level of improper intent" in a redistricting plan, and there is no need to "show[] malevolent or evil purpose." *Id.*

78.     In evaluating the Legislature's intent, "the focus of the analysis must be on both direct and circumstantial evidence of intent." *Apportionment I*, 83 So. 3d at 617. "[O]bjective indicators . . . can be discerned from the Legislature's level of compliance with . . . tier-two requirements," and a "disregard for these principles can serve as indicia of improper intent." *Id.* at 618. The Court must "evaluate the shapes of districts together with . . . objective data, such as the relevant voter registration and elections data, incumbents' addresses, and demographics." *Id.* Because this is an as-applied challenge, this Court must also consider "fact-intensive claims" of improper intent in addition to objective indicators. *Apportionment III*, 118 So. 3d at 201.

79.     Although the constitutional language focuses on intent rather than result, the Court may consider "the effects of the plan" in determining whether there is improper intent, *Apportionment I*, 83 So. 3d at 617, and should not "disregard obvious conclusions from the undisputed facts," *id.* at 619. After a finding or admission of unconstitutional intent, the partisan consequences of the Legislature's choices necessarily assume a more prominent role in the

analysis. *See Apportionment VII*, 172 So. 3d at 401 (holding that it is "particularly true" that the Legislature must justify its "decision to choose one compact district over another compact district, or one tier-two compliant map over another tier-two compliant map" when "the challengers present[] evidence that the Legislature's choices ultimately benefited the Republican Party and also show[] alternative maps that performed more fairly"). For example, in rejecting the Legislature's remedial proposal for Congressional Districts 26 and 27, the Florida Supreme Court emphasized that the redrawn configuration was "even more favorable to the Republican Party than the enacted district, which was invalidated partly for being drawn with the intent to favor the Republican Party." *Apportionment VIII*, 2015 WL 7753054, at \*21.

80. Senate Map 1 contains numerous indicators of partisan intent. It was chosen as part of a process that generated progressively increasing benefits for the Republican Party and incumbents. The sole individual involved in creating and selecting Senate Map 1 was Senator Galvano. Although the Legislature pointed to reliance on staff as a sort of gold standard for tier-one compliance, the Senate expressly rejected staff's work product by amending Plan 9078/9090 during the special session, and Senate leadership disregarded more tier-two compliant, staff-drawn alternatives when Senate Map 1 was created so that it performed better for the Republican Party and incumbents than any other option prepared by staff.

81. The Senate attempts to explain away its progressive elimination of Republican incumbent pairings from the base maps to Plan 9078/9090 to Senate Map 1 by claiming that incumbent pairings do not really matter because incumbents can move from district to district.[182] But the Florida Supreme Court has repeatedly stated that the presence or absence of incumbent pairings is an important consideration under Article III, Section 21(a). In *Apportionment I*, the

---

[182] *See, e.g.*, Rem. Tr. Vol. 5 at 528:22-537:3, 563:25-565:9.

Supreme Court held that courts should consider "the shape of the district in relation to the incumbent's legal residence" and maneuvers that "avoid pitting incumbents against one another in new districts." *Apportionment I*, 83 So. 3d at 618-19. The Supreme Court noted that one indicium of improper intent in the 2012 Initial Plan was that it did "not pit incumbents against each other." *Id.* at 654. In *Apportionment VIII*, by contrast, the Supreme Court found it indicative of a *lack* of partisan intent that Plaintiffs' proposed congressional plan, CP-1, paired two Democratic incumbents in the same district. *See Apportionment VIII*, 2015 WL 7753054, at *2. Legislative staff and Senator Galvano testified that they did not have access to incumbent addresses, but "the fact that the Senate or House or their staff may or may not have had the incumbents' addresses is not determinative of intent or lack of intent." *Apportionment I*, 83 So. 3d at 619. In sum, the Supreme Court has rejected any notion that incumbent pairings should be ignored or discounted simply because incumbents have the ability to move residences.

82.     In the face of more tier-two compliant options that perform more fairly than Senate Map 1, the Court cannot disregard that the Senate has advanced a plan that protects incumbents and matches the Republican performance of the admittedly unconstitutional 2012 Enacted Plan. *Cf. Apportionment VIII*, 2015 WL 7753054, at *21 (holding that Legislature failed to carry its burden in congressional remedial proceedings where "the Legislature's proposed configuration of Districts 26 and 27 was even more favorable to the Republican Party than the enacted district" and "the redrawn Districts 26 and 27 are less compact and split more cities than the alternative maps submitted at trial"). The Court finds that the Senate has failed to carry its burden of demonstrating that Senate Map 1 was not drawn with unconstitutional intent.

83.     Even apart from considerations of improper intent, Senate Map 1 is invalid in its entirety because it needlessly deviates from the constitutional requirement of equal population. As the Florida Supreme Court has explained: "Because obtaining equal population 'if

practicable' is an explicit and important constitutional mandate under the Florida Constitution, any deviation from that goal of mathematical precision must be based upon compliance with other constitutional standards." *Apportionment I*, 83 So. 3d at 630. The Legislature simply set an arbitrary limit of 4% total deviation and never made a serious effort to determine whether it could lessen the 3.1% total deviation in Senate Map 1, which increased the total deviation as compared with the unconstitutional 2012 Initial and Enacted Plans by more than 50%. As it stands, Plaintiffs have shown that deviation can be reduced by more than 50% while actually *improving* compliance with the other tier-two requirements. Accordingly, the Legislature has not carried its burden of showing that its increased deviation from the goal of mathematical precision in Senate Map 1 is based upon compliance with other constitutional standards. Indeed, Senate Map 1 lags behind Plaintiffs' alternative plans on virtually every tier-two metric.

84.    The Court further rejects the Senate's argument that the Court should decline to adopt Plaintiffs' plans because they are alleged to have been drawn with partisan intent. The Florida Supreme Court has recently held that the intent of challengers is not relevant in remedial proceedings:

> [T]he Legislature's and Justice Polston's argument that the trial court should have considered the intent of the drafters of CP-1 fundamentally misunderstands the trial court's role and this Court's role in the current proceeding . . . . *Apportionment VII* did not forbid a citizen affiliated with a particular party from drawing a map, nor was our affirmance of the trial court's finding of unconstitutional intent based solely on the fact that political consultants aligned with the Republican Party had drawn maps. Instead, this Court's decision rested largely on the Legislature's own claims that it had conducted an open and transparent redistricting process, while it was being manipulated into a violation of its constitutional duty. . . . The reason that improper partisan intent was found in the drawing of the map was not because of the intent of a particular map drawer or partisan operative.

* * *

> Simply put, as this Court's directive in *Apportionment VII* made clear . . . the alternative maps are not on trial themselves, as is the Legislature's map. . . .

> Rather, in this case, the alternative plans . . . serve to demonstrate that the . . .
> districts could have been drawn to be more tier-two compliant.

*Apportionment VIII*, 2015 WL 7753054 at *17-*19.

85.    Regardless, this Court finds that Plaintiffs did not draw their alternative plans with
improper partisan intent for the following reasons. Plaintiffs' intentions are obvious, they have
submitted alternative maps to demonstrate what they believe were the constitutional infirmities
in Senate Map 1 and to present to the Court what they believed was a more constitutionally
compliant map based on every measurable metric. It could be argued that Plaintiffs merely seek
to benefit an opposing political party by challenging the Senate's proposed redistricting map, but
it appears to me that Plaintiffs intention in submitting the alternative maps and in specifically
promoting CPS-4(a) is to provide the Court a map that objectively demonstrates that a map or
several maps can be drawn that significantly improve the constitutional measures set forth in the
Fair District Amendment. Plaintiffs' plans are more tier-two compliant by every constitutionally
recognized measure, and O'Neill credibly testified that he did not use partisan data except as
necessary to draw minority districts, did not have access to incumbent data, and did not draw
Plaintiffs' plans with partisan intent. Notably, Plaintiffs' plans contain features that disfavor
Democrats and Republicans alike – for example, by pairing both Democratic and Republican
incumbents together. *Cf. id.* at *18 (holding that the record "belies [partisan] motive" because
"[a]lthough Democrats complained that the redrawn map pitted two Democratic incumbents
against one another, and even though the Romo Plaintiffs championed a vertical configuration
before the trial court, the Coalition Plaintiffs maintained their advocacy for a 'stacked'
configuration of Districts 21 and 22 that substantially improves tier-two compliance"). Finally,
Plaintiffs' maps politically perform in a reasonably expected way district by district and
statewide. Plaintiff's Plan CPS-4a, does an excellent job of demonstrating the point the Court is trying

to make regarding the evaluation of political performance data. When historical political performance data is applied to its proposed structure it reveals what the results it would have produced in 2008, 2010, and 2012, using the 2008 and 2012 presidential election results and the 2010 gubernatorial election results:[183]

|  | 2008 | 2010 | 2012 |
|---|---|---|---|
| Dems | 20 | 18 | 21 |
| Reps | 20 | 22 | 19 |

Plaintiff's in this case suggest this outcome for each of the three election cycles is reasonable based on an overall understanding of election data in Florida and it constitutes evidence that their plan was not drawn with the intent to favor or disfavor a political party. That certainly seems reasonable. Plaintiff's presented this election data as evidence that their map performs within reasonable bounds of expectation and the historical political performance data lends credence to the finding that CPS-4a does not ". . . .favor or disfavor a political party."

