```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION

 3
     KETO NORD HODGES, ET AL.,        )
 4                                    )
               Plaintiffs,            )   CASE NO.
 5                                    )   8:24-cv-879
          vs.                         )
 6                                    )
     KATHLEEN PASSIDOMO, ET AL.,      )
 7                                    )
               Defendants.            )
 8   _____  )

 9

10

11

12

13              VIDEOCONFERENCE DEPOSITION OF

14                    JENNIFER GARCIA

15

16

17               November 20, 2024

18                    3:34 p.m.

19

20              Saint Petersburg, Florida

21

22

23

24                    Jake Coppola
                      Digital Reporter
25              Commission No. HH 240208
```



```
 1                    APPEARANCES OF COUNSEL

 2

 3   On behalf of the Plaintiffs/Witness, KETO NORD HODGES,
     ET AL. AND JENNIFER GARCIA:
 4
         ACLU OF FLORIDA
 5       Attorneys at Law
         4343 West Flagler Street
 6       Suite 400
         Miami, Florida 33134
 7       786-363-1769
         nwarren@aclufl.org
 8       BY:  NICHOLAS WARREN, ESQ.

 9       AND

10       BUTLER WEIHMULLER KATZ CRAIG LLP
         Attorneys at Law
11       400 North Ashley Drive
         Suite 2300
12       Tampa, Florida 33602
         813-594-5603
13       jshaw@butler.legal
         nrobertson@butler.legal
14       zhasbini@butler.legal
         BY:  JAMES MICHAEL SHAW, JR., ESQ.
15       BY:  NAOMI R. ROBERTSON, ESQ.
         BY:  ZEINA HASBINI, ESQ. (OBSERVING)
16

17

18

19

20

21

22

23

24

25
```



```
 1                    APPEARANCES OF COUNSEL (CONT.)

 2


 3

    On behalf of the Defendants, KATHLEEN PASSIDOMO, ET AL.:
 4
         SHUTTS & BOWEN, LLP
 5       Attorneys at Law
         215 South Monroe Street
 6       Suite 804
         Tallahassee, Florida 32301
 7       850-241-1727
         dharle@shutts.com
 8       BY:  DENISE HARLE, ESQ.

 9       AND

10       SHUTTS & BOWEN, LLP
         Attorneys at Law
11       4301 West Boy Scout Boulevard
         Suite 300
12       Tampa, Florida 33607
         813-227-8181
13       loberschall@shutts.com
         BY:  LEILA OBERSCHALL, ESQ.
14

15

16

17

18

19

20

21

22

23

24

25
```



JENNIFER GARCIA                                          November 20, 2024
HODGES V. PASSIDOMO                                                     4

```
 1                    INDEX TO EXAMINATION

 2

 3   EXAMINATION                                         PAGE

 4   Direct Examination By Ms. Harle                     6

 5   Cross-Examination By Mr. Warren                     51

 6

 7

 8                     INDEX TO EXHIBITS

 9   NO.                    DESCRIPTION                 PAGE

10   Garcia Exhibit 1       Interrogatories             26

11   Garcia Exhibit 2       Complaint                   26

12   Garcia Exhibit 3       Initial Disclosures         48

13

14

15     (Exhibits 1 through 3 were attached to the original

16   transcript.)

17

18

19

20

21

22

23

24

25
```



JENNIFER GARCIA                                    November 20, 2024
HODGES V. PASSIDOMO                                               5

```
 1          THE REPORTER:  All right.  We're now on the
 2   record at 3:34 p.m. on November 20th, 2024, to take the
 3   deposition of Jennifer Garcia, in the case of Keto Nord
 4   Hodges, et al., versus Kathleen Passidomo, et al.  My
 5   name is Eric Stumpf, notary public and digital reporter
 6   for Esquire Deposition Solutions in the state of
 7   Florida.  Pursuant to the general laws of the state of
 8   Florida, I'll be capturing the verbatim record of
 9   today's proceeding using electronic audio equipment, a
10   computer, and specialized recording software which is
11   not a form of stenography.
12          The witness is currently located in St.
13   Petersburg, Florida, and has confirmed their identity
14   with a Florida driver's license.
15          Could Counsel please identify yourself for the
16   record and state who you represent.
17          MR. WARREN:  Nicholas Warren with the ACLU of
18   Florida representing the plaintiffs, including Ms.
19   Garcia.  And we will object to the manner of taking the
20   deposition as different than the manner specified in the
21   Notice.
22          MR. SHAW:  James Michael Shaw, Jr., Butler
23   Weihmuller Katz Craig, for the plaintiffs.  And I -- I'm
24   sorry.  And with me as my associate, Naomi Robertson.
25   Observing is Zeina Hasbini.
```



 1            MS. HARLE:  And Denise Harle of Shutts & Bowen

 2  on behalf of Senate President Ben Albritton in his

 3  official capacity as the President of the Florida

 4  Senate.  With me is my associate, Leila Oberschall.

 5            THE REPORTER:  Perfect.  Thank you.  I think

 6  that's everyone.

 7            And absent any objection at this point,

 8  Counsel and the Witness agree to my remote

 9  administration of the oath and that the final transcript

10  may be used for all purposes allowed by the general laws

11  of the state of Florida.

12            MR. WARREN:  Yes.

13            THE WITNESS:  Yes.

14            THE REPORTER:  And, Counsel, are we okay to

15  move forward if -- if they're objecting?

16            MS. HARLE:  Yes.

17            THE REPORTER:  All right.  Thank you.

18            And, Ms. Garcia, could you please raise your

19  right hand?

20                      JENNIFER GARCIA,

21     having first been duly sworn, testified as follows:

22            THE REPORTER:  All right.  You may proceed,

23  Counsel.

24                      DIRECT EXAMINATION

25  BY MS. HARLE:



JENNIFER GARCIA                                    November 20, 2024
HODGES V. PASSIDOMO                                              7

```
 1        Q.    Good afternoon, Ms. Garcia.

 2        A.    Hi.

 3        Q.    My name is Denise Harle, I will be taking your

 4   deposition today.  Could you please just state and spell

 5   your name for the record?

 6        A.    Yes, my name is Jennifer Garcia.  That's

 7   spelled, J-E-N-N-I-F-E-R, G-A-R-C-I-A.

 8        Q.    And do you understand that you are being

 9   deposed today under oath, under penalty of perjury?

10        A.    Yes.

11        Q.    Have you ever been de before?

12        A.    No.

13        Q.    Okay.  I see your attorney is there with you.

14   Is there anyone else in the room with you?

15        A.    No.

16        Q.    Okay.  Do you have any other programs open on

17   your computer besides Zoom?

18        A.    No.

19        Q.    Okay.  Do you have your cell phone nearby?

20        A.    Yes.

21        Q.    I would just ask you not to communicate or --

22   or receive any communications during this deposition on

23   your cell phone; is that okay?

24        A.    Yes.

25        Q.    -- or receive any communication.  Is there
```



1  anything preventing you from giving your best truthful

2  testimony today?  For example, a medical condition or

3  have you taken any medication or other drugs?

4       A.   No.

5       Q.   I'm going to just go over some ground rules

6  for depositions.  So it sounds like this is your first

7  time.  And I -- I will at the end just ask you if you

8  have any questions about them or if you are okay with

9  the rules; is that okay?

