IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KETO NORD HODGES, et al.,

   *Plaintiffs*,

v.                                                       Case No. 8:24-cv-879

KATHLEEN PASSIDOMO, et al.,

   *Defendants*.

_____/

**THE SECRETARY'S REPLY IN SUPPORT OF SUMMARY JUDGMENT**

Given the complexities inherent in redistricting, narrow tailoring doesn't require the least restrictive means to achieve a compelling interest. Plaintiffs agree. Doc.80 at 27. They acknowledge that the State gets "'breathing room'" "when drawing race-based district lines." *Id.* (quoting *Cooper v. Harris*, 581 U.S. 285, 293 (2017)). This means that courts will not second-guess the results of a "meaningful legislative inquiry into" a district's configuration, *Cooper*, 581 U.S. at 304, where there's "a strong showing of a pre-enactment analysis with justifiable conclusions," *Abbott v. Perez*, 585 U.S. 579, 621 (2018). The breathing room is greater still when a state attempts to comply with Section 5 of the Voting Rights Act, the analog for the Florida Constitution's non-diminishment standard, because "[t]he standards of § 5 are complex," and "the law cannot lay a trap for an unwary legislature, condemning its redistricting plan" for "either" "plac[ing] a few too many minority voters in a district"

1

or for being "retrogressive under § 5 should the legislature place a few too few." *Ala. Leg. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015) (cleaned up).

To be sure, this case concerns the Florida Legislature's drawing of a race-conscious district in the Tampa-St. Petersburg-Clearwater Metropolitan Statistical Area to comply with the Florida Constitution's non-diminishment standard, not Section 5 of the Voting Rights Act. But Plaintiffs say that the "[narrow] tailoring analysis is the same whether the compelling interest is compliance with the Voting Rights Act or the non-diminishment mandate in Tier One of Florida's Fair Districts Amendments," such that "references to the VRA in the authority cited" "encompass Florida's non-diminishment requirement, too." Doc.80 at 27, n.14. Thus, judged against the breathing-room standard, which makes still more room for the complexities inherent in complying with non-diminishment, the Secretary is entitled to summary judgment because the Florida Legislature narrowly tailored its use of race. As mentioned in the Secretary's summary judgment motion, summary judgment is appropriate when the State narrowly tailors its race-based drawing. Doc.75 at 15 (citing *Walden v. Burgum*, 700 F. Supp. 3d 759, 775 (D.N.D. 2023) (three-judge court)).

*First*, there's no dispute that the legislature conducted a pre-enactment, district-specific assessment before drawing Senate District 16, the race-conscious district. The legislature identified the predecessor district, the former-Senate District 19, as worthy of protection from diminishment of black voting strength. Doc.75-1 at 2, 5-8. The legislature then undertook a functional analysis of voting patterns in primary and general elections to assess whether black voters within the district could continue

electing a candidate of their choice once the district was reconfigured into Senate District 16. Doc.75-3 at 2, 5-8. "[T]he historical configuration of pre-existing districts" was considered, Doc.80-11 at 8, as part of the map drawer's assessment and "base level understanding" of options, Doc.75-2 at 40-44. District-specific compactness numbers were ultimately included. Doc.75-3 at 2. As were district-specific numbers that judged adherence to political and geographic boundaries. *Id.* Plaintiffs don't challenge the method used to identify the benchmark district, the decision to make the benchmark district worthy of non-diminishment protection, the functional analysis undertaken to ensure non-diminishment, or the conclusion that the enacted Senate District 16 protects from diminishment the black community's ability to elect a representative of its choice when compared to the benchmark. Nor do Plaintiffs engage with *Bethune-Hill v. Virginia State Board of Elections*, where, as here, narrow tailoring was met through an "informed" discussion of a district that "considered turnout rates" and "the results of the recent contested primary and general elections." 580 U.S. 178, 193-95 (2017).

