IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KÉTO NORD HODGES, *et al.*,

    *Plaintiffs*,

v.

                                      Case No. 8:24-cv-879-CEH-TPB-ALB

BEN ALBRITTON, in his official
capacity as President of the Florida
Senate, *et al.*,

    *Defendants*.
_____/

## REPLY BRIEF OF PRESIDENT ALBRITTON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiffs' opposition to summary judgment fails to identify material disputed facts. Instead, it focuses on the irrelevant and undisputed fact that the Florida Legislature was *aware of* race as a factor when adopting the Enacted Plan. Indeed, both federal and Florida law acknowledge that race is one of many considerations legislatures can weigh during the redistricting process. And Supreme Court precedent rejects the argument Plaintiffs try to advance: that a legislature's mere consideration of race constitutes an unconstitutional gerrymander. *Allen v. Milligan*, 599 U.S. 1, 30-33 (2023).

As to the complaint's defective "impact theory" allegations regarding District 18 and the two plaintiffs residing there, Plaintiffs point to no facts that

overcome the legal defects in their allegations. Instead, they repeat the argument that those residents live *near* District 16, which they believe was drawn improperly, and that District 16 and District 18 partially share a border. This is a textbook impermissible "impact theory" warranting summary judgment as to District 18 and its plaintiff-residents Azis and Garcia.

Finally, Plaintiffs do not raise any material factual dispute to rescue their complaint's near-total reliance on an alleged *state-law* violation, which Plaintiffs refer to numerous times in their complaint. This Court may not decide whether state officials violated state law, and thus Plaintiffs' case should be dismissed.

The absence of material disputed facts exposes this lawsuit for what it is: an attempt by Plaintiffs and their counsel to obtain a different Florida Senate district configuration in Tampa Bay for reasons other than those asserted in the complaint. But their mere desire that district lines be drawn differently—or the related argument that Plaintiffs' preferred alternative maps produced in litigation are "better"—do not make out an Equal Protection claim. The Senate is entitled to summary judgment on Plaintiffs' sole claim.

## Argument

### A. Plaintiffs' response brief confirms that their claim against District 18 is an "impact theory" claim, which fails as a matter of law.

It is undisputed that plaintiffs residing in District 16 cannot challenge District 18, and plaintiffs residing in District 18 cannot challenge District 16. It is

also undisputed that plaintiffs residing in District 18 cannot challenge their own district on the theory that its shape was "impacted" by the alleged racial gerrymander of a neighboring district. *Sinkfield v. Kelley*, 531 U.S. 28, 30-31 (2000); *United States v. Hays*, 515 U.S. 737, 746 (1995).

Plaintiffs concede that *Hays* and *Sinkfield* stand for the proposition that "a person cannot demonstrate injury-in-fact to challenge a district in which they do not live without showing personal harm from the racial classification in that district." DE 80 at 32. Plaintiffs even concede to the Eleventh Circuit's articulation of *Hays*'s "bright-line standing rule": "if the plaintiff lives in the racially gerrymandered district, she has standing; if she does not, she must produce specific evidence of harm other than the fact that the composition of her district might have been different were it not for the gerrymandering of the other district." *Id.* (quoting *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1331 n.3 (11th Cir. 2007)). This bright-line standing rule is exactly why plaintiffs Azis and Garcia, who do not live in District 16, lack standing in this case.

Plaintiffs now argue that they previously alleged that District 18 itself was racially gerrymandered. But as support, they cite to only three allegations out of the entire complaint, *see id.* at 33, none of which show specific and personal harm. Plaintiffs cite the complaint's reference to dividing St. Petersburg and Pinellas, but omit the rest of their allegation, which states ". . . and lumping parts of St.

3

Petersburg and Tampa together *in District 16—simply because they are both predominantly Black areas.*" DE 1 ¶ 11 (emphasis added). Plaintiffs also cite paragraph 12, but that allegation on its face says the "Legislature's racial gerrymandering *unjustifiably packed Black voters into District 16 . . . .*" *Id.* ¶ 12 (emphasis added). And Plaintiffs' only other purportedly relevant allegation is paragraph 101, regarding the western border between Districts 16 and 18, but that allegation says nothing about the composition of District 18.[1] In fact, it is situated between allegations that "racial lines . . . split St. Petersburg and Pinellas County to scoop predominantly Black areas *into District 16*," *id.* ¶ 99 (emphasis added), and "to group far-flung Black residents [into District 16]," *id.* ¶ 102.

And, when Plaintiffs finally purport to identify the "personal injury from a racial classification" of the District 18 plaintiffs, their impact-theory argument is exposed once again: "Plaintiffs Azis and Garcia each live . . . in District 18, very close to the district boundary." *Id.* at 34. But even if "Plaintiff Garcia lives literally across the street[2] from District 16," *id.*, she does not live in that district and cannot bring a claim that it is racially gerrymandered—or that her district is an incidental gerrymander byproduct. Plaintiffs have not offered any "specific evidence of

---

[1] The western border between Districts 16 and 18 runs north to south along 58th Street North, follows the municipal boundary between St. Petersburg and Gulfport, and then travels south on US-19 and I-275 across the Sunshine Skyway Bridge. DE 75-3 at 1; *see also* DE 75-4 at 19:21-23.
[2] The "street" in question is US-19, a six-lane divided highway. DE 1-17.

4

harm," which is fatal to any argument that Azis or Garcia have standing.

Plaintiffs' last-ditch plea is for this Court to leave Azis and Garcia in the case because the other three plaintiffs "live in District 16, and nobody disputes their standing." *Id.* But this assertion ignores the fact that the other three Plaintiffs allege a different injury than Azis and Garcia—the alleged racial gerrymandering of District 16—one for which Azis and Garcia cannot join in or state a claim under the law. Neither of the two cases Plaintiffs cite involve redistricting, and in one of them the Eleventh Circuit "remand[ed] for the district court to *dismiss for lack of standing* the portions of the plaintiffs' complaint" outside of the narrow claim (a single book, out of multiple books challenged by multiple plaintiffs) where the court had determined that standing existed. *Id.* (citing *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1197-98 (11th Cir. 2009)). Here, District 18 and its two plaintiff-residents should suffer the same fate.

### B. At heart, Plaintiffs' Complaint is a state-law claim brought against state actors.

Given that the complaint rests upon allegations that state law was violated, Plaintiffs instead attempt to pivot to an argument that they can parlay alleged state-law violations into a federal claim. *Compare* DE 1 ¶¶ 7-9, 33-43, 47-48, 58-60, 65, 67-68, 78-80, 85, 104, 106-07, 109, 117-18, 123-24, 131-32 (variously alleging the requirements for Tier One and Tier Two criteria in the Florida Constitution and whether the Legislature complied), *with* DE 80 at 5 ("State law is relevant to

5

Plaintiffs' claim as a factual matter . . . .").

But because federal law prohibits this Court from deciding whether Plaintiffs' numerous state-law-related allegations against the Florida Legislature have merit, those allegations do not inform this Court's inquiry regarding *any* federal claim. Instead, they reveal that the complaint is a state-law claim dressed up in federal-law clothing. At a minimum, Plaintiffs' allegations involving a departure from state law should be stricken from the complaint.

Plaintiffs attempt to argue that their allegations about the Legislature's supposed failure to follow the Florida Constitution merely informs the Court's analysis of racial predominance, DE 80 at 7, but the cited cases do not support their position. Instead, Plaintiffs mistakenly equate a court opinion's *explanation* of state law with the allegations in a complaint upon which a plaintiff's claim is based. Unlike Plaintiffs' complaint, the operative complaints in those cases do not contain dozens of allegations regarding the application and violations of state law. *Bethune-Hill v. Va. State Bd. of Educ.*, 3:14-cv-00852-REP-AWA-BMK, DE 71 (E.D. Va. June 16, 2015); *Covington v. North Carolina*, 1:15-cv-00399-TDS-JEP, DE 11 (M.D.N.C. July 24, 2015). Regardless, Plaintiffs cannot rely upon those cases as persuasive when sovereign immunity was never raised or decided.

The overabundance of state-law allegations within the complaint requires this Court to make decisions about whether state officials followed state law.

Regardless of whether Plaintiffs now argue that this Court could do an independent federal law analysis, Plaintiffs pled their case as a state law claim.

Plaintiffs also misconstrue the Secretary's summary-judgment motion seeking dismissal of the case, DE 80 at 3 (citing DE 75 at 2, and this Court's Order dated May 14, 2024), *id.* at 4 (citing DE 33 at 4-5), as supporting their position on this issue. First, the Secretary's introductory statement describing this as a racial gerrymandering case, in a different motion addressing different issues, lacks relevance here. Second, this Court has never ruled as to whether Plaintiffs' sole claim is based upon violations of federal or state law—the cited Order decided only that Plaintiffs' claim was not a vote-dilution claim, which has a different analytical framework. Because the complaint contains allegations of state-law violations cloaked as a federal-law claim, this Court should dismiss the case.

### C. There is no material fact indicating that race *predominated* in the Legislature's Plan.

Finally, Plaintiffs also attempt to avoid summary judgment by arguing the existence of disputed material facts. But the "evidence" Plaintiffs cite—even if true—falls far short of showing that race predominated, and Plaintiffs' arguments misconstrue the law on the use of race in redistricting.

At most, Plaintiffs' cited evidence shows only that the Legislature was aware of race when drawing state senate districts. This is unremarkable, as federal law recognizes that " 'the legislature always is *aware* of race when it draws district

lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors.' " *Hays*, 515 U.S. at 745 (quoting *Shaw v. Reno*, 509 U.S. 630, 646 (1993)). But, " 'race consciousness does not lead inevitably to impermissible race discrimination.' " *Id.* (quoting *Shaw*, 509 U.S. at 646).

Plaintiffs have cited no evidence showing that "race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 10 (2024) (cleaned up). And though they claim that *Alexander* does not apply, Plaintiffs' purported "direct evidence" is circumstantial at best and lacks what *Alexander* requires: an undeniable admission that traditional redistricting standards (and any other potential objectives) were abandoned in favor of race. *Id.* at 8-10. For example, Plaintiffs in this case did not " 'smoke[] out' " any " 'leaked e-mails from state officials instructing their mapmaker to pack as many black voters as possible in a district.' " *Id.* at 8 (quoting *Cooper v. Harris*, 581 U.S. 285, 318 (2017)). And there is no evidence that the legislature "deliberately chose additional black voters to move into underpopulated majority-minority districts."[3] *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 265 (2015). To the contrary, both District 19 in the Benchmark Map and District 16 in the Enacted Map include portions of the

---

[3] The Census data belies Plaintiffs' "packing" rhetoric. District 16 is far from a majority-minority district—its Black Voting Age Population is 33.20%. DE 74-19 at 3. And Plaintiffs concede that their proposed alternative maps reflect a "similar" racial composition in District 16. DE 80 at 26.

8

Tampa Bay area that have been combined within the same state senate district for decades. DE 74-16.

Plaintiffs also urge this Court to credit evidence from one of their expert witnesses that is deficient as a matter of law. DE 80 at 14-15. Notably, Plaintiffs' expert conceded at deposition that his analysis of District 16's district boundaries did not "replicate the 'myriad considerations' that a legislature must balance as part of its redistricting efforts" and " 'ignored certain traditional districting criteria,' such as geographical constraints." *Alexander*, 602 U.S. at 24 (quoting *Allen*, 599 U.S. at 34-35); *see also* DE 74-25 at 78:15-21 (admitting that he did not consider geographical boundaries such as roads). Plaintiffs' failure to even try to account for all of the considerations the Legislature incorporates when drawing districts necessarily means their expert's opinion is "flawed" and "cannot sustain a finding that race played a predominant role in the drawing of District [16's] lines." *Alexander*, 602 U.S. at 24.

Plaintiffs have "failed to meet the high bar for a racial-gerrymandering claim by failing to produce, among other things, an alternative map showing that a rational legislature sincerely driven by its professed [constitutional] goals would have drawn a different map with greater racial balance." *Alexander*, 602 U.S. at 10; *see also* DE 74 at 21 (showing the similarity of the BVAP percentages of Plaintiffs' maps and the Enacted Plan). The mere fact that Plaintiffs can draw different

districts reflecting similar black voting populations is not evidence of a constitutional violation. *Alexander*, 602 U.S. at 35-36 (recognizing that alternative maps are "remarkably easy to produce"); *Rucho v. Common Cause*, 588 U.S. 684, 729 (2019) (Kagan, J., dissenting) ("[T]oday's mapmakers can generate thousands of possibilities at the touch of a key—and then choose the one giving their party maximum advantage (usually while still meeting traditional districting requirements).").

## Conclusion

This Court should grant summary judgment in favor of the Florida Senate.

Respectfully submitted,

|  |  |
|---|---|
| CARLOS REY (FBN 11648)<br>**FLORIDA SENATE**<br>404 South Monroe Street<br>Tallahassee, Florida 32399<br>(850) 487-5855<br>*Rey.Carlos@flsenate.gov* | */s/ Daniel Nordby*<br>RICKY L. POLSTON (FBN 648906)<br>DANIEL E. NORDBY (FBN 14588)<br>DENISE M. HARLE (FBN 81977)<br>TARA R. PRICE (FBN 98073)<br>ALYSSA L. CORY (FBN 118150)<br>KASSANDRA S. REARDON (FBN 1033220)<br>**SHUTTS & BOWEN LLP**<br>215 South Monroe Street, Suite 804<br>Tallahassee, Florida 32301<br>(850) 241-1717<br>*RPolston@shutts.com*<br>*DNordby@shutts.com*<br>*DHarle@shutts.com*<br>*TPrice@shutts.com*<br>*ACory@shutts.com*<br>*KReardon@shutts.com* |

*Counsel for Florida Senate President Ben Albritton, in his official capacity*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 6, 2025, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

>                          */s/ Daniel Nordby*\_\_\_\_\_
>                          Attorney