# EXHIBIT C

**In the Matter Of:**

HODGES V. PASSIDOMO

8:24-cv-879

---

**MATTHEW BARRETO, PH.D.**

*November 25, 2024*

---



800.211.DEPO (3376)
EsquireSolutions.com

1            IN THE UNITED STATES DISTRICT COURT
                     TAMPA DIVISION
2                CASE NO. 8:24-cv-879

3

    KETO NORD HODGES, et al.
4
         Plaintiffs,
5
     vs.
6
    KATHLEEN PASSIDOMO, et al.,
7
         Defendants.
8    _____/

9


10
  VIDEOCONFERENCE EXPERT TESTIMONY OF MATTHEW BARRETO, PH.D.
11
                Monday, November 25, 2024
12                11:30 a.m. - 3:16 p.m.

13              Esquire Deposition Solutions
                   Zoom Videoconference
14
         ---------------------------------------------
15

16

17

18

19

20   Stenographically Reported by:
     Nancy H. Swartz, Court Reporter
21   Notary Public, State of Florida at Large
     Appearing Remotely from Hillsborough County, Florida
22   Esquire Deposition Solutions - Tampa Office
     Phone - 813.221.2535, 800.838.2814
23   Esquire Job No. 11986647

24

25



MATTHEW BARRETO, PH.D.                                    November 25, 2024
HODGES V. PASSIDOMO                                                      2

```
 1   APPEARANCES:

 2

 3   Attorney for Plaintiffs
     (Appeared via Zoom)
 4   DAVID CHEN, ESQUIRE
     DEBORAH ARCHER, ESQUIRE
 5   ABE EVANS, LAW STUDENT
     New York University School of Law
 6   Washington Square Legal Services
     245 Sullivan Street, Fifth Floor
 7   New York, New York  10012
     Phone:  212.998.6430
 8   Email:  Davidchen@nyu.edu

 9

10   Attorney for Defendant, Kathleen Passidomo in her
     Official Capacity as President of the Florida Senate
11   (Appeared via Zoom)
     TARA PRICE, ESQUIRE
12   GEORGE MEROS, ESQUIRE
     KASSANDRA REARDON, ESQUIRE
13   Shutts & Bowen, LLP
     215 South Monroe Street, Suite 804
14   Tallahassee, Florida  32301
     Phone:  850.241.1717
15   Email: Tprice@shutts.com

16

17

18

19   ALSO PRESENT:  OLIVER THOMAS, FLORIDA SENATE

20

21

22

23

24

25
```



MATTHEW BARRETO, PH.D.                                    November 25, 2024
HODGES V. PASSIDOMO                                                      3

```
 1                          I N D E X

 2    WITNESS                     EXAMINATION              PAGE NO.

 3    Called by the Defendants:

 4    Expert Witness Matthew Barreto, Ph.D.

 5                         Direct by Ms. Price              4

 6                         Certificate of Oath            116

 7                         Certificate of Reporter        117

 8                         Errata Page                    118

 9

10                          E X H I B I T S

11

12    Exhibit Number      Description                     Page

13    Exhibit 1           Expert Report                    17

14    Exhibit 2           Rebuttal Report                  87

15    Exhibit 3           Voss Expert Report               90

16

17

18

19

20

21

22

23

24

25
```



```
 1        The EXPERT TESTIMONY of MATTHEW BARRETO, PH.D., was taken

 2   pursuant to Notice by counsel for the Defendants on Monday,

 3   November 25, 2024, commencing at 11:30 a.m. via Zoom.  Said

 4   deposition was reported by NANCY H. SWARTZ, Court Reporter and

 5   Notary Public, State of Florida at Large.

 6                    - - - - - - - - - -

 7   WHEREUPON:

 8             THE REPORTER:  Please raise your right hand.

 9             Do you swear or affirm the testimony you are about

10        to give will be the truth, the whole truth and nothing but

11        the truth?

12             THE WITNESS:  I do.

13                  MATTHEW BARRETO, PH.D.,

14   a witness, having been duly sworn to tell the truth, the whole

15   truth and nothing but the truth, was examined and testified as

16   follows:

17                  DIRECT EXAMINATION

18   BY MS. PRICE:

19        Q.   Good morning, Doctor.  How are you doing this

20   morning?

21        A.   Good.

22        Q.   My name is Tara Price.  As I said before, I'll be

23   taking your deposition.

24             Would you mind stating your full legal name for the

25   record.
```



1     A.    My name is Matthew Alejandro Barreto Guy.

2     Q.    And would you mind identifying where you're located

3  right now, just city, state?

4     A.    Yeah, I'm in Los Angeles County, California.

5     Q.    Thank you.  Dr. Barreto, I've reviewed your expert

6  report, so I understand you've likely had your deposition

7  taken several times before; is that correct?

8     A.    That is correct.

9     Q.    So you're familiar with the general ground rules?

10     A.    I would say so, probably.

11     Q.    I'll mention them, but I'll go through it briefly to

12  spare you the detail.

13     A.    Okay.

14     Q.    So you understand your testimony here today is under

15  oath, and you have an obligation to tell the truth, the same

16  as if we were in a courtroom; is that right?

17     A.    Yes.

18     Q.    And when you respond to my questions, as you just

19  did, you'll need to make sure you say yes or no instead of

20  shaking your head or nodding, essentially since we're on Zoom.

21  You understand?

22     A.    Yes, I do.

23     Q.    Thank you.  And if for any reason you don't

24  understand my questions, and I know I'm a little hoarse today,

25  please feel free to let me know so I can either explain it or



1  rephrase it or say it again if I'm not being clear.

2      A.    Okay.

3      Q.    And is it fair, do you agree if you answer my

4  question, then I'm going to assume you understood it.  Is that

5  a fair assumption?

6      A.    Probably.  If I don't understand something I will

7  probably let you know.

8      Q.    Well, will you agree to let me know?

9      A.    I will try my best, yes, I usually do.

10     Q.    Thank you.  I appreciate that.

11           And today is, you know, there's no test today.  If

12  you don't know the answer to something I'm asking you, just

13  please let me know.  That's fine and we can move on to the

14  next subject.  Do you understand?

15     A.    Yes.

16     Q.    Great.  And if at any point you need a break, please

17  let me know.  I just ask if we're in the middle of a question,

18  you finish the answer to that question and then we can go

19  ahead and take a break.

20     A.    Sounds good.

21     Q.    Great.  Is there any reason today why you might be

22  unable to testify completely and truthfully?

23     A.    No.

24     Q.    Okay.  So you're not feeling sick or ill or under

25  any medication that might affect your participation in the



 1  deposition?

 2      A.    No.

 3      Q.    Thank you very much.  I appreciate that.

 4            And since we're doing the deposition via Zoom, I

 5  have to ask, is there anybody else in the room with you?

 6      A.    There is not.

 7      Q.    Do you have any materials or notes in front of you?

 8      A.    I have two screens on my computer.  One of them,

 9  when I turn my head this way, has the expert report in PDF and

10  that's it.  The other screen I'm looking at now has the Zoom

11  with the camera.

12      Q.    And your expert report that is up on the screen to

13  your right, does it have any writing or notes or comments on

14  it?

15      A.    Just the text that I typed into it and saved as a

16  PDF and submitted to counsel.

17      Q.    Okay.  So it would be identical to the version that

18  we should be looking at today?

19      A.    I believe so, yes.

20      Q.    Okay.  You'll let me know if it's not?

21      A.    Yes.

22      Q.    Is there any highlighting or any kind of marks on

23  it?

24      A.    Nope.

25      Q.    Okay.  Thank you.



1          And is there anybody that's communicating with you

2    right now via your computer or your cell phone?

3       A.    You.

4       Q.    Anyone else?

5       A.    Just you.

6       Q.    Okay.  Thank you.

7          Dr. Barreto, so who hired you to participate in this

8    lawsuit?

9       A.    I believe it was the ACLU of Florida.

10      Q.    Do you remember when you were first contacted?

11      A.    Not off the top of my head.

12      Q.    Do you remember the month?

13      A.    I do not.

14      Q.    Do you remember the year?

15      A.    I would have to guess it was this year, 2024.

16      Q.    You're not sure.  It could have been 2023?

17      A.    I also worked on a matter in the state of Florida in

18   2022 and 2023 for a different group of plaintiffs.  So I don't

19   exactly recall when, but I believe it was 2024 that I heard

20   from the ACLU of Florida.

21      Q.    Okay.  Were you aware of this lawsuit before you

22   were contacted?

23      A.    I don't believe so.

24      Q.    And you mentioned there was some other litigation

25   that you worked on in 2022 and 2023.  Was that through ACLU



 1  Florida or on behalf of another entity?

 2      A.    I think that was on behalf of Common Cause.

 3      Q.    There were two lawsuits on behalf of Common Cause?

 4      A.    I think there was one that got started and then it

 5  was dropped or dismissed.  And then a second one that moved

 6  forward.

 7      Q.    Okay.  And those are the other two lawsuits you were

 8  referring to?

 9      A.    I think so, yeah.

10      Q.    And other than that, it's just that and then this

11  current lawsuit that we're talking about today?

12      A.    In Florida, is that your question?

13      Q.    In Florida.  Yes.

14      A.    I think so, yes.  I don't recall other Florida

15  voting rights matters, no.

16      Q.    Okay.

17      A.    Not since the --

18      Q.    I'm sorry.  Can you say that one more time?

19      A.    Not since the redistricting.

20      Q.    Okay.

21      A.    I might have worked on something the last decade,

22  but not this decade.

23      Q.    Understood.

24            And just as an overview, getting back to this

25  lawsuit, can you explain what you were asked to do in this



1  litigation?

2      A.    I think to evaluate some maps that the plaintiffs

3  drew and to determine whether or not the benchmark map, which

4  was passed in the new redistricting cycle this decade,

5  diminished African-American voting strength generally.  I know

6  I have a paragraph in my report that's more specific.

7      Q.    Understand.

8          You mentioned a benchmark map.  Can you describe

9  what you mean by "benchmark"?

10     A.    The map that was passed -- well, I guess there's --

11 depending on the year that we're in, usually we refer to the

12 benchmark as the most recent, an active map.  In this case I

13 know I also refer to the 2016 benchmark, which would have been

14 the previous district.  And then of course a new district was

15 passed in 2022, I believe.  And so that would be the current

16 benchmark.

17     Q.    Will you understand if when -- well, tell me if this

18 works for you.  If we're talking about the benchmark, we mean

19 the map that was in place prior to 2022 or I guess up through

20 the spring of 2022.  And if we want to refer to the map that

21 was enacted in 2022, we can use the "enacted map," does that

22 work?

23     A.    That makes sense to me.

24     Q.    Great.  Thank you.

25          And then you mentioned some map from the plaintiffs.



MATTHEW BARRETO, PH.D.                                    November 25, 2024
HODGES V. PASSIDOMO                                                      11

```
 1  Can you talk to me about what those maps are?
 2       A.   I believe there was three different maps.  I believe
 3  they were lettered A, B, C.  And they were drawn by another
 4  expert working with the plaintiffs in the Tampa Bay region.
 5       Q.   Is that Dr. McCartan, Dr. Corey McCartan?
 6       A.   I think that might be his name, or her name.  I
 7  don't know if it's a male or a female.
 8       Q.   You don't know Dr. McCartan?
 9       A.   I do not.
10       Q.   Have you ever spoken with Dr. McCartan?
11       A.   Not to my knowledge.
12       Q.   Have you ever emailed with Dr. McCartan?
13       A.   I don't think so.
14       Q.   Did you create or draw any maps as a part of this
15  litigation?
16       A.   I did not.
17       Q.   And what about any maps that might not have made it
18  into your expert report?
19       A.   I did not draw any maps as a part of this
20  litigation.
21       Q.   Did you draw any maps for the 2020 redistricting
22  cycle that are not a part of this litigation?
23       A.   My co-author, Dr. Kassra Oskooii, was the co-author
24  on my other report we were talking about.
25       Q.   Okay.
```



1    A.    He drew a map in the Jacksonville area.

2    Q.    Okay.

3    A.    And that was included in the report, I believe, that

4  we submitted.

5    Q.    Okay.  Anything in the Tampa Bay area?

6    A.    I don't recall if he drew any Tampa Bay maps.  I

7  believe the previous litigation was mostly focused on a map in

8  the Jacksonville area.  Although, I know there were data

9  analyses of at least four regions of the state.  But I believe

10  the map, my recollection is the map was in the Jacksonville

11  area that he drew.

12    Q.    Okay.  But you don't recall drawing or creating any

13  maps as a part of the 2020 redistricting cycle?  I mean,

14  there's none in your report and none that you drew that are

15  not in your report?

16    A.    That's my recollection, that's correct.

17    Q.    What about Dr. McCartan, did you review any maps

18  that Dr. McCartan created that are not in Dr. McCartan's

19  expert report?

20    A.    I only reviewed the maps that are lettered A, B, and

21  C.

22    Q.    Okay.

23    A.    Which I used for my analyses.

24    Q.    And besides the enacted map, did you review any of

25  the senate staff drawn maps that the Florida Senate considered



1  during the redistricting process?

2      A.    That was a large part of my original report.  When I

3  say "original," I mean the other litigation.

4      Q.    Okay.

5      A.    I had to, for the other litigation, review almost

6  every single document related to redistricting.  Which

7  included:  testimony, maps, memos, veto declarations.  But

8  that was, I'd say about two years ago.

9      Q.    For your work in this litigation did you review the

10  materials?

11      A.    I did not rereview the materials I had already

12  reviewed when I wrote this report, no.

13      Q.    Did you review any of the maps that were submitted

14  to the Florida Senate from the public during the redistricting

15  process?

16      A.    I believe for the previous litigation I did.  As I

17  said, it was a very intensive effort to determine why the maps

18  were drawn and why certain maps were picked and certain

19  boundaries were drawn.

20      Q.    Okay.

21      A.    And so as part of that previous litigation, I

22  reviewed almost all documents related to the redistricting

23  that took place for the State House, the State Senate and the

24  U.S. Congress.

25      Q.    Did you review those for this litigation?



1      A.   I did not reread any of those for this litigation,

2  no.  As I said, that would have been well over a year ago.

3      Q.   Are you familiar with the public submission the

4  State Senate received known as P00S0042 or Plan 42?

5      A.   Possibly.  I don't have the numbers memorized off

6  the top of my head.

7      Q.   Okay.  That was a public submission that was created

8  and submitted by Nicholas Warren.  Do you remember whether you

9  might have reviewed that or not?

10     A.   If it was part of the 2022 redistricting cycle when

11  I took on the previous case, there's a good chance I reviewed

12  it.  I don't have the case numbers or plan numbers memorized.

13  But as a part of that previous litigation I was asked to

14  review a lot of maps.

15     Q.   Okay.  And that was only as a part of the previous

16  litigation, not the current litigation?

17     A.   For the current litigation I just reviewed the maps

18  lettered A, B, and C in the Tampa Bay region for State Senate

19  and did a functional analysis of those.  As well as enacted --

20     Q.   Understood.

21          Were you given any financial constraints with regard

22  to your analysis in this case?

23     A.   I don't think so.

24     Q.   What about any time constraints?

25     A.   The only time constraints of the real world that at



 1    some point the court orders reports due and depositions and

 2    things like that.

 3        Q.    Okay.  Do you recall offhand or do you know about

 4    how much time you spent between the time you were hired and

 5    the time that you submitted your expert report?

 6        A.    I don't recall.

 7        Q.    Would it be days?

 8        A.    I don't recall.  I work on a lot of projects and

 9    2024 was a busy year.

10        Q.    Let's talk about today's deposition.  Can you tell

11    me what you did to prepare for today's deposition?

12        A.    Yeah.

13        Q.    Would you mind telling me?

14        A.    Oh, okay.  I had a conversation with Mr. Chen.  It's

15    the first time he and I have worked on a deposition together,

16    so he gave me sort of his ground rules and just some

17    deposition, general deposition advice.  I reviewed my expert

18    report and my rebuttal and select portions of Dr. Voss's

19    report that applied to me.  And that was about it.

20        Q.    Can you tell me when you spoke with Mr. Chen?

21        A.    I think it was Friday.  This past Friday, about

22    three or four days ago.

23        Q.    And for about how long?

24        A.    Probably about 40 minutes.

25        Q.    And is that the only time that you've spoken with



1  Mr. Chen?

2      A.   He was probably on some other calls with the entire

3  team, but I believe that was the only time he and I spoke

4  one-on-one.

5      Q.   Okay.  Is that the only person you spoke to for

6  preparation of this deposition?

7      A.   Yes.

8      Q.   And for documents, you said your expert report, your

9  rebuttal report, Dr. Voss's report, I'm probably missing

10 something.

11     A.   I think that's about it.

12     Q.   Did you review the complaint?

13     A.   I did not.

14     Q.   Okay.  What about any documents that might have been

15 exchanged in discovery?

16     A.   Not since Friday.

17     Q.   How recently did you review documents that might

18 have been exchanged in discovery?

19     A.   Whenever it would have been relevant to my report, I

20 would guess, or to my rebuttal.

21     Q.   Okay.  So it would have been prior to those dates --

22 nothing since those dates?

23     A.   Nothing since I've turned in my report or rebuttal.

24     Q.   Okay.  What about did you review either the Florida

25 or the Federal Constitution in preparation for today?



1    A.    I did not.

2    Q.    What about any case law?

3    A.    Nope.

4    Q.    And nothing else comes to mind?

5    A.    Nothing else.

6    Q.    I am going to go ahead and pull up your expert

7    report.  I'm going to show you this document entitled -- I'm

8    going to share the screen -- "Report of Matthew Barreto, PhD."

9          Do you see that, Doctor?

10   A.    I do.

11   Q.    And we can just very slowly scroll through to about

12   page 17, and I know that was kind of fast.  Do you see your

13   signature there on page 17, Doctor?

14   A.    I do.

15   Q.    Again, I know this was a quick scroll through, but

16   does this appear to be a true and correct copy of the expert

17   report that you authored in this case?

18   A.    It appears to be, yes, through what I can see

19   through Zoom.

20   Q.    And there's several appendices you'll see, with the

21   page count.  We don't need to go through all of those.

22         MS. PRICE:  But let's go ahead and mark this as

23         Exhibit Number 1.

24             (EXHIBIT NUMBER 1 WAS MARKED FOR IDENTIFICATION.)

25



1    BY MS. PRICE:

2        Q.   Dr. Barreto, we talked about Exhibit 1 and your

3    preparation, but as part of your work, can we talk about what

4    documents you reviewed as part of preparation for the expert

5    report?

6        A.   It would have been whatever I listed in this expert

7    report.  I believe I wrote this back in July, so I don't

8    recall sitting here what documents I reviewed, but I know that

9    I would have put footnotes or referenced them in this report.

10       Q.   So every single document you would have reviewed,

11   would be listed in here?

12       A.   My understanding is whatever I relied on, like if I

13   reviewed something that was irrelevant, I probably wouldn't

14   have said that, but I don't have such list, so my answer is

15   yes.  Whatever is important in my report that I relied on, I

16   would have referenced in here for sure.

17       Q.   Okay.  And I imagine you would have gotten

18   Dr. Marcartan's plan, Plans A, B, and C from the plaintiffs'

19   attorney since you've never spoken or emailed with

20   Dr. McCartan, correct?

21       A.   I believe that's correct.

22       Q.   Okay.

23       A.   Whenever they sent me some map files.

24       Q.   Okay.  Are there any other documents that

25   plaintiffs' attorney sent you to review as a part of your



 1  work?

 2      A.   They probably sent me the complaint.  Nothing

 3  specific that I recall though.

 4      Q.   Okay.  And if we go to page 2 of your report,

 5  paragraph 5, it says, I think the last sentence says you were

 6  assisted in this matter by a research assistant, Michael Rios;

 7  do you see that?

 8      A.   I do.

 9      Q.   Is this big enough for you, Doctor?

10      A.   Yeah, it's about right.

11      Q.   All right.  Can you tell us who Mr. Rios is?

12      A.   He is a data scientist at the UCLA Voting Rights

13  Project.

14      Q.   How long have you known him?

15      A.   Probably six or -- yeah, I'd say six years.

16      Q.   Okay.  And what did he do with you for this

17  litigation?

18      A.   He served as my research assistant.

19      Q.   And so what does that mean?

20      A.   He may have organized some of the data files, may

21  have merged some files together, insured that the files were

22  ready for analysis, perhaps made some of the tables or charts

23  that are in the appendix, those sorts of tasks.

24      Q.   Okay.  Did he draft any sections of the expert

25  report?



1       A.    Not the narrative, no.

2       Q.    Were there any -- you said some parts of the

3   appendices.  Would he possibly have created any of the maps or

4   anything within your expert report?

5       A.    I think there's some visual image maps that I recall

6   working on with him in Esri and then perhaps some of the data

7   tables that are in the appendix, yes.

8       Q.    And I'm sorry.  Did you say you worked with somebody

9   else as well?

10      A.    Esri, that's the name of the software.

11      Q.    The software.  Okay.  Thank you.

12      A.    I definitely worked with the software.  It sounds

13  like a person's name but, yeah, it's just the initials

14  E-S-R-I.

15      Q.    I understand.  Thank you.

16            Did you double-check all his work or review all his

17  work for accuracy?

18      A.    Yes.  Always.

19      Q.    And if we move to paragraph 6, right below that it

20  says here:  Your work is ongoing and you reserve the right to

21  modify or supplement conclusions as additional information is

22  made available or as I perform additional further analysis; do

23  you see that?

24      A.    I do.

25      Q.    And I think we just talked about this but I want to



1   be clear.  Have you had additional information made available
2   to you since you submitted this report on July 2, 2024?
3        A.   Yes.
4        Q.   And what is that?
5        A.   The Dr. Voss report.
6        Q.   Anything else?
7        A.   I don't think anything else.  I know I issued a
8   response or a rebuttal to the Dr. Voss report after July.
9        Q.   Okay.  Is there any, as of today, have you performed
10  any further analysis?
11       A.   I have not.
12       Q.   Is your work still ongoing?
13       A.   My general sense is that my work is always ongoing.
14  Sometimes even the court asks experts on both sides to weigh
15  in on some things, so I don't have any current open files on
16  this case, but, you know, if yourself or the other attorneys
17  or the court asks the experts to do something, certainly we
18  should do that.
19       Q.   Okay.  So as of right now do you plan to perform any
20  further analysis?
21       A.   I have no current plans, no.
22       Q.   Do you plan to modify or supplement any of the
23  conclusions or opinions in your report?
24       A.   Only if asked.  I don't have any pending assignments
25  in my mind.



1    Q.   Okay.  You're not aware of any pending assignments

2    that have been asked of you or that might be asked of you in

3    the future?

4    A.   I'm not aware of anything in the future, that's for

5    sure.  I don't think any of us are, but right now I have

6    nothing pending.

7    Q.   If you were, I would ask you for the winning lotto

8    numbers.

9    A.   Exactly.

10   Q.   So no expectations of future work at this moment as

11   we sit here today?

12   A.   Not today.

13   Q.   Great.  And then as we get to paragraph 7 at the

14   bottom, you start talking about the scope of your work.  Can

15   you explain a little bit what you mean by assessing whether

16   alternative configurations of Senate District 16 diminish flag

17   voters as compared to the benchmark District 19?

18   A.   Sure.  There I believe I'm referring to the enacted

19   map or the plaintiffs' three maps.

20   Q.   Enacted map, is that where we're talking about

21   Senate District 16?  I'm just trying to understand from a

22   broad perspective, this paragraph in your own words, what this

23   means.

24   A.   My understanding is that there are probably five

25   versions of the Senate district:  the benchmark from 2016, the



1  enacted map that went into place where I believe it changed

2  its number, and then three lettered versions from the

3  plaintiffs.  Those would be the sub or alternative

4  configurations I think that I'm referring to.

5      Q.   And then it says here that you were to assess

6  whether the alternative configurations were diminished.  Can

7  you tell me, for purpose of the analysis you performed, what

8  does "diminishment" mean?

9      A.   Well, my understanding is that there is a legal

10  standard established by either the Constitution or amendments

11  or different laws in Florida.  So I'll leave that to the

12  lawyers to decide what diminishment means.

13         Here I was just looking at whether or not voting

14  opportunities could be, for African-Americans in particular,

15  for representation, could be maintained or if they were

16  decreased or diminished under different configurations.

17      Q.   Okay.  So for your purposes, diminishment meant a

18  decrease?  If it wasn't equal, it was a diminishment?

19      A.   If their opportunity to elect their candidate and

20  have influence in that district so, you know, it depends on

21  the context.  If you go from a 52 percent performing district

22  to a 48 percent performing district, those four points would

23  seem fairly substantial, because you fall under 50 now.

24         If you go from a 62 percent performing district to a

25  58 percent performing district, those four points might not



1    seem so substantial, because the district might still perform.

2              That's my general understanding of diminishment.  As

3    I also said, that it's also a legal concept and that's for the

4    lawyers to determine.  Or the courts, not even the lawyers.

5    So I was just providing data tables that would help instruct

6    that decision of whether or not there was this decrease or

7    diminishment in the opportunity or representation.

8        Q.   Okay.  I understand.  And I'm not asking for a legal

9    opinion, I'm just trying to figure out what you meant by that

10   word.  Because you do use the word "diminishment" as opposed

11   to "decrease," so I'm just trying to understand how it

12   triggers diminishment for you, whether something is not a

13   diminishment?

14       A.   Well, I think from one account diminishment can just

15   mean lessening opportunity.  And there is, as I've tried to

16   maintain, there's separately a legal standard of whether or

17   not a voting rights violation has taken place, because

18   opportunities for representation have been diminished or

19   decreased.

20             So here I was just comparing, as I said, tables of

21   the five districts, of the five versions of the maps, to

22   assess whether or not there had been any sort of diminishment

23   or decrease in African-American voting strength.

24             As I said, in some cases one percent could be

25   consequential.  My understanding is that in this case, the



1  plaintiffs' maps are all quite similar and within that one

2  percent boundary of the 2016 benchmark map.

3      Q.   And so you analyzed Plan A, B, and Plan C for

4  diminishment against the benchmark District's 19; is that

5  correct?

6      A.   And I believe the enacted plan as well.

7      Q.   Where -- can you point to me where in your expert

8  report you analyzed the enacted plan for diminishment?

9      A.   I believe it's in some of the map images in the

10 discussion of the movement of VTDs in pointing out the

11 decrease in the black population.

12     Q.   Do you want to scroll through the images or do you

13 want to take a look at your PDF?  I just want to make sure I

14 understand where that is.

15     A.   Well, I know for sure in Figure 3, which is on

16 page 14.

17     Q.   And you're saying Figure 3 shows diminishment?

18     A.   It shows the -- these figures that show both the

19 enacted and the benchmark at the same time.  So many of these

20 figures show both the enacted and the benchmark at the same

21 time, or they show where the enacted map moved the boundary

22 specifically.

23          I demonstrate that as well as in paragraph, I think

24 39.  Yeah, on the bottom of page 15.  I go through and compare

25 each of the precinct VTDs in the enacted versus the benchmark



1  to demonstrate that the enacted map picked lower black

2  population VTDs to include.

3      Q.   Did you analyze either District 16 or 18 as a whole

4  for diminishment against District 19?

5      A.   I analyzed the enacted -- so, yes, to answer your

6  question, yes, in the maps and the analysis in paragraph 39

7  and the subsequent paragraphs, those refer to those.  And I

8  believe I refer specifically to 16 and 18.  In the tables,

9  which start on page 19, I use the benchmark from 2016 to

10 compare to the three illustratives.

11     Q.   Can you point to me where you have any opinions or

12 comments in the narrative about diminishment of enacted 16 or

13 18?

14     A.   Well, all these sections, starting with the map, I

15 guess that starts on paragraph 30 on page 11 and continues all

16 the way down through paragraph 43 on page 17.  I'm talking

17 about the movement of black voter populations out of districts

18 and into districts to leave the resulting districts less

19 conducive to black representation.

20          So this section here is talking about how when you

21 look at 16 and 18 as compared to where the old benchmark lines

22 used to be, these lines appeared to follow racial boundaries

23 with the purpose of decreasing the black population on one

24 side of a district, I believe that was 18, and packing it into

25 another side of a district.



MATTHEW BARRETO, PH.D.                                    November 25, 2024
HODGES V. PASSIDOMO                                                        27

1      Q.   Doctor, in -- let's go to paragraph 26, maybe this

2   will help.

3           Paragraph 26 you specifically talk about Plans A, B,

4   and C, about how there's no diminishment whatsoever.  I'm

5   trying to understand where in this report, if at all, if at

6   all, if you were asked to opine on diminishment in enacted 16

7   or 18 and where I can find that statement?

8      A.   So I think I already answered that, but I'm happy to

9   say the same exact words again out loud.  Which is if you

10  start on page 11, paragraph 30, and you continue through

11  paragraph 43 on page 17, here I have an analysis of the

12  enacted maps.  And how they followed racial boundaries in VDTs

13  and have the purpose of decreasing the black voting population

14  or packing the black voting population into an adjacent

15  district.

16     Q.   Can you point me to a paragraph that uses the word

17  "diminishment" in District 16 or District 18?

18     A.   Your question is, is the word "diminishment"

19  specifically in paragraph 33 or 43, is that what --

20     Q.   Anywhere -- my question is:  Can you point me to a

21  paragraph in your expert report where you're talking about

22  diminishment, using that word, with regard to enacted District

23  16 or enacted District 18?

24     A.   I'm going to go ahead and read my whole report, so

25  give me a few minutes here.  I'll be back to you soon.



1    Q.   Okay.  Do you want to take a quick --

2    A.   No, I'm going to stay on.  You asked me a question

3  about my report, so I'm not going off the record.

4    Q.   Whatever is convenient for you, Doctor.

5    A.   Okay.  You want a list of paragraphs or what do you

6  want?

7    Q.   Sure.  Let's go one at a time.

8    A.   Paragraph 32, page 12; paragraph 33 --

9    Q.   Hold on.  Paragraph 32.  Where's the reference to

10  which district you're saying is diminished or not diminished

11  or . . .

12    A.   Last sentence "What's more, SD18 has moved lines so

13  as to exclude black populations and increase its white map."

14    Q.   So that means you -- it's your opinion that Senate

15  District 18 is diminished as compared to benchmark 19?

16    A.   That's correct.

17    Q.   Next?

18    A.   Paragraph 33, page 13.

19    Q.   What part of that paragraph?

20    A.   The entire part of it.  It's comparing 16 and 18 and

21  how the black population was moved into 16 and excluded from

22  18.

23    Q.   Okay.  And so that constitutes diminishment for

24  purposes of your analyses?

25    A.   Paragraph 35, page 13.



1      Q.   Sorry.  Was that -- I didn't hear you, Doctor.  Was

2   that a yes?  In 33, that constitutes diminishment?

3      A.   I didn't know you asked a question.  You made a

4   statement.  I'm sorry.

5      Q.   I'm asking a question.  Does that constitute

6   diminishment for purposes of your analysis?

7      A.   I believe it demonstrates that the black population

8   was decreased in District 18.

9      Q.   Does that constitute diminishment?

10      A.   Well, that's a legal standard in my opinion.  And

11   what I'm attempting to do is use data to document where the

12   black population was decreased and by what amount.  And I'll

13   leave it to the judge and the court to decide the legal

14   standards.

15      Q.   I understand that, Dr. Barreto, but with regard to

16   Plans A, B, and C, you very specifically used the word

17   "diminishment" and you said you were asked to provide analysis

18   and opinions about whether those plans diminished.  I'm trying

19   to figure out if you're planning to provide an expert opinion

20   about whether District 18 or 16 diminished.  That's all I'm

21   trying to do.  I'm not asking you for a legal opinion.

22      A.   I believe District 18 has diminished the black

23   opportunity and increased non-black populations there.  I

24   believe that is the point of page 11 through 17 of my report,

25   is to demonstrate how the specific boundaries followed the



 1   black population so as to further increase the black

 2   population in 16 and remove it from 18.

 3       Q.   And so is it accurate then to say that your opinion

 4   is that 18 is diminished, not 16, since you're saying it was

 5   moved into 16?  I'm just trying to understand which of these

 6   districts you believe are diminished.

 7       A.   The entire analysis here demonstrates that 18 has

 8   seen a decreased black population.

 9       Q.   I understand that.  I'm specifically using the word

10   "diminishment" in the same context that you used it for Plans

11   A, B, and C.  Are you planning to offer an opinion in this

12   case that District 18 diminishes against the benchmark 19?

13       A.   I don't know that I'm planning to offer any specific

14   legal analysis of diminishment.  I'm only planning to testify

15   to all of the maps and tables that I have in here to

16   demonstrate how race was used in this section to follow the

17   black population and specifically put the black population in

18   one district where previous lines had had it higher perhaps in

19   another district.

20           And you asked me where there is any evidence of

21   diminishment or decrease, so I'm attempting to find that.

22   Those all happen to be pointing to District 18.

23       Q.   Sure.  Let's go back to paragraph 26.  I want to

24   make sure we're not speaking past each other.

25           In paragraph 26 you state:  There's no diminishment



1   whatsoever for illustrative A, B, or C.

2          Is that an opinion you plan on offering in this

3   litigation?

4      A.    Whatever I wrote there, yes.

5      Q.    Do you plan on offering an opinion as to whether

6   there's diminishment in District 18 in the enacted map?

7      A.    I only plan to offer the opinions related to my

8   analysis in this report in Sections 31, wherever we started,

9   through 43.  So if there is some sort of specific, you know,

10  legal analysis of what is constituting diminishment, I'm going

11  to completely leave that up to the legal scholars and judge.

12  I'm only planning to offer opinions as outlined in this

13  report.  As you asked me earlier, I've not done any new

14  analysis.  And so I'm happy to stick to all the paragraphs

15  here.

16     Q.    Can you explain what you mean by that, you're happy

17  to stick to the paragraphs here?

18     A.    In this report and in my rebuttal.  Those are my

19  opinions.

20     Q.    So does that mean if you're using the word

21  "diminishment" with A, B, and C, you may offer an opinion on

22  that, but if you're not using the word "diminishment" with 18

23  or 16, you're not going to offer that opinion?

24     A.    I'm not going to offer any legal interpretations of

25  the diminishment clause in the law.  That's not my role here.



1    My role is just to collect data, aggregate it, put it in

2    tables and maps, and tell you what I see in the data.

3       Q.    Doctor, I'm not asking --

4       A.    That's all --

5       Q.    -- you for a legal opinion --

6       A.    A legal opinion is a legal standard. I mean,

7    neither one of us --

8       Q.    Okay.

9       A.    -- misunderstands that. I completely understand the

10   question you're attempting to ask me, and so do you.

11   Diminishment is a Florida legal standard. And so I'm trying

12   to be very clear that I'm not a JD, I'm not a lawyer. My job

13   is not to interpret the Florida clause of diminishment. It's

14   just to provide data that can assist others, including the

15   judge, in drawing that conclusion. I am not attempting to

16   make a legal conclusion about diminishment as it is defined

17   under law. Just to provide data tables.

18      Q.    Does that mean that you are not going to be offering

19   an opinion about whether Plans A, B, and C were diminished --

20      A.    I'm going to --

21      Q.    -- analysis?

22      A.    I'm going to be offering all the opinions in my

23   report. Which is that if the data demonstrates there is no

24   decrease or diminishment from a nonlegal standard, that's what

25   I'm attempting to demonstrate. If the data demonstrates that



1   there was, then that's what my data will demonstrate.

2          My report, as in every report I write, is just a

3   collection of actual, real census data, election results data

4   and then aggregating them to different map boundaries.  And

5   then it is for others to argue whether or not those factual

6   pieces of data constitute some sort of violation of the law.

7   And that's --

8       Q.   Right.

9       A.   -- what I've attempted to do in this case, was to

10  compile as much data as possible and to use these words

11  "diminishment," "increase," "exclude," "decrease," in the

12  social science sense.  I'm not offering these opinions as

13  legal fact or legal matter or whatever you would call it.

14      Q.   If that's the case, why can you use the word

15  "diminishment" with Plans A, B, and C but not with enacted

16  Districts 18 or 19 -- I'm sorry.  18 or 16.

17      A.   We can use it anywhere.  It's just a word choice.

18  If it's not in there, I'm not trying to argue with you that

19  the word is in a paragraph or not.  That's an empirical

20  question.  We can both read the paragraph and decide what

21  English words are in the paragraph.  I'm not arguing with you.

22  I can use whatever words make sense to describe something.  So

23  if it's not in there with respect to those, that's fine with

24  me.  I --

25      Q.   I'm just trying to understand the analysis you did



1    and how you would describe it.  Not putting anything on you.

2              So what I see as you're talking about diminishment

3    with A, B, and C, and I see an analysis of what you've been

4    talking about with regard to District 16 and 18, but I don't

5    see any conclusions or opinions regarding diminishment.  So I

6    just want to make sure that's significant that that word is

7    not present.  If it's not and you're planning to offer an

8    opinion about diminishment on 16 and 18.  I'm just trying to

9    understand that.

10       A.   The only opinions I'm planning to offer on 16 and 18

11   are the ones outlined in these exact paragraphs.  About how

12   race was used to draw 16 and 18 and what the black population

13   was on either side of the boundaries as the boundaries

14   shifted, and whether or not the black population was increased

15   or decreased in 16 or 18.

16             If somebody else comes along and says there's clear

17   evidence that the black population was excluded from District

18   18 according to the Barreto report, which appears to be the

19   case from my eye, based on actual pieces of data, then they

20   can make those interpretations.

21             There's nothing extra.  I'm not trying to hide

22   anything.  I'm not going to sneak anything on you at trial.

23   I'm going to stick to what's in this report, which is what I

24   always do.

25       Q.   I'm just wondering if you did the same type of



 1    analysis for enacted District 16 and 18 that you did with

 2    regard to your diminishment analysis for Plans A, B, and C?

 3        A.    I only did analysis that's reported in this report.

 4        Q.    Okay.  It says here, going back to paragraph 7, and

 5    elsewhere throughout your report, you compared a number of

 6    things, and I'd just kind of like to go through them one by

 7    one.

 8            It looks like you compared the black voting age

 9    population.  Is that correct?

10        A.    I see that in paragraph 7, yes.

11        Q.    Can you tell me about why you made that comparison?

12        A.    I think it says there was three types of demographic

13    data:  black voting age population, black voter registration,

14    black voter turnout.  Those would be the demographic

15    population items that are in there.  And those are all three

16    potential indicators of the electoral strength that a racial

17    or ethnic community might have in a district.

18        Q.    So if you wanted to look at the racial or electoral

19    strength of a community, you would assess those three?

20        A.    Those are among three things that you could assess

21    by themselves --

22        Q.    Okay.

23        A.    -- they don't tell the entire story.  There has to

24    be a functional analysis as well.  Which we refer to in the

25    social science more as a performance analysis, looking at the



1    outcomes of the elections.  And that's, I believe, the fourth

2    item I indicate in that same paragraph, black candidates of

3    preference.

4        Q.   Okay.  Did you analyze each of these four things for

5    enacted District 16?

6        A.   I believe we already looked at those tables in the

7    appendix, and it's the benchmark and the plaintiffs' three

8    illustrative lettered districts.

9        Q.   So not enacted 16.  What about enacted 18?

10       A.   I believe it's just benchmark 19, I believe the

11   benchmark was called 19 --

12       Q.   Yes.

13       A.   -- and then the three illustrative.

14       Q.   Okay.

15       A.   Those make up the tables.

16       Q.   Thank you.

17            Can you -- we've talked a little about this when we

18   were talking about 16 and 18, but can you, just kind of

19   briefly, summarize what you concluded or what your opinion is

20   with regard your comparisons of A, B, and C as compared to

21   benchmark District 19?

22       A.   Yeah, I think I have that in paragraph 9.

23       Q.   Yeah, looks like that's a summary?

24       A.   Yeah, paragraph 9, I state that "I conclude that the

25   three maps offered by plaintiffs performed nearly identically



1   as the benchmark SD19."  And then I go through some more

2   specific data points.

3        Q.   And then it looks like in paragraphs 18 through 26,

4   if you want to scan on your own, you go through more detail on

5   that point?

6        A.   Yes.  Down below on paragraph, starting at

7   paragraph 18 on page 7, I believe I go into more specific

8   detail on the three lettered districts, the illustrative

9   districts A, B, and C, as compared to the benchmark District

10  19.  Many of those tables are included in the appendix.

11       Q.   Understood.  And then if we could go to 26.  That

12  looks like your final conclusion on this point, and you say

13  "If anything, two of the three Illustrative maps (A and B)

14  offer Black voters a slightly better opportunity to elect

15  candidates of their choice."  Do you see that?

16       A.   I do.

17       Q.   Does that mean those plans are better than C in your

18  opinion?

19       A.   No.

20       Q.   Can you tell me what you mean by that statement?

21       A.   That in the data tables they, across the different

22  metrics of population, voter registration, and voter turnout,

23  and black candidates of choice, that two of the maps, A and B,

24  have consistently higher numbers supporting black opportunity

25  by one to two to three points over the SD19 benchmark.  That



1    C, I believe is either tied or, in some cases, one point

2    lower.

3            So that summary sentence there is just indicating

4    that those two maps, A and B, have even higher functional or

5    performance analysis, sort of, measures.  But all three of

6    them, including SD19, in my opinion, are clearly above the bar

7    in terms of measuring black opportunity and opportunity to

8    elect candidates of choice.

9        Q.   Is that -- are you saying that's a positive or a

10   slightly better opportunity?

11       A.   I'm just reporting that they have a slightly better

12   opportunity, meaning the numbers that I just reviewed are

13   higher in A and B.  And in C, the numbers are slightly slower.

14   So if somebody were picking maps, I think these are all

15   illustrative.  None of these are meant for the purposes of

16   creating a district.  So I don't know -- I don't know what the

17   core plan is to do with the three illustrative maps, actually.

18       Q.   So the statement, this is just a summary of data,

19   it's not an opinion?

20       A.   I mean, the entire report is my opinion I believe.

21   But, yes, it is a summary of data.  It's stating that

22   throughout all of the tables, A and B appear to have slightly

23   higher numbers than the benchmark.

24       Q.   Mm-hmm.

25       A.   And that C appears to have either equal or very



1    slightly lower numbers than the benchmark.

2          I believe at some point there was a question as to

3    whether or not it was even possible to draw a district that

4    could match the benchmark.  That was my recollection, was that

5    someone stated that perhaps it wasn't possible.  And so here

6    I'm just demonstrating that not only is it possible, but you

7    could actually even exceed the benchmark, you could have

8    "slightly better opportunity."

9     Q.   Do you know if any of the districts in the enacted

10   map have sightly better opportunity?

11    A.   I believe they do not.  I believe they have slightly

12   worse opportunity or significantly worse opportunity.  In this

13   region.

14    Q.   Understood.

15          I am going to move on to your analysis about

16   cohesion next, so I'm wondering if it's okay if we take a

17   5-minute comfort break?

18    A.   Yup.  I can keep going or take a break.  Whatever

19   works for you is fine with me.

20          (RECESS TAKEN.)

21                    CONTINUING EXAMINATION

22   BY MS. PRICE:

23    Q.   Thank you, Dr. Barreto, I appreciate it.

24          Before we took that break we were talking about a

25   number of paragraphs, including number 7.  And towards the end



1  you talk about how you reviewed voting patterns by race and

2  ethnicity to look for whether certain groups were cohesive.

3       Do you see that?  Oh.  Let's share screen.  My

4  apologies.

5  A.   I think it was paragraph 27, is that where we were?

6  Q.   We can go there if you want to get into the more

7  detailed portion.  That's fine.

8  A.   I want to go wherever your questions are, so.

9  Q.   I think the bottom is just one sentence of the

10  summary.  So 27 is actually probably a better place to be.

11  Thank you.

12       Can you tell me a little about what cohesion is and

13  why you looked at this?

14  A.   Here I'm referring to cohesion as similarities in

15  candidate choice by racial or ethnic voters.  In this report,

16  looking at black and white voters and whether or not they vote

17  for the same, which would be cohesive, or different

18  candidates.

19  Q.   Okay.  And can you tell me for this litigation what

20  racial or ethnic group you analyzed?

21  A.   I believe most of the focus was on black and white

22  voters.  I believe we also had data on Hispanic voters using

23  census data.  And in the charts and graphs in this original

24  report, I broke voters out by white, Hispanic and black.

25  Q.   And by original report, do you mean the expert



 1  report you did in Common Cause Florida versus Byrd?

 2      A.   I believe I'm referring to this report that we're

 3  talking about, and I was contrasting that to my rebuttal.  I'm

 4  sorry.  The July 2nd report.

 5      Q.   I see.  So you're saying you did an additional

 6  cohesive analysis in the rebuttal report?

 7      A.   That is a true statement.  I did do an additional

 8  analysis in the rebuttal report.  Well, I responded to

 9  Dr. Voss.

10      Q.   Understood.  For this litigation I'm looking at

11  paragraphs 27 through 29.  And if I need to look somewhere

12  else, please let me know.

13          I see where you're talking about black cohesion and

14  I see where you're talking about black voters and white

15  voters.  When you reference Hispanic, is that the additional

16  cohesive analysis for the rebuttal?

17      A.   No, I know that's in this report.  If you scroll

18  down to page 27, Figure 5 contains data on candidate choice by

19  race.  I believe in the rebuttal I confine the analysis to

20  just black versus not black voters.

21      Q.   Are you planning to offer an opinion with regard to

22  Plans A, B, or C and cohesion of Hispanics?

23      A.   These analyses here are in reference to the region

24  of both -- where these districts are, in the Tampa region I

25  believe there's two counties there, mostly.  These analyses



1    are not necessarily confined to the district boundaries of any

2    one particular district, but more how voters in the region

3    voted in these three primary elections.

4        Q.    Is this analysis that you did for the other Common

5    Cause federal case?

6        A.    This analysis you're looking at right now is an

7    analysis that was part of the July 2nd report.

8        Q.    I understand it's in the report.  I'm trying to

9    understand when you did this analysis.

10       A.    In the months or weeks leading up to the submission

11   of the July 2nd report.

12       Q.    Okay.

13       A.    I did separate analyses for the Common Cause

14   redistricting statewide case.

15       Q.    Okay.

16       A.    And those are actually included.  I attached my

17   entire appendix in the original report.

18       Q.    I saw that.  I'm just trying to -- let's stick with

19   this.  So for the analysis you did for cohesion in this

20   litigation, you analyzed the region but not a specific

21   district or potential district or plan you're offering?

22       A.    With respect to racially polarized voting patterns I

23   analyzed the region, whether it was a one-county region or

24   two-county region as a whole.

25             With respect to the functional analysis, the



 1  performance analysis of reaggregated election results, that's

 2  where I honed in just specifically on either the 2016

 3  benchmark or the illustrative maps A, B, and C.  But the

 4  rationally polarized voting analysis is meant to tell us how

 5  voters in the region are voting.

 6      Q.   So, yeah, just sticking with racially polarized, we

 7  can leave the earlier topics.  What did you consider the

 8  region that you analyzed?

 9      A.   Well, there's Hillsborough and Pinellas County,

10  there's two counties.  I don't have the maps memorized.  I

11  believe one of the two counties, perhaps Hillsborough,

12  contains more of the region that might be in dispute.  But

13  that, generally, the Tampa Bay region as a whole is understood

14  to be those two counties.  And so I believe I described those

15  two counties, Hillsborough and Pinellas, in this report.

16          In my rebuttal I believe there are some sections

17  where I just analyzed one of the counties and then both of

18  them together.

19      Q.   Thank you.  That's helpful.

20          So when you refer to the region or refer to your

21  analysis, it would have been one of those two counties, but

22  are you saying not any other counties?

23      A.   I'm almost certain that I only pulled data for this

24  report, this July 2nd report and my rebuttal, which was in

25  October, for Hillsborough and Pinellas County.  I don't



1    believe I went outside of those two counties for this racially

2    polarized voting analysis.  In --

3        Q.    Okay.

4        A.    -- Common Cause versus Byrd, the other one --

5        Q.    Mm-hmm.

6        A.    -- I analyzed almost the entire state, but not for

7    this report.

8        Q.    And for this report why did you do it on a

9    countywide basis as opposed to looking at racially polarized

10   voting within specific districts?

11       A.    Well, I think this is the accepted standard in the

12   social sciences, which is to understand the region.  Because

13   the district boundaries can shift by one census block or one

14   census tract.  And, indeed, when districting is done, those

15   boundaries are somewhat artificial and can move, and do move,

16   during the districting process as different versions of a map

17   are being drawn.

18            So from our perspective, as political scientists,

19   what we're interested in is how are voters in this region,

20   where the maps could be drawn, how are the voters in this

21   region voting.  Are they cohesive?  Are they on opposite sides

22   of each other?  Are they in coalition?  And so for this

23   purpose, I focused on those two counties.

24       Q.    Okay.  So -- I understand.

25            If there were nuances or changes, they might be



1  outside of those counties, but for purposes of what you needed

2  to do, you looked at that -- the entirety of that region?

3      A.   Correct.  And in some cases just on Hillsborough

4  County, which I believe contained more of the focal point of

5  the districts in question.

6      Q.   What would make you decide to look at just one

7  county versus the entire region?

8      A.   If more of the -- if most of the district of the

9  voters that are being questioned as to whether or not they're

10  in coalition with each other, meaning cohesive, or if they're

11  block voting against each other, if where the real population

12  of interest is, is only in one county, then it might make

13  sense to hone in on that county.

14         If the population perhaps in a more suburban or

15  rural area stretches across six counties and that makes up a

16  region or community, then we would want to expand and include

17  all of those, perhaps, areas.

18         In this case almost all of the boundaries are

19  existing in Pinellas and Hillsborough County and so those are

20  the county regions that contain the voters that I'm the most

21  interested in understanding.

22      Q.   That's helpful.  Thank you.

23         And what were your -- well, before we get there, you

24  mentioned the Common Cause analysis that you did, where you

25  analyzed the whole state.  Can you tell me why you attached



1    that and made that part of your report in this case?

2         A.   Yeah, one of the regions -- I don't know if I did

3    every single county in the state, I would say across the state

4    in the first report.  One of the regions that I did do

5    analysis in in the Common Cause versus Byrd report was the

6    Tampa Bay region.  And so in one section here of my report, in

7    this report, July 2nd report, I reference the established

8    findings of racially polarized voting in the state of Florida.

9    And because I had just analyzed a variety of elections in the

10   Tampa Bay region, I included that as an exhibit or attachment,

11   appendix, whatever the court would call it here, because it

12   was just further evidence that had already been introduced in

13   a public litigation and relied upon as more evidence that,

14   yes, in fact, there is racially polarized voting in this

15   region.  So it was just for the purpose of referencing

16   additional evidence.

17        Q.   Okay.  So a supplementation as opposed to something

18   you're relying on for this case?

19        A.   I mean, I would say I'm relying on it, because it's

20   my own original analysis in this region of interest.  And I'm

21   familiar with it.  I would agree that it's from a previous

22   case and that it does supplement the analysis I did do for

23   this case.

24        Q.   And if we move to paragraph 28 on page 11, it looks

25   like you talk about a stipulation that was entered into in



1    state court in another case.  Do you see that?

2        A.    I do.

3        Q.    Can you tell me why you're referencing that as a

4    part of this expert report?

5        A.    As I said, my approach here was an attempt to

6    demonstrate that this is a widely accepted phenomenon that

7    African-American voters in Florida generally, and in the Tampa

8    region specifically, are cohesive and vote for like candidates

9    and that they are opposed by white voters in this region or in

10   the state generally.  And so there have been a number of court

11   cases that have been decided over the past two decades that

12   have demonstrated this.

13          And I recalled, because the state court -- the state

14   case was moving, I believe, just before the federal case.  I

15   was involved in the federal case.  And as a part of the state

16   case, I had recalled that the attorneys for the State of

17   Florida had agreed with the plaintiffs that there was in fact

18   racially polarized voting throughout the state of Florida and

19   that black voters were cohesive.

20          So I was just referencing, almost in a way to say,

21   and I believe your own expert agrees with the conclusion, that

22   this is not really a controversial or debated topic, that

23   black voters are cohesive.  In fact, even the attorneys for

24   the State of Florida have previously stipulated to these facts

25   in front of a state court.



1    So that is why I referenced my previous report, and

2    other items, is just to try to demonstrate that while there

3    might be some parts of this litigation where there's a lot of

4    debate and disagreement, this one is generally, at least for

5    the last 20 years, has been one in which courts and lawyers

6    and experts on all sides have generally agreed that black

7    voters are cohesive and that white voters block vote against

8    their interests.

9    Q.   And in paragraph 29 you talk about an analysis of

10   three primary elections.

11        Can you tell me, and I understand you supplemented

12   this in your rebuttal, and we'll get there, but can you tell

13   me a little bit about why you chose these elections and what

14   the purposes of this is and what you were setting out to do?

15   A.   Yeah, these were primary elections in previous

16   statewide election cycles, so '18 and '14 were both years,

17   mid-term congressional years in which Florida's constitutional

18   offices are up.  And there were identifiable black candidates

19   of choice running in primary elections.  And so I analyzed

20   those.  I think there was only three.  Determined whether or

21   not there was continued evidence of cohesion in the Tampa

22   region.

23   Q.   Did you choose those because they were statewide

24   races or -- I'm trying to understand why you picked those

25   particular elections as opposed to local races or something



1    else.

2        A.   Sure.  Usually when we're going across the counties

3    or across districts, local races for mayor, city council,

4    school board, or even a congressional district may not

5    encompass an entire region.  And so, therefore, statewide

6    elections are often seen as a nice stand-in, because it's the

7    same ballot for voters in all counties and all cities across

8    the state.

9        Q.   We've just been through 27 through 29 and there's a

10   part in paragraph 7 that's all of your expert opinions with

11   regard to cohesion, are they all contained here in your expert

12   report?

13       A.   And then also in my rebuttal as we referenced a

14   couple times.

15       Q.   Of course.

16           Except for your rebuttal, are there any opinions

17   relating to cohesion that you're planning to offer that are

18   not in your expert report?

19       A.    I don't know what the direct will look like and

20   whether or not they'll ask me about my appendix that I

21   attached, which was my original report.  They might.  And if

22   it is, I'll give them the same answer, which I already gave

23   you here, which is that I see that as just additional evidence

24   documenting very consistent patterns of cohesion among black,

25   I believe I also analyzed Hispanic voters in that previous



1    report, in block voting by white voters.

2        Q.   And in that report did you do -- I know you said the

3    region.  Did you also do it on a statewide basis or do you

4    really need to focus on region or how does that work?

5        A.   In the previous report I believe we looked at it by

6    region.  I'm sure you know, you are from Florida or have

7    studied it, that there's a dramatic difference in Hispanic

8    voters in Miami-Dade County than Orange, Osceola,

9    Hillsborough, Pinellas, and other parts.  And so typically I

10   look at regional analyses, especially because the questions

11   are usually about districts in a region.  And so, I believe in

12   that previous report, I looked at racially polarized voting in

13   the North Florida area, the Tallahassee to Jacksonville area,

14   in the Tampa/St. Pete area, in the Orange/Osceola area, and

15   then in South Florida maybe as well.

16       Q.   So for expectation purposes in this litigation, if

17   you're talking about your prior report, are you going to offer

18   expert opinions only about the Tampa Bay region or are you

19   going to also offer opinions about cohesion among

20   African-Americans in other areas of Florida?

21       A.   My expectation is that most of the testimony will be

22   about Tampa.  I don't know.  If they ask me a question about

23   another part of the state and the judge allows me to answer

24   it, I will certainly answer it.  I imagine you might try to

25   object to that.  I don't know what will happen.  We'll see.



1  But my expectation is we're mostly talking about Tampa.

2      Q.   Is there any instance in which you would go outside

3  of either the expert report in this litigation or the expert

4  report you offered in Common Cause for your rebuttal report?

5      A.   Go outside in what way?

6      Q.   To offer an opinion on cohesion that's not contained

7  within one of the three reports?

8      A.   I mean, I will plan to answer whatever questions are

9  asked of me by either my plaintiffs' counsel or your team

10 during the cross.  And so my experience, having done this more

11 than a few times, is that sometimes people will ask me

12 questions, well, what do you think about the 2022 election?

13 And if the judge lets me answer it, I'll answer the question

14 as someone who studies elections quite closely.

15         I don't have any immediate plans, no, as I told you

16 from the start.  I'm planning to keep my testimony to the

17 reports I've submitted in the case.  But having been on the

18 stand numerous times, I can't predict what questions I'll be

19 asked.  And my job is to do my best to answer those based on

20 my expertise.

21     Q.   But that would be a question on the stand.  You're

22 not planning on doing an analysis as part of this litigation

23 that's separate from the current reports?

24     A.   That is correct.

25     Q.   And then going to -- I know you talk about this.



1   Just starting on page 11 and then also paragraph 8.  We can

2   start with paragraph 30.  That's fine.

3          It looks like you were -- no, I lied.  I'm sorry.

4   Let's go back to 8.  It looks like you were asked to assess

5   whether and the extent to which race explains the shapes and

6   borders of enacted Districts 16 and 18; is that correct?

7       A.   Yes, as I wrote there in paragraph 8.

8       Q.   Can you explain a little bit about that and what

9   that means?

10      A.   Well, as I get down to, I think you were going to

11  paragraph 30, I include some maps and some VTD precinct

12  analysis of VTDs right along the district border boundaries.

13         And here in this section, generally, I'm attempting

14  to assess whether or not the district boundaries appear to

15  follow racial boundaries.

16      Q.   You used the acronym "VTDs," can you explain what

17  that is, please?

18      A.   A voting district as defined by the census.

19      Q.   Is that the same as a precinct?  Or kind of walk me

20  through the different areas and boundaries and what that

21  specifically means.

22      A.   They are quite similar to precincts.  Some states,

23  they're 100 percent identical.  It's a designation, a

24  geographic designation that the census has used, called VTD.

25  Precincts are additional boundaries that might encompass



1    slightly different neighborhoods or streets by which voters
2    are grouped and by which the ballots are prepared.  So that if
3    you live in District 18, as you can see on this map, or
4    District 16, you need to make sure you get the right ballot
5    and you're in the right precinct in terms of your ballot
6    assignment and polling place location.
7        Q.   Why is a VTD the measurement of choice?
8        A.   Depends on the question.  And then depending on what
9    question you're trying to answer, you might use different
10   types of data.
11       Q.   For the analysis you did here, why did you choose
12   VTDs?
13       A.   In these maps, you mean?
14       Q.   Mm-hmm.
15       A.   In this case, VTDs are often observable to map
16   drawers.  And they are easy geographic components to
17   understand and to see.  And as a result, they're quite often
18   used in districting.  Even when other levels of geography,
19   such as census blocks are also available, VTDs are one that
20   are quite common.  And so as a result, it was the level of
21   analysis that I used here.
22       Q.   Okay.  If you want to go back up to 10.  I know this
23   is just the summary.  It looks like -- this is your conclusion
24   for that summary and you say you found a clear pattern
25   regarding boundary edges and cores.  Do you see that?



1        A.    I see that.

2        Q.    Can you tell me what you mean by "clear pattern"?

3        A.    That the boundary lines are following closely racial

4   and ethnic population demographics of geographic units, and

5   that it's not explained by chance alone, that a line might

6   have been drawn somewhere.  But that there is a clear

7   association between race and ethnicity of a geographic unit

8   and where the line was placed.

9        Q.    Can you -- and if we need to go to a certain page on

10  the report, that's fine.  But can you kind of walk me through

11  how you did this boundary analysis?

12       A.    Yeah.  I think that starts on paragraph 30.  There

13  it is just on the bottom of the page.

14            So it starts with a series of maps in which the

15  geographic units in this map contain the percent black among

16  the voting age population.  And they're shaded either pink or

17  red if there's a larger black population, and they're shaded

18  green if there's a larger non-black population.

19            And in these maps I have overlaid the enacted

20  boundaries of Districts 16 and 18 so that someone can visually

21  see where the boundaries are, and they can visually see, on

22  different levels of Zoom, how close the boundaries follow the

23  black or the non-black population.

24            And then as you scroll through, some of the maps

25  also contain the enacted -- excuse me -- the benchmark



1  boundary.  I believe the next figure, Figure 3, is an example

2  that it has -- the former black line there is the old boundary

3  and the red line is the new boundary.

4         And this is one example, I believe there are

5  numerous additional maps in the appendix, demonstrating that

6  this red line, which is the enacted boundary, deviates from

7  the old benchmark by following very closely to black

8  populations and excluding white populations.

9         So that's generally what I did, is I went across and

10  looked where there were changes in the boundaries and whether

11  or not those changes are correlated with race and ethnicity.

12     Q.   And which boundary edges did you find more closely

13  related with race and ethnicity?

14     A.   I think starting in Figure 2 just above.  Zooming in

15  on a portion of St. Petersburg there demonstrates, I believe I

16  write in the text, on the western portion of the boundary,

17  that it follows closely along larger black population centers

18  and excludes places that have white populations.  I believe

19  Figure 3 we already looked at.

20         Figure 4 on page 15, this attempts to look in on the

21  portion of the district near the City of Tampa.  And, again,

22  shows that the red line follows closely to population centers

23  that are larger in the black population.

24         And as I said, I replicated these maps, I believe

25  they're in the appendix down below on page, let's see where



 1  those are -- starting on page 36.  I replicated all these for

 2  different population --

 3      Q.   Mm-hmm.

 4      A.   -- center -- population characteristics, such as

 5  registered voters, registered Democrats, by demonstrating

 6  where those lines fall vis-à-vis the populations.

 7      Q.   This is page 36?

 8      A.   The appendix maps, I believe start on page 36.

 9      Q.   Okay.  So we just talked about a boundary between 18

10  and 16.  And we talked about boundary between 14 and 16 with

11  regard to Tampa; is that correct?

12      A.   I think that's right, yes.

13      Q.   Starting with District 18, are there any other

14  boundaries besides the one that we talked about that would

15  have that clear pattern regarding boundary edges?

16      A.   I'm just looking at my appendix to see if I included

17  additional maps.  I think the main focus is on the

18  St. Petersburg region.  There's probably also some exclusion

19  of black populations in Clearwater on the northern reach of

20  18.

21      Q.   Are you -- when you say "probably," does that mean

22  you're going to offer an expert opinion?

23      A.   I think if you scroll down to Figure 13, which is a

24  couple pages down.

25      Q.   Mm-hmm.



1    A.   I can show you what I'm talking about.  Yeah, so

2    this one here -- no, that's 14, go up one, 13.

3         So I'll plan to answer questions and offer opinions

4    on anything that's included in my report.  So just as I was

5    looking at this, you asked me a question of if there were any

6    other boundaries.  And this Figure 13, I think demonstrates

7    that there's a cut there in the, sort of, Clearwater region

8    where a high-density black Democratic geographic area there

9    shaded in pink, appears to have been just below the line and

10   not included.

11        So that might be, you know, something of interest to

12   the court.  But I believe most of my analysis, at least the

13   text, is focused on the St. Petersburg region.

14    Q.   Okay.  Yeah, that's what I'm trying to understand.

15   I hear what you're saying might be of interest.  I'm trying to

16   figure out what you're going to offer an opinion on as to

17   whether that's a clear pattern of a boundary edge or if you're

18   going to limit yourself to the narrative that's in your

19   report, which is the boundary between 18 and 16.  With regard

20   to 18.

21    A.   Yeah, I'm going to be prepared to offer, you know,

22   thoughts on all of the charts, maps, and figures in my report.

23   So that's why I'm highlighting this for you right now, is that

24   this appears to show an additional portion of District 18

25   where a higher-density black population was drawn on the



 1  outside edge of District 18.

 2      Q.   Okay.  What else with regard to District 18 would

 3  qualify as a clear pattern?

 4      A.   I would say those seem to be the main regions.

 5      Q.   And then if we turn to 16, we talked about the

 6  boundary between 18 and 16, correct?

 7      A.   Yes.

 8      Q.   And we talked about a boundary between 14 and

 9  Tampa -- do you mean towards the bottom?  Can you be a little

10  descriptive with what you're talking about?

11      A.   I'd say most of the western border of 16 and the

12  boundary between 14 and 16.

13      Q.   That fits a clear pattern to you?

14      A.   Yes.

15      Q.   Okay.  What about the northern part of District 16?

16      A.   Need to zoom out a bit more.  Let me see if I have

17  one where it's zoomed out.  I believe the northern -- the

18  northern portion also hones in more on areas that have

19  higher-density black populations.

20      Q.   By honing in on higher-density areas of black

21  population, do you mean that also qualifies as a clear pattern

22  regarding the boundary edges?

23      A.   I think everything in here is what I used to draw my

24  conclusion.  There's not a specific data point that turns my

25  entire analysis but, rather, looking at the maps, looking at



1  the adjacency graph in the appendix, it all points in a

2  similar direction for me, and that's where I draw my

3  conclusion that there's a clear pattern.

4       Q.   In your report in the narrative you talk about the

5  boundary between 16 and 18.  And I don't see a discussion

6  about other boundary edges.  And so that's what I'm trying to

7  understand.  What boundary edges -- the specific language is,

8  make sure I've got this right -- you say they follow a clear

9  pattern and there are numerous examples where the district

10  followed racial populations.

11          So I'm just trying to figure out what those numerous

12  examples are and whether you consider the northern border or

13  whether it's your opinion that the northern border of 16 is

14  one of those numerous examples?

15  A.   Can I get you to scroll up a little bit to

16  Figure 12?  You can see there that when we look at percent

17  black among registered, there is a large non-black population

18  just on the other side of that red line on the northern edge.

19  And as you go further north, it gets more heavily non-black.

20  So I think that would be a reasonable interpretation that

21  there's a line there that is attempting to consider race.

22          And in the adjacency analysis that I have, I think

23  starting on paragraph 38 -- 39, excuse me -- I go through and

24  try to look at the different black voting age populations on

25  either side of the district boundaries.



1      Q.   In Figure 12 which you just pointed to, that's

2    percent black among registered.  And Figure 13 is percent

3    black among Democrats.  Are you looking at both or one or the

4    other to do your boundary analysis?

5      A.   All of them.  As I stated, there's three different

6    population considerations that have been informative, I would

7    say in other analyses in Florida over the years.  That's:  the

8    voting age population, the registered population, and then the

9    voting population, and then sometimes if primary elections are

10   in question, honing down to the percent within the Democratic

11   or Republican party.

12         So all of those things to me are important pieces of

13   data that help us understand why a mapmaker might have been

14   drawing a line in a particular place.

15     Q.   Okay.  So you then would consider the northern -- I

16   think you said this, I just want to clarify.  You would

17   consider the northern boundary of 16 as one of those examples?

18     A.   I think anywhere that there's a boundary that the

19   map visually demonstrates distinct racial populations on

20   either side of the boundary, and then the boundary itself

21   seems to be a demarcator, that that is additional evidence

22   that race was relied on as the primary factor.

23     Q.   Is that true for the boundary north of 16 for you?

24     A.   In this instance, in Figure 12, appears to be

25   telling us that there are less black registered voters on the



1  northern excluded part of the boundary than in the southern

2  included part of the boundary.

3          So as I said, as you go through, you can apply these

4  different types of population and voting data to help

5  understand whether or not there is a pattern.

6          And as I look at these maps and then compare the

7  actual demographics of the VTDs on the inside or the outside,

8  they all point in the same direction, that there is, in fact,

9  a pattern by which the red boundaries are following more

10  closely to the racial demographics.

11     Q.   What about the eastern boundary of 16?

12     A.   In Tampa or which part?

13     Q.   We can start at the top if you want to look at

14  the -- let's go back to -- I don't know if you want to use 12

15  or 13.  12 only shows the top.  But do any parts -- if you

16  want to scroll to 13, do any parts of the eastern portion of

17  16 provide you with an example that race shaped the boundary

18  edge?

19     A.   I would say generally, if the edges of 16, you know,

20  appear to follow closer to black populations if you, in

21  particular, go to that sort of southeastern part, you can see

22  the red boundary follows much closer between the sort of light

23  shaded areas and the dark green shaded areas.  The dark green

24  shaded areas are on the excluded side of 16.  Those would be

25  areas that have substantially less African-Americans.



MATTHEW BARRETO, PH.D.                          November 25, 2024
HODGES V. PASSIDOMO                                            62

1          And, you know, so those are the sorts of things that

2    are part of the analysis, looking at places where the boundary

3    appears to be following very closely to racial demographics.

4    And when you piece together the entire district, as I said, I

5    don't think any analysis turns singly on one census block or

6    one VTD.  But taken holistically and then taken with the

7    adjacency analysis on what is the actual population of the

8    inside and outside of the boundary, they sort of help point us

9    to an understanding of whether or not race was a factor.

10       Q.   You talked a little about the southeastern portion,

11   I guess the line that's kind of on a diagonal.  What about the

12   line that goes pretty much almost up and down along almost the

13   whole way of 16, is there any part of that that provides an

14   example to you that race was used in the boundary edges?

15       A.   I would say that part is not quite as clear.  I

16   would have to go in and look at the exact -- visually it's not

17   quite as clear.  I would have to go and look at the exact

18   demographics on either side of the boundary, which is what I

19   did do in the adjacency analysis.  There I looked at the black

20   population on the inside and the outside.

21          So in some cases, even if a geographic unit is

22   shaded a similar color, such as that north, south, eastern

23   boundary, what the adjacency analysis found was that where the

24   line was put, the black population was always smaller on the

25   excluded side.  Not always.  I should say predominantly



1    smaller on the excluded side.

2           So even sometimes when the map visually appears to

3    cut through a section that is, in this case, say 35 percent

4    black, what the adjacency analysis found was that the excluded

5    portion was perhaps 20 percent black and the included portion

6    was 41 percent black.

7           And so even in areas that were somewhat similar,

8    more often than not, the lower black population was excluded

9    and the higher black population was included.

10       Q.   Did you do the adjacency analysis on every boundary

11   for 16?

12       A.   I don't recall off the top of my head, but I know I

13   have listed a table of all the VTDs.  I'm just scrolling

14   through my own report so I can reference that.  It's Table 6

15   starting on page 32.

16          And I believe I looked at the edges of 16 in both

17   Pinellas and Hillsborough and listed them by number, 6A and

18   6B.

19       Q.   At the edge of where 16, I guess, Pinellas and

20   Hillsborough are adjacent on 16?

21       A.   I don't understand your question.

22       Q.   I'm trying to understand where you did this

23   analysis.  Like, for what boundaries of 16 this separate

24   analysis was run on?

25       A.   My recollection, we could map all these precinct



1  numbers, VTD numbers, these are precincts, these have them

2  listed.  So I'm not trying to avoid your question or hide

3  anything.  Like, these are all the precincts that I analyzed

4  in 16 and 18.  My recollection is that it is all the boundary

5  edges in Pinellas and Hillsborough.

6      Q.   Okay.  So your recollection is that it's the whole

7  thing for 16?

8      A.   That's my recollection.  But as I said, I have them

9  listed here exactly.  And I have them broken out by county,

10 so --

11     Q.   Okay.

12     A.   -- we could see.

13     Q.   Is the same true for 18 or is that just an analysis

14 done from 16?

15     A.   In some places it's implied for 18, but the analysis

16 is meant to look at the 16 boundary.  In some places the

17 boundary division is 16, 18.  And in other places, as we just

18 discussed, it might be 16 and 14.

19          But my recollection is that these are the precincts

20 on the inside versus the immediate outside adjacent edge of

21 16.  And I was attempting to determine what was the black

22 population of the included and excluded precincts along the

23 entire boundary, and determine if it was higher or lower on

24 the excluded or included.

25     Q.   That's helpful.  Thank you.



1          You also stated, if we could go back to

2    paragraph 10.  I know we just talked about the racial

3    populations.

4          A.   Paragraph 10?

5          Q.   Paragraph 10, mm-hmm.

6          You say "Rather than respecting community or natural

7    boundaries."  Do you see that?

8          A.   I see that.

9          Q.   Can you tell me what you meant by "community

10   boundary"?

11         A.   It has a different meaning in, you know, different

12   circumstances.  Here I'm thinking in the more general, you

13   know, districting sense of communities and that can encompass,

14   you know, just a city, or just a part of a city if it's a huge

15   city.  It can also encompass sort of a region if there are

16   similarities.  But usually referring to communities as

17   communities of interest where there's similarities.

18         Q.   What communities of interest did you analyze in this

19   litigation with regard to this boundary edge analysis?

20         A.   I didn't analyze any specific proper name

21   communities.  If you, you know, have specific communities by a

22   proper name, that's not what I was looking at.  I was looking

23   at whether or not these district boundaries were more likely

24   to just follow racial boundaries.

25         Q.   What community boundaries, I guess, rather than



1   respecting community -- it also says natural, we'll get to

2   that.  But rather than respecting community boundaries.  So

3   I'm just wondering what community boundaries you looked at

4   that were ignored?

5       A.   I would say what I already said, which is that

6   communities could represent:  cities, parts of cities, regions

7   of cities.  In some cases the suburbs or portions just outside

8   of a city limit might have a lot in common with those adjacent

9   areas.  And in which case, sometimes the cities are kept

10  together or the region is kept together.

11      Q.   And you're talking in the abstract.  And I'm

12  specifically talking about the analysis that you did in this

13  litigation.  Are there any community boundaries that you

14  looked at as a part of your analysis that you're going to

15  offer an expert opinion on?

16      A.   Just the ones I've described.

17      Q.   And specifically which ones are those?

18      A.   Cities, regions within cities.

19      Q.   Okay.  Let's start with the cities.  What city

20  community boundaries were not respected?

21      A.   Where there are areas that the lines deviate from

22  the exact city limits.  Whether it's in St. Petersburg or

23  Tampa specifically.  Those are the two largest cities in this

24  area.

25      Q.   So you're saying the fact that the district doesn't



1  encompass the city as a whole?

2       A.   And then in some cases it might have used to

3  encompass the city as a whole, but things were changed.  That

4  is sometimes an example of community and community boundaries.

5            In some cases, as I said, there's communities within

6  cities.

7       Q.   I hear you.  And I understand some cases and

8  possible -- and lots of different applications.  But if I'm

9  the judge and I ask you what communities were not respected

10  for purposes of this litigation, do you have an expert opinion

11  on that?

12      A.   Lots of parts of St. Petersburg were cut out of 16

13  that had been included in the previous district.  Parts of

14  Tampa as well which had been included were also cut out or

15  excluded based on the new boundaries.  Or cut in half in some

16  places.

17      Q.   And is that something that you are planning to offer

18  an expert opinion on?

19      A.   I'm just planning to offer the opinion exactly as it

20  has in here.  I don't have, as I said, proper name communities

21  of interest outlined in this report.  I'm speaking more

22  generally that the boundaries do not appear to be explainable

23  by specific city limits or community of interest boundaries or

24  areas.  Instead they appear to be more reasonably explained by

25  the racial demographics of the precincts or the VDTs or the



1   census blocks that the mapmaker chose.

2       Q.   And thank you for sharing that with regard to

3   cities.  You mentioned communities of interest.

4            What communities of interest did your analysis show

5   were not respected?

6       A.   I don't have proper names of specific communities.

7   I'd leave that to sort of folks local on the ground to discuss

8   and offer opinions on.  Here what I've done is just attempted

9   to follow the lines and demonstrate that the lines do not

10  appear to be drawn by any specific communities of interest.

11  Instead, they appear to hue very closely to the racial

12  demographics.

13      Q.   I'm not trying to get you to have an opinion on

14  something that you don't, right, or you're not planning on

15  offering.  I'm just trying to understand what your opinion is

16  going to be.  And so if the judge asks you what communities of

17  interest were not respected, are you going to say, I don't

18  know, I'm going to leave that to other folks?  Or are you

19  going to say, these are the communities of interest that were

20  not respected?

21      A.   I'll say exactly what I just said under oath.

22  You've got my testimony.  I'm not going to change it.  I

23  guarantee you that.

24      Q.   Can you answer my question as to which -- whether

25  you're going to identify communities of interest that were not



1  respected with a drawing of boundaries?

2      A.   Well, I don't know which iteration this is, fourth

3  maybe.  I'll attempt to use the same words, because I don't

4  like to contradict myself when I'm under oath.

5          There are city boundaries, there are regions within

6  the cities.  Primarily the two largest cities in this region

7  are St. Petersburg and Tampa.  There are places where either

8  the whole city was not included or was excluded or the city

9  boundaries themselves were not followed, which they could have

10 been.  And, instead, it appears that the boundaries followed

11 much more closely to the racial demographics on either side of

12 the line in both the St. Petersburg city region and in the

13 Tampa city region.

14         As I said, I do not have proper names of subregions

15 within the cities.  I know that every city in America has

16 regions within the city that are often referred to as a

17 community.  As I stated, I did not attempt to create a

18 delineated list of subregions within these cities, but rather

19 to focus on, from my perspective, what do the lines appear to

20 follow.  And that is they appear to follow the racial

21 demographics of the black population.

22     Q.   I think we're clear on cities.  I think we're clear

23 on your conclusion.  I understand you don't know any specific

24 names of communities of interest.  You mentioned subregions.

25 Are there any subregions that you don't know the names of that



1   you can identify today that you would say as an example that

2   wasn't respected?

3       A.   I did not do this analysis for this report, no.

4       Q.   Thank you.

5            You also said the same for natural boundaries, that

6   natural boundaries were not respected.  Can you tell me what

7   you mean by natural boundaries?

8       A.   I think just places where, across the bay, lines

9   could have been drawn slightly differently.  If there was a

10  decision that, you know, this boundary needed to more closely

11  follow one particular area or another.  Certainly this

12  District 16, you know, stretches across the water, is not

13  physically contiguous and so, you know, portions of, you know,

14  the peninsula, South Tampa, I think that's what I'm referring

15  to in terms of the natural boundaries.  Is that there does not

16  appear to be an obvious natural boundary reason why these

17  lines were drawn in such a way.

18      Q.   And you mentioned the bay.  Is that the only natural

19  boundary that you have an opinion on that wasn't respected or

20  are there other natural boundaries for 16 that were not

21  respected?

22      A.   I think that's the most, you know, obvious.  The

23  most obvious natural boundary is certainly the bay.  And the

24  decision, not just in the bay, but the different -- and I may

25  not get the wording right as a non-geographer or geologist or



1   whatever the word would be, but the various peninsulas and

2   islands and other sort of natural boundaries within the

3   region.  You know, there's also oftentimes consideration of,

4   you know, other rivers and marshes and that sort of land in

5   Florida.

6          But I think primarily looking at whether or not the

7   sort of different fingers and islands and peninsulas and

8   different portions that might constitute, you know, a natural

9   boundary are included or excluded.

10  Q.   That's what I'm asking about, is not hypothetically

11  but specific for this litigation, if you did an analysis on

12  natural boundaries for anything for District 16 besides the

13  bay?

14  A.   Well, I would say, you know, all of the -- all of

15  the area that touches the bay, certainly.  But as I said,

16  there's, you know, I know -- without being -- I hope no one

17  tries to qualify me as a geographic expert on the Tampa Bay

18  region, that's not what I'm suggesting.  But I know there's

19  also, from having looked at the region, you know, various

20  rivers and wetlands and things that run off, which sometimes

21  we as map drawers consider to be natural boundaries.

22  Oftentimes if there's a big river that separates different

23  communities or because there's a bridge or there happens to

24  not be a bridge there, those are the examples of natural

25  boundaries that, you know, may have been considered or, in



1   this case, not considered for purposes.

2           Similar to the communities of interest, I'm not

3   outlining, this is a sentence in one of my conclusions, I'm

4   not outlining a delineated list of all the natural boundaries

5   in the region.  I meant this more to say that it does not

6   appear that the explanation can be natural boundaries or

7   communities, such that the main peninsula of Tampa was drawn

8   into 14 instead of 16.  And that, you know, East Tampa was

9   drawn into 16 and other portions of the city were drawn into

10  14.  Then it goes south and then it jumps across the bay.  So

11  I've seen other maps, including the Bay Area in San Francisco,

12  where lines much more closely approximate the natural

13  boundaries.  And I'm going to offer the opinion that that does

14  not appear to be the case here.

15  Q.   I heard you mention 14, so I guess as we're talking

16  about 18 and 16, you see the same issues with 14 and 16?

17  A.   Well, just in terms of if somebody said, why is

18  there a line, you know, in the middle of Tampa and excludes

19  the main peninsula and even parts of the islands, there are

20  natural boundary regions why oftentimes mapmakers try to keep

21  certain parts of a district together or whole, whether it's

22  ports or shipping channels or all sorts of bridges.  And we

23  already discussed the western portion of Tampa, which goes

24  between 16 and 14.

25  Q.   Mm-hmm.



1    A.   So if I'm asked questions, that's clearly part of my

2    Figure 1 on page 12, I would be happy to talk about it.

3    Q.   And I'm going to use "the bay" just to refer to

4    anything that touches the big blue bunch of water.  I'm not

5    trying to get you on a channel or an inlet or peninsula or

6    anything like that.

7    A.   Okay.

8    Q.   If you look at -- we're on -- go to 12, Figure 1.

9    If you look at Figure 1 on page 12, I'm just trying to figure

10   out, like, any of the red line for 16 that touches green, no

11   blue, just green, did you look at any natural boundaries for

12   those lines?

13   A.   I think if you go into Figure 2, you can see sort of

14   more of a Zoom there on that southern portion of 16.  You

15   know, I think there are portions there on the western boundary

16   there of St. Petersburg where the city of St. Petersburg

17   extends beyond that red line in many instances.  There's also

18   these --

19   Q.   Oh yeah.  I'm sorry.  I'm talking about the

20   Hillsborough side of 16 for this question.  For the

21   Hillsborough side of 16, anything on the east in Figure 1.

22   Not counting anything touching the blue.  I'm not trying to

23   get you.  I'm just wondering, like, the boundary between 14

24   and 16 or the boundary between 16 and whatever is in the top

25   right corner or the boundary between 16 and 20, did you look



1  at natural boundaries for those?

2      A.   I'd say maybe Figure 4 is the zoom in on Tampa, that

3  might be a relevant one to look at.

4      Q.   Okay.  Great.  So just for the green parts, not

5  talking about anything with the water.

6      A.   Yeah, so there's, you know, just on the south part

7  of Tampa where the main peninsula comes down, you know,

8  there's questions as to why the red line sort of cuts there in

9  the southern part and then dissects one of the islands or -- I

10 don't know if that's an island or if it's actually physically

11 connected right there, I can't tell, and excludes the main

12 peninsula, which is still within Tampa Bay city limits.

13          And so those are the sort of discussions that, you

14 know, we would have about natural boundaries of whether or

15 not, you know, the line is following, purposefully following

16 natural boundaries, and that can be an explanation that

17 mapmakers give, that, oh, we had to draw the line there

18 because there's an inlet or there's a shipping channel or

19 there's something else that keeps those communities together.

20          And in this case, I think you can see the red line

21 kind of, in my opinion and based on my data, it appears to

22 more closely follow racial demographics and is not drawn in

23 such a way that follows a natural boundary.

24          There appears to be a river there, just sort of in

25 the center part of the screen on the left, and the map could



1  have followed part of that, you can see the map does follow

2  the river, and then it juts in, it turns east instead of

3  continuing to follow that river.  And so I think that's --

4  that's like a pretty specific example of whether or not the

5  map is trying to follow a natural boundary such as a river or

6  a waterway or something else.

7        Q.   Yeah.  And I appreciate you saying that.  I'm just

8  wondering if looking at this map today, if you did as a part

9  of your analysis or if you can identify any other natural

10 boundaries that you would have looked at on land?

11       A.   I think that's what I was just talking about.  I

12 mean, this little squiggly black line is a river or

13 waterway --

14       Q.   Okay.  What else?

15       A.   -- part of it follows that.

16            Well, I think the southern part, the decision not to

17 follow and include the sort of main peninsula of Tampa city.

18 There's a decision after you kind of come really closely

19 around this area that's got a 35 and 55 percent black

20 population, that little part that kind of sticks out, it

21 follows it in very, very closely, then cuts up, cuts across,

22 it dissects either an island or a wetland there.  You know,

23 the question would be, why wasn't that included.

24       Q.   Do you know if there's natural boundaries there?

25       A.   What's that?



1      Q.   Do you know today if there's natural boundaries

2   there?

3      A.   I don't know looking at it from here.  I'm just

4   saying that there is an opportunity to follow some natural

5   boundaries, but instead the map -- the line, red line appears

6   to follow more closely to the racial and ethnic boundaries.

7      Q.   On this map.  I hear you.  But it doesn't sound like

8   you took a geographic map with all the rivers or tributaries

9   or any of these other things and then overlaid this on top of

10   it.

11      A.   Well, that's exactly what you're looking at.  I

12   mean, you can see rivers and tributaries and inlets.  It just

13   depends on the level of zoom you want to put onto these.

14      Q.   But do we know if it's not shown here whether it

15   exists or not?

16      A.   Whether what exists?

17      Q.   A natural boundary?

18      A.   I don't understand your question right now.  Natural

19   boundaries either exist or they don't.

20      Q.   Are you telling me that for Figure 4, every natural

21   boundary that exists in this area is shown on this map?

22      A.   You asked me if it was possible to overlay, and I'm

23   telling you that's exactly what this is.  This has lots of

24   examples.  If you zoom in to a higher level of zoom, you'll

25   see, you know, more and different types of natural boundaries.



1    It's up to --

2       Q.   Is every natural boundary that exists, if you did

3    analysis -- and I'm trying to talk about anything but the bay,

4    so if you want to talk about -- we talked about the river.  Is

5    there anything else about the western portion of 16, the

6    northern portion of 16, the eastern portion of 16, is there

7    any natural boundaries, that you're aware of as of today, that

8    were not respected?

9       A.   Well, I think if you want to go through this and

10   zoom in, I mean, we could probably talk about this for hours

11   would be my guess --

12      Q.   I'm asking what analysis you did and what opinion

13   you're planning to offer, Doctor.  I'm not asking for a

14   hypothetical.  I'm not trying to quiz you.  I want to know if

15   that's something you're going to testify about in this case.

16      A.   If I'm asked, then I will definitely testify about

17   it.

18      Q.   Sitting here today, can you identify any other

19   natural boundaries in Figure 4 that were not respected that we

20   have not already discussed?

21      A.   That's what I was attempting to say.  That if we

22   zoom in and we go back to some other figures, Figure 1 even,

23   and then zoom in on different portions, I think we could find

24   lots of different examples.  Which is why I tried to include

25   levels of zoom in here where there are boundaries, that we



1   might define as natural boundaries, that the red line either

2   cuts through or could have followed but didn't.

3          And that's the exact type of analysis that would be

4   done, is to have a map like this, whether it's in Figure 1,

5   which is more of a wide angle, or Figure 4, which is more of a

6   zoom, if you're talking about the Tampa region.  And you could

7   even zoom in further in the Esri software.

8          And by doing that, it makes clear that there are

9   places where natural boundaries could have been offered as the

10  explanation but, at least according to this map, it does not

11  appear that they were followed.

12         And I think there's numerous examples.  If you want

13  to go back up to Figure 1, zoom in a lot, we can go through

14  there and see them.

15     Q.   What about manmade boundaries like roads, did you

16  analyze any of those?

17     A.   I think those are typically to be considered parts

18  of communities, and people will oftentimes consider roads.

19     Q.   I'm asking whether you considered roads?

20     A.   Only if they were important parts of communities.  I

21  did not do a separate analysis of roads, no.

22     Q.   You mentioned before that 16, the enacted 16, was

23  not physically contiguous.  Can you tell me what you mean by

24  that?

25     A.   That all the portions of it don't physically touch



 1   each other.  The land --

 2        Q.   And were you -- I'm sorry.  Go ahead.

 3        A.   The land portions.

 4        Q.   Are you planning to offer an expert opinion on the

 5   contiguousness of District 16?

 6        A.   I mean, I don't think that's an opinion.  I think

 7   it's a fact, that it doesn't all physically touch each other.

 8        Q.   Is that -- do you know if you're defining contiguous

 9   in the way that it's defined under Florida Law?

10        A.   I did not do an analysis of Florida Law.  As I've

11   tried to maintain from the first minute of this, I'm not

12   offering any legal opinions.

13        Q.   You also mentioned -- I'm almost done with 10.  Go

14   back to paragraph 10.  You also mentioned that you did an

15   analysis of not just the boundary edges but the cores.  And

16   I'm wondering what you -- can you go to -- I'm sorry.  Can you

17   go to page 5, paragraph 10.  It says "16 and 18 follow a clear

18   pattern whereby the boundary edges, as well as the cores, can

19   be explained by the race and ethnicity of voters/residents."

20             Can you tell me what you mean by cores?

21        A.   I'd say just the more interior portions of the

22   district that have larger black or white populations.

23        Q.   And what analysis did you do regarding the core for

24   16?

25        A.   I would say that all the maps that are included,



1  both in the main portion of the report and the appendix, are

2  -- support that conclusion.

3      Q.   It's a visual conclusion, that the cores are clear

4  examples?

5      A.   I would say when you're not comparing edges, yes,

6  you would have to just sort of look at the map to determine

7  that Figure 1 is a reasonable figure to demonstrate this.  The

8  sort of denser parts or larger population centers, which are

9  sometimes considered the cores for both 16 and 18 have, you

10 know, very large, either black or white populations.

11     Q.   And when you're referring to this analysis that you

12 did for the cores for 16 and 18, is that different than a core

13 retention analysis?

14     A.   I did not do a core retention analysis.

15     Q.   Okay.  Why not?

16     A.   I didn't think that was relevant to determine

17 whether or not race was followed on the drawing of these maps.

18     Q.   Can you explain what a core retention analysis is?

19     A.   Usually it's used in a statewide redistricting,

20 comparing across multiple districts when there are questions

21 as to how substantial of changes are being made to districts,

22 comparisons are made between a benchmark previous map and a

23 new map.

24     Q.   With regard to this boundary analysis and the core

25 analysis, did you also conduct that on Plans A, B, and C?



1    A.    I only conducted the functional and demographic

2    analysis on A, B, and C as compared to the benchmark.

3    Q.    Okay.  So you did not do an analysis like we're

4    talking about here about the boundary edges and the core?

5    A.    I did not.

6    Q.    Is there any reason why not?

7    A.    The illustrative maps are not enacted.  And here I

8    was just looking at whether or not the enacted map, which had

9    been drawn, followed racial boundaries.  My question I was

10   attempting to answer about the illustrative maps was whether

11   or not they allowed African-Americans to retain voting

12   strength as compared to the benchmark.  So they were just

13   different types of questions that I was asked to answer.

14   Q.    So is it correct then, you do not plan to offer an

15   expert opinion about the boundary edges or cores of Plans A,

16   B, and C?

17   A.    I do not.

18   Q.    Dr. Barreto, you talked a little bit about how -- I

19   know there's parts of your expert report that say -- you

20   talked about how it doesn't respect community or natural

21   borders and you said it seems to follow along racial

22   populations.  What is the significance of that statement?

23   A.    That from my opinion, and my data, it seems that the

24   map drawers were paying close attention to the racial

25   demographics of the boundaries when attempting to draw the



 1  lines and that they were using that as their metric.

 2      Q.    Sole metric?

 3      A.    What's the question?  Sorry.  I didn't hear that.

 4      Q.    Are you saying that they were using that as their

 5  sole metric?

 6      A.    I think I outlined in here in paragraph 10, the one

 7  we were talking about.

 8      Q.    Mm-hmm.

 9      A.    I'm just saying that they can be explained by race

10  and ethnicity, and I think it's up to the court to decide

11  whether or not that was appropriate.

12      Q.    Do you know what it means for race to predominate in

13  the drawing of district lines?

14      A.    I've heard that phrase before.

15      Q.    Do you know what it means?

16      A.    Probably varies by state and district court and what

17  the interpretations of that have been.  It's mostly a legal

18  standard.

19      Q.    Are you planning on offering an opinion as to

20  whether race predominated in the drawing of enacted District

21  16?

22      A.    I would say I'm going to stick to the opinions that

23  I've outlined here.  Which is that these lines can be

24  explained by race and ethnicity.  That there are numerous

25  examples where the district borders follow very closely to



1   racial populations.  And that the placement of the boundaries

2   cannot be explained by chance, but rather there is an

3   overwhelming statistical probability that race was relied on.

4        Q.   Are you planning to offer an opinion about the

5   quantitative amount that race was relied on?

6        A.   In my probability analysis, towards the end of the

7   report, I assess what is the likelihood of the black

8   population being higher on the included and lower on the

9   excluded adjacent pairs of VTDs.  And I conclude in that

10  section, with some statistical probability analysis, that

11  it's, you know, far less than a 100th of a percent probability

12  that this occurred by chance.

13       Q.   Is it your understanding that if it didn't occur by

14  chance, that it's unlawful?

15       A.   I'm not going to offer --

16            MR. CHEN:  Object as to form.  Excuse me.

17            THE WITNESS:  I'm not going to offer any legal

18       opinions.  I'm just going to tell you what my data says

19       and you and Mr. Chen and the judge can all figure out what

20       the law says.

21  BY MS. PRICE:

22       Q.   So does that mean you are not going to offer an

23  opinion that race predominated in the drawing of enacted

24  District 16?

25            MR. CHEN:  Objection to form.



1          THE WITNESS:  I don't know how you want me to use
2      that word.  I know it's a legal standard, just like
3      diminishment.  I've been in voting rights cases a lot, so
4      I've heard these words a lot and I know that these are
5      legal standards.  And I know what my job is as a political
6      scientist.  And that is to analyze the data and give my
7      opinion on what the data says.
8          In this case my opinion is that the boundaries do
9      follow race very closely, and that there are numerous
10     examples of this.  And that it's clear to me, both through
11     the visual maps, the analysis of the adjacent VTDs, that
12     race was clearly relied on in drawing Senate District 16.
13         Someone else can determine exactly whether or not
14     that was lawful or not.  But that's my opinion, is that
15     it's very clear that race was relied on.  And I don't
16     quantify if it was 100 percent of the decision or 99
17     percent.
18 BY MS. PRICE:
19     Q.    Okay.  That's just what I'm trying to understand.  I
20 think this is similar to our earlier discussion regarding
21 diminishment.  I'm not trying to get you to have an opinion on
22 something that you may or may not have an opinion on.  But I'm
23 trying to make sure that I understand the words that we're
24 gonna hear at trial that are your expert opinion.
25         And so I hear you saying that it's clear to you that



1  race was relied upon.  I hear you saying race was used as a

2  metric.  Both of those are correct, right?

3      A.   Yes.

4      Q.   And I'm just wondering, let's take "predominate" out

5  of it.  I'm wondering whether we're going to hear a statement

6  from you at trial about whether race was the primary metric,

7  the sole metric, the guiding principle, if we're going to hear

8  anything that says anything other than race was used?

9      A.   I would agree with all of those characterizations.

10 That it was a primary metric, that it was a guiding principle,

11 that's what it appears to me.

12          You're gonna have to get the mapmaker under oath and

13 he or she will probably have a very different opinion based on

14 what his lawyers tell him or her.  But that's what it appears

15 to.

16     Q.   But you agree it was the primary --

17     A.   Guiding, primary.  I'm not attempting to qualify it

18 but -- in terms of a quantification.  But from my perspective,

19 as someone who has looked at lots of maps and done this exact

20 type of boundary analysis before, it appears to me that the

21 mapmaker was closely following racial boundaries on these

22 edges of these districts.

23     Q.   And we've discussed all the reasons for that today.

24 And those are all contained within your expert report?

25     A.   I don't know the reasons.  Only the map drawer and



1  the map drawer's --

2      Q.   I'm sorry.  I don't mean that the lines were drawn

3  by the legislature, I mean the reasons why you come to that

4  conclusion.

5      A.   Yes, they're all contained within this report.

6      Q.   Okay.

7      A.   And the images and the maps.  As I said in one

8  point, I think if we zoomed in on the maps, Figure 1 and

9  really kept zooming in, we would see all different types of

10  boundaries and we might say, ah-ha, look at that.  And what I

11  have attempted to do in my report is tell you, in summary

12  format, how I drew my conclusions.

13      Q.   Okay.  We talked about 16.  So it sounds like, would

14  that be the same for 18 then?

15      A.   I would say generally the same logic.  We could pull

16  up those maps, maybe look at, you know, Figure 2, Figure 3.

17  Wherever 18 is in more of the picture as opposed to 14.  I

18  think that's the St. Petersburg portion of the district.  But

19  I would say generally the same rationale, logic, and standards

20  were applied.

21      Q.   And I think before you talked about, we went

22  through 14 and 16, so the same would be true for 14 as well?

23      A.   Correct.

24      Q.   Okay.  Let's go ahead and turn to your rebuttal

25  report.  We've talked about it a couple of times.



1          Pull that up.  And I think we're close, but if you

2    need a short break, that's okay.

3       A.    I'm good.

4       Q.    Okay.  Thank you, Doctor.

5          All right.  The title of this is "Rebuttal Report of

6    Matthew Barreto, Ph.D."

7          Do you see that?

8       A.    I see it.

9       Q.    Okay.  Let's slowly scroll down to page 5.  And do

10   you see your signature there?

11      A.    Yes.

12      Q.    It's dated October 9th; is that right?

13      A.    That's correct.

14      Q.    Okay.  And I know we went through this fast, but

15   does this appear to be a true and correct copy of your

16   rebuttal expert report?

17      A.    As best as I can tell through Zoom, yes, it looks

18   correct.

19          MS. PRICE:  Let's mark that as Exhibit 2.

20          (EXHIBIT NUMBER 2 WAS MARKED FOR IDENTIFICATION.)

21   BY MS. PRICE:

22      Q.    I think we touched on this a little bit, but can you

23   explain why you wrote this rebuttal report?

24      A.    I'd say it's fairly standard.  The opposing expert

25   wrote a report.  And portions of his report, Dr. Voss, raised



MATTHEW BARRETO, PH.D.                     November 25, 2024
HODGES V. PASSIDOMO                                       88

1  criticisms of portions of my report, which is the custom.  I
2  believe that's what you paid him money to do, and he did it,
3  so now I'm responding to him.
4      Q.   Okay.  Do you have any additional opinions regarding
5  Dr. Voss's report that are not -- let me start over.  I don't
6  want to ask a confusing question.
7          Are all the opinions regarding Dr. Voss's report,
8  that you're planning on giving, contained within your rebuttal
9  report?
10     A.   I would say probably not.
11     Q.   Okay.  What other opinions regarding Dr. Voss's
12 report are not within your rebuttal report?
13     A.   I don't have a list, but I have read Dr. Voss's
14 report.  I disagree with many of the sentences that he wrote
15 and his interpretation or his conclusion.
16         In my rebuttal report here I chose to respond to
17 some of the specific things that I thought needed additional
18 data analysis or clarification.  But in no way does that mean
19 that the portions that I did not specifically respond to I
20 agree with.
21         This is my custom in every rebuttal.  I think it's
22 every expert's custom is that they respond to the points that
23 they need to get on paper, but there's, you know, additional
24 sections of his report.  Mostly that applies to me.  I don't
25 have a lot of opinions on the portions of his expert report



 1  that apply to other experts.  But I disagree with lots of
 2  words he wrote.
 3      Q.   Let's start from the top.
 4          Are you planning to offer any opinions in this
 5  litigation about portions of Dr. Voss's expert report that are
 6  not about you?
 7      A.   I don't think so.  There are portions where he's
 8  just talking about performance analysis sort of in general,
 9  and it wasn't clear if he named me.  But I recall reading his
10  report, you know, and discussing with my attorneys and saying,
11  well, that's just a factually wrong statement.  I don't need
12  to spend two hours of my time writing an essay as to why
13  that's wrong.  I can just explain to the judge when someone
14  asks me that that's a factually wrong statement.
15          But I think they were mostly about performance or
16  functional analysis.  I don't have opinions on the portions of
17  his expert report that explicitly don't apply to me.  So I
18  know he was discussing other experts, and I'll sort of leave
19  that between them.
20      Q.   Okay.  So what's kind of then your -- so no opinions
21  that you're going to offer if it's specific to another expert;
22  is that correct?
23      A.   I don't think so.  And I'm not trying to be elusive.
24  I just don't have his report up.  I'm going to open it up, if
25  you don't mind?



MATTHEW BARRETO, PH.D.                                    November 25, 2024
HODGES V. PASSIDOMO                                                      90

1       Q.    Sure.

2       A.    Maybe you want to open it up as well.  I did glance

3   at it this weekend.  I didn't go super in depth.  I think I

4   just mostly control F'ed on my name and tried to find my name.

5           But there were portions where he talked about

6   combining my data with the McCartan data and other stuff like

7   that, that didn't appear to be super relevant to me.

8       Q.    Well, so I guess here's my -- my question, you know

9   it's November and trial is in June and the discovery cutoff is

10  a week from today.  And I'm trying to figure out how I figure

11  out what opinions you're going to offer if they're not all

12  contained in your rebuttal report?

13      A.    I would say the best way is to take me to a

14  paragraph of his report and ask me a question.  That's usually

15  how it works at trial; for me at least.

16          MS. PRICE:  Let's go ahead and mark this as

17      Exhibit 3, please.

18          (EXHIBIT NUMBER 3 WAS MARKED FOR IDENTIFICATION.)

19  BY MS. PRICE:

20      Q.    Dr. Barreto, does this look like the expert report

21  of Dr. D. Stephen Voss that you reviewed?

22      A.    Yes, it does.

23      Q.    Do you plan to offer any expert opinions with regard

24  to paragraph 1(a)?

25      A.    Nope.



MATTHEW BARRETO, PH.D.                              November 25, 2024
HODGES V. PASSIDOMO                                              91

 1     Q.   What about paragraph 1(b)?

 2     A.   Nope.

 3     Q.   Paragraph 1(c)?

 4     A.   I will say I probably disagree with his

 5   characterization that this paper he wrote with Brad has got

 6   widespread prominence or influence in race politics.  But he's

 7   entitled to his opinion on that.

 8     Q.   Are you planning to offer an opinion about that in

 9   the litigation?

10     A.   I will say if you ask me about it, I will tell you

11   that I've written 83 articles specifically about race in

12   politics, and that I disagree that it's a prominent -- his

13   paper with Brad is a prominent paper.  But he's entitled to

14   his own opinion on his own papers and how prominent he thinks

15   they are.

16     Q.   I understand if you disagree.  I'm trying to

17   understand if you are planning to offer an expert opinion

18   about this at the litigation?

19     A.   Just exactly what I just told you.  I don't think it

20   will probably come up at trial.

21     Q.   Okay.  Paragraph 1(d)?

22     A.   No.

23     Q.   Paragraph 1(e)?

24     A.   Nope.

25     Q.   Paragraph 1(f)?



MATTHEW BARRETO, PH.D.                    November 25, 2024
HODGES V. PASSIDOMO                                          92

1     A.    No.

2     Q.    Paragraph 2(a)?

3     A.    Nope.

4     Q.    Paragraph 2(b)?

5     A.    Yup.

6     Q.    What opinions are you going to offer in this

7  litigation regarding paragraph B?

8     A.    He does not employ the same ecological inference

9  methods.

10    Q.    How are they different?

11    A.    He subset his analysis to blocks, I think in part,

12 because he misunderstood what I did.  And that's not what I

13 did.  I subset my analysis to VTDs.

14    Q.    So is your opinion -- what else, what other opinions

15 are you going to offer regarding 2(b)?

16    A.    That's it on 2(b).  He goes into that a little bit

17 later in his report where he talks about how I used census

18 block data as my geographic unit, which is factually

19 incorrect.

20    Q.    Okay.  2(c)?

21    A.    No.  No.  Nothing to offer there.

22    Q.    2(d)?

23    A.    No.

24    Q.    2(e)?

25    A.    Yes.



1    Q.   Okay.  What opinions are you planning to offer

2    regarding 2(e)?

3    A.   That he was provided with all of my data and code

4    that he needed.

5    Q.   Anything else?

6    A.   Also, there was more -- there was no error in my

7    code.  He's incorrect in how he attempted to apply the

8    analysis.  I disagree with almost everything.

9    Q.   Okay.  What about 3(a)?

10   A.   Nothing there.

11   Q.   3(b)?

12   A.   I don't plan to debate him on this.  As I mentioned

13   before, I noted that with respect to natural boundaries, the

14   district is not contiguous.  But my job in this case was not

15   to do an analysis of the districts to see if they met the

16   traditional redistricting criteria.  I believe that other

17   expert did that, so . . .

18   Q.   Does that mean nothing in 3(b)?

19   A.   No.  I just don't want you surprised if I state,

20   which I've already stated under oath, that I don't think SD16

21   follows natural boundaries and is contiguous and physically

22   touches itself across all land portions.

23   Q.   Is there any other opinions that you would offer on

24   3(b)?

25   A.   I don't think so, no.



1    Q.   What about 3(c)?

2    A.   I did not do a compactness analysis, no.

3    Q.   Would that include Table 1?

4    A.   Correct.  That's a compactness analysis.  I didn't

5    do that --

6    Q.   And --

7    A.   (Inaudible.)

8    Q.   I'm sorry.  Can you say that again one more time?

9    A.   I presume McCartan might have, but I don't know.

10   Q.   What about 3(d)?

11   A.   I would say my section on the drawing of 16 and

12   following racial boundaries disagrees with this.

13   Q.   Is there anything about 3(d) that would not be

14   contained within your expert reports for which we haven't

15   discussed today?

16   A.   I believe the part that we spent a long time

17   discussing in terms of the boundary analysis, directly

18   responds to the italicized first sentence.  And if asked,

19   that's what I would point to.

20   Q.   Right.  I'm just wondering -- and that's in your

21   report.  I'm just wondering if there are any other opinions

22   regarding 3(d) that we haven't talked about, whether or not

23   they're in your report.

24   A.   I'm going to stick to my report, so, no.

25   Q.   Okay.  Next page 3(e)?



1    A.   Nothing specifically on 3(e).  My data does refer to

2    African-American Democratic partisanship.  So I suppose that

3    could come up, but I did not do a partisan analysis.

4    Q.   Okay.  Can you scroll back up to Table 2?  Sorry.  I

5    jumped over Table 2.  I just want to make sure whether you

6    plan on offering any opinions with regard to Table 2?

7    A.   I did not analyze Table 2.  It appears to just be

8    actual partisanship scores or rates, so I presume, I presume

9    it to just be a factual table.

10    Q.   I'm just asking whether you're planning on offering

11    an opinion regarding Table 2?

12    A.   I don't know how Table 2 will come up.  It wasn't

13    part of my report.  What I'm telling you is that this is just

14    a factual piece of information, is what it appears to be.  And

15    so I can envision you or someone else asking me a question

16    saying, you know, isn't it the case that Hillsborough County

17    is 51 percent Democrat.  And I don't want to say -- I'm not

18    going to say yes.

19    Q.   Are you planning on rebutting --

20    A.   No.

21    Q.   -- Table 2.  Thank you.  Yeah, I'm not trying to

22    trap you in semantics here.  I just want to know what your

23    opinions are going to be.

24         Let's scroll down to 3(f), which looks like it spans

25    two pages, so let's go slowly.



1    A.   No.

2    Q.   Okay.  Let's go to the second page for F.

3    A.   Nothing on F.

4    Q.   What about just that first paragraph of G?  G is

5    pretty long, so let's start there.

6    A.   Nothing on the first part.

7    Q.   Okay.  (g)(1)?

8    A.   No.

9    Q.   Let's go to (g)(2), looks like it spans a couple

10   pages, so let's just do (g)(2) on the bottom of the page 6 for

11   now.

12   A.   Nothing there.

13   Q.   Top of page 7 has Table 3.  Is there anything that

14   you would rebut in Table 3?

15   A.   Probably.  This appears to be somewhat similar to

16   some of the analysis I did in my tables.  And so to the extent

17   there's any disagreement, I would probably lean on my tables

18   and interpret my tables differently.

19        A lot of the words in here are Dr. Voss's opinions

20   on hypothetical scenarios in the future.  But Table 3 does

21   appear to be somewhat similar to some of the tables I created,

22   at least for the ACLU or the McCartan maps.  So I can imagine

23   some scenario in which someone says, hey, is this different

24   than the table you created?  And I would probably testify to

25   that.



 1      Q.    Okay.  So you created tables regarding percentage
 2   Republicans and percentage Democrats in these districts?
 3      A.    The functional analysis essentially does that, yes.
 4      Q.    Are you planning on offering any opinions -- I
 5   understand if you're asked a question about something.  Are
 6   you planning on offering any opinions with regard to the
 7   percentage of Democrats or Republicans in either the enacted
 8   map districts or the ACLU A, B, C that are listed here for
 9   these districts?
10      A.    Well, I have similar tables in my original report,
11   for example, Table 4.  Table 5, both Table 4 and Table 5 in my
12   original report I would think, you know, speak to some of
13   these same things.
14           He's kind of trying to squeeze in some performance
15   analysis assessment here, which is what my reports are about.
16   So I think my Tables 4 and 5 probably speak directly to some
17   of the claims he's making here.
18      Q.    Is that in your appendix?  I'm sorry.
19      A.    Yeah, pages 24 and 25.  26 --
20      Q.    Okay.
21      A.    24, 25, 26.
22      Q.    Are you planning on offering opinions regarding, not
23   the functional analysis or not regarding cohesion, but are you
24   planning on offering opinions regarding the performance of
25   political parties in these districts?



1    A.    That's what the functional analysis is.

2    Q.    Okay.  Let me back up.  Are you planning on offering

3    any opinions with regard to whether maps favor -- sorry --

4    whether specific districts favor a Democratic candidate or a

5    Republican candidate?

6    A.    Probably.  I mean, that's in my analysis as well.

7    We identified Democratic candidates as typically candidates of

8    choice of African-American voters, so probably so.

9    Q.    Are you planning on offering any opinions with

10   regard to whether Districts 16 or 18 were drawn with the

11   intent to benefit a political party or candidate?

12   A.    By inference, yes, I would say.  Because they may

13   have been drawn, 18 in particular, may have been drawn to the

14   detriment of African-American voting interests and, as I just

15   said, their candidates of choice, in this region of Florida

16   have, in the elections I analyzed, been Democrats.

17        So I imagine that question could come up and I would

18   be prepared to offer an opinion, based on my data, that

19   District 18, in particular, would appear to be one that

20   decreased those opportunities.

21   Q.    Okay.  I'm not asking if District 18 decreased

22   opportunities for black voters.  I'm asking if you're planning

23   on offering an expert opinion that District 18 or District 16

24   were drawn with intent to benefit the political party or

25   political candidate?



1          MR. CHEN:  I'm going to object to form.

2          THE WITNESS:  I would say probably not on the intent

3      for partisan reasons.  I'm saying that my data would be

4      informative, what I've already written would be

5      informative to answer that question though.  Because my

6      data suggests that Republican candidates, as is being

7      highlighted in this loss table, tend to be the candidates

8      of choice of white voters.  And that Democratic candidates

9      tend to be the candidates of choice of black voters.

10  BY MS. PRICE:

11     Q.   And does your data also have any of this information

12  with regard to District 16?

13     A.   I don't believe we did a performance analysis of 16.

14  As I stated earlier, the performance analysis was comparing

15  the illustrative maps to the 2016 benchmark of SD19.

16     Q.   And does the data or information in your report,

17  does it shed any light with regard to partisan leanings or

18  intent for Plan A?

19          MR. CHEN:  Object to form.

20          THE WITNESS:  I don't understand what you mean by --

21      I don't understand the question at all.

22  BY MS. PRICE:

23     Q.   Okay.  Let's go back.  Starting with Table 3.  I'm

24  trying to understand what opinion you might offer, if any, in

25  this litigation with regard to Table 3.  And correct me if I'm



1  wrong, but I understand you said, well, there's parts of my

2  report and data that kind of were similar to parts of

3  information that's in Table 3, so maybe if I'm asked a

4  question.

5      A.   That's exactly correct.  I cannot forecast how the

6  question would come in direct, cross, or redirect.  I cannot

7  envision that right now.  But looking at Table 3, I can tell

8  you that there's lots of data there that is somewhat similar

9  to data I have compiled.  And I can envision somebody asking

10  me a question as to whether or not this is consistent or

11  inconsistent with my own data.  And I'm just trying to tell

12  you that I will not be surprised if that came up, and that I

13  would stick to my report to point out where there were

14  similarities and differences.

15      Q.   And will your testimony about Table 3 be limited to

16  the similarities and differences in the data that's presented

17  in Table 3 and the data that's presented in your report?

18      A.   I think it would be limited to how the question is

19  answered.  It's very difficult for me to forecast.  Because I

20  don't want to tell you an answer and then someone asks an

21  extremely similar but slightly different question and you

22  stand up and say, ah-ha, in your deposition you said it would

23  be limited.

24          I don't know what questions are going to be asked at

25  trial.  I'm just trying to tell you that my tables are in



1  conversation with these Voss tables, and it would be a

2  disservice, if there's a reasonable question between the two

3  experts, for me to not state what I think.

4         So I don't know what the question will be, but I

5  could envision talking about this, because it's somewhat

6  similar to some of my tables.

7     Q.   If asked, have you done sufficient analysis to where

8  you would give an opinion with regard to packing and cracking

9  Republican voters in these districts?

10    A.   I did not do an analysis of partisanship.  I did the

11 analysis of whether or not race was being followed in using

12 these districts.  As I mentioned earlier, in Florida there's a

13 connection, in this region in particular, between black voters

14 preferring Democratic candidates of choice and white voters

15 preferring Republican candidates of choice.  So there is an

16 inherent connection between partisanship and race there.

17        But my analysis, as we just mentioned I was going

18 through, focuses on the racial demographics of the population

19 and of the voting population in these districts.

20    Q.   Thank you.

21        Let's go to the paragraph that's right under

22 Table 3, which is a continuation of 3(g)(2).  I know that's

23 just a portion, but is there anything written there that you

24 plan to offer an opinion on?

25    A.   Only if it relates to Table 3.  I don't envision



 1  anything specific.  That paragraph appears to be a debate

 2  between himself and McCartan.

 3      Q.   Okay.  And then if we can just go to -- let's skip

 4  Figure 3 and go to the top of 8 so you can see the end of that

 5  paragraph just to make sure.

 6      A.   Same answer.

 7      Q.   Okay.  If we can go back up to Figure 3.  Is there

 8  anything about that figure that you plan to offer an expert

 9  opinion on?

10      A.   No.

11      Q.   Thank you.

12           Next one is paragraph 3 on page 8.

13      A.   I remember reading this, and as I already mentioned,

14  I did not do an analysis of the McCartan shapes.  I only did

15  the performance analysis.  But I could envision responding to

16  this, because he's using similar language as I am in my

17  critique of 16 and 18, just to explain perhaps to the judge or

18  if someone asks, that Dr. Voss is trying to draw similar

19  conclusions about the use of race that I am in my section.

20      Q.   Anything else with regard to paragraph 3?

21      A.   I don't think so.  Not to rebut necessarily.

22      Q.   What does that mean?

23      A.   Well, he has a sentence that says "The partisan

24  racial pattern is plainly visible."  Which is, I think we

25  could both agree, is similar to a sentence I had written about



1    the racial pattern is clear.  I don't remember my language.

2    But he's attempting to do a similar type of analysis where

3    he's talking about how the boundary follows racial boundaries.

4    And in his opinion, that type of analysis suggests that there

5    is some sort of racial gerrymandering going on.  Those are the

6    types of words he's using.

7         So I will probably reference this in saying, see,

8    even your expert agrees that doing this type of analysis, of

9    following the district boundary lines, is how we can draw

10   conclusions about whether or not there is some racial

11   boundaries.  He's especially --

12   Q.   Anything else?

13   A.   -- making the same arguments as me.

14   Q.   Okay.  I didn't mean to cut you off.  Anything else?

15   A.   No.

16   Q.   Great.  Next page is Figure 4.  District maps.

17   A.   Yes.

18   Q.   What would you rebut about Figure 4?

19   A.   I'm sorry.  I thought you were on Section 4.

20   Nothing on Figure 4 --

21   Q.   Okay.  Thank you.  Let's go to Section 4(a).

22   A.   Yes.

23   Q.   What opinions do you have regarding that?

24   A.   He's wrong.

25   Q.   Can you elaborate on that?



1    A.    He says that it was necessary to pack black voters

2    into this district.  I disagree with that.

3         And he says that -- he implies that Map C is taking

4    them to a point where they've slipped.  That's false.  My

5    performance analysis demonstrates that's false.

6         So a lot of his interpretations or opinions are

7    wrong in A.

8    Q.    Okay.  What about 4(b) which goes on two different

9    pages?

10   A.    Yeah, I disagree with his conclusion there.

11   Q.    What would you rebut in 4(b)?

12   A.    Again, he's saying that the packing of black voters

13   is needed; and that's not true.

14   Q.    I'll just scroll to the second part of B.  Is there

15   anything different or additional?

16   A.    I disagree with all these sections where he's

17   attempting to justify the use of race to pack D16.  I agree

18   that the enacted map did pack SD16, so he and I agree on that.

19   He said it was necessary, that is not true.  So most of my

20   report suggests that's the case.  And all of these sections

21   where he's talking about that, I don't plan to offer my

22   opinion.

23   Q.    Okay.  So would that be A through -- would that be

24   all of Section 4?

25   A.    That was my recollection, is that a lot of this was



1   stuff that I didn't need to go line by line on, but I

2   definitely disagree with him on.  And some of his sentences

3   are factually untrue and others are, he's drawing a conclusion

4   that I disagree with.

5          Q.   For each paragraph in Section 4?

6          A.   I think so.

7          Q.   Okay.  Is there anything else about Section 4 that

8   we haven't discussed that you plan to offer an opinion on?

9          A.   I mean, I plan to offer opinions on Section 4 as I

10  am asked questions about them.  Part of it will depend how the

11  question is asked of me, but I disagree with much of what he

12  has said here.  And I think that's evidenced in my report

13  already.

14         Q.   Is there any analysis that you plan to offer an

15  opinion on with regard to Section 4 that is not present in

16  your expert reports?

17         A.   I would say mostly using my expert report to rebut

18  statements he has in here that are factually incorrect.

19         Q.   Is there anything you would use besides your expert

20  report?

21         A.   I mean, possibly.  I assume you've put experts on

22  before.  Sometimes we get asked about, have you ever seen an

23  election where this happened.  And, you know, I'm not planning

24  to do any new analysis at all, but oftentimes we get asked

25  questions about our general expertise on both sides, on direct



 1  and cross.  So I don't want to say I'm not going to answer a
 2  question with facts that I know if I have to, but I'm not --
 3      Q.   Understood --
 4      A.   -- offering any new analysis.
 5      Q.   Understood.  Thank you.
 6           Let's go to Section 5.  And this talks a lot about
 7  you.  Let's go paragraph by paragraph.
 8           Do you plan to offer a rebuttal to Section 5(a)?
 9      A.   Yes.
10      Q.   Okay.  And is that the rebuttal that's included
11  within your rebuttal report that discusses this or is there
12  more?
13      A.   As I said before, in the sections where he's
14  specifically talking about ecologic inference in my report, I
15  did not get into a line-by-line systemic disagreement.  I
16  didn't think that that would be helpful for anyone.  But I --
17  my opinion is that he has misread or does not understand my
18  report, and that he is misinterpreting or factually wrong
19  about many of these statements that he has made here; and I
20  will testify to that.
21      Q.   Okay.  What about 5(b)?
22      A.   Yes, I thought you were talking about all of 5,
23  sorry.
24      Q.   Yes, that applies to all of 5.
25      A.   I plan to have opinions on, I would say, every



1  single bullet point of 5, if asked.

2      Q.   Are you planning on doing any additional analysis

3  that would inform those opinions?

4      A.   Nope.

5      Q.   Let's skip over to page 15.  And Section 6?

6      A.   I would say the same thing pretty much for the

7  entirety of Section 6 and all the tables.  I mean, all the

8  part where he's directly engaging with me, I disagree with

9  many of his interpretations and conclusions.  Some of which I

10  very specifically outlined in my rebuttal.  But I have read

11  these and I plan to rebut pretty much every letter in his

12  substructure if asked about them.

13     Q.   6, is that correct?

14     A.   6, exploring the ecological inference results.  And

15  there's a couple --

16     Q.   Okay.

17     A.   -- charts and a table.

18     Q.   And that goes all the way to Page 21, correct?

19     A.   That's correct.

20     Q.   Is there any additional analysis that you're

21  planning to do that you would use in your rebuttal for

22  Section 6?

23     A.   Nothing new, just pointing out the portions of his

24  lettered paragraphs which are wrong or misinterpreted.

25     Q.   Is it the same for Section 6 as it was for



1   Section 5, that you're going to disagree with every paragraph

2   of Section 6?

3       A.   Most likely.  And there's some parts where he says,

4   yes, I also found racially polarized voting.  So I definitely

5   agree with him on that.  Multiple times he says that he also

6   found racially polarized voting.  He just appears to want to

7   start a methods fight for some reason.

8           So my census are conclusions about how people of

9   this region in Florida vote are actually the same.  But he has

10  made many misstatements here that, if I'm asked, I will give

11  my opinion on.

12      Q.   We're not going to know what those are until we show

13  up at trial and you're asked at trial?

14      A.   You can ask me right now.  Here we are, we still got

15  four hours left.

16      Q.   Are these things you can identify or do you want to

17  go sentence by sentence?

18      A.   There's huge, factually wrong statements that he

19  makes in here.  And his understanding of ecological inference

20  and how it is applied and how it is implemented is, at times,

21  incorrect.  There are times where he confuses rows by columns

22  with iterative.  There are times where he misunderstands the

23  competence intervals.  There are times where he's actually

24  wrong about the type of data I used.

25          So, I mean, we can go through more if you want, but



 1   some of the high points are laid out in my rebuttal.  But

 2   there's just a lot of, I would say, inconsistencies and

 3   misinterpretations.

 4        Q.   Okay.  Prior to that conclusion -- so let's go to --

 5   this is Section 5, but let's go to paragraph A on 21.

 6        A.   Okay.

 7        Q.   Is there anything that you plan to offer an opinion

 8   on regarding paragraph A?

 9        A.   Yes.

10        Q.   And those are?

11        A.   This idea that there are errors in what I submitted.

12   I can't speak for the other expert, but . . .

13        Q.   Okay.  Anything else?

14        A.   That's probably the main thing in A.

15        Q.   Okay.  What about B?

16        A.   B appears to be more about McCartan.

17        Q.   Does that mean you will not have an expert opinion

18   on that?

19        A.   Well, part of this is already what you asked me in

20   Table 3 above, so I don't think I will.  But I feel like my

21   job is to answer the questions I'm asked when I'm on the stand

22   and not to get into some sort of thing where you say, oh, but

23   you said you won't say anything about B on 21.  It's, like,

24   I'm just trying to get my opinion to the judge.  But I don't

25   have anything planned for B.  But I'm also not trying to hide



1  anything.  And if someone asks me a question, I want to be

2  able to say, actually, that's inconsistent with Table 3 or

3  that's inconsistent with mine.

4          And as I said, I don't have opinions on the Voss and

5  McCartan debate, that's between them.

6      Q.   What about C?  It spans two pages.

7      A.   Yes, I disagree that black voters are weakened in

8  the ACLU maps.

9      Q.   And what is that based on?

10     A.   My functional analysis that shows that in all three

11  illustrative maps, black voters are able to retain a

12  performing district in the illustrative map.

13     Q.   All right.  What else about paragraph C, if

14  anything?

15     A.   I think his interpretation of racially polarized

16  voting is wrong.

17     Q.   Okay.  How do you define it?

18     A.   He's drawing inferences without pointing to a

19  specific data point here on how high or low racially polarized

20  voting would need to be for African-Americans to win or not

21  win, but this is just a made-up opinion.  It's not referenced

22  in any of his performance analysis tables that demonstrate

23  this.  And my performance analysis or what Florida calls

24  functional analysis, clearly indicates that the illustrative

25  maps will all perform well for African-American voters.



MATTHEW BARRETO, PH.D.                                    November 25, 2024
HODGES V. PASSIDOMO                                                    111

1        Q.    Okay.  Anything else in C?

2        A.    I don't think so.

3        Q.    Paragraph D?

4        A.    Yes.

5        Q.    Okay.  What opinions do you plan to offer regarding

6   paragraph D?

7        A.    He is wrong that I used census blocks.  I cleared

8   that up in my rebuttal, just pointed out that I used VDTs, not

9   blocks.  That was just an error that he made in his

10  interpretation of my data.  I disagree with his conclusions

11  about that.  I disagree with most every single word in this

12  paragraph.  Except the last one, "No one denies racial/ethnic

13  identity still shapes voting behavior in Florida."  I agree

14  with that.

15       Q.    I imagine you disagree with the second half of that

16  sentence?

17       A.    You imagine correctly.

18       Q.    Is there any additional data or analysis that you

19  would rely upon that's not in your expert report to rebut

20  paragraph D?

21       A.    I don't think so.  I think, you know, where we

22  started this discussion I'm, we'll probably refer to, just in

23  terms of supplemental evidence, the Common Cause versus Byrd

24  report or the stipulation that you guys made, or any number of

25  other huge amounts of pieces of data that racially polarized



1  voting does in fact exist in the state of Florida.  But I

2  don't plan any new analysis, no.

3       Q.   Anything else in paragraph D?

4       A.   I mean, I think I said I disagree with almost all

5  the words, but I think that covers it.

6       Q.   What about paragraph E?

7       A.   Yes, I disagree with E.

8       Q.   What parts?

9       A.   I disagree that it holds together the black

10 neighborhoods.  I believe that that's justification for

11 packing, and that it was attempting to reverse erosions of

12 black voting power, like my analysis of the illustrative maps

13 demonstrates that that is not true.

14          I think that it follows racial boundaries pretty

15 clearly.  He says it's unremarkable.  But I think that it

16 follows racial boundaries very clearly using the same logic

17 that he applied to the McCartan maps above.  And I don't

18 believe that the plaintiffs' maps would dilute the black vote.

19      Q.   Anything else?

20      A.   I don't think so.

21      Q.   We've reached the end.

22      A.   He's got this appendix where he criticizes me on the

23 next page, and I disagree with most of it.

24      Q.   Okay.  So that's just that page or going through?

25      A.   He's written some sort of theory of ecological



1  inference that is just generic, it doesn't apply to this case

2  in particular.  But it's a long, sort of appendix with some

3  tomography plots and other stuff that there's lots of parts I

4  disagree with.  I don't know if he plans to use it, but . . .

5       Q.   Is it fair to say if he does, you have done the data

6  analysis in order to provide a rebuttal opinion on that?

7       A.   That is correct.

8       Q.   Is there anything else about Dr. Voss's report that

9  we haven't discussed that you plan to offer an opinion on?

10       A.   I don't think so.  Nothing that I planned, no.

11       Q.   Okay.  I think I have just a few more questions.

12       A.   Okay.

13       Q.   I may be done, but if you need a comfort break, we

14  can go.

15       A.   No, I'm good.

16       Q.   Okay.  Again, I'm not trying to -- let me see.  What

17  about Dr. Stephen Trende, did you review his expert report as

18  part of your work in this litigation?

19       A.   I don't recall doing that no.

20       Q.   Okay.

21       A.   Is it Sean Trende, maybe?

22       Q.   Maybe I read it wrong.  My apologies.

23            So you did not read that?

24       A.   Nope.

25       Q.   Do you plan on offering any opinions regarding any



 1   topics discussed within Dr. Trende's report?
 2        A.   I don't know.  There's some chance that counsel
 3   might want me to look at it.  That might be something McCartan
 4   is supposed to do.  I don't know.  I've read Trende's work
 5   before and rebutted it in other cases.  I know him.  He mostly
 6   does maps and jingles one stuff (phonetic), but he does a
 7   little bit of everything.  So I don't currently have any
 8   plans.  And as I said, I don't recall reading or seeing his
 9   report.
10        Q.   Has anybody asked you to look at it?
11        A.   No one has asked me at this point.
12        Q.   Do you mind giving me two minutes and we might be
13   close to done?
14        A.   Sounds great.
15             (RECESS TAKEN.)
16                  CONTINUING EXAMINATION
17   BY MS. PRICE:
18        Q.   I just want to ask if there's anything else that
19   you're planning to testify about that we haven't talked about
20   today?
21        A.   I don't think so.
22             MS. PRICE:  I think that's it.  Thank you so much
23        for your time, Dr. Barreto.
24             We'd like to order the transcript, please.
25             MR. CHEN:  We'd like to take a look at the



1    transcript and see if we need to correct for any errors.

2         COURT REPORTER:  So the witness is going to read.

3    Are you ordering a copy, Mr. Chen?

4         MR. CHEN:  We'd also like to order a copy.

5         (TESTIMONY WAS CONCLUDED AT 3:16 P.M.)



```
 1                        CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF HILLSBOROUGH

 5

 6          I, the undersigned authority, certify that

 7   MATTHEW BARRETO, PH.D., remotely appeared before me on

 8   November 25, 2024, and was duly sworn.

 9

10          WITNESS my hand and official seal this 9th day of

11   December 2024.

12
                         _____
13

14                       Nancy H. Swartz

15                       Florida Court Reporter

16                       Notary Public - State of Florida

17                       My Commission Expires:  4/2/2028

18                       Commission No. HH 511217

19

20

21

22

23

24

25
```



```
 1                     REPORTER'S CERTIFICATE

 2

 3    STATE OF FLORIDA

 4    COUNTY OF HILLSBOROUGH

 5
              I, Nancy H. Swartz, Florida Court Reporter, Notary
 6    Public, certify that I was authorized to and did
      stenographically report the deposition of MATTHEW BARRETO,
 7    PH.D.; that a review of the transcript was requested; and that
      the transcript is a true and complete record of the testimony
 8    given by the witness.

 9

10            I further certify that I am not a relative,
      employee, attorney, or counsel of any of the parties, nor am I
11    a relative or employee of any of the parties' attorney or
      counsel connected with the action, nor am I financially
12    interested in the action.

13

14            Dated this 9th day of December 2024.

15

16

17          _____

18          Nancy H. Swartz, Court Reporter

19

20

21

22

23

24

25
```



MATTHEW BARRETO, PH.D.                                    November 25, 2024
HODGES V. PASSIDOMO                                                    118

```
 1                          ERRATA SHEET

 2         DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

 3              IN RE:  Hodges, et al. v. Kathleen Passidomo, et al.
                WITNESS:  Matthew Barreto, Ph.D.
 4              DATE OF DEPOSITION:  November 24, 2024

 5    PAGE  LINE           CHANGE           REASON

 6    ____  ____    _____    _____

 7    ____  ____    _____    _____

 8    ____  ____    _____    _____

 9    ____  ____    _____    _____

10    ____  ____    _____    _____

11    ____  ____    _____    _____

12    ____  ____    _____    _____

13    ____  ____    _____    _____

14    ____  ____    _____    _____

15    ____  ____    _____    _____

16    ____  ____    _____    _____

17    ____  ____    _____    _____

18    ____  ____    _____    _____

19    ____  ____    _____    _____

20
      Under penalties of perjury, I declare that I have read the
21    foregoing document and that the facts stated in it are true.

22

23    _____
      DATE                MATTHEW BARRETO, PH.D.
24

25    Reporter:  Nancy H. Swartz
```



```
  Exhibits

11986647 Ma
tthew.
Barreto,
 Ph.D..
EXHIBIT1
   3:13
   17:23,24
   18:2

11986647 Ma
tthew.
Barreto,
 Ph.D..
EXHIBIT2
   3:14
   87:19,20

11986647 Ma
tthew.
Barreto,
 Ph.D..
EXHIBIT3
   3:15
   90:17,18

       (


  (g)(1)
   96:7

  (g)(2)
   96:9,10

       1

1
   17:23,24
   18:2
   73:2,8,9,
   21 77:22
   78:4,13
   80:7 86:8
   94:3

1(a)
   90:24

1(b)
   91:1

1(c)
   91:3

1(d)
   91:21

1(e)
   91:23

1(f)
   91:25

10
   53:22
   65:2,4,5
   79:13,14,
   17 82:6

100
   52:23
   84:16

100th
   83:11

11
   26:15
   27:10
   29:24
   46:24
   52:1

12
   28:8
   59:16
   60:1,24
   61:14,15
   73:2,8,9

13
   28:18,25
   56:23
   57:2,6
   60:2
   61:15,16

14

25:16
48:16
56:10
57:2
58:8,12
64:18
72:8,10,
15,16,24
73:23
86:17,22

15
   25:24
   55:20
   107:5

16
   22:16,21
   26:3,8,
   12,21
   27:6,17,
   23 28:20,
   21 29:20
   30:2,4,5
   31:23
   33:16
   34:4,8,
   10,12,15
   35:1
   36:5,9,18
   52:6 53:4
   54:20
   56:10
   57:19
   58:5,6,
   11,12,15
   59:5,13
   60:17,23
   61:11,17,
   19,24
   62:13
   63:11,16,
   19,20,23
   64:4,7,
   14,16,17,
   18,21
   67:12
   70:12,20

71:12
72:8,9,
16,24
73:10,14,
20,21,24,
25 77:5,6
78:22
79:5,17,
24 80:9,
12 82:21
83:24
84:12
86:13,22
94:11
98:10,23
99:12,13
102:17

17
   17:12,13
   26:16
   27:11
   29:24

18
   26:3,8,
   13,21,24
   27:7,17,
   23 28:15,
   20,22
   29:8,20,
   22 30:2,
   4,7,12,22
   31:6,22
   33:16
   34:4,8,
   10,12,15,
   18 35:1
   36:9,18
   37:3,7
   48:16
   52:6 53:3
   54:20
   56:9,13,
   20 57:19,
   20,24
   58:1,2,6
   59:5

64:4,13,
15,17
72:16
79:17
80:9,12
86:14,17
98:10,13,
19,21,23
102:17

19
   22:17
   25:4
   26:4,9
   28:15
   30:12
   33:16
   36:10,11,
   21 37:10


       2

2
   19:4 21:2
   55:14
   73:13
   86:16
   87:19,20
   95:4,5,6,
   7,11,12,
   21

2(a)
   92:2

2(b)
   92:4,15,
   16

2(c)
   92:20

2(d)
   92:22

2(e)
   92:24
   93:2
```



**20**
48:5 63:5
73:25

**2016**
10:13
22:25
25:2 26:9
43:2
99:15

**2020**
11:21
12:13

**2022**
8:18,25
10:15,19,
20,21
14:10
51:12

**2023**
8:16,18,
25

**2024**
8:15,19
15:9 21:2

**21**
107:18
109:5,23

**24**
97:19,21

**25**
97:19,21

**26**
27:1,3
30:23,25
37:3,11
97:19,21

**27**
40:5,10
41:11,18
49:9

**28**
46:24

**29**
41:11
48:9 49:9

**2nd**
41:4
42:7,11
43:24
46:7

───────────

**3**

**3**
25:15,17
55:1,19
86:16
90:17,18
96:13,14,
20 99:23,
25 100:3,
7,15,17
101:22,25
102:4,7,
12,20
109:20
110:2

**3(a)**
93:9

**3(b)**
93:11,18,
24

**3(c)**
94:1

**3(d)**
94:10,13,
22

**3(e)**
94:25
95:1

**3(f)**
95:24

**3(g) (2)**
101:22

**30**
26:15
27:10
52:2,11
54:12

**31**
31:8

**32**
28:8,9
63:15

**33**
27:19
28:8,18
29:2

**35**
28:25
63:3
75:19

**36**
56:1,7,8

**38**
59:23

**39**
25:24
26:6
59:23

───────────

**4**

**4**
55:20
74:2
76:20
77:19
78:5
97:11,16
103:16,
18,19,20
104:24
105:5,7,
9,15

**4(a)**

103:21

**4(b)**
104:8,11

**40**
15:24

**41**
63:6

**42**
14:4

**43**
26:16
27:11,19
31:9

**48**
23:22

───────────

**5**

**5**
19:5
41:18
79:17
87:9
97:11,16
106:6,22,
24 107:1
108:1
109:5

**5(a)**
106:8

**5(b)**
106:21

**5-minute**
39:17

**50**
23:23

**51**
95:17

**52**
23:21

**55**
75:19

**58**
23:25

───────────

**6**

**6**
20:19
63:14
96:10
107:5,7,
13,14,22,
25 108:2

**62**
23:24

**6A**
63:17

**6B**
63:18

───────────

**7**

**7**
22:13
35:4,10
37:7
39:25
49:10
96:13

───────────

**8**

**8**
52:1,4,7
102:4,12

**83**
91:11



**9**

9
  36:22,24

99
  84:16

9th
  87:12

**A**

abstract
  66:11

accepted
  44:11
  47:6

account
  24:14

accuracy
  20:17

accurate
  30:3

ACLU
  8:9,20,25
  96:22
  97:8
  110:8

acronym
  52:16

active
  10:12

actual
  33:3
  34:19
  61:7 62:7
  95:8

additional
  20:21,22
  21:1

41:5,7,15
46:16
49:23
52:25
55:5
56:17
57:24
60:21
88:4,17,
23 104:15
107:2,20
111:18

adjacency
  59:1,22
  62:7,19,
  23 63:4,
  10

adjacent
  27:14
  63:20
  64:20
  66:8 83:9
  84:11

advice
  15:17

affect
  6:25

affirm
  4:9

African-
american
  10:5
  24:23
  47:7 95:2
  98:8,14
  110:25

African-
americans
  23:14
  50:20
  61:25
  81:11
  110:20

age
  35:8,13
  54:16
  59:24
  60:8

aggregate
  32:1

aggregating
  33:4

agree
  6:3,8
  46:21
  85:9,16
  88:20
  102:25
  104:17,18
  108:5
  111:13

agreed
  47:17
  48:6

agrees
  47:21
  103:8

ah-ha
  86:10
  100:22

ahead
  6:19
  17:6,22
  27:24
  79:2
  86:24
  90:16

Alejandro
  5:1

allowed
  81:11

alternative
  22:16
  23:3,6

amendments
  23:10

America
  69:15

amount
  29:12
  83:5

amounts
  111:25

analyses
  12:9,23
  28:24
  41:23,25
  42:13
  50:10
  60:7

analysis
  14:19,22
  19:22
  20:22
  21:10,20
  23:7 26:6
  27:11
  29:6,17
  30:7,14
  31:8,10,
  14 32:21
  33:25
  34:3
  35:1,2,3,
  24,25
  38:5
  39:15
  41:6,8,
  16,19
  42:4,6,7,
  9,19,25
  43:1,4,21
  44:2
  45:24
  46:5,20,
  22 48:9
  51:22
  52:12

53:11,21
54:11
57:12
58:25
59:22
60:4
62:2,5,7,
19,23
63:4,10,
23,24
64:13,15
65:19
66:12,14
68:4 70:3
71:11
75:9
77:3,12
78:3,21
79:10,15,
23 80:11,
13,14,18,
24,25
81:2,3
83:6,10
84:11
85:20
88:18
89:8,16
92:11,13
93:8,15
94:2,4,17
95:3
96:16
97:3,15,
23 98:1,6
99:13,14
101:7,10,
11,17
102:14,15
103:2,4,8
104:5
105:14,24
106:4
107:2,20
110:10,
22,23,24
111:18



112:2,12
113:6

**analyze**
26:3 36:4
65:18,20
78:16
84:6 95:7

**analyzed**
25:3,8
26:5
40:20
42:20,23
43:8,17
44:6
45:25
46:9
48:19
49:25
64:3
98:16

**Angeles**
5:4

**angle**
78:5

**apologies**
40:4
113:22

**appeared**
26:22

**appears**
17:18
34:18
38:25
57:9,24
60:24
62:3 63:2
69:10
74:21,24
76:5
85:11,14,
20 95:7,
14 96:15
102:1
108:6

109:16

**appendices**
17:20
20:3

**appendix**
19:23
20:7 36:7
37:10
42:17
46:11
49:20
55:5,25
56:8,16
59:1 80:1
97:18
112:22
113:2

**applications**
67:8

**applied**
15:19
86:20
108:20
112:17

**applies**
88:24
106:24

**apply**
61:3
89:1,17
93:7
113:1

**approach**
47:5

**approximate**
72:12

**area**
12:1,5,8,
11 45:15
50:13,14
57:8
66:24

70:11
71:15
72:11
75:19
76:21

**areas**
45:17
50:20
52:20
58:18,20
61:23,24,
25 63:7
66:9,21
67:24

**argue**
33:5,18

**arguing**
33:21

**arguments**
103:13

**articles**
91:11

**artificial**
44:15

**asks**
21:14,17
68:16
89:14
100:20
102:18
110:1

**assess**
23:5
24:22
35:19,20
52:4,14
83:7

**assessing**
22:15

**assessment**
97:15

**assignment**
53:6

**assignments**
21:24
22:1

**assist**
32:14

**assistant**
19:6,18

**assisted**
19:6

**association**
54:7

**assume**
6:4
105:21

**assumption**
6:5

**attached**
42:16
45:25
49:21

**attachment**
46:10

**attempt**
47:5
69:3,17

**attempted**
33:9 68:8
86:11
93:7

**attempting**
29:11
30:21
32:10,15,
25 52:13
59:21
64:21
77:21
81:10,25
85:17

103:2
104:17
112:11

**attempts**
55:20

**attention**
81:24

**attorney**
18:19,25

**attorneys**
21:16
47:16,23
89:10

**authored**
17:17

**avoid**
64:2

**aware**
8:21
22:1,4
77:7

_____

                B

**back**
9:24 18:7
27:25
30:23
35:4 52:4
53:22
61:14
65:1
77:22
78:13
79:14
95:4 98:2
99:23
102:7

**ballot**
49:7
53:4,5



**ballots**
53:2

**bar**
38:6

**Barreto**
4:13 5:1,
5 8:7
17:8 18:2
29:15
34:18
39:23
81:18
87:6
90:20
114:23

**based**
34:19
51:19
67:15
74:21
85:13
98:18
110:9

**basis**
44:9 50:3

**bay**
11:4
12:5,6
14:18
43:13
46:6,10
50:18
70:8,18,
23,24
71:13,15,
17 72:10,
11 73:3
74:12
77:3

**behalf**
9:1,2,3

**behavior**
111:13

**benchmark**
10:3,8,9,
12,13,16,
18 22:17,
25 25:2,
4,19,20,
25 26:9,
21 28:15
30:12
36:7,10,
11,21
37:1,9,25
38:23
39:1,4,7
43:3
54:25
55:7
80:25
81:2,12
99:15

**benefit**
98:11,24

**big**
19:9
71:22
73:4

**bit**
22:15
48:13
52:8
58:16
59:15
81:18
87:22
92:16
114:7

**black**
25:11
26:1,17,
19,23
27:13,14
28:13,21
29:7,12,
22 30:1,
8,17

**34:12,14,**
17 35:8,
13,14
36:2
37:14,23,
24 38:7
40:16,21,
24 41:13,
14,20
47:19,23
48:6,18
49:24
54:15,17,
23 55:2,
7,17,23
56:19
57:8,25
58:19,20
59:17,24
60:2,3,25
61:20
62:19,24
63:4,5,6,
8,9 64:21
69:21
75:12,19
79:22
80:10
83:7
98:22
99:9
101:13
104:1,15
110:7,11
112:9,12,
18

**block**
44:13
45:11
48:7 50:1
62:5
92:18

**blocks**
53:19
68:1
92:11

**111:**7,9

**blue**
73:4,11,
22

**board**
49:4

**border**
52:12
58:11
59:12,13

**borders**
52:6
81:21
82:25

**bottom**
22:14
25:24
40:9
54:13
58:9
96:10

**boundaries**
13:19
26:22
27:12
29:25
33:4
34:13
42:1
44:13,15
45:18
52:12,14,
15,20,25
54:20,21,
22 55:10
56:14
57:6
59:25
61:9
63:23
65:7,23,
24,25
66:2,3,
13,20

**67:**4,15,
22,23
69:1,5,9,
10 70:5,
6,7,15,20
71:2,12,
21,25
72:4,6,13
73:11
74:1,14,
16 75:10,
24 76:1,
5,6,19,25
77:7,19,
25 78:1,
9,15
81:9,25
83:1 84:8
85:21
86:10
93:13,21
94:12
103:3,11
112:14,16

**boundary**
25:2,21
53:25
54:3,11
55:1,2,3,
6,12,16
56:9,10,
15 57:17,
19 58:6,
8,12,22
59:5,6,7
60:4,17,
18,20,23
61:1,2,
11,17,22
62:2,8,
14,18,23
63:10
64:4,16,
17,23
65:10,19
70:10,16,



19,23
71:9
72:20
73:15,23,
24,25
74:23
75:5
76:17,21
77:2
79:15,18
80:24
81:4,15
85:20
94:17
103:3,9

Brad
91:5,13

break
6:16,19
39:17,18,
24 87:2
113:13

bridge
71:23,24

bridges
72:22

briefly
5:11
36:19

broad
22:22

broke
40:24

broken
64:9

bullet
107:1

bunch
73:4

busy
15:9

Byrd
41:1 44:4
46:5
111:23

——————————

——————————
C
——————————

California
5:4

call
33:13
46:11

called
36:11
52:24

calls
16:2
110:23

camera
7:11

candidate
23:19
40:15
41:18
98:4,5,
11,25

candidates
36:2
37:15,23
38:8
40:18
47:8
48:18
98:7,15
99:6,7,8,
9 101:14,
15

case
10:12
14:11,12,
22 17:2,
17 21:16
24:25

30:12
33:9,14
34:19
42:5,14
45:18
46:1,18,
22,23
47:1,14,
15,16
51:17
53:15
63:3 66:9
72:1,14
74:20
77:15
84:8
93:14
95:16
104:20
113:1

cases
24:24
38:1 45:3
47:11
62:21
66:7
67:2,5,7
84:3
114:5

cell
8:2

census
33:3
40:23
44:13,14
52:18,24
53:19
62:5 68:1
92:17
108:8
111:7

center
56:4
74:25

centers
55:17,22
80:8

chance
14:11
54:5
83:2,12,
14 114:2

change
68:22

changed
23:1 67:3

channel
73:5
74:18

channels
72:22

characteris
tics
56:4

characteriz
ation
91:5

characteriz
ations
85:9

charts
19:22
40:23
57:22
107:17

Chen
15:14,20
16:1
83:16,19,
25 99:1,
19 114:25
115:3,4

choice
33:17
37:15,23
38:8

40:15
41:18
48:19
53:7
98:8,15
99:8,9
101:14,15

choose
48:23
53:11

chose
48:13
68:1
88:16

circumstanc
es
65:12

cities
49:7
66:6,7,9,
18,19,23
67:6 68:3
69:6,15,
18,22

city
5:3 49:3
55:21
65:14,15
66:8,19,
22 67:1,
3,23
69:5,8,
12,13,15,
16 72:9
73:16
74:12
75:17

claims
97:17

clarificati
on
88:18

clarify



60:16

**clause**
31:25
32:13

**clear**
6:1 21:1
32:12
34:16
53:24
54:2,6
56:15
57:17
58:3,13,
21 59:3,8
62:15,17
69:22
78:8
79:17
80:3
84:10,15,
25 89:9
103:1

**cleared**
111:7

**Clearwater**
56:19
57:7

**close**
54:22
81:24
87:1
114:13

**closely**
51:14
54:3
55:7,12,
17,22
61:10
62:3
68:11
69:11
70:10
72:12
74:22

75:18,21
76:6
82:25
84:9
85:21

**closer**
61:20,22

**co-author**
11:23

**coalition**
44:22
45:10

**code**
93:3,7

**cohesion**
39:16
40:12,14
41:13,22
42:19
48:21
49:11,17,
24 50:19
51:6
97:23

**cohesive**
40:2,17
41:6,16
44:21
45:10
47:8,19,
23 48:7

**collect**
32:1

**collection**
33:3

**color**
62:22

**columns**
108:21

**combining**
90:6

**comfort**
39:17
113:13

**comments**
7:13
26:12

**common**
9:2,3
41:1
42:4,13
44:4
45:24
46:5 51:4
53:20
66:8
111:23

**communicati
ng**
8:1

**communities**
65:13,16,
17,18,21
66:6
67:5,9,20
68:3,4,6,
10,16,19,
25 69:24
71:23
72:2,7
74:19
78:18,20

**community**
35:17,19
45:16
65:6,9,25
66:1,2,3,
13,20
67:4,23
69:17
81:20

**compactness**
94:2,4

**compare**
25:24

26:10
61:6

**compared**
22:17
26:21
28:15
35:5,8
36:20
37:9
81:2,12

**comparing**
24:20
28:20
80:5,20
99:14

**comparison**
35:11

**comparisons**
36:20
80:22

**competence**
108:23

**compile**
33:10

**compiled**
100:9

**complaint**
16:12
19:2

**completely**
6:22
31:11
32:9

**components**
53:16

**computer**
7:8 8:2

**concept**
24:3

**conclude**
36:24

83:9

**concluded**
36:19

**conclusion**
32:15,16
37:12
47:21
53:23
58:24
59:3
69:23
80:2,3
86:4
88:15
104:10
105:3
109:4

**conclusions**
20:21
21:23
34:5 72:3
86:12
102:19
103:10
107:9
108:8
111:10

**conducive**
26:19

**conduct**
80:25

**conducted**
81:1

**configurati
ons**
22:16
23:4,6,16

**confine**
41:19

**confined**
42:1

**confuses**



108:21

confusing
88:6

Congress
13:24

congressional
48:17
49:4

connected
74:11

connection
101:13,16

consequential
24:25

consideration
71:3

considerations
60:6

considered
12:25
71:25
72:1
78:17,19
80:9

consistent
49:24
100:10

consistently
37:24

constitute
29:5,9
33:6 71:8

constitutes
28:23
29:2

constituting
31:10

Constitution
16:25
23:10

constitutional
48:17

constraints
14:21,24,
25

contacted
8:10,22

contained
45:4
49:11
51:6
85:24
86:5 88:8
90:12
94:14

context
23:21
30:10

contiguous
70:13
78:23
79:8
93:14,21

contiguousness
79:5

continuation
101:22

continue
27:10

continued
48:21

continues
26:15

continuing
39:21
75:3
114:16

contradict
69:4

contrasting
41:3

control
90:4

controversial
47:22

convenient
28:4

conversation
15:14
101:1

copy
17:16
87:15
115:3,4

core
38:17
79:23
80:12,14,
18,24
81:4

cores
53:25
79:15,18,
20 80:3,
9,12
81:15

Corey
11:5

corner
73:25

correct
5:7,8
12:16
17:16
18:20,21
25:5
28:16
35:9 45:3
51:24
52:6
56:11
58:6
81:14
85:2
86:23
87:13,15,
18 89:22
94:4
99:25
100:5
107:13,
18,19
113:7
115:1

correctly
111:17

correlated
55:11

council
49:3

counsel
7:16 51:9
114:2

count
17:21

counties
41:25
43:10,11,
14,15,17,
21,22
44:1,23
45:1,15
49:2,7

counting
73:22

county
5:4 43:9,
25 45:4,
7,12,13,
19,20
46:3 50:8
64:9
95:16

countywide
44:9

couple
49:14
56:24
86:25
96:9
107:15

court
15:1
21:14,17
29:13
46:11
47:1,10,
13,25
57:12
82:10,16
115:2

courtroom
5:16

courts
24:4 48:5

covers
112:5

cracking
101:8

create
11:14
69:17

created
12:18
14:7 20:3



96:21,24
97:1

**creating**
12:12
38:16

**criteria**
93:16

**criticisms**
88:1

**criticizes**
112:22

**critique**
102:17

**cross**
51:10
100:6
106:1

**current**
9:11
10:15
14:16,17
21:15,21
51:23

**custom**
88:1,21,
22

**cut**
57:7 63:3
67:12,14,
15 103:14

**cutoff**
90:9

**cuts**
74:8
75:21
78:2

**cycle**
10:4
11:22
12:13
14:10

**cycles**
48:16

— D —

**D16**
104:17

**dark**
61:23

**data**
12:8
19:12,20
20:6 24:5
29:11
32:1,2,
14,17,23,
25 33:1,
3,6,10
34:19
35:13
37:2,21
38:18,21
40:22,23
41:18
43:23
53:10
58:24
60:13
61:4
74:21
81:23
83:18
84:6,7
88:18
90:6
92:18
93:3 95:1
98:18
99:3,6,
11,16
100:2,8,
9,11,16,
17 108:24
110:19
111:10,

18,25
113:5

**dated**
87:12

**dates**
16:21,22

**days**
15:7,22

**debate**
48:4
93:12
102:1
110:5

**debated**
47:22

**decade**
9:21,22
10:4

**decades**
47:11

**decide**
23:12
29:13
33:20
45:6
82:10

**decided**
47:11

**decision**
24:6
70:10,24
75:16,18
84:16

**declaration
s**
13:7

**decrease**
23:18
24:6,11,
23 25:11
30:21

32:24
33:11

**decreased**
23:16
24:19
29:8,12
30:8
34:15
98:20,21

**decreasing**
26:23
27:13

**define**
78:1
110:17

**defined**
32:16
52:18
79:9

**defining**
79:8

**delineated**
69:18
72:4

**demarcator**
60:21

**Democrat**
95:17

**Democratic**
57:8
60:10
95:2
98:4,7
99:8
101:14

**Democrats**
56:5 60:3
97:2,7
98:16

**demographic**
35:12,14
81:1

**demographic
s**
54:4
61:7,10
62:3,18
67:25
68:12
69:11,21
74:22
81:25
101:18

**demonstrate**
25:23
26:1
29:25
30:16
32:25
33:1 47:6
48:2 68:9
80:7
110:22

**demonstrate
d**
47:12

**demonstrate
s**
29:7 30:7
32:23,25
55:15
57:6
60:19
104:5
112:13

**demonstrati
ng**
39:6 55:5
56:5

**denies**
111:12

**denser**
80:8

**depend**
105:10



MATTHEW BARRETO, PH.D.                                November 25, 2024
HODGES V. PASSIDOMO                             Index: depending..district

depending
  10:11
  53:8

depends
  23:20
  53:8
  76:13

deposition
  4:23 5:6
  7:1, 4
  15:10,11,
  15,17
  16:6
  100:22

depositions
  15:1

depth
  90:3

describe
  10:8
  33:22
  34:1

descriptive
  58:10

designation
  52:23,24

detail
  5:12
  37:4,8

detailed
  40:7

determine
  10:3
  13:17
  24:4
  64:21,23
  80:6,16
  84:13

Determined
  48:20

detriment

98:14

deviate
  66:21

deviates
  55:6

diagonal
  62:11

difference
  50:7

differences
  100:14,16

differently
  70:9
  96:18

difficult
  100:19

dilute
  112:18

diminish
  22:16

diminished
  10:5
  23:6,16
  24:18
  28:10,15
  29:18,20,
  22 30:4,6
  32:19

diminishes
  30:12

diminishmen
t
  23:8,12,
  17,18
  24:2,7,
  10,12,13,
  14,22
  25:4,8,17
  26:4,12
  27:4,6,
  17,18,22

28:23
29:2,6,9,
17 30:10,
14,21,25
31:6,10,
21,22,25
32:11,13,
16,24
33:11,15
34:2,5,8
35:2
84:3,21

direct
  4:17
  49:19
  100:6
  105:25

direction
  59:2 61:8

directly
  94:17
  97:16
  107:8

disagree
  88:14
  89:1
  91:4,12,
  16 93:8
  104:2,10,
  16 105:2,
  4,11
  107:8
  108:1
  110:7
  111:10,
  11,15
  112:4,7,
  9,23
  113:4

disagreemen
t
  48:4
  96:17
  106:15

disagrees
  94:12

discovery
  16:15,18
  90:9

discuss
  68:7

discussed
  64:18
  72:23
  77:20
  85:23
  94:15
  105:8
  113:9
  114:1

discusses
  106:11

discussing
  89:10,18
  94:17

discussion
  25:10
  59:5
  84:20
  111:22

discussions
  74:13

dismissed
  9:5

dispute
  43:12

dissects
  74:9
  75:22

disservice
  101:2

distinct
  60:19

district
  10:14

22:16,17,
21,25
23:20,21,
22,24,25
24:1
26:3,4,
24,25
27:15,17,
22,23
28:10,15
29:8,20,
22 30:12,
18,19,22
31:6
34:4,17
35:1,17
36:5,21
37:9
38:16
39:3
42:1,2,21
44:13
45:8 49:4
52:12,14,
18 53:3,4
55:21
56:13
57:24
58:1,2,15
59:9,25
62:4
65:23
66:25
67:13
70:12
71:12
72:21
79:5,22
82:13,16,
20,25
83:24
84:12
86:18
93:14
98:19,21,
23 99:12
103:9,16



104:2
110:12

District's
25:4

districting
44:14,16
53:18
65:13

districts
24:21
26:17,18
30:6
33:16
36:8
37:8,9
39:9
41:24
44:10
45:5 49:3
50:11
52:6
54:20
80:20,21
85:22
93:15
97:2,8,9,
25 98:4,
10 101:9,
12,19

division
64:17

Doctor
4:19
17:9,13
19:9 27:1
28:4 29:1
32:3
77:13
87:4

document
13:6 17:7
18:10
29:11

documenting
49:24

documents
13:22
16:8,14,
17 18:4,
8,24

double-
check
20:16

draft
19:24

dramatic
50:7

draw
11:14,19,
21 34:12
39:3
58:23
59:2
74:17
81:25
102:18
103:9

drawer
85:25

drawer's
86:1

drawers
53:16
71:21
81:24

drawing
12:12
32:15
60:14
69:1
80:17
82:13,20
83:23
84:12
94:11
105:3

110:18

drawn
11:3
12:25
13:18,19
44:17,20
54:6
57:25
68:10
70:9,17
72:7,9
74:22
81:9 86:2
98:10,13,
24

drew
10:3
12:1,6,
11,14
86:12

dropped
9:5

due
15:1

duly
4:14

—————————

—————————

E

—————————

E-S-R-I
20:14

earlier
31:13
43:7
84:20
99:14
101:12

east
72:8
73:21
75:2

eastern

61:11,16
62:22
77:6

easy
53:16

ecologic
106:14

ecological
92:8
107:14
108:19
112:25

edge
57:17
58:1
59:18
61:18
63:19
64:20
65:19

edges
53:25
55:12
56:15
58:22
59:6,7
61:19
62:14
63:16
64:5
79:15,18
80:5
81:4,15
85:22

effort
13:17

elaborate
103:25

elect
23:19
37:14
38:8

election
33:3 43:1
48:16
51:12
105:23

elections
36:1 42:3
46:9
48:10,13,
15,19,25
49:6
51:14
60:9
98:16

electoral
35:16,18

elusive
89:23

emailed
11:12
18:19

empirical
33:19

employ
92:8

enacted
10:21
12:24
14:19
22:18,20
23:1
25:6,8,
19,20,21,
25 26:1,
5,12
27:6,12,
22,23
31:6
33:15
35:1
36:5,9
39:9 52:6
54:19,25
55:6



78:22
81:7,8
82:20
83:23
97:7
104:18

**encompass**
49:5
52:25
65:13,15
67:1,3

**end**
39:25
83:6
102:4
112:21

**engaging**
107:8

**English**
33:21

**entered**
46:25

**entire**
16:2
28:20
30:7
35:23
38:20
42:17
44:6 45:7
49:5
58:25
62:4
64:23

**entirety**
45:2
107:7

**entitled**
17:7
91:7,13

**entity**
9:1

**envision**
95:15
100:7,9
101:5,25
102:15

**equal**
23:18
38:25

**erosions**
112:11

**error**
93:6
111:9

**errors**
109:11
115:1

**Esri**
20:6,10
78:7

**essay**
89:12

**essentially**
5:20 97:3

**established**
23:10
46:7

**ethnic**
35:17
40:15,20
54:4 76:6

**ethnicity**
40:2 54:7
55:11,13
79:19
82:10,24

**evaluate**
10:2

**evidence**
30:20
34:17
46:12,13,

16 48:21
49:23
60:21
111:23

**evidenced**
105:12

**exact**
27:9
34:11
62:16,17
66:22
78:3
85:19

**EXAMINATION**
4:17
39:21
114:16

**examined**
4:15

**examples**
59:9,12,
14 60:17
71:24
76:24
77:24
78:12
80:4
82:25
84:10

**exceed**
39:7

**exchanged**
16:15,18

**exclude**
28:13
33:11

**excluded**
28:21
34:17
61:1,24
62:25
63:1,4,8
64:22,24

67:15
69:8 71:9
83:9

**excludes**
55:18
72:18
74:11

**excluding**
55:8

**exclusion**
56:18

**excuse**
54:25
59:23
83:16

**exhibit**
17:23,24
18:2
46:10
87:19,20
90:17,18

**exist**
76:19
112:1

**existing**
45:19

**exists**
76:15,16,
21 77:2

**expand**
45:16

**expectation**
50:16,21
51:1

**expectation
s**
22:10

**experience**
51:10

**expert**
5:5 7:9,

12 11:4,
18 12:19
15:5,17
16:8
17:6,16
18:4,6
19:24
20:4 25:7
27:21
29:19
40:25
47:4,21
49:10,11,
18 50:18
51:3
56:22
66:15
67:10,18
71:17
79:4
81:15,19
84:24
85:24
87:16,24
88:25
89:5,17,
21 90:20,
23 91:17
93:17
94:14
98:23
102:8
103:8
105:16,
17,19
109:12,17
111:19
113:17

**expert's**
88:22

**expertise**
51:20
105:25

**experts**
21:14,17



Case 8:24-cv-00879-CEH-TPB-ALB    Document 99-3    Filed 04/22/25    Page 133 of 153
PageID 2898

MATTHEW BARRETO, PH.D.
HODGES V. PASSIDOMO

November 25, 2024
Index: explain..follow

48:6
89:1,18
101:3
105:21

**explain**
5:25  9:25
22:15
31:16
52:8,16
80:18
87:23
89:13
102:17

**explainable**
67:22

**explained**
54:5
67:24
79:19
82:9,24
83:2

**explains**
52:5

**explanation**
72:6
74:16
78:10

**explicitly**
89:17

**exploring**
107:14

**extends**
73:17

**extent**
52:5
96:16

**extra**
34:21

**extremely**
100:21

**eye**

34:19

——————

**F**

——————

**F'ED**
90:4

**fact**
33:13
46:14
47:17,23
61:8
66:25
79:7
112:1

**factor**
60:22
62:9

**facts**
47:24
106:2

**factual**
33:5
95:9,14

**factually**
89:11,14
92:18
105:3,18
106:18
108:18

**fair**
6:3,5
113:5

**fairly**
23:23
87:24

**fall**
23:23
56:6

**false**
104:4,5

**familiar**

5:9  14:3
46:21

**fast**
17:12
87:14

**favor**
98:3,4

**federal**
16:25
42:5
47:14,15

**feel**
5:25
109:20

**feeling**
6:24

**female**
11:7

**fight**
108:7

**figure**
24:9
25:15,17
29:19
41:18
55:1,14,
19,20
56:23
57:6,16
59:11,16
60:1,2,24
73:2,8,9,
13,21
74:2
76:20
77:19,22
78:4,5,13
80:7
83:19
86:8,16
90:10
102:4,7,8
103:16,

18,20

**figures**
25:18,20
57:22
77:22

**files**
18:23
19:20,21
21:15

**final**
37:12

**financial**
14:21

**find**
27:7
30:21
55:12
77:23
90:4

**findings**
46:8

**fine**
6:13
33:23
39:19
40:7  52:2
54:10

**fingers**
71:7

**finish**
6:18

**fits**
58:13

**flag**
22:16

**Florida**
8:9,17,20
9:1,12,
13,14
12:25
13:14

16:24
23:11
32:11,13
41:1  46:8
47:7,17,
18,24
50:6,13,
15,20
60:7  71:5
79:9,10
98:15
101:12
108:9
110:23
111:13
112:1

**Florida's**
48:17

**focal**
45:4

**focus**
40:21
50:4
56:17
69:19

**focused**
12:7
44:23
57:13

**focuses**
101:18

**folks**
68:7,18

**follow**
26:22
30:16
52:15
54:22
59:8
61:20
65:24
68:9
69:20
70:11



74:22
75:1,3,5,
17 76:4,6
79:17
81:21
82:25
84:9

**footnotes**
18:9

**forecast**
100:5,19

**form**
83:16,25
99:1,19

**format**
86:12

**forward**
9:6

**found**
53:24
62:23
63:4
108:4,6

**fourth**
36:1 69:2

**Francisco**
72:11

**free**
5:25

**Friday**
15:21
16:16

**front**
7:7 47:25

**full**
4:24

**functional**
14:19
35:24
38:4
42:25

81:1
89:16
97:3,23
98:1
110:10,24

**future**
22:3,4,10
96:20

———————

**G**
———————

**gave**
15:16
49:22

**general**
5:9 15:17
21:13
24:2
65:12
89:8
105:25

**generally**
10:5
43:13
47:7,10
48:4,6
52:13
55:9
61:19
67:22
86:15,19

**generic**
113:1

**geographic**
52:24
53:16
54:4,7,15
57:8
62:21
71:17
76:8
92:18

**geography**

53:18

**geologist**
70:25

**gerrymander
ing**
103:5

**give**
4:10
27:25
49:22
74:17
84:6
101:8
108:10

**giving**
88:8
114:12

**glance**
90:2

**good**
4:19,21
6:20
14:11
87:3
113:15

**graph**
59:1

**graphs**
40:23

**great**
6:16,21
10:24
22:13
74:4
103:16
114:14

**green**
54:18
61:23
73:10,11
74:4

**ground**
5:9 15:16
68:7

**group**
8:18
40:20

**grouped**
53:2

**groups**
40:2

**guarantee**
68:23

**guess**
8:15
10:10,19
16:20
26:15
62:11
63:19
65:25
72:15
77:11
90:8

**guiding**
85:7,10,
17

**Guy**
5:1

**guys**
111:24

———————

**H**
———————

**half**
67:15
111:15

**hand**
4:8

**happen**
30:22
50:25

**happened**
105:23

**happy**
27:8
31:14,16
73:2

**head**
5:20 7:9
8:11 14:6
63:12

**hear**
29:1
57:15
67:7 76:7
82:3
84:24,25
85:1,5,7

**heard**
8:19
72:15
82:14
84:4

**heavily**
59:19

**helpful**
43:19
45:22
64:25
106:16

**hey**
96:23

**hide**
34:21
64:2
109:25

**high**
109:1
110:19

**high-
density**
57:8



higher
  30:18
  37:24
  38:4,13,
  23 63:9
  64:23
  76:24
  83:8

higher-
density
  57:25
  58:19,20

highlighted
  99:7

highlighting
  7:22
  57:23

Hillsborough
  43:9,11,
  15,25
  45:3,19
  50:9
  63:17,20
  64:5
  73:20,21
  95:16

hired
  8:7 15:4

Hispanic
  40:22,24
  41:15
  49:25
  50:7

Hispanics
  41:22

hoarse
  5:24

Hold
  28:9

holds

  112:9

holistically
  62:6

hone
  45:13

honed
  43:2

hones
  58:18

honing
  58:20
  60:10

hope
  71:16

hours
  77:10
  89:12
  108:15

House
  13:23

hue
  68:11

huge
  65:14
  108:18
  111:25

hypothetical
  77:14
  96:20

hypothetically
  71:10

―――――――

        I
―――――――

idea
  109:11

identical

  7:17
  52:23

identically
  36:25

identifiable
  48:18

IDENTIFICATION
  17:24
  87:20
  90:18

identified
  98:7

identify
  68:25
  70:1 75:9
  77:18
  108:16

identifying
  5:2

identity
  111:13

ill
  6:24

illustrative
  31:1
  36:8,13
  37:8,13
  38:15,17
  43:3
  81:7,10
  99:15
  110:11,
  12,24
  112:12

illustratives
  26:10

image
  20:5

images
  25:9,12
  86:7

imagine
  18:17
  50:24
  96:22
  98:17
  111:15,17

implemented
  108:20

implied
  64:15

implies
  104:3

important
  18:15
  60:12
  78:20

Inaudible
  94:7

include
  26:2
  45:16
  52:11
  75:17
  77:24
  94:3

included
  12:3 13:7
  37:10
  42:16
  46:10
  56:16
  57:4,10
  61:2
  63:5,9
  64:22,24
  67:13,14
  69:8 71:9
  75:23
  79:25
  83:8

  106:10

including
  32:14
  38:6
  39:25
  72:11

inconsistencies
  109:2

inconsistent
  100:11
  110:2,3

incorrect
  92:19
  93:7
  105:18
  108:21

increase
  28:13
  30:1
  33:11

increased
  29:23
  34:14

indicating
  38:3

indicators
  35:16

inference
  92:8
  98:12
  106:14
  107:14
  108:19
  113:1

inferences
  110:18

influence
  23:20
  91:6



**inform**
  107:3

**information**
  20:21
  21:1
  95:14
  99:11,16
  100:3

**informative**
  60:6
  99:4,5

**inherent**
  101:16

**initials**
  20:13

**inlet**
  73:5
  74:18

**inlets**
  76:12

**inside**
  61:7
  62:8,20
  64:20

**instance**
  51:2
  60:24

**instances**
  73:17

**instruct**
  24:5

**insured**
  19:21

**intensive**
  13:17

**intent**
  98:11,24
  99:2,18

**interest**
  45:12

46:20
57:11,15
65:17,18
67:21,23
68:3,4,
10,17,19,
25 69:24
72:2

**interested**
  44:19
  45:21

**interests**
  48:8
  98:14

**interior**
  79:21

**interpret**
  32:13
  96:18

**interpretat
ion**
  59:20
  88:15
  110:15
  111:10

**interpretat
ions**
  31:24
  34:20
  82:17
  104:6
  107:9

**intervals**
  108:23

**introduced**
  46:12

**involved**
  47:15

**irrelevant**
  18:13

**island**
  74:10

75:22

**islands**
  71:2,7
  72:19
  74:9

**issued**
  21:7

**issues**
  72:16

**italicized**
  94:18

**item**
  36:2

**items**
  35:15
  48:2

**iteration**
  69:2

**iterative**
  108:22

───────────

**J**

**Jacksonvill
e**
  12:1,8,10
  50:13

**JD**
  32:12

**jingles**
  114:6

**job**
  32:12
  51:19
  84:5
  93:14
  109:21

**judge**
  29:13
  31:11

32:15
50:23
51:13
67:9
68:16
83:19
89:13
102:17
109:24

**July**
  18:7
  21:2,8
  41:4
  42:7,11
  43:24
  46:7

**jumped**
  95:5

**jumps**
  72:10

**June**
  90:9

**justificati
on**
  112:10

**justify**
  104:17

**juts**
  75:2

───────────

**K**

**Kassra**
  11:23

**kind**
  7:22
  17:12
  35:6
  36:18
  52:19
  54:10
  62:11

74:21
75:18,20
89:20
97:14
100:2

**knowledge**
  11:11

───────────

**L**

**laid**
  109:1

**land**
  71:4
  75:10
  79:1,3
  93:22

**language**
  59:7
  102:16
  103:1

**large**
  13:2
  59:17
  80:10

**larger**
  54:17,18
  55:17,23
  79:22
  80:8

**largest**
  66:23
  69:6

**law**
  17:2
  31:25
  32:17
  33:6
  79:9,10
  83:20

**lawful**
  84:14



laws
    23:11

lawsuit
    8:8,21
    9:11,25

lawsuits
    9:3,7

lawyer
    32:12

lawyers
    23:12
    24:4 48:5
    85:14

leading
    42:10

lean
    96:17

leanings
    99:17

leave
    23:11
    26:18
    29:13
    31:11
    43:7
    68:7,18
    89:18

left
    74:25
    108:15

legal
    4:24 23:9
    24:3,8,16
    29:10,13,
    21 30:14
    31:10,11,
    24 32:5,
    6,11,16
    33:13
    79:12
    82:17
    83:17

    84:2,5

legislature
    86:3

lessening
    24:15

lets
    51:13

letter
    107:11

lettered
    11:3
    12:20
    14:18
    23:2 36:8
    37:8
    107:24

level
    53:20
    76:13,24

levels
    53:18
    54:22
    77:25

lied
    52:3

light
    61:22
    99:17

likelihood
    83:7

limit
    57:18
    66:8

limited
    100:15,
    18,23

limits
    66:22
    67:23
    74:12

line-by-
line
    106:15

lines
    26:21,22
    28:12
    30:18
    54:3 56:6
    66:21
    68:9
    69:19
    70:8,17
    72:12
    73:12
    82:1,13,
    23 86:2
    103:9

list
    18:14
    28:5
    69:18
    72:4
    88:13

listed
    18:6,11
    63:13,17
    64:2,9
    97:8

litigation
    8:24 10:1
    11:15,20,
    22 12:7
    13:3,5,9,
    16,21,25
    14:1,13,
    16,17
    19:17
    31:3
    40:19
    41:10
    42:20
    46:13
    48:3
    50:16
    51:3,22

    65:19
    66:13
    67:10
    71:11
    89:5
    91:9,18
    92:7
    99:25
    113:18

live
    53:3

local
    48:25
    49:3 68:7

located
    5:2

location
    53:6

logic
    86:15,19
    112:16

long
    15:23
    19:14
    94:16
    96:5
    113:2

looked
    36:6
    40:13
    45:2
    50:5,12
    55:10,19
    62:19
    63:16
    66:3,14
    71:19
    75:10
    85:19

Los
    5:4

loss
    99:7

lot
    14:14
    15:8 48:3
    66:8
    78:13
    84:3,4
    88:25
    96:19
    104:6,25
    106:6
    109:2

lots
    67:8,12
    76:23
    77:24
    85:19
    89:1
    100:8
    113:3

lotto
    22:7

loud
    27:9

low
    110:19

lower
    26:1 38:2
    39:1 63:8
    64:23
    83:8

_____

              M

_____

made
    11:17
    19:22
    20:22
    21:1 29:3
    35:11
    46:1
    80:21,22
    106:19
    108:10
    111:9,24



**made-up**
110:21

**main**
56:17
58:4
72:7,19
74:7,11
75:17
80:1
109:14

**maintain**
24:16
79:11

**maintained**
23:15

**make**
5:19
25:13
30:24
32:16
33:22
34:6,20
36:15
45:6,12
53:4 59:8
84:23
95:5
102:5

**makes**
10:23
45:15
78:8
108:19

**making**
97:17
103:13

**male**
11:7

**manmade**
78:15

**map**
10:3,8,
10,12,19,

20,21,25
12:1,7,
10,24
18:23
22:19,20
23:1
25:2,9,21
26:1,14
28:13
31:6 33:4
39:10
44:16
53:3,15
54:15
60:19
63:2,25
71:21
74:25
75:1,5,8
76:5,7,8,
21 78:4,
10 80:6,
22,23
81:8,24
85:25
86:1 97:8
104:3,18
110:12

**mapmaker**
60:13
68:1
85:12,21

**mapmakers**
72:20
74:17

**maps**
10:2
11:1,2,
14,17,19,
21 12:6,
13,17,20,
25 13:7,
13,17,18
14:14,17
20:3,5

22:19
24:21
25:1 26:6
27:12
30:15
32:2
36:25
37:13,23
38:4,14,
17 43:3,
10 44:20
52:11
53:13
54:14,19,
24 55:5,
24 56:8,
17 57:22
58:25
61:6
72:11
79:25
80:17
81:7,10
84:11
85:19
86:7,8,16
96:22
98:3
99:15
103:16
110:8,11,
25
112:12,
17,18
114:6

**Marcartan's**
18:18

**mark**
17:22
87:19
90:16

**MARKED**
17:24
87:20
90:18

**marks**
7:22

**marshes**
71:4

**match**
39:4

**materials**
7:7
13:10,11

**matter**
8:17 19:6
33:13

**matters**
9:15

**Matthew**
4:13 5:1
17:8 87:6

**mayor**
49:3

**Mccartan**
11:5,8,
10,12
12:17,18
18:20
90:6 94:9
96:22
102:2,14
109:16
110:5
112:17
114:3

**Mccartan's**
12:18

**meaning**
38:12
45:10
65:11

**means**
22:23
23:12
28:14
52:9,21

82:12,15

**meant**
23:17
24:9
38:15
43:4
64:16
65:9 72:5

**measurement**
53:7

**measures**
38:5

**measuring**
38:7

**medication**
6:25

**memorized**
14:5,12
43:10

**memos**
13:7

**mention**
5:11
72:15

**mentioned**
8:24
10:8,25
45:24
68:3
69:24
70:18
78:22
79:13,14
93:12
101:12,17
102:13

**merged**
19:21

**met**
93:15

**methods**



92:9
108:7

**metric**
82:1,2,5
85:2,6,7,
10

**metrics**
37:22

**Miami-dade**
50:8

**Michael**
19:6

**mid-term**
48:17

**middle**
6:17
72:18

**mind**
4:24 5:2
15:13
17:4
21:25
89:25
114:12

**mine**
110:3

**minute**
79:11

**minutes**
15:24
27:25
114:12

**misinterpre
tations**
109:3

**misinterpre
ted**
107:24

**misinterpre
ting**
106:18

**misread**
106:17

**missing**
16:9

**misstatemen
ts**
108:10

**misundersta
nds**
32:9
108:22

**misundersto
od**
92:12

**mm-hmm**
38:24
44:5
53:14
56:3,25
65:5
72:25
82:8

**modify**
20:21
21:22

**moment**
22:10

**money**
88:2

**month**
8:12

**months**
42:10

**morning**
4:19,20

**move**
6:13
20:19
39:15
44:15
46:24

**moved**
9:5 25:21
28:12,21
30:5

**movement**
25:10
26:17

**moving**
47:14

**multiple**
80:20
108:5

_____

_____

**N**

**named**
89:9

**names**
68:6
69:14,24,
25

**narrative**
20:1
26:12
57:18
59:4

**natural**
65:6 66:1
70:5,6,7,
15,16,18,
20,23
71:2,8,
12,21,24
72:4,6,
12,20
73:11
74:1,14,
16,23
75:5,9,24
76:1,4,
17,18,20,
25 77:2,
7,19

78:1,9
81:20
93:13,21

**necessarily**
42:1
102:21

**needed**
45:1
70:10
88:17
93:4
104:13

**neighborhoo
ds**
53:1
112:10

**nice**
49:6

**Nicholas**
14:8

**nodding**
5:20

**non-black**
29:23
54:18,23
59:17,19

**non-
geographer**
70:25

**nonlegal**
32:24

**north**
50:13
59:19
60:23
62:22

**northern**
56:19
58:15,17,
18 59:12,
13,18
60:15,17

61:1 77:6

**noted**
93:13

**notes**
7:7,13

**November**
90:9

**nuances**
44:25

**number**
17:23,24
23:2 35:5
39:25
47:10
63:17
87:20
90:18
111:24

**numbers**
14:5,12
22:8
37:24
38:12,13,
23 39:1
64:1

**numerous**
51:18
55:5
59:9,11,
14 78:12
82:24
84:9

_____

**O**

_____

**oath**
5:15
68:21
69:4
85:12
93:20

**object**



50:25
83:16
99:1,19

Objection
83:25

obligation
5:15

observable
53:15

obvious
70:16,22,
23

occur
83:13

occurred
83:12

October
43:25
87:12

offer
30:11,13
31:7,12,
21,23,24
34:7,10
37:14
41:21
49:17
50:17,19
51:6
56:22
57:3,16,
21 66:15
67:17,19
68:8
72:13
77:13
79:4
81:14
83:4,15,
17,22
89:4,21
90:11,23
91:8,17

92:6,15,
21 93:1,
23 98:18
99:24
101:24
102:8
104:21
105:8,9,
14 106:8
109:7
111:5
113:9

offered
36:25
51:4 78:9

offering
31:2,5
32:18,22
33:12
42:21
68:15
79:12
82:19
95:6,10
97:4,6,
22,24
98:2,9,23
106:4
113:25

offhand
15:3

offices
48:18

oftentimes
71:3,22
72:20
78:18
105:24

one-county
42:23

one-on-one
16:4

ongoing

20:20
21:12,13

open
21:15
89:24
90:2

opine
27:6

opinion
24:9
28:14
29:10,19,
21 30:3,
11 31:2,
5,21,23
32:5,6,19
34:8
36:19
37:18
38:6,19,
20 41:21
51:6
56:22
57:16
59:13
66:15
67:10,18,
19 68:13,
15 70:19
72:13
74:21
77:12
79:4,6
81:15,23
82:19
83:4,23
84:7,8,
14,21,22,
24 85:13
91:7,8,
14,17
92:14
95:11
98:18,23
99:24

101:8,24
102:9
103:4
104:22
105:8,15
106:17
108:11
109:7,17,
24 110:21
113:6,9

opinions
21:23
26:11
29:18
31:7,12,
19 32:22
33:12
34:5,10
49:10,16
50:18,19
57:3 68:8
79:12
82:22
83:18
88:4,7,
11,25
89:4,16,
20 90:11,
23 92:6,
14 93:1,
23 94:21
95:6,23
96:19
97:4,6,
22,24
98:3,9
103:23
104:6
105:9
106:25
107:3
110:4
111:5
113:25

opportuniti
es

23:14
24:18
98:20,22

opportunity
23:19
24:7,15
29:23
37:14,24
38:7,10,
12 39:8,
10,12
76:4

opposed
24:10
44:9
46:17
47:9
48:25
86:17

opposing
87:24

opposite
44:21

Orange
50:8

Orange/
osceola
50:14

order
113:6
114:24
115:4

ordering
115:3

orders
15:1

organized
19:20

original
13:2,3
40:23,25
42:17



46:20
49:21
97:10,12

**Osceola**
50:8

**Oskooii**
11:23

**outcomes**
36:1

**outlined**
31:12
34:11
67:21
82:6,23
107:10

**outlining**
72:3,4

**overlaid**
54:19
76:9

**overlay**
76:22

**overview**
9:24

**overwhelming**
83:3

———————
**P**
———————

**P00s0042**
14:4

**pack**
104:1,17,
18

**packing**
26:24
27:14
101:8
104:12
112:11

**pages**
56:24
95:25
96:10
97:19
104:9
110:6

**paid**
88:2

**pairs**
83:9

**paper**
88:23
91:5,13

**papers**
91:14

**paragraph**
10:6 19:5
20:19
22:13,22
25:23
26:6,15,
16 27:1,
3,10,11,
16,19,21
28:8,9,
18,19,25
30:23,25
33:19,20,
21 35:4,
10 36:2,
22,24
37:6,7
40:5
46:24
48:9
49:10
52:1,2,7,
11 54:12
59:23
65:2,4,5
79:14,17
82:6
90:14,24

91:1,3,
21,23,25
92:2,4,7
96:4
101:21
102:1,5,
12,20
105:5
106:7
108:1
109:5,8
110:13
111:3,6,
12,20
112:3,6

**paragraphs**
26:7 28:5
31:14,17
34:11
37:3
39:25
41:11
107:24

**part**
11:14,19,
22 12:13
13:2,21
14:10,13,
15 18:3,
4,25
28:19,20
42:7 46:1
47:4,15
49:10
50:23
51:22
58:15
61:1,2,
12,21
62:2,13,
15 65:14
66:14
73:1
74:6,9,25
75:1,8,
15,16,20

92:11
94:16
95:13
96:6
104:14
105:10
107:8
109:19
113:18

**participate**
8:7

**participation**
6:25

**parties**
97:25

**partisan**
95:3
99:3,17
102:23

**partisanship**
95:2,8
101:10,16

**parts**
20:2 48:3
50:9
61:15,16
66:6
67:12,13
72:19,21
74:4
78:17,20
80:8
81:19
100:1,2
108:3
112:8
113:3

**party**
60:11
98:11,24

**passed**

10:4,10,
15

**past**
15:21
30:24
47:11

**pattern**
53:24
54:2
56:15
57:17
58:3,13,
21 59:3,9
61:5,9
79:18
102:24
103:1

**patterns**
40:1
42:22
49:24

**paying**
81:24

**PDF**
7:9,16
25:13

**pending**
21:24
22:1,6

**peninsula**
70:14
72:7,19
73:5
74:7,12
75:17

**peninsulas**
71:1,7

**people**
51:11
78:18
108:8

**percent**



23:21,22,          69:19          95:14           25:1 36:7        91:8,17
24,25              85:18                           51:9             93:1
24:24                             **pieces**       112:18           95:10,19
25:2               **Pete**        33:6                             97:4,6,
52:23               50:14          34:19          **plan**          22,24
54:15                             60:12            14:4,12          98:2,9,22
59:16              **Petersburg** 111:25          18:18            105:23
60:2,10            55:15                           21:19,22         107:2,21
63:3,5,6           56:18          **Pinellas**     25:3,6,8         114:19
75:19              57:13           43:9,15,        31:2,5,7
83:11              66:22           25 45:19        38:17           **plans**
84:16,17           67:12          50:9            42:21            18:18
95:17              69:7,12        63:17,19        51:8 57:3        21:21
                   73:16          64:5            81:14            27:3
**percentage**     86:18                          90:23           29:16,18
97:1,2,7                          **pink**        93:12            30:10
                   **Ph.d.**       54:16          95:6            32:19
**perform**        4:13 87:6      57:9            99:18           33:15
20:22                                             101:24          35:2
21:19              **Phd**        **place**       102:8           37:17
24:1               17:8           10:19           104:21          41:22
110:25                            13:23           105:8,9,        51:15
                   **phenomenon** 23:1            14 106:8,       80:25
**performance**    47:6           24:17           25 107:11       81:15
35:25                             40:10           109:7           113:4
38:5 43:1          **phone**      53:6            111:5           114:8
89:8,15            8:2            60:14           112:2
97:14,24                                          113:9,25        **plots**
99:13,14           **phonetic**   **placement**                   113:3
102:15             114:6          83:1            **planned**
104:5                                             109:25          **point**
110:22,23          **phrase**     **places**      113:10          6:16 15:1
                   82:14          55:18                            25:7
**performed**                     62:2            **planning**     26:11
21:9 23:7          **physically** 64:15,16,       29:19           27:16,20
36:25              70:13          17 67:16        30:11,13,        29:24
                   74:10          69:7 70:8       14 31:12         37:5,12
**performing**     78:23,25       78:9            34:7,10          38:1 39:2
23:21,22,          79:7                           41:21            45:4
24,25              93:21          **plainly**     49:17            58:24
110:12                            102:24          51:16,22         61:8 62:8
                   **picked**                     67:17,19         86:8
**person**         13:18          **plaintiffs**  68:14            94:19
16:5               26:1           8:18            77:13            100:13
                   48:24          10:2,25         79:4             104:4
**person's**                      11:4 23:3       82:19            107:1
20:13              **picking**    36:25           83:4 88:8        110:19
                   38:14          47:17           89:4             114:11
**perspective**
22:22              **picture**    **plaintiffs'**
44:18              86:17          18:18,25
                                  22:19
                   **piece**
                   62:4



pointed
  60:1
  111:8

pointing
  25:10
  30:22
  107:23
  110:18

points
  23:22,25
  37:2,25
  59:1
  88:22
  109:1

polarized
  42:22
  43:4,6
  44:2,9
  46:8,14
  47:18
  50:12
  108:4,6
  110:15,19
  111:25

political
  44:18
  84:5
  97:25
  98:11,24,
  25

politics
  91:6,12

polling
  53:6

population
  25:11
  26:2,23
  27:13,14
  28:21
  29:7,12
  30:1,2,8,
  17 34:12,
  14,17
  35:9,13,

15 37:22
45:11,14
54:4,16,
17,18,23
55:17,22,
23 56:2,4
57:25
58:21
59:17
60:6,8,9
61:4
62:7,20,
24 63:8,9
64:22
69:21
75:20
80:8 83:8
101:18,19

populations
  26:17
  28:13
  29:23
  55:8,18
  56:6,19
  58:19
  59:10,24
  60:19
  61:20
  65:3
  79:22
  80:10
  81:22
  83:1

portion
  40:7
  55:15,16,
  21 57:24
  58:18
  61:16
  62:10
  63:5
  72:23
  73:14
  77:5,6
  80:1
  86:18

101:23

portions
  15:18
  66:7
  70:13
  71:8 72:9
  73:15
  77:23
  78:25
  79:3,21
  87:25
  88:1,19,
  25 89:5,
  7,16 90:5
  93:22
  107:23

ports
  72:22

positive
  38:9

possibly
  14:5 20:3
  105:21

potential
  35:16
  42:21

power
  112:12

precinct
  25:25
  52:11,19
  53:5
  63:25

precincts
  52:22,25
  64:1,3,
  19,22
  67:25

predict
  51:18

predominant
ly

62:25

predominate
  82:12
  85:4

predominate
d
  82:20
  83:23

preference
  36:3

preferring
  101:14,15

preparation
  16:6,25
  18:3,4

prepare
  15:11

prepared
  53:2
  57:21
  98:18

present
  34:7
  105:15

presented
  100:16,17

presume
  94:9 95:8

pretty
  62:12
  75:4 96:5
  107:6,11
  112:14

previous
  10:14
  12:7
  13:16,21
  14:11,13,
  15 30:18
  46:21
  48:1,15

49:25
50:5,12
67:13
80:22

previously
  47:24

Price
  4:18,22
  17:22
  18:1
  39:22
  83:21
  84:18
  87:19,21
  90:16,19
  99:10,22
  114:17,22

primarily
  69:6 71:6

primary
  42:3
  48:10,15,
  19 60:9,
  22 85:6,
  10,16,17

principle
  85:7,10

prior
  10:19
  16:21
  50:17
  109:4

probability
  83:3,6,
  10,11

process
  13:1,15
  44:16

Project
  19:13

projects
  15:8



prominence
  91:6

prominent
  91:12,13,
  14

proper
  65:20,22
  67:20
  68:6
  69:14

provide
  29:17,19
  32:14,17
  61:17
  113:6

provided
  93:3

providing
  24:5

public
  13:14
  14:3,7
  46:13

pull
  17:6
  86:15
  87:1

pulled
  43:23

purpose
  23:7
  26:23
  27:13
  44:23
  46:15

purposefully
  74:15

purposes
  23:17
  28:24
  29:6

38:15
45:1
48:14
50:16
67:10
72:1

put
  18:9
  30:17
  32:1
  62:24
  76:13
  105:21

putting
  34:1

Q

qualifies
  58:21

qualify
  58:3
  71:17
  85:17

quantification
  85:18

quantify
  84:16

quantitative
  83:5

question
  6:4,17,18
  9:12 26:6
  27:18,20
  28:2
  29:3,5
  32:10
  33:20
  39:2 45:5
  50:22
  51:13,21

53:8,9
57:5
60:10
63:21
64:2
68:24
73:20
75:23
76:18
81:9 82:3
88:6
90:8,14
95:15
97:5
98:17
99:5,21
100:4,6,
10,18,21
101:2,4
105:11
106:2
110:1

questioned
  45:9

questions
  5:18,24
  40:8
  50:10
  51:8,12,
  18 57:3
  73:1 74:8
  80:20
  81:13
  100:24
  105:10,25
  109:21
  113:11

quick
  17:15
  28:1

quiz
  77:14

R

race
  30:16
  34:12
  40:1
  41:19
  52:5 54:7
  55:11,13
  59:21
  60:22
  61:17
  62:9,14
  79:19
  80:17
  82:9,12,
  20,24
  83:3,5,23
  84:9,12,
  15 85:1,
  6,8 91:6,
  11
  101:11,16
  102:19
  104:17

races
  48:24,25
  49:3

racial
  26:22
  27:12
  35:16,18
  40:15,20
  52:15
  54:3
  59:10
  60:19
  61:10
  62:3
  65:2,24
  67:25
  68:11
  69:11,20
  74:22

76:6
81:9,21,
24 83:1
85:21
94:12
101:18
102:24
103:1,3,
5,10
112:14,16

racial/
ethnic
  111:12

racially
  42:22
  43:6
  44:1,9
  46:8,14
  47:18
  50:12
  108:4,6
  110:15,19
  111:25

raise
  4:8

raised
  87:25

rates
  95:8

rationale
  86:19

rationally
  43:4

reach
  56:19

reached
  112:21

read
  27:24
  33:20
  88:13
  107:10



113:22,23
114:4
115:2

**reading**
89:9
102:13
114:8

**ready**
19:22

**reaggregate d**
43:1

**real**
14:25
33:3
45:11

**reason**
5:23 6:21
70:16
81:6
108:7

**reasonable**
59:20
80:7
101:2

**reasons**
85:23,25
86:3 99:3

**rebut**
96:14
102:21
103:18
104:11
105:17
107:11
111:19

**rebuttal**
15:18
16:9,20,
23 21:8
31:18
41:3,6,8,
16,19

43:16,24
48:12
49:13,16
51:4
86:24
87:5,16,
23 88:8,
12,16,21
90:12
106:8,10,
11
107:10,21
109:1
111:8
113:6

**rebutted**
114:5

**rebutting**
95:19

**recall**
8:19 9:14
12:6,12
15:3,6,8
18:8 19:3
20:5
63:12
89:9
113:19
114:8

**recalled**
47:13,16

**received**
14:4

**recent**
10:12

**recently**
16:17

**RECESS**
39:20
114:15

**recollectio n**
12:10,16

39:4
63:25
64:4,6,8,
19 104:25

**record**
4:25 28:3

**red**
54:17
55:3,6,22
59:18
61:9,22
73:10,17
74:8,20
76:5 78:1

**redirect**
100:6

**redistricti ng**
9:19 10:4
11:21
12:13
13:1,6,
14,22
14:10
42:14
80:19
93:16

**refer**
10:11,13,
20 26:7,8
35:24
43:20
73:3 95:1
111:22

**reference**
28:9
41:15,23
46:7
63:14
103:7

**referenced**
18:9,16
48:1
49:13

110:21

**referencing**
46:15
47:3,20

**referred**
69:16

**referring**
9:8 22:18
23:4
40:14
41:2
65:16
70:14
80:11

**regard**
14:21
27:22
29:15
34:4 35:2
36:20
41:21
49:11
56:11
57:19
58:2
65:19
68:2
80:24
90:23
95:6 97:6
98:3,10
99:12,17,
25 101:8
102:20
105:15

**region**
11:4
14:18
39:13
41:23,24
42:2,20,
23,24
43:5,8,
12,13,20

44:12,19,
21 45:2,
7,16
46:6,10,
15,20
47:8,9
48:22
49:5
50:3,4,6,
11,18
56:18
57:7,13
65:15
66:10
69:6,12,
13 71:3,
18,19
72:5 78:6
98:15
101:13
108:9

**regional**
50:10

**regions**
12:9
45:20
46:2,4
58:4
66:6,18
69:5,16
72:20

**registered**
56:5
59:17
60:2,8,25

**registratio n**
35:13
37:22

**related**
13:6,22
31:7
55:13

**relates**



101:25

relating
  49:17

relevant
  16:19
  74:3
  80:16
  90:7

relied
  18:12,15
  46:13
  60:22
  83:3,5
  84:12,15
  85:1

rely
  111:19

relying
  46:18,19

remember
  8:10,12,
  14 14:8
  102:13
  103:1

remove
  30:2

rephrase
  6:1

replicated
  55:24
  56:1

report
  5:6 7:9,
  12 10:6
  11:18,24
  12:3,14,
  15,19
  13:2,12
  15:5,18,
  19 16:8,
  9,19,23
  17:7,8,17

18:5,7,9,
15 19:4,
25 20:4
21:2,5,8,
23 25:8
27:5,21,
24 28:3
29:24
31:8,13,
18 32:23
33:2
34:18,23
35:3,5
38:20
40:15,24,
25 41:1,
2,4,6,8,
17 42:7,
8,11,17
43:15,24
44:7,8
46:1,4,5,
6,7 47:4
48:1
49:12,18,
21 50:1,
2,5,12,17
51:3,4
54:10
57:4,19,
22 59:4
63:14
67:21
70:3 80:1
81:19
83:7
85:24
86:5,11,
25 87:5,
16,23,25
88:1,5,7,
9,12,14,
16,24,25
89:5,10,
17,24
90:12,14,
20 92:17

94:21,23,
24 95:13
97:10,12
99:16
100:2,13,
17 104:20
105:12,
17,20
106:11,
14,18
111:19,24
113:8,17
114:1,9

reported
  35:3

REPORTER
  4:8 115:2

reporting
  38:11

reports
  15:1
  51:7,17,
  23 94:14
  97:15
  105:16

represent
  66:6

representat
ion
  23:15
  24:7,18
  26:19

Republican
  60:11
  98:5 99:6
  101:9,15

Republicans
  97:2,7

reread
  14:1

rereview
  13:11

research
  19:6,18

reserve
  20:20

respect
  33:23
  42:22,25
  81:20
  93:13

respected
  66:20
  67:9
  68:5,17,
  20 69:1
  70:2,6,
  19,21
  77:8,19

respecting
  65:6
  66:1,2

respond
  5:18
  88:16,19,
  22

responded
  41:8

responding
  88:3
  102:15

responds
  94:18

response
  21:8

result
  53:17,20

resulting
  26:18

results
  33:3 43:1
  107:14

retain

81:11
110:11

retention
  80:13,14,
  18

reverse
  112:11

review
  12:17,24
  13:5,9,
  13,25
  14:14
  16:12,17,
  24 18:25
  20:16
  113:17

reviewed
  5:5 12:20
  13:12,22
  14:9,11,
  17 15:17
  18:4,8,
  10,13
  38:12
  40:1
  90:21

rights
  9:15
  19:12
  24:17
  84:3

Rios
  19:6,11

river
  71:22
  74:24
  75:2,3,5,
  12 77:4

rivers
  71:4,20
  76:8,12

roads
  78:15,18,



19,21

role
  31:25
  32:1

room
  7:5

rows
  108:21

rules
  5:9 15:16

run
  63:24
  71:20

running
  48:19

rural
  45:15

——————————

—————— S ——————

San
  72:11

saved
  7:15

scan
  37:4

scenario
  96:23

scenarios
  96:20

scholars
  31:11

school
  49:4

science
  33:12
  35:25

sciences
  44:12

scientist
  19:12
  84:6

scientists
  44:18

scope
  22:14

scores
  95:8

screen
  7:10,12
  17:8 40:3
  74:25

screens
  7:8

scroll
  17:11,15
  25:12
  41:17
  54:24
  56:23
  59:15
  61:16
  87:9
  95:4,24
  104:14

scrolling
  63:13

SD16
  93:20
  104:18

SD18
  28:12

SD19
  37:1,25
  38:6
  99:15

Sean
  113:21

section
  26:20

30:16
46:6
52:13
63:3
83:10
94:11
102:19
103:19,21
104:24
105:5,7,
9,15
106:6,8
107:5,7,
22,25
108:1,2
109:5

sections
  19:24
  26:14
  31:8
  43:16
  88:24
  104:16,20
  106:13

select
  15:18

semantics
  95:22

senate
  12:25
  13:14,23
  14:4,18
  22:16,21,
  25 28:14
  84:12

sense
  10:23
  21:13
  33:12,22
  45:13
  65:13

sentence
  19:5
  28:12

38:3 40:9
72:3
94:18
102:23,25
108:17
111:16

sentences
  88:14
  105:2

separate
  42:13
  51:23
  63:23
  78:21

separately
  24:16

separates
  71:22

series
  54:14

served
  19:18

setting
  48:14

shaded
  54:16,17
  57:9
  61:23,24
  62:22

shaking
  5:20

shaped
  61:17

shapes
  52:5
  102:14
  111:13

share
  17:8 40:3

sharing
  68:2

shed
  99:17

shift
  44:13

shifted
  34:14

shipping
  72:22
  74:18

short
  87:2

show
  17:7
  25:18,20,
  21 57:1,
  24 68:4
  108:12

shown
  76:14,21

shows
  25:17,18
  55:22
  61:15
  110:10

sick
  6:24

side
  26:24,25
  34:13
  59:18,25
  60:20
  61:24
  62:18,25
  63:1
  69:11
  73:20,21

sides
  21:14
  44:21
  48:6
  105:25



sightly
  39:10

signature
  17:13
  87:10

significanc
e
  81:22

significant
  34:6

significant
ly
  39:12

similar
  25:1
  52:22
  59:2
  62:22
  63:7 72:2
  84:20
  96:15,21
  97:10
  100:2,8,
  21 101:6
  102:16,
  18,25
  103:2

similaritie
s
  40:14
  65:16,17
  100:14,16

single
  13:6
  18:10
  46:3
  107:1
  111:11

singly
  62:5

sit
  22:11

sitting
  18:8
  77:18

skip
  102:3
  107:5

slightly
  37:14
  38:10,11,
  13,22
  39:1,8,11
  53:1 70:9
  100:21

slipped
  104:4

slower
  38:13

slowly
  17:11
  87:9
  95:25

smaller
  62:24
  63:1

sneak
  34:22

social
  33:12
  35:25
  44:12

software
  20:10,11,
  12 78:7

sole
  82:2,5
  85:7

sort
  15:16
  24:22
  31:9 33:6
  38:5 57:7
  61:21,22

62:8
  65:15
  68:7
  71:2,4,7
  73:13
  74:8,13,
  24 75:17
  80:6,8
  89:8,18
  103:5
  109:22
  112:25
  113:2

sorts
  19:23
  62:1
  72:22

sound
  76:7

sounds
  6:1
  20:12
  86:13
  114:14

south
  50:15
  62:22
  70:14
  72:10
  74:6

southeaster
n
  61:21
  62:10

southern
  61:1
  73:14
  74:9
  75:16

spans
  95:24
  96:9
  110:6

spare
  5:12

speak
  97:12,16
  109:12

speaking
  30:24
  67:21

specific
  10:6 19:3
  29:25
  30:13
  31:9
  37:2,7
  42:20
  44:10
  58:24
  59:7
  65:20,21
  67:23
  68:6,10
  69:23
  71:11
  75:4
  88:17
  89:21
  98:4
  102:1
  110:19

specificall
y
  25:22
  26:8
  27:3,19
  29:16
  30:9,17
  43:2 47:8
  52:21
  66:12,17,
  23 88:19
  91:11
  95:1
  106:14
  107:10

spend
  89:12

spent
  15:4
  94:16

spoke
  15:20
  16:3,5

spoken
  11:10
  15:25
  18:19

spring
  10:20

squeeze
  97:14

squiggly
  75:12

St
  55:15
  56:18
  57:13
  66:22
  67:12
  69:7,12
  73:16
  86:18

staff
  12:25

stand
  51:18,21
  100:22
  109:21

stand-in
  49:6

standard
  23:10
  24:16
  29:10
  32:6,11,
  24 44:11
  82:18



84:2
87:24

**standards**
29:14
84:5
86:19

**start**
22:14
26:9
27:10
51:16
52:2 56:8
61:13
66:19
88:5 89:3
96:5
108:7

**started**
9:4 31:8
111:22

**starting**
26:14
37:6 52:1
55:14
56:1,13
59:23
63:15
99:23

**starts**
26:15
54:12,14

**state**
5:3 8:17
12:9
13:23
14:4,18
30:25
36:24
44:6
45:25
46:3,8
47:1,10,
13,15,16,
18,24,25

49:8
50:23
82:16
93:19
101:3
112:1

**stated**
39:5 60:5
65:1
69:17
93:20
99:14

**statement**
27:7 29:4
37:20
38:18
41:7
81:22
85:5
89:11,14

**statements**
105:18
106:19
108:18

**states**
52:22

**statewide**
42:14
48:16,23
49:5 50:3
80:19

**stating**
4:24
38:21

**statistical**
83:3,10

**stay**
28:2

**Stephen**
90:21
113:17

**stick**

31:14,17
34:23
42:18
82:22
94:24
100:13

**sticking**
43:6

**sticks**
75:20

**stipulated**
47:24

**stipulation**
46:25
111:24

**story**
35:23

**streets**
53:1

**strength**
10:5
24:23
35:16,19
81:12

**stretches**
45:15
70:12

**studied**
50:7

**studies**
51:14

**stuff**
90:6
105:1
113:3
114:6

**subject**
6:14

**submission**
14:3,7
42:10

**submitted**
7:16 12:4
13:13
14:8 15:5
21:2
51:17
109:11

**subregions**
69:14,18,
24,25

**subsequent**
26:7

**subset**
92:11,13

**substantial**
23:23
24:1
80:21

**substantially**
61:25

**substructure**
107:12

**suburban**
45:14

**suburbs**
66:7

**sufficient**
101:7

**suggesting**
71:18

**suggests**
99:6
103:4
104:20

**summarize**
36:19

**summary**
36:23
38:3,18,

21 40:10
53:23,24
86:11

**super**
90:3,7

**supplement**
20:21
21:22
46:22

**supplemental**
111:23

**supplementation**
46:17

**supplemented**
48:11

**support**
80:2

**supporting**
37:24

**suppose**
95:2

**supposed**
114:4

**surprised**
93:19
100:12

**swear**
4:9

**sworn**
4:14

**systemic**
106:15

_____

**T**

_____

**table**
63:13,14



94:3
95:4,5,6,
7,9,11,
12,21
96:13,14,
20,24
97:11
99:7,23,
25 100:3,
7,15,17
101:22,25
107:17
109:20
110:2

**tables**
19:22
20:7
24:5,20
26:8
30:15
32:2,17
36:6,15
37:10,21
38:22
96:16,17,
18,21
97:1,10,
16 100:25
101:1,6
107:7
110:22

**taking**
4:23
104:3

**talk**
11:1
15:10
18:3 27:3
40:1
46:25
48:9
51:25
59:4 73:2
77:3,4,10

**talked**
18:2
20:25
36:17
56:9,10,
14 58:5,8
62:10
65:2 77:4
81:18,20
86:13,21,
25 90:5
94:22
114:19

**talking**
9:11
10:18
11:24
22:14,20
26:16,20
27:21
34:2,4
36:18
39:24
41:3,13,
14 50:17
51:1 57:1
58:10
66:11,12
72:15
73:19
74:5
75:11
78:6 81:4
82:7 89:8
101:5
103:3
104:21
106:14,22

**talks**
92:17
106:6

**Tallahassee**
50:13

**Tampa**
11:4

12:5,6
14:18
41:24
43:13
46:6,10
47:7
48:21
50:18,22
51:1
55:21
56:11
58:9
61:12
66:23
67:14
69:7,13
70:14
71:17
72:7,8,
18,23
74:2,7,12
75:17
78:6

**Tampa/st**
50:14

**Tara**
4:22

**tasks**
19:23

**team**
16:3 51:9

**telling**
15:13
60:25
76:20,23
95:13

**tend**
99:7,9

**terms**
38:7 53:5
70:15
72:17
85:18
94:17

111:23

**test**
6:11

**testified**
4:15

**testify**
6:22
30:14
77:15,16
96:24
106:20
114:19

**testimony**
4:9 5:14
13:7
50:21
51:16
68:22
100:15

**text**
7:15
55:16
57:13

**theory**
112:25

**thing**
64:7
107:6
109:14,22

**things**
15:2
21:15
35:6,20
36:4
60:12
62:1 67:3
71:20
76:9
88:17
97:13
108:16

**thinking**
65:12

**thinks**
91:14

**thought**
88:17
103:19
106:22

**thoughts**
57:22

**tied**
38:1

**time**
9:18
14:24,25
15:4,5,
15,25
16:3
25:19,21
28:7
89:12
94:8,16
114:23

**times**
5:7 49:14
51:11,18
86:25
108:5,20,
21,22,23

**title**
87:5

**today**
5:14,24
6:11,21
7:18 9:11
16:25
21:9
22:11,12
70:1 75:8
76:1
77:7,18
85:23
90:10
94:15
114:20



today's
  15:10,11

told
  51:15
  91:19

tomography
  113:3

top
  8:11 14:6
  61:13,15
  63:12
  73:24
  76:9 89:3
  96:13
  102:4

topic
  47:22

topics
  43:7
  114:1

touch
  78:25
  79:7

touched
  87:22

touches
  71:15
  73:4,10
  93:22

touching
  73:22

tract
  44:14

traditional
  93:16

transcript
  114:24
  115:1

trap
  95:22

Trende
  113:17,21

Trende's
  114:1,4

trial
  34:22
  84:24
  85:6
  90:9,15
  91:20
  100:25
  108:13

tributaries
  76:8,12

triggers
  24:12

true
  17:16
  41:7
  60:23
  64:13
  86:22
  87:15
  104:13,19
  112:13

truth
  4:10,11,
  14,15
  5:15

truthfully
  6:22

turn
  7:9 58:5
  86:24

turned
  16:23

turnout
  35:14
  37:22

turns
  58:24
  62:5 75:2

two-county
  42:24

type
  34:25
  78:3
  85:20
  103:2,4,8
  108:24

typed
  7:15

types
  35:12
  53:10
  61:4
  76:25
  81:13
  86:9
  103:6

typically
  50:9
  78:17
  98:7

———————

U

U.S.
  13:24

UCLA
  19:12

unable
  6:22

understand
  5:6,14,
  21,24
  6:6,14
  10:7,17
  20:15
  22:21
  24:8,11
  25:14
  27:5
  29:15
  30:5,9

32:9
33:25
34:9
42:8,9
44:12,24
48:11,24
53:17
57:14
59:7
60:13
61:5
63:21,22
67:7
68:15
69:23
76:18
84:19,23
91:16,17
97:5
99:20,21,
24 100:1
106:17

understandi
ng
  18:12
  22:24
  23:9
  24:2,25
  45:21
  62:9
  83:13
  108:19

understood
  6:4 9:23
  14:20
  37:11
  39:14
  41:10
  43:13
  106:3,5

unit
  54:7
  62:21
  92:18

units
  54:4,15

unlawful
  83:14

unremarkabl
e
  112:15

untrue
  105:3

———————

V

varies
  82:16

variety
  46:9

VDTS
  27:12
  67:25
  111:8

version
  7:17

versions
  22:25
  23:2
  24:21
  44:16

versus
  25:25
  41:1,20
  44:4 45:7
  46:5
  64:20
  111:23

veto
  13:7

violation
  24:17
  33:6

vis-à-vis
  56:6



MATTHEW BARRETO, PH.D.
HODGES V. PASSIDOMO

November 25, 2024
Index: visible..works

**visible**
  102:24

**visual**
  20:5 80:3
  84:11

**visually**
  54:20,21
  60:19
  62:16
  63:2

**Voss**
  21:5,8
  41:9
  87:25
  90:21
  101:1
  102:18
  110:4

**Voss's**
  15:18
  16:9
  88:5,7,
  11,13
  89:5
  96:19
  113:8

**vote**
  40:16
  47:8 48:7
  108:9
  112:18

**voted**
  42:3

**voter**
  26:17
  35:13,14
  37:22

**voters**
  22:17
  37:14
  40:15,16,
  22,24
  41:14,15,

20 42:2
43:5
44:19,20
45:9,20
47:7,9,
19,23
48:7
49:7,25
50:1,8
53:1 56:5
60:25
98:8,22
99:8,9
101:9,13,
14 104:1,
12 110:7,
11,25

**voters/
residents**
  79:19

**voting**
  9:15 10:5
  19:12
  23:13
  24:17,23
  27:13,14
  35:8,13
  40:1
  42:22
  43:4,5
  44:2,10,
  21 45:11
  46:8,14
  47:18
  50:1,12
  52:18
  54:16
  59:24
  60:8,9
  61:4
  81:11
  84:3
  98:14
  101:19
  108:4,6
  110:16,20

111:13
112:1,12

**VTD**
  52:11,24
  53:7 62:6
  64:1

**VTDS**
  25:10,25
  26:2
  52:12,16
  53:12,15,
  19 61:7
  63:13
  83:9
  84:11
  92:13

_____

**W**

_____

**walk**
  52:19
  54:10

**wanted**
  35:18

**Warren**
  14:8

**water**
  70:12
  73:4 74:5

**waterway**
  75:6,13

**weakened**
  110:7

**week**
  90:10

**weekend**
  90:3

**weeks**
  42:10

**weigh**
  21:14

**western**
  55:16
  58:11
  72:23
  73:15
  77:5

**wetland**
  75:22

**wetlands**
  71:20

**whatsoever**
  27:4 31:1

**white**
  28:13
  40:16,21,
  24 41:14
  47:9 48:7
  50:1
  55:8,18
  79:22
  80:10
  99:8
  101:14

**wide**
  78:5

**widely**
  47:6

**widespread**
  91:6

**win**
  110:20,21

**winning**
  22:7

**wondering**
  34:25
  39:16
  66:3
  73:23
  75:8
  79:16
  85:4,5
  94:20,21

**word**
  24:10
  27:16,18,
  22 29:16
  30:9
  31:20,22
  33:14,17,
  19 34:6
  71:1 84:2
  111:11

**wording**
  70:25

**words**
  22:22
  27:9
  33:10,21,
  22 69:3
  84:4,23
  89:2
  96:19
  103:6
  112:5

**work**
  10:22
  13:9 15:8
  18:3 19:1
  20:16,17,
  20 21:12,
  13 22:10,
  14 50:4
  113:18
  114:4

**worked**
  8:17,25
  9:21
  15:15
  20:8,12

**working**
  11:4 20:6

**works**
  10:18
  39:19
  90:15



MATTHEW BARRETO, PH.D.
HODGES V. PASSIDOMO

**world**
  14:25

**worse**
  39:12

**write**
  33:2
  55:16

**writing**
  7:13
  89:12

**written**
  91:11
  99:4
  101:23
  102:25
  112:25

**wrong**
  89:11,13,
  14 100:1
  103:24
  104:7
  106:18
  107:24
  108:18,24
  110:16
  111:7
  113:22

**wrote**
  13:12
  18:7 31:4
  52:7
  87:23,25
  88:14
  89:2 91:5

———————

**Y**
———————

**year**
  8:14,15
  10:11
  14:2 15:9

**years**
  13:8

  19:15
  48:5,16,
  17 60:7

**Yup**
  39:18
  92:5

———————

**Z**
———————

**zoom**
  5:20 7:4,
  10 17:19
  54:22
  58:16
  73:14
  74:2
  76:13,24
  77:10,22,
  23,25
  78:6,7,13
  87:17

**zoomed**
  58:17
  86:8

**zooming**
  55:14
  86:9

