## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KÉTO NORD HODGES, *et al.*,

    *Plaintiffs*,

v.

                                Case No. 8:24-cv-879-CEH-TPB-ALB

BEN ALBRITTON, in his official
capacity as President of the Florida
Senate, *et al.*,

    *Defendants*.

_____/

## DEFENDANTS' JOINT RESPONSE IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR NON-SEQUESTRATION

The Court:     "Would you be the lawyer that came into court, or would you be a witness? . . . ."

Mr. Warren: " . . . . [M]y co-Counsel, my clients and I have all conferred and discussed about this issue [of the Florida Bar rules concerning a lawyer acting as an advocate at a trial] throughout the case . . . . ***[M]yself and my co-Counsel are all prepared to act accordingly*** should that rule be implicated later in this case."

***Ex. 1***, 33:8-25 (Mar. 13, 2025 Motion Hearing Transcript) (emphasis added).

But instead of "act[ing] accordingly," Plaintiffs—who have six other attorneys of record—now argue that Mr. Warren should be allowed to (1) testify as a witness about disputed material factual issues *and* (2) serve as Plaintiffs' lead legal advocate at trial. The Motion seeks to avoid the sequestration requirements of Federal Rule of Evidence 615 to allow a will-call fact witness who worked to

influence the legislative record in this case to influence the course of the proceedings at trial.

Defendants, Florida Senate President Ben Albritton and Secretary of State Cord Byrd, both in their official capacities, respond in opposition to Plaintiffs' Motion for Non-Sequestration. The Motion should be denied.

## Background

### I.     Redistricting in Florida Generally

1.     Florida's redistricting process is governed by multiple provisions of federal and state law, including the Florida Constitution, which, in part, prohibits the drawing of districts to favor or disfavor a political party or incumbent, and prohibits the drawing of districts with the intent or result of diminishing the ability of racial or language minorities to elect representatives of their choice. *See* Art. III, § 21, Fla. Const.

2.     The Florida Supreme Court has held that evidence of unconstitutional intent by outside individuals who submit proposed maps for consideration by the Legislature is relevant to the question of whether a redistricting plan adopted by the Legislature satisfies the constitutional standards. *See League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363, 378–86 (Fla. 2015). Based on its conclusions of improper partisan intent (derived in part from discovery on non-parties), the Florida Supreme Court in 2015 ordered the Florida Legislature to redraw eight congressional districts and all other districts affected thereby. *Id*. at 416.

3.      Following the 2020 decennial census, the Florida Senate adopted new procedures to protect its redistricting process from improper outside influence. Members of the public who submitted redistricting maps for consideration by the Florida Senate were required to identify whether they were a lobbyist or being compensated for their appearance or sponsorship and "to list every person, group, or organization they collaborated with on their map, comment, or suggestion." ***Ex. 2*** (Sen. Rodrigues memo dated Nov. 22, 2021).  Individuals who "submit[] maps must [also] acknowledge that their communications and submissions may be included, reviewed, and examined in all steps of the legislative process until, and even after, new district maps are enacted into law." *Id.*

## II.    Mr. Warren Works Behind the Scenes with a Democratic Political Consultant to Influence Redistricting

4.      Mr. Warren has been a lawyer for the ACLU of Florida since 2020. ***Ex. 3***, 8:3-4 (N. Warren depo). Matthew Isbell is a political operative who works to support Democrats. ***Ex. 4***, 26:23-27:9 (M. Isbell depo). Before the Legislature even began its 2020 redistricting process, Mr. Warren and Mr. Isbell began messaging back and forth about redistricting and the Democratic legislators. In May 2021, Mr. Warren asked, "are you involved in caucus strategy or anything?" *See **Ex. 5***, at pdf 4 (Excerpts of messages b/w N. Warren & M. Isbell). Mr. Isbell responded, "directly with members? no. will I be involved? yes. . . . i don't think with members, what i'll be doing is still being worked out, i'll say as much." *Id.* at pdf 5. Mr. Warren responded, "well keep me updated to the extent you can. . . . I

3

have concerns with how things have been going so far." *Id.* "i'll def[initely] keep you updated," Mr. Isbell responded. *Id.*

5.      Mr. Isbell subsequently asked Mr. Warren for "links on florida redistricting cases" so that, as a political consultant for Democratic interests, he could "be sure I get my head entirely wrapped around some of these." *Id.* at pdf 7. Mr. Warren obliged. *Id.* at pdf 7-8.

6.      In August 2021, Mr. Warren publicly tweeted and privately messaged Mr. Isbell about a map he drew that had "the same Black population as the benchmark, without crossing Tampa Bay." *Id.* at pdf 14; *see also* ***Ex. 3***, 62:12-63:23. Mr. Isbell replied that if "the bay gets crossed" it "might also relate to if they try to screw over [Democratic Senator Janet] Cruz and just cede a pinellas seat." ***Ex. 5***, at pdf 14. Mr. Warren explained in deposition that "Mr. Isbell is referring to speculation about whether the Senate majority would choose to put a plan without a district that crossed Tampa Bay. And the result of that being that one Senate District in Pinellas County would become less Republican." ***Ex. 3***, 63:18-23.

## III.    Mr. Warren Works Behind the Scenes to Try to Influence Democratic Legislators on Redistricting

7.      The Florida Senate began holding committee meetings to discuss the redistricting of the state Senate Map in September 2021. In October 2021, Mr. Warren communicated with John Toman, an in-house lawyer for the Senate Democratic Caucus. ***Ex. 6*** (Email thread b/w N. Warren & J. Toman). Mr. Warren assisted Mr. Toman with redistricting issues, and Mr. Toman asked Mr. Warren to

provide him with "queries/responses that we *should have raised* at yesterday's staff marching order confab" relating to redistricting. *Id.* Mr. Warren again obliged, suggesting questions for future meetings and providing a link to Mr. Warren's redistricting webinar through the ACLU. *Id.*; *see also **Ex. 7*** (Email thread b/w N. Warren & D. Grimes) (showing Mr. Warren communicating with House Democratic Caucus staff about redistricting issues and providing questions for the Democratic Members to ask in committee).

8.      On October 18, 2021, Mr. Warren vented to Mr. Isbell, "What's the point of preparing great questions for Dem[ocratic] senators if they don't even say a fucking word." ***Ex. 5***, at pdf 21. Mr. Isbell replied, "These people are worthless," to which Mr. Warren replied, "Yup." *Id.* Mr. Warren also complained that he had deleted a tweet he described as "FL Dems are doing exactly the wrong things to prepare for this redistricting cycle" because "random important people start[ed] shitting on [him]." *Id.*

## IV.   Unsatisfied with Democratic Legislators' Inaction, Mr. Warren Directly Tries to Influence Redistricting in the Senate

9.      On November 11, 2021, Mr. Warren texted Mr. Isbell, "they don't know i just submitted a tampa bay senate map." *Id.* at 22. Mr. Isbell responded, "What I find amazing is that the Dem[ocratic] primary makeup for their plan is almost the same as mine (and I don't cross the bay). The pinellas portion isnt even that black since they grab a ring of white liberal Dem[ocrats] as well." *Id.* Mr.

Warren replied, "I know! Mine has a higher black share of Dem[ocratic] primary than the benchmark!!" *Id.* at 23.

10.    As required, Mr. Warren submitted a 2022 Redistricting Suggestion Form along with his state Senate map (which became known as "Plan 42"). ***Ex. 8*** (N. Warren suggestion form). Mr. Warren did not disclose the ACLU as his employer; affirmed that he had not "received compensation or anything of value (travel, meals, lodging, etc.) from any groups or organizations that have an interest in redistricting as a part of, or in exchange for, his comments, suggestions, or map"; and wrote "None" when asked to "[l]ist the name of every person(s), group(s), or organization(s) you collaborated with on your comment, suggestion, or submitted map below." *Id.*  Mr. Warren texted Mr. Isbell that he had been "spending way too many hours drawing maps" and had "submitted 4 now." ***Ex. 5***, at 24.

11.    On November 17, 2021, the Senate Select Subcommittee on Legislative Reapportionment held a meeting. Mr. Warren submitted an appearance card to publicly address the Subcommittee about his map. ***Ex. 9*** (N. Warren appearance card). Mr. Warren wrote that he was speaking for "information," and checked a box stating that he was appearing "without compensation or sponsorship." *Id.* Mr. Warren did not provide his ACLU email and instead listed a Gmail address. *Id.*

12.    During the meeting, Mr. Warren said he had "just one brief comment to make," and directed the Senators to his Plan 42, which he stated "just tries to solve one problem that I identified or one issue with Tier-Two compliance." ***Ex.***

6

*10*, at 30:5-8 (Nov. 17, 2021 Select Subcommittee on Legislative Reapportionment transcript). Mr. Warren explained Plan 42 and made clear that he wanted the Senate "to avoid having a district that crosses Tampa Bay." *Id.* at 30:9.

13.    Following the meeting, Mr. Warren complained to Mr. Isbell that "the 4 Dem[ocrats] on the Senate Committee are some of the least equipped to be smart." *Ex. 5*, at pdf 25.

## V.    Mr. Warren's Undisclosed Affiliations Are Exposed

14.    On November 22, 2021, Senator Rodrigues sent a memorandum to all senators regarding "Misleading Committee Appearance Forms." *Ex. 2*. Senator Rodrigues wanted all senators to be aware of Mr. Warren's employment as a staff attorney with the ACLU, which Mr. Warren did not disclose. *Id.*

15.    Mr. Warren sent a letter to all Florida Senators on December 8, 2021, confirming his employment with the ACLU. *Ex. 11* (N. Warren letter dated Dec. 8, 2021). He stated that he did not collaborate with the ACLU and that he "drew [his] plans and gave [his] testimony on [his] own personal time, using [his] own personal resources." *Id.*

16.    No Senators submitted a written request to Senate staff (Senate protocol) to include any of Mr. Warren's suggestions in future redistricting maps.

## VI.    Mr. Warren Continues His Attempts to Influence the Senate in Secret

17.    On December 2, 2021, Mr. Warren messaged Mr. Isbell asking what the "coalition's and Dem[ocrats'] strategy" was, and Mr. Isbell responded that his

strategy and the "dem[ocrat] strategy is not the same." ***Ex. 5***, at pdf 26. Mr. Isbell stated that he didn't "talk to those members who spoke today. I don't give them advice. Frankly I don't find them capable." *Id.* "I see," replied Mr. Warren. *Id.*

18.     Five days later, Mr. Warren messaged Mr. Isbell, "you, me, and [reporter] andrew pantazi are the real fair districts coalition." *Id.* at pdf 27. "Someone has to stand up [to] do it. Might as well be us!" said Mr. Isbell." *Id.*

19.     On January 14, 2022, Mr. Warren asked Mr. Isbell, "Could I ***launder*** through you a history lesson thread on the importance of filing floor amendments to maps?" *Id.* at pdf 31 (emphasis added). "Trying to get [Democratic Senator] Shev[rin Jones] or [Democratic Senator Annette] Taddeo *anyone* else to file a Tampa map," he continued. "Sure, sounds good to me," responded Mr. Isbell. *Id.* Mr. Warren sent Mr. Isbell a written thread 77 minutes later, complete with screenshots coordinating with Mr. Warren's analysis. *Id.* "[F]eel free to gussy it up in your own voice, add/cut . . . .," Mr. Warren instructed Mr. Isbell. *Id.*

20.     The next day, Mr. Isbell messaged Mr. Warren a public tweet with a link to Mr. Warren's "launder[ed]" article, which was titled, "As the Fla Senate maps are poised for floor votes next week, here's a little history lesson on why it's important for legislators to propose alternative maps." *Id.* at pdf 35. "Thank you!!!! Beautiful," Mr. Warren responded. *Id.*

21.     The Florida Senate on January 20, passed the state Senate map, which was then transmitted to the House for review.  That day, Mr. Isbell complained to Mr. Warren that it was "nuts" that "we get no amendments offering changes to

tampa or broward senate seats." *Id.* at pdf 40. Mr. Warren responded that he suspected "an unwillingness to rock the boat lest it backfire and things get shaken up all over. [C]ombined with a lack of understanding of the facts and issues." *Id.*

22.    After the House considered the state Senate map, Mr. Isbell messaged Mr. Warren that "the lack of any democratic amendment to not cross the tampa bay for senate is still angering me a week later." *Id.* at pdf 46. Mr. Warren responded that "[***a]ll the issues we've been pounding for months*** have been raised by lower level staff. ***Tossed in the Trash. Every. Single. Issue***." *Id.* (emphasis added).

23.    Both the Florida House and Senate passed the state Senate Enacted Map in February 2022.

## VII. <u>Plaintiffs Make Mr. Warren a Fact Witness in the Litigation, Then Try to Run Away from It</u>

24.    On April 10, 2024, Plaintiffs filed the Complaint in this litigation. ECF No. 1. The complaint includes multiple allegations about Mr. Warren's conduct as a private citizen, including his drafting and submission of Plan 42, as well as a picture of the Plan 42 map, without identifying Mr. Warren as the map drafter. *Id.* at 13-14 (¶ 64 & Fig. 2). Plaintiffs also provided quotes from Mr. Warren's legislative presentation explaining Plan 42—again without identifying Mr. Warren as the speaker. *Id.* at 14-15 (¶ 65). Plaintiffs also alleged that Plan 42 was an alternative rejected by the Legislature that was more narrowly tailored to comply with Tier One requirements than the Enacted Map. *Id.* at 26-27 (¶¶ 122, 124).

25.   In October 2024, the Florida Senate served a deposition subpoena on Mr. Warren regarding his personal, pre-litigation involvement in Florida's redistricting process. Mr. Warren moved to quash the Florida Senate's subpoena in the Northern District of Florida. *Nord Hodges v. Passidomo*, No. 4:24-mc-139, ECF No. 1 (N.D. Fla. Nov. 2, 2024) (Warren's Emergency Motion to Quash).

26.   In his motion, Mr. Warren argued that the Florida Senate should not be permitted to make "any inquiry into Mr. Warren's pre-litigation advocacy, opinions, and motivations." *Id.* at 25.  Contrary to his December 8 letter to the Florida Senate, Mr. Warren now claimed to the Northern District that he "is a public interest attorney, and as such, ***is always wearing two proverbial hats***: one as a citizen and one as a lawyer." *Id.* (emphasis added). In fact, "[a]s a public interest attorney, Mr. Warren is constantly conducting investigations, both in his representative capacity for the ACLU of Florida and in his spare time as a concerned citizen." *Id.* And apparently, "many of Mr. Warren's motivations, opinions, and thoughts constitute his own mental impressions as a public interest attorney in anticipation of litigation—even if they were outside the scope of his employment with the ACLU." *Id.*

27.   The Court disagreed and authorized Mr. Warren's deposition. *Nord Hodges v. Passidomo*, No. 4:24-mc-139, ECF No. 10 (N.D. Fla. Nov. 15, 2024) (Walker, C.J.). Defendants deposed Mr. Warren on November 18, 2024, subject to the parameters of the Northern District's Order.

## VIII.  <u>Plaintiffs Want Mr. Warren to Continue to Wear Two Hats</u>

28.    Defendants have long made clear their intent to call Mr. Warren as a fact witness. This intent was also apparent to this Court, which asked Mr. Warren at the summary judgment hearing if he would be the lawyer or a witness at trial. *Ex. 1*, 33:8-10. Mr. Warren replied:

> my co-Counsel, my clients and I have all conferred and discussed about this issue [of the Florida Bar rules concerning a lawyer acting as an advocate at a trial] throughout the case . . . . [M]yself and my co-Counsel are all prepared to act accordingly should that rule be implicated later in this case.

*Id.* at 33:19-25.

29.    Plaintiffs now attempt to change course, making Mr. Warren one of their own fact witnesses and, according to the Motion, an attorney whose presence is "necessary" at trial. Mot. at 5 (arguing in part that he "has been directly involved in the preparation of trial exhibits"). On April 22, 2025, Plaintiffs listed Mr. Warren as a may-call witness (he is a will-call on Defendants' list). ECF No. 101 at 4. And they included more than 40 exhibits on their exhibit list that related to Mr. Warren, including emails, messages, or other communications from or to Mr. Warren during the legislative session. *See* ECF No. 101-1.

30.    And perhaps as yet additional indications of Mr. Warren's two proverbial hats, Plaintiffs included as evidence two emails sent from Mr. Warren in this litigation in his capacity as Plaintiffs' attorney. *Id.* at 10-11. Mr. Warren also personally provided written instructions to Plaintiffs' expert witness Dr. Cory McCartan as to how Plaintiffs' Maps A, B, and C should be drawn. *Id.* at 5.

**Legal Standard—Federal Rule of Evidence 615—Excluding Witnesses**

Federal Rule of Evidence 615(a) provides that "the court must order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony" "[a]t a party's request." Rule 615(a) recognizes narrow categories of individuals who are exempted from exclusion, including "any person whose presence a party shows to be *essential* to presenting the party's claim or defense." Fed. R. Evid. 615(a)(3) (emphasis added).

The party moving for an exception to the sequestration rule bears the burden of showing the exception is warranted and "must overcome a '*strong presumption*' in favor of sequestration." *United States v. Forehand*, 943 F. Supp. 2d 1329, 1331 (M.D. Ala. 2013) (citation omitted; emphasis added). "While the courts have not developed a precise test for what makes a witness's presence essential, it is clear that the test is 'not whether the witness' testimony may be important but, rather, whether *he is needed in the courtroom* when he is not testifying.'" *Id.* (quoting Wright & Miller, 29 Fed. Prac. & Proc. § 6245 (1st ed.) (emphasis added)).

## Argument

From the very beginning, the complications arising from Mr. Warren's dual roles as both a material fact witness and an attorney in this litigation were obvious and avoidable. According to the Motion, Plaintiffs sought to retain Mr. Warren, despite his numerous attempts to influence the redistricting process for partisan benefit, and decided to further inject Mr. Warren as a fact witness into this litigation, going so far as to identify and present Mr. Warren's Plan 42, allege that

his map was a reasonable alternative to the Enacted Map, and quote his testimony before the Florida Senate in their Complaint.

Given these circumstances, Defendants have long made known their intent to call Mr. Warren as a fact witness to testify about disputed material issues, such as his communications with legislators and staff, his attempts to influence the process for partisan benefit, and his partisan-motivated map that could not serve as a viable alternative configuration for the Legislature to adopt. Defendants listed Mr. Warren on their initial disclosures in May 2024, successfully fought to depose Mr. Warren in November 2024, discussed Mr. Warren's involvement in their summary judgment motions in January 2025, made clear to Plaintiffs and the Court in March 2025 that Mr. Warren would be a will-call witness for Defendants, and were transparent with their intentions to invoke Federal Rule of Evidence 615 at trial when Plaintiffs asked in early April 2025.

But despite the long-known risks and potential consequences of Mr. Warren's two proverbial hats, including this Court's inquiries as to the potential implications, Plaintiffs and their counsel have continued to proceed as though they had every right to make Mr. Warren a fact witness and their lead advocate at trial. Plaintiffs have listed Mr. Warren as a may-call fact witness and propose to introduce more than 40 exhibits—more than 20% of their exhibit list—that relate to Mr. Warren's role during the redistricting process. It is against this backdrop that Plaintiffs request this Court deny Defendants' right to invoke Rule 615.

## I.    Plaintiffs' Arguments Regarding Disqualification and the Rules Regulating the Florida Bar Are Inapplicable and Misplaced

First, Defendants want to be clear. Defendants have not moved, and do not intend to move, for Mr. Warren's disqualification in this litigation. Defendants have no objection to Mr. Warren serving as counsel for Plaintiffs *before* trial and *after* trial—Defendants' concern is his role *during* trial.

Second, Rule 4-3.7 of the Rules Regulating the Florida Bar is not at issue before this Court. Rule 4-3.7 concerns whether it is *ethical* for Mr. Warren to serve as an attorney at trial in a case where he is a material witness. Whether Mr. Warren is complying (or not) with his ethical responsibilities as a Florida Bar attorney is between him, his clients, and the Florida Bar. Rule 4-3.7 has no control over the application and operation of Rule 615.

For these reasons, Plaintiffs' argument that "Defendants' failure to file a motion to disqualify should itself be fatal" (Mot. 4), completely misses the mark. Plaintiffs have cited no authority for the illogical proposition that Defendants are required to move to disqualify Mr. Warren as counsel from the litigation or to show that his actions violate Florida Bar rules if Defendants wished to invoke the Rule with regard to Mr. Warren's presence at trial. To the contrary, it is Mr. Warren who should have anticipated this situation and resolved it before the eve of trial:

> If counsel is aware of the necessity for his testimony before the trial begins, he should discuss the matter with his client and decide whether other counsel should be substituted or if he should retire from the case. The rule on the point is so clear that counsel should anticipate the reason and effect of his testimony beforehand and if it

goes beyond formal matters he should advise his client and make proper arrangements for other counsel to handle the trial.

*Millican v. Hunter*, 73 So. 2d 58, 60 (Fla. 1954).

Thus, many of the cases cited in the Motion are inapplicable, because they relate to the *disqualification* of an attorney, not his or her *sequestration* at trial. Those cases have no relevance to the issue before this Court under Rule 615, and this Court should reject Plaintiffs' invitation to shift their burden to overcome a strong presumption in favor of sequestration into one placed upon Defendants to meet the "strict scrutiny" burden of disqualification.

## II.    Mr. Warren Should Be Sequestered

Rule 615 applies for a commonsense reason: it prevents witnesses from coordinating and shaping each other's testimony. *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1373 (5th Cir. 1981). In doing so, it also works to safeguard the integrity of the judiciary and avoid the appearance of impropriety. Those concerns are especially important here, where the evidence shows that Mr. Warren, as a private citizen: (1) worked behind the scenes to influence redistricting with Democratic legislative staffers and at least one Democratic consultant; (2) submitted a map to the Florida Senate concerning the very district at issue in this case—without identifying his ACLU employment; (3) testified before a Florida Senate Subcommittee—again, without identifying his ACLU employment; (4) claimed before the Florida Senate that he presented his ideas as a private citizen; (5) walked back that claim before the Northern District of Florida by explaining

15

that he always wears "two proverbial hats" in an effort to avoid deposition; (6) "launder[ed]" an article through a Democratic consultant in an effort to persuade Democratic Senators to file a new map redrawing the Tampa Bay area; and (7) filed a Complaint quoting himself and relying upon his map, again without attribution.

Moreover, Mr. Warren has interacted in a meaningful way with at least *six* fact witnesses and *one* expert witness during the last four years: Mr. Warren (1) spoke before Jay Ferrin and Democratic Senator Bracy in Senate Subcommittee regarding his Plan 42 map; (2) personally spoke with House Democratic Leader Driskell regarding redistricting, at a minimum, involving prisons; (3) spoke with reporters Mary Ellen Klas and Jacob Ogles, during the redistricting cycle, according to Plaintiffs; (4) coordinated at length, laundered an article, and gave information to help benefit Democrats during the redistricting cycle with Democratic political consultant Matt Isbell; and (5) personally provided written instructions as to how Plaintiffs' Maps A, B, and C should be drawn to Dr. Cory McCartan. All seven of these witnesses are either will-call or, because they live within the State of Florida, fall within this Court's subpoena power to compel testimony at trial. *See* Fed. R. Civ. P. 45.

Despite Mr. Warren informing this Court that Plaintiffs would be prepared if he could not serve as an attorney at trial, Plaintiffs have changed course and now complain that Mr. Warren's "presence at trial is essential to Plaintiffs' presentation of their case." Mot. 5. Plaintiffs' arguments surrounding Mr. Warren's presence being "essential" concern his performance and knowledge as an attorney. *Id.*

(discussing the "knowledge and familiarity" with the case that Mr. Warren has that "his co-counsel would not be able to bring to the Court as easily"). Many courts consider the term "essential" with regard to a party's need for a witness's presence during trial due to some special technical or scientific knowledge, not an attorney's knowledge of the law. *Forehand*, 943 F. Supp. 2d at 1331 (holding the test is "whether [the witness] is needed in the courtroom when he is not testifying." (citation omitted)); *see also United States v. Peter R. Brown Constr., Inc.*, No. 8:12-CV-942-T-33MAP, 2014 WL 12614496, at *5 (M.D. Fla. Feb. 18, 2014) (holding a party failed to "overcome the strong presumption in favor of sequestration" where the witness's presence was "merely desirable, not essential").

Moreover, Plaintiffs' suggestions that Mr. Warren be present in the courtroom, even if he does not speak as an attorney; to read daily trial transcripts and to communicate with co-counsel and Plaintiffs' witnesses before and after their testimony; or perhaps even to participate in the direct or cross-examinations of all but three witnesses (Mot. at 6-8), are no panacea. "The opportunity to shape testimony is as great with a witness who reads trial testimony as with one who hears the testimony in open court." *Miller*, 650 F.2d at 1373. "The harm may be even more pronounced with a witness who reads trial transcript[s] than with one who hears the testimony in open court, because the former need not rely on his memory of the testimony but can thoroughly review and study the transcript in formulating his own testimony." *Id.* Moreover, Plaintiffs could easily call Mr.

Warren as a rebuttal witness at the end of the case to knowingly shape the testimony and evidence within the record, contrary to the Rule's purpose.

The fact that Mr. Warren has a "more detailed historical knowledge of the evidence than his co-counsel" (Mot. at 5) is not because of his attorney hat—it's because he is a material part of the disputed evidence wearing his "private citizen" hat. The fact that Plaintiffs willingly chose from the very beginning to make one of their attorneys a material fact witness in their Complaint, listed him as a may-call witness, and placed more than 20% of the exhibits on their exhibit list relating to Mr. Warren should work in favor of sequestration—not against it. Otherwise, the party seeking to avoid sequestration could always prevent it through willful blindness and doubling down on the material involvement of their counsel.

It is also unclear how Plaintiffs can argue that Mr. Warren "has a stronger understanding of the witnesses." *Id.* Plaintiffs' other six attorneys have been highly involved in all aspects of this case, from discovery to pre-trial preparation. In fact, Mr. Warren only conducted one out of Plaintiffs' five requested depositions, and defended only two of the nine depositions Defendants conducted. No fewer than five of the Plaintiffs' other lawyers (Tilley, Chen, McNamara, Shaw, and Robertson) either took or defended depositions on behalf of Plaintiffs in this litigation, which should make them sufficiently familiar with the witnesses in this case.

There is no indication or argument that any of Plaintiffs' six other attorneys of record are not highly competent and skilled attorneys. At least half of them have been attorneys far longer than Mr. Warren, and they bring a variety of experiences

18

that could only benefit Plaintiffs' representation: one is the President of the National ACLU, others have federal court litigation experience on civil rights issues in Florida, and another teaches civil rights related issues at New York University.

Under circumstances like these, federal courts have enforced Rule 615. For example, in *State Farm Mut. Auto. Ins. Co. v. Duval Imaging, LLC*, No. 3:07-cv-627-J-25JRK, 2011 WL 13186335 (M.D. Fla. Sept. 27, 2011), the Court held that the Rule of Sequestration was applicable to an attorney who was also a fact witness because he was not "essential" to the Defendants' presentation of the issues at trial. *Id.* at \*2. The Court found it significant that the Defendants were also represented by other attorneys in the litigation. *Id.*; *see also id.* at \*1-2 (rejecting the idea that the attorney's sequestration would "impede on his ability to communicate with co-counsel and [that] he [wa]s essential to the presentation" of Defendants' case). Notably, the Court enforced the attorney's sequestration even though he had "been involved with this matter for years." *Id.* at \*2.

Plaintiffs' cited cases are factually dissimilar and inapposite. *Milicevic v. Fletcher Jones Imports, Ltd.*, relates to whether a Plaintiff's husband, who was also one of her attorneys, should be excluded from the courtroom during certain witnesses' testimony because he wrote a letter on her behalf to a car manufacturer. 402 F.3d 912, 914 (9th Cir. 2005). The attorney's testimony was not a major issue, was narrow, and was duplicative of another witness's testimony. *Id.* at 916. Furthermore, the Ninth Circuit expressly held that the "essential" exception under Rule 615 should be extended to witnesses who are essential as attorneys. *Id.*

Plaintiffs have cited no case law from the Eleventh Circuit extending Rule 615 to determine whether an attorney is essential.

Moreover, *Mineba Co., Ltd. v. Pabst*, 374 F. Supp. 2d 231 (D.D.C. 2005), shows the dangers of allowing attorney participation *during* trial. The *Mineba* Court ruled that an attorney was "such an integral part of the facts and circumstances of th[e] case" as a fact witness, that he would not be permitted to sit at counsel's table during trial. *Id.* at 234. Ultimately, the Court allowed the attorney to watch the proceedings from the back of the courtroom and to review trial transcripts and help prepare witnesses outside of the courtroom, but this was because the attorney had "unique" knowledge of the facts and technology involved with patents, a major issue in the case. *Id.* at 234.

Conversely, here, there is no specialized technical or scientific knowledge that Mr. Warren possesses that is critical to this litigation, and he will not be testifying as an expert witness. Instead, Plaintiffs try to paint Mr. Warren's legal knowledge of redistricting as unique and complicated, and thus essential. That's not so, as detailed above. Any hardship Plaintiffs might face in this litigation from the sequestration of Mr. Warren is one of their own making that they could have prevented.

## Conclusion

Plaintiffs' Motion for Non-Sequestration should be denied, and Mr. Warren should be sequestered from the courtroom and other fact witnesses throughout the duration of trial.

Respectfully submitted,

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe Street, Suite 500
Tallahassee, Florida 32301
(850) 270-5938

Bradley R. McVay (FBN 79034)
brad.mcvay@dos.myflorida.com
Ashley Davis (FBN 48032)
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough Street
Tallahassee, Florida 32399
(850) 245-6536

*Counsel for the Secretary*

/s/ Daniel Nordby
RICKY L. POLSTON (FBN 648906)
DANIEL E. NORDBY (FBN 14588)
DENISE M. HARLE (FBN 81977)
TARA R. PRICE (FBN 98073)
ALYSSA L. CORY (FBN 118150)
KASSANDRA S. REARDON (FBN 1033220)
**SHUTTS & BOWEN LLP**
215 South Monroe Street, Suite 804
Tallahassee, Florida 32301
(850) 241-1717
*RPolston@shutts.com*
*DNordby@shutts.com*
*DHarle@shutts.com*
*TPrice@shutts.com*
*ACory@shutts.com*
*KReardon@shutts.com*

CARLOS REY (FBN 11648)
**FLORIDA SENATE**
404 South Monroe Street
Tallahassee, Florida 32399
(850) 487-5855
*Rey.Carlos@flsenate.gov*

*Counsel for Florida Senate President Ben Albritton, in his official capacity*

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2025, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Daniel Nordby
Attorney