1

IN THE UNITED STATES DISTRICT COURT
2                  MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
3

4   KETO NORD HODGES, MEIKO SEYMOUR,   )
JARVIS EL-AMIN, JENNIFER GARCIA,   )
5                                      )
Plaintiffs,   )
6                                      )
vs.              ) Case No.
7                                      )
BEN ALBRITTON, in his official     ) 8:24-cv-879-CEH-TPB-ALB
8   capacity as President of the      )
Florida Senate, and CORY BYRD, in  )
9   his official capacity as Florida   )
Secretary of State,                )
10                  Defendants.   )

11

12                       MOTION HEARING
Sam M. Gibbons United States Courthouse
13                   801 North Florida Avenue
Tampa, Florida  33602
14                      March 13, 2025
10:03 a.m.
15

16

17      DISTRICT JUDGE CHARLENE EDWARDS HONEYWELL
CIRCUIT JUDGE ANDREW L. BRASHER
18        DISTRICT JUDGE THOMAS P. BARBER

19

20

21      SHARON A. MILLER, CSR, RPR, CRR, RMR
Federal Official Court Reporter
22   Sam M. Gibbons United States Courthouse
Tampa, Florida  33602
23        sharon_miller@flmd.uscourts.gov
813.301.5041
24

Proceedings recorded by machine shorthand
25   Transcript produced by computer-assisted transcription

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

Exhibit 1

```
 1

 2                          APPEARANCES

 3    PRESENT ON BEHALF OF THE PLAINTIFFS:

 4                          MR. NICHOLAS WARREN, ESQ.
                            MR. DANIEL B. TILLEY, ESQ.
 5                          MS. CAROLINE ANDREWS McNAMARA, ESQ.
                            ACLU Foundation of Florida
 6                          4343 West Flagler Street, Suite 400
                            Miami, Florida  33134
 7                          (786)363-1769

 8                          MR. DAVID CHEN, ESQ.
                            245 Sullivan Street, 5th Floor
 9                          New York, NY 10012
                            (908)240-6252
10

11                          MR. JAMES MICHAEL SHAW, JR. ESQ
                            MS. NAOMI ROBERTSON, ESQ.
12                          Butler Weihmuller Katz Craig, LLP
                            400 N. Ashley Drive, Suite 2300
13                          Tampa, FL  33602
                            (813)281-1900
14

15    PRESENT ON BEHALF OF THE DEFENDANT:

16                          MR. DANIEL ELDEN NORDBY, ESQ.
                            MS. DENISE HARLE, ESQ.
17                          MS. TARA RENEE KLIMEK PRICE, ESQ.
                            Shutts & Bowen
18                          215 South Monroe Street, Suite 804
                            Tallahasse, Florida 32301
19                          (850)241-1722

20                          MR. MOHAMMAD O. JAZIL, ESQ.
                            Holtzman Vogel Baran Torchinsky & Josefiak
21                          119 S. Monroe Streeet, Suite 500
                            Tallahassee, Florida, 32301
22                          (850)391-0503

23                          MS. ASHLEY E. DAVIS, ESQ.
                            Florida Department of State
24                          400 S. Bronough Street, Suite 100
                            Tallahassee, FL  32301
25                          (850)245-6531


      UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION
```

1    (Court in session at 10:03 a.m.)

2              THE COURT:  All right.  Counsel, good morning.  We

3    are here in the matter of Nord Hodges versus Albritton, case

4    8:24-cv-879.  Please identify yourselves for the Courts

5    starting first with Counsel for the plaintiffs.

6              MR. WARREN:  Good morning, Your Honor.  This is

7    Nicholas Warren for the plaintiffs.

8              THE COURT:  Counsel for the Defendants?

9              MR. NORDBY:  Good morning.  This is Dan Nordby from

10   Shutts & Bowen for Florida Senate President Ben Albritton.

11             MR. JAZIL:  Good morning, Your Honor.  Mohammad

12   Jazil on behalf of the Florida Secretary of State and Cory

13   Byrd.

14             THE COURT:  Good morning.  I am Charlene Honeywell,

15   United States District Judge here in the Middle District of

16   Florida, Tampa Division, and my colleagues will now introduce

17   themselves.

18             JUDGE BRASHER:  Sure.  My name is Andrew Brasher

19   from the Eleventh Circuit Court of Appeals.

20             JUDGE BARBER:  Hi.  Tom Barber, Tampa, District

21   Judge with Judge Honeywell in the same building but doing

22   different Zooms I guess.  Good morning.

23             JUDGE HONEYWELL:  All right.  Good morning.  And we

24   are here for oral argument on the defendants' motions for

25   summary judgment.  We will start first, of course, with

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    Counsel for the moving parties.  You will be given an

2    opportunity for brief rebuttal, and, of course, the Court will

3    interrupt when needed to ask questions and may have additional

4    questions at the end of the oral argument.

5            So who is going to proceed first on behalf of the

6    defendants?

7            MR. NORDBY:  Good morning, Your Honor.  Daniel

8    Nordby for the Senate President.  I'll be speaking first.

9    I'll be dividing the defendants' time with Mr. Jazil for the

10   Secretary of State, and collectively we'd like to reserve four

11   minutes of our 30 for rebuttal.

12           THE COURT:  Okay.

13           MR. NORDBY:  May it please the Court.  The

14   plaintiffs here have challenged the configuration of Florida

15   Senate District 16 and 18 alleging unconstitutional racial

16   discrimination and gerrymandering.  The undisputed record

17   demonstrate that summary judgment should be granted in favor

18   of the defense.  This case presents no genuine issue of

19   material fact.

20           As we set forth in our papers, the plaintiffs rely

21   on flawed legal theories and fail to present evidence

22   sufficient to establish a constitutional violation.  We seek

23   summary judgment on two primary grounds.  First, that the

24   plaintiffs lacked standing to challenge Senate District 18,

25   and, second, that the plaintiffs' racial gerrymandering claim

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    regarding District 16 fails as a matter of law.

2            I'll start with the standing as to District 18.

3    Under the Supreme Court's decision in United States versus

4    Hays, plaintiffs must show a personal injury caused by a

5    racial classification in order to have standing to bring a

6    racial gerrymandering claim, and standing requires either

7    residence in the district or specific personal harm.

8            Now, as to the plaintiffs here, after the stipulated

9    dismissal of plaintiff Garcia last week, only plaintiff Azis

10   resides in District 18.  The other named plaintiffs reside in

11   District 16.  And the plaintiffs' only claim as to District 18

12   is based on an impermissible impact theory arguing that

13   District 18's shape was affected by the configuration of

14   District 16.

15           The Supreme Court rejected this type of claim in

16   Hays.  An alleged racial motivation behind the drawing of

17   other districts does not prove anything with respect to the

18   plaintiffs' districts.  And the record in Hays and the record

19   here does not reflect that the legislature intended the

20   plaintiffs' district, District 18 to have any particular

21   configuration.

22           The Supreme Court --

23           JUDGE BRASHER:  Can I ask you a question about this?

24   So you raise this as sort of a standing issue, but it doesn't

25   really seem like it's a standing issue to me.  It seems like

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    they have standing, or there's one plaintiff has standing to

2    challenge the district, but your argument is just that

3    challenge fails because there's no evidence that race was

4    behind the drawing of that particular district.  Am I

5    misunderstanding your argument?

6         MR. NORDBY:  I think you're -- I think you're

7    understanding the argument correctly.

8         The Supreme Court in Hays and Sinkfield

9    characterized it in the sense of standing, but I think whether

10   it's understanding or whether it's a failure to state a claim

11   because of the lack of injury tied to that, you would get to

12   the same result as to Plaintiff Azis.

13        JUDGE BRASHER:  So in Hays, though, and correct me

14   if I'm wrong because I read this a couple weeks ago, but in

15   Hays, it was a plaintiff who lived in one district that was

16   complaining about the other district.

17        And here, if I understand correctly, this plaintiff

18   is complaining about his own district.  It may be that his

19   complaint fails, like I said, as a matter of summary judgment.

20   Maybe there's no evidence that Hays had anything to do with

21   drawing his district.  But I guess that's why I'm trying to

22   figure out.  Like, this doesn't seem to be the same thing in

23   Hays because he is complaining about his own district; right?

24        MR. NORDBY:  Well, Plaintiff Azis is complaining

25   about District 18, so maybe it's Sinkfield that's the more

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    close analogy here.  In Sinkfield, the plaintiffs allege that

2    the Alabama legislature had racially gerrymandered their

3    districts when it created majority-minority districts adjacent

4    to their districts.

5              The Supreme Court said in Sinkfield that that was

6    essentially indistinguishable from Hays and rejected the

7    theory of racial gerrymandering based on the configuration of

8    neighboring districts.  That's the sort of claim that we say

9    is at issue here.

10             Plaintiff Azis is a resident of District 18, but the

11   complaint of Plaintiff Azis is essentially that District 16, a

12   district in which that plaintiff does not reside, was racially

13   gerrymandered, not that the legislature had some motivation

14   tied to the racial composition of District 18, the district in

15   which that plaintiff resides.

16             So that's the theory that we're traveling under,

17   plaintiffs' lacking, no plaintiff having standing or the

18   ability to maintain a challenge against District 18, that

19   there aren't any allegations in the Complaint and there isn't

20   any summary judgment evidence sufficient to support a claim

21   that District 18 was racially gerrymandered, and, therefore,

22   the plaintiffs cannot maintain a claim against District 18.

23             So because neither Plaintiff Azis cannot show as a

24   general matter any allegations about the racial composition of

25   District 18 in the record and Plaintiff Azis can also not show

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    any specific harm arising from District's 18 configuration

2    because the remaining plaintiffs do not live in District 18,

3    the claims regarding District 18 should be dismissed and

4    judgment should be entered in favor of the defendants.

5          Now, as to District 16, the summary judgment

6    evidence does not establish racial predominance.  To prevail

7    on this claim, the plaintiffs must prove that race was the

8    predominant factor in drawing 16 and that the legislature

9    subordinated traditional districting principles to race.

10          We've cited case -- the recent case out of the

11    Middle District, Atkins versus Sarasota County which Judge

12    Jung granted summary judgment in favor of the defendants on a

13    racial gerrymandering claim.  We think that case is

14    instructive here.

15          The Supreme Court has made clear that racial

16    gerrymandering claims require evidence that race predominated

17    over traditional redistricting criteria.

18          Here, the undisputed record evidence establishes

19    that compactness, adherence to political and geographical

20    boundaries and historical continuity throughout the drawing of

21    District 16, not race.  The Senate followed traditional

22    redistricting criteria, including compactness, contiguity and

23    adherence to political and geographical boundaries.  We --

24          JUDGE BRASHER:  Answer this question for me because

25    I think I'm right about this in the record, that the map

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    drawer testified that he started from a map that had racial

2    composition data on it?

3        MR. NORDBY:  The map drawer testified that he did

4    have racial composition data in the record, yes.

5        JUDGE BRASHER:  Well, I guess that's not exactly my

6    question.  I know obviously at some point you considered race.

7    I guess my understanding of the record, and maybe I'm wrong,

8    is that when he was sitting down to draw the districts

9    initially, he considered race.  So he had racial data when he

10   first sat down to look at sort of a blank map.

11        MR. NORDBY:  So, Judge Brasher, I think you're

12   referring to the testimony of Mr. Ferrin who's the Senate's

13   primary map drawer, and at the portions of his deposition that

14   are cited at page 23 of our motion, what he says is that he

15   drew the district, and after drawing the district lines, he

16   verified the other racial data that the Senate had complied

17   with the Florida Constitution's now diminishment requirements,

18   not that he started from a racial premise and drew the

19   district lines around that.

20        JUDGE BRASHER:  Okay.

21        MR. NORDBY:  And the configuration of the district

22   is consistent with that interpretation.  The configuration of

23   District 16 has a very high adherence to political and

24   geographical boundaries.

25        The eastern border of the district, District 16 is

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   composed of Interstate 75, and then just south of Brandon it

2   breaks off into the more north/south road of U.S. Highway 301

3   before adjoining Interstate 75 again down along the

4   Manatee/Hillsborough County border, taking the Sunshine Skyway

5   Bridge of I-275 and U.S. Highway 19 before following municipal

6   boundaries and major north/south and east/west roads in

7   Pinellas County and then going back again to the border with

8   Hillsborough County.

9         This is a district more than 80 percent of the

10  boundaries of which coincide with major geographic and

11  political boundaries as required by the Florida Constitution.

12  Florida Constitution requires maps of districts to, where

13  feasible, use political and geographical boundaries.  District

14  16 adheres to that.  Its use of political and geographical

15  boundaries and its compactness measures are comparable to

16  other districts in the region and are improvements upon its

17  predecessor district under the 2016 map.

18        So the fact that the Senate followed, excuse me,

19  traditional redistricting criteria while being aware of race

20  or considering race does not establish a racial gerrymandering

21  claim.

22        JUDGE BRASHER:  Can you address this?  So I found

23  out -- I looked back at my notes and I found the thing that I

24  was based on.  It wasn't Ferrin's testimony.  It was Senator

25  Rodrigues who said this on the Senate floor.  He said, quote,

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    "so once we've identified the Tier One districts, we then

2    start with the blank map, highlight the data we've received

3    from the U.S. Census Bureau by race, and then the staff began

4    drawing around the population distribution in order to ensure

5    we had not diminished the opportunity for minorities to

6    participate or elect a voter of their choice.  Once we

7    highlighted the racial population, we began drawing from

8    there."  So it's a quote, and I think -- I think it's in the

9    plaintiffs' response brief.

10          So are you saying that that's not what actually

11   happened?  Are you saying that we should disregard that

12   statement?  How am I supposed to read that in light of what

13   you said the actual method of drawing it was?

14          MR. NORDBY:  So then, Judge Brasher, two responses

15   to that.  One is that we cited in our supplemental authority

16   the Southern District's recent decision for the idea that the

17   same sort of statements, in fact, I think one of the same

18   statements from Senator Rodrigues was too generalized to

19   support a claim of racial predominance even at the motion to

20   dismiss stage in a racial gerrymandering claim and that the

21   statements must be district specific.  That statement is more

22   generalized.

23          The second, and maybe the more important point, is

24   the testimony of Mr. Ferrin who was the actual staff member

25   drawing the map.  And what he testified is that Senator

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    Rodrigues' statement was not an accurate description of the

2    process that he undertook in actually drawing the districts;

3    that he, in drawing this district and other districts, did not

4    start with a blank map.  He started with, what, in some sense

5    he started with a blank map because there weren't other

6    districts, but when drawing this district in particular, he

7    took as a starting point a prior configuration of the

8    district, a historical configuration that has existed for

9    decades joining portions of St. Petersburg and Tampa, and a

10   configuration that had been litigated in the past and upheld

11   against legal challenge.  And he saw as a reasonable starting

12   point for the configuration of the district under the 2020

13   census data was a configuration that had been adopted in the

14   past and it survived legal challenge.  And he drew a new

15   district with a general configuration mirroring that but with

16   better adherence to political and geographical boundaries,

17   with better compactness measures, and that still complied with

18   the one-person/one-vote principle within 1 percent as provided

19   by the Equal Protection Clause.

20          And after drawing the district under that sort of an

21   approach, after drawing that, verified that the

22   non-diminishment requirement of the Florida Constitution was

23   also satisfied.

24          So the specific sworn testimony of Mr. Ferrin, the

25   map drawer here, as to what he did on this district we submit

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   is a far superior presentation of what happened with this

2   district than the more generalized comments of the Senator on

3   the Senate floor.

4            JUDGE BRASHER:  Did Senator Rodrigues, was he

5   deposed or anything like that?

6            MR. NORDBY:  He was not.

7            JUDGE BRASHER:  Okay.

8            MR. NORDBY:  As I mentioned, the Senate -- the

9   Senate District here also maintains this historic continuity

10  and that precedent also undermines the claim that race

11  uniquely drove the district's shape in the last redistricting

12  cycle.

13           Other evidence supporting this is that the

14  alternative maps proposed by the plaintiffs don't meaningfully

15  improve on the Enacted Plan.  The plaintiffs in this case

16  submitted three alternative maps through their experts, and

17  those alternative plans show similar racial composition to the

18  Enacted Plan.

19           This is not, for example, your traditional racial

20  gerrymandering case where the plaintiffs are alleging packing

21  of minority voters in a district that should not have happened

22  consistent with the Equal Protection Clause.  The Enacted Plan

23  has a Black voting-age population of approximately 33 percent.

24  The plaintiffs' alternative plans have Black voting-age

25  populations between 30 and 31 percent, in the same ballpark as

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1     the Enacted Plan itself.

2          The plaintiffs' alternative plans, however, fall far

3     short of the Enacted Plan on traditional redistricting

4     criteria.  They're comparable on compactness measures.

5     They're not meaningfully improved on compactness measures, and

6     they're far inferior on adherence to political and

7     geographical boundaries.  They follow sidestreets and alleys

8     through neighborhoods in Hillsborough County rather than using

9     major political and geographical boundaries like county

10    borders, interstate highways and U.S. highway systems, so

11    their alternative plans don't do any better on traditional

12    redistricting criteria and they're comparable on racial

13    measures as well.

14         If, in fact, race predominated in the drawing of the

15    Enacted Plan, you would expect the racial composition of the

16    plaintiffs' proffered alternative districts to be meaningfully

17    different in some way, but they aren't here.

18         So the plaintiffs have failed to show that race

19    predominated in the drawing of District 16.  We have conceded

20    in our papers that the Senate considered race in the drawing

21    of this district and in the drawing of the Senate districts

22    generally.  We're required to do so by the State Constitution.

23         But consideration or awareness of racial facts does

24    not constitute racial predominance under Cooper versus Harris,

25    under Allen versus Millikin or under the Alexander case from

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    the U.S. Supreme Court.

2         JUDGE BRASHER:  Before you wrap up, I just want to

3    make sure you address the crossing the Bay aspect of this,

4    because that seems to be their main claim against, you know,

5    lack of traditional redistricting criteria.  Can you

6    specifically address that?

7         MR. NORDBY:  I'd be happy to.  And I fully agree

8    that seems to be their main claim, that crossing the Bay

9    establishes a constitutional violation.  Of course, the Equal

10   Protection Clause doesn't have a crossing-the-Bay criteria and

11   Florida Constitution does not distinguish or give priority

12   among different political and geographical boundaries.

13        A bay or a county line is on equal footing with a

14   municipal boundary or a highway or any other sort of political

15   and geographical boundary.

16        The Bay here is afforded no more priority than, for

17   example, the St. John's river in northeast Florida which also

18   has its Florida Senate district crossing it.  Florida Senate

19   districts cross other bays around the State of Florida.  Tampa

20   Bay is a large water feature, but it is not a large water

21   feature of federal constitutional significance.  And --

22        JUDGE BARBER:  Let me ask you a question about that.

23   The current congressional district for the U.S. House, section

24   of my district that I live in, District 14 crosses the Bay and

25   takes a big piece of Pinellas County and puts it with

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    Hillsborough where I live.  Has the ACLU or anybody else that

2    you know of filed any lawsuits challenging that district

3    because it crosses Tampa Bay or for any other reason?

4              MR. NORDBY:  No, Judge Barber.  I'm not aware of any

5    challenges to that district, and I agree with you that its

6    configuration including portions of two adjacent counties in

7    the Tampa/St. Petersburg/Clearwater municipal service area is

8    very similar.  It's a district that includes portions of two

9    adjacent counties which is not uncommon in the remainder of

10   the Senate map.  Many districts cross county boundaries to

11   include municipalities on either side of the county boundary.

12   Throughout southeast Florida, for example, there's districts

13   that connect portions of Miami-Dade County and Broward County

14   and municipalities on either side.

15             The fact that there's a water body here does not

16   have constitutional significance.  The plaintiffs seem to

17   allege that there's a lack of contiguity between different

18   portions of the district, but there's a Florida Supreme Court

19   opinion cited in the reply brief of Secretary of State that

20   makes clear that contiguity across water is considered

21   identical as contiguity across land.  There is no state

22   constitutional requirement or federal constitutional

23   requirement that districts be connected by a bridge and be

24   passible by land from one part to another.

25             There are districts in Florida that are largely

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    swamp land where you can't connect or walk from one part of a

2    district to another on dry land.  That's simply not

3    constitutional and significant.  I don't want to take up

4    Mr. Jazil's time.

5            JUDGE BRASHER:  Can I just ask one more about

6    crossing the Bay?  Is that unique to this plan?  Is that

7    something that was innovated with respect to this new

8    districting or has it been done before in this area?

9            MR. NORDBY:  Judge Brasher, there has been a State

10   Senate district connecting portions of St. Petersburg on the

11   west side of the Bay and Tampa on the east side of the Bay

12   since 1992.  This is not unique to this map, and there's

13   nothing in this record that indicates some racial motivation,

14   racial predominant motivation throughout the district in this

15   way, in this cycle any differently than in the past cycles.

16           Instead, what we have is compactness, adherence to

17   political and geographical boundaries and historical

18   continuity with the district that has long connected

19   municipalities and communities on both sides of the Bay here.

20           It does so here in a way that complies with Florida

21   Constitution's multiple standards and does not violate the

22   Equal Protection Clause.

23           Unless the Court has further questions on those

24   point, I'll concede my time to Mr. Jazil and address other

25   points on rebuttal.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          JUDGE HONEYWELL:  I have one question that I'd like

2   you to respond to.  Plaintiffs contend that because there are

3   competing reports from experts in this case that questions of

4   fact exist such that the case should be tried as opposed to

5   being decided on summary judgment.  You believe otherwise.

6   Why so?

7          MR. NORDBY:  Thank you, Judge Honeywell.  In order

8   to meet their summary judgment burden, the plaintiffs would

9   have to come forward with significant probative evidence, not

10  simply a speculative or a colorable claim.  We'd cite the

11  Sarasota County decision that Judge Jung offered for that

12  point, if you achieve granted summary judgment for the

13  defendants in a racial gerrymandering place, and our argument

14  is that plaintiffs don't surpass that burden.

15          The plaintiffs' experts, for example, and we cited

16  this in our papers, the plaintiffs' expert did not even

17  conduct a boundary analysis or examine whether this Senate

18  district adhered to roads as part of its boundaries.  He

19  concluded on the basis of his examination that race was the

20  reason for the drawing of the district lines, but did not even

21  consider whether the districts followed Interstate 75, and

22  that might be a reason for dividing communities on one side of

23  that major road as opposed to communities on the other side of

24  the road.

25          The plaintiffs' experts didn't consider whether

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   municipal boundaries were followed, for example, the boundary

2   between St. Petersburg and the City of Gulfport on the

3   southwest portion of District 16, which keeps the City of

4   Gulfport entirely within District 18 rather than splitting it

5   between District 16 and 18.  That's one portion of the western

6   boundary that is slightly irregular from a visual depiction,

7   but it has a logical non-racial explanation that the

8   plaintiffs' experts did not even consider.

9           So, Judge Honeywell, our argument as to that is that

10  the plaintiffs' experts' reports do not suffice to establish

11  their burden on summary judgment, particularly in light of the

12  Supreme Court's admonitions that there has to be a presumption

13  of good faith in favor of the State and the Legislature in

14  redistricting cases, and particularly in light of the

15  breathing room that the states are accorded in redistricting

16  cases, particularly when racial considerations are in play and

17  that they're not held to specific rigid criteria.  They have

18  to have some flexibility in how they balance these multiple

19  interests.

20          THE COURT:  Thank you.

21          MR. NORDBY:  Thank you.

22          MR. JAZIL:  Thank you, Your Honor.  Mohammad Jazil

23  for the Secretary of State.  I'd like to pick up where my

24  friend left off.  In the protection context, there are three

25  main questions that the Court has to answer.  One, does race

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    predominate; two, was there a compelling interest; and, three,

2    was the State's ultimate configuration of the districts

3    narrowly tailored?

4            Let's assume for a moment that race is predominant.

5    Let's also assume that trying to comply with the State

6    Constitution's non-retrogression requirement is a compelling

7    interest as plaintiffs say on Paragraph 8 of their Complaint.

8            Plaintiffs, however, still lose on the narrow

9    tailoring problem.  Narrow tailoring in redistricting does not

10   require a perfect fit between means and ends, because

11   redistricting is incredibly complex.  States get breathing

12   space.

13           So what does that breathing space mean?  Well, that

14   breathing space means that if the state shows that there's

15   been a thoughtful district-specific analysis, then the state's

16   map should be upheld.  The best way to understand how this

17   narrow tailoring and breathing space requirement works is to

18   take a look at some of the cases and see where it worked and

19   where it didn't work.

20           In the Wisconsin legislature case in 2022, the state

21   erased a state wide and uncritical Supreme Court's words,

22   policy of majority maximizing the districts.  That was the,

23   quote, "only evidence or analysis that was provided by the

24   state."  So there was no district-specific assessment about

25   the need for additional majority-minority districts.  There

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    was no district-specific colloquy in the Eleventh Circuit

2    record.   There was no district-specific functional analysis.

3           If you look at the Cooper versus Harris case that

4    dealt with the North Carolina District One, there was as part

5    of the pre-enactment review which is the focus, what did the

6    legislature do when it was drawing districts?  As part of the

7    pre-enactment review, there is no real assessment of the need

8    for --

9           THE REPORTER:  You need to slow down, please,

10   Mr. Jazil.

11          MR. JAZIL:  Yes, ma'am.

12          JUDGE BRASHER:  That used to happen to me all the

13   time.

14          JUDGE HONEYWELL:  Me too.

15          JUDGE BRASHER:  Let me interrupt you for a second.

16   Because you assume -- you made a big assumption there that the

17   Fair Districting Amendments and the non-retrogression

18   principle in those amendments provides a compelling interest.

19   And I realize that you made that assumption because the

20   plaintiffs have made that assumption, but I -- so are you

21   involved in this case in the Florida Supreme Court, Byrd

22   versus Black Voters?

23          MR. JAZIL:  Yes, Your Honor, I am.

24          THE COURT:  It's my understanding that the Secretary

25   of State, I think it's the Secretary of State in that case, is

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  actually arguing that the Fair Districting Amendments are

2  unconstitutional under the Protection Clause.  Am I right

3  about that?

4        MR. JAZIL:  Yes, Your Honor.  That's part of the

5  arguments.

6        JUDGE BRASHER:  You know, I'll just say I haven't

7  really dug down into this in any sort of meaningful depth, but

8  just as a theoretical matter, it seems odd to say that a state

9  could use race in a way that would otherwise violate the Equal

10 Protection Clause merely because the state has a state law

11 that says it should do that.

12       I mean, I guess, like I said, I understand you're

13 assuming because the plaintiffs assume it, but I don't feel

14 like as a Court we can necessarily assume it.  Could you just

15 give me some comfort that we can do that?

16       MR. JAZIL:  Understood, Your Honor.  First, your

17 positions are well put on why it is that the State cannot rely

18 on this, and I think the Senate and the Secretary of State are

19 simpatico, that trying to say that complying with the State

20 Constitution is a compelling interest as well.

21       However, Your Honor, I would note that as this case

22 has been pled, as it's been presented, the plaintiffs have not

23 put the compelling interest point at issue in the case.  So

24 the Court is deciding the case on summary judgment and the

25 party that is saying that race predominated and there's racial

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  gerrymandering is not putting the compelling interest point at

2  issue in the case.  I think it's appropriate for the Court in

3  an effort to resolve the case to assume, not deciding, that

4  this is a compelling interest, and, again, the United States

5  Supreme Court has done this for a while.  Section 2 and

6  Section 5 cases facing those still without deciding that it's

7  a compelling interest, and then they move on to the analysis

8  that proves to be dispositive.

9          In this case, Your Honor, I would suggest a similar

10  approach where the Court can assume without deciding that it's

11  a compelling interest and then still rule for the State on

12  summary judgment, because at the end of the day, they cannot

13  show that narrow tailoring has been run afoul, and that's

14  where, I suppose, we land.

15          JUDGE BRASHER:  So just -- and this is totally out

16  of order, so I get you may not have an answer to this.  But I

17  guess from just a practical perspective, if we were to say

18  that -- let's say we were at summary judgment opinion in your

19  favor, you know, might even this month, in April or something

20  like that.  The Florida Supreme Court has heard argument on

21  this issue about whether the fair voting amendments, Fair

22  Districting Amendments and this non-retrogression principle is

23  unconstitutional.  I guess I'm concerned, just maybe as a

24  practical matter, that you're asking us to rely on something

25  that the Florida Supreme Court at any day now could say

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    doesn't exist as a matter of Florida law anymore because it

2    violates the Equal Protection Clause in the United States

3    Constitution.

4        MR. JAZIL:  Understood, Your Honor.  A couple points

5    about that.  No. 1, the Florida Supreme Court heard oral

6    argument on this issue six months or so ago.  No. 2, the

7    Florida Supreme Court has a long list of issues that it's

8    considering as part of the Black Voter Matters case.  Among

9    them is the constitutionality of the Fair Districting

10   Amendments as a facial matter for lack of a better phrase,

11   which would go to this.  But there are other issues that the

12   Florida Supreme Court could decide the matter on.

13       So the Florida Supreme Court has before it an appeal

14   from an Intermediate Appellate Court.  The Intermediate

15   Appellate Court did not throw out the Fair Districting

16   Amendments.  The Intermediary Appellate Court tried to make

17   some distinctions between the Fair Districting Amendments and

18   federal case law based on the text of the Fair Districting

19   Amendments.

20       So the Florida Supreme Court could do a lot of

21   things, one of which is to throw out the Fair Districting

22   Amendments.  In addition, Your Honor, for this Court to enter

23   summary judgment in the State's favor and to dismiss this case

24   would not be inappropriate, because at the end of the day,

25   this particular challenge would no longer be at issue.  This

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    Court would not be providing commentary on State law questions

2    that the Florida Supreme Court can decide in the subsequent

3    case, and if down the line there's another plaintiff who

4    wishes to file a challenge based on different issues, i.e.,

5    that the State's reliant on the Fair Districting Amendments in

6    the Tampa area was improper because that reliance does not

7    serve a compelling interest, that's a case for another day.

8    That's a case for another day that does not address the issues

9    that are at play here.

10           So I think it would be appropriate for the Court to

11   decide this case consistent with the Supreme Court's past

12   version of, you know, seemingly without deciding that certain

13   things are a compelling interest, and then, though I agree

14   with my friend Mr. Nordby's argument, the narrow tailoring

15   point is the cleanest way to get there.  Because narrow

16   tailoring, if we look at the breathing space question, if we

17   look at Wisconsin legislature, if we look at Cooper versus

18   Harris, if we look at Brooks versus Vera, the Court said that

19   narrow tailoring was not satisfied because there was no

20   district-specific analysis.  At best folks were taking a look

21   at things on a state-wide basis and Wisconsin legislature in

22   Cooper.

23           In Bush versus Vera, there's a 10 percentage point

24   jump in the BVAP of the congressional district where the

25   narrow tailoring was the focus, and here we have a 1.87

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   percent jump in Black voting-age population between the two

2   districts.  That's justified with the functional analysis

3   which was lacking in the Wisconsin case, which was lacking in

4   Cooper versus Harris.

5          We have a functional analysis which proved to be

6   dispositive in Bethune-Hill which is the case we rely on and

7   the plaintiffs don't really grapple with on narrow tailoring

8   where the functional analysis of district-specific colloquy is

9   evidence for a thoughtful analysis.

10         Again, the focus of the thoughtful analysis that

11  Judge Honeywell's questions about the expert reports is

12  important because we're looking at a pre-enactment review.

13  We're not looking at postop expert case justifications for

14  what happened and why it happened.  We're taking a look at the

15  pre-enactment review.  The pre-enactment review has the

16  colloquy between Senator Burgess and Ferrin and Senator Bracy.

17  It has the district-specific assessment of voter registration

18  numbers --

19         JUDGE HONEYWELL:  Slow down a little bit, please.

20  The court reporter wants you to slow down.

21         MR. JAZIL:  Yes, ma'am.  The district-specific

22  assessment of voter turnout demographics where

23  district-specific assessment of how things perform for the

24  benchmark map and the enacted map in 14 primary elections, in

25  14 test elections.  We have, therefore, functional analysis.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    And as a the Supreme Court has said, we have evidence of

2    bipartisan consensus here.  This map passed 37 to nothing.

3    Thirty-seven to nothing in this polarized environment is the

4    result that this map had.

5              For the Court to assess whether or not there was a

6    thoughtful analysis, I believe we get a checkmark and an A

7    plus, double gold star here.  Because at the end of the day,

8    what we did is what you're supposed to do to ensure that

9    there's a thoughtful analysis.

10             Now, the plaintiff is concerned about, A, you can't

11   cross the Bay.  I challenge them to point to a specific case

12   that says that one cannot cross the Bay.  I challenge them to

13   point to a specific case that we have to have the lowest

14   possible Black voting-age population.  The case law goes the

15   other way.  I challenge them to point to a case that says that

16   compact needs to hit some kind of metric.  Again Bush versus

17   Vera.  Justice O'Connor talked about how there is no perfect

18   shape.

19             At the end of the day, if the yardstick is

20   thoughtful, re-enactment review, the State has satisfied that

21   standard, and that narrow tailoring standard is why we

22   maintain from Secretary of State that summary judgment is

23   appropriate in the case.

24             Unless the Court has additional questions, I would

25   like to reserve some thoughts for rebuttal.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          THE COURT:  Okay.  Thank you.  Counsel for the

2     plaintiff.

3          MR. WARREN:  Thank you, Your Honor.  Defendants in

4     this case have not met their burden to show there's no genuine

5     dispute of material fact, and as to the facts that are not in

6     dispute, they have not shown entitlement to judgment as a

7     matter of law.

8          I'd like to first address racial predominance before

9     turning to narrow tailoring and welcome the Court's questions.

10         The Supreme Court just last term articulated the

11    racial predominance inquiry this way; that a plaintiff can

12    present direct evidence including a relevant state actor's

13    express acknowledgment that race played a role in the drawing

14    of district lines.

15         The record here shows clearly that the State did so

16    here, that race was the criterion that in the State's view

17    could not be compromised in the drawing of district lines.

18         Much of the direct evidence, it is true, relates to

19    why the Senate crossed Tampa Bay in drawing the challenged

20    District 16.  It is, of course, not per se unconstitutional to

21    cross a water body, but what does trigger strict scrutiny is

22    doing so for racial reasons.  And the record shows a dispute

23    of fact as to that point.

24         The reasons why the Senators and their staff gave on

25    the record at the time they were drawing these districts for

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    configuring these Districts in this way was race.  The

2    Senate's chief map drawer, Mr. Ferrin, quote, "that was to

3    comply with the Tier One non-diminishment standards."

4          Senator Burgess, the Subcommittee Chair in charge of

5    drawing the Senate map.  "Voters would be disenfranchised if

6    they drew it a different way."

7          Mr. Ferrin again, "Black voters would not be able to

8    control the primary numerically and that would constitute

9    diminishment."

10          These were the reasons the Senate gave at the time

11    they drew these districts for configuring these districts in

12    this manner.

13          Senator Rodrigues, as Judge Brasher pointed out, who

14    was the committee chair in the Senate explained that this

15    district includes the minority populations of St. Pete and

16    Tampa to ensure the configuration does not result in the

17    denial or abridgment of those voters to participate, the Tier

18    One minority protection standards.

19          This -- it's important here I think to keep in mind

20    that racial predominance does not mean that race has to be the

21    State's only motive.  The Eleventh Circuit made that clear in

22    Clark v. Putnam County when it said that -- when it reversed

23    the district court who had found for the county and found that

24    even though race was not the county's only motive, that race

25    still predominated.

1          Race may be shown -- this is a quote from Clark v.

2    Putnam County, quote, "race may be shown to have predominated

3    even if, as here, factors other than race are shown to have

4    played a significant role in the precise location and shape of

5    the districts."

6          I think there is more than a dispute of fact as to

7    whether race predominated.

8          JUDGE BRASHER:  Can you answer this question?  So,

9    you know, I raised the Rodrigues quote, and the response from

10    Mr. Nordby was, yeah, but that's not really the way the lines

11    were drawn; that if you look at the testimony of the actual

12    map drawing, the staffer that drew the draft, he did not

13    consider race until after drawing the district and only as a

14    confirmatory to make sure that the district was drawn in such

15    a way as to be consistent with the Florida law.  What do you

16    say about that?

17          MR. WARREN:  Whether the court credits Mr. Ferrin,

18    the map maker's testimony, or Senator Rodrigues' quote at the

19    time the districts were drawn is a quintessential factual

20    dispute for trial.

21          JUDGE BRASHER:  I guess that would make sense if

22    Rodrigues had been deposed or something.  But I mean that's

23    what's odd.  I mean you're -- I mean maybe I'm wrong, but in

24    the way the trial seems to set up on this issue would be the

25    map drawer would show up and give his testimony and then you

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    would point us to something in the legislative record that

2    some senator said at some previous time.

3              What would be the determination that we would have

4    to make?  I mean would we only have one witness in front of

5    us?

6              MR. WARREN:  I think that's likely, Your Honor.

7    Plaintiffs did try to depose Senator Rodrigues and he asserted

8    legislative privilege that prevented his deposition.

9              I still think that that's a factual dispute,

10   especially when the quote from the Senator is the evidence of

11   the intent of the legislative body at the time it was making

12   the decisions rather than a post hoc explanation by somebody

13   years later in the middle of litigation.

14             I'll also note that I believe Mr. Nordby cited the

15   Cubanos Pa'lante case in the Southern District that

16   disregarded this quote in the context of that case.  That was

17   explicitly because the Southern District case is challenging

18   Congressional and House districts which -- and said that this

19   quote went to the drawing of the Senate districts and so it

20   couldn't be relevant at the motion to dismiss stage to support

21   racial predominance and districts that the Senate was not

22   drawing.

23             JUDGE BARBER:  Hold on one second.  Picking up on

24   something Judge Brasher got into.  If this is the trial, what

25   does it look like?  I mean, are we going to just have a bunch

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   of written deposition -- or transcripts from legislative

2   hearings?  Do you plan on calling these experts?  What's --

3   what do you think it looks like in terms of how long, how many

4   witnesses, what's the evidence?

5           MR. WARREN:  Certainly, Your Honor, the legislative

6   record.  I think this is a relatively unique case in that

7   there is a large amount of direct evidence of racial intent.

8           In the explanations that the Senate gave on the

9   record at the time it drew its districts all pointed to race

10  as the reason why these districts are configured this way.

11  So, yes, a lot of the evidence at trial will be from the

12  legislative record.  In addition to that, there will be expert

13  testimony opining on the statistical analysis that Dr. Barreto

14  did.

15          THE COURT:  We have all that already.  We have all

16  that already, so far.  Everything you said we already have, I

17  think, but keep going.

18          MR. WARREN:  Certainly.  What the Court can't do, of

19  course, is make credibility determinations and determine how

20  much weight to give to the expert opinions.  I think a good

21  example of the path here is in Georgia State Conference of the

22  NAACP versus Georgia from the Northern District of Georgia

23  about a year-and-a-half ago, when the Court at summary

24  judgment was presented with a record that consisted pretty

25  much entirely of the type of expert analysis and reports that

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

```
 1   are in Dr. Barreto's report here, there was no direct evidence
 2   that race even played a role in the drawing of the districts
 3   that were challenged in that case and the panel unanimously
 4   denied summary judgment for the defendants.
 5          I think there were over a dozen districts that were
 6   challenged and that proceeded to trial.  I don't think a trial
 7   has happened yet.
 8          THE COURT:  Well, would you be the lawyer on this
 9   case if we did a trial here in Tampa?  Would you be the lawyer
10   that came into court, or would you be a witness?  Because
11   they've said in their filings that you yourself submitted a
12   map and then apparently got your text messages with some sort
13   of political operative.  I don't even know what -- does that
14   come into this case?  What is that all about?
15          MR. WARREN:  Your Honor, I think at this stage it's
16   not an issue.  I don't think that the -- although the Senate
17   cites those materials in its motion, it's not part of the
18   argument the Senate makes.
19          Certainly my co-Counsel, my clients and I have all
20   conferred and discussed about this issue throughout the case,
21   and we are mindful of the Florida Bar rules concerning a
22   lawyer acting as an advocate at a trial.  I note that that
23   rule applies to an attorney's conduct at a trial, and myself
24   and my co-Counsel are all prepared to act accordingly should
25   that rule be implicated later in this case.
```

1          As yet, obviously no witness list had been exchanged

2    and the pretrial conference and pretrial meeting of Counsel

3    has not yet occurred, but we will certainly comport our

4    representation and conduct with the relevant rules of the

5    Florida bar and this Court.

6          JUDGE HONEYWELL:  Mr. Warren, I have a question.

7    You haven't really talked much about District 18.  Most of the

8    discussions in the written submissions pertain to District 16

9    and the allegation that it's racially gerrymandered.  You also

10   contend that District 18 is racially gerrymandered, but it

11   appears that your argument regarding District 18 is because of

12   the impact on District 18 from the racial gerrymandering that

13   occurred in District 16.

14         Why is that not -- why is the impact theory

15   something that has been foreclosed by the Supreme Court in

16   United States versus Hays back in 1995, and then we have the

17   Sinkfield v. Kelly case?  I'm struggling to figure out what

18   exactly is your racial gerrymandering claim with regard to

19   District 18?

20         MR. WARREN:  Certainly.  So I would say that we

21   present a dispute of fact as to racial predominance in

22   District 18 specifically; that race played a role in the

23   drawing not only of District 16 but also District 18.

24         THE COURT:  What is your evidence regarding 18,

25   though?  Because what I saw cited in the written submissions

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    really dealt with 16.  I did not see that.  Maybe I missed

2    something.  Can you point that out for me?

3           MR. WARREN:  So District 18 essentially only has two

4    boundaries, a southern boundary and a northern boundary.  The

5    east and west sides are water bodies in the boundary of

6    Pinellas County.

7           Dr. Barreto examined one of those two boundaries and

8    found a significant -- statistically significant racial

9    disparity, that the line through St. Pete was drawn to

10   separate more Black from less Black areas with surgical

11   precision that could not be explained statistically unless

12   race was driving that boundary line.

13          The other line is a function -- of the decision to

14   make that split of St. Petersburg.  That is, at least,

15   presents a dispute of fact as to racial predominance in

16   District 18.

17          I note that although it appears in quotes, impacts

18   in the Senate's brief.  Impact is not a word that appears in

19   Hays or Sinkfield.  In Hays, as I think was discussed by

20   Mr. Nordby, the plaintiffs lived several parishes away from

21   the district that they were challenging in Louisiana and they

22   had no evidence about their district or their parish beyond

23   the legislature's awareness of race.

24          In Sinkfield, the plaintiffs were explicitly

25   challenging their own district as the product of racial

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    gerrymandering.  The District Court improperly found that

2    those districts were the products of racial gerrymandering.

3    That's a direct quote from the Supreme Court opinion.  And the

4    plaintiffs didn't even allege that they were assigned to their

5    district as a result of being personally subjected to a racial

6    classification.

7              JUDGE BARBER:  Hold on one second.  Hold on one

8    second.  Just to push this issue, all right?  Can you just say

9    in practical terms what do you get for having District 18 in

10   this case?  I mean if you win, I guess the courts have to

11   redraw the lines in some way.  That's going to impact District

12   18.  It's going to impact all the other districts.  Why do you

13   need this in this case?  Is there a practical reason?  What do

14   you get for having that in here and creating all of this

15   conversation in this hearing?  I mean, what's the point?

16             MR. WARREN:  I think practically if the Court finds

17   for the plaintiffs after trial and enjoins District 16, that

18   will require the removal of District 16 from southern Pinellas

19   County, and District 18 would naturally have to include that

20   territory.

21             So I think your point, Judge Barber, practically

22   there may be no impact, but if plaintiffs present a dispute of

23   facts as to racial predominance in that District, then, of

24   course, defendants are not entitled to summary judgment.

25             The other point I'd make is that this is an

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  extremely similar situation to several of the district pairs

2  challenge in Georgia State Conference where there was one

3  district that was drawn to be a predominantly Black district

4  protected ostensibly by the Voting Rights Act in that case and

5  a neighboring district that excluded Black voters and

6  separated them out splitting a county along racial lines

7  similar to St. Pete and Pinellas here.  And the Court in that

8  case unanimously denied summary judgment for the defendants.

9         It's also similar to the Jacksonville branch of the

10  NAACP from this court where Judge Howard enjoined four

11  majority Black districts that were drawn to comply with the

12  Voting Rights Act, but also enjoined three adjacent majority

13  White districts that were stripped of Black residents based on

14  expert testimony similar to what plaintiffs have presented

15  here that analyzed the racial divisions of the precincts and

16  the way in which those cut subdivisions of the City of

17  Jacksonville along racial lines.

18         So I think that would be a similar situation here.

19  This isn't new ground that we are trying to tread here.

20         I'd like to turn to narrow tailoring.

21         JUDGE HONEYWELL:  Before you leave that issue, let

22  me just ask, though.  You would agree if on summary judgment

23  we were to conclude that there was no evidence to establish

24  racial gerrymandering with regard to District 18, and, of

25  course, we wouldn't have to address, necessarily address the

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    standing, but the only standing issue, the only standing

2    connection of the only remaining plaintiff for 18 is

3    Jacqueline Azis is that she resides in 18 and you've argued

4    that 18 is racially gerrymandered.  Is that correct?  It's

5    clear she doesn't have standing with regard to District 16.

6         MR. WARREN:  That's correct, Your Honor.  I think

7    Judge Brasher's point at the beginning of the argument that

8    the standing and merits argument sort of are combined here is

9    of good instinct.

10        THE COURT:  Okay.

11        MR. WARREN:  Briefly, still on racial predominance,

12   the point that Judge Brasher made about the road history here

13   I think is answered very directly by the Eleventh Circuit's

14   opinion in Clark v. Putnam County where a district failed

15   strict scrutiny even when it preserved as much as possible a

16   previously court-ordered district.  And the Eleventh Circuit

17   in that case reversed the District Court's decision that

18   reasoned that just because the Court had previously ordered

19   it, that the county had good reasons to carry that forward.

20        The Court -- excuse me.  The Senate has the duty to

21   narrowly tailor its use of race and to re-examine its use of

22   race every time it draws a district.  That's especially true

23   here where the Senate disclaims that it had a goal of

24   retaining the cores of preexisting districts which federal

25   courts have acknowledged can be a race neutral traditional

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    redistricting criterion that may undermine the case for racial

2    predominance.

3         Turning now to narrow tailoring --

4         JUDGE BRASHER:  Before you get there, could you

5    address the crossing the Bay in a little bit more detail?

6    Because I understand.  Maybe I'm wrong about this, Mr. Warren.

7    I understand your case to really turn on two things.  One,

8    whether the parties sort of used a blank map and looked at

9    race to draw lines as to one thing, and then there's the

10   Rodrigues quote, and the other is the crossing the Bay.

11        And the response from, I guess it was Mr. Nordby,

12   was sort of, look, the Bay is going to be crossed.  It's, you

13   know, crossed in other areas of Florida.  These things happen.

14   And I think that's where the history really comes in is like,

15   look, the Bay's always been crossed here so how could we sort

16   of presume race was the reason when it was just of

17   historically the way this district has been drawn?

18        JUDGE BARBER:  Let me just add to Judge Brasher's

19   question.  There is an existing U.S. Congressional District

20   that crosses the Bay that nobody seems to have any problems

21   with, so.

22        MR. WARREN:  I'd be happy to address both questions.

23   First, again, it is not per se unconstitutional to cross a bay

24   or split a city or split a precinct, but doing so for racial

25   reasons implicates equal protection.  And that is exactly the

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    reason that the Senate articulated at the time it drew these

2    districts but why it configured District 16 in this manner,

3    why it connected these otherwise completely disconnected Black

4    population centers in the region and grouped them together in

5    the same district.

6          And those are the direct quotes that we cite in the

7    brief from Mr. Ferrin, Senator Burgess, Senator Rodrigues when

8    asked by other Senators, can't we do it a different way; can't

9    we draw this district wholly within Hillsborough County as our

10   directives would indicate that we should in the absence of a

11   race-base superior legal mandate.  The reason why they said

12   they couldn't do that was because of race.  That's what's

13   problematic about the crossing of the Bay.

14         To Judge Barber's point about Congressional District

15   14, I think it's important that that congressional map was

16   actually not drawn by the Senate.  It was drawn by Governor

17   DeSantis after National Republican groups complained that the

18   legislative congressional maps were not Republican enough and

19   it actually was challenged initially in State court as a

20   partisan gerrymander.  I believe that District specifically

21   was challenged as a partisan gerrymander by other plaintiffs

22   who were not represented by me.  And that was part of the

23   origin of the Black Voter Matters case in State court.

24         So there I think crossing the Bay may have been

25   problematic for a different reason, for partisan reasons.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    Here, the Senate is also disclaiming that it had any partisan

2    or political motivations, and so that is not an issue for the

3    Court in this case.

4        JUDGE BRASHER:  Can I just ask one kind of

5    follow-up?  I don't want to belabor this point too much.  But

6    the quotes that you're citing are in response to -- and just

7    correct me if I'm wrong -- but there's a presentation of the

8    plan, sort of like, this is where we come up with, and then

9    there are folks who are saying, look, I don't like this or I

10   don't like that, can you do something different?  And then the

11   response of the map drawers is, look, we don't want to uncross

12   the Bay because that would create -- that could potentially

13   create problems for these Fair Districting Amendments.

14       That seems to be somewhat different than what you're

15   sort of inferring which is that we drew these lines for race

16   reasons to comply with the Fair Districting Amendments.

17   Right?  Is there no daylight I guess between, you know, look,

18   we drew the lines for this reason, someone says we should draw

19   them differently, and our response is that would create a

20   problem with the Fair Districting Amendments.

21       How does that response mean that the lines were

22   drawn to comply with the Fair Districting Amendments?  Does

23   that question make sense?

24       MR. WARREN:  I think so.  I guess I would put these

25   quotes in the context of the legislative process which was

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    ongoing, and there were tweaks to all of the Districts around

2    this time, and I think there continue to be tweaks to these

3    districts after these quotes came out.

4            I think another important point is that the Senate

5    gave no other reasons besides race for why these districts

6    were shaped this way.  They didn't say we think these two

7    cities are communities of interest that should be grouped

8    together in the same district which is a traditional race

9    neutral criteria that federal courts have credited.

10           They didn't say it was important to keep the two

11   largest cities in the metro area in the same district.  They

12   didn't say we were looking for a particular boundary analysis

13   score or compactness score.  They didn't give any other

14   reasons why this map is shaped the way it is.

15           The only reason they did articulate was because if

16   they didn't do it this way it would violate the race-based

17   mandates of Tier One, and I think that at the very least

18   presents a dispute of fact as to racial predominance.

19           JUDGE BRASHER:  Thank you.

20           MR. WARREN:  Turning now to narrow tailoring, I

21   think I have maybe about five minutes left.  I want to stress

22   that strong basis in evidence that the Supreme Court requires

23   for drawing race-based lines is not just a plausible reason.

24   It has real teeth, or else the racial gerrymandering would be

25   subject to intermediate or rational basis scrutiny.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    There is leeway but it is a limited degree of leeway

2    as the Court has articulated as far back as Bush v. Vera.   The

3    State must still show that it had a strong basis and evidence

4    for concluding that the law demanded, required its actions,

5    not just that it might violate the Voting Rights Act or Tier

6    One if it took these steps, that the law demanded such steps.

7    And that requires a strong showing of a pre-enactment analysis

8    with justifiable conclusions.

9    Mr. Jazil focused on the fact that defendant

10    conducted an analysis to ensure that District 16 did not

11    diminish the ability of Black voters to elect a preferred

12    candidate.

13    Plaintiffs do not contest that the enacted district

14    affords Black voters that opportunity.   We contest that the

15    use of race to achieve that interest was not sufficiently

16    tailored.

17    And, again, Clark v. Putnam County, binding Eleventh

18    Circuit precedent on this Court, rejected the county's drawing

19    of Black majority districts when the county, quote, went well

20    beyond what is necessary to avoid retrogression.

21    Additionally, the -- in Shaw, the first racial

22    gerrymandering case, the Supreme Court noted that a

23    redistricting plan, quote, "would not be narrowly tailored to

24    the goal of avoiding retrogression if the State went beyond

25    what was reasonably necessary to avoid it."

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          In this case, drawing districts that violate the

2     traditional race neutral criteria, to the extent that the

3     Senate did, without doing much inquiry into whether it could

4     draw the district a different way does not meet that burden,

5     or at least creates, of course, a dispute of material fact as

6     to whether the Senate meets that burden.

7          I'd like to stress that the evidence from Mr. Ferrin

8     at his deposition, although he told the Senators in committee

9     meetings when they asked have you tried to do this a different

10    way, is there any way that we can draw this district to be

11    wholly within a single county and not split St. Pete and not

12    split Pinellas County, he said there was no way to do it, and

13    he looked into it.

14         His deposition testimony contradicts that.  It shows

15    that he imagined in his head what it might look like, what

16    might be required, but he didn't actually try it.

17         And the alternative maps from Dr. McCartan that

18    plaintiffs present show that it is incredibly easy to draw a

19    very compact blob of the district wholly within Hillsborough

20    County that avoids crossing this open water body that's not

21    even connected by any bridges; that avoids splitting St. Pete

22    and Pinellas County along racial lines, as Dr. Barreto

23    testifies to, and the Senate did not do a meaningful inquiry

24    into whether that was possible.

25         That is --

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          THE COURT:  Mr. Warren, let me ask you, though.  Was

2     the State required to explore every possible alternative once

3     they had found an option that the functional analysis

4     confirmed was effective to avoid diminishment?  And that's

5     even if they could have avoided diminishment without crossing

6     the Bay, were they required to do that?

7          MR. WARREN:  I think that what they did does not

8     meet the demanding standard of strict scrutiny.

9          JUDGE HONEYWELL:  Strict scrutiny is less.  Isn't it

10    less strict than the redistricting context?

11          MR. WARREN:  It is.  There is some leeway again, but

12    I think the Supreme Court has made clear that that standard

13    has real teeth.  And it is a strong showing of a pre-enactment

14    analysis with justifiable conclusions.

15          The Senate made conclusions that this wasn't

16    possible.  They said it requires a spidery shape and

17    non-compact configuration that has tentacles and appendages

18    reaching out to grab Black voters all over Hillsborough

19    County.

20          That turned out not to be true.  It turned out to be

21    far from the truth.  And I don't think those are the

22    justifiable conclusions that the Supreme Court demands the

23    State have to support its use of race when it is drawing

24    race-based districts.

25          Those are more akin to the uncritical assumptions

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  and generalizations that the Supreme Court found wanting in

2  Wisconsin legislature.

3          Again, the State needs good reasons for thinking

4  that the law demands the steps that it takes, not just that it

5  may require it.

6          JUDGE BARBER:  There's something in the Florida

7  Constitution that says you're supposed to look at this.  They

8  looked at it.  They came up with an answer.

9          Judge Honeywell's question was:  Well, then do they

10  have to keep looking at all these other things?  Is there any

11  legal requirement that they do that?  I take your answer is

12  that, no, there isn't any legal requirement that they do that.

13          MR. WARREN:  I don't think that's true here.  I

14  think that the Senate's mapmaker's statements that he looked

15  into it was -- I guess there's a factual dispute as to that,

16  and his testimony in his deposition was that he didn't, was

17  that he imagined in his head what it would look like but he

18  didn't actually try to draw that district.  And I think that

19  is less than the justifiable conclusion and strong showing of

20  a pre-enactment analysis that strict scrutiny demands.  I

21  think that renders the bipartisan consensus that developed an

22  uninformed one rather than an informed one that Abbott and

23  Bethune-Hill praised.

24          The lack --

25          JUDGE BARBER:  So we're supposed to then say, just

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    picking up on that point, that all of the State Senators who

2    are all elected and all voted for it, they just got it all

3    wrong and it needs to be redone?

4         MR. WARREN:  Your Honor, that's what happens in

5    these cases.  I think a good example to look to is Abbott v.

6    Perez where the Supreme Court affirmed the finding that one

7    State House District in Texas was an unconstitutional racial

8    gerrymandering that wasn't justified because of the way the

9    legislature had moved a single neighborhood and responded to

10   moving that neighborhood by moving racial populations in

11   different ways.  That is a more minute error, I would put it,

12   than what happened in this case.

13        And there are other cases where the legislature did

14   expert analysis.  In Cooper, the legislature commissioned two

15   expert reports that reached conclusions that the legislature

16   had to draw districts in certain race-based ways.  That was

17   not sufficient for the Court in Cooper.  Cooper found that

18   those expert reports did not meet the justifiable conclusions

19   that were necessary.

20        And here, you know, I don't think the Senate

21   conducted commissioned expert reports.  It asked its mapmaker

22   to look into something and it turned out that he didn't.  I

23   think that's a far cry from what strict scrutiny demands.

24        The final point I would make is that the Supreme

25   Court warned in Hunt v. Cromartie that, quote, "the task of

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    assessing a jurisdiction's motivation is not a simple matter.

2    On the contrary, it is an inherently complex endeavor, one

3    requiring the trial court to perform a sensitive inquiry into

4    such circumstantial and direct evidence of intent as may be

5    available."  And the Court reversed summary judgment in that

6    case for the plaintiffs, and noted that in previous racial

7    gerrymandering cases came to the Supreme Court on a developed

8    factual record after trial.  Bush v. Vera, Shaw, Miller.

9    Additionally since then, Alexander, Abbott v. Perez, Cooper,

10   Bethune-Hill, Alabama Legislative Black Caucus.  All of these

11   cases were reached after a developed trial record.

12          In contrast, cases in which summary judgment has

13   been granted for defendants in redistricting cases either

14   applied, what I would argue, is an incorrect heightened

15   standard.  DeWitt v. Wilson from California and Robertson v.

16   Bartels from New Jersey essentially required the plaintiffs to

17   prove that the districts were not based solely on race which

18   is different in a heightened showing than that they were based

19   predominantly on race.

20          The Court in DeWitt also required irregular shapes

21   which the Supreme Court later clarified in Bethune-Hill were

22   not prerequisites for a racial gerrymander.

23          Other cases, the Atkins v. Sarasota County from this

24   district.  That was a dispute over a single neighborhood of

25   less than a square mile where there was essentially no

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    evidence that anything racial was motivating the district

2    lines.   Instead, that the County was motivated by protecting a

3    Republican incumbent and the plaintiffs failed to disentangle

4    race from party, an issue that the Court may not worry about

5    here because the Senate has disclaimed any partisan

6    motivations.

7         Similar dynamic in Johnson Lee versus Minneapolis in

8    Minnesota where the plaintiffs in that case actually brought

9    not just a racial gerrymandering claim but a partisan

10   gerrymandering claim.   And I would argue that those are very

11   different than the situation here.

12        In sum, if there are no more questions, defendants

13   have not met their summary judgment burden.   There are a

14   number of factual disputes to resolve at trial, and as to the

15   facts that are not in dispute, defendants have not shown

16   entitlement to judgment as a matter of law.

17        THE COURT:  Okay.  Thank you.  Rebuttal.

18        MR. NORDBY:  Thank you very much.

19        THE COURT:  You may proceed.

20        MR. NORDBY:  Thank you, Judge Honeywell.   Three

21   brief points on rebuttal.   The first goes to a question that

22   Judge Barber asked.   If this case proceeds beyond summary

23   judgment, Mr. Warren would absolutely be a witness at the

24   trial in this case.   Although it doesn't go to our legal

25   arguments on summary judgment, there was extensive evidence

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   uncovered in discovery that the Hillsborough-only district was

2   proposed for partisan political reasons which is separately

3   prohibited by the Florida Constitution.

4        That evidence includes Mr. Warren's deposition

5   testimony in this case which Judge Walker in the Northern

6   District allowed us to take over Mr. Warren's objection.  So

7   if this case does proceed to trial, in response to Judge

8   Barbers' inquiry, Mr. Warren would be indeed a witness at that

9   trial.

10        The second point goes to a question that Judge

11   Brasher asked about the interplay between this case and the

12   Black Voter Matters case that's currently pending before the

13   Florida Supreme Court.  Mr. Jazil and I happen to represent

14   the same clients in that case, so I just wanted to briefly

15   address how that case interacts with this case.

16        First of all, that case involves several grounds on

17   which the State has argued that a judgment should be issued in

18   its favor that do not require the Florida Supreme Court to

19   evaluate the constitutionality, the federal constitutionality

20   of the State constitutional provision.  There are significant

21   arguments based on the sufficiency of the evidence that the

22   plaintiffs presented at the trial in that case.  There are the

23   arguments that the Intermediate Appellate Court in Florida

24   adopted which rely on essentially a narrowing construction of

25   the State constitutional provision to avoid a federal

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    constitutional issue.

2              So it's not in any sense guaranteed that the Florida

3    Supreme Court will, in fact, address the constitutionality of

4    the race-related provisions of the Florida Constitution.

5              That case also with respect to this case presents an

6    interesting contrast.  In that case, the State ultimately

7    determined that it could not apply the Florida Constitution's

8    non-diminishment requirement as to a north Florida

9    Congressional District consistent with the requirements of the

10   Equal Protection Clause.

11             In that case, to comply with the non-diminishment

12   requirement, the State would have had to re-draw a Tallahassee

13   to Jacksonville based congressional district but disregard a

14   tradition redistricting criteria.  The State ultimately

15   determined that it should not and could not do that consistent

16   with the Equal Protection Clause, so it didn't.

17             Here, in contrast, State Senate District 16 is

18   justifiable on traditional redistricting criteria irrespective

19   of the non-diminishment in the Florida Constitution.  It's a

20   compact district that adheres well to political and

21   geographical boundaries and maintains a historic continuity

22   with prior districts in the area.

23             So consistent with Mr. Ferrin's sworn deposition

24   testimony, this is a district that is drawn and is justifiable

25   and is also consistent with the non-diminishment requirement,

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    not a district in which race predominated.

2           Third and finally, addressing narrow tailoring.  The

3    plaintiffs here appear to have a conception of the narrow

4    tailoring requirement of strict scrutiny that is really

5    irreconcilable with the case law on that question.

6           The cases suggest that narrow tailoring is involved

7    with whether the State or the legislature considered race more

8    than was necessary to accomplish some interest.  It focused on

9    the quantum of the racial consideration.

10          The plaintiffs here appear to view narrow tailoring

11   as whether the State complied with the traditional

12   redistricting criteria as much as it could, and that different

13   conception here is epitomized by their focus on Tampa Bay, as

14   though Tampa Bay is different from any other county boundary,

15   municipal boundary or highway in the State of Florida that the

16   State considers when drawing districts.  It's simply not.

17          There's no constitutional principle privileging

18   Tampa Bay over other political and geographical boundaries,

19   and, indeed, even in the Tampa Bay region, District 21 crosses

20   the county boundary from Pasco County into northern Pinellas

21   County.  That's the same constitutional principle as a

22   district crossing from Hillsborough County into Pinellas

23   County that includes portions of Tampa Bay.

24          I think an obvious example of that because of this

25   focus on the Bay is if the legislature had, in fact, drawn

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    District 16 with exactly the same racial composition as the

2    plaintiffs are proposing in their alternative districts,

3    31 percent rather than 33 percent.  What if the drawing of

4    that district included portions of St. Petersburg and

5    Hillsborough County, I suspect the plaintiffs would still say

6    that violates narrow tailoring.  That's just not narrow

7    tailoring as the Florida Supreme Court has described it.

8            In a way, that goes to what we've argued in our

9    papers under the Pennhurst case.  What plaintiffs are really

10   doing here is saying that our district isn't compliant enough

11   with the traditional redistricting criteria under the Florida

12   Constitution.

13           We've made a sovereign immunity argument in our

14   papers, and I'll rest largely on those papers unless the Court

15   has questions.

16           JUDGE BRASHER:  Can I ask you a question just to

17   respond to something that Mr. Warren said?  So there, the

18   crossing the Bay thing, he says, look, the reason why we know

19   that was race-based is because during I think it was a

20   committee hearing, I'm not entirely remembering exactly, but

21   during this discussion of the plan, you know, people said,

22   let's not do that.  Let's not cross the Bay.  And the only

23   response from the drafters of the plan was, that really

24   happened was because of the Fair Districting Amendments.  What

25   do you say about that?  And -- what do you say about it?

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          MR. NORDBY:  Judge Brasher, I don't think that's a

2    complete summary of the colloquy there.  Certainly, and as

3    I've said throughout the argument, compliance with the

4    non-diminishment requirement was something that the Florida

5    Senate considered, and the districts' configuration that does

6    cross the Bay here is one that complies with the

7    non-diminishment requirement.

8          Whether some other configuration might also comply

9    with the non-diminishment requirement, it's certainly

10   possible.  There are innumerable ways to draw districts that

11   may comply.

12         But going back to the point that I mentioned

13   earlier, the prior configuration of this district, consistent

14   with decades of patterns that did include portions of Pinellas

15   County and Hillsborough County was one that worked, one that

16   complied with all of the different constitutional

17   requirements, and particularly in a heavy litigated, heavily

18   litigated area of the state, it's a reasonable act for the map

19   drawer here who testified in the deposition testimony to not

20   try to upset the apple cart and introduce lots of new novel

21   concepts just to see if there's lots of way to comply with it.

22   In fact, going with what Judge Honeywell said --

23         JUDGE BRASHER:  I guess -- I understand your point

24   there.  I think Mr. Warren's point is, look, that's maybe an

25   inference that you can draw from his testimony at trial.  We

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    could, for example, hear the testimony of the map drawer and

2    say, yeah, when they are responding, their response to this

3    was basically just, look, it would be really hard to draw this

4    district again without crossing the Bay in a way that's

5    consistent with the Fair Districting Amendments.

6           That's sort of -- but that seems to be maybe drawing

7    an inference in your favor.  In his favor, I think he's

8    saying, look, the inference in my favor is, look, the reason

9    that they crossed the Bay is because they wanted to draw this,

10   not majority Black I guess, non-retrogressive district, and

11   that's the only reason they did this, and so that's the reason

12   they did it.  That's kind of what he's saying.

13          MR. NORDBY:  I don't think -- I don't think that's a

14   complete summary of what they're --

15          JUDGE BRASHER:  I guess, I think put the legal

16   phrase on it, like, why isn't that a reasonable inference from

17   his testimony?  I mean, not testimony, his statements.  I mean

18   the statements are we can't change the Bay crossing because of

19   the needed characteristics of this district as being one that

20   doesn't retrogress.  Why isn't one reasonable inference from

21   that is that the reason that they crossed the Bay was to make

22   this a district that didn't retrogress?

23          MR. NORDBY:  I think what Mr. Ferrin testified here

24   was a number of different reasons for the district's

25   configuration.  In that specific colloquy, that was one that

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    he mentioned, but I think considering the legislative record

2    as a whole and particularly in light of the presumption of

3    good faith of the legislature here, which I recognize is in

4    some tension with the inferences of summary judgment stage, I

5    think the better conclusion would be drawn here is that if

6    that doesn't -- that alone does not demonstrate racial

7    predominance even with the inference in favor of the

8    plaintiffs on summary judgment.  But that was a reason that

9    was given, but it was not the exclusive or the predominant

10   reason for the drawing.

11         JUDGE BRASHER:  Okay.

12         MR. JAZIL:  Okay.  If the Court can indulge me a

13   brief rebuttal as well?

14         JUDGE HONEYWELL:  You may proceed.

15         MR. JAZIL:  Thank You, Your Honor.  Judge Brasher,

16   I'd like to build on some of the points that my friend

17   Mr. Nordby made in response to your questions.  One way to

18   look at this is that whose actions are we judging?  We're

19   judging the actions of the legislature when it drew this map.

20   And Jay Ferrin, during his colloquy before the legislature,

21   said there was a reasonable fear of violating the Fair

22   Districting Amendments, so I think it's important to also keep

23   that in mind; that Jay Ferrin is telling the legislators who

24   are ultimately voting on this package that there was a

25   reasonable fear that we would violate the redistricting

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    amendments.

2          And that's important, because if we go to Bush

3    versus Vera, Justice O'Connor writing, which I think is a

4    controlling opinion in that case, and it talked about how the

5    standard that we use in assessing whether or not there was

6    narrow tailoring is, one, was there a reasonable fear for

7    violating a provision; two, were there reasonable efforts

8    made to try to comply?

9          Now, when we add the additional laws to the case

10   law, we know from the Wisconsin case, from Cooper versus

11   Harris and others, that when we're looking at sort of

12   state-wide assessments to try to comply, that's not good

13   enough.  You have to have something that is district specific.

14         Bethune-Hill tells us that a district-specific

15   functional analysis is the gold standard.  That's what

16   complies.

17         Attachments 1 and 3 of the Secretary summary

18   judgment versions include that district-specific functional

19   analysis that's done.  So we get again the check box there.

20         Second, I'd like to point out that Justice O'Connor

21   in Bush versus Vera said that the State does not have an

22   obligation to explore every single possible permutation.  This

23   is not a, quote, endless beauty contest is what Justice

24   O'Connor said, which then goes to the point that Judge

25   Honeywell was making; that we do not need to keep looking at

1   endless variations and knock them down.  We have to come up

2   with something that's thoughtful that makes sense in the

3   moment.  And we have that.

4          Next point, Your Honor, my friend from the other

5   side keeps harping on the Clark case from the Eleventh Circuit

6   where, quote, "the municipality went well beyond what was

7   necessary to comply."

8          The well beyond that they went beyond, if memory

9   serves me right, they went to a 60 percent BVAP.  And again

10  Bush versus Vera is helpful to contrast that with.  So Bush

11  versus Vera also threw out a congressional district that Texas

12  had drawn.  The Texas district had the BVAP, the Black voting

13  age -- population jumped from 42.2 percent to 50.9 percent.

14  It clearly jumped.

15         Here, again, what we have is a 1.87 percent,

16  1.87 percent, less than 2 percent increase in Black voting-age

17  population that was done.  It justified with a

18  district-specific functional analysis.  If you peel the layers

19  of the functional analysis, you see that there's an erosion of

20  Black voters grid.  Here are Black people in the democratic

21  primaries.  That increase made sense for it to be a

22  Black-performing district.  All this data is in, again, a

23  thoughtful, well-reasoned, district-specific functional

24  analysis.

25         My friend, I pose to him a challenge of my mutual

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    discussion with the Court to point me to certain cases that

2    require the State to have more justification for crossing the

3    Bay.  He did not provide that justification because there is

4    no specific case that says that the State needs to consider

5    endless permutations that are being put forward that the State

6    must knock down in its defense of a map that it chose to pass,

7    regardless of whether or not you look at Wisconsin, you look

8    at Cooper versus Harris, you look at Bethune-Hill.  The map

9    that was being judged was a map that was actually enacted, not

10   some endless permutation as part of a beauty contest.

11         And for those reasons, Your Honor, we're going to

12   ask that the Court grant our summary judgment motion.

13         JUDGE BARBER:  Real quick question, and the answer

14   is a cite, not anything other than a cite.

15         You just talked about this idea, you mentioned

16   Justice O'Connor, the State does not have an obligation to

17   explore endless variations.  What's the cite for that?

18         MR. JAZIL:  Yes, Your Honor.  I've got it as page

19   977.  It's a pin site and the citation is 517 U.S. 952 and the

20   pin site is 977, Your Honor.

21         JUDGE BARBER:  Thank you.  Thank you.

22         JUDGE HONEYWELL:  All right.  If there's nothing

23   else, Counsel, we will take this matter under advisement and

24   issue a written opinion.  You all are free to leave the

25   meeting.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    (Court adjourned at 11:22 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

```
 1   UNITED STATES DISTRICT COURT   )

 2                                  )

 3   MIDDLE DISTRICT OF FLORIDA     )

 4

 5           I, SHARON A. MILLER, Official Court Reporter for the

 6   United States District Court, Middle District of Florida, do

 7   hereby certify that pursuant to Section 753, Title 28, United

 8   States Code that the foregoing is a true and correct

 9   transcript of the stenographic notes taken by computer-aided

10   transcription taken in the above-entitled cause by the

11   undersigned and that the transcript format is in conformance

12   with the regulations of the Judicial conference of the United

13   States.

14   /S/Sharon A. Miller, CSR, RPR, CRR, RMR

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25

     UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION
```