**In the Matter Of:**

KETO NORD HODGES vs PASSIDOMO

8:24-cv-879

---

# NICHOLAS WARREN

*November 18, 2024*

---

<span style="color:red">Exhibit 3</span>



800.211.DEPO (3376)
EsquireSolutions.com

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  MIDDLE DISTRICT OF FLORIDA

 3                      TAMPA DIVISION

 4

 5   KETO NORD HODGES, ET AL.,

 6          Plaintiffs,

 7   v.                          Case No.  8:24-cv-879

 8   KATHLEEN PASSIDOMO, ET AL.,

 9          Defendants.

10

11

12                      DEPOSITION OF

13                     NICHOLAS WARREN

14

15            Monday, November 18, 2024

16                      10:01 a.m.

17                  Shutts & Bowen LLP

18       200 South Biscayne Boulevard, Suite 4100

19                  Miami, Florida 33131

20

21                  MILENA ARZUMANYANTS

22                     Digital Reporter

23              Commission No:  HH 562384

24

25
```



```
 1                    APPEARANCES OF COUNSEL

 2    On behalf of the Plaintiffs:

 3         DANIEL B. TILLEY, ESQUIRE
           CAROLINE A. MCNAMARA, ESQUIRE
 4         ACLU FOUNDATION OF FLORIDA
           4343 West Flagler Street
 5         Suite 400
           Miami, Florida 33134
 6         786-363-2714
           dtilley@aclufl.org
 7         cmcnamara@aclufl.org

 8    On behalf of the Defendant, Kathleen Passidomo, in her
      official capacity as President of the Florida Senate:
 9
           DANIEL E. NORDBY, ESQUIRE
10         KASSANDRA S. REARDON, ESQUIRE
           SHUTTS & BOWEN LLP
11         215 South Monroe Street
           Suite 804
12         Tallahassee, Florida 32301
           850-241-1717
13         dnordby@shutts.com
           kreardon@shutts.com
14
      On behalf of the Defendant, Florida Senate:
15
           SHIZA FRANCIS, ESQUIRE
16         SHUTTS & BOWEN LLP
           200 South Biscayne Boulevard
17         Suite 4100
           Miami, Florida 33131
18         305-415-9020
           sfrancis@shutts.com
19
      On behalf of the Defendant, Florida Secretary of
20    State:

21         MICHAEL BEATO, ESQUIRE
           MOHAMMAD O. JAZIL, ESQUIRE
22         HOLTZMAN VOGEL
           119 South Monroe Street
23         Suite 500
           Tallahassee, Florida 32301
24         850-270-5938
           mbeato@holtzmanvogel.com
25         mjazil@holtzmanvogel.com
```



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                      3

1
     On behalf of the Deponent, Nicholas Warren:
2
          REID LEVIN, ESQUIRE
3         LEYLANY E. RODRIGUEZ, ESQUIRE
          REID LEVIN, PLLC
4         PO Box 880682
          Boca Raton, Florida 33488
5         561-866-6089
          reid@reidlevinpllc.com
6         leylany@reidlevinpllc.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    INDEX TO EXAMINATION

 2

 3    EXAMINATION                                   PAGE

 4    Examination by Mr. Nordby                     6

 5    Examination by Mr. Jazil                      102

 6

 7

 8                    INDEX OF EXHIBITS

 9

10    DEFENDANTS'          DESCRIPTION             PAGE

11    Exhibit 1 - Email chain                      27

12    Exhibit 2 - Email chain                      29

13    Exhibit 3 - Email chain                      36

14    Exhibit 5 - Appearance record               48

15    Exhibit 6 - Twitter direct messages         51

16    Exhibit 7 - Plan                            84

17    Exhibit 8 - Messages                        94

18

19

20

21

22

23

24

25
```



```
 1                    (On the record at 10:01 a.m.)

 2              THE REPORTER:  Okay.  We are now on the

 3    record.  The time is 10:01 a.m. on November 18, 2024,

 4    to take the deposition of Nicholas Warren in the case

 5    of Keto Nord Hodges, et al. versus Kathleen Passidomo,

 6    et al.

 7              My name is Milena Arzumanyants, notary public

 8    and digital reporter for Esquire Deposition Solutions

 9    in the State of Florida.

10              I will be capturing the verbatim record of

11    today's proceeding using electronic audio equipment, a

12    computer and specialized recording software, which is

13    not a form of stenography.

14              The witness is located in Miami, Florida, and

15    has confirmed her [sic] identity with the driver's

16    license issued by the Florida Department of Motor

17    vehicles.

18              Will everyone in attendance, please identify

19    yourselves for the record and state who you represent?

20              MR. LEVIN:  Reid Levin, of Reid Levin, PLLC,

21    and I represent Mr. Nicholas Warren.

22              MR. TILLEY:  Daniel Tilley, ACLU Foundation

23    of Florida, Plaintiffs.

24              MS. MCNAMARA:  Caroline McNamara, ACLU

25    Foundation of Florida, represent the plaintiffs.
```



 1            MS. RODRIGUEZ:  Leylany Rodriguez from Reid

 2    Levin, PLLC, representing the plaintiff.

 3            MR. LEVIN:  Representing Mr. Warren.

 4            MS. RODRIGUEZ:  Mr. Warren.

 5            MS. FRANCIS:  Shiza Francis from Shutts &

 6    Bowen representing the Florida Senate.

 7            MR. BEATO:  Michael Beato, B-E-A-T-O, Florida

 8    Secretary of State.

 9            MR. JAZIL:  Mohammed Jazil, J-A-Z-I-L, for

10    the Florida Secretary of State.

11            MR. NORDBY:  Daniel Nordby, N-O-R-D-B-Y, from

12    Shutts & Bowen law firm, representing Florida Senate

13    President, Kathleen Passidomo, in her official

14    capacity.

15            MS. REARDON:  Kassandra Reardon, Shutts &

16    Bowen, representing the Florida Senate President,

17    Kathleen Passidomo, in her official capacity.

18            THE REPORTER:  Thank you.  Mr. Warren, please

19    raise your right hand to be sworn.

20                      NICHOLAS WARREN

21    having been first duly sworn, testified as follows:

22            THE REPORTER:  Thank you,

23            Counsel, you may begin.

24            MR. NORDBY::  Thank you.

25                      EXAMINATION



1    BY MR. NORDBY::

2         Q.  Good morning, Mr. Warren.

3         A.  Good morning.

4         Q.  You've stated your name for the record.  Have

5    you ever been deposed before?

6         A.  Nope.

7         Q.  Are you familiar with the rules governing

8    depositions?

9         A.  I am.

10        Q.  Do you have any questions at all about the

11   way a deposition works, your obligation to answer

12   truthfully, anything of the sort?

13        A.  I do not.

14        Q.  Is there anything that would cause you to not

15   be able to give truthful and clear answers today?

16        A.  No.

17        Q.  You're not under any medication?

18        A.  No.

19        Q.  You're not ill?

20        A.  No.

21        Q.  Okay.  If you don't understand the question

22   that I'm asking, will you agree to ask me to clarify

23   that question?

24        A.  I will.

25        Q.  Mr. Warren, by whom are you currently



 1  employed?

 2       A.   The ACLU of Florida.

 3       Q.   How long have you worked for them?

 4       A.   Since September 2020.

 5       Q.   Is that a different organization than the

 6  ACLU Foundation of Florida?

 7       A.   I am employed by the Foundation.

 8       Q.   Okay.  Could you explain to me what the

 9  difference is between those two?  Are those two

10  organizations?

11       A.   I will try to explain the difference.  My

12  understanding is that the foundation is a C 00 is a

13  501(c)(3).  And there's another entity, which is

14  the -- we call the Union, which I think is the

15  AC -- the American Civil Liberties Union of Florida.

16  And that's a 501(c)(4).

17       Q.   You are employed by the 501(c)(3)

18  organization?

19       A.   That's my understanding.

20       Q.   Your understanding is that you're employed by

21  the 501(c)(3), or your understanding is that they are

22  a 501(c)(3)?

23       A.   My understanding is that I'm employed by

24  them.  I know that they are a 501(c)(3).

25       Q.   Okay.  Do you have a question in your mind as



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                      9

```
 1   to who your employer is?
 2        A.  No.
 3        Q.  Okay.  You said you've been working for them
 4   since 2020?
 5        A.  Yes.
 6        Q.  Where were you employed before that?
 7        A.  I was at the United States District Court for
 8   the Middle District of Georgia.
 9        Q.  And what were you doing there?
10        A.  I was a digital law clerk.
11        Q.  For which Judge?
12        A.  Judge Gardner.
13        Q.  What time period?
14        A.  From -- for a year.  From August or September
15   2019 until September 2020.
16        Q.  And where were you employed before that?
17        A.  I was not employed.
18        Q.  Okay.  At any time before 2019?
19        A.  Immediately before 2019, I was not employed.
20        Q.  Okay.  What were you doing immediately before
21   2019?
22        A.  I was in law school.
23        Q.  Where did you attend law school?
24        A.  NYU.
25        Q.  Roughly three years 2016 to 2019?
```



```
 1        A.  Yes, sir.
 2        Q.  And where were you employed before law
 3   school, if at all?
 4        A.  In the year --
 5        Q.  Actually, let me withdraw that.  Were you
 6   employed at all during law school in any legal
 7   capacity job?
 8        A.  Yes.
 9        Q.  Which jobs?
10        A.  I was a research assistant at the law school.
11   I was -- I spent a day as a poll worker.  I think that
12   is -- other than unpaid internships, those are all the
13   employment that I had during law school.
14        Q.  Okay.  What about prior to law school?
15        A.  Prior to law school, in the year in between
16   college and law school I -- let's see, going in
17   reverse chronological order.  I had an -- had two
18   unpaid internships.  One was with Congresswoman Gwen
19   Graham's office in DC.  The other was at the Florida
20   Supreme Court.  And then before that, I was employed
21   for money at a off Broadway theater company called
22   PTP/NYC.
23        Q.  I don't intend to go any farther back than
24   that unless you tell me that you've had employment,
25   that was relevant to the issues in this case.
```



1          Did you have any employment prior to those unpaid

2     internships and theater that would be relevant to the

3     issues in this case?

4          A.   Could you be more specific about what might

5     be relevant?

6          Q.   Were you employed in any redistricting or

7     elections-related jobs prior to that?

8          A.   Yes.

9          Q.   Okay.   Where?

10         A.   So -- so I guess those would all have been

11    unpaid internships.   Would you like me to walk through

12    those?

13         Q.   Yes, please.

14         A.   Going in reverse chronological order.   I was

15    an intern in the United -- the Parliament of the UK in

16    the summer of 2014.   I was an intern at the voting

17    section in the Department of Justice in the spring of

18    2014.   I worked or volunteered on the campaign of the

19    three Supreme Court justices that were up for merit

20    retention in the summer of 2012.   And then in 2011 and

21    2012, I was an intern in the Florida Supreme Court.

22         Q.   Is that a separate internship in the Florida

23    Supreme Court from the one you mentioned earlier?

24         A.   It was a separate time period.

25         Q.   Okay.   So you had two separate unpaid



 1  internships in the Florida Supreme Court?

 2      A.  Correct.

 3      Q.  Okay.  What were the time periods for each of

 4  those?

 5      A.  The first one was in the summer of 2011, and

 6  my college has a January term, winter term.  I was

 7  there during that term as well in 2012, January 2012.

 8  And then the second time which we've already discussed

 9  was in the fall of 2015.

10      Q.  Were you working with any particular justices

11  or offices of the Florida Supreme Court during those

12  time periods?

13      A.  Yes.

14      Q.  Whose?

15      A.  Justice Pariente.

16      Q.  On both occasions?

17      A.  Correct.

18      Q.  I'm going to ask you about methods by which

19  you communicate with others.  Do you have any email

20  addresses that you use to communicate?

21      A.  Yes.

22      Q.  What are those addresses?

23      A.  I have a Gmail -- you want the address?

24      Q.  I think it's on some of your correspondence.

25  So maybe skipping a step.  Is it



NICHOLAS WARREN                                          November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                          13

```
 1   nicholaslvwarren@gmail.com?

 2        A.   Yes.

 3        Q.   Are there other email addresses that you used

 4   to communicate?

 5        A.   Yes.

 6        Q.   What are those?

 7        A.   I have my work email address, which I think

 8   you also have.

 9        Q.   Okay.  Any others?

10        A.   Those are all -- I have -- those are all the

11   ones that I have to communicate with others.  I have

12   ones that are for spam, and like, when you have to

13   give an email at a coffee shop to get rewards.

14        Q.   Okay.  Have you used any other email

15   addresses to communicate with others from 2019 to the

16   present?

17        A.   Yes.  Oh, I'm sorry.  I have my NYU law email

18   account still, but I don't use it much.  But I did use

19   it more in 2019.

20        Q.   Okay.  Any others?

21        A.   When I was working at the Middle District of

22   Georgia, I had a work email through them.

23        Q.   Okay.  Your phone number on some of your

24   materials is 850-509-5450; is that correct?

25        A.   That's right.
```



1      Q.  Do you have any other phone numbers that you

2   used to communicate with others?

3      A.  I have my work phone number.

4      Q.  Okay.  Do you have any -- the number I read

5   as a cell phone number?

6      A.  Yes.

7      Q.  Do you have any other cell phone numbers?

8      A.  No.

9      Q.  Did you use any other cell phone numbers in

10  2020 or 2021?

11     A.  No.

12     Q.  Do you communicate using social media

13  accounts?

14     A.  Yes.

15     Q.  Which ones?

16     A.  Twitter.  Instagram.  And those are the main

17  ones.

18     Q.  Okay.  What are the non-main ones?

19     A.  Snapchat, to some extent.  That's it.

20     Q.  Okay.  What is your Twitter handle?

21     A.  NLVWarren.

22     Q.  And the same question as to Instagram.

23     A.  That is N period W-A-R-R underscore N.

24     Q.  And Snapchat?

25     A.  That is a little inside joke.  That is



NICHOLAS WARREN                                November 18, 2024
KETO NORD HODGES vs PASSIDOMO                              15

```
 1   H-U-N-G period J-U-R-O-R.
 2        Q.  Okay.  Any other social media accounts that
 3   you use?
 4        A.  No.
 5        Q.  Do you have a Facebook account?
 6        A.  I don't.  It's deactivated, and I haven't
 7   used it since, I think 2015 or 2016.
 8        Q.  Okay.  Do you have a Signal account?
 9        A.  Yes.
10        Q.  Okay.  What is your information for that?
11        A.  I think it's the same as my cell phone
12   number.
13        Q.  Is that something you used to communicate?
14        A.  Yes.
15        Q.  Do you have a Telegram account?
16        A.  No.
17        Q.  Okay.  Are there any other -- do you have a
18   WhatsApp account?
19        A.  Yes.
20        Q.  What is your WhatsApp account information?
21        A.  I think it's the same as my cell phone
22   number.  I think -- yeah.
23        Q.  And you use that to communicate?
24        A.  Yes.
25        Q.  Any other technological methods you use to
```



1  communicate with others, other than email -- let me

2  ask one other.

3      Do you text using your cell phone number?

4      A.  Yes.

5      Q.  Do you use iMessage?

6      A.  Yes.

7      Q.  And SMS messages as well?

8      A.  That's --

9      Q.  For individuals who do not have iPhones, if

10  you wanted to text someone?

11      A.  Yes.

12      Q.  Okay.  Anything else?  Any other apps or

13  other methods that you use to communicate with other

14  people?

15      A.  I write letters.  I think that's it.

16      Q.  I'm going to ask you some questions about who

17  you talked to during the redistricting process, most

18  recent redistricting process in Florida.  I'm going to

19  go through some kind of categories of people just to

20  break it down a little bit.  And the relevant time

21  period I'm talking about here is 2020 through the

22  present.  Do you understand what I'm asking?

23          MR. LEVIN:  That's a little outside the scope

24  of the order.

25          MR. NORDBY::  Do you have the order?  There's



1   a time period in there.

2          MR. LEVIN:  "Personal involvement in the

3   legislative redistricting process, Which occurred in

4   2020 through January 2022, when the Senate enacted its

5   plan."

6          MR. NORDBY::  Okay.

7          MR. LEVIN:  Which should have been January

8   20th, 2022.

9   BY MR. NORDBY::

10         Q.  We'll limit it to that time period, 2020

11  through January of 2022.

12         A.  Okay.

13         Q.  Did you speak with any members of the Florida

14  House of Representatives during that time period?

15         A.  About redistricting?

16         Q.  Yes.

17         A.  Yes.

18         Q.  With whom did you speak?  Which members of

19  the Florida House?

20         A.  I had a meeting with several members about

21  prison populations.  And I can't remember everyone who

22  was there, but at least Fentrice Driskell was there.

23         Q.  Do you remember anyone else that was there?

24         A.  David Grimes was there.

25         Q.  Do you know Mr. Grimes' job title or in what



1    capacity he's employed?

2        A.   He is the -- I think it's like the staff

3    director or the chief of staff or the caucus director

4    of the Minority Caucus, the Democratic Caucus, in the

5    House, Florida House.

6        Q.   You mentioned Representative Driskell.  Any

7    other members that you remember being in that meeting?

8        A.   I think there may have been some, but I can't

9    remember who.

10       Q.   Approximately how many people were in that

11   meeting?

12       A.   Including me and Representative Driskell and

13   David Grimes, there may have been one or two other

14   people there, but I'm not sure.

15       Q.   Okay.  Did you know who they were?

16       A.   At the time that I was there, I'm sure I was

17   introduced to them.

18       Q.   Okay.  Is there anyone else in that meeting?

19       A.   Not that I can remember.

20       Q.   Okay.  Are there are any other members or

21   staff of the Florida House of Representatives that you

22   communicated with during the redistricting process?

23       A.   No.

24       Q.   Okay.  Do you know an individual with the

25   last name of Dye?



1        A.  Yes.

2        Q.  Who am I referring to?

3        A.  That's Joe Dye.

4        Q.  Okay.  Who's Joe Dye?

5        A.  He is -- he, until recently, was a legal

6   support staff at the ACLU of Florida, and before that,

7   he was an intern with the House Minority Office.

8        Q.  Would he have been present in that meeting

9   you mentioned earlier?

10        A.  No.

11        Q.  Any other members of the House that you

12   communicated with during the redistricting process?

13        A.  No.

14        Q.  And I'm referring to other than just this one

15   meeting.  At any point through any method of

16   communication that we've discussed earlier?

17        A.  No.

18        Q.  Any other staff of the Florida House of

19   Representatives that you communicated with?

20        A.  No.  Other than when I submitted my

21   five -- or four or five or six redistricting plans

22   that went to I think, a Joint Senate House staff body.

23   And I think there was an exchange of emails about the

24   submission of the plans with those individuals, but I

25   don't know who they were.




1      Q.   Okay.  Similar questions as to members of the

2   Florida Senate.  Did you speak with any members of the

3   Florida Senate during the redistricting process?

4      A.   Other than in person at the two subcommittees

5   of which I gave public comment, no.

6      Q.   You didn't have any emails, texts, or any

7   other method of communication outside with any member

8   of the Senate other than in your public testimony?

9      A.   I emailed Senator Bradley after I spoke at

10   her subcommittee.  And I emailed all members of the

11   Florida Senate with a letter after that.

12      Q.   What about staff of the Florida Senate?  Did

13   you communicate with any staff of the Florida Senate

14   regarding redistricting during the redistricting

15   process?

16      A.   Yes.

17      Q.   Who?

18      A.   John Toman.

19      Q.   Who's John Toman?

20      A.   I think he is a lawyer in the Senate Minority

21   Office.

22      Q.   Did you meet with or communicate with any

23   other members or staff of the Florida Senate during

24   the redistricting process?

25      A.   No.



1      Q.   Same question as to members of Congress.   Did

2    you communicate with any members of Congress during

3    the redistricting process?

4      A.   No.

5      Q.   Did you communicate with any congressional

6    staffers during the redistricting process?

7      A.   No.

8      Q.   The Florida Executive Branch officials.   Did

9    you speak with anyone at the Secretary of State's

10   Office or the Governor's Office or any other Executive

11   Branch Office regarding redistricting?

12     A.   No.

13     Q.   Did you speak with any judges about

14   redistricting?

15     A.   No.

16     Q.   Okay.   Did you speak with any former judges

17   about redistricting?

18     A.   I remember sending an email to Justice

19   Pariente with one of the news articles after I spoke

20   in, I think, the first subcommittee in -- in the

21   Senate, the one that referred to me as a

22   cartography-smitten gadfly.   And I sent that email

23   to -- or sent that article to her.   But other than

24   that, no.

25     Q.   Okay.   Did you have any subsequent

 1  conversations with her during this process?

 2      A.  No.

 3      Q.  Was that email turned over in discovery in

 4  this case to your knowledge?

 5      A.  To my knowledge, no.

 6      Q.  Okay.  Do you know why?

 7      A.  I don't think it was requested, subject to

 8  any of the requests.

 9      Q.  Any other judges, or former judges that you

10  spoke with about redistricting?

11      A.  No.

12      Q.  What about members of the media?  Who did you

13  speak with that would be considered a member of the

14  media during the redistricting process.

15          MR. LEVIN:  I'm going to object based on

16  reporter's privilege, which is privilege of the

17  reporter and it can't be waived by Mr. Warren.

18          MR. NORDBY::  You're instructing him not to

19  answer based on a privilege of a reporter, or you're

20  allowing him to answer, subject to that objection?

21          MR. LEVIN:  I'm instructing him not to answer

22  based on reporter's privilege.

23          MR. NORDBY::  And this is a privilege that

24  belongs to someone else?

25          MR. LEVIN:  Like an --



```
 1            MR. NORDBY::  It's the basis for your
 2      objection?
 3            MR. LEVIN:  Like an attorney-client
 4      privilege, you can't waive the client's privilege.
 5      Mr. Warren can't waive the reporter's privilege.
 6            MR. NORDBY::  Okay.  We may need to hold the
 7      deposition open, but I'll -- I understand your
 8      objection on this point.
 9      BY MR. NORDBY::
10         Q.  I'm going to ask you about political
11      operatives now.  Do you understand what the term
12      political operative means?
13         A.  Maybe it would be helpful if you defined it.
14         Q.  Well, how would you define it?  You've heard
15      that phrase before, that term before?
16         A.  I've heard that term before.
17         Q.  Okay.  How would you define a political
18      operative?
19         A.  Someone who operates in politics.
20         Q.  Okay.  Would you understand that term to
21      include people who might call themselves campaign
22      advisors?
23         A.  I can -- if you -- if you give me a
24      definition, I can answer a question using that
25      definition.
```



1        Q.   Why don't I give you a definition then --

2        A.   That would be very --

3        Q.   -- if this is a term that is unclear.

4        When I use the term political operative, I'm

5   speaking of people who operated, they may advise

6   candidates, they may call themselves analysts or

7   consultants, or campaign managers, or campaign workers

8   or organizers.  But they're people who, as part of

9   their job duty is to help a candidate or a political

10  party succeed in their objectives.

11       Does that definition make sense to you?

12       A.   Sure.

13       Q.   Do you understand the type of person I'm

14  referring to there?

15       A.   Yes.

16       Q.   Okay.  And did you speak in this process with

17  any political operatives as I have defined that term?

18       A.   Yes.

19       Q.   Who did you speak with?

20       A.   Matthew Isbell.

21       Q.   Who else?

22       A.   I think that's it.

23       Q.   Did you speak with Christian Ulvert at any

24  point?

25       A.   No.



 1        Q.  Did you speak with anyone who is employed by
 2   the Florida Democratic Party?
 3        A.  To my knowledge, no.
 4        Q.  Is there someone that you're thinking of that
 5   you're unclear of whether they worked for the Florida
 6   Democratic Party?
 7        A.  No.
 8        Q.  Okay.  Did you speak with anyone that works
 9   for the Florida Democratic Senatorial Campaign
10   Committee?
11        A.  No.
12        Q.  Did you speak with anyone that works for the
13   National Democratic Redistricting Trust?
14        A.  No.
15        Q.  Did you speak with anyone that works for the
16   Democratic National Committee?
17        A.  No.
18        Q.  We've gone through a lot of categories.  Is
19   there anyone that you spoke to about redistricting
20   during this relevant time period that you haven't
21   named so far?
22        A.  Anyone that I spoke to about redistricting at
23   all during this time period?
24        Q.  Yes.
25        A.  Members of my family.  I'm sure I talked to



1  friends about it, whether they were listening or not.
2  I'm not sure.
3      Q.  Any of your friends who worked in politics in
4  any capacity?
5      A.  No.
6      Q.  Do you speak with Natalie Katoo about
7  redistricting?
8      A.  No.
9      Q.  Do you know who that is?
10     A.  Yes.
11     Q.  Okay.  Who is she?
12     A.  She's a lawyer in Tallahassee.  I learned
13  that she was -- I think she was registered to lobby
14  for the -- one of the -- I'm not sure of the exact
15  entity, but one of the NDRC affiliated corporate
16  entities.  Other than that, that's who she is.
17     Q.  Okay.  Other than members of your family and
18  friends who are not involved in any way in politics,
19  is there someone who you spoke with about
20  redistricting that you have not already discussed?
21     A.  People at work.
22     Q.  Okay.  Who specifically?
23     A.  Mr. Tilley who was my supervisor during most
24  of this time.  My previous supervisor, Anya Marino.
25  Ms. McNamara, maybe.  She joined the ACLU of Florida,



```
1    I think, right around the end of this -- the relevant
2    time period.  Those would be the main people.
3              MR. NORDBY::  Okay.  So 19.  All right.
4    We'll mark this as Exhibit 1.
5              (Defendants' Exhibit No. 1 was marked for
6         identification.)
7    BY MR. NORDBY::
8         Q.  All right.  Mr. Warren, we'll mark this as
9    Exhibit 1.  Do you recognize this document that I've
10   handed to you?
11        A.  Yes.
12        Q.  Okay.  What is this?
13        A.  This is an email chain involving me and David
14   Grimes and Kara Gross.
15        Q.  Who is Kara Gross?
16        A.  She is the legislative director and senior
17   policy counsel for the ACLU of Florida.
18        Q.  Okay.  She's someone you work with?
19        A.  Yes.
20        Q.  Is this email about that meeting you
21   mentioned earlier?
22        A.  Yes.
23        Q.  Okay.  So it says on Bates page 17, it says,
24   "Hey, Nick, we are set to meet with Rep Driskell and
25   possibly others on Monday from 2 p.m. to 2:45.  Are
```



 1   you still free to join us in person at the Capitol?

 2   Thanks - DG," referring to David Grimes.

 3        Do you see that?

 4        A.  Yes.

 5        Q.  And it's sometimes easier to read these

 6   emails from the bottom to the top.  This is the first

 7   email on the back page.  It's an email from Kara Gross

 8   to David Grimes and to you, it says, "Just wanted to

 9   connect you both.  David is the fabulous staff

10   director for the House Democratic Office.  He's

11   looking for someone to come and speak to House

12   Legislators about prison gerrymandering.  Nick is our

13   fabulous voting rights attorney, who, fortunately for

14   us, is located in Tallahassee."

15        Do you see that?

16        A.  Yes.

17        Q.  And this meeting happened?

18        A.  Yes.

19        Q.  Okay.  Was this a meeting that you were

20   having in your capacity as a lawyer for the ACLU?

21        A.  Yes.

22        Q.  What was the subject of that meeting?

23        A.  It was, as it says, about prison

24   gerrymandering and the use of prison populations in

25   redistricting.  And the case that the ACLU of Florida



NICHOLAS WARREN                                        November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                        29

```
 1   had recently had in Jefferson County on that subject.
 2           MR. NORDBY::  Okay.  So 20.
 3   BY MR. NORDBY::
 4       Q.  Let's mark this as Exhibit 2.
 5           (Defendants' Exhibit No. 2 was marked for
 6       identification.)
 7   BY MR. NORDBY::
 8       Q.  Mr. Warren, do you recognize this email?
 9       A.  Yes.
10       Q.  This appears to be an email from John Toman
11   to you.  It's the first one on the string at the
12   bottom.  The subject line "Great to meet".  Do you see
13   that?
14       A.  Yes.
15       Q.  So you mentioned earlier that you believe
16   John Toman is a lawyer in the Senate Democratic
17   Office?
18       A.  Yes.
19       Q.  Okay.  Did you have any communications with
20   Mr. Toman before this email?
21       A.  Yes.
22       Q.  Okay.  Tell me about those communications?
23       A.  We -- I think it was the same day that I had
24   the prisons meeting with David Grimes.  He introduced
25   me to some of the people in the -- in his office and
```



 1  gave me a little tour of the Capitol.  And -- and I
 2  was introduced to John Toman that same day.
 3        Q.  Was he at that meeting with Mr. Grimes and
 4  Representative Driskell?
 5        A.  No.
 6        Q.  Okay.  Is there anyone else you met that day?
 7        A.  No.  There may have been someone else in the
 8  Senate Office where John Toman works that was also
 9  there when I was introduced to him, but I can't
10  remember who that was or if there were -- if there was
11  more than one person who worked there.
12        Q.  Okay.  Mr. Toman's email to you says that
13  he's, "Looking forward to accessing your
14  context/insights/outrage on reapportionment."  And it
15  says, "As admitted yesterday, my background knowledge
16  of the process is low."
17        Do you understand his reference to, "as admitted
18  yesterday," to be a reference to your conversation
19  with him that you just discussed?
20        A.  Yes.
21        Q.  Okay.  He's "Looking forward to accessing
22  your context/insights/outrage on reapportionment."
23  Had you expressed some of those to him in that
24  meeting?
25        A.  My memory of the first time we met was that I



1   was introduced as someone who knew about the

2   redistricting process.  And he had asked -- well, I

3   think it's basically a lot of what he's saying here is

4   that I'm trying to get educated in this topic because

5   I'll be the point person, I think for the Senate Dems

6   Caucus on this issue, and what are the pointers that

7   you have for me getting up to speed on it.

8        Q.  At the end of the second paragraph, Mr. Toman

9   says, "I'm sure," -- "I'm unsure if a Caucus "plan,"

10  will emerge, or if everyone will just be hanging out

11  under the big tent, doing their own thing.  This makes

12  it hard (impossible?) to strategize."

13       You understand that to be referring to a

14  potential plan of the Senate Democratic Caucus?

15       A.  Yes.

16       Q.  And Mr. Toman's wanting to strategize with

17  you about what the Caucus plan will be, if there will

18  be one?

19       A.  I don't know that he -- I don't know that

20  that's what this says.

21       Q.  Okay.  How did you understand it?

22       A.  Well, I don't remember how I would have

23  understood it at the time, but I think in -- in

24  general terms, he is saying that he's unsure of

25  whether a Caucus plan will emerge or all the



1  individual members of the Caucus will be doing their
2  own thing, and so that makes it hard to strategize.
3      Q.  He also asks in the third paragraph, if there
4  would be -- he asks you if there would be any value in
5  creating queries or responses that we should have
6  raised at yesterday's staff marching orders, confab.
7  Do you see that?
8      A.  I do.
9      Q.  He appears to be asking you again for your
10  advice on what should have been raised at the staff
11  meeting.  Is that how you understand that?
12      A.  Yes.
13      Q.  Your response is at the top of the same page,
14  correct?
15      A.  That's right.
16      Q.  Your response provides him a link and a
17  password to your redistricting webinar.  What is the
18  redistricting webinar?
19      A.  It's a webinar about redistricting.  It was a
20  CLE that I did -- was allowed to do in August or
21  September around that time of 2021.  It was called a
22  Florida Redistricting Primer.
23      Q.  And the link is to an ACLU Zoom account.
24  This was done in your capacity as an employee of the
25  ACLU?



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                    33

 1       A.  That CLE was, yes.

 2       Q.  Okay.  Or the ACLU Foundation?

 3       A.  Yes.

 4       Q.  Okay.  And I guess I should have noted your

 5  email that Mr. Toman emailed is also a aclufl.org

 6  email address, correct?

 7       A.  That's right.  Although I did not understand

 8  this exchange to be -- to be work that I was doing for

 9  work.

10       Q.  How did you understand this exchange?

11       A.  As an extracurricular, I guess, as something

12  I was doing personally.

13       Q.  Is that both the CLE and this interaction

14  with Mr. Toman?

15       A.  The CLE was through work.

16       Q.  Okay.  You mentioned that you were allowed to

17  do the CLE.  Why did you phrase it that way?

18       A.  Because my work allowed me to do a CLE on

19  redistricting.

20       Q.  Okay.  Was there a resistance to that in some

21  way?

22       A.  Our executive director in -- well, I think

23  before I started working there, had made a decision

24  that the affiliate was not going to be working on the

25  State level redistricting process in any substantive



 1  way.  And so this CLE was an exception to that general

 2  rule.

 3      Q.  Okay.  Was the meeting with Representative

 4  Driskell and David Grimes an exception to that as

 5  well?

 6      A.  Yes.

 7      Q.  And the communications with Mr. Toman were an

 8  exception to that?

 9      A.  No.  I didn't understand the communications

10  with John Toman to be part of my work duties.

11      Q.  You go on to tell Mr. Toman in this email

12  that, "I'm sure there's value in asking questions

13  about the directions to staff that might have been

14  asked Monday, as well as Rodriguez's unilateral?

15  pronouncement that only amendments that improved on

16  the constitutional criteria would be advanced."

17      I understand this to be you responding to Mr.

18  Toman's request for advice on how his members should

19  proceed by telling him, there's value to asking

20  questions.  Is that how you intended that response?

21          MR. LEVIN:  Objection.  Goes to subjective

22  intent in the redistricting process.  So that's

23  outside the scope.

24          MR. NORDBY::  I'm asking him -- I appreciate

25  that.  I'll rephrase.



1  BY MR. NORDBY::

2      Q.  I'm asking you specifically what this

3  communication is.  He asked you for advice, and what

4  did you provide him in response to that request?  Not

5  what did you subjectively intend, but what did you

6  tell him?

7      A.  Would you like me to quote the email of what

8  I told him?

9      Q.  Sure.

10     A.  "As far as questions in future meetings, I'm

11 sure there's value in asking questions about the

12 directions to staff that might have been asked Monday,

13 as well as Rodriguez's unilateral? pronouncement that

14 only amendments that improved on the constitutional

15 criteria would be advanced.  A map is either

16 constitutional or not.  There's no such thing as a

17 more constitutional map.  In terms of reading

18 materials, I can't really recommend anything useful at

19 the moment, besides the most obvious federal and state

20 cases that I'm sure you already know."

21     Q.  What does that reference to Rodriguez's

22 unilateral pronouncement mean?

23     A.  That was a reference to a statement that

24 Senator Rodriguez made at the October 18th,

25 Redistricting Committee meeting or Reapportionment



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                      36

1    Committee meeting about the criteria that -- or the

2    standards by which amendments would be judged.

3        Q.  Did you observe all of the Redistricting

4    Committee and Subcommittee meetings that were held?

5        A.  No.

6        Q.  Had you reviewed the one that you referenced

7    here?

8        A.  Certainly, part of it, at least.

9            MR. NORDBY::  21.  Okay.  Mark this as

10   Exhibit 3.

11           (Defendants' Exhibit No. 3 was marked for

12     identification.)

13   BY MR. NORDBY::

14       Q.  Okay.  Mr. Warren, do you recognize this

15   email exchange?

16       A.  Yes.

17       Q.  Okay.  These are your emails with John Toman

18   again?

19       A.  Correct.

20       Q.  The first email in the string at the bottom

21   of the page is an email from Mr. Toman to you on

22   November 15th, 2021.  We've gone forward a month here.

23   Mr. Toman says that he's guessing you've had a chance

24   to digest the proposed Congressional and State Senate

25   Maps created by the reapportionment staff.  And he



 1   asked you if you've already created any understanding

 2   or context information or have sources you can point

 3   to, or link to, to forward those along or give him a

 4   call.  Because he'll be providing his members with

 5   notes this afternoon, to generate informed and

 6   productive discussions and insights at the week's

 7   meeting.  And you responded, "John feel free to give

 8   me a call this morning.  I have a few notes on the

 9   maps.  Luckily, not too many."

10        You invited him to call you; is that correct?

11        A.   That's correct.

12        Q.   And did he in fact call you?

13        A.   So I will first say, I didn't remember this

14   second exchange with John Toman until I conducted the

15   search for the -- for documents that resulted in

16   finding this.  And I'm still not sure I have any

17   independent memory of this exchange or the call.  But

18   I don't doubt that he called me and we had a

19   discussion.

20        Q.   Okay.  What was discussed during that

21   meeting?

22        A.   I'm guessing that we talked about the draft

23   staff-produced maps that the Senate had released, I

24   guess, that day or the previous day.

25        Q.   To make sure I'm understanding your answer,



 1  the day before or -- oh, you're saying the maps were

 2  produced the day before or the previous day before

 3  this email exchange?

 4       A.  Yeah.  Although, I guess I think they must

 5  have been several days before because the first

 6  subcommittee meeting was on the 16th.  So anyway,

 7  within the prior week, staff had produced the

 8  first -- committee -- the Reapportionment Committee

 9  staff in the Senate had produced the first

10  staff-developed plans.  Yeah.

11       Q.  Do you recall what you discussed with Mr.

12  Toman during this either call or Zoom meeting?

13       A.  I don't have any independent memory of that

14  call, unfortunately.

15       Q.  The next email in the string, appears to

16  provide him a copy of Apportionment 8 and directs him

17  to discussion of Hispanic cohesion, and also mentions

18  review of Tampa Bay is 30-31.

19       Does that help refresh your recollection at all

20  as to what you may have discussed with Mr. Toman?

21       A.  I still don't really remember the call, but I

22  don't doubt that we discussed the apportionment 8

23  discussion of Hispanic voters and -- and the role of

24  voting cohesion in the minority protection

25  requirements.  And I guess, the discussion of the



1   configuration of Tampa Bay and the Congressional Map

2   in the 2015 decision.

3       Q.  Then the final email in this string is sent

4   the following day.  Actually, maybe very late the

5   night of that same one.  It looks like it's November

6   16th at 00:31, maybe 12:30 a.m. on the 16th.  And

7   that's an email from you to Mr. Toman saying, "It

8   looks like your maps won't be posted in time for

9   tomorrow's committee," but you offered him a link to a

10  Twitter thread explaining them and links to

11  interactive maps; is that right?

12      A.  That's right.

13      Q.  Okay.  When did you draw these maps?  These

14  two, what appears to be two Congressional Maps and the

15  State Senate Map?

16      A.  After the staff draft -- staff-produced maps

17  plans were released several days before this or a week

18  before this, I worked on developing these alterations

19  to those.

20      Q.  And then you provided those to Mr. Toman?

21      A.  That's correct.

22      Q.  Had he asked you to provide him copies of

23  amended redistricting plans?

24      A.  He didn't in this email.  I don't remember if

25  he did over the phone call that we had.



1        Q.  He may have?

2        A.  I don't know.

3        Q.  You have no recollection one way or another

4   as to whether these proposed amendments were solicited

5   by Mr. Toman?

6        A.  Well, they weren't -- they wouldn't have

7   been -- he wouldn't have asked me to make them because

8   I had had already done that.  I don't know whether I

9   mentioned that I had already submitted plans and

10  whether I volunteered that I would send them to him,

11  or whether he asked me to, I don't remember.

12       Q.  Are you saying you made the plans before you

13  talked to Mr. Toman for the first time in this string?

14       A.  Did I make them before I talked to him the

15  first time in this thread?

16       Q.  In this thread, yes.

17       A.  Yes.  I made them definitely before Monday

18  November 15th at 8 a.m.

19       Q.  Would those plans have been part of the

20  discussion that you had with him, either by phone or

21  Zoom?

22       A.  I don't remember.  Although, I mean, this is

23  piecing the pieces together from reading this, but

24  it -- the last email on this thread references my maps

25  as if they aren't going to be brand new news to him.



NICHOLAS WARREN                                November 18, 2024
KETO NORD HODGES vs PASSIDOMO                              41

```
 1   So I'm guessing that I discussed the fact that I had
 2   submitted -- had submitted those already.
 3        Q.  Did you suggest to Mr. Toman that some of his
 4   members should consider adopting your maps?
 5        A.  I don't remember.  I don't think we talked
 6   much about the members when we talked ever.
 7        Q.  You said earlier that the only member of the
 8   Senate who you communicated with outside of the public
 9   meeting with Senator Bradley; is that right?
10        A.  And all 40 Senators when I sent them the
11   letter later in December.
12        Q.  You never spoke with Representative Shevrin
13   Jones, for example?
14        A.  No.
15        Q.  You spoke Senator Bracy?
16        A.  No.
17        Q.  You never spoke with Senator Gibson?
18        A.  No.
19        Q.  Did you speak with any legislative aides for
20   any of those members?
21        A.  No.
22        Q.  Okay.  I'm giving you here a document titled
23   Florida Senate Select Subcommittee on Legislative
24   Apportionment.  Date on it is 11/17/21.  Do you see
25   that document?
```



1    A.   I do.

2    Q.   This is a transcribed portion of a Senate

3 Select Subcommittee meeting that was held on November

4 17th, 2021.  On the second page of this document,

5 which is page number 30 at the bottom, line 5 starts

6 off with Warren Nicola.  Do you see that?

7    A.   I do.

8    Q.   What's that?

9    A.   I'm not used to seeing such big text.

10   Q.   What does this document appear to be to you?

11   A.   This is a transcript of the November 17th,

12 2021, Senate Select Subcommittee on Legislative

13 Reapportionment excerpted to include my public

14 testimony at that meeting.

15   Q.   You mentioned earlier you did provide public

16 testimony at that meeting?

17   A.   I did.

18   Q.   Okay.  Your public testimony is laid out here

19 on page 30 and 31.  I'm not going to read all of it to

20 you or ask you to read all of it here, but I wanted to

21 ask you a few questions about this.  You refer to

22 something that you call plan P000S0042.  Can we call

23 that plan 42?

24   A.   We can.

25   Q.   All right.  You'll understand what I mean?



1      A.  I will.

2      Q.  Your testimony in front of the Senate Select

3   Subcommittee was that your plan, I'm reading from line

4   8 here, "just tries to solve one problem that I

5   identified or one issue with Tier Two compliance,

6   which is in Tampa Bay and seeks to avoid having a

7   district that crosses Tampa Bay and thereby alters six

8   Districts from the staff-drawn maps."

9      Did I read that accurately?

10      A.  You did.

11      Q.  What is Tier Two compliance in your

12   understanding?

13      A.   That is compliance with Tier Two of the

14   Florida Constitution's requirements for redistricting

15   plans in Article III, Section 21(a) and 20(a).

16      Q.  And what do you understand those requirements

17   to be the Tier Two compliance requirements?

18      A.  So you're asking about my understanding of

19   something, but I think I would say the same

20   understanding that Mr. Ferrin gave on Friday, which is

21   that Districts have to be compact and shall utilize

22   existing political and geographic boundaries where

23   feasible.  And -- and be equally populated.

24      Q.  Okay.  And your testimony goes on to explain

25   why you believe your district satisfied those



1    requirements, correct?

2        A.  I think it does, yes.

3        Q.  Okay.  You refer to boundary of Tampa Bay,

4    and you refer to compactness, and you refer to Pasco

5    County making up a certain percentage of the District

6    in certain cities being kept whole; is that right?

7    I'm generalizing from your testimony here.

8        A.  I think that's a pretty good summary, yes.

9        Q.  Okay.  At the conclusion of your testimony,

10   you explained that the -- you say those are the

11   advantages of this approach, and you hope the

12   Subcommittee gives it some consideration as y'all keep

13   doing this work.  So you --

14       A.  I said y'all, but yes.

15       Q.  You did say y'all.  Your public testimony

16   does not say that the plan currently before the

17   Florida Senate was a racial gerrymander, does it?

18       A.  I did not say that.

19       Q.  You don't say that at all in this testimony?

20       A.  I did not say that in this public comment.

21   No.

22       Q.  And your public comment refers to this being

23   methods to improve Tier Two compliance, correct?

24       A.  Are you quoting?

25       Q.  I am.  Line 8, "tries to solve one problem



 1   that I identified or one issue with Tier Two

 2   compliance which is in Tampa Bay."

 3        A.   That's what I said, yes.

 4        Q.   Okay.  You don't identify your employer in

 5   this public testimony, do you?

 6        A.   I did not volunteer that, no.

 7        Q.   Okay.  Did you believe that your employer was

 8   known to the members of the Senate, such that it did

 9   not need to be identified?

10           MR. LEVIN:  So objection.  That's his

11   subjective intent and motivations.

12           MR. NORDBY::  No, I don't think it is.  I'm

13   asking if he believed that the Senate knew who his

14   employer was.  Not what he intended by means of his

15   testimony.

16           THE WITNESS:  Some of the members of the

17   Senate knew who I worked for, yes.

18           MR. NORDBY::  Okay.  Get number 11 for me.

19           THE WITNESS:  The second part of your

20   question was such that it didn't need to be disclosed,

21   and I wasn't asked.

22   BY MR. NORDBY::

23        Q.   Appreciate it.  Which members of the Florida

24   Senate knew your employer?

25        A.   Well, I had had previous interactions with



1    Senator Bradley on Twitter, where my employer is

2    identified.  I'm not sure whether -- I don't know for

3    a fact that she knew who I worked for, but she had

4    previously interacted with me.  Senator Gruters had

5    also previously interacted with me on Twitter.  I -- I

6    know I had -- not part of my work, but I had, I think

7    essentially sent sort of public comment-type emails on

8    different issues to at least some senators prior to

9    that subcommittee meeting, such that I wasn't, you

10   know, wouldn't have been a total stranger to some

11   senators, or it wouldn't have been the first time that

12   they had ever interacted with me.  And then -- yeah.

13        Q.  Did you have any interactions with any

14   members of the Florida Senate on Twitter about

15   redistricting?

16        A.  I don't think so.

17        Q.  And when I referred to Twitter, I'm referring

18   to both the public timeline and the direct messaging

19   function on Twitter.

20        A.  Definitely not the direct messaging function.

21        I will say there, before I worked for the ACLU, I

22   reached out to some -- this was -- would have been in

23   maybe 2017, 2018, 2019.  I reached out to some of the

24   members, both the House and Senate, who represented

25   Dixie County and its border with Gilchrist, I think,



1   because there was a quirk of the county boundary in

2   that area where if I'm thinking of the right county,

3   Dixie is noncontiguous as a county.  And so there are

4   certain district configurations that you could draw,

5   where you might be trying to follow the county

6   boundary, but you end up with a noncontiguity.  And I

7   suggested in advance of the redistricting process

8   before the Census had even happened, I think, to the

9   members who represented that area that they might

10  suggest just tweaking the boundary in the middle of

11  the Swanee River, I think, to make it easier in future

12  redistrictings for the legislature to draw districts

13  in that area without worrying about that.

14      I can't remember who represented those areas at

15  that time, but I my recollection is that I emailed the

16  reps and senators who represented that area about

17  that.  So that's somewhat related to redistricting.

18      Q.  Okay.

19      A.  I also -- this is -- well, I'm not sure --

20      Q.  And let me limit my question to Florida

21  Senate Redistricting.

22      A.  Well, it could affect the redistricting of

23  Florida Senate.  But I also -- I don't remember the

24  beginning of the time period when you asked me

25  communications with senators about redistricting.  And



1   I can't remember exactly when these letters would have

2   been.  But I think it would have been in the first

3   half of 2020.  I mailed letters to some of the

4   leadership in the House and Senate, essentially

5   expressing an interest in applying for work in the

6   Redistricting Committees if there was an opportunity

7   to apply for open positions.

8       Q.  Okay.

9       A.  And I think one of those letters went to now

10  President Passidomo.

11      Q.  Okay.  The document in front of you is your

12  appearance record, we'll call this Exhibit 5.

13         (Defendants' Exhibit No. 5 was marked for

14     identification.)

15  BY MR. NORDBY::

16      Q.  Do you recognize this document?

17      A.  Yes.

18      Q.  Is this the appearance record that you

19  submitted before the testimony that we just reviewed?

20      A.  Correct.

21      Q.  The email address you include on here is not

22  your ACLU of Florida email address, correct?

23      A.  Correct.

24      Q.  Why is that?

25      A.  That's because this appearance was as an



1    individual and not related to work.

2         Q.  Your communications with Mr. Grimes, and Mr.

3    Toman, were conducted under your ACLU email address,

4    though, correct?

5         A.  That's correct.

6              MR. NORDBY::  And number 18.  Actually right

7    down.

8    BY MR. NORDBY::

9         Q.  You mentioned earlier, in response to a

10   question about political operatives that you've spoken

11   with Mr. Isbell.  Who is Mr. Isbell?

12        A.  He is a -- I think his day job, is in the

13   Leon County Property Appraiser's Office.  He also is

14   a -- my understanding is that he does consulting work

15   for -- data consulting work for political campaigns,

16   and he comments about politics and has a blog.

17        Q.  Does he have any particular partisan

18   affiliation in the candidates that he works for?

19        A.  I think they're all Democrats.

20        Q.  Okay.  When did you first meet Mr. Isbell?

21        A.  Meet?  I mean, I'm sure I followed him on

22   Twitter since around when I joined Twitter in 2015 or

23   2016.  I'm not sure when we first interacted beyond

24   that.

25        Q.  Did you interact with him at all in 2015 or



1    2016?

2        A.   I don't think so.  Other than -- I mean, my

3    Twitter would tell that better than me, which is

4    public, whether we commented on each other's posts or

5    something like that.

6        Q.   This is at the time when you were working at

7    Florida Supreme Court for Justice Pariente?

8        A.   No.  I was not on Twitter while I was at the

9    Florida Supreme Court, or I didn't have an account.

10       Q.   Okay.

11       A.   Or if I had an account.  I'm not sure when I

12   started my account, but -- but I would not have been

13   interacting with him besides following him during that

14   time.

15       Q.   You did communicate with him though during

16   this relevant time period, 2020 to 2022?

17       A.   Correct.

18       Q.   Did you meet with him in person at any time?

19       A.   No.

20       Q.   Did you have phone calls with him?

21       A.   No.

22       Q.   Did you leave voice memos for him?

23       A.   Not during the time period covered by the

24   protective order.

25       Q.   Did you communicate with him via Snapchat or



 1   Signal or Telegram at all during the time period?

 2        A.  No.

 3        Q.  How did you primarily communicate with him?

 4        A.  Twitter Message.

 5        Q.  So what I've handed you is an excerpt of some

 6   of the Twitter direct message exchanges between you

 7   and Mr. Isbell that were produced in discovery in this

 8   case.

 9            (Defendants' Exhibit No. 6 was marked for

10        identification.)

11   BY MR. NORDBY::

12        Q.  Have you seen these documents before?

13        A.  Yes.

14        Q.  Do you have any reason to doubt the

15   authenticity of these direct message exchanges?

16        A.  I haven't checked every single message.  I'm

17   not even sure that I have my version of these.  I

18   don't think that anyone forged them.

19        Q.  Why do you not have your version of these?

20        A.  I said I don't -- I'm not sure if I do.

21        Q.  Okay.  Did you turn over any direct messages

22   with Mr. Isbell in discovery in this case?

23        A.  No.

24        Q.  To your knowledge, did you delete direct

25   messages with Mr. Isbell?



 1        A.   No.  To my knowledge, no.

 2        Q.   Do you routinely delete direct messages?

 3        A.   Of all kinds?  Yes.

 4        Q.   Okay.  Including with Mr. Isbell?

 5        A.   Not to my knowledge, no, or not.  I don't

 6   think I have, no.

 7        Q.   So you routinely delete direct messages, but

 8   you do not delete messages from Mr. Isbell.  Is that

 9   what you're saying?

10        A.   I have no memory of specifically deleting

11   direct messages from Isbell.  I routinely delete

12   messages.

13        Q.   The dates on these direct messages start with

14   May of 2021.  Do you see that?

15        A.   I do.

16        Q.   Okay.  You and Mr. Isbell appeared to discuss

17   redistricting a lot.  Is that a fair characterization?

18        A.   During this time period, yes.

19        Q.   I'm going to ask you to turn to the second

20   page of this composite, the Bates number at the lower

21   right is Isbell000012.  Do you see that?

22        A.   Yes.

23        Q.   There's a message in the middle of this page

24   that says, "It's so gratifying to see people argue

25   about something I worked on."  And then a follow-up



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                              53

1    with what appears to be a picture of a map.  Do you

2    see that?

3         A.  Yes.

4         Q.  What is that?

5         A.  That is an excerpt of the Supreme -- Florida

6    Supreme Court's Apportionment 8 decision, I think.

7         Q.  Okay.  And why do you say that that's

8    something you worked on?

9         A.  Because I made those physical maps that

10   appear in that opinion.

11        Q.  Okay.  The bottom of this page, is a

12   reference -- this is from Mr. Isbell -- actually, it's

13   from Florida Data Geek, a square with a cross in it,

14   and it says, "@mappingfl."  Is that Mr. Isbell to your

15   knowledge?

16        A.  To my knowledge, yes.

17        Q.  If I just refer to it as Mr. Isbell rather

18   than Florida Data Geek Mapping FL, will you understand

19   what I'm talking about?

20        A.  I will.

21        Q.  Okay.  Mr. Isbell says, "Also, the Tampa Bay

22   never gonna not be fought over.  Can't wait for the

23   State Senate fight up."  And you respond on the next

24   page.  "Yeah.  We will lose that fight."

25        Do you see that?



1      A.  I do.

2      Q.  Okay.  What does that mean?

3      A.  What does it mean?

4      Q.  Yes.

5      A.  It is a reference to the configuration of

6   districts in the Tampa Bay area.  And an expression

7   that we will lose the fight over the configuration of

8   districts in that area.

9      Q.  Okay.  Who is "we"?  You say, "We will lose

10  that fight."?

11     A.  I'm not sure.  It could be me and Mr. Isbell.

12  It could be people who want the districts to be

13  configured differently.

14     Q.  Were you in May of 2021 having a fight over

15  Tampa Bay Senate Districts?

16     A.  Well, the message from a few -- from the

17  minute prior is about Congressional Districts in the

18  area.  So I'm not sure that this was discussing -- oh,

19  I see.  He mentioned the State Senate fight.

20     Can you repeat your question?

21     Q.  My question is who is "we"?  He refers to a

22  State Senate fight.  You say, "We will lose that

23  fight."  And then reading two messages later, you say,

24  "Unless they trade Brandes for Cruz."

25     Brandes, I understand, is referring to former



 1  Senator Jeff Brandes?

 2       A.  That's correct.

 3       Q.  And Cruz is referring to former Senator Janet

 4  Cruz?

 5       A.  That's correct.

 6       Q.  So my question is, you refer to "we," and

 7  "they," and I'm wondering who "we," and "they," were

 8  in this exchange?

 9       A.  I think "we," definitely includes me and

10  Isbell.  And I'm assuming that "they," refers to the

11  legislative majority of the people drawing the maps in

12  the Legislature.

13       Q.  Okay.  How were you and Mr. Isbell having a

14  fight on State Senate maps?

15       A.  Having a fight with each other?

16       Q.  No.  Having a fight with "they," whoever they

17  are, the majority of the Florida Legislature.

18       A.  Well, we were not having a fight in this

19  discussion because the map drawing hadn't happened

20  yet.

21       Q.  Okay.  You anticipated a fight though?

22       A.  At this time, I did.

23       Q.  You refer down further on page 13 of this

24  composite exhibit here, "It's also funny that HD70 on

25  the whole," --



1      A.  Wait, wait, wait.  Sorry.  What page?

2      Q.  I'm sorry, Isbell 13.

3      A.  Okay.

4      Q.  Bates number at the bottom.  The same page.

5  You say, "It's also funny that HD70 on the whole helps

6  Dems, because if it were just in St. Pete, HD69 would

7  be much redder."

8      What is much redder a reference to?

9      A.  It's a reference to the partisan lien of that

10 district.

11     Q.  And the word Dems, is it fair to say that

12 refers to Democrats?

13     A.  That would be fair to say.

14     Q.  Mr. Isbell responds, "LOL, wonder if the GOP

15 will figure that out."

16     That's also referring to the Republican Party?

17     A.  It is.

18     Q.  Then further on, I would give the minutes,

19 but it looks like these were coming in rapid

20 succession.  So several of them are at 11:51 p.m.

21 Third message from the bottom of the same page says,

22 "They are winning and will keep winning.  They won at

23 worst a 23-17 majority in a Senate Map drawn in John

24 O'Neal's Los Angeles apartment."

25     Is the reference to "they," in that message also



1    to the Republican majority in the Florida Senate?

2         A.   Yes.

3         Q.   Who is John O'Neal?

4         A.   My memory is that he was the -- the map

5    drawer in the 2015 Congressional and Senate

6    litigation, who was retained by the plaintiffs in

7    those cases and who -- there was a -- a discussion, I

8    think, in one of -- at least one of those hearings

9    about how he lived in Los Angeles and was drawing

10   these maps in his apartment that were submitted to the

11   courts in those cases.

12        Q.   Okay.  Do you know John O'Neil?

13        A.   No.

14        Q.   The next message also refers to a Florida

15   Senate District becoming deep red and says, "they'll

16   naturally gain a seat out of that."  "They," also

17   refers to the Republican majority there?

18        A.   Correct.

19        Q.   I'm going to ask you to turn to the next page

20   of this, which is Isbell 15 Bates number of the lower

21   right-hand corner.  Do you see that?

22        A.   Yes.

23        Q.   This is a conversation from the following day

24   where you ask Mr. Isbell "Are you involved in Caucus

25   strategy or anything?"



1      What Caucus strategy is being referenced there?

2      A.  That would have been the Minority Caucuses, I

3  suppose.

4      Q.  You were asking Mr. Isbell if he was involved

5  in Caucus -- in strategy for the Democratic Caucus in

6  the Legislature?

7      A.  Yes.

8      Q.  Mr. Isbell responds, it looks like there was

9  a cross talk about a meme, but Mr. Isbell responds on

10  the following page that "Directly with members?  No.

11  Will I be involved?  Yes."

12      Mr. Isbell seems to be saying that he will be

13  involved in the Caucus strategy, but not working

14  directly with members.  Is that how you understand

15  that?

16      A.  He says he won't be working directly with

17  members and that he'll be involved.

18      Q.  Okay.  And you ask him to keep you updated to

19  the extent that he can.  And this is the 12:04 message

20  "I have concerns with how things have been going so

21  far."

22      Do you see your message to that effect?

23      A.  I do.

24      Q.  What were your concerns in May of 2021 of how

25  things have been going so far?



 1          MR. LEVIN:  I'm going to object to the scope,

 2   subjective intent and motivations.

 3          MR. NORDBY::  I'm not asking subjectively.

 4   I'm asking objectively what were his concerns with how

 5   things have been going so far.

 6          MR. LEVIN:  Well, someone's concerns are

 7   their own subjective feelings about something, right?

 8   I mean, is a concern, can it ever be objective?  I

 9   don't --

10          MR. NORDBY::  Sure it can.  I'll try to

11   rephrase and see if that answers your objection.

12   BY MR. NORDBY::

13      Q.  Did you communicate with someone, what your

14   concerns were with what's going on in May of 2021?

15      A.  Other than in these messages with Isabel, no.

16      Q.  Okay.  What were your concerns?

17      A.  I don't remember what that reference is.

18   It's possible that I tweeted about it.

19      Q.  Okay.  Were there any maps -- had any maps

20   been released in May of 2021?

21      A.  No.

22      Q.  Was the Census data available in May of 2021?

23      A.  No.

24      Q.  Sitting here today, you don't recall what

25   your concerns were?



 1        A.   No.   I -- at that time?   No, I'm not sure

 2    what that refers to.   But there may have been news

 3    stories.   I mean, there must have been news stories or

 4    something that the fact that covered how the

 5    Legislature and the Democratic Caucuses were preparing

 6    or not preparing, I think.   But I'm not sure.

 7        Q.   I'm going to ask you to flip forward a few

 8    pages to Isbell 26.   About halfway down that page, you

 9    say, "It's funny, I'm now remembering that last year,

10    Dan Newman asked me to come up with a list with all

11    the districts that were protected by the VRA/FDA."

12        Do you see that?

13        A.   I do.

14        Q.   Who is Dan Newman?

15        A.   He is a political consultant.   And a person

16    who works in campaigns.   I'm not sure if he currently

17    works in campaigns, but he did at this time, at least.

18        Q.   Okay.   He's not someone you mentioned

19    earlier, when I asked you about political operatives?

20        A.   That's correct.

21        Q.   Would you consider him a political operative?

22        A.   Yes.

23        Q.   Okay.   What did he ask you to come up with?

24        A.   A list of all the districts in his

25    understanding that were protected by the Voting Rights



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                    61

 1   Act and the Minority Protection Provisions of the Fair
 2   Districts Amendments.
 3        Q.  Did you provide that to him?
 4        A.  I'm not sure.  I think I actually explain
 5   what I told him further down the page.  Which -- which
 6   I think explains that -- what he was asking for.  I
 7   can't remember.  I think some of his assumptions in
 8   asking the question were sort of faulty.
 9        Q.  Does Mr. Newman work primarily with Democrats
10   or Republicans?
11        A.  Well, I know he's worked with both, I think.
12   I think, so I'm not sure.
13        Q.  You don't know primarily whether he works
14   with one party's candidates over an others?
15        A.  Nowadays, I'm -- I don't know.
16        Q.  I'm going to ask you to flip over to page
17   Isbell 61.  This is an exchange from August of 2021.
18        A.  And I think -- staying on Mr. Newman for a
19   second.  I didn't speak to him about redistricting
20   during the time period that you requested, just that
21   one exchange about Amendment III in the 2020 election.
22   That wasn't really about redistricting, just about the
23   impact of Amendment III on minority voting
24   opportunities.
25        Q.  But do you know whether Mr. Newman was



 1 | working at -- for primarily Democratic or Republican
 2 | candidates at that time?
 3 |     A.   I'm trying to remember when -- at -- in 2020?
 4 |     Q.   Whenever Mr. Newman spoke to you?
 5 |     A.   In 2020, I think it would have been my
 6 | understanding that he was primarily working for
 7 | Democrats.
 8 |     Q.   Okay.
 9 |     A.   Whether he was or not, I'm not sure.
10 |     Q.   Okay.  Are you on page Isbell 61?
11 |     A.   Yes.
12 |     Q   What is that at the top of the page there?
13 |     A.   That is a tweet of mine.
14 |     Q.   And there's an image, but what's the text
15 | beneath that indicate that the text or the tweet was?
16 |     A.   The text of the tweet was "Well, this could
17 | be a big deal if Florida Senate District 19." -- "a
18 | Florida Senate District 19 with the same Black
19 | population as the benchmark without crossing Tampa
20 | Bay."
21 |     Q.   Okay.  And there's an image of a draft State
22 | Senate District there?
23 |     A.   Yes.
24 |     Q.   Mr. Isbell responds to your tweet, responds
25 | by direct message to the forwarding of your tweet.



1   "One person told me whether the Bay gets crossed might
2   also relate to if they try to screw over Cruz and just
3   cede a Pinellas seat."  "They," refers to the
4   Republican majority in the Senate there?
5        A.  I believe so, yes.
6        Q.  Do you understand that to have been the
7   partisan impact of the plan that you have proposed in
8   that tweet?
9        A.  Of that district that I drew, no.
10        Q.  Why is that?
11        A.  That's an individual district.
12        Q.  Okay.  Mr. Isbell reacts to that district,
13   though, by referring to ceding a Pinellas seat.
14        A.  Right.
15        Q.  Okay.  What do you understand the partisan
16   impact to be based on this plan he's drawn to the
17   overall State Senate --
18        A.  Well, I think Mr. Isbell is referring to a
19   speculation about whether the Senate majority would
20   choose to put forward a plan without a district that
21   crossed Tampa Bay.  And the result of that being that
22   one Senate District in Pinellas County would become
23   less Republican.  Or that would be a potential result.
24        Q.  Can you flip to Isabel 90, please?
25        A.  You don't want to talk about Suwannee County?



1    Q.  I want to talk to Jackson County.  You say

2    about halfway down this page "Do you know anyone who

3    could explain to me the dynamics of a 2020 Dem primary

4    in Jackson County?"

5        Do you see that?

6        A.  Let me find it.  Yes.

7        Q.  And Mr. Warren -- not Mr. Warren.  You're,

8    Mr. Warren.  Mr. Isbell responds to you by referring

9    you to somebody named Jeremy Branch and also someone

10   named Judy Mount.  Do you know who those individuals

11   are?

12       A.  I know Jeremy Branch was a former County

13   Commissioner in Jackson County.  And Isabel says Judy

14   Mount is the current and long-time chair of the County

15   Democrats in Jackson.  I think she also works in the

16   House Democratic Office.

17       Q.  Okay.  Did you in fact speak with Judy Mount

18   or Jeremy Branch?

19       A.  No.

20       Q.  Take you now to page Isbell 102.  So this is

21   an exchange between you and Mr. Isbell on October 17

22   and 18th of 2021.  Do you see that?

23       A.  Yes.

24       Q.  You have a message about two thirds of the

25   way down the stage starts with "What's the point."



1  Could you read that?

2      A.  "What's the point of preparing great

3  questions for Dem Senators if they don't even say a

4  fucking word."

5      Q.  And Mr. Isbell responded, "I'm losing my mind

6  in a text chain right now.  These people are

7  worthless."

8      What was the context for this exchange?

9      A.  Well, I recognized the date as a date of the

10  big Senate Reapportionment Committee Meeting on

11  October 18th.  So I --

12      Q.  We earlier looked at an exhibit -- sorry to

13  interrupt you.

14      We earlier looked at an exhibit that was an email

15  exchange between you and Mr. Toman from a couple of

16  days after that same meeting, correct?

17      A.  Yes.

18      Q.  Okay.  What else can you tell me about the

19  context of these -- of this exchange?

20      A.  Can you ask a more specific question?

21      Q.  Sure.  The exchange says, "What's the point

22  of preparing great questions for Dem Senators."  Did

23  you prepare great questions for Dem Senators?

24      A.  No.

25      Q.  Did you prepare any questions for Dem



1  Senators?

2      A.  No.

3      Q.  Who prepared questions for the Democratic

4  Senators?

5      A.  I'm not sure.

6      Q.  Did you prepare questions for someone else

7  that should be asked at that meeting?

8      A.  No.

9      Q.  Are you aware of someone else preparing

10  questions for the Democratic Senators at that meeting?

11      A.  No, I'm not aware.

12      Q.  Can you explain why you would say, "What's

13  the point of preparing great questions for Dem

14  Senators," when neither you nor anyone else you knew

15  had prepared great questions for Dem Senators?  I'm

16  trying to understand why this -- what this

17  email -- what this text means.

18          MR. LEVIN:  And I think asking him why he

19  would explain is objectionable.  I object because that

20  goes to his subjective intent and his actions.

21  BY MR. NORDBY::

22      Q.  You don't know what this this text means, or

23  this Twitter direct message means?

24      A.  I know what it says.  And I definitely was

25  disappointed in the quality of the understanding of



1    redistricting amongst many of the members of the

2    Legislature throughout the process.  But I'm not sure

3    what this is in specific reference to.

4         Q.  Did you see any questions that were provided

5    for Democratic Senators?

6         A.  No.  Not that I remember, no.

7         Q.  Did you have any meetings about questions

8    that could be asked in a Redistricting Committee

9    Meeting?

10        A.  No.  If my discussion with Toman happened

11   after this meeting, I don't think so, no.  Although,

12   I'm not sure what time of day we would have met, when

13   we met first in person.  So it's possible that this is

14   in reference to discussing potential things that

15   people could ask at the October 18th meeting with him

16   the first time I met him, but I'm not sure.

17        Q.  The next page, 115.  There's what appears to

18   be an image of somebody standing alone in a corner

19   with a party hat.  Do you see that?

20        A.  I do.

21        Q.  And it appears to be an image associated with

22   a tweet that says, "They don't know I just submitted a

23   Tampa Bay Senate Map."

24        Do you see that?

25        A.  It is actually not an image associated with a



1   tweet.  That is an image that was just sent over this

2   message.

3       Q.  Okay.  Could you explain the difference of

4   that?

5       A.  The image was sent in the message.  There's

6   not a link to a tweet in the message.

7       Q.  Okay.  This was sent just by direct message

8   then; this was not tweeted?

9       A.  Correct.

10      Q.  Okay.  This is you telling Mr. Isbell you had

11  just submitted a Tampa Bay Senate Map?

12      A.  That's what it says, yes.

13      Q.  Mr. Isbell response to you, it says, "What I

14  find amazing is that the Dem primary makeup for their

15  plan is almost the same as mine, and I don't cross the

16  Bay.  The Pinellas portion isn't even that Black since

17  they grab a ring of white liberal Dems as well."

18      Do you see that?

19      A.  I do.

20      Q.  What do you understand Mr. Isbell to be

21  referring to in that response?

22      A.  He is referring to the comparing the share of

23  Democratic Primary Electorate that is Black, in what

24  we've been referring to in this litigation as the

25  Protected District.  And comparing that in the



 1  staff-drawn plan, and I guess, the plan that Isabel

 2  had posted on his blog.  And then he is referring to

 3  the portion of that Protected District that staff drew

 4  in Pinellas County and the racial makeup of that

 5  portion.

 6      Q.  His comment is, "It isn't even that Black

 7  since they grab a ring of white liberal Dems as well."

 8  I assume there Democrats -- Dems is referring to

 9  Democrats?

10      A.  I think you're right about that.

11      Q.  Mr. Isbell's reaction is that the Pinellas

12  portion of this State Senate District isn't that Black

13  because they, presumably the staff, grab a ring of

14  white liberal Dems as well.  That's his reaction?

15      A.  That's what he says.  Yes.

16      Q.  Did you agree with that comment?

17      A.  I agree that that is an accurate statement of

18  what the staff drafted plans did.  Or I mean, the

19  relative racial makeup of the Pinellas County portion

20  of the Protected District in the staff-drafted plans.

21  I think that's an accurate statement of that, yeah.

22      Q.  So when you responded and said, "I know,"

23  exclamation point.  You were expressing agreement with

24  Mr. Isbell's comment on that?

25      A.  I definitely was agreeing that it's factually



1    correct.

2         Q.  And you responded, "Mine has a higher share

3    of Dem primaries than the benchmark."

4         That's referring to the plan that you submitted?

5         A.  Yes.  And I guess I should say there's sort

6    of -- there's two different things or several

7    different things that he's expressing in that first

8    message.  And it certainly was remarkable to me in the

9    sense that I remarked on it or that I felt it was

10   interesting.  That going back to the image of the

11   standalone district that I tweeted, that under the

12   2020 Census data, it was possible to draw a district

13   just in Hillsboro County that had the same metrics in

14   the functional analysis, especially with the Black

15   share or the share of Democratic primary voters who

16   are Black, that that metric could be the same as in

17   the benchmark, even without crossing into Pinellas

18   County, and including that -- that heavily Black

19   section of St. Pete.

20        Q.  And that was a focus of your plan, wasn't it?

21        A.  Was not crossing Tampa Bay and including a

22   Protected District just in Hillsborough County, yes.

23        Q.  And including a higher Black share of

24   Democratic primary voters than the benchmark?

25        A.   It my plan definitely had a higher Black



 1   share of Democratic primary voters than in the

 2   benchmark, yes.

 3        Q.  I'll ask you to flip over to Isbell 119.

 4        A.  It's a big picture of me.

 5        Q.  There's a picture of you.  I'm not going to

 6   ask about that.  I'm asking you about the messages on

 7   November 17th, 2021.  The bottom, you say, "I'm

 8   guessing Dems decided.," -- this is following a

 9   discussion of Senate District 38.  You say, "I'm

10   guessing Dems decided they don't want to shake

11   anything up for fear of things only getting worse.

12   But the four Dems on the Senate Committee are some of

13   the least equipped to be smart."

14        "Things only getting worse."  What is that

15   referring to?

16        A.  That's probably a reference to the plan not

17   getting -- well, the plan being less fair or in a

18   sense, less favorable for the Democrats in the Senate.

19   And I'm guessing there about their motivations, and

20   what they -- what they figured to do in the Senate

21   process.

22        Q.  Okay.  I'll ask you to look now, Isbell 128.

23   Moving ahead, December 2nd of 2021.  The second

24   message on this page says -- is you asking Mr. Isbell,

25   "What is the strategy?  I really have to ask."  And he



1   responds, and you say, "No.  The coalitions and Dems

2   strategy, your strategy."

3        What is the strategy that you're referring to

4   there?

5        A.  So I recognize the date as I -- from reading

6   a lot of transcripts recently, I think being one of

7   the dates of the House Subcommittees.  So I think it

8   was probably -- if I'm guessing right, a comment on

9   probably, some of the questions that the Democratic

10  members in the House Committee were asking at that

11  meeting.  And the second message broadens that out to

12  ask about the Legislative Democrat strategy and

13  Isabel's strategy.

14       Q.  You were frustrated with the approach being

15  taken by the Democratic Caucuses in the Legislature.

16  Is that a fair characterization?

17       A.  I think I said it was excruciating.

18       Q.  Okay.  On the next page, Isbell 132, you have

19  an email stating "You, me," or Twitter direct message

20  is rather saying, "You, me, and Andrew Pantazi are the

21  real Fair Districts Coalition."

22       Who is Andrew Pantazi?

23       A.  He's a reporter.

24       Q.  Okay.  Why are you Mr. Isbell and Mr. Pantazi

25  the real Fair Districts Coalition in you're telling?



```
 1        A.  I think this is a reflection of the fact that
 2   the three of us we each disseminating a lot of factual
 3   information about the redistricting process in
 4   contrast to others who were -- who were giving less
 5   than well-taken comment on what was happening in the
 6   Legislature.
 7             MR. NORDBY::  I've been going for about an
 8   hour and a half.  Do we want to pause the clock --
 9             MR. LEVIN:  I would love to use the bathroom.
10             MR. NORDBY::  -- and take a break?
11             MR. LEVIN:  I would love to use the bathroom.
12             MR. NORDBY::  Let's do that.
13             THE REPORTER:  We're off the record 11:35.
14                    (Off the record.)
15             THE REPORTER:  Okay.  Back on record 11:47.
16             MR. NORDBY::  Thank you.
17   BY MR. NORDBY::
18        Q.  I'm going to ask you to actually flip back a
19   few pages to Isbell 102.  The second message from the
20   bottom says, "In the spring, I deleted a tweet that
21   was like, Florida Dems are doing exactly the wrong
22   things to prepare for this redistricting cycle after
23   random, important people started shitting on me.  Wish
24   I hadn't deleted it."  Mr. Isbell responds, "I hear
25   you.  I'm holding public fire for the moment, but it
```



 1  won't last this rate."

 2       This was a further exchange on October 18th.  Who

 3  are the "random, important people," referenced in your

 4  message?

 5       A.  My memory is -- this actually jogs my memory

 6  about what we were talking earlier in the spring in

 7  May or something of 2021.  That I think there was an

 8  article, let's see.  My memory is that there was an

 9  article about Florida Democrats prepare for

10  redistricting by doing X, Y, Z, or something like

11  that.  And -- and it just -- yeah.  It caused me to

12  tweet that.  And I think random important people is

13  definitely an exaggeration.  A friend of mine, I

14  think, sent me a message that he had received from

15  someone who I don't even think I learned their

16  identity.  That was along the lines of who is this

17  asshole, in reaction to what I had tweeted about.

18       Q.  Which friend of yours relayed that message?

19       A.  I think that was Matt Christ.

20       Q.  And what was the -- which person was it that

21  made the negative comment about you?

22       A.  I don't think I ever learned that person's

23  identity.  I think it was just a screenshot of the

24  message itself.

25       Q.  And you said you responded to that



1  communication by deleting your tweet?

2       A.  Yes.

3       Q.  And by October, you wish you hadn't deleted

4  that tweet?

5       A.  Yes.

6       Q.  Is that because you were frustrated with the

7  way that Florida Democrats were approaching the

8  redistricting process?

9       A.  Yes.

10      Q.  It was excruciating, I think in your later

11  words, correct?

12      A.  It was.

13      Q.  Okay.  Mr. Isbell agreed with that?

14      A.  Yes.  I think -- I think Tom Leek and Cord

15  Byrd and Tyler Sorois would probably share some of

16  those same feelings too.

17      Q.  I'd like to skip ahead to January of 2022,

18  page 14- -- Isbell 148.  Actually, 136, I'm sorry, one

19  prior page.

20      Let me correct myself one more time.  Page 135,

21  one page earlier than that.  This is an exchange

22  between you and Mr. Isbell that extends over two or

23  three pages and appears to express a disagreement

24  between you and Mr. Isbell about a map.

25      Can you tell from the context on page 135 whether



 1  this is a Senate, Congressional or House Map?

 2        A.  This is a State House Map.

 3        Q.  Okay.  And on page 133, Isbell 133, you say,

 4  "There is simply no partisan intent in any of the

 5  draft maps.  They drew new Dem seats voluntarily.  The

 6  Committee Chair's own district gets shaken up

 7  dramatically."

 8        Do you see that?

 9        A.  I do.

10        Q.  Mr. Isbell disagreed with you --

11        A.  He did.

12        Q.  -- correct?

13        A.  He did.

14        Q.  Okay.  You say that "They're party blind."

15  Are you referring to the maps there that those are

16  party blind?

17        A.  Yes.

18        Q.  These are the State House Maps?

19        A.  The State House Maps, for sure.  And

20  I'm -- I'm guessing also the -- well, I guess I'm not

21  sure, but it's possible that it also covers the

22  Congressional Maps as well.

23        Q.  Okay.  And then on page 135, and I'll try to

24  read these together because it looks like there's some

25  crosstalk with Mr. IsBel.  But you say, "I think it's



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                    77

1   not smart for you to ascribe intent where you don't
2   have evidence when the pattern of map drawing is not a
3   GOP gerrymander."  And Mr. Isbell disagreed with you?
4        A.  He disagreed with me, yes.
5        Q.  Okay.  Your conclusion, though, is that the
6   pattern of the Map drawing was not a Republican
7   gerrymander?
8        A.  That's correct.
9        Q.  And on page 136, Isbell 136, you continue
10  that.  You say to Mr. Isbell "Argue that they don't
11  respect COI."  Is that communities of interest?
12       A.  That's correct.
13       Q.  "But don't dress that argument up as though
14  as they're egregiously gerrymandering."  And Mr.
15  Isbell says, "I'm not going to give them the benefit
16  of the doubt."
17       "Them," is referring to the Republican majority
18  in the Legislature?
19       A.  Yes.
20       Q.  And your conclusion was --
21       A.  Or, that's -- that's my understanding.
22       Q.  Okay.  You conclusion was that there was not
23  a Republican gerrymander based on the maps?
24       A.  That's correct.
25       Q.  Now, I'll get to page 148.  The top of the



 1    page it says, "Wait, aren't Baxley and Perry paired?"

 2         Do you know who Baxley and Perry are?

 3         A.   They were or are two senators.

 4         Q.   Okay.  What does "aren't Baxley and Perry

 5    paired," mean to you?

 6         A.   It means I'm asking whether Baxley and Perry

 7    were paired in the same district.

 8         Q.   Those are two Republican state senators?

 9         A.   That's correct.

10         Q.   Would generally be disadvantageous to pair

11    them in the same district.

12         A.   For them, yes.

13         Q.   Okay.  And Mr. Isbell responds, "As best I

14    know, yes."  And you say, "Hmm, leadership said they

15    were yday," I interpret as yesterday; is that correct?

16         A.   That's a good interpretation.

17         Q.   "Wonder if Baxley moves to Lake."  Who is

18    "leadership," in that message that you sent?

19         A.   I -- let's see.  This came a day after the

20    full Senate Redistricting Committee met on January

21    13th.  I'm guessing that either Ray Rodriguez -- I

22    guess, Ray Rodrigues commented that there was a

23    pairing of senators.  I think.

24         Q.   Do you think the Senate in the Committee

25    referred to where incumbents live and whether they're



1  paired or not?

2       A.  I don't remember where that came from, but I

3  do remember some comment coming from Senate Leadership

4  about -- maybe it was from whatever the campaign arm

5  is of the Senate Republicans, if they have a chair or

6  something like that and commented on the fact that two

7  people were chaired -- were paired.  I think that's

8  what that refers to.  But I'm not sure.

9       Q.  You don't remember that.

10      A.  I don't have a firm memory of that, no.  But

11  I think there was an acknowledgment from Senate

12  Leadership that in the Senate Plan that was coming out

13  of the Committee that -- that there was a pairing of

14  Republican incumbents.

15      Q.  Could it have come from the Democratic Office

16  Leadership?

17      A.  I'm not -- I don't think that's what that

18  refers to.  But if it -- if it is, that would have

19  been from news reports that were published around that

20  time.

21      Q.  You then respond, "Could I launder through

22  you a history lesson thread on the importance of

23  filing floor amendments to maps, trying to get Shev or

24  Taddeo, anyone else to file a Tampa Map?"  And Mr.

25  Isbell says, "Sure, sounds good to me."



```
 1       Tell me about wandering through Mr. Isbell a
 2  history lesson on the importance of filing floor
 3  amendments?
 4       A.   My memory is I drafted a thread on the
 5  importance of filing floor amendments, and he posted
 6  it.
 7       Q.   With attribution to you?
 8       A.   I don't believe so, no.
 9       Q.   Why was it important to you to launder
10  through Mr. Isbell this history thread rather than
11  publishing it in your own name?
12            MR. LEVIN:   Objection.   Goes to his
13  subjective intent and motivations and his
14  participation in the redistricting process.
15  BY MR. NORDBY::
16       Q.   Did you, under your own name, provide a
17  history lesson on the importance of filing floor
18  amendments?
19       A.   I tweeted many things about redistricting
20  around this time.   And I'm not sure whether any of
21  those encompassed topic that you just asked about.
22       Q.   Okay.   Well, this --
23       A.   The specific thread that we're discussing
24  now, I did not post.
25       Q.   Okay.   Mr. Isbell posted it?
```



```
1        A.  That's correct.

2        Q.  But you wrote it?

3        A.  That's correct.

4        Q.  And he didn't indicate that he wrote it.  He

5  indicated as though he wrote it.

6        A.  He didn't indicate that I wrote it.  He

7  posted it.

8        Q.  Okay.  And you say, "trying to get Shev or

9  Taddeo, "who are Shev and Taddeo?

10       A.  That's Senator Shevrin Jones, and Senator

11 Annette Taddeo.

12       Q.  Okay.  You spoke with them about filing a

13 Tampa Map?

14       A.  No.

15       Q.  Can you explain to me why it says, "trying to

16 get Shev or Taddeo, anyone else to file a Tampa Map?

17       A.  I viewed them as some of the smartest members

18 of the Florida Senate.

19       Q.  Okay.  You didn't speak to them?

20       A.  No.

21       Q.  Did you speak to someone else who could speak

22 to them?

23       A.  I didn't -- I mean, I spoke to a lot of

24 people who could speak to a lot of people, but --

25       Q.  Let me be more clear.  Did you speak to
```





1  someone else with the intent that they communicate to

2  Representative Senator Jones or Senator Taddeo, that

3  you would like a Tampa Map filed?

4      A.  No.

5      Q.  Okay.  Can you explain what this message

6  means, if, in fact, you are not trying to get Shev or

7  Taddeo to file a Tampa Map?

8      A.  I mean, that is what I was trying to do.

9      Q.  How were you trying to do that?

10     A.  By asking Isbell to post a thread on the

11  importance of filing floor amendments to Maps.

12     Q.  Your expectation was that they would read Mr.

13  Isbell's thread?

14     A.  I don't know that I had -- had that specific

15  an expectation.

16     Q.  Your testimony is you did not speak to

17  Senator Jones or Senator Taddeo, or anyone else, to

18  pass a message along to them?

19     A.  That's correct.  Just throwing it out into

20  the void.  Hoping somebody listened.

21     Q.  Page Isbell 149.  Near the end of this page,

22  "Is my initial thought on renumbering when I worked

23  for the court in 2011, '12, was that they did

24  manipulate the numbers to make competitive seats up in

25  midterms."



1          This is referring to the numbering process for

2     State Senate Districts in 2011, 2012?

3          A.   That's correct.

4          Q.   And "they," again, refers to the Republican

5     Leadership there?

6          A.   That's correct.  Actually, no.  That refers

7     to -- we're a little -- we're getting a little bit

8     outside of the -- my involvement in the 2022 process.

9     But my initial thought was looking back at what

10    happened in 2002, that what leadership did in 2002 was

11    to make competitive seats up in midterms.

12         Q.   You said 2002.  Did you me 2012?

13         A.   No.  I mean, when I was working at the court

14    in 2011 and 2012, when I was looking back at what

15    happened in 2002, my initial thought was that the

16    Republican Leadership manipulated the numbers to make

17    competitive seats up in midterms.

18         Q.   Okay.  Take you now to Isbell 150.  At the

19    top of the page, it says, "Makes me feel like we

20    deserve a good midterm in a bad national environment,

21    but I know better than to expect/hope for that."

22         "We," again, refers to Democrats?

23         A.   That's correct.

24         Q.   And Mr. Isbell responds that "it would be

25    ironic if we," again, I assume meaning, Democrats,



```
 1   "gained some legislative seats and knock DeSantis off
 2   in 2022.  Frankly, my goals are just defend 3, 14, and
 3   38 and take 10, but even that seems like a monumental
 4   task."
 5        Do you have an understanding of what 3, 14, 38,
 6   and 10 are?
 7        A.  38, I -- well, 38, I recognize as a Senate
 8   District number.  I think my -- I would have a better
 9   understanding if I was able to refer to maps with
10   district numbers on them.
11            MR. NORDBY::  Kassie, can you get the 858
12   plan?
13            THE WITNESS:  Oh, I think these are all
14   Senate District numbers under the -- under old Senate
15   Map.
16            MS. REARDON:  This one.
17            MR. NORDBY::  Yeah.  This one.  This will be
18   Exhibit 6 --
19            THE REPORTER:  7.
20            MR. NORDBY::  7.
21        (Defendants' Exhibit No. 7 was marked for
22     identification.)
23   BY MR. NORDBY::
24        Q.  Mr. Warren, do you recognize this map that
25   has be placed in front of you?
```



1      A.  Yes.

2      Q.  Okay.  Do you understand this to be the

3  Enacted Plan?

4      A.  Yes.

5      Q.  Okay.  Looking at this plan and those numbers

6  that were referred to, do you have a -- provide you

7  better context to answer my question about Mr.

8  Isbell's numbers?

9      A.  Yes.

10     Q.  Okay.  What is Mr. Isbell referring to there

11 to your understanding?

12     A.  He's referring to Senate Districts 3, 14, 38,

13 and 10 under the new Senate Plan.

14     Q.  Okay.  Mr. Isbell wanted to defend those

15 Senate Districts, 3, 14 and 38 and to take 10.  Is

16 your understanding that Districts 3, 14 and 38 were

17 represented by Democrats at that -- at the time this

18 message was sent?

19     A.  The -- in the sense that the senators

20 representing generally the same area were Democrats,

21 but obviously not yet elected under this plan, yes.

22     Q.  Fair point.  And in later that same year in

23 2022, Senator Ausley attempted to defend District 3,

24 Senator Cruz, attempted to defend District 14, and

25 somebody was down in District 38.  Whose name does



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                    86

```
 1   it --
 2        A.   I think it was open.
 3        Q.   And District 10 is in Seminole County?
 4        A.   And a little bit of Orange.
 5        Q.   Okay.  You responded to Mr. Isbell's
 6   statement of his goals to defend Democratic seats and
 7   take a Republican seat by saying, "Ya, Ausley loses in
 8   a 2010 14 environment."
 9        A.   Very prescient.
10        Q.   And that is what happened?
11        A.   It is.
12        Q.   Later on that page, you expressed, "Hopefully
13   a House Dem proposes amendments."  Do you know what
14   amendments were at issue there?
15        A.   I'm sure they were redistricting amendments.
16        Q.   Okay.  Do you remember which map?
17        A.   No.  I -- no.  I think probably any map.
18        Q.   Okay.  And again, you referred to Shev and
19   Taddeo, proposing amendments in the alternative to
20   House Democrats proposing amendments.  You didn't
21   speak to either of them?
22        A.   No.
23        Q.   And you didn't speak to anyone who spoke to
24   them about this?
25        A.   No.
```



1     Q.  I'll take you now to Isabel 152.  There's an

2     image of a -- I don't know what you'd call it.  The

3     image of a person with a hoodie on that says,"As the

4     Florida Senate Maps are poised for floor votes next

5     week, here's a little history lesson on why it's

6     important for legislators to propose alternative

7     maps."

8          Do you see that?

9     A.  I do.

10     Q.  Is it your understanding this is the Twitter

11     thread that you laundered through Mr. Isbell?

12     A.  I believe it's the Twitter thread that I

13     wrote and that he posted, yes.

14     Q.  And you responded, "Thank you," exclamation

15     point.  Exclamation point.  Exclamation point.

16     "Beautiful."  His thread achieved your objectives?

17     A.  I don't think anyone proposed any amendments,

18     so I would say the answer to that is no.

19     Q.  Your immediate objective of having that

20     information put out into the ether so you said.  That

21     that was achieved?

22     A.  Yes.

23     Q.  On the next page, Isbell 161, halfway down

24     the page, you say, "Please tell UMich it's Fair

25     Districts, not the VRA or 14th Amendment that



 1   prohibits St. Pete-Tampa."

 2        Do you see that?

 3        A.  Yes.

 4        Q.  Who is UMich?

 5        A.  That's another person on Twitter who was

 6   active talking about redistricting.

 7        A.  Okay.

 8        Q.  What is this message referring to?

 9        A.  Well, there was a lot of misunderstandings

10   floating around about redistricting during this whole

11   time period.  And I'm assuming that UMich, who I don't

12   know what their real name is, had posted something

13   about the Florida Maps that I thought was inaccurate

14   or reflected a misunderstanding of the law.

15        Q.  Do you know whether Mr. Isbell knew who UMich

16   was?

17        A.  I don't know.

18        Q.  Okay.  I'm asking because you're asking Mr.

19   Isbell to tell someone else something.

20        A.  Well, I'll rephrase that.  I don't know, like

21   the true identity of an anonymous account.  I don't

22   know whether he knew that.

23        Q.  Okay.  The message you were asking to be

24   conveyed, though, is that it's Fair Districts, meaning

25   the Florida Constitutional requirements, not the



 1  Voting Rights Act or the 14th Amendment that prohibits

 2  St. Pete-Tampa, correct?

 3      A.  Right.

 4      Q.  And you say, "It's just partisan

 5  gerrymandering and Tier Two.  Nothing racial about it,

 6  except if that's their pretext, it's obviously faked."

 7      Did I read that correctly.

 8      A.  You did.

 9      Q.  Are you expressing to Mr. Isbell and asking

10  him to convey to UMich that a district connecting St.

11  Petersburg and Tampa could be explained by partisan

12  gerrymandering or Tier Two considerations, but not by

13  racial means?

14      A.  In reference to the Congressional Map, yes.

15  This is -- you probably will be able to find the tweet

16  that I was reacting to from UMich around this time.

17  My memory is that, as you might expect that person, I

18  think, lived in Michigan.  And so was interested in

19  the Florida Congressional Map because that had

20  national implications.  And that person, and I think

21  this was part of the general conversation amongst

22  people who were following closely the redistricting

23  around the country, was that the Florida Supreme Court

24  had ruled that in the Apportionment 7 Decision, that

25  that the Congressional Map couldn't connect Tampa and



1   St. Pete.

2       And My memory from looking at this is that that's

3   what I was reacting to.  Is that that was a

4   misunderstanding.  Whatever that person was expressing

5   about what the Floor Supreme Court had said was a

6   misunderstanding of -- of why St. Pete

7   and -- what -- what they said, the reasons why Tampa

8   and St. Pete couldn't be connected in the

9   Congressional Map in 2015, which I think in Plan

10  8060 -- well, in one or both of the Congressional

11  Plans that were being bandied about at that time, I

12  think that was a feature of those plans.

13      Q.  Okay.  I'll turn you now to Isbell 178.

14  There was a tweet at the top from Lauren Book.  You

15  understood her to be a State Senator at the time?

16      A.  I understood that, yes.

17      Q.  Okay.  Mr. Isbell responds to that tweet by

18  theorizing about the motivations of Senate Democrats

19  with regard to the State Senate and Congressional

20  Maps.  Is that a fair characterization of what he

21  said?

22      A.  I think that's a good summary of his message.

23  Yes.

24      Q.  Okay.  And Mr. Isbell says, what drives him

25  nuts, is "how we get no amendments, offering changes



1  to Tampa or Broward Senate seats.  And all the

2  Hispanic talk made my mind melt."

3       What is he referring to there?

4       A.  Which part?

5       Q.  Take it in pieces.  First, what drives him

6  nuts about getting no amendments?  What is he

7  referring to there?

8       A.  That he was driven nuts.  That he was

9  frustrated.  Well, I guess, you know, this is me

10  characterizing what he meant, but I am guessing he was

11  frustrated that no Democratic Senators offered changes

12  to the Tampa or Broward Senate configurations.

13       Q.  That was a consistent subject of frustration

14  between you and Mr. Isbell throughout this chain,

15  correct?

16       A.  A lack of engagement in the in the

17  redistricting process on the part of the Minority

18  Caucuses in both chambers.  A lack of interest in

19  engaging in the process in a meaningful way was

20  definitely a common thread.  It was certainly a -- a

21  frustration that I held personally.

22       Q.  And part of your response here says,

23  "Combined with a lack of understanding of the facts

24  and issues."

25       Is that part of your characterization of the



 1   Caucus as well?

 2        A.   That's right.

 3        Q.   Following page, Isbell 179.

 4        A.   You forgot to ask about all the Hispanic

 5   talk, but -- we can move on if you want.

 6        Q.   You say on page 179, "House Dems are

 7   apparently going to be another shit show TMR."  Which

 8   I understand to mean tomorrow.  And Mr. Isbell says,

 9   "Oh, I have no fucking doubt."  You say, "They are

10   taking really bad advice and ignoring good advice."

11        What bad advice were the House Democrats taking

12   and what good advice were they ignoring?

13        A.   I believe these messages came outside the

14   time frame of the protective order.

15             MR. LEVIN:  So the protective order goes

16   through January 20th, when the Senate passed its

17   Enacted Plan and its final form.

18             MR. NORDBY::  Okay.  These are from January

19   20th.

20             MR. LEVIN:  Right.  So I guess the question

21   is what time of day the plan was enacted.  Once it's

22   enacted, it's outside the scope of the protective

23   order.  So Mr. Warren is stating that these messages

24   happened after the plan was enacted.

25   BY MR. NORDBY::



1    Q.  So these messages about the good advice that
2    the House Democrats were taking and -- the bad advice
3    that they were taking and the good advice that they
4    were ignoring, this message came outside of the time
5    frame, is that your position?
6    A.  Well, if you go back to the previous page,
7    you were asking me about Senator Books's comment about
8    the State Senate Map that the Senate had just passed.
9    Which that message was from 6:33 p.m., so --
10    Q.  Well, let me take it outside the context of
11    this message then, which may or may not have come
12    after the Senate Plan was mapped -- was passed.
13    Before that time period, what bad advice were the
14    House Democrats taking?
15    A.  I'm not sure that I have any specific
16    knowledge before this time about the advice that they
17    were actually given.  But it was certainly apparent to
18    me from watching them in the public meetings, that
19    they were as I said before, had a lack of
20    understanding of the facts and issues about
21    redistricting.
22    Q.  Were you giving them advice?
23    A.  No.
24    Q.  You were communicating with Mr. Grimes
25    throughout this process, though, weren't you?



```
 1        A.  I communicated with David Grimes a couple of

 2   times.  I wouldn't say that was throughout the

 3   process.  I also don't -- I mean, we can turn to those

 4   messages if you want, but --

 5        Q.  So let's do that.

 6            MR. NORDBY::  Do you have 24, Kassie?

 7            (Defendants' Exhibit No. 8 was marked for

 8        identification.)

 9   BY MR. NORDBY::

10        Q.  Exhibit 8.  This is a document that you

11   produced in discovery.  Do you recognize this

12   document?

13        A.  Yes.

14        Q.  Okay.  What is this document?

15        A.  These are messages that I sent David Grimes.

16        Q.  Okay.  This is something you sent by phone

17   text messages or iMessage?

18        A.  I'm not sure.  I think this was on Twitter.

19        Q.  Okay.  The messages that are provided here,

20   are these messages or content that you sent or that

21   were sent to you?

22        A.  These are messages that I sent.

23        Q.  Okay.  So what's here is your communications

24   to Mr. Grimes, correct?

25        A.  That's correct.
```



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                              95

1        Q.  Okay.  So what you say to Mr. Grimes is, I
2   understand this to be "For what it's worth, enough
3   different people have separately reached out to me
4   with extreme frustration about what's going on inside
5   the Caucus on redistricting, that I thought I should
6   say something.  I don't have the firsthand knowledge
7   like they do, but I know what I see on the Florida
8   Channel for what it's worth.  Given what all I've
9   heard, I didn't feel comfortable not saying anything,
10  especially since the chance of litigation is near
11  zero."
12       Who are you referring to as people that had
13  "separately reached out to you about what's going on
14  inside the Caucus"?
15       A.  First, I'd say, I -- I believe these messages
16  came after January 20th as well.  So I'm not sure
17  they're inside the scope of the protective order.
18       Q.  Okay.  Setting these messages aside, did
19  people reach out to you with extreme frustration about
20  what's going on inside the Caucus?
21       A.  No.  Not -- not during the time period that
22  we're discussing.
23       Q.  Okay.  Were you not telling the truth to Mr.
24  Grimes when you said that different people have
25  separately reached out to you?



1     A.   So again, you're asking me about messages

2   that happened after January 20th.  And I gave you an

3   answer about what happened before January 20th.

4     Q.   Okay.  So you're parsing it in that way, that

5   people reached out to you after January 20?

6     A.   I'm not going to testify to things that

7   happened outside the temporal scope of the protective

8   order.

9     Q.   Okay.  Before January 20th, did anyone reach

10   out to you with frustration about what was going on

11   inside the House Redistricting Caucus?

12     A.   Not people who worked inside the Caucus, no.

13     Q.   Who did?

14     A.   I mean, there were definitely people who

15   were -- well, I guess when I say people.  I know Mr.

16   Isbell was frustrated what was going on inside the

17   Caucus from all the messages that you've already read.

18   And I don't have any specific memory of others beyond

19   that, but I think people who were -- who followed

20   redistricting could tell that -- that the questions

21   that the House Democrats were asking in particular

22   were just not -- just not based in any kind of

23   understanding of the subject matter.

24     Q.   You said people who followed redistricting,

25   I'm looking for more specifics than that.  Which



```
 1  people?
 2      A.  I -- I don't have any memory of talking to
 3  anybody about this during this time period.  But I
 4  think if you -- if you were to scroll the people that
 5  I follow on Twitter, news articles that were published
 6  about the committee meetings, I think -- I think that
 7  was in the air.
 8      Q.  You talked to Mr. Grimes about redistricting
 9  in this process?
10      A.  I sent -- well, other than the meeting about
11  prison populations, I sent him messages.  I otherwise
12  didn't talk to him.
13      Q.  Okay.  And you talked to Mr. Toman on the
14  Senate side about redistricting during the process?
15      A.  Correct.
16      Q.  From the earlier email exchange, we went
17  through, he appeared to be frustrated with the
18  members.  Is that a fair characterization?
19      A.  I'm not sure.
20      Q.  Okay.  He was soliciting advice from you
21  about strategy on and questions that could be asked?
22      A.  I think he referenced that in his email.
23      Q.  Okay.  And you wrote a Twitter thread for Mr.
24  Isbell to publish that talked about questions that
25  should be asked?
```



 1      A.  I don't know about questions that should be
 2   asked.  I think the thread was about the importance of
 3   filing amendments in -- in historical redistricting
 4   cycles.
 5      Q.  And is it correct you won't answer questions
 6   that I ask you about communications with members of
 7   the media about these topics?
 8      A.  On the instruction of my lawyer, that's
 9   correct.
10      Q.  There may have been some, but you won't tell
11   me if there were any.  Is that part of your objection
12   as well, whether there were, in fact, conversations?
13         MR. LEVIN:  Yeah.  Whether there were,
14   whether there weren't, who they were with, subject
15   matter, anything like that is subject to the common
16   law reporters privilege.
17         MR. NORDBY::  So just to be clear, you
18   construe the reporters privilege a broader than the
19   attorney-client privilege and that it doesn't even
20   extend to when conversations occurred, with whom they
21   occurred, setting content of the conversations aside,
22   that's the position you taking?
23         MR. LEVIN:  Well, with whom they occurred is
24   one of the chief protections of the common law
25   reporters privilege because it protects sources.  And



 1    it's reciprocal in the sense that if a source were to

 2    divulge who they spoke with, then it's giving up the

 3    reporter's privilege to protect the source.  And case

 4    law --

 5              MR. NORDBY::  I'm just trying to understand

 6    your objection.

 7              Okay.  Mr. Warren, I'm done with my questions

 8    for now.  Mr. Jazil may have some.

 9              MR. JAZIL:  Counsel, I would like to

10    understand the objection to questions based on the

11    common law reporters privilege.  Is it your position

12    that any information that one would ordinarily see on

13    a privilege log is information to which we're not

14    entitled based on your use of the common law reporters

15    privilege?

16              MR. LEVIN:  I'm not really sure I understand

17    the question --

18                        (Crosstalk.)

19              MR. JAZIL:  Sure.  So let me ask you the

20    question this way.  The question of when a

21    conversation happened, so not with whom, but when a

22    conversation happened would be material that would

23    ordinarily appear on a privilege log for

24    attorney-client privilege, right?

25              MR. LEVIN:  (No audible response.)



 1              MR. JAZIL:  Yes?

 2              MR. LEVIN:  Sure.

 3              MR. JAZIL:  And so it's your position that

 4   we're not entitled to the when of a conversation that

 5   Mr. Warren might have had with a reporter, right?

 6              MR. LEVIN:  Well, as a lawyer, I always want

 7   to do research and know the law.  My gut is telling me

 8   that yes, because the "when," if there's a

 9   communication, and then there's, let's say, an article

10   printed the next day, then the when leads to giving up

11   the, you know, giving up the privilege.

12              MR. JAZIL:  Got it.  So, Counsel, so you're

13   instructing your client not to answer questions about

14   when conversations happened with reporters based on

15   your gut, about what the common law privilege would

16   cover?  I just want to make sure the record is clear

17   for purposes of Rule 37 and your instructions to your

18   client.

19              MR. LEVIN:  Well, I can take a five minute

20   break, and I can, you know, double-check my research

21   on this issue.  My understanding is reporters and any

22   discussions with reporters may be outside the scope of

23   the deposition to begin with.  I don't know that

24   reporters are defined as political operatives or

25   legislators or legislative staff.



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                   101

```
 1              MR. JAZIL:  So let's take that five-minute
 2    break.
 3              And Madam Court Reporter, can you tell me how
 4    much time we have left in the deposition?
 5              THE REPORTER:  How much time?
 6              MR. LEVIN:  Seventeen minutes.
 7              MR. JAZIL:  All right.  Let's take that
 8    break.
 9              THE REPORTER:  Okay.  Off record 12:26.
10                    (Off the record.)
11              THE REPORTER:  Okay.  Back on record 11:36
12    [sic].
13              MR. JAZIL:  A.  All right.  Counsel, so are
14    you going to ask your client to continue to not answer
15    any questions concerning when conversations with
16    reporters were had about redistricting?
17              MR. LEVIN:  So we have two objections.
18              MR. JAZIL:  Okay.
19              MR. LEVIN:  One is the objection to the
20    scope, right?  So in the order, the questions may
21    concern how he developed plan 42 and who may have
22    provided him with assistance.
23              MR. JAZIL:  Okay.
24              MR. LEVIN:  So you are free to bring within
25    the scope, ask questions about who provided him with
```



 1  │ assistance, and we can go from there and whether

 2  │ people provided him with assistance.

 3  │        And then our second objection is with the

 4  │ reporter privilege.  So any information that would

 5  │ reveal Mr. Warren as a confidential source would

 6  │ defeat the privilege.  You can ask if he was a

 7  │ confidential source, you can ask if he had any

 8  │ non-confidential communications with reporters or was

 9  │ a non-confidential source of reporter.  If he was

10  │ quoted in a news story, and so on and so forth.  But

11  │ to the extent that there may have been confidential

12  │ communications that fall within the scope of that.

13  │        MR. JAZIL:  Okay.  So I get.

14  │                    EXAMINATION

15  │ BY MR. JAZIL:

16  │    Q.  So, Mr. Warren, let me ask you this, did Mr.

17  │ Andrew Pantazi ever provide any assistance concerning

18  │ redistricting?

19  │        MR. LEVIN:  And I'm sorry to interrupt.

20  │ We're still talking about within the scope of that

21  │ time frame.

22  │ BY MR. JAZIL:

23  │    Q.  Within the scope of the time frame that your

24  │ counsel has outlined.

25  │    A.  To -- to use the language from the magistrate



 1  judge's order, no.  He never provided me assistance in

 2  developing Plan 42.

 3       Q.  Did he review Plan 42 before you submitted

 4  it?

 5       A.  No.

 6       Q.  Did he review Plan 42 after you submitted it?

 7       A.  I think he reported on it publicly.  So I'm

 8  assuming that he did, yes.

 9       Q.  Were you on-the-record source for that

10  reporting?

11       A.  About legislative redistricting?  No.

12       Q.  Were you off-the-record source for that

13  reporting?

14       A.  I can't answer that question.

15       Q.  Did Mary Ellen Klas provide any assistance to

16  you about the redistricting plans that you submitted

17  during the time frame?

18       A.  No.

19       Q.  Did Jacob Ogles provide you any assistance

20  regarding the plans that you submitted --

21       A.  No.

22       Q.  -- during this time frame?

23       And, sir, if I understood your testimony

24  correctly, your testimony is that you did not draft

25  any questions for Democratic members of the Florida



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                    104

1  Legislature to ask during their public sessions on

2  redistricting, correct?

3       A.  Within the period that I was asked about,

4  that's correct.

5       Q.  Okay.  Did you --

6       A.  As far as -- with the exception of based on

7  the timing of the first time I met John Toman and the

8  message that Dan asked about -- about questions at the

9  Senate meeting on October 18th.  I don't remember

10 that, but I'm not ruling out the possibility that I

11 suggested some questions for John Toman to put to his

12 Caucus members.

13      Q.  So if I understand this, you don't recall

14 whether or not you suggested questions to Mr. Toman to

15 give to his Caucus members to ask on redistricting?

16      A.  I don't remember that.  No.  I don't -- I

17 don't remember doing that.  No.

18      Q.  You could have done it or you might not have

19 done it, right?

20      A.  It's possible that during that first

21 conversation with him, that I said here a few things

22 that could be asked about at today's meeting, but I'm

23 not sure.

24      Q.  Did you provide any questions to Mr. Grimes

25 or suggest any topics for Mr. Grimes for his Caucus



1    members to ask?

2         A.  I think that's in an email.

3         Q.  Okay.  You have an email that lays out

4    questions that Mr. Grimes should have his Caucus

5    members ask during the sessions?

6         A.  I think I gave you that email.  About

7    prisons.

8         Q.  Anything beyond prisons?

9         A.  No.

10        Q>  Sir, did you speak to Dan Newman and offer to

11   Mr. Newman any questions that Democratic members of

12   the Florida Legislature should ask about

13   redistricting?

14        A.  No.

15        Q.  Did you ask Mr. Ulvert to forward any

16   questions on legislative redistricting to the

17   Democratic members of the Florida Legislature?

18        A.  No.  I don't think I've been asked about

19   Christian Ulvert yet today.  Maybe I have, but I know

20   who you're talking about, and, no.

21        Q.  And what's your understanding of who Mr.

22   Ulvert is?

23        A.  My first understanding of him was as a

24   plaintiff in some of the gay marriage cases that the

25   ACLU of Florida worked on before I started here.  And



 1  other than that, I think he's a political consultant.

 2      Q.  Did you know that Mr. Ulvert was advising the

 3  Democratic members of the Florida Legislature on

 4  redistricting this past cycle?

 5      A.  I didn't know that at the time the

 6  redistricting was happening.

 7      Q.  When did you find out that Mr. Ulvert was

 8  advising Democratic members of the Florida Legislature

 9  on redistricting?

10      A.  I think it was when you asked Fentrice

11  Driskell about an email involving him at the Common

12  Cause trial last year.

13      Q.  Did you know that Democratic members of the

14  Florida Legislature were speaking to individuals

15  affiliated with the National Democratic Redistricting

16  Trust about redistricting?

17      A.  Later in the process, I looked up the

18  lobbyist registrations and found that out.  Well, I

19  found out that -- that members of -- that there were

20  lobbyists who were registered for, as I said, Natalie

21  Kato was registered for one of the NDRC-affiliated

22  entities?  And I later learned as reflected in my

23  messages with Isbell that she was advising the House

24  Democrats on redistricting.

25      Q.  What's your understanding of what Ms. Kato



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                    107

```
 1  was hired to advise the House Democrats on?
 2       A.  I don't know.
 3       Q.  Do you know whether Ms. Kato was advising the
 4  House -- pardon me, the Senate Democrats on
 5  redistricting?
 6       A.  I don't know.
 7       Q.  Did you know whether Mr. Isbell and Ms. Kato
 8  ever discussed redistricting?
 9       A.  I don't know.  I don't think so.
10       Q.  Did you ever ask Mr. Isbell whether he was
11  communicating with Ms. Kato?
12       A.  If I did, it would be in the messages.
13       Q.  Did you ever speak to Ms. Kato about
14  redistricting?
15       A.  No.
16       Q.  Have you ever spoken to Ms. Kato?
17       A.  I have.
18       Q.  When?
19       A.  That would be beyond the scope of the
20  protective order.
21       Q.  What did you speak to her about?
22       A.  Non redistricting work or non -- not
23  redistricting-related topics.
24       Q.  Sir, did you give any questions to Mr. Isbell
25  to give to Democratic members about redistricting?
```



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                    108

1       A.  I don't think so, but if I did, it would be
2   in the Twitter messages.
3       Q.  So you would never talk to Mr. Isbell on the
4   phone about questions or ideas?
5       A.  Never spoken to him on the phone.
6       Q.  You only communicate with him via text or
7   Twitter?
8       A.  About 99 percent Twitter message.  And then
9   there were a few voice memos that I sent him over
10  texts that you also have.
11      Q.  So Twitter, text, and voice memos, those are
12  the only forms of communication with Mr. Isbell?
13      A.  Yes.  Although, I don't remember texting him
14  except for sending him the voice memos.
15      Q.  Did you ever meet up with Mr. Isbell to
16  discuss redistricting in person?
17      A.  Not during the time period.
18      Q.  Were you in Tallahassee during the January
19  20, 2021, time frame?
20      A.  I don't remember if I was in Tallahassee on
21  January 20th, 2022, but I was living in Tallahassee
22  during that time, yeah.
23      Q.  Okay.  Can you tell me how long you've lived
24  in Tallahassee?
25      A.  I actually don't live there anymore, but I



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                    109

1  was born there and lived there until I moved away for

2  college and then came back for breaks and whatnot.

3  And I was there in between college and law school when

4  I wasn't -- when I -- when I wasn't working in another

5  city.  And then I moved -- I moved fully back to

6  Tallahassee after the pandemic in February or March,

7  2021.  And then I moved to Jacksonville last October.

8      Q.  So, sir, when the Florida Legislature was

9  considering the Senate Redistricting Plan, this past

10 cycle, you lived in Tallahassee, right?

11     A.  That's right.

12     Q.  When the Florida Legislature was considering

13 the Florida House Maps, you lived in Tallahassee,

14 right?

15     A.  That's right.

16     Q.  And when the Florida Legislature was

17 considering the Congressional Map, this past

18 redistricting cycle, you lived in Tallahassee, right?

19     A.  Same time frame.  That's right.

20     Q.  And how far away from the Florida Legislature

21 did you live during that time frame, physically?

22     A.  Well, I think my -- my home address Secretary

23 Byrd kind of has in his possession on my voter

24 registration.  It was probably a 10 or 15 minute drive

25 away.



1        Q.   Ten or fifteen minute drive.  And are you a

2   registered voter?

3        A.   I think -- I think that's also in Secretary

4   Byrd's records.  Yes.

5        Q.   And you're a registered Democrat, right?

6        A.   I am.

7        Q.   And how long have you been a registered

8   Democrat?

9        A.   Since I registered to vote.

10       Q.   When was that?

11       A.   I think I pre-registered, which I think you

12   can do when you're 16.

13       Q.   Yes.  So you pre-registered to vote when you

14   were 16?

15       A.   That's my memory.

16       Q.   And you pre-registered to vote as a Democrat?

17       A.   I -- my party affiliation was with the

18   Democratic Party.

19       Q.   And have you ever changed that party

20   affiliation?

21       A.   No.

22       Q.   So you've been a registered Democrat since

23   you pre-registered at 16 until now, right?

24       A.   Yes.

25       Q.   And you mentioned Joe Dye in your earlier



NICHOLAS WARREN                                    November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                    111

1   colloquy with Mr. Nordby, and you said, as I

2   understand it, that Joe Dye worked for the ACLU for a

3   period of time?

4        A.  He did.

5        Q.  Who hired him at the ACLU?

6        A.  He was brought in as an intern that I

7   supervised.  He was -- he was initially -- I'm not

8   sure whether he was a paid intern or an unpaid intern,

9   but he was working in the legal department.

10       Q.  Did you recommend --

11       A.  But that, again, we're now out -- well

12  outside the scope of the protective order.

13       Q.  Did you recommend him for the internship?

14       A.  I -- I think this is well outside the scope

15  of the protective order.

16       Q.  With respect, sir, Mr. Dye was working in the

17  Florida Legislature during this redistricting cycle,

18  then he started working for the ALU.  I have a right

19  to know whether or not he was hired because of your

20  recommendation and whether or not there's a link

21  there.  So you can answer the question.

22           MR. LEVIN:  Not if he was hired because of a

23  recommendation that occurred outside the time frame.

24  I mean, the scope is pretty clear about his personal

25  involvement in the Legislative Redistricting Process,



 1 | which occurred, 2020 through January 2022.  So
 2 | anything that happened after that is outside the
 3 | scope.
 4 | BY MR. JAZIL:
 5 |     Q.  Did you speak to Mr. Dye about redistricting
 6 | at any point during the 2022 redistricting cycle?
 7 |     A.  I definitely didn't speak to him about
 8 | redistricting, my recollection is before January 20th.
 9 |     Q.  You did not coach Mr. Dye on redistricting
10 | issues before January of 2021.  That's your testimony?
11 |     A.  My, again --
12 |         MR. TILLEY:  Object to the form.
13 |         THE WITNESS:  Again, and I think except for
14 | going through some of my historical background and
15 | education and work history, all my answers to all
16 | these questions are going to be with respect to the
17 | time period outlined in the protective order.  I did
18 | not know Mr. Dye during that time period.
19 | BY MR. JAZIL:
20 |     Q.  You did not know Mr. Dye during the time
21 | period that is the subject of this deposition.  Is
22 | that a fair characterization of what you just said?
23 |     A.  Correct.
24 |     Q.  And during that period, you did not talk to
25 | Mr. Dye about redistricting?



1       A.  I didn't know him.  Didn't talk to him.

2   That's my memory.

3       Q.  And earlier, you mentioned a meeting that Mr.

4   Grimes organized with the House members about

5   redistricting.  Do you recall that?

6       A.  I do.

7       Q.  Do you know whether or not Mr. Dye was in the

8   room in that meeting?

9       A.  I don't remember him being there.  I think as

10  I said, the only people there were David Grimes,

11  Fentrice Driskell, and one or two other

12  representatives.

13      Q.  All right.  Mr. Warren, I have no other

14  questions.

15      Thank you for your time.

16      A.  Thank you.

17          THE REPORTER:  Will you be ordering the

18  transcript?

19          MR. NORDBY::  I didn't know if they had any

20  questions.

21          THE REPORTER:  Sorry.

22          MR. LEVIN:  I don't have any questions.

23          MR. NORDBY::  Okay.  Yes, we'll be ordering.

24          THE REPORTER:  Yes.

25          Okay.  I'm going to go off the record.  The



NICHOLAS WARREN                                              November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                           114

 1   time is 12:49.

 2       (Whereupon, the deposition concluded at 12:49 p.m.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



NICHOLAS WARREN                                          November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                         115

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF MIAMI-DADE

 5

 6          I, the undersigned authority, certify that

 7   NICHOLAS WARREN personally appeared before me and was

 8   duly sworn on NOVEMBER 18, 2024.

 9

10          Witness my hand and official seal this 25th

11   day of November, 2024.

12

13

14

15
            Milena Arzumanyants
16          _____

17          MILENA ARZUMANYANTS, DIGITAL REPORTER

18          Notary Commission No. HH 562384

19          Commission Expires:  June 17, 2028

20

21

22

23

24

25
```



1                    REPORTER'S CERTIFICATE

2

3          I, MILENA ARZUMANYANTS, Digital Reporter and

4    Notary Public within and for the State of Florida do

5    hereby certify:

6          That the foregoing witness whose examination

7    is hereinbefore set forth was duly sworn and that said

8    testimony was accurately captured with annotations by

9    me during the proceeding.

10          I further certify that I am not related to

11    any of the parties to this action by blood or

12    marriage, and that I am in no way interested in the

13    outcome of this matter.

14          In witness thereof, I have hereunto set my

15    hand this 25th day of November, 2024.

16

17          *Milena Arzumanyants*

18    _____

19          MILENA ARZUMANYANTS, DIGITAL REPORTER

20          Notary Commission No. HH 562384

21          Commission Expires:  June 17, 2028

22

23

24

25



```
 1              TRANSCRIBER'S CERTIFICATE

 2

 3         I, Natalie Young, legal transcriptionist, do

 4   hereby certify:

 5              That the foregoing is a complete and accurate

 6   transcript of the original digital audio recording of

 7   the testimony and proceedings captured in the above

 8   entitled matter.  As the transcriptionist, I have

 9   reviewed and transcribed the entirety of the

10   proceeding to ensure a verbatim record to the best of

11   my ability.

12              I further certify that I am not neither

13   attorney for, nor a relative or employee of any of the

14   parties to the action; further, that I am not a

15   relative or employee of any attorney employed by the

16   parties hereto, nor financially or otherwise

17   interested in the outcome of this matter.

18              In witness thereof, I have hereunto set my

19   hand this 25th day of November, 2024.

20

21                      Natalie Young

22        _____

23                    Natalie Young

24                  Legal Transcriber

25
```



```
 1                    DEPOSITION ERRATA SHEET

 2

 3    Our Assignment No. J12015947

 4    Case Caption:  KETO NORD HODGES, ET AL. vs. KATHLEEN

 5    PASSIDOMO, ET AL.

 6

 7            DECLARATION UNDER PENALTY OF PERJURY

 8

 9            I declare under penalty of perjury that I

10    have read the entire transcript of my examination

11    taken in the above-captioned matter or the same has

12    been read to me, and the same is true and accurate,

13    save and except for changes and/or corrections, if

14    any, as indicated by me on the DEPOSITION ERRATA SHEET

15    hereof, with the understanding that I offer these

16    changes as if still under oath.

17

18       Signed on the _____ day of _____, 20___.

19

20

21            _____

22                  NICHOLAS WARREN

23

24

25
```



NICHOLAS WARREN                                     November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                     119

```
1   DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23

24     SIGNATURE:_____DATE:_____

25                    NICHOLAS WARREN
```



NICHOLAS WARREN                                        November 18, 2024
KETO NORD HODGES vs PASSIDOMO                                        120

```
 1   DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24     SIGNATURE:_____DATE:_____

25                     NICHOLAS WARREN
```



**Exhibits**

12015947 NI
CHOLAS.
WARREN.
EXHIBIT1
  4:11
  27:4,5,9

12015947 NI
CHOLAS.
WARREN.
EXHIBIT2
  4:12
  29:4,5

12015947 NI
CHOLAS.
WARREN.
EXHIBIT3
  4:13
  36:10,11

12015947 NI
CHOLAS.
WARREN.
EXHIBIT4

12015947 NI
CHOLAS.
WARREN.
EXHIBIT5
  4:14
  48:12,13

12015947 NI
CHOLAS.
WARREN.
EXHIBIT6
  4:15 51:9
  84:18

12015947 NI
CHOLAS.
WARREN.
EXHIBIT7
  4:16
  84:21

12015947 NI
CHOLAS.
WARREN.
EXHIBIT8
  4:17
  94:7,10

_____

**0**
_____

00
  8:12

00:31
  39:6

_____

**1**
_____

1
  27:4,5,9

10
  84:3,6
  85:13,15
  86:3
  109:24

102
  64:20
  73:19

10:01
  5:1,3

11
  45:18

11/17/21
  41:24

115
  67:17

119
  71:3

11:35
  73:13

11:36
  101:11

11:47
  73:15

11:51
  56:20

12
  82:23

128
  71:22

12:04
  58:19

12:26
  101:9

12:30
  39:6

12:49
  114:1,2

13
  55:23
  56:2

132
  72:18

133
  76:3

135
  75:20,25
  76:23

136
  75:18
  77:9

13th
  78:21

14
  84:2,5
  85:12,15,
  16,24
  86:8

14-
  75:18

148
  75:18

77:25

149
  82:21

14th
  87:25
  89:1

15
  57:20
  109:24

150
  83:18

152
  87:1

15th
  36:22
  40:18

16
  110:12,
  14,23

161
  87:23

16th
  38:6 39:6

17
  27:23
  64:21

178
  90:13

179
  92:3,6

17th
  42:4,11
  71:7

18
  5:3 49:6

18th
  35:24
  64:22
  65:11
  67:15

74:2
  104:9

19
  27:3
  62:17,18

_____

**2**
_____

2
  27:25
  29:4,5

20
  29:2 96:5
  108:19

20(a)
  43:15

2002
  83:10,12,
  15

2010
  86:8

2011
  11:20
  12:5
  82:23
  83:2,14

2012
  11:20,21
  12:7
  83:2,12,
  14

2014
  11:16,18

2015
  12:9 15:7
  39:2
  49:22,25
  57:5 90:9

2016
  9:25 15:7
  49:23



50:1

**2017**
46:23

**2018**
46:23

**2019**
9:15,18,
19,21,25
13:15,19
46:23

**2020**
8:4 9:4,
15 14:10
16:21
17:4,10
48:3
50:16
61:21
62:3,5
64:3
70:12
112:1

**2021**
14:10
32:21
36:22
42:4,12
52:14
54:14
58:24
59:14,20,
22 61:17
64:22
71:7,23
74:7
108:19
109:7
112:10

**2022**
17:4,8,11
50:16
75:17
83:8 84:2
85:23

108:21
112:1,6

**2024**
5:3

**20th**
17:8
92:16,19
95:16
96:2,3,9
108:21
112:8

**21**
36:9

**21(a)**
43:15

**23-17**
56:23

**24**
94:6

**26**
60:8

**2:45**
27:25

**2nd**
71:23

---

**3**

**3**
36:10,11
84:2,5
85:12,15,
16,23

**30**
42:5,19

**30-31**
38:18

**31**
42:19

**37**

100:17

**38**
71:9
84:3,5,7
85:12,15,
16,25

---

**4**

**40**
41:10

**42**
42:23
101:21
103:2,3,6

---

**5**

**5**
42:5
48:12,13

**501(c)(3)**
8:13,17,
21,22,24

**501(c)(4)**
8:16

---

**6**

**6**
51:9
84:18

**61**
61:17
62:10

**6:33**
93:9

---

**7**

**7**

84:19,20,
21 89:24

---

**8**

**8**
38:16,22
40:18
43:4
44:25
53:6
94:7,10

**8060**
90:10

**850-509-
5450**
13:24

**858**
84:11

---

**9**

**90**
63:24

**99**
108:8

---

**@**

**@mappingfl**
53:14

---

**A**

**a.m.**
5:1,3
39:6
40:18

**AC**
8:15

**accessing**
30:13,21

**account**
13:18
15:5,8,
15,18,20
32:23
50:9,11,
12 88:21

**accounts**
14:13
15:2

**accurate**
69:17,21

**accurately**
43:9

**achieved**
87:16,21

**acknowledgm
ent**
79:11

**ACLU**
5:22,24
8:2,6
19:6
26:25
27:17
28:20,25
32:23,25
33:2
46:21
48:22
49:3
105:25
111:2,5

**aclufl.org**
33:5

**Act**
61:1 89:1

**actions**
66:20



Case 8:24-cv-00879-CEH-TPB-ALB    Document 109-3    Filed 05/06/25    Page 124 of 151
PageID 3642

NICHOLAS WARREN
KETO NORD HODGES vs PASSIDOMO

November 18, 2024
Index: active..assistance

active
  88:6

address
  12:23
  13:7 33:6
  48:21,22
  49:3
  109:22

addresses
  12:20,22
  13:3,15

admitted
  30:15,17

adopting
  41:4

advance
  47:7

advanced
  34:16
  35:15

advantages
  44:11

advice
  32:10
  34:18
  35:3
  92:10,11,
  12 93:1,
  2,3,13,
  16,22
  97:20

advise
  24:5
  107:1

advising
  106:2,8,
  23 107:3

advisors
  23:22

affect
  47:22

affiliate
  33:24

affiliated
  26:15
  106:15

affiliation
  49:18
  110:17,20

afternoon
  37:5

agree
  7:22
  69:16,17

agreed
  75:13

agreeing
  69:25

agreement
  69:23

ahead
  71:23
  75:17

aides
  41:19

air
  97:7

allowed
  32:20
  33:16,18

allowing
  22:20

alterations
  39:18

alternative
  86:19
  87:6

alters
  43:7

ALU
  111:18

amazing
  68:14

amended
  39:23

Amendment
  61:21,23
  87:25
  89:1

amendments
  34:15
  35:14
  36:2 40:4
  61:2
  79:23
  80:3,5,18
  82:11
  86:13,14,
  15,19,20
  87:17
  90:25
  91:6 98:3

American
  8:15

analysis
  70:14

analysts
  24:6

Andrew
  72:20,22
  102:17

Angeles
  56:24
  57:9

Annette
  81:11

anonymous
  88:21

answers
  7:15
  59:11
  112:15

anticipated
  55:21

Anya
  26:24

anymore
  108:25

apartment
  56:24
  57:10

apparent
  93:17

apparently
  92:7

appearance
  48:12,18,
  25

appeared
  52:16
  97:17

appears
  29:10
  32:9
  38:15
  39:14
  53:1
  67:17,21
  75:23

apply
  48:7

applying
  48:5

apportionme
  nt
  38:16,22
  41:24
  53:6
  89:24

Appraiser's
  49:13

approach
  44:11

72:14

approaching
  75:7

Approximate
  ly
  18:10

apps
  16:12

area
  47:2,9,
  13,16
  54:6,8,18
  85:20

areas
  47:14

argue
  52:24
  77:10

argument
  77:13

arm
  79:4

article
  21:23
  43:15
  74:8,9
  100:9

articles
  21:19
  97:5

Arzumanyant
  s
  5:7

ascribe
  77:1

asks
  32:3,4

asshole
  74:17

assistance



Case 8:24-cv-00879-CEH-TPB-ALB    Document 109-3    Filed 05/06/25    Page 125 of 151
PageID 3643

NICHOLAS WARREN
KETO NORD HODGES vs PASSIDOMO

November 18, 2024
Index: assistant..brought

101:22
102:1,2,
17 103:1,
15,19

**assistant**
10:10

**assume**
69:8
83:25

**assuming**
55:10
88:11
103:8

**assumptions**
61:7

**attempted**
85:23,24

**attend**
9:23

**attendance**
5:18

**attorney**
28:13

**attorney-client**
23:3
98:19
99:24

**attribution**
80:7

**audible**
99:25

**audio**
5:11

**August**
9:14
32:20
61:17

**Ausley**
85:23

86:7

**authenticity**
51:15

**avoid**
43:6

**aware**
66:9,11

───────────

───────────

**B**

**B-E-A-T-O**
6:7

**back**
10:23
28:7
70:10
73:15,18
83:9,14
93:6
101:11
109:2,5

**background**
30:15
112:14

**bad**
83:20
92:10,11
93:2,13

**bandied**
90:11

**based**
22:15,19,
22 63:16
77:23
96:22
99:10,14
100:14
104:6

**basically**
31:3

**basis**
23:1

**Bates**
27:23
52:20
56:4
57:20

**bathroom**
73:9,11

**Baxley**
78:1,2,4,
6,17

**Bay**
38:18
39:1
43:6,7
44:3 45:2
53:21
54:6,15
62:20
63:1,21
67:23
68:11,16
70:21

**Beato**
6:7

**Beautiful**
87:16

**begin**
6:23
100:23

**beginning**
47:24

**believed**
45:13

**belongs**
22:24

**benchmark**
62:19
70:3,17,
24 71:2

**beneath**
62:15

**benefit**
77:15

**big**
31:11
42:9
62:17
65:10
71:4

**bit**
16:20
83:7 86:4

**Black**
62:18
68:16,23
69:6,12
70:14,16,
18,23,25

**blind**
76:14,16

**blog**
49:16
69:2

**body**
19:22

**Book**
90:14

**Books's**
93:7

**border**
46:25

**born**
109:1

**bottom**
28:6
29:12
36:20
42:5
53:11
56:4,21

71:7
73:20

**boundaries**
43:22

**boundary**
44:3
47:1,6,10

**Bowen**
6:6,12,16

**Bracy**
41:15

**Bradley**
20:9 41:9
46:1

**Branch**
21:8,11
64:9,12,
18

**brand**
40:25

**Brandes**
54:24,25
55:1

**break**
16:20
73:10
100:20
101:2,8

**breaks**
109:2

**bring**
101:24

**broadens**
72:11

**broader**
98:18

**Broadway**
10:21

**brought**
111:6



Broward
    91:1,12

Byrd
    75:15
    109:23

Byrd's
    110:4

_____

        C

call
    8:14
    23:21
    24:6
    37:4,8,
    10,12,17
    38:12,14,
    21 39:25
    42:22
    48:12
    87:2

called
    10:21
    32:21
    37:18

calls
    50:20

campaign
    11:18
    23:21
    24:7 25:9
    79:4

campaigns
    49:15
    60:16,17

candidate
    24:9

candidates
    24:6
    49:18
    61:14
    62:2

capacity
    6:14,17
    10:7 18:1
    26:4
    28:20
    32:24

Capitol
    28:1 30:1

capturing
    5:10

Caroline
    5:24

cartography
-smitten
    21:22

case
    5:4 10:25
    11:3 22:4
    28:25
    51:8,22
    99:3

cases
    35:20
    57:7,11
    105:24

categories
    16:19
    25:18

caucus
    18:3,4
    31:6,9,
    14,17,25
    32:1
    57:24
    58:1,5,13
    92:1
    95:5,14,
    20 96:11,
    12,17
    104:12,
    15,25
    105:4

Caucuses
    58:2 60:5
    72:15
    91:18

caused
    74:11

cede
    63:3

ceding
    63:13

cell
    14:5,7,9
    15:11,21
    16:3

Census
    47:8
    59:22
    70:12

chain
    27:13
    65:6
    91:14

chair
    64:14
    79:5

Chair's
    76:6

chaired
    79:7

chambers
    91:18

chance
    36:23
    95:10

changed
    110:19

Channel
    95:8

characteriz
ation

52:17
    72:16
    90:20
    91:25
    97:18
    112:22

characteriz
ing
    91:10

checked
    51:16

chief
    18:3
    98:24

choose
    63:20

Christ
    74:19

Christian
    24:23
    105:19

chronologic
al
    10:17
    11:14

cities
    44:6

city
    109:5

Civil
    8:15

clarify
    7:22

CLE
    32:20
    33:1,13,
    15,17,18
    34:1

clear
    7:15
    81:25

98:17
    100:16
    111:24

clerk
    9:10

client
    100:13,18
    101:14

client's
    23:4

clock
    73:8

closely
    89:22

coach
    112:9

Coalition
    72:21,25

coalitions
    72:1

coffee
    13:13

cohesion
    38:17,24

COI
    77:11

college
    10:16
    12:6
    109:2,3

colloquy
    111:1

Combined
    91:23

comfortable
    95:9

comment
    20:5
    44:20,22
    69:6,16,



24 72:8
73:5
74:21
79:3 93:7

comment-
type
46:7

commented
50:4
78:22
79:6

comments
49:16

Commissione
r
64:13

committee
25:10,16
35:25
36:1,4
38:8 39:9
65:10
67:8
71:12
72:10
76:6
78:20,24
79:3
97:6

Committees
48:6

common
91:20
98:15,24
99:11,14
100:15
106:11

communicate
12:19,20
13:4,11,
15 14:2,
12 15:13,
23 16:1,

13 20:13,
22 21:2,5
50:15,25
51:3
59:13
82:1
108:6

communicate
d
18:22
19:12,19
41:8 94:1

communicati
ng
93:24
107:11

communicati
on
19:16
20:7 35:3
75:1
100:9
108:12

communicati
ons
29:19,22
34:7,9
47:25
49:2
94:23
98:6
102:8,12

communities
77:11

compact
43:21

compactness
44:4

company
10:21

comparing
68:22,25

competitive
82:24
83:11,17

compliance
43:5,11,
13,17
44:23
45:2

composite
52:20
55:24

computer
5:12

concern
59:8
101:21

concerns
58:20,24
59:4,6,
14,16,25

concluded
114:2

conclusion
44:9
77:5,20,
22

conducted
37:14
49:3

confab
32:6

confidentia
l
102:5,7,
11

configurati
on
39:1
54:5,7

configurati
ons

47:4
91:12

configured
54:13

confirmed
5:15

Congress
21:1,2

congression
al
21:5
36:24
39:1,14
54:17
57:5
76:1,22
89:14,19,
25 90:9,
10,19
109:17

Congresswom
an
10:18

connect
28:9
89:25

connected
90:8

connecting
89:10

considerati
on
44:12

considerati
ons
89:12

considered
22:13

consistent
91:13

Constitutio
n's
43:14

constitutio
nal
34:16
35:14,16,
17 88:25

construe
98:18

consultant
60:15
106:1

consultants
24:7

consulting
49:14,15

content
94:20
98:21

context
37:2
65:8,19
75:25
85:7
93:10

context/
insights/
outrage
30:14,22

continue
77:9
101:14

contrast
73:4

conversatio
n
30:18
57:23
89:21
99:21,22
100:4



104:21

conversations
    22:1
    98:12,20,
    21 100:14
    101:15

convey
    89:10

conveyed
    88:24

copies
    39:22

copy
    38:16

Cord
    75:14

corner
    57:21
    67:18

corporate
    26:15

correct
    12:2,17
    13:24
    32:14
    33:6
    36:19
    37:10,11
    39:21
    44:1,23
    48:20,22,
    23 49:4,5
    50:17
    55:2,5
    57:18
    60:20
    65:16
    68:9 70:1
    75:11,20
    76:12
    77:8,12,
    24 78:9,

15 81:1,3
    82:19
    83:3,6,23
    89:2
    91:15
    94:24,25
    97:15
    98:5,9
    104:2,4
    112:23

correctly
    89:7
    103:24

corresponde
nce
    12:24

counsel
    6:23
    27:17
    99:9
    100:12
    101:13
    102:24

country
    89:23

county
    29:1 44:5
    46:25
    47:1,2,3,
    5 49:13
    63:22,25
    64:1,4,
    12,13,14
    69:4,19
    70:13,18,
    22 86:3

couple
    65:15
    94:1

court
    9:7 10:20
    11:19,21,
    23 12:1,
    11 50:7,9

82:23
    83:13
    89:23
    90:5
    101:3

Court's
    53:6

courts
    57:11

cover
    100:16

covered
    50:23
    60:4

covers
    76:21

created
    36:25
    37:1

creating
    32:5

criteria
    34:16
    35:15
    36:1

cross
    53:13
    58:9
    68:15

crossed
    63:1,21

crosses
    43:7

crossing
    62:19
    70:17,21

crosstalk
    76:25
    99:18

Cruz

54:24
    55:3,4
    63:2
    85:24

current
    64:14

cycle
    73:22
    106:4
    109:10,18
    111:17
    112:6

cycles
    98:4

————————
         D
————————

Dan
    60:10,14
    104:8
    105:10

Daniel
    5:22 6:11

data
    49:15
    53:13,18
    59:22
    70:12

date
    41:24
    65:9 72:5

dates
    52:13
    72:7

David
    17:24
    18:13
    27:13
    28:2,8,9
    29:24
    34:4
    94:1,15

113:10

day
    10:11
    29:23
    30:2,6
    37:24
    38:1,2
    39:4
    49:12
    57:23
    67:12
    78:19
    92:21
    100:10

days
    38:5
    39:17
    65:16

DC
    10:19

deactivated
    15:6

deal
    62:17

December
    41:11
    71:23

decided
    71:8,10

decision
    33:23
    39:2 53:6
    89:24

deep
    57:15

defeat
    102:6

defend
    84:2
    85:14,23,
    24 86:6



**defendants'**
27:5 29:5
36:11
48:13
51:9
84:21
94:7

**define**
23:14,17

**defined**
23:13
24:17
100:24

**definition**
23:24,25
24:1,11

**delete**
51:24
52:2,7,8,
11

**deleted**
73:20,24
75:3

**deleting**
52:10
75:1

**Dem**
64:3
65:3,22,
23,25
66:13,15
68:14
70:3 76:5
86:13

**Democrat**
72:12
110:5,8,
16,22

**Democratic**
18:4
25:2,6,9,
13,16
28:10

29:16
31:14
58:5 60:5
62:1
64:16
66:3,10
67:5
68:23
70:15,24
71:1
72:9,15
79:15
86:6
91:11
103:25
105:11,17
106:3,8,
13,15
107:25
110:18

**Democrats**
49:19
56:12
61:9 62:7
64:15
69:8,9
71:18
74:9 75:7
83:22,25
85:17,20
86:20
90:18
92:11
93:2,14
96:21
106:24
107:1,4

**Dems**
31:5
56:6,11
68:17
69:7,8,14
71:8,10,
12 72:1
73:21
92:6

**department**
5:16
11:17
111:9

**deposed**
7:5

**deposition**
5:4,8
7:11 23:7
100:23
101:4
112:21
114:2

**depositions**
7:8

**Desantis**
84:1

**deserve**
83:20

**developed**
101:21

**developing**
39:18
103:2

**DG**
28:2

**difference**
8:9,11
68:3

**differently**
54:13

**digest**
36:24

**digital**
5:8 9:10

**direct**
46:18,20
51:6,15,
21,24
52:2,7,
11,13

62:25
66:23
68:7
72:19

**directions**
34:13
35:12

**directly**
58:10,14,
16

**director**
18:3
27:16
28:10
33:22

**directs**
38:16

**disadvantag
eous**
78:10

**disagreed**
76:10
77:3,4

**disagreemen
t**
75:23

**disappointe
d**
66:25

**disclosed**
45:20

**discovery**
22:3
51:7,22
94:11

**discuss**
52:16
108:16

**discussed**
12:8
19:16

26:20
30:19
37:20
38:11,20,
22 41:1
107:8

**discussing**
54:18
67:14
80:23
95:22

**discussion**
37:19
38:17,23,
25 40:20
55:19
57:7
67:10
71:9

**discussions**
37:6
100:22

**disseminati
ng**
73:2

**district**
9:7,8
13:21
43:7,25
44:5 47:4
56:10
57:15
62:17,18,
22 63:9,
11,12,20,
22 68:25
69:3,12,
20 70:11,
12,22
71:9 76:6
78:7,11
84:8,10,
14 85:23,
24,25



86:3
89:10

**districts**
43:8,21
47:12
54:6,8,
12,15,17
60:11,24
61:2
72:21,25
83:2
85:12,15,
16 87:25
88:24

**divulge**
99:2

**Dixie**
46:25
47:3

**document**
27:9
41:22,25
42:4,10
48:11,16
94:10,12,
14

**documents**
37:15
51:12

**double-**
**check**
100:20

**doubt**
37:18
38:22
51:14
77:16
92:9

**draft**
37:22
39:16
62:21
76:5

103:24

**drafted**
69:18
80:4

**dramaticall**
**y**
76:7

**draw**
39:13
47:4,12
70:12

**drawer**
57:5

**drawing**
55:11,19
57:9
77:2,6

**drawn**
56:23
63:16

**dress**
77:13

**drew**
63:9 69:3
76:5

**Driskell**
17:22
18:6,12
27:24
30:4 34:4
106:11
113:11

**drive**
109:24
110:1

**driven**
91:8

**driver's**
5:15

**drives**
90:24

91:5

**duly**
6:21

**duties**
34:10

**duty**
24:9

**Dye**
18:25
19:3,4
110:25
111:2,16
112:5,9,
18,20,25
113:7

**dynamics**
64:3

———————————
          **E**
———————————

**earlier**
11:23
19:9,16
27:21
29:15
41:7
42:15
49:9
60:19
65:12,14
74:6
75:21
97:16
110:25
113:3

**easier**
28:5
47:11

**educated**
31:4

**education**
112:15

**effect**
58:22

**egregiously**
77:14

**elected**
85:21

**election**
61:21

**elections-**
**related**
11:7

**Electorate**
68:23

**electronic**
5:11

**Ellen**
103:15

**email**
12:19
13:3,7,
13,14,17,
22 16:1
21:18,22
22:3
27:13,20
28:7
29:8,10,
20 30:12
33:5,6
34:11
35:7
36:15,20,
21 38:3,
15 39:3,
7,24
40:24
48:21,22
49:3
65:14
66:17
72:19
97:16,22
105:2,3,6

106:11

**emailed**
20:9,10
33:5
47:15

**emails**
19:23
20:6 28:6
36:17
46:7

**emerge**
31:10,25

**employed**
8:1,7,17,
20,23
9:6,16,
17,19
10:2,6,20
11:6 18:1
25:1

**employee**
32:24

**employer**
9:1 45:4,
7,14,24
46:1

**employment**
10:13,24
11:1

**enacted**
17:4 85:3
92:17,21,
22,24

**encompassed**
80:21

**end**
27:1 31:8
47:6
82:21

**engagement**
91:16



engaging
   91:19

entities
   26:16
   106:22

entitled
   99:14
   100:4

entity
   8:13
   26:15

environment
   83:20
   86:8

equally
   43:23

equipment
   5:11

equipped
   71:13

Esquire
   5:8

essentially
   46:7 48:4

et al
   5:5,6

ether
   87:20

evidence
   77:2

exact
   26:14

exaggeratio
n
   74:13

EXAMINATION
   6:25
   102:14

exception
   34:1,4,8

104:6

excerpt
   51:5 53:5

excerpted
   42:13

exchange
   19:23
   33:8,10
   36:15
   37:14,17
   38:3 55:8
   61:17,21
   64:21
   65:8,15,
   19,21
   74:2
   75:21
   97:16

exchanges
   51:6,15

exclamation
   69:23
   87:14,15

excruciatin
g
   72:17
   75:10

executive
   21:8,10
   33:22

exhibit
   27:4,5,9
   29:4,5
   36:10,11
   48:12,13
   51:9
   55:24
   65:12,14
   84:18,21
   94:7,10

existing
   43:22

expect
   89:17

expect/hope
   83:21

expectation
   82:12,15

explain
   8:8,11
   43:24
   61:4 64:3
   66:12,19
   68:3
   81:15
   82:5

explained
   44:10
   89:11

explaining
   39:10

explains
   61:6

express
   75:23

expressed
   30:23
   86:12

expressing
   48:5
   69:23
   70:7 89:9
   90:4

expression
   54:6

extend
   98:20

extends
   75:22

extent
   14:19
   58:19
   102:11

extracurric
ular
   33:11

extreme
   95:4,19

_____

F

_____

fabulous
   28:9,13

Facebook
   15:5

fact
   37:12
   41:1 46:3
   60:4
   64:17
   73:1 79:6
   82:6
   98:12

facts
   91:23
   93:20

factual
   73:2

factually
   69:25

fair
   52:17
   56:11,13
   61:1
   71:17
   72:16,21,
   25 85:22
   87:24
   88:24
   90:20
   97:18
   112:22

faked
   89:6

fall
   12:9
   102:12

familiar
   7:7

family
   25:25
   26:17

farther
   10:23

faulty
   61:8

favorable
   71:18

fear
   71:11

feasible
   43:23

feature
   90:12

February
   109:6

federal
   35:19

feel
   37:7
   83:19
   95:9

feelings
   59:7
   75:16

felt
   70:9

Fentrice
   17:22
   106:10
   113:11

Ferrin
   43:20



**fifteen**
  110:1

**fight**
  53:23,24
  54:7,10,
  14,19,22,
  23 55:14,
  15,16,18,
  21

**figure**
  56:15

**figured**
  71:20

**file**
  79:24
  81:16
  82:7

**filed**
  82:3

**filing**
  79:23
  80:2,5,17
  81:12
  82:11
  98:3

**final**
  39:3
  92:17

**find**
  64:6
  68:14
  89:15
  106:7

**finding**
  37:16

**fire**
  73:25

**firm**
  6:12
  79:10

**firsthand**

95:6

**five-minute**
  101:1

**FL**
  53:18

**flip**
  60:7
  61:16
  63:24
  71:3
  73:18

**floating**
  88:10

**floor**
  79:23
  80:2,5,17
  82:11
  87:4 90:5

**Florida**
  5:9,14,
  16,23,25
  6:6,7,10,
  12,16
  8:2,6,15
  10:19
  11:21,22
  12:1,11
  16:18
  17:13,19
  18:5,21
  19:6,18
  20:2,3,
  11,12,13,
  23 21:8
  25:2,5,9
  26:25
  27:17
  28:25
  32:22
  41:23
  43:14
  44:17
  45:23
  46:14

47:20,23
48:22
50:7,9
53:5,13,
18 55:17
57:1,14
62:17,18
73:21
74:9 75:7
81:18
87:4
88:13,25
89:19,23
95:7
103:25
105:12,
17,25
106:3,8,
14 109:8,
12,13,16,
20 111:17

**focus**
  70:20

**follow**
  47:5 97:5

**follow-up**
  52:25

**forged**
  51:18

**forgot**
  92:4

**form**
  5:13
  92:17
  112:12

**forms**
  108:12

**fortunately**
  28:13

**forward**
  30:13,21
  36:22
  37:3 60:7

63:20
105:15

**forwarding**
  62:25

**fought**
  53:22

**found**
  106:18,19

**foundation**
  5:22,25
  8:6,7,12
  33:2

**frame**
  92:14
  93:5
  102:21,23
  103:17,22
  108:19
  109:19,21
  111:23

**Francis**
  6:5

**Frankly**
  84:2

**free**
  28:1 37:7
  101:24

**Friday**
  43:20

**friend**
  74:13,18

**friends**
  26:1,3,18

**front**
  43:2
  48:11
  84:25

**frustrated**
  72:14
  75:6
  91:9,11

96:16
97:17

**frustration**
  91:13,21
  95:4,19
  96:10

**fucking**
  65:4 92:9

**full**
  78:20

**fully**
  109:5

**function**
  46:19,20

**functional**
  70:14

**funny**
  55:24
  56:5 60:9

**future**
  35:10
  47:11

────────────

G

────────────

**gadfly**
  21:22

**gain**
  57:16

**gained**
  84:1

**Gardner**
  9:12

**gave**
  20:5 30:1
  43:20
  96:2
  105:6

**gay**
  105:24



**Geek**
53:13,18

**general**
31:24
34:1
89:21

**generalizin
g**
44:7

**generally**
78:10
85:20

**generate**
37:5

**geographic**
43:22

**Georgia**
9:8 13:22

**gerrymander**
44:17
77:3,7,23

**gerrymander
ing**
28:12,24
77:14
89:5,12

**Gibson**
41:17

**Gilchrist**
46:25

**give**
7:13
13:13
23:23
24:1
37:3,7
56:18
77:15
104:15
107:24,25

**giving**

41:22
73:4
93:22
99:2
100:10,11

**Gmail**
12:23

**goals**
84:2 86:6

**good**
7:2,3
44:8
78:16
79:25
83:20
90:22
92:10,12
93:1,3

**GOP**
56:14
77:3

**governing**
7:7

**Governor's**
21:10

**grab**
68:17
69:7,13

**Graham's**
10:19

**gratifying**
52:24

**great**
29:12
65:2,22,
23 66:13,
15

**Grimes**
17:24
18:13
27:14
28:2,8

29:24
30:3 34:4
49:2
93:24
94:1,15,
24 95:1,
24 97:8
104:24,25
105:4
113:4,10

**Grimes'**
17:25

**Gross**
27:14,15
28:7

**Gruters**
46:4

**guess**
11:10
33:4,11
37:24
38:4,25
69:1 70:5
76:20
78:22
91:9
92:20
96:15

**guessing**
36:23
37:22
41:1
71:8,10,
19 72:8
76:20
78:21
91:10

**gut**
100:7,15

**Gwen**
10:18

———————

**H**

———————

**H-U-N-G**
15:1

**half**
48:3 73:8

**halfway**
60:8 64:2
87:23

**hand**
6:19

**handed**
27:10
51:5

**handle**
14:20

**hanging**
31:10

**happened**
28:17
47:8
55:19
67:10
83:10,15
86:10
92:24
96:2,3,7
99:21,22
100:14
112:2

**happening**
73:5
106:6

**hard**
31:12
32:2

**hat**
67:19

**HD69**
56:6

**HD70**
55:24
56:5

**he'll**
37:4
58:17

**hear**
73:24

**heard**
23:14,16
95:9

**hearings**
57:8

**heavily**
70:18

**held**
36:4 42:3
91:21

**helpful**
23:13

**helps**
56:5

**Hey**
27:24

**higher**
70:2,23,
25

**Hillsboro**
70:13

**Hillsboroug
h**
70:22

**hired**
107:1
111:5,19,
22

**Hispanic**
38:17,23
91:2 92:4

**historical**



98:3
112:14

**history**
79:22
80:2,10,
17 87:5
112:15

**Hmm**
78:14

**Hodges**
5:5

**hold**
23:6

**holding**
73:25

**home**
109:22

**hoodie**
87:3

**hope**
44:11

**Hoping**
82:20

**hour**
73:8

**House**
17:14,19
18:5,21
19:7,11,
18,22
28:10,11
46:24
48:4
64:16
72:7,10
76:1,2,
18,19
86:13,20
92:6,11
93:2,14
96:11,21
106:23

107:1,4
109:13
113:4

—————————
**I**
—————————

**ideas**
108:4

**identificat
ion**
27:6 29:6
36:12
48:14
51:10
84:22
94:8

**identified**
43:5
45:1,9
46:2

**identify**
5:18 45:4

**identity**
5:15
74:16,23
88:21

**ignoring**
92:10,12
93:4

**III**
43:15
61:21,23

**ill**
7:19

**image**
62:14,21
67:18,21,
25 68:1,5
70:10
87:2,3

**imessage**
16:5

94:17

**immediately**
9:19,20

**impact**
61:23
63:7,16

**implication
s**
89:20

**importance**
79:22
80:2,5,17
82:11
98:2

**important**
73:23
74:3,12
80:9 87:6

**impossible**
31:12

**improve**
44:23

**improved**
34:15
35:14

**inaccurate**
88:13

**include**
23:21
42:13
48:21

**includes**
55:9

**including**
18:12
52:4
70:18,21,
23

**incumbents**
78:25
79:14

**independent**
37:17
38:13

**individual**
18:24
32:1 49:1
63:11

**individuals**
16:9
19:24
64:10
106:14

**information**
15:10,20
37:2 73:3
87:20
99:12,13
102:4

**informed**
37:5

**initial**
82:22
83:9,15

**initially**
111:7

**inside**
14:25
95:4,14,
17,20
96:11,12,
16

**insights**
37:6

**Instagram**
14:16,22

**instructing**
22:18,21
100:13

**instruction**
98:8

**instruction
s**
100:17

**intend**
10:23
35:5

**intended**
34:20
45:14

**intent**
34:22
45:11
59:2
66:20
76:4 77:1
80:13
82:1

**interact**
49:25

**interacted**
46:4,5,12
49:23

**interacting**
50:13

**interaction**
33:13

**interaction
s**
45:25
46:13

**interactive**
39:11

**interest**
48:5
77:11
91:18

**interested**
89:18

**interesting**
70:10

**intern**



11:15,16,
21 19:7
111:6,8

**internship**
11:22
111:13

**internships**
10:12,18
11:2,11
12:1

**interpret**
78:15

**interpretat
ion**
78:16

**interrupt**
65:13
102:19

**introduced**
18:17
29:24
30:2,9
31:1

**invited**
37:10

**involved**
26:18
57:24
58:4,11,
13,17

**involvement**
17:2 83:8
111:25

**involving**
27:13
106:11

**iphones**
16:9

**ironic**
83:25

**Isabel**

59:15
63:24
64:13
69:1 87:1

**Isabel's**
72:13

**Isbel**
76:25

**Isbell**
24:20
49:11,20
51:7,22,
25 52:4,
8,11,16
53:12,14,
17,21
54:11
55:10,13
56:2,14
57:20,24
58:4,8,9,
12 60:8
61:17
62:10,24
63:12,18
64:8,20,
21 65:5
68:10,13,
20 71:3,
22,24
72:18,24
73:19,24
75:13,18,
22,24
76:3,10
77:3,9,
10,15
78:13
79:25
80:1,10,
25 82:10,
21 83:18,
24 85:10,
14 87:11,
23 88:15,

19 89:9
90:13,17,
24 91:14
92:3,8
96:16
97:24
106:23
107:7,10,
24 108:3,
12,15

**Isbell's**
69:11,24
82:13
85:8 86:5

**Isbell00001
2**
52:21

**issue**
31:6 43:5
45:1
86:14
100:21

**issued**
5:16

**issues**
10:25
11:3 46:8
91:24
93:20
112:10

_____

**J**
_____

**J-A-Z-I-L**
6:9

**J-U-R-O-R**
15:1

**Jackson**
64:1,4,
13,15

**Jacksonvill
e**

109:7

**Jacob**
103:19

**Janet**
55:3

**January**
12:6,7
17:4,7,11
75:17
78:20
92:16,18
95:16
96:2,3,5,
9 108:18,
21 112:1,
8,10

**Jazil**
6:9 99:8,
9,19
100:1,3,
12 101:1,
7,13,18,
23
102:13,
15,22
112:4,19

**Jeff**
55:1

**Jefferson**
29:1

**Jeremy**
64:9,12,
18

**job**
10:7
17:25
24:9
49:12

**jobs**
10:9 11:7

**Joe**
19:3,4

110:25
111:2

**jogs**
74:5

**John**
20:18,19
29:10,16
30:2,8
34:10
36:17
37:7,14
56:23
57:3,12
104:7,11

**join**
28:1

**joined**
26:25
49:22

**Joint**
19:22

**joke**
14:25

**Jones**
41:13
81:10
82:2,17

**Judge**
9:11,12

**judge's**
103:1

**judged**
36:2

**judges**
21:13,16
22:9

**Judy**
64:10,13,
17

**Justice**
11:17



Case 8:24-cv-00879-CEH-TPB-ALB    Document 109-3    Filed 05/06/25    Page 136 of 151
PageID 3654

NICHOLAS WARREN
KETO NORD HODGES vs PASSIDOMO

November 18, 2024
Index: justices..listened

12:15
21:18
50:7

justices
  11:19
  12:10

_____

K

Kara
  27:14,15
  28:7

Kassandra
  6:15

Kassie
  84:11
  94:6

Kathleen
  5:5 6:13,
  17

Kato
  106:21,25
  107:3,7,
  11,13,16

Katoo
  26:6

Keto
  5:5

kind
  16:19
  96:22
  109:23

kinds
  52:3

Klas
  103:15

knew
  31:1
  45:13,17,
  24 46:3
  66:14

88:15,22

knock
  84:1

knowledge
  22:4,5
  25:3
  30:15
  51:24
  52:1,5
  53:15,16
  93:16
  95:6

_____

L

lack
  91:16,18,
  23 93:19

laid
  42:18

Lake
  78:17

language
  102:25

late
  39:4

launder
  79:21
  80:9

laundered
  87:11

Lauren
  90:14

law
  6:12
  9:10,22,
  23 10:2,
  6,10,13,
  14,15,16
  13:17
  88:14

98:16,24
99:4,11,
14 100:7,
15 109:3

lawyer
  20:20
  26:12
  28:20
  29:16
  98:8
  100:6

lays
  105:3

leadership
  48:4
  78:14,18
  79:3,12,
  16 83:5,
  10,16

leads
  100:10

learned
  26:12
  74:15,22
  106:22

leave
  50:22

Leek
  75:14

left
  101:4

legal
  10:6 19:5
  111:9

legislative
  17:3
  27:16
  41:19,23
  42:12
  55:11
  72:12
  84:1

100:25
103:11
105:16
111:25

legislators
  28:12
  87:6
  100:25

legislature
  47:12
  55:12,17
  58:6 60:5
  67:2
  72:15
  73:6
  77:18
  104:1
  105:12,17
  106:3,8,
  14 109:8,
  12,16,20
  111:17

Leon
  49:13

lesson
  79:22
  80:2,17
  87:5

letter
  20:11
  41:11

letters
  16:15
  48:1,3,9

level
  33:25

Levin
  5:20 6:2,
  3 16:23
  17:2,7
  22:15,21,
  25 23:3
  34:21

45:10
59:1,6
66:18
73:9,11
80:12
92:15,20
98:13,23
99:16,25
100:2,6,
19 101:6,
17,19,24
102:19
111:22
113:22

Leylany
  6:1

liberal
  68:17
  69:7,14

Liberties
  8:15

license
  5:16

lien
  56:9

limit
  17:10
  47:20

lines
  74:16

link
  32:16,23
  37:3 39:9
  68:6
  111:20

links
  39:10

list
  60:10,24

listened
  82:20



listening
    26:1

litigation
    57:6
    68:24
    95:10

live
    78:10
    108:25
    109:21

lived
    57:9
    89:18
    108:23
    109:1,10,
    13,18

living
    108:21

lobby
    26:13

lobbyist
    106:18

lobbyists
    106:20

located
    5:14
    28:14

log
    99:13,23

LOL
    56:14

long
    8:3
    108:23
    110:7

long-time
    64:14

looked
    65:12,14
    106:17

Los
    56:24
    57:9

lose
    53:24
    54:7,9,22

loses
    86:7

losing
    65:5

lot
    25:18
    31:3
    52:17
    72:6 73:2
    81:23,24
    88:9

love
    73:9,11

low
    30:16

lower
    52:20
    57:20

Luckily
    37:9

————————

**M**
————————

Madam
    101:3

made
    33:23
    35:24
    40:12,17
    53:9
    74:21
    91:2

magistrate
    102:25

mailed
    48:3

main
    14:16
    27:2

majority
    55:11,17
    56:23
    57:1,17
    63:4,19
    77:17

make
    24:11
    37:25
    40:7,14
    47:11
    82:24
    83:11,16
    100:16

makes
    31:11
    32:2
    83:19

makeup
    68:14
    69:4,19

making
    44:5

managers
    24:7

manipulate
    82:24

manipulated
    83:16

map
    35:15,17
    39:1,15
    53:1
    55:19
    56:23
    57:4
    67:23

68:11
    75:24
    76:1,2
    77:2,6
    79:24
    81:13,16
    82:3,7
    84:15,24
    86:16,17
    89:14,19,
    25 90:9
    93:8
    109:17

mapped
    93:12

Mapping
    53:18

maps
    36:25
    37:9,23
    38:1
    39:8,11,
    13,14,16
    40:24
    41:4 43:8
    53:9
    55:11,14
    57:10
    59:19
    76:5,15,
    18,19,22
    77:23
    79:23
    82:11
    84:9
    87:4,7
    88:13
    90:20
    109:13

March
    109:6

marching
    32:6

Marino

26:24

mark
    27:4,8
    29:4 36:9

marked
    27:5 29:5
    36:11
    48:13
    51:9
    84:21
    94:7

marriage
    105:24

Mary
    103:15

material
    99:22

materials
    13:24
    35:18

Matt
    74:19

matter
    96:23
    98:15

Matthew
    24:20

Mcnamara
    5:24
    26:25

meaning
    83:25
    88:24

meaningful
    91:19

means
    23:12
    45:14
    66:17,22,
    23 78:6
    82:6



Case 8:24-cv-00879-CEH-TPB-ALB    Document 109-3    Filed 05/06/25    Page 138 of 151
PageID 3656

NICHOLAS WARREN
KETO NORD HODGES vs PASSIDOMO

November 18, 2024
Index: meant..minute

89:13

**meant**
91:10

**media**
14:12
15:2
22:12,14
98:7

**medication**
7:17

**meet**
20:22
27:24
29:12
49:20,21
50:18
108:15

**meeting**
17:20
18:7,11,
18 19:8,
15 27:20
28:17,19,
22 29:24
30:3,24
32:11
34:3
35:25
36:1
37:7,21
38:6,12
41:9
42:3,14,
16 46:9
65:10,16
66:7,10
67:9,11,
15 72:11
97:10
104:9,22
113:3,8

**meetings**
35:10
36:4 67:7

93:18
97:6

**melt**
91:2

**member**
20:7
22:13
41:7

**members**
17:13,18,
20 18:7,
20 19:11
20:1,2,
10,23
21:1,2
22:12
25:25
26:17
32:1
34:18
37:4
41:4,6,20
45:8,16,
23 46:14,
24 47:9
58:10,14,
17 67:1
72:10
81:17
97:18
98:6
103:25
104:12,15
105:1,5,
11,17
106:3,8,
13,19
107:25
113:4

**meme**
58:9

**memory**
30:25
37:17

38:13
52:10
57:4
74:5,8
79:10
80:4
89:17
90:2
96:18
97:2
110:15
113:2

**memos**
50:22
108:9,11,
14

**mentioned**
11:23
18:6 19:9
27:21
29:15
33:16
40:9
42:15
49:9
54:19
60:18
110:25
113:3

**mentions**
38:17

**merit**
11:19

**message**
51:4,6,
15,16
52:23
54:16
56:21,25
57:14
58:19,22
62:25
64:24
66:23

68:2,5,6,
7 70:8
71:24
72:11,19
73:19
74:4,14,
18,24
78:18
82:5,18
85:18
88:8,23
90:22
93:4,9,11
104:8
108:8

**messages**
16:7
51:21,25
52:2,7,8,
11,12,13
54:23
59:15
71:6
92:13,23
93:1
94:4,15,
17,19,20,
22 95:15,
18 96:1,
17 97:11
106:23
107:12
108:2

**messaging**
46:18,20

**met**
30:6,25
67:12,13,
16 78:20
104:7

**method**
19:15
20:7

**methods**

12:18
15:25
16:13
44:23

**metric**
70:16

**metrics**
70:13

**Miami**
5:14

**Michael**
6:7

**Michigan**
89:18

**middle**
9:8 13:21
47:10
52:23

**midterm**
83:20

**midterms**
82:25
83:11,17

**Milena**
5:7

**mind**
8:25 65:5
91:2

**mine**
62:13
68:15
70:2
74:13

**minority**
18:4 19:7
20:20
38:24
58:2
61:1,23
91:17

**minute**



54:17
100:19
109:24
110:1

**minutes**
56:18
101:6

**misunderstanding**
88:14
90:4,6

**misunderstandings**
88:9

**Mohammed**
6:9

**moment**
35:19
73:25

**Monday**
27:25
34:14
35:12
40:17

**money**
10:21

**month**
36:22

**monumental**
84:3

**morning**
7:2,3
37:8

**motivations**
45:11
59:2
71:19
80:13
90:18

**Motor**
5:16

**Mount**
64:10,14,17

**move**
92:5

**moved**
109:1,5,7

**moves**
78:17

**Moving**
71:23

———————

**N**

———————

**N-O-R-D-B-Y**
6:11

**named**
25:21
64:9,10

**Natalie**
26:6
106:20

**national**
25:13,16
83:20
89:20
106:15

**naturally**
57:16

**NDRC**
26:15

**NDRC-AFFILIATED**
106:21

**negative**
74:21

**Newman**
60:10,14
61:9,18,25  62:4

105:10,11

**news**
21:19
40:25
60:2,3
79:19
97:5
102:10

**Nicholas**
5:4,21
6:20

**nicholaslvwarren@gmail.com**
13:1

**Nick**
27:24
28:12

**Nicola**
42:6

**night**
39:5

**NLVWARREN**
14:21

**non-confidential**
102:8,9

**non-main**
14:18

**noncontiguity**
47:6

**noncontiguous**
47:3

**Nord**
5:5

**Nordby**
6:11,24
7:1  16:25

17:6,9
22:18,23
23:1,6,9
27:3,7
29:2,3,7
34:24
35:1
36:9,13
45:12,18,22  48:15
49:6,8
51:11
59:3,10,12  66:21
73:7,10,12,16,17
80:15
84:11,17,20,23
92:18,25
94:6,9
98:17
99:5
111:1
113:19,23

**notary**
5:7

**noted**
33:4

**notes**
37:5,8

**November**
5:3  36:22
39:5
40:18
42:3,11
71:7

**Nowadays**
61:15

**number**
13:23
14:3,4,5
15:12,22
16:3  42:5

45:18
49:6
52:20
56:4
57:20
84:8

**numbering**
83:1

**numbers**
14:1,7,9
82:24
83:16
84:10,14
85:5,8

**nuts**
90:25
91:6,8

**NYU**
9:24
13:17

———————

**O**

———————

**O'NEAL**
57:3

**O'Neal's**
56:24

**O'NEIL**
57:12

**object**
22:15
59:1
66:19
112:12

**objection**
22:20
23:2,8
34:21
45:10
59:11
80:12
98:11



99:6,10
101:19
102:3

**objectionable**
66:19

**objections**
101:17

**objective**
59:8
87:19

**objectively**
59:4

**objectives**
24:10
87:16

**obligation**
7:11

**observe**
36:3

**obvious**
35:19

**occasions**
12:16

**occurred**
17:3
98:20,21,
23 111:23
112:1

**October**
35:24
64:21
65:11
67:15
74:2 75:3
104:9
109:7

**off-the-record**
103:12

**offer**

105:10

**offered**
39:9
91:11

**offering**
90:25

**office**
10:19
19:7
20:21
21:10,11
28:10
29:17,25
30:8
49:13
64:16
79:15

**offices**
12:11

**official**
6:13,17

**officials**
21:8

**Ogles**
103:19

**on-the-record**
103:9

**open**
23:7 48:7
86:2

**operated**
24:5

**operates**
23:19

**operative**
23:12,18
24:4
60:21

**operatives**
23:11

24:17
49:10
60:19
100:24

**opinion**
53:10

**opportunities**
61:24

**opportunity**
48:6

**Orange**
86:4

**order**
10:17
11:14
16:24,25
50:24
92:14,15,
23 95:17
96:8
101:20
103:1
107:20
111:12,15
112:17

**ordering**
113:17,23

**orders**
32:6

**ordinarily**
99:12,23

**organization**
8:5,18

**organizations**
8:10

**organized**
113:4

**organizers**

24:8

**other's**
50:4

**outlined**
102:24
112:17

_____

**P**

_____

**p.m.**
27:25
56:20
93:9
114:2

**P000s0042**
42:22

**pages**
60:8
73:19
75:23

**paid**
111:8

**pair**
78:10

**paired**
78:1,5,7
79:1,7

**pairing**
78:23
79:13

**pandemic**
109:6

**Pantazi**
72:20,22,
24 102:17

**paragraph**
31:8 32:3

**pardon**
107:4

**Pariente**

12:15
21:19
50:7

**Parliament**
11:15

**parsing**
96:4

**part**
24:8
34:10
36:8
40:19
45:19
46:6
89:21
91:4,17,
22,25
98:11

**participation**
80:14

**partisan**
49:17
56:9
63:7,15
76:4
89:4,11

**party**
24:10
25:2,6
56:16
67:19
76:14,16
110:17,
18,19

**party's**
61:14

**Pasco**
44:4

**pass**
82:18

**passed**



92:16
93:8,12

**Passidomo**
5:5 6:13,
17 48:10

**password**
32:17

**past**
106:4
109:9,17

**pattern**
77:2,6

**pause**
73:8

**people**
16:14,19
18:10,14
23:21
24:5,8
26:21
27:2
29:25
52:24
54:12
55:11
65:6
67:15
73:23
74:3,12
79:7
81:24
89:22
95:3,12,
19,24
96:5,12,
14,15,19,
24 97:1,4
102:2
113:10

**percent**
108:8

**percentage**
44:5

**period**
9:13
11:24
14:23
15:1
16:21
17:1,10,
14 25:20,
23 27:2
47:24
50:16,23
51:1
52:18
61:20
88:11
93:13
95:21
97:3
104:3
108:17
111:3
112:17,
18,21,24

**periods**
12:3,12

**Perry**
78:1,2,4,
6

**person**
20:4
24:13
28:1
30:11
31:5
50:18
60:15
63:1
67:13
74:20
87:3 88:5
89:17,20
90:4
108:16

**person's**
74:22

**personal**
17:2
111:24

**personally**
33:12
91:21

**Pete**
56:6
70:19
90:1,6,8

**Pete-tampa**
88:1 89:2

**Petersburg**
89:11

**phone**
13:23
14:1,3,5,
7,9
15:11,21
16:3
39:25
40:20
50:20
94:16
108:4,5

**phrase**
23:15
33:17

**physical**
53:9

**physically**
109:21

**picture**
53:1
71:4,5

**pieces**
40:23
91:5

**piecing**
40:23

**Pinellas**

63:3,13,
22 68:16
69:4,11,
19 70:17

**plaintiff**
6:2
105:24

**plaintiffs**
5:23,25
57:6

**plan**
17:5
31:9,14,
17,25
42:22,23
43:3
44:16
63:7,16,
20 68:15
69:1
70:4,20,
25 71:16,
17 79:12
84:12
85:3,5,
13,21
90:9
92:17,21,
24 93:12
101:21
103:2,3,6
109:9

**plans**
19:21,24
38:10
39:17,23
40:9,12,
19 43:15
69:18,20
90:11,12
103:16,20

**PLLC**
5:20 6:2

**point**

19:15
23:8
24:24
31:5 37:2
64:25
65:2,21
66:13
69:23
85:22
87:15
112:6

**pointers**
31:6

**poised**
87:4

**policy**
27:17

**political**
23:10,12,
17 24:4,
9,17
43:22
49:10,15
60:15,19,
21 100:24
106:1

**politics**
23:19
26:3,18
49:16

**poll**
10:11

**populated**
43:23

**population**
62:19

**populations**
17:21
28:24
97:11

**portion**
42:2



68:16
69:3,5,
12,19

**position**
93:5
98:22
99:11
100:3

**positions**
48:7

**possession**
109:23

**possibility**
104:10

**possibly**
27:25

**post**
80:24
82:10

**posted**
39:8  69:2
80:5,25
81:7
87:13
88:12

**posts**
50:4

**potential**
31:14
63:23
67:14

**pre-
registered**
110:11,
13,16,23

**prepare**
65:23,25
66:6
73:22
74:9

**prepared**

66:3,15

**preparing**
60:5,6
65:2,22
66:9,13

**prescient**
86:9

**present**
13:16
16:22
19:8

**President**
6:13,16
48:10

**pretext**
89:6

**pretty**
44:8
111:24

**previous**
26:24
37:24
38:2
45:25
93:6

**previously**
46:4,5

**primaries**
70:3

**primarily**
51:3
61:9,13
62:1,6

**primary**
64:3
68:14,23
70:15,24
71:1

**Primer**
32:22

**printed**

100:10

**prior**
10:14,15
11:1,7
38:7  46:8
54:17
75:19

**prison**
17:21
28:12,23,
24  97:11

**prisons**
29:24
105:7,8

**privilege**
22:16,19,
22,23
23:4,5
98:16,18,
19,25
99:3,11,
13,15,23,
24
100:11,15
102:4,6

**problem**
43:4
44:25

**proceed**
34:19

**proceeding**
5:11

**process**
16:17,18
17:3
18:22
19:12
20:3,15,
24  21:3,6
22:1,14
24:16
30:16
31:2

33:25
34:22
47:7  67:2
71:21
73:3  75:8
80:14
83:1,8
91:17,19
93:25
94:3
97:9,14
106:17
111:25

**produced**
38:2,7,9
51:7
94:11

**productive**
37:6

**prohibits**
88:1  89:1

**pronouncem
nt**
34:15
35:13,22

**Property**
49:13

**propose**
87:6

**proposed**
36:24
40:4  63:7
87:17

**proposes**
86:13

**proposing**
86:19,20

**protect**
99:3

**protected**
60:11,25
68:25

69:3,20
70:22

**protection**
38:24
61:1

**protections**
98:24

**protective**
50:24
92:14,15,
22  95:17
96:7
107:20
111:12,15
112:17

**protects**
98:25

**provide**
35:4
38:16
39:22
42:15
61:3
80:16
85:6
102:17
103:15,19
104:24

**provided**
39:20
67:4
94:19
101:22,25
102:2
103:1

**providing**
37:4

**Provisions**
61:1

**PTP/NYC**
10:22

**public**



5:7 20:5,
8 41:8
42:13,15,
18 44:15,
20,22
45:5
46:7,18
50:4
73:25
93:18
104:1

**publicly**
103:7

**publish**
97:24

**published**
79:19
97:5

**publishing**
80:11

**purposes**
100:17

**put**
63:20
87:20
104:11

――――――――――

Q
――――――――――

**quality**
66:25

**queries**
32:5

**question**
7:21,23
8:25
14:22
21:1
23:24
45:20
47:20
49:10

54:20,21
55:6 61:8
65:20
85:7
92:20
99:17,20
103:14
111:21

**questions**
7:10
16:16
20:1
34:12,20
35:10,11
42:21
65:3,22,
23,25
66:3,6,
10,13,15
67:4,7
72:9
96:20
97:21,24
98:1,5
99:7,10
100:13
101:15,
20,25
103:25
104:8,11,
14,24
105:4,11,
16 107:24
108:4
112:16
113:14,
20,22

**quirk**
47:1

**quote**
35:7

**quoted**
102:10

**quoting**

44:24

――――――――――

R
――――――――――

**racial**
44:17
69:4,19
89:5,13

**raise**
6:19

**raised**
32:6,10

**random**
73:23
74:3,12

**rapid**
56:19

**rate**
74:1

**Ray**
78:21,22

**reach**
95:19
96:9

**reached**
46:22,23
95:3,13,
25 96:5

**reacting**
89:16
90:3

**reaction**
69:11,14
74:17

**reacts**
63:12

**read**
14:4 28:5
42:19,20
43:9 65:1

76:24
82:12
89:7
96:17

**reading**
35:17
40:23
43:3
54:23
72:5

**real**
72:21,25
88:12

**reapportion
ment**
30:14,22
35:25
36:25
38:8
42:13
65:10

**Reardon**
6:15
84:16

**reason**
51:14

**reasons**
90:7

**recall**
38:11
59:24
104:13
113:5

**received**
74:14

**recent**
16:18

**recently**
19:5 29:1
72:6

**reciprocal**
99:1

**recognize**
27:9 29:8
36:14
48:16
72:5
84:7,24
94:11

**recognized**
65:9

**recollectio
n**
38:19
40:3
47:15
112:8

**recommend**
35:18
111:10,13

**recommendat
ion**
111:20,23

**record**
5:1,3,10,
19 7:4
48:12,18
73:13,14,
15 100:16
101:9,10,
11 113:25

**recording**
5:12

**records**
110:4

**red**
57:15

**redder**
56:7,8

**redistricti
ng**
11:6
16:17,18
17:3,15



18:22
19:12,21
20:3,14,
24 21:3,
6,11,14,
17 22:10,
14 25:13,
19,22
26:7,20
28:25
31:2
32:17,18,
19,22
33:19,25
34:22
35:25
36:3
39:23
43:14
46:15
47:7,17,
21,22,25
48:6
52:17
61:19,22
67:1,8
73:3,22
74:10
75:8
78:20
80:14,19
86:15
88:6,10
89:22
91:17
93:21
95:5
96:11,20,
24 97:8,
14 98:3
101:16
102:18
103:11,16
104:2,15
105:13,16
106:4,6,
9,15,16,

24 107:5,
8,14,22,
25 108:16
109:9,18
111:17,25
112:5,6,
8,9,25
113:5

redistricti
ng-related
107:23

redistricti
ngs
47:12

refer
42:21
44:3,4
53:17
55:6,23
84:9

reference
30:17,18
35:21,23
53:12
54:5
56:8,9,25
59:17
67:3,14
71:16
89:14

referenced
36:6 58:1
74:3
97:22

references
40:24

referred
21:21
46:17
78:25
85:6
86:18

referring

19:2,14
24:14
28:2
31:13
46:17
54:25
55:3
56:16
63:13,18
64:8
68:21,22,
24 69:2,8
70:4
71:15
72:3
76:15
77:17
83:1
85:10,12
88:8
91:3,7
95:12

refers
44:22
54:21
55:10
56:12
57:14,17
60:2 63:3
79:8,18
83:4,6,22

reflected
88:14
106:22

reflection
73:1

refresh
38:19

regard
90:19

registered
26:13
106:20,21
110:2,5,

7,9,22

registratio
n
109:24

registratio
ns
106:18

Reid
5:20 6:1

relate
63:2

related
47:17
49:1

relative
69:19

relayed
74:18

released
37:23
39:17
59:20

relevant
10:25
11:2,5
16:20
25:20
27:1
50:16

remarkable
70:8

remarked
70:9

remember
17:21,23
18:7,9,19
21:18
30:10
31:22
37:13
38:21

39:24
40:11,22
41:5
47:14,23
48:1
59:17
61:7 62:3
67:6
79:2,3,9
86:16
104:9,16,
17
108:13,20
113:9

remembering
60:9

renumbering
82:22

Rep
27:24

repeat
54:20

rephrase
34:25
59:11
88:20

reported
103:7

reporter
5:2,8
6:18,22
22:17,19
72:23
73:13,15
84:19
100:5
101:3,5,
9,11
102:4,9
113:17,
21,24

reporter's
22:16,22



23:5 99:3

reporters
98:16,18,
25 99:11,
14
100:14,
21,22,24
101:16
102:8

reporting
103:10,13

reports
79:19

represent
5:19,21,
25

Representat
ive
18:6,12
30:4 34:3
41:12
82:2

representat
ives
17:14
18:21
19:19
113:12

represented
46:24
47:9,14,
16 85:17

representin
g
6:2,3,6,
12,16
85:20

reps
47:16

Republican
56:16
57:1,17

62:1
63:4,23
77:6,17,
23 78:8
79:14
83:4,16
86:7

Republicans
61:10
79:5

request
34:18
35:4

requested
22:7
61:20

requests
22:8

requirement
s
38:25
43:14,16,
17 44:1
88:25

research
10:10
100:7,20

resistance
33:20

respect
77:11
111:16
112:16

respond
53:23
79:21

responded
37:7 65:5
69:22
70:2
74:25
86:5

87:14

responding
34:17

responds
56:14
58:8,9
62:24
64:8 72:1
73:24
78:13
83:24
90:17

response
32:13,16
34:20
35:4 49:9
68:13,21
91:22
99:25

responses
32:5

result
63:21,23

resulted
37:15

retained
57:6

retention
11:20

reveal
102:5

reverse
10:17
11:14

review
38:18
103:3,6

reviewed
36:6
48:19

rewards

13:13

right-hand
57:21

rights
28:13
60:25
89:1

ring
68:17
69:7,13

River
47:11

Rodrigues
78:22

Rodriguez
6:1,4
35:24
78:21

Rodriguez's
34:14
35:13,21

role
38:23

room
113:8

Roughly
9:25

routinely
52:2,7,11

rule
34:2
100:17

ruled
89:24

rules
7:7

ruling
104:10

——————

S

satisfied
43:25

says,"as
87:3

school
9:22,23
10:3,6,
10,13,14,
15,16
109:3

scope
16:23
34:23
59:1
92:22
95:17
96:7
100:22
101:20,25
102:12,
20,23
107:19
111:12,
14,24
112:3

screenshot
74:23

screw
63:2

scroll
97:4

search
37:15

seat
57:16
63:3,13
86:7

seats
76:5



82:24
83:11,17
84:1 86:6
91:1

**Secretary**
6:8,10
21:9
109:22
110:3

**section**
11:17
43:15
70:19

**seeks**
43:6

**Select**
41:23
42:3,12
43:2

**Seminole**
86:3

**Senate**
6:6,12,16
17:4
19:22
20:2,3,8,
11,12,13,
20,23
21:21
29:16
30:8
31:5,14
36:24
37:23
38:9
39:15
41:8,23
42:2,12
43:2
44:17
45:8,13,
17,24
46:14,24
47:21,23

48:4
53:23
54:15,19,
22 55:14
56:23
57:1,5,15
62:17,18,
22 63:4,
17,19,22
65:10
67:23
68:11
69:12
71:9,12,
18,20
76:1
78:20,24
79:3,5,
11,12
81:18
83:2
84:7,14
85:12,13,
15 87:4
90:18,19
91:1,12
92:16
93:8,12
97:14
104:9
107:4
109:9

**Senator**
20:9
35:24
41:9,15,
17 46:1,4
55:1,3
81:10
82:2,17
85:23,24
90:15
93:7

**Senatorial**
25:9

**senators**
41:10
46:8,11
47:16,25
65:3,22,
23 66:1,
4,10,14,
15 67:5
78:3,8,23
85:19
91:11

**send**
40:10

**sending**
21:18
108:14

**senior**
27:16

**sense**
24:11
70:9
71:18
85:19
99:1

**separate**
11:22,24,
25

**separately**
95:3,13,
25

**September**
8:4 9:14,
15 32:21

**sessions**
104:1
105:5

**set**
27:24

**setting**
95:18
98:21

**Seventeen**
101:6

**shake**
71:10

**shaken**
76:6

**share**
68:22
70:2,15,
23 71:1
75:15

**Shev**
79:23
81:8,9,16
82:6
86:18

**Shevrin**
41:12
81:10

**shit**
92:7

**shitting**
73:23

**Shiza**
6:5

**shop**
13:13

**show**
92:7

**Shutts**
6:5,12,15

**sic**
5:15
101:12

**side**
97:14

**Signal**
15:8 51:1

**Similar**
20:1

**simply**
76:4

**single**
51:16

**sir**
10:1
103:23
105:10
107:24
109:8
111:16

**Sitting**
59:24

**skip**
75:17

**skipping**
12:25

**smart**
71:13
77:1

**smartest**
81:17

**SMS**
16:7

**Snapchat**
14:19,24
50:25

**social**
14:12
15:2

**software**
5:12

**solicited**
40:4

**soliciting**
97:20

**Solutions**
5:8

**solve**
43:4



44:25

someone's
59:6

Sorois
75:15

sort
7:12 46:7
61:8 70:5

sounds
79:25

source
99:1,3
102:5,7,9
103:9,12

sources
37:2
98:25

spam
13:12

speak
17:13,18
20:2
21:9,13,
16 22:13
24:16,19,
23 25:1,
8,12,15
26:6
28:11
41:19
61:19
64:17
81:19,21,
24,25
82:16
86:21,23
105:10
107:13,21
112:5,7

speaking
24:5
106:14

specialized
5:12

specific
11:4
65:20
67:3
80:23
82:14
93:15
96:18

specificall
y
26:22
35:2
52:10

specifics
96:25

speculation
63:19

speed
31:7

spent
10:11

spoke
20:9
21:19
22:10
25:19,22
26:19
41:12,15,
17 62:4
81:12,23
86:23
99:2

spoken
49:10
107:16
108:5

spring
11:17
73:20
74:6

square
53:13

St
56:6
70:19
88:1
89:2,10
90:1,6,8

staff
18:2,3,21
19:6,18,
22 20:12,
13,23
28:9
32:6,10
34:13
35:12
36:25
38:7,9
39:16
69:3,13,
18 100:25

staff-
developed
38:10

staff-
drafted
69:20

staff-drawn
43:8 69:1

staff-
produced
37:23
39:16

staffers
21:6

stage
64:25

standalone
70:11

standards
36:2

standing
67:18

start
52:13

started
33:23
50:12
73:23
105:25
111:18

starts
42:5
64:25

state
5:9,19
6:8,10
33:25
35:19
36:24
39:15
53:23
54:19,22
55:14
62:21
63:17
69:12
76:2,18,
19 78:8
83:2
90:15,19
93:8

State's
21:9

stated
7:4

statement
35:23
69:17,21
86:6

States
9:7

stating
72:19

92:23

staying
61:18

stenography
5:13

step
12:25

stories
60:3

story
102:10

stranger
46:10

strategize
31:12,16
32:2

strategy
57:25
58:1,5,13
71:25
72:2,3,
12,13
97:21

string
29:11
36:20
38:15
39:3
40:13

subcommitte
e
20:10
21:20
36:4 38:6
41:23
42:3,12
43:3
44:12
46:9

subcommitte
es
20:4 72:7



**subject**
  22:7,20
  28:22
  29:1,12
  91:13
  96:23
  98:14,15
  112:21

**subjective**
  34:21
  45:11
  59:2,7
  66:20
  80:13

**subjectively**
  35:5  59:3

**submission**
  19:24

**submitted**
  19:20
  40:9  41:2
  48:19
  57:10
  67:22
  68:11
  70:4
  103:3,6,
  16,20

**subsequent**
  21:25

**substantive**
  33:25

**succeed**
  24:10

**succession**
  56:20

**suggest**
  41:3
  47:10
  104:25

**suggested**

  47:7
  104:11,14

**summary**
  44:8
  90:22

**summer**
  11:16,20
  12:5

**supervised**
  111:7

**supervisor**
  26:23,24

**support**
  19:6

**suppose**
  58:3

**Supreme**
  10:20
  11:19,21,
  23  12:1,
  11  50:7,9
  53:5,6
  89:23
  90:5

**Suwannee**
  63:25

**Swanee**
  47:11

**sworn**
  6:19,21

—————————

        **T**

**Taddeo**
  79:24
  81:9,11,
  16  82:2,
  7,17
  86:19

**taking**
  92:10,11

  93:2,3,14
  98:22

**talk**
  58:9
  63:25
  64:1  91:2
  92:5
  97:12
  108:3
  112:24
  113:1

**talked**
  16:17
  25:25
  37:22
  40:13,14
  41:5,6
  97:8,13,
  24

**talking**
  16:21
  53:19
  74:6  88:6
  97:2
  102:20
  105:20

**Tallahassee**
  26:12
  28:14
  108:18,
  20,21,24
  109:6,10,
  13,18

**Tampa**
  38:18
  39:1
  43:6,7
  44:3  45:2
  53:21
  54:6,15
  62:19
  63:21
  67:23
  68:11

  70:21
  79:24
  81:13,16
  82:3,7
  89:11,25
  90:7
  91:1,12

**task**
  84:4

**technological**
  15:25

**Telegram**
  15:15
  51:1

**telling**
  34:19
  68:10
  72:25
  95:23
  100:7

**temporal**
  96:7

**Ten**
  110:1

**tent**
  31:11

**term**
  12:6,7
  23:11,15,
  16,20
  24:3,4,17

**terms**
  31:24
  35:17

**testified**
  6:21

**testify**
  96:6

**testimony**
  20:8

  42:14,16,
  18  43:2,
  24  44:7,
  9,15,19
  45:5,15
  48:19
  82:16
  103:23,24
  112:10

**text**
  16:3,10
  42:9
  62:14,15,
  16  65:6
  66:17,22
  94:17
  108:6,11

**texting**
  108:13

**texts**
  20:6
  108:10

**theater**
  10:21
  11:2

**theorizing**
  90:18

**thing**
  31:11
  32:2
  35:16

**things**
  58:20,25
  59:5
  67:14
  70:6,7
  71:11,14
  73:22
  80:19
  96:6
  104:21

**thinking**
  25:4  47:2



**thirds**
    64:24

**thought**
    82:22
    83:9,15
    88:13
    95:5

**thread**
    39:10
    40:15,16,
    24 79:22
    80:4,10,
    23 82:10,
    13 87:11,
    12,16
    91:21
    97:23
    98:2

**throwing**
    82:19

**Tier**
    43:5,11,
    13,17
    44:23
    45:1
    89:5,12

**Tilley**
    5:22
    26:23
    112:12

**time**
    5:3 9:13,
    18 11:24
    12:3,8,12
    16:20
    17:1,10,
    14 18:16
    25:20,23
    26:24
    27:2
    30:25
    31:23
    32:21
    39:8

40:13,15
46:11
47:15,24
50:6,14,
16,18,23
51:1
52:18
55:22
60:1,17
61:20
62:2
67:12,16
75:20
79:20
80:20
85:17
88:11
89:16
90:11,15
92:14,21
93:4,13,
16 95:21
97:3
101:4,5
102:21,23
103:17,22
104:7
106:5
108:17,
19,22
109:19,21
111:3,23
112:17,
18,20
113:15
114:1

**timeline**
    46:18

**times**
    94:2

**timing**
    104:7

**title**
    17:25

**titled**
    41:22

**TMR**
    92:7

**today**
    7:15
    59:24
    105:19

**today's**
    5:11
    104:22

**told**
    35:8 61:5
    63:1

**Tom**
    75:14

**Toman**
    20:18,19
    29:10,16,
    20 30:2,8
    31:8
    33:5,14
    34:7,10,
    11 36:17,
    21,23
    37:14
    38:12,20
    39:7,20
    40:5,13
    41:3 49:3
    65:15
    67:10
    97:13
    104:7,11,
    14

**Toman's**
    30:12
    31:16
    34:18

**tomorrow**
    92:8

**tomorrow's**
    39:9

**top**
    28:6
    32:13
    62:12
    77:25
    83:19
    90:14

**topic**
    31:4
    80:21

**topics**
    98:7
    104:25
    107:23

**total**
    46:10

**tour**
    30:1

**trade**
    54:24

**transcribed**
    42:2

**transcript**
    42:11
    113:18

**transcripts**
    72:6

**trial**
    106:12

**true**
    88:21

**Trust**
    25:13
    106:16

**truth**
    95:23

**truthful**
    7:15

**truthfully**
    7:12

**turn**
    51:21
    52:19
    57:19
    90:13
    94:3

**turned**
    22:3

**tweaking**
    47:10

**tweet**
    62:13,15,
    16,24,25
    63:8
    67:22
    68:1,6
    73:20
    74:12
    75:1,4
    89:15
    90:14,17

**tweeted**
    59:18
    68:8
    70:11
    74:17
    80:19

**Twitter**
    14:16,20
    39:10
    46:1,5,
    14,17,19
    49:22
    50:3,8
    51:4,6
    66:23
    72:19
    87:10,12
    88:5
    94:18
    97:5,23
    108:2,7,
    8,11

**Tyler**



75:15

**type**
   24:13

_____

**U**
_____

**UK**
   11:15

**Ulvert**
   24:23
   105:15,
   19,22
   106:2,7

**UMICH**
   87:24
   88:4,11,
   15 89:10,
   16

**unclear**
   24:3 25:5

**underscore**
   14:23

**understand**
   7:21
   16:22
   23:7,11,
   20 24:13
   30:17
   31:13,21
   32:11
   33:7,10
   34:9,17
   42:25
   43:16
   53:18
   54:25
   58:14
   63:6,15
   66:16
   68:20
   85:2 92:8
   95:2
   99:5,10,

16 104:13
111:2

**understandi
ng**
   8:12,19,
   20,21,23
   37:1,25
   43:12,18,
   20 49:14
   60:25
   62:6
   66:25
   77:21
   84:5,9
   85:11,16
   87:10
   91:23
   93:20
   96:23
   100:21
   105:21,23
   106:25

**understood**
   31:23
   90:15,16
   103:23

**unilateral**
   34:14
   35:13,22

**Union**
   8:14,15

**United**
   9:7 11:15

**unpaid**
   10:12,18
   11:1,11,
   25 111:8

**unsure**
   31:9,24

**updated**
   58:18

**utilize**
   43:21

_____

**V**
_____

**vehicles**
   5:17

**verbatim**
   5:10

**version**
   51:17,19

**versus**
   5:5

**viewed**
   81:17

**voice**
   50:22
   108:9,11,
   14

**void**
   82:20

**voluntarily**
   76:5

**volunteer**
   45:6

**volunteered**
   11:18
   40:10

**vote**
   110:9,13,
   16

**voter**
   109:23
   110:2

**voters**
   38:23
   70:15,24
   71:1

**votes**
   87:4

**voting**
   11:16

28:13
38:24
60:25
61:23
89:1

**VRA**
   87:25

**VRA/FDA**
   60:11

_____

**W**
_____

**W-A-R-R**
   14:23

**wait**
   53:22
   56:1 78:1

**waive**
   23:4,5

**waived**
   22:17

**walk**
   11:11

**wandering**
   80:1

**wanted**
   16:10
   28:8
   42:20
   85:14

**wanting**
   31:16

**Warren**
   5:4,21
   6:3,4,18,
   20 7:2,25
   22:17
   23:5 27:8
   29:8
   36:14
   42:6

64:7,8
84:24
92:23
99:7
100:5
102:5,16
113:13

**watching**
   93:18

**webinar**
   32:17,18,
   19

**week**
   38:7
   39:17
   87:5

**week's**
   37:6

**well-taken**
   73:5

**whatnot**
   109:2

**Whatsapp**
   15:18,20

**white**
   68:17
   69:7,14

**winning**
   56:22

**winter**
   12:6

**withdraw**
   10:5

**won**
   56:22

**wondering**
   55:7

**word**
   56:11
   65:4



Case 8:24-cv-00879-CEH-TPB-ALB    Document 109-3    Filed 05/06/25    Page 151 of 151
PageID 3669

NICHOLAS WARREN
KETO NORD HODGES vs PASSIDOMO

November 18, 2024
Index: words..Zoom

**words**
75:11

**work**
13:7,22
14:3
26:21
27:18
33:8,9,
15,18
34:10
44:13
46:6 48:5
49:1,14,
15 61:9
107:22
112:15

**worked**
8:3 11:18
25:5 26:3
30:11
39:18
45:17
46:3,21
52:25
53:8
61:11
82:22
96:12
105:25
111:2

**worker**
10:11

**workers**
24:7

**working**
9:3 12:10
13:21
33:23,24
50:6
58:13,16
62:1,6
83:13
109:4
111:9,16,

18

**works**
7:11
25:8,12,
15 30:8
49:18
60:16,17
61:13
64:15

**worrying**
47:13

**worse**
71:11,14

**worst**
56:23

**worth**
95:2,8

**worthless**
65:7

**write**
16:15

**wrong**
73:21

**wrote**
81:2,4,5,
6 87:13
97:23

---

**Y**

---

**y'all**
44:12,14,
15

**Ya**
86:7

**yday**
78:15

**year**
9:14
10:4,15

60:9
85:22
106:12

**years**
9:25

**yesterday**
30:15,18
78:15

**yesterday's**
32:6

---

**Z**

---

**Zoom**
32:23
38:12
40:21

