UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


CASE NO. 8:24-cv-879


KETO NORD HODGES, MEIKO
SEYMOUR, JARVIS EL-AMIN,
JENNIFER GARCIA and JACQUELINE
AZIS,
          Plaintiffs,
vs.

KATHLEEN PASSIDOMO, in her
official capacity as President
of the Florida Senate, and
CORD BYRD, in his official
capacity as Florida Secretary
of State,
          Defendants.
_____


VIDEO-RECORDED DEPOSITION OF MATTHEW ISBELL

Tuesday, November 26, 2024

9:05 a.m. - 3:05 p.m.



LOCATION:

SHUTTS & BOWEN

215 South Monroe Street, #800

Tallahassee, FL  32301



STENOGRAPHICALLY REPORTED BY:

SANDRA L. NARGIZ
RPR, CM, CRR, CRC, CCR
Job No.  J11986497



Exhibit 4

MATTHEW ISBELL                                          November 26, 2024
HODGES vs PASSIDOMO                                                     2

```
1   APPEARANCES:

2

      ON BEHALF OF THE PLAINTIFFS:
3

4       ACLU OF FLORIDA
        4343 W. Flagler Street, #400
5       Miami, FL 33134
        786.363.1392
6       BY: CAROLINE ANDREWS McNAMARA, ESQUIRE
        cmcnamara@aclufl.org
7       BY: NICHOLAS WARREN, ESQUIRE
        nwarren@aclufl.org
8
      ON BEHALF OF THE DEFENDANTS:
9

10      SHUTTS AND BOWEN
        215 S. Monroe Street, #800
11      Tallahassee, FL  32301
        850.241.1717
12      BY: DANIEL E. NORDBY, ESQUIRE
        dnordby@shutts.com
13      BY: KASSANDRA SATTERLY REARDON, ESQUIRE
        kreardon@shutts.com
14

15    ON BEHALF OF THE DEPONENT:

16
        JUNNIER LAW & RESEARCH
17      113 S Monroe Street,  Flr. 1
        Tallahassee, FL  32301
18      850.201.7141
        BY: RICHARD SCOTT JUNNIER, ESQUIRE
19      rjunnier@junnierlaw.com

20

21    ALSO PRESENT:

22      Gabe Dunlap, Videographer
        Tracy Kelly, Assistant Videographer
23      Michelle Martin, ACLU
        Carlos Alberto Rey, Esquire, Florida Senate
24

25
```



1                    I N D E X

2    WITNESS                                    PAGE

3    MATTHEW ISBELL                                5

4        Direct Examination by Mr. Nordby          5

5        Cross Examination by Ms. McNamara        203

6    CERTIFICATE OF OATH                          220

7    CERTIFICATE OF REPORTER                      221

8
                        INDEX OF EXHIBITS
9

10   NO.          DESCRIPTION                      ID

11   Exhibit 1    Notice of Third Party Deposition   7
     Exhibit 2    Complaint                          58
12   Exhibit 3    Documents previously submitted     64
     Exhibit 4    Text messages with Allison Tant    71
13   Exhibit 5    Dye messages                       85
     Exhibit 6    Summary of phone call              97
14   Exhibit 7    Summary of meeting, May 2021       99
     Exhibit 8    Group text with Dan Newman and    102
15                Jena Kingery
     Exhibit 9    Text with Dan Newman, 01-27-2021  105
16   Exhibit 10   Text from Drew Shannon, 01-19-2022 110
     Exhibit 11   Texts with Jena Kingery           114
17   Exhibit 12   POP email                         126
     Exhibit 13   Matt Isbell Redistricting Insights 131
18   Exhibit 14   Twitter DMs with Matt Dixon       134
     Exhibit 15   Texts with Marc Caputo            135
19   Exhibit 16   Twitter DMs with Nathaniel Rakich 137
     Exhibit 17   Twitter DM's with Andrew Pantazi  147
20   Exhibit 18   Emails with Matt Dixon            147
     Exhibit 19   Twitter DMs with Nicholas Warren  149

21

22

23

24

25



1   The following video-recorded remote proceedings

2                  began at 9:05 a.m.

3          THE VIDEOGRAPHER:  Good morning, we are

4   now on the record, The time is 9:05 a.m. on

5   November 26th, 2024.

6          This begins the video-recorded deposition

7   of Matthew Isbell, taken in the matter of Keto

8   Nord Hodges et al., versus Kathleen Passidomo

9   et al., filed in the United States District

10  Court, Middle District of Florida, Tampa

11  Division, Case Number which is 8:24-CV-879.

12         Your videographer today is Gabe Dunlap,

13  and your court reporter today is Sandi Nargiz.

14  We are both representing Esquire.

15         Counsel, will you please announce your

16  name and whom you represent, after which the

17  court reporter will swear in the witness.

18         MR. JUNNIER:  Richard Junnier for Mr.

19  Isbell.

20         MR. NORDBY:  Daniel Nordby from

21  Shutts & Bowen, along with Kassandra Reardon

22  from Shutts & Bowen and Carlos Ray from the

23  Florida Senate, representing the Senate

24  president.

25         MS. McNAMARA:  Caroline McNamara for the



```
 1        plaintiffs from the ACLU of Florida,

 2        accompanied by Michelle Martin and Nicholas

 3        Warren from the ACLU of Florida for the

 4        plaintiffs.

 5             THE STENOGRAPHER:  Would you raise your

 6        right hand, please?  Do you swear or affirm

 7        that the testimony you are about to give will

 8        be the truth, the whole truth, and nothing but

 9        the truth?

10             THE WITNESS:  I -- Yes, I do.

11             THE STENOGRAPHER:  Thank you.

12   Thereupon,

13                       MATTHEW ISBELL

14   having been first duly sworn or affirmed, as

15   hereinafter certified testified as follows:

16                    DIRECT EXAMINATION

17   BY MR. NORDBY

18        Q    Good morning, Mr. Isbell.

19        A    Good morning.

20        Q    As I just introduced myself, I'm Dan

21   Nordby.  I'm representing the Senate president in

22   this matter.

23             Mr. Isbell, have you ever had your

24   deposition taken before?

25        A    No.
```



1      Q    Okay.  Let me explain the process for you,

2   to answer any questions that you have.

3            You have the court reporter sitting to

4   your left.  You've been sworn in.  And I'll be

5   asking you a series of questions, showing you some

6   documents, and asking you questions about those

7   documents.  What I'll do is attempt to ask clear

8   questions that are understandable, and then you'll

9   provide answers to those questions.  Do you

10  understand that?

11     A    Yes, I do.

12     Q    You understand that you've been sworn in

13  and you're under oath?

14     A    Yes.

15     Q    As I said, I'm going to try to ask clear

16  questions, not confusing questions.  If you don't

17  understand any of my questions, will you agree to

18  ask me for a clarification?

19     A    I will, yes.

20     Q    And if you don't ask me for a

21  clarification, is it fair to say that you understand

22  my question and that you're giving me a complete

23  answer?

24     A    Yes.

25     Q    Okay.  There may be some times during the



MATTHEW ISBELL                                   November 26, 2024
HODGES vs PASSIDOMO                                              7

```
 1    course of this deposition where your attorney might
 2    object to a question.  Unless your attorney
 3    instructs you not to answer that question, you'll be
 4    required to answer that question subject to the
 5    objection.  Do you understand that?
 6         A    Yep.
 7              MR. NORDBY:  Exhibit 2, please.
 8              (Exhibit 1 was marked for identification.)
 9              THE WITNESS:  Thank you.
10              (Brief discussion off record.)
11    BY MR. NORDBY
12         Q    Mr. Isbell, I've handed you a document
13    titled Notice of Third Party Deposition, and
14    attached to this document is -- on the third page is
15    a subpoena to testify at a deposition in a civil
16    action.  Do you see that?
17         A    Yes.
18         Q    Okay.  Have you seen this document before?
19         A    Yes.
20         Q    Okay.  What is this document?
21         A    So this was compelling me to, you know,
22    meet with you guys today.  I believe you guys sent
23    it to my attorney initially, and it was on
24    October 31st that it officially got served.
25              MR. NORDBY:  Okay.  We'll call this
```



```
 1        Exhibit 1.
 2    BY MR. NORDBY:
 3        Q    Is this the subpoena that led to you being
 4    here today?
 5        A    Yes.
 6        Q    Okay.  Mr. Isbell, I'm going to ask you a
 7    few questions about your background/occupation at
 8    the beginning of this.  Where are you currently
 9    employed?
10        A    I work at the Leon County property
11    appraiser's office.
12        Q    And what do you do for the Leon County
13    property appraiser?
14        A    I work in the mapping department, you
15    know, dealing with the property map.
16        Q    How long have you worked there?
17        A    Since 2017.
18        Q    Were you employed before working for the
19    Leon County property appraiser?
20        A    I was doing freelance political work.
21        Q    Let's break that down a little bit.  When
22    did you start doing freelance political work?
23        A    Essentially when I got out of grad school
24    around 2013 or '14.  I would say somewhere around
25    there.
```



```
 1        Q    Who were your clients during that

 2   freelance political work?

 3        A    Generally different candidates, different

 4   local candidates, you know, different party

 5   committees.  I was sort of doing field and data

 6   work, you know, kind of like post-grad school.

 7        Q    Okay.  Which -- which candidates?

 8        A    County commission candidate down in

 9   Broward County, Mark Bogen.  Let's see, you know,

10   Sean Desmond for state attorney up here.  Assorted

11   candidates, you know.  It's hard to kind of remember

12   that long ago, but I was essentially kind of a

13   jack-of-all-trades, you know, hired to do data work

14   for campaigns.

15        Q    Okay.  And I understand it was 10 years

16   ago --

17        A    Yeah.

18        Q    -- so it's not a memory test, but --

19        A    Yeah.

20        Q    -- any -- any other specific candidates

21   that you can recall doing work for during that

22   three- or four-year time period?

23        A    Let me think.  Off the top of my head, I

24   really don't recall.  Like, you know, it's -- I'm

25   trying to think if there's anything specific.  I did
```



1   work for -- I mean, I did work for different like,

2   you know, political committees.

3            Like 2016, I was doing work for the For

4   Our Future campaign.

5            And, let's see, I did a little bit of work

6   for the George Sheldon for Attorney General campaign

7   in 2014.

8            I did some work for the -- I think around

9   2015 I started doing data work every now and then

10  for the state party, Democratic party of Florida or

11  the different affiliates of it.  I know there's a

12  lot of different committees.  I don't follow a lot

13  of that that closely.

14           Let me see.  And sort of, in general,

15  campaigns and stuff like that.

16      Q    You mentioned a committee in 2016,

17  something with the Future?

18      A    For -- For Our Future, yeah.  It was a

19  political committee that was, like, working

20  generally for, like, the -- supporting the Hilary

21  Clinton campaign and democratic campaigns in 2016

22  elections.

23      Q    And you mentioned starting in 2015 you did

24  some work for the Florida Democratic party and some

25  of its affiliates?



MATTHEW ISBELL                                    November 26, 2024
HODGES vs PASSIDOMO                                           11

1        A    Yeah, and I actually think, if I remember
2    correctly, in 2014 I started doing -- I was
3    interning with the party for a while.  Then I left
4    because I went to go work a full campaign down in
5    Broward County.
6             And then around 2015 is kind of when I
7    really started doing like data analysis where, like,
8    the party would start hiring me to do like data
9    breakdowns of different races, districts, you know,
10   what have you.
11       Q    You mentioned some affiliates of the
12   Florida Democratic party.  Would these be the
13   affiliated committees that run their state House and
14   state Senate campaigns?
15       A    Yeah, yeah.  Yeah, House Victory, Senate
16   Victory, and I know the committee names have changed
17   a few times, but yeah.
18       Q    One other thing I forgot to mention in the
19   introductory remarks, is Ms. Nargiz does a very good
20   job of writing things down, but it's difficult to do
21   that if we're talking at the same time.  So I'm
22   going to try to let you complete your answer before
23   asking the next question.  If you could do the same
24   thing, the crosstalk is difficult.
25       A    Got you.



1       Q    And, similarly, in normal conversation,

2    nodding or uh-uh is a common way to interact with

3    one another.  That's hard to take down in a

4    transcript; so yeses and noes probably would be the

5    easiest thing --

6       A    I got -- I understand, yeah.

7       Q    Thank you.  You mentioned just now a

8    campaign in Broward County that you worked on.

9    Which was that?

10      A    In 2014, it was the Mark Rogen for county

11   commissioner.

12      Q    Any other work between 2013, '14 and 2017

13   as a freelance data analyst that you can recall?

14      A    Not that I can recall off the top of my

15   head.

16      Q    Did you do any work for candidates for the

17   Florida Senate?

18      A    I'm trying to make sure.  I believe I did

19   some data work -- and I -- again, I honestly, it's

20   very kind of hard to remember at times.  I think I

21   did some work for Ed Narain, who ran for the state

22   Senate in Tampa, I think.  I believe I did some work

23   for Joseph Abruzzo, who was running for state Senate

24   in Palm Beach, but then I actually think he ended up

25   running for state House instead.  It was like some



1   musical chairs that happened, I guess.

2          And -- and I'm trying to think if there's

3   anything else I'm missing.  I think that's stuff

4   that kind of stands out in my head at the moment.

5   Because that was during -- certainly during the time

6   when the state Senate had to do its redistricting in

7   2015.  There was definitely several campaigns

8   where -- it wasn't that I was working on them

9   full-time, really.  It was more like candidate wants

10  to run, they're trying to understand what their new

11  district looks like.

12         Like, I think Senator Clemens I might have

13  also done maybe some data work for.  And that's

14  definitely the kind of instances where it's -- I

15  might have done one project, or it's like hey, help

16  us understand the new district.  I do that project,

17  and then they kind of use the data to run their

18  campaigns.

19         I'm not involved in the day-to-day.  So

20  how much I was involved in any campaign tended to

21  vary by candidate itself.  And that's still kind of

22  the case today.  If I'm working for a campaign,

23  maybe I'm more involved completely or maybe it's

24  just a one-time project.

25     Q    Thank you.  That's helpful.



1          When you mentioned that you did some work

2    for Senate Victory, I want to be sure that my

3    question's clear, that if you were working for

4    Senate Victory, assisting candidates, that's also

5    within the scope of my question, rather than just

6    contracts with the campaign committees themselves.

7     A     So, in general, the work I did with Senate

8    Victory would have been similarly they asked me,

9    hey, can you break down some of these districts?  We

10   want to have a feel for whether it's like what a

11   democratic primary might look like in terms of, you

12   know, makeup of, you know, partisanship or race or a

13   general election.

14          So I was never like a day to day

15   consultant for any of those committees.  That,

16   again, was more of the oh, hey let's hire -- let's

17   get Matt Isbell to do a breakdown of this district.

18          And then also at the same time -- oh, and

19   this is over the course of several months, maybe

20   that two-year period of 2015 -- excuse me -- to

21   2016, where there was so much, sort of, moving parts

22   with the map, that I was definitely doing a lot of

23   different campaigns at different points or committee

24   works.  But it was, basically, I was always a

25   freelance consultant in that respect.



1    Q    Meaning, you weren't a salaried employee?

2    A    Correct.

3    Q    Could you tell me a little bit more about

4  the specific type of work you did?  You said

5  "breaking down the districts."  Were you drawing

6  maps, were you analyzing maps that others had drawn?

7  Explain a little more for me, please.

8    A    Sure.  There has been times, and I believe

9  in the 2015 cycle, and I was, like -- especially

10 before the redistricting began -- there was

11 definitely -- I think I was hired at one point to

12 kind of try to draw out some maps, basically to

13 figure out what might happen.  You know, there had

14 been these Court orders.  So wait a minute, what

15 might they actually try?

16        But really, the vast majority of work I

17 did at any point was maps came out from the

18 legislature or from any organization, and somebody

19 would ask me, hey, can you get us, you know, what

20 does this map look like on a partisan level, what

21 does it look like on a racial representation level?

22        And at the same time, I was doing some of

23 that analysis for my website, which was just sort of

24 me being a sort of like a talking head about things.

25 I was very, very passionate about this issue,



1    redistricting specifically.  So I was doing a lot of

2    articles that were just because I wanted to write

3    them.  But then also there would be times where, you

4    know, whether it was the state party directly or one

5    of these committees, would say, hey, here -- the

6    legis- -- you know, this new draft came out, can you

7    get us, you know, whatever data they were asking

8    for?  And I would, you know, basically do that on a

9    per-item basis.  You know, it would cost X amount to

10   do that, and so on.  So it was mostly reaction

11   analysis.

12        Q    That information on partisan performance

13   and racial performance is something you'd share with

14   your client?

15        A    Yes.

16        Q    And with the candidates directly or with

17   Senate Victory, which you'd then share with the

18   candidates?

19        A    Yeah, so, you know, a good example --

20             MR. JUNNIER:  Objection, calls for

21        speculation.  He doesn't know what they'd do

22        with the information.

23   BY MR. NORDBY:

24        Q    Let me withdraw and rephrase that

25   question.



1          You'd share that partisan and racial

2     performance information with the entity that hired

3     you?

4          A     Yes.

5          Q     Okay.  Did you also share it with

6     candidates directly?

7          A     Yes, if I was contracted to.

8          Q     Okay.  Would that include Senator Clemens,

9     Representative Narain, and the other candidates that

10     you mentioned?

11          A     Yeah, partisan data would be part of any

12     data analysis I do.

13          Q     Was there anything else you did in that

14     time period related to redistricting or campaigns?

15     And I guess, just to repeat, we're talking about the

16     period when you were working as a freelance analyst

17     between 2013 and 2017.

18          A     Not that I can recall.

19          Q     Okay.  Anything else specifically related

20     to Tampa Bay?

21          A     I've done some campaign work, mostly for

22     some municipal races, and that's more like

23     Hillsborough tax collector in 20- -- that would be

24     in 2020.  And a couple other, like, local races.

25     Largo city commission just this last cycle.  So I've



1   done different works for -- for local campaigns more

2   than, I think -- I did some work for Senator Cruz at

3   different points, but, yeah, it varies.

4        Q    Okay.  You said a few moments ago that a

5   lot of the work you did was, you characterized it as

6   "reactive," you responding to things that came out

7   from the legislative process and analyzing it.  Did

8   I get that right?

9        A    Yes.

10       Q    Did you also do some more proactive work

11  on behalf of any of these committees or candidates,

12  drawing districts in configurations that they --

13  that they might appreciate?

14       A    No, not that I recall.

15       Q    Okay.  Do you recall drafting any state

16  Senate districts or state House districts that

17  candidates introduced as amendments during that

18  remedial process in 2014, '15?

19       A    There was -- I do recall one time where

20  State Representative Alan Williams asked me if I

21  could help him come up with an alternative

22  Congressional map.  This was when they were -- the

23  initial debate over the Fifth Congressional

24  District, the Jacksonville to Tallahassee district.

25       Q    Uh-huh.



1        A      State Rep Williams was hoping to have a

2   map that would have Tallahassee entirely within the

3   Fifth District because the city was split by the

4   initial base map.  And so I worked with -- with

5   Brett Williams.  And if I recall correctly, I don't

6   think I was even paid.  That was something I

7   believed in, not splitting the city.

8              So I remember I worked with him in the

9   legislative office.  And he did submit an amendment;

10  I was listed on the sheet as somebody that helped

11  with it.  And that was a submitted amendment to the

12  process.

13             That, and there was -- the one other

14  instance was I worked with, at the time, I believe

15  he -- he might have already been left, but he was

16  the former state committee man for Leon County, John

17  Osmond.  He had wanted to make a proposal to submit

18  a map that kept Leon County all in the Fifth

19  Congressional District that he submitted and

20  presented to the legislature.  I helped him with

21  that, and I was compensated for that.  I can't

22  remember the amount.

23             But, yeah, that -- those are the two

24  instances I remember.  I don't recall any other

25  instances, but those are the two that I rem- -- that



 1    stand out in my memory.

 2         Q    Representative Williams represented

 3    portions of Leon and Gadsden County when he was in

 4    the legislature?

 5         A    Correct, House District 8.

 6         Q    Did you have a sense as to whether he

 7    would potentially run for that Congressional

 8    district that you assisted in drawing?

 9         A    I don't recall.  I really didn't have a

10    sense of that.

11         Q    Not something he ever mentioned to you?

12         A    Not that I recall.

13         Q    Okay.  What about -- what about Senator

14    Clemens?  Did you draw any districts for him to

15    introduce into the legislative process?

16         A    Not that I recall.

17         Q    Okay.  Do you think you might have but

18    don't recall, or do you clearly recall that you did

19    not do it?

20         MR. JUNNIER:  Objection, asked and

21         answered.  He doesn't recall.

22         A    I don't recall.

23    BY MR. NORDBY:

24         Q    Okay.  You don't -- and I'm just trying to

25    get clarification -- you don't recall one way or



 1   another; is that what you're saying?

 2        A    Yeah, I don't recall one way or the other.

 3        Q    Okay.  Anything else from that time period

 4   of 2013 to 2017 that you did, involved in politics

 5   or the redistricting process?

 6        A    Not that I recall.

 7        Q    I want to move closer in time now.  You

 8   mentioned that you were at the Leon County property

 9   appraiser's office since 2017.

10        A    Uh-huh.

11        Q    Have you continued to do freelance work or

12   any other employment other than your work at the

13   property appraiser's office?

14        A    Yes.

15        Q    Okay.  Tell me about that.

16        A    So I -- the most of the work that I'll do

17   is sort of in my own free time, the weekends and the

18   evenings, mostly is data analysis for different

19   campaigns or committees.  There's a few campaigns

20   that I'll be more hands-on -- hu- -- I'm sorry,

21   hands-on with.

22             But for the most part, a lot of my work

23   will be sort of analysis for campaigns.  Again,

24   mostly providing sort of breakdowns of districts,

25   cities, jurisdictions, what is your election likely



MATTHEW ISBELL                                    November 26, 2024
HODGES vs PASSIDOMO                                              22

1    to look like, who should you target, a lot of

2    them -- a lot of analysis in that sort of field.

3          And I do that off and on.  I take clients

4    as I can sort of fit it into my schedule and not

5    burn myself out too much, I'd say.  So, yeah.

6      Q    Is that an arrangement that you have with

7    the property appraiser that you're allowed to do the

8    secondary work on nights and weekends?

9      A    Yes, I'm allowed to do that, you know, as

10   long as there's no obvious conflict, you know; like

11   if it's something that -- like, I try to kind of

12   steer away from anything that might be -- like, I

13   guess you'd say, like you really wouldn't want to do

14   work that's a little too close to home in a way.

15   That's just more good form.

16         So I mostly do work for campaigns outside

17   of the city and -- and such -- and, yeah -- yeah.

18   It's basically the property appraisers, as long as

19   we're not doing it on company time, you can do as

20   you please.

21     Q    So you wouldn't represent a candidate

22   that's running against your boss?

23     A    Exactly.  Yeah, that -- I like my boss, so

24   yeah, I wouldn't.

25     Q    Okay.  You've also maintained either a



1   website or a substack through this process between

2   2017 and the present; is that correct?

3       A    Yes, I have a website, MCIMaps.com, and

4   the substack, which is MCIMaps as well.  The

5   substack is primarily for shorter articles, and the

6   main website, MCIMaps.com, is for much more

7   detail-dense stuff.

8       Q    Do you consider that to be a part of what

9   you do separately from the data analysis that you do

10  for campaigns?

11      A    Yes, I mean -- yes.  The work I do for my

12  website and my substack is largely me wanting to --

13  whether comment on Florida politics or national

14  politics, but also to cover international stuff.

15  I'm certainly a, I guess you would say, a nerd.  You

16  know, I've always loved this kind of analysis --

17  history, too.  I have a lot of history stuff I

18  write.

19          So yeah, it -- it's separate.  You know,

20  I -- I -- you could say it's part of like -- it's

21  just part of like what I personally care about, you

22  know, those -- I pick what I want to write about for

23  the most part, you know.

24      Q    Do you have any social media accounts that

25  you use?



```
 1        A    Yes, I have an Instagram and a Twitter, X,
 2   whatever you want to call it.  Bluesky I just
 3   started on.  So, yeah, Facebook.
 4        Q    What is your Instagram handle?
 5        A    I believe it's Mat -- well, I have an
 6   official Instagram for MCIMaps on Instagram, and I
 7   have a personal Instagram that is MattDem, I
 8   believe.  I'll be honest, I can't remember the exact
 9   username.  I'm not on it that much.
10        Q    You said MattDem?
11        A    Yeah, like as in Democrat.  I believe it's
12   something like that.  Search Matthew Isbell; you'll
13   find me.
14        Q    Okay.  And your Twitter or X account,
15   what's your handle for that?
16        A    The X account is @MappingFL, as in
17   Florida.
18        Q    Did you previously have a different X or
19   Twitter handle?
20        A    I did.  I had a MCIMaps Twitter account.
21        Q    What happened to that one?
22        A    It got suspended because I was commenting
23   on -- one of the big issues was I was commenting on
24   a coup in Myanmar that was happening at the time.
25   And I essentially expressed that I had no sympathy
```



1  for the people doing the coup or the people being

2  couped.  And I got -- this is back in 2020, when I

3  think X was doing a lot of like nuking accounts for

4  like anything that was considered controversial or

5  like perceived as violence, even though it wasn't.

6         And I lost the account and I appealed it

7  and it just did not come back.  They rejected the

8  appeal.

9     Q    So you rebooted under MappingFL?

10    A    Yep, correct.

11    Q    What is your Bluesky handle?

12    A    MCIMaps.

13    Q    MCI are your initials, correct?

14    A    Yes.

15    Q    Do you have a Snapchat account?

16    A    No.

17    Q    Okay.

18    A    I used to, but I never really used it.

19  I -- mostly for my sister, and she stopped using it,

20  so I think I deactivated it.

21    Q    Do you use any other apps or

22  communications infrastructures to communicate about

23  topics?

24    A    Other than text messaging, I don't recall

25  anything else I've used, especially in the last



 1   several years.

 2        Q    Do you have a Signal account?

 3        A    No.

 4        Q    Telegram?

 5        A    No.

 6        Q    WhatsApp?

 7        A    I think I had WhatsApp for a short bit,

 8   but only to communicate with, for example, my

 9   attorney here every now and then as he's traveling

10   overseas.

11        Q    And just to interrupt; I don't want you to

12   tell me anything about your conversations with your

13   attorney.

14        A    Of course.  Of course.  But, yeah, I've

15   had it once or twice to use for international

16   contact.

17        Q    Other than the -- the websites and the

18   social media handles that we discussed, are there

19   any other that -- any other accounts or methods that

20   you use to communicate about politics or

21   redistricting?

22        A    No, not that I recall.

23        Q    This may be clear already from the

24   context, but the candidates and the political

25   parties you represented are all aligned with the



1   Democratic party?

2        A    Yes.

3        Q    You yourself are a Democrat?

4        A    Yes.

5        Q    And the purpose of these committees is to

6   try to elect Democrats to political office?

7        A    Yes.

8        Q    Is that a goal that you share as well?

9        A    Yes.

10        Q    Let's talk about the most recent

11   redistricting cycle in Florida, the -- and for ease

12   of reference, we'll say it's the one that started in

13   2020.  What was your involvement in that cycle?

14        A    So for a while, I was never sure what my

15   direct involvement would be.  My intention was

16   always to be, similar to the 2015 and 2016 cycle, to

17   be a public voice on the issue.  And I was, you

18   know, looking to see at different points, you know,

19   waiting for the census data.

20             You know, there was obviously a bit of a

21   delay in a lot of things because of the census

22   delays.  But in general, in that early process, I

23   was -- basically always knew I'd be involved.

24   Exactly what realm I would be involved, you know, if

25   I would either work for a specific group or I would



```
 1   just sort of do my own thing, it was unclear for a
 2   little while, you know.
 3        Q    Okay.  When did it become more clear?
 4        A    Around 2021, at least in terms of I
 5   made -- I made -- I had a -- I created a contract
 6   with the People Over Profits committee, which is
 7   made up of a -- of assorted different Demo- --
 8   largely Democrats, Sean Shaw and a couple of others,
 9   who would go- -- who wanted to essentially say --
10   because I knew I wanted to do a lot of redistricting
11   work, but I also, you know, have clients.  I didn't
12   want to, you know, sort of overextend myself.
13            And the agreement we came up with was that
14   I would, you know, get a monthly stipend to write
15   articles to cover the redistricting cycle as I saw
16   fit; you know, basically to -- with -- with
17   editorial, complete editorial control myself to
18   write.
19            So it was sort of like a:  We're paying
20   you, cover it -- you know, essentially it was paying
21   me so that I could not take on a couple extra
22   clients to, you know, try to, you know, keep my
23   budget in line and I could focus on the research and
24   the redistricting and everything like that.  So that
25   started around the summer of 2021.
```



1       Q    Okay.  Who's Sean Shaw?

2       A    Sean Shaw is a former state representative

3   who's in the Hillsborough area.  He was a county

4   commission candidate just this last cycle here.  I

5   can't remember the exact term he was in the state

6   House, but I've known him off and on for, you know,

7   several years.  Not really close, but...

8       Q    He ran for Attorney General as well,

9   didn't he?

10      A    Correct, I forgot about that.

11      Q    And you mentioned, he is associated with

12  the People Over Profits committee?

13      A    Yes.

14      Q    Okay.  Tell me more about that committee.

15      A    I'll be honest, I do not know that much

16  else about it.  I just know that it's a political

17  committee that essentially contracted me.  What they

18  do in terms of campaigns, I don't especially know.

19      Q    Who else do you know that is associated

20  with that committee, other than Sean Shaw?

21      A    At the time, I knew that Dan Newman was

22  associated with it.  I believe Christian Ulvert was

23  associated with it to some degree, and Jena Kingery

24  was associated with it.

25      Q    Who's Dan Newman?



1      A     Dan Newman is a political consultant.  He

2  was the former head of House Victory back in the

3  2015, 2016 era.  And he is still a consultant to

4  this day.

5      Q     Consultant for Democratic candidates?

6      A     Largely, yes.  I can't speak to every

7  client he works for.

8      Q     Your interactions, though, with him have

9  been in the context of working for Democratic

10  candidates?

11      A     Yes.

12      Q     Who's Christian Ulvert?

13      A     He is a -- also a consultant.  He also has

14  done work with the state party, and just in a

15  similar vein to Dan Newman, a candidate I largely

16  worked with in the issue of Democratic campaigns.

17      Q     And who is Jena Kingery?

18      A     Jena Kingery is a -- also a consultant,

19  predominantly a fundraiser.  She also works for

20  different campaigns, and I'm also personal friends

21  with her.

22      Q     Other than those three and Sean Shaw, who

23  else is associated with the People Over Profits

24  committee?

25      A     No one else that I can recall.



1      Q    Tell me a little bit more about the work

2    you did.  You said you were -- you were "paid a

3    monthly stipend by the People Over Profits committee

4    to write articles about the redistricting process"?

5           Did I get that right?

6      A    Correct.  Yes.  It started off with doing

7    a series of histories of redistricting in Florida,

8    and then transitioned into analysis of the 2022

9    cycle itself.

10     Q    Okay.  With whom did you communicate about

11   the articles you were writing?

12     A    The person I primarily communicated with

13   was Jena Kingery, largely in the vein of updating on

14   what topic I was going to cover and when I would

15   have the article ready.

16          They would send the articles out via email

17   campaign, and so I would submit, like, a couple,

18   like, sort of sentences as a summary.  It's, like,

19   here's the summary; go here to read it.  And so most

20   of the contact was about scheduling and items like

21   that.

22     Q    You said "they would send the articles out

23   by email."  The People Over Profits committee had an

24   email list that they would send that out to?

25     A    Correct.



1      Q    Did anyone associated with that committee
2  explain to you why they were paying you to write
3  these articles?
4      A    No, not that I really recall.
5      Q    Do you have any independent reason to know
6  why they were paying you to write these articles?
7      A    My general vibe is that we all were in the
8  same boat where we believed that the most important
9  thing with the redistricting cycle was to have open,
10  like, conversations about it; because there was a
11  concern that the Republicans that controlled the
12  legislature would try to gerrymander the maps under
13  the cover of darkness.
14         So the main goal was to, like, be talking
15  about the issues, explaining the history, why these
16  districts look the way they do.  And then explain
17  how they might try to be gerrymandered again, what
18  might be alternative maps, and to essentially to
19  sort of be a check on what the legislature was going
20  to be doing and arguing when they started submitting
21  their maps later in the 2021 year.
22      Q    Okay.  Did you believe that the maps that
23  resulted from the redistricting litigation last
24  cycle were gerrymandered?
25      A    When you say "litigation," the legislative



1   maps or the Congressional map that's in litigation?

2       Q    Let me be clear.  I'm talking about the

3   litigation after the 2012 redistricting cycle, the

4   maps that were in place at the beginning of this

5   cycle.  Did you believe that those maps that were in

6   place before the most recent redistricting cycle

7   were gerrymandered?

8            MS. McNAMARA:  Objection to the form.

9       A    I'll be honest, so to clarify what you're

10  asking, the maps that they passed after the 2015 --

11  because they changed two maps in 2015.

12           My opinion that I've stated on the record

13  is the Congressional map that passed in 2015 was

14  predominantly fair.  The state Senate map was

15  predominantly fair as well with a couple of issues;

16  I had issues with the Tampa Bay at the time.

17           The House map, which was not taken up in

18  the 2015 issue, I believe to be a gerrymander.

19  BY MR. NORDBY:

20      Q    Other than your contract with the People

21  Over Profits committee to write articles, how were

22  you involved in the redistricting cycle after the

23  2020 census?

24      A    My primary involvement then was doing --

25  and basically my People Over Profits contract went



1   from -- through the end of 2021.  And af- -- so
2   after the end of the -- after the turn of the new
3   year, when the 2022 began, I was primarily covering
4   the redistricting cycle just as sort of part of my
5   newsletter and my substack.
6          When I started doing data work for
7   campaigns, that started to emerge after the maps, I
8   cannot especially recall the timeline.  But my
9   contract with People Over Profits essentially just
10  went from like sometime in the summer through the
11  end of December of 2021.  And then 2022 and onward,
12  the articles that I'm writing are entirely just sort
13  of my own analysis of it that I was doing because I
14  just was, you know, cared about it.
15      Q    Were you doing freelance work for the
16  Florida Democratic Party in 2021?
17      A    I don't recall.  I'm -- I don't recall
18  exactly when.  I most likely did.  But I cannot
19  recall specifics because I -- with the Florida
20  Democratic Party, especially, it'll come and go.  I
21  might get contacted:  Hey, Matt, we -- we need an
22  analysis of any race or, you know, if they have a
23  question about something, I do it and then it wraps
24  up.  So that stuff can be off and on.  There was no
25  extended contract, I -- as best as I can recall.



1        Q    Okay.  The -- the legislature first

2    published its maps in late 2021; is that right?

3        A    As best I recall, yeah.

4        Q    Okay.  Would you have done any data

5    analysis on those maps for the Florida Democratic

6    Party?

7        A    I don't recall doing anything directly for

8    the party.  I was doing analysis on my substack and

9    on my website, and that was part of my coverage at

10   the time.  And still in 2021, I was doing work with

11   People Over Profits, so at least a few of the

12   articles I was writing were then also kind of

13   covering -- there was -- essentially, the way you

14   would look at it at the time is anything on my

15   substack in 2021 was just me writing because I

16   wanted to write it.  And then anything on my main

17   site, MCIMaps.com, specifically the articles

18   entitled the Florida Redistricting Tour, those were

19   part of the People Over Profits.

20            I don't recall if at that time in the

21   fall/winter of 2021 the state party asked me for

22   something.  I don't recall.

23       Q    You mentioned your contract with People

24   Over Profits ended at the end of 2021?

25       A    Correct.



1    Q    Okay.  Let's think about early 2022 then.
2  After your contract with People Over Profits had
3  ended, the redistricting process was still playing
4  out.  Were you doing data analysis for the Florida
5  Democratic Party then in 2022 during the legislative
6  session?

7    A    If -- I don't really recall.  Most of the
8  work I was doing at the time, especially
9  redistricting-wise, was just me covering stuff for
10  my own public substack.

11         I don't want to state for sure that I
12  wasn't because it's simply a matter of such a
13  chaotic time when the party might have asked me for
14  some data, and whether or not that was related to
15  redistricting at all, I can't recall.  They might
16  have, you know -- I don't want to say "no" and then
17  it turns out that I did like a project that had
18  nothing to do with it.  So as best I recall, no.

19    Q    If the Florida Democratic Party was paying
20  you for work during that time period, who would be
21  the payee on the campaign finance reports?

22         MR. JUNNIER:  Objection.  That calls for
23     speculation.

24    A    I don't recall.

25



1  BY MR. NORDBY:

2      Q    Let me rephrase that.  Were you paid

3  individually, or did you have some sort of company

4  or corporation set up that contracted with the

5  Democratic party?

6      A    My -- my -- my LLC, MCI Maps, LLC, is

7  where all of my campaign and data analysis payments

8  go to.

9      Q    The paychecks would have been made out to

10 MCI Maps, LLC?

11     A    Correct.

12     Q    Similar question but about candidates for

13 office or officeholders.  Did you do any work during

14 this time period for any officeholders or

15 candidates?

16     A    The truth is I just do not remember the

17 exact timeline of when I might have started working

18 for a candidate or doing a one-off analysis for a

19 candidate, at any given period.

20         My -- my own calendar in my head is very

21 fuzzy about exact timelines of when I might have

22 been contracted.  And whether or not that was just

23 to like do a one-off analysis, you know, I just --

24 the timeline I can't recall.

25     Q    I understand.  This was almost 3 years ago



 1   now, right?

 2        A     Yeah.

 3        Q     People's memories fade over time.

 4        A     (Nods head.)

 5        Q     Okay.  Did you -- did you talk to any

 6   legislators about the proposed maps and how they

 7   might affect their political futures?

 8        A     I do recall -- the one conversation I

 9   real- -- I especially recall was discussions with --

10   and I don't remember the timeline of it, but

11   discussions with Lauren Book over -- there was --

12   you know, the big issue was maps would come out --

13   and whether or not I had this conversation with

14   anybody else, I don't recall.

15             I just remember the Lauren Book

16   conversation because they were trying to confirm

17   different drafts, who -- is the senator living in

18   the district based on the draft, trying to confirm

19   things because I was sort of viewed as like the map

20   expert to essentially be like -- essentially, the

21   way it would go is we're not sure about something,

22   call Matt.  Or hey, Matt, can we have a conversation

23   tonight, can you confirm what drafts are doing what?

24   You know, how, you know --

25             And so there was definitely a conversation



1  about whether or not Senator Book was in the

2  district, like, which district she was in based on

3  the different drafts.  So that's the one I recall.

4         Whether or not there were others, I don't

5  recall, but that would have generally been kind of

6  the vibe of different conversations, if any

7  occurred.

8     Q    Uh-huh.

9     A    I do also recall this largely -- there

10 were at least two conversations with State

11 Representative Allison Tant before drafts came out.

12 Before the initial drafts from the legislature came

13 out, I had a meeting with Representative Allison

14 Tant and Representative Ramon Alexander, who was

15 still the state rep for the House district at the

16 time, about trying to think about what the maps

17 might look like, because Tallahassee and the general

18 Panhandle region was underpopulated and would have

19 to change.

20         And obviously with House District 8

21 there's different mandates about racial

22 representation.  You know, there's competing; you

23 know, the rural counties want to maintain a cohesive

24 sort of district, and essentially the meeting was

25 about trying to look at well, okay, what do the



1    population numbers look like, what would the

2    districts have to change, and how can you change

3    them in a way that balances the racial

4    considerations, you know, geographies wanting to be

5    together.

6            And then after the initial maps came out,

7    I believe I had a conversation with Representative

8    Tant at one point about the two different drafts.

9    There were two very different drafts.

10           One cracked Tallahassee three different

11   ways; that was largely viewed as a Republican

12   gerrymander.  And so I definitely at least had a

13   conversation about -- with her about that.  The

14   exact specifics I cannot recall.  Generally like,

15   oh, this map is terrible kind of dynamic.

16           I've known Representative Tant since 2012,

17   and I consider her a good friend so, you know, it's

18   also more like, you know, complaining, like, about

19   the proposal.

20           So those are the like official

21   conversations I can certainly remember.  There might

22   have been others, but I don't recall.

23       Q    Okay.  Might you have talked to Senator

24   Ausley?

25       A    I don't recall talking to Senator Ausley,



1   but -- I don't recall, to be honest.

2       Q    Okay.  How about Senator Polsky?  Do you

3   recall any conversations with her?

4       A    No, I don't recall.  I'm trying to

5   actually remember -- I don't recall.

6       Q    Senator Bracy, do you recall talking to

7   him at all?

8       A    I do think I had a conversation with

9   Senator Bracy, but I'll also be honest, I just -- I

10  cannot remember if these would have been a

11  conversation I would have had directly.  Sometimes I

12  would interact with people on social media.

13  Sometimes the senator would actually, like, reply,

14  you know.

15          Senator -- you know, Senator Bracy, I

16  certainly was -- I -- there might have been a

17  conversation, but I'll -- about the Orlando area,

18  because there was a lot of debate about the

19  maintaining of a black access seat in Orlando.  I

20  was a firm believer that the -- specifically the

21  state House plan for Orlando was terrible, that it

22  was hurting black voters by splitting them up

23  between two districts, which is what it does today.

24  And -- but whether or not there was like a formal

25  conversation or not, it's -- I don't recall.  It's a



1    very hazy and chaotic time in my head.

2        Q    Your memory would have been better if I

3    were to have taken your deposition two years ago?

4        A    Yes.

5        Q    Did you speak with any staff members for

6    the legislature, either legislative aides or caucus

7    staff?

8        A    My -- one of my friends is Dave Spore.

9    He's a state House -- he's a staffer for the state

10   House.  He deals with healthcare stuff.  You know,

11   there was -- and it's in -- it's in the subpoenaed

12   documents, so there's like one or two times where

13   I'd ask him, hey, do you know when the committee

14   schedules are for something.

15            But for the most part because he was,

16   like, you know, Fair District rules, we didn't want

17   anything -- we -- I mean, I'm friends with Dave, but

18   we would just not talk about redistricting stuff.

19            I would have talked with some staffers of

20   Representative Tant during the planning of the

21   meetings, and there might have been other staff on

22   calls or something.  But I'll be honest, I don't

23   recall any specific names or anything like that.

24       Q    Could you elaborate a little more on the

25   "Fair District stuff I don't want to talk about with



1   David Spore" that you just mentioned?

2       A    Well, no -- sorry.

3       Q    What was the concern about that?

4       A    Well, what I -- what we wanted to make

5   sure about was because Fair Districts mandates that,

6   you know, the legislature draft its maps without the

7   consideration of partisanship, and I am, of course,

8   as a political, you know, campaign guy on Democratic

9   sides, what we didn't want is for it to seem like I

10  was talking to Dave about redistricting stuff in a

11  way to try to feed anything.

12           So, you know -- and Dave, you know, he's a

13  healthcare analyst for the House, so it very much

14  was a:  That's not what we would talk about.  We

15  would just talk about the things we normally talk

16  about in our day-to-day lives.  Because I've known

17  Dave for over 10 years now.

18      Q    In your role as an outside analyst, you

19  had no issues taking partisanship into account; is

20  that fair to say?

21           MS. McNAMARA:  Objection to the form.

22      A    Yeah, I mean, that is -- I didn't -- me

23  using partisan data, the main reason I would ever

24  use partisan data for my mapping analysis was, A,

25  reactive analysis about what does the partisanship



1    of this look like.

2              And then if I was drafting a map proposal,

3    I would only use partisanship especially to verify

4    under the concepts of -- of analysis about whether

5    or not a district performed for a minority

6    candidate.  So you get into the issue of functional

7    analysis -- for some reason we're like skimming the

8    micro over there -- the functional analysis, which

9    is that you might say okay, how does a primary look?

10   How does it look in a general, you know, to

11   determine if a district performs for a minority

12   candidate?

13             I was not -- yeah, that was the primary

14   use of me using partisanship.

15   BY MR. NORDBY:

16        Q    Those weren't considerations though in

17   your conversation with Senator Book, were they?

18        A    No, the conversation with Senator Book

19   largely revolved around the question of whether or

20   not she lived in which district, as best I recall.

21        Q    Do you recall any conversations with David

22   Grimes?

23        A    I've known David Grimes off and on for

24   several years, but he was very -- we really didn't

25   see each other a lot during the redistricting time.



1   And he was obviously, I imagine, very busy in the

2   Capitol.  I only see him every now and then out in

3   the open.

4            We never had a conversation about, like,

5   in-detail redistricting stuff. I might have messaged

6   him at one point asking about a committee schedule,

7   again, in that respect, you know, trying to confirm

8   when something is.  But we did not have any in-depth

9   conversations about redistricting during the

10  redistricting session.

11       Q    And just to clarify, who is David Grimes?

12       A    So David Grimes is -- I don't know what

13  his exact title is.  He works for the state House;

14  he's like counsel, or like he's -- I think he's the

15  head of the staff at this point.  I don't know the

16  exact title, but he's been with the House, State

17  House Caucus for a long time, but I'm not sure of

18  the exact timeline.

19       Q    That's the Democratic Caucus?

20       A    Democratic Caucus, yes.

21       Q    Did you have any conversations with John

22  Tobet (phonetic)?

23       A    Not that I recall.

24       Q    Do you know who he is?

25       A    No.



1      Q     Did you have any conversations with Joe

2  Dye?

3      A     Yes, I had a couple of conversations with

4  Joe Dye.

5      Q     Who is Joe Dye?

6      A     So at the time that I first talked with

7  him, he was either still with the House Caucus or he

8  was about to leave.

9      Q     That's the Democratic Caucus?

10      A     The Democratic Caucus, yes.  He was, I

11  think, about to leave, and I don't remember the

12  timeline exactly of when he left, but I believe it

13  was sometime in the late 2021 that he reached out to

14  me.

15      Q     Okay.  What conversations do you recall

16  having with him?

17      A     He was very frustrated with how the

18  redistricting session was going, and he initially

19  was kind of reaching out to me -- he reached out to

20  me on Twitter versus -- through DMs to complain

21  about the process.

22           And I think -- and then we had like a

23  phone conversation at one point where, likewise, he

24  was venting about the process.  And I think we

25  maintained, you know, off-and-on communication



1  through the rest of the cycle.

2           I was -- he would basically just reach out

3  to me, vent about something.  I was in large

4  agreement about, you know, being frustrated, burned

5  out by every -- the process was going on and on.

6  But that was sort of the gist of it.

7       Q    Okay.  Do you know Nicholas Warren?

8       A    Yes.

9       Q    Did you speak with him during the process?

10      A    Yes.

11      Q    What did you talk to Mr. Warren about

12  during the process?

13      A    So I've known -- I've known Nick Warren

14  for about, I'd say almost 10 years, a little less.

15  You know, not a -- we've gotten to know each other

16  more over time.  I would largely -- Nick was a very

17  good resource in terms of, like, helping me

18  understand the legalese, a lot of the legal cases.

19          Like, as I have learned more about

20  redistricting over the last 10 to 15 years, I

21  started off like having a general value system about

22  what -- how a map should be drawn, but there's a lot

23  of legal precedent.  I mean, there's laws and then

24  there's court cases that sort of changed mandates.

25          And Nick really helped me understand



 1    correctly what precedents were currently in place,

 2    what is Fair Districts mandates versus VRA, Voting

 3    Rights Act, mandates, which I was at different times

 4    getting confused.  You know --

 5         Q    Uh-huh.

 6         A    -- so Nick especially was helpful in sort

 7    of making sure I was getting the case law right and

 8    understanding what was mandated; you know, that

 9    there are certain districts that are either

10    protected and they're protected because of the

11    Voting Rights Act or Fair Districts, what is guiding

12    that?  That was -- that was a large part of our

13    conversations.

14         Q    You mentioned a moment ago the Florida

15    constitutional requirement that districts can't be

16    drawn with the intent to favor a political party --

17    or favor or disfavor a political party or incumbent;

18    is that right?

19         A    Correct.

20         Q    That's your understanding of that

21    provision?

22         A    Yes.

23              MR. NORDBY:  We've been going for about an

24         hour.  Do you want to take a short break?

25         We're about to get into some documents.



```
 1              THE WITNESS:  Yeah, let's take like a
 2      5 minute at least for now.
 3              MR. NORDBY:  Let's do that.
 4              THE VIDEOGRAPHER:  The time now is
 5      9:55 a.m.  We're off the record.
 6              (A recess took place from 9:55 a.m. until
 7      10:05 a.m.)
 8              THE VIDEOGRAPHER:  The time is 10:05 a.m.
 9      This is the beginning of Media Unit 2.  We're
10      back on the record.
11  BY MR. NORDBY:
12      Q    Welcome back, Mr. Isbell.  What did you do
13  to prepare for your deposition today?
14      A    Spoke with my attorney.
15      Q    I don't want to ask -- I'm not asking you
16  any questions about your conversations with your
17  attorney.
18              Other than those conversations, what did
19  you do to prepare?
20      A    That's it.
21      Q    Did you review any documents?
22      A    Yes, with my attorney.
23      Q    Okay.  What documents did you review?
24      A    The documents that were subpoenaed
25  initially as part of the lawsuit.
```



```
 1        Q     Are those the documents that you turned
 2   over in the BVM lawsuit --
 3        A     I --
 4        Q     -- in response to the subpoena?
 5        A     The documents that I turned over in the --
 6   yeah, the subpoena for both the Congressional
 7   lawsuit from before and the one that's for this,
 8   which there was some overlap.
 9        Q     Anything else you did to prepare for this
10   deposition?
11        A     No.
12        Q     Did you speak with anyone other than your
13   attorney about your participation in the deposition
14   today?
15        A     My work knows that I'm at the deposition
16   because I had to request administrative leave and,
17   you know, mentioning to family and a couple of
18   friends, oh, I have to sit for a deposition.
19        Q     Which friends did you speak to?
20        A     Just different friends I have.  My
21   friend -- Danielle, my friend, you know, different
22   folks.
23        Q     Anyone else, other than Danielle?
24        A     Several, like just Chelsea, you know,
25   Anders, my sister, my dad.  Just mentioning that
```



1    the -- the deposition was happening.

2         Q    Okay.  Are your sister or your dad at all

3    involved in Florida politics?

4         A    No.

5         Q    Okay.  I'm going to ask you about the

6    other folks that you mentioned then.  Who

7    specifically did you talk to?

8         A    To mention that I have a deposition at

9    all, which is the extent of it:  Dave.

10        Q    Can you give me last names?

11        A    Dave Spore, Anders Croy, John Webber.  And

12   I'm not honestly sure -- Jena Kingery, Ben Sharpe, I

13   believe.  And I can't -- I can't honestly recall

14   everybody that I might have mentioned it to.

15        Q    You mentioned someone named Danielle.  Who

16   is that?

17        A    My friend who I met in college.

18        Q    What is her last name?

19        A    Criss.

20        Q    We spoke earlier about Dave Spore; did we

21   not?

22        A    Yes.

23        Q    Is he a staffer for a health committee of

24   the Florida legislature?

25        A    He's their health expert for the -- I



1   think the Democratic Caucus.

2       Q    Who is Anders Croy?

3       A    He is a political consultant who works

4   for, I believe, Florida Watch right now.

5       Q    Who is John Webber?

6       A    He is also a political consultant.  He

7   works for the Southern Poverty Law Center now, and

8   he worked for -- I don't remember who he worked for

9   before.

10      Q    We spoke earlier about Jena Kingery; did

11  we not?

12      A    Yes.

13      Q    What does she do?

14      A    She at this point I believe works for

15  Senate Victory in fundraising, although I'll be

16  honest, the title I'm not sure of.

17      Q    Who is Ben Sharpe?

18      A    Ben Sharpe is also a political operative.

19  I'm -- he runs his own consulting firm.  I'm not

20  sure if he's hired by anybody specifically right

21  now.

22      Q    And who is Danielle Criss?

23      A    My friend from college.

24      Q    Okay.  Is she otherwise involved in

25  Florida politics?



1      A    No, she lives in California.

2      Q    You mentioned someone named Chelsea?

3      A    Yes.

4      Q    Who -- who's that?

5      A    She's another friend of mine.  She lives

6   in Tennessee.

7      Q    Is she involved in Florida politics at

8   all?

9      A    No.

10     Q    Why did you speak with Dave Spore, Anders

11   Croy, John Webber, Jena Kingery, and Ben Sharpe

12   about your participation in the deposition today?

13     A    The only --

14          MS. McNAMARA:  Objection to the form.

15     A    Yeah, the only thing was to mention, oh, I

16   have to sit for a deposition.  And, you know,

17   obviously it's first time, it's like, you know, a

18   whole thing.  So it was just really to mention --

19   kind of like if I had to mention I had jury duty.

20   That was the extent of it.

21   BY MR. NORDBY:

22     Q    Did they respond to that at all?

23     A    That's -- you know, in general, like, oh,

24   that stinks.  Like, these are people I've been

25   friends with for years.



MATTHEW ISBELL                                    November 26, 2024
HODGES vs PASSIDOMO                                              54

```
 1        Q     Why did you mention your participation in
 2    this deposition to those individuals?
 3        A     Because they're my friends.
 4        Q     Were those communications in writing or
 5    orally?
 6        A     I'll be honest, I can't remember what
 7    was -- might have been in writing or might have been
 8    when I came out of the bar one night.
 9        Q     And when did those conversations happen?
10        A     Over the course of since I was deposed.
11        Q     So do you still have Exhibit 1 in front of
12    you?
13        A     Yes.
14        Q     You see on page 3, the subpoena was issued
15    on October 31st?
16        A     Yes.
17        Q     It's now November 26th?
18        A     Yes.
19        Q     These conversations happened in -- within
20    the last month then?
21        A     Yes.
22        Q     But you don't recall what the substance of
23    them was, other than what you've already testified
24    to?
25        A     They were that I had to sit for a
```



 1  deposition.

 2      Q    Okay.  You didn't communicate at all about

 3  the substance of what the deposition might cover?

 4      A    I might have mentioned that it was about

 5  the state Senate lawsuit, but not specifics.

 6      Q    Okay.  Let me ask you specifically about

 7  Jena Kingery.

 8      A    Uh-huh.

 9      Q    You said she -- she's in charge of the

10  Florida Senate Victory program for the Florida

11  Democratic party?

12      A    She's involved in it.  Whether she's in

13  charge of it, I'm not sure about the titles or

14  anything like that.

15      Q    Her -- her job involves attempting to get

16  more Democrats elected to the Florida Senate?

17      A    Yes.

18          MS. McNAMARA:  Objection to the form.

19  BY MR. NORDBY:

20      Q    Do you understand my question?

21      A    Yes.

22      Q    And you communicated about the fact that

23  you were sitting for this deposition with her?

24      A    Yeah.

25      Q    For what purpose?



1      A    She's -- Jena is a good friend of mine,

2    and it was -- and this was, again, in the context of

3    oh, man, I have to sit for a deposition.  Part of my

4    language was like oh, that sucks.  Just because it's

5    obviously, you know, it's a very formal thing,

6    you've got to take time off work, you've got to

7    prepare for it.  So it was more just -- I would

8    really characterize it as the equivalent of

9    complaining to friends that you have jury duty.  You

10   know, there wasn't talk of specifics.

11     Q    Okay.  Did you have any conversation about

12   what your testimony might be at the deposition?

13     A    No.

14     Q    Have you shared any of these documents

15   that you provided in response to the document

16   subpoena with any of these individuals?

17     A    No.

18     Q    Is there anyone else that you've provided

19   any of those documents to other than to the lawyers

20   in response to the subpoena?

21     A    No.

22     Q    All right.  Did you speak about this

23   deposition with any reporters?

24     A    One reporter -- one reporter had actually

25   reached out to me about -- actually not deposition,



1   but the subpoenas, Andrew Pantazi.  And that was

2   mostly that he had been subpoenaed for documents and

3   was asking, you know, like, basically like if I had

4   too, because I guess my name was on the list of, you

5   know, evidence gathering.

6           And I said, yes and that I really, you

7   know, couldn't talk about it because I only talk

8   with my attorney.  But about the deposition itself,

9   I don't recall.  I don't believe so, but I don't

10  recall for sure.

11      Q    All right.  Did you speak with -- do you

12  know any of the plaintiffs in this case?

13      A    I know Nick Warren.  I don't -- oh, in

14  terms of, like, the actual people doing the suit?  I

15  don't believe.

16          Is the names on here by any chance?

17          MR. NORDBY:  Do we have a list?

18  BY MR. NORDBY:

19      Q    I'll give you a copy of the complaint.

20      A    Okay.

21          THE STENOGRAPHER:  Thank you.

22      A    So the names at the top here?

23  BY MR. NORDBY:

24      Q    Yes.  So, Mr. Isbell, this is a copy of

25  the complaint filed in this case.  Have you seen



1    this document before?

2         A    Yes.

3         Q    Okay.

4              MR. NORDBY:  We'll call this Exhibit 2.

5              (Exhibit 2 was marked for identification.)

6    BY MR. NORDBY:

7         Q    The names listed above "Plaintiffs" on the

8    first page are the actual individual plaintiffs in

9    this case.  Do you recognize any of their names?

10        A    No, I don't.

11        Q    As far as you know, you haven't spoken to

12   them?

13        A    As far as I know.

14        Q    Have you spoken with any of the attorneys

15   in this case for the plaintiffs?  Not your attorney

16   but the attorneys for the plaintiffs?

17        A    No, not that I recall.

18        Q    You said you've known Mr. Warren for more

19   than 10 years.  Have you not spoken with Mr. Warren

20   about this?

21        A    Not about the deposition, no.

22        Q    Okay.  What about the case more generally?

23        A    I don't believe we've really talked about

24   the case once the case got filed.  We talked about

25   Tampa Bay at different points before, but I -- I



1   don't recall once the case was filed talking with

2   him about it.

3        Q    You wrote about the case on your social

4   media at least, correct?

5        A    I mentioned it, yes, but I don't recall

6   doing an article or a piece on it.  I just never

7   really had the time to get to it.  But I probably

8   mentioned that the case was happening on my social

9   media.

10       Q    Have you communicated with Mr. Warren

11  about the case since it was filed?

12       A    Not that I recall.

13       Q    You may have or may not have?

14       A    Correct.

15       Q    You said specifically "since it was

16  filed."  Did you speak with Mr. Warren about this

17  case before it was filed?

18       A    I don't recall.  I don't know if I even

19  knew the case was being filed.  I'll be honest, I

20  don't recall exactly which -- what conversations

21  about a case specifically versus the broad issue of

22  Tampa Bay.

23       Q    Let me ask you about the second then.  The

24  broad issue of Tampa Bay, have you talked to

25  Mr. Warren about that?



1      A     Yes.

2      Q     Okay.  Tell me about those conversations.

3      A     Most of those conversations were taking

4  place before the -- the original draft maps came

5  out, but then also once there were drafts and

6  debates, you know, about the different state Senate

7  drafts.

8            The issue of Tampa, it was an issue I

9  cared about way back in 2015.  So I was always kind

10  of mindful about whether or not the whole Bay

11  crossing thing would continue again in the new maps.

12  So there was at least some conversations before

13  the -- I was going to say before the -- before the

14  initial drafts came out about whether or not -- what

15  they might drew (sic) and what different legal

16  mandates there were.

17            And then once maps came out, I'm pretty

18  sure we talked about it once or twice, commenting on

19  it.  So I can't remember the exact specifics, but,

20  yeah, conversations in that vein.

21      Q     Did you speak with anyone else about your

22  participation in this deposition?

23      A     I don't recall.

24      Q     Did you speak with anyone else about your

25  response to the document subpoena?



1         A     Could you clarify the question?

2         Q     Sure.  You mentioned that you'd received a

3    subpoena for documents in the prior litigation,

4    correct?

5         A     Yes.

6         Q     Okay.  And you turned over documents in

7    response to that subpoena?

8         A     Yes.

9         Q     Okay.  Did you speak with anyone other

10   than your attorney about the fact that you had

11   turned over documents?

12        A     Yes.

13        Q     Who did you speak with?

14        A     The same list you see for the deposition

15   there.  Largely friends.  Probably in that same

16   vein, whether or not it was everybody specifically;

17   friends and family, you know, sort of knew, like, I

18   was having to spend some time.

19              I believe the initial -- the initial

20   subpoena for documents back in the case from 2013 --

21   or not 2013, 2023, the Congressional case -- I

22   believe it stalled me going out to Pensacola to see

23   some family.  I had to prepare the documents, so

24   like hey, I can't come out this weekend.  I need to

25   handle this.  You know, so in that vein, just not



1   about specifics but about the fact that I was having

2   to deal with the document subpoena.

3        Q    Some of the friends that you mentioned

4   earlier are the Democratic Caucus staffers and

5   political consultants for candidates and committees?

6        A    Yes.

7             MS. McNAMARA:  Objection to the form.

8        A    Yes.

9   BY MR. NORDBY:

10       Q    Let me be more specific then.  Did you

11  speak with Dave Spore about that?

12       A    Only in the context that it was like I

13  have to deal with the subpoena.

14       Q    And he works for the Democratic Caucus of

15  the legislature?

16       A    Yes.

17       Q    Anders Croy, you said is a political

18  consultant for Florida Watch?

19       A    Yes.

20       Q    You spoke with him about it?

21       A    To the extent that I mentioned it was

22  happening.

23       Q    John Webber, you said is a political

24  consultant for the Southern Poverty Law Center?

25       A    Yes.



1       Q    You spoke with him about the subpoena?

2       A    Yes.

3       Q    Jena Kingery, who works for Senate Victory

4   for the Democratic Caucus?

5       A    Yes, to let them know it was happening.

6       Q    And Ben Sharpe is another political

7   operative for Democratic candidates?

8       A    Yes.

9       Q    You spoke with him about the subpoena?

10      A    Yes.

11           (Brief pause.)

12  BY MR. NORDBY:

13      Q    Mr. Isbell, I'm going to ask you some

14  questions now about some documents.

15      A    Uh-huh.

16      Q    Many of these documents are documents that

17  you provided in response to that earlier subpoena.

18  So this is not a memory test, again, but I need to

19  ask you some questions about these.

20           Do you recognize these documents?  Take a

21  moment to look at them if you want to.

22      A    Yeah.  These look like some of the

23  different text messages.  Yeah, these look like some

24  of the documents I submitted back during one of the

25  litigations, you know, whichever one it was.



MATTHEW ISBELL                                    November 26, 2024
HODGES vs PASSIDOMO                                            64

1      Q    Okay.  And I'll represent to you that

2   these are some -- this is like kind of a composite

3   exhibit with some messages that you provided in

4   response to that earlier litigation.

5      A    Uh-huh.

6      Q    That seems right to you?

7      A    Yes.

8           MR. NORDBY:  Okay.  Let's call this

9      Exhibit 3.

10          (Exhibit 3 was marked for identification.)

11  BY MR. NORDBY:

12     Q    What is the -- what's this message on the

13  first page appear to be to you?

14     A    I can't remember if it's a -- who Lorraine

15  is or is that Loranne?  I'm not sure.  I'm trying to

16  recall.

17     Q    Is there any chance that's Loranne Ausley,

18  former state senator?

19     A    I don't know.  I don't remember talking

20  with her, so I'm not sure.  I don't think that's --

21  I think that might have been one of the staffers for

22  Allison.  I honestly don't know who that is.

23     Q    So the name at the top of this string is

24  "LA," and it says "Loranne"?

25     A    Oh, so is that Ausley?  That might have



1   been -- that might have been Loranne Ausley.

2        Q    I'm not telling you it is.  I'm asking

3   you.  Do you recall?

4        A    I don't -- I don't recall.  I don't recall

5   who this is.

6        Q    Okay.  These are documents that you

7   provided in response to the subpoena.

8        A    Yes.  I provided a full list of names too.

9   I don't know where that is.

10       Q    Okay.  Is it your understanding that the

11  blue bubbles here are your communications because

12  these are things you provided?

13       A    Yes.

14       Q    Okay.  There's a message in the middle of

15  this page just under the "April 20th, 2022," that

16  is -- appears to be a message from the person you

17  were speaking with.  It says, "Double-checking that

18  nothing changed based on questions yesterday and

19  that the numbers are accurate in these points."

20            Do you see that?

21       A    I do.

22       Q    Okay.  And your response is, "Yes, two of

23  the counties in that district.  I think Union and

24  one other only have 15 percent Af/Am population, but

25  the high Af/Am pop in places like Gadsden County



1   pulls up the average to at least 25 percent."

2          Do you see that?

3      A    Yes.

4      Q    It says, "The 70 percent voter turnout

5   number was pulled from Matt Isbell's analysis."

6      A    And that's what's kind of confusing me

7   because why would I talk like that?  I'm not -- I'm

8   trying to confirm that, if this was me, why would I

9   talk like that?  I mean, I see this, but I am

10   honestly confused about what conversation this was.

11     Q    You don't have any independent

12   recollection about this text exchange?

13     A    No.

14     Q    Okay.  Do you recall speaking with Senator

15   Ausley and answering her questions about

16   redistricting?

17     A    I don't really recall doing that.  I mean,

18   I'm not saying I didn't.  Like, to my point, it's

19   all very fuzzy.  I am confused about the text bubble

20   saying like, you know, "was pulled from Matt

21   Isbell's analysis."  I would -- I don't really talk

22   about myself in the third person.

23     Q    Would you have had better recollection of

24   this two years ago?

25     A    I would presume.



1        Q    Okay.  I'll take you through that.  Let's

2   go to the second page then.

3        A    Okay.

4        Q    So this is a screenshot of a text message

5   exchange with T -- a contact identified as "TP".  It

6   says Tina underneath it.  Do you know who this would

7   have been?

8        A    I would assume Tina Polsky.

9        Q    Who is Tina Polsky?

10       A    State senator.

11       Q    Okay.  You spoke with Senator Polsky about

12   redistricting during the process?

13       A    I'll be honest, I don't recall this

14   conversation.  "I can draft the email."

15            I'll be honest, I don't think this was me.

16   Because also this timeline here, December of 2021, I

17   was dead sick with COVID.  "Call me when the

18   other" -- yeah, these blue bubbles I do not believe

19   are me.

20       Q    You don't believe these are you?

21       A    No.  I...

22       Q    The Bates number on this, SOS Hodges

23   0000199.

24       A    Sorry, what page are you on?

25       Q    I'm looking at the same one.  I'm reading



MATTHEW ISBELL                                          November 26, 2024
HODGES vs PASSIDOMO                                                    68

```
 1   the number at the bottom --

 2        A    Oh.

 3        Q    -- of the page.

 4        A    I don't know.

 5        Q    Just for the record.

 6        A    Okay.

 7        Q    So this is somebody talking with Senator

 8   Polsky about an amendment?

 9             MR. JUNNIER:  Objection.

10   BY MR. NORDBY:

11        Q    You don't know if this is you?

12             MR. JUNNIER:  Speculation.

13        A    I don't know.

14   BY MR. NORDBY:

15        Q    I'll ask you to go to the next page then.

16   This is a message exchange with "KS" and it says

17   "Kelly."  Any idea who that might have been?

18        A    No, I do not know who that is.

19        Q    Okay.  Are you familiar with a former

20   legislator named Kelly Skidmore?

21        A    Yes.  I'm not sure if I ever really

22   interacted with her that much.  I think I might have

23   done -- I'll be honest, I don't recall exactly how

24   much I've communicated with Kelly Skidmore.

25             Palm Beach, right?  Yeah.
```



1    Q    Your testimony is you don't think you --
2  this is your message exchange with her either?
3    A    I don't -- I don't recall this
4  conversation.  "Read the story here."
5         (Examining document.)
6    Q    This exchange goes over the next three or
7  four pages.
8    A    Okay.  Yeah.  This -- I don't really
9  recall this conversation.
10    Q    These were not documents that you reviewed
11  in preparation for this deposition?
12    A    No.
13    Q    All right.  Let me ask you to go to the
14  message exchange that has a picture of someone and
15  it says "David" at the top.  The number at the
16  bottom is SOS Hodges 0000204.
17    A    Yes.
18    Q    Who do you know David to be?
19    A    That's David Grimes.
20    Q    Okay.  Do you recognize this text message
21  exchange?
22    A    This looks a little bit more familiar, I
23  believe.
24    Q    You mentioned earlier David Grimes is the
25  staff director for the Senate Democratic Caucus?



MATTHEW ISBELL                                      November 26, 2024
HODGES vs PASSIDOMO                                              70

1          A     House Democratic Caucus.

2          Q     Thanks for correcting.  The House

3     Democratic Caucus.  Do you believe this text

4     exchange to be your communications with David

5     Grimes?

6          A     I'll be honest, I know there's at least a

7     couple communications with David Grimes I submitted,

8     but I'm a little -- the fact that the other stuff

9     isn't, I don't want to presume that this was me.

10               If it -- and that's why I'm trying to look

11    through it to kind of confirm and see if this kind

12    of rings a bell.

13         Q     If you look at the bottom of the page,

14    there's one that ends in a 207?

15         A     2-0 -- sorry, what am I looking at?  Oh,

16    the numbering --

17         Q     The numbering on the right.

18         A     -- at the bottom.  Okay.  Okay.  Yes.

19         Q     Okay.  There's an exchange between someone

20    and Mr. Grimes, where Mr. Grimes says, "How is your

21    arm doing?"

22               The response is, "Good, just ugly."

23               Did you have something happening with your

24    arm during this time period?

25         A     I don't recall having any injury to my arm



 1   at that time.  "Good, just ugly."  I don't recall
 2   anything like that.
 3        Q    Okay.  Okay.  I handed you another
 4   exchange of messages.  Do you recognize these
 5   messages?
 6        A    Yes.
 7        Q    Okay.  So the Bates number in the lower
 8   right-hand corner of this is Isbell 000341.
 9             MR. NORDBY:  I'll call this Exhibit 4.
10             (Exhibit 4 was marked for identification.)
11   BY MR. NORDBY:
12        Q    What do you recognize this document to be?
13        A    This is some text messages with State
14   Representative Allison Tant.
15        Q    Okay.  So the first message in the string
16   here says, "Toby is trying to reach you,
17   rescheduling a meeting for you, me, and Ramon."
18             Who is Toby?
19        A    I believe Toby was a staff member for
20   Representative Tant.  I don't know a specific title.
21        Q    Okay.  Then there's a subsequent exchange
22   on November the 10th, 2021, which is a link to a
23   FloridaRedistricting.gov website.  There's a text
24   message that says, "What does the Senate map look
25   like for Loranne."



1          Do you see that?

2     A    Yes.

3     Q    Okay.  Do you recall based on the timing

4  of this message what was happening in the

5  legislative process on November 10th, 2021?

6     A    This looks like the time when the first

7  drafts were coming out or at least some set of

8  drafts.  Whether it was the second version or not, I

9  cannot recall.

10     Q    Okay.  And this is Representative Tant

11  asking you what the Senate map looked like for

12  Loranne?

13     A    Yes.

14     Q    You understand that to be Senator Loranne

15  Ausley?

16     A    Yes.

17     Q    Your response is, "Looks like it's Biden

18  plus three generally, as I expected"; is that

19  correct?

20     A    Yes.

21     Q    What does that mean?

22     A    That meant that the district, the new

23  version of it was a district that would have

24  backed -- that would have -- the voters within the

25  district would have voted for Joe Biden by three



 1  points.  It was sort of like the initial analysis of

 2  how the district had changed.

 3       Q    Okay.  Why were you providing that

 4  information to Representative Tant?

 5       A    I was asked.

 6       Q    Is this just one of many exchanges where

 7  you were asked for political information about

 8  districts?

 9       A    Yeah, through the redistricting cycle I

10  was always asked about different data points,

11  whether race or partisan data, and that was always

12  part of my analysis and breakdowns, like here's how

13  the different districts perform, and so on.

14       Q    Okay.  You mentioned in earlier testimony

15  that you sometimes considered partisanship for the

16  purposes of conducting a functional analysis; is

17  that right?

18       A    Correct.

19       Q    Was a functional analysis involved at all

20  in an analysis of Senator Ausley's proposed Senate

21  seat?

22       A    No, this was just a quick answer about how

23  the district, you know, leans partisan-wise.

24       Q    This is political performance, not racial?

25       A    Correct.



1    Q    Representative Tant stated after that that

2    "She can still win that."

3         How did you understand that message?

4    A    The idea was that okay, this is not a

5    district that suddenly became -- you know, in the

6    real politics, like, if you have a district that,

7    you know, backed Donald Trump by say 30 percent,

8    Democrat's probably not going to ever win it, and

9    vice versa.  A district that's heavily backed by --

10   or whoever your Democratic, Republican candidates

11   are for president, governor, and so on.  It was --

12   it was essentially being, like, this district is a

13   swing seat; either party could win it, and it was

14   basically just a look at what does the partisan

15   makeup of this new district look like.

16   Q    And your response to that is, "Yep, the

17   final district looks exactly like we expected."

18   A    As I expected.

19   Q    It says, "Yep, the final district looks

20   exactly like we expected.  Basically went into Dixie

21   and Suwannee and Lafayette, while" --

22   A    Hmm.

23   Q    -- "losing Calhoun."

24        Who's "we"?

25   A    Sorry, yeah, and I got confused because of



 1    the "I" at the top.  "We," really honestly -- and if

 2    you look at my writing, "we" tends to be a reference

 3    just for the broad sort of political culture.  It

 4    wasn't a reference to a specific person.  It was

 5    definitely -- I mean, I'll be honest, the district

 6    was exactly what I predicted it would be.  I

 7    predicted exactly which counties it would go into.

 8    So it was mostly kind of me bragging.

 9         Q    This was a state Senate district made up

10    of whole counties only?

11         A    Yes, the only district.

12         Q    I'm sorry, before I turn the page, at the

13    bottom of the first page there appear to be two

14    images of state House maps; is that accurate?

15         A    Yes.

16         Q    And there's a message from Representative

17    Tant that says, "Call me," exclamation point.

18         A    Yes.

19         Q    And then another picture of a map that

20    says, "And this" --

21         A    Yes.

22         Q    -- dot, dot, dot.

23              Now flipping to the next page, you say,

24    "That first plan is insane."

25              Representative Tant says, "They are def



1    screwing TLH."

2            What do you understand that to be?

3        A    TLH is Tallahassee.

4        Q    Okay.  Later in the same string, on

5    December 1st, you send Representative Tant a link to

6    your website?

7        A    Yes, my substack.

8        Q    Okay.  "This is hot off of the presses.  I

9    lay into the Tallahassee districts."

10       A    Oh, I'd like to apologize.  It's not

11   substack; it's my main site.

12       Q    Okay.  And then Representative Tant

13   responds to you, and it says, "Matt Herrie us" --

14   maybe is -- "saying a D can't win map 7.  What does

15   you think?"

16           Who is Matt Herrie?

17       A    Matt Herrie -- it might actually be Max

18   Hurley.  I can't remember if she got the name wrong

19   or if I'm thinking of it.  Max Hurley is a -- or Max

20   or Matt Hurley -- I'll stick with that.  He's a

21   local political, sort of a lob- -- he's a lobbyist.

22   He's kind of around -- I'm not sure exactly what his

23   current role is or, like, who he works for.  He's

24   sort of like one of the local politicos.

25       Q    He represents Democratic candidates?



 1        A    I'll be honest, I don't know much about

 2    who he will represent at any given moment.

 3        Q    Okay.  Who -- and could you read your

 4    response to that suggestion?

 5        A    Sure.  The one that starts with "It's very

 6    tough"?

 7        Q    Yes.

 8        A    "It's very tough.  It's a narrow Trump and

 9    narrow Gillum district, the biggest issue being that

10    it's going to be a red midterm, so that's a bad

11    starting point.  I delve into it in the article.  If

12    plan 8007 passes, the HD9 there, the one that goes

13    into Madison," could still -- "would still be

14    Democratic."

15        Q    And what was Representative Tant's

16    response?

17        A    "I gotta get 07.  Herrie is telling me a

18    Republican won- -- that -- me a Republican wins that

19    one too."

20             And then you want me to keep reading?

21        Q    No, that's it for now.  Tell me more about

22    what that -- what's the context of that

23    communication?

24        A    So -- so when the initial -- those two

25    drafts on the other page, those were the initial



 1  first two state House plans -- or at least they were
 2  the latest.  I can't remember if they were the first
 3  or not.  And the issue was that you had the plan
 4  8007, the map on the bottom of the first page, that
 5  was a map that sort of lined up with what seemed
 6  more realistic about a potential changing of the
 7  districts that HD9 would have to get bigger.
 8          The other map, the one that, like, we were
 9  talking about that had like a narrow Trump and
10  Gillum district was this plan that basically cracked
11  Tallahassee into three ways, and it was taking parts
12  of midtown Democratic Tallahassee and pairing it
13  with, like, the rural counties of Gulf, Franklin,
14  and Wakulla.
15          And then the other district number,
16  District 9 was taking some of the other Democrats
17  and moving them into the other world.  So
18  essentially, and as I saw it and it was, it was a
19  Republican gerrymander aiming to crack the City of
20  Tallahassee.
21      Q    Okay.  You disagreed with the analysis by
22  Matt or Max Hurley that was provided to
23  Representative Tant?
24      A    Yeah, and if I understand correctly, Max
25  was claiming that even the plan 8007, he was



1   claiming that a Republican would still win that

2   version of House District 9, which I believe to be

3   the blue district in the map just below on this same

4   page.  And I was pointing out that Max was wrong,

5   and he was.

6        Q    I'll ask you to turn to the next page.

7   It's a communication at 8:54 p.m. from

8   Representative Tant that says, "Do you know the

9   Biden performance in map 7?"

10            Do you see that?

11       A    Yes.

12       Q    Okay.  And what was your response to that?

13       A    "Yep, I have them for all districts and

14  plans in this article link," and then I linked the

15  article.

16       Q    So you were providing Representative Tant

17  political performance data for all of the districts

18  in the state House map?

19       A    For data --

20            MS. McNAMARA:  Object to the form.

21            MR. JUNNIER:  Object to the form.

22       A    Yeah, for data that was on my public

23  website.  That wasn't a private link.

24  BY MR. NORDBY:

25       Q    This text exchange is private though?



1      A    Correct.

2      Q    Before you turned it over in response --

3      A    Correct.

4      Q    -- to the subpoena?

5      A    Correct.

6      Q    At the bottom of this page, there's a text

7  message from you that says, "BTW, I have an update

8  on what we discussed.  You can call me whenever."

9           Do you see that?

10     A    Yes.

11     Q    Do you have any idea what that references?

12     A    As best I recall, at some point -- and

13  this would have still been when there were different

14  drafts being debated, and my timeline is fuzzy here,

15  but I do believe we're still in the middle of House

16  drafts being debated.

17          There was still a debate between these two

18  different plans, and I think at one point me and

19  Allison would have had a conversation that was sort

20  of about where things might have stood.

21          There was a very notable opposition

22  building within Tallahassee from the elected

23  officials, like the different city and county

24  commissioners.  I believe some of them, like,

25  testified at the Capitol when the different



 1   committees were meeting.

 2            And so essentially I think Allison was

 3   giving me some sort of update on that.  Specifics, I

 4   can't really recall, but it would have sort of been

 5   in that vein.  I think this was also a time where I

 6   was still kind of recovering from COVID and I was

 7   bedridden --

 8        Q    Okay.

 9        A    -- but moving around.

10        Q    Then I'm going to ask you about one more

11   exchange from this string.  On the back page, the

12   Bates is number Isbell 000344.  Do you see the

13   message that starts off, "Hey, Allison"?

14        A    Yes.

15        Q    Can you read that one for me?

16        A    Yes.  "Hey, Allison, for the breakdown of

17   your new seat, do you just want overall partisan

18   breakdowns for now or do you want a bigger" -- I

19   meant to say deep dive but I said "dean dive" --

20   "into the areas lost or gained.  I can get deep into

21   the weeds or start off more at top level."

22        Q    And what was her response to that?

23        A    "Both and I'll pay you.  Let's start with

24   overall, and then go deep.  I gotta figure out where

25   to start walking."



1      Q    Okay.  Is this part of your work for

2   Representative Tant that you alluded to earlier as a

3   freelance data analyst and operative?

4      A    Yes, so this was after the maps had

5   passed, and then out -- and then they had opted for,

6   I believe, what was plan 8007.  I don't know -- I

7   think they might have changed a couple of other

8   districts.

9           I think the final plan was number 8013,

10   but the point is that district, she now knew what

11   her district was, and they had passed the resolution

12   to pass the maps.

13           So then Allison was reaching out to me to

14   get -- to do a deep dive -- eventually I did -- on

15   the specifics of the new district because she was

16   gaining a lot of new territory and -- to the point,

17   especially about where to start walking, what do I

18   need -- who do I need to start reaching out to?

19      Q    Okay.  Going back to the first page of

20   this string, the first communication you provided

21   was in October of 2021 about a meeting between you,

22   Representative Alexander and Representative Tant?

23      A    Yes.

24      Q    Then Representative Tant asked you for

25   political performance data on the state Senate map



 1   and on her proposed state House district.

 2        A     So I would like to kind of clarify here.

 3        Q     Please do.

 4        A     Yes.  So in these earlier conversations,

 5   this is more just about asking for quick and dirty,

 6   so what's the deal.  What's the -- you know, how did

 7   this district perform in the presidential election,

 8   governor, and so on.  At the very end, this -- this

 9   part here is more about then maps are passed.  We're

10   not reacting to stuff anymore.

11             Okay.  This is where I would have been

12   doing a deep dive.  And what that really means is it

13   was not just about here's how the new district

14   looks, that sort of baseline, oh, Biden won it by

15   whatever.  It would also be more about me helping

16   her with her campaign plan for her new district.

17   What are the new precincts, you know, what cities

18   are there, where should you start walking, and

19   what's a nice dense area?

20             That's where, like, post everything's

21   passed, we -- that's essentially where this is, the

22   type of thing where I would have these types of

23   campaign work for any different client, whether they

24   were for -- running for city council or state

25   legislature.



1          So I view it as very much a separate type

2   of -- this all stuff was stuff I was just doing -- I

3   was basically giving her information, this like top

4   line data that I was also pumping out onto my

5   website.

6          But normally, you know, a lot of times

7   anybody might be like hey, Matt, you know, I don't

8   want to look through your site.  Can you just

9   quickly tell me what's this number?

10         This at the end here would have been the

11  type of more confidential analysis that I'm doing

12  for a campaign as part of a paid contract,

13  essentially.

14     Q    Your earlier analysis is before the maps

15  had been finalized?

16     A    Correct.

17     Q    And you gave her political performance

18  data about alternative proposals before the

19  legislature?

20     A    I gave her the performances for the drafts

21  that were submitted.

22     Q    Thank you.

23     A    Can I also add something really quick?

24     Q    Of course.

25     A    So I definitely do think this might --



1   this one might be a mistake because I certainly

2   don't remember -- the thing that stands out to me is

3   like I remember this format because this was the

4   type of program I used to export stuff.  I don't

5   remember submitting screenshots like this.  So that

6   might be one of the issues.

7        Q    Thank you.  I think I verified where those

8   came from.

9        A    Okay.  I'm like oh, no, do I have like

10  dementia there or something?

11            (Exhibit 5 was marked for identification.)

12  BY MR. NORDBY:

13       Q    You've been handed another series of

14  messages.  Do you recognize this document?

15       A    Yes.

16       Q    Okay.  What is this document?

17       A    This looks like the export of -- at least

18  on this first page here -- Twitter DMs between me

19  and Joe Dye.

20       Q    Okay.  If I accidentally refer to a

21  Twitter DM as a text, will you understand what I'm

22  talking about?

23       A    Yes.

24       Q    Okay.  So this exchange between you and

25  Mr. Dye is something you provided in response to the



1    document subpoena?

2         A    Yes.

3         Q    Okay.  Remind me again, who is Joe Dye?

4         A    Joe Dye, when I first -- when he first

5    made contact with me, I understood that he was -- I

6    don't know exactly what his title was, working in

7    the House, whether he was a full-time staffer or an

8    intern.  I just knew that he was in the Capitol

9    building, I believe in the Democratic Caucus in

10   general.

11        Q    Okay.  The first message here is on

12   November 29th, 2021.  Do you know if this is the

13   first exchange you had with Mr. Dye?

14        A    Yes, I believe so.

15        Q    Okay.  What is Mr. Dye's first message to

16   you then?

17        A    "FYI, they drew Barnaby and Fetterhoff in

18   the same district."

19        Q    And who are Barnaby and Fetterhoff?

20        A    They were two state representatives for

21   Volusia -- in the Volusia County area.

22        Q    Okay.  Do you know why Mr. Dye

23   communicated that to you?

24        A    You know, a lot of times people will DM me

25   with, like, questions or, like, political notes



1  because I'm a fairly big -- big's the wrong word;

2  it's not like I'm massive.  But like I'm a fairly

3  active Florida political Twitter account.

4          So sometimes people, like when I first got

5  this first message, I was like, oh, okay, cool,

6  thanks for letting me know.  I'm not sure if I had

7  known it already or not, but I get texts and

8  messages like that, where people just kind of want

9  to point something out to me.

10     Q    Okay.  And what is Mr. Dye's second

11  message to you?

12     A    "Hey, I work with the Florida Dems on

13  redistricting.  Please keep pushing them to shut up

14  about prison gerrymandering."

15     Q    What is that message about?

16     A    So this was, as best I gleaned from future

17  conversations, Dye was, like, frustrated with a lot

18  of what was happening.  And I guess he was just

19  messaging me because I was prob- -- I definitely

20  talked about prison issues at the time in

21  redistricting.  I don't remember if I was talking

22  about it right then.  Like, maybe he was responding

23  to something else I had written before, but I guess

24  he was reaching out to me to tell me to keep pushing

25  that issue.



1      Q    Okay.  Did you push that issue?

2      A    I don't recall doing anything in direct

3    response to him saying anything.

4      Q    Okay.  And then what was Mr. Dye's next

5    message to you?

6      A    "I wrote 14 pages of functional analysis

7    questions, none asked."

8      Q    And your response to that?

9      A    "Oh, just lovely."

10     Q    What was the context of that exchange?

11     A    So as I gathered it, the -- the issue was

12   that the Democratic members in the House were not,

13   like, Joe was saying, he was a staffer and he was

14   doing analysis and trying to help, you know, perhaps

15   as part of his job -- again, I can't speak to

16   exactly what his role was -- was to, like, provide

17   some talking points or information.  And he was

18   frustrated that the members were not asking any

19   questions during the process.

20     Q    Was that a frustration you shared?

21     A    Yes.

22     Q    Okay.  I'm going to ask you to turn to the

23   second page of this exhibit, Isbell 358.  There's an

24   exchange that starts at the bottom on January 26th

25   at -- 2022 at 2:15 p.m.  Do you see that?



```
 1        A     Yes.

 2        Q     Okay.  What does Mr. Dye say there?

 3        A     "What is wrong with my bosses?"

 4        Q     The one before that.

 5        A     "This is a fucking sorry performance."

 6        Q     And then?

 7        A     "The" --

 8        Q     Could you continue with that exchange?

 9        A     "The whole thing with Ryan Newman

10   submitting" --

11        Q     I'm sorry, I'm -- just reading down.

12        A     Oh, okay.  Okay.  Sorry.  All right.

13              "What is wrong with my bosses?"

14              I replied, "This is painful to watch."

15              And then "Also harder not to just Tweet

16   out, oh, my God, my party is full of idiots."

17              And then he replied, "My party is full of

18   idiots.  They paid someone to do this too."

19              "Yeah, all I hear is bad things."

20              He says, "Nick Warren."

21              I said, "He's great."

22              He says, "Hell, yeah, he is, but" we're

23   talking -- "but we've been talking and he's been

24   coaching me on stuff.  Not that I was this bad

25   before.  This shit is heading for litigation.  Oh,
```



MATTHEW ISBELL                                    November 26, 2024
HODGES vs PASSIDOMO                                              90

 1   my God."

 2              And then he sent me a photo of a --

 3        Q    Let me ask you to stop there because it

 4   looks like we're going on to another day.  I want to

 5   ask you about --

 6        A    Oh, sorry.  Yeah, my bad.

 7        Q    -- an earlier exchange.  That's fine.

 8              Tell me more about the context of this

 9   exchange with Mr. Dye.

10        A    So the general frustration for me at the

11   time, and Joe clearly shared my frustration, was

12   that I certainly felt that the House legislators

13   were not doing a good job of pointing out problems

14   in the maps, pointing out, like, glaring flaws or

15   arguments.

16              You know, certainly those were the

17   opinions I had, and as best -- I really don't know

18   what all the internal dynamics were in the

19   legislature side, but clearly there were some shared

20   frustrations.  And so I think this was a lot of,

21   like, us venting back and forth about the process.

22        Q    Okay.  Mr. Dye mentions that Mr. Warren

23   has been talking with him and he's been coaching him

24   on stuff.  What do you know about that?

25              MS. McNAMARA:  Objection --



```
 1                MR. JUNNIER:  Objection, form.

 2                MS. McNAMARA:  -- form.

 3        A    That was the extent that I knew about it.

 4   BY MR. NORDBY:

 5        Q    You don't have any specific knowledge

 6   about any coaching that Mr. Warren was giving to

 7   Mr. Dye?

 8        A    Other than Dye mentioning it.

 9        Q    Have you had any other conversations with

10   Mr. Dye about that?

11        A    I don't recall, you know, until we go

12   through some of this.

13        Q    Okay.  Go on to the next page, Isbell 360.

14   There's an exchange from Mr. Dye that says, "I'm

15   leaving in a week, thank God."

16                Do you see that?

17        A    Yes.

18        Q    Okay.  Could you read down from that?

19        A    "I wrote a ton of amendments.  Reps pushed

20   Jenne, but didn't -- but he didn't budge.

21                "My Lord, these people are conspiring to

22   kill me.

23                "I'm gone.  I'm gonna work for Nick

24   Warren.

25                "Do it.
```



```
 1              "No ink is dry.  I'm so excited."

 2              "Nice."

 3         Oh, "My God, I'm just the last guy out of

 4    a burning building.  Fucking Natalie Kato.  The

 5    DeSantis Jacksonville District 3 is a Trump plus six

 6    now.

 7              "Correct."

 8         And that was the next day, I guess.

 9    Q    Okay.  Tell me more about the context of

10    this exchange.

11    A    So this I gathered was Dye was officially

12    leaving the state House to go work for Nick or maybe

13    the ACLU.  I wasn't sure about any of the specifics.

14    Q    Okay.  There's a reference to Natalie

15    Kato.  Do you know who that is?

16    A    Natalie Kato was a polit- -- is a

17    political consultant.  I don't know her really

18    personally.

19              And the understanding was she had been

20    hired to do the counseling or the guidance on

21    redistricting in the Caucus.  I wasn't really ever

22    sure about the specifics of, you know, who was doing

23    what, but that was the general understanding.

24    Q    Your general understanding is she was

25    hired by the Democratic Caucus to provide counsel?
```



```
 1         A     Some -- yeah, whether it was by the House
 2    or the House Democratic Caucus, yeah, something of
 3    that effect.
 4         Q     Mr. Dye, is it fair to say, seems
 5    frustrated with her?
 6         A     Yes.
 7         Q     Is that frustration something you shared?
 8         A     Yes.
 9         Q     Why?
10         A     In general, this came down to the belief
11    that the members were being -- were not asking any
12    real questions and pushing back.  And it seemed like
13    there was this notion that they should just not say
14    anything.
15              And sort of as a -- for me personally, as
16    an outsider sort of pushing some of these issues, I
17    was frustrated that it felt like no one in the halls
18    of the Capitol were pointing out glaring problems.
19    And so I think that's sort of what the general
20    frustration was.
21         Q     I'll ask you now to turn to Isbell 368.
22    There's an exchange that -- in the middle of that
23    page that says, "I know.  I'm just checking in,"
24    from Joe Dye.  Do you see that?  Where it says I-K?
25         A     Oh, yeah, yeah.
```



1        Q    Can you read that exchange?

2        A    Do I start with the going down?

3        Q    Yes, please.

4        A    "Appreciate it, man."

5             And then he says, "I'm working in" 2020 --

6   or "2022, JAX in '23, but I look up to you as a

7   young data nerd who deals with idiotic Dems all

8   day."

9             And I said, "Hey, man, I appreciate it.

10  Trust me, I feel your frustration.  Do you feel

11  content -- do what you feel content doing.  Even

12  with all the bullshit, if you're proud of it, it's

13  worth it."

14            And he said, "I work for Nick Warren.  We

15  actually win."

16            And I said, "Warren is great."

17            And then he says in the next page, "He's

18  tired of this shit too."

19            And I said, "Oh, I know he is.  There is

20  a" universital -- "there is a universal 'fuck, I'm

21  tired' sentiment right now among all Dems who aren't

22  idiots."

23            He said, "You and Nick" make the smart

24  Dem- -- make -- "You and Nick should make the smart

25  Dem lobbying firm."



1    Q    Okay.  Tell me about the context of this

2    exchange with Mr. Dye.

3    A    Yeah, so by this point, you know, we're

4    way past the state legislative maps being passed.

5    There's this ongoing controversy over the

6    Congressional map.  DeSantis has submitted his own

7    proposals to get rid of the north Florida district.

8    There's a lot of frustration, I think, in general

9    about how much the Democratic Caucus is doing to

10   push back on it.  Certainly just a broad sense of,

11   like, I just want this to be over with, I'm

12   exhausted.  You know, I was definitely burned out by

13   that point.  So I think that was the general guise

14   of it all.

15   Q    I'll ask you to turn now to page 372.

16   This is an exchange on April 19th, 2022.  Do you

17   recall the context of what was happening in the

18   redistricting process at the time?

19   A    April 19?

20   Q    Yes.

21   A    "Should I come to the House meeting?"

22       This -- this, I guess, was right at the

23   point -- yeah, this was at the point of the special

24   session had started that they had called back to

25   pass a Congressional map.  I think it was also when



1    they were doing the Disney stuff.  And I know there

2    was a House meeting and Senate meeting.  And I guess

3    he was probably asking if he should -- probably --

4    this was probably about testifying, whether or not

5    to testify at the meetings.

6         Q    Whether or not Mr. Dye should testify at

7    the meetings?

8         A    Yeah, as best I can think at the time.

9         Q    Okay.  And he had one exchange and said,

10   "Let's round some people up and go down there with

11   them"; is that right?

12        A    Yes.

13        Q    Was he suggesting that the two of you

14   round some people up and go down to the Florida

15   legislature?

16        A    Yeah -- I was going to -- for the -- there

17   was a sit-in going on from some of the black

18   lawmakers when they were trying to pass the map, and

19   there -- I think there was a couple of different

20   people rallying outside to protest the racist map.

21   So he was talking about -- he was being pretty gung

22   ho about, like, going down there.

23        Q    What was your advice?

24        A    My advice was like -- especially when

25   he's, like, really just got all ridiculous there



1    with, like, oh, they want an insurrection.  Give

2    them one.  I was, like, stop with that.  And I was

3    really just kind of blowing that off.  It was, like,

4    bravado.

5         Q    Mr. Dye said, "They want an insurrection.

6    Give them one"?

7         A    Yes.

8         Q    You disagree with that advice?

9         A    Of course.  And I honestly think it was

10   just bravado.

11        Q    Mr. Isbell, do you recognize the document

12   that's been put in front of you that has the Bates

13   number Isbell 378?

14        A    Yes.

15        Q    What is this document?

16        A    This looks like a document I submitted

17   that was recalling a phone call that I had with

18   Christian Ulvert and Lauren -- Senator Lauren Book.

19             MR. NORDBY:  We'll call this Exhibit 6.

20             (Exhibit 6 was marked for identification.)

21   BY MR. NORDBY:

22        Q    Tell me what this -- tell me what this

23   summary is.  What is this describing?

24        A    Just, if you don't mind.

25        Q    Please read it.  Take your time.



1      A    (Examining document.)  Okay.  Yes, so this

2   was a conversation I had, I believe, in January to

3   discuss the latest state Senate drafts, which, yeah,

4   sort of, as I laid out in this writing, their -- the

5   issue was that they had drawn up the state Senate

6   drafts in Broward County, which, you know, seemed

7   to, like -- seemed to really go out of their way to,

8   like, be sure to pair Lauren Book with Senator

9   Lauren (sic) Osgood because otherwise the lines were

10   really weird and why they would do it the way they

11   did.

12          And so this was a conversation I would

13   have -- I would have had probably more, as I said,

14   in the role as a consultant for Christian Ulvert,

15   who was Lauren Books' general consultant.  I don't

16   know exactly what their formal tie is.

17      Q    This would have been January of 2022?

18      A    Yes.

19      Q    While the Senate maps were under

20   consideration?

21      A    Yes.

22      Q    Mr. Isbell, I handed you another document

23   that begins with "On May 19th."  It's Isbell 379.

24   Do you recognize this document?

25      A    Yes.



1      Q    What is this document?

2      A    This is another writeup describing a

3   meeting I had in May of 2021.

4      Q    And this is something you wrote up and

5   provided in response to the earlier document

6   subpoena?

7      A    Yes, correct.

8           MR. NORDBY:  We'll call this Exhibit 7.

9           (Exhibit 7 was marked for identification.)

10  BY MR. NORDBY:

11     Q    Take a moment to read this, if you'd like

12  to, and then tell me about what is being discussed

13  in this document.

14     A    (Examining document.)  Okay.  I've read

15  it.

16     Q    Okay.  What is this document?

17     A    So this first starts off laying out my

18  People Over Profits work, that it was around May of

19  2021 where there was initial conversations about,

20  you know, doing some work to sort of be a

21  redistricting advocate and a voice and being

22  compensated for that so that I could focus on it

23  without having to deal with other client work at the

24  time.

25          And then also I discuss, you know, I think



1   in the second half here the sort of layout that

2   people like Jena and Dan Newman -- and like these

3   are people I, like -- social friends with for a long

4   time; and just sort of laying out in general, you

5   know, that every now and then I'd meet with them.

6   And it wouldn't always be about work.  These weren't

7   always work meetings, but also sometimes just social

8   contacts, you know, where you kind of meet after

9   work and whatnot.

10       Q    Remind me again, if you would, who Jena

11  Kingery and Dan Newman were.

12       A    At the time, I'm not entirely sure what

13  Jena King -- I think Jena Kingery, she was working

14  for People Over Profits.  I don't know her role in

15  terms of House or Senate campaign things were at the

16  time.  You know, I know where she is now, but I

17  don't think it was always that.

18            And I think Dan was also a freelance

19  consultant.  I'm not sure exactly what their roles

20  were with different committees or entities or

21  whatnot.

22       Q    You mentioned earlier that Jena Kingery is

23  associated with the Florida Democratic Party Senate

24  Victory program?

25       A    Currently, yes.



1        Q     That's where she is currently?

2        A     Yes.

3        Q     She may not have been at the time?

4        A     Correct.  I do not know.

5        Q     She was a political operative for

6   Democratic candidates and committees?

7        A     Yes.

8        Q     And Dan Newman was as well?

9        A     Yes.

10       Q     Fair to say that they wanted more

11  Democrats to get elected to the Florida Senate?

12             MS. McNAMARA:  Objection to the form.

13             MR. JUNNIER:  Calls for speculation.

14  BY MR. NORDBY:

15       Q     To the extent you know.

16       A     My opinion was we wanted to make sure that

17  Republicans didn't gerrymander.  There was a concern

18  more about bad maps, which perhaps was in their

19  interest, obviously, not to have a bad map.

20       Q     You don't know whether Jena Kingery and

21  Dan Newman wanted more Democrats to get elected to

22  the Florida Senate?

23             MR. JUNNIER:  Objection, speculation.

24       A     I -- in general, I could only presume it

25  the same way they didn't want to get hit by a car.



MATTHEW ISBELL                                      November 26, 2024
HODGES vs PASSIDOMO                                              102

```
 1    Like, sure.
 2    BY MR. NORDBY:
 3         Q    You don't think that was something
 4    important to them?
 5         A    I'm sure it was.
 6         Q    Okay.  Mr. Isbell, this is a document that
 7    was provided to you, a text message exchange, page
 8    number Isbell 400 at the bottom right-hand corner;
 9    do you see that?
10         A    Yes.
11         Q    Have you seen this document before?
12         A    Yes.
13         Q    What is this document?
14         A    This is the text exchange in a group text
15    between Dan Newman and Jena Kingery.
16         Q    Okay.  And this is something you provided
17    in response to the earlier document subpoena?
18         A    Yes.
19              MR. NORDBY:  We'll call this Exhibit 8.
20              (Exhibit 8 was marked for identification.)
21    BY MR. NORDBY:
22         Q    Tell me about the context of this message
23    exchange here.
24         A    (Examining document.) I'm just reading
25    through it.
```



1      Q    Please take your time.

2      A    (Examining document.)  So it starts off

3   initially, I think the first kind of paragraph in

4   that first bubble, is also more about me just kind

5   of letting folks know that I had started up a

6   substack.  This is when -- the time I decided to

7   start doing the whole email newsletter item.  And

8   that was also going to be in the context of -- that

9   wasn't necessarily directly tied to the People Over

10  Profits work that we were then kind of talking

11  about.  This would have been post that meeting,

12  where we sort of started to lay out the ideas of

13  what the articles could look like.

14          I was sort of coming up with different

15  ideas about how to write things and what I wanted to

16  write about.  And so I was just kind of bouncing

17  general notions off of them in those early parts

18  there.  And then we started talking more about,

19  like, pay and schedules and everything like that.

20     Q    Okay.  Does this early part on this first

21  page reflect the arrangement you discussed earlier

22  about you being hired to write these articles by the

23  People For Profits committee?

24          MR. JUNNIER:  Objection to the form.

25          MS. McNAMARA:  Objection to the form.



1    BY MR. NORDBY:

2        Q    I guess I should say People Over Profits.

3    I don't think it was People For Profits.

4        A    Yeah, this was the -- yeah, this was

5    working out the crux of the, you know, the payment

6    and everything.

7        Q    And you were -- the proposal in the middle

8    of this page says, "CU and I would like to propose

9    4K a month for now.  We're raising for a lot of

10   different things and don't want to overcommit."

11       A    Uh-huh.

12       Q    Is "CU" a reference to Christian Ulvert?

13       A    Correct.

14       Q    Do you understand this to be Mr. Newman

15   proposing $4,000 a month payments to you in exchange

16   for writing these articles?

17            MR. JUNNIER:  Object to the form.

18            MS. McNAMARA:  Objection to the form.

19       A    Yes, this was the agreement to then, you

20   know, be basically committing to providing articles.

21   BY MR. NORDBY:

22       Q    Was that ultimately the deal that you

23   reached?

24       A    Yes.

25       Q    Mr. Isbell, I handed you a document, Bates



1   number Isbell 409; do you see that?

2        A    Yes.

3        Q    Do you recognize this document?

4        A    Yes.

5        Q    What is this document?

6        A    It's text messages with Dan Newman.

7        Q    The first message here is, "Would like to

8   discuss redistricting at some point.  POP has a

9   budget and needs some advice."

10            And the date on that is January 27, 2021;

11   do you see that?

12       A    Yes.

13       Q    Okay.  Based on that context, what is

14   this -- what is this document?

15       A    I think this must have been the initial

16   beginning of the conversations about doing work for

17   People Over Profits.

18       Q    Okay.

19            MR. NORDBY:  I'll call this Exhibit 9.

20            (Exhibit 9 was marked for identification.)

21   BY MR. NORDBY:

22       Q    There's a reference a little further down

23   this page, 11-13-21, from Mr. Newman to you that

24   says, "Can you do a primary and general analysis of

25   FL15 proposed?"



1      A    Yes.

2      Q    Do you see that?

3      A    Yes.

4      Q    Okay.  Could you read your response that?

5      A    "Hey, Dan, sure thing.  I can get you some

6   top line numbers in a day or so.  I'm collecting

7   data, Florida 15, I'll have for you later today.

8   Breakdown of top line and primary items.

9           "Thanks.

10           "Sent over.

11           "Just checking back.  Did you -- did that

12   breakdown cover what you needed short-term?

13           "Perfect, thank you."

14      Q    What is that a reference to?

15      A    So I can't remember specifically which

16   district, but this would have been 15th District

17   under one of the plans.  I don't know if this was

18   the Senate or House at the time.

19           But basically he was asking for a

20   breakdown of the 15th, and as I look at it here,

21   "top line and primary," that would have generally

22   meant, like, saying okay, how does the district

23   perform at the top of the ticket, and what's the

24   makeup of the primary look like, probably more on a

25   racial level; presumably Democratic primary, for



1  sure.

2      Q    So you're testifying this was doing some

3  kind of a functional analysis or providing partisan

4  information?

5      A    Both.  Yeah, essentially a top line in the

6  general and a functional analysis for the primary.

7      Q    Okay.  And you don't know which district

8  this was?

9      A    You know, not to, you know, to hold me to

10  it, but I do believe the 15th would have been -- it

11  would have been one of the Hillsborough

12  Congressional districts in the state Senate plan

13  initially.  I believe that -- yeah, I do believe

14  that was the district we were -- that we were

15  talking about at the time.

16          But, like, which iteration of it, you

17  know, without kind of seeing the maps in front of

18  me.

19      Q    Okay.  Let me ask you to turn over to

20  page 411.  It's the last page of this exchange.

21          Actually, one earlier than that.  Page 410

22  there's a -- appears to be text that includes a

23  tweet.  It's a little hard to read.  Can you see

24  what that is?

25      A    Yes.



1        Q     Tweet from Matt Dixon?

2        A     Yes.

3        Q     What does that say?

4        A     "Florida Senate redistricting chair" --

5    that would have been Rodriguez, whatever his user

6    name is -- "he selected a Congressional and Florida

7    Senate map for reconsideration by the Senate

8    redistricting committee later this" something -- I

9    don't know that that last word is.  Linked the two

10   maps, the Congressional and state Senate maps.

11       Q     Okay.  And what was Mr. Newman's response

12   to that?

13       A     "Which one is 8040?  Regarding the east

14   Hillsborough seat Shaw" could run -- "would run for?

15             And then I said, "Totally good for Shaw.

16   All of the Senate -- all of the Senate's"

17   confessional -- obviously, I mean Congressional --

18   "plans are same for Tampa.  Biden plus eight seat

19   with a 40 percent plus Dem primary."

20             And then I link a Twitter thing and then,

21   yeah.

22       Q     Is the reference to "Shaw" there Sean

23   Shaw?

24       A     Yes.

25       Q     He's the former legislator and former



1  candidate for Attorney General that you mentioned is

2  associated with the People Over Profits committee?

3      A    Yes.

4      Q    And this is about "an east Hillsborough

5  seat Shaw would run for."  What is that?

6      A    So when the -- yeah, I kind of remember

7  this.  When the Congressional maps were coming out

8  for -- the one that Senator Rodriguez had proposed,

9  like this was the map he was going to put forward to

10  the full Senate and the Senate committee; there was

11  a district that was sort of based in eastern

12  Hillsborough that, you know, per the data here was a

13  seat that Biden would have won by eight points.  And

14  the "40 percent plus" is black.  That's what I would

15  with have been referencing there.  The primary is

16  about 40 percent black.

17          And so, as I ventured and I gleaned from

18  the text, that, you know, it looked like a good

19  district for Sean to potentially then run in.  And

20  so Dan was asking me for some -- like to confirm,

21  like, is this a good district?  You know, like,

22  which would be sort of the equivalent of like is it

23  a red district or what.

24      Q    Mr. Isbell, you have a document in front

25  of you, Bates number Isbell 412.  Do you recognize



MATTHEW ISBELL                                    November 26, 2024
HODGES vs PASSIDOMO                                          110

 1  this document?

 2      A    Yes.

 3      Q    What is this?

 4      A    This is a text message with a Drew

 5  Shannon.

 6      Q    Who is Drew Shannon?

 7      A    Drew Shannon is the -- was the director

 8  or, like, one of the top folks in House Victory, the

 9  House -- that's -- House Democratic campaign arm,

10  who I started to get to know socially in

11  Tallahassee.

12      Q    Okay.  And this is a document you turned

13  over in response to the document subpoena?

14      A    Correct.

15           MR. NORDBY:  We'll call this Exhibit 10.

16           (Exhibit 10 was marked for

17      identification.)

18  BY MR. NORDBY:

19      Q    What is Mr. -- is it Mister or

20  Ms. Shannon?

21      A    Mister.

22      Q    What is Mr. Shannon asking you to provide?

23      A    So here in -- at the top there, he was

24  essentially, I think, asking for the -- these

25  different races, Trump versus Biden.  Like these are



1  the different state partisan, statewide races that

2  took place, looking for them broken down by the

3  different House districts.

4          I don't know if this was when there was a

5  final map that had been picked on for the state

6  House or if there was a couple of drafts at that

7  point, but he was clearly asking for the partisan

8  breakdown of the respective districts for all the

9  different plans -- or if it was one plan; I can't

10 remember.

11      Q    So the date at the top of this is

12 January 19th, 2022; do you see that?

13      A    Yes.

14      Q    Does that give you any more insight as to

15 whether there was a plan adopted at that point or

16 not?

17      A    I don't believe there was a plan adopted,

18 but the key is I don't remember when they narrowed

19 it down to just one state House plan or if they

20 still had two at that point.  That timeline's a

21 little fuzzy for me.

22      Q    There's a later reference in this string

23 to DPI being more of a, quote, more of a priority

24 for Mr. Shannon.  Do you know what DPI is?

25      A    I believe DPI is a phrase for, like,



1   essentially how it breaks down those -- because as I

2   was saying before, getting the registration data

3   would be a little bit more complicated or I wasn't

4   sure if I'd be able to get that as easily.

5          And I believe DPI -- and I honestly can't

6   remember what those three letters stand for -- but I

7   believe that was reference to -- it was more

8   important to get some of those top line presidential

9   and governor, like Scott, Nelson, DeSantis, Gillum,

10  stuff like that.

11      Q    So is this some of your work you described

12  earlier that you were doing for the Florida

13  Democratic party after your People Over Profits

14  contract ended?

15      A    I don't even recall if this was like

16  necessarily part of paid work, because this would

17  have likely been me sending over the raw data that I

18  was using to make some of the maps I was putting

19  online.  Normally, when I did a map or, like, I did

20  an article and I was saying here's the, you know,

21  top line data for the new state House plan that had

22  this many Biden districts and this many, you know,

23  Trump districts, and I put it on Twitter or my

24  website, I would just include the percentages

25  normally.  And I think essentially Drew might have



 1  just been asking for some expanded data, maybe the

 2  raw vote counts.  I don't recall if this was

 3  something I was really being paid for or if it was

 4  just like I'm sending over data I'm already using

 5  for public stuff.

 6       Q    And then on the back page of this, there's

 7  a reference.  It says, "Let's see what the new 70

 8  looks like."

 9            Do you see that?

10       A    (Nods head.)

11       Q    "69 may be off map, but 70 may be on the

12  map."

13            What is that a reference to?

14       A    I -- so 69 would have been a reference to

15  House District 69.  And 70 would have also been

16  House District 70.  And he was essentially ask- --

17  he was essentially asking me what, like, the top

18  line data was for those districts.

19       Q    What did you tell him?

20       A    And I said, "69 is Trump plus 2, and 70 is

21  Trump plus 10."

22       Q    Okay.  Mr. Isbell, this is a compilation

23  that starts with Isbell 414; do you see that?

24       A    Yes.

25       Q    What is this?



1        A     This is text messages with Jena Kingery.

2        Q     Okay.  Jena Kingery is a political

3    operative for Democrats?

4        A     Yes.

5        Q     She's currently, you believe, involved

6    with the Senate Victory for the Florida Democratic

7    Party?

8        A     Yes.

9        Q     Okay.  This is a document you turned over

10   in response to the document subpoena?

11       A     Yes.

12             MR. NORDBY:  We'll call this Exhibit 11.

13             (Exhibit 11 was marked for

14        identification.)

15   BY MR. NORDBY:

16       Q     If you could, just read the first page or

17   so of this and tell me what the context is of this

18   exchange between you and Ms. Kingery.

19       A     Yep.  "Yo, I promise not to bug you to

20   death, I'll allow, but just curious if any word came

21   yesterday on redistricting, meaning from Dan.  I

22   guess special session will end today, and it turns

23   out tomorrow I'm off work because of county holiday,

24   so my freedom for me is greater than I thought."

25             And then she replies, "He's meeting



 1   Christian today, so I was going to remind him right
 2   before that so he doesn't forget."
 3            And I said, "Sweet.  Thank you.  On one
 4   hand, I hate constantly" annoying -- "annoyingly
 5   checking in, but definitely in we must plot out the
 6   defense for the fall because the GOP is going to ram
 7   shit through wherever they can.  So trying to
 8   balance being diligent without just annoying the
 9   piss out of people."
10            And then she said, "No, no, not annoying.
11   Just limited time to bring up more things to him.  I
12   try to gauge his moods.  I liked that tweet," and
13   then "or text."
14            And then I said, "Oh, right on.  I really
15   appreciate it.  And, yeah, obviously he and
16   Christian and you all have multiple issues to deal
17   with.  My mind is almost entirely
18   redistricting-focused right now, which" my work
19   makes -- "for my work makes sense, but Dan obviously
20   has a lot of other things to focus on as well."
21            And then keep going?
22       Q    No, that's good.  So is this more about
23   the conversations you talked about earlier of your
24   contract with People Over Profits?
25       A    Yes, this might have been the same day



MATTHEW ISBELL                                          November 26, 2024
HODGES vs PASSIDOMO                                                  116

```
 1   that we then met later that day or within -- yeah, I
 2   believe that that's the same date, the 19th, yes.
 3               MR. NORDBY:  We've been going an hour and
 4        a half.  We want to take a break?
 5               THE WITNESS:  Yeah.
 6               MR. NORDBY:  Let's go off the record.
 7        Okay.
 8               THE VIDEOGRAPHER:  The time is 11:25 a.m.
 9        We are off the record.
10               (A recess took place from 11:25 a.m. to
11        12:38 p.m.)
12               THE VIDEOGRAPHER:  The time is 12:38 p.m.
13        This is the beginning of Media Unit 3.  We're
14        on the record.
15   BY MR. NORDBY:
16        Q    Thank you.  Welcome back, Mr. Isbell.
17        A    Thank you.
18        Q    Before I go back into this exhibit, did
19   you speak with anyone over our break about this
20   redistricting deposition?
21        A    No.
22        Q    Okay.  I'm going to ask you to turn to
23   Exhibit 11, page Isbell 431.
24        A    All right.  I'm on it.
25        Q    All right.  And just to refresh where we
```



 1  all are on this.  This is a text message exchange

 2  between you and Jena Kingery; is that correct?

 3       A    Correct.

 4       Q    This particular exchange on page 431,

 5  dated November 29th, 2021.  Do you recall from that

 6  date what was happening in the redistricting process

 7  at that point?

 8       A    No, I don't recall, like, if anything

 9  specific happened that day.

10       Q    Okay.  What is the first message from

11  Ms. Kingery at the top of that page?

12       A    "There's no way they draw south Pinellas

13  and south Tampa Bay together.  Like, Kathy has to be

14  spinning right now."

15       Q    Who is -- who is "they"?

16       A    The legislature.

17       Q    Okay.  And who is Kathy?

18       A    That would be Kathy Castor, the

19  congresswoman from Tampa Bay.  I believe that's who

20  that was a reference to.

21       Q    Okay.  So it is your understanding of this

22  message that the Republican legislature was drawing

23  south Pinellas and south Tampa together in the

24  Congressional seat?

25       A    Yes, that's what I believe this is about.



1    Q    Okay.  Or the governor was drawing a

2    district like that?

3    A    I don't believe this was when the governor

4    had gotten involved yet.

5    Q    Okay.  Your response to Ms. Kingery's

6    message is what?

7    A    "They are clearly trying to short circuit

8    the Tampa Bay gains along I-75 by creating a new Dem

9    vote sink."

10    Q    And "Dem" there refers to Democrats?

11    A    Yes.

12    Q    And what did Ms. Kingery respond?

13    A    "I guess what I'm trying to figure out is,

14    like, does Ben need to call Kathy?  LOL.  Not that

15    this is your problem.  I'm just confused."

16    Q    Who is Ben?

17    A    I believe that would have been Ben

18    Diamond, the state rep, one of the state reps in the

19    Pinellas County area at the time.

20    Q    What is Mr. Diamond's relationship to this

21    conversation?

22    A    I know that Jena was, like, either -- I'm

23    not sure exactly about timelines here.  I know at

24    one point she was considering working for Ben

25    Diamond for his Congressional campaign.  Again,



1   timelines, I don't know for sure.  But that to me

2   was the general vibe.

3       Q    Okay.  And what was your response to

4   that -- to that text from Ms. Kingery?

5       A    "Oh, my God, yeah, I get what you mean.

6   They might want to huddle.  Granted only one plan

7   crosses the Bay.  Plan 803 is fine for Ben, terrible

8   for Murphy."

9       Q    Who is Murphy?

10      A    Per the reply, Stephanie Murphy.

11      Q    Who's Stephanie Murphy?

12      A    Stephanie Murphy was -- I believe that was

13  a -- oh, congresswoman for Orlando.

14      Q    Okay.  And what did Ms. Kingery respond

15  regarding Congresswoman Murphy?

16      A    "Stephanie Murphy can get Ben for all I

17  care."

18      Q    Can you elaborate on your comment that

19  "Plan 8003 is fine for Ben"?

20      A    So as best I recall, 803 was a more of a

21  traditional -- like, the way Charlie Crist at that

22  time 13th Congressional District was, it was just

23  south Pinellas, pretty straightforward.  And that

24  was like considered a swing-ish district, and the

25  plan that the legislature had come up with, which



 1    was crossing -- had done what they had been told not

 2    to do back in 2015, which was cross the Tampa Bay in

 3    Congressional redistricting.

 4            They were essentially trying to create a

 5    vote sink for Kathy Castor, or, like, for any

 6    Democrat, and to make sure that all the other seats

 7    around it were Republican.  So this was sort of us

 8    replying to the Republican gerrymander of it all.

 9        Q    And you said Ms. Kingery was working for

10    Mr. Diamond's campaign?

11        A    I can't speak to exactly what she was

12    doing by that point.

13        Q    Okay.  What is this reference then to

14    "Does Ben need to call Kathy?"

15            Do you have any understanding of what

16    that's referencing?

17        A    No, not really.

18        Q    Okay.  Would this have been a district

19    that would have put Representative Diamond and

20    Congressman Castor in the same area?

21        A    Oh, I don't know.  I don't know where

22    anybody lived.

23        Q    Okay.  Turn to the next page, page 432.

24    About halfway down the page, a little more than

25    halfway, the response from you, it says, "No



1    worries.  I know you were stuck handling this stuff

2    while running Ben's campaign, so I'm never pushing,

3    just checking before I tweet."

4          Does that give you any additional

5    information as to whether Ms. Kingery may have been

6    working for Mr. Diamond at the time?

7       A    Yeah, that seems to indicate that by that

8    point she was working for him.

9       Q    Turning to the next page, page 433, it's a

10   map at the top of that page.  What is that map?

11      A    This is a fun little thing I did, and I

12   posted it on Twitter.  You know, there's a lot of us

13   in the -- on Twitter, especially in redistricting

14   stuff.  There's quite a few people that are sort of,

15   like, redistricting kind of nerds.  And so the joke

16   sometimes is what kind of crazy gerrymander can you

17   draw?  Like, can you actually draw a Republican

18   district in Massachusetts.

19          And for me the thing was can you try to

20   draw two Democratic districts in red Kentucky.  So

21   it is stuff that we would kind of post for fun.

22   Stuff that was never going to -- it's not something

23   that you were submitting.  It's literally like go

24   online, look at what I drew, you know.  So I guess I

25   was sharing that.  I was pretty proud of it.



1        Q     So this was a map you drew to gerrymander

2   Kentucky?

3        A     For fun, yeah.

4        Q     Okay.  How much time does it take to do

5   something like that?

6        A     That one probably didn't take that long.

7   That one probably took like an hour or two.  You go

8   into Dave's Redistricting app and just start

9   grabbing stuff.

10        Q     Do you typically use Dave's Redistricting

11   app when you're drawing maps?

12        A     Yeah, normally.

13        Q     Why?

14        A     It's a very intuitive, easy-to-use site.

15   It's been around for well over a decade.  And it's

16   been refined a lot, so it's got a lot -- it's got

17   all the major data you need in it, and it's just

18   it's easy to use.

19        Q     What kind of -- what kind of information

20   does it have?

21        A     It has racial data and partisan data.

22   Like, top line partisan, you know, how somebody

23   voted for president or governor, and racial data,

24   like census data.

25        Q     Would that map allow you -- does that map



MATTHEW ISBELL                                November 26, 2024
HODGES vs PASSIDOMO                                        123

1   allow you to draw up a partisan gerrymander easily?

2        A    I mean, it allows you to draw any type of

3   map you want in.

4        Q    Can you turn on partisan data while you're

5   doing the drawing itself?

6        A    Yes.

7        Q    If you wanted to draw a district that

8   would perform in the partisan gerrymander, Dave's

9   Redistricting app allows you to do that?

10       A    Yes.

11       Q    I'll ask you to turn to page 438 now.

12  This is later in your text message exchange with

13  Ms. Kingery.  Can you start reading with the text

14  message that starts "Also half"?

15       A    Oh, okay.  "Also half of me is, like, I

16  literally hate St. Pete, so just take me out now."

17            And then I said "LOL, so I won't lie.  One

18  thought I had for texting you was to be, well, on

19  the plus side, maybe you wanted to stay in

20  St. Pete."

21            And she replied, "It literally crossed my

22  mind."

23            And I LOL'd in reply.

24       Q    Okay.  What -- what does that mean?  Can

25  you give the context for her maybe not having to



1    stay in St. Pete?

2         A    So at that point they were passing the

3    final Congressional map, and one of the things was

4    it does gerrymander Tampa, so Ben Diamond was likely

5    to end his -- to not continue his campaign.  And I

6    think Jena at that point was like I'm fine not

7    staying around in St. Pete.

8         Q    Later on this same page, Ms. Kingery says,

9    "Have you seen Darryl's map?"

10             Do you see that?

11        A    Yes.

12        Q    Who is Darryl?

13        A    That would be Darryl Rouson.

14        Q    Okay.  Who is Darryl Rouson?

15        A    State senator for the Tampa Bay area,

16   based out of Pinellas.

17        Q    Okay.  What was your response to her text?

18        A    "Looking at it now.  It will never happen.

19   It's definitely no good for Tampa."

20        Q    And what does she say?

21        A    "Yeah, we just talked to him."

22        Q    So Ms. Kingery was talking with Senator

23   Rouson, according to her text?

24        A    Apparently, yes.

25        Q    Okay.



MATTHEW ISBELL                                    November 26, 2024
HODGES vs PASSIDOMO                                            125

1           Mr. Isbell, you've been handed a copy of
2    an email.  Do you recognize this?
3         A    Yes.
4         Q    Bates number is Isbell 502 at the bottom.
5    What is this document?
6         A    So this was Jena sending out to the People
7    Over Profits group of us basically the layout for
8    the email she was going to send.  You know, as I
9    mentioned, I would do the articles, and they would
10   then send them out in an email blast.  So she was
11   basically sending this to everyone, I think to
12   review.
13          Like, I had submitted some of these
14   different quotes from my article in the link, you
15   know, you can see is there.  And she was basically
16   confirming how, like, does this look good for the
17   email send out?
18        Q    Who were -- who were the individuals on
19   this email string for approval?
20        A    Sean Shaw, Dan Newman, and myself.
21        Q    Okay.  Sean Shaw is the former state
22   legislator from the Tampa Bay area?
23        A    Yes.
24        Q    And in an earlier discussion today we
25   talked about his potential run for a Congressional



```
 1  seat?
 2       A    Yes.
 3       Q    Dan Newman is a Democratic political
 4  consultant?
 5       A    Yes.
 6       Q    Jena Kingery is also a Democratic
 7  political consultant?
 8       A    Yes.
 9       Q    And she was running the campaign for Ben
10  Diamond, who was also a Congressional candidate in
11  the Tampa Bay area?
12            MS. McNAMARA:  Objection to the form.
13       A    November 8, December, something around
14  here.  Again, I don't want to say when she started.
15            (Exhibit 12 was marked for
16       identification.)
17  BY MR. NORDBY:
18       Q    I'll break it into two parts.  Jena
19  Kingery was also a Democratic political consultant?
20       A    Yes.
21       Q    And at some point Jena Kingery was running
22  a Congressional campaign for Ben Diamond?
23       A    Yes.
24       Q    And then you're on this email string?
25       A    Yes.
```



1      Q    What is the topic of this proposed email
2   to be sent by POP?
3      A    Yeah, this article was an article I wrote.
4   This is before any drafts came out for the state
5   House plans; and I mean, like state legislature, not
6   Congress.  And I had worked on the map of, like,
7   what potential district lines might look like for
8   the Tampa Bay area, Pinellas and Hillsborough
9   County.
10     Q    Do you know why these individuals,
11  Mr. Shaw and Mr. Newman, Ms. Kingery, wanted these
12  articles placed out there?
13     A    Well, to be clear, this is an article that
14  I came up with the idea of the topic for.
15  Basically, the way the People Over Profits contract
16  worked was I was to provide articles contact
17  coverage, but it was my decision really on, you
18  know, hey, I think this is a good thing to write
19  about.
20     Q    Okay.  But do you know why they were
21  paying you to write these articles?
22     A    I can only go by what they told me, which
23  was to provide, you know, redistricting coverage.
24  Per the -- some of the other messages that we've
25  kind of gone over, it was our firm belief that



MATTHEW ISBELL                                    November 26, 2024
HODGES vs PASSIDOMO                                              128

1    Republicans were going to gerrymander the lines,

2    create Republican-leaning maps.  And the idea was to

3    be sort of a counter voice, pointing out flaws

4    and/or alternatives.

5         Q    Alternatives that would perform better for

6    Democrats?

7         A    By not being Republican gerrymanders, yes.

8         Q    And your articles included political

9    performance information, did they not?

10        A    Yes.

11        Q    Okay.  Why is that?

12        A    To highlight if a certain map was passed,

13   whether or not it was designed to benefit

14   Republicans.  You know, in this case, and I don't

15   have the article in front me, but, you know, I would

16   sometimes say, you know, if the Republicans want to

17   draw a gerrymander, if they want to crack Democrats

18   and, you know, keep them confined to a few seats,

19   this is how they could do it.  And these lines would

20   produce these, you know, top line data.

21        Q    And in parallel with these articles, you

22   were also communicating in separate messages with

23   some Democratic legislators about political

24   performance?

25        A    Yeah, in the general year-long process.



1        Q    Okay.  Mr. Isbell, this is a document that
2    was produced in discovery in this case, not by you.
3        A    Okay.
4        Q    But I'm going to ask if you recognize this
5    document at all?
6        A    I will be honest, I do not recall seeing
7    this document before.
8        Q    Okay.  This is a document entitled, at the
9    top is "Matt Isbell redistricting insights."
10       A    Yeah.
11       Q    Do you see why I might ask you about it?
12       A    Yeah, I'm not -- and to be clear, I don't
13   want to say this was never maybe sent to me.  It
14   feels like maybe a compilation of things that I had
15   said or different articles, but I -- I just don't --
16   yeah, some of these graphs, like on the other side,
17   I don't think necessarily I produced it.  If someone
18   sent it to me, I don't recall.
19       Q    Okay.  Take a moment to look at the
20   front --
21       A    Yeah.
22       Q    -- and back, if you would.
23       A    (Examining document.)  So I will stick
24   with the first page for the moment.  So, yeah, this
25   definitely looks like a lot of different items I was



1   saying.  And, you know, again, whether or not I had
2   given -- and I'm not sure who even produced this --
3   so whether or not I -- this was based off data I
4   gave someone or data that I was writing about,
5   because I was definitely, in the lead-up to
6   redistricting, kind of pointing out things like --
7   especially stuff like about the Florida
8   Supreme Court, you know, and what they might do.
9           I was definitely -- I was writing
10  different substacks or articles, some of it part of
11  PO -- the People Over Profits, but also just some of
12  it, like, just stuff that I wanted to write to
13  explain to the sort of layman about redistricting,
14  what was likely to happen.
15          So whether or not this is pulled directly
16  from -- I'm not sure exactly what it's pulled from,
17  but it definitely kind of vibes with what I've
18  articulated before.
19      Q    Okay.  And I'll represent to you this is a
20  document produced by David Grimes --
21      A    Okay.
22      Q    -- in discovery.
23      A    Okay.
24      Q    I think -- did you say earlier that you
25  had spoken to Mr. Grimes?



1        A    Very little.  Whatever texts I sent in the

2   dep- -- in the subpoena stuff.  We never talked

3   about specifics like this.  Not that I recall at

4   least, that's for sure.

5        Q    You think he drew this -- these Matt

6   Isbell redistricting insights from something else?

7        A    Probably.  Probably from, you know -- and

8   again, without knowing for sure, but like a lot of

9   this is stuff I had on, like, my public substacks

10  and that I was tweeting about and messaging about at

11  the time in my newsletters.

12           MR. NORDBY:  We'll call that Exhibit 14?

13           (Discussion off record.)

14           MS. McNAMARA:  13 was the next number.

15           (Exhibit 13 was marked for

16      identification.)

17  BY MR. NORDBY:

18       Q    Mr. Isbell, you have a document in front

19  of you, the Bates number on it at the bottom is SOS

20  Hodges, a lot of zeros, and then an 8 at the end.

21  Do you recognize this document?

22       A    Yes.

23       Q    What is this?

24       A    This is a Twitter DMs with Matt Dixon.

25       Q    Who is Matt Dixon?



 1        A     A reporter here in Florida.

 2        Q     And to be clear, these are Twitter DMs

 3   between you and Matt Dixon?

 4        A     Correct.

 5        Q     And this is a document that you produced

 6   in response to the subpoena for documents?

 7        A     Correct.

 8        Q     Talk to me about, please, about your

 9   communications with Mr. Dixon.  What was the genesis

10   of those?

11        A     I've been talking with Matt Dixon for

12   many, many years.  I talk with plenty of reporters

13   about database analysis, especially.  And I think

14   that was sort of the gist of these conversations

15   here.

16        Q     Okay.  Mr. Dixon in several of these

17   messages asked you to provide an analysis or a quote

18   for a story that he was working on.  Is that a fair

19   characterization of them?

20        A     Yes.

21        Q     Is that something you did?

22        A     Yes.

23        Q     Is this something that you did as part of

24   your People Over Profits contract?

25        A     By this point, I was not working for



MATTHEW ISBELL                                November 26, 2024
HODGES vs PASSIDOMO                                        133

1    People Over Profits anymore.  This was in January of

2    2022.

3        Q    Okay.  What was the reason you engaged

4    with Mr. Dixon in this matter?

5        A    Like I said, I've known Matt Dixon for --

6    for probably a decade now.  Back in the 2015

7    redistricting, when Dixon and Marc Caputo, another

8    reporter, worked for Politico Florida, I was doing

9    some redistricting articles for them at the time,

10   like coverage and stuff.

11            So essentially people like Matt Dixon

12   would view me as like sort of a redistricting

13   authority, you know, someone to get some

14   understanding of maps and information and also to

15   get some quotes.  You know, there would obviously be

16   probably quotes by, you know, me and other people.

17       Q    Do you think you were generally regarded

18   as -- as an expert on redistricting throughout this

19   process?

20            MR. JUNNIER:  Objection, speculation.

21            MS. McNAMARA:  Objection, form.

22   BY MR. NORDBY:

23       Q    Did you understand my question?

24       A    I did.  Yeah, I feel that, yes, they

25   considered me an expert.



MATTHEW ISBELL                                     November 26, 2024
HODGES vs PASSIDOMO                                            134

```
 1        Q    Okay.  Were there members of the
 2   legislature who read your substacks, website, and
 3   tweets?
 4             MR. JUNNIER:  Objection, he doesn't know.
 5        A    Yeah, I can't speak to that.
 6             MR. JUNNIER:  Sorry, I didn't mean to do a
 7        speaking objection.
 8   BY MR. NORDBY:
 9        Q    Did any member of the legislature ever
10   tell you that they had read your substack?
11        A    Yes.
12        Q    Did members of the legislature tell you
13   that they had read your tweets?
14        A    Yes.
15        Q    Did members of the legislature tell you
16   that they had read your website?
17        A    Yes.
18             MR. NORDBY:  That's 14?
19             THE STENOGRAPHER:  Uh-huh.
20             (Exhibit 14 was marked for
21        identification.)
22   BY MR. NORDBY:
23        Q    Mr. Isbell, you have a document now, SOS
24   Hodges 82; do you see that?
25        A    Yes.
```



1      Q    What is this document?

2      A    This is some text messages with Marc

3 Caputo.

4      Q    Between you and Marc Caputo?

5      A    Yes.

6      Q    Is this a document you produced in

7 response to the document subpoena?

8      A    Yes.

9           MR. NORDBY:  Okay.  We'll call this 15.

10          (Exhibit 15 was marked for

11      identification.)

12 BY MR. NORDBY:

13     Q    Tell me about your interactions with

14 Mr. Caputo during the redistricting cycle.

15     A    Marc Caputo's also a reporter here in

16 Florida and, you know, whenever he had maybe

17 questions or wanted some thoughts on the maps, he

18 would reach out to me, similar to Mr. Dixon.  I've

19 known and talked with Marc Caputo for probably a

20 decade at this point, a little less.

21     Q    If you would read the first few texts on

22 here.  I'm going to ask you some questions about the

23 context of those.

24     A    Okay.

25     Q    Sorry, not the first one.  The second



1   string there, starting with the Twitter link.

2        A    Uhm.

3        Q    It says, "What are the race demos of this

4   district's primary?"

5             Read a few and see if that helps you.

6        A    You want me to read it out loud or --

7        Q    No, just to yourself.

8        A    (Examining document.)  Okay.

9        Q    What is this exchange about?

10       A    So this was about -- this was after the

11  legislature had finalized the maps.  They had passed

12  them I think probably at this point about a month

13  ago, the state legislative maps.  And Marc was

14  asking me questions about -- I don't know the

15  number, but what Lauren Book's district was going to

16  be, the district based in southwest Broward County.

17  I think number 35, but I might be wrong.

18       Q    Mr. Isbell, you have a document with a

19  Bates number ending SOS Hodges 56.  What is this?

20       A    This is some Twitter DMs between me and

21  Nathaniel Rakich.

22       Q    Who is Nathaniel Rakich?

23       A    Nathaniel Rakich is a data journalist, is

24  probably the way I would categorize it.  He works --

25  or he did at the time worked for FiveThirtyEight.



1      Q    What is FiveThirtyEight?

2      A    FiveThirtyEight is a political data news

3  website originally created by Nate Silver.

4           MR. NORDBY:  We'll call this Exhibit 16.

5           (Exhibit 16 was marked for

6      identification.)

7  BY MR. NORDBY:

8      Q    I'll ask you to turn to the second page of

9  this.  There's a message about halfway down this --

10  the page.  It starts with "Have you mapped."  Do you

11  see that?

12      A    Yes.

13      Q    Okay.  Could you read that exchange out

14  loud?

15      A    "Have you mapped the new Florida and

16  Florida Senate and House maps?  I thought I

17  remembered you did, but I can't find it via search."

18           "Yep, I have it.  Here they are," and then

19  I send two links.

20           And then he said, "Thanks.  Do you think

21  Dems have a realistic shot at the Senate this decade

22  or nah?"  And then he kind of put in parentheses

23  that he's writing an article about redistricting.

24           And I said, "Not without a shift in

25  coalitions.  They'd have to take all the Biden



MATTHEW ISBELL                                          November 26, 2024
HODGES vs PASSIDOMO                                                    138

 1   seats" -- I list a bunch of numbers there -- "and

 2   they are at risk of losing some others.  You know,

 3   does the math on paper make it possible?  Yes.  Is

 4   it especially likely, given national demographic

 5   trends and current funding discrepancies in the

 6   party?  No."

 7        Q    And then what was your final piece of your

 8   response?

 9        A    Oh, "I'll say this:  It's not the map

10   preventing it."

11        Q    Okay.  Mr. Isbell, you have a document in

12   front of you with a Bates number ending in 18; do

13   you see that?

14        A    Yes.

15        Q    What is this document?

16        A    This is Twitter DMs between me and Andrew

17   Pannatazi (sic) --

18        Q    Who --

19        A    Pantazi.

20        Q    Who is Andrew Pantazi?

21        A    He is a journalist out of Jacksonville.

22        Q    Okay.  When did you come to meet

23   Mr. Pantazi?

24        A    I'll be honest, I cannot recall if -- how

25   long I knew him before this process began.



1      Q    Been more than 10 years?

2      A    I don't believe so.

3      Q    Okay.  Is this the beginning of your

4    exchange here in September of 2021 or had you spoken

5    with him earlier?

6      A    I don't recall.  This might have been

7    when -- based on when you guys were requesting data

8    documents.  I -- probably, but I don't have it in

9    front of me.

10     Q    Talk to me about your relationship with

11   Mr. Pantazi.

12     A    Similar to my relationship with Marc

13   Caputo or Matt Dixon and other reporters, Pantazi is

14   certainly more -- more like, you know, like, not

15   just reports.  He'll, like, try to offer critical

16   analysis.  But I kind of treat it like a -- like a

17   communication with a reporter.

18          We would talk about a lot of different

19   redistricting concepts.  He clearly cared about

20   redistricting, and we would chat a lot about it.

21     Q    Is Mr. Pantazi a journalist, or is he more

22   of an opinion columnist in your view?

23     A    I would definitely consider him a

24   journalist, maybe as well as an opinion columnist.

25     Q    Okay.  Turn to page 20, Hodges 22.



 1        A    I'm on it.

 2        Q    Could you start reading the exchange at

 3   the top of that page?

 4        A    Yes.  "There was a proposal submitted to

 5   the Senate that didn't diminish -- that didn't

 6   diminish, that kept SD19 hold in Hillsborough,

 7   contrasting Bracy with Rouson, who is actively

 8   hurting, and Gibson, who doesn't know which room

 9   she's in.  It is crazy that they are in the same

10   party."

11            And then I replied, "Totally I agree.  I

12   wish I could tweet that, but I have to be nice, but

13   God damn."

14        Q    And what does he say?

15        A    "I literally believe Democrats are

16   fortunate they're not in the majority this time.

17   The Republicans and staff are drawing better fairer

18   maps" that I think Democrats -- "than Democrats

19   would have."

20            And then he says, "Republicans have

21   learned they can win under Fair Maps and seem to

22   just want to avoid litigation.  Democrats are

23   misinformed and keep advocating changes that would

24   hurt Democrats and black voters."

25            And I said, "Yep, you nailed it."



1        Q    Could you turn to page 27.

2        A    Okay.

3        Q    The first text from Mr. Pantazi at the top

4   of that page, could you read that out loud?

5        A    "Cecile -- Cecile Scoon is so close to

6   making good points, but then she botches it with her

7   maximized points."

8        Q    Who is Cecile Scoon?

9        A    I'm trying to remember.  I don't remember

10  which group she was with.

11       Q    Okay.  What was your response to

12  Mr. Pantazi's message?

13       A    The -- "This difference is pretty damning.

14  The House plan leaves black voters out of 7 even.

15  Scoon and Latino Justice getting so much coverage,

16  angered the piss out of me, almost as -- almost as

17  much as Rouson and Gibson."

18       Q    Is that Senator Rouson and Senator Gibson?

19       A    Yes.

20       Q    I ask you to turn to the next page, 28.

21  You have a message about halfway down the page that

22  says, "So my talking point is they are giving us a

23  fake possible new Dem seat while cracking black

24  voters in South Broward."

25            Do you see that?



1    A    Yes.

2    Q    Who is "they"?

3    A    The Republican legislature.

4    Q    Okay.  Had you drawn a map?

5    A    I drew a proposal for Broward, which is on

6  the other page, that I did for an article that I

7  wrote in January.

8    Q    Okay.  And at the bottom of page 28,

9  what's Mr. Pantazi's question to you?

10    A    "Did you submit to the Leg?"

11    Q    And your response?

12    A    "No, I just post publicly.  Let others

13  submit."

14    Q    Okay.  Talk to me more about that.

15    A    That just means that I really didn't have

16  an interest in like officially put -- submitting

17  something to the legislature.  And if people wanted

18  to submit stuff, they could.

19          I was trying to kind of essentially just

20  do my site, talk about these issues, but I wasn't

21  really interested in -- because, quite frankly, I

22  did not think the legislature cared whether anyone

23  submitted, so I wasn't going to waste my time with

24  it.

25    Q    Okay.  Did you talk with any members about



 1  them submitting proposals that you had drawn?

 2       A    I remember that with State Representative

 3  Allison Tant there was -- I had -- and this might

 4  have been before drafts came out for maps, when I

 5  had had the meeting with her and Ramon about

 6  different redistricting, like what might things look

 7  like.

 8            And, again, I -- timeline here, I cannot

 9  remember.  I know I -- and this is part of the

10  documents.  Like, I sent over like a proposal, what,

11  like, an alternative House thing could look like for

12  the Tallahassee area; that if they wanted to then

13  try to turn it into a submittal, they could.

14            You know, I was like giving them, like,

15  you know, this was what kind of makes sense.  But --

16  and I -- again, I don't remember exactly if that was

17  pre- or post-drafts coming out.

18            Other than that, I think that's the only

19  time I sent anything to directly to a lawmaker, as

20  best I can recall.

21       Q    Okay.  Was it your hope that members would

22  take the proposals that you posted publicly and

23  introduce them themselves?

24       A    I was hoping members would submit

25  something, but I did not specifically hope that they



1   would submit something I did.  Part of my write --

2   part of my drafting proposals and writing about them

3   at this point was really just to articulate and make

4   sure the press knew and the public knew, hey, these

5   maps are doing bad things; like in this case it was

6   cracking black voters in south Broward County, which

7   I was greatly offended by.

8           And -- and so I was just sort of

9   highlighting it.  That was just to me sort of part

10  of what I would do, regardless if I knew a lawmaker

11  or not.

12      Q    Can I ask you to turn to page 42.

13      A    Okay.

14      Q    So move forward to late March of 2022.  At

15  this point, Mr. Pantazi sends a text to you that

16  says -- about halfway down the page it starts off

17  with "I've got"; do you see that?

18      A    Yes.

19      Q    Okay.  Could you read that exchange out

20  loud, please?

21      A    "I've got about three versions now I'm --

22  I've worked on that are similar with zero

23  deviation."

24          And I said, "Oh, you beat me.  What is the

25  Biden number there?" -- excuse me -- "I'm at Biden



 1    plus six."

 2              And then he sent a tweet link.

 3              I said, "Gotcha."

 4              And then I said, "I generally turned off

 5    partisan and demographic data while mapping it."

 6              And I said, "I didn't, fuck the process."

 7              "I have" -- And then he said, "I have

 8    another version that's a higher DNI and black

 9    percent."

10       Q    To clarify, Mr. Pantazi said he had turned

11    off partisan and demographic data when mapping it?

12       A    That's what he says, yes.

13       Q    And you said that you didn't?

14       A    No.

15       Q    Why?

16       A    So this was at the point where the

17    Congressional map was the only thing left.  DeSantis

18    had either vetoed the map by now or he was gonna.

19    And the legislature was trying to come up -- I

20    believe this was about creating a Jacksonville-only

21    5th Congressional District.  It would still perform

22    for a black candidate because, you know, DeSantis

23    had said the east-west Tallahassee to Jacksonville

24    thing was a gerrymander according to him, and there

25    was these proposals to create a Jacksonville-only



 1  district.

 2          Now, as far as I was concerned, there was

 3  no reason to turn the political data off because in

 4  order to do a functional analysis for whether or not

 5  a district will perform for a black candidate, you

 6  need to see what the primary looks like and then how

 7  will that district perform in the general.

 8          This also would certainly express my

 9  frustration at this point that DeSantis had involved

10  himself in trying to gerrymander the map the way he

11  eventually did.

12      Q    Do you understand Mr. Pantazi to be saying

13  that he is himself drawing maps?

14          MR. JUNNIER:  Objection, speculation.

15  BY MR. NORDBY:

16      Q    I'm asking how you understood

17  Mr. Pantazi's message:  "I've got about three

18  versions now I've worked on that are similar with

19  zero deviation."

20          How do you understand that?

21      A    I understood it that he was drawing maps.

22      Q    Okay.  And you were drawing maps too?

23      A    Yes.

24      Q    And you were providing Mr. Pantazi

25  political information about the performance of the



MATTHEW ISBELL                                      November 26, 2024
HODGES vs PASSIDOMO                                              147

```
 1   maps that you were drawing?
 2        A    Top line data, yeah.
 3             MR. NORDBY:  That's number 17.
 4             (Exhibit 17 was marked for
 5        identification.)
 6   BY MR. NORDBY:
 7        Q    Mr. Isbell, you have a document with Bates
 8   label SOS Hodges 100; do you see that?
 9        A    Yes.
10        Q    Do you recognize this document?
11        A    Yes.
12        Q    What is this?
13        A    It's an email chain between me and Matt
14   Dixon.
15        Q    Is this a document you turned over in
16   discovery?
17        A    Yes.
18             MR. NORDBY:  We'll call this Exhibit 18.
19             (Exhibit 18 was marked for
20        identification.)
21   BY MR. NORDBY:
22        Q    What is the context of this email exchange
23   between you and Mr. Dixon?
24        A    This was when the initial drafts had come
25   out from the state Senate for both Congressional and
```



 1  state Senate proposals.  And this was us, you know,

 2  I think first waiting for them to be published.  And

 3  then I think they finally got published.

 4       Q    Okay.  On the second page, 101, about

 5  two-thirds of the way down, Mr. Dixon asks you, "You

 6  okay if I drop this quote in our initial draft?"

 7            Do you see that?

 8       A    Yes.

 9       Q    What is the quote beneath that?

10       A    "Overall takeaway, this isn't an

11  aggressive gerrymander, but that's a quick

12  takeaway."

13       Q    That was your response to the initial

14  release of the Senate and Congressional maps?

15       A    Yes.

16       Q    Why did you provide this information to

17  Mr. Dixon?

18       A    This was the normal type of dynamic we

19  had.  He was a reporter, and I wanted to offer my

20  thoughts on the maps for the articles coming up.

21       Q    Okay.  Was this done as part of your

22  People Over Profits contract?

23       A    No.

24       Q    Was this during the time period when you

25  were under contract with People Over Profits?



```
 1        A    Yes.

 2        Q    Mr. Isbell, you have a document in front

 3   of you with a Bates number in the lower right,

 4   Isbell 11; do you see that?

 5        A    Yes.

 6        Q    Do you recognize this document?

 7        A    Yes.

 8        Q    What is this?

 9        A    These are Twitter DMs between me and

10   Nicholas Warren.

11        Q    Is this something you turned over in

12   response to the document subpoena?

13        A    Yes.

14             MR. NORDBY:  We'll call this Exhibit 19.

15             (Exhibit 19 was marked for

16        identification.)

17   BY MR. NORDBY:

18        Q    Mr. Isbell, if I accidentally refer to a

19   Twitter DM as a text, will you understand what I'm

20   talking about?

21        A    Yes.

22        Q    You mentioned earlier that you spoke with

23   Mr. Warren throughout this redistricting process,

24   correct?

25        A    Yes, correct.
```



1     Q    Tell me about the nature of those

2   conversations, generally.

3     A    So, you know, as I kind of mentioned

4   earlier, Nick, I knew, was, like, a very good legal

5   authority on the case laws involved and the federal

6   and state laws involved in it.  I was certainly at

7   this point trying to make sure I understood the

8   different legalese of, like, what was mandated and

9   what wasn't.  And obviously we know each other, so

10  there's also like kind of a friendly dynamic here.

11  It wasn't just like asking about legal questions.

12    Q    Okay.  The first part of this exchange on

13  page 1 is May 23rd of 2021.

14    A    Uh-huh.

15    Q    Tell me where in the redistricting process

16  we were in May of 2021.

17    A    No drafts yet.  And I think we had the

18  census data or we were about to.  Yeah, we had the

19  census data.  No drafts yet.  It was still pretty

20  early in the process.

21    Q    Okay.  So any conversations that you and

22  Mr. Warren had at this point were not commenting on

23  anything that had been proposed by the legislature?

24    A    As best I recall, yes.

25    Q    Okay.  Read Mr. Warren's exchange,



1   starting with the one that says "In general" about

2   halfway down the page.

3        A    Yes.  "In general, given a favorable state

4   judiciary, the pickle they'll find themselves in is

5   this.  They will" certain -- "they will justify

6   certain configurations based on VRA/FDA racial

7   concerns just like last time.  And just like last

8   time, there will be a pretext for partisan

9   gerrymandering.  The state courts won't care, but

10  you can still bring a federal racial gerrymandering

11  claim that race predominated in the drawing of a

12  district and the Leg didn't have a justification for

13  race predomination."

14       Q    Continue.

15       A    "If there's an actual Section 2 or

16  Section 5 issue that would justify their districts,

17  they'll be fine.  But if racial concerns are truly

18  pretextual, they won't be able to defend.  In other

19  states, like North Carolina, you can say it was a

20  partisan gerrymander, not a racial gerrymander, but

21  you obviously can't admit that" it -- "that in

22  Florida, given FDA."

23       Q    And the next one?

24       A    "And that's how you'd win a federal racial

25  gerrymandering claim to undo some of this."



1          Q     How did you understand this analysis?

2          A     This was analysis essentially around the

3    different issues of -- of sort of the issues about

4    when race is predominating and whether or not a

5    district, like, is only existing to grab a racial

6    block with little elder consideration and why that's

7    not okay, and kind of pointing out that in some

8    states that don't -- don't have antipartisan

9    gerrymandering laws, and Florida does have

10   antipartisan gerrymandering laws.  The legislature

11   can't just say oh, no, this is a political

12   gerrymander.

13         I think he's just pointing out that the

14   federal courts would be a better avenue than the

15   state courts, especially because the state courts,

16   as we all know, is more conservative these days.

17         Q     I'm going to ask you to turn to the next

18   page.  About two-thirds of the way down this page,

19   it looks like there's a forwarded link to a tweet

20   with a picture of some maps.  Do you see that?

21         A     Yes.

22         Q     This is on page Isbell 12.  Can you tell

23   what those maps depict?

24         A     This was a -- this was a -- is, the best I

25   recall, this is a screenshot of some maps from



1   redistricting litigation, and this is Congress,

2   Congressional districts.

3        Q    Okay.  And this is Mr. Warren's DM to you?

4        A    Yes.

5        Q    And his comment under that is "Especially

6   gratifying to see people screenshot maps I made."

7        A    Yes.

8        Q    What was your response?

9        A    "Dude, it's sweet."

10       Q    And then what?

11       A    "Also the Tampa Bay never not going to be

12   fought over.  Can't wait for the state Senate

13   fight."

14       Q    What does that refer to?

15       A    Essentially, this was about -- I was

16   figuring that the state legislature would continue

17   to cross the Tampa Bay for -- for the state Senate

18   black district they have.  It's in Hillsborough and

19   goes into Pinellas.  And I kind of figured they were

20   going to try to maintain that gerrymander.  And I

21   was kind of like grumbling that it's probably going

22   to be the situation again.

23       Q    How did Mr. Warren respond to your

24   proposal?

25       A    "Yeah, we will lose that fight."



 1       Q    And then it looks like there may be some
 2   crosstalk, but what was Mr. Warren's next comment?
 3       A    "Unless they trade Brandes for Cruz."
 4       Q    What does -- what did you understand that
 5   to be a reference to?
 6       A    This was a reference to the fact that,
 7   presuming that the Republicans were completely lying
 8   when they said they weren't gonna not use
 9   partisanship as a factor to join their lines, that
10   if they were actually going to not cross the bay,
11   which would have screwed over Senator Brandes in
12   south Pinellas, and it would have turned his
13   Republican-leaning seat into a Democratic-leaning
14   seat, they would probably then try to screw over
15   Senator Cruz to keep the balance.
16           This is basically presuming that while the
17   Republicans say publicly they're not going to
18   gerrymander their maps, I don't believe them.  And
19   he didn't either.
20       Q    So was it your belief that a district that
21   does not connect a portion of St. Petersburg with
22   Tampa would be more likely to elect a Democrat?
23       A    It would create a district in the south
24   Pinellas region that leans more Democratic, yes.
25       Q    And that's something that you would



 1   prefer?

 2        A    No, that's not what I would say.  I would

 3   say that what I care about the most is not crossing

 4   the Tampa Bay to connect black voters.

 5        Q    Why is that?

 6        A    Because you should never be crossing an

 7   open waterway like that to grab a racial group

 8   unless it's the only way, the only way you can draw

 9   the black-performing seat.  And before 2012, that

10   was the argument.  You really could only do it that

11   way.

12             But the way racial data is in Hillsborough

13   now, you don't need to be doing that.  You know,

14   you, like why would you have a district that's in

15   Hillsborough and then cross open water and then grab

16   other people, when you don't need to, to create the

17   racial district you need?

18        Q    Are there any other water bodies in this

19   state that you believe should not be crossed by a

20   district?

21        A    Tampa Bay is the big one.  I'm trying

22   to -- I'm just trying to think off the top of my

23   head here to make sure.  In general, I don't have

24   opposition to any.  There's no other water body

25   that's so big that I have an issue with it.



1        Q    I'll ask you to turn to Isbell 15 now.
2    There's a map in the middle of that page; do you see
3    that?
4        A    Yes.
5        Q    Okay.  This is something sent again on
6    May 23rd, 2011, the same date that the earlier
7    conversation was.  What do you understand that map
8    to be?
9        A    So I can't remember the specifics of why
10   the district lines would have looked exactly the way
11   they did.  This -- this came during a conversation
12   we were having about what the Republicans might try
13   to do in the, sort of, that north Florida region
14   around Gainesville.  And this was presumably, yeah,
15   something Nick drew up and -- and -- and, yeah, I
16   guess it's just one of his proposals about how
17   things might look.
18       Q    This -- this, again, is well before the
19   census results were released?
20       A    No, I believe the census data was out, but
21   we didn't have draft maps yet.
22       Q    At the bottom of this page, you say, "Oh,
23   that will do it."
24            What's that a reference to?
25       A    I'm trying to remember.  I honestly can't



 1    remember exactly if this was, like, oh, this will

 2    look fine or, you know, this will -- you know, this

 3    is what they might try to do.  I really couldn't

 4    tell you really what -- I can't remember at this

 5    point.

 6        Q    Okay.  Mr. Warren asked at the end of this

 7    page, "Are you involved in Caucus strategies or

 8    anything?"

 9        A    Uh-huh.

10        Q    Do you see that?

11        A    Yes.

12        Q    It's my impression that the next two

13    tweets or DMs here are crosstalk --

14        A    Yes.

15        Q    -- before you respond to that question; is

16    that accurate?

17        A    That is correct.

18        Q    What was your response to Mr. Warren's

19    question, "Are you involved in Caucus strategies or

20    anything"?

21        A    "I don't think with members but I'll be

22    doing" -- but I'll be doing -- "I don't think with

23    members, what I'll be doing is still being worked

24    out, I'll say as much."

25        Q    I'm sorry, but actually I asked you to



1    read your message right before there.

2         A    Oh, sorry.  "Directly with members, no.

3    Will I be involved?  Yes."

4         Q    And then you continue to say what?

5         A    "I don't think with members what I'll be

6    doing is still being worked out, I'll say as much."

7         Q    What is that in reference to?

8         A    This was right around the time where I was

9    finalizing the People Over Profits work.  So at this

10   point, I had an idea that that's more the avenue I

11   would be going in.  But I was not getting the

12   specifics because I think things were still being

13   finalized.

14        Q    Okay.  Mr. Warren then responded by

15   saying, quote, I have concerns with how things have

16   been going so far.

17             Do you see that?

18        A    Yes.

19        Q    What -- do you have any sense as to what

20   those concerns are?

21        A    No.

22        Q    Okay.  Did you have concerns with how

23   things had been going so far in May of 2021?

24        A    I don't recall any concerns at that time.

25        Q    I'll ask you to turn to Isbell 20 now.



1   Could you read your message that starts off, "Yo"?

2       A    On 20?

3       Q    On page -- on Isbell 20, June 2nd --

4       A    Oh --

5       Q    -- 2021?

6       A    -- yes.  "Yo, hey, whenever you can, can

7   you send me those links on Florida redistricting

8   cases?  There was some site that had a bunch of past

9   rulings you sent" me -- "you sent my old account.

10  I'm trying to be sure I get my head currently

11  wrapped around some of these."

12      Q    Okay.  This is you requesting that

13  Mr. Warren send you links to Florida redistricting

14  cases?

15      A    Yes.

16      Q    And did he, in fact, send you links to

17  cases?

18      A    Yes.

19      Q    Okay.  Why did you ask him to send you

20  links to those cases?

21      A    So that I could read them and make sure I

22  understood the legal precedence.

23      Q    Is this part of your work for the People

24  Over Profits?

25      A    Yeah, by this point I was gonna start with



1   articles and I was gonna do a history.  And I wanted

2   to make sure I didn't misrepresent the legalese of,

3   like, the past cases, especially the 1990s.

4       Q    Could you turn to page 26.  Remind me

5   again before -- who is Dan Newman?

6       A    Dan Newman's a political consultant.

7       Q    And he was someone you worked with on your

8   People Over Profits project?

9       A    Yes.  Yes.

10      Q    Mr. Warren has a DM here that says, "It's

11  funny, I'm now remembering that last year Dan Newman

12  asked me to come up with a list" of all -- "with all

13  the districts that were protected by the VRA/FDA."

14           Do you have any knowledge of that

15  conversation between Mr. Warren and Mr. Newman?

16      A    No.

17      Q    Okay.  Mr. Newman never mentioned it to

18  you?

19      A    Not that I recall.

20      Q    Mr. Warren never mentioned it to you,

21  other than in this direct message?

22      A    Not that I recall.

23      Q    I'll ask you to turn to page 61 now.

24           Okay.  Do you see a map at the top of that

25  page?



1      A     Yes.

2      Q     Okay.  What does that appear to be?

3      A     This was -- let me read it really quick.

4      Q     Of course.  Take the time you need.

5      A     (Examining document.)  So this was Nick

6   Warren sending me a link to a tweet he had sent out

7   with the map of this proposal, Tampa Bay district.

8      Q     Okay.  And is this a district that the

9   legislature had put forward?

10     A     No, I believe this was something he drew

11  or somebody drew.

12     Q     Okay.  You don't have any other knowledge

13  as to where this came from?

14     A     No.

15     Q     Okay.  What was your response to

16  Mr. Warren's proposed Senate district?

17     A     "One person told me whether the Bay gets

18  crossed might relate to if they try to screw over

19  Cruz and just seat a Pinellas seat."

20     Q     Who told you that?

21     A     Honestly, I'm not sure if I -- Nick had

22  told it to me a while ago, and I was like kind of it

23  was kind of rumbling through my head.  It was

24  definitely the sentiment I had, but I think honestly

25  it might have been the fact that Nick had said it



1    several months back in our earlier exchange.  So

2    that's as best as I can think of.  I couldn't recall

3    any other specific conversation with any specific

4    person.

5        Q    Did you have any other conversations with

6    anyone about a Tampa Bay state Senate district?

7        A    Not that I recall.

8        Q    And let me break that down.  You had

9    conversations with Ms. Kingery about Tampa Bay state

10   Senate districts, correct?

11       A    State Senate?  I'm not sure if we ever

12   talked about state Senate.  I know we talked about

13   Congress, but I guess yeah, the People Over Profits

14   is one of the articles I wrote, so...

15       Q    So as far as you can remember, you're

16   saying that when you told Mr. Warren that "one

17   person told me whether the Bay gets crossed," that

18   one person is referring to Mr. Warren himself?

19       A    I'm saying that I -- that's the only

20   person I can remember, based literally on the thing

21   we just read, that that was there.  So whether or

22   not then there's a different conversation I had that

23   I don't recall, I'm just saying I'm not sure.

24       Q    Turn to page 101.

25       A    Got it.



 1      Q    No, I'm sorry, 102.

 2      A    Okay.

 3      Q    You see the first direct message exchange

 4  on October 18th?

 5      A    Yes.

 6      Q    Starting with an exchange from Mr. Warren,

 7  could you read that, please?

 8      A    "What's the point of preparing great

 9  questions for Dem senators if they don't pay -- if

10  they don't even say a fucking word?"

11      Q    And your response was what?

12      A    "I am losing my mind in a text chain right

13  now.  These people are worthless."

14      Q    Continue reading, please.

15      A    "Yep, in the spring I deleted a tweet that

16  said 'Florida Dems are doing exactly the wrong thing

17  to prepare for this redistricting cycle.' After

18  random important people started shitting on me, wish

19  I hadn't deleted it."

20           And then I --

21      Q    And your response?

22      A    And then I said, "I hear you.  I'm holding

23  public fire for the moment, but it won't last at

24  this rate."

25      Q    Okay.  Could you tell me what you know



1   about the context of this exchange about "What's the

2   point of preparing great questions for Dem senators

3   if they don't even say a fucking word"?

4          MS. McNAMARA:  Objection to the form.

5   BY MR. NORDBY:

6      Q    What do you know about that?

7      A    Not -- other than what he was sending me,

8   not much else.

9      Q    Okay.  Did you prepare any questions for

10  Democratic senators to ask in committee?

11     A    No, not that I recall.

12     Q    Do you know of anyone else who did?

13     A    No, not that I recall.

14     Q    Do you know whether Mr. Warren did?

15     A    Per these messages, it seems like he did.

16  But I'm kind of going based off that.

17     Q    And you responded that you were "losing

18  your mind in a text chain right now."

19          What is that referring to?

20     A    I'm not sure which text chain it was, if

21  it was just me chatting with other politicos or

22  whatnot.  You know, like I talk about redistricting

23  all the time.  You know, I was very kind of involved

24  in it, like obsessed with it.  So I really honestly

25  couldn't remember, you know.  I was definitely



1    frustrated at this point.

2        Q    Do you recall why you were frustrated in

3    October of 2021?

4        A    So it was to this point, it felt like the

5    lawmakers were not asking diligent questions and

6    they were not pushing back on some of the issues.

7        Q    Any more specifics than that?

8        A    No, that was kind of the key thing.  It

9    just felt like the Democrat -- Democratic lawmakers

10   were letting the Republicans just say whatever they

11   wanted to justify their maps and they weren't

12   pushing back enough.

13       Q    I'm going to ask you to turn now to

14   page 115.  About three-quarters of the way down that

15   page, there's what appears to be a picture of a

16   person standing in a corner sad with a party hat on;

17   do you see that?

18       A    Yes.

19       Q    Okay.  Could you explain to me what that

20   is?

21       A    It's a meme.  And then the message is,

22   "They don't know I just submitted a Tampa Bay state

23   Senate map."

24       Q    And what was your response to that?  Let

25   me get the date.  This is November 11th of 2021.



1        A     Yes.

2        Q     What was your response to Mr. Warren's

3   message that he had submitted a Tampa Bay state

4   Senate map?

5        A     "What I find amazing is -- what I find

6   amazing is that the Dem primary makeup for the plan

7   is almost the same as mine, and I don't cross the

8   Bay.  The Pinellas portion isn't even that black

9   since they grab a ring of white liberal Democrats as

10  well."

11       Q     When you say the "Dem primary makeup for

12  their plan," who is "their"?

13       A     The legislature's plan, as I understand

14  it.  That's what I was referring to.

15       Q     Okay.  So -- and when you say "the

16  Pinellas portion isn't even that black since they

17  grab a rim -- a ring of white liberal Dems as well,"

18  they, again, is referring to the Republican

19  legislature?

20       A     Yes.

21       Q     Could you explain what you mean by

22  "grabbing a ring of white liberal Democrats"?

23       A     Yeah, my -- my sentiment was that the --

24  the, you know, Republican legislature said they

25  needed to connect the black voters of Tampa,



1    Hillsborough side of the Bay, and then cross the

2    water to grab the black voting population in

3    St. Petersburg in order to make it a

4    black-performing district.

5            But in their own proposal, they had also

6    grabbed all of these white democratic-leaning

7    voters, which was like kind of counterintuitive to

8    their point about why you're crossing the bay, which

9    is to grab black voters and also, oh, how convenient

10   it is that you're siphoning up more Democrats from

11   the seat that would be north of it.

12       Q    Well, can you explain a little more about

13   that?  You're saying in Pinellas County, that

14   portion of the legislature's district did not

15   primarily grab black voters?

16       A    My -- my -- what I was saying was that

17   the -- of the Senate district that crosses the

18   Bay -- whatever the numbering was at the time; I

19   know all the numbers changed -- is that the Pinellas

20   portion, while it was grabbing the black population,

21   it was also grabbing a bunch of other white voters.

22           So the thing was, like, you're saying you

23   need to cross the bay to connect black voters, but

24   you're also grabbing a bunch of white voters and

25   therefore the primary is less black.  Like, so



1    you're contradicting your own logic for why you're

2    doing it.

3         Q    Okay.  What was Mr. Warren's response?

4         A    "I know mine has a higher black share in

5    the Dem primary than the benchmark."

6         Q    Do you understand that to be Mr. Warren's

7    plan has a higher black share of the Democratic

8    primary than the benchmark?

9              MS. McNAMARA:  Objection to the form.

10   BY MR. NORDBY:

11        Q    How do you understand that?

12        A    That's how I understood it, to reference

13   his map.

14        Q    I'll ask you to turn now to Isbell 128.

15        A    Okay.

16        Q    Could you read starting with the first

17   message on -- second message on that page, the

18   2:17 p.m. message.

19        A    Nick messaged me, "What is the strategy?

20   I really have to ask."

21             And keep reading?

22        Q    Yes.

23        A    And I replied, "For Congress maps, they

24   basically are saying Option B is more compact and

25   keeps more stuff whole or whatever."



 1            And then he said, "No, the coalition of
 2     the Dem strategy and your strategy."
 3            And I said, "My strategy and Dem strategy
 4     is not the same.  I don't talk to those members who
 5     spoke today.  I don't give them advice.  Frankly, I
 6     don't find them capable.  My personal goal is to
 7     push data into the public."
 8            He said, "I see.  This is excruciating."
 9     Q     Which members were you referring to in
10     your response?
11     A     It must have been who was ever speaking at
12     a committee that day.  I think this was in response
13     to committee meetings that were happening that day
14     in the legislature.
15     Q     When you said that your strategy and the
16     Dems strategy is not the same, what did you mean?
17     A     I was trying to kind of reemphasize
18     because I wasn't sure if Nick got it confused or,
19     you know, whatnot.  But like that I was not working
20     directly with any coalition plaintiffs or like the
21     Democratic Caucus.
22            That, like, what I was talking about with
23     redistricting, even though I was still under People
24     for Profits at this point, these were like my words
25     and like what I was pushing as an issue.  So I was



 1  just trying to reiterate, to be clear, I don't know

 2  what the Caucus is doing.  I'm not dictating their

 3  strategy.

 4       Q    Your testimony is you were not working

 5  with the Democratic Caucus?

 6       A    Correct.

 7       Q    You were not working with Democratic

 8  members of the legislature?

 9       A    Well, it was one thing if like a member

10  emailed me or texted me, like Representative Tant,

11  to ask me something.  I was trying to emphasize that

12  I was not like, say, the Caucus's, like, in-house

13  consultant or something in that respect.

14       Q    Who was?

15       A    I have no -- I'm not sure.  At different

16  points I know people like Natalie Kato and others

17  have come up in names, but I still don't know

18  exactly what the structure of any of that was.

19       Q    You were speaking with Joe Dye about

20  redistricting, right?

21       A    Yes, yes.

22       Q    And in an earlier message we saw, he said

23  he had been working on redistricting for the

24  Democratic Caucus?

25       A    Yes.



MATTHEW ISBELL                                  November 26, 2024
HODGES vs PASSIDOMO                                           171

 1        Q    He said Mr. Warren had been coaching him

 2   up?

 3             MS. McNAMARA:  Objection to form.

 4        A    Going back to the documents, he said had

 5   helped him understand some stuff.  I don't remember

 6   the exact framing.

 7   BY MR. NORDBY:

 8        Q    Do you still have Exhibit 5 in front of

 9   you?

10        A    Buried in this stack of documents, but

11   yes.  There we go.

12        Q    Okay.  I'll ask you to turn to Isbell 359.

13        A    Got it.

14        Q    Okay.  Do you see Mr. Dye's message that I

15   was referring to about halfway down that page?

16        A    Yes.

17        Q    Okay.  This is a direct message exchange

18   between you and Joe Dye?

19        A    Yes.

20        Q    Joe Dye was a staffer for the Democratic

21   Caucus of the legislature on the House side?

22        A    Yes.

23        Q    Okay.  What does Mr. Dye say in his direct

24   message at 2:35 p.m. on January 26th?

25        A    "But we've been talking and he's been



1  coaching me on stuff.  Not that I was -- not that I
2  was this bad before."
3       Q    And three messages earlier then that, who
4  is "he"?
5       A    Nick.
6       Q    You understand this to be Joe Dye saying
7  that Nick Warren has been coaching him on stuff?
8       A    Yes.
9       Q    Okay.  You were -- also talked to Joe Dye
10  about redistricting as indicated throughout
11  Exhibit 5, correct?
12       A    Yes.
13       Q    And you talked with Jena Kingery, who is
14  now in charge of the Florida Democratic Party Senate
15  Victory program?
16       A    Yes.
17       Q    And she at the time was working for a
18  member of the legislature, Ben Diamond, who was
19  exploring a Congressional run?
20       A    Yes.
21       Q    You talked to Dave Spore, who was also
22  working for the Democratic Caucus?
23       A    To ask him a couple of quick questions,
24  yes.
25       Q    You talked to Andrew Pantazi?



```
 1        A    Yes.

 2        Q    Okay.  And he spoke with the Democratic

 3   Caucus quite a bit?

 4        A    Oh, I don't know what Ander -- Andrews

 5   did.

 6        Q    Okay.  You talked to Christian Ulvert?

 7        A    Yes.

 8        Q    He's a Democratic political consultant?

 9        A    Correct.

10        Q    He was working for Senator Book at the

11   time?

12        A    Yes.

13        Q    Senator Book was the leader of the

14   Democratic caucus of the legislature?

15        A    Yes.

16        Q    And you talked to Mr. Ulvert and Ms. Book

17   specifically about state Senate districts and how

18   they would perform for her?

19        A    Whether or not she lived in the district.

20        Q    Whether she lived in what district?

21        A    The different districts that were -- the

22   diff- -- which maps, like which district she was

23   living in.

24        Q    What was the purpose of that conversation?

25        A    To clarify, like, what the -- to clarify,
```



 1   like, which -- like, which -- how the lines looked

 2   and like which side of the districts she was in.

 3        Q    She didn't want to be in a district with

 4   another member of the state Senate?

 5             MS. McNAMARA:  Objection to the form.

 6        A    I mean, I -- I can't presume.  I would

 7   presume that that's the case, but, you know -- you

 8   know, she never expressed -- I'm not sure if in the

 9   old exhibit she expressed that directly because we

10   had a phone call.  I can't remember how that -- all

11   the details of that call.  I would presume that no

12   member wants to be in the same district as another

13   member.

14   BY MR. NORDBY:

15        Q    Okay.  And you talked to Representative

16   Tant about the political performance of a proposed

17   district that would affect her?

18             MS. McNAMARA:  Objection to the form.

19        A    Yes.

20   BY MR. NORDBY:

21        Q    And Representative Tant also asked you

22   about the political performance of Senator Ausley's

23   district?

24        A    Yes.

25        Q    But your testimony is that you weren't



```
 1   working with the Democratic Caucus on redistricting?
 2        A    No, because that's a different thing.
 3   Talking to a couple of members, people who I've
 4   known for a long time, to clarify to them when they
 5   ask me questions is one thing.  What I thought Nick
 6   was asking here was, like, am I, like, the general
 7   consultant for the Caucus?  Like, am I, like, doing
 8   what maybe David Grimes or Kato were doing?
 9             Again, I don't know exactly what those
10   roles were.  So that was how I was interpreting this
11   conversation.  So, like, did I talk with members?
12   Yes.  But was I, like, the head of Caucus strategy?
13   No, certainly not because most of what they did, I
14   wouldn't have wanted to do.
15        Q    You would have been more effective than
16   who they had advising?
17             MR. JUNNIER:  Objection.
18        A    I don't want to say that.  I don't want to
19   presume that.  Maybe I would have crashed and
20   burned.
21   BY MR. NORDBY:
22        Q    You don't think that though?
23             MR. JUNNIER:  Objection.
24             MS. McNAMARA:  Objection to the form.
25        A    No.
```



```
 1   BY MR. NORDBY:
 2        Q    I'll ask you to look at page Isbell 132.
 3   We're back on Exhibit 19 now.
 4        A    Okay.
 5             MS. McNAMARA:  Can we take a break at some
 6        point?  I need to use the restroom.
 7             MR. NORDBY:  Of course.  Off the record.
 8             THE VIDEOGRAPHER:  The time is 1:54 p.m.
 9        We're off the record.
10             (A recess took place from 1:54 p.m. until
11        2:04 p.m.)
12             THE VIDEOGRAPHER:  This begins media --
13        this begins the recording for Media Number 4.
14        The time is 2:04 p.m., and we are now on the
15        record.
16   BY MR. NORDBY:
17        Q    Welcome back, Mr. Isbell.  Let me ask you
18   now to pick up where we left off on Isbell 132 of
19   Exhibit 19.
20        A    Yes.
21        Q    Mr. Warren has a message to you near the
22   bottom of that page.  What's that say?
23        A    "You, me, Andrew Pantazi are the real fair
24   districts coalition."
25        Q    And how did you respond?
```



1    A    "Someone has to stand up and do it.  Might

2    as well be us."

3    Q    Okay.  What did you understand that to

4    mean?

5    A    This was really just about the fact that

6    the three of us seemed to be the folks pushing,

7    like, proper questioning and, like, you know, hey,

8    here's the problems with these maps and such.

9         It wasn't like a formal thing.  It was

10   more just like a "we" seem to be the only people who

11   understand what the legislature's doing and are

12   trying to argue against it.

13   Q    Similar to the exchange you had with

14   Mr. Dye earlier, wasn't it?

15   A    I'm trying to think of the timeline here

16   because this was during -- because for the most part

17   I started talking with Dye more in January.  These

18   were back in December.  So at the time my thought

19   about Dye wasn't really in play when that was being

20   sent.

21   Q    I'll ask you to look at page 130-- Isbell

22   133 now.

23   A    Okay.

24   Q    Could you look at the exchange beginning

25   about halfway down the page on December 13th?



 1        A    Yes.

 2        Q    Okay.  What does Mr. Warren say to

 3   initiate this exchange?

 4        A    "There is simply no partisan intent in any

 5   of the draft maps.  They drew Dem seats voluntarily.

 6   The committee's chair's own district gets shaken up

 7   dramatically."

 8        Q    What is this referring to?

 9        A    I'm assuming this is in relation to any of

10   the different draft maps out.  I can't speak to, you

11   know, which drafts these were.

12        Q    Okay.  And based on the response there,

13   did you agree with Mr. Warren's observation?

14        A    No.

15        Q    Okay.  What did you say?

16        A    "I see packing and cracking in Tampa,

17   which I'll argue in my upcoming article.  The" --

18   I'm assuming I meant to say "they" -- "they drew --

19   they draw good in some areas to shield them from bad

20   lines in others."

21        Q    And Mr. Warren did not adhere to your view

22   on that?

23        A    No.

24        Q    He said what?

25        A    "Which indicates a lack of intent.  The



 1   lines fell where they did.  There's no grand scheme

 2   or plan."

 3        Q    Let me ask you to turn to Isbell 148 now.

 4        A    Okay.

 5        Q    There's a message January 14th, 2022, at

 6   10:34 a.m. from Mr. Warren to you.  Could you read

 7   that string first?

 8        A    Yes.  "Could I launder through you a

 9   history lesson thread on the importance of filing

10   floor amendments to maps?  Trying to get Shev or

11   Taddeo or anyone else to file a Tampa map."

12             And I said, "Sure.  It sounds good to me."

13        Q    Okay.  How did you understand that request

14   from Mr. Warren?

15        A    So, one of the big issues kind of to

16   what's already been talked about is that there was a

17   frustration that, like, it seemed the lawmakers

18   understood the benefit of offering up their own

19   proposals.  And Nick had some legal -- I think

20   especially what the thread became was good legal

21   precedent of, like, submitting proposals, because

22   then those proposals could be cited potentially in

23   future litigation.  So, you know -- you know,

24   whether -- you know, why me do it versus him, you

25   know.  He just basically asked if I'd be willing to



1  do it, and I said yeah.

2      Q    Okay.  Did anyone else submit to you

3  material to publish under your own name?

4      A    No, not that I recall.

5      Q    This is unusual?

6      A    Yeah -- no.  I mean, what I would say is

7  that like, you know, there's certainly instances

8  where, like, someone helps you understand something

9  better.  Like, you know, through many conversations

10  with Nick, you know, he'd help me understand the

11  legalese better, for sure.  But that's more about

12  just like kind of helping make sure that what you're

13  saying is correct.

14      Q    That's different from what the request is

15  here?

16      A    Yes, yes.  So this is, as best I know, the

17  only time.

18      Q    Okay.  This is the only occasion where

19  someone requested to, quote, launder through you,

20  end quote, something published on your site?

21      A    On my Twitter.  It was going to be on my

22  Twitter front, but yes.

23      Q    The next message says, "Trying to get Shev

24  or Taddeo, anyone else to file a Tampa map."

25          Who are the individuals referenced there?



 1        A     Senator Shevrin Jones and Senator Annette
 2   Taddeo.
 3        Q     Those are Democratic members of the
 4   Florida Senate?
 5        A     Yes.
 6        Q     How do you understand this reference
 7   "trying to get Senator Jones and Senator Taddeo to
 8   file a Tampa map"?
 9        A     I venture it stems from the fact that it
10   seems that the lawmakers didn't think that they
11   should be submitting anything.  If they had an issue
12   with the proposals, their -- their -- their strategy
13   seemed to be to not submit and let the courts deal
14   with it.
15           And that was sort of like the difference
16   of opinion about, like, whether or not it was good
17   to file a proposal anyway.  Hey, you did this, but
18   what about this instead?
19        Q     Okay.  Did you have any conversations with
20   Senator Jones or Senator Taddeo about filing a Tampa
21   map?
22        A     No.
23        Q     Are you aware of anyone else who did?
24        A     No.
25        Q     You don't know whether Ms. Kingery did?



MATTHEW ISBELL                                          November 26, 2024
HODGES vs PASSIDOMO                                                   182

1        A     No.

2        Q     You don't know whether Mr. Ulvert did?

3        A     No.

4        Q     You don't know whether Mr. Warren did?

5        A     Other than what he said right here.

6        Q     How do you interpret what he says there?

7        A     I wasn't sure if it meant he actually

8    talked to somebody or if it was just about pushing

9    the notion out there that it's important that people

10   submit amendments.

11       Q     Mr. Warren then goes on to say, "Okay,

12   here's a Google doc with the thread, including

13   images/screenshots from an Apportionment 8."

14             Do you see that?

15       A     Yes.

16       Q     Was this a transmittal of the Twitter

17   thread that you then published?

18       A     As best I recall, this was, like, it

19   provided the key data points.  And then I definitely

20   was adding my own language.  He was giving me the

21   specific, like -- like the images and screenshots

22   from Apportionment 8, which sort of had laid out

23   different times where the Court might cite an

24   amendment that was proposed during the process as an

25   alternative then when litigation eventually came



1   around.

2          So how much wording was in there, I don't

3   know if that -- that -- that thing is still live or

4   not, but it was a bit of like making sure I

5   understood the legal precedent so I could put it in

6   my own verbiage to argue the points, which was a

7   point I agreed with.

8      Q   Could you turn now to page 150?  Let me

9   ask you to read this string that starts at

10  4:04 p.m., top of the page.  Starting with

11  Mr. Warren's message to you.

12     A   Okay.  "Makes me feel like we deserve a

13  good midterm in a bad national environment, but I

14  know better than to hope/expect that."

15          I said, "LOL, wouldn't that be ironic?  We

16  gain some left seats and knock DeSantis off in 2022.

17  Frankly, my goals are to defend 3, 14, 13, 10, but

18  even that seems like a monumental task."

19          And he said, "Yep."  And then he said,

20  "Ausley loses in 2010/2014 environments."

21          I said, "Uh-hum."

22     Q   Okay.  When you say "We deserve a good

23  midterm in a bad national environment" -- excuse me,

24  you didn't say that.  You said, "LOL, wouldn't that

25  be ironic?  We gain some left seats and knock



 1 | DeSantis off in 2022."  Who is "we"?
 2 |      A    Democrats.
 3 |      Q    And then provide some context on your next
 4 | response about your goals?
 5 |      A    Yes, so by this point, I believe we either
 6 | had a final state Senate map in mind or it was very
 7 | close.  I think the numbering might have been
 8 | changed.  But I was then looking ahead
 9 | post-redistricting on the state legislative side and
10 | being, like, as now a Democratic operative, you
11 | know, and somebody who cares about Democrats
12 | winning -- excuse me -- what seats it seemed like
13 | were going to be the most -- excuse me -- most
14 | contested.  You know, that there were plenty of
15 | seats that were safely Democratic or Republican, and
16 | these were the seats that were, like, I thought
17 | important for, like, defense in one way, shape, or
18 | form.
19 |      Q    District 3 is where?
20 |      A    This seat right here.  The one that was at
21 | the time held by Loranne Ausley and now Corey Simon.
22 |      Q    Seat 14 is where?
23 |      A    So at this time, I think the numbering
24 | might have changed, but that was what was going to
25 | be the seat in western Hillsborough that -- that was



 1  held by Janet Cruz.

 2       Q    And seat 38?

 3       A    That was the -- what -- one of the

 4  Miami-Dade seats that was south of the city of

 5  Miami.  I couldn't put an exact town in it.

 6       Q    Do you know what 10 is?

 7       A    Yeah, 10 was the district that was -- it's

 8  Seminole County and part of Or- -- Orange County.

 9  It's held by -- I honestly can't remember the

10  senator's name.  He's a Republican.

11       Q    Okay.  Further on this same page, actually

12  part of the same conversation just minutes later,

13  Mr. Warren says, "Hopeful a House Dem proposes

14  amendments."

15            Do you know what that's in reference to?

16       A    I was assuming this was about him hoping a

17  Democratic member would actually propose some

18  amendments to the legislative -- or Congressional

19  plans.  I'm not sure what maps this was in reference

20  to.

21       Q    And what was your response to that?

22       A    "That sounds good.  I'll start that up

23  later today."

24       Q    What is that referring to?

25       A    Oh, that was referring then -- because



 1    then he had sent an update of the thread, and I

 2    don't think I -- yeah, I hadn't done the thread yet

 3    that we had -- that had been discussed in the other

 4    pages.  So I was finally getting around to actually

 5    kind of tweeting out the thread about why it's

 6    important to submit amendments.

 7         Q    It says, "More of the effort to get a

 8    House Democrat to propose amendments to the state

 9    Senate map?"

10         A    Yeah, to emphasize the point that people

11    should be submitting amendments if they have a

12    problem with the map, rather than just sitting on

13    their hands.

14         Q    Did you talk to any House members about

15    submitting amendments?

16         A    No, I don't believe at this point.  I

17    had -- I think, like I said, I had talked with

18    Allison Tant earlier in this month, but I don't

19    believe at this point there was anything about

20    submitting anything.  This was just more of a broad

21    bones, like, frustration with how the Caucus was

22    handling things.

23         Q    I'll ask you to turn to page 152.  There's

24    a message, the second from the bottom.  Is that your

25    Mapping FL; what do you call that, an icon or



```
 1   avatar?
 2        A    Yes.
 3        Q    Is this a link to the -- your version of
 4   the thread that Mr. Warren provided you?
 5        A    Yes.
 6        Q    Okay.  And Mr. Warren appreciated you
 7   sending that?
 8        A    Yes.
 9        Q    Okay.  You didn't reference in that thread
10   that content had come from Mr. Warren, did you?
11        A    I do not recall.  I don't think so, but I
12   don't have the thread in front of me.
13        Q    I'll ask you to turn to page 167 now.
14        A    Okay.
15        Q    There's a -- top, a link to a tweet from
16   Mr. Warren.  The description of it is "Revised
17   Florida House map, how it builds on the first maps
18   from November."
19             Do you see that?
20        A    Yes.
21        Q    Okay.  Does that help you to have some
22   context for the timing of this conversation?
23        A    Yes.
24        Q    Okay.  Mr. Warren says on -- at 4:37 p.m.
25   on this page, "This is a much better drafted map.
```



1  Good job, Lita."

2          Do you see that?

3      A    Yes.

4      Q    Okay.  What was your reaction to the

5  revised Florida House map?

6      A    I was happy that the Tallahassee portion

7  was no longer a Republican gerrymander.  And I --

8  and then I can see down -- further down, I wasn't

9  happy with the lines in Tampa and Alachua and such.

10          But, yeah, this was a reaction to the

11  latest map that the legislature -- legislative

12  committees had released as their proposal.

13      Q    When you say, "Oh, they got rid of the

14  Biden seat in Polk.  Damn," what is that a reference

15  to?

16      A    So in the original two drafts that the

17  state House released, they had two proposals for

18  Polk -- and I wrote about this on my -- on my site.

19  It was that one draft, like, seemed to, like, keep

20  some of the different towns whole.

21          And then the prospect of that, it actually

22  created a seat that leaned towards Democrats.  You

23  know, it was, like, four House seats in Polk, and

24  three would -- being Republican, one would be

25  Democratic.



1              The other proposal was a proposal that

2     cracks -- as far as I'm concerned, cracks in cities

3     to make sure that all four were Republican.

4              So when I was looking at the final draft

5     that the legislature was releasing, it was like oh,

6     okay, Tan- -- Tallahassee is better -- ah, man, they

7     went with the Republican gerrymander version at

8     Polk.  So that was me sort of talking about that.

9        Q    So in your -- in your view, any -- any map

10    that eliminates a Democratic-leaning seat is a

11    gerrymander?

12       A    No.

13       Q    Okay.  You mentioned that Tallahassee's

14    been adjusted one way and Polk another way, but you

15    only described one of those two as a gerrymander.

16       A    So the reason I considered this -- the

17    reason the Tallahassee isn't a gerrymander in this

18    proposal was because it was no longer carving the

19    city up in three ways and siphoning them off into

20    different rural sections.

21             The issue with the Polk maps is, as I

22    saw -- you know, if you draw the lines and they just

23    don't have a Democratic seat, that's fine.  I never

24    thought about Polk County as a like Democratic hot

25    bed.  But it was the fact that the map that they



1   used also seemed to split cities and just seemed to

2   be not as following some of the other Fair District

3   rules.

4          So, yeah -- and I come at this with not

5   trusting the legislature.  So, yeah, I viewed it as

6   a gerrymander.

7          Q    You would have preferred a seat that had a

8   Democratic -- a map that had a Democratic-leaning

9   seat in Polk County?

10         A    I preferred the map that -- yeah, I mean,

11  that had a Democratic-leaning seat and kept the more

12  cities whole in Polk County.

13         Q    Okay.  Mr. Warren responded, "Yeah, well,

14  this is the most compact option in all three

15  regions."

16         A    Yes.

17         Q    And what was your view on the next page

18  about compactness?

19         A    "Compactness means nothing to me."

20         Q    Okay.  Could you explain what that is?

21         A    So this started back in 2015 even.  I grew

22  increasingly -- and I still am -- just sort of

23  exhausted with everyone focusing so much on these

24  compactness scores they come up with.  Like, the

25  legislature has to use these different -- I can't



1 | remember any of the names of the different scores,
2 | but essentially these scores, like Polsby-Popper and
3 | stuff like that.  It's sort of giving mathematical
4 | quotation for, like, how less-jagged a district is.
5 | It essentially aims to make them super compact.
6 |         And while I certainly favor compactness in
7 | the sense of not drawing some of the crazy old
8 | districts from the '90s or anything, I am still very
9 | much a person where, like, I don't -- like,
10 | fundamentally, as somebody who cares about how
11 | district lines are drawn, I don't care about a
12 | compactness score.  I care about how it deals with
13 | towns and cities and communities, and is it biased
14 | by partisanship, is it -- you know, does it give
15 | racial minority groups their fair share of seats?  I
16 | don't care about a mathematical score.
17 |     Q    Okay.  Do you understand the Florida
18 | Constitution requires compactness?
19 |     A    Yes.
20 |     Q    And use of political and geographical
21 | boundaries where feasible?
22 |     A    Yes.
23 |     Q    Okay.  But you said compactness means
24 | nothing to you?
25 |     A    Personally, yes.



MATTHEW ISBELL                                    November 26, 2024
HODGES vs PASSIDOMO                                            192

1        Q    You acknowledge that was something that
2   the legislature appropriately considered?
3        A    What I would say is that the definition of
4   compactness, I agree with things being compact.  And
5   you can look at something on a space and think is it
6   compact?
7             But to say, well, this score is
8   compactness score of 95 percent versus 93 percent.
9   Well, that doesn't mean the 95 is better than the
10  93.  What else is happening here?
11            So it was more of a broader frustration
12  with -- especially specifically compactness scores
13  versus anything else.
14       Q    I'll ask you to turn to 179.  You see the
15  message from Mr. Warren that starts off with "Yeah,
16  she" near the top of the page?
17       A    Yes.
18       Q    Can you read that exchange?
19       A    "Yeah, she has to give lip service -- lip
20  service to her caucus anyhow.  House Dems are
21  apparently going to be another shit show tomorrow."
22            And then I said, "Oh, I have no fucking
23  doubt."
24       Q    Keep going.
25       A    Oh, sorry.  "They are taking really bad



```
 1    advice and ignoring good advice."

 2              And I said, "Oh, God, like what?"

 3              And then he said, "So tweet at them more

 4    and at Dan Daley.  Oh, no, Daley is not

 5    Congressional.  I can't say specifically.  Do you

 6    know who is all in the room advising them?"

 7              And I said, "I know Grimes is a constant

 8    counsel, but otherwise not really."

 9              And then he says, "Oh, wait.  Daley is on

10    legislature."

11              "Yeah, at Daley a ton early on and he

12    started reading off Pantazi's tweets in one meeting.

13    I expect Tant to be quiet now that Leon is fixed."

14        Q    Mr. Warren messaged you to say "They" --

15    meaning the house Democrats -- "are taking really

16    bad advice and ignoring good advice."

17        A    Uh-huh.

18        Q    That's how you understood that?

19        A    Yes.

20        Q    What -- what is the bad advice and what is

21    the good advice, to your understanding?

22        A    At that point, I can't say specifically

23    what this would be related to.  Like, because

24    obviously there's been other discussions about

25    amendments and stuff, but I don't know if there was
```



 1  something about talking points or what.  I don't

 2  know.

 3       Q    Okay.  Had you provided talking points to

 4  anyone in the legislature?

 5       A    No, I mean, again, other than the talking

 6  to members and trying to explain maps and what

 7  something looked like, but there was never a -- you

 8  should say this, or anything like that.

 9       Q    Go to page 183.  Turn to page -- 183,

10  there's a message from Mr. Warren at 5:00 p.m. on

11  January 21st, 2022.  It starts off with the word

12  "Apparently"; do you see that?

13       A    Yes.

14       Q    Okay.  Can you read that string, please.

15       A    "Apparently, the lawyer advising the House

16  Dems dismissed my Haitian map saying it wasn't

17  public data."

18            And then I said, "Is that Grimes or

19  someone else?"

20            And he said, "I don't know.  Things are

21  far worse than we feared.  Starting to think it's

22  more" just -- "it's more than just incompetence.  No

23  one can that be incompetent, right?"

24            And I said, "Let me put my ear lightly to

25  the ground and see if I can confirm who's giving



 1   advice.  I've always heard of some outside firm, so

 2   it might be that."

 3        Q    Okay.  What are you talking about here?

 4        A    So I remember there was a discussion in

 5   January at some point in the legislature.  This had

 6   come up at least in one of the committees, I think,

 7   about considering racial -- like nationality groups.

 8   So this reference to the Haitian map, you know, the

 9   legislature wasn't using nationality data like they

10   had back in 2012.  And so there was this --

11   especially, like, you know, like, I can't remember

12   how much details were in debate at the time, but,

13   like, are you trying to consider, you know, ensuring

14   the Haitian communities or, you know, different

15   nationalities have like unified districts where they

16   can like, you know, have influence.

17            And apparently that was discarded, either

18   it wasn't considered or -- I don't; again, I don't

19   know all the back -- back stage, you know, back --

20   back whatever details.

21        Q    Okay.  Your message at the end of that

22   exchange said that you were going to "see if you

23   could confirm who's giving advice."

24        A    Yes.

25        Q    Is that advice to the House Democratic



 1  Caucus?

 2       A    Yeah, whoever this, like, legal, you know,

 3  whoever, yeah.

 4       Q    And you said, "I've always heard of some

 5  outside firm."  What is that referencing?

 6       A    I mean, that was just the general talking

 7  point around the town.  Like, that there was --

 8  whether it was -- and I never had a good sense of

 9  things, like -- because obviously, you know, like

10  you couldn't talk to people directly, especially in

11  the legislature.

12            But the general vibe you got was like,

13  okay, there's some national group that's like

14  contracting advising, but I wasn't sure about a lot

15  of the details most of the time.

16       Q    And what did you find out?

17       A    So, yeah, next page.  I said, "I give you

18  names.  Don't repeat you got them from me."

19            He said, "Absolutely."

20            And I said, "Natalie Kato is apparently

21  the main consultant."

22            And then he said, "I see.  Anyone

23  outside?"

24            I said, "I'm not even sure if she's inside

25  or outside, but that's the name I keep getting."



1        Q    Are you aware of anyone else other than

2   Natalie Kato who is advising the House Democratic

3   Caucus on redistricting?

4        A    I think we kind of referenced Grimes

5   before at least was working there and maybe was

6   directly involved, but I didn't know -- I didn't

7   know of anyone else.

8             Yeah, that's the extent of which I kind of

9   understood.

10       Q    Okay.  Were you aware that the House

11  Democratic Redistricting Trust was advising

12  Democrats?

13            MS. McNAMARA:  Objection to the form.

14       A    If -- if -- if it was ever mentioned to

15  me, it did not stay in my brain.

16  BY MR. NORDBY:

17       Q    If you look at page 185.  It's a

18  continuation of that same discussion.

19       A    Start at the top?

20       Q    Yeah, you can start at the top of that

21  page.

22       A    "It reveals her ignorance.  She still

23  doesn't understand what the ACS is.  She dismissed

24  my Haitian map this week."

25            And I said, "Oh, my God.  So follow-up.



1  I've never worked with her directly, but the

2  universal reaction I've gotten was that she was

3  doing a bad job and then nothing -- and here and

4  nothing but exasperation."

5          And then she said -- sorry, Nick said,

6  "Multiple nonredistricting people say they don't

7  trust her.  The NDRC is one of her lobbying

8  organizations."

9          And I said, "Good, Lord."

10         And then he says, "I told everyone years

11  ago that anything the NDRC connected would taint the

12  whole Caucus."

13     Q    The words "she" in here -- "her" now in

14  this exchange, you're talking both Natalie Kato?

15     A    Ah, yes.

16     Q    You're sure of that based on the context?

17     A    Yeah, yeah.

18     Q    What is the NDRC?

19     A    National -- I guess National -- I guess it

20  would be the National Democratic Redistricting

21  Committee.  Yeah, I guess.

22     Q    Okay.  Do you understand this to be saying

23  that Ms. Kato, who is advising the House Democratic

24  Caucus, was registered as a lobbyist for the

25  National Democratic Redistricting Committee?



1    A    Yes, that's what this seems to say.

2    Q    Okay.  And then continue your -- with your

3  response to Mr. Warren there.  6:53 p.m.

4    A    Oh, okay.  "Yeah, one pretty prominent

5  person has nothing nice to say.  I don't even

6  understand how she got this gig."

7         "I don't either.  I was talking to Ben

8  Diamond multiple times in 2019, and then he stopped

9  texting me back.  I don't know what happened."

10   Q    Okay.  Who is the "pretty prominent person

11 who had nothing nice to say" about Ms. Kato?

12   A    I'll be honest, I don't recall who I would

13 have been talking to at that point.  A consultant of

14 some sort, for sure.

15   Q    Do you recall speaking with people about

16 Ms. Kato?

17   A    I don't recall who I spoke with.  I

18 remember obviously at this time asking to try to

19 find out, you know, what was going on, but I don't

20 remember who specifically.

21   Q    Would you have remembered that information

22 better a couple of years ago?

23   A    I would assume.

24   Q    Okay.  Mr. Warren mentioned in part of the

25 exchange you had there that he had been talking to



1   Ben Diamond in 2019.  Do you see that?

2       A    Yes.

3       Q    We talked earlier about Ben Diamond and

4   his connections to Ms. Kingery who you were working

5   with?

6       A    Yes.

7       Q    Turn to the next page, to 188.  Read this

8   exchange, starting with the second message down at

9   8:22 p.m.

10      A    "The lack of Democrat amendments to not

11  cross the Tampa Bay for Senate is still angering me

12  a week later, and latest House Dem statement today

13  still hung up on Hispanic districts.  Whole Caucus

14  is fucking worthless."

15          And then Nick says, "Everything is

16  either -- everyone is either receiving terrible

17  advice or no advice and nobody actually knows

18  anything.  They had fucking years.  I can get Senate

19  instinct not to rock the boat, but, yes, it's

20  depressing.  Whoever hired Kato should get their

21  head chopped off.  And the issue we've been -- we've

22  been pounding for months has been raised by lower

23  level staff, tossed in the trash every single

24  issue."

25          And I said, "If I had no soul, I'd just



 1  have gone to work for the Republicans."

 2          And he said, "I tried to."

 3          And I said, "Honest to God, you could

 4  probably have steered them in a good direction.  At

 5  least you'd be heard."

 6      Q    What do you know about this reference:

 7  "All the issues we've been pounding for months have

 8  been raised by lower level staff."

 9          Do you know what that's in reference to?

10      A    No, not really.

11      Q    Okay.  You don't know whether that refers

12  to Joe Dye?

13      A    No.

14      Q    Turn to Isbell 200, next page.  Can you

15  read from that exchange starting at the top, please?

16      A    "House Dem leadership said suspension from

17  the Caucus is on the table if anyone submits maps."

18          I said, "What?  Are they going to suspend

19  Anika for voting for the House bill in committee?

20  Fucking hell."

21          And then he said, "And they are -- they

22  think winning in court is a slam dunk."

23          And I said, "Oh, boy, are they about to be

24  shocked."

25          And Nick said, "They're on drugs.  Their



1    lawyers are on drugs."

2              I said, "I have no doubt."

3              So the committee pages -- and then -- oh,

4    yeah, so "And then the committee pages still don't

5    show a Friday meeting of a set that or could they

6    delay it again?"

7              And then it's -- you want me to keep

8    reading about the meeting itself?

9         Q    No.  What do you know about -- about this

10   supposed directive about suspension from the Caucus

11   as that referred to?

12        A    So Nick mentioned it to me, and -- and so

13   I think that was -- yeah, that was obviously the

14   first I heard of it.  And I -- what I gleaned at the

15   time was that apparently the directive of the

16   strategy of the Democratic Caucus was:  Don't submit

17   anything.  Let them just pass stuff and courts will

18   sort it out.

19              That was the -- kind of the extent to it.

20        Q    Okay.  Do you have any other independent

21   knowledge of those Caucus discussions?

22        A    I don't remember if Dye mentioned them or

23   not.  If anybody else, it probably would have been

24   him.  But other than that, I don't believe so, or I

25   don't recall.



```
 1            MR. NORDBY:  Can we take a five-minute
 2       break now?  I may be done.  I want to confirm.
 3            THE WITNESS:  And then I think my attorney
 4       might have a couple of followups.
 5            MS. McNAMARA:  Yeah.  Well, I have some
 6       questions as well.
 7            THE VIDEOGRAPHER:  The time is now 2:35,
 8       and we are off the record.
 9            (A recess took place from 2:35 p.m. until
10       2:48 p.m.)
11            THE VIDEOGRAPHER:  This begins the
12       recording for Media Number 5.  The time is
13       2:48.  We are now on the record.
14                     CROSS EXAMINATION
15   BY MS. McNAMARA:
16       Q    Hello, Mr. Isbell.  My name is Caroline
17   McNamara.  I'm a counsel for the plaintiffs.  I have
18   a few questions for you.
19            Can we go to Exhibit 5?  That's the text
20   messages with Joe Dye.
21       A    Okay.
22       Q    Do these text messages represent all of
23   the communications you had with Mr. Dye?
24       A    I don't know.  This is what I submitted
25   per the timeline of stuff.  I'm sure there's
```



1  communications after this timeline.

2       Q    Were there communications before this

3  timeline?

4       A    No, I do not believe so.  This is when he

5  first reached out.

6       Q    Okay.  And have you had any telephone

7  conversations with Mr. Dye?

8       A    Yes.

9       Q    How many?

10      A    One, as best I recall.

11      Q    Okay.  If you'd turn to page 363 in the

12 texts.

13      A    Yes.

14      Q    You see on 3-2-22, 8:49 p.m.?

15      A    Yes.

16      Q    What is -- can you read me the text that

17 Joe sent you and what you respond with?

18      A    So he said, "What's your number?"

19           And I said, "(954 559-7459."  Sorry, I'll

20 slow down.  "(954)559-7459."

21           "They had" -- and then Joe said, "They had

22 a meeting tonight, which is why all the amendments

23 got repealed."

24           And I said, "Fucking hell.  Number above."

25      Q    Is -- is this when the telephone



1    conversation happened?

2        A    Yes.

3        Q    And you had no previous telephone

4    conversations with him?

5        A    Correct.

6        Q    And was this before or after the Senate

7    and House district maps were passed?

8        A    I believe this was after.

9        Q    Did you ever meet with him in person?

10       A    No, not that I ever would be aware of.

11       Q    Would you recognize Mr. Dye on the street

12   if you saw him?

13       A    No.

14       Q    Now there's some messages in here about

15   the coaching that we discussed before.  That is

16   page 359.

17       A    Yes.

18       Q    What is the -- what is the date on which

19   Joe Dye messaged you about "He has been coaching me

20   on stuff"?

21       A    January 26th, 2022.

22       Q    Do you have any awareness of what Joe Dye

23   might have been coached on before then?

24       A    No.

25       Q    This -- this is -- you only know about



1    this from what he said in this text message; is that

2    correct?

3        A    Correct.

4        Q    Now, if we go to -- let me put this one

5    away.  If we go back to Exhibit 19, the Nick Warren

6    DMs.

7            You testified you've known Mr. Warren for

8    a decade; is that correct?

9        A    Correct.

10       Q    How did you first meet him?

11       A    So it's actually, it's hard for me to

12   really remember.  I was trying to figure that out at

13   one point.  I just remember that we probably made

14   contact via the internet and redistricting focus

15   during the 2015, '16 cycle.

16           I remember us having some conversations

17   about historic maps and -- and some of this was kind

18   of lost because my old Twitter account was nuked.

19   But it was definitely kind of around that 2015

20   redistricting era.  You know, exactly first contact,

21   hard to remember.

22       Q    Have you ever met Mr. Warren in person

23   before today?

24       A    Yes.

25       Q    How many times?



1        A    As best I recall, only once.

2        Q    When was that?

3        A    So that's a great question.  I cannot

4   remember if it was before or after COVID.  And it

5   was -- Nick Warren was in town, and we met to get a

6   drink and chat about redistricting and data stuff,

7   and, you know, that general vibe, at what used to be

8   Water Works, which is now sadly closed.  I do

9   believe this was before the COVID pandemic in the

10  2022 redistricting cycle.

11       Q    Okay.  And it was after the 2015

12  redistricting was done?

13       A    Yes.

14       Q    Somewhere in between 2015 and 2020?

15       A    Correct.

16       Q    And that's the only time you met him in

17  person?

18       A    As far as I recall, yes.

19       Q    When we all arrived here this morning, did

20  you recognize Mr. Warren?

21       A    No.

22       Q    When you -- he introduced himself to you?

23       A    (Nods head.)  Yeah, and then I was, like,

24  oh, Nick.

25       Q    Okay.  Okay.  So going to the Warren DMs,



1    page 128.  This is the 12-2-2021, "What's the

2    strategy?  I have to ask."

3              This is the part where, you know, Nick

4    Warren, he asks you, "The Coalition and Dem

5    strategy, your strategy?"

6              That was in -- that's in December 2nd,

7    2021?

8         A    Yes.

9         Q    This was before you -- before the -- I'll

10   pull it out.

11             This happened weeks before the statement

12   where Joe Dye said that Nick Warren was coaching

13   him?

14        A    Correct.

15        Q    Do you have any basis to think that Joe

16   Dye's coaching him is tied in any way to this

17   statement from 12-2-21?

18        A    No, I don't know how they made contact.

19        Q    Were your conversations with Mr. Warren

20   about the Tampa Bay redistricting issue contained

21   within Twitter DMs?

22        A    Yes.

23        Q    And you followed him on Twitter for a

24   number of years?

25        A    Correct, yes.



MATTHEW ISBELL                                    November 26, 2024
HODGES vs PASSIDOMO                                              209

1        Q    And that's primarily how you know him?

2        A    Yes.  As I recall, our initial -- that's

3    always -- that's definitely been the main mode of

4    communication and, you know, goes back to my old

5    Twitter account that's no longer active.  Yeah.

6        Q    Have you ever had any other mode of

7    communication?

8        A    There was one instance, and it's kind of

9    referenced in these documents, that he sent me some

10   audio, like, recordings of him to explain some long

11   legalese about, like, different racial predominant

12   stuff.

13             This was more of like abstract, like this

14   might have been earlier in the summer.  I -- you

15   know, it's in the submitted documents I sent; that

16   it was essentially just him, rather than typing out

17   a long form of stuff, he sent me audio of him just

18   explaining things verbally, which was better for me

19   to kind of grasp some of the legal.

20             But other than that, as best I could

21   recall, it's all been Twitter DMs.  If there was

22   texting back in the -- long time ago, you know, old

23   phones, but not that I recall.

24       Q    So beside the voice memos and the one

25   in-person meeting you had before COVID, all your



MATTHEW ISBELL                                    November 26, 2024
HODGES vs PASSIDOMO                                           210

1   communications are contained in these Twitter DMs?

2       A    As best I recall.

3       Q    Did you ever tell Mr. Warren that you were

4   working for People Over Party?

5       A    Oh, and really quick, just one

6   clarification -- probably not much.  But there were

7   at times it would be an email, where like normally

8   it was like, hey, can you email me, like, do you

9   have a historic file?  Or can you send me a case

10  file?

11       But those emails were largely just

12  something like -- and most of that's like way before

13  all this.  It would be like, hey, can you send me,

14  you know, that PDF you have of old maps, so...

15       Q    Setting aside the question I asked

16  before --

17       A    Yeah.

18       Q    -- but going on what you're talking about,

19  if -- if he was -- Mr. Warren was sending you an

20  email, it was in service of the conversation you

21  were having?

22       A    Yes, sending an attachment, yes.

23       Q    Okay.  So going back to the question I

24  asked a second ago, did you ever tell Mr. Warren

25  that you were working for this People Over Party



MATTHEW ISBELL                                         November 26, 2024
HODGES vs PASSIDOMO                                                  211

1   committee?

2        A    I'm not sure that I ever did.

3        Q    I mean, I saw in here that you mentioned

4   that there was -- you weren't sure yet that you

5   could say what your relationship was?

6        A    Correct.  Yeah.  I'm not sure if I ever

7   outright just told him, hey, I'm doing work for this

8   group, you know.

9        Q    Did People Over Party ever ask you about

10  Mr. Warren?

11       A    No, not that I recall.

12       Q    Did they ever ask you to go find some

13  lawyer to help you understand the assignments

14  they're giving you?

15       A    No, that was -- that -- I reached out to

16  Nick about that stuff because it was like I wanted

17  to make sure I wasn't misrepresenting anything.  So

18  that was all me to make sure I was accurate about

19  stuff.

20       Q    So is it fair to say that you had a

21  contracted task to do, and in your own judgment, you

22  thought that Mr. Warren could help you --

23            MR. JUNNIER:  Object to the form.

24  BY MS. McNAMARA:

25       Q    -- understand?



```
 1               MR. NORDBY:  Object to the form.
 2        A     In general, me reaching out to Nick --
 3   and, honestly, I would have been reaching out to
 4   Nick about a lot of this stuff even if I had not
 5   been under contract.  I wanted to make sure I
 6   understood.
 7               And kind of the early messages point to
 8   that there have been conversation, an old Twitter
 9   where -- even back in 2020 probably -- excuse me --
10   I was trying to get a feel for the actual legal case
11   law.
12               But then when I then took on the People
13   Over Profits contract, I definitely was like okay,
14   now I really need to get on this to make sure,
15   because if I'm going to write about this stuff, I
16   don't want to be quoting the wrong case.  So, yeah.
17   BY MS. McNAMARA:
18        Q     If you ever had told Mr. Warren you were
19   working for People Over Profit, would you have done
20   it through these DMs?
21        A     Yes.
22        Q     Do people ever message you unsolicited
23   about Florida redistricting?
24        A     Oh, yes.
25        Q     Would you say it's a common occurrence?
```



1          A     During the redistricting cycle, it was

2    fairly common.  It slows down, obviously, but I get

3    a lot of unsolicited DMs.

4          Q     Why do you think that is?

5          A     Because I'm a pretty prominent name in

6    sort of like the Florida redistricting and data

7    scene in general, with my site and my newsletter and

8    my quotes in the press.  I'm definitely considered,

9    like, sort of like the -- I have people who ask me

10   questions, like, hey, how did this area vote or

11   whatnot.

12              So, yeah, I'm kind of considered like a --

13   as I said, a Florida data geek, and people

14   definitely reach out to me about questions.

15         Q     If someone reaches out to you and you

16   don't know who they are, do you do anything to vet

17   who they are before you respond to them?

18         A     It can vary.  Not often.  I don't get into

19   it that closely.  You know, there's plenty of people

20   I just might never get a chance to even reply to,

21   and there's a lot of, you know, questionable

22   accounts.

23              But if someone reaches out and it doesn't

24   seem overtly weird, I'll reply, yeah.  I'll

25   answer -- I'll answer them when I can.  You know,



```
 1   it's not always.
 2        Q    I'll pull up Exhibit Number 6.
 3        A    Which one's 6?
 4        Q    It's a one-page in early January.  It's
 5   like --
 6        A    Yes.
 7        Q    -- talking about Christian Ulvert and
 8   Lauren Book.
 9        A    Yes.
10        Q    When did you write this document?
11        A    When I was -- when I got my initial
12   subpoena back in 2023 over the Congressional
13   redistricting stuff, I submitted this as part of my
14   list of communications I had with different leaders.
15        Q    You wrote this in 2023?
16        A    Yes.
17        Q    And the events you're describing happened
18   in 2022?
19        A    Yes.
20        Q    Early January of 2022?
21        A    Yes.
22        Q    Did you have a writing from January 2022
23   that you used to base this on?
24        A    No.
25        Q    Is it just based on your memory a year
```



1   later?

2        A    Yes, when I was, like, going through the

3   different texting messages and stuff that I

4   submitted with Christian Ulvert and others, it kind

5   of jogged my memory:  Oh, that's right, I had a

6   phone call with Christian Ulvert and Senator Book.

7   And then I kind of recalled it the best I could.

8        Q    So why did you write it?

9        A    To try to not -- I didn't want to hide

10  anything.  I wanted to be like, hey -- because I was

11  subpoenaed to ask for any infor- -- any

12  communication I had with different lawmakers.

13       Q    Pull up Exhibit 7, which is --

14       A    Yeah.

15       Q    -- similar to it.  When did you write

16  Exhibit 7?

17       A    2023, as well, the same time I wrote

18  Exhibit 6, in response to the subpoena.

19       Q    Okay.  But the content of Exhibit 7 is

20  referring to May of 2021?

21       A    Correct.

22       Q    And did you base this on any notes you had

23  from 2021?

24       A    The text with Dan Newman and Jena about

25  like the meeting time, and I just kind of remembered



1    the broad brushes of the meeting.

2         Q    Let's look at Exhibit 9.

3         A    Which one's that?

4         Q    This is Dan Newman text messages.

5         A    Okay.

6         Q    It's stamped --

7         A    Yeah.

8         Q    -- Isbell 0000409?

9         A    Yes.

10        Q    And in this -- on the first page here,

11   you're talking about "Florida 15."

12        A    Yes.

13        Q    Is that Florida's 15th Congressional

14   District?

15        A    Correct.

16        Q    And when you -- you testified earlier, you

17   would talk about -- I don't know if it was House or

18   Senate, are you -- do you remember that?

19        A    I don't.  I don't remember if this was the

20   plan that was submitted by the state Senate or the

21   state House, but the Florida 15 references

22   Congressional districts.

23        Q    Okay.  So it's -- it's the two -- the

24   Florida House or the Florida Senate, considering the

25   Congressional map?



 1          A     Correct.

 2          Q     This has nothing to do with the -- either

 3     the House or Senate maps for the Florida --

 4          A     Correct.

 5          Q     -- legislature?

 6                Any knowledge -- you can put that back.

 7                Any knowledge you have about Nicholas

 8     Warren comes solely from your Twitter DMs with

 9     him -- I mean, there's more of them --

10          A     Correct, yeah.

11          Q     And you've disclosed those, as well as the

12     voice memo?

13          A     Yes.

14          Q     And you had that one meeting with him

15     pre-COVID?

16          A     Yes.

17          Q     And publicly available information that

18     you've obtained?

19          A     Correct.

20          Q     Nothing else?

21          A     No, not that I recall.

22          Q     And so with Joe Dye, any knowledge you

23     have about him comes from your Twitter DMs with him?

24          A     Correct.

25          Q     And that one telephone call you had?



```
 1        A    Correct.
 2        Q    And publicly available information about
 3   him?
 4        A    Correct.
 5        Q    But nothing else?
 6        A    No, not that I recall.
 7             MS. McNAMARA:  I have no further
 8        questions.
 9             THE VIDEOGRAPHER:  Counsel, prior to going
10        off record, would you like to place any
11        transcript or video orders?
12             MR. JUNNIER:  Yeah.
13             MR. NORDBY:  His coun- -- his counsel may
14        have --
15             THE VIDEOGRAPHER:  State your name and
16        what you're --
17             MR. JUNNIER:  Richard Junnier,
18        J-U-N-N-I-E-R.
19             THE VIDEOGRAPHER:  And transcript and
20        video?
21             MR. JUNNIER:  Just the transcript.
22             THE VIDEOGRAPHER:  Very well.
23             Counsel?
24             MR. NORDBY:  Dan Nordby for the Senate.
25        We'll ask for the transcript and video, please.
```



1        THE VIDEOGRAPHER:  Video synced or

2    unsynced?

3        MR. NORDBY:  Synced, please.

4        THE VIDEOGRAPHER:  Very well.

5        Counsel?

6        MS. McNAMARA:  Yes, we'll take the

7    transcript and the video.  Same as what he has.

8        THE VIDEOGRAPHER:  Very well.

9        That concludes all orders today.  The time

10   is 3:05 p.m.  That concludes today's

11   deposition.  We are off the record.

12        (Proceedings concluded at 3:05 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25



MATTHEW ISBELL
HODGES vs PASSIDOMO

November 26, 2024
220

```
 1                 CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA          )

 4   COUNTY OF LEON            )

 5           I, the undersigned authority, certify that

 6   MATTHEW ISBELL personally appeared before me on

 7   November 26, 2024, and was duly sworn.

 8

 9

10           SIGNED AND SEALED on December 8, 2024.

11   IDENTIFICATION: Driver's license.

12

13

14

15            SANDRA L. NARGIZ
              RPR, RMR, CRR, CRC, CCR-GA
16            snargiz@comcast.net
              Commission #HH239213
17            EXPIRES: APRIL 18TH, 2026

18

19

20

21

22

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1               CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA    )

 3   COUNTY OF LEON      )

 4            I, SANDRA L. NARGIZ, Registered

 5   Professional Reporter, certify that I was authorized

 6   to and did stenographically report the remote

 7   deposition of MATTHEW ISBELL; that a review of the

 8   transcript was requested, and that the foregoing

 9   transcript, pages 1 through 219, is a true record of

10   my stenographic notes.

11            I further certify that I am not a

12   relative, employee, attorney or counsel of any of

13   the parties, nor am I a relative or employee of any

14   of the parties' attorney or counsel connected with

15   the action, nor am I financially interested in the

16   action.

17            DATED on December 8, 2024.

18

19

20

21            SANDRA L. NARGIZ
              RPR, RMR, CRR, CRC, CCR-GA
22            Notary Public in Florida
              snargiz@comcast.net
23

24

25
```



```
 1              DEPOSITION ERRATA SHEET

 2

 3
          Job No.  J11986497
 4

 5        Case Caption:   KETO NORD HODGES, et al.,

 6        vs.  KATHLEEN PASSIDOMO, et al..

 7

 8

 9         DECLARATION UNDER PENALTY OF PERJURY

10

11             I, MATTHEW ISBELL,

12      declare under penalty of perjury that I have

13      read the entire transcript of my

14      Deposition taken in the captioned matter

15      or the same has been read to me, and

16      the same is true and accurate, save and

17      except for changes and/or corrections, if

18      any, as indicated by me on the DEPOSITION

19      ERRATA SHEET hereof, with the understanding

20      that I offer these changes as if still under

21      oath.

22           Signed on the _____ day of

23      _____, 2024.

24

25   _____
     MATTHEW ISBELL
```



```
 1                  DEPOSITION ERRATA SHEET

 2        Page No._____Line No._____Change

 3    to:_____

 4

 5    _____

 6        Reason for

 7    change:_____

 8        Page No._____Line No._____Change

 9    to:_____

10

11    _____

12        Reason for

13    change:_____

14        Page No._____Line No._____Change

15    to:_____

16

17    _____

18        Reason for

19    change:_____

20        Page No._____Line No._____Change

21    to:_____

22

23    _____

24        Reason for

25    change:_____
```



MATTHEW ISBELL                                    November 26, 2024
HODGES vs PASSIDOMO                                            224

```
 1        Page No._____Line No._____Change

 2   to:_____

 3

 4   _____

 5        Reason for

 6   change:_____

 7        Page No._____Line No._____Change

 8   to:_____

 9

10   _____

11        Reason for

12   change:_____

13        Page No._____Line No._____Change

14   to:_____

15

16   _____

17        Reason for

18   change:_____

19

20   SIGNATURE:_____DATE:_____

21          MATTHEW ISBELL
            J11986497
22

23

24

25
```



```
 1              DEPOSITION ERRATA SHEET

 2      Page No._____Line No._____Change

 3   to:_____

 4

 5   _____

 6      Reason for

 7   change:_____

 8      Page No._____Line No._____Change

 9   to:_____

10

11   _____

12      Reason for

13   change:_____

14      Page No._____Line No._____Change

15   to:_____

16

17   _____

18      Reason for

19   change:_____

20      Page No._____Line No._____Change

21   to:_____

22

23   _____

24      Reason for

25   change:_____
```



MATTHEW ISBELL                                          November 26, 2024
HODGES vs PASSIDOMO                                                  226

1        Page No._____Line No._____Change

2    to:_____

3

4    _____

5        Reason for

6    change:_____

7        Page No._____Line No._____Change

8    to:_____

9

10   _____

11       Reason for

12   change:_____

13       Page No._____Line No._____Change

14   to:_____

15

16   _____

17       Reason for

18   change:_____

19

20
     SIGNATURE:_____DATE:_____
21           MATTHEW ISBELL
             J11986497
22

23

24

25

