## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KÉTO NORD HODGES, *et al.*,

     *Plaintiffs*,

v.

                                     Case No. 8:24-cv-879-CEH-TPB-ALB

BEN ALBRITTON, in his official
capacity as President of the Florida
Senate, *et al.*,

     *Defendants*.

_____/

## PRESIDENT ALBRITTON'S TRIAL BRIEF

Florida Senate President Albritton provides the following trial brief addressing issues and evidence that will require the Court's attention at trial, and proposing findings of fact and conclusions of law derived from the evidence to be presented at trial.

### Introduction

In 2016, 2018, and 2020, Florida conducted its congressional and state senate elections based on court-ordered maps imposed after extensive state-court litigation over claims of partisan gerrymandering. *See League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258 (Fla. 2015) (approving remedial congressional plan); *League of Women Voters of Fla. v. Detzner*, No. 2012-ca-2842 (Fla. 2d Cir. Ct., Dec. 30, 2015) (adopting remedial senate plan). Following the 2020 Census, the Florida Senate adopted redistricting procedures intended to avoid a similar

result. After months of public deliberation regarding potential district configurations, the Senate unanimously passed Senate Joint Resolution 100 (the "Enacted Plan") to apportion Florida's legislative districts. The Florida Supreme Court subsequently entered a declaratory judgment affirming the validity of the legislative apportionment under the Florida Constitution following a proceeding in which no party challenged the map's configuration. *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d 1282 (Fla. 2022).

More than two years later, Plaintiffs filed suit claiming that two senate districts in the Tampa Bay region—Districts 16 and 18—are "racially gerrymandered in violation of the Fourteenth Amendment." Doc. 1 at 1. The Court granted summary judgment against Plaintiffs as to District 18 because Plaintiffs offered no direct or circumstantial evidence of racial gerrymandering as to that district. Doc. 95 at 10-11.

Plaintiffs' remaining claim against District 16 will fail on the merits at trial. Plaintiffs acknowledge that the Florida Constitution required the Legislature to be *aware* of racial demographics to confirm that District 16's configuration did not "diminish" the ability of racial minorities to "elect representatives of their choice." Fla. Const. art. III, § 21(a). Stated differently, Plaintiffs do not seek a "race neutral" configuration of the Tampa Bay region. Instead, Plaintiffs effectively ask this Court to conclude that District 16 is racially gerrymandered simply because it includes portions of Hillsborough and Pinellas Counties; Plaintiffs prefer an alternative

configuration of the district with similar racial demographics that does not include a portion of Pinellas County.

Plaintiffs' claim that District 16 is a racial gerrymander requires proof they do not have: namely, that facially neutral district lines are "unexplainable on grounds other than race." *Miller v. Johnson*, 515 U.S. 900, 905 (1995) (quoting *Shaw v. Reno*, 509 U.S. 630, 644 (1993)). The evidence proves that the contrary is true: District 16 is compact both visually and by quantitative measures, adheres closely to political and geographical boundaries, and maintains a historical configuration joining portions of Tampa and St. Petersburg in a single senatorial district. These facts defeat any circumstantial attack on District 16's "shape and demographics," Doc. 1 ¶97. And Plaintiffs offer no direct evidence that racial considerations improperly predominated over traditional race-neutral redistricting criteria in the configuration of District 16.

The evidence at trial will show that race did not predominate in the configuration of District 16, and that it is not an unconstitutional racial gerrymander.

### Factual Background and Proposed Findings of Fact

In addition to the admitted facts contained in the parties' Final Pretrial Statement (Doc. 101), President Albritton provides the following proposed findings of fact relevant to the issues in this case.

A.    **The Florida Legislature approves the Enacted Plan.**

Following the 2020 Census, the Florida Legislature was required to redraw the state's congressional and legislative districts to account for changes in the state's population. Ex. 1 (Jt. Trial Ex. 2) at 3-5 (Florida Senate Committee Meeting Expanded Agenda Sept. 20, 2021). At its first two meetings, the Senate Committee on Reapportionment received informational briefings on the census data and legal requirements governing redistricting. Exs. 1, 2 (Jt. Trial Exs. 2, 5) (Florida Senate Committee Meeting Expanded Agendas Sept. 20 and Oct. 11, 2021 (including presentation on federal and state legal requirements)). An overriding consideration for the Florida Senate was to avoid the circumstances that resulted in litigation and the imposition of a court-drawn map following the 2010 Census— a "shadow process" in which "partisan, political operatives from both parties wrote scripts and recruited speakers to advocate for certain plans or district configurations to create a false impression of a wide-spread grassroots movement." Ex. 3 (Jt. Trial Ex. 1) at 17:8-17 (Senate Committee on Reapportionment Sept. 20, 2021). To that end, enhanced disclosure requirements were imposed on anyone testifying before the Committee or submitting comments, suggestions, or maps for consideration. *Id.* at 17:18-18:21. The Senate's professional staff were directed not to review or consider publicly submitted maps "unless and until a senator asks them to do so in writing." *Id.* at 18:22-19:1. And the Committee unanimously adopted a series of directives establishing priorities and standards that would

4

govern the drawing of senate district maps by professional staff. Ex. 4 (Def. Trial Ex. 6) (Sen. Rodrigues Memo dated Oct. 18, 2021).

In the Tampa Bay region, the court-imposed Benchmark Plan from 2015 included a district containing portions of Hillsborough and Pinellas Counties in which racial minority voters could elect a candidate of their choice. That district, Senate District 19 in the 2015 Benchmark Plan, is depicted in orange below:



Ex. 5 (Jt. Trial Ex. 11) at 45 (Florida Senate Committee Meeting Expanded Agenda Nov. 17, 2021).

The Senate Select Subcommittee on Legislative Reapportionment held three public meetings to workshop and comment on staff-drawn draft maps. Exs. 5-7 (Jt.

Trial Exs. 11, 14, 17) (Florida Senate Select Subcommittee Meeting Expanded Agendas Nov. 17, 29, 2021 and Jan. 10, 2022). The four staff-drawn draft maps initially presented at the November 17 meeting were drawn in accordance with the Committee directives and included two configurations of Tampa Bay, each of which maintained a district containing portions of Hillsborough and Pinellas Counties. Those alternative drafts of District 19 are depicted in orange below:

 

Ex. 5 (Jt. Trial Ex. 11) at 53, 69. For District 19, each of these staff-drawn drafts adhered more closely to existing political and geographical boundaries than the corresponding district in the Benchmark Plan. *Compare id.* at 46 (70% use of recognized political and geographical boundaries for Benchmark District 19) *with id.* at 54 (73% use of recognized political and geographical boundaries in Plan 8010), and *id.* at 70 (77% use of recognized political and geographical boundaries in Plan 8014). Each of the draft alternatives was also more compact than Benchmark District 19 on at least one quantitative compactness measure. *See id.* (reflecting Convex Hull, Polsby-Popper, and Reock Ratio compactness measures

6

for Benchmark and draft alternatives). And a functional analysis of the staff-drawn alternative districts confirmed that they would not diminish the ability of racial minorities to elect candidates of their choice as compared to Benchmark District 19. *See id.* at 49-52, 57-60, 73-76.

At the conclusion of the November 17 meeting, the Senate's professional redistricting staff were directed to look for "improvements and consistency in the application of the various tradeoffs" involved in redistricting. Ex. 8 (Jt. Trial Ex. 10) at 34:8-10 (Senate Legislative Reapportionment Subcommittee Nov. 17, 2021). And at the November 29 and January 10 meetings, the Select Subcommittee received presentations from professional staff on updated draft maps reflecting iterative improvements on various redistricting metrics throughout the state. Ex. 6, 7 (Jt. Trial Exs. 14, 17). The improvements in the Tampa Bay region over the course of the drafting process are apparent visually:



Ex. 7 (Jt. Trial Ex. 17) at 15. As revised, draft District 19's use of recognized political and geographical boundaries increased to 82% (as compared to 70% in the court-imposed benchmark district) and its Convex Hull and Polsby-Popper compactness scores were superior to the court-imposed benchmark district. *Compare* Ex. 7 (Jt. Trial Ex. 17) at 27, *with* Ex. 5 (Jt. Trial Ex. 11) at 46.

At its January 10 meeting, the Select Subcommittee recommended two draft maps for consideration by the Committee, each of which had an identical configuration of the Tampa Bay region. Exs. 7, 9 (Jt. Trial Exs. 17, 16) (Senate Legislative Reapportionment Subcommittee Jan. 10, 2022). The Reapportionment Committee held a final meeting, adopted amendments to renumber the districts[1] and eliminate minor splits in five cities, and favorably reported CS/SJR 100 by a vote of 10-2.[2] Ex. 10, 11 (Jt. Trial Exs. 19, 20) (Senate Committee on Reapportionment Jan. 13, 2022 and Florida Senate Committee Meeting Expanded Agenda Jan. 13, 2022).

The full Senate passed CS/SJR 100 on January 20, 2022. Fla. S. Jour. 215 (Reg. Sess. 2022). After the Florida House of Representatives adopted an amendment to add the representative districts, the Senate unanimously concurred in the House amendment and passed the Enacted Plan by a vote of 37-0. Fla. S.

---

[1] District 19 in the Benchmark Plan and draft maps was renumbered as District 16 in the Enacted Plan.
[2] The Florida Senate, *Committee Vote Record*, https://www.flsenate.gov/Session/Bill/2022/100/Vote/2022-01-13%200130PM~S00100%20Vote%20Record.PDF.

Jour. 325 (Reg. Sess. 2022). District 16, the subject of Plaintiff's claims in this case, is depicted in yellow below:



Ex. 12 (Def. Trial Ex. 314) at 1 (Enacted Map Full Map and Stats).

The Florida Senate Reapportionment Committee's directives to staff show that traditional redistricting criteria, such as the compactness, boundary usage, and population equality requirements in article III, section 21(b) of the Florida Constitution ("Tier Two" requirements), were not subordinated to predominant

racial concerns in the configuration of the senate districts. Ex. 4 (Def. Trial Ex. 6). The Committee's directives required professional redistricting staff to comply principally with the objective and race-neutral "Tier Two" constitutional standards. *Id.* at 1-2. The directives explicitly recognize a secondary role for the race-conscious non-diminishment requirement: "[W]hen drawing compact districts consistent with the population equality requirements, and that utilize political and geographic boundaries where feasible," professional staff were also to "*confirm* that the districts comply with the Tier-One constitutional standards and with federal law." *Id.* at 2 (emphasis added). Because every district in the Enacted Plan (including District 16) complies with the Tier-Two standards, no district presents the conflict between Tier One and Tier Two that might suggest racial predominance.

District 16's compliance with the objective and race-neutral Tier Two criteria further confirms that racial considerations did not predominate over traditional redistricting criteria. District 16 is a compact, contiguous[3] district with only minor deviations from the ideal population of a Florida senatorial district under the one-person, one-vote standard. Ex. 12 (Def. Trial Ex. 314) at 1-2. District 16 maintains the general historical configuration of the court-imposed Benchmark District 19,

---

[3] The Florida Supreme Court has defined "contiguous" as being in actual contact: touching along a boundary or a point." *In re Constitutionality of House Jt. Resol. 1987,* 817 So. 2d 819, 827 (Fla. 2002). The definition "does not impose a requirement of a paved, dry road connecting all parts of a district. Contiguity does not require convenience and ease of travel, or travel by terrestrial rather than marine forms of transportation . . ." *Id.* at 828 (cleaned up).

which also joined portions of Tampa and St. Petersburg in a single senatorial district. The Senate's map drawer, Jay Ferrin, confirmed in his deposition testimony that the Senate carefully and intentionally drew the district lines based on objective criteria directing the numerous decisions affecting the location of District 16's boundaries. Ex. 13 at 13:15-24, 14:6-9, 33:20-24, 48:19-49:6, 55:11-15 (Ferrin Depo); *see also id.* at 52:11-54:22, 86:1-87:2, 90:8-14 (Senate drew the district lines and then looked to confirm that the districts complied with the Florida Constitution's non-diminishment standard, balancing tier-one and tier-two compliance through a dynamic process); *id.* at 84:1-21 .

Based on these findings regarding the Senate's processes and the non-racial criteria that drove its configuration, the Court should find that race was not the predominant factor in the design of District 16 and that District 16 is not a racial gerrymander in violation of the Fourteenth Amendment.

**B.    Nicholas Warren advocates before the Senate for an alternative configuration of the Tampa Bay region without disclosing his affiliations or collaboration with partisan political interests.**

At its November 17 meeting, the Select Subcommittee heard public testimony on an alternative district configuration proposed by Mr. Nicholas Warren. Ex. 8 (Jt. Trial Ex. 10) at 30:5-31:16; Ex. 14 (Def. Trial Ex. 140) at 44:15-21 (Warren Depo). Mr. Warren publicly justified his preferred configuration of the Tampa Bay region districts on "Tier Two" grounds—specifically, alleged improvements in compactness. *See* Ex. 8 at 30:5-10, 31:1 (Warren public testimony that his concern was limited to "one issue with Tier-Two compliance" and that his

proposed map had "Tier-Two advantages"). Mr. Warren did not assert that the staff-drawn configuration of the Tampa Bay districts was a "racial gerrymander." Ex. 14 (Def. Trial Ex. 140) at 44:15-21.

Mr. Warren did not disclose his affiliation with the ACLU of Florida on his redistricting map submission form, his committee appearance card, or in his legislative testimony. Ex. 15 (Def. Trial Ex. 163) (Warren Suggestion Form); Ex. 16 (Def. Trial Ex. 144) (Warren Appearance Card); Ex. 8 (Jt. Trial Ex. 10) at 30:5-31:16. After Mr. Warren's affiliations were noted by the press, Reapportionment Committee Chair Rodrigues sent a memorandum to all Senators advising them that Mr. Warren was employed by an entity with an interest in redistricting. Ex. 17 (Def. Trial Ex. 12) (Sen. Rodrigues Memo dated Nov. 22, 2021). Mr. Warren's employer responded by disavowing any connection to his committee testimony or proposed map. Ex. 18 (Def. Trial Ex. 13) (ACLU Letter dated Nov. 24, 2021). And Mr. Warren himself responded, in writing, to state that he had "collaborated with no person or organization on any of [his] submitted maps." Ex. 19 (Def. Trial Ex. 14) (Warren letter dated Dec. 8, 2021).

Discovery, including Mr. Warren's own deposition in this case, has revealed Mr. Warren's extensive collaboration on redistricting matters with Matthew Isbell, a partisan political operative working on redistricting data analysis for the Florida Democratic Party and its candidates and officeholders (including members of the Florida Senate and their political consultants). Mr. Warren and Mr. Isbell specifically discussed potential configurations of Tampa Bay senatorial districts

and their partisan impacts for Democratic and Republican Party candidates. *E.g.*, Ex. 20 at pdf 14 (Excerpts of messages between N. Warren & M. Isbell); Ex. 14 at 62:12-63:23. Mr. Warren disclosed to Mr. Isbell in advance that he had submitted the senatorial map that would form the basis of his committee testimony. Ex. 20 at pdf 22. Mr. Warren enlisted Mr. Isbell in his efforts to find Democratic legislators to offer amendments to the redistricting legislation, including amendments regarding the Tampa Bay region. *Id.* at pdf 31. Mr. Warren then "launder[ed]" an article he had drafted regarding redistricting through Mr. Isbell, an article that was published to Mr. Isbell's website under Mr. Isbell's byline without attribution to Mr. Warren. *Id.*; Ex. 14 at 80:1-8. Mr. Warren complained to Mr. Isbell that Democratic legislators would not ask "great questions" prepared for them. Ex. 20 at pdf 21. And Mr. Warren held private meetings and emailed legislators and partisan office staff from the House and Senate Democratic Caucuses regarding redistricting. Ex. 14 at 17:13-18:19, 20:2-21. None of this information indicating a potential partisan bias prohibited by the Florida Constitution was publicly disclosed by Mr. Warren in connection with his submission of and advocacy for a senatorial map containing an alternative Tampa Bay region.

As noted above, the Florida Senate responded to its experience in the 2012-15 redistricting litigation by adopting prophylactic measures to ensure that no district was "drawn with the intent to favor or disfavor a political party" in violation of the Florida Constitution. To "safeguard against the kind of shadow process that

occurred in the last cycle" and "astroturfing" by "partisan, political operatives," the Florida Senate's professional redistricting staff were directed not to review or consider publicly submitted maps "unless and until a senator asks them to do so in writing." Ex. 3 (Jt. Trial Ex. 1) at 17:8-19:1. No senator proposed an amendment incorporating Mr. Warren's preferred configuration of the senatorial districts in the Tampa Bay region.

Based on these findings, the Court should conclude that the Florida Senate's decision not to adopt Mr. Warren's preferred configuration of the Tampa Bay senatorial districts was not driven by prohibited racial considerations, but by its good faith efforts to comply with the Florida Constitution's prohibition on intentional partisan favoritism.

## Legal Argument and Proposed Conclusions of Law

In addition to the agreed principles of law contained in the parties' Final Pretrial Statement (Doc. 101), President Albritton provides the following proposed conclusions of law relevant to the issues in this case.

### A.    Plaintiffs must *prove* racial predominance to succeed on their claim.

Plaintiffs' bar at trial is very high. To succeed in this racial gerrymandering challenge, Plaintiffs bear the burden to show that the Legislature used race as the "predominant" motive in drawing district lines. *Miller*, 515 U.S. at 916. Plaintiffs must "prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for

14

political subdivisions or communities defined by actual shared interests, to racial considerations." *Id.* The burden is "a demanding one." *Id.* at 928 (O'Connor, J., concurring).

Courts approach any inquiry into the legislature's motives in a gerrymandering case with "extraordinary caution," *Miller*, 515 U.S. at 916, starting with the "presumption that the legislature acted in good faith," *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024). The presumption is "especially stringent" in redistricting cases, requiring "district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10-11.

Underlying this presumption is the reality that redistricting is a "most difficult subject"—one that presents a "complex interplay of forces" and requires the "balance [of] competing interests." *Miller*, 515 U.S. at 915-16. State legislatures must clear a "legal obstacle course," *Abbott v. Perez*, 585 U.S. 579, 587 (2018), navigating "delicately balanced requirements regarding the consideration of race," *id.* at 585. Thus, federal courts recognize that scrutinizing reapportionment plans "represents a serious intrusion on the most vital of local functions," *Miller*, 515. U.S. at 915, and that a plan grouping voters of a certain race into the same district may well "reflect wholly legitimate purposes," *Shaw*, 509 U.S. at 646.

**B.    The Legislature relied on traditional race-neutral districting principles in the development of senatorial districts in the Tampa Bay region.**

Plaintiffs typically "need to show that the State's chosen map conflicts with traditional redistricting criteria." *Alexander*, 602 U.S. at 8; *see generally Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 190 (2017) ("In fact, this Court to date has not affirmed a predominance finding, or remanded a case for a determination of predominance, without evidence that some district lines deviated from traditional principles."). But here, as discussed above, the record evidence shows extensive conformity with traditional race-neutral districting criteria—most significantly, the Florida Constitution's requirements of population equality, boundary usage, compactness, and contiguity and its prohibition on intentional partisan favoritism. *See* Fla. Const., art. III, § 21(a)-(b); Ex. 21 at 4 (Senate's Responses and Objections to Plaintiffs' First Set of Interrogatories) (Senate's objectives in drawing District 16 were "to comply with the applicable provisions of state and federal law . . . including the Florida Constitution's requirements that districts be as equal in population as practicable, compact, and use existing political and geographical boundaries where feasible.").

The record reflects that the Senate carefully and intentionally drew the district lines on non-racial traditional constitutional criteria that predominately influenced the numerous decisions embodied in the location of the District 16 lines. Ex. 13 at 13:15-24, 14:6-9, 33:20-24, 48:19-49:6, 55:11-15; *see also id.* at 52:11-54:22, 86:1-87:2, 90:8-14 (Senate drew the district lines and then looked to

confirm that the districts complied with the Florida Constitution's non-diminishment standard, balancing tier-one and tier-two compliance through a dynamic process). For example, the Senate sought to draw districts that consist of contiguous territory for tier-one compliance, and to draw compact districts "with district population deviations not to exceed 1 percent of the ideal population of 538,455 people" for tier-two compliance. *Id.* at 18:6-10. And the Senate "ran compactness scores for all districts and all plans and looked at them as a whole, as well as regionally" utilizing both visual and mathematical scores in a "total assessment" "relevant to the compactness basement." *Id.* at 19:18-20, 20:7-12. Indeed, the Florida Supreme Court has concluded that the Senate districts in the Enacted Plan "are visually at least as compact as the districts that they replace—in many cases more so." *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1287.

District 16 also maintains the general Hillsborough-Pinellas configuration of District 19 in the court-imposed Benchmark Plan. *See, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 338 (2017) (Alito, J., concurring in judgment in part and dissenting in part) (noting "common practice" of "chang[ing] the boundaries of the prior districts only as needed to comply with the one-person, one-vote mandate and to achieve other desired ends" to "honor settled expectations and, if the prior plan survived legal challenge, minimize[] the risk that the new plan will be overturned.").

It is also undisputed that the Enacted Plan demonstrates a high use of "existing political and geographical boundaries," *id*. at 1288, —82% in District 16, Ex. 22 at 11 (McCartan Report). To confirm, the Senate used a boundary analysis report "to measure the coincidence of a district boundary with each category of political and geographic feature[]." Ex. 13 at 31:18-20; *see also id*. at 32:3-8.

District 16 in the Enacted Plan aligns with traditional districting principles and defeats Plaintiffs' claim that deviations exist that would be attributable to race.

## C.  The Legislature's confirmation that District 16 complied with the Florida Constitution's non-diminishment requirement does not amount to racial predominance in the district's configuration.

Under Supreme Court precedent, the Fourteenth Amendment does not prohibit all consideration of race during the redistricting process. As the Court recently reaffirmed, "[t]he line that we have long drawn is between consciousness and predominance." *Allen v. Milligan*, 599 U.S. 1, 33 (2023). And "awareness" of race does not violate federal law. *Miller*, 515 U.S. at 916. Although the Florida Senate was *aware* of race when developing the Enacted Plan, that showing is legally insufficient to establish a violation of the Equal Protection Clause.

Of course, a legislature engaged in redistricting will "almost always be aware of racial demographics, but such race consciousness does not lead inevitably to impermissible race discrimination." *Allen*, 599 U.S. at 30 (cleaned up); *see Miller*, 515 U.S. at 916 ("Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the restricting process."). Where, as here, mapmakers considered traditional

18

redistricting criteria, like compactness, contiguity, political and geographic boundary usage, and population equality—and merely considered race—a racial gerrymander claim fails. *Allen*, 599 U.S. at 31-32.

The material evidence here establishes that the Florida Senate permissibly *considered* race only as required by the federal Voting Rights Act and the Florida Constitution. In its decision affirming the state-law validity of this legislative apportionment, the Florida Supreme Court noted that the Legislature had looked to "objective statistical data" to confirm that the Enacted Plan would not "diminish minority voters' ability to elect representatives of their choice." *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1290. But the record evidence described above also shows that traditional redistricting factors such as compactness, contiguity, boundary usage, and population equality were not outweighed by race. On these facts, Plaintiffs cannot establish racial predominance. *See Alexander*, 602 U.S. at 8 (The Supreme Court has "never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence" of racial predominance.).

And while Plaintiffs' claim of racial predominance appears to focus on the portion of District 16 in Pinellas County, the Supreme Court has also instructed courts to consider "the legislature's predominant motive for the design of the district *as a whole*." *Bethune-Hill*, 580 U.S. at 192 (emphasis added). As to District 16, neither direct nor circumstantial evidence shows racial predominance.

### a. No direct evidence of racial predominance

Plaintiffs have been unable to adduce any direct evidence of racial predominance. Each plaintiff testified that he had no specific evidence that racial criteria predominated in the redistricting process. *See* Ex. 23 (Def. Trial Ex. 3) at 35:12-15 (El-Amin Depo) ("All I know is that to put—go across a body of water and put one group in South St. Pete, in with the Hillsborough side, don't seem as fair to me."); Ex. 24 (Def. Trial Ex. 139) at 39:1-3 (Seymour Depo) ("[O]ther than what is obvious on the map and through – yeah, what's on the map, I am not bringing any other sort of evidence."); Ex. 25 (Def. Trial Ex. 15) at 48:13-14 (Nord Hodges Depo) ("I'm not sure at this time, but I can't see why else you would need to draw a district in this way.") No documents in discovery or elsewhere in the record provide direct evidence of racial predominance in the configuration of District 16. At most, Plaintiffs seize on isolated comments by individual legislators, some of which are wrenched from their context and others of which do not clearly even relate to the configuration of District 16. Even if those statements indicate "a relevant state actor's express acknowledgement that race played a role in the drawing of district lines," *Alexander*, 602 U.S. at 8, they do not plausibly establish predominance.

### b. No circumstantial evidence of racial predominance

Having no direct evidence of racial predominance, Plaintiffs rest their case on supposed circumstantial evidence of the Legislature's intent, based on Plaintiffs' general awareness of the racial composition of South St. Petersburg. But

this speculation does not provide material evidence of racial predominance. A district court granted summary judgment against plaintiffs in *Johnson-Lee v. City of Minneapolis*, 2004 WL 2212044, at *1 (D. Minn. 2004), who raised similar arguments. There, "plaintiffs testified that they believed that racial considerations predominated" the redistricting process, pointing to racial composition of various regions. *Id.* at *14. But, as here, the plaintiffs "d[id] not have any direct or personal knowledge of the Redistricting Commission's intent to discriminate." *Id.* Therefore, "the testimony of plaintiffs that the Redistricting Commission's racial focus is obvious from the resulting map cannot, without corroborating evidence, support their claim," and summary judgment was warranted. *Id.* at *15, *17.

Although Plaintiffs claim that the district's "shape and demographics" are "circumstantial evidence" of racial predominance, Doc. 1 ¶97, that argument quickly falls apart upon examination of the evidence. While District 16 comprises part of two neighboring counties, so do many other districts in the Enacted Plan. And the undisputed objective facts on traditional districting indicators such as compactness, population equality, contiguity, and boundary usage are substantially in the state's favor. As noted above, the district's configuration was predominantly driven by these factors—not race.

Given District 16's overall adherence to traditional redistricting criteria, Plaintiffs cannot establish that its shape is so "highly irregular" or "bizarre" that it provides circumstantial evidence of racial predominance. *Cooper*, 581 U.S. at 308. Comparing the evidence here on shape and demographics with the evidence in

cases where racial predominance *was* found shows that Plaintiffs lack material facts to prove their case.

For example, conspicuous combinations of "high population deviation" and "twisted shapes" or "an iguana-like shape" have been found to "bear witness to racial motivation." *Abrams v. Johnson*, 521 U.S. 74, 89 (1997). Elsewhere, "drawing of narrow land bridges to incorporate within the district outlying appendages containing nearly 80% of the district's total black population"—in addition to "considerable additional evidence" in the form of witness testimony to the use of race—was enough to support a claim for racial gerrymander. *Miller*, 515 U.S. at 917. And when "Alabama expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote)," that constituted "evidence that race motivated that drawing of particular lines in multiple districts." *Ala. Leg. Black Caucus v. Alabama*, 575 U.S. 254, 267 (2015). But no evidence of the sort exists here.

Nor will expert testimony at trial bolster Plaintiffs' allegations of racial predominance. As Plaintiffs' experts expressly acknowledge, Plaintiffs' alternative plans contain a similar black voting age population in their District 16 to that in the Enacted Plan, further undercutting any suggestion that racial considerations predominated. *Compare* Ex. 26 (Barreto Report at 3, 7 (Plan A BVAP of 30.8%, Plan B BVAP of 30.8%, and Plan C BVAP of 30.0%))*, with* Ex. 12 at 2 (Dist. 16 BVAP of 33.2%)). Plaintiffs' alternative plans score far worse than the Enacted Plan's Tampa Bay districts on the use of existing political and geographical

boundaries; the quantitative compactness score also fail to provide any basis to judge the Plaintiffs' proposed alternatives objectively superior.

The Court should conclude that District 16 does not violate the Equal Protection Clause of the Fourteen Amendment, in that racial considerations did not predominate in its configuration.

Respectfully submitted,

CARLOS REY (FBN 11648)
**FLORIDA SENATE**
404 South Monroe Street
Tallahassee, Florida 32399
(850) 487-5855
*Rey.Carlos@flsenate.gov*

*/s/ Daniel Nordby*
RICKY L. POLSTON (FBN 648906)
DANIEL E. NORDBY (FBN 14588)
DENISE M. HARLE (FBN 81977)
TARA R. PRICE (FBN 98073)
KASSANDRA S. REARDON (FBN 1033220)
**SHUTTS & BOWEN LLP**
215 South Monroe Street, Suite 804
Tallahassee, Florida 32301
(850) 241-1717
*RPolston@shutts.com*
*DNordby@shutts.com*
*DHarle@shutts.com*
*TPrice@shutts.com*
*KReardon@shutts.com*

ALYSSA L. CORY (FBN 118150)
**SHUTTS & BOWEN LLP**
4301 W. Boy Scout Blvd., Suite 300
Tampa, Florida 33607
(813) 227-8103
*ACory@shutts.com*

*Counsel for Florida Senate President Ben Albritton, in his official capacity*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2025, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

*/s/ Daniel Nordby*

Attorney
