**Florida Senate Select Subcommittee on
Legislative Reapportionment
January 10, 2022**

Transcript of video recording available at:
https://thefloridachannel.org/videos/1-10-22-senate-select-subcommittee-on-legislative-
reapportionment/

Exhibit 9

P-000939

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1    Chair Burgess: Good afternoon everybody. The committee on legislative reapportionment

2  will now come to order. Dana, please call the roll.

3    Dana: Senator Burgess.

4    Chair Burgess: Here.

5    Dana: Senator Bracy.

6    Senator Bracy: Here

7    Dana: Senator Gibson.

8    Senator Gibson Here.

9    Dana: Senator Rodriguez.

10    Senator Rodriquez: Here.

11    Dana: Senator Stargel.

12    Senator Stargel: Here.

13    Dana: The quorum is present, Mr. Chair.

14    Chair Burgess: Please silence all electronic devices and anyone wishing to speak before

15  the committee should complete an appearance form and hand it to a member of the sergeant's

16  office. Should you select to waive your speaking time, your position will be included in the

17  committee meeting records. Senators, based on the feedback and guidance we gave staff at our

18  last meeting, we have four additional staff-produced maps on our workshop agenda today that

19  have further improved upon the prior drafts we have reviewed. Our feedback should continue to

20  conform to the directives issued unanimously by the full committee. You will find a copy of the

21  directives in your meeting materials. I would caution members in their questions, feedback or

22  guidance to staff today to express themselves carefully so that nothing said in this meeting is

23  misperceived as motivated by an impermissible purpose. By the conclusion of this meeting, we

2

P-000940

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1   will have reviewed twelve total plans.

2       I propose that before we adjourn that we submit a recommendation which will consist of

3   a map or set of maps to Chairman Rodrigues. I propose that we focus our recommendation on the

4   last four plans. So the plans that are presented before us here today, as they have consistently

5   shown metric improvement week over week. If there's a district configuration, one of the prior

6   plans, that anyone here finds preferable, the appropriate time to address that is by offering it as

7   an amendment at the full committee later this week. I've been advised by counsel that these

8   additional plans brought forward by staff today comply with the complex layering of federal and

9   state standards, contain tradeoffs within the co-equal Tier Two standards presented in each plan.

10       Before we begin with Mr. Ferrin's presentation, are there any questions before

11   proceeding? Seeing none, and before I pass it off to Mr. Ferrin, I neglected to say happy new

12   year to everybody. It is great to see you here in 2022. And Mr. Ferrin, you are recognized for a

13   walkthrough of these new staff-prepared plans.

14       Mr. Ferrin: Thank you Mr. Chairman. So today we have four additional maps for the

15   select subcommittee to workshop. And when preparing these plans, we reviewed the maps from

16   the last meeting in the select subcommittee and as instructed, looked for improvements in

17   consistency in the application of the various tradeoffs presented in the maps. When we talk about

18   the consistency of application, we're referring to the treatment of one area of the state like

19   another. The maps we reviewed in November illustrated a few different ways of drawing districts

20   and we went back and reviewed those to examine whether one of the variations was more

21   appropriate in terms of matching the methodology applied throughout the state. We also looked

22   for the opportunity to improve upon some of the Tier Two metrics, particularly compactness and

23   the utilization of political and geographic boundaries. This also had the effect of keeping some

3

P-000941

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1  additional cities whole.

2      The plans being presented today present policy choices for the select subcommittee, show

3  improvements in Tier Two metrics and do not retrogress or diminish the ability for racial and

4  language minorities to participate in the political process and elect candidates of their choice.

5  Plans 8044, 8046 both have effective minority districts for African Americans. They have

6  excluded, excuse me, four effective minority districts for African Americans in District 6,

7  District 11, District 19, and District 33, and one majority-minority African American district,

8  which is District 35. Plans 8048 and 8050 have three effective minority districts for African

9  Americans in District 6, 11, 19, and then two majority-minority African American districts in

10  Districts 33 and 35. All four of the plans being workshopped today have five majority-minority

11  Hispanic districts in districts 15, 36, 37, 39, and 40.

12      Our review of the prior plans also resulted in a narrowing of some of the options

13  previously workshopped. In making those recommendations, we referred both to the plain

14  language of Article 3 of Section 21 of the Florida Constitution, applicable case law, and the

15  directives of the committee that were issued on October 18, 2021. A copy of these directives is

16  included in the meeting materials for reference. As with the plans previously workshop, we

17  didn't review any political data other than where a review of that political data was required to

18  perform an appropriate functional analysis to evaluate whether or not a proposed district denied

19  or abridged a racial or language minority group's ability to participate in the political process or

20  diminish their ability to elect candidates of their choice. As I've mentioned, our conclusion is

21  that the plans we'll be reviewing today do not retrogress or diminish the opportunities for

22  minority voters.

23      The   staff-drawn   plans   being   workshopped   today   were   published   to

P-000942

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1   www.floridaredistricting.gov on Wednesday, January 5, 2022. The plan packets were published

2   in the meeting materials and are available on the select subcommittees page of the flsenate.gov

3   website. As we've discussed before, these packets contain everything used to analyze the

4   redistricting plan. Data comes from the redistricting application and is reformatted for easier

5   consumption. On the cover page, we have a statewide map with insets of South Florida,

6   Jacksonville, Tampa Bay, and Orlando. On the second page we have census and boundary

7   statistics that show the population deviation, Black and Hispanic voting-age, population, area

8   perimeter compactness scores, whole counties and cities, and the percentage of boundary overlap

9   with existing and political geographic boundaries. This information is shown for each district as

10  well as for the plan overall.

11          The additional table on the census and boundary statistics page shows information about

12  the number of whole and split cities and counties. Included here are plan-level counts of cities

13  and counties with only one district. So cities that are – cities and counties that are kept whole by

14  their geography. Districts with only one county, meaning that the district is wholly contained

15  entirely within a county. Counties and cities with all population in a single district, which is

16  whole counties or cities by population, and this is presented because the Florida Supreme Court

17  has indicated that an unpopulated split should not be counted. We also count the aggregate

18  number of county or city splits in the aggregate, aggregate number of county or city splits with

19  population and the aggregate splits are account. The way those are calculated is by counting the

20  number of times a political subdivision is split and show the districts that split. Excuse me, so

21  that if a county has three districts and it counts as three aggregate splits, and if it has two

22  districts, it counts as two aggregate splits. Third and fourth pages of the packet lists the counties

23  and cities that are split and show the districts that split the subdivision and the percentage of its

5

P-000943

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1  population and area within each of those districts.

2  The remaining pages contain the functional analysis of the districts for which it is

3  necessary to evaluate whether or not a proposed district denies or abridges a racial or language

4  minority group's ability to participate in the political process, or if it diminishes their ability to

5  elect representatives of their choice. Page five of the packet contains the BVAP, which is census

6  respondents who identified as being Black, either singly or in combination with some other race

7  and or ethnicity, including Hispanic, and it shows HVAP, which is census respondents who

8  identified as Hispanic and of any race or combination of races, including Black. It also has a

9  2020 general election voter registration information for registration by party, registration by race

10  or ethnicity, registration by race or ethnicity and party, and for registration by party and race or

11  ethnicity.

12  Page six has the data needed for a functional analysis normalized and shown across all

13  available statewide elections to make it digestible and to help control for extraneous variables

14  that may have driven turnout or performance in a particular election. It contains the average voter

15  turnout in 2012, 2014, 2016, 2018, and 2020 primary elections by party and race or ethnicity has

16  the average voter turnout in 2012, 2014, 2016, and 2018 and 2020 general elections by party, by

17  race and ethnicity, and by race or ethnicity and party. And finally, this page contains information

18  about the districts' general election performance in statewide elections from 2012 through 2020.

19  Specifically, it shows the average performance of the vote share for the Democrat and

20  Republican candidate. It shows the count of wins in statewide contests for Democrat and

21  Republican candidates, shows the maximum margin of victory in a statewide contest for either

22  the Democrat or Republican candidate, shows the minimum margin of victory in a statewide

23  contest for either the Democrat or Republican candidate, and then it shows the average margin of

6

Case 8:24-cv-00879-CEH-TPB-ALB   Document 175-9   Filed 05/23/25   Page 7 of 49
PageID 4688

# 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1  victory in the statewide contest for either the Republican or Democrat candidate.

2  Page seven of the packet shows the percentage of the votes received by each candidate in

3  contests for which there was a statewide primary election, and those were held in 2012, 2014,

4  2016 and 2018. And then finally, on page eight, we show the percentage of votes received by

5  each candidate in the contest for which there was a statewide general election, and that includes

6  all five years or all five cycles. 2012, 2014, 2016, 2018 and 2020 and Mr. Chairman, if there's no

7  questions now, we can proceed to the districts.

8  Chair Burgess: I say we go ahead and proceed. Hold on one second. Senator Bracy, do

9  you have a question before we proceed?

10  Senator Bracy: Yeah, I do. I talked to staff about the Tampa Bay area, and I think I

11  brought this question up the last committee, but I wanted to see if you can explain the reason for

12  not crossing the Bay or for crossing the Bay in all of the configurations that we see, as opposed

13  to not crossing the Bay in that Tampa-area seat.

14  Chair Burgess: Thank you, Senator Bracy, and certainly that came up in discussion, and

15  I'll let Mr. Ferrin piggyback with a more detailed answer. But staff did – my understanding is

16  staff did look at those options. However, there was a significant number of – of potential voters

17  that would be disenfranchised under not crossing the Bay. And so in order to avoid that potential

18  diminishment, there was just no way to make that work practically. And with that, I'll kick it to

19  Mr. Ferrin for a more detailed explanation.

20  Mr. Ferrin: Thank you, Mr. Chairman and Senator. I think in looking at a configuration

21  like that, it was likely that diminishment would occur based on the fact that in order to draw a

22  minority district solely within Hillsborough County, it begins to look like a fairly spidery, non-

23  compact configuration there, it does some damage to the surrounding districts and their metrics

P-000945

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1   as well. In addition to, as Senator Burgess mentioned, potentially disenfranchising the voters –

2   Black voters in Pinellas County that have had the ability to elect the candidate of their choice

3   since about 1992 when the courts ordered a configuration that resulted in a district that did cross

4   the Bay between Hillsborough and Pinellas County.

5       Senator Bracy: What would be the percentage that it would have dropped if we didn't

6   cross the Bay? Like, I guess, what would be the Black percentage now in that district? What

7   would it have been if it didn't cross the Bay?

8       Chair Burgess: Mr. Ferrin, you're recognized.

9       Mr. Ferrin: My recollection from having looked at it was, was somewhere close to 30%,

10  either just shy of it or just above. I don't recall specifically. The configurations we're looking at

11  today are a little bit higher. Is that what you were talking about, or are you talking about specific

12  other?

13      Chair Burgess: Senator Bracy?

14      Senator Bracy: Yeah, I'm just trying to understand, like, how much it would have

15  diminished the ability for Black voters to vote for the candidate of their choice. So right now, if

16  it's a – if it is a, I guess, a minority-majority district where African Americans make up 50%, did

17  it drop to 30%? Like, was that – I guess I'm trying to measure how much of a diminishment that

18  would have been.

19      Chair Burgess: Mr. Ferrin.

20      Mr. Ferrin: So it's not currently a majority-minority district. It's currently an effective

21  minority district. And the question of diminishment is less about how much diminishment, but is

22  it diminished. Because I think the courts have been clear that diminishment, any diminishment, is

23  diminishment. And so the way we've drawn it, the Black voters within District 19 are able to

8

P-000946

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1   effectively control the Democratic primary in a district that performs for Democrats. If we look

2   at drawing it differently, I think we're looking at a situation where the Black voters would not be

3   able to control the primary numerically, would not make up a majority of the primary turnout,

4   and that would potentially constitute diminishment.

5   Senator Bracy: Okay, that's all I have for you.

6   Chair Burgess: Thank you. Any other questions before we move on to the presentations

7   on the particular maps? Seeing none, Mr. Ferrin, you're recognized to proceed with our four

8   maps.

9   Mr. Ferrin: Thank you, Mr. Chairman. So we'll start in the Panhandle, where Districts 1

10  and 2 split Okaloosa County. The image on the screen shows a configuration that was

11  workshopped in November, is plan 8028 on the left. In that plan, the boundary between Districts

12  1 and 2 kept the city of Crestview whole by utilizing some of its municipal boundaries for its

13  border. In today's plans, 8044 through 8050, which is shown on the right, the boundary follows

14  State Road 85, Interstate 10, and the Yellow River. While this configuration splits the cities of

15  Crestview and Laurel Hill, this boundary follows only static geographic features throughout the

16  county. This is consistent with how other areas of the state have been drawn where population

17  distribution caused us to have split a county.

18  Examples of similar district boundaries include in Pasco County, where district

19  boundaries follow the Suncoast Parkway and State Road 52, in Volusia County, where the

20  boundaries between District 7 and 14 adheres to State Roads 45A and 430, in Brevard County,

21  where the districts boundary between 14 and 17 follows State Roads 50 and 405 through

22  Titusville to the Kennedy Space Center, and then in Manatee County, where between Districts 21

23  and 23, we follow State Road 70 almost all the way through the county to the Gulf of Mexico.

9

P-000947

# 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1      This slide illustrates the comparisons between Districts 1 and 2 in 8028 and all four of the

2  plans being workshopped today. The top table, which displays Districts 1 and 2 in the new plans,

3  has lower nonpolitical and geographic scores and increased compactness scores on two of the

4  three measurements. The configuration in the plans being workshopped today demonstrates that

5  it is feasible to use existing political and geographic boundaries for the entire boundary between

6  Districts 1 and 2, while balancing the population between them, and provides a more consistent

7  application of methodology when considering the use of static geographic features versus

8  impermanent municipal boundaries as directed by the committee. Improvements in compactness,

9  the use of static geographic boundaries and the consistency in statewide application led to the

10  inclusion of this configuration in the plans we're workshopping today.

11      Moving to Northeast Florida, we can see that there's two separate configurations of 5 and

12  8 in the plans for today. The plans today do have the same Districts 4, 6 and 7, and so we'll look

13  first in Duval County, where the configurations we're workshopping today appeared most

14  recently in Plans 8030, 8034 and that's shown on the right. The alternative configuration on the

15  left was previously workshopped as 8026 and 8028, and that configuration utilizes more of the

16  Duval County boundaries where they are shared between Nassau and Clay. The plans for today,

17  8044 through 8050, demonstrate that it is feasible to draw a compact district that utilizes political

18  and geographic boundaries for the entire boundary between Districts 4 and 6, while not

19  diminishing the ability for African Americans to participate in the political process and elect

20  candidates of their choice in District 6.

21      Senator Gibson: Are we waiting till the end of the presentation?

22      Chair Burgess: Is there a question? Would you? We can certainly stop and ask a question,

23  if that's your preference. Mr. Ferrin, if you don't mind, Senator Gibson has a quick question and

P-000948

# 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1  we'll address that while we're on the point in this map. You're recognized Senator Gibson.

2  Senator Gibson: Thank you, Mr. Chair. I think I have to go – can we go back to where

3  it's left and right, because I can make sure I got the numbers straight. So can you repeat a little of

4  what you said? The left, the map on the left, does it have less square miles than the map on the

5  right? Or what was the point? Not your –.

6  Mr. Ferrin: Thank you. And, Senator Gibson, I'm going to go ahead and skip to the table

7  here, because this does show that for these districts. So we have on the top the configuration as it

8  was in the image on the right, and the bottom table is as it was in the image on the left. And so,

9  looking at the differences here, we can see that for Black voting-age population in the top table,

10  we're at 41.62%. In the bottom one, we're at 42.66. And so the bottom one being the more

11  triangular-shaped District 6, and the top one being the circle that mostly follows the Beltway and

12  the Suncoast Parkway or the First Coast Expressway.

13  Senator Gibson: The duck one.

14  Mr. Ferrin: Are you calling it the duck? Okay, I'll defer to you on that, Senator. So as far

15  as some of the Tier Two metrics go, both districts are obviously going to have the same overall

16  area. You can see, as it relates to the specific districts, District 6 has less area in the top

17  configuration of 248 square miles and the bottom, it's 454. We've also got a much lower

18  perimeter in terms of miles for the top configuration, which is 69 versus 94. The convex hull,

19  Polsby-Popper and Reock ratio scores, we can look at them both for the individual districts and

20  for the configuration of the two districts as a whole, because the two districts interact with each

21  other. So by impacting one of them's compactness score, we're necessarily going to impact the

22  others, right? So if we look first at the kind of overall, which is in the gray shaded area there,

23  that's the average for the two. So we see that the convex hull is 0.81 for the top set and 0.79 for

11

P-000949

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1   the bottom. Polsby-Popper is 0.45 at the top, 0.44 at the bottom, and Reock is .56 at the top and

2   .49 on the bottom. And so that would lead us to draw the conclusion that, at least metrically, I'll

3   recognize that visual compactness is probably in the eye of the beholder, but at least metrically,

4   the duck, as you stated, is going to be more compact on the mathematics. In terms of cities and

5   counties, that's kind of unrelevant here because Duval County is entirely incorporated within the

6   city of Jacksonville.

7       Right, and then so then we would look at the city, the political and geographic

8   boundaries. And we see one of the best ways to use this metric is to look at the proportion of the

9   district's boundaries that do not follow political and geographic features, because all of the other

10  features are considered to be on equal footing under the Constitution, whether they are political

11  or geographic. And so we look at that nonpolitical geographic boundary score and we see that in

12  the bottom section, for the average of the two districts, we're at 3% non-boundary usage and at

13  the top, we're at zero. So the top configuration is going to have entire total compliance with the

14  use of political and geographic boundaries, which in this particular circumstance, there's a small

15  variety of those type of features that it follows because it follows the Beltway, I-95 and the First

16  Coast Expressway, as well as the Duval-Clay County line.

17      Senator Gibson: I'm sorry, and that was?

18      Mr. Ferrin: So that's the one on the right in this slide. So that's going to be metrically

19  more compact, going to have better compliance with the – better demonstrate that it's feasible to

20  use political and geographic boundaries for the entire boundary of the district. And the – the

21  image on the left, we were forced to come off of that a little bit in order to balance the population

22  between the two districts.

23      Senator Gibson: And can you show me that, Mr. Chair? Can you show me the – where's

12

P-000950

# 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1   the population line?

2      Mr. Ferrin: So the population for both of these works out to be a little over 9,000

3   overpopulated. So if you're summing up the population of Duval and Nassau, we're looking at –

4   thank you – we're looking at a little more than almost 10,000 people over the ideal population

5   for two Senate districts. And so we have to divide that evenly between the two districts. And so

6   that gets us the deviation of roughly 4,500 in each district overpopulated.

7      Senator Gibson: I'm sorry, 4,500 in each.

8      Mr. Ferrin: Right so the idea –

9      Senator Gibson: Four and six are overpopulated.

10      Mr. Ferrin: By, yes, by roughly 4,500 and that can be kind of split. So in the top

11   configuration, it's 4,000 – District 4 is over 4,000, District 6 is over almost 5,000. But in the

12   bottom configuration, they're both closer to 4,500, which would be kind of the average

13   overpopulation for the districts in the area.

14      Senator Gibson: And the bottom is the one on the right? No.

15      Mr. Ferrin: The bottom table is the image on the left.

16      Senator Gibson: On the left. Okay.

17      Mr. Ferrin: So.

18      Senator Gibson: And that overpopulation. I'm sorry, could you repeat what you said on

19   the overpopulation portion, that they're about equal, overly populated?

20      Mr. Ferrin: Well, so –

21      Senator Gibson: 4 and 6.

22      Mr. Ferrin: Yes, our overall requirement was to draw districts that are less than 1%. And

23   so in order to do that, we had to balance. You know, we wanted to take these two counties and

13

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1    contain two districts within them. And in order to do that, each district had to be overpopulated

2    by somewhere between 4,000 or 5,000 people and balance that as best we could accordingly.

3       Chair Burgess: Senator Gibson.

4       Senator Gibson: So, thank you Mr. Chair. In the one on the left, is there any

5    diminishment to in District 6.

6       Chair Burgess: From the one on the right, Senator Gibson.

7       Senator Gibson: Yes, thank you, sorry.

8       Chair Burgess: Okay. You're recognized Mr. Ferrin.

9       Mr. Ferrin: Thank you. And so our review of the functional analysis indicates that there's

10   – neither of these configurations diminish the opportunity to elect. They both allow for Black

11   voters to control the Democratic primary and both are constitutional districts that are gonna

12   perform for Democrat candidates. And therefore we're led to the direction of concluding that

13   these are likely to perform at a very similar rate despite the 1% difference in Black voting-age

14   population between the two configurations.

15      Chair Burgess: Senator Gibson.

16      Senator Gibson: I think this is my last one. Thank you, Mr. Chair. And so in terms of the

17   square mile difference between the two, what does that look like?

18      Chair Burgess: Mr. Ferrin.

19      Mr. Ferrin: So the top configuration there, which was the more compact, adhered to the

20   Beltway and the First Coast Expressway, that's 248 square miles. And the bottom configuration

21   which followed the Nassau-Duval County line and more of the Duval-Clay County line is 454

22   square miles. So let's call it roughly 200 square mile difference.

23      Senator Gibson: Well, it's not my last question.

14

P-000952

# 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1    Chair Burgess: Senator Gibson.

2    Senator Gibson: Thank you Mr. Chair. The current, the current configuration of Senate

3    District 6, which I used to call it Bullwinkle, but then in 2012 we got one of the ears lopped off

4    and now we're getting an even smaller area, that's a duck. And so what was the square miles?

5    What's the square miles in the current, if you have it? And if not, we can get it later. In the

6    current configuration of Senate District 6.

7    Chair Burgess: Mr. Ferrin.

8    Mr. Ferrin: Thank you, Mr. Chairman. And so, just noting that we really weren't

9    instructed to consider the benchmark configurations when drawing these plans. Nonetheless, we

10   end up with a square mileage for benchmark Senate District 6 of 240.

11   Chair Burgess: Does that answer your question, Senator Gibson?

12   Senator Gibson: 240. I have one last question then.

13   Chair Burgess: Recognized.

14   Senator Gibson: So within the current, if it's 248 in the top one and it's 240, it was, it's

15   240 currently, I think you said. So I guess I'm trying to understand if it's that similar then there's

16   not much growth in the current configuration of the, of the district.

17   Chair Burgess: Mr. Ferrin, you're recognize.

18   Mr. Ferrin: Let me take a shot at that one if I can. So, well you're not far off, Senator. So

19   the current district was underpopulated by 11,000 people and that's current District 6. So that's

20   the benchmark. So when we take the district boundaries as they were drawn in 2016, we apply

21   the 2020 census data and we discover that there's been an underpopulation. So that district failed

22   to keep pace with the growth for the rest of the state to the tune of 11,000 people, where it kept

23   close pace to the growth of the rest of the state. But we also have to balance that with

15

P-000953

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1  neighboring District 4, which was overpopulated by 20,000 people.

2      Chair Burgess: Does that answer your question, Senator Gibson?

3      Senator Gibson: Overpopulated. I'm sorry? 4 was overpopulated with 20,000 and 6 was

4  eleven.

5      Mr. Ferrin: It was underpopulated by eleven.

6      Senator Gibson: And thank you, Mr. Chair. And this strikes a balance in the square

7  mile –.

8      Chair Burgess: Mr. Ferrin.

9      Senator Gibson: Population.

10      Mr. Ferrin: It strikes a balance between population. We don't really, in drawing Senate

11  plans, I mean, the area certainly factors in a sense of compactness, but we certainly didn't go

12  about this by looking to match the square mileage of the benchmark districts. That was not what

13  we factored into our calculus when drawing these.

14      Senator Gibson: Thank you, Mr. Chairman.

15      Chair Burgess: Thank you, Senator Gibson.

16      Senator Bracy: I got a quick.

17      Chair Burgess: Senator Bracy.

18      Senator Bracy: Thank you. What is the Black pop– the Black voting-age population

19  currently compared to this Jacksonville seat that's drawn?

20      Chair Burgess: Mr. Ferrin?

21      Mr. Ferrin: So in the benchmark plan, the population of District 6, the BVAP, was

22  43.06%.

23      Senator Bracy: And this map that we're looking at, it's what now?

16

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1     Mr. Ferrin: It would be 41.62.

2     Senator Bracy: Okay, so with the Black voting-age population going down, is that not

3     considered diminishment?

4     Chair Burgess: Mr. Ferrin.

5     Mr. Ferrin: So, Senator, as we've discussed, the diminishment is not solely based on

6     Black, on voting-age population. It's based on the effectual ability to elect candidates of their

7     choice. And so we have to look to the functional analysis for that. And so in this case, a review

8     of the functional analysis, whether the district is at 42.6 or 41.6%, both of the analysis indicates

9     that both of those districts are going to perform at a similar level.

10    Chair Burgess: Senator Bracy.

11    Senator Bracy: I got it. Okay, sorry but just understanding the functional analysis, like

12    what is the metric to determine that it meets the standard to elect the candidate of their choice?

13    Chair Burgess: Mr. Ferrin.

14    Mr. Ferrin: So we look at a number of different things, one of which is the primary

15    turnout and primary turnout by race. We look at voter registration by race, we look at voter

16    turnout by race, and we look at the election results and the overall performance of the district to

17    determine who kind of wins in generals and which primary election we should be looking to, to

18    determine the ability to control the primary.

19    Chair Burgess: Senator Bracy, do you have a follow up?

20    Senator Bracy: I do. I guess I'm saying, like, is there a set number, when you're looking

21    at the functional analysis, that when it meets that threshold, that is enough to meet the ability for

22    a district to elect the candidate of their choice, or is it kind of an arbitrary analysis of these

23    numbers?

17

P-000955

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1  Mr. Ferrin: Thank you, Mr. Chairman. So it's certainly not arbitrary. It's a totality of

2  those circumstances. And we review those and it's in – keep in mind it's in relation to the

3  benchmark district. So if a benchmark district is performing for an African American candidate

4  or for a Hispanic candidate at, you know, 35% VAP, but the analysis dictates. We're comparing

5  the benchmark functional analysis to the revised district functional analysis. And if we're not

6  seeing those numbers slip as a result of a reduction in the voting-age population, or we're not

7  seeing them gain or whatever, we're considering that the nature of the performance of that

8  district has not changed based on our reconfiguration. If dropping the BVAP or the HVAP a few

9  points starts to change the nature of primary control or voter registration, voter cohesion in terms

10 of registration and overall election performance, that's when we start looking at that as a

11 possibility that we could be infringing on diminishment. So as long as we're performing in a

12 manner consistent with the benchmark, we consider that. So there is no magic number. It's an

13 overall totality-of-the-circumstances analysis.

14 Senator Bracy: Okay. Okay. Thank you.

15 Chair Burgess: Thank you, Senator Bracy, Mr. Ferrin, seeing no questions at this time.

16 You are recognized to proceed with the presentation.

17 Mr. Ferrin: Thank you, Mr. Chairman. So we kind of last left off on this slide of the

18 tables between Districts 4 and 6. I believe we've covered that. And so we'll move next to

19 Districts 5 and 8, which are configured differently in the plans that we're looking at today. And

20 so plans 8044 and 8048 have Gilchrist County in District 8. And whereas plans 8046 and 8050

21 have it in District 5, in both variations, Alachua County is split to equalize population. And

22 moving Gilchrist County between Districts 5 and 8 demonstrates how Alachua County so it can

23 be split differently while drawing districts that are mathematically and visually compact and

18

# 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1  utilize readily ascertainable and commonly understood geographic features for the entirety of

2  their boundaries. So this slide shows the comparison of 5 and 8 as they appear in 8044 and 8048

3  as compared to how they appear in 8046 and 8050. The top table shows the metrics for 8044 and

4  48 with Gilchrist in District 8, and the bottom shows the metrics for plan 8046 and 8050 with

5  Gilchrist County in District 5. Both configurations possess the same number of whole counties

6  and municipalities, and both use political and geographic boundaries through the entire length of

7  the district. The difference between the variations is in the convex hull and Reock compactness

8  scores, where the version of District 5 and 8 that appears in 8044 and 8048 have a higher overall

9  Reock score for the two districts, and the versions in plans 8046 and 8050 has a higher overall

10  convex hull score. Because the Tier Two metrics are very similar and one compactness score

11  doesn't carry more weight than the other, both configurations are present in the plans before the

12  committee today.

13  So the next region to review is Tampa Bay and the I-4 corridor, and all districts within

14  this region are the same in the plans being workshopped today. From the last workshop, minor

15  adjustments were made to Districts 10, 16, 18, and 20 to more consistently follow the Suncoast

16  Parkway in Pasco County and I-75 in Hillsborough County. Similar changes were made between

17  Districts 11 and 13 along I-4 in Orange and between Districts 14 and 17 along State Road 50 in

18  Brevard. The left and middle images on this slide demonstrate the previous configurations of the

19  boundaries of Districts 16 and 24 and Districts 19 and 21. The right image shows it in plans 8044

20  through 8050 in Hillsborough County, today's plans use the same boundary of Districts 19 and

21  21, and that's from Plan 8034. In Pinellas County, District 19 and 24's boundary was adjusted to

22  keep the city of Gulfport whole. In Pinellas County the boundary primarily follows 22nd Avenue

23  North, 13th Avenue North, 58th Street South, and the municipal boundary of Gulfport now. The

19

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1  boundary departs from these geographic features where necessary to maintain the ability-to-elect

2  in this Tier One-protected district.

3      Additionally, the maps being reviewed today all use the boundary between Districts 16

4  and 24 as it appeared in Plan 8034 at the subcommittee's last workshop. When compared to the

5  most recently workshop plans, today's iterations reflect improved metrics in the Tampa Bay

6  region, the average district perimeter is smaller, the mathematical compactness scores for convex

7  hull and Polsby-Popper increase, while the Reock score remains the same. The nonpolitical and

8  geographic boundary usage rate is reduced and an additional city is kept whole.

9      This slide shows the metrics for District 10, 16, 18, 19, 20, 21, and 24 as configured in

10  each plan. The revised drafts row displays the metrics for Plans 8044 through 8050, and the other

11  four plans show the Tier Two metrics for the different combinations of the Districts 10, 16, 18,

12  19, 20, 21, and 24. We can see that the revised drafts have the higher convex hull and Polsby-

13  Popper scores than previous configurations and the same Reock, and they also keep an additional

14  city whole while using scoring the lowest nonpolitical and geographic boundary usage rate.

15  Districts 22 and 26 are the same in all the configurations of the plans being workshopped today.

16  It was most recently used in Plans 8026 and 8034. The left image shows Districts 22 and 26 as

17  previously workshopped in plans 8028 and 8030, and the right image shows it in today's. In this

18  configuration, the shape of District 22 is impacted by the boundary between Osceola and Polk

19  where it uses – which it uses for the entirety of its eastern border, and its usage is of easily

20  ascertainable and commonly understood geographic features.

21      This slide shows the metrics for Districts 22 and 26 in today's plans and for the

22  alternative configuration that existed in Plans 28 and 30. We can see that Districts 22 and 26 in

23  the revised plans have lower mathematical compactness scores and keep one less city whole, but

P-000958

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1   this configuration scores lower on its use of nonpolitical and geographic boundaries. And the

2   configuration of the plans being workshopped today was selected to consistently apply the

3   methodology of using static geographic features where feasible, rather than using impermanent

4   municipal boundaries and switching from one feature type to another. While we also drew the

5   other configuration to follow political and geographic boundaries, it contains a wider variety of

6   these features, and throughout the rest of the map, as I mentioned with the examples earlier, we

7   look to avoid hopping from one feature type to another, and so recommending this configuration

8   is consistent with the methodology applied in other areas of the state and follows the directives

9   issued by the committee.

10      In the southern portion of the state, Districts 23, 27, 28, 35, 36, 37, 39, and 40 remain the

11  same as they were presented in plans 8030 and 8034 at the last subcommittee meeting. Districts

12  36, 37, 39, and 40 are all majority-minority Hispanic districts, and District 35 is a majority

13  African American district. A minor technical change was made along the boundary of Districts

14  25 and 29 to more consistently follow the East Coast Railway in St. Lucie County and in Palm

15  Beach County. Districts 29, 30, and 31 were reconfigured in all the plans we're reviewing today.

16      For the plans being workshopped today, there are differences in how Broward County is

17  configured. Plans 8044 and 8046 show that image on the left and have the alternative

18  configuration of District 33 where it's drawn as an effective minority-majority African American

19  district – excuse me, as an effective minority district on the right – I'm sorry, that's on the left.

20  Some minor technical changes were also made to more consistently follow primary and

21  secondary roads in that configuration. In plans 8048 and 8050, this is the image on the right, they

22  have the additional majority-minority African American District 33 that was workshopped in

23  Plan 8034. These two plans also contain similar minor technical changes along the boundary of

21

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1   Districts 32 and 38 and along the Florida Turnpike. The functional analysis of both of these

2   configurations of District 33 shows that these configurations don't deny or abridge the

3   opportunity for minorities to participate in the political process and does not diminish their

4   ability to elect candidates of their choice.

5   　　　　Looking more closely at Senate Districts 29, 30 and 31 in Palm Beach County, where

6   these were reconfigured, we look to the instructions from the subcommittee to continue to look

7   for improvements in the maps. These redrawn districts shown here are on the right and the prior

8   configurations are on the left. District 29 still contains all of Martin County and part of St. Lucie

9   and Palm Beach Counties, but in Palm Beach County, boundaries moved to primarily follow

10  Southern Boulevard, which is State Road 80, the Florida Turnpike, Military Trail, and PGA

11  Boulevard. District 30 is wholly contained within eastern Palm Beach County where it uses the

12  municipal boundaries of Boynton Beach, uses Hypoluxo Road, Florida Turnpike, Military Trail,

13  and, as I mentioned, PGA Boulevard. District 31 is wholly contained within the rest of southern

14  Palm Beach County.

15  　　　　This slide illustrates the comparisons between the configuration of District 29, 30, and 31

16  in Plans 8028 through 8034 and all of the plans being workshopped today. In the top table, which

17  is Plans 8044 through 8050, we see that there's increased mathematical compactness. We keep

18  two additional cities whole and utilize more political or geographic boundaries, and that's what

19  drove the decision to include this improved configuration in all four today's plans. This slide

20  shows the comparison of Broward County, which is configured differently in the plans that we're

21  reviewing today. So in Plans 8044 and 8046 on the left and 8048 and 8050 are on the right. So on

22  the left we have District 33 drawn as an effective minority African American district, and on the

23  right we've got it drawn as a majority-minority African American district. The functional

22

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1   analysis that's included with these meeting materials shows that neither configuration constitutes

2   diminishment under the interpretation provided by the Supreme Court in *Apportionment I* and

3   that the benchmark plan – and we would also note that the benchmark plan did only contain one

4   majority-minority African American district, and that was District 33 in the benchmark plan and

5   was located within Broward County. But when the plan was initially drawn, the only majority-

6   minority African American district in that plan was in District 35, that crossed the Miami-Dade-

7   Broward County line. Due to population and demographic changes between 2010 and 2020

8   censuses, these two districts kind of exchanged statuses. Benchmark District 33 became a

9   majority-minority district and Benchmark District 35 became the effective minority district.

10          The tables on this slide show the different versions of these districts within Broward. The

11   first one shows the metrics when District 33 is drawn as an effective African American district

12   and in Plans 8044 and 8046. The second table is going to show the metrics when District 33 is

13   drawn as a majority-minority district in Plans 8048 and 8050. You can see that in the first set of

14   plans, we have the higher convex hull and Polsby-Popper compactness scores, and that we use

15   more political and geographic boundaries and keep an additional city whole. And so the policy

16   choice here for the committee is between an arrangement with an additional African American

17   majority-minority district or one that with generally higher Tier Two metrics and an effective

18   minority African American district.

19          This table shows the twelve State Senate plans for which this committee has

20   workshopped, as shown in the Plan column. The first four plans, which are 8010, 8012, 8014 and

21   8016, these were presented to the committee on November 17. The second set, which was 8026,

22   8028, 8030, 8034, were presented to the committee on November 29. And then plans 8044

23   through 8050 were released on January 5 for discussion today. We can see overall improvements

P-000961

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1    in the Tier Two metrics over the three workshops, which is a result of consistently following the

2    committee's directive to seek out improvements and consistency in applying the various

3    tradeoffs presented within the maps. In our last four plans that we reviewed today, we matched

4    the lowest overall population deviation at 1.92%, which is the same population deviation that

5    was in the benchmark plan. And just as a side note, we were able to go back and do some

6    research. And since 1982, which is when we went to single-member Senate districts, these

7    Senate plans have always been under 1% for each district, plus or minus 1%, so an overall

8    deviation of 2% or less. And so we also see here on this slide how we've been able to improve

9    the average mathematical compactness for both convex hull and Polsby-Popper scores, while our

10   average Reock score remains pretty consistent throughout the twelve plans at either 0.46 or 0.47,

11   we also can see the improvement in the use of political and geographic boundaries with today's

12   plans. They have the lowest overall average of non-political and geographic boundary usage at

13   4%, and that's in the right-most column on the slide. And additionally, we see that three

14   iterations show improvements in keeping counties and municipalities whole. All four of today's

15   plans have the highest number of counties and cities kept whole within a district.

16       However, we would also like to note that according to the Census Bureau's voluntary

17   boundary and annexation survey, for which we got some more recent data over the holiday

18   break, we've – since the tighter deadline of January 1, 2020, for locking down census geometry

19   for the redistricting cycle, 92 of Florida's municipalities have altered their boundaries, which,

20   and that amounts to about 22% of our cities. So while we talk about the cities that we kept whole

21   here, it's worth noting that in reality, there may have been some annexations that would cross

22   some of our proposed district lines. And so we just try to keep that in the back of our minds.

23       And then finally, this slide is just going to show the count of State Senate districts that

P-000962

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1   fall within a specific range of non-political or geographic boundary usage. We show it this way

2   to demonstrate the iterative improvement in the range of distribution of non-political or

3   geographic scores for each plan. So, for example, the number of districts with a score below 10%

4   rose from 31 to 35 districts in the first iteration to 37 districts in the plans being presented today.

5   And the number of plans with 100% usage of political or geographic boundaries increased from

6   eight to ten to approximately 13 or 14. Well, the count of 13 or 14. Also, over two-thirds of the

7   districts presented in today's plans achieve scores equal to or greater than 95% of boundary

8   usage.

9   And the only three that are higher than 10% for non-political or geographic boundary

10  usage are Districts 19, 31, and 33. District, I think it's 30, not 31, but in District 30, we – part of

11  the reason for that being an outlier is because Hypoluxo Road and PGA Boulevard, both of

12  which are six-lane highways, are not recognized by the Census Bureau as primary or secondary

13  roads within the data set that we used for our analysis. District 34's configuration, that was the

14  other one in the list. I think it's supposed to be 34, not 33. That's impacted by the configuration

15  of 33 to its south. And it also follows State Road 808, which is Glades Road, for the majority of

16  its northern boundary. Most of that road is classified as a major roadway by the census but the

17  portion west of Highway 441 is not, even though it's still a four-lane highway at that point.

18  And then District 19 is the other one that's over 10%. And as we've discussed, that's a

19  minority district that's protected from diminishment under Tier One. And it does use some other

20  significant roadways, such as 22nd Avenue in St. Petersburg and East Fletcher Avenue. Those

21  don't actually count as primary or secondary roads in our census data set either, although they're

22  both locally well-known four-lane highways.

23  And so the kind of takeaway from that is that, because we relied on the US Census

25

### 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1   Bureau's classification for these roads that we're going to be using as boundaries, certain ones of

2   them may not meet our strict requirements for inclusion, but they're nonetheless widely known

3   as major geographic boundaries in the area. And so the takeaway is that our analysis is kind of a

4   conservative estimate on the boundary usage, but it's still a pretty good indicator of how well we

5   comply with the constitutional requirement to, where feasible, utilize political and geographic

6   boundaries. And with that, Mr. Chairman, those are the plans for today.

7           Chair Burgess: Thank you very much, Mr. Ferrin. Senators, as you can see, and the

8   reason I kind of directed us in the beginning to think about these last four as we're discussing

9   which to propose to Chair Rodrigues and the full committee today, is because I think slides 23

10  and 24 really demonstrate that each and every one of the plans before us today that are new are

11  built upon the plans that – the eight plans that we reviewed in the prior committee meetings. And

12  you can see that those metrics have improved every step of the way to try to comply with all the

13  coequal standards and make sure that it meets constitutional muster. So my preference, Senators,

14  is, before we go into discussion here, would be to do our best to, at a minimum, try to narrow this

15  down to two. And that would be my request of the committee today. Is that a minimum, if we

16  could take these four, narrow our recommendation to two, obviously, if others feel differently,

17  this is a select committee and we're here to hear your thoughts. So that would be my preference

18  as the chair, and I feel that we are in a position to possibly be able to do that.

19          So I think the main discussion points before us are kind of obviously between Districts 5

20  and 8, with the Alachua and Gilchrist County scenario, and of course, with District 33 in both the

21  effective minority and majority-minority district options that are before us with – with District

22  33. So with that, I would like to, I think what we'll do first before going into public discussion,

23  public comment is have discussion amongst the members. Since we just saw the presentation, it's

P-000964

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1    fresh. Then we'll go into public comment and then we'll circle back with potential

2    recommendations. Senators, everybody agrees with that plan of attack. So with that, I'll open the

3    floor up to fellow Senators for any input, feedback, or preferences. Senator Gibson, you are

4    recognized.

5        Senator Gibson: Thank you, Mr. Chair. And I look at the, I'm going back to the square

6    miles kind of the section and it's a, the very interesting thing to me is that the Black voting-age

7    population districts are very close, except for when you get to the 33 and 30. Well, 33 more, at

8    least 35 is 144. It's very tight and it seems to continue to be tight even as I was asking questions

9    about even Senate District 6, it seems to me that we have an opportunity to, and where we have

10   opportunities to increase square area and still remain obviously within the Constitution, we

11   should do that. And I want to use a Senate District 6 as an example. So this 4 and 6, as we talked

12   about earlier, were pretty, they didn't, it didn't change. It didn't deviate or change much,

13   actually. I think the BVAP was higher in whatever that bottom. I don't, I have the, it's in 26 and

14   28 I think that is. Is that right? Right. Thank you, Jay. And so we have an opportunity to increase

15   the area. And I know for a fact that would, and it may not be constitutional, but it certainly

16   economically impacts that district because the tighter square area lends itself to the creation of a

17   poverty district, too, which we should not do. And if the larger area is constitutional and affords

18   a district that not only can elect the candidate of their choice, but also do so in a more

19   economically sound district, we should be able to do that and stay within and stay within the

20   Constitution. And I think we certainly should be reviewing 4 and 6 in those, in the constitutional

21   manner that we should, of course. And both of them, as far as I can see, based on in 8026, meet

22   the constitutional requirements that we are required to follow and is more inclusive of more

23   African American voters in 8026. Thank you.

27

P-000965

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1    Chair Burgess: Senator, thank you and thank you for your feedback on that. I mean, that's

2    exactly what we're here to do and discuss today as a subcommittee. And, you know, obviously in

3    all four of the maps before us today that we're looking to provide a recommendation for, 4 and 6

4    are the same. So with your feedback and with that guidance, I would recommend that at the full

5    committee, if you feel it appropriate, that that would be the time to submit that amendment to

6    offer that conversation forward and see if those changes are something that the full committee

7    would, would be willing to accept.

8    Senator Gibson: Thank you, Mr. Chair.

9    Chair Burgess: Thank you, Senator Gibson, I appreciate that. Senator Bracy, you're

10   recognized.

11   Senator Bracy: Thank you. I'm going to give my opinion on one of these maps, but I

12   wanted to go back, and I'm sorry for belaboring the points that I was – the questions that I had

13   before. And this may be for staff. I know he's talking to Senator Gibson. No, that's okay. So

14   when you look at the functional analysis, which takes into account many factors, and you have a

15   district that, looking at the functional analysis and having all these factors in that functional

16   analysis, let's say it reduces the district's ability to elect the candidate of their choice by say 2%.

17   And the staff determines that that reduction is okay, but then – and doesn't reduce their ability to

18   elect the candidate of their choice. But then another district, proposed district, it may reduce their

19   chances by 7%, let's say. And staff says, well we decided that that's too much of a reduction. I

20   guess I'm trying to get to how you're analyzing that data. If it's not a specific number, 5%

21   reduction is enough, but 10% is too much. How are you determining it if there's not a specific

22   number you're going by.

23   Chair Burgess: Mr. Ferrin, if you feel comfortable, I'll allow you to go into a little more

P-000966

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1   depth there. What I'll say based on that is obviously we have coequal tradeoffs that are to be

2   considered. And in that analysis I would submit that I believe that the ultimate deciding factor in

3   a lot of what you've probably reviewed, Mr. Ferrin, was does the ultimate outcome or the

4   effective outcome within those functional analyses change based on that, with the totality of the

5   circumstances, when it relates to the other factors that you've – directives you've been asked to

6   view, would that be accurate?

7       Mr. Ferrin: Yes, Mr. Chairman, I think you've captured it very eloquently.

8       Chair Burgess: I don't know if I'm eloquent, but I'll take it. Senator Bracy, any follow up

9   or?

10      Senator Bracy: Well, I'll just say when it comes to, I guess, the district in South Florida, I

11  think having the minority-majority district, I think, would be my preference as opposed to, I

12  guess, the effective. Because then, I think, in that instance that district still has the ability to elect

13  a candidate of their choice and so that would be my preference. But that's all I have to give on

14  that.

15      Chair Burgess: Thank you, Senator Bracy. Actually, that's exactly what we're looking

16  for, is what's your preference? What are you looking at when it comes to these two most

17  significant changes within the four provided before us? And that's precisely what we need to

18  hear. Senator Gibson, other Senators on the committee, I don't know if there's a preference.

19  Senator Stargel, for comments.

20      Senator Stargel: Can you, what Senator Bracy said, can you translate that into the map so

21  that I can follow where he was standing, like which of the maps he was preferring to?

22      Chair Burgess: Absolutely, Senator. I would say that that would be 8050 and 8048, Mr.

23  Ferrin?

P-000967

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1    Mr. Ferrin: Yep.

2    Chair Burgess: So 8050 and 8048 would show the majority-minority, and 8046 and 8044

3    would show the effective minority. And it's important to point out that with both versions of the

4    map that we have before us today, they all would perform in the same effect and manner. The

5    effective minority would keep consistent with the benchmark standard and also provide a more

6    compact, it would also meet with more of the Tier Two standards, quite frankly. Whereas the

7    majority-minority certainly is a constitutional and possible approach as well. It would be the

8    addition of a new majority-minority district, but it would not necessarily have as much in terms

9    of the compactness and maybe some of the other Tier Two. So really, it's sort of one of those

10   choices. Our committee staff, in my opinion, has done so well to get us to this point that we have

11   some of these very challenging decisions before us because of the great work that they've done.

12   And that's where our focus is really narrowed to those two areas.

13           If I could do this, and if the committee would indulge me for a second, I would say that I

14   have a preference when it comes to 5 and 8. And so I'll just go ahead and throw that out there.

15   Districts 5 and 8 in Alachua and Gilchrist. And in reviewing that visually, optically, I would say

16   that 46 and 50 have a more compact look to them in keeping Gilchrist within District 5. That

17   configuration would also follow with the more rural counties of Columbia, Baker, Union, and

18   Bradford. It keeps with the directive to draw plans where I believe, where feasible, results in

19   district consisting of whole counties in less-populated areas. So with the more rural-minded

20   analysis that we've been asked to consider, where practical. So I don't know, you know, since 33

21   may be more of a question that we need to discuss further, I'm wondering if perhaps we could at

22   least finalize a decision on 5 and 8 in the process. If the committee feels comfortable with that

23   direction.

30

P-000968

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1    Senator Gibson: Mr. Chair, can you repeat what you just said?

2    Chair Burgess: Sure. Sure. So my preference when it comes to 5 and 8 would be, I

3    believe that would be maps 8046 and 8050.

4    Senator Gibson: Okay.

5    Chair Burgess: So for me, those appear more visually compact. There's a bit of a bulge,

6    as you can see, in five, I'd call it. No science there, that's just what I'm going to call it. And it

7    also keeps Gilchrist within 5, which is consistent with the usage of keeping rural counties

8    together, where practical. And I'm just throwing that out there, committee. So obviously, feel

9    free to weigh in and or tell me I'm off the reservation if you want to. Senator Gibson, for a

10   question.

11   Senator Gibson: I have a technical question. So when we're recommending, we're

12   recommending the map in its entirety, not recommending a new map be made with the things

13   that we're putting.

14   Chair Burgess: That is correct.

15   Senator Gibson: I'm confused with it.

16   Chair Burgess: That is correct, and my apologies if I haven't been clear enough on that.

17   I'll definitely address that. So we have the four maps before us. We're recommending one, two,

18   three, or all four of those, if we can't come to a decision in their entirety to the full committee, as

19   a select committee, we're not allowed to take a vote. However, we are charged with making

20   those recommendations to Chairman Rodrigues and the full committee. My preference would be

21   to see if we could get it to, at a minimum, two. Obviously, if we could all come to an agreement

22   and say, here's the one, that certainly would make work a little easier on the big committee. But

23   understanding that there's some big decisions here to be made, I think probably the more

31

P-000969

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1  practical approach, in fairness, would be to put two of the four forward. If the committee feels

2  comfortable doing so, and if it's the committee's preference that we just can't come to that

3  conclusion. Of course we can send the four up there. And if there's obviously the discussions of

4  4 and 6, those amendments could be proffered during the big committee for consideration.

5  However, we do, through our charge, need to come to a decision when it comes to these maps as

6  to which to send up. Senator Stargel.

7           Senator Stargel: Thank you, Mr. Chairman. I don't have a strong preference. I think the

8  staff did a phenomenal job of putting together these four maps, so I don't have a strong

9  preference. But considering what was just said, you were saying that you had a preference of 46

10  and 50, and Senator Bracy said he had a preference of 48 and 50. So I think together 50 is kind

11  of a common. So that might be one to consider.

12          Female Speaker: What are these two? They're not in.

13          Chair Burgess: I think that that's a great suggestion personally, Senator Stargel. Senator

14  Bracy.

15          Senator Bracy: Thank you. I just wanted to go back to your points about District 5 and 8,

16  Gilchrist County, which side it will be on. I wanted to just ask staff if they could kind of

17  highlight what changes for both districts would happen if like Gilchrist was in 5 as opposed to 8.

18  It looks like there's some changes with Alachua County too. A little more Alachua County is in

19  one.

20          Chair Burgess: Thank you, Senator Bracy. Absolutely, at a very high level, the interesting

21  thing about 5 and 8 is really the tradeoffs and make it almost a statistical tie in a lot of ways with

22  small variations in each area, but almost the ultimate total outcome is the same. And that's kind

23  of why we had a bit of a hard time narrowing that down further and wanted to put this forth to

32

P-000970

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1  the committee. So, Mr. Ferrin, you can talk about the details within that, but that's really why

2  that's such a decision before us.

3      Mr. Ferrin: Thank you, Mr. Chairman. And I'll just maybe try to jump back to the slide

4  here and maybe we can look at that. But so here's the image where we see that on the left

5  Gilchrist County's with District 8 and on the right it's with District 5. And that has a result of

6  moving the boundaries within Alachua a little bit as well. And so the net effect of all that is, as

7  shown here in the, the metrics for the plans is very, very close. You have one that does a little

8  better on a convex hull score versus one that does a little better on the Reock score, when you're

9  looking at the two different plans as they compare to each other, they're both well within the 1%

10  population deviation range. Obviously, they both use political and geographic boundaries for the

11  entire district boundary where it is split in Alachua. And so these are all easily recognizable and

12  commonly understood features. And so the metrics themselves don't necessarily lend themselves

13  to obvious choice and so we left the hard work for the committee.

14      Chair Burgess: Thank you, Mr. Ferrin, for doing such a good job that you left the hard

15  work to us. Does that answer your question, Senator Bracy? Perfect, any thoughts on the 5-8

16  discussion? You know, if we can narrow that down, Senators, then we can kind of gear our focus

17  then to District 33, which depending on the direction we go, obviously changes the status from

18  an effective minority or a majority-minority. So being that 5 and 8 are such a small transition,

19  just depending on which way we go with Gilchrist. I'm hoping we can at least maybe narrow that

20  down. Anybody in agreeance there?

21      Senator Bracy: Well, wait, I just I had a question. So I'm looking at district, the left map,

22  and it has a little bit more of Alachua County. Is that like an urban area? The little tip that is

23  added to the left map, is it a densely populated area?

P-000971

# 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1    Chair Burgess: Mr. Ferrin?

2    Mr. Ferrin: So, within Alachua County, the core of the population of that county is going

3    to be centered in and around Gainesville. And so the population of Gilchrist is somewhere

4    around 15,000 people, I think. And so, as a result of putting that into 5, you do have to push up

5    the boundary of District 8 along – somewhere along the eastern side of the boundary there. And

6    so that you can see that they do use a lot of similar boundaries coming into Alachua County from

7    the east. But then there is about 15,000 people's worth of deviation or movement there in

8    Gainesville, where 5 is going north.

9    Senator Bracy: What is the current district for? Like, that Alachua County area, the

10   current district number, is it 5 now?

11   Chair Burgess: Mr. Ferrin.

12   Mr. Ferrin: I believe all the Alachua County is contained within Senate District 8

13   currently.

14   Senator Bracy: Okay.

15   Chair Burgess: Senator Bracy, any follow up?

16   Senator Bracy: Well, I would just say that I think that I would prefer to keep it as close to

17   the way it is currently and keeping Alachua in 8. And so I don't know which map that is, but.

18   Chair Burgess: I don't know that that changes and I know that we could all probably have

19   reasonable disagreement on those shifts, but I would submit that essentially none of them would

20   probably keep that, keep Alachua entirely whole. So it's really the difference is all in Gilchrist.

21   Senator Bracy: Right.

22   Senator Stargel: Mr. Chairman?

23   Chair Burgess: Senator Stargel?

34

P-000972

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1  Senator Stargel: I think the difference from that area, I'm not super familiar. It's just –

2  it's a couple of different roads, difference that they're populated areas. So I believe that little bit

3  of a shift gives you Gilchrist. Like I said, it's not my area of the state, so I'm not super familiar.

4  But from what I do know, I do agree with you and that Gilchrist, as a county, I would believe, is

5  probably more likeminded to the more rural north than the more urban south, which is the gray

6  district. And I see what you're saying, Senator Bracy, but I think that's just a difference of, like,

7  just a few roads to make up a population. I don't think it really changes city, unless I'm

8  mistaken, Mr. Ferrin, if that changes, like a city breakup or anything like that. It was just moving

9  roads to accommodate people. That was because Gilchrist is a very sparsely populated county so

10  that's why a small move in an urban area accommodates the entire county of Gilchrist. Correct?

11  Okay.

12  Mr. Ferrin: Yes.

13  Chair Burgess: So my preference, Senators, would obviously be to narrow the choices to

14  46 and 50 just depends on whether or not we can, in terms of eliminating – the question of which

15  direction to go in 5, 8. And then that gears the conversation more towards 33 and whether or not

16  we want to pursue one direction or provide both of those options then to the full committee to

17  determine which direction to go in the effective minority or the majority-minority options.

18  Senator Bracy.

19  Senator Bracy: Chairman, I would say why don't we just give both options to the next

20  committee and like that South Florida seat and District 5, District 8. So maybe one map with the

21  Gilchrist in District 5, one of them with in District 8, and then the same for the South Florida

22  seat, one that has the effective minority, one that may have the majority-minority or minority-

23  majority, just so that there's the option.

35

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1    Chair Burgess: So your suggestion, Senator Bracy, would be to move to the four final

2  ones that we have before is the most current, just forward to the full committee for those

3  considerations?

4    Senator Bracy: Well, I was saying I thought we could do maybe two if we could

5  encompass everything I just said in the two maps.

6    Chair Burgess: In order, if I understand correctly, Senator Bracy, and I'm sorry if I

7  misunderstood, that would to do both options for both areas would require the four maps before

8  us to proceed because each map has a different configuration to the other.

9    Senator Stargel: Chairman.

10    Chair Burgess: Senator Stargel.

11    Senator Stargel: Thank you, Mr. Chairman. I think if you did 50 and 46, 50 accomplishes

12  the two. I'm sorry, 50 and 44 gives you the difference in Alachua between the two, and then it

13  also gives you the difference between 33 between the two, am I potentially –.

14    Chair Burgess: So, Senator Stargel, if I understand correctly, that would lock us into –

15  I'm going to kick this over to Mr. Ferrin real quick for a bit of an explanation on the out – like

16  the outcome of sending 44 and 50 up, if that's okay.

17    Mr. Ferrin: Thank you, Mr. Chairman. And so the way this was set up was to provide,

18  you know, we have the two decisions before the subcommittee, and so the four maps provide all

19  options and all combinations of those decision. So if we were to send two to the Chairman for

20  him to put forward for consideration before the full committee, I would recommend that, that at

21  least eliminate one of the choices rather than try to preserve. If we're trying to preserve both

22  choices, we probably need to recommend the four maps. And I hope that's clear. I understand

23  there's moving parts and pieces here, but I think that's, it sounds to me like maybe where we are,

36

P-000974

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1  Mr. Chairman.

2  Chair Burgess: Sure. Senator Stargel, is that, follow?

3  Senator Stargel: Yeah, that makes sense. But one final thing. I think given that, with the

4  discussion, I personally liked your idea of trying to narrow it down to make the decision a little

5  bit easier. Given that, I would just like to move, maybe that we put forth 8050, which

6  accomplished what was the priority of Senator Bracy and the priority of you, and just put forth

7  the one map.

8  Chair Burgess: Thank you, Senator Stargel, that would certainly narrow things down.

9  Any discussion on that, Senators? Senator Gibson.

10  Senator Gibson: Thank you, Mr. Chair. So because those are, those areas are in 8050, but

11  the drawing of 4 and 6 is not in 8050, we'll send forward 8050. But if I wanted to get the

12  drawings of 4 and 6 as it is in 8026, I guess in 8028, I would have to do an amendment, is that

13  correct? At the, which committee?

14  Chair Burgess: At the next committee meeting for the full redistricting committee. That is

15  correct, Senator Gibson. The amendment process would be at this juncture, if we decide together

16  to send 8050 forward as the map to consider the full committee, then an amendment would be

17  the appropriate process to consider that going forward.

18  Senator Gibson: And that's because we've already passed by 80 – We've moved, we've

19  moved on to a new road from 8026 and 8028. Is that correct?

20  Chair Burgess: So to your point, if I understand your question correctly, Senator Gibson,

21  I mean, all twelve maps before us are certainly up for consideration. The reason I'm focusing us

22  in on the last four is because of the work, the hard work, and the commitment to improving the

23  metrics to build upon each iteration to get to this point. So, you know, certainly I'm not in any

P-000975

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1   way, I want to be clear, trying to take the other maps off the table. However, in its totality, it

2   might be, it might take away in some of the – like in addressing 4 and 6, maybe in a prior

3   iteration. It might also take away a significant number of improvements that were made across

4   the state as a whole in its totality on those maps. So that's why, you know, if we're focusing in

5   on 4 and 6 in this discussion, it might be more appropriate if you feel comfortable with the other

6   areas that we've made improvements on, say, within 8050 or these four that are before us today,

7   that an amendment targeting sort of that area of discussion would be the most surgical way of

8   doing it.

9        Senator Gibson: At the next.

10        Chair Burgess: Yes, Senator, at the –

11        Senator Gibson: Got you.

12        Chair Burgess: Next committee, the full committee.

13        Senator Gibson: I just want to make sure my voice isn't being silenced. That's all.

14        Chair Burgess: Never. Absolutely not. We are in this together.

15        Senator Bracy: Chairman.

16        Chair Burgess: Senator Bracy?

17        Senator Bracy: Yes, I would like to recommend all four of the – of the maps that we've

18   just discussed today. Just to give the next committee the options on what we're talking about.

19   And I respect Senator Stargel's recommendation, but I think that there just needs to be more

20   discussion, more analysis on these maps. So since the last four are the product of the staff's work

21   and revising it and making it tighter, I just would say it's probably best. I know you want to

22   narrow it, but if we just sent all four and then continue to work the next committee, that would be

23   my suggestion.

P-000976

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1    Chair Burgess: Okay. So Senator Bracy, in your preference would be to move the four

2    forward for consideration to Chair Rodrigues. And in doing so, one of those four, if I understand

3    the process correctly and this could be a question from Mr. Ferrin, would then be brought

4    forward at the next committee for the committee's final consideration and any potential

5    amendments to that. Mr. Ferrin, for any clarification.

6    Mr. Ferrin: That's right, Mr. Chair. That's my understanding of the process, is that in

7    order to get in the proper posture for the parliamentary aspect of this, Chairman would file,

8    consider the recommendations of the subcommittee and file an amendment that contains one of

9    these maps. And then we would be in a position to consider other maps that either staff has

10   drawn or members have drawn as amendments to that, and then be in a position to select the final

11   configuration on Thursday and then move forward from there.

12   Chair Burgess: Understanding that Senator Bracy and that come Thursday we may very

13   well just see one of these four, that we move forward for the final consideration. Would you still

14   prefer to send those four or would you prefer that we narrow it down within our capacity?

15   Senator Bracy: Just so I understand it correctly, if we passed four maps, Chairman

16   Rodrigues would pick one of those maps and would take that to the committee for a vote. Is that

17   correct?

18   Chair Burgess: Senator Bracy, that's my understanding that we as a select committee

19   were charged with getting it to as focused and as narrow of an option pool as we could. That

20   way, come time for the, you know, the full committee, Senator Rodrigues would have the chance

21   to review our work and then be able to make final proposals for the committee to consider in any

22   potential amendments at that time. Senator Stargel.

23   Senator Stargel: Thank you. So then, thank you, Mr. Chairman. So at that point, then, if

P-000977

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1     anyone had a strong opinion about one of the ones that went or something, you would do it

2     through an amendment process off of that one map so that we're all working off the same map.

3           Chair Burgess: That's correct, Senator, which is why I think it's important that we, if we

4     feel comfortable, focus this as much as possible. I think the suggestion of 8050 is a strong one

5     because certainly it addresses two preferences that have been put on the table. And again,

6     Senator Bracy, if it's a strong preference that you see the four go forward and certainly we can

7     bump those up. Like I said, we're kind of a team here is the way I view it and we're making a

8     team suggestion. But if the team feels that we can at least narrow and focus to two, I think that's

9     for the benefit of the process. And first, certainly the considerations at the next level. Senator

10     Stargel.

11           Senator Stargel: Thank you, Mr. Chairman. I apologize. So let's, we send, let's say we

12     send 8050 and the entire community of Gilchrist calls me and says, you know what, we don't

13     like that. We want to be in the other one. We would have the opportunity to do an amendment to

14     amend back to something that was discussed today, if necessary.

15           Chair Burgess: Yes, Senator. That's absolutely correct.

16           Senator Bracy: I got a question though.

17           Chair Burgess: Senator.

18           Senator Bracy: Yeah, how would we amend a map if he has one chosen map, how could

19     we amend it to, let's say, include an effective majority? Basically the amendment would be to

20     take the old map because I don't know how you would amend a map that's already done.

21           Chair Burgess: Thank you, Senator Bracy. I think, and I'll let Mr. Ferrin kind of explain

22     the process a little bit on this and the impact of obviously changing an area sometimes changes

23     surrounding things, too. But like in these four maps that are before us, really the only areas of

P-000978

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1   some change are 5 and 8 and 33 and some of the surrounding areas down in Southeast Florida.

2   So it is possible to focus in on a more surgical approach through an amendment. And if there's a

3   preference that the committee goes for. But Mr. Ferrin might be able to best address how that

4   amendment would come forward and in what form. And is it an entire map based on that and

5   some other changes and so forth?

6          Mr. Ferrin: Yes. Thank you, Mr. Chairman. And Senator Bracy, anytime we draw a map,

7   we draw an entirely new map. And so that entire new map is capable of being filed as an

8   amendment. And so if you were to, if the committee makes a recommendation today and you

9   disagree with a part of that recommendation, you can come see me and we can draft any one of

10   these plans that we've already drawn. Or if you have new ideas, draft those into any one of the

11   plans that we've already drawn up and file those as an amendment to the Chairman's amendment

12   for Thursday's committee.

13          Senator Bracy: Got it. Yeah, my concern in picking what I think is important to minority-

14   majority over an effective minority, there may be others that don't think that they don't see it the

15   way I do. And so I guess that's why I wanted to give more than one choice. Let me ask this, this

16   final question, making, going back to this 33 and 34, making that district an effective minority,

17   right, district. What does it do to the other district surrounding it? Does it make it more likely

18   that they can elect the candidate of their choice? When you. Does that make sense what I just

19   asked?

20          Chair Burgess: Mr. Ferrin, you're recognized.

21          Mr. Ferrin: Thank you. Senator Bracy, so the movement of the change between the

22   effective minority and the majority-minority district is unlikely to have any impacts on the

23   surrounding districts in terms of their ability to perform for minorities simply based off of the

P-000979

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1  density of the population not getting to that level. In terms of comparing the two, I think one way

2  to look at it is that the creation of the majority-minority district does have some impacts to the

3  surrounding districts in terms of their Tier Two metrics. So compactness, use of political and

4  geographic boundaries as our features as boundaries, some of the cities are kept whole, more

5  kept whole as a result. And so those are, I think, where the meaningful tradeoffs are between Tier

6  Two and your decision to decide to make it a majority-minority versus an effective minority

7  district.

8      Chair Burgess: Senator Bracy, for a follow up?

9      Senator Bracy: Yeah. If there is not an increase for a change in how a district can elect a

10  candidate of their choice, and I understand you're saying there are some other factors,

11  compactness or what have you, but it essentially is the same result. What's the point? I mean, I

12  get, I don't, now that I'm talking through it, it just doesn't seem like there's much difference

13  between the two. So I don't. What are we talking about?

14      Chair Burgess: I think the difference, Senator Bracy, and that's actually honestly your,

15  it's not wrong in the sense that it's like if it has the same net effect in practice, then what are we

16  talking about with these distinctions? I think the question that staff came across in drawing these

17  so well, and then obviously the question before us today is some of the implications of going

18  either way and in the tradeoffs. Do you stay consistent with the benchmark, maybe having a little

19  more consistency when it comes, comes to the static boundaries and some of the other directives

20  we've been given, or do you maybe sacrifice some of those in the other tradeoffs to be able to

21  create constitutionally a new majority-minority district. And so in those, that's just, it's the

22  mechanics that's before us, really both have the same practical effect. And, you know, I think

23  we're at 46.15%. So no diminishment as an effective minority, and then, obviously as a BVAP,

42

P-000980

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1    we'd be at just over 50%. Is that right, Mr. Ferrin?

2    Mr. Ferrin: So, plus or minus four. Four percentage points there does change the

3    classification of the district. The effective minority, although having the same effect, does stay

4    more consistent with some of the other criteria that staff was asked to consider in drawing the

5    rest of the state. And so I think the reason that's before us is because that is probably more in line

6    with how it was drawn. But in doing so, the realization that we could also create a new majority-

7    minority district, maybe just not with some adherence to some of those other standards, was a

8    question that we needed to pose to the committee today.

9    Senator Bracy: Right, right, that makes sense.

10   Chair Burgess: And that's a long winded answer and –

11   Senator Bracy: I get it, though.

12   Chair Burgess: Did it as well as our staff could, but.

13   Senator Bracy: Well, then I guess I stand by my original point that I think the majority-

14   minority district may be the better option for that particular seat.

15   Chair Burgess: That would be 33. Oh, I'm sorry. You're talking about the maps. Any

16   other Senators have any preference when it comes to effective minority/majority-minority, the 33

17   – District 33 equation that we're talking about here, Senator? Any preference either way? So that

18   would be maps 46 and maps, if we can all agree on the notion that Gilchrist, for purposes of

19   staying compact and also remaining within a rural consistency moving forward. And, of course,

20   if Gilchrist would have strong preferences and an amendment is proffered, we could always

21   change that at the full committee. If we could at least put that question to bed, then we could

22   maybe look to moving forward. If there is no other strong preference outside of Senator Bracy's

23   good points, 8046 and 8050 would leave the final question related to 33 available for

43

P-000981

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1    consideration when it comes to the full committee. Would we be able to get to that point,

2    Senators? Senator Gibson.

3         Senator Gibson: Thank you. So are you saying now we're moving two maps, two of these

4    maps forward, or we're just moving one?

5         Chair Burgess: It's really the committee's preference. My preference, as I've said, and I

6    guess I'm gearing discussion to maybe get to that point, is could we resolve enough debate to

7    where two of the maps can be kept here and two of the maps would be put forward.

8         Senator Gibson: Could I follow up?

9         Chair Burgess: Yes.

10        Senator Gibson: Thank you. And so is the discussion that Senator Bracy was having and

11   his concerns in both or one of the maps.

12        Chair Burgess: If we moved 8046 and 8050, then the discussion would be in District 33,

13   which would be, I don't want to put words in your mouth, Senator Bracy, but I think where your

14   stronger preference might lie, the question of what to do with districts 5 and 8 were also raised

15   by Senator Bracy. I would defer to Senator Bracy as to whether or not he feels comfortable

16   moving in a particular direction there and if changes are made at the big committee, then they

17   can be submitted through an amendment.

18        Senator Gibson: Okay.

19        Chair Burgess: Senator, I wasn't trying to put words in your mouth. Please feel free –

20        Senator Bracy: No, well just to understand. 46 and 50 are the one you're proposing?

21        Chair Burgess: That would be correct, Senator. So 46 would be the effective minority.

22        Senator Bracy: Okay.

23        Chair Burgess: For, yes. And then 50 would be the majority-minority.

44

P-000982

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1   Senator Bracy: Got it.

2   Chair Burgess: Sorry, I'm just making sure I'm straight on my numbers here, too.

3   Senator Bracy: Is there any difference in the 5, District 5 and District 8?

4   Chair Burgess: In that proposal? In that proposal that I just put forward, there would not

5   be. That would, that would put Gilchrist within District 5.

6   Senator Bracy: Yeah, I'm fine with that.

7   Chair Burgess: Okay, so we've narrowed down to two, Senators. Do we feel comfortable

8   –

9   Senator Gibson: There are two going forward?

10   Chair Burgess: Correct. Correct, Senator Gibson. There are two going forward. We have

11   8046 and 8050. Would everybody be okay moving both of those options forward to our full

12   committee for consideration? Senator Gibson?

13   Senator Gibson: Sure, Mr. Chair, keeping in mind that what I have a concern about,

14   which doesn't constitutionally change anything or impact anything, actually improves the,

15   improves the districts, is not there. And that I have, I can at least offer an amendment in the next

16   committee. Is that correct? Because neither of those two maps represent the areas of concern that

17   I have. Am I right?

18   Chair Burgess: That is correct, Senator Gibson. Yes, Districts 4 and District 6 are

19   consistent within all four of these iterations. And considering these four to move forward, an

20   amendment would be the appropriate process, at which point you have the ability to do so at the

21   next committee stop, at the full committee. You're correct on your analysis there. Seeing no

22   further points, we do have some public discussions, so I don't want to overlook that before we

23   make final decisions. This is obviously what the committee has discussed, but we do want to

45

P-000983

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1   make sure to hear the feedback from the public before moving forward. And I'll come back to

2   the committee after this. So, Ms. Cecile Scoon with the – President of the Florida League of

3   Women Voters, you are recognized. You're welcome. Thank you. Please come to the podium.

4          Ms. Cecile Scoon: The League of Women Voters of Florida. It's actually really

5   interesting and engaging to have you all have these conversations back and forth, weighing the

6   different options that you have at. It's encouraging to me, and I'm sure all of us who are

7   watching. But I did want to point out that overall, and today in particular, there has been a focus

8   on improving the Tier Two. And there's charts that show how Tier Two has been improved on

9   pretty much every section. There are no charts on improving Tier One, Tier One is mandatory.

10  Tier One is what tracks the Voting Rights Act, which is still in effect. So I feel like there should

11  be more effort to improve Tier One compliance. And when there's so much discussion back and

12  forth between, is it compact? You know, are the little points going up and down? Those are,

13  those are certainly relevant. That's in Fair Districts. But the primary and the only thing that's

14  mandatory is what's in Tier One. Now, Tier One is not just about no regression. That's very

15  important, that's a big part of it. But there's also a separate part which says that if you must

16  essentially give racial minorities and language minorities every opportunity to select a

17  representative of their choice, and that means you need to maximize that. And I just haven't

18  heard a lot of discussion about maximizing that. What I hear is, so long as it meets the

19  benchmark, we're good. So long as we meet the benchmark, you know, that's fine and I feel like

20  Fair Districts actually requires you to do a deeper analysis and deeper work. Sort of what Senator

21  Bracy was saying, he wanted to be sure. He is saying, I want to elevate a Tier One requirement

22  which is mandatory over concerns from the Tier Two compactness. And that's the way it should

23  be, that is the analysis. That is the way Fair Districts was set up. And so I would ask you on

46

P-000984

## 1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment

1   behalf of the League and the many citizens to look at the map from that perspective. Tier One

2   should always be maximized and it should always be elevated. But the conversation and the

3   charts are reflecting improvements only on the things that are not mandatory, such as Tier Two.

4   So I would just, you know, ask you to keep in mind what Senator Bracy is saying, because he,

5   again, is trying to shift the balance to the mandatory and the things that must be done versus

6   balancing, you know, Tier One against Tier Two. Tier One wins. Thank you.

7         Chair Burgess: Thank you very much for your comments. Any further public discussion?

8   Seeing none, we will come back to the committee to see if there's any further feedback before

9   moving forward with our proposed two maps, seeing none. Senators –

10         Senator Bracy: Sorry, I did have a comment.

11         Chair Burgess: Senator Bracy.

12         Senator Bracy: Yeah, I know I've asked a lot about the crossing the Bay issue, and it's

13   been talk about diminishment and other factors. And I think the spokesperson from League of

14   Women Voters makes an excellent point that Tier One should trump all of the other tiers. And so

15   I think in that instance, I'm not sure if we did that. Obviously we did it in District 19, but there

16   could have been an opportunity to do it in the district next to it if we didn't cross the Bay. So, but

17   that's here nor there, we got the maps that we have. And I just thought it a point to make to make

18   during this committee. But staff, thank you for your work. Chairman, done a great job leading

19   this effort and look forward to see what comes up in the next committee. Thanks.

20         Chair Burgess: Thank you very much, Senator Bracy, I appreciate that. Staff has done an

21   amazing job. And like anything we do in this process, there's certainly various, you know, ways

22   you can approach something. And we have, you know, legislative deference and legislative

23   decision-making that is happening here in the public today. And I appreciate those words of

P-000985

**1-10-22 Florida Senate Select Subcommittee on Legislative Reapportionment**

1    encouragement from our public presenter. And, you know, in doing so, I feel like we've done a

2    really great job of expressing these opinions out here in the open. Thank you to our staff for

3    everything you've done to this point. Senators, I propose that we do submit the two

4    recommendations that we just concluded to Chair Rodrigues, that plans 8046 and 8050 – I want

5    to make sure I got those numbers correct – 8046 and 8050 most consistently adhere to the

6    directives that we've been issued. They provide options and they should be taken into

7    consideration for the substance of Senator Rodrigues's bill that will be before the full committee

8    on Thursday. Thank you so much, Senators, for helping us get to these recommendations, for

9    helping us narrow these decisions down. And see you all at the full committee on Thursday. And

10   seeing no further comments, Senator Gibson moves that we adjourn. Without any objection, we

11   are adjourned.

P-000986



## Vanan Online Services, Inc.
### Think Service Think Vanan

## **Certificate of Transcription**

Transcription of "1_10_22FloridaSenateSelectSubcommitteeonLegislativeReapportionment"

We, Vanan Online Services, Inc. a professional transcription company, hereby certify that the above-mentioned document(s) has/have been transcribed by our qualified and experienced transcriber(s) is/are accurate and true transcription of the original document(s).

This is to certify the correctness of the transcription only. Our transcriber is in no way related, by immediate family ties or marriage, to any parties related to the materials transcript.

A copy of the transcription is attached to this certification.

**Danny Negley, Production Manager.**

Date: 26th August of 2024

Vanan Online Services, Inc.
EIN 81-3795675
ATA Member #266532
ISO 9001:2015

**Vanan Online Services, Inc.**
**10711 Spotsylvania Ave., Suite A**
**Fredericksburg VA 22408**
**Office: (888) 535-5668**
**Email: support@vananservices.com**
**Website: www.vananservices.com**