**In the Matter Of:**

HODGES V. PASSIDOMO

8 24 CV 879

---

## JARVIS EL-AMIN

*November 21, 2024*

---

Exhibit 23



211.DEPO (3376)
*quireSolutions.com*



ESQ

DEPOSITION SOLUTIONS

JARVIS EL-AMIN                                    November 21, 2024
HODGES V. PASSIDOMO                                              1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3

 4   KÉTO NORD HODGES, et al.,

 5        Plaintiffs,

 6            vs.                    Case No:  8:24-CV-879

 7   KATHLEEN PASSIDOMO, et al.,

 8        Defendants.

 9   _____/

10

11

12

13

14              DEPOSITION OF JARVIS EL-AMIN

15

16

17

18      DATE:           November 21, 2024

19      TIME:           2:01 p.m. to 3:51 p.m.

20      LOCATION:       Videoconference-Zoom

21      SETTING FIRM:   Shutts & Bowen - Tallahassee

22      REPORTER:       Jill Saravis-Regan, Court
                        Reporter and Notary Public for
23                        The State of Florida at Large

24      FILE:           J12008347

25
```



JARVIS EL-AMIN                                        November 21, 2024
HODGES V. PASSIDOMO                                                 2

 1  APPEARANCE:

 2

 3  FOR THE PLAINTIFFS KÉTO NORD HODGES, ET AL:

 4  James Michael Shaw, II, Esquire
    Butler Weihmuller Katz Craig, LLP
 5  400 N Ashley Drive
    Suite 2300
 6  Tampa, FL 33602-4305
    813-594-5603
 7  jshaw@butler.legal

 8

 9

10
    COUNSEL FOR KATHLEEN PASSIDOMO IN HER OFFICIAL CAPACITY
11  AS PRESIDENT OF THE FLORIDA SENATE:

12
    Denise M. Harle, Esquire
13  Shutts & Bowen, LLP
    215 South Monroe Street
14  Suite 804
    Tallahassee, Florida 32301
15  (850) 241-1717
    DHarle@shutts.com

16

17

18

19

20

21

22

23

24

25



```
 1                      EXAMINATION INDEX

 2

 3

 4   JARVIS EL-AMIN
           DIRECT BY MS. HARLE . . . . . . . . . . .    4
 5

 6

 7

 8

 9

10
     ------------------------------------------------------------
11

12

13

14                       EXHIBIT INDEX

15

16
     Exhibit
17

18    1       Complaint                              34

19    2       Initial disclosures                    55

20

21

22

23

24

25
```



```
 1  THEREUPON,

 2                        JARVIS EL-AMIN,

 3  a witness, having been first duly sworn, upon his oath,

 4  testified as follows:

 5                     DIRECT EXAMINATION

 6  BY MS. HARLE:

 7     Q.   Good afternoon, Mr. El-Amin.  My name is Denise

 8  Harle.  I'm one of the attorneys for the Florida Senate in

 9  this case.

10     Could you please state and spell your name for the

11  record?

12          MR. SHAW:  I think -- before we start, are we --

13     (Thereupon, a discussion was held off the record.)

14  BY MS. HARLE:

15     Q.   Will you please state and spell your name for the

16  record?

17     A.   Jarvis Karin El-Amin, Jarvis is J-a-r-v-i-s;

18  Karin is K-a-r-i-n; El-Amin is E-l, hyphen, capital "A,"

19  m-i-n.

20     Q.   Thank you.  Did you attend yesterday's deposition

21  of Ms. Garcia in this case?

22     A.   No.

23     Q.   All right.  Have you -- do you understand that

24  you're being deposed under oath today?  Meaning, your

25  testimony is subject to penalty of perjury.
```



1      A.    Yes, ma'am.

2      Q.    Do you -- let's see.  Have you ever been deposed?

3      A.    Yes.

4      Q.    Okay.  Tell me about all of the other times

5  you've been deposed, please.

6      A.    I can't recall.

7      Q.    Okay.  Do you recall any times that you've been

8  deposed previously?

9      A.    No.

10     Q.    Okay.  Have you -- have you been a witness and

11 sat for a deposition before?

12     A.    Repeat your question.  I can't understand what

13 you're saying.

14     Q.    Sorry.  Have you been deposed before today?

15     A.    Yes.

16     Q.    Okay, when were you deposed?

17     A.    I don't remember.  A long time ago.

18     Q.    Were you previously deposed one time or more than

19 one time?

20     A.    One time.

21     Q.    Was it a criminal matter or a civil matter?

22     A.    I don't recall.

23     Q.    Were you a party to the dispute?

24     A.    I can't remember, ma'am.

25     Q.    What was the nature of your deposition testimony;



1  what was the subject matter?

2      A.   I don't remember.

3      Q.   Is there anything at all that you remember about

4  your previous deposition; where it happened, who was

5  involved, which court it was related to?

6      A.   All I remember is it was a long time ago in

7  Miami, I'm sorry.

8      Q.   Okay.  You -- was it 30 years ago, can you give

9  me a ballpark estimate?

10     A.   I can't recall how many years, ma'am.

11     Q.   Do you think it was more than ten years ago?

12     A.   I cannot say.

13     Q.   Were you a defendant in the case?

14     A.   I don't remember, ma'am.

15     Q.   Have you ever testified in court?

16     A.   Could you clarify what you mean by that?

17     Q.   Have you ever given testimony in a court of law?

18     A.   Yes.

19     Q.   Okay.  Have you done that more than one time?

20     A.   I don't recall, ma'am.

21     Q.   Is there only one time you recall previously

22  giving testimony in court?

23     A.   One time I remember.

24     Q.   Okay.  Can you tell me about that time, please?

25     A.   I don't remember what it was.  I was young, I



 1  don't remember.

 2      Q.   Was it the same matter that you gave the

 3  deposition in?

 4      A.   No, I don't remember, ma'am.

 5      Q.   Mr. El-Amin, when you testified in court

 6  previously, was that in a civil case?

 7      A.   I don't remember.  I think it was civil, I'm not

 8  remembering for certain.

 9      Q.   Were you a party in that lawsuit?

10      A.   I don't remember, ma'am.

11      Q.   What were the civil claims, or what was the

12  subject matter of the dispute that you testified in court

13  about?

14      A.   I don't recall, ma'am.

15      Q.   Was that here in Florida?

16      A.   Yes.

17      Q.   What city was that in?

18      A.   Miami.

19      Q.   Can you estimate what year or what decade your

20  court testimony occurred in?

21      A.   It could have been the late 70s.

22      Q.   Do you remember anyone else who was involved in

23  that case that you can identify?

24      A.   No, I don't.

25      Q.   How did you get involved in the case where you



 1  testified in court?

 2      A.    I don't remember, ma'am.

 3      Q.    And the previous deposition testimony you gave,

 4  was that also here in Florida?

 5      A.    Could you clarify what you said?

 6      Q.    Earlier, you told me that you had been deposed

 7  before.  I'm asking, did that occur here in Florida, your

 8  deposition?

 9      A.    Yes.

10      Q.    Okay.  What city was that in?

11      A.    It could have been Miami.  I'm not certain.

12      Q.    And are you able to give me an estimated decade

13  when that occurred?

14      A.    No, ma'am.

15      Q.    We'll just to go over a few ground rules for

16  today.  So far you seem to be doing well on all of these,

17  but I just need to make sure that you give a verbal

18  response to all of my questions; that you're careful not

19  to interrupt me or talk over me.  If you have any trouble

20  understanding my question, please just ask me to rephrase

21  or try it again.  I'm happy to do that.

22      If you do answer my question, that answer will be

23  under oath, and we will all assume that you understood my

24  question and the answer you gave is binding and accurate.

25      If at any point, seeing a document would help you



1  refresh your recollection or your understanding, please

2  just let me know and I'll be happy to try to assist you on

3  that.

4      If at any point you need a break, I'm also happy to

5  accommodate that as well, just let me know.  We'll find a

6  good stopping point.

7      Your attorney may object to some of the questions I

8  today, but unless your attorney instructs you not to

9  answer, you do still need do go ahead and answer the

10 question.

11     Does all of that make sense?

12     A.   Yes, ma'am.

13     Q.   Thank you.  Could you please state your address,

14 your current residence?

15     A.   4818 East 99th Avenue, Tampa, Florida 33617.

16     Q.   And when did you move there?

17     A.   I moved there initially in 1989.  For two years,

18 I moved away, and came back in 2003 to current.

19     Q.   In that exact same address?

20     A.   Excuse me, not 2003, 2005.

21     Q.   Okay, so just to clarify, you've lived at your

22 current address, 4818 East 99th Street in Tampa -- excuse

23 me, East 99th Avenue in Tampa since 2005?

24     A.   I initially moved there in 1989 and stayed away

25 from there from 2003 to 2005.  I moved back there in 2005.



JARVIS EL-AMIN                                   November 21, 2024
HODGES V. PASSIDOMO                                            10

1  I've been there since 2005.

2      Q.   And is that a house?

3      A.   Yes, ma'am, yes.

4      Q.   Do you own the house?

5      A.   Yes.

6      Q.   Is there any chance that you're aware that you

7  might be moving in the next year or two?

8      A.   No chance.

9      Q.   What's your educational background since high

10  school?

11     A.   I have high school diploma and some college.

12     Q.   Where did you attend college?

13     A.   I attended Miami-Dade Junior College and

14  Hillsborough County Community College.

15     Q.   Sir, after college, what did you do after leaving

16  college?

17     A.   Well, opened up the restaurant business.

18     Q.   Was that -- was that in the Miami area?

19     A.   In Miami.

20     Q.   And how long did you work in the Miami -- excuse

21  me, the restaurant business in Miami?

22     A.   About five years, six years.

23     Q.   What did you do after that?

24     A.   I went into salesmanship.  I worked for a company

25  doing sales.



1      Q.    And what kind of sales?

2      A.    Insurance.

3      Q.    How long did you do insurance sales?

4      A.    I don't recall, a couple of years.

5      Q.    And what did you do after that for a line of

6    work?

7      A.    Entrepreneurship, working at flea markets.

8      Q.    Did you say flea markets?

9      A.    Yes, ma'am.

10     Q.    Is that what you still do, nowadays?

11     A.    No.

12     Q.    Okay.  You don't do entrepreneurship now -- or do

13   you do entrepreneurship now?

14     A.    Yes.

15     Q.    Okay.  Well, maybe we'll start there and then we

16   can work backwards if we need to.  What -- tell me about

17   your current employer, please.

18     A.    I have my own company, Enhancement Enterprises.

19   I do sales training and consulting.

20     Q.    What's the name of your business?

21     A.    Enhancement Enterprises.

22     Q.    How long have you owned that business?

23     A.    Fifteen years.

24     Q.    Do you have a physical office location?

25     A.    No.



1    Q.   Have you ever worked for a political

2  organization?

3    A.   Yes.

4    Q.   Which political organization have you worked for?

5    A.   I worked for specific engagement -- I don't know

6  if it's political -- Florida Rising

7    Q.   I'm sorry, what was it called?

8    A.   Florida Rising.

9    Q.   Florida Rising, okay.  And what does Florida

10  Rising do?

11    A.   Specific engagement.

12    Q.   Can you tell me more specifically some of the

13  particular activities of Florida Rising?

14    A.   Yes, it's canvassing about particular issues in

15  the community, all people, about different issues in the

16  community and educate people through the voting process.

17    Q.   And when did you work there?

18    A.   Recently, from July to -- this year, July to

19  September of 2024; July, 2024, to September.

20    Q.   So you worked with Florida Rising for three or

21  four months earlier this year.  Is that right?

22    A.   Forty-five days.

23    Q.   Okay, and how did you get involved with Florida

24  Rising?

25    A.   Just knew of the work that they do in the



 1 | community.
 2 |     Q.   Where -- geographically, where did you do your
 3 | work for Florida Rising?
 4 |     A.   In the Tampa Bay area.
 5 |     Q.   Anything more particular or is it the whole
 6 | entire Greater Tampa Bay area?
 7 |     A.   Inside of Tampa.
 8 |     Q.   Was it certain areas inside of Tampa?
 9 |     A.   No.
10 |     Q.   Was there any particular reason why you focused
11 | on doing the Florida Rising work inside Tampa?
12 |     A.   I don't understand that question.
13 |     Q.   Well, you told me that Florida Rising does
14 | specific engagements and that you've worked with them on
15 | specific engagements inside of Tampa.  So out of the
16 | Greater Tampa Bay area -- just curious -- was there any
17 | reason why your focus was inside the City of Tampa?
18 |     A.   No.
19 |     Q.   What particular issues did you work on with
20 | Florida Rising?
21 |     A.   Affordable housing.
22 |     Q.   I'm sorry, say that one more time.
23 |     A.   Housing.
24 |     Q.   Housing.  Affordable housing.  Anything else?
25 |     A.   And high electric bills.



1    Q.    Anything else?

2    A.    That's it.

3    Q.    Other than Florida Rising, have you ever worked

4 for a political organization or a civic engagement

5 organization?

6    A.    No.

7    Q.    Have you ever worked for a legal organization?

8    A.    No.

9    Q.    Are you currently involved in any civil rights

10 organization?

11    A.    Could you clarify what you mean by "civil rights

12 organization"?

13    Q.    Are you currently involved in any voting rights

14 organizations?

15    A.    Could you clarify what you mean by "voting rights

16 organization"?

17    Q.    Are you currently involved with any organization

18 that works on issues related to voters and voting?

19    A.    Yes.

20    Q.    Okay, and what organization is that?

21    A.    NAACP.

22    Q.    And are you an officer with NAACP?

23    A.    No.

24    Q.    Are you a member of NAACP?

25    A.    Yes.



JARVIS EL-AMIN                                      November 21, 2024
HODGES V. PASSIDOMO                                              15

1     Q.    How long have you been a member of NAACP?

2     A.    I can't recall the exact date.

3     Q.    Can you estimate?

4     A.    Maybe five years.

5     Q.    And what does the NAACP have to do with respect

6  to voting?

7     A.    Civic engagement.

8     Q.    What do you mean by "civic engagement"?

9     A.    Encouraging people to participate in the

10 political process.

11    Q.    And what do you do as a member of NAACP in terms

12 of that organization?

13    A.    (inaudible).

14    Q.    What do you do in terms of activities within the

15 NAACP organization?  You personally.

16    A.    I sit on the executive committee.

17    Q.    Do you sit on the executive committee?

18    A.    Yes.

19    Q.    But you're not an officer?

20    A.    No.

21    Q.    Okay.  Do you have a title on the executive

22 committee?

23    A.    Executive Committee Member At Large.

24    Q.    Does the NAACP do advocacy relating to black

25 voters specifically?



JARVIS EL-AMIN                                    November 21, 2024
HODGES V. PASSIDOMO                                              16

1    A.    No.

2    Q.    Are you a member of any other organization or are

3  you involved with any other community organization that

4  focuses on issues relating to black residents of the Tampa

5  area?

6    A.    No.

7    Q.    Are you a member of City of Tampa Racial

8  Reconciliation Committee?

9    A.    Yes.

10   Q.    Okay, and what does that organization do?

11   A.    Well --

12         MR. SHAW:  Object to form.

13         Go ahead and answer.

14         THE WITNESS:  Well, it hasn't been formed yet.

15    It's just been made by the city counsel.  It hasn't

16    been formed.  We haven't even had its first meeting.

17  BY MS. HARLE:

18   Q.    Are you involved in any other community

19  organization that focuses on particular groups or

20  subgroups of people?

21   A.    What do you mean by that?

22   Q.    Well, one of the issues of the case is, you know,

23  you talking and complaining about communities of interest.

24  So are there any other organizations you're involved with

25  actively that focus on certain communities of interest,



```
 1  whether that be voters, black residents, religion,
 2  anything at all?
 3          MR. SHAW:  Object to form.
 4          You can answer it.
 5          THE WITNESS:  I'm involved with my faith
 6      community.  The same way --
 7  BY MS. HARLE:
 8      Q.  Very good.  What -- okay.
 9      A.  The same way in terms of civic engagement.
10  And --
11      Q.  Okay.  And are -- is there a -- I'm sorry, I
12  interrupted you.
13      A.  Yes.  I'm involved in my faith community and
14  civic engagement educating them to the voting process.
15      Q.  And is that an organized involvement with a
16  particular group, or is that something more organic?
17      A.  Organic.
18      Q.  In other words, is there a specific group with a
19  group name that you are involved with in your faith
20  community?
21      A.  No.
22      Q.  Are you familiar with a Nasr Community
23  Development Corporation?
24      A.  Yes.
25      Q.  Okay.  And what is that?
```



1    A.   That is a community development organization,

2  it's called "Nasr."  "An-Nasr" means help.  It does youth

3  development, youth entrepreneurship, and training youth in

4  lower income communities teaching them about

5  entrepreneurship.  I'm one of the founding members of

6  that.

7    Q.   That's great.  Are you familiar with the

8  Jacksonville Masjid of Al-Islam?

9    A.   Could you repeat the question?

10    Q.   Well, I might be saying it wrong, but are you

11  familiar with the Jacksonville Masjid, M-a-s-j-i-d, of

12  Al-Islam?

13    A.   I'm familiar with it because it is a part of a

14  African-American Muslim Association that I'm familiar

15  with, and it's called Jacksonville Masjid.  "Masjid" means

16  "place of worship."

17    Q.   Are you actually involved in that organization or

18  just aware of it?

19    A.   Just aware of it.

20    Q.   How about the Masjid and Nasr, are you familiar

21  with that organization?

22    A.   Yes.

23    Q.   Are you involved with that organization?

24    A.   Yes.

25    Q.   Are you the vice chairman of that organization?



1      A.   Yes.

2      Q.   Okay, and what does that organization do?

3      A.   It is a community that do outreach in the

4  community; food pantry, social concerns, youth

5  development, and mentoring young, new Muslims into the

6  Islamic faith.

7      Q.   So does that organization have any participation

8  on the civic engagement front?

9      A.   No.

10     Q.   Is there any other voting-related activities that

11  you're involved with that I haven't asked about yet?

12     A.   No.

13     Q.   Okay.  Did you at one time participate in a tax

14  payer-funded voter education program in Hillsborough's

15  black community?

16     A.   Repeat the question.

17     Q.   Did you at one time participate in a tax

18  payer-funded voter education program in Hillsborough's

19  black community?

20     A.   No, I didn't.

21     Q.   Do you know someone named Buddy Johnson?

22     A.   Yes, I do.

23     Q.   Okay.  Did you participate in a voter education

24  program, Buddy Johnson?  Does that refresh you memory?

25     A.   It was a campaign event.  He was running for



 1  re-election.  In his campaign, I did some consulting work

 2  for him, for his campaign; not for the supervisor election

 3  office.

 4      Q.   So it was a -- was it a one-time campaign event,

 5  or you're you saying you worked for his campaign?

 6      A.   I did consulting work for his campaign.

 7      Q.   Over what period of time?

 8      A.   I can't recall the dates.  It's been a quite a

 9  while ago.

10      Q.   And who paid you for that?

11      A.   Each campaign paid my company, my consulting

12  company.

13      Q.   Is that a consulting company that you still

14  currently operate?

15      A.   No.

16      Q.   Other than working with Buddy Johnson, have you

17  done any other campaign consulting?

18      A.   Yes, I have.

19      Q.   Okay.  And please tell me the candidates or

20  issues or groups that you've done campaign consulting.

21      A.   It's been quite a few, so I'll name as many as I

22  can remember.

23      Q.   Thanks.

24      A.   I worked with Bob Buckhorn when he ran for Mayor.

25  I worked for Kevin Beckner.  I worked with Sandra Murman.



 1  I worked with Betty Reed.  Just to name a few.

 2       Q.   Have you ever been an outreach coordinator for a

 3  campaign?

 4       A.   Yes.

 5       Q.   Okay, and when was that?

 6       A.   I worked with David Strauss campaign, 2019.  I

 7  was the Urban and Muslim outreach coordinator.

 8       Q.   And what did you do in your capacity as an

 9  outreach coordinator for that campaign?

10       A.   I reached to the black voters and Muslim voters

11  and discussed his campaign with those people.

12       Q.   And was your outreach focused on a particular

13  geographic area?

14       A.   Yes.

15       Q.   Which geographic area was your outreach focused

16  on?

17       A.   The Urban core and the Muslim community.

18       Q.   Was all of that within the city of Tampa?

19       A.   Yes.

20       Q.   And where -- if you can just sort of give me a

21  rough idea -- is the urban core of Tampa, toward the north

22  or the east or the south, somewhere else?

23       A.   Central east.

24       Q.   Is there any other time that we haven't discussed

25  that you worked on voting issues or campaign issues or



1  partisan issues?

2      A.   No.

3      Q.   Have you ever volunteered as a phone maker in an

4  election?

5      A.   Yes.

6      Q.   Okay, and when was that?

7      A.   A long time ago, when Barack Obama ran for

8  president.

9      Q.   Any other time?

10     A.   No.

11     Q.   And have you ever canvassed for an election?

12     A.   Yes.

13     Q.   And when was that?

14     A.   When Barack Obama ran for president.

15     Q.   Any other time?

16     A.   When I was hired for campaigns.  Any of those

17 campaigns I mentioned to you, I did some canvassing with

18 those campaigns.

19     Q.   Besides this lawsuit, have you ever been involved

20 in a civil lawsuit as a party?

21     A.   No.

22     Q.   Have you ever been convicted of a crime?

23     A.   Say it again, ma'am.

24     Q.   Have you ever been convicted of a crime?

25     A.   I had a case that was in a Federal court that was



1  a pre-arrangement I made.  I'm not certain.  My lawyers

2  know that it wasn't -- was told through litigation I

3  wasn't convicted.  I'm not certain of that.

4      Q.   And do you recall what year that was in?

5      A.   2000; twenty-four years ago.  It's been quite a

6  while ago.

7      Q.   And what were the charges?

8      A.   It was credit card -- no, it was social security

9  identity and mail fraud.

10     Q.   And I think you said you plead no contest, or you

11 said you were convicted?

12     A.   It was a plea agreement; I made a plea with the

13 U.S. Attorney's Office.

14     Q.   Have you ever plead no contest to a crime?

15     A.   I can't recall.

16     Q.   Are there any other times that you recall when

17 you were convicted of a crime?

18     A.   No.

19     Q.   Do you recall pleading no contest to a first

20 degree domestic violence battery in the year 2000?

21     A.   No.  I had problems with my daughter and that

22 case was dissolved in anger management.  I don't recall

23 pleading guilty to the charge.

24     Q.   And, so, you don't recall whether you were

25 convicted of that?



1    A.    No.

2    Q.    And the earlier -- the other incident you

3  described with the identity and the mail fraud, and the

4  plea agreement, what did you say was the ultimate penalty

5  or punishment of that case?

6    A.    Yes.  It was three years, 36-month regular

7  probation at six months.

8    Q.    Are there any other times that you have been

9  convicted of a crime or plead no contest to a crime?

10    A.    I can't recall.

11    Q.    Okay.  Do you recall a time in 2005 where there

12  was a felony information filed against you for a criminal

13  incident?

14    A.    Some of the things that you mentioned have been

15  over 20 years ago, so I may not recall them clearly.  So

16  if you can, refresh my recollection.

17    Q.    The reason -- you know, the reason I'm exploring

18  this is, just, in the Federal Courts when someone has been

19  convicted of a crime or pled no contest to a crime that is

20  subject to a year or more in prison, that's something that

21  actually can become relevant in the case; so I'm just

22  trying to figure out what happened in some of your

23  background here.

24    So have you ever lost your voting rights at any point?

25    A.    I'm not sure that I'd lost my voting rights.



JARVIS EL-AMIN                                      November 21, 2024
HODGES V. PASSIDOMO                                                25

1  Because what happened was, action was taken, but -- and I

2  was on probation.  And when they resolved the probation,

3  they gave me any passport back.  So I don't recall losing

4  my voting right.

5      Q.  Do you recall ever having to take steps to

6  restore your voting rights?

7      A.  No.

8      Q.  Do you recall ever having to pay any criminal

9  fees or costs or restitution related to the felony?

10     A.  Yes.

11     Q.  Okay, and as far as you know, do you have any

12  outstanding costs that you need to pay related to the

13  felony at this point?

14     A.  No outstanding costs.  They -- all was paid.

15  They wouldn't have let me off probation with it.  That's

16  the only thing.

17     Q.  Have you ever been a party to any bankruptcy

18  proceedings?

19     A.  Yes.

20     Q.  How many times?

21     A.  Three times.

22     Q.  Did those end up involving any court testimony?

23     A.  I don't recall.

24     Q.  Do you recall what years those bankruptcies were?

25     A.  No.



1    Q.   All right.  Tell me, just in your own words, if

2  you will, why you're bringing this lawsuit challenging the

3  map?

4    A.   Well, I was put in touch with one of the

5  attorneys and discussed representation, fair

6  representation, for the community in which I live in.  And

7  fairness and equity is all I can say.

8    Q.   Okay.  Well, let me be clear.  I don't want you

9  to ever tell me anything you said to your attorney or

10  anything your attorneys have said to you, but I would like

11  it if you would be able to unpack a little bit more why

12  you think that fairness and equity support your current

13  legal challenge to the map.

14    A.    I just think representation matters and -- I'll

15  leave it there.

16    Q.   And what is it about the map that you're

17  challenging that you think harms fair representation?

18    A.    Well, I'm not an expert on maps, but I can tell

19  you for certain that the only reason I can see that you

20  would take one group of people and lock them across the

21  bay to another group of people, would be to put people

22  that look alike in all in one area.  I don't think that

23  it's fair.

24    Q.   And when you say "people that look alike," what

25  kinds of people are you talking about?



1    A.    Black people.

2    Q.    Okay.  And, so -- and do you think it's unfair to

3  have black voters in the same district as other black

4  voters?

5         MR. SHAW:  Object to form.

6         Go ahead and answer.

7         THE WITNESS:  I didn't say that.  If you -- you

8    can ask me the question another way, but that ain't

9    what I said.  But you can ask me a question.

10 BY MS. HARLE:

11   Q.    Yeah, so what's unfair about having groups of

12 black voters in the same district?

13   A.    Nothing.

14        MR. SHAW:  Object to form.

15        Go ahead and answer.

16        THE WITNESS:  Nothing.

17 BY MS. HARLE:

18   Q.    Okay.  Well, then what's unfair about the map

19 you're challenging?

20   A.    Like I said, I'm not an expert on maps, but I

21 know that people on this side of the bay and the

22 Hillsborough side of the bay have different issues and

23 concerns than people that live in South St. Petersburg,

24 even though they're going to be the same color.  They got

25 different issues, different concerns, and they process



 1  issues differently.

 2      Q.   And what are some of the issues that the voters

 3  on the one side of the bay would see differently than

 4  voters on the other side of the bay?

 5      A.   I'll just say this, I'm not an expert on what

 6  other people see, but I do know the issues are different.

 7  Very -- they're different.

 8      Q.   Okay.  Yeah.  Tell me what those very different

 9  issues are.

10      A.   I'm not an expert on what the issues are, but

11  I'll give you one example.  Housing is different on this

12  side of the bay than it is in South St. Petersburg.

13      Q.   And in your perspective, what are the housing

14  issues that are of concern on the Tampa side?

15      A.   I think that the housing issues concerned on the

16  Tampa side is affordability and gentrification.

17      Q.   Do you know if there's any housing issues of

18  concern on the St. Pete side of the bay?

19      A.   No.

20      Q.   Are there any other issues you can think of that

21  are very different from Tampa and St. Pete?

22      A.   The way crime is addressed.

23      Q.   Tell me more about that.

24      A.   Well, policing one area, small area, can be

25  different from policing a larger area that's more diverse.



1      Q.   What's -- what police in a small area are you

2  referring to?

3      A.   Well, we're talking about South St. Petersburg.

4      Q.   Okay.  And so what's the different in policing

5  between South St. Petersburg and policing in Tampa, if

6  there is any difference.

7      A.   One is policing an almost all-black community,

8  and one is policing a more diverse area with people of

9  different diverse backgrounds.

10     Q.   And which area is almost all black?

11     A.   South St. Petersburg.

12     Q.   I'm making sure that I don't miss anything.  So

13 are there any other issues that jump out to you that are

14 very different than the two areas of the district that

15 you're challenging?

16     A.   No, those are the main two.

17     Q.   Other than your attorneys, who have you spoken

18 with about this lawsuit?

19     A.   My wife.

20     Q.   Anybody else?

21     A.   I briefly spoke to Mr. Keto Nord.

22     Q.   Another plaintiff in this case?

23     A.   Right.

24     Q.   And I don't want you to tell me what you guys

25 talked about, but was that -- do you remember roughly when



1  you spoke to him?

2      A.    After the case was filed in court.

3      Q.    Shortly after it was filed, or more recently?

4      A.    Shortly after it was filed.

5      Q.    Okay.  Do you know any of the other plaintiffs in

6  this lawsuit in a personal capacity?

7      A.    No.

8      Q.    And other than Mr. Nord Hodges, have you spoken

9  with any of the other plaintiffs?

10     A.    No.

11     Q.    During the redistricting process that resulted in

12 the maps at issue in this case, did you communicate with

13 any members of staff of the Florida legislature?

14     A.    No, I did not.

15     Q.    When the redistricting process was going on that

16 resulted in the map you're challenging, were you aware

17 that redistricting was happening?

18     A.    I saw pictures recently.  Pictures just on the

19 news, and just a sound-bite on the news talking about it,

20 that's it.

21     Q.    Do you remember what year that was?

22     A.    Sometime this year.

23     Q.    After the redistricting was done and the new map

24 you're challenging was selected, did you communicate at

25 that point with any members or staff of the Florida



1  legislature?

2      A.   No, I did not.

3      Q.   At any point during or after the redistricting

4  process, have you communicated with any members of the

5  media regarding the redistricting process or the map?

6      A.   Would you repeat the question again?

7      Q.   Well, maybe I can just say it this way.  Have you

8  communicated with any members of the media regarding the

9  redistricting process or the resulting map?

10         MR. SHAW:  Object to form.

11         You can go ahead and answer.

12         THE WITNESS:  I spoke to -- not directly to the

13     media -- some people on my attorneys, just for the

14     press release together, and ask for a statement from

15     me.

16  BY MS. HARLE:

17     Q.   Okay.  If I understood you, your attorneys put

18  together press releases on this case.  Is that what you

19  said?

20     A.   There was somebody on my attorney's staff that

21  said they was putting together a press --

22         MR. SHAW:  Don't say what you discussed in the

23     attorney's office.

24  BY MS. HARLE:

25     Q.   So have you -- but have you ever spoken directly



1  with a member of the media regarding the redistricting

2  process of map --

3       A.    No.

4       Q.    Okay.

5       A.    No, I have not spoken directly to the media.

6             MR. SHAW:  Hey, Denise, we're almost at an hour

7       and I need to use the restroom.  Is now a good time

8       for a -- like, a five-minute break?

9             MS. HARLE:  This is just fine, yes.

10             (Thereupon, a short break was taken.)

11  BY MS. HARLE:

12       Q.    All right.  Mr. El-Amin, have you made any

13  statements to any of the community organizations that

14  you're involved with regarding this lawsuit?

15       A.    No.

16       Q.    Have you made any social media posts about this

17  lawsuit?

18       A.    No.

19       Q.    What social media apps or accounts do you have?

20       A.    I have Facebook and Instagram.

21       Q.    Do you have X, or Twitter?

22       A.    No.

23       Q.    Do you have LinkedIn?

24       A.    Yes, but I don't use it.

25       Q.    Do you have a TikTok?



1     A.    No.

2     Q.    Are you currently a registered voter?

3     A.    Yes.

4     Q.    Have you voted in every state's senate election

5  since you have been 18?

6     A.    Yes.

7     Q.    When was the most recent time that you voted in a

8  state senate election?

9     A.    I think two years ago.

10     Q.    Did you vote in the election -- the election we

11  just had in November for any -- in any capacity for any of

12  the elections involved?

13     A.    Yes.  Yes.

14     Q.    You did.  Do you know any reason why you wouldn't

15  show up on the Secretary of State's voter registration

16  rolls?

17     A.    No.

18     Q.    Is your polling place still at Temple Terrace

19  United Methodist Church?

20     A.    Yes.

21     Q.    Have you seen any of the alternative maps

22  involved in this lawsuit?  In other words, if we didn't

23  have the challenge map, some different maps that you in

24  your complaint say would be preferable.  Have you seen

25  those maps?



1          MR. SHAW:  Object to form.

2          Go ahead.

3          THE WITNESS:  Yes, I've seen some maps.

4    BY MS. HARLE:

5      Q.   Let's pull up the complaint.  So if we have some

6    exhibits today, my colleague Leila is going to share her

7    screen.  Hopefully you'll be able to see it.  Just let us

8    know if you need us to zoom in or zoom out, or if we need

9    to try to get it to you in some other format, we'll do

10   that as well.

11     So looking at the complaint --

12          MS. HARLE:  And, Jill, this will be I guess

13     Exhibit 1, LLE-1.

14   (The document referred to was marked for identification as

15             Exhibit No. LLE-1.)

16   BY MS. HARLE:

17     Q.   Let's look, just for example, at -- well, I'll

18   start with this question.  Did you read the complaint

19   before it was filed?

20     A.   Briefly, not fully.

21     Q.   I'm sorry, what did you say?

22     A.   I read it briefly.

23     Q.   And did you approve of everything in the

24   complaint before it was filed?

25     A.   Yes.



1      Q.   Let's look at paragraph 6 and 7.  Do you need

2  time to read that -- the gist of these?

3      And my question will be, in these allegations, you

4  alleged, for example, in paragraph 6, quote, the

5  legislature elevated race above all other considerations.

6  And then in paragraph 7, it says, quote, the legislators

7  and their staff reportedly drew these districts in a race-

8  predominate manner to avoid the diminishment of black

9  voters' ability to elect representatives of their choice.

10      So my question is, what facts do you know is related

11  to the legislature's racial motive in drawing the maps?

12      A.   I'm not an expert on maps.  All I know is that to

13  put -- go across a body of water and put one group in

14  South St. Pete, in with the Hillsborough side, don't seem

15  as fair to me.

16      Q.   And do you personally know any facts that

17  indicate that the legislature's predominant criteria in

18  drawing District 16 was race?

19          MR. SHAW:  Objection to form.

20          Go ahead and answer.

21          THE WITNESS:  No, like I said, I just don't see

22     putting one body of South St. Pete and up and into

23     Tampa as being fair.

24  BY MS. HARLE:

25      Q.   Do you personally know any facts indicating that



1  a legislature's central consideration in the overall

2  map-making process was race?

3           MR. SHAW:  Object to form.

4           Go ahead.

5           THE WITNESS:  No.

6  BY MS. HARLE:

7      Q.   Is there a certain percentage of black voting age

8  population that you think should be in District 16?

9      A.   No.

10     Q.   Do you know how the crime percentage of black

11 voting age population in District 16 compares to the

12 percentage and of black voters' population under the prior

13 map?

14     A.   No.

15     Q.   Are you familiar with the history of the district

16 boundaries of Hillsborough and Pinellas Counties?

17          MR. SHAW:  Object to form.

18          THE WITNESS:  Somewhat.

19 BY MS. HARLE:

20     Q.   Okay.  And what do you know about the history of

21 those district lines in Hillsborough sand Pinellas County?

22     A.   I know it --

23          MR. SHAW:  Object to form.

24          Go ahead.

25          THE WITNESS:  I know it's drawn similar to the



1    way it's not.  It was wrong then and it is wrong now.

2  BY MS. HARLE:

3    Q.    So are you aware that the communities currently

4  combined in District 16 have been combined in a -- in the

5  same district since the early 1990s?

6    A.    Yes, ma'am, I'm aware of that.  It was wrong

7  then, and it's wrong now.  Unfair then, and it's unfair

8  now.

9    Q.    Before filing this lawsuit, have you ever done

10  any advocacy or spoken out against the district boundaries

11  combining those parts of Hillsborough and Pinellas?

12    A.    No.

13    Q.    Have you ever spoken about the issue with the

14  NAACP?

15    A.    No.

16    Q.    Looking at paragraph 11 of your complaint, that

17  paragraph says that, quote, The legislature sacrificed the

18  genuine communities of interest.

19    So my question is which communities of interest are

20  you referring to there?

21    A.    It would be faith community, black community,

22  civic community that vote.

23    Q.    Did you say the faith community?

24    A.    Faith communities, black community, and civic

25  communities that vote.



1    Q.    What do you mean by the civic community that

2  votes?

3    A.    People that live in that community can vote.

4    Q.    And where do you define the community?  Are there

5  certain boundaries?

6          MR. SHAW:  Object to form.

7          Go ahead.

8          THE WITNESS:  Community of Hillsborough.

9  BY MS. HARLE:

10    Q.    Oh, okay.  So in your view, is Hillsborough

11  County a genuine community of interest?

12          MR. SHAW:  Object to form.

13          Go ahead.

14          THE WITNESS:  The community interest is that --

15      is the areas in Hillsborough that the map been drawn

16      for.  There's a community interest.

17  BY MS. HARLE:

18    Q.    And what are the shared -- if there are any, what

19  are the shared characteristics of these members of these

20  communities of interest?  I just want to get more details

21  of, you know, who exactly you're talking about?

22    A.    I don't understand your question.  Could you

23  repeat the question and clarify what you're saying?

24    Q.    Yeah.  What do you understand "communities of

25  interest" to mean?



 1    A.    Anybody that shared the same interest of

 2 representation.

 3    Q.    And how many communities of interest do you

 4 allege are sacrificed under the map you're challenging?

 5          MR. SHAW:   Object to form.

 6          Go ahead.

 7          THE WITNESS:   Community interest would be the

 8      communities that has already been assigned to the maps

 9      that -- that the legislature had put together.

10 BY MS. HARLE:

11    Q.    And where your complaint says the legislature

12 sacrificed genuine communities of interest, I'm just

13 asking, can you describe for me which communities of

14 interest are sacrificed under the map?

15    A.    The greatest one is the black community.

16    Q.    The black community where?

17    A.    In Hillsborough County.

18    Q.    Any other communities of interest that are

19 sacrificed, in your view, under the map?

20    A.    Yes.

21    Q.    Okay, please tell me.

22    A.    South St. Petersburg.

23    Q.    Is certain people in South St. Petersburg, or all

24 people in South St. Petersburg?

25    A.    Like I said, I'm not an expert on the map, but



1  the only other reason I can see predominant people that

2  live in South St. Petersburg, black men, lumped into

3  Hillsborough County.  It's simply sacrifices interests of

4  both black communities.

5       Q.    Okay.  So in your view, is South St. Petersburg

6  itself a community of interest?

7       A.    Yes, ma'am.

8       Q.    Are there any other communities of interest that

9  you believe are sacrificed in the map you're challenging?

10      A.    No.

11      Q.    Do you believe that communities of interest could

12  be based on a political party?

13      A.    I'm not sure.

14      Q.    Do you think that communities of interest might

15  be based on religion?

16      A.    I don't know.

17      Q.    Do you think that communities of interest might

18  be based on socioeconomic status?

19      A.    I'm not sure.

20      Q.    Do you think that communities of interest might

21  be based on sex?

22      A.    I'm not sure.

23      Q.    And how did you identify the communities of

24  interest that you allege are sacrificed in the plan?

25           MR. SHAW:  Object to form.



JARVIS EL-AMIN                                      November 21, 2024
HODGES V. PASSIDOMO                                                41

```
 1          Go ahead.
 2          THE WITNESS:  Black voters.
 3  BY MS. HARLE:
 4     Q.   Well, my question was, how did you identify the
 5  communities of interest that you allege are sacrificed?
 6          MR. SHAW:  Object to form.
 7          THE WITNESS:  I think that -- like I said, I'm
 8     not an expert.  It's obvious that a predominant black
 9     community, South St. Petersburg, was locked into a
10     body of water across the bay into Tampa.
11  BY MS. HARLE:
12     Q.   And when did you first form that belief?
13     A.   As I said earlier, it's been wrong since it's
14  been designed like that, and it's wrong now.
15     Q.   When did you first come to believe that
16  communities of interest are sacrificed under the current
17  district lines?
18     A.   I can't give you an exact date.
19     Q.   Can you give me a month and year?
20     A.   I cannot.
21     Q.   Can you give me a year?
22     A.   All I can say is, long time ago.
23     Q.   And how did you -- how did you come to realize
24  and form the opinion that communities of interest are
25  sacrificed under the district lines?
```



1     A.   It's very simple for me.  One representative

2   trying to represent two sets of citizen's interests being

3   separated by a body of water, instead of one

4   representative for each of the areas.  It seems very

5   simple to me.

6     Q.   And is it your view that a district should only

7   have one community of interest per district?

8     A.   I wouldn't say that.  When you're talking about

9   this particular one you're asking me about.  I don't have

10  expertise on those districts.  I have expertise on this

11  district, the best answer to that question that you're

12  asking.

13    Q.   Is it your understanding that a district might

14  have multiple communities of interest?

15    A.   It's possible.  Everything is possible.  But in

16  my opinion, it's wrong then and it's wrong now.

17    Q.   And what is it that's sacrificed when South

18  St. Pete black voters are voting for the same

19  representative as voters in Tampa?

20    A.   Representation, separately.  True representation

21  of their interests and concerns.

22    Q.   And what, to you, would allow the voters of South

23  St. Pete to have true representation, in your words?

24    A.   A representative that understands the issues and

25  concerns; and, geographically, is there to answer their



1  concerns.

2      Q.   And you don't live in South St. Pete, do you?

3      Sir, do you live in South St. Pete?

4      A.   No, I don't.

5      Q.   Let's look at -- oh, we're there already.

6  Paragraph 12 says that -- let's see.  It's referring to

7  black voters in District 16.

8      It says, the legislature, quote, stripping them from

9  adjacent District 18 and reducing their influence there.

10     So my question would be, do you know of any facts

11  supporting the allegation that the map reduces the

12  influence of black voters?

13     A.   No.

14     Q.   Here in Paragraph 13, it says that, starting with

15  the third line, quote, Floridians, including individual

16  legislators, called out and questioned the legislature's

17  unconstitutional actions.

18     Do you know that what these Floridians called out and

19  questioned?

20     A.   Yes.  Representative Driscoll spoke about the

21  maps.  I saw that on TV.  And that's to the extent that I

22  know about the call out.

23     Q.   Okay.  And what did the representative Driscoll

24  call out?

25     A.   I don't know specifically, but something along



 1  the lines of areas.

 2      Q.   And what was the legislature's response to that

 3  concern?

 4      A.   I don't know what their response was.

 5      Q.   Any other incidents you're aware of where

 6  Floridians called out and questioned the legislature in

 7  redistricting?

 8      A.   No, ma'am; no.

 9      Q.   And when did you -- you told me, when did you

10  learn about Representative Driscoll's comments?

11      A.   As I said before, it was a soundbite on TV

12  somewhere, sometime, this year in 2024.  I can't give you

13  exact date.

14      Q.   Okay.  I just want to make sure I understood your

15  earlier testimony.  Did you say you weren't aware of the

16  redistricting process while it was actually going on, is

17  that right?

18      A.   No, I wasn't.

19      Q.   Okay.  Let's move down to Paragraph 20, please.

20  This says, quote, The inactive plan harms plaintiffs

21  because, among other reasons, it splits up their

22  communities among racial lines and groups their

23  communities with dissimilar ones, unnecessarily, simple

24  because of their race.

25      So my first question is, when this says it splits up



1  the community -- it's -- your plaintiff -- which community

2  are you referring to there, specifically?

3          MR. SHAW:  Object to form.

4          Go ahead.

5          THE WITNESS:  Could you show me a picture of the

6      enacted map, so I can see it?

7  BY MS. HARLE:

8      Q.   Yes.

9          MS. HARLE:  Leila, I think that's figure 3.  Are

10     you able to scroll to figure 3?  I think it's page 23.

11         THE WITNESS:  Is that the enacted map?

12  BY MS. HARLE:

13     Q.   That's the enacted map, sir.

14     A.   Okay.

15     Q.   So the question was, in your allegation, that the

16  plan splits up your community, which community are you

17  referring to specifically?

18     A.   Specifically, according to this enacted map, is

19  clearly a mix of southern part of St. Pete, South

20  St. Pete, with Hillsborough split up by a body of water

21  that you can see on the map.

22     Q.   Okay, so is your community split up in the map

23  you're challenging?

24         MR. SHAW:  Object to form.

25         Go ahead.



 1        THE WITNESS:  What do you mean when you say "your

 2     community," could you explain that?

 3  BY MS. HARLE:

 4     Q.   Well, your allegation is that you -- is it okay

 5  if we scroll back to your allegations so we can see the

 6  words that you used?

 7     Paragraph 20, your allegation is that the plan splits

 8  up your community.

 9     So I am asking you, is your community split up under

10  the plan you're challenging?

11        MR. SHAW:  Object to form.

12        Go ahead and answer.

13        THE WITNESS:  Well, what I'm reading, ma'am, it

14     said "their communities," split up "their communities"

15     along racial lines; and it says, "your community."

16        So could you repeat the question?  I'm reading it

17     myself.

18  BY MS. HARLE:

19     Q.   So you are a plaintiff, right, sir?

20     A.   Ma'am?

21     Q.   Are you a plaintiff?

22     A.   Yes.

23     Q.   Okay, great.  So this says, the enacted plan

24  harms plaintiffs because, among other reasons, it splits

25  up "their" -- "their" being the plaintiff, that would be



1   you -- communities.

2        So I'm asking you, is your community split up under

3   the enacted plan?

4            MS. HARLE:  Object to form.

5            Go ahead.

6            THE WITNESS:  Yes.

7   BY MS. HARLE:

8        Q.   Okay, and what is your community?

9        A.   The community of voters that live in Hillsborough

10  County and community voters that live in South St. Pete.

11       Q.   Okay, so is your definition -- and you can say no

12  if I'm getting it wrong.  But are you defining your

13  community as the voters of Hillsborough and the voters of

14  South St. Pete?

15       A.   No.  I'm saying that their community is the

16  communities of your enacted map.  That is the communities.

17  The enacted plan is the communities I'm talking about,

18  according to the map you showed me a minute ago.

19       Q.   Okay, so this allegation says that the plan

20  splits up the plaintiff's communities.

21       Do you understand that?

22            MR. SHAW:  Object to form.

23            THE WITNESS:  Yes, ma'am, I do.

24  BY MS. HARLE:

25       Q.   Do you agree with that?



1     A.    I do agree with it.

2     Q.    Okay.  So can you tell me yes or no.  Is your

3  community split up under the enacted plan?

4     A.    Yes, it does.

5     Q.    Okay.  Can you tell me, how do you view or define

6  your community, sir?

7     A.    A community of voters that has similar interests.

8     Q.    Okay, great.  And what are some of those

9  interests that you and your community share as voters?

10    A.    I don't have a list of interests, but I did

11 create some testimony that said we have housing issues,

12 issues of the client's address, gentrification.  Those are

13 the ones I mentioned before, and those are the ones I'm

14 mentioning now.

15    Q.    Okay, and what is it about the lines that splits

16 up your community of interest?

17    A.    Those issues I just mentioned now are addressed

18 differently, based on the geographic location that they're

19 taking place in.

20    Q.    And are you split from others in your community

21 into different districts?

22         MR. SHAW:  Object to form.

23         THE WITNESS:  I don't understand that question.

24    Can you explain and clarify what you're asking?

25 BY MS. HARLE:



1     Q.   Yeah.  You've testified, and you allege, that the

2  plan splits up your community.  So I'm asking you, what is

3  it about the district lines that splits your community?

4          MR. SHAW:  Object to form.

5          THE WITNESS:  I'll just say it like this, again.

6       People on different sides of the bay being separated

7       by water have different interests, and they have to be

8       addressed differently by the representative for the

9       district, and representation matters.

10          And the only reason I can see that South St. Pete

11       is locked into the district is because of race.

12       That's the only thing that I can see.

13          MR. SHAW:  Denise, I think all of your questions

14       are assuming a certain reading of Paragraph 20 that I

15       don't think is right, and that's why we're having such

16       a who's-on-first disconnect between your questions and

17       his answer.

18  BY MS. HARLE:

19     Q.   Mr. El-Amin, is there anyone in your community

20  who's in a different voting district than you in this map?

21     A.   I'm not an expert on voting districts, to be

22  honest.  I can't answer that question.  I don't know for

23  certain, ma'am.

24     Q.   Okay, and do you -- what are the dissimilar

25  communities that you allege you're grouped with?



1    A.   Well, let me just answer it this way.   There are

2  different issues in South St. Pete than there are, for

3  example, in Temple Terrace in east Tampa.   There are

4  different issues that are addressed different by the

5  representative.   That's what I mean in this complaint.

6    Q.   So is it your -- is it your view that black

7  voters are a community of interest?

8         MR. SHAW:   Object to form.

9         THE WITNESS:   Yes, ma'am, I would say so.

10  BY MS. HARLE:

11    Q.   Is it your view that black voters may have

12  certain issues that they see differently than other black

13  voters?

14    A.   Yes.

15    Q.   And then just before we move on from that

16  paragraph, it says that, you know, the plaintiffs are

17  split up, the communities are split up, and grouped with

18  dissimilar ones simply because of their race.   I just want

19  to make sure, are there any facts you're relying on there

20  when you say the communities were split up and grouped

21  differently because of their race?

22    A.   I personally don't have no advice, but it's

23  simply looking at -- in maps, and looking at who lives in

24  south St. Pete and who lives in, for example, in east

25  Tampa and Tampa Terrace.   It's different as a race.



1    Q.   Do you know what types of criteria the

2  legislature is allowed to use when drawing district lines?

3    A.   I'm not an expert on maps; I honestly don't.

4    Q.   Do you know any criteria that the legislature is

5  allowed to use when drawing district lines?

6    A.   No.

7    Q.   Do you know any criteria that the legislature is

8  required to use when drawing district lines?

9    A.   No.

10   Q.   Let's look at Paragraph 95 of your complaint.

11   Okay.  So this allegation says, quote, these

12 race-based decision resulted in a map that splits up

13 neighborhoods and ignores traditional redistricting

14 criteria.

15   What traditional redistricting criteria do you allege

16 is ignored in the current map?

17   A.   Genuine fairness is all I can say.

18   Q.   Did you say "fairness?"

19   A.   Genuine fairness --

20   Q.   Genuine fairness.

21   A.   -- is all I can stay.

22   Q.   And what's your understanding of how the

23 legislature usually uses fairness as a criteria?

24   A.   I'm not sure -- an expert on -- or how they come

25 up with that.  All I can say is, it's the way this one is



JARVIS EL-AMIN                                        November 21, 2024
HODGES V. PASSIDOMO                                                 52

1  drawn.  It's not giving genuine fairness to me.  It's not

2  giving that to me.

3      Q.   Are there any other traditional redistricting

4  criteria that you're aware of that you believe that

5  legislature ignored?

6      A.   No.

7      Q.   And let's look at Paragraph 131.

8      All right.  This one says, quote, The legislature

9  lacked good reasons to believe that the enacted plan was

10 necessary to achieve Tier 1 compliance.

11     Do you know what Tier 1 compliance means in your

12 complaint?

13     A.   No, I don't.

14     Q.   Okay.  Did you do anything to confirm the

15 allegations in the complaint before it was filed?

16         MR. SHAW:  Before you answer that, do not discuss

17     any conversations that you had with your attorneys or

18     their staff.  You can answer if you did anything other

19     than communicate with your attorneys and your staff.

20         THE WITNESS:  I'm not at liberty to discuss what

21     I talked about with my attorneys.

22 BY MS. HARLE:

23     Q.   And did you do any independent research to verify

24 any of the allegations in the complaint?

25         MR. SHAW:  That's a work product inquiry and I'm



```
 1      instructing him not answer.
 2           MS. HARLE:  I can't -- I didn't hear that.
 3   BY MS. HARLE:
 4      Q.   Sir, did you do any independent research to
 5   confirm any of the allegations in the complaint?
 6           MR. SHAW:  Objection because it's a work product
 7        question.  And I'm going to instruct him not to
 8        answer.
 9   BY MS. HARLE:
10      Q.   Sir, did you draft the complaint?
11           MR. SHAW:  Denise, you know he didn't draft the
12        complaint.
13           Did you draft the complaint, Mr. El-Amin?
14           MS. HARLE:  Then how is it work product?
15           MR. SHAW:  Because you're not allowed to ask a
16        litigant about the research that they did about the
17        case.  You're not -- just like you're not allowed to
18        ask him about the conversations that he had with his
19        attorney.
20   BY MS. HARLE:
21      Q.   All right.  Let's look at pages 13 and 14 of your
22   complaints.  This is a map called "Plan 42."
23      Have you seen that map before, do you recall?
24      A.   Yes.
25      Q.   And can you just tell me in your own words what
```



JARVIS EL-AMIN                                          November 21, 2024
HODGES V. PASSIDOMO                                                   54

1  I -- if you contend this map is better than the enacted

2  map?

3      A.   Repeat your question.

4      Q.   Yes.  Can you tell me, do you contend that this

5  map is better than the map that you're challenging?

6      A.   Yes.

7      Q.   Okay, and if you could just tell me in your own

8  words, what is it about this map that you think is better

9  than the map that you're challenging?

10     A.   Number one, it's all in Hillsborough County, it

11 don't separate no water.

12     Q.   Anything else?

13     A.   No.

14     Q.   And then if we can look at figure 6, I think it's

15 on page 23 or 26 of the complaint.  Thank you.

16     Okay, do you recall seeing this map before, sir?

17     A.   Yes, I do.

18     Q.   Okay, and do you contend that this map is better

19 than the map you're challenging?

20     A.   Yes.

21     Q.   Okay.  And what is it about this map that you

22 think is better than the map you're challenging?

23     A.   It's all in Hillsborough County, and it stands a

24 little further south than Hillsborough County.

25     Q.   Have you seen any of the maps that your expert



 1  witnesses have proposed in this case?

 2      A.    I'm not sure.

 3      Q.    Alright, let's look at your initial disclosures.

 4            MS. HARLE:   This will be, I guess, Exhibit 2.

 5  (The document referred to was marked for identification as

 6                   Exhibit No. 2.)

 7  BY MS. HARLE:

 8      Q.    Does this document look familiar to you?

 9            MS. HARLE:   Leila, do you want to scroll down

10      just a little bit so we can see the whole thing.

11  BY MS. HARLE:

12      Q.    Do you remember seeing this document before?

13      A.    Yes.

14      Q.    Okay.  On the first page at part A-1, it says

15  there, you'll see your name, Jarvis El-Amin, says you

16  have, quote, have information tending to show that the

17  challenge districts caused harm to themselves and other

18  residents.

19      So the first question is, what is the harm that the

20  challenged district lines caused to you personally?

21      A.    Can you explain what you mean by "challenged

22  district?"

23      Q.    Yes, sir.  I think that is -- well, maybe it's

24  your attorney's words, but in the document that you all

25  submitted there, you say "challenged districts."  I --



1  that should be referring, I assume, to District 16 and 18

2  in the complaint that you're challenging.

3      So the question was, what harm do the challenged

4  districts do to you personally?

5      A.   What it does to me personally is, it takes away

6  my chance to have equitable, fair, and good representation

7  in the Florida House of Representatives Senate.

8      Q.   Is it your contention that your vote is diluted

9  because of the district lines?

10     A.   Repeat that question again, ma'am.

11     Q.   Yeah.  Is it your contention that your vote is

12  diluted by the district lines?

13     A.   I would just answer it the way I just answered

14  it.  It just robs me and other people like me in that the

15  community has a chance to have fair and equitable and good

16  representation, addressing concerns of the community.

17     Q.   And when you say people like you, who are you

18  referring to?

19     A.   Other voters.

20     Q.   All other voters?

21     A    Other voters.

22     Q.   Which other voters?

23     A.   Other voters in the same geographical area that I

24  live in.

25     Q.   And you were on the Hillsborough side, sort of



 1 | the south, is that right?

 2 |     A.    Repeat what you said.

 3 |     Q.    You're in Hillsborough in the south part of

 4 | Tampa?

 5 |     A.    Yes.

 6 |     Q.    And going back to that sentence, what is the harm

 7 | that you believe the districts caused to other residents?

 8 | Is it anything different that when what you just told me?

 9 |     A.    There's nothing different than what I just told

10 | you; it's the same.  It's the same.

11 |     Q.    And then looking down at document -- at Section

12 | 1D, that's where you shared -- and the other plaintiff

13 | shared -- some individuals you believe may have

14 | information regarding consideration of race in their

15 | districting process.

16 |     So my question is, on that list --

17 |         MS. HARLE:  And, Leila, can you scroll a little

18 |     bit?

19 | BY MS. HARLE:

20 |     Q.    Do you know of any members of the media

21 | specifically who would have information about whether the

22 | district lines were drawn primarily based on race?

23 |     A.    No.

24 |     Q.    Any of those names on the list -- can you

25 | identify any of the people on the list of people who you



1  believe have information that would suggest the lines are

2  drawn primarily based race?

3          MR. SHAW:  Object to form.

4          Go ahead.

5          THE WITNESS:  No.

6          MS. HARLE:  Well, that's the end of my questions.

7          Did you want to take a -- I don't know if you're-

8          Did you want to ask --

9          MR. SHAW:  I don't have any follow-up questions.

10         We will be ordering a copy.  Witness will read.

11         MS. HARLE:  We'll order a copy, thank you.

12         MR. SHAW:  Okay.  Then we'll take one, too.

13           (Thereupon, the deposition concluded.)

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                      CERTIFICATE OF OATH

 2

 3

 4   STATE OF FLORIDA)

 5   COUNTY OF COLLIER)

 6

 7

 8         I, the undersigned authority, certify that Jarvis

 9   El-Amin personally appeared before me and was duly sworn.

10

11

12         WITNESS my hand and official seal this 10th day

13   of December, 2024.

14

15                      _____

16

17                      _____

18                      Jill Saravis-Regan
                        Notary Public-State of Florida
                        My Commission No.:  HH 452361
19                      Expires:  10-09-2027

20

21

22

23

24

25
```



```
 1              REPORTER'S DEPOSITION CERTIFICATE

 2

 3   STATE OF FLORIDA)

 4   COUNTY OF COLLIER)

 5

 6          I, Jill T. Saravis-Regan, Certified Shorthand

 7   Reporter, and Notary Public, certify that I was authorized

 8   to and did stenographically report the deposition of

 9   Jarvis El-Amin; that a review of the transcript was

10   requested and that transcript is a true and complete

11   record of my stenographic notes.

12

13          I further certify that I am not a relative,

14   employee, attorney, or counsel of any of the parties; nor

15   am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action; nor am I

17   financially interested in the action.

18

19   DATED this 10th day of December, 2024

20          _____

21

22          _____

23              Jill T. Saravis-Regan, CSR

24

25
```



```
1                           ERRATA SHEET
                        CHANGES AND SIGNATURE
2

3    WITNESS NAME:  JARVIS EL-AMIN            DATE: _____

4
     PAGE/LINE        CHANGE               REASON
5

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22
     Executed this _____ day of _____, _____
23

24           _____
                        JARVIS EL-AMIN
25
```



```
 1                      WITNESS DECLARATION

 2

 3

 4        I declare under penalty of perjury under the laws

 5   of the State of _____ that the foregoing is true

 6   and correct.  Executed at _____, _____,

 7   on _____.

 8

 9        _____

10                      JARVIS EL-AMIN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



49:14

**1**

1
  34:13
  52:10,11

11
  37:16

12
  43:6

13
  43:14
  53:21

131
  52:7

14
  53:21

16
  35:18
  36:8,11
  37:4 43:7
  56:1

18
  33:5 43:9
  56:1

1989
  9:17,24

1990s
  37:5

1D
  57:12

**2**

2
  55:4,6

20
  24:15
  44:19
  46:7

2000
  23:5,20

2003
  9:18,20,
  25

2005
  9:20,23,
  25 10:1
  24:11

2019
  21:6

2024
  12:19
  44:12

23
  45:10
  54:15

26
  54:15

**3**

3
  45:9,10

30
  6:8

33617
  9:15

36-month
  24:6

**4**

42
  53:22

4818
  9:15,22

**6**

6
  35:1,4
  54:14

**7**

7
  35:1,6

70s
  7:21

**9**

95
  51:10

99th
  9:15,22,
  23

**A**

A-1
  55:14

ability
  35:9

accommodate
  9:5

accounts
  32:19

accurate
  8:24

achieve
  52:10

action
  25:1

actions
  43:17

actively
  16:25

activities
  12:13
  15:14
  19:10

address
  9:13,19,
  22 48:12

addressed
  28:22
  48:17
  49:8 50:4

addressing
  56:16

adjacent
  43:9

advice
  50:22

advocacy
  15:24
  37:10

affordabili
ty
  28:16

Affordable
  13:21,24

African-
american
  18:14

afternoon
  4:7

age
  36:7,11

agree
  47:25
  48:1

agreement
  23:12
  24:4

ahead
  9:9 16:13
  27:6,15
  31:11
  34:2
  35:20
  36:4,24
  38:7,13
  39:6 41:1
  45:4,25
  46:12
  47:5 58:4

Al-islam
  18:8,12

alike
  26:22,24

all-black
  29:7

allegation
  43:11
  45:15
  46:4,7
  47:19
  51:11

allegations
  35:3 46:5
  52:15,24
  53:5

allege
  39:4
  40:24
  41:5
  49:1,25
  51:15

alleged
  35:4

allowed
  51:2,5
  53:15,17

Alright
  55:3

alternative



33:21

**An-nasr**
  18:2

**anger**
  23:22

**approve**
  34:23

**apps**
  32:19

**area**
  10:18
  13:4,6,16
  16:5
  21:13,15
  26:22
  28:24,25
  29:1,8,10
  56:23

**areas**
  13:8
  29:14
  38:15
  42:4 44:1

**assigned**
  39:8

**assist**
  9:2

**Association**
  18:14

**assume**
  8:23 56:1

**assuming**
  49:14

**attend**
  4:20
  10:12

**attended**
  10:13

**attorney**
  9:7,8

26:9
53:19

**attorney's**
  23:13
  31:20,23
  55:24

**attorneys**
  4:8 26:5,
  10 29:17
  31:13,17
  52:17,19,
  21

**Avenue**
  9:15,23

**avoid**
  35:8

**aware**
  10:6
  18:18,19
  30:16
  37:3,6
  44:5,15
  52:4

―――――――
        **B**
―――――――

**back**
  9:18,25
  25:3 46:5
  57:6

**background**
  10:9
  24:23

**backgrounds**
  29:9

**backwards**
  11:16

**ballpark**
  6:9

**bankruptcie
s**

25:24

**bankruptcy**
  25:17

**Barack**
  22:7,14

**based**
  40:12,15,
  18,21
  48:18
  57:22
  58:2

**battery**
  23:20

**bay**
  13:4,6,16
  26:21
  27:21,22
  28:3,4,
  12,18
  41:10
  49:6

**Beckner**
  20:25

**belief**
  41:12

**Betty**
  21:1

**bills**
  13:25

**binding**
  8:24

**bit**
  26:11
  55:10
  57:18

**black**
  15:24
  16:4 17:1
  19:15,19
  21:10
  27:1,3,12

29:10
35:8
36:7,10,
12 37:21,
24 39:15,
16 40:2,4
41:2,8
42:18
43:7,12
50:6,11,
12

**Bob**
  20:24

**body**
  35:13,22
  41:10
  42:3
  45:20

**boundaries**
  36:16
  37:10
  38:5

**break**
  9:4 32:8,
  10

**briefly**
  29:21
  34:20,22

**bringing**
  26:2

**Buckhorn**
  20:24

**Buddy**
  19:21,24
  20:16

**business**
  10:17,21
  11:20,22

―――――――
        **C**
―――――――

**call**

43:22,24

**called**
  12:7
  18:2,15
  43:16,18
  44:6
  53:22

**campaign**
  19:25
  20:1,2,4,
  5,6,11,
  17,20
  21:3,6,9,
  11,25

**campaigns**
  22:16,17,
  18

**candidates**
  20:19

**canvassed**
  22:11

**canvassing**
  12:14
  22:17

**capacity**
  21:8 30:6
  33:11

**capital**
  4:18

**card**
  23:8

**careful**
  8:18

**case**
  4:9,21
  6:13 7:6,
  23,25
  16:22
  22:25
  23:22
  24:5,21
  29:22



30:2,12
31:18
53:17
55:1

caused
55:17,20
57:7

central
21:23
36:1

chairman
18:25

challenge
26:13
33:23
55:17

challenged
55:20,21,
25 56:3

challenging
26:2,17
27:19
29:15
30:16,24
39:4 40:9
45:23
46:10
54:5,9,
19,22
56:2

chance
10:6,8
56:6,15

characteris
tics
38:19

charge
23:23

charges
23:7

choice
35:9

Church
33:19

citizen's
42:2

city
7:17 8:10
13:17
16:7,15
21:18

civic
14:4
15:7,8
17:9,14
19:8
37:22,24
38:1

civil
5:21 7:6,
7,11
14:9,11
22:20

claims
7:11

clarify
6:16 8:5
9:21
14:11,15
38:23
48:24

clear
26:8

client's
48:12

colleague
34:6

college
10:11,12,
13,14,15,
16

color
27:24

combined
37:4

combining
37:11

comments
44:10

committee
15:16,17,
22,23
16:8

communicate
30:12,24
52:19

communicate
d
31:4,8

communities
16:23,25
18:4
37:3,18,
19,24,25
38:20,24
39:3,8,
12,13,18
40:4,8,
11,14,17,
20,23
41:5,16,
24 42:14
44:22,23
46:14
47:1,16,
17,20
49:25
50:17,20

community
10:14
12:15,16
13:1
16:3,18
17:6,13,
20,22
18:1
19:3,4,

15,19
21:17
26:6 29:7
32:13
37:21,22,
23,24
38:1,3,4,
8,11,14,
16 39:7,
15,16
40:6 41:9
42:7
45:1,16,
22 46:2,
8,9,15
47:2,8,9,
10,13,15
48:3,6,7,
9,16,20
49:2,3,19
50:7
56:15,16

company
10:24
11:18
20:11,12,
13

compares
36:11

complaining
16:23

complaint
33:24
34:5,11,
18,24
37:16
39:11
50:5
51:10
52:12,15,
24 53:5,
10,12,13
54:15
56:2

complaints
53:22

compliance
52:10,11

concern
28:14,18
44:3

concerned
28:15

concerns
19:4
27:23,25
42:21,25
43:1
56:16

confirm
52:14
53:5

considerati
on
36:1
57:14

considerati
ons
35:5

consulting
11:19
20:1,6,
11,13,17,
20

contend
54:1,4,18

contention
56:8,11

contest
23:10,14,
19 24:9,
19

conversatio
ns
52:17



53:18

**convicted**
22:22,24
23:3,11,
17,25
24:9,19

**coordinator**
21:2,7,9

**copy**
58:10,11

**core**
21:17,21

**Corporation**
17:23

**costs**
25:9,12,
14

**counsel**
16:15

**Counties**
36:16

**County**
10:14
36:21
38:11
39:17
40:3
47:10
54:10,23,
24

**couple**
11:4

**court**
6:5,15,
17,22
7:5,12,20
8:1 22:25
25:22
30:2

**Courts**
24:18

**create**
48:11

**credit**
23:8

**crime**
22:22,24
23:14,17
24:9,19
28:22
36:10

**criminal**
5:21
24:12
25:8

**criteria**
35:17
51:1,4,7,
14,15,23
52:4

**curious**
13:16

**current**
9:14,18,
22 11:17
26:12
41:16
51:16

———————

**D**

———————

**date**
15:2
41:18
44:13

**dates**
20:8

**daughter**
23:21

**David**
21:6

**days**

12:22

**decade**
7:19 8:12

**decision**
51:12

**defendant**
6:13

**define**
38:4 48:5

**defining**
47:12

**definition**
47:11

**degree**
23:20

**Denise**
4:7 32:6
49:13
53:11

**deposed**
4:24 5:2,
5,8,14,
16,18 8:6

**deposition**
4:20
5:11,25
6:4 7:3
8:3,8

**describe**
39:13

**designed**
41:14

**details**
38:20

**development**
17:23
18:1,3
19:5

**difference**
29:6

**differently**
28:1,3
48:18
49:8
50:12,21

**diluted**
56:8,12

**diminishment**
35:8

**diploma**
10:11

**directly**
31:12,25
32:5

**disclosures**
55:3

**disconnect**
49:16

**discuss**
52:16,20

**discussed**
21:11,24
26:5
31:22

**discussion**
4:13

**dispute**
5:23 7:12

**dissimilar**
44:23
49:24
50:18

**dissolved**
23:22

**district**
27:3,12
29:14
35:18
36:8,11,
15,21

**37:**4,5,10
41:17,25
42:6,7,
11,13
43:7,9
49:3,9,
11,20
51:2,5,8
55:20,22
56:1,9,12
57:22

**districting**
57:15

**districts**
35:7
42:10
48:21
49:21
55:17,25
56:4 57:7

**diverse**
28:25
29:8,9

**document**
8:25
34:14
55:5,8,
12,24
57:11

**domestic**
23:20

**draft**
53:10,11,
13

**drawing**
35:11,18
51:2,5,8

**drawn**
36:25
38:15
52:1
57:22
58:2



drew
  35:7

Driscoll
  43:20,23

Driscoll's
  44:10

_____

          E

_____

E-L
  4:18

earlier
  8:6 12:21
  24:2
  41:13
  44:15

early
  37:5

east
  9:15,22,
  23 21:22,
  23 50:3,
  24

educate
  12:16

educating
  17:14

education
  19:14,18,
  23

educational
  10:9

El-amin
  4:7,17,18
  7:5 32:12
  49:19
  53:13
  55:15

elect
  35:9

election
  20:2
  22:4,11
  33:4,8,10

elections
  33:12

electric
  13:25

elevated
  35:5

employer
  11:17

enacted
  45:6,11,
  13,18
  46:23
  47:3,16,
  17 48:3
  52:9 54:1

Encouraging
  15:9

end
  25:22
  58:6

engagement
  12:5,11
  14:4
  15:7,8
  17:9,14
  19:8

engagements
  13:14,15

Enhancement
  11:18,21

Enterprises
  11:18,21

entire
  13:6

entrepreneurship
  11:7,12,

13 18:3,5

equitable
  56:6,15

equity
  26:7,12

estimate
  6:9 7:19
  15:3

estimated
  8:12

event
  19:25
  20:4

exact
  9:19 15:2
  41:18
  44:13

excuse
  9:20,22
  10:20

executive
  15:16,17,
  21,23

Exhibit
  34:13,15
  55:4,6

exhibits
  34:6

expert
  26:18
  27:20
  28:5,10
  35:12
  39:25
  41:8
  49:21
  51:3,24
  54:25

expertise
  42:10

explain

46:2
48:24
55:21

exploring
  24:17

extent
  43:21

_____

          F

_____

Facebook
  32:20

facts
  35:10,16,
  25 43:10
  50:19

fair
  26:5,17,
  23 35:15,
  23 56:6,
  15

fairness
  26:7,12
  51:17,18,
  19,20,23
  52:1

faith
  17:5,13,
  19 19:6
  37:21,23,
  24

familiar
  17:22
  18:7,11,
  13,14,20
  36:15
  55:8

Federal
  22:25
  24:18

fees
  25:9

felony
  24:12
  25:9,13

Fifteen
  11:23

figure
  24:22
  45:9,10
  54:14

filed
  24:12
  30:2,3,4
  34:19,24
  52:15

filing
  37:9

find
  9:5

fine
  32:9

five-minute
  32:8

flea
  11:7,8

Florida
  4:8 7:15
  8:4,7
  9:15
  12:6,8,9,
  13,20,23
  13:3,11,
  13,20
  14:3
  30:13,25
  56:7

Floridians
  43:15,18
  44:6

focus
  13:17
  16:25



focused
  13:10
  21:12,15

focuses
  16:4,19

follow-up
  58:9

food
  19:4

form
  16:12
  17:3
  27:5,14
  31:10
  34:1
  35:19
  36:3,17,
  23 38:6,
  12 39:5
  40:25
  41:6,12,
  24 45:3,
  24 46:11
  47:4,22
  48:22
  49:4 50:8
  58:3

format
  34:9

formed
  16:14,16

Forty-five
  12:22

founding
  18:5

fraud
  23:9 24:3

front
  19:8

fully
  34:20

——————————

G

——————————

Garcia
  4:21

gave
  7:2 8:3,
  24 25:3

gentrificat
ion
  28:16
  48:12

genuine
  37:18
  38:11
  39:12
  51:17,19,
  20 52:1

geographic
  21:13,15
  48:18

geographica
l
  56:23

geographica
lly
  13:2
  42:25

gist
  35:2

give
  6:8 8:12,
  17 21:20
  28:11
  41:18,19,
  21 44:12

giving
  6:22
  52:1,2

good
  4:7 9:6
  17:8 32:7

52:9
  56:6,15

great
  18:7
  46:23
  48:8

Greater
  13:6,16

greatest
  39:15

ground
  8:15

group
  17:16,18,
  19 26:20,
  21 35:13

grouped
  49:25
  50:17,20

groups
  16:19
  20:20
  27:11
  44:22

guess
  34:12
  55:4

guilty
  23:23

guys
  29:24

——————————

H

——————————

happened
  6:4 24:22
  25:1

happening
  30:17

happy

8:21 9:2,
4

Harle
  4:8,14
  16:17
  17:7
  27:10,17
  31:16,24
  32:9,11
  34:4,12,
  16 35:24
  36:6,19
  37:2
  38:9,17
  39:10
  41:3,11
  45:7,9,12
  46:3,18
  47:4,7,24
  48:25
  49:18
  50:10
  52:22
  53:2,3,9,
  14,20
  55:4,7,9,
  11 57:17,
  19 58:6,
  11

harm
  55:17,19
  56:3 57:6

harms
  26:17
  44:20
  46:24

hear
  53:2

held
  4:13

Hey
  32:6

high
  10:9,11

13:25

Hillsboroug
h
  10:14
  27:22
  35:14
  36:16,21
  37:11
  38:8,10,
  15 39:17
  40:3
  45:20
  47:9,13
  54:10,23,
  24 56:25
  57:3

Hillsboroug
h's
  19:14,18

hired
  22:16

history
  36:15,20

Hodges
  30:8

honest
  49:22

honestly
  51:3

hour
  32:6

house
  10:2,4
  56:7

housing
  13:21,23,
  24 28:11,
  13,15,17
  48:11

hyphen
  4:18



**I**

idea
    21:21

identificat
ion
    34:14
    55:5

identify
    7:23
    40:23
    41:4
    57:25

identity
    23:9 24:3

ignores
    51:13

inactive
    44:20

inaudible
    15:13

incident
    24:2,13

incidents
    44:5

including
    43:15

income
    18:4

independent
    52:23
    53:4

indicating
    35:25

individual
    43:15

individuals
    57:13

influence
    43:9,12

information
    24:12
    55:16
    57:14,21
    58:1

initial
    55:3

initially
    9:17,24

inquiry
    52:25

inside
    13:7,8,
    11,15,17

Instagram
    32:20

instruct
    53:7

instructing
    53:1

instructs
    9:8

insurance
    11:2,3

interest
    16:23,25
    37:18,19
    38:11,14,
    16,20,25
    39:1,3,7,
    12,14,18
    40:6,8,
    11,14,17,
    20,24
    41:5,16,
    24 42:7,
    14 48:16
    50:7

interests

40:3
42:2,21
48:7,9,10
49:7

interrupt
    8:19

interrupted
    17:12

involved
    6:5 7:22,
    25 12:23
    14:9,13,
    17 16:3,
    18,24
    17:5,13,
    19 18:17,
    23 19:11
    22:19
    32:14
    33:12,22

involvement
    17:15

involving
    25:22

Islamic
    19:6

issue
    30:12
    37:13

issues
    12:14,15
    13:19
    14:18
    16:4,22
    20:20
    21:25
    22:1
    27:22,25
    28:1,2,6,
    9,10,14,
    15,17,20
    29:13
    42:24

48:11,12,
17 50:2,
4,12

**J**

J-A-R-V-I-S
    4:17

Jacksonvill
e
    18:8,11,
    15

Jarvis
    4:17
    55:15

Jill
    34:12

Johnson
    19:21,24
    20:16

July
    12:18,19

jump
    29:13

Junior
    10:13

**K**

K-A-R-I-N
    4:18

Karin
    4:17,18

Keto
    29:21

Kevin
    20:25

kind
    11:1

kinds
    26:25

knew
    12:25

**L**

lacked
    52:9

Large
    15:23

larger
    28:25

late
    7:21

law
    6:17

lawsuit
    7:9
    22:19,20
    26:2
    29:18
    30:6
    32:14,17
    33:22
    37:9

lawyers
    23:1

learn
    44:10

leave
    26:15

leaving
    10:15

legal
    14:7
    26:13

legislators
    35:6
    43:16



Case 8:24-cv-00879-CEH-TPB-ALB    Document 113-23    Filed 05/13/25    Page 71 of 77
PageID 5784

JARVIS EL-AMIN
HODGES V. PASSIDOMO

November 21, 2024
Index: legislature..month

legislature
  30:13
  31:1 35:5
  37:17
  39:9,11
  43:8 44:6
  51:2,4,7,
  23 52:5,8

legislature
's
  35:11,17
  36:1
  43:16
  44:2

Leila
  34:6 45:9
  55:9
  57:17

liberty
  52:20

lines
  36:21
  41:17,25
  44:1,22
  46:15
  48:15
  49:3
  51:2,5,8
  55:20
  56:9,12
  57:22
  58:1

Linkedin
  32:23

list
  48:10
  57:16,24,
  25

litigant
  53:16

litigation
  23:2

live
  26:6
  27:23
  38:3 40:2
  43:2,3
  47:9,10
  56:24

lived
  9:21

lives
  50:23,24

LLE-1
  34:13,15

location
  11:24
  48:18

lock
  26:20

locked
  41:9
  49:11

long
  5:17 6:6
  10:20
  11:3,22
  15:1 22:7
  41:22

losing
  25:3

lost
  24:24,25

lower
  18:4

lumped
  40:2

———————

M

———————

M-A-S-J-I-D
  18:11

m-i-n
  4:19

made
  16:15
  23:1,12
  32:12,16

mail
  23:9 24:3

main
  29:16

make
  8:17 9:11
  44:14
  50:19

maker
  22:3

making
  29:12

management
  23:22

manner
  35:8

map
  26:3,13,
  16 27:18
  30:16,23
  31:5,9
  32:2
  33:23
  36:13
  38:15
  39:4,14,
  19,25
  40:9
  43:11
  45:6,11,
  13,18,21,
  22 47:16,
  18 49:20
  51:12,16
  53:22,23
  54:1,2,5,
  8,9,16,

18,19,21,
22

map-making
  36:2

maps
  26:18
  27:20
  30:12
  33:21,23,
  25 34:3
  35:11,12
  39:8
  43:21
  50:23
  51:3
  54:25

marked
  34:14
  55:5

markets
  11:7,8

Masjid
  18:8,11,
  15,20

matter
  5:21 6:1
  7:2,12

matters
  26:14
  49:9

Mayor
  20:24

Meaning
  4:24

means
  18:2,15
  52:11

media
  31:5,8,13
  32:1,5,
  16,19
  57:20

meeting
  16:16

member
  14:24
  15:1,11,
  23 16:2,7
  32:1

members
  18:5
  30:13,25
  31:4,8
  38:19
  57:20

memory
  19:24

men
  40:2

mentioned
  22:17
  24:14
  48:13,17

mentioning
  48:14

mentoring
  19:5

Methodist
  33:19

Miami
  6:7 7:18
  8:11
  10:18,19,
  20,21

Miami-dade
  10:13

minute
  47:18

mix
  45:19

month
  41:19



months
  12:21
  24:7

motive
  35:11

move
  9:16
  44:19
  50:15

moved
  9:17,18,
  24,25

moving
  10:7

multiple
  42:14

Murman
  20:25

Muslim
  18:14
  21:7,10,
  17

Muslims
  19:5

——————————

N

——————————

NAACP
  14:21,22,
  24 15:1,
  5,11,15,
  24 37:14

named
  19:21

names
  57:24

Nasr
  17:22
  18:2,20

nature

5:25

neighborhoo
ds
  51:13

news
  30:19

Nord
  29:21
  30:8

north
  21:21

November
  33:11

nowadays
  11:10

Number
  54:10

——————————

O

——————————

oath
  4:24 8:23

Obama
  22:7,14

object
  9:7 16:12
  17:3
  27:5,14
  31:10
  34:1
  36:3,17,
  23 38:6,
  12 39:5
  40:25
  41:6
  45:3,24
  46:11
  47:4,22
  48:22
  49:4 50:8
  58:3

Objection
  35:19
  53:6

obvious
  41:8

occur
  8:7

occurred
  7:20 8:13

office
  11:24
  20:3
  23:13
  31:23

officer
  14:22
  15:19

one-time
  20:4

opened
  10:17

operate
  20:14

opinion
  41:24
  42:16

order
  58:11

ordering
  58:10

organic
  17:16,17

organizatio
n
  12:2,4
  14:4,5,7,
  10,12,16,
  17,20
  15:12,15
  16:2,3,
  10,19

18:1,17,
21,23,25
19:2,7

organizatio
ns
  14:14
  16:24
  32:13

organized
  17:15

outreach
  19:3
  21:2,7,9,
  12,15

outstanding
  25:12,14

owned
  11:22

——————————

P

——————————

pages
  53:21

paid
  20:10,11
  25:14

pantry
  19:4

paragraph
  35:1,4,6
  37:16,17
  43:6,14
  44:19
  46:7
  49:14
  50:16
  51:10
  52:7

part
  18:13
  45:19
  55:14

57:3

participate
  15:9
  19:13,17,
  23

participati
on
  19:7

partisan
  22:1

parts
  37:11

party
  5:23 7:9
  22:20
  25:17
  40:12

passport
  25:3

pay
  25:8,12

payer-
funded
  19:14,18

penalty
  4:25 24:4

people
  12:15,16
  15:9
  16:20
  21:11
  26:20,21,
  24,25
  27:1,21,
  23 28:6
  29:8
  31:13
  38:3
  39:23,24
  40:1 49:6
  56:14,17
  57:25



**percentage**
  36:7,10,
  12

**period**
  20:7

**perjury**
  4:25

**personal**
  30:6

**personally**
  15:15
  35:16,25
  50:22
  55:20
  56:4,5

**perspective**
  28:13

**Pete**
  28:18,21
  35:14,22
  42:18,23
  43:2,3
  45:19,20
  47:10,14
  49:10
  50:2,24

**Petersburg**
  27:23
  28:12
  29:3,5,11
  39:22,23,
  24 40:2,5
  41:9

**phone**
  22:3

**physical**
  11:24

**picture**
  45:5

**pictures**
  30:18

**Pinellas**
  36:16,21
  37:11

**place**
  18:16
  33:18
  48:19

**plaintiff**
  29:22
  45:1
  46:19,21,
  25 57:12

**plaintiff's**
  47:20

**plaintiffs**
  30:5,9
  44:20
  46:24
  50:16

**plan**
  40:24
  44:20
  45:16
  46:7,10,
  23 47:3,
  17,19
  48:3 49:2
  52:9
  53:22

**plea**
  23:12
  24:4

**plead**
  23:10,14
  24:9

**pleading**
  23:19,23

**pled**
  24:19

**point**
  8:25 9:4,
  6 24:24

**25**:13
  30:25
  31:3

**police**
  29:1

**policing**
  28:24,25
  29:4,5,7,
  8

**political**
  12:1,4,6
  14:4
  15:10
  40:12

**polling**
  33:18

**population**
  36:8,11,
  12

**posts**
  32:16

**pre-
arrangement**
  23:1

**predominant**
  35:17
  40:1 41:8

**predominate**
  35:8

**preferable**
  33:24

**president**
  22:8,14

**press**
  31:14,18,
  21

**previous**
  6:4 8:3

**previously**
  5:8,18

**6**:21 7:6

**primarily**
  57:22
  58:2

**prior**
  36:12

**prison**
  24:20

**probation**
  24:7
  25:2,15

**problems**
  23:21

**proceedings**
  25:18

**process**
  12:16
  15:10
  17:14
  27:25
  30:11,15
  31:4,5,9
  32:2 36:2
  44:16
  57:15

**product**
  52:25
  53:6,14

**program**
  19:14,18,
  24

**proposed**
  55:1

**pull**
  34:5

**punishment**
  24:5

**put**
  26:4,21
  31:17
  35:13

**39**:9

**putting**
  31:21
  35:22

─────────

**Q**

─────────

**question**
  5:12
  8:20,22,
  24 9:10
  13:12
  18:9
  19:16
  27:8,9
  31:6
  34:18
  35:3,10
  37:19
  38:22,23
  41:4
  42:11
  43:10
  44:25
  45:15
  46:16
  48:23
  49:22
  53:7 54:3
  55:19
  56:3,10
  57:16

**questioned**
  43:16,19
  44:6

**questions**
  8:18 9:7
  49:13,16
  58:6,9

**quote**
  35:4,6
  37:17
  43:8,15
  44:20



51:11
52:8
55:16

**R**

**race**
35:5,18
36:2
44:24
49:11
50:18,21,
25 57:14,
22 58:2

**race-**
35:7

**race-based**
51:12

**racial**
16:7
35:11
44:22
46:15

**ran**
20:24
22:7,14

**re-election**
20:1

**reached**
21:10

**read**
34:18,22
35:2
58:10

**reading**
46:13,16
49:14

**realize**
41:23

**reason**
13:10,17

24:17
26:19
33:14
40:1
49:10

**reasons**
44:21
46:24
52:9

**recall**
5:6,7,22
6:10,20,
21 7:14
11:4 15:2
20:8
23:4,15,
16,19,22,
24 24:10,
11,15
25:3,5,8,
23,24
53:23
54:16

**recent**
33:7

**recently**
12:18
30:3,18

**recollectio
n**
9:1 24:16

**Reconciliat
ion**
16:8

**record**
4:11,13,
16

**redistricti
ng**
30:11,15,
17,23
31:3,5,9
32:1

44:7,16
51:13,15
52:3

**reduces**
43:11

**reducing**
43:9

**Reed**
21:1

**referred**
34:14
55:5

**referring**
29:2
37:20
43:6
45:2,17
56:1,18

**refresh**
9:1 19:24
24:16

**registered**
33:2

**registratio
n**
33:15

**regular**
24:6

**related**
6:5 14:18
25:9,12
35:10

**relating**
15:24
16:4

**release**
31:14

**releases**
31:18

**relevant**

24:21

**religion**
17:1
40:15

**relying**
50:19

**remember**
5:17,24
6:2,3,6,
14,23,25
7:1,4,7,
10,22 8:2
20:22
29:25
30:21
55:12

**remembering**
7:8

**repeat**
5:12 18:9
19:16
31:6
38:23
46:16
54:3
56:10
57:2

**rephrase**
8:20

**reportedly**
35:7

**represent**
42:2

**representat
ion**
26:5,6,
14,17
39:2
42:20,23
49:9
56:6,16

24:21

**representat
ive**
42:1,4,
19,24
43:20,23
44:10
49:8 50:5

**representat
ives**
35:9 56:7

**required**
51:8

**research**
52:23
53:4,16

**residence**
9:14

**residents**
16:4 17:1
55:18
57:7

**resolved**
25:2

**respect**
15:5

**response**
8:18
44:2,4

**restaurant**
10:17,21

**restitution**
25:9

**restore**
25:6

**restroom**
32:7

**resulted**
30:11,16
51:12

**resulting**



Case 8:24-cv-00879-CEH-TPB-ALB    Document 113-23    Filed 05/13/25    Page 75 of 77
PageID 5788

JARVIS EL-AMIN
HODGES V. PASSIDOMO

November 21, 2024
Index: rights..splits

31:9

**rights**
14:9,11,
13,15
24:24,25
25:6

**Rising**
12:6,8,9,
10,13,20,
24  13:3,
11,13,20
14:3

**robs**
56:14

**rolls**
33:16

**rough**
21:21

**roughly**
29:25

**rules**
8:15

**running**
19:25

――――――――
S
――――――――

**sacrificed**
37:17
39:4,12,
14,19
40:9,24
41:5,16,
25  42:17

**sacrifices**
40:3

**sales**
10:25
11:1,3,19

**salesmanshi**
**p**

10:24

**sand**
36:21

**Sandra**
20:25

**sat**
5:11

**school**
10:10,11

**screen**
34:7

**scroll**
45:10
46:5  55:9
57:17

**Secretary**
33:15

**Section**
57:11

**security**
23:8

**selected**
30:24

**senate**
4:8  33:4,
8  56:7

**sense**
9:11

**sentence**
57:6

**separate**
54:11

**separated**
42:3  49:6

**separately**
42:20

**September**
12:19

**sets**
42:2

**sex**
40:21

**share**
34:6  48:9

**shared**
38:18,19
39:1
57:12,13

**SHAW**
4:12
16:12
17:3
27:5,14
31:10,22
32:6  34:1
35:19
36:3,17,
23  38:6,
12  39:5
40:25
41:6
45:3,24
46:11
47:22
48:22
49:4,13
50:8
52:16,25
53:6,11,
15  58:3,
9,12

**short**
32:10

**Shortly**
30:3,4

**show**
33:15
45:5
55:16

**showed**
47:18

**side**
27:21,22
28:3,4,
12,14,16,
18  35:14
56:25

**sides**
49:6

**similar**
36:25
48:7

**simple**
42:1,5
44:23

**simply**
40:3
50:18,23

**sir**
10:15
43:3
45:13
46:19
48:6
53:4,10
54:16
55:23

**sit**
15:16,17

**small**
28:24
29:1

**social**
19:4  23:8
32:16,19

**socioeconom**
**ic**
40:18

**sort**
21:20
56:25

**sound-bite**
30:19

**soundbite**
44:11

**south**
21:22
27:23
28:12
29:3,5,11
35:14,22
39:22,23,
24  40:2,5
41:9
42:17,22
43:2,3
45:19
47:10,14
49:10
50:2,24
54:24
57:1,3

**southern**
45:19

**specific**
12:5,11
13:14,15
17:18

**specificall**
**y**
12:12
15:25
43:25
45:2,17,
18  57:21

**spell**
4:10,15

**split**
45:20,22
46:9,14
47:2
48:3,20
50:17,20

**splits**
44:21,25
45:16
46:7,24



47:20
48:15
49:2,3
51:12

spoke
29:21
30:1
31:12
43:20

spoken
29:17
30:8
31:25
32:5
37:10,13

St
27:23
28:12,18,
21 29:3,
5,11
35:14,22
39:22,23,
24 40:2,5
41:9
42:18,23
43:2,3
45:19,20
47:10,14
49:10
50:2,24

staff
30:13,25
31:20
35:7
52:18,19

stands
54:23

start
4:12
11:15
34:18

starting
43:14

state
4:10,15
9:13 33:8

state's
33:4,15

statement
31:14

statements
32:13

status
40:18

stay
51:21

stayed
9:24

steps
25:5

stopping
9:6

Strauss
21:6

Street
9:22

stripping
43:8

subgroups
16:20

subject
4:25 6:1
7:12
24:20

submitted
55:25

suggest
58:1

supervisor
20:2

support
26:12

supporting
43:11

—————————

T

—————————

takes
56:5

taking
48:19

talk
8:19

talked
29:25
52:21

talking
16:23
26:25
29:3
30:19
38:21
42:8
47:17

Tampa
9:15,22,
23 13:4,
6,7,8,11,
15,16,17
16:4,7
21:18,21
28:14,16,
21 29:5
35:23
41:10
42:19
50:3,25
57:4

tax
19:13,17

teaching
18:4

Temple
33:18

50:3

ten
6:11

tending
55:16

terms
15:11,14
17:9

Terrace
33:18
50:3,25

testified
6:15 7:5,
12 8:1
49:1

testimony
4:25 5:25
6:17,22
7:20 8:3
25:22
44:15
48:11

thing
25:16
49:12
55:10

things
24:14

Tier
52:10,11

Tiktok
32:25

time
5:17,18,
19,20
6:6,19,
21,23,24
13:22
19:13,17
20:7
21:24
22:7,9,15

24:11
32:7 33:7
35:2
41:22

times
5:4,7
23:16
24:8
25:20,21

title
15:21

today
4:24 5:14
8:16 9:8
34:6

told
8:6 13:13
23:2 44:9
57:8,9

touch
26:4

traditional
51:13,15
52:3

training
11:19
18:3

trouble
8:19

true
42:20,23

TV
43:21
44:11

twenty-four
23:5

Twitter
32:21

types
51:1



**U**

U.S.
  23:13
ultimate
  24:4
unconstitut
ional
  43:17
understand
  4:23 5:12
  13:12
  38:22,24
  47:21
  48:23
understandi
ng
  8:20 9:1
  42:13
  51:22
understands
  42:24
understood
  8:23
  31:17
  44:14
unfair
  27:2,11,
  18 37:7
United
  33:19
unnecessari
ly
  44:23
unpack
  26:11
urban
  21:7,17,
  21

**V**

verbal
  8:17
verify
  52:23
vice
  18:25
view
  38:10
  39:19
  40:5 42:6
  48:5
  50:6,11
violence
  23:20
volunteered
  22:3
vote
  33:10
  37:22,25
  38:3
  56:8,11
voted
  33:4,7
voter
  19:14,18,
  23 33:2,
  15
voters
  14:18
  15:25
  17:1
  21:10
  27:3,4,12
  28:2,4
  41:2
  42:18,19,
  22 43:7,
  12 47:9,
  10,13

48:7,9
50:7,11,
13 56:19,
20,21,22,
23
voters'
  35:9
  36:12
votes
  38:2
voting
  12:16
  14:13,15,
  18 15:6
  17:14
  21:25
  24:24,25
  25:4,6
  36:7,11
  42:18
  49:20,21
voting-
related
  19:10

**W**

water
  35:13
  41:10
  42:3
  45:20
  49:7
  54:11
who's-on-
first
  49:16
wife
  29:19
witnesses
  55:1
words

17:18
26:1
33:22
42:23
46:6
53:25
54:8
55:24
work
  10:20
  11:6,16
  12:17,25
  13:3,11,
  19 20:1,6
  52:25
  53:6,14
worked
  10:24
  12:1,4,5,
  20 13:14
  14:3,7
  20:5,24,
  25 21:1,
  6,25
working
  11:7
  20:16
works
  14:18
worship
  18:16
wrong
  18:10
  37:1,6,7
  41:13,14
  42:16
  47:12

**Y**

year
  7:19 10:7
  12:18,21

23:4,20
24:20
30:21,22
41:19,21
44:12
years
  6:8,10,11
  9:17
  10:22
  11:4,23
  15:4 23:5
  24:6,15
  25:24
  33:9
yesterday's
  4:20
you're-
  58:7
young
  6:25 19:5
youth
  18:2,3
  19:4

**Z**

zoom
  34:8

