# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

Case No. 8:24-cv-879-CEH-TPB-ALB

KÉTO NORD HODGES, *et al.*,

*Plaintiffs,*

v.

BEN ALBRITTON, *etc., et al.*,

*Defendants.*

## PLAINTIFFS' TRIAL BRIEF

Nicholas Warren (FBN 1019018)
Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
nwarren@aclufl.org
dtilley@aclufl.org
cmcnamara@aclufl.org

James Michael Shaw, Jr. (FBN 677851)
Naomi Robertson (FBN 1032076)
**Butler Weihmuller Katz Craig LLP**
400 North Ashley Drive, Suite 2300
Tampa, FL 33602
(813) 281-1900
jshaw@butler.legal
nrobertson@butler.legal

David Chen*
Deborah N. Archer*
**Civil Rights & Racial Justice Clinic**
**Washington Square Legal Services**
245 Sullivan Street
New York, NY 10012
(212) 998-6473
davidchen@nyu.edu
deborah.archer@nyu.edu

* *Admitted pro hac vice*

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................3

II.   LEGAL STANDARDS ......................................................................................4

    A.   Standing .......................................................................................................4

    B.   Racial Gerrymandering ...............................................................................5

        1.   *Racial Predominance* ............................................................................6

        2.   *Strict Scrutiny* ..................................................................................10

    C.   Remedy .....................................................................................................13

    D.   Laches .......................................................................................................14

III.  FINDINGS OF FACT .....................................................................................14

    A.   Parties .......................................................................................................14

    B.   Florida Senate Redistricting Background .................................................15

    C.   Historical Background ...............................................................................17

    D.   The 2020 Redistricting Cycle ..................................................................19

        1.   *Redistricting Process Begins* ............................................................19

        2.   *Committee Staff Development of the Enacted Plan* ..........................23

        3.   *Workshopping the Enacted Plan in Committee* .................................25

        4.   *Passage of the Enacted Plan* ............................................................29

    E.   Direct Evidence of Racial Predominance .................................................31

    F.   Circumstantial Evidence of Racial Predominance ...................................34

    G.   Remedy .....................................................................................................37

    H.   Laches .......................................................................................................38

IV.   CONCLUSIONS OF LAW .............................................................................38

    A.   Plaintiffs have standing to sue. ................................................................38

    B.   District 16 fails strict scrutiny because it is not narrowly tailored. .................38

        1.   *The Senate's use of race fails to clear the Constitution's "limited degree of leeway".*...39

        2.   *The Senate refused to appropriately investigate a more tailored use of race*............40

        3.   *The Senate's other justification is legally erroneous.* ......................43

    C.   Plaintiffs' claims are not barred by laches. ..............................................45

    D.   The constitutional violation should be remedied for the 2026 elections............46

    E.   The Court need not address the Secretary's constitutional arguments. ............47

        1.   *The Secretary lacks standing to make these arguments.* ..................48

        2.   *Compliance with the non-diminishment requirement is a compelling interest.* ..........49

        3.   *A remedy can comport with both equal protection and non-diminishment.* .............53

V.    CONCLUSION ...............................................................................................55

## I.  INTRODUCTION

Plaintiffs challenge Florida Senate District 16 in the Tampa Bay area as racially gerrymandered in violation of the Fourteenth Amendment. District 16 stretches across the waters of Tampa Bay to connect disparate and distinct Black communities in Tampa and St. Petersburg, packing more than half of the region's Black residents into one district. As a result, Black residents are artificially stripped from adjacent District 18, diminishing their influence and voice in elections there. In crafting District 16, the State focused predominantly on racial considerations and ignored the major geographical divide between the two unconnected portions of District 16:



The Equal Protection Clause requires the State's use of race both to be narrowly tailored and to serve a compelling interest, but the State refused to narrowly tailor its

use of race. The Florida Constitution requires the State to avoid diminishing Black voters' ability to elect representatives of their choice in District 16, but the State unnecessarily used race to disregard traditional, race-neutral redistricting considerations. And far from advancing representation, District 16 sorts Black voters with disparate needs on either side of Tampa Bay into one district. The State could have drawn District 16 to both avoid the diminishment of Black voting power and respect traditional redistricting criteria. Instead, the State engaged in racial gerrymandering that unconstitutionally abridges Plaintiffs' rights to equal protection of the laws.

## II.  LEGAL STANDARDS

### A. Standing

1.    To have Article III standing, Plaintiffs must demonstrate an injury-in-fact, causation, and redressability. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

2.    "Where a plaintiff resides in a racially gerrymandered district, [] the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." *United States v. Hays*, 515 U.S. 737, 744–45 (1995) (cleaned up).

3.    The injury-in-fact inheres in the use of race to draw legislative districts. An individual who lives in a racially gerrymandered district is injured because she is "subjected to a racial classification, as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group." *Ala. Legis. Black Caucus v. Alabama* (*ALBC I*), 575 U.S. 254, 263 (2015) (cleaned

4

up); *see also Miller v. Johnson*, 515 U.S. 900, 911–12 (1995) ("When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993))).

4.    Plaintiffs' injuries are redressed when they are no longer subject to a racial classification—when they live in districts that are not drawn predominantly based on race, or where the use of race is narrowly tailored to a compelling interest.

5.    Beyond the racial classification, racial gerrymandering can cause other types of harm that "are more than just theoretical." *Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville I*), 635 F. Supp. 3d 1229, 1273 (M.D. Fla. 2022). Such harms can include impaired constituent-representative relationships, less responsiveness on the part of elected officials to the communities that compose their districts, and difficulty in advocating around shared interests. *Id.* at 1271–73.

### B. Racial Gerrymandering

6.    "The Equal Protection Clause prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller*, 515 U.S. at 911).

7.    Racial gerrymandering claims involve "a two-step analysis": (1) that race was the predominant factor in drawing the districts; and (2) if so, the districts must withstand strict scrutiny. *Cooper v. Harris*, 581 U.S. 285, 291 (2017).

### *1. Racial Predominance*

8.    First, plaintiffs must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.* (quoting *Miller*, 515 U.S. at 916).

9.    To show racial predominance, "a plaintiff must prove that the State 'subordinated' race-neutral districting criteria such as compactness, contiguity, and core preservation to 'racial considerations.'" *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 7 (2024) (quoting *Miller*, 515 U.S. at 916). The consideration of the role race played requires a "holistic analysis." *Bethune-Hill*, 580 U.S. at 192. A showing of predominance can therefore "be made through some combination of direct and circumstantial evidence." *Id.* at 8.

10.    "Direct evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Alexander*, 602 U.S. at 8; *see also Jacksonville Branch of NAACP v. City of Jacksonville,* No. 22-13544, 2022 WL 16754389, at *4 (11th Cir. Nov. 7, 2022) ("[R]elevant, contemporaneous statements of key legislators are to be assessed when determining whether racial considerations predominated in redistricting processes."). "Such concessions are not uncommon because States often admit to considering race for the purpose of satisfying [Supreme Court] precedent interpreting"—for example—"the Voting Rights Act of 1965." *Alexander*, 602 U.S. at 8.

11.    A plaintiff can also point to indirect evidence, such as the challenged district's lack of "conformity to traditional districting principles, such as compactness

and respect for county lines." *Cooper*, 581 U.S. at 308.

12.    Minimizing changes to districts from the prior plan, commonly referred to as "core preservation," is one race-neutral redistricting principle legislatures can sometimes follow. *Alexander*, 602 U.S. at 7. But "[r]ace may predominate even when a reapportionment plan respects traditional principles." *Bethune-Hill*, 580 U.S. at 179. The possibility "that other considerations may have played a role . . . in redistricting does not mean that race did not predominate." *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1270 (11th Cir. 2002). Thus, even if a state does follow the core-preservation principle, it cannot "immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Allen v. Milligan*, 599 U.S. 1, 22 (2023); *see also Bethune-Hill v. Va. State Bd. of Elections*, 141 F. Supp. 3d 505, 545 (E.D. Va. 2015) ("'That's the way we've always done it' may be a neutral response, but it is not a meaningful answer."), *aff'd in part, vacated in part*, 580 U.S. 178.

13.    There is no "special evidentiary prerequisite" for proving racial predominance. *Cooper*, 581 U.S. at 318. Plaintiffs need not show actual "conflict or inconsistency" between district design and traditional race-neutral districting principles: "Race may predominate even when a reapportionment plan respects traditional principles . . . if 'race was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" *Bethune-Hill*, 580 U.S. at 189–90 (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996)) (alteration in original omitted). "[P]arties may rely on

evidence other than bizarreness to establish race-based districting." *Miller*, 515 U.S. at 913.

14.     Alternative district configurations that satisfy race-neutral criteria can be probative of racial predominance. *GRACE, Inc. v. City of Miami* (*GRACE IV*), 730 F. Supp. 3d 1245, 1283 (S.D. Fla. 2024) (rejected alternative plans constitute evidence of racial predominance).

15.     Because being classified on the basis of race is itself the harm of racial gerrymandering, an alternative plan (or remedy) need not reflect different racial demographics than the challenged plan. *GRACE, Inc. v. City of Miami* (*GRACE III*), 702 F. Supp. 3d 1263, 1278 (S.D. Fla. 2023) ("Defendant's assertion that the districts are not racially gerrymandered because they reflect the demographic reality of the city is inapposite."); *see also Perez v. Texas*, slip op. at 1–2, No. 5:11-cv-360 (W.D. Tex. May 28, 2019), ECF No. 1631 (ordering remedy that "eliminates the changes that led this Court to find racial gerrymandering" despite "maintain[ing] [the district's] majority [Hispanic] status"); *Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville II*), No. 3:22-cv-493, 2022 WL 17751416, at *2, *20 (M.D. Fla. Dec. 19, 2022) (summarizing earlier order finding racial gerrymandering in predominantly Black protected districts resulted in "stripping" Black voters from surrounding districts, even where the court-ordered remedy did not yield an additional Black-performing seat), *stay denied*, No. 22-14260, 2023 WL 119425 (11th Cir. Jan. 6, 2023).

16.     That said, an alternative map is not *required* to prove racial predominance, especially where, as here, the state does not assert a partisan-

gerrymandering defense (*i.e.*, argues that partisan considerations, not racial ones, drove mapping decisions). *Alexander*, 602 U.S. at 9–10; *Easley v. Cromartie*, 532 U.S. 234, 249 (2001); *Cubanos Pa'lante v. Fla. House of Representatives*, --- F. Supp. 3d ---, No. 24-cv-21983, 2025 WL 500904, at *4 (S.D. Fla. Feb. 13, 2025) ("The existence of an alternative map is not a substantive requirement of a racial-gerrymandering claim, because the courts do not force 'plaintiffs to submit one particular form of proof to prevail' in equal protection cases." (quoting *Cooper*, 581 U.S. at 319)).

17.     Splitting of cities, precincts, and other geographic subdivisions along racial lines "strongly suggests" racial predominance. *Covington v. North Carolina* (*Covington I*), 316 F.R.D. 117, 145, 160 (M.D.N.C. 2016), *aff'd*, 581 U.S. 1015 (2017); *Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 148 (E.D. Va. 2018); *Jacksonville I*, 635 F. Supp. 3d at 1275 (discussing racial patterns in how precincts were split); *GRACE, Inc. v. City of Miami* (*GRACE I*), 674 F. Supp. 3d 1141, 1193–94, 1210–11 (S.D. Fla. 2023), *appeal dismissed*, No. 23-11854-D, 2023 WL 5624206 (11th Cir. July 13, 2023). But so can *following* geographic subdivisions if doing so tracks a racial pattern. *Jacksonville I*, 635 F. Supp. 3d at 1284 (finding precinct demographic data was "strong evidence that the borders of the Challenged Districts follow racial lines" and noting city failed to explain "how such consistent racial sorting would result if the border lines were not drawn on the basis of race").

18.     Racial predominance is analyzed "district-by-district." *ALBC I*, 575 U.S. at 262. But "[t]his is not to suggest that courts evaluating racial gerrymandering claims

may not consider evidence pertaining to an area that is larger or smaller than the district at issue." *Bethune-Hill*, 580 U.S. at 192. "[A] legislature's race-based decisionmaking may be evident in a notable way in a particular part of a district. It follows that a court may consider evidence regarding certain portions of a district's lines, including portions that conflict with traditional redistricting principles." *Id*.

19.     "Although race-based decisionmaking is inherently suspect, until a claimant makes a showing sufficient to support that allegation the good faith of a state legislature must be presumed." *Miller*, 515 U.S. at 915 (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 218 (1995), and *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 318–19 (1978) (opinion of Powell, J.)). In other words, courts presume the legislature was engaged in policymaking without regard to race unless the plaintiff meets their burden of proving racial predominance. *See Ga. State Conf. of the NAACP v. Georgia*, No. 1:21-cv-5338, 2023 WL 7093025, at *8 (N.D. Ga. Oct. 26, 2023); *GRACE IV*, 730 F. Supp. 3d 1245, 1293–94 (S.D. Fla. 2024).

### 2.  *Strict Scrutiny*

20.     "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 581 U.S. at 292 (quoting *Bethune-Hill*, 580 U.S. at 193) (internal citation omitted).

21.     The Court need not address the compelling interest prong to hold that a challenged district is inadequately tailored to that interest. In an unbroken line of cases,

"[The Supreme] Court has long assumed that one compelling interest is complying with operative provisions of the Voting Rights Act of 1965." *Cooper*, 581 U.S. at 292; *see Hunt*, 517 U.S. at 915; *Bush v. Vera*, 517 U.S. 952, 977–79 (1996); *Miller*, 515 U.S. at 921; *ALBC I*, 575 U.S. at 279; *Bethune-Hill*, 580 U.S. at 193; *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 401 (2022) (per curiam); *Abbott v. Perez*, 585 U.S. 579, 587 (2018). In *LULAC v. Perry*, 548 U.S. 399 (2006), eight justices announced that they agreed—not just assumed—that compliance with Section 5's non-diminishment provision is a compelling state interest. *See id.* at 518 (Scalia, J., joined by Roberts, C.J., Thomas & Alito, J.J., concurring); *id.* at 475 n.12 (Stevens, J., joined by Breyer, J., concurring); *id.* at 485 n.2 (Souter, J., joined by Ginsburg, J., concurring). Because the Fair Districts Amendment codifies "the principles enumerated in Sections 2 and 5 of the VRA," *In re Senate Joint Res. of Legis. Apportionment 1176* (*Apportionment I*), 83 So. 3d 597, 619 (Fla. 2012), it can similarly be assumed that compliance with the Fair Districts Amendment is a compelling interest.

22.    Although the narrow tailoring standard gives legislatures "breathing room," *Cooper*, 581 U.S. at 293 (quoting *Bethune-Hill*, 580 U.S. at 196), when drawing race-based district lines to comply with legal requirements like the Voting Rights Act, it affords only a "limited degree of leeway," *Vera*, 517 U.S. at 977. To satisfy narrow tailoring, the state must show "that it had 'a strong basis in evidence' for concluding that the statute required its action"—*i.e.*, "'good reasons' to think that it would transgress the Act if it did *not* draw race-based district lines." *Cooper*, 581 U.S. at 292–

93 (quoting *ALBC I*, 575 U.S. at 278).

23.    This requires "evidence or analysis supporting [the] claim that the VRA required" the race-based measures, "much more" than "uncritical" assumptions and "generalizations." *Wis. Legislature*, 595 U.S. at 403–04; *see also Abbott*, 585 U.S. at 621 (requiring "a strong showing of a pre-enactment analysis with justifiable conclusions"); *Bethune-Hill*, 580 U.S. at 194–95 (finding proper tailoring where "informed bipartisan consensus" relied on "careful assessment of local conditions and structures," including "functional analysis" of proposed district). When a state takes race-based measures to draw a district, the state must prove it had "good reasons for thinking that the Act *demanded* such steps," not just "that the VRA *might* support race-based districting." *Wis. Legislature*, 595 U.S. at 403–04 (emphasis in original) (quotations omitted).

24.    A state fails to clear strict scrutiny when the law does not require the state's race-based measures "under a correct reading of the statute," *Miller*, 515 U.S. at 921, when the state follows an interpretation of the law that courts had "rejected" and which "fell short of [judicial] standards," *Wis. Legislature*, 595 U.S. at 403–04, or when the state's use of race "went well beyond what is necessary to avoid retrogression." *Clark*, 293 F.3d at 1278.

25.    States have a duty to narrowly tailor their use of race every time they redraw a district, even when they inherit a court-ordered plan. *See Clark*, 293 F.3d at 1267 n.16 (holding that map failed strict scrutiny even where it "preserved as much as possible" court-ordered predecessor districts); *Johnson v. Mortham*, 926 F. Supp. 1460,

1492 (N.D. Fla. 1996) (finding congressional district failed strict scrutiny in racial-gerrymandering challenge to redistricting plan which had been ordered by that same district court four years prior).[1]

### C. Remedy

26.    "Relief in redistricting cases is fashioned in the light of well-known principles of equity. A district court therefore must undertake an equitable weighing process to select a fitting remedy for the legal violations it has identified, taking account of what is necessary, what is fair, and what is workable." *North Carolina v. Covington* (*Covington II*), 581 U.S. 486, 488 (2017) (quotations and citations omitted).

27.    "[I]ndividuals . . . whose constitutional rights have been injured by improper racial gerrymandering . . . are entitled to vote as soon as possible for their representatives under a constitutional apportionment plan." *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (cleaned up), *aff'd sub nom. Cooper*, 581 U.S. 285. "[I]t would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under" a map held to be constitutionally invalid. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

28.    "When a federal court declares an existing apportionment scheme

---

[1]    *See also Ala. Legis. Black Caucus v. Alabama* (*ALBC II*), 231 F. Supp. 3d 1026, 1065 (M.D. Ala. 2017) (striking down district that "maintained . . . core" of previous one); *id.* at 1085 (concluding that, notwithstanding similarities between new and prior districts, "the legislature drew new lines in 2012 that must be evaluated on their own merit"); *Navajo Nation v. San Juan Cnty.*, 162 F. Supp. 3d 1162, 1177 (D. Utah 2016) (striking down district where "the overriding consideration . . . was to preserve [it] without any modification"), *aff'd*, 929 F.3d 1270 (10th Cir. 2019); *cf. Singleton v. Merrill*, 582 F. Supp. 3d 924, 1016 (N.D. Ala. 2022) (explaining in Section 2 context that core-preservation defense "would turn the law upside-down, immunizing states from liability under Section Two so long as they have a longstanding, well-established map"), *aff'd sub nom. Milligan*, 599 U.S. 1.

unconstitutional, it is . . . appropriate . . . to afford a reasonable opportunity for the legislature to . . . adopt[ ] a substitute measure." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978).

**D. Laches**

29.     "To establish a laches defense, '[t]he defendant must show a delay in asserting a right or claim, that the delay was not excusable and that there was undue prejudice to the party against whom the claim is asserted.'" *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1283 (11th Cir. 2015) (quoting *Ecology Ctr. of La., Inc. v. Coleman*, 515 F.2d 860, 867 (5th Cir. 1975)).

30.     "[T]here is a strong presumption that a plaintiff's suit is timely if it is filed before the statute of limitations has run." *Id.* at 1286 (quoting *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1320 (11th Cir. 2008)).

31.     In Florida, 42 U.S.C. § 1983 claims are subject to a four-year statute of limitations. *McGroarty v. Swearingen*, 977 F.3d 1302, 1307 (11th Cir. 2020).

## III.     FINDINGS OF FACT

**A. Parties**

32.     Plaintiffs Kéto Nord Hodges and Jarvis El-Amin are Black residents of District 16. Mr. Nord and Mr. El-Amin live in Tampa in Hillsborough County.

33.     Plaintiff Meiko Seymour is a Black resident of District 16. Mr. Seymour lives across Tampa Bay in St. Petersburg in Pinellas County.

34.     District 16 in Plan S027S8058 ("Plan 8058" or the "Enacted Plan") harms Plaintiffs because, among other reasons, it splits up their communities along

racial lines and unnecessarily groups their communities with dissimilar ones, simply because of their race.

35.    Plaintiffs and their communities on both sides of Tampa Bay receive less effective political representation because of the difficulties of organizing across the Bay and the divergence in needs and interests of the communities on either side of the Bay.

36.    Absent an injunction, Plaintiffs will continue to be harmed by living and voting in unconstitutionally racially gerrymandered districts and by continuing to be subject to a racial classification.

37.    Defendant Ben Albritton, sued in his official capacity, is the President of the Florida Senate. The Senate over which he presides is, along with the House of Representatives, responsible for enacting legislation redrawing legislative districts after each decennial census. Fla. Const. art. III, § 16. State Senators are elected from the enacted districts.

38.    Defendant Cord Byrd, sued in his official capacity, is the Florida Secretary of State. His Department of State has "general supervision and administration of the election laws," including the Enacted Plan, administers Senate candidate qualifying, receives Senate election returns from the county canvassing boards, and issues certificates of election to successful Senate candidates. Fla. Stat. §§ 15.13, 99,061, 102.112, 102.151, 102.155.

**B. Florida Senate Redistricting Background**

39.    The Florida Senate is comprised of forty members elected from districts.

40.    Legislative redistricting (or reapportionment) is the duty of the

Legislature, which is tasked with adopting redistricting plans for both the Florida House and Senate after each decennial census. *See* Fla. Const. art. III, § 16.

41.     The Legislature's discretion in redistricting is cabined by several key legal requirements, including the Fourteenth Amendment's Equal Protection Clause and the Florida Constitution's Fair Districts Amendment.

42.     The Fair Districts Amendment sets forth two tiers of requirements for legislative redistricting. Fla. Const. art. III, § 21.[2]

43.     So-called "Tier One" contains four requirements, which take precedence over the so-called "Tier Two" requirements.

44.     *First*, Tier One prohibits redistricting plans and individual districts from being "drawn with the intent to favor or disfavor a political party or an incumbent"— banning partisan and incumbency gerrymandering. *Id.* § 21(a).

45.     *Second*, Tier One incorporates the vote dilution standard of Section 2 of the Voting Rights Act (VRA), prohibiting districts from being "drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process." *Id.*; *Apportionment I*, 83 So. 3d at 619.

46.     *Third*, Tier One incorporates the "diminishment" or "retrogression" standard from Section 5 of the VRA, 52 U.S.C. § 10304(b), prohibiting districts drawn "to diminish [racial or language minorities'] ability to elect representatives of their choice." Fla. Const. art. III, § 21(a). This requirement "attempts to eradicate

---

[2]     Article III, Section 20 lays out identical requirements for congressional redistricting.

impermissible retrogression in a minority group's ability to elect a candidate of choice." *Apportionment I*, 83 So. 3d at 620.

47.     ***Fourth***, Tier One mandates that districts be contiguous. Fla. Const. art. III, § 21(a).

48.     Tier Two sets out three more requirements, which are subordinate to the Tier One requirements. The Tier Two requirements enshrine in the Florida Constitution several race-neutral "traditional districting principles." *See Miller*, 515 U.S. at 916.

49.     Tier Two requires that districts (1) "be as nearly equal in population as is practicable"; (2) "be compact"; and (3) "where feasible, utilize existing political and geographical boundaries." Fla. Const. art. III, § 21(b).

50.     The Legislature must adhere to the Tier Two requirements, unless doing so would violate a Tier One requirement. *Id.*

51.     The Legislature can deviate from the Tier Two requirements only to the extent necessary to comply with Tier One's minority-protection provisions. *Id.*

**C. Historical Background**

52.     Challenged District 16 has its origins in the 1990 redistricting cycle.[3] During that cycle, the U.S. Department of Justice denied preclearance to the proposed

---

[3]     Plaintiffs use the term "the Protected District" to refer to this and similar districts across multiple proposed or enacted plans. This district is numbered 16 in the Enacted Plan and 19 in the plan in effect from 2016–2022 (the "Benchmark Plan"). The "benchmark plan" is the last legally enforceable redistricting plan in force or effect. A proposed redistricting plan is compared to the benchmark plan to analyze its compliance with protections for racial and language minorities under Florida's non-diminishment provision.

Senate map because it lacked a majority-minority district in Hillsborough County—at that time a "covered" county subject to the Voting Rights Act's Section 5 preclearance regime. *In re Constitutionality of Sen. Joint Resol. 2G*, 601 So. 2d 543, 545 (Fla. 1992).

53.    As a result, the Florida Supreme Court redrew the map to accede to the DOJ's demand, selecting from different submissions the option with the highest Black population in the new majority-minority district. *Id.* at 546; *see also id.* at 548 (Overton, J., dissenting).

54.    That court-drawn district then faced a *Shaw* challenge, which the state settled. *Scott v. U.S. Dep't of Justice*, 920 F. Supp. 1248, 1256 (M.D. Fla. 1996) (approving settlement over one plaintiff's objection), *aff'd sub nom. Lawyer v. Dep't of Justice*, 521 U.S. 567 (1997). Since that 1996 settlement, the Protected District included portions of Hillsborough, Pinellas, and Manatee Counties. FloridaRedistricting.gov, *FL State Senate Districts 1982–2022*, https://www.floridaredistricting.gov/apps/82253f ebdee14d8db197a7e1615a6477 (district numbered 21 from 1996–2002, 18 from 2002–2012, and 19 from 2012–2016). Thus, after the Fair Districts Amendment was adopted in 2010, the benchmark district for the 2010 cycle—against which diminishment in Black voters' ability-to-elect was measured—included those three counties.

55.    In 2015, the Senate stipulated to liability in a lawsuit challenging its 2012 map as an impermissible partisan and pro-incumbent gerrymander under the Fair Districts Amendment. *League of Women Voters of Fla. v. Detzner* (*Benchmark Case*), No. 2012-CA-2842 (Fla. 2d Jud. Cir. Ct. Dec. 30, 2015), slip op. at 3–4 (filed at ECF No. 80-15). The Legislature then undertook a remedial remapping process, during which

legislators in both chambers proposed configurations with a Protected District that did not cross Tampa Bay.

56.    For example, Republican Rep. Matt Caldwell proposed a plan with a Protected District wholly within Hillsborough County, and a South Pinellas district sitting compactly on the other side of the Bay.

57.    Democratic Sens. Jeff Clemens and Oscar Braynon proposed their own plans with a Protected District on the Tampa side of the Bay and another district that united South Pinellas and St. Petersburg.

58.    Rep. Caldwell, Sen. Clemens, and Sen. Braynon filed their plans during the 2015 special session.

59.    In the end, the Senate agreed to reconfigure the Protected District somewhat—removing its Manatee County portion—but the Protected District's configuration was not disputed in the remedial-phase litigation, and the court made no comment on it. *See generally Benchmark Case,* No. 2012-CA-2842 (Fla. 2d Jud. Cir. Ct. Dec. 30, 2015).

60.    The map the court adopted—first implemented in the 2016 elections— became the Benchmark Plan for the 2020 redistricting cycle ("Benchmark Plan").

**D. The 2020 Redistricting Cycle**

*1. Redistricting Process Begins*

61.    Following the 2020 Census, the Legislature embarked on its redistricting process. Each chamber deferred to the other in drawing the map for its own body, with the Senate developing the Senate plan.

62.    Senate redistricting proceeded through seven committee and subcommittee meetings. The full Committee on Reapportionment (the "Committee") met on September 20, October 11, and October 18, 2021 for presentations on the law and technical aspects of redistricting.

63.    During the **September 20, 2021,** meeting, Committee Staff Director Jay Ferrin gave a presentation on census data, the redistricting timeline, and other basics of redistricting.

64.    In particular, Ferrin explained the Fair Districts criteria, including an explanation of Tier One's "[p]rotections against diminishment, or reduction in the ability of racial or language minorities to elect representatives of their choice." and the Tier Two requirements.

65.    Throughout the redistricting process, legislators, their attorneys, and their staff used the terms "Tier One" and "Tier Two" as a shorthand to refer to the requirements contained within those tiers. This included using "Tier One" as a shorthand to refer to the minority-protection provisions of Article III, Section 21(a). A "Tier One protected district" or simply "protected district" refers to a district in which minority groups' ability to elect candidates of choice is protected from diminishment, dilution, or both.

66.    The Senate considered, and still considers, Black voters' ability to elect candidates of their choice in District 19 (the "Benchmark District") in the 2016 Benchmark Plan protected under Tier One's non-diminishment standard. In other words, the Benchmark District was (and is) a Tier One protected district.

67.     Ferrin's presentation also defined key terminology. His presentation explained that diminishment: "Occurs when a redistricting plan eliminates a majority-minority district, or potentially weakens a historically performing minority district where doing so would actually reduce the ability of racial or language minority groups to elect candidates of their choice when compared to the benchmark plan."

68.     Ferrin defined "geographic boundaries" and "political boundaries" as "[e]asily ascertainable and commonly understood features, such as rivers, railways, and primary and secondary roads. Primary and secondary roads include interstates, U.S. highways, and state highways;" and "[b]oundaries of a county or incorporated municipality (city, town, village, etc)," respectively.

69.     All these commonly understood definitions undergirded the Legislature's redistricting process.

70.     At the Committee's **October 11, 2021,** meeting, attorney Daniel Nordby gave a presentation on redistricting law.

71.     Nordby's presentation included an explanation of the Fourteenth Amendment's prohibition on racial gerrymandering and the Fair Districts' minority-protection provisions.

72.     Quoting *Apportionment I*, Nordby noted: "The anti-retrogression provisions of the Florida Constitution provide that the Legislature 'cannot eliminate majority-minority districts or weaken other historically performing minority districts where doing so would actually diminish a minority group's ability to elect its preferred candidates.'"

73.    Further explaining *Apportionment I*, Nordby noted: "A 'functional analysis' is required to evaluate retrogression and to determine whether a district is likely to perform for minority candidates of choice." This "[r]equires consideration of minority population in districts, minority voting-age population in districts, political data, how a minority population group has voted in the past. No 'predetermined or fixed demographic percentage' is used at any point in the assessment."

74.    Nordby further explained: "Tier Two standards may give way to the extent necessary to avoid retrogression."

75.    Finally, Nordby explained that Tier One's non-diminishment requirement "applies to the entire state and remains enforceable" notwithstanding the U.S. Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013).

76.    Assessing whether a minority group's ability-to-elect in the Benchmark District is diminished in a proposed new district requires comparing the minority group's ability in the benchmark district with the group's ability in the proposed district, to determine whether the minority group is as likely, more likely, or less likely to elect their preferred candidates. It is the minority group's ability in the district as a whole that is protected. It is irrelevant whether the district contains portions of different counties or cities, or whether a portion of a particular county or city is removed from the protected district during redistricting. In other words, the non-diminishment requirement does not operate county-by-county. *In re Sen. Joint Resol. of Legis. Apportionment 2-B* (*Apportionment II*), 89 So. 3d 872, 882–883, 887, 891 (Fla. 2012) (declaring valid two minority protected districts and rejecting a challenge that

one of them diminished Black voters' ability-to-elect—despite that both districts shed counties from the protected benchmark). The Senate understood this. Moreover, "a slight change in percentage of the minority group's population in a given district does not necessarily have a cognizable effect on a minority group's ability to elect its preferred candidate of choice[,]" "because a minority group's ability to elect a candidate of choice depends upon more than just population figures. *Apportionment I*, 83 So. 3d at 625.

### 2. *Committee Staff Development of the Enacted Plan*

77.    On **October 18, 2021**, the Committee discussed the map-drawing process and gave general directives to Committee staff to guide the development of draft maps, reduced to writing in a memorandum from Sen. Rodrigues to Ferrin (the "Directives Memo").

78.    The Directives Memo directed staff to draw districts in conformity with federal and state legal requirements. In particular, in drawing districts to comply with Tier Two, staff were directed, in part:

- "to draw districts that are visually compact in relation to their shape and geography, and to use mathematical compactness scores where appropriate;"

- "to examine the use of county boundaries where feasible;"

- "to explore concepts that, where feasible, keep districts wholly within a county in the more densely populated areas;"

- "to explore concepts that, where feasible, keep cities whole while also considering the impermanent and changing nature of municipal boundaries;" and

- "to examine the use of existing geographic boundaries where feasible. Specifically railways, interstates, federal and state highways, and large water bodies such as those that were deemed to be easily recognizable and readily ascertainable by Florida's Supreme Court."

79.    Ferrin and other Committee staff followed the criteria outlined in the Directives Memo when drawing maps, and no other criteria.

80.    In particular, the Senate's mapmaker stated that when drawing maps, the Senate did *not* in any way attempt to :

- Favor or disfavor a political party;

- Favor or disfavor an incumbent;

- Preserve the cores of pre-existing districts;

- Rely on metropolitan statistical areas (MSAs);

- Rely on unincorporated places like census-designated places (CDPs);

- Keep communities of interest together or separate communities that have diverging interests;

- Connect population centers within a region; or

- Cross a particular county line.

81.    To draw districts, Committee staff started with a blank map of the state

and implemented the Committee's directives. They performed functional analyses of protected districts to make conclusions about whether draft protected districts continued to perform for a protected minority group.

82.     The Senate had a goal in redrawing District 19 to avoid diminishing Black voters' ability-to-elect.

83.     The Senate believed, and still believes, that it is important for the state to comply with the non-diminishment requirement.

### 3. *Workshopping the Enacted Plan in Committee*

84.     The Select Subcommittee on Legislative Reapportionment (the "Subcommittee") convened for the first time on **November 17, 2021**, to workshop four draft plans Ferrin presented.

85.     All four plans (8010, 8012, 8014, and 8016) featured a configuration for the Protected District similar to the eventual Enacted Plan, grouping Black population centers in Tampa and St. Petersburg, crossing the Bay to do so.

86.     At that meeting, Sen. Randolph Bracy, a Black senator from Orlando, asked Ferrin why the Protected District crossed the Bay in the staff-drawn plans, "when it didn't seem necessary; we can still comply with all the requirements?"

87.     Ferrin responded: "That was to comply with the Tier One non-diminishment standards."

88.     Sen. Bracy followed up, "could it still be done without violating the non-diminishment requirement?"

89.     After Ferrin replied that he hadn't reviewed the statistics for that, Sen.

Bracy asked him to look into it, and Ferrin confirmed he would.

90.    At the same meeting, Nicholas Warren appeared in the Subcommittee to speak about a proposed redistricting plan he submitted as a private citizen, P000S0042 or Plan 42, which altered six discrete districts from the staff-drawn plans.

91.    Warren told the Subcommittee that Plan 42 "tried to solve . . . one issue with Tier Two compliance which is in Tampa Bay, and seeks to avoid having a district that crosses Tampa Bay." He cited Plan 42's improvements to compactness, the number of cities and counties split, and geographic-boundary utilization, and concluded:

> Whereas maybe last decade it wasn't possible to draw a district wholly in Hillsborough that maintained that ability and didn't diminish, I think the statistics bear out that it is now possible and the key statistics in that functional analysis are actually all comparable or higher than the statistics in the Benchmark District, including: the Black and Hispanic share of registered voters; the Black and Hispanic share of Democratic primary electorate in 2020 and in 2018; the Hispanic share of registered Dems; and the Black share of registered Dems, which only differs from the benchmark by two-tenths of one percentage point.

92.    Sen. Bracy and Ferrin had at least one subsequent private conversation following the meeting, during which Sen. Bracy asked questions about the functional analysis for Black-performing districts. Sen. Bracy requested Committee staff draw a draft map including a Protected District which did *not* cross Tampa Bay. And Committee staff told Sen. Bracy they would have that map ready when the legislative session began in January 2022.

93.    Ferrin never drew a plan without a district that crossed Tampa Bay, nor did he ever conduct a functional analysis on any such alternative configuration for the

Protected District.

94.    After the November 17, 2021 meeting, Committee staff took the initial draft maps and sought to make improvements on their compliance with Tier Two metrics (compactness and respect for major political and geographic boundaries).

95.    This yielded four new staff-drawn maps (8026, 8028, 8030, and 8034), which the Subcommittee workshopped on **November 29, 2021**.

96.    All four plans made small changes to the initial four plans, and all four featured a configuration for the Protected District that crossed the Bay, similar to the Enacted Plan.

97.    Following the November 29 meeting, Committee staff again sought to make improvements to the draft plans' Tier Two metrics, yielding a final round of draft plans.

98.    The Subcommittee held its final meeting on **January 10, 2022**, when it recommended advancing what would become Plan 8058[4] to the full Committee.

99.    At this meeting, Sen. Bracy referenced his earlier request for staff to look at the treatment of the Tampa Bay area, saying, "I talked to staff about the Tampa Bay area and . . . I wanted to see if you could explain the reason for crossing the Bay in all of the configurations we see, as opposed to not crossing the Bay in that Tampa-area seat."

100.    Subcommittee    Chair    Sen.    Danny    Burgess    responded,    "My

---

[4]    The *map* the Subcommittee approved was identical to Plan 8058; only the district *numbers* changed.

27

understanding is that staff did look at those options, however, there was a significant number of potential voters who would be disenfranchised under not crossing the Bay, and so in order to avoid that potential diminishment there was just no way to make that work practically."

101.    Sen. Bracy pressed Ferrin on the impact of the alternative configuration on the minority functional analysis and Black voters' share of the relevant statistics, asking: "How much it would have diminished the ability for Black voters to vote for their candidate of their choice . . . . I guess I'm trying to measure how much diminishment that would have been?"

102.    Ferrin concluded:

> So the way we've drawn it, the Black voters within D[istrict] 19[5] are able to effectively control the Democratic primary in a district that performs for Democrats. If we look at drawing it differently, I think we're looking at a situation where the Black voters would not be able to control the primary numerically, not make up a majority of the primary turnout and that would potentially constitute diminishment.

103.    Ferrin also stated:

> I think in looking at a configuration like that, it was likely that diminishment would occur based on the fact that in order to draw a minority district solely within Hillsborough County, it begins to look like a fairly spidery, non-compact configuration there, it does some damage to the surrounding districts and their metrics as well.

104.    This conclusion was based not on any attempt to draw the Protected District wholly within Hillsborough County, but was rather Ferrin's supposition of

---

[5]    The Protected District was numbered 19 in the Benchmark Plan and in drafts maps.

what a hypothetical district would look like, imagining in his mind how a district there might be drawn, based on his experience with the redistricting software and the layers within it that show population density by race and ethnicity.

105.    On **January 13, 2022**, the Reapportionment Committee considered what became Plan 8058 (after district renumbering) and approved it by a 10-2 vote.

### 4. Passage of the Enacted Plan

106.    On **January 19, 2022**, the full Senate took up Plan 8058. Sen. Rodrigues explained the Committee's approach to drawing the map in each of the areas with a Tier One-protected district: "We started with a blank map, pulled in the demographics, and then drew until we had a Tier One-protected district."

107.    Sen. Rodrigues continued:

> Once we've identified the Tier One districts [by looking at which districts in the Benchmark Plan are protected from diminishment], we then start with a blank map, highlight the data we've received from the U.S. Census Bureau by race, and then the staff began drawing around the population distribution in order to ensure we had not diminished the opportunity for minorities to participate or elect a voter of their choice. . . . Once we highlighted the racial population, we began drawing from there."

108.    "Once we had assured that we were Tier One-compliant, which trumps all the other Tier Two metrics," Sen. Rodrigues explained, the Committee then took into consideration the Tier Two standards.

109.    The full Senate passed Plan 8058 as part of Senate Joint Resolution 100 (SJR 100) on **January 20, 2022**.

110.    There was more debate on Plan 8058's treatment of the Tampa Bay area

after the Senate sent its plan to the House of Representatives.

111.    On **February 1, 2022**, the House took up SJR 100, including Plan 8058.

112.    Teeing up the joint resolution on the House floor, Speaker Chris Sprowls noted that House Redistricting Committee Chair Rep. Tom Leek would introduce and explain SJR 100, and then "you will then be able to ask questions about the Senate map with the understanding, members, that the Senate map was created by the Florida Senate, at their direction."

113.    But when Rep. Fentrice Driskell, a Black representative from Tampa, attempted to ask Rep. Leek whether certain districts in Plan 8058 had low compactness scores to achieve Tier One compliance, Rep. Leek responded, "Those questions were more appropriately directed to the Senate."

114.    Rep. Leek went on, "I can't answer the type of questions on the detail of the Senate map. I can give you the statistical data which is in the packet that you have."

115.    The following day, **February 2, 2022**, the House passed SJR 100, including Plan 8058 along with the House's plan for its own chamber.

116.    Rep. Andrew Learned of Brandon objected to District 16, explaining, "It is splitting part of eastern Hillsborough County and putting it in with downtown St. Petersburg," and commented on the lengthy amount of time it takes to drive between those two areas.

117.    Rep. Learned continued: "We're doing it because we say it's contiguous across water, which is a concept that I understand makes sense mathematically in a

formula, but it doesn't make sense to anyone who actually lives there. Crossing the Bay is a problem. It means that people will be underrepresented."

118.    Debating a similarly configured congressional district, Rep. Learned reiterated the same point: "St. Petersburg and Tampa are two different cities. This idea that water makes it contiguous and satisfies a math formula is absurd. Manatees do not vote."

119.    The House passed SJR 100 by a 77-39 vote.

120.    On **February 3, 2022**, the Senate passed the final version of SJR 100, with Plan 8058 combined with the plan for the House.

### E.  Direct Evidence of Racial Predominance

121.    The legislative record establishes "relevant state actor[]s[']' express acknowledgement[s] that race played a role in the drawing of district lines," crossing the threshold from "consciousness" to "predominance." *Alexander*, 602 U.S. at 8.

122.    The Senate considered Benchmark District 19 a "Tier One-protected district" under the non-diminishment standard, meaning "Black voters' ability to elect candidates of choice could not be diminished from their ability that existed in Benchmark District 19."

123.    Walking through the Senate's first draft maps, Ferrin introduced the Protected District as "an effective minority district protected under Tier-One," noting its BVAP. Sen. Rodrigues used the same language when the committee took up what would become the Enacted Plan.

124.    On the Senate floor, Rodrigues explained the race-predominant method

for drawing Tier One-protected districts like District 16:

> So once we've identified the Tier One districts, we then start with
> a blank map, highlight the data we've received from the U.S.
> Census Bureau by race, and then the staff began drawing around
> the population distribution in order to ensure we had not
> diminished the opportunity for minorities to participate or elect
> a voter of their choice. . . . Once we highlighted the racial
> population, we began drawing from there.

125.    The reasons the Senate did *not* draw—or even try to draw—the Protected

District wholly within Hillsborough County were that doing so could (1) potentially

diminish Black voters' ability-to-elect in either the Pinellas County portion of the

Benchmark District, the Protected District as a whole, or both; and (2) possibly require

drawing a spidery, noncompact district with tentacles and appendages.

126.    Inversely, the reason the Senate drew the Protected District to connect

portions of Hillsborough and Pinellas Counties was because it believed doing so was

necessary to avoid diminishing Black voters' ability-to-elect. In other words, "'[r]ace

was the criterion that, in the State's view, could not be compromised' in the drawing

of district lines." *Alexander*, 602 U.S. at 7–8 (quoting *Hunt*, 517 U.S. at 907).

127.    Legislators and staff expressly acknowledged that District 16 deviated

from traditional race-neutral criteria due to racial considerations. When Sen. Bracy

first asked why the Protected District crossed Tampa Bay, despite it apparently not

being necessary for it to do so, Ferrin replied simply: "That was to comply with the

Tier One non-diminishment standards."

128.    Later in the process, Sen. Bracy again asked why the Protected District

crossed the Bay. Burgess's answer pointed to the race-based non-diminishment

requirement: "there were a significant number of voters who would be disenfranchised under not crossing the Bay."

129.    Ferrin agreed: "If we look at drawing it differently, I think we're looking at a situation where the Black voters would not be able to control the primary numerically . . . and that would potentially constitute diminishment."

130.    At the final committee meeting, Rodrigues explained his view of why the Protected District "includes the minority populations of St. Petersburg and Tampa:" "[t]o ensure this configuration does not result in the denial or abridgement of the equal opportunity to participate in the political process."

131.    This view was shared by other Committee members. For example, Sen. Kelli Stargel (a member of both the Committee and Subcommittee) believed the Benchmark District was created to guarantee Black representation in the Senate, believed the Senate was required to maintain the district as such, and considered it important to do so.

132.    The explanations the Senate gave at the time for why it drew District 16 as it did all point to a single reason: race. The Legislature's stated predominant goal in drawing District 16 was to avoid diminishing Black voters' ability-to-elect. At no point did the Legislature consider viable, readily available options that would have accomplished these anti-diminishment goals while avoiding drawing the district predominantly based on race.

133.    Likewise, the Senate pointed to race when explaining why it did *not* endeavor to subordinate race-neutral criteria to a lesser extent (by, for example,

respecting the "major geographic boundary" of Tampa Bay, the "major political
boundary" of the Hillsborough-Pinellas County line, and the St. Petersburg city
limits).

### F. Circumstantial Evidence of Racial Predominance

134.    Besides the direct evidence of racial predominance, "circumstantial
evidence of [the] district[s'] shape and demographics" point to racial predominance as
well. *Miller*, 515 U.S. at 916.

135.    District 16 is noncompact, consisting of two distinct areas of land
separated by the largest geographic feature in the region—Tampa Bay. No bridge
connects these two pieces directly; it is impossible to drive or walk from one part of
the district to another without passing through another district. The district traverses
the major geographic feature that defines the region to group together far-flung Black
residents.

136.    District 16 splits political subdivisions along racial lines: it splits St.
Petersburg unnecessarily, contrary to the Senate's directive that staff explore concepts
that "keep cities whole." It splits Pinellas County into more districts than necessary
and prevents Hillsborough from hosting a second district entirely within it, contrary to
the directive to "keep districts wholly within a county in the more densely populated
areas."

137.    The division of counties and cities is not race-blind, but rather
accomplished along racial lines. Predominantly Black areas of St. Petersburg and
Pinellas County are assigned to District 16, with whiter areas assigned to the adjacent

District 18. In Hillsborough, the dividing line also tracks racial populations. In both counties, the district boundary exhibits an extraordinary statistical pattern whereby more-Black areas are consistently placed inside District 16 and less-Black areas are excluded from it; the probability of this consistent racial pattern if race were *not* driving the line-drawing decisions is exceedingly small.

138.    This pattern is even more pronounced when one compares the Enacted Plan to the Benchmark Plan: whiter areas of the Benchmark District in Pinellas County were excised from District 16 to even more closely align the district border with racial populations.

139.    Additional circumstantial evidence of racial predominance comes from Plaintiffs' three alternative maps, drawn by Dr. Cory McCartan, which achieve the Senate's interest in avoiding diminishment in District 16 while employing race in a much more tailored fashion. Employing the same directives that Committee staff purported to follow, McCartan drew plans that feature a Protected District sitting compactly on one side of Tampa Bay, wholly within Hillsborough County, rather than connecting the region's two far-flung Black population centers separated by miles of open water into a single district. McCartan's plans eliminate the unnecessary split of Pinellas County and unite all of St. Petersburg in a compact, naturally occurring district at the southern end of the peninsula—satisfying the Senate's own race-neutral directives to, where feasible, use county boundaries, keep districts wholly within a county in more densely populated areas, and keep cites whole:



140. Rather than carve the region along racial lines, McCartan "only consulted racial demographic data to the extent required to ensure that Black voters' ability to elect representatives of their choice was not diminished." Rather than picking major roads that tracked a desired racial division of St. Petersburg, or connecting Tampa and St. Petersburg's Black communities by tracking the highways that lie between them, McCartan followed and respected major boundaries irrespective of race. One notable result of McCartan's approach is to *double* the Black population in adjacent District 18. McCartan's approach to redrawing District 16 is consistent with

how the Florida Legislature has drawn other areas of the state.[6]

141.   In sum, both direct and circumstantial evidence demonstrate race predominated in the Senate's design of District 16.

### G. Remedy

142.   In 2022, Florida's legislative redistricting plans were adopted by the Legislature on February 3 and filed with the Secretary of State on February 16. SJR 100, 2022 Leg., Reg. Sess. (Fla. 2022). The Florida Supreme Court issued its decision in the automatic review on March 3, 2022. *In re Sen. Joint Res. of Legis. Apportionment 100*, 334 So. 3d 1282 (Fla. 2022).

143.   Also in 2022, Florida's congressional map was not finalized until April 22. Laws of Fla. ch. 2022-265, at 97.

144.   The Secretary of State's position is that, if a remedial Senate map can be finalized by April 1, 2026, that will ensure the Department of State and local supervisors of elections have enough time to prepare for the 2026 regular elections. The Secretary considers April 1 a "safe harbor deadline" with respect to a remedial plan.

145.   For its part, the Senate is not aware of any problems in the 2022 election

---

[6]   Defendants attack Plaintiffs' alternative plans, and the general concept of the Protected District sitting compactly in Hillsborough County, as a partisan gerrymander to bolster Democrats' chances in neighboring District 18. This argument fails for multiple reasons. ***First***, Dr. McCartan did not consider partisanship and was not even aware of the partisan results of his plans, outside confirming that Black voting strength was not diminished in District 16 using the same functional analysis data as the Senate. ***Second***, as discussed further below, the Senate explained why it rejected the Hillsborough-only configuration on the record during the legislative process. Fear of adopting a Democratic gerrymander was not the reason.

based on the amount of time between March 3 (when the Enacted Plan was finalized by the Florida Supreme Court) and the November election date. The Senate also believes local election officials would be able to conduct the 2026 elections as they conducted the 2022 elections if a remedial plan were in place by April 22—the same date Florida's congressional map was signed into law in 2022.

### H. Laches

146. The Enacted Plan was passed on February 3, 2022. Senators elected from the Enacted Plan took office upon election in November 2022. Fla. Const. art. III, § 15(d). District 16 was last on the ballot in 2022 and will next be up in 2026. *Id.* art. III, § 15(a).

147. Plaintiffs filed this case on April 10, 2024.

148. The only way in which the Senate has been prejudiced by any delay on Plaintiffs' part in bringing this suit is that Mr. Ferrin's memory of the events at issue would have been fresher had the lawsuit been brought earlier.

## IV. CONCLUSIONS OF LAW

### A. Plaintiffs have standing to sue.

All three Plaintiffs have standing to challenge District 16 because they reside there. *Hays*, 515 U.S. at 744–45. Their injuries are traceable to Defendants' enforcement of the Enacted Plan and redressable by this Court.

### B. District 16 fails strict scrutiny because it is not narrowly tailored.

Because the facts demonstrate that race predominated in the design of District 16, it must survive strict scrutiny. *See Cooper*, 581 U.S. at 292. Defendants bear the

burden to prove that the use of race in the design of District 16 was narrowly tailored to the state's asserted interest in complying with the non-diminishment requirement. *Id*. Evidence to be presented at trial will show that Defendants come up short. As a result, the Court need not decide whether Defendants' asserted interest in complying with the Florida Constitution's non-diminishment provision is a compelling interest.[7]

### 1. The Senate's use of race fails to clear the Constitution's "limited degree of leeway".

When a state invokes the VRA or a state analog to justify the use of race-based districting, the narrow tailoring requirement gives legislatures "breathing room," *Cooper*, 581 U.S. at 293 (quoting *Bethune-Hill*, 580 U.S. at 196), to comply with the statute's requirements. But that breathing room only affords States a "limited degree of leeway," *Vera*, 517 U.S. at 977. To satisfy narrow tailoring, the state must still show "that it had 'a strong basis in evidence' for concluding that the statute required its action"—*i.e.*, "'good reasons' to think that it would transgress the Act if it did not draw race-based district lines." *Cooper*, 581 U.S. at 292–93 (quoting *ALBC I*, 575 U.S. at 278). This requires "evidence or analysis supporting [the] claim that the VRA required" the race-based measures, "much more" than "uncritical" assumptions and "generalizations." *Wis. Legislature*, 595 U.S. at 403–04.

Even with the breathing room afforded to the State, Defendants fail to meet their burden of proving that District 16 is narrowly tailored in its use of race. The

---

[7] If the Court decides to reach the issue, Plaintiffs explain further in Part E, below, that compliance with the Florida Constitution provides a compelling interest.

Senate could have achieved its compelling interest in complying with Tier One's non-diminishment standard without subordinating traditional race-neutral redistricting criteria as dramatically as it did. Rather than exploring obvious viable options, the Senate was fixated on an assumed need to connect Black population centers from Tampa to St. Petersburg, split Pinellas County and St. Petersburg along racial lines, and cross Tampa Bay—the largest geographic feature in the region—to avoid diminishment. The Senate did so without presenting any evidence or conducting any analysis that compliance with non-diminishment actually required such dramatic violation to so many race-neutral redistricting criteria.

And when multiple sources alerted the Senate that Tier-One-compliant districts could be drawn without subordinating those criteria at all—from legislators during the process, proposals from the most recent cycle, and public submissions—the Senate dismissed these proposals out of hand. Rather than investigate the possibility of more closely aligning District 16 with the region's political and geographical boundaries, the Senate relied on vague and indiscriminate speculation that grouping Black voters from two far-flung cities together was necessary to comply with the non-diminishment requirement. The Senate's reasoning fails to clear the "limited degree of leeway" the Constitution affords. *ALBC II*, 231 F. Supp. 3d at 1063 (quoting *Vera*, 517 U.S. at 977).

### 2. *The Senate refused to appropriately investigate a more tailored use of race.*

Despite multiple requests by legislators and the public to explore district lines that did not cross the Bay, the Senate made no attempt to investigate whether doing so was possible. On at least three occasions, Senator Randolph Bracy questioned

Senate mapmakers, requesting that they attempt to draw the Hillsborough-only version or provide analyses to show they could not. Legislators in the House asked similar questions when that body voted to approve the Enacted Plan. During the 2015 redistricting process, Senators proposed maps that stayed on the Tampa side of the Bay as well. And Nicholas Warren—acting then as a private citizen—submitted a proposal that did not cross the Bay. In response, the Senate's mapmaker Jay Ferrin speculated that drawing a Hillsborough-only district "could" require drawing "a fairly spidery, non-compact configuration." But Ferrin did not actually draw any Hillsborough-only options, performed no actual functional analysis of a Hillsborough-only district, and based his conclusions on only his "estimation" of "the hypothetical" district he imagined might have to be drawn, which he thought "might need" "tentacles and appendages." The Senate lacked any basis in evidence—let alone a strong one—to conclude that drawing District 16 in the way that it did was required to comply with the non-diminishment requirement. Indeed, as Plaintiffs' alternative plans show, if the Senate had complied with Senator Bracy's request, it would have easily concluded that it was possible to draw a Hillsborough-only district while also avoiding diminishment.

These revelations show that the Senate could and should have done more to investigate whether a Hillsborough-only district could avoid diminishment while narrowly tailoring the use of race to that purpose. In an attempt to distract from this straightforward failure, Defendants craft a post-hoc narrative that the Senate rejected a Hillsborough-only district to avoid an alleged taint of partisan influence from

Warren. But as the Northern District explained when it limited the scope of Warren's deposition, "the private motivations of an outside map-drawer, unknown to the legislature," cannot "be imputed to the legislature." *Nord Hodges v. Passidomo*, No. 4:24-mc-139, 2024 WL 4810385, at *3 (N.D. Fla. Nov. 15, 2024) "Whether his map provided a valid alternative configuration depends on what the legislature knew, believed, and intended at the time, not Warren." *Id.* at *4.

Defendants have presented no evidence and can elicit none at trial to show that *at the time of redistricting* the Senate actually rejected the concept of a Hillsborough-only configuration on the basis of partisan influence.[8] They offer only private messages between Warren and individual legislative staff and another private citizen, but offer no indication that the messages (and the vague specter of partisanship they allegedly conjure) actually played a part in the Senate's decision-making. To the contrary, the consistent and sole justification the Senate provided for drawing District 16 to cross the Bay was to avoid diminishing Black voting power. On January 10, 2021, more than one month after Warren submitted his proposed map, Senator Bracy asked whether District 16 could be drawn to avoid crossing the Bay. Senator Burgess and mapmaker Jay Ferrin stated that it could not be done because of the Florida Constitution's non-diminishment requirement. There was no mention of Warren or his alleged partisan motivations.

---

[8]    In fact, no evidence even indicates that the Senate was aware of any partisan affiliation Warren might have had. The memorandum by Senator Rodrigues does not mention Warren's partisan affiliation, only his employment at the ACLU of Florida, a non-partisan organization.

Moreover, in Florida, it is drawing districts with partisan *intent*—not merely effects—that is unconstitutional. *Apportionment I*, 83 So. 3d at 617, 642 (holding "although effect can be an objective indicator of intent, mere effect will not necessarily invalidate a plan" and recognizing that "redistricting will inherently have political consequences, regardless of the intent used in drawing the lines"). Given racial polarization in voting, it is to be expected that curing the Senate's unconstitutional racial gerrymandering might have partisan impacts. *See. e.g.*, *Jacksonville II*, 2022 WL 17751416, at *15 (rejecting defendant city's proposed remedy and finding its "failure to unpack [majority-Black districts] stems from the high priority the City placed on protecting incumbents and candidates . . . and relatedly, maintaining the Council's partisan balance"). And in any event, separate from Warren, multiple legislators and past map proposals independently pointed the Senate to the viability of redrawing the Protected District to avoid diminishment while not crossing the Bay and subordinating other race-neutral criteria. Defendants have not shown and cannot show at trial that any alleged improper influence by Warren extended to these other sources or that a Hillsborough-only district constitutes a partisan gerrymander under Florida law.

### 3.  *The Senate's other justification is legally erroneous.*

The Senate offered another explanation why a cross-Bay district was required: it claimed to be concerned about the "potential" that drawing a Hillsborough-only Protected District would diminish the voting power of Black voters in *Pinellas County*, which (they reckoned) "could" violate Tier One, because Pinellas residents "may feel as though their opportunity was diminished if they were taken out of" the district. For

one, those tentative suppositions are not enough to justify the use of race-based districts. *See Wis. Legislature*, 595 U.S. at 403–04 (holding that it is not enough to "conclude only that the VRA *might* support race-based districting;" the state must have "'good reasons' for thinking that the Act *demanded* such steps").

For another, the Legislature's own past actions and the Florida Supreme Court's decisions reflect that Tier One's anti-diminishment requirement does not operate on a county-by-county basis as the Senate suggests. For example, the Senate itself agreed to remove the Manatee County portion of the Protect District in 2015 without claiming that Manatee Black voters would have their votes diminished. The Florida Supreme Court has reaffirmed that the non-diminishment requirement applies to districts, not portions of counties that make up districts. *Apportionment I*, 83 So. 3d at 656–57, 665–66, 673–76; *Apportionment II*, 89 So. 3d at 882–83, 887, 891. The Senate's decision to draw the Protected Districts was thus based on an interpretation of the non-diminishment standard that Florida courts previously "rejected" and thus "fell short of [judicial] standards." *Wis. Legislature*, 595 U.S. at 403–04; *cf. Miller*, 515 U.S. at 921 (rejecting race-based redistricting plan since it "was not required by the Act under a correct reading of the statute").

Because Defendants have failed to meet their strict-scrutiny burden, this Court should enjoin the use of the enacted District 16. Doing so ensures that the Senate's use of race in complying with Florida's non-diminishment provision accords with federal equal-protection rights and is properly bounded by the limits of the U.S. Constitution.

**C. Plaintiffs' claims are not barred by laches.**

The Senate has not met its burden to prove its laches affirmative defense. Plaintiffs brought this case just over two years after the Enacted Plan was passed, and a year and a half after the first election at which it was implemented. Assuming a four-year statute of limitations ran from either the Enacted Plan's enactment or implementation, Plaintiffs filed suit well within the period.[9] There is therefore a "strong presumption" of timeliness, *Black Warrior Riverkeeper*, 781 F.3d at 1286 (quotation omitted), which the Senate fails to rebut.

That Plaintiffs did not inexcusably delay in filing suit is further supported by the timing of District 16's elections. It would have been impossible for Plaintiffs to file suit in time to secure relief in the last election, in 2022. It was therefore reasonable that Plaintiffs would aim to secure relief by the next election, in 2026. *See Clarke v. Wis. Elections Comm'n*, 998 N.W.2d 370, 391 (Wis. 2023) (finding no unreasonable delay in plaintiffs' decision "to request relief in time for . . . the soonest elections for which relief could be granted" even where plaintiffs filed suit a year and a half after the districts were adopted); *Kelley v. Bennett*, 96 F. Supp. 2d 1301, 1305 (M.D. Ala.) (finding "no cognizable delay" because plaintiffs could not have filed in time to secure relief for the first election after the map's adoption), *vacated on other grounds sub nom. Sinkfield v. Kelley*, 531 U.S. 28 (2000).

Moreover, to Plaintiffs' knowledge, no court has found that a redistricting case's

---

[9]    If the constitutional violation is a continuing one, the statute of limitations would not run as long as the Enacted Plan is in effect. Regardless, the statute has not yet expired.

request for a permanent injunction was laches-barred when it was filed as quickly as Plaintiffs' suit. *See, e.g.*, *Blackmoon v. Charles Mix Cnty.*, 386 F. Supp. 2d 1108, 1115 (D.S.D. 2005) (suit filed three years after refusal to redistrict); *Kelley*, 96 F. Supp. 2d at 1305 (suit filed four years after both map's adoption and *Shaw*). In contrast, courts uphold laches defenses in redistricting cases filed late in a decade, when the next census is around the corner. *See, e.g.*, *Sanders v. Dooly Cnty.*, 245 F.3d 1289 (11th Cir. 2001) (in suit filed eight years after census, affirming district court's determination that request for injunctive relief was laches-barred, but reversing with respect to declaratory relief); *Chestnut v. Merrill*, 377 F. Supp. 3d 1308 (N.D. Ala 2019) (suit filed eight years after census was laches-barred); *Fouts v. Harris*, 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999) (same), *aff'd sub nom. Chandler v. Harris*, 529 U.S. 1084 (2000) (mem.).

### D. The constitutional violation should be remedied for the 2026 elections.

"[I]ndividuals . . . whose constitutional rights have been injured by improper racial gerrymandering have suffered significant harm. Those citizens are entitled to vote as soon as possible for their representatives under a constitutional apportionment plan." *McCrory*, 159 F. Supp. 3d at 627 (cleaned up).

Here, the Court should exercise its equitable power and impose a post-trial remedial-phase schedule to ensure a constitutional map is implemented in the 2026 elections. *North Carolina v. Covington* (*Covington IV*), 585 U.S. 969, 976 (2018) (finding district court properly retained jurisdiction over post-trial remedial phase).[10] This

---

[10]    *See also, e.g., McCrory*, 159 F. Supp. 3d at 627 (permanently enjoining map and giving legislature

Court has "its own duty to cure illegally gerrymandered districts," *id.* at 977, and thus must assess any proposed legislative remedy "to ensure that [the] remedy 'so far as possible eliminate[s] the discriminatory effects of the past as well as bar[s] like discrimination in the future.'" *Covington v. North Carolina* (*Covington III*), 283 F. Supp. 3d 410, 424 (M.D.N.C. 2018) (quoting *Louisiana v. United States*, 380 U.S. 145, 154 (1965)), *aff'd in part, rev'd in part*, 585 U.S. 969. The Court should therefore set a remedial schedule that ensures a court-approved remedial plan is in place by April 2026 (the Secretary of State's "safe harbor" deadline for election administrators).[11]

### E. The Court need not address the Secretary's constitutional arguments.

Finally, Plaintiffs address two constitutional questions the Secretary (but not the Senate) attempts to insert into this case. Both arguments share a theme: that the Fair Districts Amendment's non-diminishment requirement is incompatible with the Equal Protection Clause.[12] Federal courts must be cautious, however, when asked to strike down state election laws beyond specific applications where state and federal laws are

---

14 days to propose remedy); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1380–81 (N.D. Ga. 2023) (permanently enjoining map, giving legislature 43 days to propose remedy, and retaining jurisdiction "for oversight and further remedial proceedings, if necessary"), *appeal filed*, No. 23-13914 (11th Cir. Nov. 28, 2023); *Milligan v. Allen*, No. 2:21-cv-1530 (N.D. Ala. June 20, 2023), ECF No. 168 (after Supreme Court affirmed preliminary injunction, giving legislature 31 days to propose remedy).

[11]    In the unlikely event they cannot secure effective relief for 2026, Plaintiffs will renew the request for a special election pleaded in their Complaint, so they and their neighbors do not have to wait until 2030 to live and vote under constitutional lines.

[12]    The Secretary pressed similar arguments attacking the facial constitutionality of the Fair Districts Amendments at the Florida Supreme Court in *Black Voters Matter Capacity Building Institute v. Byrd*, No. SC23-1671. If that court changes the existing interpretation of the Fair Districts Amendments, the Parties can provide supplemental briefing on that decision's impact on this case. If necessary, the Parties can also provide supplemental briefing on the anticipated U.S. Supreme Court decision in *Louisiana v. Callais*, No. 24-109.

shown to conflict. *See Shelby Cnty.*, 570 U.S. at 543 ("Outside the strictures of the Supremacy Clause, States retain broad autonomy in structuring their governments and pursuing legislative objectives."). The Court need not resolve either question to grant Plaintiffs' requested relief. If it must, the Court can resolve both questions in Plaintiffs' favor.

### 1. The Secretary lacks standing to make these arguments.

As a threshold matter, both Defendants are jurisdictionally barred from asserting that the Fair Districts Amendment is unconstitutional. Under Florida's public official standing doctrine, public officers like the Secretary lack standing both to bring suits challenging the constitutionality of a "constitutional or statutory duty, or the means by which it is to be carried out." *Dep't of Revenue v. Markham*, 396 So. 2d 1120, 1121 (Fla. 1981), and to "defend [their] nonperformance" of such a duty by challenging the same, *Crossings at Fleming Island CDD v. Echeverri*, 991 So. 2d 793, 794 (Fla. 2008); *see also State ex rel. Atl. Coast Line R.R. v. State Bd. of Equalizers*, 94 So. 681 (Fla. 1922) (establishing the doctrine). The doctrine sweeps broadly to reach not only "those public officials charged with a duty under the challenged law" but also "public officials whose duties are 'affected' by the challenged law." *Sch. Dist. of Escambia Cnty. v. Santa Rosa Dunes Owners Ass'n*, 274 So. 3d 492, 495 (Fla. 1st DCA 2019).

As public, non-judicial officers, Defendants are bound by the public official standing doctrine. *Atl. Coast Line*, 94 So. at 682 (explaining that the doctrine "involves the right of a branch of government, other than the judiciary" to determine a law's constitutionality). As Florida's chief elections officer, the Secretary has a duty to

implement the state's legislative redistricting plans in accordance with the Florida Constitution, including the Fair Districts Amendment, meaning he has both a duty to carry it out, and has other duties which are affected by it. The Secretary's arguments that the non-diminishment provision violates the Equal Protection Clause fall squarely within the public official standing doctrine, and thus he is barred from raising them. *Black Voters Matter Capacity Bldg. Inst. v. Byrd*, No. 2022-CA-666 (Fla. 2d Jud. Cir. Ct. Sep. 2, 2023), slip op. at 32–34 (holding the doctrine bars Secretary and Legislature from arguing the non-diminishment provision is unconstitutional), *rev'd on other grounds,* 375 So. 3d 335 (Fla. 1st DCA 2023), *review granted*, No. SC2023-1671 (Fla. Jan. 24, 2024). This is so even in this federal proceeding. *See Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663–64 (2019) (dismissing appeal because, in part, state defendant lacked standing under Virginia law to pursue appeal).

### 2. *Compliance with the non-diminishment requirement is a compelling interest.*

The Secretary argues that "[t]he race-based provisions of Florida's Fair Districts Amendments do not serve a compelling state interest." ECF No. 101 at 3. The Court need not decide this issue, just as the Supreme Court has consistently avoided doing, and as the Senate has proposed. ECF No. 101 at 2–3 (taking no position on whether complying with the Fair District Amendments is a compelling interest and arguing that District 16 survives narrow tailoring).

The compelling interest question will arise only if the Court finds racial predominance *but also* concludes that District 16 is narrowly tailored, which it is not.

Otherwise, it need not—and should not—address the compelling interest prong. *See, e,g,, Dames & Moore v. Regan*, 453 U.S. 654, 660 (1981) (discussing "the necessity to rest decision on the narrowest possible ground capable of deciding the case") (citing *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)). In an unbroken line of cases, the Supreme Court has assumed that compliance with the VRA is a compelling interest and rejected state maps as racial gerrymanders solely on narrow tailoring grounds. *See Cooper*, 581 U.S. at 292; *Shaw*, 517 U.S. at 899; *Vera*, 517 U.S. at 977–79; *Miller*, 515 U.S. at 921; *ALBC I*, 575 U.S. at 279; *Wis. Legislature*, 595 U.S. at 401; *Abbott*, 585 U.S. at 587. Here, Defendants likewise fail to show that District 16 is narrowly tailored in the use of race. The Court should not depart from consistent Supreme Court precedent.

Even if the Court reaches the compelling interest issue, the Florida Legislature has a compelling interest in complying with the Florida Constitution's non-diminishment requirement. Eight justices have agreed—not just assumed—that compliance with Section 5's non-diminishment provision is a compelling state interest. *LULAC*, 548 U.S. at 475 n.12, 485 n.2, 518 (concurrences). Even if such statements are dicta, the Eleventh Circuit has "consistently recognized that dicta from the Supreme Court is not something to be lightly cast aside," but rather is "of considerable persuasive value." *Batres-Garay v. U.S. Att'y Gen.*, 748 F. App'x 204, 212 (11th Cir. 2018) (quoting *F.E.B. Corp. v. United States*, 818 F.3d 681, 690 n.10 (11th Cir. 2016)). Because the Fair Districts Amendment's non-diminishment requirement codifies Section 5, *Apportionment I*, 83 So. 3d at 619–20, this Court should similarly conclude

that compliance with the Fair Districts Amendment's non-diminishment requirement is a compelling interest.

In fact, states have even more room to enact race-conscious measures to remedy discrimination than Congress does when it exercises federal "remedial" power over the states. "In any given state, the federal Constitution [] represents the floor for basic freedoms; the state constitution, the ceiling." *Traylor v. State*, 596 So. 2d 957, 962 (Fla. 1992); *accord Shelby Cnty.*, 570 U.S. at 543. The Supreme Court recognizes the limited scope of federal constitutional review of state law in many contexts. *See, e.g.*, *Smith v. Robbins*, 528 U.S. 259, 273 (2000) ("[E]stablished practice, rooted in federalism, of allowing the States wide discretion, subject to the minimum requirements of the Fourteenth Amendment, to experiment with solutions to difficult problems of policy"). This practice is rooted in humility; states can craft workable solutions to difficult practical problems of governance like redistricting, which can be evaluated "one at a time, as they come before" courts, and these solutions can often be "superior to, or at least as good as" a federally imposed solution. *Id.* at 275–76.

In keeping with this practice, the Supreme Court has specifically recognized the greater powers of states, compared to Congress, to protect minority representation in redistricting. *See Voinovich v. Quilter*, 507 U.S. 146, 156 (1993) ("[T]he federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law. But that does not mean that the State's powers are similarly limited. Quite the opposite is true." (citation omitted)). And other courts have upheld similar state voting laws against equal protection challenges. *Higginson v. Becerra*, 363

F. Supp. 3d 1118, 1128 (S.D. Cal. 2019) (California VRA), *aff'd*, 786 F. App'x 705 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 2807 (2020); *Portugal v. Franklin Cnty.*, 530 P.3d 994, 1011 (Wash. 2023) (Washington VRA), *cert. denied*, 144 S. Ct. 1343 (2024); *Clarke v. Town of Newburgh*, 226 N.Y.S.3d 310, 324 (N.Y. App. Div. 2025) (New York VRA).

State power stands in contrast to Congress when imposing a non-diminishment requirement on states, because Congress is limited to acting under a "positive grant of legislative power" from Section 5 of the Fourteenth Amendment. *See City of Boerne v. Flores*, 521 U.S. 507, 517 (1997); *see also id.* at 518 (listing cases upholding federal "measures protecting voting rights"). Federal statutes of this type must be "remedial" legislation that enforces the Fourteenth Amendment with "congruence and proportionality" to past violations of federal law. *See id.* at 519–20. The Supreme Court has imposed these requirements because federal intrusion into matters of local concern, like the church zoning dispute in *City of Boerne,* are "the most far-reaching . . . provisions" that "impose [their] requirements on the states." *Id.* at 516; *cf. Shelby Cnty.*, 570 U.S. at 545 (calling federal preclearance of state election laws an "extraordinary departure" from "traditional" federal-state relations). When portions of a federal statute are invalidated for exceeding the scope of federal legislative power, they cease to provide valid compelling interests. States are not so limited when choosing to voluntarily impose restrictions on their own legislatures. *See Voinovich*, 507 U.S. at 156. Like any duly enacted provision of the Florida Constitution, the non-diminishment requirement's specific applications are subject to federal judicial review

only when properly presented in actual controversies. *See, e.g.*, *Griffin v. N.C. Bd. of Elections*, --- F. Supp. 3d ---, No. 5:24-cv-731, 2025 WL 1292530, at *2, 13–14 (E.D.N.C. May 5, 2025) (ordering state election board to certify election despite contrary state court orders, because particular implementation of state recount procedures violated equal protection) (citing *Bush v. Gore*, 531 U.S. 98, 104–07 (2000)).

### 3. *A remedy can comport with both equal protection and non-diminishment.*

The Secretary asks the Court to opine on "whether a remedial plan, if one is required at the end of trial, satisfies the Equal Protection Clause of the Fourteenth Amendment." ECF No. 101 at 10. If the Secretary means that the Court "has a 'duty' to ensure that any remedy 'so far as possible eliminate[s] the discriminatory effects of the past as well as bar[s] like discrimination in the future[,]'" then Plaintiffs wholeheartedly agree. *Covington III*, 283 F. Supp. 3d at 424 (quoting *Louisiana*, 380 U.S. at 154). In ordering a remedial plan, the Court will be bound to follow all state constitutional requirements as long as they do not conflict with federal law, *GRACE, Inc. v. City of Miami* (*GRACE II*), 684 F. Supp. 3d 1285, 1320 (S.D. Fla. 2023) (quoting *White v. Weiser*, 412 U.S. 783, 795 (1973)), and must guard against any *new* federal violations, *McGhee v. Granville Cnty.*, 860 F.2d 110, 115 (4th Cir. 1988) (explaining a court must "consider whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights").

But the Secretary appears to go much further and argues that "the legislature cannot draw and Plaintiffs cannot seek any remedial map that includes a black-performing district in the Tampa-St. Petersburg-Clearwater Metropolitan Statistical

Area." ECF No. 101 at 3. That suggests the Secretary believes that the Equal Protection Clause precludes Florida from imposing *any* non-diminishment requirement. That is incorrect. Strict scrutiny applies only to districts drawn predominantly on the basis of race. As the Supreme Court recently reaffirmed, "[w]hen it comes to considering race in the context of districting, we have made clear that there is a difference 'between being aware of racial considerations and being motivated by them.'" *Milligan*, 599 U.S. at 30. As *Milligan* itself explains, a mapmaker's compliance with the VRA or other analogous statute does not itself show that race predominated in the redistricting process. *Id.* at 29–31 (race did not predominate even though "it was necessary for [mapmaker] to consider race" to meet VRA requirements).

The evidence Plaintiffs will introduce at trial demonstrates that numerous maps can be and have been drawn that include a Black-performing district within Hillsborough County without being drawn predominantly based on race. And while Plaintiffs disagree that District 16 of the Enacted Plan is such a district, both Defendants argue that it is. The fact that all parties agree it is possible to comply with the non-diminishment provision without running afoul of equal protection should resolve any hypothetical facial challenge to Article III, Section 21. This Court should decline the Secretary's invitation to render an advisory opinion on this hypothetical question not properly before it.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter judgment in their favor and: (1) declare Florida Senate District 16 to be unconstitutional in violation of the Fourteenth Amendment as a racial gerrymander; (2) permanently enjoin Defendants and their agents from calling, conducting, supervising, or certifying any elections under District 16; (3) enter a remedial decree that ensures Plaintiffs live and vote in constitutional districts as soon as practicable; and (4) award Plaintiffs reasonable attorneys' fees and costs of suit.

Respectfully submitted May 13, 2025,

*/s/ Caroline A. McNamara*

Nicholas L.V. Warren (FBN 1019018)
Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
dtilley@aclufl.org
cmcnamara@aclufl.org

James Michael Shaw, Jr. (FBN 677851)
Naomi Robertson (FBN 1032076)
**Butler Weihmuller Katz Craig LLP**
400 North Ashley Drive, Suite 2300
Tampa, FL 33602
(813) 281-1900
jshaw@butler.legal
nrobertson@butler.legal

David Chen*
Deborah N. Archer*
**Civil Rights & Racial Justice Clinic**
**Washington Square Legal Services**
245 Sullivan Street
New York, NY 10012
(212) 998-6473
davidchen@nyu.edu
deborah.archer@nyu.edu

* *Special admission*

*Counsel for Plaintiffs*