Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:24-cv-879


KETO NORD HODGES, et al.,

     Plaintiffs,

vs.

KATHLEEN PASSIDOMO, in her official
capacity as President of the Florida
Senate, et al.,

     Defendants.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ /




December 2, 2024
9:05 a.m.



VIDEOCONFERENCE DEPOSITION OF MARIA MATTHEWS


     Taken before JAY H. PILCHICK, Shorthand

Reporter and Notary Public in and for the State of

Florida at Large, pursuant to Notice of Taking

Deposition filed in the above cause.

Page 2

1

2    APPEARANCES:

3

         ACLU FOUNDATION OF FLORIDA
4        BY:  CAROLINE A. McNAMARA, ESQ.
         Attorneys for Plaintiffs.
5

6        HOLTZMAN VOGEL LAW FIRM
         BY:  MOHAMMAD JAZIL, ESQ.,
7        Attorneys for Defendants.

8

9    ALSO PRESENT:

10       ASHLEY DAVIS
         LEILA OBERSCHALL
11       NICHOLAS L. V. WARREN

12

13

14
                              INDEX
15

16   WITNESS                 DIRECT  CROSS

17
     MARIA MATTHEWS             4       -
18

19

20                       EXHIBITS

21
     Plaintiffs' Exhibit No. 1 through 15......... 118
22

23

24

25

Page 3

1    Thereupon, the following proceedings were had:

2            THE REPORTER:  The attorneys

3        participating in this deposition acknowledge

4        that I am not present with the witness and that

5        I will be reporting the proceedings and

6        administering the oath remotely.  This

7        arrangement is pursuant to the Florida Supreme

8        Court Administrative Order No. AOSC-20-16 (and

9        extended by AOSC-20-17).  The parties and

10        their counsel consent to this arrangement and

11        waive any objections to this manner of

12        reporting.

13            Counsel, please indicate your agreement by

14        stating your name and your agreement on the

15        record.

16            MS. McNAMARA:  Caroline McNamara.  I agree.

17            MR. JAZIL:  Mohammad Jazil.  I agree, with

18        one exception.  I am in the same room as the

19        witness.

20    Thereupon:

21                    MARIA MATTHEWS

22    Was called as a witness by the Plaintiffs and, after

23    having been first duly sworn, was examined and

24    testified as follows:

25

Page 4

1                    DIRECT EXAMINATION

2   BY MS. McNAMARA:

3        Q.   Now, you just stated your name for the

4   record, Miss Matthews.  My name is Caroline McNamara.

5   I am the attorney representing the plaintiffs in this

6   case, Keto Nord Hodges versus Albritton.  The Case

7   Number is 8:24-cv-879, in the Middle District of

8   Florida.

9             Is there anyone else in the room with you

10  about beside your counsel?

11       A.   No.

12       Q.   We have identified everyone who is here.

13  The deposition is a question and answer session; I

14  ask questions and you will answer them.  You

15  understand that?

16       A.   Yes.

17       Q.   And like we are in court, you are under

18  oath and you have to answer them truthfully.

19       A.   Yes.

20       Q.   We have a court reporter, so you understand

21  you will need to give verbal responses so that the

22  court reporter can record the words of your answer?

23       A.   Okay.

24       Q.   And I'll finish a question, pause for a

25  second before you answer a question so that we have a

1    clean record.

2         A.   Okay.

3         Q.   And if you don't understand a question, you

4    could let me know or ask me to clarify.  Does that

5    make sense?

6         A.   Yes.

7         Q.   And if you need to take a break, just let

8    me know; we can take a break.  I will try to take one

9    every--not regularly, but, you know, every 60, 90

10   minutes, or whatever winds up properly.

11        A.   Okay.

12        Q.   The only limit on that is if a question is

13   still pending, we can't break while a question is

14   pending, but once you answer--you can finish

15   answering, then we can take a break.

16        A.   Okay.

17        Q.   And you understand that you are under oath?

18        A.   Yes.

19        Q.   Are you on any medication or substances

20   today that might affect your ability to testify

21   truthfully?

22        A.   No.

23        Q.   Any other reason you wouldn't be able to

24   give your full and best testimony today?

25        A.   No.

1        Q.    Have you been deposed before?

2        A.    Yes.

3        Q.    Many times?

4        A.    Yes.

5        Q.    When you've been deposed before, has that

6    been as a worker representative mostly or--

7        A.    I don't know the number, but yes, I have.

8        Q.    When you've been deposed in an individual

9    capacity, is it in your individual capacity of the

10   job that you are in right now?

11       A.    Correct.

12       Q.    When was the last time you were deposed?

13       A.    I don't recall the exact time.

14       Q.    In 2024?

15       A.    Maybe.

16       Q.    It happens often that you don't necessarily

17   keep track of them all?

18       A.    No, it's not something I want to keep in my

19   memory.

20       Q.    Have you testified in court before?

21       A.    Yes.

22       Q.    Do you remember the last time you testified

23   in court?

24       A.    Same thing.  It would have been either in

25   court or being deposed.

Page 7

1      Q.    You have been designated today as the

2   corporate representative of the Florida Department of

3   State?

4      A.    Yes.

5          MS. McNAMARA:  I'm going to share my screen

6      to pull up the deposition notice.

7   BY MS. McNAMARA:

8      Q.    Can you see this Schedule A?  I'll start

9   off with the top page.  Do you see this document?

10     A.    Yes.

11     Q.    Are you familiar with it?

12     A.    Yes.

13     Q.    And this is today's deposition?

14     A.    Correct.

15     Q.    And we will scroll to page three, Schedule

16   A.  It lists the topics for today's deposition?

17     A.    Correct.

18     Q.    Are you familiar with these topics?

19     A.    Yes.

20     Q.    Are you prepared to testify to these topics

21   subject to, I understand, a few objections from your

22   counsel?

23     A.    Yes.

24     Q.    What did you do to prepare for the

25   deposition today?

Page 8

1      A.   I spoke with my attorney, I reviewed the

2  discovery documents and also some emails.

3            MS. McNAMARA:  Mr. Court Reporter, we will

4       mark the deposition notice as Exhibit 1.  Once

5       we are done, I'll send over PDF's of all the

6       exhibits that we use so they can be officially

7       marked.

8  BY MS. McNAMARA:

9      Q.   Did you meet with any employees of the

10  Department of State to prepare today?

11      A.   No.

12      Q.   Did you meet with anybody with the Florida

13  House to prepare for today?

14      A.   I'm sorry, can I go back to your first--

15  your prior question?

16      Q.   Yes.

17      A.   I spoke with my counsel, Mohammad Jazil,

18  and also the general counsel for the Department of

19  State.  So he is an employee of the state.

20      Q.   And who is the general counsel for the

21  Department of State?

22      A.   Joseph Van de Bogart.

23      Q.   Did you meet with anyone who is with the

24  Florida House of Representatives in your preparation

25  today?

1          A.    No.

2          Q.    And did you meet with anyone with the

3    Florida Senate in preparation for today?

4          A.    No.

5          Q.    Did you meet with any other state employees

6    outside of Department of State or the legislature?

7          A.    (Shakes head in the negative.)

8          Q.    Is that a no?

9          A.    Oh, I'm sorry.  No, I didn't.

10         Q.    Not that you met with the governor, but if

11   you had met with the governor, that would have been

12   someone else.

13              Just to clarify, you only met with your

14   legal team.

15              Did you review any documents in preparation

16   for today?

17         A.    The discovery documents and also the

18   email--a couple of emails.

19         Q.    The discovery documents, those are

20   documents that have been produced by at least one of

21   the parties in this lawsuit?

22         A.    Correct.  Those are requests for

23   admissions, interrogatories, disclosures.

24         Q.    You said you looked at some emails.  Can

25   you describe to me what those emails are?

Page 10

1        A.    Sure.   One email chain related to the

2   communication between the Department of State and the

3   Supervisors of Election 2022 relating to the map.

4        Q.    And that is one of the topics, so we can

5   discuss that material when we get to it.

6              Did you review any of the court filings in

7   this case?

8        A.    A few, but I wouldn't be able to recall.

9   Those weren't the primary things.  I was focusing on

10  the discovery documentation.

11       Q.    Like did you read through the Complaint?

12       A.    Not recently.

13       Q.    Have you attended any of the depositions

14  that have been held in this case?

15       A.    No.

16       Q.    Have you read any of the deposition

17  transcripts?

18       A.    No.

19       Q.    Or watched any videos of any depositions?

20       A.    No.

21       Q.    Do you have any documents in front of you

22  that you're using today?

23       A.    No.

24       Q.    Is there anyone else that you spoke with

25  about your deposition today?

Page 11

```
1        A.    Just telling staff that I would be away

2   from the office because I had a deposition today.

3        Q.    What is your job title?

4        A.    I'm the Director of the Florida Division of

5   Elections.

6        Q.    And how long have you been in that

7   position?

8        A.    Since January 2013.

9        Q.    And is that an appointed position?

10       A.    No, it's not appointed, but, I mean, there

11  is an approval process for that kind of high level

12  position.

13       Q.    Who selects you?

14       A.    The Department of State would be the one

15  that would select me.

16       Q.    And you have served under multiple

17  Secretaries of State?

18       A.    I have.

19       Q.    And continuously since 2013?

20       A.    Correct.

21       Q.    How many employees does the Division of

22  Elections have?

23       A.    We have over 75 full time and over 20 that

24  are additional that are OPS that can increase and

25  decrease at any time.
```

Page 12

1      Q.   What does OPS stand for?

2      A.   It's for temporary staff based on needs,

3   projects, things like that.

4      Q.   Are those staff, like do they work in a

5   different department and they get brought over to

6   yours or are they just someone who doesn't work for

7   the state and is hired temporarily?

8      A.   They are hired temporarily and they are

9   considered employees of the Department of State and

10   their term of employment can be indefinite.  Or if

11   it's project-oriented, it could be for a shorter time

12   frame.  But they work in the Division of Elections

13   solely.

14      Q.   Did the Division of Elections hire

15   temporary staff during 2024 for the election year?

16      A.   We already had plans.  And based on

17   workload we already had sufficient staff to cover,

18   you know, our election administration.

19      Q.   If, say, a special election gets called,

20   for example, there's an election called for

21   Congressional District 1 that's been called, do you

22   need to hire additional staff to prepare for that?

23      A.   No.  The primary onus is going to be on the

24   Supervisors of Elections in terms of their conducting

25   the election, while we coordinate a lot of state

Page 13

1    level activities.  What will happen is existing staff

2    may have to work additional hours to compensate for

3    some activities and things that are due after hours

4    or on weekends, like book closing periods, answer

5    phones.  Or on election day for statewide reporting

6    results, we'll be here until the county or counties,

7    however many there are, complete their initial

8    preliminary night reporting.  So with existing staff,

9    additional hours may be expected at certain key times

10   of the election cycle.  Primarily book closing and

11   election day.

12       Q.    How is the Division of Elections organized?

13       A.    We consist of primarily three bureaus and

14   one fiscal unit and what's called the director's

15   office.

16           So you have the Bureau of Election Records

17   primarily responsible for qualifying and campaign

18   finance and that's really an oversimplification.  But

19   they are also issued commissions and they are

20   responsible for administering the statewide public

21   campaign finance program.

22           Then you have the Bureau of Voting Systems

23   certification, whose primary responsibilities are

24   testing and certifying voting systems for use in the

25   State of Florida.  No county--  There cannot be any

Page 14

1    election which a voting system is used that hasn't

2    been otherwise tested and certified.  And then they

3    also test and approve automated independent audit

4    systems which are used for post election voting

5    system audits.  And then the team also has a series

6    of reports that are due to the legislature that they

7    are responsible for.  And in an election year that

8    would be the over vote and under vote report, the

9    conduct of elections report, and also a summation of

10   the post election voting system audit reports.  And

11   then they are also--that same staff are also

12   responsible for doing election observation at the

13   local level during the cycle, starting about a month

14   out before elections start, or election day, rather,

15   in which they are sent out there to be the eyes and

16   ears and observe processes in the various counties,

17   including logic and apathy testing, which is

18   essentially pre-election testing of the voting

19   equipment to ensure that it's counting the votes

20   accurately and functioning properly.  And then also

21   to observe early voting activities.  And then also

22   election day activities.

23        Q.   Is there another--

24        A.   Yes, there is.  I'm sorry.  There is the

25   Bureau of Voter Registration Services, which is the

Page 15

1    biggest unit, and that consists of voter registration

2    services relating to voter registration.  So they

3    handle inquires about voter registration, about

4    voting.  And they are also responsible for working

5    with supervisors and other inter-agency data bases to

6    identify voters who are potentially ineligible on the

7    rolls and for which that once identified that

8    initiates the notice of due process for letting the

9    voter know and giving the voter the opportunity to be

10   able to say yea or nay in terms of their eligibility.

11          And then there's the fiscal unit, which is

12   really within the director's office.  They handle

13   purchasing, budget, legislative matters, and also any

14   distribution of federal or state funds in support of

15   election administration or election security.

16          And then the director's office oversees a

17   number of programs, everything from requests that

18   come in from Supervisors of Elections about mail-in

19   ballot election requests, special salaries that

20   supervisors can get for taking extensive continuing

21   education courses, to the constitutional amendment

22   approval, initiative processes, to the paid petition

23   circulator process, registration.  And then just the

24   general oversight of the division, administrative.

25          We are in essence the administrative arm of

Page 16

1   the Secretary of State in his capacity as the chief

2   election official.

3        Q.   Is there a specific unit that's responsible

4   for implementing a statewide apportionment plan?

5        A.   No, there is no specific unit.  We work

6   closely with our IT department, because, as in

7   anything, nothing can get done without IT.  So we

8   work very closely with them.

9             But again, what we'll do is we get the

10  information from the legislature, we incorporate it

11  how we need it for our systems, like the qualifying

12  system data bases and things.  But ultimately the

13  primary onus remains on the Supervisors of Elections

14  and we act essentially as the pass-through and give

15  guidance to them.  We will tell them, okay, yes, this

16  is the map that has been approved and has been

17  finalized and to be using that to proceed with their

18  mapping.

19       Q.   Is the department involved in the process

20  of designing the statewide apportionment plans?

21       A.   No.  That is exclusively the legislature.

22  That's a constitutional provision.  They are

23  responsible for drawing and approving the map.  We

24  have no say in that matter.

25       Q.   Do they consult with you about technical

Page 17

1    issues as far as how that works?

2        A.    No.  They may ask for polling place or

3    precinct information that the supervisors may have

4    submitted to us.  And they also make use of

5    legislative recap reports that includes registration

6    and voting history.

7        Q.    Prior to working for the Department of

8    State, did you work for the Florida Senate?

9        A.    I did at one time, yes.

10       Q.    Do you know what period of time that was?

11       A.    I worked there from 1996 to 2002.  I think

12   it was about 2002.

13       Q.    What role or roles did you work for the

14   Florida Senate?

15       A.    I worked on a number of senate committees,

16   Commerce and Economic Opportunities, which I don't

17   know if that committee exists under that name now.  I

18   also worked under regulated industries, which covered

19   waste water plants and funeral homes.  Exciting

20   stuff.  And then I went to the judiciary committee.

21   In all three of those, I served as one of the staff

22   attorneys.  And then in the judiciary committee I

23   became one of the chief attorneys there.  And I also

24   was designated as a special master at that time, so I

25   also served in that capacity.  And then I would be

Page 18

1   drawn in, because of the role of the judiciary, into

2   any special projects that involved--that the Senate

3   president needed in terms of, you know, in-house

4   legal team to work on any matters.

5       Q.   Are you a member of the Florida Bar?

6       A.   I am.

7       Q.   Currently active?

8       A.   Yes.

9       Q.   And in good standing?

10      A.   Yes.

11      Q.   I have no reason to think otherwise.  I

12  will put that on the record for you.

13           Do you currently maintain any relationships

14  with staff at the Florida Senate?

15      A.   Well, in a professional capacity, yes,

16  'cause we are frequently asked to, you know, for

17  legislative bills and things like that.  We may have

18  meetings with them.  Dawn Roberts, who currently--I

19  believe currently still serves as the director, the

20  executive director, of the Ethics and Elections

21  Committee, was actually the person who was over at

22  the Department of State and recruited me to come over

23  to the Department of State to work there.  But not in

24  Elections, because I told her I didn't want to be in

25  Elections.  But I got sucked in.

Page 19

1      Q.    And now here we are.

2      A.    And here we are.

3            You know, obviously any legislative staff

4      that asks for information, I'll have communications

5      with them regarding anything they ask about.

6      Q.    But you don't have someone who works for

7      the senate who you are best friends with who just

8      calls you up on the phone any time that has a

9      question and ask you about that?

10     A.    I have very few friends.

11     Q.    During the time you were with the Florida

12     Senate, were you involved in any of apportionment

13     processes?

14     A.    No.  That was always handled through the

15     Senate president's office, and I was never tapped for

16     that, no.

17     Q.    By the time that there was the--  I should

18     ask--  I'll pull it up.

19           Are you familiar with the court ordered

20     reapportionment process that happened in 2015 from

21     the Florida Senate?

22     A.    Yes, yes.

23     Q.    And you were at the Division of Elections

24     by that point?

25     A.    Correct.

Page 20

1    Q.   Did you play any role in that court ordered

2    reapportionment in 2015?

3    A.   No.  The only extent that we are, again,

4    going to be involved in is we are obviously going to

5    be monitoring what's happening, because it has an

6    impact for us and for the supervisors, and that is

7    to--  At least I personally didn't have anything in

8    that, and that is to see when the maps would finally

9    become settled so that supervisors could proceed with

10   whatever mapping they needed to do and any

11   consequential reprincincting and outreach to the

12   voters that are necessary.

13   Q.   And that's the same for the 2022

14   apportionment process?

15   A.   Correct.

16   Q.   Have you ever testified before the Florida

17   Senate?

18   A.   Yes.

19   Q.   How often does that happen?

20   A.   Every legislative cycle there's the

21   potential for that, so almost every cycle I have.  Or

22   I am there in the capacity of support for the

23   Secretary of State.

24   Q.   But that's not during the process of

25   apportionment; is it?

Page 21

1      A.    No.

2      Q.    I think we are already there, but we are on

3   topic one, Election Administration.  Does the

4   Department of State have a general method that it

5   follows for implementing a statewide apportionment

6   plan?

7      A.    Generally, again what we are going to do is

8   we are going to be monitoring what the legislature is

9   doing, whose exclusive responsibility is for drawing

10  and approving those maps.  We are going to monitor

11  the process to see when those maps get finalized.

12  And my point of contact is going to be Jay Farren in

13  the Senate and then whomever--I think it was Miss

14  Kelly in the House, regarding, okay, are these the

15  final maps and to send whatever information so that

16  at least I can provide to the supervisors to let them

17  know, okay, you can now proceed.

18         Now, every county is not necessarily going

19  to be impacted in a way that they have to do any

20  changes.  A county in which the district doesn't

21  change, there's nominal, if any, impact on them.  If

22  a county district lines change or there's an

23  addition, then they start getting more complex and

24  it's really crucial for them to get that map and to

25  know what they have to proceed with, because

Page 22

1    counties, if they're small, they may not have

2    in-house expertise; they will have to contract out.

3    They may have to go to their board of county

4    commissioners to ask for funds.  And that approval

5    process can, you know, have to be a publically

6    noticed meeting and they have to get that approval.

7    So time is of the essence in that regard.

8            Even for, you know--and I think in this

9    case Columbia County had actually indicated, you

10   know, the challenges that it would be for them in

11   terms of being able to do the map, knowing what the

12   map was going to be so then they could proceed.

13           The same thing happens for a large county.

14   They also, even though they may have the in-house

15   resource, they also--  It's a very complex process

16   and it can take a lot of time.  You know, GIS mapping

17   is a sophisticated process.

18           So once those maps are finalized, a

19   county--big counties like Pinellas or Hillsborough,

20   which we are on record saying that they needed, you

21   know, the feasibility of them being able to do what

22   they needed to do within the time frame, are then now

23   faced again doing the mapping, getting it done in

24   time, preparing, which was needed also before--to be

25   known before qualifying, which we also needed to know

1    because we qualify the legislators, the state and

2    federal.

3            Once the supervisors get that information,

4    currently they are working on the mapping, they're

5    out there working on finalizing the ballot once they

6    get ballot certifications.  And then they proceed to

7    get the voter information cards out, if there have

8    been changes in precincts and polling locations.

9    Again, any changes in precinct have to be brought

10   before the Board of County Commissioners.  Again,

11   they have to get on their agenda, they have to make

12   sure there's time for that process to play out.  All

13   the while they are trying to get ready for getting

14   their ballots out.  And the time frame between

15   qualifying and getting the first major ballot

16   activity out is UOCAVA, which is Uniformed Overseas

17   Citizen and Absentee Voting Act.

18       Q.   So you mentioned there's a difference

19   between, say, a small county and a large county and

20   how they implement; is that correct?

21       A.   Yes.

22       Q.   Hillsborough County, because they are a

23   large county?

24       A.   Yes.

25       Q.   And what about Pinellas?

Page 24

1          A.    Same thing.  They are a very large county.

2          Q.    What about Pasco County?

3          A.    Pasco, I believe, is either borderline

4    medium or large.

5          Q.    What's the significance of being medium as

6    opposed to large?

7          A.    It's the number of registered voters.

8    Actually, the association or Supervisors of Elections

9    has created these groups based on number of

10   registered voters in their county.  So small counties

11   are under, I think, like 75,000 voters, medium goes

12   up to a certain number, I forget, and then there's

13   the large counties.  And then that allows them to be

14   able to commensurate, you know, with similar

15   challenges and needs and best practices and

16   procedures based on that.

17               So being a large county, again, even if you

18   have all the resources to be able to do it, you are

19   still faced against time.  It's a very compressed

20   schedule as it is under the best of circumstances.

21   So compressing it even further puts a significant

22   burden on the supervisors.  And really, the bulk of

23   implementing, the primary thing is on the Supervisors

24   of Elections.

25               And, as I said previously, GIS mapping is a

Page 25

1   very sophisticated process, and it's very important

2   to be very precise about it because the impact is on

3   ultimately the voter.  And if there's changes to a

4   voter's precinct or polling location, one that

5   they've been at for, you know, at least the last ten

6   prior years, it could be a significant change for

7   them.  They now have maybe new districts that they

8   are in, new representatives that they need to be

9   looking at, you know, candidates, everything from

10  school board to legislative.

11       Q.   Is Manatee County considered medium, large?

12       A.   I believe it's considered large.

13       Q.   What about Polk County?

14       A.   Polk is getting up there, so it--  I think

15  it's--  I think it may be a large.

16       Q.   Does the work that the Department of

17  Elections does for a statewide apportionment plan

18  different based on which entity is being apportioned?

19       A.   Well, we don't do any apportionment plan;

20  okay?  Again, that's exclusively the legislature's

21  prerogative.  What we are doing is we're acting as

22  the pass-through for information and offering

23  guidance to the supervisors in terms of, you know,

24  whether a map is final and that they can go ahead and

25  implement that.  We obviously take information for

Page 26

1   the districts, we consume it into our data to realign

2   or, you know, redistribute or reassign whatever

3   districts to make sure that they are qualifying our

4   election results and our voter registration system is

5   lined up, you know, with the mapping and districting

6   information.

7        Q.   Do Supervisors of Elections report to the

8   Division of Elections?

9        A.   They report in terms of they have a slew of

10  statutory reports that they have to--that are due to

11  us, and they arrange everything from pre-election

12  activities to election day, election results, to

13  post-election activities, as well.  So they are

14  constantly reporting to the Department of State about

15  certain things.  It could be, you know, 30 days out

16  from election.  They are supposed to tell us what

17  early voting sites there are going to be that they

18  have designated and what their hours are and what

19  their days of operation are going to be.  On election

20  day, which we coordinate the statewide reporting of

21  all the counties and we oversee that process, we are

22  heavily involved in the election results reporting

23  process starting that night and all the way up

24  through two weeks later when there's the Election

25  Canvassing Commission officially certifying the

Page 27

1    results at the state level for federal, state and

2    multi county district offices and statewide issues.

3    So that's how we are involved in that process.

4        Q.    Does the Department of State have the

5    ability to remove a Supervisor of Elections from

6    office?

7        A.    No.

8        Q.    Is a Supervisor of Elections beholding at

9    all to Department of State for their job?

10       A.    Well, there are provisions in the statute

11   that if a supervisor is not following a process in

12   the election code that there is--it's under one of

13   the Secretary's duties or powers in Chapter 97

14   relating to a process by which we tell the

15   supervisor, hey, you're not doing what we hear or we

16   know of something that you're not doing, you're not

17   complying, we have to give you--there's an

18   opportunity for notice and remediation.  And if not,

19   there's a process for, you know--I don't want to say

20   punishment, but I guess for a reprimand of some sort.

21   But in terms of removal of a Supervisor of Elections,

22   no, there is--we do not have that power.  That rests

23   solely with the governor.  But we work very closely

24   with the Supervisors of Elections.  I mean, we're a

25   team for both state level and local level.

Page 28

1      Q.   Does the department put out like a best

2   practices guide for implementing district maps to the

3   supervisors?

4      A.   No.  We do offer guidance to supervisors on

5   a variety of topics.  But, again, that is not within

6   our purview.  It's the legislature that is

7   responsible for drawing and, you know, approving

8   maps.  And we do not have any guidance on that, no.

9      Q.   But you make sure that once the map is

10  finalized that they have the correct map that they

11  can use to assign precincts?

12     A.   Right.  And that's why I communicate with

13  the point of contact at the legislature, make sure

14  I've got--  You know, even though they've got their

15  reapportionment page up and everything and all the

16  files are there, I communicate with them to make

17  sure, okay, these are the maps.  And, of course, I'm

18  also consulting with my legal office to make sure,

19  you know, if there's any pending litigation or

20  anything like that, so that whatever the

21  communication is that goes out to the supervisors

22  regarding the finality of a map and being able to

23  proceed with that map is certain and that supervisors

24  can then act on that, whether communication comes

25  directly from me or from the general counsel's

Page 29

1   office.

2       Q.   Does the department wait for the plan to be

3   finalized from the legislature before preparing to

4   implement it?

5       A.   Again, we don't implement the plan.  That's

6   really--it's the Supervisors of Elections that are

7   primarily doing that.  We do take like an Excel

8   spread sheet of districts and that we use to update

9   our data, but that's not implementation really of the

10  map as you are discussing.  Again, it's the

11  Supervisors of Elections.

12      Q.   Do you monitor the process in the

13  legislature saying, oh, it looks like they are doing

14  a lot to change around the districts in Hillsborough

15  County, so you notify the Hillsborough Supervisor of

16  Elections "you need to get ready for a lot of

17  changes"?  Do you do stuff like that?

18      A.   No.  Again, it's the legislature's

19  prerogative.  Whether we know about it or not isn't

20  going to change anything in terms of the outcome.

21  What we do is we let supervisors know, and I believe

22  I did send an email to the supervisors, hey, here's a

23  link to the apportionment page, you can monitor.  I

24  mean, supervisors are not going to just wait for--

25  you know, they have an interest.  They know how this

Page 30

1    process works.  Many of them are very seasoned and

2    have been around a long time.  And I would point them

3    to the link, to that web page, so that they can

4    monitor themselves.  They have a pretty good idea on

5    their own without us having to let them know that

6    there might be changes coming.  And until a map is

7    final, there is no--it's not final.

8        Q.   For the Florida Senate map, when is it

9    considered final?

10       A.   When I'm told by--  When legislative point

11   of contacts and our legal team lets us know that it's

12   okay to proceed, that there aren't any, you know--

13   depending on whatever pending litigation is going on.

14       Q.   Does it depend on the Florida Supreme

15   Court's automatic review process?

16       A.   It's going to depend on whatever is

17   determined to be the final act in which supervisors

18   can go ahead and proceed.

19       Q.   Is there any period of time once you're

20   notified that it's final that you wait before going

21   forward?

22       A.   Again, I'm going to be checking with my

23   legal counsel, I'm going to be checking with the

24   point of contact in the legislature, hey, do we have

25   the right link and can we go ahead and inform the

Page 31

1    supervisors that they can proceed with

2    implementation.  I mean, with the 2022, supervisors

3    were already proceeding with one set.  And then with

4    litigation, there was another.

5           So we actually had to do sort of an

6    unorthodox--and I didn't remember this happening

7    before, where they kind of had to proceed on dual

8    tracks.  And they had already started with one and

9    then they were told, okay, because of certain

10   rulings, they had to proceed with another map.  But

11   because we didn't know what that final outcome was

12   going to be and when, we had to give guidance to the

13   supervisors, hey, don't get rid of all the stuff you

14   just did just because now you are working on another

15   map.  So they actually had to sort of do a dual track

16   thing, which is a significant burden because, as I

17   explained to you before, this is already on a very

18   tight compressed time frame and, you know,

19   supervisors like certainty.  We all do in elections.

20   We want certainty.  Anything less makes voters

21   nervous.

22       Q.   When you say this is on a compressed time

23   plan, is that referring to the standard process like

24   was in 2022--like we saw in 2022?

25       A.   If everything were to follow according to

Page 32

1    the timeline that exists now in statutes and the

2    constitution, and there's no litigation, it just, you

3    know, rolls right into--  Under the best of

4    circumstances, it's already a fairly tight timeline.

5        Q.   If there's a senate district that crosses

6    county lines, do you coordinate between the different

7    Supervisors of Elections to ensure that district is

8    managed uniformly for elections?

9        A.   I'm not sure I quite understand that

10   question.

11       Q.   Well, so, for example, I live in Miami-Dade

12   County, and there are a number of senate districts

13   that are wholly contained within Miami-Dade County.

14   So in those situations, that district election is

15   handled all by the Miami-Dade Supervisor of

16   Elections; is that correct?

17       A.   Yes.

18       Q.   But, for example, there are districts--  I

19   believe Senate District 20 includes both Manatee and

20   Hillsborough.  For that district like that, the

21   district crosses into multiple counties.  Is there

22   any coordination between your office and the two or

23   more Supervisors of Elections to make sure they're

24   all playing by the same playbook for that district?

25       A.   Each county is going to be responsible for

Page 33

1    their implementing their map as it's contained within

2    their county.  I don't know if there's any

3    coordination that happens between the counties in

4    terms of that.  What we are going to be monitoring is

5    we are going to be looking to see if they have, in

6    each respective county, whether they have, you know,

7    made the district changes for their voter records.

8    That's what we're going to be looking at.  But we

9    only communicate with them individually, not--  If

10   there is anything that doesn't look right, we will

11   talk to the supervisors, or that they haven't done,

12   we'll look.  We have to because we have book closing

13   numbers and then we are going to see all those

14   precincts and districts.

15        Q.   So for the current Senate District 16 that

16   is in Hillsborough with part of South Pinellas, you

17   said to Hillsborough County here's the part of this

18   district that is in Hillsborough County?

19        A.   No.  We are just going to give them

20   whatever the link, whatever the map, and then it's up

21   to them to decide how--that's where the GIS mapping

22   experts come into play.  We don't have any expertise

23   in that.

24        Q.   So you're not maintaining a, say, map of

25   Senate District 16 is in Hillsborough versus a map of

Page 34

1    Senate District 16 that's in Pinellas; that's

2    separate maps?

3         A.   No.   Whatever the legislature has put out,

4    that's what's going to be put out.   And then the

5    supervisors and their expert team, GIS team and

6    staff, that's their responsibility.

7         Q.   If someone wants to qualify to be a

8    candidate for the Florida Senate, they qualify with

9    the department?

10        A.   Yes.

11        Q.   For the senate candidate, it's all handled

12   through the statewide office?

13        A.   We handle federal, state and multi county.

14   And also statewide.

15        Q.   Is there any difference in the qualifying

16   process depending on which county you're in for the

17   Florida Senate?

18        A.   No.

19        Q.   Does the way that the Department of State

20   conveys the maps to the Supervisors of Elections

21   differ based on whether it's a legislatively enacted

22   apportionment plan versus a court ordered one?

23        A.   No.   Other than the message might give

24   context to the supervisors.   Again, it will say

25   what-- We try to keep the supervisors abreast of

Page 35

1   what's going on, you know, whether it's the legal

2   process, and they will ask about the legislative and

3   we will either tell them, you know, unless it's a

4   group email that goes out, this is what we know.  We

5   know nothing has been finaled.  You get an email when

6   things are to the point when you are directed to go

7   ahead and proceed with implementation.

8       Q.   Is the department involved in drawing the

9   precinct lines for counties?

10      A.   No.  Again, that is within the purview of

11  the Supervisors of Elections.  And actually, there's

12  a provision in 101 in which supervisors are

13  responsible for--

14           You did say precincts; right?

15      Q.   Yes.

16      A.   Yeah.  --where supervisors are--if they

17  have to make change--they don't necessarily.  I mean,

18  a map may not trigger the need to do one.  But if it

19  does, precincting is a process of kind of

20  reallocating voters evenly within a district area.

21  So if they have to make any changes or any additions,

22  they have to present that to the Board of County

23  Commissioners and recommend that, hey, I'm going to

24  be making--we want to recommend these precinct

25  changes or additions.  The board is the one that has

Page 36

1    to approve that process.  Again, publically.  They

2    have to get on their agenda.  They have to be

3    publically noticed and it's at a public meeting.  And

4    these Board of County Commissioners don't meet all

5    the time.  And depending on whether you're a small

6    county or a big county, the frequency might be less

7    or more.

8              And so that's how the supervisor has to,

9    you know, present their precinct changes.  They can't

10   just unilaterally do them.  They have to get the

11   Board of County Commissioners to agree upon it.  And

12   then once those precincts are approved, that might

13   trigger a change in polling.  And if so, then

14   definitely they're already going to have to send out

15   communications to voters about any changes in their

16   districts and any changes in their precincts and then

17   definitely in their polling location.

18             Again, we are talking apportionment is like

19   every ten years in which people get used to going to

20   one place and then suddenly they've got to change.

21   So there's that voter education process that happens.

22   And I do know in 2022 there were some counties that

23   weren't getting their voter information cards out

24   sufficiently in time; you know, it was late.

25        Q.   What does late mean?

Page 37

1       A.   Being that the voting process--  Much later

2   than the timeline they would normally do it.  So to

3   give voters enough heads up about where their polling

4   locations are, what their new districts are.

5       Q.   Is there a standard statewide timeline for

6   getting those out?

7       A.   Well, once--  By law, as soon as a polling

8   location is changed, they are required to issue a new

9   voter information card.  And I believe that's really

10  supposed to be like within five days.

11      Q.   And does that happen after the new

12  apportionment plan is implemented, so in 2022, like

13  at some point after it was finalized in 2022, they

14  sent out the cards?

15      A.   Yes.  I mean, it's key to knowing whether

16  they are still in the same district or not and/or

17  precinct.

18      Q.   Is there any notice given--  Let's say that

19  a district changes such that precincts are going to

20  have to be redrawn but it's going to take a little

21  time to do that.  Is there any notice given ahead of

22  time to the voter, hey, we're re-precincting, you

23  should expect a new precinct voter information

24  coming?

25      A.   No.  The two main ways in which voters are

Page 38

1   going to learn about it is if they are active in

2   their community and they attend Board of County

3   Commissioners meetings or whatever, they are going to

4   see that it's on the agenda.  So that's why it's a

5   publically noticed meeting matter.  On top of which,

6   it's obviously got to be voted on by the board.  So

7   that's one way the county may--a voter may learn,

8   aside from their own initiative, you know, reading

9   the news and being proactive or monitoring themselves

10  what's happening at the state legislature.  And then

11  the voter information card is the other.  Supervisors

12  are also going to put as much, you know, information

13  on their websites regarding any changes in precincts.

14  That any voter can actually look up on each

15  supervisor's website to see what their precinct is

16  and their polling location.

17       Q.   What does it mean to hold a special

18  election?

19       A.   So a special election, under the Florida

20  Statute, is triggered under several--several

21  scenarios, one of which is a vacancy in a state

22  legislative or U.S. representative office.  So once

23  that happens, the trigger is that an order has to be

24  issued.  An executive order is issued by the

25  governor.  And once the governor issues that order,

Page 39

1    then we do our notice of special election, which sets

2    forth the date that the governor has set for the

3    special election.

4            Preceding all that, there's coordination

5    with the Supervisors of Elections about, hey, there's

6    a special election that's going to be ordered, what

7    are some recommended dates doable.  If a supervisor--

8    a county has an existing scheduled election, a local

9    election or whatever, the effort is usually to try to

10   work around or work with that schedule.  But that

11   doesn't always happen.  Once that's done, the notice

12   of special election, which is issued by the Secretary

13   of State, also sets out what the qualifying period

14   is, so that individuals who may want to qualify for

15   that office can go ahead and know when that period

16   is.  And it's a compressed time frame.  It's like

17   usually the qualifying period is a day and a half.

18   Candidate petition qualifying can occur beforehand.

19   That triggers also the notice of any resignation

20   deadline, if there's a candidate who is a sitting

21   officer whose term is going to overlap partially or

22   whole, that they would have to resign in order to be

23   able to run.  In fact, we just went through this

24   exercise for two offices right now currently for the

25   U.S. Congressional District 1 and Congressional

Page 40

1    District 6.  Once the notice goes out, we communicate

2    with the supervisors about that notice.  They have to

3    publish it online or in the newspaper, if there's

4    enough time.  Then we ask them how much is it going

5    to cost, give us your best estimate of what it's

6    going to cost to do a special election.  This is

7    assuming--and it's only the cost associated with that

8    special election.  So if the special election falls

9    on a regularly scheduled election, then the cost is

10   going to be nominal.  I mean, it shouldn't be

11   anything there.  But if it falls outside,

12   freestanding, then there's definitely a cost

13   associated and those run in the hundreds of thousands

14   if not a million if you're talking about a county

15   like Hillsborough or Broward.  It just depends on the

16   district, the size of the district offices being

17   covered.  This process, even under the most--  And

18   this is a very conservative and very lean schedule

19   that we have with the Supervisors of Elections on the

20   special election for both CD 1 and CD 6.  You are

21   looking at over 141 days in which between the order

22   being viewed and the certification of the election at

23   the state.  So it's almost over a five-month period.

24   So there's a lot involved.  You know, supervisors

25   need to get their ballots prepared, approved,

Page 41

1    mailing, all that, and then their deadline for

2    UOCAVA, which is the Uniformed Overseas Citizen and

3    Absentee Voting Act, and then five days later they

4    got to do the outreach for the domestic vote by mail

5    ballot requesters, early voting, and election day.

6        Q.    You said earlier that sometimes a special

7    election can be held at the same time as the regular

8    election; is that correct?

9        A.    Correct, depending on the timing of the

10   issuance of the executive order.  That's the key,

11   because there's all those--  Once those dates are

12   set, then things before and after all pivot around

13   that, so the two most important dates are the

14   election days and the 45-day UOCAVA, which is a

15   deadline by which state and federal law those ballots

16   have to go out no later than.  In fact, we have to

17   report to Department of Justice every regular cycle,

18   as well as for special election, hey, did these

19   ballots go out no later than 45 days.  And if they

20   didn't, why.  And, you know, I'm very proud to say

21   that we have consistently been timely on our

22   issuance.  You know, the supervisors have been timely

23   on the issuance.

24       Q.    For Florida Senate elections, there are

25   certain districts that are up in the presidential

Page 42

1    election years and others that are up in the midterm

2    election years; is that correct?

3        A.   Yes.

4        Q.   How does the state divide between those

5    two?

6        A.   I forget what the time rule of that period

7    is.  We just know.  It's a process.  We have done

8    this a while, so--

9        Q.   My understanding is that the even numbered

10   senate districts are up in the midterm election years

11   and the odd numbered senate districts are up in the

12   presidential election years.

13       A.   Until I read it, then I'll agree with you.

14   I just don't recall right now, I'm sorry.

15       Q.   So you don't recall which state senate

16   districts were up for election last month?

17       A.   No.

18       Q.   If a senate district is in a special

19   election, is the term truncated or is it

20   automatically you serve for four years once you win

21   that election for a senate district?

22       A.   It's going to depend on the existing term

23   of where--that the special election is being held

24   for.  Like whatever the remainder of that term is.

25       Q.   So just speaking hypothetically, if a

Page 43

1    senate district just got elected this year, in 2024,

2    normally they would serve for four years and be up

3    for re-election in 2028; is that correct?

4        A.   2028, yes.

5        Q.   Now, if, let's say, the court in this case

6    orders a new district and it's set to go up for

7    election in 2026, would it automatically happen in

8    2026 or would they just wait until 2028 to hold that

9    election?

10       A.   The special election?

11       Q.   Well, it would only be a special election

12   if the current holder of the seat resigns; is that

13   correct?

14       A.   I'm trying to figure out what is the

15   order--what is the order saying.

16       Q.   Let's say the district that currently

17   exists and just held an election and then the court

18   orders a new map to be put in place that changes

19   those district lines, is there some additional order

20   that has to be given before a special election is

21   called?

22       A.   You know, that gets really complicated and,

23   honestly, I wouldn't want to be make making that

24   decision on my own.  That would be something that I

25   would be consulting with our general counsel as to

Page 44

1    what my steps are in terms of how to implement an

2    order, a court order, and whether that requires

3    holding a special election, you know, or waiting

4    until the next regularly scheduled election.  Those

5    are things I'm going to, even if I had an idea, a

6    firm idea on it, that I would still be consulting

7    with the legal team to ensure that--and get my

8    direction from them.

9        Q.   So if, for example, a district line changed

10   and the current holder of the seat no longer lived in

11   that district, that would be a legal question that

12   would tell you whether or not there needs to be a new

13   election rather than waiting for the scheduled

14   election?

15       A.   Again, I would consult with my legal team

16   on that.  And also anything regarding residency about

17   current legislators is again going to be within the

18   purview of the legislature.  We would not be the one

19   weighing in on that.

20           MS. McNAMARA:  Now, we are kind of moving

21       on to topic two.  Do you want to take a break

22       now?

23           THE WITNESS:  Sure.

24           MS. McNAMARA:  It's 10:05.  Let's take ten,

25       15, I guess, we'll come back.

1          (Thereupon a brief recess was taken.)

2    BY MS. McNAMARA:

3        Q.    Looking at the 2022 redistricting timeline,

4    the legislature--  Is it correct that the legislature

5    passed the Senate Joint Resolution 100 in 2022 on

6    February 3rd?

7        A.    I'm going to defer to the legislative

8    record.  I don't have that precise date in my head,

9    but--

10       Q.    And then there's a 30-day period for the

11   Florida Supreme Court to do it's automatic review of

12   validity?

13       A.    There is a 30-day review process, yes.

14       Q.    And that was completed on March 3rd?  I

15   mean, that's my record of that.

16       A.    Again, I'll defer to the record for the

17   precise date.

18       Q.    And then the congressional plan took longer

19   than that; is that correct?

20       A.    I believe it did.

21       Q.    There was a plan that was passed and then

22   the governor vetoed it?

23       A.    Correct.

24       Q.    And then the final plan which is

25   considered, SB2C Plan 109, that was passed by the

Page 46

1    legislature, I have, April 21st, 2022.

2        A.    Again, I would defer to the legislative

3    record.

4        Q.    And then the governor signed that, I have,

5    the day after that, but in April of 2022 when the

6    congressional plan was finalized.

7            And then when does the period for

8    submitting petitions to get on the ballot happen

9    after that?

10       A.    Which petitions are you talking about;

11   candidate petitions?

12       Q.    Yes, candidate for legislative or

13   congressional candidate qualifying by petition

14   method.

15       A.    So there's the official qualifying period

16   that's set out in statute for, you know, the

17   different offices.  For the 2022, the state and U.S.

18   legislative qualifying period was, I believe, mid

19   June, like around June 13th or something like that.

20   So there's that week of official qualifying preceded

21   by two weeks of pre-qualifying.  And then there's a

22   period of time before that for initiative--  Not for

23   initiative, I'm sorry.  For candidate qualifying.

24   And I think it corresponds to the start of--  I'd

25   have to look at the code to see exactly, but it

Page 47

1    precedes that either by the date before the start of

2    official qualifying or probably about two weeks

3    before that.  Again, I would need to look at the code

4    to see that.

5        Q.   But the main candidate qualifying period

6    was in June of 2022?

7        A.   That's correct.  For state and U.S.

8    legislative offices, it was then.

9        Q.   Does the timing of when the qualification

10   for state or U.S. offices change from year to year?

11       A.   It does for apportionment years.  Normally

12   it's held at a different time frame.  So it is pushed

13   back to that later--  There's two main qualifying

14   periods and those were pushed back to that June--

15   that second qualifying period.

16       Q.   And that's because 2022 was a year of

17   apportionment under state law?

18       A.   Correct.

19       Q.   If there is a court ordered new map in this

20   case, would that year in which that map is

21   implemented be considered a year apportionment, as

22   well?

23       A.   Again, I don't know if--  You know, I work

24   very closely with my legal team.  That might be a

25   question I would ask and that would be something that

Page 48

1    we would have to consider whether that would be the

2    case.  But officially, I think in the statute it sets

3    out what is considered to be the regular, you know,

4    apportionment year.

5                MS. McNAMARA:  Well, I'm going to share my

6          screen for another exhibit.  Can you see this

7          document on the screen?  I'm going to ask that

8          it be marked as Exhibit 2.

9                MR. JAZIL:  Counsel, would you minds making

10         it a little larger?

11               MS. McNAMARA:  Yes (complies).

12   BY MS. McNAMARA:

13        Q.   Do you recognize this document?  I can

14   scroll around if you--

15        A.   Yes.

16        Q.   This is marked as a Directive 2015-02 State

17   Senate Candidate Qualifying; Year of Apportionment,

18   dated August 14th, 2015.  Is that correct?

19        A.   Yes, that's the date of the memo.

20        Q.   Were you involved in the drafting of this

21   memo?

22        A.   I would have been to the extent that if

23   supervisors had any follow-up questions.  But, as you

24   can see, it came directly from the Secretary of

25   State's office, so that would have been coordinated

Page 49

1   in conjunction with our legal team.

2       Q.   Was this memorandum generated in response

3   to the court ordered Senate reapportionment in 2015?

4       A.   It would have been--  Well, as it states

5   there in the memo, supervisors were asking for

6   clarification about what, you know, the year of

7   apportionment in terms of the court ruling.  So, I

8   mean, I think the memo speaks for itself.

9       Q.   Is this memo considered still applicable or

10  is it like moot because the election already

11  happened?

12      A.   It's very specific to that particular case.

13  It may be, you know--  Again, I still would not

14  hesitate and would as a matter of practice still

15  consult with the legal team to make sure there hasn't

16  been any changes in statute or case law that would

17  suggest otherwise or take a different approach.

18  Could this have precedential value?  Of course.

19      Q.   Is there a currently existing understanding

20  that you're aware of regarding this issue as it would

21  apply going forward within the Department of State?

22          MR. JAZIL:  Object to form.

23          THE WITNESS:  Again, at this time I

24      haven't--  You know, until it's ripe for

25      addressing, I haven't had any supervisors ask

Page 50

1         for clarification.  So that probably would be

2         our trigger point on that.

3    BY MS. McNAMARA:

4         Q.   Have you had any discussions about this

5    possibility since the filing of this lawsuit?

6         A.   I mean, the discussions could have been had

7    by the legal team, but--

8         Q.   But you haven't been involved in that?

9         A.   No.

10         Q.   Going back to 2022, the Supreme Court

11    issued its automatic review opinion on March 3rd,

12    2022, as to the State House's and Senate plans.

13              Are you aware of any problems in the 2022

14    election based on the amount of time between the

15    March 3rd, 2022 date and the election held on

16    November 8, 2022?

17              MR. JAZIL:  Object to form.  It's been

18         answered.

19              THE WITNESS:  If you would restate it,

20         please?

21    BY MS. McNAMARA:

22         Q.   You testified earlier about it being--the

23    timeline in the situation is always short, the

24    compressed timeline no matter what.  So my question

25    is, with the state senate map being in place as of

Page 51

1   March 3rd, 2022, did that impede the plan's timeline

2   for the 2022 elections at all?

3        A.    I'm assuming that the map that was adopted

4   or finalized--   If you are saying hypothetically that

5   that map would be the one that was going to go

6   forward--   The more time supervisors have to be able

7   to do any mapping in advance of the schedule the

8   better it is for ensuring minimizing any errors and

9   being able to timely comply with all other, you know,

10  statutory requirements.

11       Q.    Is this a typical timeline with the

12  legislature enacting apportionment plans during its

13  regular session in 2022 and then having from March

14  until the qualifying period to start happening in May

15  and June?

16       A.    Based on what I can see from the past, it's

17  different every cycle.  So, you know--   Again, our

18  position would be, and I think we've taken this

19  always, that if we can have finality by, you know,

20  desirably by April 1st, then that's going to be--

21  that's going to ensure that supervisors have, and we

22  have, everything in place and are able to, you know,

23  adequately and precisely comply with state and

24  federal laws regarding the election process.   But I'm

25  not--   I think based on my review of what I've seen

Page 52

1   from past apportionments, it's never quite as clean

2   as that.  There's always going to be something that

3   will either extend that process or compress that

4   timeline.

5        Q.   Was there something that compressed that

6   process or extended that timeline in 2022?

7        A.   Well, I'm just talking about the CB2C and

8   in terms of what that did for supervisors being able

9   to begin their process.

10        Q.   Not the 2nd Congressional District of

11   Florida?

12        A.   No.  I'm sorry, the senate map.

13        Q.   What is the specific problem that you are

14   referring to with that?

15        A.   I think I'm getting confused by what you're

16   asking.

17        Q.   I mean, so I was asking, you know, the

18   March--  If there's a situation where the map is

19   finalized by March, or like it happened in 2022, and

20   then it follows the timelines that you've set up, and

21   you said that there were some problems in 2022, and

22   I'm asking what those problems were.

23        A.   It relates to the map that was being

24   challenged in court in 2022 in which--where

25   supervisors could not begin their--or they were

Page 53

1    proceeding with one mapping--one map and then they

2    had to--they were directed to do another map.  This

3    is all detailed in the May 2022 series of emails to

4    the supervisors.

5         Q.   Have those been produced in this case, in

6    discovery?

7         A.   I would presume that they have been.  If

8    not, I would certainly let my counsel know.

9              MR. JAZIL:  Counsel, I'm a little confused.

10             Are we talking about problems with the senate

11             map that was implemented following the 2022

12             redistricting cycle, problems with the

13             congressional map that was implemented following

14             the 2022 cycles, or problems with either of

15             those?

16             MS. McNAMARA:  I was asking about either of

17             them.

18             MR. JAZIL:  Got it.  Sorry.

19   BY MS. McNAMARA:

20        Q.   This was related to there were lawsuits

21   challenging the congressional map in 2022; is that

22   correct?

23        A.   Yes.

24        Q.   Was there any specific problem with the

25   senate map in 2022?

Page 54

1        A.    Well, that's the one--I believe is the one

2    that's the subject of the May--you know, the email

3    series that prevented supervisors--supervisors were

4    told to proceed with one map and then they had to

5    proceed with another map.  And so, you know, until

6    about May 22nd, they weren't--they didn't know really

7    which map was going to be the one to implement.

8        Q.    I mean, was there a lawsuit challenging the

9    Florida Senate districts in 2022?

10        A.    I think I'm confused now.  I apologize.

11        Q.    I mean, my understanding is that there were

12    lawsuits challenging the state congressional maps.

13    There was a federal case, Common Cause, I think, and

14    then there's a state cause, Black Lives Matter.

15    That's the one that's still going on in the Florida

16    Supreme Court.  Those are both related to the

17    congressional maps?

18            MR. JAZIL:  Counsel, do you mind if we just

19        take a five minute break?  Perhaps she can look

20        at the emails and just refresh her recollection,

21        whatever.

22            MS. McNAMARA:  Yes, that's good.  Thank

23        you.

24            MR. JAZIL:  Thanks.

25            (Thereupon, a brief recess was taken.)

Page 55

 1          MR. JAZIL:  Counsel, Director Matthews has

 2      the email she was referencing in front of her.

 3      It's also been produced to you in discovery.  So

 4      that's the one she has in front of her, so

 5      perhaps you can ask your question.

 6          MS. McNAMARA:  Okay.

 7  BY MS. McNAMARA:

 8      Q.   So what problems were there after March of

 9  2022 related to the implementation of statewide

10  redistricting plans in 2022?

11      A.   For the March that the state senate not--

12  because it was allowed sufficient time for the

13  supervisors.  I apologize.  It's been a long couple

14  of weeks.  I got confused with this SB2C, and I

15  thought the email chain that talks about the

16  congressional one, that's the one I thought you were

17  trying to get at.  But I conflated the two and I

18  apologize for that.

19          So that one did present challenges, the

20  senate one, and if everything went well according to

21  schedule with the March, that obviously was well

22  before our kind of safe harbor deadline of April 1st.

23  Supervisors would have been able to do what they

24  needed to do in a timely way with a reasonable

25  timeline and some breathing room to be able to

Page 56

```
1   implement and satisfy all the other requirements.
2        Q.   So there were no problems with implementing
3   the state senate map in 2022?
4        A.   Right.  None that I'm aware of.  Now, I
5   don't know if in terms of doing--  Because I'm not an
6   expert in GIS mapping, I don't know if they have to
7   wait for certain things, you know, to coordinate
8   those two together or whether they're able to
9   proceed, you know, with one map that's specific to,
10  you know, senate versus congressional.
11       Q.   You said that by April 1st is the target
12  goal for having the map in place?
13       A.   For having finality as to what the map is
14  going to be so that they can then do all the things
15  they need to do.
16       Q.   So let's say that in this case this is a
17  court order and the legislature passes a new map on
18  the same timeline in 2026 and it's in place before
19  April 1st, 2026.  Would there be any impediments to
20  running the senate elections in 2026 off that new
21  map?
22       A.   Again, based on, you know, what we have
23  projected to be adequate time, and if the maps were
24  deemed final and the supervisors given guidance,
25  that's been the timeline that everybody has seemed to
```

Page 57

1   be very comfortable with and has stated that in court

2   to allow them to do what they needed to do.

3       Q.   If the process went into April, like the

4   way that the congressional process did in 2022, does

5   that cause problems?

6       A.   Again, it's going to also-- I can't predict

7   exactly, because again it depends on, you know, in a

8   non-apportionment year, the qualifying periods are

9   slightly different.  So it would just be dependent on

10  how that would be treated, whether it--you know, like

11  that 2015 memo, whether it's going to be considered

12  that same kind of time frame.  But supervisors will

13  make it happen.  It's just we don't--you know, we

14  like to make sure they have a reasonable amount of

15  time.  And I think Pinellas and Hillsborough had gone

16  on record, you know, indicating what was feasible

17  within that time frame.  So that could give you a

18  pretty good idea.

19      Q.   So you testified that there's not a

20  specific existing understanding within the department

21  as to how the year of apportionment issue would be

22  dealt with if a map is ordered, say, in 2026 in this

23  case?

24           MR. JAZIL:  Object to form.

25           THE WITNESS:  Like I stated previously, I

Page 58

 1          would still consult--we would still consult with

 2          Legal as to whether the position that was taken

 3          in 2015 would still apply.  I think it would

 4          have precedential value, but, you know, you have

 5          to research, make sure there haven't been any

 6          changes in law or any court cases that would

 7          warrant a different posture.

 8    BY MS. McNAMARA:

 9          Q.   Now, setting aside whether or not 2026 will

10    be considered a year of apportionment or not, when

11    there is a year of apportionment, that changes the

12    requirements for petitioning to get on the ballot as

13    a candidate; is that correct?

14          A.   Correct.

15          Q.   And you don't have to get the petitions

16    from the specific district that you're running for?

17          A.   Right, because it's not necessarily all

18    settled; that's anticipated.

19              MS. McNAMARA:  I'm going to put up another

20          document.  This is an excerpt from the trial

21          transcript from the Common Cause versus Byrd

22          lawsuit.  This is a federal court challenge to

23          the state congressional district.  I just have a

24          couple of pages at the end here which I will go

25          into it where the court, as well as your

Page 59

1       counsel, Mr. Jazil, were discussing timelines on

2       the potential remedial map.

3            Can I have this marked as Exhibit 3?

4    BY MS. McNAMARA:

5       Q.   This is a lawsuit in which the Secretary of

6    State was a party.  Are you familiar with that

7    lawsuit?

8       A.   Yes.

9       Q.   And the Secretary of State was represented

10   by the same counsel you are represented by in this

11   case?

12      A.   Yes.

13      Q.   I'm going to page 1053 of the transcript.

14   We could provide the whole thing if we want to.  I

15   think everyone has access to it.  But here on page

16   1053, starting on line 13, Judge Jordan says, "Okay.

17   Let me ask you this question, then, and maybe we can

18   work backwards.

19            "I have a memory a little bit of what

20   happened last year when we talked about deadlines,

21   and dates and by the time we get to do something if

22   the legislature didn't act one way or another.

23            "So give me, Mr. Jazil--so I'm going to ask

24   you to assume the worst.  So if the decision were to

25   go against you and you needed to have the Secretary

Page 60

1    move, by when do you need a ruling?

2            "And I ask you the worst case scenario

3    because otherwise, to you, it doesn't really matter,

4    because if you're going to prevail on the merits--"

5            This question is essentially just asking

6    what's the timeline if the court orders a new mapping

7    process; is that correct?  Or is that your

8    understanding?

9        A.   It appears to be that.

10       Q.   And this hearing was held on October 3rd,

11   2023.  So it's discussing the potential for the 2024

12   elections, the elections that were just held this

13   year; is that right?

14       A.   Correct.

15       Q.   So after Judge Jordan asked the question,

16   on the next page, Mr. Jazil says, "Your Honor, as a

17   practical matter, if the Court rules against us and

18   orders a remedy, the legislature is in session

19   starting in January.

20           "So if you find for my friends on liability

21   but you say kick the map back to the legislature on

22   remedy, if we can give the legislature enough time to

23   go through their process, it's an 60-day session that

24   starts in January, goes through March."

25           Did I read that correctly?

Page 61

1      A.    Yes.

2      Q.    And there was a regular session of the

3  Florida Legislature in 2024 that went January through

4  March this year?

5      A.    Correct.

6      Q.    Now, if we're talking about 2026, would

7  that be on the same timeline, that the legislature

8  would start in January and go through March?

9      A.    No.  I think it starts in March.

10     Q.    Well, if it's an even numbered year in

11  which the legislature is up for election, it starts

12  in January versus odd numbered years that start in

13  March?

14     A.    I think with the presidential election year

15  it's always in January.  And then every other time

16  frame--cycle, it starts in March.

17     Q.    Well, for example, next year is going to be

18  2025.  Next year, in 2025, the legislature will be in

19  session starting in March; is that correct?

20     A.    Yes.

21     Q.    Now, going to 2026, where it is the midterm

22  election year, does the legislature start in January

23  or March of this year?

24     A.    I haven't looked and I don't recall, I'm

25  sorry.

Page 62

1     Q.   So let's just assume that the legislature

2  starts in January of 2026, on the same timeline that

3  they used in 2024.  If that were the same timeline,

4  and like your counsel said in the--last year in the

5  previous case that I have the transcript for, if in

6  this specific case that we are in today where we

7  currently have a trial scheduled for June of 2025, I

8  think, but say there is an order similar to what

9  Judge Jordan is asking here, by some time in the

10  second half of 2025, is there enough time for the

11  legislature in their regular session starting in

12  January 2026, assuming that it does in fact start

13  then, to follow the same timeline that was followed

14  in 2022?

15     A.   Assuming they meet in January?

16     Q.   Yes.

17     A.   Then it would fall in the same sort of

18  timeline.  Again, I would have to look at the statute

19  to see whether--and it will depend on whether it's

20  considered a year of apportionment or not in terms of

21  the qualifying period.

22          MR. JAZIL:  I'll object to form of the last

23     question.

24          MS. McNAMARA:  Okay.  There were a lot of

25     things in that question.

Page 63

1    BY MS. McNAMARA:

2         Q.   So, assuming that the timeline of an

3    ordered map in 2026 is the same, does your answer of

4    whether or not the timeline would work for 2026

5    depend on whether or not 2026 is considered a year of

6    apportionment or not?

7         A.   I think that's definitely a factor, and it

8    just depends, too, on when the election is scheduled

9    to be held, if it's following the same regularly

10   scheduled timeline.  It's just a hypothetical, so I

11   don't know.  Assuming those things, then, and the

12   maps are final and deemed final by no later than

13   April 1st, and the qualifying period is the same,

14   then it should be able to implement.

15        Q.   Did the department reach an understanding

16   as to whether 2024 would have been a year of

17   apportionment had the court ordered a new map in this

18   Common Cause case?

19        A.   I don't recall that discussion reaching me,

20   if it was at all.

21             MS. McNAMARA:  And the court did not order

22        a new map in that case.

23             I'll share my screen again.  I'm showing a

24        new document.  This is a joint stipulation that

25        was entered in the lawsuit entitled Black Voters

Page 64

1        Matter Capacity Building Institute versus Cord

2        Byrd in the Circuit Court for the 2nd Judicial

3        Circuit in and for Leon County.

4             Can I have this marked as Exhibit 4?

5    BY MS. McNAMARA:

6        Q.   Are you familiar with this lawsuit?

7        A.   Yes.

8        Q.   This is a state court challenge to the

9    congressional district map?

10       A.   Yes.

11       Q.   And this is a joint stipulation that was

12   entered by the parties, including the Secretary of

13   State; correct?

14       A.   I mean, if I see the last page, I'm sure.

15       Q.   Here is the--

16       A.   Yes.

17       Q.   Were you involved in the drafting of this

18   stipulation?

19       A.   Only to the extent they needed any, you

20   know, clarification or, you know, verification of a

21   statement that I would have knowledge of.

22       Q.   Well, going to page three, here at the

23   bottom there is a Roman numeral VII labeled Remedy.

24   And in this it says, under A for Remedy, "If

25   Plaintiffs prevail on Counts I before this Court and,

Page 65

1    as of April 1, 2024, the Court's decision has not

2    been reversed on appeal, the Parties agree to the

3    following:" and then there's some discussion.

4            "If the Legislature fails to enact a

5    remedial map by April 1, 2024, or if the Legislature

6    enacts a remedial map by April 1, 2024 but Plaintiffs

7    inform Defendants by April 3, 2024 of their position

8    that the remedial map does not remedy the

9    diminishment in the Enacted Map, the Parties will

10   jointly ask this Court to vacate the automatic stay

11   to conduct remedial proceedings."

12           Is that correct?

13       A.   That's what it says.

14       Q.   Did this contemplate that there had been an

15   order that the legislature would have gone through

16   the apportionment process during the regular session

17   in 2024?

18       A.   It appears so.

19       Q.   And that's where that April 1st is the same

20   deadline you talked about that April 1st is a good

21   date to have a map in place by?

22       A.   Yes.

23       Q.   But this stipulation recognizes it's

24   possible that the map wouldn't be in place by April

25   1st, 2024; is that correct?

Page 66

1        A.    It does contemplate that.

2        Q.    Scrolling down, the second to last circle

3    bullet point, it says, "If the Legislature fails to

4    enact a remedial map by April 1, 2024 that will take

5    effect for the 2024 congressional elections, or if

6    the Court agrees with Plaintiffs that the

7    Legislature's enacted remedial map does not remedy

8    the diminishment in the Enacted Map, neither

9    Plaintiffs nor Defendants will oppose the Court's

10   adoption of or seek a stay of Exhibit 2."

11           We don't necessarily need to go into that.

12   But this is contemplating the process for if the map

13   is not finalized by then; correct?

14       A.    Yes.

15       Q.    And then in the final bullet point, it

16   says, "The remedial map ordered by the Court will

17   take effect on April 30, 2024 absent a contrary

18   decision by an appellate court on or before that

19   date."

20           Did I read that properly?

21       A.    Correct.

22       Q.    So does this indicate that the goal was, at

23   the latest, that there would be a map in place by

24   April 30th, assuming that the April 1st deadline

25   wasn't sufficient?

Page 67

1          MR. JAZIL:  Object to form.

2          THE WITNESS:  Again, it's what it states

3      there.  And at the time that this joint

4      stipulation was entered into.

5  BY MS. McNAMARA:

6      Q.   What if there had been a map that was put

7  in place on April 27, 2024, for the statewide

8  congressional plan, how would that have impacted the

9  work of the Department of State in preparing for the

10 2024 election?

11         MR. JAZIL:  Object to form.

12         You can answer.

13         THE WITNESS:  Again, the process isn't

14     going to be any different; it's just that the

15     timeline is compressed.  So you still have to do

16     the same things you would do under any regular

17     time frame, but the shorter the time frame there

18     is the more compressed activities and your

19     deadlines start thumping up against each other.

20 BY MS. McNAMARA:

21     Q.   Isn't it more expensive to operate on the

22 compressed timeline?

23     A.   I believe it can definitely be for the

24 supervisors who bear, again, the main responsibility

25 and burden of implementing the maps.  If they have

Page 68

1    to--  If they don't have enough time, they may have

2    to do overtime, they may have to--it may be that

3    the--  Depending on the map's complexity, they may

4    have to contract out.  They have to, you know,

5    get--so it can cost more just in terms of staff time

6    and, you know, the payment of, you know, importing

7    those experts who do GIS mapping.

8        Q.   Does it cost more at the department level

9    to do it or is it all just borne by the Supervisors

10   of Elections?

11       A.   It's borne by the Supervisors of Elections.

12   It's their staff, any overtime that they have to do,

13   any, you know, additional experts that they have to

14   hire to be able to meet the timeline.

15           MS. McNAMARA:  I'm going to turn now to

16       topic four, which is responses to the request

17       for admissions and interrogatories.  Let me pull

18       up--  Okay.  I'm sharing a document.  This is

19       marked the Secretary's Responses to Plaintiffs'

20       First Set of Requests For Admission, in this

21       lawsuit, Keto Nord Hodges versus Kathleen

22       Passidomo.  It's now Albritton, but at the time

23       it was Passidomo.

24           Can I have this marked as Exhibit 5?

25

Page 69

1    BY MS. McNAMARA:

2        Q.    Do you recognize this document?

3        A.    Yes.

4        Q.    Were you involved in drafting the answers

5    to this document, or the responses?

6        A.    Yes.

7        Q.    So RFA 1 asks about black voters' ability

8    to elect representatives of their choice from being

9    diminished from their ability in Benchmark Senate

10   District 19 that was in place prior to the 2022

11   apportionment.  Is that correct?

12       A.    I'm sorry, repeat yourself.

13       Q.    RFA number one asks about black voters'

14   ability to elect representatives of their choice from

15   being diminished from their ability in Benchmark

16   Senate District 19.

17       A.    Correct.

18       Q.    And the Secretary's response is that the

19   Secretary is unable to answer this admission due to

20   lack of knowledge.  Is that correct?

21       A.    Yes.

22       Q.    And then going down the list, there is a

23   discussion that says, you know, the race-based

24   provisions of Article III, Section 21, that refers to

25   the Florida Constitution and what they call the Fair

Page 70

1    Districts Amendments; correct?

2         A.   Correct.

3         Q.   And that says it requires conducting

4    extensive, data intensive analysis.  Did I read that

5    properly?

6         A.   Yes.

7         Q.   And the legislature, the Florida

8    Legislature, is responsible for that analysis; is

9    that correct?

10        A.   Well, they're responsible for creating and

11   passing state legislative district maps consistent

12   with constitutional provisions.

13        Q.   But the Secretary is not involved in that

14   process, as you testified earlier; correct?

15        A.   Correct.

16        Q.   Does the department do anything when it

17   gets the apportionment plan to check the

18   legislature's work or to make sure they have complied

19   with the Florida constitutional provisions?

20        A.   No, we are not involved in that at all.  We

21   don't really have a role in that at all.

22        Q.   Do you have any reason to disagree with the

23   answer that's provided here to request for admission

24   number one?

25        A.   No.

Page 71

1          Q.   Now, RFA number two asks if the

2     constitution requires a senate district in which

3     black voters have an ability to elect representatives

4     of their choice in Hillsborough County.  Is that

5     correct?

6          A.   Yes.

7          Q.   And the response is similar to the response

8     to RFA 1; is that correct?

9          A.   Yes.

10         Q.   And do you have any reason to disagree with

11    that?

12         A.   No.

13         Q.   And then RFA 3, it asks the same question

14    as RFA 2, except for it's Pinellas County instead of

15    Hillsborough County; correct?

16         A.   Correct.

17         Q.   And the same response in general to that,

18    as well.  Do you have any reason to disagree with

19    that?

20         A.   No.

21         Q.   And then RFA 4, it's kind of the same.  It

22    combines Hillsborough and Pinellas in the same, but

23    it's the same question as two and three; is that

24    correct?

25         A.   Yes.

1      Q.    And the response is the same; correct?

2      A.    Yes.

3      Q.    And you have no reason to disagree with

4  that now; it's still the same response today as

5  opposed to when this was filed?

6      A.    Well, makes sense that our experts have

7  done an analysis, but at the time, that's definitely

8  the response.

9      Q.    And then RFA 5 is another question about

10  the process that has to do with what the legislature

11  is doing; correct?

12      A.    Yes.

13      Q.    And again the Secretary of State, the

14  Department of State, is not involved in that, has no

15  knowledge; correct?

16      A.    Correct.

17      Q.    The same thing with--six is another

18  question related to that.  It's the same as for five,

19  at least as far as the answers; is that correct?

20      A.    Can you scroll up?

21      Q.    (Complies.)

22      A.    Yes.

23      Q.    All right.  Now, RFAs 7 through 18, all of

24  them--  I can scroll through them.  All of them ask

25  questions about whether the 2022 Enacted Senate Plan

Page 73

1   was or was not drawn with an intent to favor a

2   political party or an incumbent.  It breaks down

3   District 16 all through these.  Is that correct?  I

4   mean, RFAs 7 through 18 is a group that are similar

5   so that we don't have to go through every single one.

6   Is that okay?

7        A.   Yes.

8        Q.   And for each of these, the answer is a

9   similar effect, that the Secretary is not involved

10  and doesn't have knowledge of this; correct?

11       A.   Correct.  And the Secretary doesn't have--

12  It's the legislative intent of both the House and the

13  Senate.

14       Q.   Let's go down to number 27, which says,

15  "Admit that preserving the cores of pre-existing

16  districts was not a criterion utilized in the drawing

17  of the 2022 enacted Senate Plan."  That's what 27

18  says; correct?

19       A.   Yes.

20       Q.   And 27 through 32 asks similar questions

21  broken down by district; correct?

22       A.   Yes.

23       Q.   And similar answers again, the Secretary

24  doesn't have knowledge and is not involved in that

25  process; correct?

Page 74

 1    A.    Correct.

 2    Q.    And no reason to disagree now with what was

 3  written in these responses; correct?

 4    A.    Correct.  I mean, the intent of--the

 5  legislative intent is that, the legislative intent.

 6    Q.    RFA 33 asks whether the Florida Senate

 7  complied with public records and open meeting laws;

 8  is that correct?

 9    A.    Yes.

10    Q.    And again the Secretary doesn't know

11  anything about what the Florida Senate did regarding

12  that; is that correct?

13    A.    I think it just says that, you know, how

14  they complied with the public meeting laws was up to

15  the House and the Senate.

16    Q.    RFA 34 says, "Admit that the Executive

17  Office of the Governor was not involved in the

18  drawing of the 2022 enacted Senate Plan."  Is that

19  correct?

20    A.    Correct.

21    Q.    And the responsa is, "To the best of the

22  Secretary's knowledge, admitted that the Executive

23  Office of the Governor was not involved in the

24  drawing of the 2022 enacted Senate Plan."  Did I read

25  that correctly?

Page 75

1      A.   Yes.

2      Q.   Does the Secretary's knowledge differ from

3  the department's knowledge?

4      A.   No.

5      Q.   So the department has no awareness beyond

6  what's indicated here about whether the governor was

7  involved in the 2022 enacted Senate Plan; correct?

8      A.   As I stated before, the division acts as

9  the administrative arm of the Secretary, so--

10          MR. JAZIL:  Would now be a good time to

11      take just a five minute break?

12          MS. McNAMARA:  Yes, we can do that.

13          (Thereupon, a brief recess was taken.)

14  BY MS. McNAMARA:

15      Q.   Now I'm going to turn to the rog responses.

16  I'll share the screen again.  This document, which

17  I'll offer as Exhibit 6, this is the Secretary's

18  Responses to Plaintiffs' First Set of

19  Interrogatories, and this is in this case which is

20  now captioned Keto Nord Hodges versus Albritton.  Is

21  that correct?

22      A.   Yes, it's so titled.

23      Q.   And you were involved in the drafting of

24  these interrogatories; is that correct?

25      A.   Yes.

Page 76

1          Q.   And if we go down to the final page, you

2     are the person listed as having information about

3     these responses; correct?

4          A.   Correct.

5          Q.   So going back to the top, interrogatory

6     number one asks about the State of Florida's

7     legitimate political objectives in adopting the 2022

8     enacted Senate Plan; correct?

9          A.   Yes.

10         Q.   And similar to what we were talking about

11    with RFAs, the Secretary's response is that that's up

12    to the house and Senate and that the Secretary and

13    the department are not involved in that process; is

14    that correct?

15         A.   Correct.

16         Q.   And that the Secretary defers to whatever

17    the Senate says in their version of this

18    interrogatory; correct?

19         A.   Yes, that the legislative record speaks for

20    itself.

21         Q.   And then interrogatories two and three are

22    basically the same question, just specifically

23    targeting the two districts at issue; is that

24    correct?

25         A.   Yes.

Page 77

1        Q.    And the response is the same; correct?

2        A.    Yes.

3        Q.    Do you have any reason to disagree with the

4   Answers to Interrogatories one through three today?

5        A.    No.

6        Q.    And then interrogatory four asks about can

7   you explain the responses to the request for

8   admissions; correct?

9        A.    Correct.

10        Q.    I mean, we just did that; correct?  We just

11   went through all the deposition and talked about

12   that.

13        A.    Yes.  I was just reading the--

14        Q.    Yes.  Is there anything else that the

15   department wants to say about this other than what's

16   written here in the RFA and rog responses and what

17   we've discussed so far in the deposition?

18        A.    No, other than, you know, I briefly

19   mentioned about obviously the state has experts, so

20   to the extent that that supplements or clarifies

21   anything in these admissions that maybe wasn't

22   available at that moment.

23        Q.    And you agree that there's no documents

24   supporting the Secretary's responses other than the

25   legislative record?

Page 78

1      A.   Correct.

2      Q.   I'm going to turn to topic number three.

3   This is related to state interest in using race.  So

4   generally speaking, does the Florida Department of

5   State ever use race in its work?

6      A.   No, other than we pull book closing numbers

7   on voter registration.  You know, polls, people who

8   self identify by whatever racial or ethnic group.

9   And we pull book codes and reports for that.  Those

10   are just statistical reports.  Again, anything else

11   would be just in connection with litigation.

12      Q.   When you talk about pulling the book codes

13   and statistics, how does that information impact the

14   work that you do in the department?

15      A.   It doesn't.  It's just information for the

16   public and interested candidates and parties about

17   the demographics of the voters in Florida.

18      Q.   Are there divisions of the Department of

19   State outside of the elections division that use race

20   at all?

21      A.   I would have no knowledge of that at all.

22      Q.   I mean, just, for example, like there is

23   the Division of Historical Resources that deals

24   with--  There's a Black History Month website that

25   the Department of State issues?

Page 79

1       A.    I have enough with my position.

2       Q.    That's totally outside your--

3       A.    It's totally outside.  And then the only

4   other thing that we get is, we get minority reports

5   that are just simply filed with the division.  Those

6   are reports that agencies have to file about

7   appointed people to commissions and things like that,

8   and it's a chapter outside of the code.  But we are a

9   repository for that information.

10      Q.    Are you aware of the Florida Museum of

11  Black History Task Force that's been created by

12  statute?

13      A.    I've heard of it.

14      Q.    Are you involved in that at all?

15      A.    No.

16      Q.    But other people within the Department of

17  State are involved in that; is that correct?

18      A.    I believe so.

19      Q.    Does the creation of the task force for the

20  Florida Museum of Black History, does that create a

21  law that creates a racial classification?

22          MR. JAZIL:  Object to form, and subject to

23      our objections to this deposition topic.

24  BY MS. McNAMARA:

25      Q.    And you're not aware of when the

Page 80

1    legislature passed the law creating the Florida

2    Museum of Black History Task Force whether the

3    legislature developed a record of race-based problems

4    that justified the need for that?

5         MR. JAZIL:  Object to form, and subject to

6         the objection to this deposition topic.

7         You can answer, if you would like.

8         THE WITNESS:  Again, it's really outside of

9         the division.  And I really have enough just

10        focusing on within the election world.

11   BY MS. McNAMARA:

12   Q.   Fair enough.  So does the Department of

13   State use race in the implementation of, say,

14   apportionment plans?

15   A.   Again, the whole process of drawing the

16   maps, approving the maps is the legislative

17   prerogative and constitutional responsibility.  All

18   we do is take the information, use the information to

19   the extent that we need it to update our data bases,

20   whether it's qualifying, whether it's registration or

21   anything else.  And then the supervisors are the ones

22   that have to take that map as is and implement that.

23   Q.   But the department takes the map as given

24   by the legislature; correct?

25   A.   As is finalized.  Yes, whatever that may

Page 81

1    be.

2        Q.   Whatever use of race that went into the

3    map, that's done before you ever get involved;

4    correct?

5        A.   I'm not admitting to anything that it was.

6    I'm just saying, yes, that the map is as is.

7        Q.   Is there any context other than we talked

8    about already with like the minority report and some

9    of the demographic information?  Is there any other

10   contact with which the Division of Elections uses

11   race?

12       A.   I would say that's not using race; that's

13   just statistical information that we happen to have

14   or that we are the recipients of.

15       Q.   Is race tracked on voter registration

16   records?

17       A.   Only to the extent that individuals, when

18   they fill out a voter registration application,

19   that's an optional field on a voter app, and if a

20   person so chooses to check that, that information is

21   recorded and is retained in the Florida voter

22   registration system.

23       Q.   Does race come up in the process of voter

24   list maintenance?

25            MR. JAZIL:  Object to form.

Page 82

1          THE WITNESS:  Not that I'm aware of.

2   BY MS. McNAMARA:

3      Q.   Is there anything like statistical analysis

4   of, you know, voter list of maintenance as it impacts

5   voters of different races?

6      A.   No.

7      Q.   What about in the designing or comparing of

8   ballots; is there any use of race related to that?

9      A.   No.

10     Q.   Everyone gets the same ballot based on the

11  county?

12     A.   Well, what I should state is that

13  supervisors are the ones that create the ballot, and

14  they have to do it according to statutes and rules.

15  And we have a uniform ballot rule that was adopted in

16  response to 2000 legislation.  And I am not aware of

17  anything in the rule or the law that references,

18  relies upon or in any way with race.

19     Q.   Is the Department of State involved with

20  any of the apportionment outside of statewide, like

21  county and municipal level?

22     A.   No.

23     Q.   And does the Department of State supervise

24  or advise the Supervisors of Elections in those

25  processes?

Page 83

1      A.    No.   Again, we are just guidance, asked for

2   information.   All that responsibility lies on the

3   supervisor with their county governing boards.

4      Q.    Are there any Department of State documents

5   that lay out the situations in which it's appropriate

6   to use race in your work?

7            MR. JAZIL:   Object to form.

8            You can answer, if you know.

9            THE WITNESS:   I'm not aware of any within

10        the Division of Elections.

11   BY MS. McNAMARA:

12      Q.    Is it possible that ones exist in other

13   divisions that you're not aware of?

14      A.    I can't speak to outside of the division's

15   capacity and role serving the Secretary.

16      Q.    Within the Division of Elections, in the

17   context where race comes up that you testified about,

18   does the Division of Elections perform any analysis

19   of whether any use of race in those contexts complies

20   with the Florida or United States constitutions?

21            MR. JAZIL:   Object to form, and subject to

22        the objection to the deposition topics.

23            THE WITNESS:   Answer; right?

24            MR. JAZIL:   You can answer, if you know.

25            THE WITNESS:   Can you restate the question?

Page 84

 1   BY MS. McNAMARA:

 2        Q.   I mean, there are situations where race

 3   comes up, whether or not you are using race or not,

 4   but like statistics and stuff.  Is there any analysis

 5   performed to like track whether that use of race is

 6   complying with constitutional mandates at the federal

 7   or state level?

 8        A.   No.

 9             MR. JAZIL:  Object to form.

10   BY MS. McNAMARA:

11        Q.   Do you keep a list or a form of, "Oh, we

12   used race on this issue.  I need to check and make

13   sure of any type of logs like that"?

14        A.   No.

15             MS. McNAMARA:  We'll go ahead to topic

16        five.  I'm going to pull up the Answer.  This

17        document is the Secretary's Answer in this

18        lawsuit.

19             I ask this to be marked as deposition

20        Exhibit 7.

21   BY MS. McNAMARA:

22        Q.   Do you recognize this document?

23        A.   Yes.

24        Q.   Were you involved in the drafting of it?

25        A.   Yes.

Page 85

1          Q.   Going to page ten, which is the first

2    affirmative defense--affirmative defenses at the

3    bottom of page ten.  The first affirmative defense

4    says, "If race predominates whenever the Florida

5    Legislature complies with or attempts to comply with

6    the Fair Districts Amendments, as Plaintiffs

7    seemingly contend, then the Fair Districts Amendments

8    violate the Fourteenth Amendment to the U.S.

9    Constitution, principles of federalism, and

10   principles of equal sovereignty; the Fair Districts

11   Amendments lack a record of race-based problems that

12   justify the need for their race-based solutions."

13          Did I read that correctly?

14      A.   Yes.

15          MS. McNAMARA:  Is this a legal question

16       that is subject to objection for testimony

17       today?

18          MR. JAZIL:  If that's directed to me, yes.

19   BY MS. McNAMARA:

20      Q.   Are you involved at all in assessing the

21   constitutionality of the Fair Districts Amendments?

22      A.   No.

23      Q.   Does the Department of State, whenever it's

24   performing its acts, is it checked beforehand, does

25   what I'm being asked to do comply with the federal or

Page 86

1    state constitution before it does it?

2        A.    What are you speaking about?

3        Q.    I mean, like is there any situation where

4    there's a law in the books - let's just say a Florida

5    statute has been passed - that deals with the

6    Department of State, and the Department of State says

7    we're not going to comply with this law because it

8    violates a constitutional provision such as the equal

9    protection laws?

10       A.    The legislature's job is to pass laws and

11   the agency, the executive branch, is to implement

12   those.  And if a party or individual feels that they

13   are unconstitutional, then they can be challenged in

14   court and that's how it would be addressed.

15       Q.    But absent the court rule, the department

16   isn't engaged in an independent analysis of the

17   constitutionality of laws that apply to it; is that

18   correct?

19           MR. JAZIL:  Object to form.

20           You can answer.

21           THE WITNESS:  Again, our Secretary's task

22       is to, you know, comply with the state and

23       constitutional provisions.  The

24       constitutionality of--  The underlying

25       constitutionality of anything is going to be for

Page 87

1       the courts to decide, so if it's a legal case,

2       then the matter is dealt with that way.

3  BY MS. McNAMARA:

4       Q.   But there's no existing document that you

5  are aware of within the department that says these

6  provisions of law are unconstitutional and we don't

7  have to follow them; is that correct?

8       A.   Well, unless it's a provision that's

9  already been ruled by a court that they are

10 unconstitutional.  I mean, it's not unheard of to see

11 statutory provisions in statutes that haven't been

12 repealed yet even though the courts have weighed in

13 on it and ruled them to be unconstitutional.

14      Q.   But you wait for a court ruling before not

15 enforcing that law; is that correct?

16           MR. JAZIL:  Object to form.

17           You can answer.

18           THE WITNESS:  One of the primary duties of

19      the Secretary of State, under Chapter 97, is to

20      enforce, you know, the election.

21 BY MS. McNAMARA:

22      Q.   Does the Department of State comply with

23 what we call the Fair Districts Amendments, that's

24 Article III, Sections 20 and 21 one of the Florida

25 Constitution?

Page 88

1          MR. JAZIL:  Object to form.

2          You can answer.

3          THE WITNESS:  The Fair Districts Amendments

4      is for the purpose of the legislature being able

5      to draw and approve their maps.  Again, that's

6      all within their purview and their

7      responsibility.

8  BY MS. McNAMARA:

9      Q.   The Department of State is not involved in

10  that process.  I know you testified to that before,

11  but--

12      A.   Correct.  We are not involved in this whole

13  process, in that process, except to the extent that I

14  said.

15      Q.   So, I mean, there is a case pending before

16  the Florida Supreme Court.  It's possible in the

17  coming months that the Florida Supreme Court will

18  declare parts or all of the Fair Districts Amendments

19  to be unconstitutional.  Like setting aside whether

20  or not that happens, if it did happen, would that

21  impact the Department of State's work?

22      A.   Only to the extent that it would change any

23  maps or anything like that.  But otherwise, no.

24      Q.   Has the Department of State ever looked at

25  a state apportionment plan and said, you know what, I

Page 89

1   think this district here is a racial gerrymandering,

2   is unconstitutional, and we are not going to

3   implement it?

4           MR. JAZIL:  Object to form.

5           You can answer.

6           THE WITNESS:  I can only speak to the time

7       that I've been at the department, and no.

8           Again, this is all within the Florida

9       Legislature's, you know, constitutional

10      responsibility for them to comply with state and

11      constitutional provisions, including the Fair

12      Districts Amendments.

13  BY MS. McNAMARA:

14      Q.   If the court in this case enjoins the

15  Secretary of State from enforcing the enacted Senate

16  Plan, would the department comply with that court's

17  order?

18      A.   I don't know that we would not.  I mean,

19  obviously the legal team would determine what--

20  depending which court issued the order, what course

21  of action to take.  That's all legal.

22      Q.   Absent the court injunction that Legal has

23  determined is a valid court injunction that you're

24  following, would the Department of State ever refuse

25  to implement any part of the statewide apportionment

Page 90

1    plan?

2         A.    We would abide by the court's ruling.

3         MS. McNAMARA:  The last topic we have is

4    topic six.  I think it could potentially take a

5    little bit longer than some of the others.  Do

6    we want to just keep going forward or do you

7    want to take a lunch break?  How do you feel

8    about that?

9         MR. JAZIL:  How long do you think you have

10   with topic six?

11        MS. McNAMARA:  Maybe an hour.  I don't

12   know.  Maybe that's longer, but I don't know.  I

13   could see it taking a little while.

14        MR. JAZIL:  How about we go for an hour,

15   see if we can get this wrapped up?  If not, we

16   will just take a lunch break at 12:30.  Does

17   that sound all right?

18        MS. McNAMARA:  That sounds good to me.

19        Let's go on to topic six.  Topic six deals

20   with the initial disclosures.  I will go ahead

21   and pull up the initial disclosures.  This

22   document that I've pulled up is The Secretary's

23   Initial Disclosures.  This is the first one that

24   was filed back on May 31st, 2024.

25        I'm going to ask this to be marked as

Page 91

1          Exhibit 8.

2    BY MS. McNAMARA:

3          Q.    Are you familiar with this document?

4          A.    Yes.

5          Q.    Were you involved in the drafting of it?

6          A.    I did review it, yes.

7          Q.    So under A here on the first page, it says,

8    "Individuals Likely to Have Discoverable

9    Information."  And it says, "State Senators in the

10   2022 Legislative Session."  Do you know how many

11   state senators there are?

12         A.    Yes.

13         Q.    How many?

14         A.    Forty.

15         Q.    And then similarly, it says, "State

16   Representatives in the 2022 Legislative Session."

17   How many state representatives are there within the

18   legislature?

19         A.    One hundred twenty.

20         Q.    One hundred twenty?

21         A.    Yes.

22         Q.    We will go over the amended disclosures

23   afterwards.  Then there are a list of Supervisors of

24   Elections; is that correct?

25         A.    Yes.

Page 92

1        Q.    How many Supervisors of Elections are

2    there?

3        A.    Sixty-seven.

4        Q.    One for each county in Florida?

5        A.    Correct.

6        Q.    And then there's some individuals who are

7    listed here.  Mr. Warren and Mr. Isbell have been

8    deposed.  So we can rely on that.

9              Who is Christian Ulvert?

10       A.    He was a lobbyist for the democratic party.

11       Q.    Has the Department of State had any

12    interactions with him?

13       A.    I don't recall if they've had direct

14    contact with him.

15       Q.    And is that after the filing of the

16    lawsuit, there's been no contact with him other than

17    like a subpoena perhaps?

18       A.    I don't know when the last communication

19    was with him.

20       Q.    Have there been any interactions with him

21    related to state senate elections?

22       A.    I mean, this is only where I've seen his

23    name, in the context of the congressional challenge.

24       Q.    You say in the context of congressional

25    challenge.  Is that in the lawsuits?  His name comes

Page 93

1   up in the lawsuits?

2        A.   Yes.

3        Q.   Separate from the lawsuits, has there been

4   any situations where his name has come up?

5        A.   I can't answer that; I don't know.

6        Q.   You're not aware of any?

7        A.   I don't know.

8        Q.   And then it says Barbara Pariente.  Does

9   that refer to the former Supreme Court Justice

10  Pariente?

11       A.   I assume so.  And yes, it is.

12            MS. McNAMARA:  Now I have on my screen the

13       Amended Initial Disclosures.  I'm going to ask

14       this be marked as Exhibit 9.

15  BY MS. McNAMARA:

16       Q.   These are amended disclosures which were

17  served October 4th, 2024; is that correct?

18       A.   Yeah, that's the date on there.

19       Q.   And were you involved with these amended

20  disclosures?

21       A.   Yes, I did review them.

22       Q.   I'll go down to page 30 something.

23  Christian Ulvert is still listed here.  We have

24  already discussed him.  Barbara Pariente is no longer

25  listed here; is that correct?

Page 94

1      A.    Correct.

2      Q.    Does that mean that the Secretary of State

3  no longer believes that Justice Pariente is likely to

4  have discoverable information?

5      A.    If they've amended--as amended, this would

6  be what their position would be, yes.

7      Q.    Do you know why she was listed initially?

8          MR. JAZIL:  Objection; attorney-client

9      privilege information.

10         I'm going to direct you not to answer.

11 BY MS. McNAMARA:

12     Q.    Does the Secretary have a plan to call

13 Justice Pariente to testify at trial in this case?

14     A.    These were the names that are provided and

15 disclosed, so we have an obligation to let you know.

16     Q.    If it comes up that she was going to

17 testify, I assume that that would be put on a

18 pretrial disclosure or some sort of amendment as to

19 this claim.  Is that correct?

20     A.    Correct.

21     Q.    So Natalie Kato appears here on the amended

22 disclosures.  Is that correct?

23     A.    Yes.

24     Q.    Who is Natalie Kato?

25     A.    Again, all these four names are connected

Page 95

1    with, you know, the map that I think was presented as

2    an alternative in the court.  So they all had--all

3    these individuals had a role in that alternative map

4    and have been connected with the ACLU and/or the

5    democratic party.

6         Q.   What role did Natalie Kato have in the

7    alternative maps submitted in this case?

8              MR. JAZIL:  I think you said alternative

9         maps submitted during the process.

10             MS. McNAMARA:  Okay.  So I include the maps

11        that were submitted to the legislature before

12        the enacted.

13             THE WITNESS:  Correct.

14   BY MS. McNAMARA:

15        Q.   And the Secretary of State is not involved

16   in that process; correct?

17        A.   No.

18        Q.   Did the Department of State have any

19   interactions with Natalie Kato?

20        A.   Only to the extent for the litigation.

21        Q.   But separate from whatever has happened in

22   this litigation or other litigations, there's no

23   other interactions with her outside of that context?

24        A.   Sounds fair.

25        Q.   I'll pull up a separate document here for a

Page 96

1    second.  I pulled up a document.  This is marked at

2    the bottom with a Bates number SOS Hodges 0001434 and

3    at the top it says Response to Subpoena to Produce

4    Documents By Natalie Kato.  Is that correct?

5        A.   Yes.

6             MS. McNAMARA:  I'm going to ask that this

7        exhibit be marked as Exhibit 10.

8    BY MS. McNAMARA:

9        Q.   Have you seen this document before?

10       A.   I don't recall seeing this recently, no.

11       Q.   It looks like this is a document that's

12   part of a response by Miss Kato to a subpoena.  Does

13   that look correct to you?

14       A.   That's what it's titled.

15       Q.   Do you know what case this subpoena was

16   served on her that resulted in this?

17       A.   No.

18       Q.   So number one on here says, "Any documents

19   or communications with the organizers, members,

20   employees, volunteers, or agents of the American

21   Civil Liberties Union of Florida relating to the Fair

22   Districts Amendments during the 2022 redistricting

23   cycle relating to redistricting."

24             Did I read that correctly?

25       A.   Yes.

1       Q.    And it says, "Respondent does not have any

2   items responsive to this request."  Is that correct?

3       A.    Correct.

4       Q.    Does the department have any reason to

5   believe that that's not true?

6       A.    I'm assuming the person would honestly

7   respond and if there's anything to supplement that

8   they would do so.

9       Q.    That was my assumption, as well.

10           And then for number two, it says "Any

11  documents or communications with members of staffers

12  of the Florida Legislature during the 2022

13  redistricting cycle relating to redistricting."

14           Is that what that says?

15      A.    Yes.

16      Q.    And then it lists, "Respondent has provided

17  all responsive items in a PDF format entitled

18  'Binder'," blah, blah, blah, and there's a

19  description of what's contained within the pages,

20  page one through 17.  I think there's more than 17

21  pages, but the last group starts on page 17.

22           Does that read correctly to you?

23      A.    Yes, that's the way it's listed.

24      Q.    And there are documents that are in the

25  production that we have.  I'm not going to go through

Page 98

1    them, but is it your understanding that those

2    documents are documents that have been produced to

3    the plaintiffs in this case?

4        A.   Yes.

5        Q.   And those are text communications with a

6    couple senators, a state rep, state representatives,

7    as well as David Grimes.  Am I reading that

8    correctly?

9        A.   Yes.

10       Q.   Do you know who David Grimes is?

11       A.   I am not recalling right now.

12       Q.   I believe he works in the House Minority--

13   like he's a lawyer who works for the House democrats,

14   I think, something along those lines.  You don't know

15   who David Grimes is?

16       A.   I don't have communications--  I don't have

17   communications with him personally, no.

18       Q.   Number 3, "Any documents or communications

19   with any print or online media outlet during the 2022

20   redistricting cycle relating to the 2022

21   redistricting cycle."  Is that correct?

22       A.   Yes.

23       Q.   And it says, "Respondent does not have any

24   items responsive to this request."

25       A.   Correct.

Page 99

1      Q.   And the same with number four, "Any draft

2    congressional or legislative district maps that you

3    created during the 2022 redistricting cycle."  And it

4    just says, "Respondent does not have any items

5    responsive to this request."  Is that correct?

6      A.   Yes.

7      Q.   And like I asked for number one, these are

8    the responses to the subpoena.  There's no indication

9    that you're aware of that these responses are untrue;

10   is that correct?

11     A.   Correct.

12     Q.   I'll go back to the amended disclosures.

13   So back on page 34 of the Amended Initial

14   Disclosures, it says, "Discoverable Documents," and

15   continuing on to page 35, there's a list of some

16   public websites as well as a few PDF's that are

17   available on those websites; is that correct?

18     A.   Yes.

19     Q.   And there are also documents that the

20   Secretary of State has produced to the plaintiffs in

21   this case in addition; correct?

22     A.   Yes.

23     Q.   Are there any documents that the Secretary

24   of State plans to use to support its claims or

25   defenses that are neither listed here or produced in

Page 100

1    response to the request for production in this case?

2              MR. JAZIL:  Object to form.

3    BY MS. McNAMARA:

4         Q.   Are you aware of any documents that you

5    would use in this case that aren't either available

6    on these websites as listed or otherwise produced in

7    this case?

8              MR. JAZIL:  Object to form and it goes

9         beyond the topics that are listed here.  You are

10        asking her for pretrial disclosures?

11             MS. McNAMARA:  No.  I understand that.  I'm

12        just asking like--  I'm just establishing that

13        this is the universe of documents.  There may be

14        impeachment or other stuff, I know, that comes

15        out.

16   BY MS. McNAMARA:

17        Q.   You don't see there's some category of

18   documents that would have been listed that's not

19   listed; is that correct?

20             THE WITNESS:  My understanding of civil

21        procedure is that you provide your list of what

22        you are disclosing, what you plan to rely upon,

23        and you have an obligation, if you are going to

24        additionally provide anything else, to disclose

25        it.  And if there is something, I trust that

Page 101

1          my--the legal team would abide by that.  I have

2          no reason to believe that they wouldn't.

3                MS. McNAMARA:  Yes.  I mean, I understand.

4          I'm not trying to get some pretrial disclosures;

5          I'm just going through this document to ask

6          questions.

7      BY MS. McNAMARA:

8          Q.   Going back to page 33, at the bottom, this

9      is still under the section of individuals who may

10     have information.  There's a heading here at the

11     bottom of page 33 for Supervisors of Elections;

12     correct?  The previous disclosures just said

13     Supervisors of Elections is a category, but now there

14     are individual supervisors listed; is that correct?

15         A.   Yes.

16         Q.   And first we have Craig Latimer,

17     Hillsborough County.  Is Craig Latimer the Supervisor

18     of Elections of Hillsborough County?

19         A.   Yes.

20         Q.   Has that changed since the election?

21         A.   No.

22         Q.   Obviously, if for some reason a Supervisor

23     of Elections changes and there's a new person in the

24     office, we can deal with that later.  But it's your

25     understanding that the Hillsborough County Supervisor

Page 102

1   of Elections is listed because they would be involved

2   in the implementing any remedial plan; correct?

3       A.   For Hillsborough County, yes.

4       Q.   And on page 34, there's also a Julie

5   Marcus, Pinellas County Supervisor of Elections; is

6   that correct?

7       A.   Yes.  They both won their re-election.

8       Q.   Are there any other Supervisors of

9   Elections who could be relevant to this topic other

10  than the two of them?

11      A.   Again, I trust the legal team would

12  disclose whoever they would plan to call upon at the

13  appropriate time if there's any change or addition to

14  what's been provided here.

15      Q.   Like, for example, the Pasco County

16  Supervisor of Elections is not listed here.  Is there

17  a particular reason why they're not listed?

18      A.   No, I don't know, except the fact that I

19  think Pinellas and Hillsborough had already gone on

20  record regarding the feasibility of implementing a

21  plan, a remedial plan, so they already have knowledge

22  and can just attest as much as any other supervisor.

23  And more importantly, because it impacts their

24  county.

25      Q.   You are not aware of Pasco County

Page 103

1    Supervisor of Elections office making any comments on

2    how this lawsuit could impact the senate district

3    lines in Pasco County?

4         A.   I don't recall any, no.

5         Q.   And the same question with Manatee County.

6         A.   Same answer.  Again, they're all going to

7    have the same, you know, response about, you know,

8    implementation.  Of course, it's going to be specific

9    factors that are unique to their county that impact

10   the timing of the implementation.

11        Q.   Has the Department of State had any

12   specific conversations with Craig Latimer or his

13   office about the implementation of remedial plans?

14        A.   Only to the extent in discussion with the

15   litigation and whatever they have provided on record.

16        Q.   The same question for Julie Marcus,

17   Pinellas County.

18        A.   And the same answer.

19        Q.   Let's go up to the top here, "Individuals

20   Likely to Have Discoverable Information."  Under the

21   Florida Senate, it appears that instead of, just as

22   in the initial disclosures listing the Senate

23   collectively, this now lists each of the senators

24   alphabetically; is that correct?

25        A.   If you would scroll, I believe so, that

Page 104

1    it's all alphabetical.

2        Q.    What did the Department of State do to

3    determine which senators to list?

4        A.    It would be based on the timing of when

5    this document was submitted.

6             Can you please scroll down to the end,

7    again, what date this was?

8        Q.    (Complies.)

9        A.    So October 4th.  So that's before the

10   final--you know, before the general election.  So

11   this would be all the legislators that were obviously

12   in that 2022 legislative session.  The link to the

13   legislative cycle may lead you to the Senate, but

14   then it's not specific.  It may be that there might

15   have been changes, you know, in terms of personnel in

16   general counsel's office in the Senate or even maybe

17   some legislators there has been a vacancy in a

18   special election.  So these are all very specific to

19   the 2022 legislative session, those who were serving

20   at the time and who participated in the drawing and

21   the approval of the maps.

22       Q.    Does the Department of State expect that it

23   would call every one of these senators to testify?

24            MR. JAZIL:  Same objection; beyond the

25       scope of the topics.

Page 105

1              But you can answer to the extent of that.

2              THE WITNESS:  Again, like it says there,

3         these are individuals likely to have

4         discoverable information.  So if they're listed

5         and, if necessary, for purposes of the

6         litigation, then that is a decision for the

7         legal team to make.

8    BY MS. McNAMARA:

9         Q.   So is it correct to say that how the names

10   were come up with was who was in the Senate at the

11   time of the 2022 redistricting process?  Is that

12   correct?

13        A.   Correct, who participated in the drawing

14   and the approval of the maps.  And all of that is

15   recorded.  You know, all that voting history and who

16   was serving at the time is all available on the

17   website.

18        Q.   But there's no differentiation between,

19   say, someone who was on a specific committee versus

20   someone who just voted at the end on a map in the

21   full Senate?

22        A.   My understanding is this lists who all the

23   Florida Senators are and who all the Florida House of

24   Representatives are at that time.

25        Q.   Here on page eight, it refers to Senator

Page 106

1    Linda Steward.  I think it's Stewart with a T.  Is

2    that just a typo?

3        A.   We'll definitely look into it.

4        Q.   I mean, I imagine it's not some secret

5    shadow senator with a different spelling of her name.

6    I'm just clarifying that it refers to Senator Linda

7    Stewart.  Is that correct?

8        A.   Yes.  If it's with a T, we will verify

9    that, but, yeah, it sounds like it should be a T.

10       Q.   So on page six, Senator Rosalind Osgood

11   appears here.  Is that correct?

12       A.   Yes.

13       Q.   Are you aware that Senator Osgood was I

14   elected through a special election in 2022?

15       A.   I can certainly go back and verify it.  I

16   don't recall exactly when she was elected.

17            MS. McNAMARA:  This document is a printout

18       taken from the Florida Department of State -

19       Election Results website.  It says March 8,

20       2022, special election Senate 33 and House 88.

21            Can I have this marked as Exhibit 11?

22   BY MS. McNAMARA:

23       Q.   Do you recognize the information on this

24   document?

25       A.   Yes.  This is coming from our website on

Page 107

1    election results.

2        Q.   So under District 33 for state senator, it

3    indicates that Rosalind Osgood received 80.8 percent

4    of the votes on a special election held on March 8,

5    2022; is that correct?

6        A.   Yes.

7        Q.   Was she a member of the Senate prior to

8    this special election?

9        A.   I don't recall that she was an incumbent or

10   not.

11           MS. McNAMARA:  I am showing a document

12       that's marked Journal of the Senate, Number 1 -

13       Special Session C, Tuesday, April 19, 2022.

14           I'll have this marked as Exhibit 12.

15   BY MS. McNAMARA:

16       Q.   Do you recognize this document?

17       A.   This is the--  I recognize it only based on

18   my experience in the Senate, and it's the journal

19   that the Senate keeps, and it records their

20   activities on the floor.

21       Q.   So here on page one, there's a section here

22   on the right column that says Election of Senator

23   Rosalind Osgood; correct?

24       A.   Correct.

25       Q.   And it says that the oath of office was

Page 108

1    administered and the certificate is received; is that

2    correct?

3        A.    Correct.

4        Q.    And then the, "State of Florida Department

5    of State, I, Laurel M. Lee, Secretary of State of the

6    State of Florida, do hereby certify that the

7    following candidates were duly elected at the Special

8    Election held on the 8th day of March, 2022, to the

9    office of Member, State Senate, as shown by the

10   records of this office."  And it indicates District

11   33, Rosalind Osgood was elected.

12            Is that correct?

13       A.    Correct.

14       Q.    And then she was sworn in from that;

15   correct?

16       A.    Yes.

17       Q.    Does this indicate whether she was already

18   a member of the Senate or not?

19       A.    Each respective house is responsible for

20   determining the qualifications of their members for

21   serving, so I don't know if she did appear before she

22   was administered the oath.

23       Q.    Does the Secretary have a basis to think

24   that Senator Osgood was involved in the redistricting

25   process in 2022 that was completed by March 3rd of

Page 109

1   2022?

2        A.   Well, given the timing of the maps, it's

3   possible.  I don't know.  We would have to look at

4   the record.  If we've listed them, then it would have

5   been our good faith belief that she may have had a

6   role.

7        Q.   Does the department know if Senator Osgood

8   was involved in the drawing or passage of the

9   challenged districts prior to her time being in the

10  Senate, assuming she wasn't in the Senate prior to

11  when she was sworn in?

12       A.   I can't answer that; I don't know.

13  Remember, legislators are involved in different

14  processes as the collective body, but there may be

15  individuals who, you know, are serving specifically

16  on apportionment committee that may have a greater

17  role than some of the other legislators.  So, you

18  know, it's hard to say what each one did individually

19  and to what extent.

20       Q.   So the department doesn't have specific

21  knowledge of the role of Rosalind Osgood in the

22  redistricting, just that she was a senator during

23  2022?

24       A.   To the extent of the legislative record, we

25  would defer to that.  Whatever the legislative record

Page 110

1    indicates, whether there's voting history or

2    participation in a committee or, you know, drawing a

3    map in the back room or whatever.  That's the

4    legislative record.

5        Q.   So going back to--  I think that's

6    Exhibit 9, the Amended Initial Disclosures.  I'm

7    going to scroll down.  I think page nine is where we

8    start with the House.  So Florida House of

9    Representatives, 2022 legislative session, starting

10   on page nine, starts with Ramon Alexander.  And it

11   appears to list the senators in alphabetical--not

12   senators, but representatives in alphabetical order;

13   is that correct?

14       A.   Yes, it appears that it was done that way,

15   in alphabetical order.

16       Q.   Is it done in the same way for the House as

17   with the Senate, that these are the people who were

18   in the House in 2022?

19       A.   That were in the House and had some role,

20   although the exact role that each and every one had

21   in the drawing and the approval of the maps is going

22   to be governed by whatever available legislative

23   record there is.

24       Q.   Going down the list, here at the end of the

25   B's was Secretary of State Cord Byrd in the House in

Page 111

1    2022?

2        A.   He was until May or June.  I don't recall

3    exactly when he became Secretary.

4        Q.   I think you probably recall better than I

5    do, but I recall Secretary Lee left so that she could

6    run for congress in the 2022 cycle and that's when

7    Secretary Byrd was named.  Is that correct?

8        A.   I knew it was mid year or almost mid year

9    before the qualifying period.

10           MS. McNAMARA:  This is a document that's

11           labeled Florida House of Representatives, 2022

12           Regular Session, dated 2/2/22, so that's

13           February 2nd, 2022.

14           I'm going to have this marked as

15           Exhibit 13.

16           MR. JAZIL:  Is it 12 or 13?

17           MS. McNAMARA:  Let me see.  I had 12 being

18           the Senate journal, and 11 was the Osgood

19           election results page.  I think this would be

20           13.

21    BY MS. McNAMARA:

22        Q.   Is this the House voting list for the 2020

23    Resolution 100, the passing of the State

24    Apportionment plans for the House and Senate?

25        A.   It appears to be, yes.  It's a screenshot

Page 112

1    of that, yes.

2        Q.    So this lists all the people who voted.

3    And I see in column one that it does indicate

4    Congressman Byrd at the time voted yes on that.  Is

5    that correct?

6        A.    Yes.

7        Q.    I mean he's quoted in the complaint he was

8    involved in some of the committee hearings in the

9    House during this process, as well.  Is that correct?

10       A.    Yes.  If he was asked, he would have

11   answered honestly on that, yes.

12       Q.    So is there a reason why then Rep Byrd, who

13   is now of course Secretary of State Byrd, is not

14   listed among the House members who have information

15   related to this?

16       A.    I can't answer that.

17       Q.    I mean, he is, in fact, a party to the

18   lawsuit, so it's not like we don't know that he has

19   information.  But he does not appear on that list.

20            As far as the Secretary is concerned, does

21   Secretary Byrd have knowledge about how the

22   challenged districts were drawn in the past?

23       A.    He would have experience on how those would

24   be drawn, based on his prior public service as a

25   representative.

Page 113

1       Q.    Even though as the Secretary of State - the

2   Secretary of State, whoever it happens to be at the

3   time - is not involved in the legislative process,

4   Secretary Byrd was involved in the 2022 process by

5   virtue of being a member of the House of

6   Representatives at that time.

7       A.    He definitely was serving at that time

8   until he wasn't.

9       Q.    Going down this list, all of these are just

10  the members of the House at the time.  I mean,

11  setting aside, you know, any details on who might

12  actually have any knowledge.  That is this list;

13  correct?

14      A.    Correct.  I mean, based on, you know, what

15  it says, knowledge of how challenged districts were

16  drawn and passed.

17      Q.    Here on page 16 it lists Representative

18  Jervonte Edmonds; is that correct?

19      A.    Yes.

20      Q.    Now, going back to Exhibit 11 from the

21  website, on the March 8, 2022 special election, in

22  addition to State Senator Rosalind Osgood, there was

23  also an election for State Representative, District 8

24  in which Jervonte Edmonds received 80 percent of the

25  vote; is that correct?

Page 114

1      A.    Yes.  It says 80.3.

2      Q.    So similarly as I was asking with Senator

3   Osgood, Senator Edmonds was included because he

4   became a member of the House regardless of whether or

5   not he might actually have been in the house prior to

6   when the SJR was passed?

7      A.    Correct.  He had gotten knowledge after he

8   started his service.

9      Q.    So it's possible that he started his

10  service after the vote, but then he got the

11  information about the vote afterwards?

12     A.    Correct.

13     Q.    Or maybe his predecessor handed it off to

14  him?  You don't know.

15     A.    I don't know the communications between

16  each other.  It would be in the legislative record,

17  though.

18     Q.    Then, similarly, I think he represented or

19  he replaced Representative Omari Hardy, who is listed

20  down here in the H's, Omari Hardy, who had been the

21  previous representative of District 88 who is also

22  listed here; correct?

23     A.    Correct.

24     Q.    So going back to Exhibit 13, which is the

25  House vote sheet, Representative Hardy does not

Page 115

1  appear.  There's a Representative Harding and a

2  Representative Hart.  Is that correct?

3       A.   I don't see him listed.

4       Q.   And similarly, going down to the E's,

5  Representative Edmonds would be listed here between

6  Duran and Eskamani, if he had been part of it; is

7  that correct?

8       A.   He was either not on the floor or not yet

9  sworn in.

10      Q.   But as far as this document is concerned,

11  neither Representative Hardy nor Representative

12  Edmonds voted on the SJR at this time; is that

13  correct?

14      A.   So far as this document represents,

15  because, as you note up there, it says, you know,

16  three people not voting.  I don't know who those

17  three are and whether it would have still listed them

18  or not and I can't tell from this thing.  But this

19  document appears to represent the legislative record

20  in terms of voting on the passage of that Senate

21  Joint Resolution.

22      Q.   One more thing I'd like to pull up.  This

23  document is a Journal of the House of

24  Representatives, dated Thursday, March 10th, 2022.

25  Is that correct?

Page 116

1      A.    Correct.

2            MS. McNAMARA:   I'm going to mark this as

3      Exhibit 14.

4  BY MS. McNAMARA:

5      Q.    Now, if we go down to page two, here at the

6  top, it says, "Election of Representative Jervonte

7  "Tae" Edmonds," and it says, "Representative Edmonds

8  has been elected on March 8, 2022, in a special

9  general election, as a member of the House of

10 Representatives from District 88, replacing

11 Representative Omari Hardy, who resigned effective

12 January 10, 2022."

13           Is that correct?

14     A.    Yes.

15     Q.    Is the department aware of whether or not

16 Representative Hardy or Representative Edmonds

17 participated in the redistricting process in 2022?

18     A.    Well, to the extent--  I mean, you are

19 talking about a regular session and special session.

20 It's possible that he would have participated in

21 them.  Again, the names are listed for reasons that

22 they may have knowledge of how--or that they have

23 knowledge on how the maps--and there were several

24 maps drawn and/or--and passed.  So at least perhaps

25 for this portion.  I don't know that I can speak to

Page 117

1  specifically what role he may have had up to that

2  point.

3       Q.   Just to recap all of that, or cover it,

4  for--and I'll pull up the amended disclosures--  So

5  this list of all of the House of Reps is intended to

6  include everyone who was a member of the House at

7  some point in 2022 because they might potentially

8  have information on the challenged districts and how

9  they were drawn and passed; correct?

10      A.   That they have knowledge of how the

11  challenged districts were drawn and passed.

12  Districts encompasses all of them, so Senate, you

13  know, and for purposes of this case, congressional,

14  that they may have information on it depending on

15  what their role may have been.  Again, that would be

16  part of the legislative record.

17      Q.   So it lists everyone who might have been,

18  with the exception of Representative, at the time,

19  Byrd?

20      A.   Correct.

21           MS. McNAMARA:  I don't have any more

22      questions.  We are just before 12:30.  I can

23      pass to you if you have any questions.

24           MR. JAZIL:  I don't have questions, but I

25      would like to make our objections to the next

Page 118

```
 1        exhibit, Exhibit 15.

 2             MS. McNAMARA:  Okay.  Is that the objection

 3        to the notice?

 4             MR. JAZIL:  Yes.

 5             MS. McNAMARA:  Okay.  I can pull that up.

 6             MR. JAZIL:  I went to the chat feature.  I

 7        hope I did this right.  That would be

 8        Exhibit 15.

 9             And that's it.  We'll read.

10             MS. McNAMARA:  Okay.  So, the court

11        reporter, you have the access to number 15, I

12        can go ahead and send it - I have that, as well

13        - when I send over the other ones.

14             Does that work?

15             MR. JAZIL:  It works for me.

16             MS. McNAMARA:  Okay.  Thank you so much.

17             (Thereupon, the previously referred to

18        documents were marked Plaintiffs' Exhibit No's.

19        1 to 15 for identification.)

20             (Thereupon the taking of the deposition was

21        concluded.  Reading, subscribing and notice

22        of filing were not waived.)

23

24
                      Deponent
25
```

Page 119

1

2          Sworn to and subscribed before me this _____

3   day of December, 2024.

4

5

6

                   Notary Public
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 120

1                    CERTIFICATE OF OATH

2

3     STATE OF FLORIDA

4     COUNTY OF MIAMI-DADE

5

6

7              I, the undersigned authority, certify that

8     MARIA MATTHEWS personally appeared before me via

9     videoconference and was duly sworn.

10

11             WITNESS my hand and official seal this 4th

12    day of December, 2024.

13

14

15                    *Jay H. Pilchick*

16                    JAY H. PILCHICK
                      Notary Public - State of Florida
17                    My Commission No.  HH317041
                      Expires:  January 21, 2027
18

19

20

21

22

23

24

25

Page 121

```
 1              REPORTER'S DEPOSITION CERTIFICATE

 2

 3    STATE OF FLORIDA

 4    COUNTY OF MIAMI-DADE

 5

 6              I, JAY H. PILCHICK, Court Reporter, certify

 7    that I was authorized to and did stenographically

 8    report the deposition of MARIA MATTHEWS; that a

 9    review of the transcript was requested; and that the

10    transcript is a true and complete record of my

11    stenographic notes.

12

13              I further certify that I am not a relative,

14    employee, attorney, or counsel of any of the parties,

15    nor am I a relative or employee of any of the

16    parties' attorney or counsel connected with the

17    action, nor am I financially interested in the

18    action.

19

20              DATED this 4th day of December, 2024.

21

22                        Jay H. Pilchick
                          JAY H. PILCHICK
23                        Notary Public - State of Florida
                          My Commission No.  HH317041
24                        Expires:  January 21, 2027

25
```

Page 122

1              E R R A T A   S H E E T

2    IN RE:  Hodges vs Passidomo

3    DEPOSITION OF: MARIA MATTHEWS   TAKEN: 12/2/2024
        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
4    PAGE #   LINE #   CHANGE                  REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   DATE:_____  DEPONENT:_____

23   Sworn to and subscribed before me this _____ day of
     _____, 2024.

24   _____

25           Notary Public, State of Florida

Page 123

1            BAILEY & SANCHEZ COURT REPORTING, INC.
                        PO BOX 960430
2                    MIAMI, FLORIDA  33296
                      (305) 358-2829
3

                      December 4, 2024
4

   TO:  Maria Matthews
5        c/o Mohammad Jazil, Esq.
         mjazil@holtzmanvogel.com
6

7            RE:  Hodges vs Passidomo

8   Your deposition which was taken in the above-styled
    cause on December 2, 2024 is now ready for reading
9   and signing at the office shown above.  If you choose
    to do so, please telephone to schedule an
10  appointment.

11  Your other choice, of course, is to have one of the
    counsel involved in this matter send you a copy for
12  your inspection.  In either event, any corrections or
    changes you wish to make in the transcript should be
13  made on the errata sheet provided with the
    transcript, not in the transcript itself.  Upon
14  completion, please forward the corrections or changes
    to Caroline McNamara, Esq.
15
    The original transcript will not be held in this
16  office, but will be delivered to Caroline McNamara,
    Esq.
17
    If we can be of any further assistance in this
18  matter, please contact us at the above address.

19  Sincerely,

20  *Jay H. Pilchick*

21
    BAILEY & SANCHEZ COURT REPORTING, INC.
22
    CC:  All counsel
23

24

25