**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KETO NORD HODGES, et al.,

*Plaintiffs*,

v. Case No. 8:24-cv-879

KATHLEEN PASSIDOMO, et al.,

*Defendants*.
_______________________________/

**SECRETARY OF STATE'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Consistent with this Court's direction, Defendant Secretary of State Cord Byrd submits his proposed findings of fact and conclusions of law. He asks that judgment be entered in his favor.

In this document, "PX" refers to Plaintiffs' exhibits, "DX" refers to Defendants' exhibits, and "JX" refers to joint exhibits. "Tr." refers to trial transcripts, with the trial day indicated before the "Tr." So a citation to the first day of trial would look like this: (1)Tr.12:3-4.

## I. Introduction

Plaintiffs want to replace what they see as a racial gerrymander of Florida's Senate District 16 with a *better* racial gerrymander. Their proposed alternatives just happen to be partisan gerrymanders, too. Because they have yet to provide workable alternatives as required by the U.S. Supreme Court (and now the Florida Supreme Court for the State's analog to the federal non-retrogression standard), Plaintiffs fail. Separately, because Plaintiffs carry the ultimate burden of persuasion in this case, and because their complaint never puts in dispute the compelling interest for the State's actions, Plaintiffs also fail on the narrow-tailoring prong of the Fourteenth Amendment analysis. The State of Florida has put forward good reasons for its decision to draw Senate District 16 as it did—reasons supported by a district-specific functional analysis and contemporaneous statements in the legislative record, as required by *Bethune-Hill v. Virginia State Board of Elections*, 580 U.S. 178 (2017). The trial bears this out. We provide our findings of fact and conclusions of law before entering judgment for Defendants Secretary of State and Florida Senate.

## II. Findings of Fact

We first make credibility determinations for the witnesses at trial. We summarize the evidence introduced at trial along the way.

Plaintiffs produced ten witnesses at trial. They include the named Plaintiffs: Jarvis El-Amin, Meiko Seymour, Keto Nord Hodges, and Jacqueline Azis. Other fact witnesses were Yvette Lewis, a resident in the area; Jay Ferrin, the Florida Senate's map drawer; Jacob Ogles, a reporter; and Nicholas Warren, lead counsel for Plaintiffs,

who's also a map drawer, a source for news stories, an advisor to Democratic legislators and their staff, and the person instructing Plaintiffs' experts on how best to draw alternative maps. Plaintiffs called two expert witnesses as well: Cory McCartan, PhD; and Matthew Barreto, PhD.

Defendants collectively produced five witnesses at trial. The fact witnesses were Nicholas Warren; Jay Ferrin; and Matthew Isbell, a Democratic political consultant and friend of Mr. Warren. Defendants' two experts were Sean Trende, PhD, and Stephen Voss, PhD.

We consider each witness in turn, discussing the evidence as appropriate.

**Jarvis El-Amin**. Mr. El-Amin is a registered voter, (1)Tr.14:2-3, who's black, (1)Tr.14:17-18. He resides in Senate District 16, the challenged district. (1)Tr.16:7-8. We find his testimony credible to the extent it establishes his standing to sue.

**Meiko Seymour**. Mr. Seymour also lives in the challenged district. (1)Tr.24:25 – 25:9. He too is a registered voter, (1)Tr.30:21-22, and black, (1)Tr.35:6-7. He intends to vote in future elections. (1)Tr.31:3-4. We find his testimony credible to the extent it establishes his standing to sue.

**Keto Nord Hodges**. Mr. Nord Hodges is a registered voter, (1)Tr.182:17-18, and black, (1)Tr.182:15-16. He lives in Senate District 16. (1)Tr.183:5-6. We find his testimony credible to the extent it establishes his standing to sue.

**Jacqueline Azis**. Ms. Azis identifies as a "[w]hite Hispanic" voter, (1)Tr.215:8-9, who lives in a district no longer at issue in this case, (1)Tr.218:17-19, and who has

"worked [as a lawyer] for the ACLU of Florida," Plaintiffs' counsel in this case, "for a little more than seven years," (1)Tr.216:5-7. Indeed, Ms. Azis was a staff attorney for Plaintiffs' counsel (and a Plaintiff herself) "at the time this lawsuit was filed in April 2024." (1)Tr.223:11-18. We find her testimony neither credible nor relevant to the issues before us. In the alternative, we afford her testimony little weight.

**Yvette Lewis**. Ms. Lewis isn't a Plaintiff in the case. Because she lives in the Hillsborough County portion of the challenged district, she says that the current senator for Senate District 16, Darryl Rouson, who is a black legislator from the Pinellas County portion of the district, "does not adequately serve [her] needs." (1)Tr.213:2-21. But she has never supported an attempt to challenge the senator in a primary election, (1)Tr.213:17-21, and she meets with the senator, from time to time, "at a restaurant," (1)Tr.204:19-21. To the extent Ms. Lewis's testimony is relevant, it shows that Senator Rouson goes out of his way to connect with his constituents. We otherwise afford Ms. Lewis's testimony little weight.

**Jacob Ogles**. Mr. Ogles is a reporter whose testimony is credible but largely irrelevant. The testimony is relevant in only two ways: (1) it shows that Mr. Warren was a source for news stories about the legislature's 2022 redistricting efforts, (2)Tr.47:10 – 48:4; and (2) it shows that Mr. Ogles, like others, was unable to tell whether Mr. Warren was talking to him "as an ACLU lawyer" or in some "personal capacity" separate from the ACLU, (2)Tr.48:5-7.

**Nicholas Warren**. To be sure, Mr. Warren is more than a source for reporters. He signed the complaint in this case as the "[d]esignated lead counsel." Doc.1 at 31.

The complaint includes references to "Plan 42," a map Mr. Warren drew and submitted to the Florida Senate as an alternative configuration of the challenged district. Doc.1 at 13-15; (1)Tr.94:25 – 95:2, 162:19 – 163:1. He testified about the plan in a legislative committee. (1)Tr.57:21 – 58:6. When doing so before the committee, he did not identify himself as an attorney for the ACLU who worked for the organization on redistricting issues. (1)Tr.109:20-23. He didn't use his "aclufl.org" email address, either. (1)Tr.109:24 – 110:1. Nor did he disclose the affiliation on the committee form that accompanied his submission. (1)Tr.110:2-4. Mr. Warren wants us to believe that he interacted with the legislature in his personal capacity. (1)Tr.54:13-16.

But Mr. Warren also interacted with Democratic members of the legislature and their staff about redistricting. In these interactions with Democrats, he often used his "aclufl.org" account to correspond with the legislators on *their* private email addresses, or through *his* personal cell phone number; he even used the ACLU's Zoom link for sessions with the Democrats. *See, e.g.*, PX134 (private email exchange between Senator Ausley, a Democratic state senator from Tallahassee, and Mr. Warren, where Mr. Warren provides his cell phone number); DX157 (correspondence with David Grimes, a lawyer for the Florida House Democratic Caucus); DX189 (correspondence with John Toman, who works for the Florida Senate Democratic Caucus, where Mr. Warren provides his personal cell phone number); (1)Tr.110:5-8, 178:3-24.

Notably, Mr. Warren had interactions with Democratic staff in the days before his testimony before the Florida Legislature. *E.g.*, DX189. He apparently provided

talking points and questions for the Democratic members to ask in the legislative committee. DX157; DX189; *see also* (1)Tr.141:12-17 (Mr. Warren referring to his "prepar[ation]" of "great questions for Dem senators," and expressing his disappointment in senators not "even say[ing] a effing word").

Mr. Warren even "launder[ed]" information—his word, not ours—through a Democratic political consultant, Matthew Isbell. (4)Tr.25:22 – 26:5 (referring to DX131 at SEN-2801); (1)Tr.153:1-3. A long list of private messages includes references by Mr. Warren to the Democratic members as "our caucus," making plain Mr. Warren's partisan motives, as shared with a partisan, political consultant working for the legislators. *See generally* DX131 (compiling messages that make clear the familiarity between the two).

Mr. Warren later directed Plaintiffs' map-drawing expert in this case, Dr. McCartan, to draw the alternative maps submitted to this Court. PX66. The instructions directed Dr. McCartan to *not* cross the bay between Pinellas and Hillsborough Counties, (2)Tr.68:15-17, 98:25 – 99:5, and had the effect of making *no* changes to Senate District 14, PX97 – PX100. As detailed below, the result was a one-seat shift in the area's natural partisan make-up in favor of the Democratic Party. *Infra*.

Mr. Warren is a registered Democrat. (1)Tr.164:18-19. He's been so since he pre-registered to vote in Florida at the age of sixteen. (1)Tr.164:20-24. He discussed with his friend, Mr. Isbell, the possibility of bringing a racial gerrymandering claim even "before [he] saw a single legislative map." (1)Tr.155:14-17.

We find Mr. Warren to be partisan and not credible. Mr. Warren's maps—the ones submitted to the Florida Legislature *and* this Court—are tainted with partisan intent. He fails in his attempts to distinguish work done in his personal capacity from that in his capacity as an ACLU lawyer; like Mr. Ogles, we can't tell when Mr. Warren wears which hat. And we find it troubling that Mr. Warren admitted to working on state-level redistricting behind the back of his supervisor, the ACLU's then-executive director. (1)Tr.63:2-5, 68:22 – 69:12, 146:22-23.

In sum, we find that Mr. Warren engaged in the legislative process, engaged with the press, and participated in this case, all to create an extra Democratic senate seat in the region. He also made the relevant strategic decisions in this case, from the filing of the complaint to the instructions for alternative plans. His testimony to the contrary simply isn't credible, particularly when he admits to working behind the back of his former boss.

**Cory McCartan, PhD**. We don't find Dr. McCartan credible, either. Dr. McCartan drew the alternative plans for Plaintiffs in this case that, in Plaintiffs' telling, better comply with the state and federal districting standards applicable here. The plans are called ACLU A, B, and C. *See* PX98 – PX100. There are three problems with Dr. McCartan's testimony (and the resulting plans ACLU A, B, and C).

First, consider the software Dr. McCartan used. He used Dave's Redistricting. (2)Tr.145:2-5. Dave's has racial data and partisan data available to map drawers as they draw—these are visible layers superimposed onto a map. (2)Tr.145:2-17. So, a map drawer knows where black and white voters reside, and where Democratic and

Republican voters reside. (2)Tr.145:2-17. By contrast, Florida's redistricting website doesn't have that racial and partisan data available when someone draws a map. Relevant reports become available only *after* the map is drawn. *E.g.*, (3)Tr.56:3-11, 57:20 – 58:1; JX4 27:5-10. But Dr. McCartan didn't use Florida's website to draw his maps. Nor did Dr. McCartan use *his own* redistricting software—the one for which he's won awards, (2)Tr.151:1-21, and the one used to establish his expertise, (2)Tr.151:7-9. Dr. McCartan's software allows someone to draw race-neutral and partisan-neutral maps. (2)Tr.151:10-12. Dr. McCartan's decision was, as counsel for the Secretary put it, like "Ronald McDonald eating a whopper." (4)Tr.85:24-25.

Second, consider the results. Dr. McCartan wants us to believe that he drew race- and partisan-blind maps, checking racial demographics only after drawing the maps, and never checking the partisan results. (2)Tr.149:3-16, 150:3-4. Yet this blind process somehow resulted in Dr. McCartan getting within one or two percentage points of the black voting age population—BVAP—of the enacted plan. (2)Tr.148:22 – 149:2; *see also* DX326. On cross-examination, Dr. McCartan further acknowledged that he knew where white voters lived along the coast in Hillsborough County in a portion of the county excluded from one of his alternative maps. (2)Tr.144:20 – 145:1, 145:18-21, 148:11-14. Also, in all of Dr. McCartan's maps—the heel in the Hillsborough portion of his District 16—follows with surgical precision high-BVAP areas of the county. *Infra* (Trende). Dr. McCartan's maps go on to ultimately flip the partisan divide in the area from three to two in favor of Republicans to three to two in

favor of Democrats, *infra* (Voss), a proposition he "guessed" was true on cross-examination, (2)Tr.150:1-2.

For us to believe that Dr. McCartan drew maps blind to race or partisanship strains credulity. The precision with which Dr. McCartan follows racial lines is astounding. The partisan effects can't be chalked up to chance, either.

The results for Senate District 16 also come at a price for other districts in the area. Each successive version of Plaintiffs' plan, for example, worsens the shape of Senate District 23, as Dr. McCartan himself acknowledged when discussing his alternative maps, ACLU A (PX98), ACLU B (PX99), and ACLU C (PX100), on cross examination. (2)Tr.142:25 – 144:24. The stairway from the Gulf of America to Plant City are just some of the collateral effects of Dr. McCartan's map-drawing exercise—effects a map drawer focused on compactness (as opposed to race or partisanship) wouldn't have countenanced. *See* PX99 (stairway to Plant City that begins at the Gulf of America along the southern boundary of Senate District 23); PX100 (same general stairway to Plant City).

Third, consider the directions from Mr. Warren to Dr. McCartan. Dr. McCartan was told *not* to cross the bay. PX66. Dr. McCartan also interpreted the directions as requiring him to freeze Senate District 14—to not change its configuration from the enacted map. (2)Tr.149:17-21. Senate District 14 sits in the center of our five-district region. *See* PX97 – PX100. Freezing it without crossing the bay creates a Democratic seat to the west of District 14 and to the east of District 14. *Infra* (Voss); *see also* (2)Tr.149:22 – 150:23. As the creator of a race-neutral and partisan-

neutral map-drawing software, and an experienced map drawer himself, Dr. McCartan knew better than to blindly follow such partisan directions from Mr. Warren. But he did. Perhaps that's because Dr. McCartan is a Democrat—an obvious fact he acknowledged at trial only after some hesitation—and he wants to see an additional Democratic seat in the region. (2)Tr.151:25 – 152:3 (reflecting hesitation).

In sum, we do not find Dr. McCartan credible. In the alternative, we afford his testimony little weight.

**Matthew Barreto, PhD**. Nor do we find Dr. Barreto credible. Dr. Barreto conducted a racially polarized voting analysis of Plaintiffs' alternative plans, ACLU A, B, and C, assessing whether these plans would allow black voters to elect their candidate of choice. (2)Tr.239:13-21. He also conducted a boundary analysis of Senate District 16 in the Florida Legislature's enacted plan to assess whether race predominated, (2)Tr.239:22 – 240:1, though he conducted no such analyses of ACLU A, B, and C. Again, there are three problems with the testimony.

First, the racially polarized voting analysis. Dr. Barreto acknowledged on cross-examination that Senate District 16 is not a district where black voters constitute a majority of the electorate—it isn't a majority-black district in the benchmark map, the enacted map, or Plaintiffs' alternative maps. (2)Tr.246:7-18 . So, black voters need help from voters of other races to elect their candidate of choice. (2)Tr.246:19-22, (3)Tr.182:1-9, 185:17 – 186:4. Because black voters need the assistance of others, precision is key in assessing how people of different races might vote together (or not) to elect the *black* candidate of choice. (3)Tr.182:1-9, 185:17 – 186:4.

But Dr. Barreto studies only three primary elections for the challenged district. (2)Tr.244:6-19. One shows *no* racially polarized voting. (2)Tr.244:23 – 246:1; PX71. The results for the other two are error prone. We know this because the sums for each racial demographic don't add up to one hundred percent; where the sum exceeds one hundred percent there's an overestimation, and where it falls below one hundred percent there's an underestimation for the racial demographics. *Infra* (Voss). Here, we credit Dr. Voss's general critique of the racially polarized voting analysis.

Taken together, this means Plaintiffs haven't shown that their three alternatives allow black voters to elect a candidate of their choice in ACLU A, B, or C. That's particularly true of the black voters in Pinellas County who, in Plaintiffs' maps, are removed from Senate District 16 and placed in Senate District 18.

Second, the boundary analysis. We find it troubling that Dr. Barreto conducted a boundary analysis for the Florida Legislature's plan but not for Plaintiffs' plans. Dr. Trende's boundary analysis of Plaintiffs' plans heightens our concern because Plaintiffs' plans follow racial lines with great precision and, indeed, do so more so than the legislature's plan. *See infra.*

Dr. Barreto's analysis is flawed for other reasons as well. The point comes across most clearly in one of Plaintiffs' exhibits, which highlights racial demographics in the Pinellas portion of the district. PX81. That exhibit shows the enacted district *including* white populations (in green) to the north and west of St. Petersburg; a good racial gerrymander would have *excluded* these portions, as Dr. Trende explained. *Infra*. And Dr. Barreto's analysis fails to account for political geography, the need to

maintain certain lines as they are or the tendency of people (sometimes of the same race) to cluster in an area. (2)Tr.241:5-14 (including Senate District 14's boundaries in his analysis, even though Dr. McCartan thought the district had to be drawn the way it was); (3)Tr.157:4-9 (Dr. Trende explaining "one of the problems with Dr. Barreto's binomial test is that, in a theoretical world where people are sorted 50/50, something like that works," but "in the real world, you get city boundaries that have racial meaning").

Third, past work calls into question Dr. Barreto's testimony in this case. Recently, Dr. Barreto testified in a case titled *Common Cause v. Byrd*, 726 F. Supp. 3d 1322 (N.D. Fla. 2024), a three-judge case in the Northern District of Florida concerning a challenge to the elimination of a black-performing district in north Florida. As part of his work in that case, Dr. Barreto assessed how the Florida Legislature drew black-performing districts elsewhere in Florida. (2)Tr.247:11-16. Senate District 16 was one of the districts assessed. (2)Tr.247:17-19. He said this about the district Plaintiffs challenge here: "Precisely such districts *are lawful* in Florida in order to not retrogress minority voting strength and *should be maintained*." (2)Tr.250:9-13 (emphases added). Dr. Barreto has now changed his mind in this case. Perhaps that's because he's a registered Democrat, (2)Tr.251:7-8, who has worked for every Democratic-related entity imaginable, (2)Tr.251:9-21, who has been paid "well over" $500,000 for this work, (2)Tr.251:22-23, and who wishes to see another Democratic seat in the region.

In sum, we do not find Dr. Barreto credible. In the alternative, we afford his testimony little weight.

**Jay Ferrin**. Mr. Ferrin was called as a witness for both sides. We find Mr. Ferrin to be straightforward and credible. His explanation of the map drawing process makes clear that the Florida Senate, which was responsible for drawing the challenged district, intended to limit the kind of partisan gamesmanship at play during the last redistricting cycle. Among other things, members had to "vouch for a public submission and ask staff in writing to consider its inclusion in one of the draft maps or to analyze it." (3)Tr.93:7-9. Mr. Ferrin further explains that the Senate drew the challenged district as part of an overall seven-county region—the district wasn't drawn in isolation. (3)Tr.68:10 – 69:5, 78:3 – 79:4. There was also a contemporaneous functional analysis done of Senate District 16. JX19 21:8-9; (3)Tr.56:21-24. And there was ample discussion on the legislative record about the district, *e.g.*, JX16 7:10 – 9:4, with Mr. Ferrin raising concerns about the ungainly shapes of any districts that didn't cross the bay, (2)Tr.30:8 – 32:6 (discussing appendages in alternative maps presented in this case that are consistent with the concerns Mr. Ferrin expressed in the legislative record).

Mr. Ferrin also created a table that allows for an apples-to-apples comparison of the enacted districts in the region with Plaintiffs' alternatives. (3)Tr.97:18 – 100:18 (discussing DX326). That testimony shows that Plaintiffs' alternatives aren't that different from the enacted plan on BVAP or compactness, but Plaintiffs' alternatives

are much worse when it comes to the Florida Constitution's requirement for adherence with political and geographic boundaries. *See* DX326 (providing comparisons).

In sum, we find Mr. Ferrin credible. We afford his testimony great weight.

**Sean Trende, PhD**. We likewise find the Secretary's expert, Dr. Trende, credible. Among other things, the Virginia Supreme Court appointed Dr. Trende to serve as an expert responsible for drawing its maps, (3)Tr.130:22 – 131:16, and he served as South Carolina's expert in *Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1 (2024), (3)Tr.133:22 – 134:11. Here, Dr. Trende assessed the enacted map for the region and Plaintiffs' three alternative maps for the region. (3)Tr.135:10-13.

Dr. Trende provided a map with the benchmark district (the black lines) overlayed with the new, enacted district (the dashed, blue lines). DX216 (reproduced below). He discussed where population was added and where it was subtracted, and the racial composition of different parts of the map. (3)Tr.136:17 – 139:9. He ultimately concluded that "[t]here's no [race-based] pattern" to the inclusion or exclusion of areas based on "BVAPs," and that "[i]t's a pretty incompetent racial gerrymander," "if that's what's being done because you usually want to have consistent going in, consistent coming out" "BVAPs" "to bleach or pack the district." (3)Tr.139:13-17.

Figure 7: Benchmark 19, with Enacted 16 overlaid




*DX216*

Dr. Trende then compared the enacted plan to Plaintiffs' alternatives. Like Mr. Ferrin, Dr. Trende looked to adherence with political and geographic boundaries. He did so by providing a chart and histograms. Both tell the same story but slightly differently: the State's configuration of Senate District 16 and the region more generally is more compliant with the Florida Constitution's requirement that plans "utilize existing political and geographical boundaries." Fla. Const. art. III, § 21(b).

The chart shows the five districts in the region in the left most column with the various iterations labeled "Enacted," "Map A," "Map B," and "Map C." DX217. The last column "Non-GeoPolitical Boundaries" is the most significant; it tells us the percentage of a district's boundaries that fail to adhere to geographic and political

boundaries, a requirement under the Florida Constitution. (3)Tr.142:3-5. The lower the number in this last column, the better the district. (3)Tr.142:12-19.

And based on the chart, Plaintiffs' three alternatives fare poorly compared to the enacted map—their "nonadherence percentage" is "much higher." (3)Tr.142:23 – 143:17. Plaintiffs' alternatives for Senate District 16 fail to adhere to political and geographic boundaries 41-44% of the time compared to 18% for the enacted plan's Senate District 16; the non-adherence rates for Plaintiffs' Senate Districts 20, 21, and 23 are also noticeably higher than the legislature's plan. DX217.

Figure 8: Relationship of District Boundaries to Geo-Political Boundaries, Enacted Map and Maps A-C

| Map | District | City Boundaries | County Boundaries | Road Boundaries | Water Boundaries | Rail Boundaries | Non-GeoPolitical Boundaries |
|---|---|---|---|---|---|---|---|
| Enacted | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Map A | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Map B | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Map C | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Enacted | 16 | 19% | 6% | 39% | 31% | 1% | 18% |
| Map A | 16 | 10% | 0% | 29% | 24% | 1% | 42% |
| Map B | 16 | 11% | 0% | 32% | 22% | 1% | 41% |
| Map C | 16 | 26% | 8% | 16% | 35% | 1% | 44% |
| Enacted | 18 | 24% | 52% | 16% | 71% | 0% | 8% |
| Map A | 18 | 30% | 67% | 11% | 87% | 0% | 2% |
| Map B | 18 | 30% | 66% | 11% | 86% | 0% | 3% |
| Map C | 18 | 30% | 66% | 11% | 86% | 0% | 3% |
| Enacted | 20 | 1% | 53% | 33% | 33% | 0% | 9% |
| Map A | 20 | 11% | 49% | 27% | 38% | 2% | 14% |
| Map B | 20 | 11% | 50% | 26% | 38% | 2% | 12% |
| Map C | 20 | 5% | 53% | 23% | 36% | 2% | 18% |
| Enacted | 21 | 12% | 45% | 28% | 54% | 0% | 1% |
| Map A | 21 | 11% | 48% | 12% | 64% | 0% | 13% |
| Map B | 21 | 12% | 47% | 10% | 68% | 0% | 10% |
| Map C | 21 | 12% | 47% | 10% | 68% | 0% | 10% |
| Enacted | 23 | 5% | 58% | 46% | 3% | 0% | 7% |
| Map A | 23 | 4% | 53% | 34% | 5% | 3% | 17% |
| Map B | 23 | 4% | 54% | 36% | 46% | 0% | 14% |
| Map C | 23 | 4% | 54% | 36% | 6% | 2% | 12% |

*DX217*

The histograms assess the geographic-and-political adherence issue in visual form. Each blue column "is a count of districts in the enacted map that have a certain level of adherence." (3)Tr.145:4-5. Looking at DX218, the histogram for the enacted plan, the tallest column on the far left represents "districts that have zero percent deviation" from political and geographic boundary lines, and there are fourteen such districts in the enacted plan. (3)Tr.145:7-12. The "black vertical lines" drawn atop some of the columns represent the districts in the region we are assessing. (3)Tr.145:18-

25. Histograms for ACLU A (DX219), ACLU B (DX220), and ACLU C (DX221) are similarly configured. Looking at all four histograms together makes clear that Plaintiffs' alternatives are much worse than what the Florida Legislature enacted; they are worse for Senate Districts 16, 20, 21, and 23. (3)Tr.146:24 – 148:02.

Figure 9: Histogram of Percentage of district boundaries that deviate from geopolitical boundaries; Enacted Map




*DX218*

Figure 10: Histogram of Percentage of district boundaries that deviate from geopolitical boundaries; Map A




*DX219*

Figure 11: Histogram of Percentage of district boundaries that deviate from geopolitical boundaries; Map B




*DX220*

Figure 12: Histogram of Percentage of district boundaries that deviate from geopolitical boundaries; Map C




*DX221*

From there, Dr. Trende did what Dr. Barreto didn't: he conducted a boundary analysis of Plaintiffs' alternative plans. He did so by creating "a choropleth map or a heat map of the racial makeup of the various precincts," and overlaying on top of that the various configurations of Senate District 16. (3)Tr.148:13-21. There's a heat-map for ACLU A (DX236), ACLU B (DX237), and ACLU C (DX238).

ACLU A's shape in Hillsborough County looks like a boot. From "the heel to the sole of the boot," Plaintiffs' configuration perfectly follows the racial contours of the region (in green hues). (3)Tr.149:22 – 151:2. Again, that's a miraculous bit of line-drawing from Plaintiffs' race-blind drawer, Dr. McCartan.

Figure 27: Map A, District 16, with precincts shaded by BVAP

© OpenStreetMap contributors

*DX236*

ACLU B makes some improvements to the squiggly lines in the northeastern portion of ACLU A. (3)Tr.151:4-22. But the heel and sole have the same problems.

Figure 28: Map B, District 16, with precincts shaded by BVAP




*DX237*

ACLU C has a generally better southern boundary. (3)Tr.152:4-7. But the heel, the southeast corner, "manages somehow to get in all the higher BVAP areas almost of Hillsborough County." (3)Tr.152:8-11.

Figure 29: Map C, District 16, with precincts shaded by BVAP




*DX238*

Dr. Trende then gave the same treatment to the enacted district. DX239. His conclusion: if the Florida Legislature was trying to create a racial gerrymander, "[i]t's pretty bad." (3)Tr.154:1-3. That's because the map in Hillsborough includes and excludes higher BVAP precincts—it sometimes takes in black voters and sometimes it doesn't. (3)Tr.152:16 – 153:13. The heel from Dr. McCartan's maps is excluded.

Figure 30: Enacted Map, District 16, with precincts shaded by BVAP

BVAP%
20%
25%
30%
35%
40%
45%
50%
55%
60%
65%
70%
75%
80%

© OpenStreetMap contributors

*DX239*

Plaintiffs' cross-examination of Dr. Trende further proved the point. Plaintiffs asked Dr. Trende to provide an opinion on PX81, a map from Dr. Barreto. Looking at the Pinellas portion of the enacted district, Dr. Trende explained that the enacted version of Senate District 16 "left in" a "big chunk of white people" in the upper portion of the district. (3)Tr.156:21-24; *see also* (3)Tr.155:20 – 156:24. Put another way,

Dr. Trende's assessment of Plaintiffs' exhibit underscored his point: the enacted plan kept in populations one wouldn't expect in a racial gerrymander (white people) and excluded populations one wouldn't expect to exclude (black people).

In sum, we find Dr. Trende credible. We afford his testimony great weight.

**Stephen Voss, PhD**. We also find the Secretary's other expert, Dr. Voss, credible. Dr. Voss had been hired under the assumption that Dr. McCartan would have used his "nifty cutting-edge method of simulating districts that," in Dr. Voss's estimation, "should have been used in this case." (3)Tr.168:22-25, 231:14-24. But Dr. McCartan made other choices. So, Dr. Voss, a professor at the University of Kentucky, (3)Tr.161:18-21, a registered Democrat, (3)Tr.231:9-12, and a faculty advisor for that university's chapter of the Democratic party, (3)Tr.232:14-21, responded to Dr. Barreto's testimony concerning compactness, partisan expectations in the area, and the erosion of the black voting strength in the area.

First, Dr. Barreto's racially polarized voting analysis. Like Dr. Barreto, Dr. Voss recognized that the benchmark district at issue, the enacted district, and the three ACLU alternatives are *not* majority black districts. (3)Tr.181:11-18. So, even if black voters are known to vote for candidates from the Democratic party, assessing whether those voters can control the party primary and then the general election requires a careful and accurate assessment of how white and Hispanic voters will vote in the area. (3)Tr.182:1-9, 185:17 – 186:4. But we never got that level of accuracy from Dr. Barreto:

- Dr. Barreto's claim of racial polarization between black and white voters was simply false in one of the three primary elections he

looked at for his analysis—a third of his small sample size. (3)Tr.171:17-22; PX71.

- As shown in DX261, a bar plot from Dr. Barreto that Dr. Voss modified, Dr. Barreto also underestimates (and sometimes overestimates) the racially polarized voting effects in his use of ecological inference. We know this because the figures in the bar plots don't add up to one hundred percent. Where the figures are less than one hundred percent, we have missing voters (or an underestimation). The rather large number of missing Hispanic voters is particularly problematic when accuracy is critical, and Hispanic voters can (and do) split their vote among candidates. (3)Tr.172:21 – 175:22; *see also* DX264; (3)Tr.179:2 – 180:19.




*DX261*

- Two points become apparent: (1) Dr. Barreto is "overconfident" in his assessment of racially polarized voting, especially from a small sample of elections where one shows no polarization between black and white voters; and (2) he's especially "having trouble with his methodology estimating the Hispanic vote, which can be pretty important for whether African American voters get their candidate of interest." (3)Tr.180:20 – 181:3.

Second, the compactness discussion. Dr. Voss generally agreed with Mr. Ferrin's testimony concerning compactness. But his testimony is helpful in several respects. Dr. Voss reminds us that "compactness measures" "are relative measures,"

not absolutes. (3)Tr.191:20-24. He also discusses a measure of compactness that's used on Dave's, the redistricting suite *both* Plaintiffs' experts used, (3)Tr.191:6-13, called KIWYSI or the know-it-when-you-see-it method, (3)Tr.190:6-12. This method recognizes that compactness is a visual assessment. Rather than focusing on how close to a circle or a rectangle a district's shape appears (like some of the other methods), KIWYSI uses a statistical model built on how people actually view the district; tidy-looking districts get a higher number, i.e., one closer to one hundred. (3)Tr.190:6 – 191:5. In this way, KIWYSI attempts to "blend" the features of other measures that look to specific shapes (not all common shapes) or the length of tendrils. (3)Tr.190:25 – 191:5. Dr. Voss also created a table of the districts in the area, DX253:

TABLE 1 – Compactness Scores for Select Hillsborough County Districts

| District | P-P | Reock | KIWYSI | District | P-P | Reock | KIWYSI |
|---|---|---|---|---|---|---|---|
| 16 ACLU C | 0.377 | 0.432 | 61 | 23 Enacted | 0.555 | 0.564 | 92 |
| 16 Enacted | 0.361 | 0.376 | 50 | 23 ACLU-C | 0.421 | 0.420 | 69 |
| 16 ACLU B | 0.324 | 0.391 | 55 | | | | |
| 16 ACLU A | 0.274 | 0.351 | 46 | 20 Enacted | 0.421 | 0.386 | 61 |
| 19 Obsolete | 0.260 | 0.407 | 40 | 20 ACLU-C | 0.408 | 0.405 | 60 |

NOTE: The Polsby-Popper, Reock, and KIWYSI scores are the three measures of compactness computed in Dave's Redistricting App (DRA). High scores represent more-compact districts.

*DX253*

This table shows that Plaintiffs' alternatives for Senate District 16 aren't any better than the enacted plan when it comes to compactness. (Note that Dr. Voss calls the benchmark plan the "obsolete" plan because he refuses to become "part of the consulting industry." (3)Tr.189:2-11.) ACLU A and B are about the same as the

enacted version of Senate District 16, with ACLU C showing improvements but at the cost of adjacent Senate Districts 20 and 23. (3)Tr.192:9-17. But as shown on the right-hand column of DX253, Senate District 23, in particular, becomes far less compact in ACLU C when compared to the enacted plan's version of that district. (3)Tr.192:18 – 193:12. That's the numerical effect of Dr. McCartan's creation of a stairway from the Gulf of America to Plant City. (3)Tr.192:18-22.

Third, the partisan implications. To identify the area of study—to better define the Tampa Bay region—Dr. Voss used the Tampa–St. Petersburg–Clearwater metropolitan statistical area. MSAs are set by the Census Bureau as a unit to represent an urban area and used by scholars for studying the area. (3)Tr.193:24 – 194:18. For this MSA, Dr. Voss then created a table showing the partisan breakdown by county; he used election returns available from Dave's for six elections in creating the breakdown shown in DX255. (3)Tr.195:7 – 196:3. With a slight correction not particularly relevant here, (3)Tr.194:19 – 195:5, the table in DX255 tells us that "the most likely outcome," (3)Tr.197:2, given the total population and partisan breakdown, would be the creation of two seats that would elect Democratic candidates to the Florida Senate and three seats that would elect Republican candidates to the Florida Senate, (3)Tr.193:14 – 197:1.

TABLE 2 – Partisanship in the Tampa-St. Petersburg-Clearwater Metropolitan Statistical Area (MSA)

| County | Total Population | Democratic Voters Count | Democratic Voters Percent | Republican Voters Count | Republican Voters Percent | Other Voters Count | Other Voters Percent |
|---|---|---|---|---|---|---|---|
| Hillsborough | 1,459,762 | 296,341 | 51.4% | 268,092 | 46.5% | 12,152 | 2.1% |
| Pinellas | 959,107 | 229,446 | 48.5% | 229,466 | 49.1% | 11,104 | 2.3% |
| Pasco | 561,891 | 91,577 | 38.9% | 137,996 | 58.7% | 5,642 | 2.4% |
| Hernando | 194,515 | 31,322 | 35.2% | 55,745 | 62.6% | 2,040 | 2.3% |
| TOTAL for MSA | 3,175,275 | 648,686 | 47.3% | 691,299 | 50.4% | 30,938 | 2.3% |

NOTE: The electorate's partisanship is a 2016-2020 composite created by Dave's Redistricting App (DRA) using returns from six contests: the two presidential elections (2016 & 2020), the two Senate races (2016 & 2018), and two statewide contests from 2018 (governor & attorney general).

*DX255*

But Dr. Voss's assessment of ACLU A, B, and C tells us what Dr. McCartan conceded on cross-examination: Plaintiffs' alternatives tilt the balance in favor of the Democrats. (3)Tr.197:4-25, 198:1 – 199:8. Dr. Voss's table, admitted as DX257, makes this point by showing that Senate District 18 goes from leaning Republican to leaning Democratic, particularly when the adjacent, leaning Democratic Senate District 14 is frozen in all of Plaintiffs' alternative plans.

TABLE 3 – Packing and Cracking Republican Voters

| District | Enacted Map Democratic % | Enacted Map Republican % | McCartan's Adjusted GOP Share ACLU-C | ACLU-B | ACLU-A |
|---|---|---|---|---|---|
| SSD14 | 49.90% | 47.98% | 47.98% | 47.98% | 47.98% |
| SSD16 | 68.66% | 29.43% | 34.99% | 33.36% | 33.45% |
| SSD18 | 46.10% | 51.37% | 45.33% | 45.33% | 45.33% |
| SSD20 | 41.28% | 56.66% | 58.17% | 58.69% | 58.73% |
| SSD23 | 42.30% | 55.47% | 57.28% | 57.28% | 57.33% |

NOTE: McCartan's hypothetical maps not only flip SSD18 from leaning Republican to leaning Democratic, they freeze the competitive and slightly Democratic-tilted SSD14 so that any changes crack the Republican vote around Tampa (burying part of it in SSD16) and while packing outlying Republican voters into two more-lopsided districts (i.e., SSD20 and SSD23).

*DX257*

Finally, the erosion of black voting strength in the area. Through DX260, Dr. Voss explains that the black share of registered voters, general election voters, and primary voters in Senate District 19 from 2012—the first row in the table—decreased when compared to Senate District 19 from 2020 (the benchmark district)—the fifth row in the table. The table also shows that only the enacted version of Senate District 16 stems the erosion of black voting strength in the area; ACLU A, B, and C further erode the black vote. (3)Tr.200:24 – 202:22. So, given the erosion in the black vote, and the poor analysis from Dr. Barreto, there's no guarantee that Plaintiffs' alternatives will continue to allow black voters to elect their candidate of choice.

In sum, we find Dr. Voss credible. We afford his testimony great weight.

**Matthew Isbell**. Mr. Isbell was the last witness called in Defendants' case. He's a political consultant who works for Democratic candidates, including Democratic members of the Florida Legislature. (4)Tr.7:3-19, 7:25 – 8:17, 9:11-25, 10:1-20. Mr. Isbell worked with Mr. Warren (and Democratic legislators) during this redistricting cycle to submit or otherwise work toward the passage of maps that favor Democrats. (4)Tr.11:3-16, 12:18-25, 13:1-9, 14:1-3, 14:20 – 16:21, 17:5-13, 18:4 – 19:1, 19:3-16, 23:3-10, 24:18-21, 24:24 – 25:17, 25:22 – 26:18, 26:24 – 28:12. We find Mr. Isbell credible and his testimony relevant in establishing a link between Mr. Warren and others hoping to create maps that favor Democratic candidates.

## III. Conclusions of Law (and Application of Law to Facts)

### A. Binding Precedent for Three-Judge Courts

Precedent from the U.S. Supreme Court obviously binds us. Other three-judge district courts in this circuit have concluded that Eleventh Circuit precedent binds our decisions as well. *Ga. State Conf. of the NAACP v. Georgia*, 269 F. Supp. 3d 1266, 1278-79 (N.D. Ga. 2017) (three-judge court) ("We do not write on a clean slate, and we are bound by Eleventh Circuit precedent."); *Ala. Leg. Black Caucus v. Alabama*, 988 F. Supp. 2d 1285, 1305 (M.D. Ala. 2013) (three-judge court) ("It is well settled that we are bound by Eleventh Circuit precedent when we sit as a three-judge district court." (citing additional Eleventh Circuit and old-Fifth Circuit cases)).

That said, the three-judge court in *Georgia State Conference of the NAACP v. Georgia* stated that direct appeals to the U.S. Supreme Court present an "odd[]" area of "federal jurisprudence" and may "not" entirely "make sense." 269 F. Supp. 3d at 1278 n.7. Legal scholars have also provided thoughts on the issue. *See, e.g.*, Michael Morley, *Vertical Stare Decisis and Three-Judge District Courts*, 108 Geo. L.J. 699 (2020); Joshua Douglas & Michael Solimine, *Precedent, Three-Judge District Courts, and the Law of Democracy*, 107 Geo. L.J. 413 (2019). As a practical matter, however, the result is the same regardless of whether we are bound by Eleventh Circuit precedent: *Alexander v. South Carolina State Conference of the NAACP* requires workable, alternative maps, and *Bethune-Hill v. Virginia State Board of Elections* governs the good-reasons analysis for narrow tailoring.

### B. Three Key Questions in Racial Gerrymandering Cases

This is a racial gerrymandering case, Doc.1 at 1, 29-30, and only a racial gerrymandering case, Docs.28, 33. The first question in such cases is whether race predominated in the drawing of districts. *Alexander*, 144 S. Ct. at 1233. If so, the next question is whether the State had a compelling interest for the racial predominance. *Shaw v. Hunt*, 517 U.S. 899, 915 (1996). Where there's a compelling interest, we must assess whether the State's use of race was narrowly tailored to further that interest. *Id.*

Race predominates when it's "the criterion that, in the" legislature's "view, could not be compromised," *id.* at 907, subordinating race-neutral districting criteria, like "compactness, contiguity, and core preservation," *Alexander*, 144 S. Ct. at 1234. Plaintiffs can prove racial predominance through direct evidence, such as explicit legislative language making race the predominant criterion, *id.*; circumstantial evidence, such as a district's bizarre shape explained by race alone, *id.*; or circumstantial evidence presented through an assessment of the *Arlington Heights* factors, *see Jacksonville Branch of the NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229, 1244-45 (M.D. Fla. 2022) (collecting cases, including *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)). Circumstantial evidence of racial predominance is a high bar; something like the creation of a "'strangely irregular twenty-eight-sided'" district is needed. *Alexander*, 144 S. Ct. at 1250 (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960)).

Here, Plaintiffs make no attempt to present the kind of evidence needed for an assessment under *Arlington Heights*. We therefore conclude that this route to proving racial predominance has now been foreclosed to Plaintiffs.

For racial predominance, Plaintiffs rely on the shape of enacted Senate District 16 (most akin to the text of a bill passed by the legislature), statements made during the legislative session (most akin to the context surrounding the bill), and the testimony of their experts commenting on the enacted map and their own alternatives. That's it.

The Florida Senate relies on the map, the legislative record, the trial testimony of Mr. Ferrin, and the testimony of the Secretary's expert witnesses. The Senate says that race did not predominate in the drawing of Senate District 16.

The Secretary takes no position on predominance. He simply presented facts through the examination and cross-examination of witnesses. His legal position is that Plaintiffs must, as a threshold matter, present viable alternative plans under *Alexander*. He further argues that even if race predominated, because Plaintiffs haven't put the compelling-interest question at issue in this case, the State should prevail on the narrow-tailoring prong of the Fourteenth Amendment test.

We agree with the Secretary. Plaintiffs have failed to present viable, alternative plans as required by *Alexander*. And, separately, they lose on narrow tailoring.

### C. *Alexander*'s Alternative Map Requirement

*Alexander* concerned a racial-gerrymandering claim against South Carolina's congressional plan. Two related propositions stand out from this case. First, the party challenging a map must disentangle permissible from impermissible considerations,

and the way to do that is to submit a viable, alternative map. 144 S. Ct. at 1249-50. Only by disentangling the permissible from the impermissible can the challenger show that a rational legislature had the ability to draw a more compliant map. *Id.* Second, and relatedly, without a viable, alternative map, a challenger can't overcome the presumption of good faith that applies to a legislature's actions. *Id.* at 1235-36.

**1.** Plaintiffs' proposed alternatives aren't viable under federal or state law. For purposes of federal law, the alternatives can't pass muster under the Fourteenth Amendment's equal protection clause. Plaintiffs say that compliance with the Florida Constitution's non-retrogression standard is "a laudable and constitutional goal" that serves as "a compelling governmental interest." Doc.1 at 4. So, they want a version of Senate District 16 that performs for black voters but doesn't cross the bay between Pinellas and Hillsborough Counties. Doc. 1 at 4-5; PX98 – PX100. They wish to sort people based on race, but only on the Hillsborough side of the bay. Yet the record includes no evidence of a compelling-governmental interest that would justify this race-based sorting of voters in Hillsborough County. That's because Plaintiffs' complaint never put the compelling-interest question at issue in the case, and there's been no evidence offered in support of that proposition. Thus, "Plaintiffs' request for relief to remedy an assertedly unconstitutional race-based redistricting plan is itself unconstitutional under the same principle." *Polish Am. Cong. v. City of Chicago*, 226 F. Supp. 2d 930, 934 (N.D. Ill. 2002). Their alternatives aren't viable under federal law.

Nor are Plaintiffs' alternatives viable under state law, because they are tainted with impermissible partisan intent. As discussed in our findings of fact above, Mr.

Warren was the fulcrum around which turned a partisan effort to create an extra Democratic seat in the area. *Supra.* Mr. Warren created a partisan map, worked with a partisan political operative on the map and associated talking points, worked with Democratic members and their staff in support of such a configuration, and directed experts in this case to make map-drawing choices with partisan effects. *Supra.* The result is three alternatives (ACLU A, B, and C) that skew the partisan make-up of the area, as Dr. Voss explained and Dr. McCartan conceded. *Supra.* Dr. Barreto's attempt to nevertheless bless the alternatives as better, black-performing districts backfires on Plaintiffs. It's obvious that Dr. Barreto is himself a partisan operative—paid "well over" $500,000 from Democratic-party coffers—who just last year held up the enacted Senate District 16 as an exemplar district that should be preserved. *Supra*. The Florida Supreme Court prohibits such partisan influence in the map-drawing process. *See League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363, 378 (Fla. 2015).

**2.** And, without viable, alternative plans, Plaintiffs can't overcome the presumption of good faith that attaches to the enacted plan. The presumption plays an outsized role in redistricting cases. It imposes an "especially stringent" evidentiary requirement that "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 144 S. Ct. at 1235-36. Importantly, the presumption avoids the judicial branch "quick[ly]" "hurl[ing]" race-based "accusations at the political branches." *Id.*

Viable, workable alternative maps become critical in redistricting cases such as this. "Without an alternative map, it is difficult for plaintiffs to defeat [this Court's] starting presumption that the legislature acted in good faith." *Id*. at 1235. Again, an alternative map, the U.S. Supreme Court explained, can be easily drawn and "can perform the critical task of distinguishing between" permissible and impermissible motivations in drawing district lines. *Id.* at 1249-50. It becomes essential in racial gerrymandering cases where there's a lack of weighty "direct evidence," or "some extraordinarily powerful circumstantial evidence." *Id.* In other words, without clear evidence that cuts against the State, "only an alternative map" "can carry the day" for Plaintiffs in this case. *Id.* at 1249. Yet we have no viable, alternative maps here.

* * *

Finally, a word about the Florida Supreme Court's recent decision in *Black Voters Matter Capacity Building Institute, Inc. v. Secretary of State*, Case No. SC2023-1671 (Fla. Jul. 17, 2025), a challenge to the State's congressional plan. There, the Florida Supreme Court said this when discussing the need for an alternative map:

> To establish the invalidity of the Enacted Plan, the plaintiffs bore the burden of proving the possibility of drawing a North Florida district that is both non-diminishing and non-race-predominant. And the plaintiffs had to do so with an alternative map. As indicated in our *Apportionment I* decision, it is not enough in the redistricting context for challengers to identify a flaw in an enacted districting plan and demand that the court send the Legislature back to the drawing board. The plaintiffs were required to produce an alternative plan proving that any asserted defect in the Legislature's plan is remediable. *See, e.g.*, *Apportionment I*, 83 So. 3d [597,] 648, 650, 653, 664 (Fla. 2012).

Slip Op. at 41. To be clear, the Florida Supreme Court's alternative map requirement is much like ours: it requires Plaintiffs to submit alternatives that satisfy both federal and state law. *Id.* Plaintiffs here haven't done that.

### D. Narrow Tailoring and the Good-Reasons Test

**1.** To recap, the Secretary and Senate maintain that attempting to comply with the Florida Constitution's non-retrogression standard does *not* serve a compelling state interest. They've taken that position in this Court and the Florida Supreme Court. Slip Op. at 36-39 (agreeing with Defendants' position). But Defendants say that we can assume without deciding that there is a compelling interest—even if we ultimately uphold enacted Senate District 16—because Plaintiffs haven't put the issue in dispute. This is unusual but true.

Justice Thomas commented on this very point in his *Bethune-Hill* dissent when he said that the U.S. Supreme Court had "never, before today, assumed a compelling state interest while upholding a state redistricting plan" and that he "kn[e]w of no other case, in any context, in which the Court ha[d] assumed away part of the State's burden to justify its intentional use of race." 580 U.S. at 200 (Thomas, J., dissenting). But Justice Thomas's perspective didn't carry the day. The majority in *Bethune-Hill* "assume[d], without deciding, that the State's interest in complying with the Voting Rights Act was compelling." *Id.* at 193. It then decided that narrow tailoring was satisfied because the state "had sufficient grounds to determine that the race-based calculus it employed in District 75 was necessary to avoid violating §5." *Id.* at 194.

What's more, the party-presentation rule works in favor of the approach. Plaintiffs say in their complaint that "[c]omplying with Fair Districts' non-diminishment (or 'non-retrogression') requirement is a compelling governmental interest that could justify race-predominant redistricting." Doc.1 at 4. They never put the compelling-governmental-interest question in dispute. Once presented this way by Plaintiffs, we need look no further for our purposes. *See United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) ("[W]hen cases arise, courts normally decide only questions presented by the parties." (cleaned up)).

Finally, there's another route to accepting Defendants' invitation for getting to narrow tailoring. Here, we recognize that the burden of *production* shifts to Defendants if Plaintiffs establish racial predominance. But the ultimate "burden of *persuasion*" remains with Plaintiffs throughout the litigation. *Hunt*, 526 U.S. at 553 (emphasis added); *see also Johnson v. Mortham*, 915 F. Supp. 1574, 1575-79 (N.D. Fla. 1996) (three-judge court) (collecting and discussing cases). Production and persuasion are different. The latter requires Plaintiffs to "persuad[e] the court that the State's evidence did not support a finding that the redistricting plan was narrowly tailored to a compelling state interest." *Johnson*, 915 F. Supp. at 1578 (cleaned up). Plaintiffs in this case haven't done that. By their silence, Plaintiffs have not carried their ultimate burden of persuasion on all elements of their claim. *Id.*

So, whether we assume without deciding, or find that Plaintiffs haven't carried their burden of persuasion, we can move past the compelling-interest question to an assessment of narrow tailoring.

**2.** Given the complexities inherent in redistricting, narrow tailoring doesn't require the least restrictive means. The State need only show that it had "a strong basis in evidence" for its race-conscious actions. *Cooper v. Harris*, 581 U.S. 285, 292-93 (2017). That "strong basis," or "good reasons" standard, then gives the State "breathing room" "to adopt reasonable compliance measures." *Id.* (cleaned up). The reasonable compliance measures should be upheld even if they prove, "in perfect hindsight, not to have been needed." *Id.* Put another way, narrow tailoring, for redistricting purposes, doesn't require the State to hit specific targets for BVAP, compactness, or adherence to geographic and political boundaries. *See id*; *Ala. Leg. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015) (no specific BVAP targets).

To be sure, the breathing-room standard for narrow tailoring isn't meaningless. It requires more than "uncritical" assumptions and "generalizations," untethered to "evidence or analysis." *Wis. Legis. v. Wis. Elections Comm'n*, 595 U.S. 398, 403-04 (2022). It requires a "meaningful legislative inquiry into" a district's configuration, *Cooper*, 581 U.S. at 304, "a strong showing of a pre-enactment analysis with justifiable conclusions," *Abbott v. Perez*, 585 U.S. 579, 621 (2018).

Applied to this case, the narrow tailoring standard tilts in the State's favor. The record shows a debate on the continued configuration of a race-conscious district that connects black communities from Pinellas and Hillsborough Counties. *E.g.*, JX16 7:10 – 9:4. The record includes an assessment of the demographic make-up of the district and, critically, a functional analysis evaluating the ability of the black population to

control the Democratic primary and then elect its preferred candidate in fourteen test elections. JX20 at 639-46. Assessments of traditional districting criteria—like compactness and adherence to political and geographic boundaries—were also available for both the race-conscious and the adjacent districts as legislators did their work. *In re Sen. Joint Res. of Leg. Apportionment 100*, 334 So. 3d 1282, 1291 (Fla. 2022) (Florida Supreme Court facial approval of enacted senate map).

The record thus shows far more than an "uncritical" assessment untethered to "evidence or analysis" on the part of the Florida Legislature as it drew Senate Districts 16 and 18. *Wis. Legis.*, 595 U.S. at 403-04. Under the circumstances, the State is entitled to its "breathing room." *Cooper*, 581 U.S. at 293.

The State's attempts to comply also compare favorably with other cases. Take *Bethune-Hill*, where Virginia drew a legislative district with a target BVAP of 55% in its attempt to comply with Section 5 of the Voting Rights Act. 580 U.S. at 193. The U.S. Supreme Court assumed such attempted compliance to be a compelling interest, and it went on to conclude that Virginia could draw the district as it did because it performed a "functional analysis" to justify the shape, and the legislative record showed an "informed" discussion of the district, one that "considered turnout rates" and "the results of the recent contested primary and general elections." *Id.* at 193-95. The State of Florida's done much the same with its district-specific functional analysis, albeit without setting a numeric floor for BVAP.

Take other cases where the Court ruled *against* States on narrow tailoring. In *Cooper v. Harris*, North Carolina never conducted a district-specific analysis. 581 U.S.

at 304 n.5. The same was true for Texas in *Abbott v. Perez*. 585 U.S. at 621-22. Wisconsin, in *Wisconsin Legislature v. Wisconsin Elections Commission*, also had an "uncritical majority-minority district maximization" policy that failed to focus on district-specific needs. 595 U.S. at 403. And in *Bush v. Vera*, Texas sought "substantial augmentation" of the black population without a district-specific justification—to the tune of a 10.1% increase in the black population—in its attempt to satisfy the Voting Rights Act's non-retrogression requirement. 517 U.S. 952, 983 (1996). (Florida has kept the black voting age population in the challenged district about the same.)

Plaintiffs nevertheless allege that the State could've drawn a better Senate District 16. They say this even though the three alternatives they offer aren't better in any meaningful way. Yes, in ACLU C, the compactness figures for Senate District 16 are slightly better. *See supra*. But that improvement comes at the cost of compactness figures for Senate Districts 20 and (especially) 23. *See supra*. The BVAP numbers are within a handful of percentage points of one another for the enacted plan and the three alternatives, though the enacted plan's slightly higher BVAP helps prevent the further erosion of black-voting strength compared to the benchmark. *See supra*. And, yes, there's one fewer county split in Plaintiffs' three alternatives, compared to the enacted plan, but the alternatives are far worse on overall adherence to geographic and political boundary lines. *See supra.* Plaintiffs' alternatives thus aren't any better than the State's enacted plan (unless you're a Democrat because Plaintiffs' alternatives give the Democrats one extra seat in the region). *See supra.*

## IV. Conclusion

For the foregoing reasons, we enter judgment in favor of Defendants.

Dated: July 21, 2025

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Michael Beato (FBN 1017715)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St. Suite 500
Tallahassee, Florida 32301
(850) 270-5938
mjazil@holtzmanvogel.com
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com

Bradley R. McVay (FBN 79034)
Ashley Davis (FBN 48032)
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 South Bronough Street
Tallahassee, Florida 32399
(850) 245-6536
brad.mcvay@dos.fl.gov
ashley.davis@dos.fl.gov

*Counsel for the Secretary*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2025, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil