# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

KÉTO NORD HODGES, *et al.*,

     *Plaintiffs*,

v.

                                  Case No. 8:24-cv-879-CEH-TPB-ALB

BEN ALBRITTON, in his official
capacity as President of the Florida
Senate, *et al.*,

     *Defendants*.

_____/

## FLORIDA SENATE PRESIDENT BEN ALBRITTON'S POST-TRIAL BRIEF

As requested by this Court on June 12, 2025, Florida Senate President Ben Albritton provides the following proposed findings of fact and conclusions of law.

### Introduction

This case concerns a challenge to Florida Senate District 16 under the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs allege that the Florida Legislature drew the district predominantly based on race and failed to narrowly tailor its use of race to satisfy a compelling governmental interest. They seek a declaration that the district is an unconstitutional racial gerrymander and an injunction prohibiting its use in future elections.

Defendants, the President of the Florida Senate and Florida's Secretary of State, deny these allegations. They maintain that traditional, race-neutral districting principles—including compactness, contiguity, and political and geographical boundary usage—governed the drawing of the district. Race, they contend, was considered only after the fact and solely for the limited purpose of ensuring compliance with the Florida Constitution's "non-diminishment" requirement.

A three-judge district court convened under 28 U.S.C. § 2284(a) and held a four-day bench trial from June 9 to June 12, 2025. The Court heard live testimony from fact and expert witnesses, received extensive documentary evidence, and considered the arguments of counsel and post-trial briefing. For the reasons that follow, the Court concludes that Plaintiffs have not shown by a preponderance of the evidence that race predominated in the design of Senate District 16. Judgment will therefore be entered in favor of the Defendants.

**Findings of Fact**

I.    **Jurisdiction and Procedural History**

A.    *Subject Matter Jurisdiction & Venue*

This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 to adjudicate Plaintiffs' claim that Senate District 16 violates the Equal Protection Clause of the Fourteenth Amendment. Because the Complaint seeks to enjoin

enforcement of a statewide legislative redistricting plan on constitutional grounds, a three-judge district court was properly convened under 28 U.S.C. § 2284(a). Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b)(2), as Senate District 16 lies within this district..

### B.    *Summary of Pleadings, Key Motions, & Trial Timeline*

Plaintiffs Kéto Nord Hodges, Meiko Seymour, and Jarvis El-Amin reside in District 16. Doc. 1 at 5-6. Defendant Ben Albritton, the current President of the Florida Senate, is sued in his official capacity. Doc. 68. At the time the Complaint was filed, Kathleen Passidomo held that position and was originally named as a defendant. *Id.* at 7. Defendant Cord Byrd, Florida's Secretary of State, is also sued in his official capacity. *Id.*

Plaintiffs initiated this action on April 10, 2024, challenging Florida's 2022 Senate redistricting plan. They alleged that Senate Districts 16 and 18 were drawn with race as the predominant factor, in violation of the Equal Protection Clause, and that their configuration was not narrowly tailored to satisfy a compelling governmental interest. *Id.* at 3-4. District 16 includes portions of Hillsborough and Pinellas Counties; District 18 encompasses areas of central Pinellas County. *Id.* at 20.

Defendants moved to dismiss the Complaint. Docs. 19, 24. After full briefing, the Court denied both motions and entered a case management and

3

scheduling order. Docs. 33, 35. The parties conducted fact and expert discovery, including a deposition of Plaintiffs' counsel Nicholas Warren regarding his role in the legislative process. *See Nord Hodges v. Passidomo,* No. 4:24mc139MW/MAF, 2024 WL 4810385 (N.D. Fla. Nov. 15, 2024).

Following the close of discovery, both Defendants moved for summary judgment. Docs. 74, 75. On March 31, 2025, the Court granted the Senate President's motion in part and denied it in part; the Secretary's motion was denied in full. Doc. 95. The Court rejected Plaintiffs' "impact theory" of racial gerrymandering as to District 18, holding the undisputed facts did not support an equal protection violation. *Id.* at 10-11. However, the Court found genuine disputes of material fact remained as to District 16, warranting a trial. *Id.* at 5-9.

A four-day bench trial was held in Tampa, Florida, from June 9 to June 12, 2025. The Court heard live testimony from fact witnesses—including Jay Ferrin, Nicholas Warren, Matthew Isbell, the three named Plaintiffs, Jacqueline Azis, Yvette Lewis, and Jacob Ogles—as well as expert witnesses Dr. Matthew Barreto, Dr. Cory McCartan, Dr. Sean Trende, and Dr. Stephen Voss. Extensive documentary evidence was admitted, including proposed and enacted maps, reports, demographic analyses, and legislative records.

At the conclusion of trial, the Court directed the parties to file post-trial briefs containing proposed findings of fact and conclusions of law. Docs. 124, 166.

The matter is now ripe for decision.

## II.    Legal Framework

### A.    *Federal Constitutional Standards*

#### 1.    *Equal Protection Clause Standard*

The Equal Protection Clause of the Fourteenth Amendment prohibits States from drawing district lines where race predominates over traditional districting principles. To prevail, Plaintiffs must prove that race was the Legislature's controlling rationale in drawing District 16—superseding traditional race-neutral criteria such as compactness, contiguity, population equality, and respect for political and geographical boundaries. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). This is a "demanding" burden. *Id.* at 928 (O'Connor, J., concurring).

The Supreme Court has "never invalidated an electoral map" absent direct evidence that race predominated. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 8 (2024). Mere awareness of race does not suffice. *Miller*, 515 U.S. at 916. As reaffirmed in *Allen v. Milligan*, 599 U.S. 1 (2023), "[t]he line that we have long drawn is between consciousness and predominance." *Id.* at 33. Mapmakers are nearly always "aware of racial demographics," but awareness alone does not amount to unconstitutional predominance. *Id.* at 30 (quoting *Miller*, 515 U.S. at 916).

Where a legislature considers race but prioritizes traditional redistricting criteria, an equal protection claim fails. *Allen*, 599 U.S. at 31-32. Courts must assess whether race-neutral principles were subordinated to race and whether the district's configuration reflects racial sorting. *See Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 192 (2017) (courts must evaluate "the legislature's predominant motive for the design of the district as a whole" considering "all of the lines of the district at issue," and taking into account "the districtwide context" and the State's "explanation for a particular portion of the lines").

2.    *Narrow Tailoring Requirement*

If Plaintiffs carry their burden to establish racial predominance, the State must show that its use of race was narrowly tailored to achieve a compelling interest. *Miller*, 515 U.S. at 920. The Supreme Court has assumed, though not definitively held, that compliance with the Voting Rights Act qualifies as a compelling interest. *Bethune-Hill*, 580 U.S. at 193.

To satisfy narrow tailoring, the State must have a "strong basis in evidence" to believe that race-based considerations were necessary to avoid a legal violation. *Id*. (quoting *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (U.S. 2015). This standard provides "breathing room" for legislatures attempting good-faith compliance. *Cooper v. Harris*, 581 U.S. 285, 293 (2017) (quoting *Bethune-Hill*, 580 U.S. at 802).

6

Additionally, the plaintiff must demonstrate that the State could have achieved its goals through a less race-conscious alternative. *Alexander*, 602 U.S. at 8, 35. A plaintiff's failure to propose a viable alternative plan that satisfies the State's permissible interests supports an inference of narrow tailoring. *Id.* at 35.

### 3. *Presumption of Legislative Good Faith*

In the redistricting context, courts begin with a strong presumption that the legislature acted in good faith. *Miller*, 515 U.S. at 915; *Abbott v. Perez*, 585 U.S. 579, 603 (2018); *Alexander*, 602 US. at 6. This presumption reflects fundamental principles of federalism, separation of powers, and institutional competence. As the Supreme Court has repeatedly observed, redistricting is a complex and inherently political process that demands the balancing of numerous legitimate state interests. *Miller*, 515 U.S. at 915-16.

Because of the complexity and sensitivity of redistricting, courts must approach allegations of improper motive—particularly racial motive—with "extraordinary caution." *Id.* at 916. Courts must be hesitant to presume bad faith and must resist being used as "weapons of political warfare" for partisan ends. *Cooper*, 581 U.S. at 335 (Alito, J., concurring in the judgment in part and dissenting in part); *see also Alexander*, 601 U.S. at 11 (courts "should not be quick to hurl [racial] accusations at the political branches"). These principles shield legislatures from

improper judicial interference unless plaintiffs meet their heavy burden with concrete and persuasive evidence.

In *Abbott*, the Court described the challenges redistricting presents as a "legal obstacle course" requiring legislatures to navigate "delicately balanced requirements regarding the consideration of race." 585 U.S. at 585, 587. And the Court has recognized that scrutinizing reapportionment plans "represents a serious intrusion on the most vital of local functions," *Miller*, 515. U.S. at 915, and that a plan grouping voters of a certain race into the same district may well "reflect wholly legitimate purposes," *Shaw v. Reno*, 509 U.S. 630, 646 (1993).

The Court recently reaffirmed the strength of the presumption of legislative good faith in *Alexander*. There, it held that where the legislature offers a race-neutral rationale, plaintiffs bear the burden to "disentangle" race from legitimate non-racial considerations and to prove that race—not traditional principles—was the legislature's predominant motive. *Alexander*, 602 U.S. at 6, 9. To meet this "high bar," *id.* at 10, a plaintiff must "rul[e] out the competing explanation" the state has offered, *id.* at 9. District courts are to "draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Id.* at 10.

As the Court noted, it has "never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence" of racial predominance.

*Id.* at 8. In a circumstantial evidence case, plaintiffs must offer an alternative map that shows how the legislature could have achieved its legitimate goals while producing "significantly greater racial balance." *Easley v. Cromartie*, 532 U.S. 234, 258 (2001). Failure to produce such an alternative map supports an adverse inference against the plaintiffs. *Alexander*, 602 U.S. at 35. "The adverse inference may be dispositive in many, if not most, cases where the plaintiff lacks direct evidence or some extraordinarily powerful circumstantial evidence such as the 'strangely irregular twenty-eight-sided' district lines" in *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960), "which betrayed the State's aim of segregating voters on the basis of race with 'mathematical' precision." *Id.* at 35. The requirement to proffer alternative maps separating permissible from impermissible considerations serves to reveal whether "race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines." *Miller*, 515 U.S. at 913.

This dual principle—the presumption of good faith and the adverse inference for failing to offer a viable alternative—has proven decisive in every Supreme Court racial gerrymandering case lacking direct evidence. *See Alexander*, 602 U.S. at 11 ("Without an alternative map, it is difficult for plaintiffs to defeat our starting presumption that the legislature acted in good faith."); *see also id.* (where evidence "could plausibly support multiple conclusions," courts must

"draw the inference that cuts in the legislature's favor") (citing *Abbott*, 585 U.S. at 610–612).

### B. Florida Constitutional Requirements

Florida's Constitution imposes additional mandatory redistricting criteria for legislative districts. These appear in Article III, section 21 and are divided into two "tiers" of standards.

Tier One requires contiguous districts, prohibits intentional partisan or incumbent favoritism, and includes protections for racial and language minorities. Art. III, § 21(a), Fla. Const. As relevant here, the non-diminishment standard prohibits the Legislature from "diminish[ing]" the ability of racial and language minorities to "elect representatives of their choice." *Id.* The Florida Supreme Court has stated that this provision was modeled on section 5 of the federal Voting Rights Act of 1965. *In re Sen. Jt. Resol. of Legis. Apportionment 100*, 334 So. 3d 1282, 1288 (Fla. 2022) ("*Apportionment 2022*"). And it has held that the non-diminishment provision "means that 'the Legislature cannot eliminate majority-minority districts or weaken other historically performing minority districts where doing so would actually diminish a minority group's ability to elect its preferred candidates.'" *Id.* at 1289 (quoting *In re Sen. Jt. Resol. of Legis. Apportionment 1176*, 83 So. 3d 597, 625 (Fla. 2012) ("*Apportionment I*")). Compliance with this provision requires a comparison between the former redistricting plan (the "benchmark"

plan) and the enacted plan, evaluated through a district-specific "functional analysis" of demographic and elections data. *Apportionment 2022*, 334 So. 3d at 1289.

Tier Two requires districts to be as nearly equal in population as practicable, compact, and drawn using existing political and geographical boundaries where feasible. Art. III, § 21(b), Fla. Const. Compactness is assessed using both visual and quantitative metrics, including the Convex Hull, Polsby-Popper, and Reock tests. *Apportionment 2022*, 334 So. 3d at 1287. Boundary usage is assessed based on the degree to which district lines follow county and municipal boundaries and geographic features that are "easily ascertainable and commonly understood," such as state and federal highways, railways, and large water bodies. *Id.* at 1288 (quoting *Apportionment 1*, 83 So. 3d at 638).

## III.    Factual Background

### A.    *The Redistricting Process*

Following the 2020 Census, the Florida Legislature was required to redraw its legislative districts to account for population changes. The Senate conducted this task through its Committee on Reapportionment and its Select Subcommittee on Legislative Reapportionment. Doc. 160-2 at 3-5; Doc. 101 at 6. Jay Ferrin served as Staff Director and led a small team of professional staff assigned to develop draft Senate maps. Doc. 162-6.

11

The Committee held four public meetings between September 2021 and January 2022. Doc. 101 at 6. During the initial meetings, the Committee received briefings on census data and governing legal standards. *Id.*; *see also* Docs. 160-2, 160-4 (including presentation on federal and state legal requirements). Recognizing deficiencies in the 2010 cycle, which concluded with a court-imposed map, Senate leaders emphasized the need for transparency and safeguards against improper influence. Doc. 160-1 at 17:8-17.

In response, the Senate adopted heightened disclosure rules for public comments and imposed strict limits on the consideration of third-party maps. *Id.* at 17:18-18:21. Staff were directed not to review or rely on public map submissions "unless and until a senator asks them to do so in writing." *Id.* at 18:22-19:1.

The Committee unanimously adopted a series of directives to staff establishing criteria for the Senate's map-drawing process. Doc. 162-6. On October 18, 2021, Chair Ray Rodrigues issued a memorandum reflecting these directives. The directives prioritized adherence to Tier Two principles—compactness, population equality, and boundary usage—except where compliance would conflict with the Tier One standards or federal law. *Id.* The memorandum instructed staff to balance all Tier Two considerations without giving priority to any one criterion, and to document compliance using objective metrics. *Id.* at 3.

Chair Rodrigues's October 2021 memorandum provided further direction to Senate staff on the application of the Tier Two criteria. Specifically, staff were directed to:

- Maintain population deviations within +/- 1% of the ideal district size (538,455 people),
- Draw visually compact districts and use mathematical compactness scores where appropriate,
- Prioritize whole-county districts in rural areas and single-county districts in urban areas, where feasible,
- Preserve municipal boundaries where feasible, while also considering the impermanent and changing nature of municipal boundaries, and
- Use existing geographical features—specifically "railways, interstates, federal and state highways, and large water bodies"—where feasible and present a boundary analysis report with each plan.

*Id.* at 1-2.

With respect to Tier One compliance, the memorandum directed staff to ensure that "compact districts" drawn "consistent with the population equality requirements, and that utilize political and geographic boundaries where feasible" also complied with Tier One and with federal law. *Id.* at 2. Staff were instructed to:

- Conduct a district-specific functional analysis to confirm that districts that had been drawn did not deny or abridge the equal opportunity of racial or language minorities to participate in the political process or diminish their ability to elect representatives of their choice,
- Refrain from considering political data except as required to perform an appropriate functional analysis,
- Avoid using any information about incumbents' residences and draw districts without regard to the preservation of existing district boundaries.

*Id.*

13

The Senate Select Subcommittee on Legislative Reapportionment convened on November 17, November 29, and January 10 to evaluate and refine draft Senate maps. Docs. 160-8, 160-10, 160-12. At the initial meeting on November 17, Ferrin presented four statewide drafts, all of which included a district linking parts of Hillsborough and southern Pinellas Counties. Doc. 160-8 at 53, 61, 69, 77. In response to committee feedback, staff were asked to seek "improvements and consistency in the application of the various tradeoffs" inherent in redistricting. Doc. 160-7 at 34:8-10.

At the subsequent meetings on November 29 and January 10, the Subcommittee reviewed updated drafts reflecting iterative improvements to compactness, boundary usage, and population equality. Docs. 160-10, 160-12. On January 10, the Subcommittee recommended two draft maps, each reflecting an identical configuration of the Tampa Bay region, including Senate District 16. Doc. 101 at 7; *see also* Docs. 160-11, 160-12.

On January 13, 2022, the full Committee adopted minor revisions to eliminate unnecessary municipal splits in five cities and to randomly renumber the districts. Doc. 101 at 7. The Committee then voted 10-2 to approve the Committee Substitute for Senate Joint Resolution 100 (CS/SJR 100) and forward it to the full Senate. *Id.*; *see also* Docs. 160-13, 160-14.

The Florida Senate passed CS/SJR 100 on January 20, 2022. Fla. S. Jour. 215 (Reg. Sess. 2022). The House amended it to add State House districts, and the Senate concurred in the changes, passing the Enacted Plan by a vote of 37-0. Fla. S. Jour. 325 (Reg. Sess. 2022).

**B.    *Summary of Witnesses' Testimony***

Plaintiffs produced nine witnesses at trial: Jay Ferrin (Staff Director of the Senate Committee on Reapportionment during the 2020-22 redistricting process and current Senior Policy Advisor for Environment, Ethics, and Elections for the Florida Senate); Nicholas Warren (an attorney for the ACLU of Florida who injected himself into the Senate's redistricting process and later became lead counsel for Plaintiffs); Jarvis El-Amin, Meiko Seymour, and Keto Nord Hodges (the named Plaintiffs); Yvette Lewis (a Hillsborough County resident); Jacqueline Azis (a Pinellas County resident of District 18 and former Plaintiff); Jacob Ogles (a journalist); Dr. Cory McCartan (an expert witness and mathematician/statistician); and Dr. Matthew Barreto (an expert witness and political scientist).

Defendants produced five witnesses: Ferrin; Warren; Dr. Sean Patrick Trende (an expert witness and political scientist/applied statistician); Dr. Stephen Voss (an expert witness and political methodologist); and Matthew Isbell (a

political consultant for Florida Democrats during the 2020-22 redistricting process
and frequent communicant with Warren on redistricting matters).

We consider each witness in turn.

    1.   <u>Jay Ferrin</u>

We find Ferrin to be a credible witness and afford his testimony significant
weight. Ferrin has spent his career in public service and brings deep experience in
legislative redistricting. Trial Tr. vol. 3, 116:21-118:1. He previously served as the
administrative assistant for the Senate Committee on Reapportionment during the
2010 redistricting cycle, Trial Tr. vol. 3, 25:2-8, before assisting with the 2015
remedial redistricting process as an analyst and staff director, Trial Tr. vol. 3, 25:6-
8. Most recently, he served as Staff Director of the Committee during the 2020
cycle. Trial Tr. vol. 3, 24:6-16. He is currently a Senior Policy Adviser in the Office
of the Senate President. Trial Tr. vol. 3, 23:23-25.

Ferrin oversaw nearly all operational aspects of the Senate's redistricting
process in 2020-22: procuring and developing software, constructing datasets,
supervising Committee staff, coordinating with Committee leadership, and
personally drawing the maps. Trial Tr. vol. 2, 22:1-5; vol. 3, 24:17-23. He testified
that these tasks demanded long hours and intensive engagement during the
redistricting process. The map drawing process itself involved two-and-a-half
months of intense 60- to 80-hour work weeks after the Committee provided its

directives on priorities and standards in mid-October. Trial Tr. vol. 2, 28:5-29:17; vol. 3, 63:6-12.

Ferrin demonstrated comprehensive knowledge of the State's political and geographical boundaries and redistricting requirements. Trial Tr. vol. 3, 51:9-13; 64:17-78:9. His testimony illustrated a clear knowledge of the map-drawing process in the Tampa Bay region, including how various districting decisions flowed from an effort to comply with the legal requirements and priorities in the Rodrigues memorandum. Trial Tr. vol. 3, 66:16-78:12. Ferrin explained the implementation of the Tier Two standards—compactness, population equality, and use of existing political and geographical boundaries—and his adherence to the Tier One protections for minority voting rights and prohibition on intentional partisan and incumbent favoritism. *See* Trial Tr. vol. 3, 39:12-25 (explaining directive to implement requirement for population equality by drawing district not to exceed 1 percent of the ideal population); 40:1-15 (explaining directive to implement requirement for compact districts); 44:11-22 (explaining directive to implement requirement for utilizing political and geographic boundaries); 50:25-51:4 (explaining directive to implement requirement for contiguous districts); 53:14-54:1 (explaining directive to comply with prohibition on partisanship); 56:3-11 (explaining directive to comply with minority voter protections); *see also* Doc. 162-6.

Ferrin credibly testified that District 16 was drawn based on race-neutral considerations, such as achieving population equality, maintaining compact shapes, and using existing political and geographical boundaries. Trial Tr. vol. 3, 66:16-79:4. He explained his statewide and regional "north-south" approach focusing on compliance with Tier Two standards, which resulted in a residual population in southern Pinellas County that needed to be joined with either Hillsborough or Manatee County. Trial Tr. vol. 3, 64:17-79:4. He emphasized that he had no preconceived intent to preserve any prior district configuration or to cross (or not cross) Tampa Bay, nor did he receive instructions to do so. Trial Tr. vol. 1, 270:11-271:24; vol. 3, 78:22-79:1; *see* Trial Tr. vol. 3, 78:16-21 (Ferrin was not instructed to retain configuration that joined parts of southern Pinellas and Hillsborough County). Ferrin unequivocally testified that verifying District 16's compliance with the Florida Constitution's non-diminishment requirement was one of many competing priorities he balanced throughout the map. Trial Tr. vol. 3, 92:4-11.

We further credit Ferrin's testimony explaining how safeguards implemented by Chair Rodrigues—including heightened disclosure requirements and restrictions on professional staff's consideration of public submissions— protected the integrity of the redistricting process. Trial Tr. vol. 3, 25:9-19; 54:2-10; 55:15-56:1. Ferrin also explained why the Senate did not consider the redistricting

18

map submitted by Nicholas Warren, citing both procedural grounds and legal concerns. No Senator submitted a written request, in line with the Committee's safeguards, requesting that Ferrin review or analyze Warren's submission or any similar proposed alternative configuration of District 16. Trial Tr. vol. 3, 95:17-96:8; 103:12-20; 104:24-5:4.

Ferrin provided clarifying context for public statements made by Chair Rodrigues and Senators Burgess and Bracy, testifying that their remarks did not reflect racial motives in the design of District 16. He explained that Chair Rodrigues's discussion of Tier One compliance during a colloquy with Senator Gibson (Doc. 160-15 at 23:4-9, 23:15-17, 24:3-11) referred to a district in the Jacksonville area, not Tampa Bay. Ferrin testified that he understood Chair Rodrigues to be trying to explain to Senator Gibson how "we dr[a]w [a district] in the Jacksonville area." Trial Tr. vol. 1, 240:17-241:11; vol. 2, 27:10-28:1. Ferrin's testimony confirmed that the districts at issue in Chair Rodrigues's comments were not drawn first on racial grounds, as the districts were first drawn on Tier Two grounds and then verified for compliance with the non-diminishment requirements. *Id.* As to Senator Bracy's comments about "crossing the Bay" (Doc. 160-7 at 31:21-23, 32:5-6), and a later exchange between Senator Burgess and Senator Bracy on the same topic (Doc. 160-11 at 7:10-9:4), Ferrin testified that his responses were framed in terms of legal compliance and a district-specific

functional analysis—not racial engineering. *See* Trial Tr. vol. 1, 263:4-5, 269:21-270:5; vol. 2, 8:20-9:18 (Ferrin explanation that Hillsborough-only district could risk violation of non-diminishment requirement); *see also* Trial Tr. vol. 1, 264:8-23; 268:12-15 (Ferrin testimony that post-meeting discussion with Senator Bracy involved functional analysis generally and was not district specific).

We credit Ferrin's testimony that Tier Two considerations remained central throughout the process, even in Senate districts subject to the Florida Constitution's non-diminishment provision. *See* Trial Tr. vol. 1, 243:6-7. ("We were consistently focused on Tier 2 even in areas that were considered to be protected districts."). His ultimate conclusion was that race did not predominate over other considerations and that the configuration of the Senate districts in the Tampa Bay region complied with all of the Florida Constitution's standards—protecting against non-diminishment in District 16 while maintaining compactness and use of existing political and geographical boundaries not only in District 16, but in all other districts in the region. Trial Tr. vol. 3, 101:24-102:6; vol. 2, 24:19-23.

## 2. Nicholas Warren

Nicholas Warren, a staff attorney for the ACLU of Florida, testified on the first day of trial. Trial Tr. vol. 1, 51:3-6. Although he appeared in his capacity as a witness, Warren was not a neutral observer of the redistricting process. Rather, the evidence demonstrated that he was a partisan actor who actively sought to

influence the Senate's redistricting process while concealing those efforts from his employer and the public. He later became lead counsel for the plaintiffs in this litigation.

Warren testified that, despite an organizational decision that the ACLU of Florida would not substantively participate in the legislative redistricting process, he engaged in sustained, undisclosed efforts to shape the Senate's maps. Trial Tr. vol. 1, 51:25-52:10. Those efforts included frequent, non-public communications with Democratic legislators and staff. Trial Tr. vol. 1, 56:4-57:22, 110:5-8, 111:21-25, 118:12-119:6, 120:15-122:21. Documentary evidence confirmed that Warren conferred with Democratic Senate staff regarding redistricting matters. Doc. 161-54 (Democratic Senate staff asking Warren for suggestions on questions Democratic senators should have asked at a committee meeting).

He also maintained a private dialogue with partisan consultant Matthew Isbell, with whom he exchanged maps, analyzed the partisan implications of proposed districts, and commented on potential litigation strategy. Trial Tr. vol. 1, 123:1-8; *see also* Doc. 162-15 (a compilation of private Twitter messages between Warren and Isbell relating to redistricting); Trial Tr. vol. 1, 143:15-145:15 (citing 162-15 at 14 and discussing how a configuration of Senate districts in the Tampa Bay region would give Democrats an extra seat but make it harder for a particular incumbent to win reelection). They also would discuss racial implications of

district maps. For example, Isbell noted that the Pinellas County portion of a Senate draft of District 19 (which became Enacted District 16) "[wa]sn't even that black since they grab a ring of white liberal Dems as well," a characterization that Warren did not dispute. Trial Tr. vol. 1, 147:1-5; 148:15-22; 148:24-149:10. Warren expressed frustration with Democratic legislators' failure to follow his preferred redistricting strategy. Trial Tr. vol. 1, 141:12-14 (citing Doc. 162-15 at 21 and complaining: "What's the point of preparing great questions for Dem senators if they don't even say a effing word?").

The centerpiece of Warren's involvement was his submission of "Plan 42," a proposed Senate map that included a "Hillsborough-only" version of the district that became Enacted District 16. Warren initially testified that he began work on this proposal in response to the release of the Senate's draft maps on November 10, 2021. Trial Tr. vol. 1, 61:4-6; *see also* Trial Tr. vol. 1, 62:13-17. On cross-examination, however, Warren conceded that he had drawn a version of this district months earlier based on a preliminary conclusion that such a configuration was "possible." Trial Tr. vol. 1, 126:24-127:4. His initial Hillsborough-only configuration was a map of a single district in isolation and was not shaped by the district lines of any other districts around it. Trial Tr. vol. 1, 135:8-14.

Warren acknowledged that his early version of the district included a southwest appendage or tail, and that the district was not drawn in the context of

surrounding districts. Trial Tr. vol. 1, 135:8-14, 137:9-19, 140:8-21. He admitted to using racial data during the map drawing process and to selectively excluding the "more white" areas around Apollo Beach and Ruskin to the west of his district's appendage. Trial Tr. vol. 1, 61:20-24, 138:7-8, 139:15-16, 140:19-21. And when asked to confirm that "partisan considerations played no role at all for [him] in the drawing of the map that [he] submitted to the legislature," Warren declined to answer the question directly and ultimately conceded that "obviously, [he] was aware of, in general terms, the partisanship of the state and the region." Trial Tr. vol. 1, 160:20-161:7.

Warren submitted Plan 42 to the Senate and appeared before the Subcommittee to advocate for its adoption, claiming that his map made Tier Two improvements over the Senate's draft maps. Trial Tr. vol. 1, 92:24-93:1. On cross-examination, however, Warren was confronted with metrics showing that his map was less compact and had similar or worse boundary-usage scores compared to the Senate's draft. Trial Tr. vol. 1, 97:2-98:2, 99:1-100:13, 106:16-109:4; *see also* Doc. 160-8. Warren testified that he tried to "sell [his] map to the members of the subcommittee" during the meeting, and so he encouraged Chair Burgess to consider the "advantages" of Warren's plan for Pasco County (the location of Chair Burgess's district), even though it would have been unconstitutional for the

Legislature to adopt a plan with the intent to favor an incumbent such as Chair Burgess. Trial Tr. vol. 1, 87:3-88:12.

Warren testified that the ACLU did not know that he had submitted redistricting maps or testified in committee until after it read about Warren in the news. Trial Tr. vol. 1, 63:3-5. He used his personal email address and phone number to submit the Senate's redistricting suggestion form and did not disclose the ACLU as his employer to the Legislature. Trial Tr. vol. 1, 63:24-64:17, 110:2-4; *see also* Doc. 161-55. When he submitted an appearance card before speaking at the Senate reapportionment subcommittee meeting, Warren also used his personal email, personal phone number, and did not disclose his employment with the ACLU. Trial Tr. vol. 1, 67:22-68:21, 109:20-110:1; *see also* Doc. 161-57.

Warren's executive director had a "negative reaction" when he learned of Warren's involvement in the redistricting process and "felt that it was inappropriate for [Warren] to have done this without getting approval." Trial Tr. vol. 1, 68:24-69:2; *see also* Trial Tr. vol. 1, 113:24-114:2 (describing the aftermath at work as a "fallout"). He was "told not to do it again or not to further engage in the redistricting process without, essentially, permission." Trial Tr. vol. 1, 69:4-6. Warren also had "some cleanup" to do to make sure that it was publicly known that his submissions were not submissions by the ACLU. Trial Tr. vol. 1, 69:8-12. Warren and the ACLU subsequently sent separate letters to the Florida Senate

stating that Warren was not acting on behalf of the ACLU when he submitted his maps or spoke to the Subcommittee. Docs. 161-59, 161-60.

Warren became frustrated at his failure to secure legislative support for Plan 42. Trial Tr. vol. 1, 149:11-17. In an effort to urge its adoption, Warren authored an article that he "lauder[ed]" through Isbell to appear under the latter's name rather than his own. Trial Tr. vol. 1, 151:1-152:1; *see also* Doc. 162-15 at 31 (explaining that Warren was trying to get Democratic senators to submit an amendment on Tampa Bay). Isbell published Warren's article (Trial Tr. vol. 1, 152:11-153:6), but no legislator introduced Plan 42 as an amendment. Warren vented to Isbell that "[e]veryone is either receiving terrible advice or no advice, and nobody actually knows anything. They had effing years. . . . All the issues we've been pounding for months have been raised by lower-level staff, tossed in trash, every single issue." Trial Tr. vol. 1, 154:23-155:4; *see also* Doc. 162-15 at 46.

The Court finds that Warren's dual role as a behind-the-scenes partisan advocate and later trial counsel undermines the credibility of his testimony and submission. Taken as a whole, Warren's testimony reflects an effort to influence the Legislature from outside its formal map-drawing process through political advocacy and indirect pressure. No legislator ever asked for Warren's Plan 42 to be formally drafted as an amendment by the Senate's professional staff. No credible evidence shows that legislative decisionmakers considered Warren's

plan. His Plan 42 was neither race-neutral nor fully developed, and the evidence fails to show that it would have been a viable alternative that met Tier Two standards or advanced the Legislature's stated redistricting criteria. The Court therefore does not credit Warren's testimony as evidence of legislative intent or as probative of the motivations underlying the enactment of Senate District 16.

### 3. Plaintiffs and "community" witnesses

Plaintiffs presented four residents of District 16—Jarvis El-Amin, Meiko Seymour, Kéto Nord Hodges, and Yvette Lewis—and one resident of District 18—Jacqueline Azis. These witnesses expressed dissatisfaction with District 16's configuration. While their concerns reflect sincerely held views, none of these witnesses had personal knowledge of the criteria used in drawing District 16 or direct involvement in the 2022 redistricting process. Their testimony, while sincere, does not provide evidence bearing on the Legislature's intent or the constitutional question of whether race predominated in the design of the district.

**Jarvis El-Amin** testified that he resides in District 16 and believes the communities in Pinellas and Hillsborough Counties face different issues and concerns. Trial Tr. vol. 1, 16:1-2, 17:10-18:7. He stated that the current district lines result in unfair representation. Trial Tr. vol. 1, 18:8-22. On cross-examination, however, El-Amin acknowledged that he had no personal knowledge of the Legislature's redistricting criteria, no information suggesting race predominated,

and no familiarity with the redistricting process prior to his involvement with this litigation. Trial Tr. vol. 1, 19:6-20:18.

**Meiko Seymour**, a resident of St. Petersburg, testified that he did not view Hillsborough County as part of his community and believed the district lines split the black community. Trial Tr. vol. 1, 24:22-25:9, 29:14-16, 32:17-23, 35:9-15. Like El-Amin, Seymour acknowledged on cross-examination that he lacked personal knowledge of the redistricting criteria and had not participated in the process. Trial Tr. vol. 1, 36:9-19, 37:5-15.

**Kéto Nord Hodges**, a Tampa resident, testified that he did not believe a senator could effectively represent both Hillsborough and Pinellas Counties and stated that he perceived the district to be racially motivated. Trial Tr. vol. 1, 183:2-6, 185:16-189:24. On cross-examination, he admitted that he had no knowledge of the Legislature's motivations or methods, had not contacted the Legislature during the redistricting process, and had not attempted to engage with Senator Rouson's Hillsborough-based offices. Trial Tr. vol. 1, 193:14-194:4, 194:10-19, 195:4-11.

**Yvette Lewis**, a Hillsborough County resident and NAACP official, testified that District 16's configuration makes it more difficult for constituents in her community to access their senator. Trial Tr. vol. 1, 197:18-198:10, 202:22-203:12. However, she conceded that Senator Rouson maintains offices in Hillsborough

County and that she has met with him locally, including at area restaurants. Trial Tr. vol. 1, 203:13-204:23. She also testified that she had no personal knowledge of the criteria applied during the redistricting process. Trial Tr. vol. 1, 209:17-20.

**Jacqueline Azis**, a resident of District 18 in Pinellas County, testified that she felt her community in St. Petersburg was divided under the Enacted Map. Trial Tr. vol. 1, 218:17-24, 220:6-9. However, Ms. Azis conceded that she possessed no evidence indicating that the Legislature subordinated traditional districting criteria to racial considerations when drawing District 16. Trial Tr. vol. 1, 223:24-224:2, 225:4-7. She further acknowledged that the boundary near her home followed 22nd Avenue North, a major east-west thoroughfare in Pinellas County. Trial Tr. vol. 1, 226:10-20.

Collectively, the testimony of these five witnesses illustrates their personal dissatisfaction with the configuration of District 16 but does not provide probative evidence of the Legislature's intent or of racial predominance in the map-drawing process. None of the witnesses had insight into how or why the lines were drawn, nor did they participate in the redistricting proceedings in 2022.

4.    Plaintiffs' expert witnesses (Dr. McCartan, Dr. Barreto)

**Dr. Cory McCartan**, a statistician and mathematician, testified on behalf of Plaintiffs regarding three alternative maps—ACLU Maps A, B, and C—that he drew at the direction of Plaintiffs' counsel. Trial Tr. Vol. 2, 55:19-22; Docs. 161-41,

28

161-42, 161-43. Dr. McCartan is known for developing award-winning simulation software capable of generating race-neutral and non-partisan maps, but he admitted that he did not use this software in this litigation. Trial Tr. vol. 2, 151:1-21; *see also* Trial Tr. vol. 2, 51:24-52:15, 53:24-54:13.

Instead, Dr. McCartan worked from a set of written instructions prepared by Nicholas Warren. Doc. 161-9. Warren specifically instructed Dr. McCartan to draw District 16 entirely within Hillsborough County and to "[a]lter surrounding districts *only* to the extent necessary" to accomplish this goal. *Id*. at 1 (emphasis added). Dr. McCartan received no instructions to keep any other districts wholly within one county. Trial Tr. vol. 2, 108:22-24. Dr. McCartan admitted that these constraints left him with "not a lot of choices" in how ACLU Maps A, B, and C were drawn. Trial Tr. vol. 2, 76:12-13.

Dr. McCartan testified that he started by "acquaint[ing] [himself] with the general demographic patterns in the county." Trial Tr. vol. 2, 58:21-22. He testified that "as [he] was drawing the maps, [he] wasn't consulting racial data." Trial Tr. vol. 2, 59:10. But he did review "racial data" to include "all the detailed demographics, Black voting age population, primary turnout, all those statistics" after he had drafted "particular maps." Trial Tr. vol. 2, 59:1-4.

Dr. McCartan also created visual images of the Enacted Map that differed from those published by the Legislature. Trial Tr. vol. 2, 66:2-7. He "stacked" water

blocks representing Tampa Bay over census blocks assigned to districts, creating the impression that Enacted District 16 was split into two discontiguous pieces. Trial Tr. vol. 2, 66:8-12, 103:6-11, 105:12-19; *see also* Doc. 161-40. Dr. McCartan's revised Enacted Map thus obscured the districts to which those census blocks had been assigned. Trial Tr. vol. 2, 69:14-16. Although Dr. McCartan initially tried to show that District 16 in the Enacted Map was "in two pieces," Trial Tr., vol. 2, 78:12-17, he later conceded that District 16 was "legally contiguous," Trial Tr. vol. 2, 107:7-8.

Dr. McCartan testified that ACLU Maps A, B, and C had one fewer county split and one fewer city split than Enacted District 16 due to Warren's instructions to keep District 16 within Hillsborough County. Trial Tr. vol. 2, 85:10-18. He ran boundary analysis, compactness, and demographic reports through the Legislature's software, comparing the Enacted Plan with ACLU Maps A, B, and C. Doc. 161-64; *see also* Doc. 162-168 (providing a more-easily readable summary of the same data). However, he conceded that ACLU Maps A, B, and C all have dramatically worse boundary usage scores than the Enacted Map and are only "comparable" on quantitative compactness measures. Trial Tr., vol. 2, 121:14-123:2, 129:6-10, 137:4-139:5.

As to boundaries, Dr. McCartan admitted that he was instructed to use political and geographical boundaries including incorporated cities, counties,

major roads, and waterways. Trial Tr. vol. 2, 131:6-21. He agreed that the Florida Constitution does not make any one of those boundaries more important than any of the others. Trial Tr. vol. 2, 131:22-132:11. When comparing some of those boundary scores, Dr. McCartan admitted that ACLU Maps A, B, and C all have lower road scores in every single district in the Tampa Bay area than the road scores in the Enacted Map. Trial Tr. vol. 2, 135:21-24, 136:5-8. And when comparing the total nonpolitical/geographical boundaries, Dr. McCartan admitted that his ACLU Maps A, B, and C for District 16 all have dramatically worse scores for boundary adherence than District 16 in the Enacted Map. Trial Tr. vol. 2, 137:4-138:12; *see also* Doc. 162-168 at 2. In fact, Dr. McCartan conceded that ACLU Maps A, B, and C have worse boundary scores for all but one of the districts that he adjusted. Trial Tr. vol. 2, 138:13-139:5.

With regard to compactness, Dr. McCartan stated that he considered the compactness scores for ACLU Maps A, B, and C to be comparable to the Enacted Map. Trial Tr. vol. 2, 129:6-10. Visually, however, he admitted that ACLU Map A has "less regular" and more "jagged" district lines than the Enacted Map, with portions that jut east and west, creating a bit of a stair. Trial Tr. vol. 2, 143:14, 144:4-6, 144:11-16; *compare* Doc. 161-40, *with* Doc. 161-41. Dr. McCartan also created an appendage in the southern portion of District 16, because he excluded the white population living along the coastline. Trial Tr. vol. 2, 144:20-24, 145:18-21. As to

31

ACLU Map B, Dr. McCartan admitted that his adjusted boundary for District 23—the "stairway to Plant City"—"does look somewhat like a staircase," and he still excluded the white population along the coast in southern Hillsborough County. Trial Tr. vol. 2, 145:24-146:1, 147:12-15, 148:11-15; *compare* Doc. 161-41, *with* Doc. 161-42. By the time Dr. McCartan drew ACLU Map C, he had picked up the white population along the coastline. Trial Tr. vol. 2, 148:11-16; Doc. 161-43.

On racial measures, Dr. McCartan considered his ACLU Maps A, B, and C to have comparable Black Voting Age Populations for District 16, as compared to the Enacted Map. Trial Tr. vol. 2, 129:23-130:4. He testified that he achieved a Black Voting Age Population for District 16 in all three ACLU maps that was "pretty close" to the Black Voting Age Population in the Enacted Map because he "familiarized [him]self roughly with the demographics of Hillsborough." Trial Tr. vol. 2, 149:3-10.

During cross-examination, Dr. McCartan's credibility was further undermined when he attempted to deny that Warren's instructions prohibited changes to District 14. *See* Trial Tr. vol. 2, 109:21-110:4 (Dr. McCartan initial testimony that instructions meant he could not adjust District 14), 111:1 (Dr. McCartan testimony that he "was allowed to adjust District 14"). After impeachment with his deposition testimony, McCartan ultimately conceded that

he was not free to alter District 14 except as necessary to satisfy Warren's Hillsborough-only requirement. Trial Tr. vol. 2, 112:8-13, 113:9, 114:10-13.

Dr. McCartan also admitted that ACLU Maps A, B, and C were not the first drafts of the maps he created for Plaintiffs' counsel. Trial Tr. vol. 2, 140:4-11. Dr. McCartan showed Plaintiffs' counsel his initial draft maps. Trial Tr. vol. 2, 141:10-12. He then made changes to the drafts after Plaintiffs' counsel reviewed them. Trial Tr. vol. 2, 141:14-17. All told, Dr. McCartan devoted only "a couple days" to creating initial drafts and final versions of ACLU Maps A, B, and C, writing his expert report, and sitting for his deposition in this case. Trial Tr. vol. 2, 141:18-21.

Taken as a whole, Dr. McCartan's testimony demonstrated that the Plaintiffs' alternative maps were not developed independently using race-neutral redistricting principles, but instead were narrowly designed to comply with a preordained outcome directed by counsel. These constraints, combined with methodological irregularities and visual distortions, undermined the credibility and utility of his illustrative maps as evidence of a viable alternative plan that would have achieved the Legislature's goals without considering race.

The Court finds that Dr. McCartan's testimony fails to show that the Legislature's map was racially motivated. His alternative maps were drawn under constraints that were both arbitrary and inconsistent with the Legislature's race-

33

neutral and permissible Tier Two objectives. His misleading visualizations of Tampa Bay also reduce the weight of his testimony.

**Dr. Matthew Barreto**, a political scientist, offered expert testimony for Plaintiffs. He testified regarding his functional analysis of ACLU Maps A, B, and C, as well as his analysis of the boundaries of District 16 in the Enacted Map. Trial Tr. vol. 2, 170:1-8. Dr. Barreto testified that black voters in District 16 maintained the opportunity to elect the representatives of their choice in ACLU Maps A, B, and C. Trial Tr. vol. 2, 171:25-172:2, 196:7-9. Dr. Barreto did not conduct this same analysis for District 16 in the Enacted Plan. Trial Tr. vol. 2, 222:19, 223:25-224:1. Dr. Barreto also opined that black voters are generally cohesive and vote for Democratic candidates. Trial Tr. vol. 2, 180:10-15. These were not disputed issues in the litigation.

The parties did, however, dispute the validity of other portions of Dr. Barreto's analyses. First, Dr. Barreto analyzed three primary elections to arrive at a conclusion that a majority of all white voters voted for "the opposite candidate" as black voters. Trial Tr. vol. 2, 180:10-15, 182:19-22, 183:2-4. Based on his analysis, Dr. Barreto concluded that black voters were cohesive and that voting was racially polarized, because "whites are vote-blocking in the opposite direction of African Americans." Trial Tr. vol. 2, 185:13-186:4.

Dr. also Barreto used Voting Tabulation Districts, or VTDs—not census block data—to evaluate whether he believed "race was used" by the Florida Legislature to draw District 16 in the Enacted Map and "can explain exactly where the boundary lines are." Trial Tr. vol. 2, 172:7-10, 179:17. Dr. Barreto examined "boundary line[s] [that] hug[] closely the Black population" to, in his opinion, "include a larger Black population on the inside of [District 16.]" Trial Tr. vol. 2, 199:18-21. One of those examples was the boundary between Districts 14 and 16, which Dr. McCartan did not change and is identical to the boundary line used in ACLU Maps A, B, and C. Trial Tr. vol. 2, 203:14-204:4, 204:12-16. A second example was the boundary between Districts 16 and 18 in Pinellas County. Trial Tr. vol. 2, 205:7-12.

Dr. Barreto created and compared multiple maps showing black populations in VTDs on both sides of Districts 14 and 16, and Districts 16 and 18. According to Dr. Barreto, each neighborhood block "should have a 50/50 chance . . . of having a higher Black population on either the left side or the right side." Trial Tr. vol. 2, 212:18-20. Because he did not see 50% of black populations on each side of a district line, Dr. Barreto concluded that the Legislature's decisions were "not left to chance" and that "race was definitely . . . an important factor." Trial Tr. vol. 2, 214:25-215:10.

On cross-examination, Dr. Barreto admitted that he knew the Florida Legislature used census blocks (not VTDs) to draw the Enacted Map, and that a single VTD could be comprised of multiple census blocks of differing racial populations. Trial Tr. vol. 2, 224:24-225:11. Thus, Dr. Barreto conceded that Ferrin might not have seen the same visual maps Dr. Barreto produced when Ferrin drew the Enacted Map. Trial Tr. vol. 2, 225:7-11. Dr. Barreto also conceded that his visual maps used color coding according to percentages, and not the raw number of people in a particular VTD, so in any one VTD with 50% black population, that could represent two people, one of whom is black, or 500 people, 250 of whom are black. Trial Tr. vol. 2, 258:25-259:16.

Notably, Dr. Barreto did not perform this same racial boundary analysis on ACLU Maps A, B, and C. Trial Tr. vol. 2, 226:17-227:14. And even though Dr. Barreto wrote a rebuttal report to Defendants' expert witness Dr. Voss's expert report, Dr. Barreto ignored a figure in Dr. Voss's report that showed a similar type of racial boundary analysis as which Dr. Barreto conducted—the disparate Black Voting Populations inside and outside a portion of ACLU Map A. Trial Tr. vol. 2, 229:22-230:1. When asked whether ACLU Maps A, B, and C would show Dr. Barreto's theoretical 50% Black Voting Age Population on the inside and outside of those boundaries, Dr. Barreto replied, "I have no idea." Trial Tr. vol. 2, 230:3-7. Continuing further, Dr. Barreto explained, "[t]he 50/50 chance is . . . [a] theoretical

36

prior," and "where you draw a boundary, if you're being random and you're not looking at race, it would be 50/50." Trial Tr. vol. 2, 230:14-231:3. Despite this "theory," Dr. Barreto conceded that the "Florida Constitution requires map drawers to follow political and geographical boundaries," and "lines can't just be drawn randomly anywhere without regard to what natural or city or county or other boundaries might be there." Trial Tr. vol. 2, 231:12-19. And despite being asked multiple times, Dr. Barreto could not point to a single example of a map that illustrates his 50/50 theory in real life, and he did not conduct his purported 50/50 analysis on any other part of the state. Trial Tr. vol. 2, 230:11-231:11, 232:2-11.

By the end of his testimony, Dr. Barreto ended up walking away from his initial opinions about the Legislature's use of race, ultimately testifying that he "was just [assessing] and answering the question whether or not race was a primary factor" and that he "did not look at whether or not other factors outweighed that." Trial Tr. vol. 2, 234:4-8. In fact, Dr. Barreto could not provide an opinion as to whether the boundaries of District 16 followed major roads and highways because he did not examine road boundaries as a part of his analysis. Trial Tr. vol. 2, 238:11-17. This omission speaks to the flawed nature of Dr. Barreto's analysis, as even on direct testimony Dr. Barreto admitted that the boundary between Districts 14 and 16 "coincides with a major roadway." Trial Tr. vol. 2, 204:20-23. Dr. Barreto's analysis is even more suspect because he chose not

to analyze the boundary reports from the Legislature's website (where he obtained his data) when forming his opinions. Trial Tr. vol. 2, 232:12-233:12. Finally, Dr. Barreto conceded to the Court that he could not rule out that other reasons, such as politics, and not race, influenced the Legislature's line drawing of District 16. Trial Tr. vol. 2, 258:3-15.

Problematically, Dr. Barreto also provided erroneous expert opinions. First, he testified that District 18 in the Enacted Map has a decreased black population as compared to the old District 24 in the Benchmark Map. Trial Tr. vol. 2, 234:9-12. This opinion was shown to be demonstrably false when Defense counsel asked Dr. Barreto to compare the increased Black Voting Age Population in District 18 compared with District 24. Trial Tr. vol. 2, 236:19-237:1; *see also* Doc. 160-14 at 604, 640.

Dr. Barreto's expert report also erred in concluding that "white voters in Hillsborough block vote against . . . Black preferred primary candidates in each" of the three primary races he analyzed. Trial Tr. vol. 2, 245:2-3. On cross-examination, Dr. Barreto admitted that he made an error in one of the three primary races he analyzed, because white voters voted *with* black voters, not against them. Trial Tr. vol. 2, 245:9, 245:19-24, 247:7-9. And because District 16 is not a majority black district, Dr. Barreto conceded that black voters would need help from white voters to elect their candidates of choice. Trial Tr. vol. 2, 246:7-23.

Finally, the Court notes that before another three-judge panel on redistricting, Dr. Barreto testified:

> State Senate District 16 was accepted and implemented by the State of Florida for the express purpose of not retrogressing Florida voters' ability to elect a candidate of their choice . . . . Precisely such districts are lawful in Florida in order to not retrogress minority voting strength and should be maintained.

Trial Tr. vol. 2, 250:4-13. Dr. Barreto's attempt to explain that his testimony in this litigation is consistent with his testimony in the Northern District because "it's up to the judges to determine whether or not that was permissible" is not well taken. Trial Tr. vol. 2, 250:24-251:1.

In sum, while Dr. Barreto offered high-level opinions regarding voter behavior and racial composition, the methodological limitations and significant concessions under cross-examination substantially undermined the weight of his testimony. His failure to apply his own analytical techniques to the Plaintiffs' proposed maps, combined with his reliance on inapposite data sources, weakened his ability to demonstrate that race predominated in the drawing of District 16.

The Court finds that Dr. Barreto's testimony does not support a finding of racial predominance. While his analysis suggests modest differences in election outcomes between the Enacted Plan and alternative maps ACLU A, B, and C, he offered no evidence regarding the Legislature's motivations. His conclusion that the Legislature did not draw lines "randomly" is not probative of the disputed

issues to be resolved in this case, and his testimony before the Northern District of

Florida that District 16 is "lawful" and "should be maintained" undercuts any

conclusions to the contrary in this litigation.

5.    Defendants' expert witnesses (Dr. Trende, Dr. Voss)

**Dr. Sean Patrick Trende**, an expert witness, political scientist with an

emphasis on redistricting, and applied statistician, testified about his analysis

comparing the Benchmark and Enacted Maps as well as his analysis of Dr.

McCartan's expert report. Trial Tr. vol. 3, 134:24-135:13.

First, Dr. Trende analyzed and explained the Legislature's changes in the

district lines from the Benchmark Map to the Enacted Map, including which

populations were excluded or included in the new District 16. Trial Tr. vol. 3,

136:17-139:25; *see also* Doc. 162-88. Based on Dr. Trende's analysis, "[t]here's no

particular pattern to it in terms of adding or subtracting BVAPs. It's a pretty

incompetent racial gerrymander, I have to say, if that's what's being done because

you usually want to have consistent going in, consistent coming out to bleach or

pack the district." Trial Tr. vol. 3, 139:13-17. Dr. Trende elaborated that District 16

in the Enacted Map, "in [his] experience drawing maps, that would be a really bad

racial gerrymander if that was the goal." Trial Tr. vol. 3, 139:23-25.

Second, Dr. Trende analyzed Dr. McCartan's ACLU Maps A, B, and C, and

found that they failed to meet the standard in *Alexander* because they did not

40

accomplish the Legislature's goals "without the alleged racial gerrymandering." Trial Tr. vol. 3, 140:11-23. With regard to utilizing geographical and political boundaries, as required by the Florida Constitution, Dr. Trende explained that for the Enacted Map, "82 percent of [District 16's] boundary adheres to some sort of road or county or water line." Trial Tr. vol. 3, 143:1-4. But Dr. McCartan's ACLU Maps A, B, and C scored far worse, with only 58% of ACLU Map A, 59% of ACLU Map B, and 56% of ACLU Map C adhering to geographical and political boundaries. Trial Tr. vol. 3, 143:5-13; *see also* Doc. 162-89.

Dr. Trende then analyzed all the maps with the use of a histogram. Trial Tr. vol. 3, 144:22-145:6; *see also* Doc. 162-90. Reviewing the Enacted Map, Dr. Trende explained that District 21 had "extremely good adherence" to boundaries, and that all the Enacted Map's districts adhered to boundaries at least 82 percent of the time. Trial Tr. vol. 3, 142:23-143:4, 145:23-24; *see also* Doc. 162-90. When plotting the districts on ACLU Maps A, B, and C, however, Dr. McCartan's Districts 16, 20, 21, and 23 "become nonadherent" to boundaries and outliers from the rest of the districts in the state. Trial Tr. vol. 3, 147:18-148:2; *see also* Docs. 162-90, 162-91, 162-92, 162-93.

Dr. Trende also created choropleth maps, or heat maps, of the various racial precincts in District 16 for Dr. McCartan's ACLU Maps A, B, and C, which was "similar to what Dr. Barreto did in assessing the enacted map." Trial Tr. vol. 3,

148:18-25, 149:12-152:15; *see also* Docs. 162-108, 162-109, 162-110. Dr. Trende showed how ACLU Maps A, B, and C had such tight adherence to racial boundaries that the district lines were "like going through with a scalpel and carving out the higher BVAP precincts." Trial Tr. vol. 3, 150:17-19. Ultimately, Dr. Trende didn't "want to cast aspersions" on Dr. McCartan, but opined that "he must have gotten really lucky or really relied on some background knowledge to get things that precise." Trial Tr. vol. 3, 154:6-9.

Moreover, unlike Dr. Barreto's selective applications of his analyses, Dr. Trende also performed the same choropleth map analysis on District 16 in the Enacted Map. Trial Tr. vol. 3, 152:16-154:3 *see also* Doc. 162-111. Dr. Trende noted that there were "precincts that were available [to the map drawer] with high BVAPs that were excluded." Trial Tr. vol. 3, 153:12-13. He then showed the Court a number of precincts with low BVAPs that were included in District 16. Trial Tr. vol. 3, 153:18-25. According to Dr. Trende, the inclusion of "areas that are pretty heavily white . . . , if you're really trying to segregate people by race in the drawing of your districts, you just don't do that." Trial Tr. vol. 3, 153:23-25; *see also id.* at 154:1-3 (calling District 16 in the Enacted Map a "pretty bad" racial gerrymander).

On cross-examination, Dr. Trende noted that District 16 in the Enacted Map in Pinellas County "doesn't adhere tightly [to race] there either." Trial Tr. vol. 3,

42

155:23-25, 156:23-24. When asked about District 16's western lines following the City of Gulfport, Dr. Trende testified:

> That's one of the problems with Dr. Barreto's binomial test is that, in a theoretical world where people are sorted 50/50, something like that works. But in the real world, you get city boundaries that have racial meaning. And if you have a law that requires you to follow city boundaries, you're going to get results like that.

Trial Tr. vol. 3, 156:25-157:9. Rather, what was "interesting" to Dr. Trende was "what you do when you don't have a city boundary to follow and it's not following the racial contours of St. Petersburg. That's exactly what I'm talking about." Trial Tr. vol. 3, 157:10-13.

The Court finds Dr. Trende's testimony credible and analytically rigorous. His comparative analysis of district metrics supports a finding that the Legislature's map adhered closely to race-neutral traditional redistricting standards and that Plaintiffs' alternatives did not offer a more constitutionally appropriate configuration that could accomplish the Senate's stated goals.

**Dr. Stephen Voss**, an expert witness, political methodologist familiar with ecological inference and the use of statistical and demographic data in redistricting, testified about his analysis of the deviations from scientific standards present in Dr. McCartan's and Barreto's expert reports in this litigation. Trial Tr. vol. 3, 169:20-170:21. Dr. Voss is a registered Democrat, considers himself nonpartisan, and works for entities affiliated with both political parties, including

serving as the advisor for the College Democrats at the University of Kentucky. Trial Tr. vol. 3, 231:7-13, 232:11-21.

With regard to Dr. Barreto, Dr. Voss opined that Dr. Barreto made "a number of deviations from best practices" in his expert analysis. Trial Tr. vol. 3, 171:5:11. Dr. Voss detailed how Dr. Barreto concluded that white voters were polarized from Black voters in three Democratic primaries, "even [though] his own report ultimately showed that his conclusion was not true." Trial Tr. vol. 3, 171:17-25; *see also* Trial Tr. vol. 2, 245:9; 245:19-24; 247:7-9 (Dr. Barreto admitting on cross examination that he erred).

Dr. Voss also ran a separate ecological inference analysis of Dr. Barreto's analysis of white, Hispanic, and Black voters' votes for all the candidates in the 2018 Governor's Democratic primary election. Trial Tr. vol. 3, 173:3-174:13; *see also* Doc. 162-133. Dr. Voss testified that, within each racial classification, the percentages of each race's votes should equal 100% total when adding all the possible candidate choices and an "Other" selection. Trial Tr. vol. 3, 173:14-19; *see also* Doc. 162-133. But Dr. Barreto's results for each race did not sum to 100%: he failed to account for 4.4% of the Black voters' voting results and nearly 13% of the Hispanic voters' preferences. Trial Tr. vol. 3, 173:20-174:13; *see also* Doc. 162-133. Dr. Voss testified that the large number of missing voters in Dr. Barreto's analysis

44

shows his method and estimates are flawed, "consistently . . . across all analyses." Trial Tr. vol. 3, 174:2-13.

Furthermore, Dr. Barreto's discounting of Hispanic voters makes the divide between Black and white voters "look really large." Trial Tr. vol. 3, 175:15-17. Including Hispanics in the analysis changes the expected performance of the district. Trial Tr. vol. 3, 175:18-22. Dr. Voss testified that "[t]he shift in Florida's Hispanic vote in recent elections makes knowing which of these voters are white and which of these voters are Hispanic a lot more important in the current time period." Trial Tr. vol. 3, 227:11-14.

Even where Dr. Barreto counted Hispanic or white voters, he made assumptions that they all vote the same. But "[t]hat's not true. It's well known among people who study race and ethnicity that Cuban Hispanics are notably more Republican than other Hispanic groups." Trial Tr. vol. 3, 226:2-4. Moreover, "not all whites vote the same way everywhere." Trial Tr. vol. 3, 226:4-5. But instead of analyzing the share of white voters that are registered Democrats in the region, Dr. Barreto "assum[ed] that, on balance, on average, all white voters vote the same way." Trial Tr. vol, 3, 226:10-17. This was disclaimed by his own analysis of Democratic primaries, where one in three primaries, Democratic white voters voted for the same candidate as most of the Black voters. Trial Tr. 230:9-12. As Dr. Voss further explained, "[t]rying to project from how people voted in 2016 to how

they're going to vote 10 years later in 2026 is not a great forecast. It's nothing I would try to do in a peer-reviewed publication." Trial Tr. vol. 3, 227:15-18.

Moreover, Dr. Barreto's voting estimates overestimate their level of certainty. Trial Tr. vol. 3, 177:3-13. Dr. Voss testified that "a well-run simulation [will have] stability," while "a poorly run simulation [will have] you bounc[ing] around doing roughly the same thing." Trial Tr. vol. 3, 178:7-10. Dr. Voss explained that when he ran Dr. Barreto's data through a different version of ecological inference analysis—R by C instead of iterative VI—"you've got some fairly significant differences . . . on the same data . . . . [that] can make a big difference in whether a candidate wins or loses. And we're talking errors of that size." Trial Tr. vol. 3, 178:12-179:1; *see also* Doc. 162-134 (looking at Hillsborough County voters); Trial Tr. vol. 3, 179:6-8.

When Dr. Voss examined Dr. Barreto's results for Pinellas County voters, "the mistakes [we]re even bigger and even more egregious, clearer signs something is going wrong." Trial Tr. vol. 3, 179:2-22; *see also* Doc. 162-136. Dr. Voss testified that Dr. Barreto should have known that "[w]hen you're getting 103% of the Black vote . . . you've violated some of the assumptions of the method, you are doing something wrong, and . . . you really need to be refining the use of the methodology before you present results." Trial Tr. vol. 3, 179:23-180:2.

In the end, Dr. Barreto "is overconfident about his estimations of how the vote will shake out in his racially polarized voting analysis." Trial Tr. vol. 3, 180:20-24. In particular, the "trouble with [Dr. Barreto's] methodology estimating the Hispanic vote . . . can be pretty important for whether African American voters get their candidate of interest." Trial Tr. vol. 3, 180:25-181:3. And although Dr. Voss does not dispute that "Black voters tend to vote for Democrats" (Trial Tr. vol. 3, 174:20, 182:2-3), "[w]hether polarization would keep [Black voters] from getting their candidate of choice . . . depends on with whom they share the space, with whom they share the geography (Trial Tr. vol. 3, 181:8-10). Notably, "Black voters in these districts rely on some degree of lack of cohesion from other groups in order to elect their candidate of interest," and so "knowing how those other groups are behaving, how they're voting is part of a scientific estimation of whether they're likely to obtain their candidate of interest," and "how hard it will be to obtain their candidate of interest." Trial Tr. vol. 3, 181:19-25.

Dr. Voss criticized Dr. Barreto's "[i]nexplicabl[e]" choice to use voting-age population data, which is "going to produce error in the estimate," instead of voter turnout data, which is "the right data." Trial Tr. vol. 3, 183:13-23, 184:8. "[U]sing the wrong data results in a bigger gap; so we have a larger white vote for Graham [a white Democrat], a lower white vote for Gillum [a Black Democrat] than what happens when you estimate it using who actually showed up on election day."

47

Trial Tr. vol. 3, 184:12-15. Dr. Barreto's "overestimating the polarization means [he's] overestimating how cohesive whites are on the opposite side of Black voters." Trial Tr. vol. 3, 184:24-185:1. Dr. Voss agreed that getting a "more precise racially polarized voting analysis is important, especially when we have . . . a district where Blacks don't make up a majority of the district." Trial Tr. vol. 3, 185:25-186:3 .

With regard to Dr. McCartan, Dr. Voss analyzed the compactness of the Benchmark Map, the Enacted Map, and ACLU Maps A, B, and C. Trial Tr. vol. 3, 188:14-189:4; *see also* Doc. 162-125. Dr. Voss created a chart examining the Polsby-Popper score, the Reock score, and "know it when you see it," or "KIWYSI" method. Doc. 162-125. The KIWYSI method is "a mathematically objective measure" that was developed by creating a complex statistical model that is "trained to judge what people think of as a tidy district versus a messy district." Trial Tr. vol. 3, 190:6-19. KIWYSI is "fairly new, but it's beneficial enough and popular enough that Dave's Redistricting app," which both Dr. McCartan and Dr. Barreto used in their analyses, "has incorporated the calculation of it into their software." Trial Tr. vol. 3, 191:7-13. Shapes like circles and squares will have higher ratings under the KIWYSI method than convex shapes or shapes with tendrils. Trial Tr. vol. 3, 190:20-25.

Dr. Voss testified that compact measures are "not absolute measures; they are relative measures," because "[h]ow compactly you can draw a district . . . are partly features of geography." Trial Tr. vol. 3, 191:23-192:1. In reviewing the maps, Dr. Voss explained how ACLU Map A has a lower compactness score for District 16 than the Enacted Map; and ACLU Map B has mixed compactness scores. Trial Tr. vol. 3, 192:9-13; *see also* Doc. 162-125. ACLU Map C has higher compactness scores on District 16, "but it comes at the expense of District 23." Trial Tr. vol. 3, 193:7-9; *see also* Doc. 162-125.

Next Dr. Voss examined partisanship in the Tampa-St. Petersburg-Clearwater metropolitan statistical area (the "MSA"). Doc. 162-127. Dr. Voss testified that based on the partisan composition of the four counties in the MSA—Hillsborough, Pinellas, Pasco, and Hernando—exceeding 50% Republican, he would expect to see five senate districts, with three of them republican. Trial Tr. vol. 3, 196:24-197:2. In the Enacted Plan, Dr. Voss testified that he would expect three districts with a Republican advantage, and two districts with a Democratic advantage. Trial Tr. vol. 3, 197:23-25. But in ACLU Maps A, B, and C, Dr. McCartan packed and cracked Republican voters "to waste more Republican votes" by making a "district that was already leaning Republican become[] even more Republican" (packing) and putting "more Republican votes into a place they're likely to lose" (cracking). Trial Tr. vol. 3, 198:1-21. Under Dr. McCartan's ACLU

Maps A, B, and C, District 18 "drops from 51.37 percent Republican to consistently 45.33 percent Republican," making it a district "which used to tilt Republican, [and] now tilts Democratic." Trial Tr. vol. 3, 198:9-199:3. In short, Dr. McCartan's ACLU Maps A, B, and C "giv[e] the Democrats one more seat." Trial Tr. vol. 3, 199:5-8. Meanwhile, the black voters in Pinellas County who are moved into District 18 in ACLU Maps A, B, and C can no longer control the Democratic primary in the district, and "in the [2018] governor's election . . . they would have been outvoted." Trial Tr. vol. 3, 230:23-231:2.

Finally, Dr. Voss examined black voting strength in the Tampa Bay area. Doc. 162-132. Dr. Voss found that, as a result of population change, the black vote "had steadily eroded" since 2012. Trial Tr. vol. 3, 201:4-17. Under the Enacted Map, District 16 "restored [black voting] numbers that had slipped" since 2012. Trial Tr. vol. 3, 202:3-10. But Dr. McCartan's ACLU Maps A, B, and C either "further erode[]" the black vote relative to 2012" or "leave it lower." Trial Tr. vol. 3, 202:13-22.

The Court finds Dr. Voss's testimony credible and consistent with the evidence. His expert opinion reinforces the conclusion that traditional districting principles—not racial considerations—adequately explain the design of Senate District 16.

6. Matthew Isbell

**Matthew Isbell**, is a Democratic political consultant who testified at trial regarding his partisan redistricting interests and his communications with Nicholas Warren. Isbell explained that he has worked for Democratic legislators and political committees during Florida's two most recent redistricting cycles. Trial Tr. vol. 4, 7:7-10:20. He testified that during the 2020 redistricting cycle, he was retained by the People Over Profits committee and received a stipend to publish articles that analyzed the partisan consequences of redistricting proposals. Trial Tr. vol. 4, 9:14-10:4. Isbell candidly acknowledged that the purpose of this work—and that of those funding him—was to help elect more Democrats in Florida. Trial Tr. vol. 4, 10:1-20.

Isbell described regular communication with legislators, political consultants, and members of the press to discuss the partisan implications of draft maps. Trial Tr. vol. 4, 14:21-16:14. He also frequently exchanged private messages with Warren throughout the redistricting process. Trial Tr. vol. 4, 13:6-9; *see also* Doc. 162-15. Isbell confirmed that Warren privately advocated for specific map configurations that would improve Democratic prospects in the Tampa Bay region and expressed frustration with the perceived failure of Democratic legislators to press these objectives publicly and with advice Democratic legislators had received from a lobbyist for the National Democratic Redistricting Committee.

Trial Tr. vol. 4, 26:14-27:13. In one exchange, Isbell agreed to publish an article drafted by Warren under Isbell's own name—an effort Warren described as "launder[ing]" the message to obscure its origin. Trial Tr. vol.4, 26:4-13.

Isbell also testified that a Democratic staffer in the Florida House told him that Warren had been "coaching him on stuff" during the legislative session and that the staffer was preparing to leave state employment to work directly for Warren. Trial Tr. vol. 4, 18:23-19:16.

Notably, Isbell viewed the Legislature's drawing of District 16 as having partisan motivations, not race-based ones.[1] Trial Tr. vol. 4, 33:14-34:7. Regarding a potential District 16 located entirely within Hillsborough County, Isbell testified that creating a state senate seat that "keeps South Pinellas whole," "would be a Democratic-aligned seat." Trial Tr. vol. 4, 28:3-12. And, in private messages with Warren, Isbell commented on viewing the Legislature's District 16 that "[t]he Pinellas portion isn't even that black since they grab a ring of white liberal Dems as well." Trial Tr. vol 4, 25:7-8, 25:11-17 (explaining that he did not believe the

---

[1] The Court takes no position as to whether Isbell's opinion that the Legislature acted with partisan motivations is accurate. His opinion, however, is relevant even if inaccurate, because it shows the individuals during the redistricting process who were acting to try to influence the redistricting process from the outside to change the configuration of the districts in Tampa Bay, including Warren, were themselves focused on partisan outcomes. *See* Trial Tr. vol. 4, 34:6-7. Notably, the Florida Constitution prohibits the drawing of districts with the intent to favor a political party. Art. III, § 21(a), Fla. Const.

Legislature was attempting to "increas[e] the African American share of the electorate by crossing the bay" because the Legislature was also "grabbing all these white voters").

Isbell's testimony and documentary evidence confirm a pattern of coordinated partisan strategy during the redistricting cycle, pursued outside the legislative process and without public disclosure. This coordination between Warren and Isbell, coupled with Isbell's stated goal of electing more Democrats, supports a finding that Plaintiffs' alternative proposals and advocacy efforts were grounded in partisan, not race-based, objectives.

## IV.    Senate District 16: Configuration and Justifications

### A.    Map Design

The evidence at trial established that Senate District 16 was not the product of racial gerrymandering. The Court credits the testimony of Mr. Ferrin, who explained how District 16 was drawn in accordance with race-neutral districting principles. Trial Tr. vol. 3, 66:16-79:4. The district's boundaries were shaped by a methodical statewide approach, moving from the northern and southern portions of Florida toward the Tampa Bay region and guided principally by the Florida Constitution's Tier Two criteria—compactness, population equality, and use of existing political and geographical boundaries. Trial Tr. vol. 3, 64:17-67:6.

The same approach used statewide was also used in the Tampa Bay region, with eight Senate districts drawn between Citrus County in the north and Sarasota County in the south. Trial Tr. vol. 2, 18:11-20, vol. 3, 66:16-67:13. This eight-district group in the Tampa Bay region (Districts 11, 21, 23, 18, 14, 16, 20, and 22) has as its perimeter county boundaries to the north (Trial Tr. vol. 3, 67:10-13), south (Trial Tr. vol. 3, 67:25-68:2), east (Trial Tr. vol. 3, 67:14-24), and west (Trial Tr. vol. 3, 68:5-6). The western boundary is also a water boundary: the Gulf of America. Trial Tr. vol. 3, 68:3-4. A visual depiction of the Enacted Map was admitted as Joint Exhibit 20 at 639 (Doc. 160-14 at 639); an enlarged excerpt of the Tampa Bay region is set forth below for convenient reference:



Ferrin's overarching emphasis in drawing districts in this grouping of counties was to first draw by whole counties and then, when a county split was required, to use a geographical or political boundary for the boundary of the district. Trial Tr. vol. 3, 68:20-69:20. Ferrin testified in great detail about the process for drawing the eight districts in the Tampa Bay region. Trial Tr. vol. 3, 66:16-74:9. He specifically described how compactness and boundary-usage decisions made in drawing Districts 11, 23, and 14 led to the decision to draw District 21 to include portions of northern Pinellas County. Trial Tr. vol. 3, 69:6-71:11. And Ferrin explained that a consequence of that decision in northern Pinellas County was that the remainder of Pinellas County had roughly 650,000 people to be assigned to districts, approximately 100,000 more than a single district could accommodate under the population equality requirement. Trial Tr. vol. 3, 72:13-73:16. To comply with the one-person, one-vote standard, the southern portion of Pinellas County would need to be divided between District 18 (entirely within Pinellas County) and the remaining population joined in a district either with Hillsborough County to the east or Manatee County to the south. *Id.*

District 16's ultimate configuration reflects Ferrin's choice to join the southern Pinellas population with Hillsborough County rather than Manatee County. This arrangement is similar to the 2015 court-imposed benchmark plan, which also joined communities in southern Pinellas County with Hillsborough

56

County. Trial Tr. vol. 3, 78:10-21. Ferrin testified credibly that he had no preconceived notion to cross (or not to cross) Tampa Bay or to retain any specific configuration from prior cycles. Trial Tr. vol. 1, 270:11-271:23; vol 3, 78:22-79:1. He was not instructed to preserve any portion of the 2015 court-imposed benchmark district. Trial Tr. vol. 3, 78:16-21.

Ferrin further testified that during the refinement process, the initial draft of District 16—which had split the City of Gulfport in Pinellas County—was adjusted to use the city boundary and keep it whole. Trial Tr. vol. 3, 113:5-18, 121:12-122:18. This choice was made not for racial reasons, but to better use municipal boundaries. Trial Tr. vol. 3, 119:9-120:2. Dr. Trende corroborated this, noting that District 16 followed the Gulfport boundary. Trial Tr. vol. 3, 156:6-23.

After Senate districts were drawn on Tier Two grounds as described above, and the Senate's staff were "happy with the general configuration of the district," a district-specific functional analysis was performed to ensure compliance with the Florida Constitution's non-diminishment provision. Trial Tr. vol. 3, 57:20-58:10, 91:13-22. The district-specific functional analysis confirmed that District 16 complied with the non-diminishment requirement, as even Plaintiffs' counsel/witness Nicholas Warren confirmed in trial testimony. Trial Tr. vol. 1, 157:24-158:1.

The Court credits Ferrin's testimony on all of these points. He was consistent, credible, knowledgeable, and unrebutted. No evidence shows that Ferrin or any Senate decisionmaker drew District 16 with a racial target or goal. Plaintiffs presented no contemporaneous evidence to the contrary, and no legislators testified contrary to Ferrin at trial.

Although Plaintiffs initially identified multiple legislators on their witness lists, they attempted to call only one at trial: former Senator Randolph Bracy. Trial Tr. vol. 1, 196:15-21. When contacted by phone, Bracy advised a U.S. Marshal that he had "told the plaintiffs in the case that he did not want to be involved." Trial Tr. vol. 2, 95:19-96:15. Other legislators asserted legislative privilege in response to Plaintiffs' requests to depose them during this case. Trial Tr. vol. 3, 20:2-22:25.

The Court draws no conclusions or inferences based on legislators' invocation of legislative privilege. *See Pernell v. Fla. Bd. of Governors of State Univ.*, 84 F.4th 1339, 1343 (11th Cir. 2023) (explaining purpose of common-law legislative privilege). Although contemporaneous statements of key legislators "are relevant to an *Arlington Heights* analysis, a statement or inquiry by a single legislator would constitute little evidence of discriminatory intent on the part of the legislature." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 939 (11th Cir. 2023); *see also Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299,

58

1324 (11th Cir. 2021) (finding it "questionable whether the sponsor speaks for all legislators").

In *Florida v. United States*, 885 F. Supp. 2d 299 (D.D.C. 2012), a three-judge district court in the District of Columbia denied the federal government's request for an adverse inference against the State of Florida when Florida legislators invoked the legislative privilege to avoid testifying in preclearance litigation under Section 5 of the Voting Rights Act. *Id*. at 353 n.65. The court found that "drawing an adverse inference from the absence of such testimony would run contrary to the instruction of *Arlington Heights*." *Id*. The same principle applies here.

Based on the full trial record, and as further explained below, the Court concludes that the configuration of Senate District 16 was not based predominantly on racial considerations, but rather on geography, population arithmetic, and adherence to the traditional race-neutral districting principles found in Tier Two of the Florida Constitution.

### B.    Compactness and Boundary Usage Metrics

Ferrin drew race-neutral lines seeking to achieve contiguous, compact shapes and seeking to respect geographic and political boundaries.

a. <u>Contiguity</u>

The Court finds that Senate District 16, as enacted, satisfies the Florida Constitution's contiguity requirement notwithstanding the fact that it joins portions of Hillsborough and Pinellas Counties with a portion of Tampa Bay. As Ferrin credibly explained, contiguity in redistricting is assessed using census blocks, which include water bodies. Thus, a district remains legally contiguous even when it connects land areas across a body of water, provided the relevant census blocks are geographically adjacent.[2] Trial Tr. vol. 3, 50:25-51:21 (Ferrin). The contiguity requirement was implemented by Mr. Ferrin and evaluated through the Legislature's software. Trial Tr. vol. 3, 50:25-51:4.

Each census block, including water blocks, must be assigned to a district during the map drawing process. Tr. vol. 2, 35:15-22; vol. 3, 51:14-21. The testimony of Dr. McCartan and Dr. Trende established that Plaintiffs' illustrative maps were manipulated visually to create the appearance of discontiguity by removing water census blocks from view. Trial Tr. vol. 2, 69:14-16; 78:12-17; 105:12-19; vol. 3, 52:17-

---

[2] The Court notes that Mr. Ferrin's testimony as to legal contiguity is consistent with the decisional law of the Florida Supreme Court. "[T]he presence in a district of a body of water without a connecting bridge, even if it necessitates land travel outside the district in order to reach other parts of the district, does not violate this Court's standard for determining contiguity under the Florida Constitution." *In re Sen. Jt. Resol. 2G, Special Apportionment Sess. 1992*, 597 So. 2d 276, 280 (Fla. 1992), *amended sub nom. In re Constitutionality of Sen. Jt. Resol. 2G, Special Apportionment Sess. 1992*, 601 So. 2d 543 (Fla. 1992).

53:4; Docs. 161-41, 161-42, 161-43; *see also* Trial Tr. vol. 2, 31:14-21 (Ferrin explaining: "[T[hese maps don't show all of the census blocks in the region. We have to assign all the census blocks, even the ones in the water. And those get factored into the compactness metrics like anything else, whether it's an unpopulated piece of land or water. So to not show those—I mean, there may be other oddly shaped blocks that are a result of these kind of configurations that we have to account for because we have to assign all the census blocks."). The Court finds that this selective exclusion created an inaccurate impression of legal non-contiguity and served to mislead rather than inform.

No evidence presented at trial supports a finding that the Senate's configuration of District 16 violated contiguity requirements. On the contrary, the Senate's adherence to census-based contiguity standards demonstrates full compliance with state and federal law.

### b.  Compactness and Boundary Usage

Enacted District 16 achieved objective improvements in both compactness and boundary usage compared to the court-imposed benchmark district. Ferrin testified that the compactness requirement was evaluated both visually and mathematically using the Reock, Convex-Hull, and Polsby-Popper metrics. Trial Tr. vol. 3, 40:1-24, 42:2-25, 88:5-13; Doc. 160-4 at 56; *In re Sen. Jt. Resolution of Legislative Appointment 1176*, 83 So. 3d 597 (Fla. 2012) (describing Reock and

Convex Hull); *see also League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258 (Fla. 2015) (using all three objective mathematical calculations). Specifically, District 16 received a Convex Hull score of 0.69, a Polsby Popper score of 0.36, and a Reock Ratio of 0.36. *See* Doc. 162-168 at 2; 161-64 at 19 (Dr. McCartan's legislative reports); *see also* Doc. 160-14 at 640 (Enacted Map-Census and Boundary Statistics). These were comparable scores or improvements over District 19 in the Benchmark Map, which received a Convex Hull score 0.67, a Polsby Popper score of 0.26, and a Reock Ratio of 0.42. *See* Doc. 160-14 at 604 (Benchmark Map-Census and Boundary Statistics). These metrics demonstrate that Enacted District 16 is more geographically and visually compact than the benchmark configuration.

In addition to compactness, Enacted District 16 also scored highly on objective boundary-use metrics. Ferrin testified regarding the boundary analysis report available in the Legislature's redistricting software and how it was implemented to ensure compliance with the Florida Constitution's requirement for districts to use existing political and geographical boundaries, where feasible. Trial Tr. vol. 3, 44:11-46:20, 48:2-6; Doc. 160-4 at 53-54.

Every set of maps produced for consideration to the committee included a boundary analysis report. Trial Tr. vol. 3, 48:15-19. This analysis was also included in the software so "users could visually see which boundaries would be eligible under these objective standards as they were drawing." Trial Tr. vol. 3, 46:9-13.

The reports provide the percent of each district where a particular type of boundary (city, county, road, water, rail) was utilized for the district boundaries. *See, e.g.*, Doc. 160-14 at 604, 640. Because city and county lines can coincide with other boundaries, such as roads and water, there are times when the sum of these percentages will exceed 100%. Thus, the most important objective score in the boundary analysis for evaluating compliance with the boundary requirement is the "nongeo/pol column," as it measures the noncompliant portions of the boundary. Trial Tr. vol. 3, 47:6-21, 48:2-6 (Ferrin explaining that lower number indicates higher compliance with boundary requirement).

Although county roads were considered and used when appropriate for drawing district lines, county roads were not considered qualifying roads for the boundary analysis score given the different degrees of county roads throughout the state. Trial Tr. vol. 3, 48:23-50:9 (distinguishing rural county roads from county-owned four-lane divided highways).

The Senate also evaluated city and county splits that occurred as a result of district lines, a metric in place since the 2010 cycle. Trial Tr. vol. 3, 59:22-25. Chair Rodrigues' memorandum also gave directives regarding the treatment of counties and municipal boundaries specifically. Trial Tr. vol. 3, 58:17-20; *see also* Doc. 162-6 at 2. This directive informed that municipal boundaries were "a little bit less important than some of the geographical features that were more static through

63

the decade" due to the ever-evolving boundaries of Florida cities and municipalities. Trial Tr. vol. 3, 58:21-59:13; *see also* Trial Tr. vol. 3, 83:16-84:23 (discussing trade-offs during refinement of draft districts that showcased prioritization between municipal boundaries and boundary usage throughout the Enacted map). Although there was an effort to keep cities whole, it was not the highest priority, and the ability to keep cities whole was impacted by prioritizing the use of other boundaries, like an interstate or a river. Trial Tr. vol. 3, 60:6-12; *see also* Trial Tr. vol. 3, 59:14-21 (discussing the prioritization of identifiable geographic features like rivers and interstate highways).

Ferrin testified that approximately 80% of District 16's perimeter follows the existing major political and geographical boundaries measured by the Legislature's boundary analysis report. These boundaries include major highways such as Interstate 75, Interstate 275, U.S. Highways 19 and 301; the border between Hillsborough and Manatee Counties; and municipal boundaries, including the border between St. Petersburg and Gulfport. Trial Tr. vol. 3, 75:15-76:20. District 16's boundaries also included major county roads not reflected in the boundary analysis score, such as Fletcher Avenue, Bruce B. Downs, and Bearss Avenue in Hillsborough County and 22nd Avenue North in Pinellas County. Trial Tr. vol. 3, 76:21-77:12. An enlarged map reflecting District 16 was introduced as Defendants' Exhibit 316 and is reproduced below for convenient reference:



65

The boundary analysis for Enacted District 16 reflected an improvement over the benchmark district on this objective metric, and compliance with the Florida Constitution's requirement to use such boundaries "where feasible." *See* Doc. 161-64 at 28 (Enacted Map); Doc. 160-14 at 604 (Benchmark Map).

The Senate's configuration also avoided the unnecessary division of municipalities. The Enacted Map did not split the City of Gulfport—an adjustment from earlier drafts that had done so. Trial Tr. vol. 3, 113:5-18. The Court credits the testimony of Ferrin that this change was made to better conform to municipal integrity, not for racial purposes.

Importantly, Plaintiffs did not dispute the accuracy of the Senate's compactness or boundary-usage metrics. Given this unrebutted analysis, the Court finds that Enacted District 16 reflects compliance with Florida's race-neutral Tier Two constitutional standards. The objective evidence weighs strongly against a finding that race predominated over traditional redistricting criteria.

### C.    Justifications for County Splits (Pinellas and Hillsborough)

The Court finds that the Enacted District 16's split of Hillsborough and Pinellas Counties was justified by legitimate, race-neutral districting criteria consistent with the Florida Constitution and federal law.

As Ferrin credibly testified, Pinellas County contains a population greater than one Senate district and thus necessarily had to be divided. Trial Tr. vol. 3,

68:24-73:16. The configuration of District 21 (in the northern part of the county, anchored in north Pinellas and southwest Pasco Counties) and District 18 (entirely within Pinellas County) used well-recognized political and geographical boundaries and achieved high compactness and boundary usage scores. Trial Tr. vol. 3, 70:18-73:13. This decision left approximately 100,000 people in south Pinellas County who needed to be joined with population from a neighboring county. Trial Tr. vol. 3, 72:13-73:16.

Ferrin further explained that his decision to join south Pinellas County with adjacent areas of Hillsborough County—rather than Manatee County—was based on non-racial considerations, including compactness and boundary usage. The longest east-west portion of the boundary between District 18 and District 16 is 22nd Avenue North, a prominent four-lane highway. Trial Tr. vol. 3, 75:21-76:2, 77:10-12; *see also* Trial Tr. vol. 1, 226:10-20 (Plaintiff's witness Azis confirming that 22nd Avenue North is a major four-lane highway near her home in Pinellas County). And as discussed above, District 16's configuration achieved superior compactness scores and boundary usage scores as compared to the benchmark district.

The Florida Constitution does not prohibit county splits. Rather, it requires that districts, "where feasible, utilize existing political and geographical boundaries." Art. III, § 21(b), Fla. Const. In choosing to prioritize the use of such

boundaries over an arbitrary rule against splitting counties, the Senate complied with the constitutional mandate.

Contrary to Plaintiffs' assertions, the weight of the evidence does not indicate that the Senate's decision to split Hillsborough and Pinellas Counties reflected racial motivations. The trial record contains no evidence that racial data was consulted when deciding how to divide these counties. Ferrin testified that he did not review racial demographic data until after the general configuration of the districts was complete and the draft map was finalized for purposes of a functional analysis. Trial Tr. vol. 3, 56:2-13, 57:20-58:1.

Moreover, the Senate did not split either county in a manner that surgically included or excluded particular racial groups. Instead, the Enacted Map followed existing major political and geographical features to divide the counties. The Senate's adjustments to boundaries near the City of Gulfport in the southwestern portion of District 16 illustrate the emphasis on non-racial factors. In the Senate's initial draft map, the district that became Enacted District 16 (then designated as District 19) split the City of Gulfport. Trial Tr. vol. 3, 113:5-18. As Ferrin and his staff refined the draft map of District 16 throughout the process, later iterations kept the City of Gulfport whole and used the boundary between Gulfport and St. Petersburg for a portion of District 16's boundary. Trial Tr. vol. 3, 113:10-18, 119:9-120:2, 121:12-21, 121:25-122:9; *see also* Trial Tr. vol. 3, 119:8-120:15 (Ferrin's

68

explanation to the Court that a "squiggle" in the southwest border of District 16 was the boundary between Gulfport and St. Petersburg).

The racial demographics in the Pinellas County portion of District 16 are also inconsistent with a conclusion of racial predominance. Trial Tr. vol. 3, 122:7-14; *see also* Trial Tr. vol. 3, 156:7-157:3 (Dr. Trende citing Doc. 161-24 and explaining that the Pinellas boundary of District 16 followed the City of Gulfport but "left a big chunk of white people up there" along the Pinellas boundary between Districts 16 and 18); vol. 4, 25:7-17 (Isbell explaining that "as the legislature crossed the bay, they were also grabbing all of these white voters"). Indeed, as Dr. Trende testified, District 16 would be a "pretty bad" racial gerrymander. Trial Tr. vol. 3, 154:1-3.

Taken together, the evidence supports the conclusion that the county splits in Senate District 16 were driven primarily by population equality, compactness, and use of political and geographical boundaries—not by racial considerations. The plaintiffs offered no credible evidence to the contrary.

### D. Functional analysis and compliance with non-diminishment requirement

The Florida Constitution includes a prohibition on drawing plans that "diminish" the ability of racial or language minorities to "elect representatives of their choice." Art. III, § 21(a), Fla. Const. This non-diminishment standard, although rooted in protecting minority voting strength, does not mandate any specific racial composition for districts. Rather, it directs the Legislature to ensure

69

that enacted districts do not retrogress in their ability to elect representatives of their choice, relative to the benchmark plan.

Ferrin testified extensively about the Senate's efforts to comply with the non-diminishment standard. He explained that race was not used as a drawing criterion during the configuration of District 16 and that District 16 was not drawn to reach a particular racial target. Trial Tr. vol. 3, 79:2-4. Instead, once a reasonably configured district was reached, Mr. Ferrin conducted a district-specific functional analysis evaluating a variety of demographic and election-related statistics. Trial Tr. vol. 1, 247:9-17, Trial Tr. vol. 3, 56:3-57:13. This functional analysis included comparison of a draft district with the court-imposed benchmark district in effect from 2016-2020 to ensure that the ability of racial and language minorities to elect representatives of their choice had not been diminished. Tr. vol. 1, 237:7-11.

The functional analysis Ferrin performed after configuring District 16 confirmed non-diminishment. Trial Tr. vol. 3, 89:18-21, 91:17-22; *see also* Doc. 160-14 at 643 (showing District 16's functional analysis results). Indeed, Plaintiffs do not allege that District 16 diminishes black voters' ability to elect representatives of their choice in violation of Tier One under Florida law. Dr. Barreto agreed with the way the Senate conducted its functional analysis of District 16. Trial Tr. vol. 2, 187:1-6, 194:6-9; vol. 3, 57:14-19; *see also* Trial Tr. vol. 3, 89:18-21 (Ferrin testifying that District 16 in the Enacted Map did not diminish), 91:17-92:3 (same); Trial Tr.

vol. 1, 157:24-158:1 (Warren agreeing that District 16 in the Enacted Map does not diminish black voters' ability to elect representatives of their choice).

In sum, the Senate's limited consideration of racial data—only after the completion of initial district lines and only to verify compliance with the non-diminishment standard—does not transform the Senate's process into one in which race predominated. This approach is consistent with the Supreme Court's decisions in *Allen*, *Bethune-Hill*, and *Miller*, which permit a legislature to be race-conscious without allowing race to predominate.

The evidence demonstrates that the Senate did not employ race as a predominant factor in drawing District 16, but rather made use of demographic and electoral-performance data only as a back-end check to ensure compliance with applicable law. That is consistent not only with the Florida Constitution, but with the federal Constitution as well.

## V. Analysis of Plaintiffs' Alternative Maps

The ACLU alternative maps—Plans A, B, and C—were developed by Dr. McCartan pursuant to detailed instructions from Plaintiffs' counsel, particularly Warren. These instructions directed the construction of a Hillsborough-only District 16 and prohibited alteration of District 14. This constraint mirrored the configuration of Warren's own Plan 42 and aligned with express partisan preferences of Warren and Isbell. The Court finds that these maps were not the

product of an independent, race-neutral redistricting process but rather reflected predetermined race- and party-conscious objectives. As such, they do not provide a credible, less race-conscious alternative that would satisfy the State's legitimate goals under the Florida Constitution.

The Court notes below specific findings as to some of the deficiencies in ACLU Maps A, B, and C.

### A.   Compactness and Boundary Usage Deficiencies in Alternative Maps

#### a.  Compactness

Ferrin credibly testified that he began map drawing without any preconceived intent regarding the shape of District 16 and instead approached the Tampa Bay region holistically. Trial Tr. vol. 3, 78:10-12. In contrast, Plaintiffs began by isolating District 16, and, as Dr. McCartan admitted, this approach dictated the shape of neighboring districts. *See* Trial Tr. vol. 3, 68:15-18 (Dr. McCartan explaining that he "had to begin with the first instruction, which was to keep District 16 contained within Hillsborough County. At that point adjustments had to be made to create a contiguous and complete set of districts").

While Plaintiffs attempted to emphasize compactness scores for District 16 alone, Dr. McCartan acknowledged that altering one district's compactness necessarily impacts surrounding districts. Trial Tr. vol. 2, 119:19-120:1. And even within this isolated focus, the compactness scores for District 16 in ACLU Maps A,

72

B, and C were mixed. For example, Convex Hull scores for District 16 improved in all three ACLU maps, but Polsby-Popper and Reock scores declined in two of them. Doc. 162-168 at 2; 161-64 at 18-26. These modifications also degraded the compactness of neighboring districts, such as District 23, which Dr. McCartan configured into the so-called "Stairway to Plant City." Trial Tr. vol. 2, 147:10-15; Doc. 162-68 at 2 (showing lower compactness scores for ACLU Maps A, B, and C across all three compactness measures); 161-64 at 18-26. The Stairway to Plant City along the southern boundary of District 23 in ACLU C is depicted below:



Even Dr. McCartan conceded that the regional compactness scores in ACLU Maps A, B, and C were ultimately "similar and comparable" to those in the

Enacted Map. Trial Tr. vol. 2, 129:6-10. Plaintiffs have therefore not shown that their proposed configurations improved compactness in the Tampa Bay area.

      b.  <u>Boundary Usage</u>

The boundary scores for all three ACLU alternative maps were demonstrably worse than the Enacted Map. In particular, every district in all three plans showed diminished adherence to road boundaries. Doc. 162-168 at 2; Doc. 161-64 at 27-35.

More significantly, the ACLU alternative maps were markedly inferior on their overall use of existing political and geographical boundaries—a critical race-neutral districting standard required by the Florida Constitution. In District 16, the Enacted Map achieved 82% boundary usage, while ACLU Maps A, B, and C registered only 58%, 59%, and 56%, respectively, *See* Doc. 162-168 at 2; Doc. 161-64 at 27-35. Districts 21 and 23 in the ACLU Maps also showed sharp declines. For example, District 21 dropped from 99% utilization of existing political and geographical boundaries to 87% in Map A and 90% in Maps B and C. Docs. 162-168 at 2; 161-64 at 27-35.

With the exception of District 18, all other districts in the region performed worse on boundary usage under the ACLU proposals. Docs. 162-168 at 2; 161-64 at 27-35. Far from improving on the Legislature's work, Plaintiffs' maps represent

a regression in complying with this key race-neutral and legitimate constitutional metric emphasized by the Florida Senate in its map-drawing process.

### B. Evidence of Partisan Intent in Alternative Maps

The trial record strongly supports a finding that ACLU Maps A, B, and C were drawn to benefit the Democratic Party. Warren's testimony, and contemporaneous records, show that he actively collaborated on redistricting matters with Democratic legislators, staffers, and operatives to promote a Hillsborough-only configuration of District 16 for partisan purposes. Trial Tr. vol. 1, 151:1-153:6; Doc. 162-15.

Warren also directly instructed Dr. McCartan to isolate District 16 within Hillsborough County and to alter surrounding districts only as needed. Doc. 161-9 at 1. These instructions, combined with the Florida Constitution's traditional districting constraints, essentially locked in the configuration Warren had promoted publicly during the redistricting process. Dr. McCartan acknowledged that this guidance left him without "a lot of choices" in crafting the ACLU Maps. Trial Tr. vol. 2, 76:12-13.

Although he initially denied it, Dr. McCartan ultimately admitted that Warren's directions precluded any changes to District 14—an area with Democratic-leaning performance, although currently held by a Republican. Trial Tr. vol. 2, 109:21-110:4, 114:10-13; *see also* Trial Tr. vol. 3, 197:7-16 (Dr. Voss's

testimony regarding the Democratic-leaning nature of District 14), 219:7-23 (discussing the political affiliation of the current state senator).

Dr. Voss's analysis confirmed that Plaintiffs' proposed changes shifted the projected partisan balance in the Tampa Bay region from a projected 3-2 Republican advantage to a projected 3-2 Democratic advantage under the ACLU proposals. Trial Tr. vol. 3, 197:23-25, 199:5-8.

Given the Florida Constitution's explicit prohibition on intentional partisan favoritism in redistricting, the evidence of partisan intent in ACLU Maps A, B, and C would bar the Florida Legislature from adopting them as alternative maps. *See* Art. III, § 21(a), Fla. Const. (providing that no district "shall be drawn with the intent to favor or disfavor a political party or an incumbent"); *League of Women Voters of Florida v. Detzner*, 172 So. 3d 363, 376-77 (Fla. 2015) (invalidating congressional districts where political operatives "managed to taint the redistricting process and the resulting map with improper partisan intent" by "submitting maps and partial maps through the public process" and concealing their participation). The alternative maps therefore do not satisfy the Supreme Court's requirement that plaintiffs present a substitute map showing how a legislature, "driven only by its professed mapmaking criteria," could have produced a different map with "greater racial balance." *Alexander*, 602 U.S. at 34. The Senate's professed mapmaking criteria explicitly forbade the production of an

intentional partisan gerrymander such as that proposed by Plaintiffs in ACLU
Maps A, B, and C.

### C.    Evidence of Racial Predominance in Alternative Maps

The record also raises significant concerns that race predominated in the
design of ACLU Maps A, B, and C. The poor boundary usage scores noted above
(Doc. 162-168 at 2; Doc. 161-64 at 27-35) suggest an overriding consideration other
than traditional districting principles.

Dr. McCartan acknowledged that he began his mapping process by
reviewing demographic data, including racial data, for the Tampa Bay area. Trial
Tr. vol. 2, 58:21-22, 149:3-10. He admitted that "appendages" in Maps A and B
excluded heavily white coastal precincts. Trial Tr. vol. 2, 144:20-24, 145:18-21. Dr.
Trende testified persuasively that Dr. McCartan's maps tracked racial lines so
precisely that the effect was comparable to using a "scalpel" to carve out "higher
BVAP precincts." Trial Tr. vol. 3, 150:17-19, 154:6-9. ACLU Maps A and B and their
southern appendages are depicted on the following page, excerpted from
Plaintiffs' Exhibits 98 and 99 (*see* Docs. 161-41, 161-42):





Even more troubling, Plaintiffs instructed Dr. McCartan to preserve the same boundary between Districts 14 and 16 that Dr. Barreto criticized as racially gerrymandered. Trial Tr. vol. 2, 109:21-110:4; 114:10-13, 202:3-19, 202:23-203:7; *see also* Trial Tr. vol. 2, 203:22-204:18 (Warren confirming in response to the Court's questioning that ACLU Maps A, B, and C use the same boundary line for Districts 14 and 16 as the Enacted Map).

Finally, Dr. McCartan revealed that he created draft maps that Plaintiffs never disclosed in discovery and revised them based on guidance from Plaintiffs' counsel. Trial Tr. vol. 2, 140:4-17, 141:14-17. Although some consultation with counsel is expected, the lack of transparency and evidence of undisclosed versions invite an adverse inference that Plaintiffs' legal team—not their expert—directly shaped the final configurations of ACLU Maps A, B, and C.

By contrast, District 16 in the Enacted Map achieves far higher adherence to political and geographical boundaries than ACLU Maps A, B, and C suggesting that the Senate focused less than Plaintiffs on the racial consequences underlying the placement of the district's boundary lines. Doc. 162-168 at 2; Doc. 161-64 at 27-35; Trial Tr. vol. 3, 154:1-3; *see also* Trial Tr., vol 4, 25:7-8, 25:11-17 (Isbell comments that Pinellas portion of Enacted District 16 was "grabbing all these white voters"). Indeed, large portions of the Enacted Plan—particularly in Pinellas County, where

Plaintiffs' main complaints are centered—do not track racial lines. Trial Tr. vol. 3, 154:1-3, 155:23-156:5, 156:23-24; *see also* Trial Tr. vol 4, 25:7-8, 25:11-17.

While Plaintiffs challenge the Enacted Map as a racial gerrymander, the stronger evidence of racial sorting appears in Plaintiffs' own proposed configurations.

## VI.    Conclusions of Law

The Equal Protection Clause of the Fourteenth Amendment prohibits states from drawing district lines in which race is the predominant factor motivating the placement of voters within or without a district, unless the use of race is narrowly tailored to serve a compelling governmental interest. *Miller*, 515 U.S. at 916. To establish such a claim, plaintiffs bear the burden of proving that race was the "dominant and controlling" consideration in the district's design. *Id.* at 913.

The standard is a demanding one. As the Supreme Court has made clear, mere awareness of race, or even the use of racial data for compliance purposes, does not establish that race predominated. *Bethune-Hill*, 580 U.S. at 189-90. Race must have "subordinated" traditional districting criteria such as compactness, contiguity, and adherence to existing political and geographical boundaries.

Plaintiffs have not met that burden here.

### A.    Predominance

Based on the full record, including four days of live testimony and documentary evidence, the Court finds that race did not predominate in the drawing of Senate District 16. The district was drawn by Jay Ferin, the staff director of the Senate Reapportionment Committee, under instructions to prioritize traditional districting principles—specifically, population equality, compactness, contiguity, and use of existing political and geographical boundaries.

Ferrin testified credibly and consistently that race was not used in the initial drawing of district lines. As discussed above in Section IV.A., District 16's general configuration resulted from the aggregation of race-neutral choices made from the north and the south of the Tampa Bay region. Ferrin began drawing districts by grouping together whole counties and then adjusted the districts to achieve population balance in compact districts using existing political and geographical boundaries and, in compliance with the committee's directives, placed a district within counties with the population to support at least one whole Senate district. The resulting configuration of District 16 was not preordained or reverse-engineered to achieve racial targets, but arose from adherence to neutral mapping priorities.

Specifically, Ferrin drew Tampa Bay districts incrementally from the north and south. Trial Tr., vol. 3, 66:16-74:9. From the north, he drew Senate District 11

using three whole counties (Citrus, Sumter, and Hernando) and added a portion of northwest Pasco County to achieve population equality using clear boundaries. *Id*. He then joined north Pinellas County with southwest Pasco County in Senate District 21 using the east-west road coming off the Courtney Campbell Causeway to Clearwater and municipal lines to create a compact district. *Id*. These decisions anchored Senate District 14 entirely in northwest Hillsborough County and shaped a compact Senate District 23 from east Pasco County and northeast Hillsborough County, again using existing political and geographical boundaries such as the Suncoast Expressway, Interstate 75, and State Road 60. *Id*. From the south, he drew Senate District 22 using Sarasota County and the necessary portion of Manatee County to achieve population equality while preserving compactness and using existing political and geographical boundaries. *Id*.

Ferrin testified, and the Court finds, that these decisions were made without consulting racial demographic data and were driven by the Florida Constitution's obligations to balance population, draw compact and contiguous districts, and use existing political and geographical boundaries. They also resulted in a residual population in south Pinellas County that necessarily had to be joined to another county—either Hillsborough to the east or Manatee to the south. Trial Tr., vol. 3, 72:13-73:16.

Objective metrics corroborate Ferrin's testimony. District 16 exhibits compactness scores and boundary usage figures that are consistent with, and in many instances superior to, both the court-imposed 2015 benchmark plan and the alternative districts proposed by Plaintiffs. More than 80% of District 16's boundaries follow existing major political and geographical boundaries such as highways, rivers, county and municipal boundaries, and rivers. The remaining 20% of District 16's boundaries include other major east-west and north-south county roads, which are not counted in the State's boundary-analysis report but are recognized locally as major thoroughfares.

Critically, racial data was not considered during the initial line-drawing process and did not dictate the configuration of the district. Ferrin testified, and the Court finds, that racial data was reviewed only afterward to conduct a district-specific functional analysis to ensure compliance with the Florida Constitution's non-diminishment requirement. There is no evidence that the Senate employed racial targets or quotas. That limited compliance check does not rise to the level of predominance.

The Court finds no direct evidence that race subordinated traditional districting principles. Nor do the circumstantial inferences—such as the shape of the district, or its demographic composition—overcome the presumption that the Legislature acted in good faith. *Abbott*, 585 U.S. at 603.

### B.    Presumption of Legislative Good Faith

Federal courts must presume that state legislatures act in good faith when redistricting. This presumption, grounded in principles of federalism and separation of powers, is well-established and re-affirmed in a long line of Supreme Court precedent. *Miller*, 515 U.S. at 915; *Abbott*, 585 U.S. at 603. It applies with full force even when a redistricting plan is challenged under the Equal Protection Clause. *Alexander*, 602 U.S. at 15-16.

This presumption places the stringent evidentiary burden squarely on the plaintiffs to overcome the inference that the Legislature acted properly. *Id.* at 11. To do so, plaintiffs must adduce clear and persuasive evidence of racial predominance, supported by facts, not speculation.

In this case, Plaintiffs failed to rebut that presumption. The Senate's redistricting process was designed with explicit safeguards to minimize improper influence, including clear public directives to staff, the use of consistent race-neutral criteria, and a transparent map-drawing process. The record reflects that the Senate's staff operated under firm constraints prohibiting the use of racial or partisan data during the initial map drawing, and that they adhered to these constraints.

Ferrin, the lead map drawer, provided detailed testimony describing his race-neutral approach to drawing District 16. Ferrin emphasized that he did not

84

consult racial data while drawing lines and was instead guided by the Legislature's criteria emphasizing population equality, compactness, and use of political and geographic boundaries. He testified credibly and consistently, and his account was not contradicted by any witness with firsthand knowledge of the Legislature's decision-making process.

Plaintiffs have relied on circumstantial factors—such as the shape and demographic composition of District 16, comparisons to alternative maps, and a few isolated statements or questions by individual legislators. None of these elements, individually or collectively, are sufficient to attribute an impermissible racial intent to the Legislature as a whole. There is no credible evidence that the Senate adopted racial targets or that race dominated the drawing of the challenged district.

Moreover, plaintiffs' failure to identify any internal communications, direct instructions, or testimony undermining Ferrin's account underscores the weakness of their claim. The absence of such evidence is especially telling in a case alleging improper legislative motive.

Accordingly, the Court finds that the presumption of legislative good faith has not been rebutted and that Plaintiffs have not carried their burden to establish racial predominance in the design of District 16.

### C.     Narrow Tailoring and Compelling Interest

Even if race predominated—which the evidence does not support—the Senate's use of race was not constitutionally infirm. Plaintiffs' challenge also fails under the second prong of strict scrutiny because the Senate's limited consideration of race was undertaken in good-faith reliance on its perceived obligation to comply with Article III, section 21(a) of the Florida Constitution.

At the time the Senate passed the Enacted plan in 2022, no state or federal court had evaluated whether compliance with the Florida Constitution's non-diminishment requirement constituted a "compelling governmental interest" that could justify race-predominant redistricting under the Equal Protection Clause of the Fourteenth Amendment. In recognition of the potential tension between these requirements, the Senate's directives to its map drawers emphasized primary compliance with the race-neutral districting criteria in Tier Two, followed by confirmation regarding non-diminishment. Doc. 162-6. The trial record reflects that Ferrin drew District 16 under those standards and was able to comply with both Tier Two and Tier One without a conflict between the two sets of standards. Trial Tr. vol. 3, 92:4-11.

Plaintiffs have argued that compliance with the non-diminishment provision is a compelling governmental interest. Doc. 1 at 8. Our system "is designed around the premise that parties represented by competent counsel know

what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (cleaned up); *see also id.* ("[W]hen cases arise, courts normally decide only questions presented by the parties") (cleaned up). This Court could acknowledge Plaintiffs' concession under principles of party presentation, "assume[], without deciding" that the State has a compelling interest in complying with the non-diminishment provision, and determine whether Plaintiffs' claim would fail on the question of narrow tailoring. *Bethune-Hill*, 580 U.S. at 193.

The Court recognizes, however, that no federal precedent has affirmatively endorsed compliance with a state-law race-based districting provision as a compelling interest under the Equal Protection Clause. And the Florida Supreme Court's post-trial decision in *Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y, Fla. Dep't of State*, No. SC2023-1671, 2025 WL 1982762 (Fla. July 17, 2025), has now determined as a matter of first impression that the Florida Legislature *does not* have a compelling interest in complying with the non-diminishment provision that would justify race-predominant districting. *Id.* at *11. That case affirmed the Legislature's decision not to draw a "nearly two-hundred-mile-long land bridge to connect the black populations of Jacksonville and Tallahassee" in a "barbell" shaped congressional district. *Id.* at *4, *13. The Florida Supreme Court's decision underscores the narrow scope of the non-diminishment requirement by clarifying

that it is not a license to impose race-based districting mandates in violation of the Fourteenth Amendment. Here, however, the Senate's approach did not go nearly so far. Its use of race was limited, non-determinative, and implemented only after District 16 was configured under race-neutral criteria. That is precisely the sort of compliance-oriented action permitted by the Equal Protection Clause.

After the coverage formula for section 5 of the Voting Rights Act was declared unconstitutional in *Shelby County, Alabama v. Holder*, 570 U.S. 529 (2013), the Supreme Court rejected efforts to retroactively apply that decision to invalidate a State's pre-decisional compliance efforts. *See Harris v. Ariz. Indep. Redistricting Com'n*, 578 U.S. 253, 264-65 (2016) (unanimously concluding that Arizona was subject to non-retrogression requirement when it adopted maps in 2010, three years before *Shelby County* decision, and rejecting claim that efforts to comply with non-retrogression provision "could not have been a legitimate state interest"); *Ala. Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1061 (M.D. Ala. 2017) (three-judge district court recognizing that the requirements of section 5 remained relevant to evaluating the constitutionality of Alabama's 2012 redistricting).

If this Court were to reach the question of narrow tailoring—either because Plaintiffs have conceded the issue of compelling interest, or because the Florida Supreme Court's contrary decisional law was issued three years after the Enacted

Plan was adopted—it would conclude that the State's good-faith efforts to comply with the non-diminishment provision are narrowly tailored to further that interest. Given the complexities inherent in redistricting, the State must have " 'breathing room' " to implement a race-based plan when necessary to serve a compelling interest. *Cooper*, 581 U.S. at 293 (quoting *Bethune-Hill*, 580 U.S. at 195-96). The State need only show that it had "a strong basis in evidence" for concluding that something like the Voting Rights Act required its race-conscious actions. *Cooper*, 581 U.S. at 292 (internal quotation marks omitted). That "strong basis," or "good reasons" standard, then gives the State "breathing room" "to adopt reasonable compliance measures." *Id*. at 293 (cleaned up). The reasonable compliance measures should be upheld even if they prove, "in perfect hindsight, not to have been needed." *Id*.

To be sure, the breathing-room standard for narrow tailoring is not meaningless. It requires more than "uncritical" assumptions and "generalizations," untethered to "evidence or analysis." *Wis. Legis. v. Wis. Elections Comm'n*, 595 U.S. 398, 403-04 (2022). It requires a "meaningful legislative inquiry into" a district's configuration, *Cooper*, 581 U.S. at 304, and "a strong showing of a pre-enactment analysis with justifiable conclusions." *Abbott*, 585 U.S. at 621.

The trial record here establishes that the Senate's consideration of race was narrowly tailored to comply with the Florida Constitution's non-diminishment

requirement. Mr. Ferrin testified, and the Court finds, that racial data was used only *after* the district lines were initially drawn in substantially their final configuration—and only to perform a district-specific functional analysis to verify that the district would not diminish minority voters' ability to elect their candidates of choice, relative to the benchmark plan imposed in 2015. Trial Tr. vol. 3, 57:17-58:1. There is no evidence that the Senate sought to engineer the black voting age population to a specific threshold, or that it relied on race more than necessary to achieve lawful compliance. The record thus shows far more than an "uncritical" assessment untethered to "evidence or analysis" on the part of the Florida Legislature as it drew Senate District 16. *Wis. Legis.*, 595 U.S. at 403-04. Under these circumstances, the State is entitled to its "breathing room." *Cooper*, 581 U.S. at 293.

This form of district-specific functional analysis aligns with the approach the Supreme Court has permitted in similar cases. *See Bethune-Hill*, 580 U.S. at 193-95 (upholding Virginia legislative district with a BVAP of 55% against racial gerrymandering claim because state had performed a "functional analysis" to justify the shape, and the legislative record showed an "informed" discussion of the district, one that "considered turnout rates" and "the results of the recent contested primary and general elections"). The Florida Senate performed the same type of functional analysis—only without an explicit racial percentage target.

Because the Court concludes that race did not predominate over traditional districting criteria, it need not reach the subsidiary questions of compelling interest and narrow tailoring. These alternative conclusions simply demonstrate that—even presuming racial predominance—Plaintiffs still would not be entitled to relief on their claim that District 16 violates the Equal Protection Clause of the Fourteenth Amendment.

### D.    Alternative Maps and Negative Inference

Plaintiffs' presentation of alternative district configurations fails to support their burden of proof, and instead reinforces the conclusion that race did not predominate in the drawing of Senate District 16.

In racial gerrymandering cases, it is not enough for plaintiffs to show that race predominated in the design of a district. They must also demonstrate that the State's legitimate districting objectives could have been achieved through a less race-conscious alternative. *Alexander*, 602 U.S. at 34. When plaintiffs fail to meet this burden, courts may draw a negative inference that no such alternative exists.

Plaintiffs offered three alternative maps at trial—ACLU Maps A, B, and C—created by their expert, Dr. McCartan, under instructions provided by Plaintiffs' counsel. Trial Tr., vol. 2, 98:22-99:5. The Court finds that none of these alternatives convincingly demonstrated that the Legislature's valid districting priorities could have been achieved through a configuration less conscious of race.

On the contrary, the trial record established that these alternative plans underperformed on the Florida Constitution's Tier Two criteria—namely, compactness and use of existing political and geographical boundaries. Dr. McCartan conceded during cross examination that ACLU Maps A, B, and C scored lower on boundary-usage metrics and that his alternative versions of District 16 disrupted the compactness of other districts in the Tampa Bay region. Trial Tr., vol. 2, 119:19-123:2, 135:21-139:5. The shape of District 16 in ACLU Maps A and B retained an "appendage" on its southern border indicative of racial predominance that was also present in Nicholas Warren's Plan 42. ACLU Map C, while more visually regular, continued to exhibit low boundary usage and introduced a jagged configuration—the "Stairway to Plant City"—stretching diagonally across from the Gulf coast in Pasco County down to Polk County and destabilizing the surrounding map.

This conclusion is confirmed by the objective boundary usage and compactness scores admitted into evidence, which consistently ranked the Enacted Plan's District 16 equal to or higher than all three ACLU alternatives. *See* Doc. 162-168 at 2 (comparing Convex Hull, Polsby-Popper, and Reock Ratio compactness scores and Boundary Analysis for Enacted Plan and ACLU Maps A, B, and C).

Additionally, communications introduced at trial between political consultant Matthew Isbell and Plaintiffs' advocate Nicholas Warren revealed a partisan strategy behind the proposed "Hillsborough-only" configuration dating to before the Senate released its first draft maps. Trial Tr. vol. 1, 126:21-127:6, 133:18-134:17, 143:15-145:15, 146:24-148:5. These communications support an inference of improper partisan intent, which the Florida Constitution expressly forbids. Art. III, § 21(a), Fla. Const.

Under *Alexander*, Plaintiffs' failure to present a viable alternative plan that satisfies the State's legitimate objectives permits a finding that the State's approach was not predominantly race-based. The Court reaches that conclusion here.

### E.    Weighing of Evidence

Having reviewed the full trial record, the Court concludes that Plaintiffs have not demonstrated by a preponderance of the evidence that race predominated in the design of District 16. The totality of the evidence—including live testimony, expert reports, alternative maps, objective metrics, and the structure of the legislative process—overwhelmingly supports the conclusion that the enacted configuration was the result of traditional, race-neutral districting considerations.

First, the most probative evidence regarding the Legislature's intent came from Ferrin, the Senate's lead map drawer. Ferrin testified in detail about the

93

criteria he applied when designing Senate districts and unequivocally stated that race did not drive his decisions. His testimony was credible, candid, consistent, and corroborated by the objective characteristics of the map itself. No witness with direct involvement in the map-drawing process offered contradictory testimony.

Second, Plaintiffs did not present any direct evidence that race predominated over traditional districting principles. Instead, they relied on circumstantial indicia, such as racial demographics and the shape of the district—above all else, that District 16 "crosses the Bay." While these factors may raise questions in some contexts, they are insufficient here to overcome the presumption of legislative good faith and Ferrin's credible testimony.

Third, Plaintiffs' expert evidence failed to meet the standard necessary to show predominance. Although Dr. Barreto and Dr. McCartan offered analyses suggesting racial awareness, neither established that race subordinated traditional districting principles. Dr. Barreto did not opine on predominance and, during cross-examination, expressly limited his opinion to the conclusion that race is "one of the reasons" for District 16's configuration in Pinellas County. Trial Tr. vol. 2, 233:20-234:8. He emphasized that he "did not look at whether or not other factors outweighed that." *Id*. Dr. McCartan conceded on cross-examination that his own alternative maps were inferior on key constitutional metrics such as certain compactness measures and boundary usage.

Fourth, the structure and safeguards of the Senate's redistricting process weigh heavily against a finding of racial predominance. The process included extensive public engagement, written criteria that expressly forbade racial targets, the deliberate safeguards to shield staff from improper influence. These procedural protections reinforce the credibility of the State's account and the transparency of its map-drawing decisions.

Fifth, the Court has considered the testimony of the individual plaintiffs and Plaintiffs' community witnesses regarding their views on District 16's configuration. While important for understanding the stakes of redistricting, this testimony did not establish that the Legislature subordinated traditional race-neutral criteria to racial considerations.

Finally, Plaintiffs' failure to present a viable alternative map that achieved the Legislature's legitimate goals through a less race-conscious means further weakens their case. Under *Alexander*, this failure supports a negative inference against Plaintiffs that viable alternatives were not feasible.

In sum, the weight of the evidence favors the conclusion that Senate District 16 was drawn predominately on the basis of race-neutral principles. The Court concludes that plaintiffs have not met their burden of proving by a preponderance of the evidence that race predominated in the drawing of Senate District 16.

## F.    Conclusion

After a four-day bench trial and careful consideration of the testimony, exhibits, and legal arguments presented by both sides, the Court concludes that Plaintiffs have not carried their burden of proving that race predominated in the design of Senate District 16. The evidence demonstrates that the Florida Senate employed race-neutral criteria, including compactness, contiguity, and use of existing political and geographical boundaries, in drawing the district. Racial considerations were not used to determine the configuration of District 16, and were reviewed only after the fact to ensure compliance with the Florida Constitution's non-diminishment standard.

Accordingly, judgment must be entered in favor of Defendants.

## ORDER

For the reasons set forth in these Findings of Fact and Conclusions of Law, the Court hereby orders as follows:

1.    Plaintiffs are not entitled to relief.

2.    The Court finds in favor of Defendants on all claims.

3.    The Court declares that Senate District 16, as enacted in the 2022 Florida Senate redistricting plan, does not violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

4.    Plaintiffs' request for declaratory and injunctive relief is denied.

5.     The Clerk is directed to enter judgment for Defendants and to close

this case.

6.     The Court retains jurisdiction to evaluate any claims for taxation of

prevailing party fees or costs.

DONE and ORDERED by this three-judge district court under 28 U.S.C. § 2284,

this _____ day of _____, 2025

_____
United States Circuit Judge

_____
United States District Judge

_____
United States District Judge

Respectfully submitted,

*/s/  Daniel Nordby*

RICKY L. POLSTON (FBN 648906)
DANIEL E. NORDBY (FBN 14588)
DENISE HARLE (FBN 81977)
TARA R. PRICE (FBN 98073)
KASSANDRA S. REARDON (FBN 1033220)
**SHUTTS & BOWEN LLP**
215 South Monroe Street, Suite 804
Tallahassee, Florida 32301
(850) 241-1717
*RPolston@shutts.com*
*DNordby@shutts.com*
*DHarle@shutts.com*
*TPrice@shutts.com*
*KReardon@shutts.com*

ALYSSA L. CORY (FBN 118150)
**SHUTTS & BOWEN LLP**
4301 W. Boy Scout Blvd., Suite 300
Tampa, Florida 33607
(813) 229-8900
*ACory@shutts.com*

CARLOS REY (FBN 11648)
**FLORIDA SENATE**
404 South Monroe Street
Tallahassee, Florida 32399
(850) 487-5855
*Rey.Carlos@flsenate.gov*

*Counsel for Ben Albritton, in his official capacity as President of the Florida Senate*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2025, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

*/s/ Daniel Nordby*
Attorney