## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KETO NORD HODGES, MEIKO
SEYMOUR, and JARVIS EL-
AMIN,

               Plaintiffs,

v.

BEN ALBRITTON and CORD
BYRD,

               Defendants.

Case No: 8:24-cv-879-CEH-UAM

THREE-JUDGE COURT

Before BRASHER, Circuit Judge, and BARBER and HONEYWELL, District Judges.

BRASHER, Circuit Judge:

### MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

This matter comes before the Court following a four-day bench trial on the plaintiffs' claim under 42 U.S.C. § 1983 that the Florida Legislature racially gerrymandered state Senate District 16 in violation of the Equal Protection Clause of the United States Constitution. For the reasons stated below, we find that Senate District 16 is not a racial gerrymander because the legislature did not subordinate traditional race-neutral redistricting criteria to race-based considerations. Because we find that Senate District 16 is not drawn predominantly based on race, we do not address whether the district would satisfy strict scrutiny. Thus, we will enter judgment in favor of the defendants.

## I.    Background

We will start with five preliminaries that inform the rest of our findings of fact and conclusions of law. First, we begin with a history of the challenged district. Second, we identify and sum up the criteria that the Senate prioritized in the 2022 reapportionment and redistricting cycle. Third, we describe committee hearings about the proposed plan and colloquies between senators and the Senate's primary map drawer about District 16. Fourth, we describe the enactment of District 16 in its final configuration. Fifth, we describe the parties to this lawsuit.

### A.    History of District 16

Senate District 16 is in the Tampa Bay region of Florida, along the state's west-central coast. The region includes many municipalities and at least four counties, *i.e.*, Pasco, Hillsborough, Pinellas, and Manatee. (JX 20 at 639). Enclosing the bay to its west is a peninsula, which includes Pinellas County and more specifically, the city of St. Petersburg. Hillsborough County, which includes the city of Tampa, borders the eastern portion of Tampa Bay. The region is served by a single major airport and shares sports teams (*e.g.*, the Tampa Bay Rays' Tropicana Field is in St. Petersburg and the Tampa Bay Buccaneers' Raymond James Stadium is in Tampa) and the like.

To travel from Tampa to St. Petersburg and vice versa, three bridges in the region make the trip feasible and cross Tampa Bay. Alternatively, without crossing the bay, a commuter could travel up to the top of the Pinellas County peninsula and then down to Hillsborough County. Together, parts of Pinellas County and Hillsborough County form Senate District 16. Specifically, the district includes the southern portion

2

of Pinellas County, which includes downtown St. Petersburg. Though no bridge directly connects the two portions of the district, this split-county configuration is nothing new. The challenged district's origins trace back to the 1990 redistricting cycle. (Doc. 154 at 270; Doc. 155 at 11). At that time, the U.S. Department of Justice denied the Florida Senate map preclearance because it lacked a majority-minority district in Hillsborough County, which was covered by Section 5 of the Voting Rights Act. *See In re Constitutionality of Sen. Joint Resol. 2G*, 601 So. 2d 543, 544 (Fla. 1992). In response to that denial, the Florida Supreme Court drafted a map to satisfy the federal standards. *Id.* at 545. That configuration soon faced a racial gerrymandering claim, and, in response, the State settled and redrew the map. *Scott v. Dep't of Justice*, 920 F. Supp. 1248, 1256 (M.D. Fla. 1996), *aff'd sub nom. Lawyer v. Dep't of Justice*, 521 U.S. 567 (1997). The revised configuration crossed Tampa Bay and included portions of Hillsborough, Pinellas, and Manatee Counties. (PX 104).



(a) FLSD2002 Plan          (b) FLSD2012 Plan

In 2010, through Florida's citizen's initiative process, the Fair Districts Amendment was added to the Florida Constitution. That Amendment required, among other things, that the legislature enact a map that allows racial minorities to "participate in the political process" and that does not "diminish their ability to elect representatives of their choice." Fla. Const. art. III, § 21(a). It also prohibits apportionment with "the intent to favor or disfavor a political party or an incumbent." *Id.* These are generally referred to as "tier one" requirements.

Following the 2012 redistricting cycle, a lawsuit challenged the map as an impermissible partisan and pro-incumbent gerrymander under the Fair Districts Amendment, and the Senate stipulated to liability. *See League of Women Voters of Fla. v. Detzner*, No. 2012-CA-2842 (Fla. 2d Jud. Cir. Dec. 30, 2015); (Doc. 156-3). The legislature remedied that violation by reconfiguring the district to remove Manatee County, leaving Hillsborough and Pinellas Counties as part of the configuration. (PX 104). That court-ordered map split Pinellas County. (Doc. 154 at 176). And that adopted map became the benchmark plan—that is, the last legally enforceable redistricting plan in effect, (Doc. 154 at 230)—in the 2020 redistricting cycle:



(JX 20 at 603).

## B.    The 2020 redistricting cycle

Following the 2020 census, the Florida Senate began the redistricting and reapportionment process. (Doc. 101 at 6). It did so with full awareness that extensive litigation followed previous redistricting cycles. The Senate redistricting process included seven committee and subcommittee meetings. (JX 1–21). The Committee on Reapportionment met on September 20, October 11, and October 18, 2021, to receive briefing about the legal requirements of reapportionment. (JX 2, 5, 8).

During those informational meetings, Committee Staff Director Jay Ferrin, who led the map-drafting efforts, explained his team's use of census data and other

redistricting basics. (JX 1–3). During those presentations, the Senators also learned about Florida's use of metric-based compactness scores: the convex hull, Polsby-Popper, and Reock scores. The "convex hull" score calculates the "ratio of the area of the district . . . to the area of the minimum convex polygon . . . that can enclose the district's geometry." (JX 5 at 56). That is, it "tests for concavities or indentations in the district boundaries." (*Id*.). The "Polsby-Popper" score is the "ratio of the area of the district . . . to the area of a circle whose circumference is equal to the perimeter of the district." (*Id*. at 57). That is, it "test[s] for jagged or squiggly district boundaries." (*Id*.). The "Reock" score is the "ratio of the area of the district . . . to the area of the smallest circle that can be drawn around the district." (*Id*.). That is, it "indicates a district's similarity to a circle." (*Id*.). All ratios return a value between zero and one, "where a score closer to 1 indicates a more compact district." (*Id*. at 56).

Ferrin's staff also presented about Florida's use of metrics that quantify adherence to political and geographic boundaries into a "boundary analysis" score. (*Id*. at 53). That score seeks to quantify the Florida Constitution's requirement to "where feasible, utilize existing political and geographical boundaries." Fla. Const., art. III, § 21(b). The metric quantifies the "extent to which district boundaries overlap city boundaries, county boundaries, primary and secondary roads (interstates, U.S. highways, and State highways), railroads, and significant water bodies (contiguous area hydrography features greater than 10 acres) as defined by the U.S. Census Bureau's TIGER/Line files." (JX 5 at 53). To abide by that requirement, the computer redistricting program includes the following additional layers to verify compliance

6

with the constitutional directive: "[c]ounty boundaries," "[m]unicipal boundaries," [p]rimary and secondary roads including [i]nterstate highways, US highways, and state highways" that meet certain criteria, "[r]ailroads," and "[s]ignificant water bodies." (*Id.* at 53–54). The analysis also returns a value that quantifies the percentage of the boundary that coincides with neither political nor geographic boundaries in the "nongeo/poli" value. (Doc. 175 at 47). But the analysis does not include "county roads" as part of the analysis. (*Id.* at 49).

Outside counsel presented to the Senate the legal requirements of the redistricting process. (JX 4–6). That presentation provided the Senators guidance, among other things, about the Fair Districts Amendment's non-diminishment requirements. (JX 4 at 61–62). As explained to the Senators, "the anti[-]retrogression provisions of the Florida Constitution provide[ ] that the Florida Legislature cannot eliminate majority, minority districts or weaken other historically performing minority districts where doing so would actually diminish minority groups' ability to elect [its] preferred candidates." (*Id.*). Additionally, "[i]n order to determine whether there has been retrogression or a diminishment, the [l]egislature must perform a functional analysis to evaluate retrogression and to determine whether a district is likely to perform for minority candidates of choice." (*Id.* at 62). A functional analysis quantifies, in some ways, compliance with that requirement. That assessment, as explained to the Senate, includes a "complex multi factor determination" that "requires consideration of minority populations in the districts, minority voting age populations in the districts, political data, turnout data, voter registration data, [and]

7

how a minority group has voted in the past." (*Id.*). But the presenting counsel noted that "[t]here is no predetermined or fixed demographic percentage used at any point in that functional analysis." (*Id.*).

### C.    Committee staff develops the enacted plan

In the October 18 meeting, Senator Ray Rodrigues, the Chair of the Committee on Reapportionment, distributed a memorandum to the map-drawing staff, which was titled "Committee Directives to Staff on Map-Drawing" and detailed the legislature's criteria for the reapportionment process. (DX 6). That memorandum—addressed to Ferrin—required that "[f]irst and foremost, you are directed to the plain language of the constitution, federal law, and the judicial precedent that exists today in regards to that language." (*Id.* at 1). It directed the staff "to comply with the objective criteria outlined in Tier Two of Article III Sections 20 and 21 of the Florida Constitution, balancing them in a manner that does not establish any priority of one standard over another, unless complying with the Tier-Two standards would conflict with Tier-One standards or federal law." (*Id.*).

The memorandum, among other things, expanded on these legal requirements by including six specific directions.

First, the memorandum directed Ferrin's staff to "prepare Senate plans with district population deviations not to exceed 1% of the ideal population of 538,455 people, and to prepare Congressional plans with population deviations of plus or minus one person of the ideal population of 769,221 people." (*Id.*).

8

Second, it directed the staff to "draw districts that are visually compact in relation to their shape and geography, and to use mathematical compactness scores where appropriate." (*Id*.).

Third, it provided that to "comply with the Tier Two standard related to utilizing existing political boundaries, you are directed to examine the use of county boundaries where feasible." (*Id*. at 2). The staff was "directed to explore concepts that, where feasible, result in districts consisting of whole counties in less populated areas, and to explore concepts that, where feasible, keep districts wholly within a county in the more densely populated areas." (*Id*.). The memorandum addressed municipal boundaries, too: it "directed [the staff] to explore concepts that, where feasible, keep cities whole while also considering the impermanent and changing nature of municipal boundaries." (*Id*.).

Fourth, it directed Ferrin to use geographic and political boundaries, specifically "railways, interstates, federal and state highways, and large water bodies such as those that were deemed to be easily recognizable and readily ascertainable by Florida's Supreme Court." (*Id*.).

Fifth, it directed Ferrin to "confirm that the districts comply with the Tier-One constitutional standards and with federal law, specifically, that districts are not drawn with the result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or diminish their ability to elect representatives of their choice." (*Id*.). To do so, it directed the staff to "conduct a functional analysis on relevant districts to confirm that any map presented for

9

consideration by this Committee or its Select Subcommittees complies with these Tier-One requirements of the Florida Constitution and with the federal Voting Rights Act." (*Id.*).

Sixth, it prohibited the staff from "reviewing political data other than where a review of political data is required to perform an appropriate functional analysis to evaluate whether a minority group has the ability to elect representatives of choice." (*Id.*). Relatedly, the staff could not use "any residence information of any sitting member of the Florida Legislature or Congress and to draw districts without regard to the preservation of existing district boundaries." (*Id.*).

Ferrin received these instructions on October 18, 2021, and his staff began drafting maps for the first Senate select subcommittee meeting on November 17, 2021. (DX 6; JX 11; Doc. 175 at 62). At that meeting, the subcommittee reviewed the draft maps, which included configurations of District 19 (eventually renumbered to District 16) that crossed Tampa Bay to include portions of Hillsborough and Pinellas Counties. (JX 11 at 17, 24, 31, 38).

10



During the November 17 meeting, the Senators heard public comments about the proposed alternative plans. Though the Committee allowed publicly submitted maps, it required anyone presenting a map to disclose, among other things, their employment or affiliations. (JX 1 at 17). The Committee imposed those disclosure requirements to "safeguard against the kind of shadow process that occurred last cycle"—which consisted of "partisan, political operatives from both parties" who "wrote scripts and recruited speakers to advocate for certain plans or district configurations to create a false impression of a wide-spread grassroots movement." (*Id.*). Also conditioning public disclosure, the committee required that a senator request "in writing" that the committee staff review and consider a publicly submitted comment, suggestion, or map. (*Id.* at 18–19).

At the November meeting, Nicholas Warren, through the public submission process, presented an alternative map for the Senate districts in the Tampa Bay area.

(JX 10 at 30). His alternative configuration kept District 19 contained to Hillsborough County—in other words, his map did not cross Tampa Bay. He explained that his alternative map "tries to solve . . . . one issue with Tier Two compliance, which is in Tampa Bay, and seeks to avoid having a district that crosses Tampa Bay." (*Id.*). He also pointed out his plan's improvements with respect to traditional redistricting criteria: "[W]hereas maybe last decade it wasn't possible to draw a district wholly in Hillsborough that maintained that ability and didn't diminish, [he] th[ought] the statistics bear out that it is now possible, and the key statistics in that functional analysis are actually all comparable or higher than the statistics in the benchmark district . . . . ." (*Id.* at 31).

Warren's configuration prompted Senator Bracy to ask Ferrin, the mapmaker, about the draft plan's crossing-the-bay configuration. He noted that Warren "brought up a good point about crossing the Bay," and he "wanted to ask the staff what was the motivation for doing that when it didn't seem necessary?" (*Id.*). Ferrin responded that the configuration crossed Tampa Bay to "comply with Tier-One non-diminishment standards." (*Id.* at 32). Senator Bracy followed up to that response: "But I guess could it still be done without violating the diminishment requirement?" (*Id.*). Ferrin responded, "I'm not sure," and that he had not "reviewed the statistics for that." (*Id.*). Then, Senator Bracy asked whether that was "something we can look into?" (*Id.*). Ferrin responded: "I think if that's something you'd like to, we can discuss that." (*Id.*). At the end of that meeting, the subcommittee chair, Senator Burgess, directed the staff to consider feedback from the subcommittee and "look[] for improvements and

consistency in the application of the various tradeoffs" discussed during the meeting. (*Id.* at 34).

After the meeting, Ferrin ultimately did not draft an alternative map or address Senator Bracy's request from this November 17 exchange. He later testified about this point, during trial, that "nobody ever asked [him] to analyze that fully as an alternative," referring to an alternative configuration of a tier-one, protected district that did not cross Tampa Bay. (Doc. 154 at 269).

Following Warren's presentation before the committee, Senator Rodrigues sent a memorandum to the Senate about Warren's alleged failure to disclose his employer. (DX 12). Senator Rodrigues titled that memorandum "Misleading Committee Appearance Forms" and informed the Senators that "Mr. Nicholas Warren, who has submitted maps and testified in both select subcommittees, is a staff attorney of the ACLU, an entity with an interest in redistricting, as evidenced by litigation filed in other states." (*Id.*). He continued, "Mr. Warren failed to disclose this information on the committee appearance form and also on the redistricting suggestion form he filed when submitting maps to the joint website." (*Id.*).

The subcommittee met two more times, on November 29, 2021, and January 10, 2022, to review the staff-drafted maps. (JX 14, 17). Those updated maps made small changes to improve District 19's adherence to political and geographic boundaries and increase the compactness score, but all the configurations continued to cross Tampa Bay. *See* (*Id.*).

At the January 10 meeting, Senator Bracy, again, inquired about the reasons for "not crossing the Bay or for crossing the Bay in all of the configurations that we see, as opposed to not crossing the Bay in that Tampa-area seat." (JX 16 at 7). Senator Burgess, serving as the subcommittee chairman, responded that he thought that the staff "look[ed] at those options[,]" and "there was a significant number of . . . potential voters that would be disenfranchised under not crossing the Bay[,] [a]nd so in order to avoid that potential diminishment, there was just no way to make that work practically." (*Id.*). He deferred to Ferrin, who provided more context to that explanation: "it was likely that diminishment would occur based on the fact that in order to draw a minority district solely within Hillsborough County, it begins to look like a fairly spidery, non-compact configuration there, it does some damage to the surrounding districts and their metrics as well." (*Id.* at 7–8). He added that "Black voters in Pinellas County . . . have had the ability to elect the candidate of their choice since about 1992 when the courts ordered a configuration that resulted in a district that did cross the Bay between Hillsborough and Pinellas County." (*Id.* at 8).

Senator Bracy then asked about the percent decrease in the "Black percentage" had the district not crossed the Bay, and Ferrin explained that he couldn't "recall specifically." (*Id.*). But Ferrin cautioned that "[i]f we look at drawing it differently, I think we're looking at a situation where the Black voters would not be able to control the primary numerically, would not make up a majority of the primary turnout, and that would potentially constitute diminishment." (*Id.* at 9). Related to this point, Ferrin later testified that he never attempted to draw a district wholly within Hillsborough

County and made these statements based on his "familiarity with the area and where the population is" and his experience using the redistricting software to consider the potential problems of a "hypothetical district." (Doc. 155 at 9–12).

During that January 10 meeting, the subcommittee recommended two draft plans to the committee on reapportionment. (JX 16 at 48). The reapportionment committee adopted amendments to renumber the districts—District 19 in the draft plan became District 16—and passed CS/SJR 100 by a vote of 10-2. (JX 19 at 47–51).

### D.    The new District 16 is approved.

On January 20, the full Senate passed CS/SJR 100, the House added its representative districts, and then the Senate unanimously passed—with an approving vote of 37-0—the enacted plan. Fla. S. Jour. 325 (Reg. Sess. 2022).

The Florida Supreme Court reviewed, as the Florida Constitution requires, art. III, section 16(c), and affirmed the validity of the legislative apportionment—based on the "record before [it], and in the absence of any filed opposition." *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d 1282, 1290 (Fla. 2022). That enacted plan results in District 16 uniting two sides of Tampa Bay and splitting Pinellas County. Citizens currently elect Senators based on that enacted plan. (Doc. 101 at 7). The district is approximately 30% Black, Black voters are likely to control the Democratic primary, and the district is likely to result in the election of a Democrat. (*See* Doc. 175 at 228; DX 260).

A visual depicts current District 16 and its surrounding districts, (JX 20 at 639):[1]



**E.    This lawsuit is filed.**

The plaintiffs, three of whom reside in District 16, challenge the district as a racial gerrymander (Doc. 1). The plaintiffs Kéto Nord Hodges and Jarvis El-Amin are Black residents of District 16, living in Tampa in Hillsborough County. Plaintiff Meiko

---

[1] We asked the parties to file, for completeness of the record, the congressional map for the Tampa Bay area because it was referenced at trial. (*See* Doc. 163). But, for purposes of resolving this dispute over racial predominance, we do not consider that map, so we do not take judicial notice of it. In turn, we do not take judicial notice of the plaintiffs' supplemental materials about that map. (*See* Doc. 164). We will deny plaintiffs' motion to take judicial notice of those materials as moot.

Seymour, a Black resident of District 16, lives across Tampa Bay in St. Petersburg in Pinellas County.

The plaintiffs sued Cord Byrd, the current Florida Secretary of State, and Ben Albritton, the current President of the Florida Senate, in their official capacities, for racially gerrymandering Districts 16 and 18 in violation of the Equal Protection Clause. (Doc. 1 at 29). This Court previously held, in an order addressing the defendants' motions for summary judgment, that the plaintiffs' theory as to District 18 failed as a matter of law and dismissed the plaintiff who resided in that district for lack of standing. (Doc. 95). But we denied the defendants' motions as to District 16 finding that a genuine dispute of material fact existed as to whether the Florida Legislature racially gerrymandered that district. Across a four-day bench trial, we heard testimony from fifteen witnesses, and the parties admitted evidence about the plaintiffs' one claim: whether District 16 is a racial gerrymander in violation of the federal Equal Protection Clause. With that context in mind, we turn to the federal and state laws that apply to this racial gerrymander claim.

## II.    Applicable law

The parties agree on the applicable law that governs the plaintiffs' racial gerrymandering claim.

### A.    Racial gerrymandering claim

"The Equal Protection Clause prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller v.*

*Johnson*, 515 U.S. 900, 911 (1995)). To determine whether a district is racially gerrymandered requires a two-step analysis: (1) race must be the predominant factor used to draw the district; and (2) if race predominated,[2] the legislature's race-based actions must satisfy strict scrutiny. *See Cooper v. Harris*, 581 U.S. 285, 291–92 (2017).

### 1. Racial predominance

To start, the plaintiffs must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916). In doing so, "a plaintiff must prove that the State 'subordinated' race-neutral districting criteria such as compactness, contiguity, and core preservation to 'racial considerations.'" *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 7 (2024) (quoting *Miller*, 515 U.S. at 916). "Race may predominate even when a reapportionment plan respects traditional principles . . . if 'race was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" *Bethune-Hill*, 580 U.S. at 189–90 (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (*Shaw II*) (citation modified)).

---

[2] No party has argued that strict scrutiny applies absent a showing of racial predominance. *Compare Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 275 (2015) (declining to express a view on "whether the intentional use of race in redistricting, even in the absence of proof that traditional districting principles were subordinated to race, triggers strict scrutiny"), *with League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 517 (2006) (Scalia, J., concurring in the judgment in part and dissenting in part) ("[W]hen a legislature intentionally creates a majority-minority district, race is necessarily its predominant motivation[,] and strict scrutiny is therefore triggered."). So we do not consider that question.

Whether the legislature subordinated race-neutral, traditional redistricting factors to race-based distinctions requires a "holistic analysis," *id*. at 192, including "some combination of direct and circumstantial evidence." *Alexander*, 602 U.S. at 8. "Direct evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Id*. Indirect evidence includes, among other things, a district's lack of "conformity to traditional districting principles, such as compactness and respect for county lines." *Cooper*, 581 U.S. at 308. The visual shape of the district—such as the "bizarreness" of the configuration—may also provide evidence of race-based redistricting. *Miller*, 515 U.S. at 913. A plaintiff's submission of race-neutral alternative maps "can perform the critical task of distinguishing between racial" and race-neutral criteria. *Alexander*, 602 U.S. at 34.

Although a racial gerrymandering claim concerns a specific district—that is, we assess predominance "district-by-district," *Ala. Legis. Black Caucus*, 575 U.S. at 262— "courts evaluating racial gerrymandering claims may . . . consider evidence pertaining to an area that is larger or smaller than the district at issue." *Bethune-Hill*, 580 U.S. at 192. That evaluation may also include "evidence regarding certain portions of a district's lines, including portions that conflict with traditional redistricting principles." *Id.*

We consider the evidence with a "presumption of legislative good faith." *Alexander*, 602 U.S. at 11. In other words, until a plaintiff provides sufficient evidence, whether direct or circumstantial, of racial predominance, we presume that the

19

legislature acted in "good faith." *Miller*, 515 U.S. at 915. That presumption ensures a federal court does not "intru[de] on the most vital of local functions." *Id.* at 915. "The courts, in assessing the sufficiency of a challenge to a districting plan, must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Id.* at 915–16. The presumption also "reflects the Federal Judiciary's due respect for the judgment of state legislators," cautions courts from "declaring that the legislature engaged in 'offensive and demeaning' conduct," and prevents courts from entering the political fray. *Alexander*, 602 U.S. at 11 (quoting *Miller*, 515 U.S. at 912).

### 2. Narrow tailoring

If race-based criteria predominated over traditional redistricting principles, the district's configuration "must survive a daunting two-step examination known in our cases as 'strict scrutiny.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023); *see also Cooper*, 581 U.S. at 292. "This standard is extraordinarily onerous because the Fourteenth Amendment was designed to eradicate race-based state action." *Alexander*, 602 U.S. at 11. The State, bearing the burden at this step, must satisfy this exacting standard by proving that its racial considerations serve a compelling interest, and that the configuration of the district is narrowly tailored to that end. *See id.* A state's interest in remedying past discrimination "must satisfy two conditions": (1) "the discrimination must be identified discrimination"; and (2) "the institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude that remedial action was necessary, *before*

20

it embarks on an affirmative-action program . . . ." *Shaw II*, 517 U.S. at 909–10 (citation modified).

### 3.    Laches

"To establish a laches defense, '[t]he defendant must show a delay in asserting a right or claim, that the delay was not excusable and that there was undue prejudice to the party against whom the claim is asserted.'" *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1283 (11th Cir. 2015) (citing *Ecology Ctr. of La., Inc. v. Coleman*, 515 F.2d 860, 867 (5th Cir. 1975)). Although not dispositive, we apply a strong presumption in favor of timeliness to a claim brought within the statute-of-limitations period. *Cf. id.* at 1286 (applying the timeliness presumption to a copyright infringement claim filed within the applicable statute of limitations). In Florida, claims brought under 42 U.S.C. § 1983 are subject to a four-year statute of limitations. *McGroarty v. Swearingen*, 977 F.3d 1302, 1307 (11th Cir. 2020).

Though the defendants asserted this affirmative defense in their answer, we find that they failed to support it with evidence during the four-day bench trial. Because the plaintiffs filed their section 1983 claim within the four-year statute of limitations, and the defendants have neither shown an undue delay nor prejudice, laches do not bar the plaintiffs' claim.

## B.    Florida's constitutional requirements

The Florida Constitution provides two criteria—commonly referred to as "tier one" and "tier two"—that the legislature must follow during the redistricting process. Fla. Const. art. III, § 21(a). Tier one requires that the legislature enact a map that

21

allows racial minorities to "participate in the political process" and that does not
"diminish their ability to elect representatives of their choice." *Id.* Practically, that non-
diminishment provision requires that the State consider, to some extent, race in the
redistricting process. The Florida Supreme Court has described that requirement as a
reflection of Section 5 of the Voting Rights Act, 42 U.S.C. § 1973(c) (2006), but
broader than that federal statute because it expands "covered jurisdictions"—the
federal law's prohibition against diminishment applied to specific counties—to "the
entire state." *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d 597, 620
(2012). Tier one also prohibits partisan gerrymandering: "No apportionment plan or
district shall be drawn with the intent to favor or disfavor a political party or an
incumbent." Fla. Const. art. III, § 21(a). And tier one requires that "[d]istricts shall
consist of contiguous territory." *Id.* Then, tier two codifies traditional redistricting
criteria: "districts shall be as nearly equal in population as is practicable; districts shall
be compact; and districts shall, where feasible, utilize existing political and
geographical boundaries." *Id.* § 21(b). The legislature must follow tier two
requirements unless doing so would violate federal law or tier one. *Id.*

## III.    Summary of witness testimony

With that background, we now address and assess the credibility of the fourteen
witnesses who testified during the four-day bench trial. The plaintiffs called ten
witnesses at trial: Jay Ferrin (the mapmaker); Nicholas Warren (an attorney who
submitted alternative maps); Jarvis El-Amin, Meiko Seymour, and Kéto Nord Hodges
(the named plaintiffs); Yvette Lewis (a Hillsborough County resident); Jacqueline Azis

22

(a District 18 resident); Jacob Ogles (a journalist); Dr. Cory McCartan (an expert witness); and Dr. Matthew Barreto (an expert witness).

The defendants called five witnesses: Ferrin; Warren; Matthew Isbell (a political consultant); Dr. Sean Patrick Trende (an expert witness); and Dr. Stephen Voss (an expert witness).

We consider the lay witnesses first and then turn to the experts.

## A.    Testimony of Tampa Bay residents

We heard from five witnesses who live in the Tampa Bay region: Jarvis El-Amin, Meiko Seymour, Kéto Nord Hodges, Yvette Lewis, and Jacqueline Azis. We consider their testimony especially relevant in four ways.

First, because the plaintiffs, Jarvis El-Amin, Meiko Seymour, and Kéto Nord Hodges, testified that they live in District 16 and challenge that district as a racial gerrymander, we find that these facts establish their standing.

Second, none of these individuals testified that they raised an objection to the configuration or submitted an alternative map during the redistricting process. Relatedly, none of the individuals testified that they have personal knowledge that the legislature drafted District 16 based on predominantly race-based criteria. (Doc. 154 at 19 (El-Amin), 37 (Seymour), 195 (Nord Hodges), 209 (Lewis), 223–24 (Azis)).

Third, all five individuals testified that they believe that communities in Hillsborough County have different priorities and needs than those in Pinellas County and vice versa. (*Id.* at 18 (El-Amin); 23, 29–30 (Seymour); 185 (Nord Hodges); 200–

23

01 (Lewis); 220 (Azis)). We credit these beliefs as being genuine, although they are of little significance to our analysis.

Fourth, Jacqueline Azis testified that she considered the road dividing District 16 and District 18 in Pinellas County a "major road." Specifically, we credit her testimony that the northern border of District 16 follows, in part, 22nd Avenue North, which she agreed on cross-examination, is a "major four-lane highway that runs east-west across Pinellas." (*Id.* at 226).

## B.    Testimony of Nicholas Warren

Nicholas Warren testified about his personal involvement in the 2022 redistricting cycle. He currently works for the ACLU of Florida as a staff attorney in Jacksonville, Florida, but, during the redistricting cycle, he submitted an alternative map for the senate districts in the Tampa region on his own initiative. (*Id.* at 47, 51).

Warren testified that he submitted four partial congressional plans and one partial state senate plan. (*Id.* at 57). He also appeared before the legislature to give public comments about the maps that he submitted. (*Id.* at 58). That occurred on November 16 and November 17. (*Id.*). In describing his motivations, he said that he wanted to give suggestions of "deficiencies" that he noticed in the proposed maps, hoping that the legislature would consider them. (*Id.*). Specifically, he considered the proposed drafts deficient in adherence to tier two criteria. (*Id.* at 59). Addressing the Pinellas and Hillsborough Counties, he "concluded that it wasn't necessary to include both portions of those counties and cross the bay in order to accomplish that goal and maintain Black ability to elect in the district," so he submitted an alternative map that

24

he viewed as a better alternative that complied with tier one and tier two. (*Id.* at 59–60).

He explained that he was not the first to draw a map with a district contained to Hillsborough County. He traced that idea back to state-court litigation, sometime during 2015, about the state senate map. (*Id.* at 60). As part of that remedial process, the plaintiffs introduced a draft that did not cross Tampa Bay to connect the two counties. (*Id.*). Subsequently, commenters and others drafted similar configurations. (*Id.*).

To generate his alternative maps, he started with the draft plans released by the reapportionment committee on November 10. (*Id.* at 61). He used publicly available software, such as the Florida legislature's redistricting software, to implement his desired changes. (*Id.*). When asked if he used racial data to draw the maps, he responded that he used that data to confirm that his alternative configurations maintained the ability of Black people to elect their preferred candidate. (*Id.*). He submitted his draft of a partial senate map sometime on November 11. (*Id.*). To accompany his proposal, he testified about the description he included. His map did not cross Tampa Bay, eliminated the county and two-city splits, and used a county boundary. (*Id.* at 65–66). He explained that, in his view, the proposal better adhered to the non-retrogression and non-diminishment standards of the tier one requirements, and that he did not use political data in drawing his map. (*Id.* at 66).

The Florida Legislature requires that any potential speaker fill out a comment card before making public comment about the proposals. (*Id.* at 67–68). He testified that he did not disclose his employment with the American Civil Liberties Union when filling out the comment card. (*Id.* at 69). He filled out that form using his home address and personal phone number, and he selected "no" to the field that asked whether he had received compensation for a group that works on redistricting matters in exchange for his comments. (*Id.* at 64). And at the meeting, he recognized several others in attendance, including other lawyers, chiefs of staff, and state senators. (*Id.* at 74–77). He testified that, based on his personal knowledge, the senate president's office knew his employer before he commented at the meeting. (*Id.* at 78).

He noted that no senators proposed his map. (*Id.* at 149). Around the time of the reapportionment committee's final meeting, Warren tried to encourage senators to submit an amendment to Tampa area of the plans. (*Id.* at 150). So he asked a Democratic consultant, Jason Isbell, to post a thread on Twitter (now X) explaining instances where proposed amendments influenced the redistricting process. (*Id.* at 151). Warren explained that he asked Isbell to post the thread because he still felt "chilled" from speaking about the issue, given his executive director's policy that prohibited involvement in an organizational capacity at that time. (*Id.* at 152). Isbell "launder[ed]" the article on Warren's behalf. (*Id.* at 153). His frustration with the fact that no Democrat had introduced his map was the impetus for this thread. (*Id.*). But

26

he also explained that he would have been happy had a Republican introduced his proposal, too. (*Id.*).

We credit Warren's testimony that he submitted his maps in a personal capacity, meaning that neither his employer nor another third party influenced his public submission of an alternative map. We consider Warren's testimony relevant to the extent it provides an alternative configuration for District 16 and how he arrived at that alternative configuration.

### C.    Testimony of Jay Ferrin

Jay Ferrin is a senior policy adviser in the office of the senate president and the staff director on the senate committee on reapportionment during Florida's redistricting cycle following the 2020 census. (Doc. 175 at 23–24). In that role, he and his staff drew the maps and presented them to the Senate. Two committee analysts and two committee administrative assistants aided him in the process. (Doc. 154 at 228). He testified about his experience in the 2022 Senate redistricting and reapportionment process. (*Id.* at 227).

Both parties questioned Ferrin extensively. For clarity, we organize his testimony into three parts: (1) his perception of the directives, debates, and questions on the Senate floor; (2) his explanation of the criteria used to draft the maps; (3) his overview of the step-by-step process his staff undertook to draft the enacted plan.

First, Ferrin testified about his interactions with and directions from the Senate. Before the first subcommittee meeting, Ferrin considered only the instructions in Senator Rodrigues's memorandum and the Senate's instructions. (*Id.* at 249). Between

27

the first and second subcommittee meeting, he looked for areas of improvement of, among other things, compactness and boundary usage. (*Id.* at 250). Then, between the second and third subcommittee meetings, he tried to improve tier two criteria. (*Id.* at 252–53).

Ferrin testified about his perception of an exchange between Senators Rodrigues and Gibson. (Doc. 154 at 241). In that exchange, Senator Rodrigues said, among other things, that "once we have identified the Tier 1 districts, we then start with a blank map, highlight the data we've received from the U.S. Census Bureau by race, and then the staff began drawing around the population distribution in order to ensure we had not diminished the opportunity for minorities to participate." (*Id.* at 239). Ferrin clarified that, as he saw it, Senator Rodrigues was "struggling to explain to Senator Gibson how we drew the Jacksonville area." (*Id.* at 240). He explained that "[s]tatewide, we started with a blank map and started filling in from north to south and kind of seamed off areas of the state as we went." (*Id.* at 242). In drafting, his team was "consistently focused on Tier 2 even in areas that were considered to be protected districts." (*Id.* at 243). He clarified that his team would evaluate a district in a functional analysis once it "had population equality and had districts around it that were equal." (*Id.* at 247).

Ferrin testified about a colloquy with Senator Bracy about drawing a district that did not cross Tampa Bay on November 17. (*Id.* at 262–63). Senator Bracy had asked Ferrin if he could look into drawing a map that did not cross the Bay. (*Id.*). Ferrin told Senator Bracy that the map crossed the Bay "to comply with Tier 1

28

nondiminishment standards," and he was not sure if he could draw an alternative map that did not cross the bay because he had not "reviewed the statistics for that." (*Id*. at 263). Ferrin explained that he never considered those statistics or drew the alternative map because Senator Bracy never followed up with a request to draft a map. (*Id*. at 263, 266). He thought that drafting a map without receiving a request would be contrary to the instructions provided by the Senate. (Doc. 154 at 266). He testified that he never assessed an alternative map that did not cross Tampa Bay because "[n]obody ever asked me to analyze that fully as an alternative." (*Id*. at 269). Ferrin also explained that he considered "questions" about a potential configuration "very different" from asking the staff to "draft" an alternative map. (Doc. 155 at 14). During the legislative process, the staff field many questions, and they do not consider each question a directive to draft an amendment, else they would "never get work done." (*Id*.).

Ferrin explained his statements from the January 10, 2022, Select Subcommittee on Legislative Reapportionment meeting, where he explained his reasons against drawing District 16 contained to Hillsborough County. (*Id*. at 8). Based on his familiarity with the area, he thought such a map would result in "appendages or other tentacles"—a noncompact configuration—to skew closely to race to protect against non-diminishment. (*Id*. at 9). To draft maps, Ferrin used software that, among other things, shows population by race. (*Id*. at 11). He "felt comfortable looking at the racial layers in the area" to create a district that satisfied tier one. (*Id*.). That choice would also require him to "sacrifice" some tier two principles. (*Id*. at 12). But he never

drew this hypothetical district because he "was never asked to draw it." (*Id*.). That meant that he also never conducted a functional analysis of a district contained to Hillsborough County. (*Id*. at 13).

He also explained that though Senator Burgess mentioned that "[t]here was a significant number of potential voters that would be disenfranchised under not crossing the bay" and that no such alternative would "practically" work, he did not share that same view. (*Id*. at 14–15). To that point, he also did not recall telling Senator Burgess that information. (*Id*. at 24).

Ferrin also testified about Warren's public submission that did not cross Tampa Bay and testimony on the Senate floor about that proposal. (Doc. 175 at 92). He never assessed that plan because, as he understood it, the legislature's policies and procedures "require[d] a member to vouch for a public submission and ask staff in writing to consider its inclusion in one of the draft maps or to analyze it for something." (*Id*. at 93). He testified that no senator asked him to prepare an amendment that incorporated Warren's submitted plan. (*Id*. at 96). He testified that after Warren submitted the map and the legislature found out about his employment with the American Civil Liberties Union, Senator Rodrigues sent a memorandum to the legislature alerting them of Warren's affiliations. (*Id*. at 94).

He explained that, to guard against partisan influence, "Chair Rodrigues developed a pretty strong policy position on public submissions and involvement in redistricting generally." (*Id*. at 54). As he saw it, Senator Rodrigues's "big concern was folks submitting plans under the guise of doing one thing when they were really drawn

30

to do another." (*Id.*). He explained that although anyone could submit a map through the legislature's redistricting website, his staff reviewed those maps only if they were "specifically instructed in writing to do so." (*Id.* at 55). He explained the "shadow process that occurred in 2011–2012 where members of the public submitted plans under a different name or submitted somebody else's plan and staff was asked to consider those plans and incorporate those and then later on found out that those were drawn with improper partisan intent." (*Id.* at 25).

Second, Ferrin testified about his understanding of the requirements to draft a state- and federal-law compliant plan.

He described a "contiguous" district as one without a "hole in it." (*Id.* at 51). And bodies of water are "contiguous" because "[t]hey count as part of the assignable territory of the state." (*Id.*). Ferrin explained that census blocks extend to the water, which measures into the compactness scores. (Doc. 155 at 31). The official territory of the state includes "3 miles out on the Atlantic side" of the state to "9 miles out on the Gulf side." (*Id.* at 32). The data, which is received from the Census Bureau, ensures that other land masses, like "island[s]," fall within a district's bounds. (*Id.* at 32–33). As he sees it, a map is incomplete if it fails to account for the water blocks and focuses solely on land. (*Id.* at 35). Without the water blocks displayed on a map—like the plaintiffs' alternatives—Ferrin would consider that visual not a "complete district if you're just looking at the land" blocks. (*Id.*). Ferrin explained that he was concerned that a Hillsborough-only region would create odd-shaped appendages. (*Id.* at 30). When asked about the plaintiffs' alternative configurations, he pointed out that those

31

maps included appendages and did not account for the census blocks in the waters that neighbored the Tampa Bay region. (*Id*. at 31).

Ferrin also testified that a district that crossed the Bay was a "longstanding configuration all the way back to [19]92." (Doc. 154 at 270). Because "[e]very time a map had been redrawn since 1992, it had crossed the [B]ay," he thought that "there was ample reason to believe that a configuration like that was legal." (*Id*.). But he clarified that he did not "start[] with the conclusion" that "it was okay" to draw a map that crossed the Bay. (*Id*. at 271).

He testified that his staff was instructed to not consider partisanship data and that they did not consider incumbency data. (Doc. 175 at 53). They only considered political data in circumstances that required "conducting a functional analysis on a district that was deemed to be protected under Tier 1." (*Id*. at 53–54).

He explained the use of county and municipal boundaries. (*Id*. at 58). He testified that his staff focused on the "geographic features that we felt like people could identify just simply by walking around on the ground and be familiar with as they traversed throughout their daily lives." (*Id*. at 59). Ferrin also testified that his team considered the number of split counties and cities. (*Id*.). And that they tried to keep cities whole "because it was a metric that was reported on and was relevant but not the highest priority." (*Id*. at 60).

He testified about the use of race when drawing the boundaries. (*Id*. at 91). He testified that his staff considered race to "ensure compliance with the non-diminishment standard of the Tier 1 criteria outlined in the Florida Constitution."

(*Id*.). He explained that race was a "consideration as we drew the boundaries and worked to equalize population and follow political/geographic boundaries while drawing compact districts within the region." (*Id*.).

Third, Ferrin testified, in detail, about his staff's process for drafting the maps to comply with these requirements. (*Id*. at 65). He explained that "[y]ou typically start redistricting in the state of Florida from the top and the bottom at the same time." (*Id*. at 64). He continued, "[y]ou're drawing towards the middle and sort of stitch it all together in the middle." (*Id*. at 65). They also considered "which counties can you add to each other to get to a senate district population of 538,000 plus or minus 1 percent." (*Id*.). Once they reached the middle of the state, he testified that in the "Tampa Bay kind of region, there is sort of a collection of counties that make up a set number of districts." (*Id*. at 66). He identified a group of whole counties that had enough population for eight districts between Citrus County in the north and Sarasota County in the south. (*Id*. at 67). Using the same approach that his team used statewide, they "dr[e]w from both the north and the south and kind of stitch[ed] everything together in the middle." (*Id*.). He explained that the north side of the eight-district group "followed the Citrus County line and the Sumter County line." (*Id*.). And the eastern boundary of that eight-district group—consisting of Sumter, Polk, Hillsborough, and Sarasota—also followed county lines. (*Id*.). The southern boundary between Sarasota and Charlotte Counties also followed a county line. (*Id*. at 67–68). And the west side of the group bordered the "Gulf of America." (*Id*. at 68).

He testified about how his staff fit these seven counties into the eight districts that met the minimum population requirements. (*Id.* at 68). The configuration of District 11 was based on "a collection of Citrus, Sumter, Hernando," and a "need" for "some more population from Pasco to fill out the population of that district." (*Id.* at 68–69). He added from Pasco County to that district because he sought to "hold that county boundary . . . we described to the north and the east." (*Id.* at 69). In turn, that "split a county," so his staff "look[ed] to a geographical or political boundary feature to try to draw as the boundary of that district." (*Id.*). Then, "to the south, District 22" is "Sarasota County, which is not enough to make up a whole senate district so you have to add some from Manatee." (*Id.*). They sought to keep District 14 "wholly within Hillsborough County." (*Id.* at 70). That choice, in turn, limited the areas from where District 23 could pick up additional population. (*Id.*). He explained the boundaries of District 23: "the county boundaries in eastern Pasco and consist of everything east of the Suncoast Parkway," and "then it goes into Hillsborough County along I–75." (*Id.*). To draw District 21, his staff "take the southwestern corner of Pasco and go into the northern part of Pinellas County," and "to let District 14 use the . . . Hillsborough/Pinellas [C]ounty lines and be contained wholly within Hillsborough County." (*Id.* at 71). He added that "in order to get the full population for District 21," his team drew "south in Pinellas County until" they reached "a major political and geographic boundary, which," he pointed out is the "Courtney Campbell Causeway that goes to Clearwater." (*Id.*).

34

For District 23, he explained that it "follows I-75 all the way down from the Pasco County line to" what he believed to be "State Road 60 there south of Plant City for the majority of its boundary, where" his team "had to deviate a little bit to equalize that population." (*Id.*). Between District 20 and District 22, he testified that "this is another state road on the south that's the boundary between District 22 and 20" and they followed that line "through Manatee County except where we had to . . . equalize population along the coast there." (*Id.* at 72).

With District 21 having the ideal population, he testified that they had to "fill out the rest of Pinellas County," which he thought included "650-ish thousand people," made up of "one full district which is 538,000 people plus the other hundred or so thousand total population that ends up in District 16." (*Id.*). He pointed out that "when we draw this way coming down from the north and use these geographic boundary features, we're limited in how we would handle the remaining population in Pinellas County." (*Id.*). Reaching Pinellas County, his staff knew that "we're going to have to draw a minority district in—a protected district under Tier 1, and knowing that in the past there's been a district that crossed the bay from Tampa to Hillsborough and that it was ordered by the courts at one point and subsequently . . . it was in the benchmark plan, that's when we . . . said, okay, well, we'll put the remaining population back with the folks in Tampa, and that will be the district that would cross the bay and be the minority access district." (*Id.* at 72–73). He testified that after drawing District 21 and District 18, about 100,000 people remained in Pinellas County, so whatever district included that population had to cross the Bay. (*Id.* at 73).

He testified that the eastern boundary of District 16, for the most part, follows I-75. (*Id.* at 75). He testified that the line deviates over to a "county road" then returns west "onto I-75 down to the Hillsborough/Manatee County boundary." (*Id.*). Moving west, he testified that the boundary follows the "Sunshine Skyway Bridge back to St. Petersburg." (*Id.*). The district—that is, the Pinellas County portion, then follows the "boundary with the city of Gulfport." (*Id.*). Through Pinellas County, he explained that the boundary consists of "waters and canals to 22nd Avenue North that moves east and west through St. Pete," which he described as a "four-lane divided highway that's a county road." (*Id.* at 75–76). The district boundaries then follow road "U.S. 19" to "13th Avenue," which is a "county road." (*Id.* at 76). He then testified, generally, about how his staff drew District 16: "we tried to follow the political or geographic boundaries for the boundaries of District 16, deviating where we needed to . . . equalize population and be cognizant of the fact that how we equalize population may inform the—or impact the functional analysis." (*Id.*).

Ferrin testified about his staff's efforts to comply with the minority protections of the Florida Constitution. (*Id.* at 56). He testified that he "believe[d]" that his staff was "able to balance Tier 1 and Tier 2 and comply with the nondiminishment standards while also being compliant with the Tier 2 standards outlined in the constitution." (*Id.* at 92). He testified that District 16 was not drawn to achieve a particular racial target. (*Id.* at 79). He explained that "once we reached what we thought was a reasonably configured district," meaning, "something that we thought were more or less complete and worked within the confines of all the other things we

36

were trying to do to comply with the various criteria, we would run the functional analysis and review that to ensure that the applicable metrics were similar to those in the benchmark." (*Id.* at 56). He explained that to verify compliance with the Florida Constitution his staff ran a functional analysis. (*Id.*). That analysis considered, among other things, "voting-age population," "percentage of the minority in question that's registered" to determine "cohesion," "turnout amongst that minority group," and "general election results." (*Id.* at 57). He made clear that he performed the functional analysis after drawing the districting on tier two grounds: his staff "evaluate[d] first for Tier 2 compliance to kind of make sure that we were happy with the general configuration of the district and then r[a]n the functional analysis." (*Id.* at 57–58). He testified that the non-diminishment requirement applied to the benchmark's District 19—that is, the enacted plan's District 16. (*Id.* at 58). He explained the history of that configuration: it was "court-ordered in 2015 for use in elections in 2016." (*Id.*).

We credit the entirety of Ferrin's testimony and afford it great weight. We find his explanation of his staff's step-by-step process for drawing District 16 and its surrounding districts credible. We find that he considered racial data only after his staff drafted a district using race-neutral criteria. We find that, in drawing District 16, Ferrin focused on tier-two requirements, even with respect to districts that remained subject to tier one requirements.

### D.    Testimony of Jacob Ogles

Jacob Ogles is a journalist, living in Florida, who has covered state politics for over twenty years. (Doc. 155 at 38–39). He covered the legislature's reapportionment

37

and redistricting process following the 2020 census. (*Id.* at 39). He stated that he did not know of the criteria that the legislature used to draw the district lines. (*Id.* at 47). We do not doubt the earnestness of Ogles's statements, but he did not have personal knowledge about any matters relevant to the issues here.

### E.    Testimony of Matthew Isbell

Matthew Isbell, a Democratic-Party-aligned political consultant, testified about his freelance political work on the redistricting process and his connections with Nicholas Warren. (Doc. 176 at 7). He spoke with Warren before and after the legislature's redistricting process. (*Id.* at 13). He testified about messages he received from Warren in 2021 about the 2022 redistricting cycle. (*Id.* at 23). He testified that he responded to Warren's message about the submission of an alternative map by pointing out that the crossing-the-bay configuration "add[s] additional African American voters," but that it also "grabb[ed] all these white voters." (*Id.* at 25). Isbell also testified that Warren asked him to publish an article written by Warren under Isbell's name. (*Id.* at 26). Isbell published that article. (*Id.*). He testified that he believed that partisan motives prompted a configuration of District 16 that crossed Tampa Bay. (*Id.* at 29). He further explained that he viewed a configuration that crossed Tampa Bay "to grab the African American voters of Pinellas County . . . was a deliberate move on the legislature to essentially pack Black voters into one seat and make the other districts around it in Pinellas County specifically more white and Republican leaning and that they really didn't need to cross the bay." (*Id.* at 33–34).

38

We do not doubt that Isbell testified truthfully about his personal opinions of the 2022 redistricting cycle. We credit his testimony about his personal opinion of District 16's configuration and his perception of his conversations with Warren. But we find that his testimony about those conversations is of low probative value as to the issues in this case.

### F.    Testimony of Dr. Cory McCartan

Dr. Cory McCartan, a statistician who focuses, among other things, on redistricting matters, testified about alternative configurations.

Dr. McCartan developed a software called "Simulation Methods for Legislative Redistricting." (Doc. 155 at 151). To generate maps, the "software takes in various inputs, shape files, population, and produces random redistricting plans to help people analyze redistricting plans." (*Id*. at 52). This award-winning software also allows a user to draw race-neutral and nonpartisan simulated maps. (*Id*. at 151). But Dr. McCartan never used this software to develop the plaintiffs' alternative configurations of District 16. (*Id*. at 61). Instead, he used a free software that is "extremely popular" in "nonprofessional circles." (*Id*.).

As the plaintiffs' expert witness, he was asked by Warren to redraw a Senate map that kept District 16 contained to Hillsborough County and adjust the map in compliance with the Florida Constitution. (Doc. 155 at 55; PX 66). Warren's instructions to Dr. McCartan included these District 16-specific directions and attached Senator Rodrigues's memorandum of redistricting directives. (PX 66). Besides keeping District 16 whole, the instructions did not direct him to alter any one

39

district boundary. (Doc. 155 at 57). He was never told to "freeze" a particular district boundary. (*Id*.). He, like Ferrin, also relied on Senator Rodrigues's directives to draft his maps. (*Id*.). After drafting his maps, he used the legislature's software, which produced a report that included detailed demographics that he used to look for evidence of diminishment. (*Id*. at 59). He did not consult racial data to draw the maps. (*Id*.). But Warren's memorandum instructed him that "District 16 must not diminish Black voters' ability to elect representatives of their choice, compared to their ability in the benchmark district (District 19 in the benchmark plan)." (PX 66 at 1).

Dr. McCartan developed three alternative maps labelled "A," "B," and "C." (PX 98–100). His third alternative, plan C, is pictured below:



(PX 100).

His alternatives complied with the one-percent population deviation set out in the Rodrigues memorandum. (Doc. 155 at 77). He confirmed that the Black voting-age population in District 16 was comparable to the enacted plan and observed that the Black population in District 18 increased from six to twelve percent. (*Id.*). He opined that it is possible to draw a district contained to Hillsborough County that complies with tier two standards. (*Id.* at 94).

As to compactness, Dr. McCartan explained that a visual and numeric assessment informs that judgment. (*Id.* at 77–78). He opined that his alternative maps

improved compactness, visually, because they did not cross Tampa Bay. (*Id.* at 78). For a numeric compactness assessment, three tests measure that value: Reock, convex hull, and Polsby-Popper. Although these tests use different formulas to measure compactness, they share a common takeaway: the higher the score, the more compact the district. First, as to the Reock score, he testified that his maps scored between .32 and .42, which he considered "comparable" to the enacted map score of .36. (*Id.* at 79). Second, as to the convex-hull score, the enacted plan had a higher score than Dr. McCartan's three alternatives. (*Id.* at 80). Third, as to the Polsby-Popper score, his alternative plans A and B scored lower than the enacted plan, but Plan C scored higher than the enacted plan. (*Id.* at 81).

He testified about the boundary analysis scores of his alternative plans and the enacted plan. He observed that District 16 had the highest score in the "none of the above" category of any senate district in Florida. (*Id.* at 84). He explained that the enacted plan "gets credit for crossing the bay" because of the underlying calculation of a "water boundary." (*Id.* at 84–85). But he pointed out that the same was true for his alternative maps. (*Id.*).

We find that Dr. McCartan testified truthfully about the ability to create a tier one compliant district that did not cross Tampa Bay. We also credit his comparisons, using objective metrics—such as compactness scores—of the enacted plan to his alternative plans.

42

### G.    Testimony of Dr. Matthew Barreto

Dr. Matthew Barreto, a political scientist, testified as the plaintiffs' expert about whether race explains the shapes and borders of District 16. (*Id.* at 162). He also performed a functional analysis of Black voters' ability to elect candidates of their choice and determined that they could do so in each of Dr. McCartan's three alternative maps. (*Id.* at 171–72).

Dr. Barreto used two methods to assess whether district boundaries correspond to race. (*Id.* at 197).

For the first method, he produced visuals that depict a racial or ethnic population as a percentage of registered Democrats. (*Id.* at 198). The visual shades voting tabulation districts by "intensity" of Black population: "darkest red, which means supermajority Black, to darkest green, which is generally supermajority white but in this case[,] it means non-Black." (*Id.*). He testified that "there are numerous boundary lines where the red boundary line hugs closely the Black population in order to include a larger Black population on the inside of SD16." (*Id.* at 199). He testified that, based on the location of the boundary lines, "it's clear that the district was drawn to join two Black populations in different counties and across the bay," and that "[i]t's obvious because the western edge of 16 comes across the bay, excludes the other peninsula of Tampa and 14, just comes straight to St. Petersburg, and very closely hugs the Black population." (*Id.* at 200). Dr. Barreto also pointed to specific boundaries that he believed deviated to capture majority Black voting tabulation districts. (*Id.* at 202).

For his second method, he used a statistical "adjacency analysis." (*Id.* at 208). He explained that the analysis considers "a hundred [voting tabulation districts] across Pinellas and Hillsborough County that could be sorted into pairs" and then "shows . . . where the [voting tabulation districts] touch each other." (*Id.* at 209). The analysis details, at an individual level, whether the boundary includes a voting tabulation district with a higher or lower Black population. (*Id.*). He explained the results of this analysis: "[t]he precincts that are pushed into SD16 are overwhelmingly more African American." (*Id.* at 211). He added that the "precincts that are chosen to be excluded are less African American." (*Id.*). In totaling these results, he testified that "over 90 percent of Pinellas was lopsided in that they were more Black on the inside of the district," and Hillsborough included "70 percent" of the Black population "inside the district." (*Id.* at 212).

He testified about the probability of the distribution of predominantly Black voting tabulation districts inside and outside the boundary. (*Id.*). He explained that "if you were drawing a line through a neighborhood, you should have about -- not knowing anything else about the neighborhood, you should have about a 50/50 chance on any given block you go through of having a higher Black population on either the left side or the right side." (*Id.*). He added, "starting from th[e] premise that a dividing line should have an equal probability, we can determine how far away from that 50/50 probability would it be." (*Id.* at 212–13). He concluded that the probability of the given percentage of Black voting tabulation districts within District 16 was "less than 1 percent." (*Id.* at 213). In other words, "there is consistently a higher Black

44

[voting age population] pushed into Senate District 16." (*Id.* at 215). Dr. Barreto conceded, however, that "lines can't just be drawn randomly anywhere without regard to what natural or city or county or other boundaries might be there." (*Id.* at 231).

We believe that Dr. Barreto truthfully and thoroughly explained his methods to assess whether racial considerations influenced the drawing of District 16, but we give little weight to his testimony for two reasons. First, we can draw our own conclusions from Dr. Barreto's maps of the populations inside and outside of Senate District 16, and we do not think those maps reflect racial sorting around the borders of the district. Second, we find that Dr. Barreto's "adjacency analysis" is not useful to determine whether race *predominated* over other redistricting criteria in this case because it assumes a world in which lines are drawn randomly without regard to natural, municipal, or other boundaries. But, here, the evidence establishes that the legislature prioritized following existing boundaries that may also correspond with race.

## H.    Testimony of Dr. Sean Patrick Trende

Dr. Sean Patrick Trende, a defense expert, and a political scientist and statistician with an emphasis on redistricting, testified about his analysis that compared the benchmark and enacted maps. He also testified about Dr. McCartan's alternative maps. (Doc. 175 at 135).

We find four aspects of his testimony particularly noteworthy.

First, he assessed and explained the differences between the boundaries of the benchmark and enacted maps and the population moved in and out of the district. (*Id.* at 136–139). He created a visual of that comparison, drawing the benchmark plan's

45

boundaries with a solid, black line, and the enacted map's boundaries with a dashed, blue line. (DX 216).

Through this analysis, he identified the Black voting age populations of the areas removed from and added to District 16. (Doc. 175 at 136–139). In the Pinellas County-side of District 16, he explained that about "17,000 people with a 7 percent BVAP that were taken out." (*Id.* at 136). On the eastern side of Hillsborough County, he explained that the configuration removed 152,449 residents, which included a Black voting age population of 22 percent. (*Id.* at 138). The northern portion of Hillsborough County added 85,000 people, which included a Black voting age population of about 27.3 percent. (*Id.*). The southern portion of the Hillsborough County-side of the enacted plan adds about 12,000 people, which includes a 15.8 percent Black voting age population percentage. (*Id.* at 139–40). In summing up these changes, he testified that "[t]here's no particular pattern . . . in terms of added or subtracting [the Black voting age population]." (*Id.* at 139). That made the configuration, as he saw it, a "pretty incompetent racial gerrymander." (*Id.*).

Second, Dr. Trende also testified about the plaintiffs' alternative configurations. (*Id.* at 140). He testified that the alternative maps did not do "as good a job as the legislature's map, particularly with respect to boundary respect." (*Id.*). He considered the far-right column of this figure, which best summarizes the differences between the maps with respect to political and geographic boundary adherence:

Figure 8: Relationship of District Boundaries to Geo-Political Boundaries, Enacted Map and Maps A-C

| Map | District | City Boundaries | County Boundaries | Road Boundaries | Water Boundaries | Rail Boundaries | Non-GeoPolitical Boundaries |
|---|---|---|---|---|---|---|---|
| Enacted | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Map A | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Map B | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Map C | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Enacted | 16 | 19% | 6% | 39% | 31% | 1% | 18% |
| Map A | 16 | 10% | 0% | 29% | 24% | 1% | 42% |
| Map B | 16 | 11% | 0% | 32% | 22% | 1% | 41% |
| Map C | 16 | 26% | 8% | 16% | 35% | 1% | 44% |
| Enacted | 18 | 24% | 52% | 16% | 71% | 0% | 8% |
| Map A | 18 | 30% | 67% | 11% | 87% | 0% | 2% |
| Map B | 18 | 30% | 66% | 11% | 86% | 0% | 3% |
| Map C | 18 | 30% | 66% | 11% | 86% | 0% | 3% |
| Enacted | 20 | 1% | 53% | 33% | 33% | 0% | 9% |
| Map A | 20 | 11% | 49% | 27% | 38% | 2% | 14% |
| Map B | 20 | 11% | 50% | 26% | 38% | 2% | 12% |
| Map C | 20 | 5% | 53% | 23% | 36% | 2% | 18% |
| Enacted | 21 | 12% | 45% | 28% | 54% | 0% | 1% |
| Map A | 21 | 11% | 48% | 12% | 64% | 0% | 13% |
| Map B | 21 | 12% | 47% | 10% | 68% | 0% | 10% |
| Map C | 21 | 12% | 47% | 10% | 68% | 0% | 10% |
| Enacted | 23 | 5% | 58% | 46% | 3% | 0% | 7% |
| Map A | 23 | 4% | 53% | 34% | 5% | 3% | 17% |
| Map B | 23 | 4% | 54% | 36% | 46% | 0% | 14% |
| Map C | 23 | 4% | 54% | 36% | 6% | 2% | 12% |

(DX 217). He testified that the enacted map's districts adhere to boundaries at least 82 percent of the time. (Doc. 175 at 143). But Dr. McCartan's alternative maps, Districts 16, 20, 21 and 23 "become nonadherent" to boundaries and appear as outliers compared to the other districts in the state. (Docs. 175 at 147–48; DXs 218–21).

Third, like Dr. Barreto, Dr. Trende created a choropleth map, or heat map, of District 16 to identify the Black voting age population of precincts removed from and added to the district. Referring to these maps, he explained that the enacted plan

included in Senate District 16 "areas that are pretty heavily white" but excluded "precincts that were available with high [black voting age populations]" on the edges of the district. (Doc. 175 at 153). In particular, he testified that the boundary in Pinellas County "doesn't adhere tightly" to race. (*Id*. at 155–56). Instead, the northern border of Senate District 16 in Pinellas County "left a big chunk of white people" in District 16 that could have been moved out. (*Id*. at 156).

Fourth, he criticized Dr. Barreto's testimony and binomial test as mistaking lines that follow natural boundaries as lines that follow race. For example, one line that Dr. Barreto viewed as race-based—District 16's western line in Pinellas County— follows the City of Gulfport's municipal boundary. (*Id*. at 156–57). Dr. Trende explained that "one of the problems with Dr. Barretto's binomial test is that" it only works "in a theoretical world where people are sorted 50/50." (*Id*. at 157). "But in the real world, you get city boundaries that have racial meaning." (*Id*.). When a "law . . . requires" that a district follow these kinds of existing boundaries, Dr. Barreto's test can view a decision as race-based when the decision is actually explained by other criteria. (*Id*.).

We find the entirety of Dr. Trende's testimony credible and give it significant weight.

## I.    Testimony of Dr. Stephen Voss

Dr. Stephen Voss, who the defendants called, testified as expert in political methodology, specifically with respect to ecological inferences and the use of statistical and demographic data in redistricting. (*Id*. at 170). He testified that he assessed Dr.

48

Barreto's analysis and pointed out that, with respect to racial polarization, he found an error. (*Id.* at 171). He explained that in one of the primaries—that Dr. Barreto relied on for his racial polarization theory—the Black and other racial and ethnic populations voted "on the same side." (*Id.*).

He testified about compactness and explained his use of the "know it when you see it" score, the "KIWYSI," to assess the benchmark, enacted, and alternative configurations. (*Id.* at 189; DX 253). That metric is the output of a statistical model that had been trained by showing shapes to laypeople and experts to identify "a tidy district versus a messy district." (Doc. 175 at 190). He explained that the other technical metrics, that is, the Polsby-Popper, Reock, and convex-hull scores are "mathematically clear," but "all of those are one-sided measures" because with the "way real people judge a map," they're thinking of multiple considerations at once. (*Id.* at 189–190). The KIWYSI score attempts to address that shortfall. (*Id.*at 190). He explained that the enacted plan had a higher KIWYSI score than the plaintiffs' alternative map "A," but a lower score than the plaintiffs' alternative maps "B" and "C." (*Id.* at 192). He pointed out that though alternative map "C" had a higher KIWYSI score than the enacted plan as to District 16, that configuration resulted in a much lower KIWYSI score than the enacted plan as to adjacent District 23. (*Id.* at 192–93). He clarified that "the one plan that improves on compactness in District 16 across the board"—that is, the plaintiffs' alternative map "A"—"causes drops in the scores in District 23." (*Id.* at 193). He captured this data in a graphic displaying comparisons of the enacted, benchmark, and the plaintiffs' alternative configurations:

49

### TABLE 1 – Compactness Scores for Select Hillsborough County Districts

| District | P-P | Reock | KIWYSI | District | P-P | Reock | KIWYSI |
|---|---|---|---|---|---|---|---|
| 16 ACLU C | 0.377 | 0.432 | 61 | 23 Enacted | 0.555 | 0.564 | 92 |
| 16 Enacted | 0.361 | 0.376 | 50 | 23 ACLU-C | 0.421 | 0.420 | 69 |
| 16 ACLU B | 0.324 | 0.391 | 55 | | | | |
| 16 ACLU A | 0.274 | 0.351 | 46 | 20 Enacted | 0.421 | 0.386 | 61 |
| 19 Obsolete | 0.260 | 0.407 | 40 | 20 ACLU-C | 0.408 | 0.405 | 60 |

NOTE: The Polsby-Popper, Reock, and KIWYSI scores are the three measures of compactness computed in Dave's Redistricting App (DRA). High scores represent more-compact districts.

(DX 253).

He also testified about the partisan analysis he performed on the enacted and alternative configurations. (Doc. 175 at 196; DX 260). He explained that, for this analysis, he used data that encompassed the Tampa-St. Petersburg-Clearwater metropolitan statistical area, which he considered a more reliable area to assess than a "subjectively" defined "Tampa Bay area or Tampa region." (Doc. 175 at 194). He testified that the majority of voters, about 50.5%, in the metropolitan area that spanned the four counties in the region, are Republicans. (*Id.* at 194–95). Based on that distribution, he explained that assuming the metropolitan area consisted of five senate districts, he would expect three Republican districts. (*Id.* at 196). The enacted plan would likely result in that three-two split. (*Id.* at 196–97). But the "likely" outcome of the plaintiffs' alternative plans would result in "giving the Democrats one more seat." (*Id.* at 199).

We credit Dr. Voss's testimony about the compactness scores of the alternative, enacted, and benchmark plans. We credit his use of the "KIWYSI" score as a measure

of compactness in the region. We also credit his explanation of the probable partisan impacts of the enacted plan compared to the plaintiffs' alternatives.

## IV.    The plaintiffs have not established that race predominated.

After a careful review of the evidence and the benefit of a four-day bench trial, we find that race did not predominate in the legislature's motivations in drawing Senate District 16. The plaintiffs have not met their burden, whether through direct or circumstantial evidence, to prove that racial considerations subordinated race-neutral criteria. Though the legislature certainly considered racial demographics to confirm that District 16 complied with tier-one requirements, it did not subordinate race-neutral considerations to race-based objectives. The Senate never set racial targets or quotas. Ferrin did not begin his map-drawing process with racial demographics. And neither Ferrin nor the Senate as a whole elevated racial considerations at the expense of other criteria. We explain the basis of our factfinding in more detail below.

### A.    The legislature did not consider racial data until after applying race-neutral criteria.

We find that the legislature did not consider racial data until after applying race-neutral criteria to draw Senate District 16. The Florida Fair Districts Amendment prohibits district configurations that "diminish" the ability of racial or language minorities to "elect representatives of their choice." Fla. Const. art. III, § 21(a). This provision requires race to be considered, but it does not require a particular quota when drafting districts or mandate that districts be drawn using race as the starting criterion.

51

Instead, it requires that, at some point in the drafting process, the legislature review racial data to ensure it will not violate the law.

There is very little direct evidence about whether and how racial considerations affected the redistricting process. No Senators testified about the reapportionment process. No plaintiff had direct evidence about the legislative process or the extent to which the legislature considered race. There were some statements in public meetings, which we discuss below, but the plaintiffs' direct evidence in this case is akin to the evidence that the Court discounted in *Alexander*:

> The District Court placed too much weight on the fact that several legislative staffers, including [the lead staffer], viewed racial data at some point during the redistricting process. This acknowledgment means little on its own because we expect that "[r]edistricting legislatures will . . . almost always be aware of racial demographics." *Miller*, 515 U.S. at 916. Here, [the staffer] testified without contradiction that he considered the relevant racial data only *after* he had drawn the Enacted Map and that he generated that data solely for a lawful purpose, namely, to check that the maps he produced complied with [the law].

*Alexander*, 602 U.S. at 22 (citation modified).

Our finding that the legislature did not consider racial data until after applying race-neutral criteria is based on two subsidiary findings. We find Ferrin's testimony credible. And we find that statements during the redistricting process do not reflect racial predominance. We detail both points below.

### 1.    *We credit Ferrin's testimony.*

First, we credit Ferrin's testimony at trial about how Senate District 16 developed over the redistricting process. Ferrin testified, and we find, that the legislature used racial demographics, as part of a functional analysis, to confirm

compliance with the Fair Districts Amendment's non-diminishment provision after the districts were configured based on race-neutral criteria. Specifically, he testified that "once [his team] reached what [they] thought was a reasonably configured district," they "r[a]n the functional analysis and review[ed] that to ensure that the applicable metrics were similar to those in the benchmark." (Doc. 175 at 56). His team "evaluate[d] *first* for Tier 2 compliance"—referring to race-neutral criteria—"to kind of make sure that [his] team [was] happy with the general configuration of the district and *then* r[a]n the functional analysis." (*Id.* at 57–58 (emphasis added)).

Ferrin provided a step-by-step explanation of the method his team used to draw Senate District 16. He identified a group of counties in the Tampa Bay region that had the right population to form eight districts. (JX 20 at 639). Using the same approach that his team used statewide, his staff drew from the "north and south" of that area, then "stitch[ed] everything together in the middle." (Doc. 175 at 67). He bounded the eight-district group by county lines, when feasible. The north side of the eight-district group "followed the Citrus County line and the Sumter County line." (*Id.*). The eastern boundary of that eight-district group—consisting of Sumter, Hillsborough, and Sarasota—also followed county lines. (*Id.*). The southern boundary between Sarasota and Charlotte Counties also followed a county line. (*Id.* at 67–68). To the west, the Gulf of America bounded the group. (*Id.* at 68).

When he got toward the middle of the area, Ferrin had to split counties. But where he departed from county lines, or had to split a county, his staff "look[ed] to a geographical or political boundary feature to try to draw as the boundary of that

district." (*Id.* at 69). For example, "to get the full population for District 21," his staff "basically dr[e]w south in Pinellas County until [they] g[o]t to a major political and geographic boundary, which" he pointed out is the "Courtney Campbell Causeway that goes to Clearwater." (*Id.* at 71). District 23, too, tracked a major boundary: he explained that it "follows I-75 all the way down from the Pasco County line" until the population requirement compelled a deviation. (*Id.*).

The plaintiffs have focused their arguments on Ferrin's decision to join the population at the southern tip of Pinellas County to a district on the other side of Tampa Bay. Ferrin credibly explained that decision. Coming from north to south, Ferrin allocated part of northern Pinellas County to District 21 to equalize population. That decision meant that the remainder of Pinellas County amounted to about 650,000 people—100,000 more than the population equality requirement permitted. (*Id.* at 72). Because Pinellas County is a peninsula, some part of the southern portion of Pinellas County had to cross the Bay to join either Hillsborough County to the east or Manatee County to the south. (*Id.* at 73). Ferrin chose to connect southern Pinellas County to Hillsborough County, instead of Manatee County, in part because that had "been a longstanding configuration all the way back to [19]92." (Doc. 154 at 270). He also chose Hillsborough County because it was more compact and allowed greater boundary usage. *See* (Doc. 175 at 75–76). As to the western boundary of the Pinellas County portion of District 16, Ferrin explained that his staff followed a municipal boundary—the City of Gulfport. (Doc. 175 at 113). The northern boundary follows a major county road. *See* (Doc. 154 at 226; Doc. 175 at 75–76). We discuss the district's

boundaries in greater detail below. For now, it is sufficient to say that we credit Ferrin's testimony that he considered nonracial criteria when he chose to carve out the southern portion of Pinellas County and connect it to Hillsborough County across the bay.

The plaintiffs say that Ferrin's admission that he considered the historical configuration of the district is itself evidence of racial predominance. We disagree. Although a legislature cannot "immunize from challenge a new facially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan," *Allen v. Milligan*, 599 U.S. 1, 22 (2023), that is not the defendants' position. Ferrin testified credibly that he had no preconceived notion to cross (or not to cross) Tampa Bay when he began drawing the districts. (Doc. 154 at 270-271). He was not instructed to preserve any portion of the 2015 court-ordered district. (Doc. 175 at 78.) But Ferrin is familiar with Florida's politics and demographics. He has spent years working in the Florida Legislature and first became involved in the Florida Legislature's reapportionment process sometime in 2010. (*Id.* at 117). It is unsurprising that, when faced with a question about how to connect a district across a body of water, Ferrin favored something that looked more like the status quo over something entirely new. Under the circumstances and in light of all the evidence, we don't see that decision as evidence of racial predominance.

The plaintiffs also complain that Ferrin never drafted or proposed a configuration of District 16 wholly contained to Hillsborough County. But his failure to exhaust alternatives is not evidence of racial predominance. That Ferrin could have

drawn an alternative district—like those presented by the plaintiffs—does not suggest that the draft plan was a racial gerrymander. Ferrin used a functional analysis to confirm that his configuration based on tier-two, race-neutral criteria satisfied the tier-one requirements. After doing so, he resisted efforts to reconfigure that district based on explicit questions about race-based criteria—such as Senate-floor conversations about the non-diminishment standard. And when asked about an alternative wholly contained to Hillsborough County, he explained his hesitation to explore that possibility based on nonracial criteria: "that in order to draw a minority district solely within Hillsborough County, it begins to look like a fairly spidery, non-compact configuration there, it does some damage to the surrounding districts and their metrics as well." (JX 16 at 7–8). Ferrin further testified at trial that the plaintiff's proposed Hillsborough-only districts had some of the odd shapes that he was concerned about. (Doc. 155 at 30.)

In short, we credit Ferrin's testimony about his staff's efforts to comply with the minority protections of the Florida Constitution. (Doc. 175 at 56). He testified that District 16 was not drawn to achieve a particular racial target. (*Id*. at 79). He explained that "once we reached what we thought was a reasonably configured district, something that we thought were more or less complete and worked within the confines of all the other things we were trying to do to comply with the various criteria, we would run the functional analysis and review that to ensure that the applicable metrics were similar to those in the benchmark." (*Id*. at 56). Only after considering traditional redistricting factors—that is, when the staff felt "happy with the general configuration

56

of the district"—they performed a functional analysis of District 16 to confirm compliance with the Fair Districts Amendment's non-diminishment provision. (*Id*. at 57–58, 91).

### 2.    *Statements in the legislative record do not reflect racial predominance.*

Second, although the plaintiffs suggest that statements made during the redistricting process indicate direct evidence of racial predominance, we disagree. Even though these statements demonstrate that various Senators and Ferrin maintained an awareness of racial demographics throughout the reapportionment process, they do not rise to direct evidence of racial predominance.

We will start with general statements that Senator Rodrigues made about the redistricting process unrelated to Tampa Bay. On the Senate floor, he said that "once we've identified the Tier One districts, we then start with a blank map, highlight the data we've received from the U.S. Census Bureau by race," and he added that "then the staff began drawing around the population distribution in order to ensure we had not diminished the opportunity for minorities to participate or elect a voter of their choice." (JX 22 at 23). Senator Rodrigues continued: "Once we highlighted the racial population, we began drawing from there." (*Id*. at 24). Ferrin's testimony provided clarity to that explanation. He testified that, as he saw it, Senator Rodrigues was "struggling to explain to Senator Gibson how we drew the Jacksonville area." (Doc. 154 at 240–41). In that area, there was enough population for a single protected district and one additional district. So, in that area according to Ferrin, the mapmakers drew

the protected district first; then the rest of the population was, necessarily, the second district. (*Id.* at 242). We credit Ferrin's explanation of this exchange, finding no reason to believe that any Senators understood this comment to apply to the Tampa Bay region. More importantly, as between Senator Rodrigues's unelaborated comment and Ferrin's in-court under-oath testimony about how Senate District 16 specifically was drawn, we credit Ferrin's testimony.

Now we will turn to Tampa Bay specifically. At a public hearing, Senator Bracy asked Ferrin about why District 16 crossed Tampa Bay. (JX 10 at 31). Ferrin explained that he believed it was to "comply with the Tier-One non-diminishment standards. (*Id.* at 32). In context, we find that Ferrin was not saying that he arrived at his draft plan by considering racial criteria to assess non-diminishment before nonracial criteria; he was saying only that he thought the draft configuration at that time was necessary to satisfy tier-one criteria because it did, in fact, satisfy those criteria. Ferrin's in-court testimony clarified that his staff had performed a "functional analysis" on the draft districts, which considered race, and confirmed that it "compl[ied] with the various criteria." (Doc. 175 at 56). Ferrin never meaningfully considered whether an alternative configuration could also comply with the tier-one criteria because Senator Bracy never formally asked him to draw an alternative. (Doc. 154 at 269).

A second exchange about the Tampa Bay region also fails to provide direct evidence of racial predominance. During the January 10 meeting, Senator Bracy, again, asked whether District 16 needed to cross Tampa Bay. (JX 16 at 7). Senator Burgess, the chair of the subcommittee, responded that "there was a significant

number of . . . potential voters that would be disenfranchised under not crossing the Bay[,] [a]nd so in order to avoid that potential diminishment, there was just no way to make that work practically." (*Id*.). As to that comment, Ferrin testified that he did not "recall telling Senator Burgess" anything about his staff's work with the "Tampa Bay region." (Doc. 155 at 21). Ferrin also explained to Senator Bracy, on the Senate floor, his considered opinion that "to draw a minority district solely within Hillsborough County, it begins to look like a fairly spidery, non-compact configuration there, it does some damage to the surrounding districts and their metrics as well." (JX 16 at 7–8). Although this exchange makes clear that Senators discussed race or were aware of race, it does not tell us that the legislature configured the district to elevate race above other traditional redistricting criteria.

We believe Ferrin's responses to these questions are consistent with his testimony, which we find credible, that "because [his staff] found something that worked, [they] didn't necessarily feel compelled to go exploring other things on [their] own." (Doc. 155 at 11). That is, Ferrin's attempts to preserve his draft map because it complied with tier-one criteria does not suggest that he drew it based on racial criteria in the first instance.

**B.    The Senate rejected Warren's alternative plan for reasons unrelated to race.**

Much of the plaintiffs' argument for racial predominance turns on the presumed reasons for why the legislature rejected Warren's proposed map after the November

hearing. But we find that the Senate rejected Warren's alternative plan for reasons unrelated to race.

First, as Ferrin explained, Senators seemed "suspiciou[s]" of Warren's configuration after receiving a memorandum from Senator Rodrigues that pointed out Warren's undisclosed ACLU employment affiliation. (Doc. 175 at 103). That memorandum cautioned legislators about Warren's supposed "misrepresentation" of his employment. (DX 12). To be clear, whether Warren in fact made misrepresentations doesn't matter; we find that the *perception* that his proposal was tainted was a key factor in why it was not meaningfully considered.

Second, Warren's proposed plan was likely to shift the partisan balance in the region in a way that benefited the Democratic Party. Because a bare majority of the voters in the metropolitan area are Republican (Doc. 175 at 195), Dr. Voss explained that he would expect three Republicans to be elected in the five-district area. (*Id.* at 196). Consistent with that expectation, the enacted plan was expected to result in a three-two split in favor of the Republican Party. (*Id.* at 197). On the other hand, the "likely" outcome of Warren's proposed plan would result in "giving the Democrats one more seat." (*Id.* at 199). That is, Warren's plan was more likely to result in the minority party in the region being elected to a majority of the region's Senate seats. Isbell, a Democratic-Party-aligned consultant whom Warren consulted about his plan, also testified that he perceived a map that did not cross Tampa Bay—like Warren's alternative submission—to be more favorable to Democrats than the draft plan. *See* (Doc. 176 at 28). Although we make no finding that the current version of District 16

60

or Warren's proposal were motivated by partisanship, we are confident that the perceived partisan effects of Warren's proposal were one reason it was not meaningfully considered.

Third, Warren's proposal was based on non-racial priorities that the legislature did not share. Warren's proposal was premised on the idea that the legislature should prioritize drawing a tier-one protected district that did not cross the Bay, even if that configuration varied from the benchmark district, even if it required substantial changes to the proposed surrounding districts in the draft plan, and even if it required the consideration of racial population data to achieve. Although the legislature instructed Ferrin to avoid county splits where practicable, there is no evidence that the legislature shared Warren's priority to keep *Senate District 16 specifically* in a single county. There is no evidence that any local legislator or political activist in the Tampa Bay region agreed with Warren's preference at the time. And there is no dispute that Florida law allows contiguity by water and the splitting of counties – as reflected in the shapes of various legislative districts in the Tampa Bay area over the past three decades. Thus, it is unsurprising that no legislator asked Ferrin to draft a proposal that used racial data to draw a tier-one protected district on a single side of Tampa Bay.

### C.    The plaintiffs' proposed alternative maps undermine their case.

We next consider the probative value of the plaintiffs' alternative maps. Alternative maps configured using race-neutral principles can perform an important function in a racial gerrymandering case. "By showing that a rational legislature, driven only by its professed mapmaking criteria, could have produced a different map

with 'greater racial balance,' an alternative map can perform the critical task of distinguishing between racial and [race-neutral] motivations when race and [race-neutral criteria] are closely entwined." *Alexander*, 602 U.S. at 34 (citation omitted).

The plaintiffs proposed three alternative maps in this case, but none were race neutral. Instead, the plaintiffs gave their expert witness instructions to draw a protected tier-one district solely in Hillsborough County. We think that, under the circumstances of this case, this evidence undermines the plaintiffs' contention that Senate District 16 is a racial gerrymander.

This is so for three reasons.

First, the plaintiffs hired an impressively credentialed expert, Dr. McCartan, who could have provided race neutral maps that merely followed the legislature's own criteria—but he didn't produce those kinds of maps. Dr. McCartan specializes in a redistricting software that he developed called "Simulation Methods for Legislative Redistricting." (Doc. 155 at 151). His "software takes in various inputs, shape files, population, and produces random redistricting plans to help people analyze redistricting plans." (*Id.* at 52). Among other functions, that software allows users to draft race-neutral and nonpartisan simulated maps. (*Id.* at 151). Notably, he did not use that software to generate the plaintiffs' alternative configurations. (*Id.*).

Second, the plaintiffs told Dr. McCartan to specifically draft a tier-one district that did not cross Tampa Bay. The elevation of this one requirement—draw a tier-one minority district solely in Hillsborough County—eliminates much of the usefulness of these maps in determining whether the legislature's map is a racial gerrymander. For

an alternative map to provide circumstantial evidence of racial predominance, it must be "driven *only* by" the State's "professed mapmaking criteria." *Alexander*, 602 U.S. at 34 (emphasis added). The value in alternative maps—and why they're required in some cases—comes from their ability to disentangle closely-related factors, such as race-based and race-neutral criteria. But here, the plaintiffs' alternative configurations lack much probative value because these alternatives add or elevate another consideration in the map-drawing process. Senate District 16 stays wholly within Hillsborough County in the plaintiffs' alternative maps not because of the legislature's traditional redistricting criteria uninfluenced by race, but because the directions explicitly told Dr. McCartan to "[a]djust District 16 to be wholly contained in Hillsborough County (i.e.[,] not cross Tampa Bay)." (PX 66 at 1).

The most we can glean from the plaintiffs' proposed maps is a disagreement about the prioritization of criteria: they seek to avoid splitting District 16 across Tampa Bay over everything else. But that's not a conflict for this Court to resolve. *Alexander*, 602 U.S. at 44 (Thomas, J., concurring in part) ("Traditional districting principles often conflict with one another, and there is no principled way for judges to resolve those conflicts."). The plaintiffs' alternative maps do not tell us that the enacted plan is the product of racial predominance. Had the plaintiffs introduced alternative maps that never (or even rarely) crossed Tampa Bay—without a directive to the expert to prioritize that one thing—that evidence would support the plaintiffs' predominance arguments. But these maps do not support an inference in favor of the plaintiffs. For all we know, a race-blind plan of District 16 *should* cross Tampa Bay—perhaps to

minimize county-splits elsewhere. The plaintiffs' alternative maps do not shed light on the issue one way or another.

Third, Dr. McCartan expressly considered race in drawing his districts. The consideration of race was in his instructions—the district he drew in Hillsborough County *had* to be one that Black voters could control to the same extent as the benchmark district. *See* (PX 66 at 1). Though the plaintiffs fault Ferrin for his historical awareness of racial demographics, Dr. McCartan testified that he also "acquainted" himself "with the general demographic patterns in the county so that, as [he] made adjustments, [he] could avoid any changes that would obviously diminish Black voters' ability to elect their representatives of choice." (Doc. 155 at 58). Although we make no definitive finding on the issue, we also believe certain aspects of Dr. McCarten's districts support a nonfrivolous argument that race actually predominated in his maps: (1) there are unusual appendages in Maps A and B that exclude mostly white coastal areas (Doc. 175 at 150, 154); (2) the defendants' expert, Dr. Trende, testified credibly about disparate racial effects of the line between the plaintiff's version of District 16 and other districts (*Id*. at 150–54), and (3) the maps preserved the enacted map's boundary between District 14 and District 16 that plaintiffs' own expert, Dr. Barreto, said was evidence of a racial gerrymander (Doc. 155 at 109–10, 114, 202–203). In any event, an admittedly race-based districting does not produce the sort of map that can disentangle race from race-neutral criteria.

64

**D.    We credit Dr. Trende's analysis and discount Dr. Barreto's.**

The parties each presented an expert with opinions about whether race was a consistent explanation for District 16's lines: Dr. Barreto and Dr. Trende. These experts provided visual representations and oral descriptions of the racial populations in and around Senate District 16. Having observed the experts' presentations, we believe Dr. Trende won the "battle of the experts."

There are two parts of Dr. Barreto's thesis that race explains the lines of District 16. First, he proposed the theory that, all things being equal, someone who is drawing a race neutral line would expect "a 50/50 chance on any given block you go through of having a higher Black population on either the left side or the right side." (Doc. 155 at 212). So, according to Dr. Barreto, a line that consistently places more Black population on one side than the other suggests race-based districting. Second, Dr. Barreto examined the demographics of the voting precincts that were on each side of the line dividing District 16 from other districts. He concluded that "[t]he precincts that are pushed into SD16 are overwhelming more African American." (*Id.* at 211).

Dr. Trende questioned both of these premises under the circumstances of this case, and we agree with his criticisms. We believe Dr. Trende's analysis was more thorough and a better explanation of the contours of District 16.

First, we agree with Dr. Trende that Dr. Barreto's statistical assumptions are not true in the real world. As Dr. Trende explained, "one of the problems with Dr. Baretto's binomial text is that, in a theoretical world where people are sorted 50/50, something like that works." (Doc. 175 at 157). But, in the real world, Hispanic people,

Black people, and people of other races and ethnicities are not evenly distributed, and the lines that divide neighborhoods are often major boundaries like interstates, waterways, municipal lines, etc. Therefore, a district line could consistently place a higher percentage of Black people on one side simply because it follows a main road or keeps a neighborhood whole. (*Id*.). Dr. Trende gave, as an example, the line at the bottom western edge of District 16. (*Id*.). Dr. Barreto testified that this squiggly line appeared to be race-based because of the statistical improbability of drawing the line randomly. But the line wasn't drawn randomly; it follows the municipal boundary between St. Petersburg and the City of Gulfport. And Ferrin testified that he modified the draft district to follow that boundary at the end of the process to eliminate a city split and increase the district's boundary usage score. (*Id*. at 113, 119-122).

We believe this problem affected the entirety of Dr. Barreto's analysis. *See, e.g.*, (Doc. 155 at 203 (concluding that the line that follows interstate I-275 was race-based because of a "very substantial racial divide on either side in terms of the communities that are there, much higher Black population on the east side of that interstate")). To be clear, it is possible for a map drawer to choose to follow a municipal line or interstate highway *because* of its racial effects. But there is a credible race-neutral explanation for the statistical disparities identified by Dr. Barreto that his analysis does not take into account. The Florida Constitution required the legislature to follow existing boundaries, and the legislature very highly valued that race-neutral criterion. The statistical disparity relied on by Dr. Barreto cannot distinguish between a map

drawer who follows an existing boundary for racial reasons and one who follows a boundary for nonracial reasons.

Second, we find persuasive Dr. Trende's examination of the demographics of the precincts on the dividing line between Senate District 16 and other districts. In the Hillsborough County part of the district, Dr. Trende explained that the new configuration added and subtracted people to the benchmark district in "no particular pattern." (Doc. 175 at 139). True, he noted that District 16 included a "couple precincts that are about 40 percent [Black voting age population]," but the district also "excluded" other "available [precincts] with high [Black voting age populations]." (*Id.* at 153). And, in Pinellas County, the line dividing the north of the district from the neighboring district left "a big chunk of white people" in District 16 that could have been moved out. (*Id.* at 156); *see also* (Doc. 176 at 25) (Isbell explaining that "as the legislature crossed the bay, they were also grabbing all of these white voters"). Ultimately, Dr. Trende concluded that District 16 would be a "pretty bad" racial gerrymander because of the white populations it included and the Black populations it excluded. (Doc. 175 at 154).

Finally, much of Dr. Baretto's testimony was an attempt to show that the inclusion of Black population in Senate District 16 was not a coincidence, but the question in this case is whether the legislature subordinated its race-neutral goals to a race-related one. Although Dr. Baretto was confident in his conclusion that race was a factor in the district's shape, he "did not look at whether or not other factors outweighed that." (Doc. 155 at 234.) As we see it, the question in this case is more like

the question that Dr. Baretto could not answer: whether "the State 'subordinated' race-neutral districting criteria such as compactness, contiguity, and core preservation to 'racial considerations.'" *Alexander*, 602 U.S. at 7 (quoting *Miller*, 515 U.S. at 916).

### E.    District 16 complies with race-neutral districting criteria.

Finally, we think District 16 complies with the legislature's race-neutral districting criteria, especially in comparison with the plaintiffs' alternatives. The weight of the evidence establishes that the legislature did not subordinate its race-neutral criteria to racial considerations. Specifically, the evidence demonstrates that Legislature prioritized compactness, boundary usage, and contiguity.

### 1.    Compactness

First, we find that objective assessments of compactness greatly influenced the configuration of District 16. Ferrin testified, and we credit, that his staff sought to improve compactness scores of the enacted plan compared to the benchmark plan. (Doc. 154 at 250–253). Data and expert testimony confirm that focus. As to the metrics, District 16 fared better or comparable to the benchmark plan District 19. It received a convex hull score of 0.69, a Polsby-Popper score of 0.36, and a Reock Ratio of 0.36. (DX 326). The benchmark district, by comparison, received a convex hull score of 0.67, a Polsby-Popper score of 0.26, and a Reock Ratio of 0.42. (JX 20 at 604). And under the "know-it-when-you-see-it" metric that Dr. Voss testified to, the enacted plan's District 16 is more compact than the benchmark map. (DX 253)

District 16 of the enacted plan scores within a range comparable to the plaintiffs' alternative maps, too. The following chart reflects that, although the plaintiffs'

alternative "map C" fares better than the enacted plan as to District 16, that improvement comes at the cost of a significant decrease in the compactness of that alternative map's District 23. (Doc. 175 at 193).

| TABLE 1 – Compactness Scores for Select Hillsborough County Districts | | | | | | | |
|---|---|---|---|---|---|---|---|
| District | P-P | Reock | KIWYSI | District | P-P | Reock | KIWYSI |
| 16 ACLU C | 0.377 | 0.432 | 61 | 23 Enacted | 0.555 | 0.564 | 92 |
| 16 Enacted | 0.361 | 0.376 | 50 | 23 ACLU-C | 0.421 | 0.420 | 69 |
| 16 ACLU B | 0.324 | 0.391 | 55 | | | | |
| 16 ACLU A | 0.274 | 0.351 | 46 | 20 Enacted | 0.421 | 0.386 | 61 |
| 19 Obsolete | 0.260 | 0.407 | 40 | 20 ACLU-C | 0.408 | 0.405 | 60 |

NOTE: The Polsby-Popper, Reock, and KIWYSI scores are the three measures of compactness computed in Dave's Redistricting App (DRA). High scores represent more-compact districts.

(DX 253).

### 2. *Boundary analysis*

Adherence to geographic and political boundaries also significantly influenced the configuration of District 16. The Florida Constitution requires the use of political and geographic boundaries where feasible. (Doc. 175 at 44). To fulfill that requirement, the legislature developed its own metric: a "nongeo/poli score." (*Id*. at 47). This metric quantifies the extent to which a district follows a pre-existing boundary. For that metric, a "lower percentage" indicates higher compliance with the boundary requirement. (*Id*. at 48). District 16 scored 18% in that category, meaning that about 80% of District 16's boundaries adhered to political and geographic boundaries. (DX 217).

The redistricting team "created a dataset that included lines for all the primary and secondary roads in the state which are federal and state highways," "railroads,"

and "the county and the municipal boundaries." (Doc. 175 at 44–45). Ferrin presented a boundary-analysis report for every set of draft plans that the Committee and Subcommittee considered. (*Id.* at 48). Senator Rodrigues's memorandum directed Ferrin to consider "railways, interstates, federal and state highways, and large water bodies such as those that were deemed to be easily recognizable and readily ascertainable by Florida's Supreme Court." (DX 6 at 2). His team included "this analysis within the [redistricting] software" so that "users could visually see which boundaries would be eligible under these objective standards as they were drawing" the districts' boundaries. (Doc. 175 at 46).

The boundaries of District 16 follow major highways, such as Interstate 75, U.S. Highways 19 and 301, the border between Manatee and Hillsborough Counties, and the municipal boundary of Gulfport. (*Id.* at 75–76). The boundary at the top of the Pinellas County portion of District 16 is 22nd Avenue North, which, as a county road, does not factor into the boundary adherence metric but is, as witness Azis agreed on cross-examination, a "major four-lane highway." (Doc. 154 at 226).

The plaintiffs' alternative configurations fall well short of District 16's score. As Dr. Trende's report explains, the "non-geo/political boundaries" score nearly triples in the alternative maps, which means it is much worse than the enacted plan:

Figure 8: Relationship of District Boundaries to Geo-Political Boundaries, Enacted Map and Maps A-C

| Map | District | City Boundaries | County Boundaries | Road Boundaries | Water Boundaries | Rail Boundaries | Non-GeoPolitical Boundaries |
|---|---|---|---|---|---|---|---|
| Enacted | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Map A | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Map B | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Map C | 14 | 45% | 48% | 19% | 41% | 1% | 7% |
| Enacted | 16 | 19% | 6% | 39% | 31% | 1% | 18% |
| Map A | 16 | 10% | 0% | 29% | 24% | 1% | 42% |
| Map B | 16 | 11% | 0% | 32% | 22% | 1% | 41% |
| Map C | 16 | 26% | 8% | 16% | 35% | 1% | 44% |
| Enacted | 18 | 24% | 52% | 16% | 71% | 0% | 8% |
| Map A | 18 | 30% | 67% | 11% | 87% | 0% | 2% |
| Map B | 18 | 30% | 66% | 11% | 86% | 0% | 3% |
| Map C | 18 | 30% | 66% | 11% | 86% | 0% | 3% |
| Enacted | 20 | 1% | 53% | 33% | 33% | 0% | 9% |
| Map A | 20 | 11% | 49% | 27% | 38% | 2% | 14% |
| Map B | 20 | 11% | 50% | 26% | 38% | 2% | 12% |
| Map C | 20 | 5% | 53% | 23% | 36% | 2% | 18% |
| Enacted | 21 | 12% | 45% | 28% | 54% | 0% | 1% |
| Map A | 21 | 11% | 48% | 12% | 64% | 0% | 13% |
| Map B | 21 | 12% | 47% | 10% | 68% | 0% | 10% |
| Map C | 21 | 12% | 47% | 10% | 68% | 0% | 10% |
| Enacted | 23 | 5% | 58% | 46% | 3% | 0% | 7% |
| Map A | 23 | 4% | 53% | 34% | 5% | 3% | 17% |
| Map B | 23 | 4% | 54% | 36% | 46% | 0% | 14% |
| Map C | 23 | 4% | 54% | 36% | 6% | 2% | 12% |

(DX 217). Dr. McCartan, the plaintiffs' expert, agreed that "using the software," the enacted plan generally performed better on this metric than his alternative plans. (Doc. 155 at 137–139). Overall, the enacted plan's adherence to political and geographic boundaries, for the most part, outperforms the alternative plans across the Tampa Bay area.

The plaintiffs complain about the usefulness of the boundary score. They posit that the "boundary analysis excludes some major roads," and that the inclusion of "Tampa Bay *actually improves* the boundary analysis score." (Doc. 171 at 57–58, ¶ 173). But the plaintiffs' appraisal of the Senate's formula misses the mark. Traditional

redistricting principles, and, in turn, metrics that quantify adherence to them, provide evidence that the legislature relied on something other than race. And when assessing those metrics, we do not judge whether those metrics are good policy or bad policy; instead, we use those metrics to inform whether the legislature used racial demographics at the expense of race-neutral criteria. *See Shaw v. Reno (Shaw I),* 509 U.S. 630, 647 (1993). These "objective factors," although not required by federal law, "may serve to defeat a claim that a district has been gerrymandered on racial lines." *Id.*

### 3. Contiguity

Contiguity influenced the configuration of District 16. Ferrin considered a district composed of geographically adjacent census blocks legally contiguous, that is, "[i]f it's one single polygon, it's contiguous." (Doc. 175 at 51). On the other hand, if the district has "a hole in it" that district is not contiguous. (*Id.*). With that configuration of census blocks, a district, under Florida law, satisfies legal contiguity: "[T]he presence in a district of a body of water without a connecting bridge, even if it necessitates land travel outside the district in order to reach other parts of the district, does not violate this Court's standard for determining contiguity under the Florida Constitution." *In re Sen. Jt. Resol. 2G, Special Apportionment Sess. 1992*, 597 So. 2d 276, 280 (Fla. 1992), *amended sub nom.*, *In re Constitutionality of Sen. Jt. Resol. 2G, Special Apportionment Sess. 1992*, 601 So. 2d 543 (Fla. 1992). Ferrin based his decision to cross Tampa Bay, in part, on his understanding of the contiguity requirement and state-law definition of that requirement. Though the district crosses the Bay, the bodies of water

are "part of the assignable territory of the state, and therefore, a body of water is contiguous." (Doc. 175 at 51). Dr. McCartan, too, confirmed that although the district is made up of "two pieces of land," it is "legally contiguous." (Doc. 155 at 107). Ferrin provided context to Dr. McCartan's graphic of the enacted plan, testifying that the plaintiffs' maps had "obviously, been manipulated to make the district appear discontiguous" by removing the water blocks from the visual. (Doc. 175 at 52–53).

If we compare the plaintiffs' preferred visual with the official map, we can see that the elimination of water blocks in the plaintiffs' map makes it look less contiguous. (*Compare* PX 97, *with* JX 20 at 639).





Because "reapportionment is one area in which appearances matter," we also find that the shape of the district does not support the conclusion that race predominated. *Shaw I*, 509 U.S. at 647. As this visual demonstrates, when accounting for census-water blocks as part of District 16, (JX 20 at 639), the district is not so "bizarre on its face" that only race could explain its configuration. *See Shaw I*, 509 U.S. at 644. This "[s]hape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its

75

district lines." *Miller*, 515 U.S. at 913. We consider the inverse probative, too. A district that is regular on its face—that is, one lacking bizarre, extending appendages—provides circumstantial evidence that the legislature did not subordinate objective race-neutral criteria to racial considerations.

## V.    We do not address whether Senate District 16 would survive strict scrutiny if race had predominated.

Because of our finding on racial predominance, we need not consider whether the district could survive strict scrutiny.

The defendants say that we could conclude on this record that Senate District 16 is narrowly tailored to comply with Florida's non-diminishment amendment. Specifically, the defendants suggest that even if race predominated, District 16 withstands strict scrutiny because they have a compelling interest in complying with Florida's Constitution. Although one defendant at least "maintain[s] that attempting to comply with the Florida Constitution's non-retrogression standard does *not* serve a compelling state interest," the defendants nonetheless jointly urge us to assume that interest anyway and uphold the constitutionality of the district based, in part, on that assumption. (Doc. 169 at 35). The gist of their argument, as we see it, turns on the fact that the plaintiffs never contested the constitutionality of that state-law requirement. (*See* Doc. 170 at 86–87). And that's true enough. The plaintiffs caution us against addressing any constitutional arguments about the non-diminishment provision. (Doc. 171 at 76). They say that the "parties' presentation of the issues to be decided at trial . . . foreclose the Court reaching these questions." (*Id.*).

The United States Supreme Court has held that a "State's interest in remedying the effects of past or present racial discrimination may in the proper case justify a government's use of racial distinction"—but such action is limited to "identified discrimination" and must be informed by a "strong basis in evidence to conclude that remedial action was necessary." *See Shaw II*, 517 U.S. at 909–10 (citation modified). But, because it has not been thoughtfully contested, neither the plaintiffs nor the defendants have attempted to provide a record identifying past discrimination in the Tampa Bay region that the non-diminishment provision would remedy with a protected district. The parties' strict scrutiny argument doesn't turn on the facts on the ground; it depends solely on the Florida non-diminishment provision's mere existence as part of the Florida Constitution.

We note that the Florida Supreme Court recently rejected the argument that the Legislature could rely on the mere existence of the non-diminishment provision to justify a race-predominant district. It determined that "compliance with the Non-Diminishment Clause is *not* a compelling governmental interest under the test established in the Supreme Court's Equal Protection Clause jurisprudence." *Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y of State*, No. SC2023-1671, 2025 WL 1982762, at *11 (Fla. Jul. 17, 2025) (emphasis added). The state's highest court pointed out that "[t]here is no pre-enactment record identifying the discrimination—past or present, public or private—that the Non-Diminishment Clause is meant to remedy." *Id.* at *11. "Nor is there pre-enactment documentation of the evidence necessary to establish a proper connection between the amendment's means and ends." *Id.* Without

that evidence, "[t]he obligation to comply with the Non-Diminishment Clause would not of its own force give the legislature a compelling interest in drawing a race-predominant district." *Id.*

We do not address whether Senate District 16 would survive strict scrutiny if race had predominated. Anything we said on this issue would be little more than an advisory opinion considering our finding on racial predominance. Because the plaintiffs have not "demonstrate[d] that race drove the mapping of district lines," our analysis ends with the racial predominance inquiry. *Alexander*, 602 U.S. at 11.

## VI.  Conclusion

We rule in favor of the defendants on the plaintiffs' racial gerrymandering claim. Judgment will be entered in a separate document.

DONE and ORDERED this 18th day of August, 2025.

_____
ANDREW L. BRASHER
UNITED STATES CIRCUIT JUDGE


_____
THOMAS P. BARBER
UNITED STATES DISTRICT JUDGE


Charlene Edwards Honeywell
United States District Judge

78