## Individual Districts

### Panhandle – Districts 1, 2, and 3[184]

86.     Senate Map 1 maintains Districts 1 and 2 in the same configuration as the 2012 Enacted Plan. Plaintiffs propose a different configuration that is identical as between all of their proposed remedial plans. All of the parties' proposed remedial plans contain the same configuration of District 3, and no party challenges that configuration.

---

[183] Plaintiffs Demonstrative Exhibit 52
[184] The Senate's and Plaintiffs' proposed remedial plans contain different district numbering. The discussion of individual challenges in this Final Judgment follows the Senate's numbering system and notes where Plaintiffs use different numbering.

87.    Plaintiffs challenge Districts 1 and 2 in Senate Map 1 on tier-one and tier-two grounds. Plaintiffs contend that Districts 1 and 2 can be drawn more compactly while still following major roadways and the municipal boundary of Crestview, as reflected in CPS-3a, 3b, 4a, and 4b. Plaintiffs further contend that the Legislature has rejected this more compact configuration because it would pair Senator Evers and Representative Gaetz, an announced candidate for the Senate seat that his term-limited father, Senator Don Gaetz, will soon vacate.

88.    Plaintiffs' configuration of Districts 1 and 2 is significantly more compact using recognized compactness metrics than the competing configuration in Senate Map 1. Further, Plaintiffs keep overpopulation in Districts 1 and 2 under 1%, while District 1 in Senate Map 1 is overpopulated by more than 1%. The below figure reflects these tier-two differences:[185]

| | Senate Map 1 | | | | CPS-3a&b, CPS-4a&b | | |
|---|---|---|---|---|---|---|---|
| SD# | Pop. Dev. # | Reock | Convex Hull | SD# | Pop. Dev. # | Reock | Convex Hull |
| 1 | 5885 | 0.45 | 0.79 | 1 | 4299 | 0.46 | 0.78 |
| 2 | 2326 | 0.43 | 0.80 | 2 | 3912 | 0.58 | 0.84 |
| | Avg. | 0.44 | 0.79 | | Avg. | 0.52 | 0.81 |

89.    The Senate did not challenge Plaintiffs' Districts 1 and 2 in its pretrial disclosure of district challenges, as required by the Amended Scheduling Order.[186] Accordingly, the Court declines to consider the Senate's untimely challenges to Plaintiffs' Districts 1 and 2.

90.    Even if this Court were to consider the Senate's untimely claim that Districts 1 and 2 in Plaintiffs' proposed plans are visually non-compact, it would reject that claim. Contrary to the Senate's claim that the Florida Supreme Court has prioritized visual compactness over metric compactness, both are equally important measures of compactness. *See Apportionment I*, 83 So. 3d at 634-35. The Supreme Court and all parties, including the Senate, have routinely

---

[185] J. Ex. 1 at 2; J. Ex. 2 at 2; J. Ex. 3 at 2; J. Ex. 4 at 2; J. Ex. 5 at 2.
[186] *See* Amended Scheduling Order dated November 12, 2015 at 2; Senate's Objections to Plaintiffs' Proposed Remedial Plans dated November 25, 2015.

used Reock and Convex Hull scores to establish that districts are more or less compact. Nevertheless, the Court perceives no meaningful difference in visual compactness as between Plaintiffs' and the Senate's proposed configurations of Districts 1 and 2.

91.    Districts 1 and 2 in the Senate Map 1 would keep Senator Evers and Representative Gaetz in different districts, while they are paired together in CPS-3a, 3b, 4a, and 4b. Because the Senate has not justified its rejection of a more tier-two compliant configuration of Districts 1 and 2, the Court finds that the Senate has maintained the configuration in the 2012 Enacted Plan with the intent to benefit the Republican Party and incumbents.

92.    The Senate has failed to carry its burden of justifying a configuration of Districts 1 and 2 that is less tier-two compliant than the alternative offered by Plaintiffs. Accordingly, the Court adopts Districts 1, 2, and 3 as reflected in all of Plaintiffs' proposed plans.

### Northwest Florida (Districts 4, 5, and 7)

93.    Senate Map 1 contains a configuration of Districts 4, 5, and 7 that divides Alachua County and Gainesville. Population from Alachua County is then paired with Bradford and Clay Counties. The 2012 Enacted Plan also paired Alachua, Bradford, and Clay Counties using a configuration prepared by the partisan operatives referenced in *Apportionment VII*.[187]

94.    Plaintiffs' proposed plans contain two variations of Districts 4, 5, and 7 that do not split Alachua County or Gainesville. CPS-3a and 3b contain a rainbow-shaped District 5 as part of overall plans that divide only 15 counties. CPS-4a and 4b contain an alternative District 5 that is more compact, while matching the number of split counties (16) in Senate Map 1.

95.    Plaintiffs object to Districts 4, 5, and 7 in Senate Map 1 on the basis that they deviate from the requirements of compactness, respect for political boundaries, and equal

---

[187] J. Stipulation Regarding Certain Publicly Submitted Senate Maps dated December 9, 2015; *compare* J. Ex. 6 *with* P. Ex. 153 (SPUBS0143).

population to enhance Republican performance. The Senate objects to Plaintiffs' configurations by claiming that they render District 5 visually non-compact. In support of its claim, the Senate submitted alternate configurations of these districts after the November 18, 2015 deadline for submitting proposed plans established by this Court's Amended Scheduling Order.[188]

96.     Districts 4, 5, and 7 in Senate Map 1 were derived from Plan 9078. Plan 9078 was the only base map that split Alachua County and Gainesville and paired population from Alachua County with Bradford and Clay Counties. The result was to keep Districts 4, 5, and 7 Republican-performing based on the 2012 presidential election, the 2010 gubernatorial election, and the 2008 presidential election, as was the case in the 2012 Enacted Plan.[189] As reflected below, District 4 in all of the other base maps is competitive or leans Democratic in those elections, while District 4 remained solidly Republican in Plan 9078 and Senate Map 1:[190]

| | Analogous District 4 Configurations – Democratic Performance (%) | | | | | |
|---|---|---|---|---|---|---|
| Elections | S9070-SD4 | S9072-SD4 | S9074-SD4 | S9076-SD4 | S9078-SD4 | S9080-SD4 |
| 2008 Pres. | 47.05% | 47.05% | 47.05% | 47.59% | **35.93%** | 47.05% |
| 2010 Gov. | 50.35% | 50.35% | 50.35% | 50.08% | **38.57%** | 50.35% |
| 2012 Pres. | 45.11% | 45.11% | 45.11% | 45.52% | **33.93%** | 45.11% |

97.     Plaintiffs' proposed plans demonstrate that Districts 4, 5, and 7 can be drawn more compactly on average than Senate Map 1 without splitting Alachua County or Gainesville and while keeping population deviation under 1%. The following is a comparison between Districts 4, 5, and 7 in Senate Map 1 and their analogs in Plaintiffs' proposed plans:[191]

| Plans | S9078 / Senate Map 1 | | | | CPS-3 a and b | | | | CPS-4 a and b | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Analog | SD4 | SD5 | SD7 | Avg | SD5 | SD7 | SD8 | Avg | SD5 | SD7 | SD8 | Avg |

---

[188] S. Exs. 17 and 18.
[189] *See* J. Ex. 1 at 7; J. Ex. 6 at 8; J. Ex. 73 at 7; J. Ex. 74 at 7; J. Ex. 75 at 7; J. Ex. 76 at 7; J. Ex. 77 at 7; J. Ex. 78 at 7.
[190] J. Exs. 73-78 at 2.
[191] J. Exs. 1-5 and 77 at 2.

| Districts | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reock | .47 | .31 | .51 | **.43** | .41 | .64 | .42 | **.49** | .58 | .55 | .51 | **.54** |
| Convex Hull | .73 | .71 | .79 | **.74** | .62 | .82 | .77 | **.74** | .71 | .82 | .72 | **.75** |
| Highest Deviation | 7695 (SD7) | | | | -3497 (SD8) | | | | 3,698 (SD8) | | | |
| Lowest Deviation | -1511 (SD5) | | | | 740 (SD5) | | | | 672 (SD5) | | | |
| Split Cities | Gainesville | | | | None | | | | None | | | |

98.     In each of Plaintiffs' proposed plans, District 7 (analog to District 5 in Senate Map 1) is a Democratic-leaning district in the 2012 presidential, 2010 gubernatorial, and 2008 presidential elections.[192]

99.     Although Districts 5, 7, and 8 in CPS-3a, 3b, 4a, and 4b are all more compact on average than their counterparts in Senate Map 1, the Senate has submitted alternate configurations that are more compact than Districts 5 and 7 in CPS-3a, 3b, 4a, and 4b.[193] Both of the Senate's alternatives, however, split Alachua County.

100.     As O'Neill explained, compactness can often be increased by breaking political boundaries, but the benefit differs based on the particular splits that are introduced.[194] O'Neill testified that he was able to improve compactness substantially across a whole region (*i.e.*, by .04 Reock on average across fifteen districts) by splitting Lake and Charlotte Counties and keeping Manatee County whole (for a net increase in one county split) in CPS-4a and 4b.[195] Splitting Alachua County, by contrast, results in compactness gains in only two districts, as is evidenced by the Senate's alternative configurations.[196] In that regard, legislative staff, like O'Neill, did not

---

[192] J. Ex. 2 at 7; J. Ex. 3 at 7; J. Ex. 4 at 7; J. Ex. 5 at 7.
[193] S. Exs. 17 and 18.
[194] Rem. Tr. Vol. 6 at 622:7-623:4, 654:17-656:21, 763:10-765:20; P. Dem. 46 and 58.
[195] Rem. Tr. Vol. 6 at 763:10-765:15; *see also*, P. Dem. 58.
[196] S. Dem. 8.

appear to attribute significant value to splitting Alachua County, considering that five of the six base maps kept Alachua County and Gainesville whole.

101.    The Senate's claim that a county should be divided for minor gains in compactness is also inconsistent with its position in the *Apportionment VIII* appeal.    In *Apportionment VIII*, the Senate urged the Florida Supreme Court to adopt one of its proposed congressional remedial maps, Plan 9066, because it split one fewer county than the other proposed plans, albeit at the expense of compactness.    On October 16, 2015, just days before the special session and after legislative staff had already drawn the base maps, the Senate made the following representations in its supplemental brief filed with the Supreme Court:

> [T]his Court should again reject [Judge Lewis'] recommendation and adopt Plan 9066, which keeps more counties whole than any other map offered in this case (or ever). . . .  In [*Apportionment I*], this Court lauded the House's emphasis on keeping counties whole. The Court noted that "[t]he House also considered municipal boundaries and geographical features, but decided that county lines were usually preferable to other boundaries." The Court quoted the House's brief with approval: "County boundaries are substantially less likely to change than municipal boundaries, and—unlike municipalities—all counties are contiguous. Moreover, although all Floridians have a home county, millions live outside any incorporated area. Additionally, by using a strategy of keeping counties whole, the House Map necessarily keeps many municipalities whole within districts. And importantly, numerous Floridians advocated an emphasis on county boundaries at the twenty-six public meetings during the summer of 2011." Meanwhile, this Court also stated that "[t]he Florida Constitution does not mandate, and no party urges, that districts within a redistricting plan achieve the highest mathematical compactness scores;" and that "lower compactness measurements may result from the Legislature's desire to follow political or geographical boundaries or to keep municipalities wholly intact.". . . **Thus, "if an oddly shaped district is a result of this state's 'irregular geometry' and the need to keep counties and municipalities whole, these explanations may serve to justify the shape of the district in a logical and constitutionally permissible way." . . . Therefore, keeping counties whole is even more important than keeping cities whole or maintaining the highest possible compactness scores.**[197](e.s.)

---

[197] S. Supp. Br. dated October 16, 2015 at 22-24 in *Apportionment VIII*, Case No. SC14-1905 (emphasis added and citations omitted), *available at*
http://www.floridasupremecourt.org/pub_info/summaries/briefs/14/14-1905/Filed_10-16-2015_Senate_Supplemental_Brief.pdf.

102.    The Senate went on to object that Judge Lewis should not have approved the House configuration of certain districts that increased compactness by dividing an additional county, arguing that "marginal differences in compactness" should not "carry more weight than Plan 9066's ability to keep 50 counties intact." [198]    Yet the compactness differences in *Apportionment VIII* were similar to and in some cases, lower than those achieved by dividing Alachua County in the Senate's alternate configurations.[199]

103.    The Senate reiterated substantially the same position in its supplemental reply brief, filed after Senator Galvano selected Plan 9078 for submission to the Committee on Reapportionment and after he directed the creation of Senate Map 1.[200]

104.    In contrast to its position before the Florida Supreme Court during the special session, the Senate now claims that a county should be divided for relatively minor compactness gains in two districts, and the Senate relies on novel metrics such as the "Pol/Geo" index, while claiming that county boundaries are a mere "proxy" for constitutional compliance.

105.    The Senate has failed to carry its burden of justifying Districts 4, 5, and 7 in Senate Map 1.  By deviating from the tier-two mandates of compactness, respect for political boundaries, and equal population for the benefit of the Republican Party, Senate Map 1 violates tiers one and two of Article III, Section 21.  The Senate's belated attempt to offer an alternate configuration that draws districts in a way that is inconsistent with the Senate's positions before the Florida Supreme Court only bolsters this conclusion.

106.    Although CPS-3a, 3b, 4a, and 4b all improve upon Senate Map 1, the Court finds that Districts 5, 7, and 8 in CPS-4a and 4b best fulfill the constitutional requirements set forth in

---

[198] *Id.* at 25.

[199] *Compare* S. Dem. 8 *with Apportionment VIII*, 2015 WL 7753054, at *47.

[200] S. Supp. Rep. Br. dated October 30, 2015 at 13-15 in *Apportionment VIII*, Case No. SC14-1905, *available at* http://www.floridasupremecourt.org/pub_info/summaries/briefs/14/14-1905/Filed_10-30-2015_Senate_Response.pdf.

Article III, Section 21. The versions of Districts 5, 7, and 8 in CPS-4a and 4b improve visual and metric compactness over their counterparts in CPS-3a and 3b and represent a careful decision to split a county only for significant compactness gains. Although the Senate has shown that minor compactness gains can be achieved by dividing Alachua County, Article III, Section 21 does not require that counties be divided for small compactness gains. *See Apportionment I*, 83 So. 3d at 636 ("[I]if an oddly shaped district is a result of this state's 'irregular geometry' and the need to keep counties and municipalities whole, these explanations may serve to justify the shape of the district in a logical and constitutionally permissible way."); *Apportionment VII*, 172 So. 3d at 408 ("[A]s this Court has recognized, following county lines may result in a reduction in compactness scores."). Accordingly, the Court approves Districts 5, 7, and 8 in CPS-4a and 4b as the most constitutionally compliant configuration.

### Districts 6 and 8 (Northeast Florida)

107.    Plaintiffs object to Districts 6 and 8 in Senate Map 1 because they deviate from the constitutional requirement of compactness. The Senate did not object to Plaintiffs' analog Districts 4 and 9, which are identical in all of Plaintiffs' plans, in its pre-trial district challenges and raised no objection to these districts at trial. In fact, Plaintiffs' configuration of Districts 4 and 9 was derived from Plan 9079, the plan passed by the House, which Plaintiffs saw as improving the compactness of these two Northeast Florida districts.[201] The parties have stipulated that none of the proposed versions of these districts would result in minority retrogression.[202]

108.    Plaintiffs' analog Districts 4 and 9 are more compact than Districts 6 and 8 in

---

[201] Rem. Tr. Vol. 6 at 630:25-632:11.
[202] J. Stipulation Regarding Minority Districts dated December 13, 2015.

Senate Map 1, while keeping population deviation under 1%:[203]

| | Senate Map 1 | | | | CPS-3a&b, CPS-4a&b | | |
|---|---|---|---|---|---|---|---|
| SD# | Pop. Dev. # | Reock | Convex Hull | SD# | Pop. Dev. # | Reock | Convex Hull |
| 6 | -1387 | 0.50 | 0.71 | 4 | -3046 | 0.52 | 0.74 |
| 8 | -1102 | 0.44 | 0.73 | 9 | 557 | 0.59 | 0.83 |
| | Avg. | 0.47 | 0.72 | | Avg. | 0.56 | 0.79 |

109.    The Senate has not carried its burden of justifying its less compact configuration of Districts 6 and 8 in Senate Map 1. Accordingly, the Court approves Districts 4 and 9 in CPS-3a, 3b, 4a, and 4b as the most constitutionally compliant districts.

### Districts 9, 11, 13, and 18 (East Coast)

110.    Plaintiffs object to Districts 9, 11, 13, and 18 in Senate Map 1 because they deviate from the requirements of compactness and equal population. The Senate did not object to Plaintiffs' analog Districts 6, 10, 13, and 16, which are identical in all of Plaintiffs' plans, in its pre-trial district challenges and raised no objection to these districts at trial.

111.    Plaintiffs' Districts 6, 10, 13, and 16 are more compact than Districts 9, 11, 13, and 18 in Senate Map 1, while keeping population deviation under 1%:[204]

| | Senate Map 1 | | | | CPS-3a&b, CPS-4a&b | | |
|---|---|---|---|---|---|---|---|
| SD# | Pop. Dev. # | Reock | Convex Hull | SD# | Pop. Dev. # | Reock | Convex Hull |
| 9 | -14 | 0.35 | 0.75 | 6 | 1158 | 0.35 | 0.75 |
| 11 | -5994 | 0.45 | 0.80 | 10 | -1343 | 0.48 | 0.85 |
| 13 | 4891 | 0.38 | 0.78 | 13 | 3444 | 0.41 | 0.79 |
| 18 | 5435 | 0.45 | 0.86 | 16 | 1059 | 0.47 | 0.89 |
| Avg. | 4084 | 0.41 | 0.80 | Avg. | 1751 | 0.43 | 0.82 |

112.    The Senate has not carried its burden of justifying less compact versions of Districts 9, 11, 13, and 18 that deviate more than 1% in three of the four districts, while Plaintiffs' configuration avoids such unnecessary populations in every instance and achieves

---

[203] J. Exs. 1-5 at 2.
[204] J. Exs. 1-5 at 2.

greater compliance with tier-two requirements. Accordingly, the Court approves Districts 6, 10, 13, and 16 in CPS-3a, 3b, 4a, and 4b as the most constitutionally compliant districts.

### Districts 10, 12, 17, 19, 20, 21, 22, 23, 24, and 26 (Tampa Bay/West Central)

113.     Plaintiffs object to Districts 10, 12, 17, 19, 20 through 24, and 26 in Senate Map 1 on the basis that they deviate from the constitutional requirements of compactness, respect for political boundaries, and equal population to benefit the Republican Party and incumbents. The Senate did not object to Plaintiffs' configurations of analog Districts 11, 15, 17 through 20, 22, 24, 26, and 28, which are different as between CPS-3a/b and CPS-4a/b, in its pre-trial district challenges and raised no objection to these districts at trial. The parties have stipulated that none of the proposed versions of these districts would result in minority retrogression.[205]

114.     Five base maps paired Republican incumbents, including future Senate Presidents Negron, Simpson, and Galvano, in the Tampa Bay/West Central districts.[206] Senator Galvano selected the only base map, Plan 9078, that paired no incumbents in the region and then used that plan as the basis for Senate Map 1.

115.     Senate Map 1 avoids pairing incumbents by, among other things, continuing a strategy that the 2012 Enacted Plan derived from a map submitted by the partisan operatives referenced in *Apportionment VII*.[207] Plaintiffs asserted in their initial district challenges that District 17 in the 2012 Enacted Plan encroached into southern Pasco County from Hillsborough County to separate then-Senator Jim Norman from then-candidate Simpson.[208] In a similar fashion, Senator Galvano selected a configuration of District 20 in Senate Map 1 that encroached

---

[205] J. Stipulation Regarding Minority Districts dated December 13, 2015.
[206] J. Ex. 416 at 2.
[207] J. Stipulation Regarding Certain Publicly Submitted Senate Maps dated December 9, 2015; *compare* J. Ex. 6 *with* P. Ex. 154 (SPUBS0147).
[208] Pltf. Disclosure of District Challenges dated May 8, 2015 at 7.

from Hillsborough County into Pasco County, leaving Senator Simpson in his own district.[209]  At

the same time, Senator Galvano rejected alternatives that kept the analogs to District 20 wholly

within Hillsborough County that would have paired Senators Simpson and Legg or other

senators.[210]

116.    These maneuvers came at the expense of tier-two compliance.  The alternative in

CPS-3a/b is more compact on balance, keeps an additional county (Lake County) whole, and

keeps population deviation under 1%.  The alternative in CPS-4a/b is still more compact and

keeps population deviation under 1%, while maintaining the same number of split counties as

Senate Map 1.  The following chart demonstrates these tier-two improvements:[211]

| | Senate Map 1 | | | | CPS-3a & CPS-3b | | | | CPS-4a & CPS-4b | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SD# | Pop. Dev. # | Reock | Convex Hull | SD# | Pop. Dev. # | Reock | Convex Hull | SD# | Pop. Dev. # | Reock | Convex Hull |
| 10 | -6670 | 0.55 | 0.89 | 11 | 3312 | 0.60 | 0.87 | 11 | -1377 | 0.60 | 0.81 |
| 12 | 6078 | 0.31 | 0.76 | 15 | 4700 | 0.57 | 0.77 | 15 | -1094 | 0.45 | 0.71 |
| 20 | -5961 | 0.36 | 0.73 | 17 | 453 | 0.44 | 0.83 | 17 | 453 | 0.44 | 0.83 |
| 21 | -6295 | 0.46 | 0.82 | 18 | 4592 | 0.41 | 0.70 | 18 | 2855 | 0.71 | 0.87 |
| 19 | -6934 | 0.25 | 0.64 | 19 | 3035 | 0.41 | 0.68 | 19 | 3035 | 0.41 | 0.68 |
| 17 | -4726 | 0.45 | 0.87 | 20 | 2973 | 0.49 | 0.91 | 20 | 2973 | 0.49 | 0.91 |
| 22 | -6369 | 0.55 | 0.77 | 22 | 4385 | 0.58 | 0.77 | 22 | 4385 | 0.58 | 0.77 |
| 23 | 6946 | 0.49 | 0.95 | 24 | 2671 | 0.37 | 0.71 | 24 | 1638 | 0.46 | 0.74 |
| 24 | 7454 | 0.54 | 0.81 | 26 | 4700 | 0.50 | 0.76 | 26 | -380 | 0.67 | 0.90 |
| 26 | 2133 | 0.32 | 0.74 | 28 | 4501 | 0.53 | 0.91 | 28 | 2375 | 0.40 | 0.89 |
| Avg. | 5957 | 0.43 | 0.80 | Avg. | 3532 | 0.49 | 0.79 | Avg. | 2057 | 0.52 | 0.81 |

117.    As the Senate deviated from tier-two requirements, it improved Republican

performance.  As reflected below, Senator Galvano selected a less compact configuration of

District 20 that encroaches into Pasco County and is Republican-performing, as compared to

alternative, Democratic-performing configurations that remain wholly within Hillsborough

---

[209] J. Ex. 416; *see* J. Ex. 1 and 77.
[210] J. Ex. 416; *see* J. Exs. 73, 74, 75, and 78.
[211] J. Exs. 1-5 at 2.

County such as in Base Map 9080 and in Plaintiffs' more compact remedial plan configurations:[212]

| Elections | Analogs to District 20 – Democratic Performance (%) | | |
|---|---|---|---|
| | Plan 9078 District 19 Senate Map 1 District 20 | Plan 9080 District 22 | CPS-3a/3b District 17 CPS-4a/4b District 17 |
| 2008 Pres. | 48.5% | 50.6% | 51.3% |
| 2010 Gov. | 48.3% | 50.3% | 50.9% |
| 2012 Pres. | 47.0% | 49.8% | 50.6% |

118.    The Senate has not carried its burden of justifying Districts 10, 12, 17, 19, 20 through 24, and 26 in Senate Map 1. By deviating from the tier-two mandates of compactness, respect for political boundaries, and equal population for the benefit of the Republican Party and incumbents, Senate Map 1 violates tiers one and two of Article III, Section 21.

119.    Although the versions of these districts in CPS-3a/b and CPS-4a/b both improve upon Senate Map 1, Districts 11, 15, 17 through 20, 22, 24, 26, and 28 in CPS-4a/b substantially improve compactness and contain lower average population deviation compared with their counterparts in CPS-3a/b. Accordingly, the Court approves Districts 11, 15, 17 through 20, 22, 24, 26, and 28 in CPS-4a/b as the most constitutionally compliant districts.

### Districts 14, 15, and 16 (Central Florida)

120.    Plaintiffs object to Districts 14, 15, and 16 in Senate Map 1 because they deviate from the constitutional requirement of compactness. The Senate did not object to Plaintiffs' analog Districts 12, 14, and 21, which are identical in all of Plaintiffs' plans, in its pre-trial district challenges and raised no objection to these districts at trial.

121.    Plaintiffs' Districts 12, 14, and 21 are more compact than Districts 14, 15, and 16 in Senate Map 1, while keeping population deviation under 1%:[213]

---

[212] J. Exs. 1-5 at 7; J. Exs. 77-78 at 7.
[213] J. Exs. 1-5 at 2.

| | Senate Map 1 | | | | CPS-3a&b, CPS-4a&b | | |
|---|---|---|---|---|---|---|---|
| SD# | Pop. Dev. # | Reock | Convex Hull | SD# | Pop. Dev. # | Reock | Convex Hull |
| 14 | 1361 | 0.47 | 0.79 | 12 | 1052 | 0.51 | 0.77 |
| 15 | 1852 | 0.34 | 0.87 | 14 | 796 | 0.37 | 0.90 |
| 16 | 1329 | 0.42 | 0.86 | 21 | 2694 | 0.43 | 0.87 |
| Avg. | 1514 | 0.41 | 0.84 | Avg. | 1514 | 0.44 | 0.85 |

122.    The Senate has failed to carry its burden of justifying its less compact versions of Districts 14, 15, and 16.  Accordingly, the Court approves Districts 12, 14, and 21 in CPS-3a, 3b, 4a, and 4b as the most constitutionally compliant districts.

**Districts 27 and 29 (Southwest Florida)**

123.    Plaintiffs object to Districts 27 and 29 in Senate Map 1 because they deviate from the requirements of compactness.  The Senate did not object to Plaintiffs' analog Districts 23 and 30, which are slightly different as between CPS-3a/b and CPS-4a/b, in its pre-trial district challenges and raised no objection to these districts at trial.

124.    Plaintiffs' Districts 23 and 30 are more compact than Districts 27 and 29 in Senate Map 1, while keeping population deviation under 1%:[214]

| | Senate Map 1 | | | | CPS-3a & CPS-3b | | | | CPS-4a & CPS-4b | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SD# | Pop. Dev. # | Reock | Convex Hull | SD# | Pop. Dev. # | Reock | Convex Hull | SD# | Pop. Dev. # | Reock | Convex Hull |
| 27 | -897 | 0.52 | 0.91 | 30 | 67 | 0.57 | 0.91 | 30 | 4168 | 0.57 | 0.90 |
| 29 | 1105 | 0.42 | 0.79 | 23 | 141 | 0.46 | 0.81 | 23 | 4158 | 0.52 | 0.89 |
| | Avg. | 0.47 | 0.85 | | Avg. | 0.52 | 0.86 | | Avg. | 0.55 | 0.90 |

125.    The Senate has not carried its burden of justifying less compact versions of Districts 27 and 29.  Although the versions in CPS-3a/b and CPS-4a/b both improve upon Senate Map 1, Districts 23 and 30 in CPS-4a and 4b are more compact than in CPS-3a and 3b.

---

[214] J. Exs. 1-5 at 2.

Accordingly, the Court approves Districts 23 and 30 in CPS-4a and 4b as the most constitutionally compliant districts.

### Districts 25, 28, and 30 through 40 (South Florida)

126.    Plaintiffs object to Districts 25, 28, and 30 through 40 in Senate Map 1 in Senate Map 1 on the basis that they deviate from the constitutional requirements of compactness, respect for political boundaries, and equal population to benefit the Republican Party and incumbents.  The Senate objects to (a) District 31 in all of Plaintiffs' plans because its BVAP is less than 50%, (b) District 35 in all of Plaintiffs' plans because of alleged retrogression, (c) District 36 in CPS-3a and 4a on compactness grounds because it extends between Districts 36 and 37 to increase the HVAP of the district, and (d) Districts 36 and 38 in CPS-3a and 4a because of alleged retrogression.  The Senate does not object to District 37 in any of Plaintiffs' plans or Districts 36 and 38 in CPS-3b and 4b on retrogression grounds, and Plaintiffs do not claim that any districts in Senate Map 1 would result in minority retrogression.[215]

127.    Plaintiffs' plans CPS-3a and 4a include an identical configuration of South Florida that includes four Hispanic-performing districts.  CPS-3b and 4b include an identical configuration of South Florida that includes three Hispanic-performing districts.

128.    By selecting Plan 9080's South Florida districts for inclusion in Senate Map 1, Senator Galvano targeted the only configuration of South Florida in any base map that avoids pairing two Republican incumbents together.[216]  Thus, Senator Galvano blended the most Republican-favorable configuration of North and Central Florida (Plan 9078/9090) with the most Republican-favorable configuration of South Florida (Plan 9080) to create a map that favors the Republican Party and incumbents more than any staff-drawn base map.  Senate Map 1 also

---

[215] J. Stipulation Regarding Minority Districts dated December 13, 2015.
[216] J. Ex. 416 at 2.

constrains Hispanics to three districts with very high HVAP that all perform for Republicans.[217]

129.    The benefits to the Republican Party and incumbents in Senate Map 1 come at the expense of tier-two compliance. As reflected in the charts below, both of Plaintiffs' configurations of the South Florida districts improve compactness, while splitting two fewer cities than Senate Map 1 and keeping population deviation under 1%:[218]

| | Senate Map 1 | | | | CPS-3a & CPS-4a | | | | CPS-3b & CPS-4b | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SD# | Pop. Dev. # | Reock | Convex Hull | SD# | Pop. Dev. # | Reock | Convex Hull | SD# | Pop. Dev. # | Reock | Convex Hull |
| 25 | -5930 | 0.43 | 0.90 | 32 | -4248 | 0.57 | 0.85 | 32 | -4248 | 0.57 | 0.85 |
| 28 | 2368 | 0.53 | 0.89 | 34 | -2081 | 0.42 | 0.78 | 34 | -2081 | 0.42 | 0.78 |
| 30 | -1052 | 0.52 | 0.83 | 25 | -3488 | 0.64 | 0.88 | 25 | -3488 | 0.64 | 0.88 |
| 31 | -5657 | 0.43 | 0.85 | 29 | -3878 | 0.55 | 0.93 | 29 | -4700 | 0.55 | 0.93 |
| 32 | -27 | 0.27 | 0.72 | 40 | -4368 | 0.38 | 0.73 | 40 | -4368 | 0.38 | 0.73 |
| 33 | -887 | 0.35 | 0.85 | 27 | -2443 | 0.67 | 0.87 | 27 | -2443 | 0.67 | 0.87 |
| 34 | 3429 | 0.52 | 0.78 | 33 | -3928 | 0.40 | 0.70 | 33 | -4677 | 0.40 | 0.70 |
| 35 | -5348 | 0.38 | 0.72 | 31 | -4366 | 0.56 | 0.76 | 31 | -4366 | 0.56 | 0.76 |
| 36 | -970 | 0.57 | 0.89 | 37 | -4415 | 0.73 | 0.92 | 37 | -4673 | 0.73 | 0.92 |
| 37 | -2776 | 0.61 | 0.79 | 35 | -4617 | 0.65 | 0.85 | 35 | -2731 | 0.64 | 0.85 |
| 38 | 2965 | 0.38 | 0.71 | 39 | -3378 | 0.58 | 0.88 | 39 | -1778 | 0.58 | 0.88 |
| 39 | 4836 | 0.19 | 0.48 | 38 | -3379 | 0.19 | 0.48 | 38 | -4581 | 0.19 | 0.48 |
| 40 | 448 | 0.57 | 0.90 | 36 | -4008 | 0.66 | 0.94 | 36 | -2806 | 0.76 | 0.94 |
| | Avg. | 0.44 | 0.79 | | Avg. | 0.54 | 0.81 | | Avg. | 0.55 | 0.81 |
| | Split Cities | | | | Split Cities | | | | Split Cities | | |
| | 8 | | | | 6 | | | | 6 | | |

130.    As the chart below demonstrates, by improving tier-two compliance and increasing the number of Hispanic-performing districts, CPS-3a and 4a naturally pair together more incumbents, including Democratic incumbents and create two Hispanic majority-minority districts that perform for Republican candidates and two Hispanic majority-minority districts in which Hispanics of either party can elect candidates of their choice. Senate Map 1, in contrast, creates only three Hispanic seats – all Republican-performing – and results in a net increase of at

---

[217] J. Ex. 1 at 2 and 7.
[218] J. Exs. 1-5 at 2.

least two Republican seats in the map as a whole:[219]

| | Senate Map 1 | | | | CPS-3a & CPS-4a | | |
|---|---|---|---|---|---|---|---|
| Hispanic Districts | 2008 Obama | 2010 Sink | 2012 Obama | Hispanic Districts | 2008 Obama | 2010 Sink | 2012 Obama |
| 36 | 43.3% | 39.8% | 49.8% | 37 | 45.7% | 42.2% | 52.0% |
| 37 | 48.7% | 48.5% | 53.0% | 35 | 49.6% | 49.8% | 53.6% |
| N/A | | | | 38 | 47.9% | 46.0% | 52.6% |
| 40 | 41.0% | 41.3% | 47.0% | 36 | 51.3% | 52.4% | 54.8% |
| Total Republican Seats | 22 | 24 | 23 | Total Republican Seats | 20 | 22 | 19 |

131.    The Senate offers no justification for its overall lower compactness and higher population deviation in the South Florida districts. Instead, the Senate offers specific challenges to minority districts in Plaintiffs' plans without justifying its remaining districts.

132.    Tier one of Article III, Section 21 requires that "districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice." FLA. CONST., art. III, § 21(a). The minority protection provision in Article III, Section 21(a) tracks the language of Sections 2 and 5 of the VRA. *See Apportionment I*, 83 So. 3d at 619-20. Thus, in interpreting this provision of the Florida Constitution, the Court should be "guided by prevailing United States Supreme Court precedent" interpreting the VRA. *Id.* at 620.

133.    Under the minority protection provision of Article III, Section 21, "the Legislature cannot eliminate majority-minority districts or weaken other historically performing minority districts where doing so would actually diminish a minority group's ability to elect its preferred candidates." *Id.* at 625. The Florida Supreme Court has held that "a slight change in percentage of the minority group's population in a given district does not necessarily have a

---

[219] J. Ex. 416 at 1; J. Ex. 1 at 7; J. Ex. 2 at 7; J. Ex. 4 at 7.

cognizable effect on a minority group's ability to elect its preferred candidate of choice. This is because a minority group's ability to elect a candidate of choice depends upon more than just population figures." *Id.*; *see also id.* at 626-27 ("Because a minority group's ability to elect a candidate of choice depends upon more than just population figures, we reject any argument that the minority population percentage in each district as of 2002 is somehow fixed to an absolute number under Florida's minority protection provision."). "[T]o determine whether a district is likely to perform for minority candidates of choice, the Court's analysis . . . will involve the review of the following statistical data: (1) voting-age populations; (2) voting-registration data; (3) voting registration of actual voters; and (4) election results history." *Id.* at 627 (footnote omitted).

134.    In *Apportionment VII*, the Supreme Court reiterated that it is "the ability to elect a preferred candidate of choice, not a particular numerical minority percentage, that is the pertinent point of reference" in a proper retrogression analysis. 172 So. 3d at 405 (quoting *Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1272 (2015)). Accordingly, the non-retrogression requirement in Article III, Section 21(a) "is satisfied if minority voters retain the ability to elect their preferred candidates," regardless of whether the applicable minority voting age population is lower when compared with the benchmark district. *Id.* Stated another way, the non-retrogression requirement "prohibits only those diminutions of a minority group's proportionate strength that *strip* the group within a district of its existing ability to elect its candidate of choice." *Ala. Legis. Black Caucus*, 135 S. Ct. at 1272-73 (emphasis added).

135.    As to District 31 in Plaintiffs' plans (analog to District 35 in Senate Map 1), the Senate claims that it would be unconstitutional to reduce the BVAP of the district below 50%. Staff drew District 35 in Senate Map 1 based on an interpretation the vote dilution requirements in Article III, Section 21 and Section 2 of the VRA under which they considered it absolutely

necessary to maintain majority-minority districts without regard to whether a reduction in minority VAP below 50% would actually deprive minorities of their ability to elect. This *per se* rule regarding the preservation of majority-minority districts is inconsistent with *Apportionment I* and U.S. Supreme Court authority interpreting Section 2 of the VRA.

136.    A majority-minority district must be created under Article III, Section 21 and Section 2 of the VRA when the three *Gingles* preconditions are present: "(1) a minority population is sufficiently large and geographically compact to constitute a majority within a single-member district; (2) the minority population is politically cohesive; and (3) the majority population votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Apportionment I*, 83 So. 3d at 622 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)). If these requirements are satisfied, "courts must then assess the totality of the circumstances to determine . . . if minority voters' political power is truly diluted." *Id.*

137.    Critically, Section 2 of the VRA is not meant "to entrench majority-minority districts by statutory command." *Bartlett v. Strickland*, 556 U.S. 1, 23 (2009). If a minority population can elect candidates of their choice without a majority voting age population, the third *Gingles* factor is not present because bloc voting is inadequate to usually defeat the minority's preferred candidate, and there is no need to maintain or create a majority-minority district. *See Baca v. Berry*, ___ F.3d ___, 2015 WL 7732641, at *9 (10th Cir. Dec. 1, 2015) ("Consider a case where racially polarized voting exists, but a minority is nevertheless electing candidates of its choice. In that case, the requirement that the white majority votes as a bloc to defeat the minority's preferred candidate would be unsatisfied."); *Page v. Bartels*, 144 F. Supp. 2d 346, 364-65 (D.N.J. 2001) (holding that third *Gingles* factor was not present where the "reduction of the African-American voting age population in District 27 from 53% under the [benchmark] plan to 27% will not impair or prevent minorities from electing their preferred

candidates"). For that reason, the Florida Supreme Court held that Article III, Section 21 only prohibits "eliminat[ing] majority-minority districts . . . where doing so would actually diminish a minority group's ability to elect its preferred candidates." *Apportionment I*, 83 So. 3d at 625.

138. During the map-drawing process itself, legislative staff reduced compactness and broke additional city boundaries in District 35 in Senate Map 1 so that the district would remain majority-minority based on an absolute rule that did not account for African American's ability to elect preferred candidates without a majority of the voting age population of the district. In doing so, the Senate deviated from tier-two requirements without a constitutional justification.

139. At trial, the Senate offered an after-the-fact claim from Professor Liu that dropping below a majority BVAP would result in diminishment because of racially polarized voting and because African Americans tend to turn out in lower numbers when a district is not majority-minority. The Senate cannot meet its burden of proof under *Apportionment VII* and the Stipulation and Consent Judgment through *post hoc* rationalizations that were not actually relied upon by the map drawers. *See Apportionment VIII*, 2015 WL 7753054, at *24.

140. Nevertheless, the Court rejects Professor Liu's opinion as unpersuasive. Professor Liu merely offered generalized factors that might conceivably impact the ability to elect without providing any fact-based explanation of how racially polarized voting or lower turnout would deprive African Americans of their ability to elect in District 31 in Plaintiffs' proposed plans. *See Daniels v. State*, 4 So. 3d 745, 748 (Fla. 2d DCA 2009) (recognizing that expert testimony cannot be "based on speculation and conjecture, not supported by the facts, or not arrived at by a recognized methodology") (internal alteration omitted); *Div. of Admin., State Dep't of Transp. v. Samter*, 393 So. 2d 1142, 1145 (Fla. 3d DCA 1981) ("[N]o weight may be accorded an expert opinion which is totally conclusory in nature and is unsupported by any discernible, factually-based chain of underlying reasoning."). Further, Professor Liu did not

have "sufficient facts or data" to support his opinion, FLA. STAT. § 90.702(1), because he relied on only a few elections that were generally outside the relevant geographic area, did not involve comparable concentrations of African-American population, and sometimes suffered from factual errors (including as to the prevailing candidate).

141.    The Senate has also failed to carry its burden of justifying District 35 on vote dilution grounds because it has not shown that District 35 can be drawn as a majority-minority district when citizenship is considered.  African American voter registration, which is a fair proxy for citizenship, has lagged below 50% in the Senate's District 35.[220]  Because "[i]n order to vote or to register to vote, one must be a citizen," a proper vote dilution analysis should take into account citizenship.  *Negron v. City of Miami Beach*, 113 F.3d 1563, 1568-69 (11th Cir. 1997); *see also Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999); *Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998).  In *League of United Latin Am. Citizens v. Perry*, the U.S. Supreme Court observed that using citizenship data "fits the language of § 2 because only eligible voters affect a group's opportunity to elect candidates," while a district in which minorities have a "bare majority of the voting-age population" might create a majority-minority district "only in a hollow sense."  548 U.S. 399, 429 (2006).  Thus, the Supreme Court criticized a state legislature for drawing a district "to have a nominal Latino voting-age majority (without a citizen voting-age majority) for political reasons . . . . to create the facade of a Latino district."  *Id.* at 441.

142.    The Senate's failure to carry its burden of justifying its District 35 is, without more, sufficient reason to adopt Plaintiffs' analog District 31 as a more tier-two compliant version of Senate District 35.

---

[220] J. Ex. 1 at 4 (reflecting African American registration of 45.1% and 47.1% in 2010 and 2012, respectively); Rem. Tr. Vol. 7 at 834:24-835:25 (reflecting Dr. Lichtman's opinion that registration is an excellent proxy for citizenship).

143.    Nevertheless, although Plaintiffs were not required to show that their proposed version of District 31 does not result in retrogression, the Court agrees with the reasons set forth in the testimony of Dr. Lichtman that Plaintiffs' District 31 provides African Americans with the ability to elect candidates of their choice and thus does not create retrogression concerns.

144.    The Senate next claims that the Challenged Hispanic Districts – *i.e.*, Districts 35 in all of Plaintiffs' plans and Districts 36 and 38 in CPS-3a and 4a – would violate the minority protection provision of Article III, Section 21(a) by creating retrogression as compared with the 2002 Benchmark Plan, which contained only three Hispanic districts.

145.    At the outset, the Senate has failed to carry its burden of showing that Senate Map 1 would not result in vote dilution by aggregating Hispanics into only three performing districts. The Senate's own expert testified that the *Gingles* preconditions are present in South Florida, meaning that the Senate should have maximized, rather than minimized, the number of performing Hispanic majority districts.  The Senate did the opposite and limited Hispanics to three performing districts with extremely high HVAPs (88.8% in District 36, 74.9% in District 37, and 85.6% in District 40).[221]  The Senate never seriously investigated the possibility of creating a fourth performing majority-minority Hispanic district, even after Plaintiffs submitted a proposed map during the special session showing that it would be possible to do so.[222]  Instead, the Senate retained its version of District 39 with an HVAP of 53.3%.[223]  The low voter registration among Hispanics in District 39 indicates that Hispanics are not a voting age majority of the district when citizenship is taken into account,[224] and no party contends that Hispanics have the ability to elect candidates of choice in District 39 in Senate Map 1.

---

[221] J. Ex. 1 at 2.
[222] P. Ex. 5.
[223] J. Ex. 1 at 2.
[224] J. Ex. 1 at 5.

146.    The Senate has further failed to carry its burden of showing that its proposed South Florida districts are necessary to avoid retrogression in the face of the more tier-two compliant configurations of South Florida offered by Plaintiffs.

147.    During the special session itself, legislative staff, counsel, an outside expert, and Senator Galvano took the position that a district virtually identical to Plaintiffs' District 35 in House-proposed Plan 9079 would not result in retrogression.[225]  Legislative staff and counsel also took the position that proposed districts in the base maps with HVAPs as low as 70.4% complied with the minority protection requirements of Article III, Section 21(a).[226]

148.    At trial, the Senate offered another *post hoc* claim through Professor Liu that Hispanic districts must have HVAPs in excess of 75%-80% to perform.  The Court finds Professor Liu did not have "sufficient facts or data" to support his opinion that HVAPs over 75%-80% are necessary to avoid retrogression, FLA. STAT. § 90.702(1), because he relied on an inadequate number of elections, and the elections he relied on actually showed that Hispanics could prevail with HVAPs as low as roughly 25%.  The only instance in which the Hispanic candidate lost was a non-partisan judicial race in which a sitting judge defeated a young lawyer, and Professor Liu could point to no instance in which a Hispanic-preferred candidate lost with an HVAP over 67%.

149.    The Senate's failure to carry its burden of justifying its three Hispanic districts and establishing that the Challenged Hispanic Districts would result in retrogression is, without more, sufficient reason to adopt alternatives that expand Hispanic voting opportunities while improving tier-two compliance throughout the South Florida districts.

150.    Nevertheless, although Plaintiffs were not required to show that the Challenged

---

[225] Rem. Tr. Vol. 5 at 494:8-502:15; P. Dem. 25.
[226] Rem. Tr. Vol. 1 at 115:24-116:20; P. Dem. Ex. 7.

Hispanic Districts do not result in retrogression, the Court accepts the better reasoned opinion of Dr. Lichtman that the Challenged Hispanic Districts provide Hispanics with the ability to elect candidates of their choice and thus do not create retrogression concerns.

151.    Even apart from the formal requirements for a vote dilution claim under Section 2 of the VRA, the demonstrated ability to create four Hispanic-performing districts would lead the Court to approve the South Florida configuration in CPS-3a and 4a.  In *Apportionment I*, the Florida Supreme Court "[did] not rule out the potential that a violation of the Florida minority voting protection provision could be established by a pattern of overpacking minorities into districts where other coalition or influence districts could be created." *Apportionment I*, 83 So. 3d at 645.  However, the Court was "unable to make such a determination on this record" as to the House plan because "[t]he challengers have failed to establish that another majority-minority district for either black or Hispanic voters potentially could have been created." *Id.*  Similarly, the Court found no overall minority protection violation in the initial Senate plan because the challengers' alternative plans did "not demonstrate that an additional majority-minority district can be created." *Id.*  Here, by contrast, Plaintiffs have shown the viability of a fourth Hispanic-performing majority-minority district, and the Senate has offered no plausible justification for failing to create such a district when it is also feasible to improve tier-two compliance in the South Florida districts on the whole compared with Senate Map 1.

152.    The Court has considered the Senate's claim that District 38 in CPS-3a and 4a is non-compact because it contains an appendage. District 38, however, has a Reock score of 0.19 and a Convex Hull score of 0.48 – the same scores as analog District 39 in Senate Map 1.[227] Based on a visual review of the district, the Court finds that District 38 in CPS-3a and 4b is not

---

[227] *Compare* J. Ex. 2 at 2 & J. Ex. 4 at 2 *with* J. Ex. 1 at 2.

rendered materially non-compact by the appendage, and the surrounding districts are on the whole more compact in CPS-3a and 4a than in Senate Map 1. In any event, the Court finds that the appendage is a necessary byproduct of creating a new performing Hispanic district and is a reasonable tradeoff for maximizing Hispanics' opportunities to elect candidates of choice.

153.    In sum, the Court finds that the Senate has not carried its burden of justifying Districts 25, 28, and 30 through 40 in Senate Map 1. By aggregating Hispanics into only three performing districts and deviating from the tier-two mandates of compactness, respect for political boundaries, and equal population for the benefit of the Republican Party and incumbents, Senate Map 1 violates tiers one and two of Article III, Section 21. Accordingly, the Court approves Districts 25, 27, 29, and 31 through 40 in CPS-3a and 4a as the most constitutionally compliant districts.

## CONCLUSION

154.    For the foregoing reasons, the Court finds that the Senate has not met its burden of justifying Senate Map 1 as a whole or the individual districts in Senate Map 1. The Court has identified the proposed district configurations that best comply with Article III, Section 21, and all of those configurations are reflected in CPS-4a. CPS-4a is the most compact plan proposed by any party, matches the number of split counties in Senate Map 1, splits three fewer cities than Senate Map 1, and contains significantly lower population deviation than Senate Map 1, while expanding the number of Hispanic-performing districts. Although CPS-4a contains one more split county than CPS-3a, the Court finds that the widespread compactness improvements in CPS-4a render it a preferable map. *See Apportionment I*, 83 So. 3d at 636 ("Unlike the mandate of compactness, [the] requirement [of respecting political and geographical boundaries] is modified by the phrase 'where feasible,' suggesting that in balancing this criterion with compactness, more flexibility is permitted."). Accordingly, the Court adopts CPS-4a as the

proposed remedial plan that best complies with the requirements of Article III, Section 21.

155.    If the Court did not adopt CPS-4a, it would adopt one of Plaintiffs' other alternative maps because they all represent material improvements over Senate Map 1.   In particular, the Court would adopt CPS-3a as the next best alternative to CPS-4a because it is more compact than Senate Map 1, splits one fewer county and four fewer cities than Senate Map 1, and contains significantly lower population deviation than Senate Map 1, while adding a fourth Hispanic-performing district.  If the Court were to adopt a remedial map with only three Hispanic-performing districts, it would select CPS-4b as the most constitutionally compliant proposal, followed by CPS-3b as the next most constitutionally compliant proposal.

156.    This Court would respectfully request that the Supreme Court provide additional guidance about the use of political performance data[228] by members of the Legislature after a map has been drafted or submitted for consideration.  It was this Court's perception that since "the motives behind the plan"[229] are the issue rather the effect of the plan as in a minority district evaluation, the Legislature feels it cannot discuss the relative political performance of a proposed plan as it would be used against them as evidence of partisan intent. Yet, the moment it is passed by the legislature, opponents of the redistricting plan naturally point to its political performance as evidence of improper partisan intent.

157.    It appears everyone uses political performance data to evaluate the efficacy of a proposed plan except the Legislature. The Court inquired as to the source of this perceived restriction and it appears to flow from an understanding of *Apportionment I*. I am unable to find in the Fair Districts Amendment or in the Supreme Court opinions such a strict interpretation. As Judge Lewis noted in his Final Judgment in the Congressional case:

---

[228] Access to political data discussed only in the context of a minority district. *Apportionment I* at 619.
[229] *Apportionment IV* at 152.

> Consideration of political performance is not the same as intending
> to favor or disfavor a political party or incumbent, and an open
> process would assist in evaluating which was in play in a particular
> situation. (at page 28)

158.    It appears that the Legislature took extraordinary steps to guard against the

perception of improper partisan influence in the drawing of its base maps and in recording the

process of discussions and amendments for public scrutiny. The Legislature, in response to

complaints in the Congressional case, recorded the actual drawing of the base map by the

Legislative map drawers. The record reveals the map drawers faithfully complied, not only with

recording their map drawing sessions together, but also as to communications made to them from

legislative members. They were under strict orders not to consider political performance data in

drawing the maps. In my opinion, the perceived prohibition on the use of political performance

data in the drawing and evaluation of maps seems to have caused a good deal of the problem and

the criticism faced by the Legislature.  That Senator Galvano, or any other Senator would be

unaware of the political performance of the senate base maps is perplexing. Why shouldn't he

know this important metric when recommending a map to his colleagues? It appeared to me that

the Legislature does not feel it is allowed to talk about the very issue everyone else is evaluating

-- performance data. Why not?  Maybe the Legislature fears that discussions about "political

performance" is nothing but "grist for the mill" for the opponents of any proposed legislative

plan and their silence on the subject might be intentional, but either way, the legislative record of

discussion or the lack thereof can be examined and weighed accordingly.

159.    Interestingly, the complaints regarding the tier two compliance of a proposed non-

minority district are most prevalent when the political performance of a district is affected.[230]

---

[230] Look at the issues of tier two compliance issue masking the political performance issue when it came
to the evaluation of district 5 & 7 (keeping Alachua County whole or not) in this Final Judgment at
paragraphs 93-100.

There is a great deal of discussion about how one version of a district is more tier two compliant by just small amounts than another version. Does it really matter that a district is .02 higher or lower on a Reock or Convex-Hull scale? Maybe, but this Court would suggest the concern over adjustments to a district based on tier two criteria is sometimes just a sophisticated way of manipulating the political performance of a district. Why are we, in many instances, masking political performance objections of a non-minority district in the guise of failure to comply with tier two compliance? Political performance is the ultimate measure of the matter in a minority district, so why is not also an equally valid consideration in a non-minority district?[231]

160.    Putting political performance data on the table, making it part of the debate, and subjecting it to judicial scrutiny is, in this Court's opinion, the best way to insure that a map is not only tier two compliant but also does not run afoul of tier one prohibitions. If a map performs in a way that is not within the bounds of reasonable expectations based on an evaluation of all election data then there will be a legislative record that will either support a valid reason for the imbalance or support the conclusion that the imbalance is the product of improper partisan political intent. The experts in election data are clearly qualified to demonstrate how a map performs outside the bounds of reasonable expectation. Election projections are a sophisticated business with election modeling that rivals financial modeling.[232] I suspect that every little change in a map is understood and ultimately evaluated in terms of how it affects performance by one partisan party over another.

161.    This Court suggests more harm is caused by having the Legislature believe they cannot openly and honestly discuss political performance data in evaluating various proposed

---

[231] In *Apportionment 1* at p. 140-141, the Supreme Court seemed to suggest that political data could be looked at when reviewing individual districts.

[232] Insurance companies in Florida use modeling to project the amount of damage they might anticipate from a hurricane and they have the ability to move the model one or two streets over and change the projected damage calculation. Election modeling does the same thing.

redistricting maps than would be caused if it was known to the Legislature that such discussions were acceptable, and not, in and of themselves, evidence of partisan intent. This would be especially freeing to open public discussion of the subject in the very forum that the Constitution provides for it to be done. If the Legislature understood that the recording of discussions and the preservation of e-mails was an expected practice in a politically sensitive event such as redistricting then maybe the map makers could come out of the "sterile" environment and the members of the Legislature could openly discuss the "elephant in the room."  If the Legislature cannot openly discuss political performance, but their plan is evaluated and criticized by opponents based on its political performance then consideration should be given to the thought that they are being asked to draw and vote in the dark. This is no way to run the State's business on such an important and fundamental matter.

162.    Regardless, if map drawers are not to have knowledge of or use political performance data in drawing non-minority districts, then it needs to be clearly stated. If members of the Legislature cannot discuss in an open forum political performance data, then it needs to be clearly stated. Redistricting is complex and since "motives" are under examination rather than "effects"[233] it is apparent to this Court that the Legislature and ultimately the citizens of Florida would benefit from further guidance on this complex issue.

163.    The appellate review of this Final Judgment should be the last in a series of redistricting cases until the State is required to re-address redistricting in 2022. Again, I would respectfully suggest that the Legislature and the people of Florida would benefit greatly in future

---

[233] In *Apportionment I* the word "effect" is used in several contexts which adds to the difficulty in understanding how redistricting is analyzed. ". . . . Florida's constitutional provision prohibits intent not *effect*, and applies to both the apportionment plan as a whole and to each district individually." at 617; "while we agree that the standard does not prohibit political *effect*, the *effects* of the plan, the shape of the district lines, and the demographics of an area are all factors that serve as objective indicators of intent." at 617; "Here, although *effect* can be an objective indicator of intent, mere *effect* will not necessarily invalidate a plan." at 642.

redistricting cases if it was understood that the open, honest and recorded discussion of political performance data by members and staff of the Legislature was not, in and of itself, evidence of partisan intent, but rather the type of discussion that would be expected when considering such a complicated matter.

164.    The Court hereby orders as follows:

a.    Within three days of the date of this Final Judgment, the Legislature shall randomly renumber the districts in CPS-4a according to the methodology used in *Apportionment II* and serve and file the renumbered plan in .doj format. Plaintiffs shall have three days to serve and file any objection to the renumbering of the districts in CPS-4a.

b.    If no objections are filed or after the resolution of any objections, the randomly renumbered version of CPS-4a shall be utilized in the 2016 Florida state senatorial elections and in Florida state senatorial elections thereafter until the next decennial redistricting.

165.    The Court reserves jurisdiction to determine entitlement to and the recoverable amount of attorneys' fees and costs and to enter any orders necessary or appropriate to enforce this Final Judgment.

**DONE AND ORDERED** in Chambers, Tallahassee, Florida, this 30th day of December, 2015.

George S. Reynolds, III
Circuit Judge

Copies to all counsel of record