10      A.   Yes.

11      Q.   Great.  So because this deposition is being

12  transcribed by our court reporter, I need to make sure

13  that you give verbal responses for the record.  Things

14  like nods and uh-huhs do not translate very well.  We

15  also need to be careful not to interrupt or to talk over

16  one another, if possible.  And if you do answer a

17  question, we will assume that you understood the

18  question.  So if I ask you something that's confusing or

19  unclear, please just ask me to clarify because once you

20  give the answer, we will assume you knew what was being

21  asked.  Also, you don't need to guess at anything today.

22  However, I am entitled to your best estimate if there is

23  a question that you can give a rough estimate to.  Do

24  you understand the difference between a guess and an

25  estimate?



```
 1        A.   Yes.

 2        Q.   Okay.  If at any point seeing a document would

 3   refresh your recollection, just let me know and we'll do

 4   our best to get it in front of you.  As I may be

 5   introducing exhibits later on, what -- what I'll plan to

 6   do is ask Leila to share her screen with you.  But if

 7   for some reason that's not workable, we can either drop

 8   a PDF in the chat or do something else that you'll have

 9   access to what you need.

10             Please be sure to give complete answers to the

11   question.  Also, please answer the question even if your

12   attorney objects.  Unless your attorney instructs you

13   not to answer, you do need to answer the whole question.

14   And I think that's the list -- the -- it's the list of

15   my standard ground rules.  Does that all make sense to

16   you?

17        A.   Yes.

18        Q.   Okay.  Great.  Will you please state your

19   address -- your current address?

20        A.   My current address is 3680 46th Avenue South,

21   Unit 219, St. Petersburg, Florida 33711.

22        Q.   And when did you move there?

23        A.   In March of 2023.

24        Q.   Is that an apartment?

25        A.   Yes.
```



JENNIFER GARCIA                                    November 20, 2024
HODGES V. PASSIDOMO                                             10

1      Q.   And do you own it or do you rent?

2      A.   Rent.

3      Q.   What was your most recent prior address?

4      A.   My most recent prior address was 2317 37th

5  Street South, St. Pete, Florida 33711.

6      Q.   And do you remember what month and year you

7  moved there?

8      A.   I believe it was November 2018.

9      Q.   Is there any chance you're aware of that you

10  might be moving in the next year or two?

11      A.   Possibly in two years, but I'm not sure.

12      Q.   And where would you be going in two years?

13      A.   I'm not sure where I would go in two years.

14      Q.   Okay.  And what makes you think you might move

15  in two years?

16      A.   Just because I would want to or because that

17  would be a decision that I would make for my family.

18      Q.   But nothing currently that you're considering

19  in terms of moving?

20      A.   No.

21      Q.   Who is your current employer?

22      A.   My current employer is Common Cause.

23      Q.   And what is Common Cause?

24      A.   Common Cause is a nonprofit democracy

25  organization.



JENNIFER GARCIA                                          November 20, 2024
HODGES V. PASSIDOMO                                                    11

1          Q.    What do you do there?

2          A.    I am the regional communication strategist for

3    the south.

4          Q.    How long have you worked at Common Cause?

5          A.    Since January of 2024.

6          Q.    And before that who was your employer?

7          A.    The ACLU of Florida.

8          Q.    And what did you do at the ACLU of Florida?

9          A.    The ACLU of Florida I was the media strategist

10   there.

11         Q.    And when you worked at the ACLU of Florida,

12   did you know your current attorneys in this lawsuit, Mr.

13   Warren and Mr. Tillian (phonetic)?  I -- I don't have a

14   whole list, but did you know your current attorneys when

15   you were working at the ACLU of Florida?

16         A.    I did.

17         Q.    And did you work -- did you work with your

18   current attorneys when you were working at ACLU of

19   Florida?

20         A.    I did.

21         Q.    What's your educational background?

22         A.    Can you be more specific?

23         Q.    Oh, sure.  Can you tell me about your -- just

24   tell me about your education since high school?

25         A.    After high school I went to the University of



JENNIFER GARCIA                                      November 20, 2024
HODGES V. PASSIDOMO                                                 12

```
 1   South Florida St. Petersburg for my bachelor's degree.
 2        Q.    Did you receive your bachelor's?
 3        A.    Yes.
 4        Q.    In what major?
 5        A.    Journalism and media studies.
 6        Q.    Did you do any advanced degrees or
 7   certificates after your bachelor's?
 8        A.    No.
 9        Q.    Was there anything else that comes to mind
10   when I ask about your educational backgrounds?
11        A.    Nothing else comes to mind.
12        Q.    Okay.  Have you worked for a political
13   organization?
14        A.    Can you define what a political organization
15   would constitute as?
16        Q.    Yeah, I guess what -- do you consider a Common
17   Cause a political organization?
18        A.    They're a nonpartisan organization, but they
19   do work in politics.
20        Q.    Okay.  Do you consider Common Cause a civil
21   rights organization?
22        A.    I would consider them more of a voting rights
23   organization.
24        Q.    Well, my next question, so thank you.  How did
25   you get connected to Common Cause?
```



JENNIFER GARCIA                                    November 20, 2024
HODGES V. PASSIDOMO                                              13

 1       A.   I applied for their job -- their listing.  I
 2  knew of their listing online.
 3       Q.   Had you heard of Common Cause before finding
 4  their job opening?
 5       A.   Yes.
 6       Q.   Had you done any collaboration or crossover
 7  work with Common Cause when you were at the ACLU of
 8  Florida?
 9       A.   I believe so, but I can't recollect when.  I
10  know that there's been times that there -- there would
11  be moments of that nature, yes.
12       Q.   At the ACLU of Florida, did any of your work
13  involve voting rights?
14       A.   Yes.
15       Q.   And besides Common Cause and ACLU of Florida,
16  have you worked at any other voting rights
17  organizations?
18       A.   No.
19       Q.   Have you volunteered in any capacity on voting
20  rights issues?
21       A.   Yes.
22       Q.   Can you tell me about that?
23       A.   Excuse me.  Can you be more specific with your
24  question?
25       Q.   Sure.  Just -- just tell me about any work



JENNIFER GARCIA                                    November 20, 2024
HODGES V. PASSIDOMO                                             14

1   that you've done in a volunteer capacity on the issue of

2   voting rights?

3        A.   I've worked with several voting rights voting.

4   I'm not sure if you'd want to know any specifics about

5   that.

6        Q.   Sure.  Like, did you -- did you canvas, did

7   you do phone banks?  What were the organizations?  Were

8   they -- were they political parties, were they

9   grassroots groups?  Just in -- in your own words.

10       A.   Okay.  I have phone-banked and I have

11  canvassed.  I have phone-banked with MoveOn and I phone-

12  banked for the Warnock campaign and then I also

13  canvassed for the Elizabeth Warren campaign.

14       Q.   Have you ever done any election canvasing?

15       A.   Yes.

16       Q.   When and where was that?

17       A.   I don't remember.  I can't recall the years.

18       Q.   Do you recall if it -- if it was for a certain

19  candidate?

20       A.   I did canvas for Elizabeth Warren.

21       Q.   Any other candidates you've canvased for or

22  phone-banked for?

23       A.   Just the ones I've previously stated.

24       Q.   And in your voting rights work, what would you

25  say are the main issues that you advocate for?



JENNIFER GARCIA                                    November 20, 2024
HODGES V. PASSIDOMO                                          15

1      A.   Can you be specific to which job you're

2  talking about?

3      Q.   Sure.  I mean, I was -- really umbrella for

4  all of them.  But -- but what are the main issues or

5  goals that you've -- that you've worked to advance in

6  your volunteer and employed capacity on voting rights?

7      A.   My -- the voting rights issues I try to

8  amplify relate to the protection of democracy.

9      Q.   And in your view, what does the protection of

10  democracy entail?

11      A.   Equal rights for all Americans.

12      Q.   Anything else besides equal rights for all

13  Americans that you advocate for in your -- your voting

14  rights advocacy?

15      A.   Fair and equal access to the ballot box.

16      Q.   Anything else?

17      A.   Not that I can think of right now.

18      Q.   Besides this lawsuit, have you ever been the

19  party to a -- a civil lawsuit?

20      A.   No.

21      Q.   Have you ever been convicted of a crime?

22      A.   No.

23      Q.   Have you ever pled no contest to a crime?

24      A.   No.

25      Q.   Just tell me in your own words why you're



 1  bringing this lawsuit?

 2       A.   I believe residents in my community should

 3  have fair representation in our democracy.

 4       Q.   And how do you define your community?

 5       A.   The St. Petersburg community, Black residents

 6  here, residents from diverse backgrounds in St.

 7  Petersburg.

 8       Q.   And do you think that the residents in your

 9  community currently do not have fair representation?

10       A.   That is correct.

11       Q.   And why is that?

12       A.   Because of the maps that are drawn to dilute

13  their voices and their voting power.

14       Q.   What is it about the map that you believe

15  dilutes the voices of the residents in your community?

16       A.   The current maps pack residents into a smaller

17  district and they also combine St. Petersburg residents

18  with Tampa residents.

19       Q.   And in terms of your community, is -- is your

20  community the former or the latter?  You feel like your

21  community is packed or is -- is combined with the wrong

22  people, or -- I mean, I want you to say it in your

23  words, but what's the problem as to your community?

24       A.   I feel like my community is split.

25       Q.   And does everyone in the community still have



1    the ability to vote?

2         A.    Yes.

3         Q.    And what is it about your community as you

4    define it being split that makes the representation

5    unfair?

6         A.    I believe it's the way the maps are split that

7    doesn't allow for voters to vote for representatives of

8    their choice and to have their influence heard.

9         Q.    And to explore that more, I think we may get

10   to the Complaint.  Do you happen to have a copy of the

11   Complaint with you?

12        A.    Not on my screen right now, no.

13        Q.    Okay.  We'll pull that up for you in a little

14   bit.  How did you become to be a plaintiff in this

15   lawsuit?

16        A.    Nicholas Warren contacted me.

17        Q.    Do you remember what month and year that

18   happened when Mr. Warren contacted you about becoming a

19   plaintiff?

20        A.    I can't remember specifics, but it was around

21   March or April before the Complaint was filed.

22        Q.    So it was after -- was it after you were no

23   longer working at the ACLU of Florida?

24        A.    I believe so, yes, yes.

25        Q.    Other than your attorneys who have you spoken



1   with about this lawsuit?

2        A.   Friends and family.

3        Q.   Have you -- you don't -- I don't need to know

4   the substance of what you said, but have you spoken with

5   any of the other plaintiffs at any point?

6        A.   No.

7        Q.   Anyone else besides friends and family?

8        A.   Just my friends and family.

9        Q.   Okay.  And during the redistricting process at

10  issue in this case, the one underlying the map that

11  you're challenging, did you communicate with any members

12  or staff of the Florida Legislature?

13       A.   No.

14       Q.   Were you aware of the redistricting process at

15  the time that it was going on?

16       A.   No.

17       Q.   After the redistricting was done, have you

18  communicated with any members or staff of the Florida

19  Legislature regarding the map?

20       A.   No.

21       Q.   Have you communicated -- other than with your

22  attorneys in this lawsuit, have you communicated with

23  anyone else at the ACLU of Florida either during or

24  after the redistricting process at issue?

25       A.   Can you be more specific with that question?



JENNIFER GARCIA                                    November 20, 2024
HODGES V. PASSIDOMO                                               19

1        Q.   Yeah.  So I guess I'll -- let me -- let me

2   break that apart.  So if I understand correctly, you

3   weren't aware of the redistricting process when it was

4   happening so if I asked you did you communicate with

5   anyone at the ACLU of Florida during the redistricting

6   process, I would -- I think the answer is no?

7        A.   Correct.

8        Q.   Okay.  And then after the redistricting

9   process Mr. Warren reached out to you regarding becoming

10  a plaintiff in this lawsuit; is that right?

11       A.   I believe so.

12       Q.   Okay.  When you were working at the ACLU of

13  Florida, did you do any kind of work or advocacy

14  relating to the map that you're challenging now?

15       A.   No.

16       Q.   Have you made any verbal or written statements

17  to any reporters regarding this lawsuit?

18       A.   No.

19       Q.   Have you made any verbal or written statements

20  to any community organizations or civics group regarding

21  this lawsuit?

22       A.   No.

23       Q.   Have you made any verbal or written statements

24  on social media regarding the lawsuit?

25       A.   No.



JENNIFER GARCIA                                    November 20, 2024
HODGES V. PASSIDOMO                                                20

```
 1        Q.   Which social media apps or accounts do you
 2   have?  If you don't mind, try to list off the ones you
 3   can think of?
 4        A.   I have an X account, I have a Twitter -- or I
 5   have an Instagram account, and I have a Facebook
 6   account, and I --
 7        Q.   All right.
 8        A.   -- also have a TikTok account.
 9        Q.   TikTok?
10        A.   Yes.
11        Q.   Do you have LinkedIn?
12        A.   Yes, I do.
13        Q.   Do you have Signal?
14        A.   Yes.
15        Q.   Do you have GroupMe?
16        A.   No.
17        Q.   Are you currently a registered voter?
18        A.   Yes.
19        Q.   Have you voted in every state Senate election
20   since you turned 18?
21        A.   No.
22        Q.   Do you recall -- or which Senate -- state
23   Senate elections have you voted in if you recall the
24   year?
25        A.   I can't recall the year.
```



JENNIFER GARCIA                                          November 20, 2024
HODGES V. PASSIDOMO                                                   21

```
 1        Q.   Okay.

 2        A.   I don't know.

 3        Q.   Let's look now at -- oh, I forgot to say

 4   earlier, and hopefully this won't be relevant, but if

 5   you do need a break at any time, just let me know.  I'm

 6   happy to stop whenever you need.

 7             MS. HARLE:  Leila, can you please pull up

 8   the -- the Answers to the Interrogatories, potential

 9   Exhibit 2 and share it on your screen.

10   BY MS. HARLE:

11        Q.   And do you remember providing interrogatory

12   responses in this lawsuit?

13        A.   I would have to see a document to know what

14   you're talking --

15        Q.   Sure.  Okay.  And I know this is a little

16   unwieldy, but we're happy to scroll up and down and Zoom

17   in or -- or whatever you need as we go through this.

18        A.   I saw this document, yes.

19        Q.   Okay.  Great.  And do you remember if you

20   reviewed all of the information and -- and signed off

21   before your attorney submitted it?

22        A.   I did, but I noticed that there was a typo.

23        Q.   Okay.  Is this --

24        A.   I realized there was -- go ahead.

25        Q.   Is there still a typo in there?
```



JENNIFER GARCIA                                      November 20, 2024
HODGES V. PASSIDOMO                                              22

1          A.    Yes.

2          Q.    Okay.  What is it?  Anything important?

3          A.    My March 2023 address is 2317 37th Street

4     South.

5          Q.    Okay.  Thank you.  Well, let me just ask a few

6     general questions before we get into the specifics.

7     Have you seen what District 18 looks like in the enacted

8     map that you're challenging?

9          A.    Yes.

10         Q.    And what facts do you have regarding the

11    racial motivations of the Florida Legislature in drawing

12    the districts in the map?

13         A.    Can you be more specific about your question,

14    please?

15         Q.    Sure.  So in your lawsuit at several points

16    you allege that the Florida Legislature had an

17    overriding and impermissible racial motivation in -- in

18    drawing the lines of the districts.  Are you aware of

19    those allegations?

20         A.    Yes.

21         Q.    Okay.  So I was just asking what facts do you

22    have regarding the racial motivations of the Florida

23    Legislature?

24         A.    While I can't speak to the racial motivations

25    of the Florida Legislature, I can share that my



```
 1  neighborhood and the neighborhood that has been
 2  sectioned off is primarily Black community and -- yeah.
 3        Q.   Do you have any other facts that you're aware
 4  of that would indicate that the districts were drawn by
 5  the Legislature with a racial motivation?
 6        A.   Other than majority Black residents are
 7  grouped into one specific area, no.
 8        Q.   And which specific area do you believe the
 9  Black residents are -- are grouped into?
10        A.   If you were able to pull up a map, I can show
11  you --
12        Q.   Okay.
13        A.   -- or I can explain it to you.
14        Q.   Yeah.  Is there -- can you describe the areas
15  of -- of the counties or the cities that you're
16  referring to?
17        A.   I would say east of 34th Street -- east and
18  southeast of 34th Street.
19        Q.   And -- and those residents are part of
20  District 18 that you live in?
21        A.   I'm not sure.  I'd have to look at the map.
22        Q.   Is there a certain percentage of Black voting-
23  age population that you think should be in District 16?
24        A.   I don't have a specific percentage in mind.  I
25  would just want equal representation for the residents
```



1    of St. Petersburg.

2        Q.    Do you know how the current percentage of

3    Black voting-age population in District 16 compares to

4    the percentage of Black voting-age population before the

5    most recent redistricting?

6        A.    Not off the top of my head, no.

7        Q.    Do you personally know any facts indicating

8    that Legislature's central consideration in drawing the

9    map was race?

10        A.    Can you be more specific in that question?

11        Q.    Sure.  Do you personally know any facts

12    indicating that the Florida Legislature's central

13    consideration in drawing the map that you're challenging

14    was race?

15        A.    I feel like -- I'd need you to break down that

16    question for me.

17        Q.    Okay.  And -- and maybe what you answered

18    before, I just want to make sure that I'm not missing

19    any facts or information that you have that the Florida

20    Legislature used race as the main purpose or motivation

21    behind the map.  So any information or facts you have on

22    that point, I just want to make sure I'm pulling that

23    out.

24        A.    I don't have any facts other than what I've

25    stated and what I can think of for right now.



JENNIFER GARCIA                                    November 20, 2024
HODGES V. PASSIDOMO                                                25

1        Q.   Are you familiar with the historical district

2    boundaries between -- of Hillsborough and Pinellas in

3    terms of, like, prior maps and earlier redistricting?

4        A.   I have not looked at prior maps, no.

5        Q.   Are you aware that the communities that are

6    combined that you've spoken about earlier, part of

7    Saint -- East St. Pete and -- and Tampa, are you aware

8    that those communities have been combined as part of the

9    same district since the early 1990s?

10       A.   I did not know that.

11       Q.   Do you know how many counties are split by

12   district lines across the state of Florida?

13       A.   No.

14       Q.   Did you read the Complaint in full before it

15   was filed?

16       A.   Yes, I've reviewed the Complaint.

17       Q.   Did you approve of all the allegations in the

18   Complaint before it was filed?

19       A.   Yes.

20       Q.   Okay.

21            MS. HARLE:   Sorry to switch gears, Leila, but

22   can you put the Complaint up, please.

23            And, Eric, I was -- I just was super sloppy on

24   that.  You can -- that can be Exhibit 1.  If we wanted

25   to make it Garcia 1 maybe.  And then the Complaint will



 1  be Garcia 2.  And we'll email these to you right

 2  afterwards.

 3          (Garcia Exhibits 1-2 were marked for

 4  identification.)

 5          MS. HARLE:  Okay.  If -- if you can scroll

 6  down to Paragraph 11.

 7  BY MS. HARLE:

 8      Q.   All right.  So there it says, this plan

 9  sacrificed genuine communities of interest.  What facts

10  were you relying on in making that allegation that the

11  Legislature sacrificed genuine communities of interest?

12      A.   Can you repeat the question?

13      Q.   Yes.  When you made that allegation that the

14  Legislature sacrificed genuine community of interests,

15  what facts were you relying on?

16      A.   I was relying on the fact that communities are

17  split and the concerns of St. Petersburg residents on

18  the east side of 34th is not the same as the interests

19  or the concerns of residents in Temple Terrace or in

20  northern parts of Tampa.

21      Q.   And what are the interests of the residents of

22  east St. Pete's?

23      A.   I believe our concerns and our situations are

24  different than those in a different county and so

25  they're going to be unique to the area.  But I can just



1   say that they're different than that of Tampa.

2        Q.   And -- and how are they different?

3        A.   I feel like the community needs different

4   things.  And so to group two different communities under

5   the same representation without giving them a say in

6   what happens to all of St. Pete seems like an upper --

7   underrepresented space for Black voters in this area.

8        Q.   So do the -- does the community in St. Pete's

9   share the same interests with -- I'm sorry.  Does the

10  community in East St. Pete's that we're talking about

11  share the same interests with all of the other residents

12  of the other parts of St. Pete?

13            MR. WARREN:  Object to form.

14            THE WITNESS:  I'm not sure the question you're

15  trying to ask.

16  BY MS. HARLE:

17       Q.   What -- what do you understand community of

18  interest to mean -- or genuine community of interest?

19  Just to use your words.

20       A.   I take that to mean what -- what concerns the

21  community members in that area.  And that will be

22  specific to the residents of St. Pete.  I can't provide

23  a list, I can't think of certain things right now in

24  this moment, but I can guarantee you that they are

25  different than that of the concerns and the interests of



1  those in Tampa who live in a completely different

2  region.

3       Q.   Is a genuine community of interest based on

4  neighborhood?

5       A.   There are several different neighborhoods in

6  St. Petersburg.  I -- that's my take on it.

7       Q.   And -- and do the several different

8  neighborhoods of St. Petersburg share the same

9  interests?

10      A.   Possibly.  I -- I can't really speak to that

11  particular point.

12      Q.   It -- does a genuine community of interest, is

13  that based on race?

14      A.   It depends on who you talk to in St. Pete.

15      Q.   Okay.  Well -- well, talking to you as the

16  plaintiff where -- where you're saying that genuine

17  communities of interest are sacrificed, are you -- are

18  you envisioning a community of interest as -- as based

19  on the race of the residents?

20      A.   I would say that the needs of and the voices

21  of Black voters in this area and the voting power of

22  Black voters in this area are -- are diminished because

23  of that, because of the way the maps are designed.

24      Q.   So are -- in your view are Black voters a

25  genuine community of interest?



1          A.    Yes.

2          Q.    Is -- is genuine community of interest, can

3    that mean religion?

4          A.    I'm predominantly talking about the Black

5    areas in St. Petersburg where voters are -- voters'

6    voices are diminished.

7          Q.    And in your view, do Black voters have the

8    same concerns as each other?

9          A.    Can you be more specific about that question?

10         Q.    Sure.  So if you've identified that a

11   community of interest, you're referring to Black voters

12   and I'm asking in your perspective then do Black voters

13   share the same concerns as voters as other Black voters?

14              MR. WARREN:  Object to form.

15              THE WITNESS:  I'm not sure I understand what

16   you're trying to ask.  And I don't know if there's

17   another way to say it or to hear it.  I'm just -- can

18   you --

19   BY MS. HARLE:

20         Q.    I'm -- I'm trying to still get an

21   understanding of what the communities of interests are

22   that you're saying were sacrificed.  And I thought we

23   narrowed it down to you are primarily talking about

24   Black voters; is that correct?

25         A.    Correct.



1        Q.    Okay.   So in your view do Black voters then

2   share -- typically share the same concerns as voters?

3        A.    I mean --

4        Q.    As opposed to non-Black voters?   Have -- most

5   have -- have -- do they have different concerns?

6        A.    I feel like the concerns is one thing, but

7   it's also who they choose to represent their district or

8   they choose to represent in leadership.   And so it --

9   it's not necessarily dependent on a specific thing.   I

10  feel like it's -- it's more so just the fact that Black

11  voices are underrepresented and -- and just diminished

12  in -- in our democracy.   And so I can't necessarily

13  pinpoint a specific thing, but I do feel like Black

14  voters' voices are -- they -- with these gerrymandered

15  maps, they -- they carry less voting power.

16       Q.    And is that based on a -- a particular fact

17  that you're aware of?

18       A.    The fact of geographical location and the

19  demographics of the maps that were -- that are being

20  presented.   Yes, that's what I'm -- that's what I'm

21  seeing.   And I've shared that the location of where

22  Black residents reside is also -- is -- is a reason that

23  I can think of.

24       Q.    And in terms of outcomes, is there -- is there

25  something particular in the outcomes of representation



JENNIFER GARCIA                                          November 20, 2024
HODGES V. PASSIDOMO                                                    31

```
 1   that you're identifying as a -- as a racial problem in
 2   terms of who is representing District 16 and District
 3   18?
 4        A.   I feel that regardless of who -- who is
 5   chosen, that -- like, in terms of outcomes, Black voters
 6   don't necessarily get a fair say in that -- in those
 7   elections or those opportunities to vote.  And so I feel
 8   like that's -- that's my reasoning for that.
 9        Q.   Did you just say Black voters don't have a
10   fair opportunity to vote?
11        A.   No.  I meant to say that they don't have a
12   fair representation in who they want to see represented.
13        Q.   And -- and you -- in your view do Black voters
14   all have the same preferences in terms of who they want
15   to represent them?
16        A.   No.
17        Q.   Do you think a -- a genuine community of
18   interest might be based on socioeconomic status?
19             MR. WARREN:  Object to form.
20             THE WITNESS:  Can you be more specific in the
21   question?
22   BY MS. HARLE:
23        Q.   Try to be more specific.  I'll try to
24   rephrase.  And you've worked a lot in the voting rights
25   space so you may have different ways you describe this.
```



1    But when you think of voting interest groups, right,

2    you've -- you've talked about Black voters, do you see

3    certain socioeconomic classes as potentially being a

4    legitimate voting interest group?

5         A.   I think it would depend, but I don't --

6    I've -- in my voting rights work it's been more

7    dependent on marginalized communities.

8         Q.   Okay.  Well, that's helpful.  Can you list for

9    me the types of marginalized communities that you think,

10   you know, comprise voting interest groups?

11        A.   I think for the basis of this case, the Black

12   voting community is the marginalized community that we

13   are discussing.

14        Q.   And are you aware there's a number of

15   different reasons why district lines can be drawn in

16   different ways?

17        A.   Yes, I'm aware.

18        Q.   So are there any other marginalized voting

19   interest groups that you're aware of that you could tell

20   me?

21        A.   I -- I don't necessarily know the process of

22   how maps are drawn and so I wouldn't necessarily be able

23   to share what's the deciding factor in those areas.

24   I -- that's my answer to this question.

25        Q.   Do you understand political parties to be



```
 1    voting interest groups?
 2         A.   Yes.
 3         Q.   And do you understand the -- the sexes to be
 4    voting interest groups?
 5         A.   Yes.
 6         Q.   Would you have done your voting rights work --
 7    well, let's just start with the Common Cause.  Which
 8    voting rights are -- which types of voters are you
 9    reaching out to with Common Cause?
10         A.   All voters.
11         Q.   All voters?  So how do you get the contact
12    info?
13         A.   I'm not responsible for getting the contact
14    info.
15         Q.   Do you recall -- and I'm trying to remember
16    what you said.  You said you discussed with them
17    protecting democracy; is that right?
18         A.   Protecting democracy I believe was my
19    definition to why I participate in voting rights or what
20    my -- what voting rights means to me.
21         Q.   And so I think -- I think you said you're the
22    senior communications strategist?  Or what was your
23    title?
24         A.   Regional communications strategist for the
25    south.
```



JENNIFER GARCIA                                      November 20, 2024
HODGES V. PASSIDOMO                                                34

1        Q.    All right.  So are you -- in that capacity are

2   you drafting written communications?

3        A.    Yes.

4        Q.    Okay.  And it would that include emails?

5        A.    No.

6        Q.    Social media?

7        A.    Not often, but sometimes.

8        Q.    Okay.  Articles?

9        A.    Press releases, yes.

10        Q.    Those fliers?

11        A.    I'm not sure what you mean by sliders.

12        Q.    Oh, I said fliers.  Sorry.

13        A.    I have --

14        Q.    -- like, pamphlets?

15        A.    I have drawn -- I've done one or two fliers in

16   my time there.

17        Q.    Okay.  What am I missing?  So basically press

18   releases and what else are you writing?

19        A.    Earned media strategy.

20        Q.    And your target audience there is -- is it all

21   voters or is it something else?

22        A.    It's all voters.

23        Q.    And what are you trying to encourage them to

24   do?

25        A.    Make their voices heard at the ballot box.



JENNIFER GARCIA                                                November 20, 2024
HODGES V. PASSIDOMO                                                          35

```
 1        Q.    So vote?

 2        A.    Yes.

 3        Q.    Does it -- does it matter to you who they vote

 4   for?

 5        A.    No.

 6        Q.    Does it matter to you which community of

 7   interest they're a part of?

 8        A.    No.

 9        Q.    Looking there at -- back to the screen on

10   Paragraph 13 it says that -- Floridians third line

11   there, Floridians, including individual legislators,

12   called out and questioned the Legislature's

13   unconstitutional actions.  Which Floridians are you

14   aware of who called out or questioned the Legislature

15   regarding the redistricting process?

16        A.    I -- I can recall that voting rights

17   organizations have -- have called out Legislature's

18   unconstitutional actions.  I can't recall other than my

19   lawyers on this call if anyone has spoken out

20   specifically on this map -- on these maps in question.

21        Q.    Okay.  So -- okay.  So then I get -- do you

22   know how the Legislature responded?  This -- it says,

23   their concerns were dismissed by the legislature as a

24   whole.  Are you aware when -- of -- of anything the

25   legislature said in response to those questions?
```



1       A.    Not specifically, no.

2       Q.    Let's look down at Paragraph 20.  We've talked

3   about this a little bit.  If this says, the enacted plan

4   harms plaintiffs because, among other reasons, it splits

5   up their communities along racial lines and groups their

6   communities with dissimilar ones simply because of their

7   race.  So my question is when you make the allegation

8   that the plan grouped your community with dissimilar

9   ones simply because of your race, which dissimilar

10  communities are you referring to there?

11      A.    Can you repeat the question please?

12      Q.    Sure.  When -- when you made the allegation

13  that the plan grouped your community with dissimilar

14  ones unnecessarily simply because of their race, which

15  dissimilar communities are you referring to there that

16  you said your -- your community was grouped with?

17      A.    I believe that the lines of these maps are

18  grouping someone like me as an Afro-Latina in other

19  majority white districts that don't allow for -- it --

20  it really honestly doesn't allow for me to vote for a

21  representative that is similar to that of maybe somebody

22  in a -- a community or a group that I would seem as

23  similar.

24      Q.    And so in terms of the dissimilarity, just

25  trying to drill down on that, is that primarily race --



JENNIFER GARCIA                                      November 20, 2024
HODGES V. PASSIDOMO                                                 37

1        A.    Yes.

2        Q.    -- or something else?

3        A.    Yes.

4        Q.    All right.  Okay.  Is it -- is the

5    dissimilarity anything else besides race in your mind?

6        A.    I believe it's also socioeconomic status.

7        Q.    And what socioeconomic status do you identify

8    yourself with?

9        A.    Middle class.

10       Q.    And are you grouped with other socioeconomic

11   classes in District 18?

12       A.    I believe my socioeconomic status in this

13   entire district could be -- I -- I'm not exactly sure

14   what the socioeconomic status is.  I can tell from my

15   nearby communities that there may be more than upper

16   middle class.

17       Q.    Do you tend -- tend to believe you vote

18   differently than folks who are not middle class?

19       A.    Can you repeat the question?

20       Q.    Yeah.  Do you -- do you tend to vote -- do --

21   you in your view, do you tend to vote differently

22   because you're in middle class?

23       A.    I vote based on the issues that are important

24   to me in my community.  And my community can look like

25   anything.



1      Q.   So your community is more than just race; is
2   that right?
3      A.   I don't -- I don't really know if that's true,
4   but race plays a big role in my community.
5      Q.   Did you vote in the last state Senate
6   election?
7      A.   No.
8      Q.   If we can look down at Paragraph 97.
9      A.   Actually, I'd --
10      Q.   Did you --
11      A.   -- like to correct.  So sorry.  I would like
12   to --
13      Q.   Yes, please do that.  Anytime.  Yeah.
14      A.   Yeah.  I would like to correct what I last
15   said.  I believe I did vote in the last state Senate
16   election.  I just didn't vote in the primaries --
17      Q.   Okay.
18      A.   -- but I did this year's election.
19      Q.   Well, I think there's a way to confirm that,
20   so --
21      A.   Okay.
22      Q.   -- we'll do that.  Do you remember what issues
23   you voted on in that -- in that -- when you were voting
24   in the last state Senate election, do you remember which
25   issues you had front of mind?



1        A.    I can't recall.  It was so long ago.

2        Q.    Do you remember what year was the last date

3    Senate election for your district?

4        A.    I couldn't tell you off the top of my head.

5        Q.    Okay.  Here we are.  Paragraph 97.  Not trying

6    to be a dead horse, but I just want to make sure I, you

7    know, hear everything you had in mind when you made

8    these allegations.  So this says, this refers to the

9    direct evidence of racial predominance.  So my first

10   question is what is your direct evidence that race

11   predominates the drawing of the lines for District 16

12   and 18?

13       A.    Based on the geographical locations of the

14   Black residents that are contained in the districts

15   outlined.

16       Q.    And in your mind that shows that race is the

17   predominant factor in where the line is?

18       A.    In my mind, yes.  Based on what I can think of

19   right now.

20       Q.    Actually, let's go up to the Paragraph 95.

21   Okay.  This one says, these race-based decisions

22   resulted in a map that splits neighborhoods and ignores

23   traditional redistricting criteria.  So I'm wondering

24   what criteria do you understand to be appropriate

25   criteria for the Legislature to use in redistricting?



```
1        A.   I think -- I think the Legislature should
2   consider grouping communities that are within the same
3   county.  I also think they should consider St.
4   Petersburg as a whole which has a diverse group of
5   opinions and thoughts but that would equally represent
6   Black voices, Black voters.
7        Q.   Any other traditional redistricting criteria
8   that you're aware of that the Legislature can use --
9        A.   Not that I can think of.
10       Q.   -- should have used?  Okay.  Okay.  So I wrote
11  down the county lines and city lines.  Did I miss
12  anything?
13       A.   Not that I can think of, no.
14       Q.   And let's see.  Do you know if it's
15  appropriate for the Legislature to -- to give deference
16  to where lines have previously been drawn in -- in prior
17  maps maybe that have already been upheld in court?
18       A.   Can you break down that question for me?
19       Q.   Yeah.  Do you know whether one of the criteria
20  the Legislature can use is where district lines have
21  traditionally been drawn in the past?
22       A.   I --
23       Q.   Do you know if that holds any weight in the
24  analysis of -- of where they draw lines?
25       A.   I do not.
```



1    Q.   And -- okay.  We're good.  We're making great

2    time.

3              MS. HARLE:  Let's go to Paragraph 131, please.

4    BY MS. HARLE:

5    Q.   This one says, the legislature lacked good

6    reasons to believe that the enacted plan was necessary

7    to achieve Tier 1 compliance.  So my question is, do you

8    know what Tier 1 compliance means?

9    A.   No.

10             MR. WARREN:  Could we zoom out on the

11   document?  It's -- it's covered up by the --

12             MS. HARLE:  Oh, yes.

13             MR. WARREN:  Thank you.

14             MS. HARLE:  Thank you, Leila.

15   BY MS. HARLE:

16   Q.   Did you remember seeing the phrase, "Tier 1"

17   in your Complaint?

18   A.   I do remember reviewing it, but it was so long

19   ago that I reviewed it, so I don't recall.

20   Q.   So do you recall any facts you were relying on

21   when you made the allegation that the Legislature did

22   not have good reasons that the plan was required for

23   Tier 1 compliance?

24   A.   Can you break down that question again,

25   please?



JENNIFER GARCIA                                          November 20, 2024
HODGES V. PASSIDOMO                                                    42

1       Q.   Yeah.  So I -- I know -- I know you said

2   you -- you don't remember what Tier 1 compliance means,

3   right?

4       A.   Yes.

5       Q.   Okay.  So I just want to make sure.  You can't

6   think of any facts that you had in mind when you made

7   that particular allegation?

8       A.   I cannot.

9       Q.   Okay.  I don't -- definitely don't tell me

10  anything you said to your attorney, but did -- you when

11  you reviewed the Complaint, did you -- do you remember

12  if you asked your attorney any questions about the

13  substance that was in there at all, anywhere in the

14  Complaint?

15      A.   Can I check with my lawyer if this is a

16  question of privilege?

17      Q.   He would object I assure you.  Just yes or no.

18  Did you -- you know, did you -- did you ask your lawyer

19  any questions about the Complaint before it was filed?

20  Just yes or no?

21          MR. WARREN:  You can answer.

22          THE WITNESS:  No, I did not ask any questions

23  about the Complaint.

24  BY MS. HARLE:

25      Q.   Okay.  Let's see.  Okay.



1              MS. HARLE:  Leila, my bad.  I just wrote down

2    a page number for this one.  But on Page -- it's Page 13

3    and 14 where Plan 42 is.  You may have to zoom out.  Oh,

4    there it is.

5    BY MS. HARLE:

6        Q.   Okay.  Are you able to see that, Jennifer -- I

7    mean, Ms. Garcia?

8        A.   Yes.

9        Q.   Okay.  Have you -- do you know have you seen

10   this map of -- this map 42 before?

11       A.   I've reviewed it in the Complaint, yes.

12       Q.   Are you able to tell me, just in your own

13   words, why is plan 42 better than the enacted map that

14   you're challenging?

15             MR. WARREN:  Object to form.

16             THE WITNESS:  I would say that this map shown

17   in front of me groups together all St. Pete residents

18   giving more voting access and more voter power and

19   influence to -- to Black voters who want their voice

20   heard.

21   BY MS. HARLE:

22       Q.   And under this map, which Black voters are you

23   saying would have more power?  Like, located where?

24       A.   In District 24 specifically listed.

25       Q.   Any particular part of that district?



JENNIFER GARCIA                                      November 20, 2024
HODGES V. PASSIDOMO                                                 44

1        A.   The ones that are currently -- the community

2   that's currently split on the current map.  So I -- I

3   would have to see the other map to show you what I mean.

4        Q.   Do you notice any other areas on there where

5   you think the Black vote would be diluted?

6        A.   I feel like this splits communities evenly and

7   gives equal representation.

8        Q.   Okay.  Your Complaint also mentions the Isbel

9   (phonetic) map.  Do you remember if you've seen a map

10  called the is Isbel map?

11       A.   Can you show it to me?

12       Q.   Yes, I think so.

13            THE WITNESS:  Also, while you're looking for

14  that, would it be okay to call for a break in five

15  minutes?

16            MS. HARLE:  Yeah.  Why don't we take a break

17  now and then I can find the map and then we'll hop back

18  on in -- maybe at 4:45?  Okay.  Thanks.

19            THE REPORTER:  Okay.  Off the record at 4:36.

20            (A recess was taken.)

21            THE REPORTER:  All right.  We're back on the

22  record 4:44.

23  BY MS. HARLE:

24       Q.   Okay.  Go ahead, Ms. Garcia.

25       A.   Yes.  I -- I recently filed for divorce and so



1    I didn't know if that can -- that was considered, like,

2    a civil -- earlier you had asked me if I was in any

3    other lawsuits.  Does that -- would that count towards

4    that as well?

5         Q.   Thank you.  It might.  And I'm -- I'm sorry to

6    hear that, but thank you for -- for clarifying that.

7         A.   Okay.

8         Q.   Hopefully that will not result in any

9    depositions.

10        A.   Yes, it has not.  It's -- it's been -- the

11   case has been settled.

12        Q.   Okay.  Okay.  So let's pull up -- you -- you

13   keep asking me and I'm -- I'm finally going to do this

14   for you.  And let's pull up Figure 3 of your Complaint

15   which is the challenge map.

16             MS. HARLE:  Leila, if you can share your

17   screen.  That's on Page 20.

18   BY MS. HARLE:

19        Q.   I just wanted to give you a chance to -- to

20   say anything else about the problems on this map that

21   you're challenging that you haven't been able to

22   articulate earlier today?

23        A.   Is this the map that you were referring to

24   before the break?

25        Q.   No, this is the map that you're challenging in



1  your lawsuit.  But I will -- I will pull up that other

2  map too and ask you about it.

3       A.   Okay.

4       Q.   So this is the existing map that you're suing

5  over?

6       A.   Yes, I understand that.

7       Q.   Okay.

8       A.   And can you repeat the question on that?  Is

9  there --

10       Q.   Yes.  And so is there anything else about this

11  map that you think is problematic that we haven't

12  already talked about today?

13       A.   No.

14       Q.   Okay.  Sometimes I thought the visual might

15  help if -- you know, if there was anything else you

16  wanted to share.  Okay.  So the other map I was asking

17  about is on is Figure 5 of your Complaint.  I think Page

18  26 under -- there it is, there it is.  The is Isbel

19  plan.  This is referenced in your Complaint as a viable

20  alternative map.  And so I was just curious, in your

21  words, why this map is a viable alternative or a better

22  alternative --

23            MR. WARREN:  Object to --

24  BY MS. HARLE:

25       Q.   -- than the challenge map?



 1              MR. WARREN:  Object to form.

 2              THE WITNESS:  This map from what I'm seeing

 3      now in front of me will group St. Petersburg residents

 4      together and keep them within the same district.

 5      BY MS. HARLE:

 6          Q.   And the St. Petersburg voters you think

 7      typically vote like one another?

 8          A.   I believe St. Petersburg voters based on their

 9      community and based on the issues pertaining to their

10      concerns.

11          Q.   Do you know the partisan composition of St.

12      Petersburg in terms of Democrat, Republican,

13      Independent?

14          A.   I do not.

15          Q.   Do you know the racial composition of St.

16      Petersburg?

17          A.   I do not.

18          Q.   This is -- just yes or no.  Have you seen any

19      of the expert witness reports that have been filed in

20      this case yet?

21          A.   I have reviewed what's in front of me and the

22      Complaint.  I have not seen any specific things from

23      other plaintiffs in this case.

24          Q.   Okay.  How -- do you know if you've seen

25      anything from expert witnesses?



1          A.    I have not.

2          Q.    Okay.  Between the two alternative maps that

3    we've talked about today, is there -- is there one that

4    you think is preferable in your view?

5          A.    I prefer the map that gives equal

6    representation to Black voters.

7          Q.    Okay.  And is that -- is that a particular map

8    you have in mind or just is there a particular map that

9    you think does that?

10         A.    Based on these two maps if both of them offer

11   equal representation to Black voters, then I am for both

12   maps.

13         Q.    Okay.  And when you're saying equal

14   representation of -- of -- to Black voters, can you --

15   can you further define what you mean by that?

16         A.    I mean, maps that don't split communities and

17   map lines that group all of St. Petersburg together so

18   that Black voters have more influence than they

19   currently have.

20              MS. HARLE:  Okay.  I think this will be our

21   last exhibit.  Pull up the Initial Disclosures.

22              (Garcia Exhibit 3 was marked for

23   identification.)

24              MS. HARLE:  And could you zoom out on this one

25   a little bit, too?  Thank you.



JENNIFER GARCIA                                    November 20, 2024
HODGES V. PASSIDOMO                                                49

```
 1   BY MS. HARLE:
 2        Q.   Does this document look familiar to you, Ms.
 3   Garcia?
 4        A.   I believe so.
 5        Q.   You want us to scroll down?
 6             MS. HARLE:   Leila, maybe can you scroll to
 7   the --
 8   BY MS. HARLE:
 9        Q.   The date on that was May 31st.  That would've
10   been late -- late spring, almost summer.  Does that --
11   does it look familiar now that you've seen it?
12        A.   Possibly.  I -- it's been, again, a very long
13   time.  So I've -- I've looked at these documents, but
14   I -- I -- I've seen a lot of documents.
15        Q.   Understood.  So can -- can you recall whether
16   you've previously reviewed the information in here?
17        A.   I believe I -- I looked over documents from --
18   for the case.  But again like I stated, I can't recall
19   if this was a specific document that comes to mind.
20        Q.   Okay.  And so just for context, these are
21   called Rule 16 Initial Disclosures.  And the general
22   idea is parties in the lawsuit exchange information with
23   each other.  I don't file this with the Court.  It just
24   shares who we think might have relevant information in
25   the case.  So for example, you can see there at 1A,
```



JENNIFER GARCIA                                                November 20, 2024
HODGES V. PASSIDOMO                                                          50

1   there's your name and the other -- the plaintiffs and it

2   says, that you're likely -- you have information

3   showing -- intending to show that the challenged

4   districts cause harm to themselves and to other

5   residents.  So what harm do you allege that the

6   challenged district lines cause you?

7        A.   Particularly as a voter I can't vote with

8   residents across the street from me -- across 34th

9   Street.  I can't vote in the same district as they are

10  in.

11       Q.   But you understand that districts do have to

12  have lines, correct?  They have to have boundaries at

13  some point, right?

14       A.   Absolutely.

15       Q.   So there will always be people who live one

16  block from boundary lines, correct?

17       A.   Correct.

18       Q.   And what harm do you -- do the challenged

19  district lines cause to other residents, in your view?

20       A.    In my view and as stated in this case, I

21  believe that these lines that are drawn as is currently

22  diminish the voting influence of Black voters in St.

23  Petersburg and in this area.

24       Q.   And let's look at 1D, which is Page 4 of the

25  documents.  This is a list of third-parties, some --



JENNIFER GARCIA                                    November 20, 2024
HODGES V. PASSIDOMO                                              51

```
 1   some media folks.
 2           MS. HARLE:  Leila, can you scroll down just a
 3   little bit?
 4   BY MS. HARLE:
 5       Q.   Do you have knowledge of any members of the
 6   media who might have information about whether the
 7   district lines for your district were drawn based on
 8   race?
 9       A.   I believe members of the media have covered
10   issues of gerrymandering in this county and in the Tampa
11   Bay area.
12       Q.   Are there any in particular that you are aware
13   of?
14       A.   Not that comes to mind, but you would have to
15   check with the people listed on this list.
16           MS. HARLE:  Okay.  That's the end of my
17   questions.
18           MR. WARREN:  I just have a -- a couple
19   questions.
20                    CROSS-EXAMINATION
21   BY MR. WARREN:
22       Q.   Ms. Garcia, Ms. Harle had asked you about if
23   you had voted in different elections.  Did you vote in
24   the 2024 general election that just happened two weeks
25   ago?
```



JENNIFER GARCIA                                    November 20, 2024
HODGES V. PASSIDOMO                                              52

1        A.    Yes.

2        Q.    Do you remember if there was a state Senate

3   race on that ballot?

4        A.    I can't remember --

5        Q.    Okay.

6        A.    -- but yeah.

7        Q.    Okay.  Did you vote in the 2022 general

8   election two years ago?

9        A.    I believe so, yes.

10       Q.    That was when Ron DeSantis was at the top of

11  the ticket I think?

12       A.    I believe so, yes.

13       Q.    Do you remember if there was a state Senate

14  race on that ballot?

15       A.    I can't remember what the ballot said.

16       Q.    Okay.  Do you remember if you voted in the

17  2020 general election?

18       A.    Yes.

19       Q.    Do you remember if there was a state Senate

20  race on that ballot?

21       A.    I cannot remember what was on that ballot.

22       Q.    Do you remember if you voted in the 2018

23  general election?

24       A.    I can't remember if I voted in that election.

25       Q.    I believe that was when Andrew Gillum and Ron



 1   DeSantis and the original Amendment 4 were on the

 2   ballot?

 3        A.   Yes, I believe so.  I remember those.

 4        Q.   And you remember voting in that election?

 5        A.   Yes.

 6        Q.   Do you remember if there was a state Senate

 7   race on that ballot?

 8        A.   I can't recall.

 9        Q.   And just one last one.  Do you remember if you

10   voted in the 2016 general election?

11        A.   Yes, I did.

12        Q.   And do you remember if there was a state

13   Senate race on that ballot?

14        A.   I cannot recall.

15             MR. WARREN:  Okay.  That's all I have.

16             MS. HARLE:  Okay.  I think we're done then.

17             MR. WARREN:  And we will read.

18             THE REPORTER:  Any orders before we get off?

19             MS. HARLE:  Yes, Eric.  Thanks.  We'd like a

20   copy.  Shutts & Bowen order one.

21             MR. WARREN:  We won't order, but we will read.

22   Thank you, Eric.

23             THE REPORTER:  No problem.  We -- so we're off

24   the record then at 4:55.

25             (Deposition concluded at 4:55 p.m.)



JENNIFER GARCIA                                             November 20, 2024
HODGES V. PASSIDOMO                                                       54

1                        CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5

6         I, the undersigned authority, certify that

7    JENNIFER GARCIA personally appeared before me and was

8    duly sworn on this 20th day of November, 2024.

9

10   WITNESS my hand and official seal this 26th day of

11   November, 2024.

12

13   _____

14   Jake Coppola

15   Notary Commission Florida No.:  HH 240208

16   Commission Expires:  March 14, 2026

17

18

19

20

21

22

23

24

25



1                    CERTIFICATE OF REPORTER

2

3            I, JAKE COPPOLA, a Digital Reporter and

4    Notary Public within and for the State of Florida do

5    hereby certify:

6

7            That the foregoing witness whose examination

8    is hereinbefore set forth was duly sworn and that said

9    testimony was accurately captured with annotations by me

10   during the proceeding.

11

12            I further certify that I am not related to

13   any of the parties to this action by blood or marriage

14   and that I am in no way interested in the outcome of

15   this matter.

16

17            IN WITNESS THEREOF, I have hereunto set my

18   hand this 26th day of November, 2024.

19                    

20   _____

21   JAKE COPPOLA

22   Notary Commission Florida No. HH 240208

23   Commission Expires:  March 14, 2026

24

25

JENNIFER GARCIA                                    November 20, 2024
HODGES V. PASSIDOMO                                              56

```
 1              CERTIFICATE OF TRANSCRIPTIONIST

 2

 3

 4   I, SANDRA REDAVID, located in the State of Florida do

 5   hereby certify:

 6

 7          That the foregoing is a complete and

 8   accurate transcript of the digital audio recording of

 9   the testimony and proceedings captured in the

10   above-entitled matter, all to the best of my skills

11   and ability.

12

13       I further certify that I am not related to

14   any of the parties to this action by blood or marriage

15   and that I am in no way interested in the outcome of

16   this matter.

17

18       IN WITNESS THEREOF, I have hereunto set my

19   hand this 26th of November, 2024.

20

21          SANDRA REDAVID

22       _____

23          SANDRA REDAVID

24

25
```