*Second*, there's no dispute that Plaintiffs' alternatives fail to meaningfully improve on the relevant redistricting metrics—there's no evidence of some meaningfully *better* configuration of the race-conscious district. Compactness is generally the same between the enacted district and Plaintiffs' alternatives. Doc.75 at 11. So too is the black-voting-age-population metric. *Id.* Adherence to political and geographic boundaries is much worse in the alternatives, *id.* at 12-13, though Plaintiffs complain, contrary to Florida law, this last metric should be ignored in favor of "visually assessing the districts." *Compare* Doc.80 at 25, n.13, *with* Fla. Const. art. III,

3

§ 21(b) (requiring districts, "where feasible," to "utilize existing political and geographical boundaries"). Plaintiffs thus fail to push back on evidence with evidence to avoid summary judgment. *See, e.g.*, *Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir. 2005) (explaining that allegations and unsupported statements aren't enough).

*Third*, it seems, Plaintiffs' entire argument on narrow tailoring comes down to the enacted Senate District 16 crossing the bay that separates Hillsborough County from Pinellas County. As an initial matter, neither State nor federal law requires that the Florida Legislature create a district wholly within Hillsborough County; nothing precludes the legislature from drawing a district that crosses the bay. *See, e.g.*, *In re Sen. Jt. Resol. 2G*, 597 So. 2d 276, 279-80 (Fla. 1992) (rejecting contiguity challenge on the point). It's also undisputed that, since 1992, there's been a district that crossed the bay and connects the black population in Pinellas County to the black population in Hillsborough County. *See* Doc.80 at 22 (acknowledging same).

So, why then should the State be deprived of its breathing room? Plaintiffs say it's because the State never "dr[e]w any Hillsborough-only options, performed [any] actual functional analysis of a Hillsborough-only district," *id.* at 29, and, therefore, in Plaintiffs' opinion, the State relies only on generalizations to justify its drawing of a race-conscious district, *id.* at 29-31. Plaintiffs miss the point.

In assessing narrow tailoring, the focus is on the district the legislature actually drew, not some hypothetical district that a litigant prefers. The district the legislature actually drew in *Bethune-Hill* came with a functional analysis and other district-specific considerations that satisfied narrow tailoring. 580 U.S. at 193-95. And the districts the

4

state supreme court actually chose in *Wisconsin Legislature v. Wisconsin Elections Commission* failed to satisfy narrow tailoring because those districts "embrac[ed] just the sort of uncritical majority-minority district maximization" that was untethered to district-specific "evidence or analysis." 595 U.S. 398, 403-04 (2022). No hypothetical district was the focus of the narrow tailoring inquiry in either case. That makes sense. A legislature can't envision, draw, and analyze every possible configuration of every possible district any future litigant might prefer in a speculative case. It follows that, in this case, the Florida Legislature didn't need to draw districts Plaintiffs prefer or run functional analyses on those hypothetical districts.

*   *   *

When focusing on the district the Florida Legislature actually drew, it's clear that narrow tailoring is satisfied. Senate District 16 comes with the kind of pre-enactment explanation and analysis that the Supreme Court deems sufficient to pass constitutional muster. As such, for the reasons in this reply in those in the Secretary's initial motion, this Court should enter summary judgment in his favor.

Respectfully submitted,

| | |
|---|---|
| Bradley R. McVay (FBN 79034) | /s/ Mohammad O. Jazil |
| brad.mcvay@dos.myflorida.com | Mohammad O. Jazil (FBN 72556) |
| Joseph S. Van de Bogart (FBN 84764) | mjazil@holtzmanvogel.com |
| joseph.vandebogart@dos.myflorida.com | Michael Beato (FBN 1017715) |
| Ashley Davis (FBN 48032) | mbeato@holtzmanvogel.com |
| ashley.davis@dos.myflorida.com | zbennington@holtzmanvogel.com |
| FLORIDA DEPARTMENT OF STATE | HOLTZMAN VOGEL BARAN |
| R.A. Gray Building | TORCHINSKY & JOSEFIAK |
| 500 S. Bronough St. | 119 S. Monroe St. Suite 500 |
| Tallahassee, FL 32399 | Tallahassee, FL 32301 |
| (850) 245-6536 | (850) 270-5938 |

Dated: February 6, 2025

## LOCAL RULE CERTIFICATION

The undersigned certifies that this memorandum contains 1,134 words, excluding the case style and certifications.

Respectfully submitted,

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2025, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil.